IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Mformation Technologies, Inc., | NO. C 08-04990 JW |
| Plaintiff, | **FIRST CLAIM CONSTRUCTION ORDER** |
| v. | |
| Research in Motion Limited, et al., | |
| Defendants. | |

_____/

## I. INTRODUCTION

This is a patent infringement case. Plaintiff is Mformation Technologies, Inc. Defendants are Research in Motion Limited and Research in Motion Corporation. Plaintiff alleges ownership of U.S. Patent Nos. 6,970,917 ("the '917 Patent") and 7,343,408 ("the '408 Patent"). The '917 and '408 Patents (collectively, "the Patents-in-Suit") pertain to a method, system, and computer program that provides the capability to manage, control, and reconfigure wireless devices remotely over a wireless network.

Plaintiff alleges that Defendants infringe the patents-in-suit by (1) importing, marketing, manufacturing, using, and selling software (which runs on Defendants' Blackberry devices) that is covered by the patents-in-suit, and (2) actively inducing and contributing to infringement by third parties. Plaintiff seeks compensatory damages, enhanced damages for willfulness, and attorney fees. Defendants seek a declaration that the patents-in-suit are invalid, unenforceable, and not infringed.

On November 20, 2009, the Court held a hearing in accordance with <u>Markman v. Westview Instruments, Inc.</u>,[1] to construe language of the asserted claims over which there is a dispute. This Claim Construction Order sets forth the Court's construction of the disputed words and phrases.

## II. BACKGROUND

**A.** **The Patents-in-Suit**

The '917 Patent is entitled "System and Method for Remote Control and Management of Wireless Devices."

The Abstract of the '917 Patent describes the invention as follows:

A method, system, and computer program product that provides the capability to manage, control, and reconfigure wireless devices remotely over a wireless network with acceptable reliability and security. In one embodiment, the method for remotely managing a wireless device over a wireless network comprising a server and the wireless device, the wireless network operable to communicatively connect the server and the wireless device, comprises the steps of: transmitting registration information relating to the wireless device from the wireless device to the server, verifying the registration information at the server, establishing a mailbox for the wireless device at the server, placing a command for the wireless device in the mailbox, delivering the command from the mailbox to the wireless device, and executing the command at the wireless device.

The '408 Patent is entitled "System and Method for Wireless Data Terminal Management Using Telecommunication Signaling Network."

The Abstract of the '408 Patent describes the invention as follows:

A method, system, and computer program product that provides the capability to manage, control, and reconfirm wireless devices remotely over a wireless network with acceptable reliability and security. A method for remotely managing a wireless device over a telecommunications network comprising a server and the wireless device, the method comprises the steps of establishing a communicative connection between the server and the wireless device over a signaling channel of the telecommunications network, transmitting a command from the server to the wireless device over the signaling network, and executing the command at the wireless device.

**B.** **Procedural History**

On August 31, 2009, Plaintiff filed its Third Amended Complaint for Patent Infringement; the only causes of action are for infringement of the '917 and '408 Patents.[2] On September 15,

---

[1] 517 U.S. 370 (1996).

[2] (hereafter, "TAC," Docket Item No. 71.)

2

2009, Defendants filed their Answer and Counterclaims to the Third Amended Complaint. (Docket Item No. 76.) Defendants counterclaimed for declaratory relief as to (1) non-infringement of the Patents-in-Suit, (2) invalidity of the Patents-in-Suit, and (3) unenforceability of the Patents-in-Suit due to inequitable conduct. (See id.) On September 30, 2009, Plaintiff filed its Answer to the Counterclaims. (Docket Item No. 84.)

## III. STANDARDS AND PROCEDURES FOR CLAIM CONSTRUCTION

### A. General Principles of Claim Construction

Claim construction is a matter of law, to be decided exclusively by the Court. Markman, 517 U.S. at 387. When the meaning of a term used in a claim is in dispute, the Court invites the parties to submit their respective proposed definitions and a brief, outlining the basis for their proposals. In addition, the Court conducts a hearing to allow oral argument of the respective proposed definitions. After the hearing, the Court takes the matter under submission, and issues an Order construing the meaning of the term. The Court's construction becomes the legally operative meaning of the term that governs further proceedings in the case. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court recognizes that claim construction is a fluid process, wherein the Court may consider a number of extrinsic sources of evidence so long as they do not contradict the intrinsic evidence. However, the Court acknowledges that greater weight should always be given to the intrinsic evidence. Phillips v. AWH Corp., 415 F.3d 1303, 1324 (Fed. Cir. 2005).

### B. Construction from the Point of View of an Ordinarily Skilled Artisan

A patent's claims define the scope of the patent: the invention that the patentee may exclude others from practicing. Phillips, 415 F.3d at 1312. The Court generally gives the patent's claims their ordinary and customary meaning. In construing the ordinary and customary meaning of a patent claim, the Court does so from the viewpoint of a person of ordinary skill in the art at the time of the invention, which is considered to be the effective filing date of the patent application. Thus, the Court seeks to construe the patent claim in accordance with what a person of ordinary skill in the art would have understood the claim to have meant at the time the patent application was filed. This inquiry forms an objective baseline from which the Court begins its claim construction. Id.

3

The Court proceeds from that baseline under the premise that a person of ordinary skill in the art would interpret claim language not only in the context of the particular claim in which the language appears, but also in the context of the entire patent specification, of which it is a part. <u>Phillips</u>, 415 F.3d at 1313.  Additionally, the Court considers that a person of ordinary skill in the art would consult the rest of the intrinsic record, including any surrounding claims, the drawings, and the prosecution history—if it is in evidence. <u>Id.</u>; <u>Teleflex, Inc. v. Fisosa N. Am. Corp.</u>, 299 F.3d 1313, 1324 (Fed. Cir. 2002).  In reading the intrinsic evidence, a person of ordinary skill in the art would give consideration to whether the disputed term is a term commonly used in lay language, a technical term, or a term defined by the patentee.

**C.      Commonly Used Terms**

In some cases, disputed claim language involves a commonly understood term that is readily apparent to the Court.  In such a case, the Court considers that a person of ordinary skill in the art would give to it its widely accepted meaning, unless a specialized definition is stated in the patent specification or was stated by the patentee during prosecution of the patent.  In articulating the widely accepted meaning of such a term, the Court may consult a general purpose dictionary. <u>Phillips</u>, 415 F.3d at 1314.

