**REDACTED per Court Order issued 4/21/11, docket #459**

Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Howard R. Lloyd, Magistrate Judge

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| Mformation Technologies, Inc., | ) | No. C08-04990 JW |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| Research in Motion Limited, et al, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

San Jose, California
Tuesday, August 3, 2010

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES:**

For Plaintiff:

Foley & Lardner, LLP
11250 El Camino Real
Suite 200
San Diego, CA  92130
**BY:  SHAWN EDWARD MCDONALD
AMARDEEP LAL THAKUR
ATTORNEYS AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Transcribed By:      Stacy Wegner
Transcriptionist
smwtyping@yahoo.com
(859) 539-2802

2

**APPEARANCES:    (Continued)**

For Defendant:

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, IL  60654
                **BY:  LINDA S. DEBRUIN**
                      **MARIA A. MARAS**
                      **MEREDITH ZINANNI**
                      **ATTORNEYS AT LAW**

Tuesday, August 3, 2010                                    11:05 a.m.

        THE COURT:  Mformation Technologies versus Research in Motion.

        MS. DEBRUIN:  Good morning, Your Honor.  Linda DeBruin on behalf of Research in Motion.

        MR. THAKUR:  Good morning, Your Honor.  Amar Thakur on behalf of Mformation.

        THE COURT:  You said that so fast.  I didn't hear you.

        MR. THAKUR:  Sorry.

        THE COURT:  Amar.

        MR. THAKUR:  Thakur.

        THE COURT:  Thakur?

        MR. THAKUR:  That's correct, Your Honor.

        THE COURT:  (Inaudible).  All right.  Three motions.  The first one is the motion to compel 30(b)(6) depositions.  Let's see.

        As I understand it, the parties agreed among themselves that each side would have 42 hours to depose 30(b)(6) witnesses.

        Defendant, Research in Motion, produced Carl Cherry to testify as to topics -- 36 topics, 14(a) and 14(c) through (e).

        There was apparently another deposition taken

earlier that day, and then the Plaintiff's counsel launched in Mr. Cherry's deposition that apparently went five hours and 40 minutes by somebody's reckoning (inaudible).  It got to be 6:00 o'clock.  It was Friday evening.  Plaintiff wasn't done.

By the way, is it Mformation?

MR. THAKUR:  Mformation, correct, Your Honor.

THE COURT:  How (inaudible).  Pick a better name.

MR. THAKUR:  Your Honor, I was not participant in that decision, Your Honor.

THE COURT:  Mformation.  All right.  Friday at 6:00 o'clock, Plaintiff is not done, wants to schedule.  Research in Motion says, "No.  Keep on going or we'll come back tomorrow, Saturday, to do it."  That doesn't work for the Plaintiff's lawyer.  It also doesn't work for the court reporter.

It seems to me like something could be worked out on this, but nevertheless, here we are.

Did I correctly state what the problem is?

MR. THAKUR:  Your Honor, you're spot on.

MS. ZINANNI:  Yes, Your Honor.  And just for the record, my name is Meredith Zinanni.  I didn't mean to do a switch on you.

THE COURT:  Oh, wait a second.

MS. ZINANNI:  You were looking down.

**THE COURT**:  Where did Ms. DeBruin go?  Oh, you're on another motion?

**MS. DEBRUIN**:  Yes, Your Honor.

**THE COURT**:  And you are?

**MS. ZINANNI**:  Meredith Zinanni.

**THE COURT**:  Okay.  Now, I've got you.  What do you have to say?

**MS. ZINANNI**:  Your Honor, we don't object to providing Mformation 42 hours of 30(b)(6) testimony, as the parties agreed.

What we object to is providing serial depositions on topics that Mformation has already had an adequate time to depose a witness on, and without taking advantage of other tools at their disposal to get this information.

The burden in this instance is on Mformation to show good cause for deposing someone on these topics for more than one day and seven hours under Federal Rule of Civil Procedure 30.

**THE COURT**:  Well, he hasn't had seven hours yet.

**MS. ZINANNI**:  Your Honor, we offered seven hours on that day, and Mformation declined to take it.

**THE COURT**:  And you don't think that was a good reason?

**MS. ZINANNI**:  No.  The -- the scheduling of the court reporter was in -- within Mformation's control.  We

offered to -- if they believed that they needed the full seven hours on these topics, they could have arranged for that time.  We offered to stay that day.  We offered to come back the next day in order to continue the deposition to provide the full seven hours.

What we can't agree to is to have them go get the record, reprepare for a deposition and basically start the clock over again to cover testimony that should have been done in the first case.

THE COURT:  What do you mean start the clock over again?

MS. ZINANNI:  Mformation has not proposed any limits on a subsequent deposition.

THE COURT:  Well, I -- I thought there was a 42-hour total.

MR. THAKUR:  That's correct, Your Honor.

THE COURT:  So if -- if they burn 42 hours with Cherry, they don't have any more hours left.

MS. ZINANNI:  That's true, Your Honor.  But they have number -- a number of other outstanding topics, for which they have yet to take --

THE COURT:  Well, I hope I don't --

MS. ZINANNI:  -- deposition time.

THE COURT:  I hope I'm not going to see them in here wanting to expand the 42 hours.

MS. ZINANNI:  We hope that too, Your Honor.

THE COURT:  But that's their problem.

MS. ZINANNI:  How they choose to use --

THE COURT:  Yeah.  How to use the 42 hours is their problem.

MS. ZINANNI:  I'm just trying to understand your question, Your Honor.

THE COURT:  If they want -- if they want to choose to use their 42 hours by spending seven or eight or nine on Cherry, I -- I don't think there's anything particularly wrong with that.

MS. ZINANNI:  Your Honor, we disagreed that we reached an agreement with them in terms of presenting the witness.  They represented that the number of topics that were scheduled for that day were the topics that they thought they could cover.

They have a number of other outstanding topics, for which we are working to schedule additional witnesses.  And there just doesn't seem to be call to go back over the same topics that they've already deposed someone on.

THE COURT:  Well, presumably they wouldn't bother to wish to spend the time on Cherry, beyond what they've already spent, if they didn't think it was important because, after all, they've only got 42 hours.

