Linda S. DeBruin
(Admitted to this Court on September 27, 1991)
Christopher R. Liro (*pro hac vice*)
Tiffany P. Cunningham (*pro hac vice*)
Aaron D. Charfoos (*pro hac vice*)
Meredith Zinanni (*pro hac vice*)
Maria A. Maras (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: linda.debruin@kirkland.com
Email: christopher.liro@kirkland.com
Email: tiffany.cunningham@kirkland.com
Email: aaron.charfoos@kirkland.com
Email: meredith.zinanni@kirkland.com
Email: maria.maras@kirkland.com

Marc H. Cohen (CA Bar No. 168773)
KIRKLAND & ELLIS LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 859-7000
Facsimile: (650) 859-7500
Email: marc.cohen@kirkland.com
*Attorneys for Defendants and Counterclaim Plaintiffs*
RESEARCH IN MOTION LIMITED and
RESEARCH IN MOTION CORPORATION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| MFORMATION TECHNOLOGIES, INC., a Delaware corporation,<br><br>Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>RESEARCH IN MOTION LIMITED, a Canadian corporation<br><br>AND<br><br>RESEARCH IN MOTION CORPORATION, a Delaware corporation,<br><br>Defendants and Counterclaim Plaintiffs. | Case No. 5:08-CV-04990-JW<br><br>Jury Trial Demanded<br><br>**RIM'S OPPOSITION TO MFORMATION'S MOTION FOR SUMMARY JUDGMENT OF NO ANTICIPATION UNDER 35 U.S.C. § 102**<br><br>**DOCUMENT FILED UNDER SEAL** |

## TABLE OF CONTENTS


PAGE

I. INTRODUCTION....1

II. ARGUMENT....1

A. Mformation's Motion For Summary Judgment Is Based On Misunderstandings Of The Relevant Law And Facts....2

1. RIM Has Significant Evidence, Not Merely Uncorroborated Testimony, To Show That The '917 Patent Is Anticipated By Multiple References....2

2. The '917 Patent Is Invalidated By Systems In Public Use, And So RIM Has Not Improperly Combined Documents....3

3. Mformation's Arguments For No Anticipation Are Also Inconsistent With Its Infringement Contentions....4

B. Each Of Four Prior Art References Independently Anticipates The '917 Patent....5

1. The Unicenter TNG System Anticipates The '917 Patent....5

a. Unicenter TNG Discloses "Remotely Managing A Wireless Device Over A Wireless Network."....6

b. Unicenter TNG Discloses "Verifying The Registration Information At The Server."....7

c. Unicenter TNG Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."....8

d. Unicenter TNG Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."....10

2. The Howard Patent Anticipates The '917 Patent....11

a. The Howard Patent Discloses "Transmitting Registration Information Relating To The Wireless Device From The Wireless Device To The Server" And "Verifying The Registration Information At The Server."....11

b. The Howard Patent Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."....12

c. The Howard Patent Discloses "Without A Request From The Wireless Device . . . Placing A Command For The Wireless Device In The Mailbox At The Server."....12

d. The Howard Patent Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."....13

3. The Mobitex System Anticipates The '917 Patent....13

a. Mobitex Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."....14

b. Mobitex Discloses "Without A Request From The Wireless Device . . . Placing A Command For The Wireless Device In The Mailbox At The Server." ....17

c. Mobitex Discloses "Accepting The Contents Of The Mailbox At The Wireless Device." ....18

4. The RemoteWare System Anticipates The '917 Patent....19

a. RemoteWare Discloses "Remotely Managing A Wireless Device Over A Wireless Network."....20

b. RemoteWare Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."....22

c. RemoteWare Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."....23

**III. CONCLUSION ....24**

## TABLE OF AUTHORITIES

**Cases**

*Adenta GmbH v. OrthoArm, Inc.*,
501 F.3d 1364 (Fed. Cir. 2007)................................................ 2, 3

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................ 1, 2

*Atlas Powder Co. v. Ireco, Inc.*,
190 F.3d 1342 (Fed. Cir. 1999)................................................ 2

*Finnigan Corp. v. Int'l Trade Comm'n*,
180 F.3d 1354 (Fed. Cir. 1999)................................................ 2, 3

*IP Innovation, LLC v. Red Hat, Inc.*,
Case No. 2:07-cv-447 (RRR), Slip Op. (E.D. Tex. Oct. 13, 2010) ........................ 3, 4

*Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*,
628 F.3d 1359 (Fed. Cir. 2010)................................................ 3

*Leggett & Platt, Inc. v. VUTEk, Inc.*,
537 F.3d 1349 (Fed. Cir. 2008)................................................ 1, 2

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)................................................ 4, 5, 23

*Thomson, S.A. v. Quixote Corp.*,
166 F.3d 1172 (Fed. Cir. 1999)................................................ 3

**Statutes**

35 U.S.C. § 102................................................ 2, 3, 24

## I. INTRODUCTION

This Court should deny Mformation's Motion for Summary Judgment of No Anticipation.[1] Mformation takes a scattershot approach, attacking fifteen claim limitations across four prior art references, but provides little or no support for any of its attacks. Mformation's myriad of conclusory and unsupported arguments cannot be the basis for summary judgment, particularly when RIM has provided extensive evidence that each of those references—the Unicenter TNG system, U.S. Patent No. 5,734,820 to Howard ("the Howard Patent"), the Mobitex system, and the RemoteWare system—independently disclosed each and every limitation of the remaining claims of the '917 patent and was known or in public use more than one year before Mformation filed the '917 patent application. Indeed, those four prior art references are described in detail in thousands of pages of product manuals and other documents, as well as the testimony of disinterested third-party witnesses, all of which support RIM's expert Dr. Anthony Acampora's opinion that the patent is invalid. This Court should reject Mformation's attempts to manufacture summary judgment positions by mischaracterizing or ignoring that evidence, and deny Mformation's motion.

## II. ARGUMENT

Mformation has not shown that it is entitled to summary judgment because it has not demonstrated—indeed cannot demonstrate—that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing Mformation's motion, this Court should believe RIM's evidence demonstrating invalidity and draw all justifiable inferences in RIM's favor. *See id.* at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008) ("In determining whether there is a genuine issue of material fact, we view the evidence in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant") (citation omitted). This Court's role is not to evaluate the weight of the

[1] Although Mformation has titled its motion as one for summary judgment of no anticipation, the requested relief relates only to the more narrow issues of whether Mformation is entitled to summary judgment—which, as discussed below, it is not—that each of four prior art references do not anticipate. Mformation's motion does not address any other bases under which the asserted claims may be invalid under 35 U.S.C. § 102, such as Mformation's own prior public use, a defense on which RIM has separately moved for summary judgment. (*See* Dkt. 565.)

evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact that the ’917 patent is invalid as anticipated. *See Anderson*, 477 U.S. at 249, 255.

Whether a patent is invalid as anticipated under 35 U.S.C. § 102 is a question of fact, normally reserved for the jury. *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999); *Leggett*, 537 F.3d at 1352. In this case, each of RIM’s four prior art references independently anticipates, and this Court should deny Mformation’s motion.