**D.      Technical Terms**

If a disputed term is a technical term in the field of the invention, the Court considers that one of skill in the art would give the term its ordinary and customary meaning in that technical field, unless a specialized definition is stated in the specification or during prosecution of the patent.  In arriving at this definition, the Court may consult a technical art-specific dictionary or invite the parties to present testimony from experts in the field on the ordinary and customary definition of the technical term at the time of the invention. <u>Phillips</u>, 415 F.3d at 1314.

**E.      Defined Terms**

The Court acknowledges that a patentee is free to act as his or her own lexicographer. Acting as such, the patentee may use a term differently than a person of ordinary skill in the art would understand it, without the benefit of the patentee's definition. <u>Vitronics Corp.</u>, 90 F.3d at

4

1582.  Thus, the Court examines the claims and the intrinsic evidence to determine if the patentee

used a term with a specialized meaning.

The Court regards a specialized definition of a term stated in the specification as highly

persuasive of the meaning of the term as it is used in a claim.  <u>Phillips</u>, 415 F.3d at 1316-17.

However, the definition must be stated in clear words, which make it apparent to the Court that the

term has been defined.  <u>See id.</u>; <u>Vitronics Corp.</u>, 90 F.3d at 1582.   If the definition is not clearly

stated or cannot be reasonably inferred, the Court may decline to construe the term pending further

proceedings.  Statements made by the patentee in the prosecution of the patent application as to the

scope of the invention may be considered when deciding the meaning of the claims.  <u>Microsoft</u>

<u>Corp. v. Multi-Tech Sys., Inc.</u>, 357 F.3d 1340, 1349 (2004).  Accordingly, the Court may also

examine the prosecution history of the patent when considering whether to construe the claim term

as having a specialized definition.

In construing claims, it is for the Court to determine the terms that require construction and

those that do not.  <u>See U.S. Surgical Corp. v. Ethicon, Inc.</u>,103 F.3d 1554, 1568 (Fed. Cir. 1997).

Moreover, the Court is not required to adopt a construction of a term, even if the parties have

stipulated to it.  <u>Pfizer, Inc. v. Teva Pharms., USA, Inc.</u>, 429 F.3d 1364, 1376 (Fed. Cir. 2005).

Instead, the Court may arrive at its own constructions of claim terms, which may differ from the

constructions proposed by the parties.

**IV.  DISCUSSION**

A.    **The '917 Patent**

Claim 1 of the '917 Patent provides:[3]

A method for **remotely managing a wireless device** over a wireless network comprising a **server** and the wireless device, the wireless network operable to communicatively connect the **server** and the wireless device, the method comprising the steps of:

---

[3]  Unless otherwise indicated, all bold typeface is added by the Court for emphasis.  Since the parties have identified disputed terms, but have not tied their dispute to particular claims in which the disputed terms appear, the Court uses independent Claim 1 as the starting point for its analysis. The Court's construction of any particular disputed term, however, is presumed to apply consistently across all claims in the '917 Patent in which the term appears.  <u>See Paragon Solutions, LLC v. Timex Corp.</u>, 566 F.3d 1075, 1087 (Fed. Cir. 2009).

transmitting registration information relating to the wireless device from the wireless device to the **server**;

verifying the registration information at the **server**; and

without a request from the wireless device, performing the steps of:
establishing a **mailbox** for the wireless device at the **server**,
**placing a command for the wireless device in the mailbox** at the server,
delivering the **command** from the **mailbox** at the **server** to the wireless device by establishing a connection between the wireless device and the **server**, transmitting the **contents of the mailbox** from the **server** to the wireless device, and accepting the **contents of the mailbox** at the wireless device, and
executing the **command** at the wireless device;

**wherein the connection is established based on a threshold condition**.

### 1. The Preamble's Limitation on Claim Scope

The first disputed language is recited in the Preamble to Claim 1. Before construing the language of the Preamble, the Court considers whether the Preamble is limiting. The Preamble of Claim 1 provides:

A method for remotely managing a wireless device over a wireless network comprising a server and the wireless device, the wireless network operable to communicatively connect the server and the wireless device, the method comprising the steps of:

('917 Patent, Col. 7:22-26.)

"A preamble to a claim has the import that the claim as a whole suggests for it." Griffen v. Bertina, 285 F.3d 1029, 1033 (Fed. Cir. 2002). "[T]here is no 'litmus test' for determining whether preamble language is limiting." Bicon, Inc. v. Straumann Co., 441 F.3d 945, 952 (Fed. Cir. 2006). A preamble simply stating the intended use or purpose of the invention will usually not limit the scope of the claim, unless the preamble provides antecedents for ensuing claim terms and limits the claim accordingly. Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1345 (Fed. Cir. 2003). An intended use or purpose appearing in the preamble to a claim usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates. Id. Preamble language will limit the claim if it recites not merely a context in which the invention may be used, but the essence of the invention without which performance of the recited steps is nothing but an academic exercise. Id. This principle, which is to

1   be analyzed based on the claim as a whole, frequently holds true for method claims.  Id.  Further, the

2   preamble may operate as a claim limitation when the inventor uses it to recite structure that defines

3   the invention and adopts that structure as an antecedents in the body of the claim.  Bell Commc'n

4   Research, Inc. v. Vitalink Commc'n Corp., 55 F.3d 615, 620 (Fed. Cir. 1995).

5           Here, the Preamble to Claim 1 describes the invention as one for "remotely managing . . . a

6   wireless device."  Neither the word "remotely" nor the word "managing" appears in the body of the

7   claim.  Thus, the Preamble gives meaning to what aspect of the relationship between components is

8   addressed by the invention.  The Preamble to Claim 1 also recites a structure for the method: "a

9   wireless network comprising a server and the wireless device."  "A server" recited in the Preamble is

10  an antecedent to "the server" recited in the body of Claim 1.  "A wireless device" recited in the

11  Preamble is antecedent to "the wireless device" recited in the body of Claim 1.  However, "a

12  wireless network" and an essential characteristic of the network, "operable to communicatively

13  connect the serve and the wireless device," are only recited in the Preamble.