MS. ZINANNI:  Your Honor, that's not clear to us.

They haven't explained too us what they have failed to get from Mr. Cherry.

THE COURT: (Inaudible - - due to simultaneous colloquy.)

MS. ZINANNI: They have available to them -- to avoid duplicative and cumulative discovery, they have multiple tools at their disposal. They could serve more focused categories that we --

THE COURT: Well, do you -- do you think that they're -- they're -- they're trying to harass Mr. Cherry? I mean, why would they burn hours that they don't feel they really need on a witness if they don't feel they really need it, particularly if there's a possibility they're going to run out of hours?

MS. ZINANNI: Then we're unclear as to what they were accomplishing during their first deposition of Mr. Cherry when they spent six hours with him, and yet managed to somehow not complete any of the noticed topics.

And -- and that's our concern is that by setting -- allowing these serial depositions on a topic, there's an unfair burden on RIM.

THE COURT: What is that?

MS. ZINANNI: One, we've already spent time preparing Mr. Cherry multiple days and presenting him for deposition.

Whether or not it's Mr. Cherry or another -- another designee, once again, we'll be taking someone from the real business of RIM to deal with these issues that Mformation could and should have dealt with during their initial deposition of Mr. Cherry.

THE COURT: Okay. What do you have to say?

MR. THAKUR: Your Honor, I did bring a Power Point. I -- obviously, you know, I -- we didn't have that set up, but I -- I wouldn't mind passing a slide out (inaudible) calendar --

THE COURT: (Inaudible - - due to simultaneous colloquy.)

MR. THAKUR: -- calendaring events.

THE COURT: I'm sorry I didn't do that.

MR. THAKUR: No problem, but the point is just to sort of -- you know, it shows -- lays out a calendar. I wouldn't mind passing to that you if -- if --

THE COURT: I -- I -- I don't want to see the calendar.

MR. THAKUR: Your Honor, the key point --

THE COURT: Tell me what's on your mind.

MR. THAKUR: Your Honor, the key point here is (inaudible) one of the other Defendants in the case that just proceeded us. We understand -- most of our lives we spend representing Defendants.

We understand that being difficult is part of the process, but not being allowed to conduct a deposition to its conclusion is -- is really reaching a point of where Defendant is making discovery in this case next to impossible for the Plaintiff.

THE COURT:  Okay.  Very good.

Anything else from you?

MS. ZINANNI:  Well, I would disagree that we're trying to be difficult in this case.

THE COURT:  I know.  I hear that all --

MS. ZINANNI:  We're just trying to set the limits.

THE COURT:  I hear it all the time.  Don't worry about it.

MS. ZINANNI:  I mean, what we're asking for is for Mformation, rather than going back over and reopening these three broad topics, if not -- exploring some of the other opportunities that they have to get this discovery.

They have not served an individual notice on Mr. Cherry.  They haven't -- they have available to them the possibility of serving further 30(b)(6) topics that would narrow the issues and focus on what they were not able to get during the initial deposition, which would minimize the burden on RIM because we would be able to -- be able to focus our preparation up and identify the proper witness for the information that Mformation actually seeks, as opposed to the

broad array of the topics that they're seeking through this motion.

THE COURT:  Okay.  Is this matter submitted?  I'm -- I'm going to give them the time it takes with Mr. Cherry. You'll get an order on that.

MR. THAKUR:  Thank you, Your Honor.

THE COURT:  It's just I'm going to give him more time.  I must be careful in my choice of words.  Okay.

Defendant's motion to compel withdrawal all -- withdrawal of privilege claims.

MS. ZINANNI:  I keep getting up here.

MS. MARAS:  Good morning, Your Honor.

THE COURT:  Another player?

MS. MARAS:  Yes.  Maria Maras for RIM.

THE COURT:  Okay.  Yesterday at 4:48 p.m. -- and I was not here yesterday, by the way -- you filed -- let's see -- M -- Mformation filed a letter indicating that Plaintiff claims that it is no longer withholding any documents on the basis of the Common Interest Doctrine.

Okay.  Well, that's nice.  How does that affect this motion?

MR. THAKUR:  Your Honor -- would -- would you like me to respond?

THE COURT:  Well, hold on.  I guess I wouldn't be surprised if I heard different things from each of you, so

we'll give you both a chance.

**MR. THAKUR**:  Your Honor, as an introduction to this issue was that we first heard about this -- this motion after it was filed without a meet and confer.  We -- we belief we resolved it by producing all the documents for Mformation, and that was done way back in June.

What I was told on the telephone was this issue has not been resolved because we have instructed third party witnesses to withhold based on common interest privilege.  I informed them that was not correct.

I had spoken more than six week ago with oppose -- with counsel for all of the three -- three parties, and they told me they were not withholding documents in common interest privilege.

And I was -- I sent them a letter last Wednesday saying, "This issue is moot.  We've produced the documents, and we're not responsible for third parties to produces their documents."  They chose not to respond to that letter.  And yesterday we sent them emails saying, "Is this issue still open?"

I got a letter from them after I landed in San Jose saying, "This issue is still open for the subset of topics."  And frankly, if I had received that letter many times ago, I would have said -- Your Honor, with respect to the letter they sent us at 7:00 p.m., I would have resolved all of those

issues.

The -- the -- we view this motion as the following, which is there is an improper claim made for withdrawal of privilege on these 55 documents, and what they're doing is they're clouding it with a legitimate issue, which is the common interest privilege.

And we believe we are -- we have an obligation to be responsive, not apply the common interest privilege where inappropriate -- where it's not appropriate, and we've done so.  Our point is Mformation does not hold -- is not applying the common interest privilege for any documents, any questions, anything of the sort.

MS. MARAS:  Your Honor, I disagree, as you expected, and there are three issues that need to be addressed in this motion.  One is the Common Interest Doctrine.  The second is the their waiver privilege, and the third are documents that are inappropriately being withheld from their privilege logs.

What happened is we -- we did get a letter from Mr. Thakur last week, and I responded.  Mr. Thakur emailed me yesterday afternoon when I was on route to San Jose, and I responded to him as soon as I could.