### A. Mformation’s Motion For Summary Judgment Is Based On Misunderstandings Of The Relevant Law And Facts.

As an initial matter, Mformation’s motion for summary judgment improperly ignores the evidence and mischaracterizes the applicable law. This Court should reject Mformation’s arguments because (1) RIM has not relied on uncorroborated testimony to support anticipation; (2) RIM has not improperly combined documents to show anticipation by systems in public use; and (3) Mformation is improperly making arguments in its motion that are inconsistent with its infringement contentions.

#### 1. RIM Has Significant Evidence, Not Merely Uncorroborated Testimony, To Show That The ’917 Patent Is Anticipated By Multiple References.

Much of Mformation’s argument in its summary judgment motion is premised on an incorrect claim that RIM is relying on uncorroborated testimony for anticipation. However, this allegedly uncorroborated testimony comes from multiple third parties who have no interest in the litigation, and is actually corroborated by numerous contemporaneous documents.

Despite Mformation’s assertion to the contrary, the Federal Circuit has held that corroboration of oral testimony is not required where evidence supporting anticipation comes from more than just one person’s testimony alone. *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007) (“[C]orroboration is required of any witness whose testimony ***alone*** is asserted to invalidate a patent . . .”) (emphasis added) (quoting *Finnigan Corp. v. Int’l Trade Comm’n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999)). Evidence corroborating oral testimony can include consistent testimony of different witnesses or consistent documents. *Adenta*, 501 F.3d at 1371. Indeed, the Federal Circuit has “not imposed an impossible standard of ‘independence’ on corroborative

evidence by requiring that every point be corroborated by evidence having a source totally independent of the witness." *Lazare Kaplan Int'l, Inc. v. Photoscribe Tech., Inc.*, 628 F.3d 1359, 1374 (Fed. Cir. 2010) (citation and internal quotations omitted). Where evidence supporting invalidity comes from more than one source, the only issue is the sufficiency of the corroborating evidence, which is analyzed under the "rule of reason" test and is a jury question. *Finnigan*, 180 F.3d at 1368-69 (citing *Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1174 (Fed. Cir. 1999)); *Adenta*, 501 F.3d at 1372; *Lazare*, 628 F.3d at 1374 (listing factors to consider in a rule of reason analysis).

In this case, as discussed in detail below, RIM and its technical expert, Dr. Acampora, have relied on testimony (in many instances, from multiple witnesses) as well as numerous documents to show that each and every limitation of the remaining claims is present in the prior art. Indeed, much of this evidence is unrebutted by Mformation's own technical expert, Dr. Vijay Madisetti. Attached as Exhibit 1[2] is a summary of the evidence, including testimony and corroborating documents, showing that every limitation Mformation raises in its motion was present in all four prior art references. Because RIM's expert has not relied on uncorroborated witness testimony, this argument cannot be the basis for summary judgment.

**2. The '917 Patent Is Invalidated By Systems In Public Use, And So RIM Has Not Improperly Combined Documents.**

RIM has shown that the remaining claims of the '917 patent are independently invalidated by each of three commercial systems in public use at the relevant time: the Unicenter TNG system, the Mobitex system, and the RemoteWare system. RIM has properly relied on multiple documents that describe the functionality of those systems. Recently, Chief Judge Rader of the Federal Circuit, sitting by designation, held that there is "no error in using multiple references to describe a single prior art system for the purpose of showing anticipation." *IP Innovation, LLC v. Red Hat, Inc.*, Case

[2] Exhibits cited in this brief as Exs. 1-60 can all be found in the Declaration of Meredith Zinanni In Support Of RIM's Opposition To Mformation Technologies, Inc.'s Motion For Summary Judgment Of No Anticipation Under 35 U.S.C. § 102 ("Zinanni Decl."), filed and submitted herewith. Exhibits cited in this brief as Ex. A-J can all be found in the Declaration of Dr. Anthony Acampora ("Acampora Decl."), filed and submitted herewith.

No. 2:07-cv-447 (RRR), Slip Op. at 9 (E.D. Tex. Oct. 13, 2010) (Rader, C.J., sitting by designation) (attached hereto as Ex. 2). There, the defendant's expert relied on multiple references to describe a prior art system in public use. *Id*. at 8. The plaintiff argued that the prior art system could not anticipate because it was a "blending of two separate articles by different authors." *Id*. Chief Judge Rader rejected that argument and held that it was permissible in establishing anticipation by a public use for defendant's expert to use "the articles to understand how the [prior art] system functioned." *Id*. at 9. As in *IP Innovation*, RIM and Dr. Acampora rely on each of the RemoteWare, Mobitex, and Unicenter TNG systems individually to show that the '917 patent is anticipated and merely use multiple documents to demonstrate how those systems functioned. Therefore, this Court should reject Mformation's argument that RIM improperly combined documents for these systems.

### 3. Mformation's Arguments For No Anticipation Are Also Inconsistent With Its Infringement Contentions.

In its motion for summary judgment, Mformation also makes arguments that are directly contrary to positions that it has taken in its infringement contentions and Dr. Madisetti's expert report. The Federal Circuit has repeatedly held that patent claims must be interpreted the same way for validity and infringement. *See, e.g., SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1316 (Fed. Cir. 2006) (noting that "claims must be construed the same way for validity and for infringement") (citation omitted). Mformation cannot attempt to cover a structure in RIM's accused products under one interpretation of its claims, but then adopt a different interpretation of the claims when attempting to save the validity of those claims.

For example, in its infringement contentions and Dr. Madisetti's infringement report, Mformation has asserted that RIM's User Config Table and the data placed therein satisfies the claim limitations of "establishing a mailbox for the wireless device at the server" and "placing a command for the wireless device in the mailbox at the server," both without a request from the wireless device. (*See, e.g.*, Ex. 3, Mar. 4, 2011 Madisetti Rep. ¶¶ 94, 96 and Ex. C thereto at 64-66.) RIM contends that Mformation's reading of the claims is improper. (*See* Acampora Decl., Ex. J ¶¶ 59, 143-44.) Nevertheless, Dr. Acampora identified structures in the prior art that meet these limitations under Mformation's strained interpretation of the claims for infringement. These include

RemoteWare [redacted], the Mobitex NCC mailbox, and the CAM database for the Mobitex system disclosed in U.S. Patent No. 6,636,489 to Fingerhut (the "Fingerhut Patent").

Mformation's summary judgment arguments that each of these structures does not disclose the "establishing a mailbox" or "placing a command" claim steps are the same as RIM's arguments as to why the User Config Table cannot infringe: the User Config Table stores configuration information relating to a wireless device and this information is not intended for delivery to a wireless device (*i.e.*, it is not a command). (*See, e.g.*, *id*. ¶¶ 143-44.)

Mformation may not have its cake and eat it too. This Court should not permit Mformation to take such contradictory positions. *See SmithKline*, 439 F.3d at 1316. In any event, as discussed below, each of the four prior art references anticipates the remaining claims of the '917 patent under a proper interpretation.