14          Thus, the Court finds that the inventors used "both the [P]reamble and the body of the claim

15  to define the subject matter of the claimed invention."  Bicon, 441 F.3d at 953.  Accordingly, the

16  Court construes the Preamble as a limitation on the scope of the claim.

17          **2.**     **"remotely managing a wireless device over a wireless network"**

18          In pertinent part, the Preamble provides:

19          A method for **remotely managing a wireless device** over a wireless network . . . comprising
            the steps of:
20
    ('917 Patent, Col. 7:22-26.)
21
22          The parties dispute the meaning of the phrase **"remotely managing a wireless device."**

23          Since the body of Claim 1 recites steps for remotely managing a wireless device, a person of

24  ordinary skill in the art reading the steps recited in the body of Claim 1 would understand the steps

25  to recite what the inventors meant to include in the phrase, "remotely managing."  However, the

26  Preamble recites that the method is "comprised" of those steps.  Thus, the definition of "remotely

27  managing" includes but is not limited to the recited steps.

28

                                                    7

The phrase "remotely managing" is recited in every independent Claim of the '917 Patent[4] and is used throughout the written description:

> Management server 114 interfaces with wireless network 102 and with multiple servers and clients that are connected to network 102 and provides **remote management** of those servers and client[s] over wireless network 102.
>
> An exemplary block diagram of a wireless network system 200 incorporating the **remote management** technique of the present invention is shown in FIG. 2. . . .  Each **remotely manage[d]** device includes a management agent 204, which is typically a software process that provides the capability for management server 114 to remotely manage the device. . . .  Management server 114 typically transmits commands to each **remotely managed** device.  These commands are directed to the management agent running on the device and are then carried out on the device under the control of the management agent.
>
> Management protocol routines 316 include software that implements the protocols that communicate the **remote management** commands to devices over wireless network 102.  Management processing routines 318 include software that receives or determines the **remote management** commands that are to be communicated to the **remotely managed** devices by management protocol routines [316].  Some commands cause the **remotely managed** device to transmit data to management server 114.

('917 Patent, Col. 4:18-49, 5:43-6:16.)

The word "remotely" is a commonly understood word that means "separated by space."  The word "managing" is a commonly understood word that means "handling or directing."[5]  See WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 722.  With respect to electronic devices, "managing" is commonly understood to mean performing housekeeping functions that enable or disable the device from performing its intended function.  See MICROSOFT COMPUTER DICTIONARY 327 (5th ed. 2002).

The written description discusses an embodiment of the invention in which various commands are sent to the wireless device, for example:

> A process 400 for remotely managing devices over a wireless network, according to the present invention, is shown in FIG. 4.  It is best viewed in conjunction with FIG. 5, which is a data flow diagram of the operation of process 400.  Process 400 begins with step 402, in which a remotely managed device, such as remotely managed device 502, is **activated**.  **Device 502** runs management agent 504, which **transmits registration event message** 506 to management server 508. . . . [M]anagement server 508 **registers device 502** [and]

---

[4]  See Claims 1, 9, 13 and 17.

[5]  Although the difference between "managing" and "controlling" or "reconfiguring" is not apparent from the written description, "managing" is defined broadly enough to include controlling or reconfiguring, for example, by directing that the wireless device enable or disable certain functionality.

**transmits a message 514 acknowledging successful registration** of remotely managed device 502 to the device. Management server 508 establishes a mailbox 512 for the newly registered remotely managed device 502. In step 406, management server 508 places commands intended for remotely managed device 502 in mailbox 512.

('917 Patent, Col. 5:52-60; 6:12-16.)

In the body of Claim 1, "remote management" is accomplished through commands issued by the server to the wireless device and signals between the server and the wireless device. Claims depending from Claim 1 recite what these various management commands are: enabling/disabling access of the wireless device to the server, enabling/disabling applications that may run on the wireless device, erasing all or part of contents of the wireless device, transmitting new programs and data to the wireless device, querying a current state of the wireless device, monitoring a level of a battery in the wireless device, monitoring a location of the wireless device in the wireless network.[6] All of these fit in the common definition of managing.

The Preamble to Claim 1 recites remotely managing a wireless device "over a wireless network." The written description summarizes the invention as a method for "transmitting information to the wireless device.[7] One embodiment explicitly states that the server-to-device

---

[6] 21. The method of claim 1, wherein the command comprises enabling/disabling access of the wireless device to the server.
22. The method of claim 1, wherein the command comprises enabling/disabling applications that may run on the wireless device.
23. The method of claim 1, wherein the command comprises erasing all or part of contents of the wireless device.
24. The method of claim 1, wherein the command comprises transmitting new programs and data to the wireless device.
25. The method of claim 1, wherein the command comprises querying a current state of the wireless device.
26. The method of claim 1, wherein the command comprises monitoring a level of a battery in the wireless device.
27. The method of claim 1, wherein the command comprises monitoring a location of the wireless device in the wireless network.

('917 Patent, Col. 9:62-67-10:1-13.)

[7] . . .the method comprising the steps of: (1) transmitting registration information [the "registration step"]; (2) verifying registration information [the "verification step"]; (3) establishing a mailbox for the wireless device at the server [the "establishing step"], (4) placing a command for the wireless device in the mailbox [the "placing step"], (5) delivering the command from the mailbox to

management is done wirelessly.[8]  Thus, a person of ordinary skill in the art would understand remote management of the wireless device to mean that management is performed wirelessly from a distance.[9]

Accordingly, as used in the Preamble to Claim 1 of the '917 Patent, in a network comprising a server and a wireless device, the Court construes, "remotely managing a wireless device over a wireless network" to mean:

**Using the server that is physically separate from the wireless device to wirelessly control the functionality of the wireless device.**

### 3.    "server"

The Preamble recites a method for managing a wireless device in a network that comprises the wireless device and "a server."  The body of Claim 1 recites steps in the method performed by "the server."  The parties dispute the meaning of the term **"server."**

The word "server" is not defined in the either the Preamble or the body of Claim 1. Although not defined, Claim 1 recites the following uses of the server:  (1) transmitting registration information **"to the server;"** (2) verifying the registration information **"at the server;"** (3) establishing a mailbox **"at the server;"** (4) placing a command in the mailbox **"at the server;"** and (5) transmitting contents **"from the server."**

The word "server" is also not defined in the written description.  However, the word server is used in embodiments that include "servers," a "management server," and "server systems:"

---

the wireless device [the "delivering step"] by sub-steps (a) establishing a connection [the "connecting sub-step"], (b) delivering contents [the "delivering sub-step"], and (c) accepting the contents at the device [the "accepting sub-step"] and (6) executing the command at the wireless device [the "executing step"].  ('917 Patent, Col. 1:59-2:2.)