The issues that are still outstanding:  First, Mformation's understanding of the Common Interest Doctrine is incorrect.  They've applied it incorrectly by giving

instructions to third parties.  They've applied it incorrectly by making -- by instructing a key witness not to answer deposition questions, and this has come up repeatedly during the case.

Even their opposition brief lays out an understanding of the Common Interest Doctrine that is legally incorrect that flies in the face of two of your cases, Your Honor, and other cases in the Northern District.

The outstanding issue -- and I'll break down the Common Interest Doctrine disputes.  If you want, Your Honor, I can give you a copy of the letter that I sent to Mr. Thakur last night, but I'm happy to discuss the issues with you right now.

THE COURT:  I'm confused.

MS. MARAS:  Okay.  Back in March RIM issued subpoenas to multiple third parties.  These third parties were investors in Mformation.  They received information from --

THE COURT:  Is that -- is that in this motion before me?

MS. MARAS:  Yes, Your Honor.

MR. THAKUR:  No, Your Honor.

THE COURT:  Well, this is a motion where -- it -- it -- it sent me to look at privilege logs to see what was on the privilege log and whether it was an (inaudible).  That's

what I thought this motion was about.

MS. MARAS:  It's about that, Your Honor.  If you turn to the first page where we said, "The statement of relief requested in our original motion."  We asked for four types of relief.

We asked to have documents produced that had been improperly withheld.  We ask asked that Mformation permit questioning at deposition regarding Mformation's communications with third parties without improper privilege objections, based on the Common Interest Doctrine.

We asked them to notify third parties that they were withdrawing improper Common Interest Doctrine objections.  And then we asked them to reproduce the documents over which they had waived privilege.

MR. THAKUR:  Your Honor --

MS. MARAS:  That was in the initial statement of relief and our first motion --

THE COURT:  Did you brief each of those four?

MS. MARAS:  Yes, we did, Your Honor.  And in particular, I -- I think our reply brief clarified the misunderstanding that Mformation had as to the focus of our motion, and lays it out in detail what the issues were.

So if you turn to pages -- if you turn to pages three, four and five of our reply brief -- excuse me -- three through six of the reply, we explain that the Common Interest

Doctrine does not apply.  And we outline why Mformation should permit questioning at depositions without improper privilege objections, and we also layout why Mformation should permit third party subpoena productions.

MR. THAKUR:  Your Honor, our position is that we've just simply done all the things they asked for, with the exception of item number four.  So we've already done the issues, and we think if there should be any discussion, it should be what is it that they still want because if they tell us what they want, we'll be happy to -- to do it.

MS. MARAS:  Your Honor, I can -- I can provide that.

First, Mformation instructed third parties not to produce documents based on the common interest privilege. We've cited telephone conversations.  We have emails.  And we have letters from the third parties themselves saying that they're not producing documents until the privilege dispute between Mformation and RIM is resolved.  If --

MR. THAKUR:  Your Honor, can we do it one at a time?

MS. MARAS:  Excuse me?

THE COURT:  No.  No.  No.

MR. THAKUR:  I'm sorry.

THE COURT:  Wait.

MR. THAKUR:  One at a time.

**THE COURT**:  Woe.  Go ahead.

**MS. MARAS**:  Okay.  So if Mformation is willing to provide written notice to each of those third parties in a way that RIM can see -- stating that it's not asserting any common interest privilege over those productions, I think that's one step.

We'd also ask that those third parties provide privilege logs about what, if any, documents are being withheld on the basis of Mformation's claims of privilege. And then we need time to assess the third parties' productions.

One of the issues that we had in responding to Mr. Thakur's letter is after -- although we issued our subpoenas in early March, the third parties had withheld productions for over -- almost five months.  I just got one of their productions late last night.  5,000 pages that was unable to review overnight prior to this motion.

**MR. THAKUR**:  Your Honor, they're represented by Cooley Bingham (phonetic) and other national firms.  I do not represent them.

What I can tell you is if they want me to send a letter -- I've already spoken with them several weeks ago informing them that we're not asserting the common interest privilege.  If the letter that was sent to me at 7:00 p.m. had been sent earlier, I would have been happy to have sent

all of those three parties a letter notifying we're not assert --

THE COURT:  Are you going to do it now?

MR. THAKUR:  Happy to do it, Your Honor.

MS. MARAS:  And we'd also ask that the -- that to the extent Mformation is asserting any claims of privilege over those productions, that those claims be outlined in a privilege log so that we can assess what's happening.

THE COURT:  Well, but that's -- that's something you want the third parties to do.

MS. MARAS:  Mformation has already provided a privilege log for one of those third party productions, for Battery.  We assume that Mformation would be willing to do so for each other third party.

MR. THAKUR:  Your Honor, they're all represented by counsel.  The only instance that she's referring to where we provided a privilege log was they sent us a copy and said, "Hey, do you want to take a look at it?"  That's it.

We're not representing them.  We have actually not -- not involved in the document production at all, Your Honor.

THE COURT:  Well --

MS. MARAS:  I have multiple letters --

THE COURT:  (Inaudible - - due to simultaneous colloquy.)

**MS. MARAS:** -- from these third parties --

**THE COURT:** If there's no common interest claim, then these third parties, to the extent they got privileged documents --

**MR. THAKUR:** Your Honor, there's two issue --

**THE COURT:** What's the --

**MS. MARAS:** Your --

**THE COURT:** (Inaudible - - due to simultaneous colloquy.) privileged documents?

**MS. MARAS:** The issue is -- I have letters that I can pass out to Your Honor -- that we did not have at the time we filed a reply brief -- where the third parties say that Mformation is asserting privileged claims over their production, and that's why they're not producing documents.

**MR. THAKUR:** Your Honor, there's -- there's -- there's a confusion (inaudible). If I may permit the answer to that? The issue is confused between the common interest privilege and the members of the Board of the Directors.

They have had no -- we -- some of those investors were members of our Board of Directors. Documents sent to the Board -- and they've agreed to us. That documents sent to the Board of Directors should not be privilege -- are not subject to waiver, but documents subject to the common interest privilege should not be asserted.