**B. Each Of Four Prior Art References Independently Anticipates The '917 Patent.**

Four prior art references independently disclose each and every limitation of the remaining claims of the '917 patent: (1) the Unicenter TNG system, (2) the Howard Patent, (3) the Mobitex system, and (4) the RemoteWare system. As discussed in detail below, RIM has presented extensive evidence demonstrating that every limitation that Mformation raised in its motion is present in each of those prior art references. (*See, e.g.*, Ex. 1.)[3]

**1. The Unicenter TNG System Anticipates The '917 Patent.**

The first system Mformation attacks is CA Technologies' ("CA's") Unicenter system.[4] CA introduced Unicenter at least as early as 1994 and released Unicenter TNG, an update, in early 1997. (*See*, *e.g.*, Ex. 4, CA_MFORM0000001-498 at 0003; Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 69:8-

[3] In this opposition, RIM addresses only the limitations on which Mformation moved for summary judgment. RIM's expert, however, has cited evidence showing that each and every limitation of the asserted claims was present in four different pieces of prior art more than one year before Mformation filed its patent application. (*See* Acampora Decl., Exs. A-G.) Mformation should not be allowed to introduce any new arguments in its reply, but if it does, RIM reserves the right to file a sur-reply to address them.

[4] CA Technologies is also known as Computer Associates. (Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 6:7-12.)

70:24.)[5] Unicenter TNG was used to [redacted] (*Id.* at 20:13-21; *see also* Ex. 6, RIM-MF2593046 at 3049; Ex. 7 CA_MFORM0010043 at 10058.) Unicenter TNG managed all [redacted] but specifically managed [redacted] such as [redacted] (Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 21:23-22:17.) The substantial evidence on which RIM relies both in its invalidity contentions and Dr. Acampora's invalidity expert report demonstrates that the Unicenter TNG system performed each of the claim limitations addressed in Mformation's motion.

**a. Unicenter TNG Discloses "Remotely Managing A Wireless Device Over A Wireless Network."**

Mformation incorrectly argues that RIM failed to show that the Unicenter TNG System "could be used, or was ever actually used, in a wireless environment." (Dkt. 547 at 7.) The evidence regarding Unicenter TNG, which includes documents and the testimony of a disinterested third-party witness familiar with the Unicenter TNG system, shows that it could—and in fact did—remotely manage devices over wireless networks, as required by the preamble of claim 1. Mformation improperly ignores this evidence.

Dr. Acampora expressed his opinion that the preamble of claim 1 was found in the Unicenter TNG system, including that it managed devices over a wireless network. (Acampora Decl., Ex. A ¶¶ 397-400; Acampora Decl., Ex. G at 2-3.) In its motion, Mformation makes the conclusory statement that RIM has relied solely on uncorroborated deposition testimony for the preamble of claim 1. (Dkt. 547 at 7.) Both RIM and its expert Dr. Acampora, however, rely upon numerous documents as well as witness testimony. (*See* Acampora Decl., Ex. G (showing the evidence on which Dr. Acampora relied as to the Unicenter TNG system on a limitation-by-limitation basis).) Thus, neither RIM nor its expert is relying solely on uncorroborated testimony.

The evidence demonstrates that the Unicenter TNG system was used to remotely manage wireless devices over a wireless network. In a July 26, 1999 Press Release, CA announced "a highly

---

[5] [redacted] (Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 24:20-25:11.)

manageable wireless application infrastructure that allows companies to rollout a new robust generation of untethered applications to enterprise mobile computing users." (Ex. 8, RIM-MF2632890 at 890.) Specifically, CA announced an initiative called TWIST that included, *inter alia*: (1) "CA's Unicenter TNG enterprise management solution, including ***the Wireless Extension for Unicenter TNG***," and (2) "PageNet's worldwide ***wireless communications network***." (*Id.* (emphasis added).) Moreover, CA partnered with the McLaren racing team and used the Unicenter TNG system to wirelessly manage numerous devices placed on McLaren racing cars. (Ex. 9, RIM-MF2640774.) Consistent with these press releases, Salvatore Lazzaro,[6] the corporate witness for CA, testified that [redacted] (Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 21:8-19, 21:23-22:4.) Not surprisingly, Mformation's expert, Dr. Madisetti, did not dispute Dr. Acampora's opinion that the Unicenter TNG system satisfies the preamble of claim 1. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶¶ 160-183.) Thus, the undisputed evidence shows that the Unicenter TNG system was used to remotely manage wireless devices over a wireless network.

**b. Unicenter TNG Discloses "Verifying The Registration Information At The Server."**

The Unicenter TNG System discloses "verifying the registration information at the server." RIM's expert, Dr. Acampora, opined that this limitation was met when the Unicenter TNG system verified the registration information sent by the device against a [redacted], as Mformation even recognizes. (Dkt. 547 at 8.) The evidence, including documents and the testimony of a disinterested third-party witness, supports Dr. Acampora's opinion.

***First***, Mformation argues that Dr. Acampora relied solely on uncorroborated deposition testimony for his opinion as to the "verifying" limitation. (*Id.*) But again, Dr. Acampora relied on documents describing the Unicenter TNG system in opining that this limitation was met. (*See* Section A.1 above; Dkt. 547 at 8; *see also* Acampora Decl., Ex. A ¶¶ 404-06; Acampora Decl., Ex.

---

[6] Mr. Lazzaro is currently the Vice President of Development at CA, the maker of Unicenter TNG, and was [redacted] (*See, e.g.*, Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 13:12-21, 19:14-16, 101:12-102:2.)

G at 3-4.) Those documents discuss in detail the [redacted] (Ex. 6, RIM-MF2593046 at 3055; Ex. 7, CA_MFORM0010043 at 10064.) Consistent with that documentation, Mr. Lazzaro testified that [redacted] (Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 58:17-59:23.) Based on those documents and testimony, Dr. Acampora opined that the "verifying" step was present in the Unicenter TNG system.

***Second***, Mformation makes a conclusory argument that Dr. Acampora's opinion somehow "defies all logic." (Dkt. 547 at 8.) There is nothing illogical, however, about Dr. Acampora's opinion. Registration information is transmitted from the device, and then the Unicenter TNG server verifies that information against a [redacted] (Ex. 6, RIM-MF2593046 at 3084; Ex. 7, CA_MFORM0010043 at 10107 ("[redacted]").) Only if that verification is successful [redacted] (*Id.*) RIM has shown that Unicenter TNG met the "verifying" step of claim 1 as a person of ordinary skill in the art would understand it.

**c. Unicenter TNG Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."**

The Unicenter TNG system discloses the claim step of establishing a mailbox for the wireless device at the server without a request from the wireless device. RIM identified multiple structures in the Unicenter TNG system that satisfy this limitation: (1) a [redacted], (2) an [redacted], and (3) the [redacted].[7] (Dkt. 547 at 8; *see also* Acampora Decl., Ex. A ¶¶ 407-411.) Mformation's arguments that these mailboxes in the Unicenter TNG system do not satisfy this claim limitation are incorrect.

---

[7] Contrary to Mformation's assertion, RIM and its expert have never identified [redacted] as a mailbox in the Unicenter TNG system. Dr. Acampora's mention of [redacted] in his report relates to his opinions as to the [redacted]. (*See* Acampora Decl., Ex. A ¶ 408.)