[8]  Management server 114 communicates with the each remotely managed device using wireless network 102.  ('917 Patent, Col. 4:33-34.)

[9]  The written description also uses the phrase "remote management" to recite wireless management of multiple servers in the wireless network:  "Management server 114 is also communicatively connected to network 102. Management server 114 interfaces with wireless network 102 and with multiple servers and clients that are connected to network 102 and provides **remote management of those servers** and client **over wireless network 102**."  ('917 Patent, Col. 4:17-23.)

1    **Management server 114** is also communicatively connected to network 102.
**Management server 114** interfaces with wireless network 102 and with multiple **servers**
2    and clients that are connected to network 102 and provides remote management of those
**servers** and client[s] over wireless network 102.
3        System 200 includes wireless network 102, **management server 112** and a plurality
of remotely managed devices 202A-202Z.  **Remotely managed devices 202A-202Z may**
4    **include both client and server systems** shown in FIG. 1. . . .  **Management server 114**
typically transmits commands to each remotely managed device. . . .  Some commands cause
5    the remotely managed device to transmit data to **management server 114.**
        An exemplary block diagram of **management server 114** is shown in FIG. 3.
6    **Management server 114** is typically a programmed general-purpose computer system, such
as a personal computer, workstation, **server system**, and minicomputer or mainframe
7    computer. . . .  FIG. 3 illustrates an embodiment in which **management server 114** is
implemented as a single processor computer system.  However, the present invention
8    contemplates embodiments in which **management server 114** is implemented as a
multi-processor system [or] a plurality of networked computer systems, which may be
9    single-processor computer systems, multi-processor computer systems, or a mix thereof.

10   ('917 Patent, Col. 4:17-5:8.)

11       In the computer industry, the ordinary and customary meaning of "server" is a computer in a

12   network that is principally charged with providing resources to other computers in the network.[10]  A

13   person of ordinary skill in the art reading the specification, including Claim 1, would understand that

14   the inventors used the word "server" with its ordinary and customary meaning.

15       Accordingly, as used in the Preamble to Claim 1 of the '917 Patent, in a network comprising

16   a server and a wireless device, the Court construes, "server" to mean:

17       **A device or computer in a network that is dedicated to providing resources to the**
         **wireless device.**

18

19

20

21

22

23

24   _____

25       [10]  See INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERING (IEEE) DICTIONARY OF
STANDARDS TERMS 1031 (7th ed. 2000) ("a device or computer system [in a network] that is
26   dedicated to providing specific facilities to other devices attached to the network"); Microsoft
Computer Dictionary, 5th edition, p. 15 (2002) ("On a local area network (LAN), a computer running
administrative software that controls access to the network and its resources, such as printers and
27   disk drives, and provides resources to computers functioning as workstations on the network.")

28                                                    11

**4.** **"establishing a mailbox for the wireless device at the server"**

For convenience of construction, the steps in Claim 1 can be labeled according to their described functions.[11] In the "establishing step," the parties dispute the meaning of the phrase, **"establishing a mailbox for the wireless device at the server."**

The word "mailbox" is not explicitly defined in Claim 1. In the field of electronics, the word "mailbox" is commonly used to refer to a storage location for information intended for a particular addressee. See MICROSOFT COMPUTER DICTIONARY 325 (5th ed. 2002). In the written description, the inventors refer to an embodiment of the wireless network in which the "mailbox" is a component of computer memory in the server that stores commands that can be delivered to the wireless device:

> Memory 308 [of management server 114] includes . . . **mailbox 314** . . . . **Mailbox 314 stores commands** that are to be delivered to remotely managed devices so that the devices can retrieve the commands.

('917 Patent, Col. 5:32-43.) Morever, Claim 1 recites "establishing"[12] "a" mailbox for "the" wireless device. ('917 Patent, Col. 7:32-35.) Thus, a person on ordinary skill in the art would understand that the method requires a mailbox to be established for each wireless device.

However, neither the language of Claim 1 nor any reference to "mailbox" in the written description require that *all* communications intended for the wireless device be through the "mailbox." For example, a step in the method recited in Claim 1 is: "transmitting registration information relating to the wireless device from the wireless device to the server." An embodiment of the registration process is described in the written description. "Management server 506 also transmits a message 514 acknowledging successful registration of remotely managed device 502 to the device." ('917 Patent, Col. 6:14-16.) Thus, with respect to this embodiment, the written description recites an exchange of registration information followed by establishing a mailbox for the newly registered device. This implies that before registration of a wireless device, there is no

---

[11] The steps recited by Claim 1 may be summarized as : (1) transmitting [receiving] registration information; (2) verifying the registration; (3) establishing a mailbox; (4) placing a command in the mailbox, and (5) delivering the contents of the mailbox.

[12] (*i.e.*, creating or setting up)

mailbox for the particular wireless device.[13]  Rather, registration or other processes can be communicated from the server to the wireless device through some method other than by storing and delivering from a mailbox.

Accordingly, as used in Claim 1 of the '917 Patent, in a network comprising a server and a wireless device, the Court construes, "establishing a mailbox for the wireless device at the server" to mean:

> **Creating an address in memory of the server that can store information intended for delivery to the wireless device.**

**5.     "placing a command for the wireless device in the mailbox at the server"**

In the "placing step," the parties dispute the meaning of the word:  **"command."**

As discussed above, the Preamble recites that the method is for remotely managing a wireless device.  The following phrases all relate to the "command:"  "placing a command;" "delivering the command;" and "executing the command."  Read together, these phrases would be understood by a person of ordinary skill in the art to mean that a command is something that is used in the method to cause the wireless device to perform or cease performing some action.

The written description discusses "commands" as follows:

> For example, the client systems may include conventional land line telephones or cellular telephones communicatively connected to a touch-tone response unit or a voice

---

[13]  Memory 308 [of management server 114] includes . . . **mailbox 314** . . .  **Mailbox 314 stores commands** that are to be delivered to remotely managed devices so that the devices can retrieve the commands.