And what we have asked them to do is send us those

documents in advance to make sure Board of Director communications are not inadvertently produced as a mix-up. We're not involved in that production. They have their own counsel writing privilege logs.

The only thing we can say is that when they have produced those documents to us, we have notified them, and I have personally notified. In the correspondence they've had with them, I've had no knowledge of whatsoever. But I can tell you I have not asserted the common interest privilege.

THE COURT: Would this matter profit or benefit by further meet and confer? It seems like things are happening as we speak.

MR. THAKUR: Your Honor, if they want to outline what they want, I'd be happy to respond on the spot. I'm simply saying we're willing to -- any question they have, we're willing to respond, rather than factually trying to create -- Your Honor, what is happening is they're trying to muddy the common interest privilege with the privilege log.

THE COURT: Don't -- don't --

MS. MARAS: Your Honor?

THE COURT: Don't cast disparagements. Just tell me --

MS. MARAS: I -- I think we --

THE COURT: -- what's your response to my question

-- and I'm not ready for you yet.

**MR. THAKUR:**  Well, I will --

**MS. MARAS:**  Sorry, Your Honor.

**MR. THAKUR:**  If -- I'm happy to have a meet and confer.  I believe that every issue outlined in their letter that was sent to me at 7:00 p.m. last night, our response would have been absolutely fine.

**THE COURT:**  Now.

**MS. MARAS:**  Thank you, Your Honor.  I think we can work out a deal with regard to the third party subpoena productions.  It sounds like we're close.

However, there's an overarching issue, which is that they have a misunderstanding of the Common Interest Doctrine.  They've asserted it during deposition where they instructed a witness not to answer.

The last -- the only -- the last and only communication we have from you regarding deposition objections is that you're going stand on those objections.  So we need clarification from the Court to avoid this issue coming up down the road.

**THE COURT:**  So my question was, do you think further meet and confer on any of these issues would be helpful?

**MS. MARAS:**  I think further meet and confer on the third party production issue would be helpful.  I think that

the parties are at an impasse regarding deposition objections, the overall understanding of the Common Interest Doctrine, and then, of course, their waiver of privilege --

**MR. THAKUR:** Your Honor --

**MS. MARAS:** -- over --

**MR. THAKUR:** -- this is the first we've heard of --

**THE COURT:** I thought -- I was told that they're not -- they're no longer withholding any documents on the basis of common interest privilege?

**MS. MARAS:** I'm talking about the -- the documents that they produced after they had notice of the risk of potentially privileged documents in their production.

There -- there are three privilege related issues in this motion. A general group of them has to do with the Common Interest Doctrine. Then there are the documents that they waived privilege over. And then there are remaining disputes regarding the documents that are on their privilege logs.

**THE COURT:** Well, that's what I thought we've been talking about, documents on privilege.

**MR. THAKUR:** Your Honor, we will not instruct a witness to not answer based on the common interest privilege. I keep repeating the (inaudible) that -- that -- that the issue is -- was long ago moot. And if there's a problem, we're be happy to address it.

THE COURT:  All right.  By the way, there's all sorts of information in these motions -- excuse me -- in this motion, which are allegedly confidential.  Some of it didn't look very confidential to me, but nevertheless, I would prefer if we could discuss it without revealing the confidential information.  If we can't, then I will order the transcript sealed.

Is there anybody in the courtroom who -- who you don't want to hear this stuff?

MR. THAKUR:  No, Your Honor.

MS. MARAS:  I don't believe there are any issues in this motion that we need to have protected under the confidentiality provisions of the protective order.

THE COURT:  Well, I mean, the -- the names of the -- the Board of Directors, the names of your investment bank, the name of your financial service provider are all allegedly confidential.

MS. MARAS:  I think those are all -- and that's all Mformation's materials.

THE COURT:  Oh, yeah.  That's all your --

MR. THAKUR:  Your Honor, we think that we're -- we're happy to have all the items, including our motion and their motion, discussed without being under seal.

THE COURT:  All right.  Now, there are motions to seal by Defendant, which I was going grant.

I assume you want me to do that?

**MS. MARAS**:  Yes, Your Honor.  Mformation marked their privilege logs confidential and since -- because we filed those in support of these motions, that we filed an administrative motion to -- under seal.

**THE COURT**:  Okay.  So we can talk about names without fear?

**MR. THAKUR**:  Yes, Your Honor.

**MS. MARAS**:  Yes, Your Honor.

**THE COURT**:  Both counsel indicate yes.

All right.  Then -- well, here's what I thought we were talking about.  There -- there are -- there's Lehman Brothers, your investment bank.  There's Silicon Valley Bank Analytics, SVBA, one of Mformation's financial service providers.  There's Mformation's Board of Directors.

And then there are these companies who have somebody on the Board of Directors:  North Bridge, Carmel Ventures and Battery Ventures.

And I thought that -- that the -- the remaining dispute -- I -- I'm probably wrong -- was only with regard to the bank and the financial advisor, and that you've sort of made your peace on the question of the Board of Directors and these other three companies.

Yes or no?

**MR. THAKUR**:  That -- that -- that's correct, Your

Honor.

MS. MARAS:  We've made our peace with the Board of Directors.  Really our -- our -- the critical issue is communications that Mformation has had with investors outside of Board of Directors communications or potential investors.

And we do not believe that the Common Interest Doctrine applies in any way to those communications.

THE COURT:  I thought he said he's not -- he's not claiming the common interest privilege at this time.

MR. THAKUR:  That's absolutely true, Your Honor. We're not claiming the common --

MS. MARAS:  This --

THE COURT:  And so he agrees with you.

MS. MARAS:  This is the first time that Mformation has agree -- has said that they will not assert deposition objections based on the common interest privilege.

THE COURT:  Right.

MS. MARAS:  Now that that representation has been made on the record, I do not believe that there is any further dispute.

THE COURT:  Great.  So let's look at the investment bank and the financial advisor.

MS. MARAS:  I believe those issues are also moot, Your Honor.  We're not -- we were -- we were concerned about investors and potential investors.