**i.** [redacted]

As to the [redacted], Mformation's only argument is that Dr. Acampora's opinions are based on uncorroborated testimony. This argument is incorrect because Dr. Acampora relied on both documents and testimony for his opinion that those queues meet the "establishing a mailbox" step. (*See* Section A.1 above.) For example, the [redacted] (*See, e.g.*, Ex. 11, RIM-MF2593301 at 3478; Ex. 29, CA_MFORM0003324 at 3502.) Consistent with that document, Mr. Lazzaro, [redacted] testified that the Unicenter TNG system [redacted] (*See, e.g.*, Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 100:21-102:7, 116:6-18.)

With respect to the [redacted], documents describing the Unicenter TNG system show that system administrators could send the Power On command to a computer being managed by the Unicenter TNG system using the user interface of the ManagedPC component. (Ex. 12, RIM-MF2593237 at 3278.) Mr. Lazzaro consistently testified that [redacted] (Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 242:18-243:9.)

In sum, documents and witness testimony demonstrate that the Unicenter TNG [redacted] satisfy the "establishing a mailbox" limitation.

**ii.** [redacted]

As to the [redacted], Mformation incorrectly argues that RIM has not shown that it was created without a request from the wireless device. (Dkt. 547 at 8-9.) Claim 1 requires that the "establishing a mailbox" step be performed "without a request from the wireless device," and Dr. Acampora specifically opined that in the Unicenter TNG system, the [redacted] was created without a request: [redacted] (Acampora Decl., Ex. A ¶ 408.) Indeed, documentation describing the Unicenter TNG system states: [redacted]

[redacted] (Ex. 7, CA_MFORM0010043 at 10266 (emphasis added).) This statement appears in a discussion of the [redacted] under the heading [redacted] not in a discussion about devices. (*Id.*) When viewed in that context, the term [redacted] refers to a [redacted] To the extent that Mformation disputes that interpretation of the documentation, such a dispute of fact is not properly resolved on summary judgment. RIM's evidence shows that the [redacted] was established without any request from a wireless device, and meets the "establishing a mailbox" limitation.

**d. Unicenter TNG Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."**

Mformation's argument that "RIM has failed to show that the Unicenter TNG System discloses the claim step of 'accepting the contents of the mailbox at wireless device'" (Dkt. 547 at 9) ignores the evidence, including Dr. Acampora's opinion, documents, and testimony. (*See* Acampora Decl., Ex. A ¶¶ 417-22; Acampora Decl., Ex. G at 7-9.) For example, Mr. Lazzaro testified that [redacted] (*See, e.g.*, Ex. 5, Jan. 6, 2011 Lazzaro Dep. at 132:3-133:10.) Such an [redacted] is further evidence that the device accepted the commands sent to it from the server, and is also strikingly similar to Mformation's arguments on infringement. (Ex. 3, Mar. 4, 2011 Madisetti Rep. ¶¶ 114-15 (opining that an [redacted] was evidence of "accepting the contents of the mailbox" by the device). The evidence shows that the Unicenter TNG system performed the "accepting" step of claim 1.

In sum, the evidence demonstrates that the Unicenter TNG system performed each and every limitation of the remaining claims of the '917 patent more than one year before Mformation filed its patent application. This Court should deny Mformation's motion for summary judgment of no anticipation as to the Unicenter TNG system.

### 2. The Howard Patent Anticipates The '917 Patent.

The next prior art reference Mformation addresses in its motion is the Howard Patent, which describes a system for establishing communications between a server and a wireless remote device. (Ex. 13, Howard Patent at 2:5-8, 2:53-55.) This system managed wireless "remotes 16, 18 and 20," in part, by sending data to them which could include "command[s] operable to cause the remote to execute a program" or to "override remote-specific information." (*Id.* at 2:47-49, claims 15-16.) The Howard Patent discloses every limitation of the remaining claims of the '917 patent.

#### a. The Howard Patent Discloses "Transmitting Registration Information Relating To The Wireless Device From The Wireless Device To The Server" And "Verifying The Registration Information At The Server."

Mformation's entire argument that the Howard Patent does not disclose "transmitting registration information relating to the wireless device from the wireless device to the server" and "verifying the registration information at the server" is premised on its incorrect claim that the information that is transmitted and verified in Howard relates to users and not devices. (Dkt. 547 at 10-11.) Dr. Acampora's opinion on these limitations, however, demonstrates that Mformation is incorrect. (*See* Acampora Decl., Ex. A ¶¶ 360-65.) Even a cursory glance through the Howard Patent confirms this:

- "Communications module 52 determines identification information ***associated with remote 16*** at step 202. Identification information may include a username, password, mailbox ID, or ***any other information suitable to identify or authorize remote 16***." (Ex. 13, Howard Patent at 9:23-27 (emphasis added).)
- "RSD 72 may further specify a password corresponding to each mailbox ID that must be communicated ***from the particular associated remote 16*** before security system 14 approves selected remote access to the processing and storage capabilities of host 12." (*Id.* at 5:23-27 (emphasis added).)
- "The method begins at step 400 where remote 16 successfully signs on using ***identification information particular to remote 16***[, which] . . . may include, for example, a username, a mailbox ID, a password, or any other identification information ***associated with remote 16***." (*Id.* at 12:45-49 (emphasis added).)

The Howard Patent discloses that the "remote" is a device, not a user. (*Id.* at 3:5-13.) Thus, the Howard Patent discloses that registration information relating to the wireless device is both

transmitted from the device to the server and verified at the server. (Acampora Decl., Ex. A ¶¶ 360-65; Acampora Decl., Ex. F at 1.)

**b. The Howard Patent Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."**

Next, the Howard Patent expressly discloses the claim step of establishing a mailbox for the wireless device at the server without a request from the wireless device. Mformation's conclusory argument, with no evidentiary citations whatsoever, ignores this express disclosure. Dr. Acampora has opined that the mailbox and child mailbox of the Howard Patent "with the associated data repositories are created ***without a request*** from the wireless device." (Acampora Decl., Ex. A ¶ 369 (emphasis added).) The Howard Patent explains how child mailboxes are spawned in that invention:

> Mailbox module 62 specifies the data batches in memory 22 that are accessible by remote 16 at step 228. In one embodiment, the particular data batches accessible by each remote 16, 18 or 20 are selectively differentiated from the remaining data batches in memory 22 to provide data repositories 4, 6 and 8, respectively. . . . At step 230, mailbox module 62 spawns a child mailbox module to interactively provide remote 16 with the selected access in accordance with the mailbox ID associated with remote 16. In one embodiment, the spawned mailbox module is a separate process, application, or instantiation of mailbox module 62.

(Ex. 13, Howard Patent at 10:51-65; *see also id*. at Fig. 4 ("MB SPAWNS CHILD MB TO PROVIDE THE SELECTED ACCESS").) In its motion, Mformation improperly ignores the express disclosure in the Howard Patent and Dr. Acampora's opinion. This evidence establishes that summary judgment is not appropriate with respect to the "establishing a mailbox" step.