**Management server 508 establishes a mailbox 512** for the newly registered remotely managed device 502. . . . In step 406, management server 508 **places commands intended for remotely managed device 502 in mailbox 512.**

In steps 408 and 410, **the commands stored in mailbox 512 are delivered to the remotely managed device.**  In particular, in step 408, a connection 516 is established between management agent 504, running on remotely managed device 502, and management server 508.  Upon connection 516 being established, **the commands that were stored in mailbox 512 in step 406 are transmitted 518 to device 502.**

In an embodiment in which remotely managed device 502 is a pull device, the management agent running on device 502 will occasionally connect to management server 508 and **request the commands in mailbox 512.**  In an embodiment in which remotely managed device 502 is a push device, management server 508 will occasionally connect to remotely managed device 502 and **transmit the commands in mailbox 512** to management agent 504.

('917 Patent, Col. 5:32-43, 6:12-50.)

13

response unit, which accepts **touch-tone or voice commands** and transmits them over network 102 and which receives responses over network 102, converts the received responses to audio, and transmits the received responses to the client systems.

Management server 114 typically transmits **commands** to each remotely managed device. These **commands** are directed to the management agent running on the device and are then carried out on the device under the control of the management agent. Typical **commands** that may be transmitted from management server 114 are enabling/disabling access of the remotely managed device to the server, enabling/disabling applications that may run on the remotely managed device, erasing all or part of the device contents, such as programs and data, transmitting new programs and data to a device, querying the current state of the device, etc. Some **commands** cause the remotely managed device to transmit data to management server 114.

Mailbox 314 stores **commands** that are to be delivered to remotely managed devices so that the devices can retrieve the **commands**. Management protocol routines 316 include software that implements the protocols that communicate the **remote management commands** to devices over wireless network 102. Management processing routines 318 include software that receives or determines the **remote management commands** that are to be communicated to the remotely managed devices by management protocol routines [316].

In step 406, management server 508 places **commands** intended for remotely managed device 502 in mailbox 512. . . . In steps 408 and 410, the **commands** stored in mailbox 512 are delivered to the remotely managed device. . . . In step 410, management agent 504 executes the retrieved **commands** and transmits a notification message 520 that informs management server 508 of the results of executing each **command**.

('917 Patent, Col. 4:9-16, 4:37-49, 5:41-50, 6:17-57.)

The ordinary and customary meaning of a "command" is an order that a recipient act or cease acting. In computer systems, a command is a signal, code or instruction issued for execution by a recipient component. See MICROSOFT COMPUTER DICTIONARY 111 (5th ed. 2002). However, in Claims 21 through 27,[14] the inventors recite limitations on "command" which give a broader meaning to the word. The use of the word "command" to include, for example, transmitting new

---

[14]    21. The method of claim 1, wherein the command comprises enabling/disabling access of the wireless device to the server.
    22. The method of claim 1, wherein the command comprises enabling/disabling applications that may run on the wireless device.
    23. The method of claim 1, wherein the command comprises erasing all or part of contents of the wireless device.
    24. The method of claim 1, wherein the command comprises transmitting new programs and data to the wireless device.
    25. The method of claim 1, wherein the command comprises querying a current state of the wireless device.
    26. The method of claim 1, wherein the command comprises monitoring a level of a battery in the wireless device.
    27. The method of claim 1, wherein the command comprises monitoring a location of the wireless device in the wireless network.

14

programs and data,[15] broadens the definition of "command" to encompass not only an order to

execute but also programs and data to be used by the wireless device during its operations.

Further, the language of Claim 1 recites that the "command" is "for the wireless device."

This would be understood to mean that the command is intended for delivery to the wireless

device.[16] For example, the written description of an embodiment provides:

> In step 406, management server 508 places commands intended for remotely
> managed device 502 in mailbox 512. . . . In steps 408 and 410, the commands stored in
> mailbox 512 are delivered to the remotely managed device. In particular, in step 408, a
> connection 516 is established between management agent 504, running on remotely managed
> device 502, and management server 508. Upon connection 516 being established, **the
> commands that were stored in mailbox 512 in step 406 are transmitted 518 to device
> 502**. . . . In step 410, management agent 504 executes the retrieved commands . . . .

('917 Patent, Col. 6:17-57.)

Accordingly, as used in Claim 1 of the '917 Patent, in a network comprising a server and a

wireless device, the Court construes, "placing a command for the wireless device in the mailbox at

the server" to mean:

> **Storing at the server in the mailbox associated with the wireless device a code or
> signal that is intended to cause the wireless device to take or cease an action with
> respect to its functionality and other data for use by the wireless device.**

**6.     "delivering the command from the mailbox at the server to the wireless device
by . . . transmitting the contents of the mailbox from the server to the wireless
device"**

The parties dispute a phrase in the "delivering" step of the method. Specifically, the parties

dispute the phrase that is recited in the "transmission" sub-step: **"transmitting the contents of the

mailbox."**

Claim 1 recites that a "command" is placed in the mailbox at the server. In the

"transmitting" sub-step, instead of reciting that the "command" is transmitted, Claim 1 recites

transmitting "the contents of the mailbox." The issue becomes whether the use of "contents" should

---

[15]  24. The method of claim 1, wherein the command comprises transmitting new programs
and data to the wireless device.

[16]  Actual delivery to the wireless device is not required in this step. Claim 1 and the written
description make clear that delivery and execution are contingent upon other steps in the method.

be construed to mean that Claim 1 covers transmitting something broader than a "command" or whether "contents" should be construed as limited to "command."

First, the transmitting sub-step is preceded by a limiting Preamble: "delivering the command from the mailbox . . . by . . . transmitting the contents." Thus, the "transmitting" sub-step is recited as a step for "delivering the command." Second, in other Claims of the '917 patent, the inventors use the word "contents" to refer to something broader than a "command." For example, Claim 19 recites:

> The computer program product of claim 17, wherein the command comprises one of: enabling/disabling access of the wireless device to the server; enabling/disabling applications that may run on the wireless device; erasing all or part of contents of the wireless device; **transmitting new programs and data to the wireless device**; querying a current state of the wireless device; monitoring a level of a battery in the wireless device; and monitoring the location of the wireless device in the wireless network.