THE COURT:  Okay.  So --

MR. THAKUR:  Your Honor, we've also produced those documents.  That's --

THE COURT:  Say that again.

MR. THAKUR:  We've produced those documents.

THE COURT:  You've produced the documents on the investment bank and financial --

MR. THAKUR:  That's correct.

THE COURT:  -- advisor?

MR. THAKUR:  That's correct.

THE COURT:  So that's (Inaudible - - due to simultaneous colloquy.)

MS. MARAS:  That's not correct, Your Honor.

THE COURT:  That's moot.  Is that what you're telling me?

MS. MARAS:  They -- they -- they alleged they produced those documents to us two days ago.  I reviewed them last night, and they are -- do not correlate to either the letter that Amar -- that Mr. Thakur referred to, a June 7th letter, nor do they correlate to the entries that are found in their opposition brief.  Specifically, I can outline the entries that we're missing.

MR. THAKUR:  Your Honor, they just simply sent us a letter that saying, "Here are the documents that are being withheld based on the common interest privilege."  We've

already (inaudible) to the Court several times over today, we're not asserting the common interest privilege.

MS. MARAS:  Your Honor, we didn't receive them in time to review them.  The first time I was able to look at them in our system was last night.

THE COURT:  Okay.  So if you feel you've been shortchanged, you'll call it to Mr. Thakur's attention, and he'll deal with it.

MS. MARAS:  Yes, Your Honor.

MR. THAKUR:  Okay.

THE COURT:  All right.  Privilege log entries 918, 945 and 965.  This is a lot of fun because there keep being amendments and updated privilege logs.

These are attachments to emails.  There are two spreadsheets and one memorandum.  I understand that the privilege claim to privilege log number 965 has been withdrawn; is that correct?

MR. THAKUR:  Correct, Your Honor.

THE COURT:  Somebody -- somebody told me that. Okay.  That leaves privilege log entries 918 and 945.

MR. THAKUR:  Your Honor -- Your Honor, also withdrawn.  No longer in the privilege log.

THE COURT:  All right.  So 918 and 945 --

MS. MARAS:  That --

THE COURT:  -- also withdrawn.

MS. MARAS: That's -- I think we haven't had an opportunity to review the documents that Mformation is claiming have been produced for that, Your Honor, but we're willing to accept his representation today.

THE COURT: That's nice. Okay. There are some privilege log entries that -- entries that do not identify a legal source. And by that I mean -- I think this means that, if you look at the log, there's nothing in the log entry that would tell you that there was a legal source involved in the creation of that document.

MS. MARAS: That's correct, Your Honor.

MR. THAKUR: Your Honor, we served an amended privilege log that has resolved that issue as well. We have -- I -- we have -- we send them a revised privilege log where -- where there is a legal advisor identified for every single one.

THE COURT: Now, wait --

MS. MARAS: Your Honor --

THE COURT: Wait a second. When did this happen?

MR. THAKUR: Your Honor, this happened after we received a motion on June 10th.

THE COURT: Well, I've got it still as a live issue.

MS. MARAS: It is, Your Honor. Exhibit 4 to our reply brief outlines -- identifies five entries from their

amended logs, for which they have still not identified a legal source.

THE COURT:  Right.  26, 38, 44 -- 499, 510 and 1375?

MS. MARAS:  Exactly, Your Honor.

THE COURT:  She says they're still live.  I'm looking at what I think is the amended privilege log.  This happens to be number 26.  And apparently there is no indication there of creation by an attorney; although, I don't know who these people are.

MS. MARAS:  That's correct, Your Honor.  Rakesh Kushwaha and Badri Nath are not attorneys.

THE COURT:  And so therefore, the explanation that its legal advice obtained regarding potential patent infringement litigation doesn't ring true?

MR. THAKUR:  Your Honor, what -- what -- what's happening in these emails is Mr. Kushwaha had conversations almost -- in almost all of those instances with myself or another law firm that was hired to -- to represent them, and then those raised questions.

And then one co-inventor would email the other inventor and would say, "I would like input on that," so we can -- we're -- if -- if what they're asking for is further information of what the original legal advice came from, Your Honor, we'll be happy to -- just like I said, if they ask us

what they want, we'd be happy to put that in.

So if they're asking us -- look, emails between Badri and Rakesh, two co-inventors -- but the first inventor spoke with an attorney and got information about the infringement allegation.  And then he said, "Can you ask the other inventor a certain question?"  And so ultimately, those emails related to attorney-client work product.

THE COURT:  Okay.  But -- but to read this, you wouldn't know that.

MR. THAKUR:  You --

THE COURT:  That's her point.

MS. MARAS:  Yes.

MR. THAKUR:  Your Honor, when they --

MS. MARAS:  Yes, Your Honor.

MR. THAKUR:  We had (Inaudible - - due to simultaneous colloquy.)

MS. MARAS:  That's our point.

MR. THAKUR:  And Your Honor, what I'm saying is this is -- how many hundreds and thousands of, you know, privilege log entries are produced --

THE COURT:  Well, at least 1375 because that one is in this motion.

MR. THAKUR:  I'm sorry?

THE COURT:  There's -- you said -- you didn't know how many privilege log entries there were.  I don't either,

but there's at least 1375 --

MR. THAKUR:  That's right, Your Honor.

THE COURT:  -- because that's one of the ones in this motion.

MR. THAKUR:  And -- and that's the thing.  We've had a very hard time communicating with opposing counsel as to what they want.  If what they're asking for is that -- what I'm offering today.

THE COURT:  Okay.  Well, this --

MR. THAKUR:  I would be happy to do it.

THE COURT:  No.  This one isn't tricky.

MR. THAKUR:  But --

THE COURT:  I mean, at least it doesn't seem to be to me.  Your privilege log entry number 26 -- and I think these other ones as well, 38, 499, 510 and 1375 -- do not give a name of a lawyer or a law firm, and so, therefore, the reader wouldn't know where you come from when you say legal advice obtained regarding potential patent infringement litigation, so that needs to be added.

MR. THAKUR:  Your Honor, we can -- we can do that.  Let's -- let's not waste anymore of your time.  We'd be happy to do it.

THE COURT:  That would be nice.