**c. The Howard Patent Discloses "Without A Request From The Wireless Device . . . Placing A Command For The Wireless Device In The Mailbox At The Server."**

The Howard Patent discloses the claim step of placing a command for the wireless device in the mailbox at the server without a request from the wireless device. Mformation's argument again is entirely conclusory, consisting of only two sentences. (Dkt. 547 at 12.) Dr. Acampora has opined that the Howard Patent discloses this precise limitation. (Acampora Decl., Ex. A ¶ 371.) Moreover, the Howard Patent expressly discloses:

- "In one embodiment, the selected data provided to a particular remote 16 is contained in data repository 4 associated with the particular remote 16, and specified in accordance with the mailbox ID associated with the particular remote 16." (Ex. 13, Howard Patent at 11:41-45.)

- "If mailbox module 62 locates the appropriate data batches at step 338, mailbox module 62 communicates the selected data to the child communications module at step 342. The child communications module then communicates the selected data to remote 16 in a format appropriate for remote 16 at step 344." (*Id.* at 12:30-35.)
- "Communications initiated by auto connect module 64 [on the server] may include . . . commands from host 12 that cause remote 16 to execute a process . . . ." (*Id.* at 6:1-7.)

In other words, the Howard Patent expressly discloses that the mailbox module on the server, not the device, automatically (*i.e.*, without a request from a wireless device) locates data batches and puts them in the child mailbox for transmission to the wireless device. The Howard Patent itself and Dr. Acampora's opinion about that patent demonstrate that the Howard Patent discloses the "placing a command" claim step.

#### d. The Howard Patent Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."

Finally, the Howard Patent discloses accepting the contents of the mailbox at the wireless device. As with Mformation's other conclusory arguments as to the Howard Patent, Mformation ignores the disclosure of the Howard Patent as well as Dr. Acampora's opinion that this limitation is met. (Acampora Decl., Ex. A ¶¶ 374-78; Acampora Decl., Ex. F at 2.) For example, the Howard Patent discloses that: "The child communications module then communicates the selected data to remote 16 in a format appropriate for remote 16 at step 344." (Ex. 13, Howard Patent at 12:33-35.) The selected data can include "commands from host 12" that are then executed by the remote. (*Id.* at 6:1-7.) Therefore, the Howard Patent discloses the "accepting" step.

In sum, the Howard Patent discloses each and every limitation of the remaining claims of the '917 patent, as Dr. Acampora has opined. Mformation's arguments in its motion ignore those disclosures and opinions, and thus, this Court should deny Mformation's motion for summary judgment of no anticipation as to the Howard Patent.

### 3. The Mobitex System Anticipates The '917 Patent.

The third prior art reference Mformation addresses in its motion is the Mobitex system, which was a network and system first developed by Ericsson in Sweden in the 1980s that provided wireless communication services to mobile devices. In the late 1980s, a predecessor to BellSouth Wireless began operating Mobitex in the U.S, more than ten years before Mformation filed the '917

patent application. Mobitex had the ability to wirelessly manage mobile devices, using commands like "DIE" and "LIVE." (Ex. 14, RIM-MF2636850 at 7137, 7139, and 7250.) The "DIE" command prevented a device from sending user traffic, and the "LIVE" command allowed a device that previously received a "DIE" command to again send user traffic. (*Id.* at 7250.)

If a mobile device was "not active" on the Mobitex network, these commands (along with other data) were "stored in the network mailbox." (*Id.*) All of the stored data, including commands, would then be "sent automatically" to the mobile device as soon as the device became available on the network again. (*Id.* at 6898, 7030.) As a result, the Mobitex system anticipates the remaining claims of the '917 patent.[8] In addition, the Fingerhut Patent,[9] which was filed in 1997, and RIM's RAD I/O product, which was introduced in 1994, both disclose additional features for use with the Mobitex system. Those additional features further support that the Mobitex system invalidates the remaining '917 patent claims, contrary to each of Mformation's arguments as discussed below.

**a. Mobitex Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."**

First, the Mobitex system discloses the claim step of establishing a mailbox for the wireless device at the server without a request from the wireless device, contrary to Mformation's argument. Indeed, RIM and its technical expert have identified four separate structures in the Mobitex system that satisfy this claim limitation: (1) the mailbox at the Network Control Center ("NCC"), (2) the [redacted], (3) the "mailbox" at the Base Radio Station ("BAS"), and (4) the client account management ("CAM") database. (Dkt. 547 at 13-14.) Dr. Acampora has explained how each of these structures satisfies this limitation. (*See, e.g.*, Acampora Decl., Ex. A ¶¶ 167-174.) Mformation's arguments in its motion ignore or misinterpret this evidence.

---

[8] RIM contends that Mobitex anticipates the remaining claims of the '917 patent under the claim interpretation Mformation has advanced for purposes of infringement. RIM disputes that claim interpretation, but even under the proper interpretation of the claims, Mobitex, along with other prior art, renders the asserted claims obvious. (*See, e.g.*, Acampora Decl., Ex. A ¶ 540.) On summary judgment, Mformation has not challenged RIM's obviousness defense.

[9] The Fingerhut Patent was assigned to Bell South Wireless Data, the operator of the Mobitex system. (*See* Ex. 20, Fingerhut Patent at cover page.)

**i. Mailbox at the Mobitex NCC and RAD I/O Server-Side Spool Directory**

Regarding the mailbox at the NCC and the RAD I/O [redacted] the evidence shows that those mailboxes were created without a request from the wireless device. ***First***, for the NCC mailbox, Mformation ignores Dr. Acampora's expert opinion that the mailbox at the NCC "was created when the Mobitex system was implemented, and ***without a request*** from the wireless device." (*Id*. at ¶ 169 (emphasis added).) Indeed, Mformation's expert, Dr. Madisetti, did not dispute in his rebuttal report that the NCC mailbox was created without a request. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶¶ 60-62.) In addition, numerous documents describe how the NCC was created when the Mobitex system was implemented without any request from a device. (Ex. 15, RIM-MF2636198 at 6212 ("The Network Control Center includes . . . a subscription authorization manager function (SAM), where subscription information is entered, stored and distributed to the network nodes").)

***Second***, the RAD I/O [redacted] was a feature of RIM's RAD I/O product that operated with the Mobitex system. (*See, e.g.*, Ex. 16, RIM-MF2640831 at 0842; Ex. 17, RIM-MF2640326.) [redacted] (*See, e.g.*, Ex. 16, RIM-MF2640831 at 0842.) The [redacted] (*See, e.g.*, Ex. 18, RIM-MF2640934 at 0948 ("[redacted]").) This evidence shows that the both the NCC mailbox and the [redacted] were established without a request from the wireless device and satisfy the "establishing a mailbox" limitation.