Finally, in ordinary use, "contents" means "something contained." See WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 282. Claim 1 does not recite placing anything other than a "command" in the mailbox.[17] The Court has construed "command" to include new programs and data. A person of ordinary skill in the art would distinguish a "command" to store a new program, for example, from the new program, itself. Thus, the new program would be understood to be "contents." Additionally, since neither Claim 1 nor the written description limit "transmitting the contents of the mailbox" to requiring transmitting *all* contents of the mailbox, the declines to include such a limitation into its construction.

---

[17] If transmission of something other than a command is essential to the method, the failure to recite placing the thing in the mailbox could arguably lead to invalidity of Claim 1 due to lack of an essential element. However, the Court's attention has not been drawn to any limitation that would make the use of the word "contents" invalidating. Moreover, since the inventors clearly recite that a "command" is placed in the mailbox, and since a "command" is a form of "contents," a recital that the "contents" are transmitted is supported by the antecedent steps.

Accordingly, as used in Claim 1 of the '917 Patent, in a network comprising a server and a wireless device, the Court construes, "transmitting the contents of the mailbox from the server to the wireless device" to mean:

> **Wirelessly sending from the server to the wireless device the contents of the mailbox.**

**7.    "establishing a connection between the wireless device and the server . . . wherein the connection is established based on a threshold condition"**

The parties dispute the meaning of the phrase **"wherein the connection is established based on a threshold condition."**

As noted previously, the phrase "establishing a connection" is a sub-step of the "delivering a command" step. The phrase, "wherein the connection is established based on . . ." is a limitation on the "establishing" sub-step. The ordinary meaning of "establish" is "to bring into existence" or "set up." See WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 425. A person of ordinary skill in the art would understand that the inventors use the phrase "establishing a connection" to mean activating electronic communications between the server and the wireless device.

The communications are activated based on a **"threshold condition."** Claims 7 and 8 state:

> 7. The method of claim 6, wherein the information relating to execution of the command is transmitted **periodically**.
> 8. The method of claim 6, wherein the information relating to execution of the command is transmitted based on a **threshold condition** of the wireless device.

Thus, Claims 7 and 8 distinguish between transmitting information "periodically" and transmission "based on a threshold condition."

The written description contrasts "periodic" transmission with transmission based on a "threshold condition:"

> In one aspect of the present invention, the delivering step comprises the steps of: establishing a connection between the wireless device and the server, transmitting a request for contents of the mailbox from the wireless device to the server, and transmitting the contents of the mailbox from the server to the wireless device. The connection may be established **periodically** or the connection may be established based on a **threshold condition**.
> In one aspect of the present invention, the delivering step comprises the steps of: establishing a connection between the wireless device and the server, transmitting the contents of the mailbox from the server to the wireless device without a request from the wireless device, and accepting the contents of the mailbox at the wireless device. The

17

connection may be established **periodically** or the connection may be established based on a **threshold condition**.

In both embodiments, the connections may be made periodically, based on some defined **time interval**, or they may be made based on predefined **threshold conditions**.

In step 410, management agent 504 executes the retrieved commands and transmits a notification message 520 that informs management server 508 of the results of executing each command. In addition, if one or more of the commands were to monitor parameters of remotely managed device 502, then, in step 412, management agent 504 will transmit the monitored information 522 to management server 508. The transmission may be **periodic, based on some defined time interval,** or they may be based on the values of certain parameters of device 502 in relation to predefined **threshold conditions**. The **time intervals** or **threshold conditions** may be inherent in device 502, or they may be transmitted as parameters or data related to the commands that were retrieved by device 502.

('917 Patent, Col. 2:3-19, 6:50-67.) In addition, there is a discussion of an embodiment in which a "threshold condition" is "predefined."[18]

The phrase "threshold condition" was the subject of attention of the examiner during the prosecution of the '917 and '408 Patents. The prosecution history of the '408 Patent is relevant because the '408 Patent is a continuation in part of the application for the '917 Patent. Discussion of the phrase "threshold condition" in the '408 Patent prosecution history may demonstrate how the inventor understood that term in the related '917 Patent.[19] During prosecution of the '917 Patent, the patent examiner rejected certain claims, including Claim 1, in light of prior art that taught accessing a mailbox periodically.[20] In response, the inventors added the following language to their claims to overcome the rejection: "the connection is established based on a threshold condition." (See id., Amendment, July 6, 2005.) The claims were subsequently allowed with the amended language.

_____

[18] In an embodiment in which remotely managed device 502 is a push device, management server 508 will occasionally connect to remotely managed device 502 and transmit the commands in mailbox 512 to management agent 504. In both embodiments, the connections may be made periodically, based on some defined time interval, or they may be made based on **predefined threshold conditions**.

The transmission may be periodic, based on some defined time interval, or they may be based on the values of certain parameters of device 502 in relation to **predefined threshold conditions**. The time intervals or threshold conditions may be inherent in device 502, or they may be transmitted as parameters or data related to the commands that were retrieved by device 502.

[19] See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc., 473 F.3d 1173, 1184 (Fed. Cir. 2006).

[20] (See '917 Patent Prosecution History, Final Office Action, June 15, 2005.)

18

1      Similarly, during prosecution of the '408 Patent, the patent examiner rejected all claims as

2 obvious in light of prior art that disclosed communicative connections and data transmissions that

3 were periodic or based on a threshold condition.[21] In an attempt to overcome the examiner's

4 rejection, the inventors contended:

5      Whereas, the present invention refers to an acknowledgment sent from the wireless
     device to the server after the execution of a command.  This acknowledgment is sent based

6      on a **threshold condition**.  This is important because **the communication from the wireless
     device to the server should be governed by a policy (threshold condition) that may be**

7      **based on cost, distance, coverage etc. and not sent as soon as a command is executed.**

8 (See id., Amendment, Nov. 15, 2006.)  Although the inventors' November 15, 2006 Amendment did

9 not propose any modification to their claims that reflected this contention, their argument to the

10 patent examiner was clear, unambiguous, and for the purpose of overcoming the prior art, and

11 therefore, may serve to narrow the scope of the claim language.  See Seachange Int'l, Inc. v.