MS. MARAS:  Thank you, Your Honor.  There's just one other issue outstanding from our motion.

THE COURT:  Documents recalled in April 2010?

MS. MARAS:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  So here's some documents that were -- were produced somewhere -- seen by RIM as privileged.  They were called back by Mformation.  Time went by.  Some more were seen as apparently privileged, and they were also sought to be called back.  And there's beef over the timing of the call back effort.

MS. MARAS:  That's correct, Your Honor.  And I have a time line that may be helpful to our discussion, if you'd be interested in seeing it.

MR. THAKUR:  I have a suspicion I'll dispute the time line, but I'm happy to --

THE COURT:  Well, I -- I thought it was set out (inaudible).

MR. THAKUR:  It is.

MS. MARAS:  It is, Your Honor.  And the issue is one, they had already been put on notice, first in January, that they had an issue with privilege in their production. We notified them that there were documents that named an attorney, Leonard Chone (phonetic).  They called them back.

Then in February, again, RIM went out of its way to notify Mformation that they had some potentially privileged documents.  And specifically in my letter I wrote that they appeared to have been drafted, in whole or in part, by

litigation counsel and previous litigation counsel.  We named nine of them, but we said there -- we think there may be other ones in your production.

THE COURT:  Okay.  So they -- they wanted -- they asked back -- for the ones back that you named specifically?

MS. MARAS:  That's correct.

THE COURT:  Okay.  And -- but you made a mention that there's some other ones in there too we think, and it took a long time before they asked for those back?

MS. MARAS:  Right.  All but --

THE COURT:  Not until -- not until you actually identified them?

MS. MARAS:  The -- the recall in April was not in -- in response to a letter from RIM.  It just took them 58 --

THE COURT:  Oh.

MS. MARAS:  -- days --

THE COURT:  (Inaudible - - due to simultaneous colloquy.)

MS. MARAS:  -- to review them on their own.

THE COURT:  (Inaudible - - due to simultaneous colloquy.)

MS. MARAS:  They figured it out the third time on their own.

THE COURT:  They figured it out on their own.  Okay.

So your position would be, "Since we alerted you to the fact that there were others in there, although we didn't tell you what they were, you took too long to identify them yourself and ask for them back"?

MS. MARAS:  I think particularly in this instance, in that all but three of them actually name Mr. Thakur in the document, according to their privilege log entries, that they could have been identified very quickly and certainly not -- they did not need seven weeks.

THE COURT:  Are these are electronically stored documents?

MS. MARAS:  Yes, Your Honor.

THE COURT:  The search term "Thakur" would have helped them, wouldn't it?

MS. MARAS:  That's what -- we stated litigation counsel had been named because there were -- in the ones that we saw, we only had identified the nine.  We let them know why we thought they may be privileged.

They may have had a different position than -- than we were taking.  But we said they name -- they appear to be -- have been drafted by litigation counsel or previous litigation counsel.

THE COURT:  Okay.  So you're giving them a heads-up, and your position is that they didn't move fast enough?

MS. MARAS:  That's correct, Your Honor.  We don't

be --

**THE COURT:**  As to your heads-up?

**MS. MARAS:**  We don't believe that they satisfied Federal Rule of Evidence 502 in order to take advantage of calling back the -- the allegedly inadvertent production.

**THE COURT:**  Well, then it's the protective order, isn't it, that gives them the right to call it back?

**MS. MARAS:**  They would fall within the protective order if they gave us notice within 10 days of -- of becoming aware of the potentially privileged documents.  And we believe that by waiting almost two months that they fall outside the provisions of the protective order.

**THE COURT:**  Okay.  Well, I -- I know -- I thought that's what your claim was.

So what do you say?

**MR. THAKUR:**  Your Honor --

**THE COURT:**  You sit -- you sitting on your hands?

**MR. THAKUR:**  Your Honor, we have point-six million pages of documents produced, 55 inadvertent privilege production.  We had between February 10th and April 19th another two million pages of document production that was going on.

Number two, did we sit on our hands?  On April 17th they sent me a letter saying nine privilege documents were produced.

**MS. MARAS:** Excuse me. It was February --

**MR. THAKUR:** I'm sorry.

**MS. MARAS:** -- February 17th.

**MR. THAKUR:** February 17th. I was in New York arguing a summary judgment motion in another patent case. I got back that evening. I ordered all the -- a full team meeting of the entire legal group.

On February 19th I asked for three things to take place. One, I want all of those nine documents called back. Two, I wanted to re-examine the entire privilege process, to make sure that no other privileged document ever leaks out. We added a second attorney review to that process.

And I said as soon as the -- we have got the process done and the document production was complete and no privilege documents are produced, number three, I want you to go back and check all the production that's been done under the old system and double check. Well, when you're dealing with 700, 800,000 pages two weeks later, your attorney focus is on getting that production out.

On 4/7 when we turned back to the production -- so Your Honor, it's a matter of 40 days where we redid the whole process going forward to make sure there were no leaks, and then 40 days later we went back and looked at all our prior production to do it.

We didn't do it -- yes, they're absolutely correct.

If I had run the search to Mr. Thakur at that point that would have solved the problem, but we didn't do that way. What we did is we did a very thorough approach. We reexamined the entire privilege process going forward, implemented and produced the documents.

And then we ran this incredibly comprehensive search for all names possible, going backward, and then went through the entire privilege production one more time.

What I can tell you, Your Honor, in this effort we have spent hundreds of hours, not -- not -- it has cost the client hundreds of thousands of dollars to address these 55 documents.

**THE COURT:** Did you miss the deadline in -- in the protective order?

**MR. THAKUR:** No, Your Honor. We -- we -- we ordered the search on February -- on -- on April 7th. On April 16th, 10 days late -- nine days later we ordered the documents. So what they're trying --

**THE COURT:** I guess -- I guess the argument is that you -- you ordered the search on April -- whatever date that was -- but you -- you were on notice, because of Ms. Maras, that you had previously produced privileged documents.

**MS. MARAS:** I would also argue that Mformation was on notice because we'd already notified them in January of other privileged documents in their production.