**ii. Mailbox at the Mobitex BAS**

Next, the mailbox at the BAS was created without a request from the wireless device. Mformation incorrectly argues that because the BAS mailbox was a subscription feature, it was created with a request from the wireless device. (Dkt. 547 at 14.) ***First***, the mailbox at the BAS was created based on subscription information stored at the NCC (*i.e.*, on the server at the network, not

the device). (Ex. 15, RIM-MF2636198 at 6212 (stating that the NCC includes "a subscription authorization manager function (SAM), where subscription information is entered, stored and distributed to the network nodes").) If a user subscribed to the mailbox feature, the NCC would distribute that subscription information to the BAS. (*Id*. at 6212, 6215.) A mailbox would then be established at the BAS without any request from the wireless device. (*See, e.g., id*.) ***Second***, any request for the subscription feature came from a user, not a wireless device, as documents describing Mobitex (and cited by Mformation in its motion (Dkt. 547 at 14)) make clear. (Ex. 19, RIM-MF2636740 at 6837 ("Mailbox. A function in Mobitex ***to which the user can subscribe***.") (emphasis added).) ***Finally,*** Dr. Acampora has specifically opined that the mailbox at the BAS was created without a request from the wireless device. (Acampora Decl., Ex. A ¶ 168.) Therefore, the BAS mailbox satisfied the "establishing a mailbox" limitation.

**iii. CAM database in the Fingerhut Patent**

Finally, the CAM database disclosed in the Fingerhut Patent, which described an invention to be used with the Mobitex system (Ex. 20, Fingerhut Patent at 4:42-46), meets the "establishing a mailbox" limitation. ***First***, the Fingerhut Patent discloses that the CAM database, which was in place before any devices were active on the network, kept "track of all records of assigned and available UNAs [Unique Network Address]" and was informed when a UNA was assigned to a particular device. (*Id*. at 4:64-67.) The network 12, not the wireless device, transmitted the information to a gateway that "facilitate[d] the ***automated*** process of assigning a UNA to the device 5 . . . ." (*Id*. at 4:42-46 (emphasis added).) In other words, the Fingerhut Patent expressly discloses creating an entry in the CAM database for a newly assigned UNA without the device requesting that such an entry be created, or indeed without the device requesting that it be assigned a UNA at all. (*See* Acampora Decl., Ex. A ¶ 171.)

***Second***, Mformation's argument regarding information being intended for delivery to the device (Dkt. 547 at 14) is inconsistent with its own infringement contentions. As discussed in Section A.3, to the extent that Mformation is allowed to continue to contend that RIM's User Config Table infringes, then the CAM database also meets the "establishing a mailbox" limitation.

**b. Mobitex Discloses "Without A Request From The Wireless Device . . . Placing A Command For The Wireless Device In The Mailbox At The Server."**

Next, the Mobitex system discloses placing a command for the wireless device in the mailbox at the server without a request from the wireless device. RIM and its expert have identified four separate items in the Mobitex system that represent the commands placed in each of the mailboxes discussed above: (1) commands such as "DIE" and "LIVE" stored in the BAS "mailbox," (2) personal subscriptions stored in the NCC mailbox, (3) changes to the UNA assignment in the CAM database, and (4) [redacted] in the RAD-I/O [redacted] (Dkt. 547 at 14-15.) The evidence shows that each of these structures satisfies this limitation. (*See, e.g.*, Acampora Decl, Ex. A ¶¶ 175-187.)

**i. Commands stored in the BAS "mailbox"**

Mformation incorrectly argues that commands were stored in the BAS mailbox "with a specific request from the device." (Dkt. 547 at 14.) But in his expert report, Dr. Madisetti did not dispute Dr. Acampora's opinion that commands such as "LIVE" and "DIE" placed in the BAS mailbox satisfy the "placing a command" limitation. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶¶ 63-65.) Despite Mformation's own expert's apparent concession, Mformation now attempts to manufacture a summary judgment position by arguing that commands are stored in the BAS mailbox only "when the device was unavailable ***and*** had either sent an 'INACTIVE' packet to the Mobitex System or had logged out." (Dkt. 547 at 14 (emphasis added).) Mformation's argument, however, is directly contradicted by the evidence showing that commands were placed in the BAS mailbox without any request from the device.

Specifically, the Mobitex system would place commands in the BAS mailbox if the system repeatedly failed to reach the terminal when sending data without the device sending an INACTIVE packet. (*See* Ex. 14, RIM-MF2636850 at 7030; *see also* Ex. 15, RIM-MF2636198 at 6225.) Thus, information, including commands, was placed in the BAS mailbox because the system could not reach the device, not because of any request from the device. (Ex. 15, RIM-MF2636198 at 6225.) Moreover, merely sending an INACTIVE packet to the network for notification of device unavailability was not a request to place commands in the mailbox. (Ex. 14, RIM-MF2636850 at

7030 ("The terminal should deactivate itself by automatically transmitting an INACTIVE packet to the network: 1) before it is powered off. 2) when the terminal's message buffer is full and the terminal is incapable of handling more packets from the network.").)

**ii. Commands stored in the remaining Mobitex mailboxes**

As to the other three Mobitex mailboxes, Mformation's argument that the data placed in them—personal subscriptions stored in the NCC mailbox, changes to the UNA assignment in the CAM database, and [redacted]—are not commands (Dkt. 547 at 15) is contrary to the evidence. (*See* Acampora Decl., Ex. A ¶¶ 181-187.)

***First***, Mformation is incorrect that the [redacted] placed into the RAD-I/O [redacted] were not commands, as that term is used in the '917 patent. Specifically, [redacted] (*See* Ex. 16, RIM-MF2640831 at 0842; Ex. 44, RIM-MF2640451 at 0460.) This disclosure is consistent with the Court's construction of "placing a command for the wireless device in the mailbox at the server" as "storing at the server in the mailbox associated with the wireless device a code or signal that is intended to cause the wireless device to take or cease an action with respect to its functionality and other data for use by the wireless device." (Dkt. 127 at 15.)

***Second***, as discussed in Section A.3, Mformation's arguments as to the NCC mailbox and CAM database are inconsistent with its infringement contentions asserting that its claims cover RIM's User Config Table. If Mformation is allowed to continue to make such a contention for purposes of alleged infringement, the data placed in these mailboxes also satisfy this limitation.

**c. Mobitex Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."**

Finally, the evidence does not support Mformation's claims that the "accepting" step is not "specifically discussed" in either RIM's invalidity contentions or RIM's expert's report for the Mobitex system. (Dkt. 547 at 15.) Dr. Acampora explicitly explained how the contents of the various mailboxes were accepted at the wireless device:

- "This data, including the 'DIE' and 'LIVE' commands, ***was accepted by the mobile terminal*** for execution." (Acampora Decl, Ex. A ¶ 189 (emphasis added).)
- "These changes [to subscription information] ***were accepted*** and used to update the mobile device." (*Id*. at ¶ 190 (emphasis added).)
- "These [RAD-I/O] [redacted] ***are then accepted*** by the destination client . . . ." (*Id*. at ¶ 194 (emphasis added).)

Given this explicit language, Mformation's argument that the limitation is not "specifically discussed" is untenable.

Further, documentation describing the Mobitex system demonstrates that commands were accepted by the wireless device. For example, the "LIVE" and "DIE" commands were transmitted to the device in an MPAK packet. When the device received such a packet, the "Data Link Layer" on the device would notify the "Application" layer on the device that an MPAK was received. (Ex. 14, RIM-MF2636850 at 7265 (signals from the Data Link Layer to the Application layer included the "MPAK_received" signal).) The facts, which are undisputed by Mformation's expert, that commands (such as the "LIVE" and "DIE" commands in the BAS mailbox and the subscription information in the NCC mailbox)[10] were transmitted by the Mobitex system and then executed by a Mobitex wireless device, provide further evidence that such commands were accepted by the device prior to execution. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶¶ 63-65, 67-72.)