12 C-COR, Inc., 413 F.3d 1361, 1372-73 (Fed. Cir. 2005).

13      In the next office action, the patent examiner again rejected all claims as obvious in light of

14 prior art that disclosed wireless devices periodically updating their data.[22]  In response, the inventors

15 added the following language to their claims to overcome the rejection: "wherein the communicative

16 connection is based on a threshold condition."  (See id., Amendment, Aug. 6, 2007.)  The claims

17 were subsequently allowed with the amended language.

18      Accordingly, in light of the language of the Claims of the '917 Patent, the prosecution

19 histories, and the written description, as used in Claim 1 of the '917 Patent, in a network comprising

20 a server and a wireless device, the Court construes, "establishing a connection between the wireless

21 device and the server . . . wherein the connection is established based on a threshold condition"

22 means:

23      **Establishing a connection between the wireless device and the server based on a
     predefined state of the server or the wireless device other than solely the**

24      **elapsing of time.**

25

26   [21] (See '408 Patent Prosecution History, Office Action, May 15, 2006.)

27   [22] (See '408 Patent Prosecution History, Office Action, Feb. 6, 2007.)

28                          19

**B.** **The '408 Patent**

Claim 1 of the '408 Patent provides:

A method for remotely managing a wireless device over a telecommunications network comprising a server and the wireless device, the method comprising the steps of:

> establishing from the server to the wireless device a communicative connection between the server and the wireless device **over a signaling channel of the telecommunications network**, wherein the communicative connection is established based on a threshold condition;
>
> transmitting a command from the server to the wireless device over **the signaling network**, wherein the wireless device executes commands including:
> > enabling access to user-specific data used by application software on the wireless device requiring user interaction locally on the wireless device, enabling the application software, erasing at least a portion of the user-specific data, transmitting new application software and new user-specific data to the wireless device, querying a current state of the wireless device, and reconfiguring the application software, disabling access to user-specific data used by application software on the wireless device requiring user interaction locally on the wireless device, and disabling the application software;
>
> executing the command at the wireless device after verifying at the wireless device that a signature sent by the server that is an origin of the command and signature of the device are in agreement; and
>
> transmitting information relating to execution of the command at the wireless device from the wireless device to the **server**.

**1.** **The Preamble's Limitation on Claim Scope**

The Preamble of Claim 1 provides:

A method for remotely managing a wireless device over a telecommunications network comprising a server and the wireless device, the method comprising the steps of:

('408 Patent, Col. 10:33-35.)

For the same reasons stated with respect to Claim 1 of the '917 Patent, the Court finds that the Preamble to Claim 1 of the '408 Patent is limiting.

**2.** **"remotely managing a wireless device," "server," "command," "threshold condition"**

The parties dispute the meaning of the phrases "remotely managing a wireless device," "server," "command," and "threshold condition," that are recited in the Preamble and body of Claim 1 of the '408 Patent. Neither the language of Claim 1 nor the written description use these phrases

20

in any novel way.[23]  Accordingly, the Court construes these phrases to have the same meanings as

found with respect to Claim 1 of the '917 Patent.

_____

[23] For example, the written description of the '408 Patent discusses "remote management" as follows:

> [A] need arises for a technique that provides the capability for more advanced **management** of wireless devices, as well as the capability to **control and reconfirm** wireless devices **remotely** over a wireless network with acceptable reliability and security.
>
> An exemplary block diagram of a wireless network system 200 incorporating the **remote management technique of the present invention** is shown in FIG. 2a. Management server 114 typically transmits commands to each remotely managed device. Some commands cause the remotely managed device to transmit data to management server 114.
>
> [A] management server 114 **communicates a control payload 210 with a remotely managed device**, such as remotely managed device 202A.  Control payload 210 includes information that is used to **control aspects of the operation of remotely managed device** 202A, such as commands to the device, status information from the device, etc.
>
> Management protocol routines 316 include software that implements the protocols that communicate the **remote management commands** to devices over telecommunications network 102.  Management processing routines 318 include software that receives or determines the **remote management commands** that are to be communicated to the remotely managed devices by management protocol routines 314.
>
> **A process 400 for remotely managing devices over a signaling channel, according to the present invention**, is shown in FIG. 4.  [M]anagement server 508 verifies the identity of remotely managed device 502.  Upon verification of device 502, management server 508 **registers device 502** [and] **establishes a mailbox 512** for the newly registered remotely managed device 502.
>
> In step 406, management server 508 **places commands intended for remotely managed device 502** in DCB 512.  In steps 408 and 410, the commands stored in DCB 512 are **delivered to the remotely managed device.**  In step 410, management agent 504 **executes the retrieved commands and transmits a notification message 520** that informs management server 508 of the results of executing each command.  In addition, if one or more of the commands were to monitor parameters of remotely managed device 502, then, in step 412, management agent 504 will **transmit the monitored information 522 to management server 508.**

('408 Patent, Col. 1:63-67, 5:18-55, 7:25-32, 8:49-60, 9:13-10:3.)

The written description of the '408 Patent also uses the term "command" in a substantively identical manner as the written description of the '917 Patent.  (See '408 Patent, Col. 5:42-55, 8:47-56, 9:23-10:10.)

Similarly, the written description is substantively identical to the '917 Patent as to use of the phrase "threshold condition."  (See '408 Patent, Col. 9:60-10:10.)  Finally, the prosecution histories of the '917 and '408 Patents inform the Court's analysis here to the same extent as with the '917 Patent.