So they not only waited from the deadline in February, they waited -- in January they were put on notice that they had an issue in their production.

**THE COURT**:  Well, I -- may -- maybe they were not as diligent as you would wish, but it sort of got you.

**MR. THAKUR**:  It -- it --

**MS. MARAS**:  I don't believe so.  It's -- it's their burden to, both establish that they were doing an appropriate privilege search and review beforehand, and that they then took reasonable steps afterwards.  That's what Federal Rule of Evidence 502 requires.

A lot of the explanation that Mr. Thakur just gave you was not in their opposition brief.

**MR. THAKUR**:  Your Honor --

**MS. MARAS**:  And I would also just make one note that, according to their litigation support specialist, at the end of the day they -- I only had identified about 400 documents or so that they needed to look at from the -- the old productions, and they could have been done well before April 7th.

**THE COURT**:  All right.

**MR. THAKUR**:  Well --

**THE COURT**:  Let -- let's just sum up here because this argument has gone all over the map.  Common interest is no longer being asserted.

**MR. THAKUR:**  Correct.

**THE COURT:**  The issues dealing with documents with -- with regard to those three investor companies, as well as the Board of Directors, as well as the bank, as well as the financial advisor are also moot.

**MR. THAKUR:**  Right.

**MS. MARAS:**  Moot to these --

**THE COURT:**  This is your motion, so if you're saying --

**MS. MARAS:**  No.

**THE COURT:**  -- yes, that's all I need --

**MR. THAKUR:**  It's their --

**MS. MARAS:**  It's -- it's my motion, Your Honor, for RIM.

**THE COURT:**  All right.  Defendant's motion.  Sorry.

**MS. MARAS:**  No problem.  And --

**THE COURT:**  Your nodding up and down doesn't count. Go ahead.

**MS. MARAS:**  Okay.  The issues with regard to investors and potential investors is moot based on representation that Mformation is no longer going -- going to assert the common interest privilege over communications with those.

**THE COURT:**  We'll put that in the order.

**MS. MARAS:**  Okay.

**THE COURT:** I'm just trying to --

**MS. MARAS:** Then yes, Your Honor, it is moot.

**THE COURT:** Okay. So what's -- what's there for me to decide, other than this last issue we just discussed about the -- the alleged delay in calling back the -- the privileged documents (inaudible)?

**MS. MARAS:** There was the issue with the privilege log entries, but based on --

**THE COURT:** Well, I (Inaudible - - due to simultaneous colloquy.)

**MS. MARAS:** -- Mr. Thakur's representation, I believe that is also moot. So the only outstanding issue right now --

**THE COURT:** He's going to spiffy up the ones that are deficient?

**MS. MARAS:** That's correct. So the only outstanding is -- is the alleged waiver in April 2010.

**THE COURT:** Which I will deal with. Thank you, Counsel. Now, I bet I'm going to see Ms. DeBruin.

**MS. DEBRUIN:** I kept trying to get up here, Your Honor. Good morning, Your Honor.

**THE COURT:** Hello. Is there anything in this motion that you -- you -- you might require to have a sealed record?

**MS. DEBRUIN:** I think we can talk about it, Your

Honor, without revealing anything that would be confidential.

**THE COURT**:  Okay.  Well, that would be my -- my desire.  I would ask that you -- you don't -- if you want to reveal information, which you have designated is confidential, that's fine, but don't reveal somebody -- the other guy's confidential.

Let's see.  There are three motions -- administrative motions to seal.  We'll grant those.  There's an administrative motion to remove an e-filed document, namely the declaration of Michael Crowley.  We will grant that.

So then we're up to Plaintiffs -- that's Mformation's motion to compel apex depositions of Jim Basillie and Mike Lazaridis.

**MS. DEBRUIN**:  Lazaridis.  Yes, Your Honor.

**THE COURT**:  As well as the de-designation of documents.  Okay.

Well, let's do Jim and Mike first.  These are the co-CEOs of Research in Motion.  We have the -- the usual arguments here about these are apex people, and you shouldn't be bothering them with a deposition.

The countervailing argument is that they're actually involved in things.  They've got personal knowledge about things that we're interested in, and we should be able to depose them.

So do I just decide, or anybody got -- tell me anything more than I've already read in the papers?

MR. THAKUR:  Your Honor, the only thing I could say is we have -- we think (inaudible).  We have advised opposing counsel that we were willing to restrict the number of numbers, because we -- we respect the fact they're CEOs, but these are people with great firsthand knowledge and so we were willing to limit the number of hours.

THE COURT:  Right.  In fact -- in fact, they're -- they've exchanged emails, or they're either senders of emails or recipients.  I forget which it is.

MR. THAKUR:  Yeah.

THE COURT:  Dealing with the subject that is of extreme interest to you?

MR. THAKUR:  That's correct.

THE COURT:  At least the way they talk about it?

MR. THAKUR:  That's correct, Your Honor.  In fact, they met with us -- ██████████████████████████ -- ████████████ --

THE COURT:  Correct.

MR. THAKUR:  -- ██████████████████████.

THE COURT:  Okay.  So you're not seriously claiming that they don't know stuff, are you?

MS. DEBRUIN:  Your Honor, I -- we are claiming, and it is true, that they don't know information that's relevant

to this patent litigation case.  Yes, they did have limited dealings with Mformation --

THE COURT:  At an earlier time?

MS. DEBRUIN:  At an earlier time, in 2001 to 2003.

The patent that's at issue here, the 917 patent, issued in 2005.  They had no dealings with Mformation concerning the patent at issue.  In fact, Mformation did not give RIM any notice of the patent prior to filing this lawsuit.

And even more important than that, Your Honor, putting aside for a minute whether they have relevant information, Mformation hasn't done its job and hasn't gone and gotten the other discovery that's available to it before they go and bother the co-CEOs of RIM.  They haven't --

THE COURT:  Like David Castell, for example?

MS. DEBRUIN:  Correct, Your Honor.  We've designated Mr. Castell as a 30(b)(6) witness on various topics, including four topics that Mformation noticed up concerning the relationship between RIM and Mformation.

THE COURT:  So --

MS. DEBRUIN:  They haven't taken his deposition.