In short, the Mobitex system, as well as the invention disclosed in the Fingerhut Patent and RIM's own RAD-I/O product, performed each and every step of the remaining claims of the '917 patent. Mformation's conclusory arguments in its motion ignore its own expert's concessions and fail to show that Mformation is entitled to summary judgment. This Court should deny Mformation's motion for summary judgment of no anticipation as to the Mobitex system.

**4. The RemoteWare System Anticipates The '917 Patent.**

The final prior art system Mformation addresses in its motion is the RemoteWare system, version 3.0 of which was publicly sold and used at least as early as 1996. (*See* Ex. 21, RIM-

---

[10] In addition, Dr. Madisetti does not dispute that the [redacted] from the RAD I/O [redacted] (Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶ 70.)

MF0036090 at 6092; *see also* Ex. 22, RIM-MF2641621 at 1622.) RemoteWare was a software product manufactured and sold by XcelleNet, Inc. and later by Sybase.[11] (Ex. 23, Mar. 31, 2010 Owen Dep. at 15:1-7, 15:15-16:1, and 20:8-11.) The RemoteWare system was used to "efficiently manage remote communications and support[] the needs of a large number of corporate users" using "mobile" devices on "McGaw's AirData network." (Ex. 24, RIM-MF2609430 at 9430-9431.) RemoteWare's management of client systems [redacted] (Ex. 25, Jan. 26, 2011 Foley Dep. at 116:22-117:5; *see also* Ex. 21, RIM-MF0036090 at 6399 ("Events are RemoteWare commands that instruct the Server to complete tasks on the Server and the client.").) In 1998, Sterling Commerce acquired XcelleNet, its patents, and all intellectual property related to RemoteWare and [redacted] (*See* Ex. 23, Mar. 31, 2010 Owen Dep. at 22:20-23:7; *see also* Ex. 25, Jan. 26, 2011 Foley Dep. at 57:12-58:16.) Each version of the RemoteWare system (versions 3.0, 3.1, and CONNECT:Manage 3.0) standing alone anticipates the remaining claims of the '917 patent. (*See* Ex. 23, Mar. 31, 2010 Owen Dep. at 89:22-90:14.)[12] In its motion for summary judgment, Mformation ignores RIM's voluminous evidence that the RemoteWare system anticipates the remaining claims of the '917 patent.

#### a. RemoteWare Discloses "Remotely Managing A Wireless Device Over A Wireless Network."

First, the evidence regarding the RemoteWare system, which includes contemporaneous documents and testimony of disinterested third-party witnesses, shows that it could—and in fact did—remotely manage devices over wireless networks. Dr. Acampora expressed his opinion that the preamble of claim 1 was found in the RemoteWare system, citing numerous documents as well

---

[11] XcelleNet is now owned by Sybase through a series of acquisitions and divestitures.

[12] The Crumper PCT Patent, filed by XcelleNet, Inc., also describes features of the RemoteWare system. (*See, e.g.*, Ex. 26, RIM-MF2642084 at 2087 ("A major breakthrough in remote/mobile computing was provided with the introduction of RemoteWare Versions 1.0-1.4 by XcelleNet, Inc., Atlanta, Georgia, assignee of the present invention.").)

as the sworn testimony of two disinterested third-party witnesses. (Acampora Decl., Ex. A ¶¶ 244-50; Acampora Decl., Ex. D at 1-3; Acampora Decl., Ex. E at 2-3.) Mformation's expert, Dr. Madisetti, did not dispute Dr. Acampora's opinion that the preamble was present in the RemoteWare system. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶¶ 124-144.)

Faced with its own expert's concession, Mformation makes the conclusory statement that RIM has relied solely on uncorroborated deposition testimony. (Dkt. 547 at 16.) As discussed in Section A.1 above, however, testimony is not uncorroborated if it is consistent with documents or the testimony of other witnesses. As to RemoteWare, even a cursory review of the documents and deposition testimony shows that Mformation's argument is wrong because the RemoteWare system was being used to remotely manage wireless devices over a wireless network years before Mformation filed the application for the '917 patent in 2001.

For example, a March 14, 1995, Business Wire Press Release stated that RemoteWare was designed to "effectively manage the flow of information between an organization's central computing enterprise and field personnel, business partners, customers or suppliers," and through the alliance between Xcellenet and McCaw, could be used with McCaw's AirData network. (*See, e.g.*, Ex. 24, RIM-MF2609430 at 9430.) Indeed, RemoteWare enabled application developers to "develop and implement new wireless applications easily for use over McCaw's Cellular Digital Packet Data (CDPD) network, called AirDataSM." (*Id.*) Sybase's corporate representative, Joe Owen, similarly testified that RemoteWare was [redacted][13] (*See, e.g.*, Ex. 23, Mar. 31, 2010 Owen Dep. at 33:19-34:1, 34:15-35:9.) And Chris Foley, a former Director and Systems Architect for Sybase, the company developing the RemoteWare system, testified that [redacted][14] For example, the RemoteWare system was used over [redacted]

---

[13] Joe Owen testified as a corporate designee of Sybase—owner of XcelleNet, the maker of the RemoteWare system—as well as in his personal capacity. (Ex. 23, Mar. 31, 2010 Owen Dep. at 26:16-27:16.) He is currently the Vice President of Engineering at Sybase and [redacted] (*Id.* at 20:18-21:2.)

[14] Chris Foley testified about the features and functionality of the RemoteWare system pursuant to a subpoena from RIM. (Ex. 25, Jan. 26, 2011 Foley Dep. at 11:15-17.) Mr. Foley was a systems architect at Sterling Commerce, the company that purchased Xcellenet, the maker of the RemoteWare system. (Ex. 28, Dep. Ex. 731 at 2.) During his tenure, he was [redacted]

[redacted] (*See*, *e.g.*, Ex. 25, Jan. 26, 2011 Foley Dep. at 75:17-76:15.) Numerous other documents and testimony show that this limitation was present in versions of the RemoteWare system that were in public use well over a year before Mformation filed for its patent application. (Acampora Decl., Ex. A ¶¶ 245-50; Acampora Decl., Ex. D at 1-3; Acampora Decl., Ex. E at 2-3.) Therefore, the evidence shows that the RemoteWare system met the preamble of claim 1.

**b. RemoteWare Discloses "Without A Request From The Wireless Device . . . Establishing A Mailbox For The Wireless Device At The Server."**

Next, the RemoteWare system established a mailbox at the server for the wireless device without a request from the device. Three structures in the RemoteWare system met this claim limitation: (1) the RemoteWare outgoing queue, (2) RemoteWare [redacted], and (3) the CONNECT:Manage outgoing queue. (Dkt. 547 at 17; *see, e.g.*, Acampora Decl., Ex. A ¶¶ 264-270; Acampora Decl., Ex. D at 4-5; Acampora Decl., Ex. E at 5-6.)