21

**3.** **"signaling channel of the telecommunications network"**

Claim 1 of the '408 Patent recites: "establishing from the server to the wireless device a communicative connection between the server and the wireless device over a signaling channel of the telecommunications network." The parties dispute the meaning of the phrase **"signaling channel of the telecommunications network."**

Claim 1 does not elaborate on the meaning of this phrase, but Claims 2 and 3, which depend from Claim 1, recite that the signaling channel may comprise a "Common Channel Signaling System 7 channel" or a "Short Message Service." ('408 Patent, Col. 10:65-11:3.) Further, the written description discusses "signaling channel of the telecommunications network" as follows:

> **Telecommunications network 102** includes a traffic channel 204 and a **signaling channel 206.** Traffic channel 204 carries telecommunications traffic, such as telephone voice and data calls. **Signaling network 206** carries signaling data relating to the telecommunications traffic and the configuration of telecommunications network 102. For example, **signaling channel 206** may include the well-known Common Channel Signaling System 7 (SS7). Management server 114 communicates with the each remotely managed device using **signaling channel 206 of telecommunications network 102.**
> **Older signaling systems were "inband,"** that is, the signaling signals were transmitted along with and on the same circuits as the voice signals in the telephone network. This was inefficient and prone to fraud. **Newer signaling system[s] are "out-of-band,"** that is, the signaling signals are transmitted in a network that is separate from the circuits that carry the voice signals in the telephone network. This improves efficiency and fraud resistance of the telecommunications network. One **example of an out-of-band signaling network** that is in widespread use is the Common Channel Signaling System 7 (SS7).
> Wireless data terminals are the devices that provide environment for deploying/running data and voice applications. Such devices are active on the network and always reachable via **signaling channel.**
> A process 400 for remotely managing devices over a **signaling channel**, according to the present invention, is shown in FIG. 4. It is best viewed in conjunction with FIG. 5, which is a data flow diagram of the operation of process 400.

('408 Patent, Col. 5:18-6:9, 6:46-49, 8:58-62.)

The written description states unambiguously that the telecommunications network includes systems with a traffic channel that is separate from a signaling channel. Thus a person of skill in the art reading the patent documents would understand the phrase "signaling channel" to refer to such a system.

Accordingly, as used in Claim 1 of the '408 Patent, in a network comprising a server and a wireless device, the Court construes, "signaling channel of the telecommunications network" to mean:

> **In a network of devices for transmitting voice and data, a separate channel in the network for carrying data about the voice and data signals.**

**4.    "transmitting a command from the server to the wireless device over the signaling network"**

The parties dispute the meaning of the phrase **"signaling network."** Claim 1 recites transmitting a command over "<u>the</u> signaling network" without any explicit antecedent recital of "a signaling network."

"[A] a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable." <u>Halliburton Energy Servs., Inc. v. M-I LLC</u>, 514 F.3d 1244, 1249 (Fed. Cir. 2008). However, before finding Claim 1 indefinite based on using "the signaling network" without prior recitation of such a network, the Court would be required to find that the lack of an antecedent makes Claim 1 insolubly ambiguous when viewed from the standpoint of a person of ordinary skill in the art reading the patent documents. <u>Id.</u>

Claim 1 recites that a connection is formed between a server and a wireless device "over a signaling channel" of the telecommunications network, and that commands are then transmitted from the server to the wireless device "over the signaling network." ('408 Patent, Col. 10:36-44.) In the written description, the phrases signal channel" and "signaling network are used interchangeably:

> Telecommunications network 102 includes a traffic channel 204 and a **signaling channel 206.** Traffic channel 204 carries telecommunications traffic, such as telephone voice and data calls. **Signaling network 206** carries signaling data relating to the telecommunications traffic and the configuration of telecommunications network 102. For example, **signaling channel 206** may include the well-known Common Channel Signaling System 7 (SS7). Management server 114 communicates with the each remotely managed device using **signaling channel 206 of telecommunications network 102.**

('408 Patent, Col. 5:23-38.)

23

Moreover, although other portions of the written description do not explicitly interchange "signaling channel" with "signaling network" in those portions, it is clear that a signaling channel is included in the signaling network:

> **Newer signaling system[s]** are "out-of-band," that is, the signaling signals are transmitted in a **network** that is separate from the circuits that carry the voice signals in the telephone network. This improves efficiency and fraud resistance of the telecommunications network. One example of an out-of-band **signaling network** that is in widespread use is the Common Channel Signaling System 7 (SS7).
> SS7 utilizes a **signaling network** that includes **physical communication channels**, as well as **protocols**. The protocols provide functions such as destination routing, data fields, variable length messages, etc. A major characteristic of SS7 is its layered functional structure. The SS7 protocol includes of a number of sub-protocols . . . .
> Among the data that can be transported using a **signaling network, such as SS7,** are messages known as Short Message Service (SMS) messages. SMS messages are placed onto the **signaling network** by a Short Message Service Center (SMS-C). For example, gateway 201, shown in FIG. 2a, may be an SMS-C.
> The SMS messages are transported using the **signaling network, such as SS7 signaling network 214** and delivered to management agent 204 of remotely managed device 202A, which extracts control payload 210 from the message.

('408 Patent, Col. 6:1-58, 7:40-44.)

Accordingly, as used in Claim 1 of the '408 Patent, in a network comprising a server and a wireless device, the Court construes, "transmitting a command from the server to the wireless device over the signaling network" to mean:

**Transmitting a command from the server to the wireless device over signaling channels in the telecommunications network.**

## V. CONCLUSION

In this Order, the Court has given its construction of submitted words and phrases of the '917 Patent and '408 Patents.

The parties shall appear for a Case Management Conference on **March 29, 2010 at 10 a.m.** On or before **March 19, 2010**, the parties shall submit a Joint Case Management Statement. The Statement shall include, among other things, a good faith discovery plan with a proposed date for the close of all discovery and a stipulation as to a mediation process.

Dated: February 25, 2010

_James Ware_

JAMES WARE
United States District Judge

United States District Court

For the Northern District of California

1    **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2    Aaron D. Charfoos acharfoos@kirkland.com
     Amardeep Lal Thakur athakur@sheppardmullin.com
3    Bradford John Black bradford.black@kirkland.com
     Carl John Blickle carl.blickle@kirkland.com
4    Eugene Goryunov egoryunov@kirkland.com
     Graham Marc Buccigross gbuccigross@sheppardmullin.com
5    Linda S. DeBruin ldebruin@kirkland.com
     Marc Howard Cohen marc.cohen@kirkland.com
6    Maria A. Maras maria.maras@kirkland.com
     Michael Anthony Parks mparks@kirkland.com
7    Nathaniel Bruno nbruno@sheppardmullin.com
     Rebecca Lea Hanovice rhanovice@smrh.com
8    Shawn Edward McDonald smcdonald@sheppardmullin.com

9

10   **Dated:  February 25, 2010**                    **Richard W. Wieking, Clerk**

11

12                                        **By:___/s/ JW Chambers_____**
                                              **Elizabeth Garcia**
13                                            **Courtroom Deputy**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28