THE COURT:  So you think they ought to do Castell first?

MS. DEBRUIN:  I think they ought to do Castell and some other witnesses and then evaluate if they do indeed

still need the co-CEOs.

THE COURT:  Oh, heck, they want them, at least to talk to them about those emails.

MS. DEBRUIN:  They may find out information from Mr. Castell and others that make them less interested in those emails.

THE COURT:  You know, the emails are interesting. Let me see if I -- if I've got this right, because it would -- or you -- you would argue that they would show, although I'm not sure they actually do, that -- that -- that there was an intent on the part of Research in Motion to do something with respect to Mformation that you're claiming they actually did?

MR. THAKUR:  Your Honor, this is not a trade secret case.  The point of those emails is not ███████████ ██████████████████████████████████████████ █████████████████████████████████.  This is not some, you know, (inaudible) -- remember they're both really small --

THE COURT:  But that's sort of old history, isn't it?

MR. THAKUR:  But Your Honor, but how -- this -- the case is about the technology that eventually -- the patent had been filed when these meetings were taking place, so the patent was in progress.  It just happened to have issued

afterwards, so the idea that they didn't know we had IP -- ██

████████████████████████████████████████████████████

█████████████████████████████████ --

MS. DEBRUIN:  (Inaudible - - due to simultaneous colloquy.)

MR. THAKUR:  -- ██████████████████████████████

████████████████████████████████████████████

██.  We want -- I mean, that's actually in deposition transcript.

The ultimate issue that broke down the dealings between RIM deciding to take our technology and license it, and ultimately deciding whether to do it itself, which is what they did --

THE COURT:  Uh-huh.

MR. THAKUR:  -- was over that issue.  ████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████, how can that not be so highly relevant?  What basis --

THE COURT:  Relevant to what?

MR. THAKUR:  Relevant to the issue of whether -- well, one, as to what the all -- all -- alternatives are, so the issue of obviousness.  To the -- the -- the quality of the patent, with respect to whether they actually willfully infringed.  And they -- they -- they've asserted that this --

all this world of (inaudible) out there.

I mean, how much more than we ask for in terms of CEO having personal knowledge?

THE COURT: Uh-huh.

MR. THAKUR: That's our position, Your Honor. I mean --

THE COURT: Yeah. I'm not sure that they actually say all that in those emails, but that would be your version?

MR. THAKUR: That is our version, and our version will be expected to (inaudible).

THE COURT: And you're going stick to it?

MR. THAKUR: Yes, Your Honor.

THE COURT: And Ms. DeBruin is going to have different take on it.

MS. DEBRUIN: Okay. Your Honor, you have picked up that these emails do not say what Mr. Thakur would like them to say.

THE COURT: Yeah, but he -- you know, that's what -- that's what lawsuits are about, and your job is to make sure that the judge or the jury understands.

MS. DEBRUIN: That's right. And -- and we're going to take on that task. It's just that our co-CEOs shouldn't have to take on that task, at least initially, until Mformation does their work with the other employees and still

determines they have a need to take the CEOs' depositions.

The CEOs did not have extensive meetings with Mformation. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. And --

THE COURT:  What --

MS. DEBRUIN:  -- and contrary to what --

THE COURT:  What -- what -- what I'm going to do is I'm going to inquire that they depose Mr. Castell first, and then I'll give them one hour each with Basillie and Lazaridis.  That's what the order will say.

De-designation of emails.  These are the emails that we've just been talking about that, apparently, are labeled -- what are they -- labeled attorneys' eyes only?

MR. THAKUR:  Your Honor --

THE COURT:  These seem pretty innocuous, other than the -- what we've just been talking about.  As a matter of fact, they -- they -- they mention some things that -- let's see.

This is your motion to de-designate the emails. The emails have -- give the identities of your investors, which in another motion here you're claiming is secret or --

MR. THAKUR:  Your Honor, we gave up that point on the other one and --

THE COURT:  That's right.  You did.

MR. THAKUR:  And --

THE COURT:  That's right.

MR. THAKUR:  -- number two, Your Honor --

THE COURT:  Okay.  You take away my ammunition on that one.  That's right.

Well, I can see where this -- these emails might well be entitled to treat as confidential, but I don't know why they would be attorneys' eyes only.

MS. DEBRUIN:  Your Honor, we would be satisfied if you would like to designate these.  We -- we would help -- we'd be happy to de-designate these as confidential --

THE COURT:  Okay.

MS. DEBRUIN:  -- and not have them attorneys' eyes only.

THE COURT:  That will be the order.

MR. THAKUR:  Your Honor --

MS. DEBRUIN:  Thank you, Your Honor.

MR. THAKUR:  -- if I might just give an explanation as to why you would like to those de-designated in entirety?

One, they don't contain any RIM confidential information.

Two, the most important is from a practical standpoint.  Our client has gone through several rounds of financing historically, and clearly, you know, it's a large -- it's almost three, 400-employee company.

But when these investors come in, they don't -- they refuse to sign an NDA, and they want to know about the merits of this lawsuit.  And frankly, we believe those emails are highly relevant to the merits of the lawsuit, and that puts us in a (inaudible) situation where we simply can't discuss that with those investors.

And it has actually created a -- a problem for us recently where we actually had to do an internal round without external investors who said, "Show us the evidence in the case," and we couldn't.

And Your Honor, there's nothing confidential in them.  I mean, it's -- I understand the pragmatism of saying, "Let's just take this issue off the table with confidentiality," but from a legal standpoint, Your Honor, RIM cannot show that they're confidential.

I mean, there is one -- even our internal employees, under the protective order, they have designated the co-inventors, the CTO, and frankly, one of the key primary decisions -- decision-maker as somebody who cannot -- who's not allowed to see the -- even confidential level stuff.

So it really is quite a problem for us, Your Honor.

**THE COURT**:  All right.  I -- the -- the order will stand as I indicated.

**MS. DEBRUIN**:  Thank you, Your Honor.

THE COURT:  You'll get an order.

(Proceedings adjourned at 11:53 a.m.)

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____   4/26/11

Signature of Transcriber      Date