***First***, for both the RemoteWare and CONNECT:Manage outgoing queues, Mformation's only argument is that RIM has relied solely on uncorroborated deposition testimony to show that those queues were established without a request from the wireless device. Mformation is wrong. (*See* Section A.1 above.) The RemoteWare documentation discloses that an outgoing queue was created during installation of the RemoteWare system and was used to store outgoing messages intended for delivery to remote devices. (*See, e.g.*, Ex. 22, RIM-MF2641621 at 2074; Ex. 27, RIM-MF2641402 at 1430.)

Consistent with this documentation, Mr. Foley testified that the RemoteWare outgoing queue was [redacted] (and thus without any request from the wireless device). (*See*, *e.g.*, Ex. 25, Jan. 26, 2011 Foley Dep. at 204:20-205:12; *see also* Ex. 27, RIM-MF2641402 at 1430.) In addition, similar to the RemoteWare system, the CONNECT:Manage system also

---

[redacted] (Ex. 25, Jan. 26, 2011 Foley Dep. at 18:17-20:2.)

maintained an outgoing queue [redacted]. (*See, e.g.*, Ex. 23, Mar. 31, 2010 Owen Dep. at 90:7-14; Ex. 25, Jan. 26, 2011 Foley Dep. at 57:9-58:16.) Numerous other documents and testimony show that these queues were established without any request from a wireless device. (Acampora Decl., Ex. A ¶¶ 264-66, 268-70; Acampora Decl., Ex. D at 4-5; Acampora Decl., Ex. E at 5-6.) Indeed, Mformation's expert, Dr. Madisetti, did not dispute Dr. Acampora's opinions that the RemoteWare outgoing queue and the CONNECT:Manage outgoing queue met this claim limitation. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶ 139.) Therefore, the evidence shows that the RemoteWare and CONNECT:Manage outgoing queues were established without a request and meet this limitation of claim 1.

***Second***, Mformation argues that RIM has not shown that any information stored in the RemoteWare [redacted] was "ever intended for delivery to the wireless device . . . [and] that any information that could possibly be a 'command' . . . is stored in these [redacted] . . . ." (Dkt. 547 at 17.) But as explained in Section A.3 above, this argument is the same as RIM's argument as to why RIM's User Config Table cannot infringe the '917 patent. (*See, e.g.*, Acampora Decl., Ex. J ¶¶ 143-44.) Mformation should not be permitted to argue two different meanings for its claims, one for the infringement and the other in attempting to show that the claims are not invalid over the prior art. *See, e.g.*, *SmithKline*, 439 F.3d at 1316.

#### c. RemoteWare Discloses "Accepting The Contents Of The Mailbox At The Wireless Device."

Finally, Mformation erroneously argues that the "accepting" step is not "specifically discussed" in RIM's invalidity contentions or RIM's expert's report. (Dkt. 547 at 17-18.) ***First***, Dr. Acampora explicitly stated: "Sessions in the 'outgoing queue' that were pending delivery to a client were then transmitted from the server to the client. . . . Once those sessions were sent to the client, ***the client accepted the sessions***." (Acampora Decl., Ex. A ¶ 285 (emphasis added).) Given this explicit language, Mformation's argument that the limitation is not "specifically discussed" is simply wrong.

***Second***, the RemoteWare documentation expressly discloses "initiat[ing] a connection to the client" from the server, "processing" commands, and then "executing" those commands on the

device. (Ex. 21, RIM-MF0036090 at 6257; Ex. 22, RIM-MF2641621 at 1785.) Consistent with this documentation, Mr. Foley testified that [redacted] (Ex. 25, Jan. 26, 2011 Foley Dep. at 141:12-24.)

***Finally***, Mformation's own expert, Dr. Madisetti, does not even dispute that the RemoteWare system delivered commands (such as electronic software distribution) from the server to the device and executed those commands on the device. (*See* Ex. 10, Mar. 25, 2011 Madisetti Rep. ¶¶ 141-43; *see also* Acampora Decl., Ex. A ¶¶ 278, 290.) The undisputed facts, that commands were transmitted and executed in the RemoteWare system, provide further evidence that such commands were accepted by the device prior to execution. Therefore, the RemoteWare system performed the "accepting" step of claim 1.

In sum, RIM, both in its invalidity contentions and its expert's report, pointed to contemporaneous documents and the testimony of disinterested third-party witnesses describing the operation of the RemoteWare system as it was publicly used more than one year prior to Mformation filing the application for the '917 patent. That evidence establishes that the RemoteWare and CONNECT:Manage systems performed each and every step of the remaining claims. Mformation's conclusory attorney argument in its motion, which ignores its own expert's concessions, falls far short of showing that it is entitled to summary judgment. This Court should deny Mformation's motion for summary judgment of no anticipation as to the RemoteWare system.

## III. CONCLUSION

For all of the foregoing reasons, RIM respectfully requests that this Court deny Mformation's Motion for Summary Judgment of No Anticipation Under 35 U.S.C. § 102 because there exist numerous genuine issues of material fact.

DATED: August 1, 2011

KIRKLAND & ELLIS LLP
Respectfully submitted,

/s/ *Aaron Charfoos*

Linda S. DeBruin
(Admitted to this Court on September 27, 1991)
Christopher R. Liro (*pro hac vice*)
Tiffany P. Cunningham (*pro hac vice*)
Aaron D. Charfoos (*pro hac vice*)
Meredith Zinanni (*pro hac vice*)
Maria A. Maras (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: linda.debruin@kirkland.com
Email: christopher.liro@kirkland.com
Email: tiffany.cunningham@kirkland.com
Email:aaron.charfoos@kirkland.com
Email:meredith.zinanni@kirkland.com
Email: maria.maras@kirkland.com

Marc H. Cohen (CA Bar No. 168773)
KIRKLAND & ELLIS LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 859-7000
Facsimile: (650) 859-7500
Email: marc.cohen@kirkland.com
*Attorneys for Defendants and Counterclaim Plaintiffs Research In Motion Limited and Research In Motion Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify on this 1st day of August, 2011 that a copy of the foregoing was filed electronically through the Court's CM/ECF system, with notice of case activity automatically generated and sent electronically to all parties.

DATED: August 1, 2011

KIRKLAND & ELLIS LLP
Respectfully submitted,

/s/ *Frank Carlow*
Frank Carlow
Intellectual Property Legal Assistant
Linda S. DeBruin
(Admitted to this Court on September 27, 1991)
Christopher R. Liro (*pro hac vice*)
Tiffany P. Cunningham (*pro hac vice*)
Aaron D. Charfoos (*pro hac vice*)
Meredith Zinanni (*pro hac vice*)
Maria A. Maras (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: linda.debruin@kirkland.com
Email: christopher.liro@kirkland.com
Email: tiffany.cunningham@kirkland.com
Email:aaron.charfoos@kirkland.com
Email:meredith.zinanni@kirkland.com
Email: maria.maras@kirkland.com

Marc H. Cohen (CA Bar No. 168773)
KIRKLAND & ELLIS LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 859-7000
Facsimile: (650) 859-7500
Email: marc.cohen@kirkland.com
*Attorneys for Defendants and Counterclaim Plaintiffs Research In Motion Limited and Research In Motion Corporation*