Pages 1 – 125

              UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

              BEFORE THE HONORABLE JAMES WARE

MFORMATION TECHNOLOGIES, INC., a   )
Delaware corporation,              )
                                   )
Plaintiff/Counterclaim Defendant,  )
                                   )
  vs.                              ) NO. C 08-04990 JW
                                   )
RESEARCH IN MOTION LIMITED, a      )
Canadian corporation, and RESEARCH )
IN MOTION CORPORATION, a Delaware  )
corporation,                       )
                                   )  San Francisco, California
Defendants/Counterclaim Plaintiffs.)  Monday
                                   )  September 26, 2011
_____)  9:15 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**         Foley & Lardner LLP
                          150 East Gilman Street
                          Madison, WI  53701-1497
                          (608) 258-4293
                          (608) 258-4258 (fax)
                     **BY:  ALLEN A. ARNSTEN**

                          Foley & Lardner LLP
                          3579 Valley Centre Drive, Suite 300
                          San Diego, CA  92130
                          (858) 847-6700
                          (858) 792-6773 (fax)
                     **BY:  JUSTIN E. GRAY**
                          **SHAWN E. MC DONALD**

(Appearances continued on next page)

Reported by:     Lydia Zinn, CSR #9223, RPR, CRR
        Official Reporter – U. S. District Court

APPEARANCES CONTINUED

**For Plaintiff**              Foley & Lardner LLP
                              321 North Clark Street, Suite 2800
                              Chicago,IL  60654-5313
                              (312) 832-4363
                              (312) 832-4700 (fax)
                         BY:  **LISA M. NOLLER**

**For Defendant**             Kirkland & Ellis LLP
                              300 North LaSalle Street
                              Chicago, IL  60654
                              (312) 862-2218
                              (312) 862-2200 (fax)
                         BY:  **AARON CHARFOOS**
                              **LINDA S. DEBRUIN**
                              **MICHAEL DALEY KARSON**
                              **MARIA A. MARAS**

                              Kirkland & Ellis LLP
                              950 Page Mill Road
                              Palo Alto, CA  94304
                              (650) 859-7052
                              (650) 859-7500 (fax)
                         BY:  **MARC H. COHEN**

**ALSO PRESENT:**       **ROBERT BARR**

                        **TODD DE LAUGHTER**

                        **FRANK GENG**

                        **ANTHONY S. KIM**

                        **RAKESH KUSHWAHA**

                        **BARBARA A. PARVIS**

THE CLERK:  Calling Civil 08-4990, M. information *Technologies versus Research in Motion, Limited, et al.*

Counsel, come forward and state your appearance, please.

MR. THAKUR:  Good morning, your Honor.  This is Amar Thakur, with Foley & Lardner, lead counsel for Mformation Technologies.  I am joined here by my partner, Shawn McDonald; my partner, Allen Artnsen; my partner, Lisa Noller; and my colleague, Justin Gray; and Ruben Rodriguez, in the back.  I'm also joined here by my client, Todd DeLaughter, who is the CEO of Mformation; and Dr. Rakesh Kushwaha, both the CTO and the co-inventor of the lead patent.  And I am also joined by Mr. Robert Barr.  He is a professor at University of California, Berkeley.

MR. COHEN:  Good morning, your Honor.  Marc Cohen, from Kirkland & Ellis' Palo Alto office.  With me is Linda DeBruin, who you've met before; from our Chicago office, Aaron Charfoos.  And from Research in Motion we have, in the back, Ms. Barbara Parvis, and also Mr. Tony Kim, and Ms. Paula Cauche (phonetic), and Frank Geng.

THE COURT:  Very well, I want the Clerk of Court to announce his appearance.

THE CLERK:  Anthony Bowser.

THE COURT:  The reason I had him do so is that this is Mr. Bowser's last motion.  He served quite well with

Judge Patel for many years, and is leaving the court.  And I wanted to acknowledge his great service.

Now, we hope to have him back.  His leaving the court is actually due to a lot of the budget shortfalls we're experiencing as a nation, and it is affecting our court.  And we always want to acknowledge the effect that it has on individuals, as well.

I am also today acknowledging Chris Campbell, who is today here in his last calendar as one of my law clerks.  He previously served as law clerk with Judge Vaughn Walker.  And I was fortunate enough when Judge Walker retired to have him join my staff.  And I've been well served by him during that period of time.  So I wanted to acknowledge his presence on the record.

It's always nice to have clients here.  It makes me feel like I ought to adjourn this law-and-motion session, and go directly to a settlement conference; see if we can resolve this case.

You've given your lawyers -- it seems to me -- a lot of resources to work on what is a well-briefed set of motions. And that's always beneficial to the Court, because it helps me to understand some of the legal issues that, even if they are not decided on this motion, help me to understand what the trial is going to be like in this case, if one is necessary.

I asked my staff to give you just a period of time

each to address these motions, and to focus your motions on particular ones that were of interest to the Court.  I'm at a loss to know what those are.  Why don't you give me that listing that you're expecting to address?

MR. THAKUR:  We could pass you a copy of the order.

THE COURT:  Thank you.

(Whereupon a document was tendered to the Court)

MR. COHEN:  What we could do is -- we've reached some agreements.  You asked us to meet and confer on the ordering and the timing.  I thought we'd tell you that.

THE COURT:  Thank you.

MR. COHEN:  So the plan will be, on the first motion, Mformation will go first.  That's Mformation's motion of -- I'll have you --

MR. THAKUR:  Mformation's motion of no anticipation.  It's the 102 motion.

MR. COHEN:  And the second motion, RIM will go first.  And that's the public-use summary-judgment motion.

Third motion, Mformation will go first.  And that's the 112 motion.

And then the fourth motion is the marking motion; the presuit-damages motion.  And RIM will go first on that one.

MR. THAKUR:  If I may just add a slight correction, I think on the second motion, we said RIM's motion of no public use -- there's actually -- we're combining RIM's motion and

Mformation's motion of no public use at the same time. So it will be heard as one motion, since the subject matter is overlapping.

**THE COURT:** Very well.

**MR. COHEN:** And then the other issue that we discussed ahead of time is confidentiality, because we do have people in the courtroom today. I've reviewed Mformation's slides, and I think you've had a chance to review our slides. Neither of us see a reason to exclude people from the courtroom because of, you know, RIM's confidential information, if there is any; but there is an issue of third-party confidentiality.

There are two third parties that -- their depositions were taken. And that would come up with the anticipation motion. That would be Computer Associates, and Sybase. We reached out to both of them. Computer Associates gave us approval; that there's no need to clear the courtroom, for that confidential information which came -- I couldn't really identify the confidential information.

What they've done is they've designated their whole deposition transcript as confidential. Computer Associates doesn't have a problem, but Sybase -- they didn't get back to us. And so it is not clear to us what Sybase's position is. And I wanted to bring that to your attention.

There is some Sybase deposition testimony that will show up in our slides. I know it at the Court's discretion

whether or not the Court has to exclude people from the courtroom because of that, but I wanted to bring that to your attention.

**THE COURT:** Well, these are open proceedings. And I don't intend to take a roll to see who's here.

And I guess I don't have a full appreciation of what Sybase's objection might be, if they've -- there is a protective order under which they've taken advantage to designate the entire deposition as confidential, without regard to whether it is or it is not?

**MS. DE BRUIN:** That's correct.

**THE COURT:** Is there someone here representing Sybase?

**MR. COHEN:** No, there's not. Mr. Charfoos did reach out to them; let them know about the hearing coming up, if you want to direct --

**MR. CHARFOOS:** Yes, your Honor. We did take the deposition of two Sybase employees: Mr. Owen, and Mr. Foley. The entire deposition transcript was designated confidential by Sybase's in-house counsel.

I've reached out to him last week. He was not able to reach the businesspeople to agree that, in fact, we could de-designate that material. I explained that your Honor may not require us to close the court. And he said, of course, if your Honor is not going to require us to close the court, we

could move forward with the information that was contained within the slides and the briefing that you have, but he just couldn't reach his business side to clear the confidentiality and the full --

THE COURT:  These slides -- do you have those on some tangible media that I could keep?

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  Why don't we do that?  I'll allow you to use it, unrestricted.  We'll seal the transcript, subject to kind of a review by this third party of any portion that they might seek to have protected in some way.  And we'll set up some process for getting that done; and after that, the transcript can be opened again.

MR. CHARFOOS:  Thank you, your Honor.

THE COURT:  All right.  So as you proceed, feel free to -- I take it that, since you've given me four areas, some of it you're sharing.  You're going to divide your time evenly within those four, or should we worry about keeping track of time?

MR. COHEN:  Well, we were going to be keeping track of each other's time and our own time.

THE COURT:  All right.  Very well.  I like that.

MR. COHEN:  And hopefully we can get that worked out.

THE COURT:  You are ready to proceed?

MR. THAKUR:  Yes, your Honor.  I have two copies of

our first motion.  I may as well, at this point, give you two copies of each motion.

**THE CLERK:**  There you go.

(Whereupon a document was tendered to the Court)

**THE COURT:**  Thank you.

**MR. THAKUR:**  Thank you.  Your Honor, first of all, I also want to acknowledge people who are leaving this court, especially due to financial limitations.  And we wish them well; you as well (indicating).

Your Honor, on the Mformation motion for summary judgment of no anticipation, I want to focus on, sort of, the key legal concept, which is that, for them to prove anticipation, they have to show that every element of the claimed invention must be identically shown.  Obviously, the key focus there being every element, and identical showing.

Much of their piece of the prior art deal with testimony of witnesses.  We have a unique situation here in this case, your Honor.  Three of the four pieces of prior art are actually products.

Well, what RIM chose to do is not actually produce those products and use them as a basis to say that there was public use or anticipation.  They brought in witnesses to say what happened ten years ago.  And so this witness -- this photograph, I think, is apropos.  What we have is witness saying this truck had air bags ten years ago.  What they didn't

do was bring in the truck with the air bag.

Well, one might argue that the trucks were lost.

Well, that's actually not the case, your Honor.

Let's focus on:  What are the four pieces of prior art?

The four pieces of prior art are Computer Associates' Unicenter, a Howard Patent, an Ericsson's Mobitex system, which is basically like Verizon Wireless -- it's the network software -- and Sybase's RemoteWare; four multibillion-dollar companies with products that were commercialized and sold extensively.

But they didn't choose to bring those products here, your Honor.  They chose to cite to thousands of pages, and witnesses who corroborated about what they recalled ten years ago, but I will focus on each one of those quickly.

Computer Associates -- it's a product for administration of laptops.

The second one is Howard Patent.  It's a patent that discloses how a user may remotely gain access to resources of a server, or for storage, and for processing capabilities.  The Howard Patent is probably pretty analogous to what we would think of today as Cloud computing:  Dumb remotes -- not dumb intellectually, but dumb capabilities.  And then they would reach the resources of a server, and have excess storage; excess processing capability.  And in all respects, the Howard

Patent is the exact opposite of what the '917 Patent is about, which is giving the server control over the remote device.

The next, obviously, the carrier system software. This is exactly I didn't Mformation's technology was needed.

And the last one being Sybase.

Quick sort of comment. And then I will get into digging into the details. What we have is nonanalogous prior art. Of course, words are going to overlap. There are going to be some concepts that are the same, but what we will focus on, obviously, is the missing element. And there are numerous missing elements from each one of their pieces of prior art.

And, your Honor, this slide, hopefully, will show you the way as to where we're going. On top is the four pieces of prior art that RIM is alleging as anticipatory. And on the left is the claim elements that we believe were missing.

Your Honor, we don't need to prove all of those elements are missing. All we need to prove is that one of those elements is missing to each one of those prior-art references. And, your Honor, especially with a couple of steps -- for example, the accepting step -- we believe there is no question of doubt that each one of those elements is missing from the four pieces of prior art.

So let's start with the California Computer Associates Unicenter file. The first element that is missing is the verification for registration system at the server.

Lydia Zinn, CSR, RPR
Official Reporter - U.S. District Court
(415) 531-6587

They have a document that says there's a concept of Auto Discovery. And they have a witness testimony, who's testified that that was implemented through an excluded list.

The question I ask this Court to consider is: When does excluded list equal registration?

And I gave an analogy of what would be an example of an excluded list versus registration.

An American citizen proudly carries an American passport to leave and enter this country. Anyone can leave and enter this country, so long as they're not on the excluded list. That is not registration.

Registration is creating a relationship between the server and the device, because at that point, the server controls the device.

Your Honor, the next, obviously, element on Computer Associates that is missing is that, without a request from the wireless device establishing a mailbox with a wireless device at the server. The Unicenter product consisted of modules, as is common for software. The first two modules -- ObjectView and ManagedPC -- there is no disclosure of temporary queues. The only thing we had is Mr. Lazzaro saying such temporary queues existed.

And, your Honor, I'll get to the case law at the end, about how there is a reason why courts have corroboration. If witnesses could invalidate patents based on testimony, alone,

your Honor, we basically would have no patents, because there is no shortage of witnesses who, for the right amount of encouragement, for the right amount of personal interest, for the right amount of payment, as was the case in this case, by RIM -- they will say what is necessary.

The next question is:  In a store-and-forward queue, the Event Management, Performance modules, they describe the Unicenter documentation.  It is controlled at the server.  There is no requirement of a request for the device.

In any case, your Honor, the first point is, for those two -- ObjectView and ManagedPC -- Mr. Lazzaro's testimony is uncorroborated.  And for the other two modules, the request is from the "you," which comes from the device.

The technology, your Honor, I will keep emphasizing, is about the server controlling the device.  That is what gives the company --

**THE COURT:**  Let me -- I understand the force and effect of your argument with respect to corroboration.

And here we have, in opposition to the motion, a declaration by someone who you don't argue is unqualified to render an opinion with respect to these matters, and who testifies that various steps in the patent are practiced by these other devices.  Is your argument that his testimony is based upon his testimony, only, and not based upon an examination of the anticipatory reference?

MR. THAKUR:  It will vary in instances.  There are some instances -- and I will specify exactly what. Dr. Acampora has not expressed an opinion at all.  So all we have standing there is Mr. Lazzaro's testimony.  And what we have, clearly, in this instance, is Dr. Acampora saying that he has reviewed the excluded list, and he believes that's sufficient.

THE COURT:  Now, so let's -- let me see if I understand your argument.  If he has examined the product, and he comes to an opinion whether or not a particular part of the patent is present in that product, do you consider that corroborated, or uncorroborated?

MR. THAKUR:  Your Honor, it's the rule of reason.  So the question is:  Is the expert's position on -- with respect to particular testimony and documentation a reasonable position to take?

What Dr. Acampora does in almost all instances is just says, "It's present," and cites to thousands of documents, without specificity.  And, your Honor, we believe in those instances you should not give weight to Dr. Acampora's opinion. If he says --

THE COURT:  Well, wait, wait.  I was listening for the word "corroborated" or "uncorroborated" in your answer.  So do you regard that as corroborated, or uncorroborated?

MR. THAKUR:  Your Honor, I would say that it can

corroborate.  The question is:  Does it corroborate, based upon the rule of reason?  Is it supportive enough?

THE COURT:  So now if it is corroborated, then the question becomes:  Is it appropriate for me to grant summary judgment, or should the trier of fact make a judgment as to whether or not it's reasonable?

MR. THAKUR:  Your Honor, the question is:  In several of the elements that I talk about, for each one of the pieces of prior art, there is at least some elements that Dr. Acampora did not opine on.

THE COURT:  I understand that.

I'm taking you down the track where we've agreed that he has reference to some product, and it is corroborative; but then the question, as I understood your argument, is whether or not it's reasonable for the Court to use that -- his opinion, as well as the corroborative reference -- as finding that there's no anticipation.  And so that was what I was bothered by, as to whether or not that, as a matter of law, is something the Court can decide, or whether I've got to leave that up to the fact finder.

MR. THAKUR:  Your Honor, as a matter of law, you can make a reasonable decision.  Otherwise, in every motion, all we would need is an expert to stand here, regardless of how absurd their position was, simply say, "This document or these set of thousands of documents support it."

THE COURT:  "Absurd" is a strong word.  Is it your argument that his opinions are absurd?

MR. THAKUR:  Your Honor, frankly, as an advocate, I do believe in some instances his opinions are completely unmeritorious.  I prefer the word "unmeritorious" over "absurd."

THE COURT:  All right.  Go ahead.

MR. THAKUR:  All right.  Your Honor, I think your key point is well taken.  So I would turn to the area where Dr. Acampora is completely silent.  So one of the steps is the "accepting" step of the Unicenter product.  Mr. Lazzaro testified that the device would acknowledge messages from the server.  We have a witness who says there is an acknowledgment capability, without support by the documentation.  RIM never points to any document that says that.  And Dr. Acampora was silent on this.

Your Honor, as a matter of law, you cannot read out an essential element of the claim.

So, in response to where you were discussing, "Well, what about Dr. Acampora," this would be an example of a situation where Dr. Acampora has no opinion, and we have solely uncorroborated testimony.

THE COURT:  Let me slow down on this one.  So he testifies that there is an acknowledgment --

MR. THAKUR:  Correct.

**THE COURT:**  -- from the device, correct?

**MR. THAKUR:**  Correct.

**THE COURT:**  And if there is, that would or would not, in your argument, constitute acceptance?

**MR. THAKUR:**  If there is, based on how -- he didn't disclose how the acknowledgment was.

**THE COURT:**  I understand, but if it is, is that accepted?

**MR. THAKUR:**  It could be accepted.

**THE COURT:**  And so your argument is the Court needs to examine his declaration to determine whether or not he explains how it acknowledges?

**MR. THAKUR:**  That's Step 1, correct; but Step 2 is: Pure testimony, alone, wouldn't be enough.  You would need some document to corroborate that there was an acknowledgment.

**THE COURT:**  I see.  So that may be the previous conversation we were having.

In other words, you read his declaration as not having examined the document which shows the acknowledgment?

**MR. THAKUR:**  Correct.

**THE COURT:**  And so that's absent.  And there is no -- if I can find a document -- if he relies on a document, then that would create a factual issue; but if there's no document showing acknowledgment, he simply says, "In my opinion, there is acknowledgment," that's the problem?

**MR. THAKUR:**  That's the problem in this case, correct.

**THE COURT:**  Thank you.

**MR. THAKUR:**  Your Honor, so I'll turn, in the interest of time, to the next piece of prior art, which is the Howard Patent.  And this is a patent, as I discussed earlier, that's quite the first to field in all regards.  This is a patent that deals with a remote user -- whether or not they're using a desktop or a laptop -- using the laptop, trying to get access to a server for excess capabilities:  Processing, storage.

A very great, typical example of that would be dialing up to Google e-mail, where the storage is sitting in a back-end server.  A user name and a password is entered.

Your Honor, I doubt there is a person in this room who has not gone on a website, and put in a word -- a user name and a password to access a website.

What RIM is arguing is that user name, password, and mailbox I.D. constitutes transmitting registration information related to the wireless device.  That is a key distinction here.

The patent is about controlling devices.  It's not about controlling -- the '917, Mformation's patent -- it's about controlling devices.  It has nothing to do with users accessing power.  So that information relates to the user, and

it does not relate to empowering the server.

So this would be another example of where you don't need to look at Dr. Acampora's report, because he just blatantly says, "user name and password is relating to the device," where the patent makes it abundantly clear.  And anyone with any practical knowledge of how users log onto the Internet and gain access to the Cloud would know that that is the case.

**THE COURT:**  Well, I was worried about whether or not I needed to construe the Howard Patent to decide this one.  I looked at it.  And so that the question becomes whether or not what happens in the Howard Patent constitutes registration information relating to the device, if what is transmitted are user name, passwords, and I.D. kind of information.  Has the Howard Patent been the subject of any construction by a court?

**MR. THAKUR:**  Not to my knowledge.  I do not believe so, your Honor; but I would just emphasize the word "user name" and "password" is used in everyone's daily vocabulary when we access the Internet.

**THE COURT:**  Well, but then the question becomes: What is sent?

And if that is part of a process by which there is a registration, then perhaps it is practicing that step.

**MR. THAKUR:**  It does, but it only accesses the -- if that was the -- it does not send information specifically for

the device registered, because the whole point of the Howard Patent is you can use that access any way you so choose.  So if -- as I've explained, the laptop and the desk where -- you couldn't do that if it was relating to the device.

The idea is:  I know I can check Google e-mail from your computer if you would grant me access.  I can do it from my laptop; from my iPad.  Those are examples of what we can do.  Clearly, no information that is required for registration is going from the device.  Otherwise, you wouldn't have access.

The Howard Patent is inherently about -- about empowering a user.

**THE COURT:**  As opposed to the device.  And the device, under Howard, is not identified or registered at all?

**MR. THAKUR:**  Correct, because the '917 Patent is about the wireless -- this is about companies controlling their employees' devices.  So it's the exact opposite of what Howard is about.

Your Honor, obviously, I'm going to, in the interest of time, sort of focus in on what I think the -- clearly, the arguments are that are the strongest.

In the Howard Patent, your Honor, they also talked about commands replacing repositories for the mailbox module.  The commands that are discussed in Howard have nothing to do with commands for controlling the device.

So again, your Honor, from what Howard -- I access

the device.  I have a Google mail -- big mailbox sitting there.

Right?  Now, they maybe meet, where the Google mailbox may say,

"Okay.  Videos are going to be put in a

child module."

(Reporter requests clarification)

**MR. THAKUR:**  So in this, I sign up to Google.  I see

my laptop; my account at the server.  And the server says I

need to access the video.

The video, unfortunately, requires Flash, as a

hypothetical.  My dumb device does not have Flash.  So what the

server will do is it will send me the technology:  The Flash

update.  We've gone onto the Internet, and where we don't have

certain clicks.  And the server provides us those capabilities.

So that is what happens.

So there's the idea that a command is coming from the

server to the user for capabilities, but this is only done

because the cycle is initiated by the user, where the server

may have to do some things at the device to make it enabled;

but that does not deal with placing a command without a request

from a wireless device.

The key is:  Where did the request start?

The request started at the user.

**THE COURT:**  You know, one of the -- one of the

features of this whole motion that somewhat was of concern to

the Court is that this is a detailed attack on the expert, but there was no expert tendered on your side to say, "In my opinion, this device does not practice without a request from the server."

MR. THAKUR:  Your Honor, we -- well, actually, I would say we did have -- we have an expert report that says that.  The reason we did not, in some of these instances, cite citations or a declaration from our expert is because I believe the document speaks for itself.  There is no question -- so we have our expert that says that.  We have their expert; but the point, your Honor, is:  At some point, this Court has to be the gatekeeper from arguments going to the jury that have no merit.  Some of these points are just clearly contrary to what the fact --

THE COURT:  It might be clear to you, but it wasn't as clear to the Court.  And what I often find myself doing is trying to understand very technical information from two sides presenting argument.

Now, at least you have, here, a circumstance where RIM has tendered someone who does an analysis; states an opinion.

And what I'm hearing from the motion is that opinion's no good; but it's all legal argument or lawyers' argument, as opposed to someone of equal stature saying, "Here is why this argument is no good," on a technical level.

And it tends to make me stand back and say,

"Okay.  Perhaps what you're saying is

right, but I need to have someone" --

-- because the trial won't be one person testifying.
It will be two experts who are facing one another.  And if I
had the two sides, and both were agreeing, clearly, summary
judgment.

If one is disagreeing with the other, no summary
judgment.

And so I'm put in a position of one talking, and the
other one not saying a word.  That tends, to me, to say no
summary judgment, as well.

**MR. THAKUR:**  Right.  And, your Honor, what I will
continue to do, as we did here, is highlight for you where
there was no report; but each one of these elements, for
example, the accepting step -- there is no -- there's no basis
for support for the accepting step.

And so maybe, in the interest of time, focus on the
accepting step from the Howard Patent, which is applicable to
all of them.  What they say is the child communications module
that communicates the selected data remote in the format
appropriate to the remote -- the selected data can include
commands that are executed.

What they're saying in the Howard Patent is
transmission plus execution must exclude -- include acceptance.

The patent discloses three steps.

Below, your Honor, I've got a sort of a hypothetical that would explain to you.  A lady there blows her nose, and passes the bug to the gentleman.  He has now received the bug. He immediately gets sick from the bug.  And at that point, he's, if you will, executed the virus.

That does not equal acceptance.  There is transmission and there is execution, but you cannot read out the acceptance step from the claim.

And that is what RIM is asking you to do for each and every single one of the four pieces of prior art.

**THE COURT:**  Well, depends on how you define accepting.

**MR. THAKUR:**  Well, your Honor, accepting is a separate step.  The claim uses the word "receipt."  The claim uses the word "transmit," "acceptance."  And it receives -- the word "execution."

A command is delivered to the device.  The device just could not -- does not just dumbly execute it.  In our patent, the command -- it looks at the command and decides whether to execute, or not.  There is an affirmative step in the acceptance process.

**THE COURT:**  Have I construed acceptance?

**MR. THAKUR:**  You have not, your Honor.  And neither party requested construction of the word "acceptance," or

believed it was necessary prior to this.

I don't believe the word "accept" -- I mean, accepting means accepting.  It sort of becomes circular if I say -- I look at the word dictionary, and it says, "Acceptance equals receipt with knowledge."  At some point, then, you have to say, "Well, do I need to acknowledge receipt?"

Simple words like "receipt," "acceptance," "execution," your Honor --

**THE COURT:**  But that -- it depends on what the inventor meant by "accepting," because even in your hypothetical situation, in order for the disease to be transferred, there could be mechanisms in the other human that rejects the disease, and therefore, it's not accepted.

And what you're calling "execution" does, in some sense of the word, require the other body to accept and be affected by what is transmitted by the sneeze.

So what I'm suggesting is that -- and I saw this on a couple of instances on the motion -- it might be necessary for the Court to give a definition, because the inventor could have meant "accepting" to be simply transmission; that it wasn't a circumstance where wireless device could reject the information.  Maybe they meant "acceptance" as a positive step that could be rejected, which is your argument; but that's a matter of construction, isn't it?

**MR. THAKUR:**  Your Honor, you're at liberty to do so,

but I believe the word "acceptance" is an essential element, your Honor.  I don't believe you're at liberty to --

THE COURT:  I'm not saying it's not an essential step.  I'm saying what's the definition saying it's an essential step doesn't help me to know what the definition is.

MR. THAKUR:  You're asking me to interpret English word.  At some point, there are words that say -- like "receipt" or "transmission" -- do I need to say more, when those words are commonly understood by people of ordinary skill in the art.  Neither party believed that the word "accepting" would not be understood.

THE COURT:  But it has many definitions.  What did the inventor mean by it?

MR. THAKUR:  Your Honor, what the inventor meant is that there would be a receipt.

THE COURT:  I could say that.

MR. THAKUR:  Sorry.  I understand, your Honor, but I -- I guess I would say I will leave it to you to appropriately interpret the word "acceptance."

THE COURT:  All right.  I understand your position.

MR. THAKUR:  Your Honor, we want to be efficient in our timing, so I will leave you have with the slides on the Ericsson.  We have, essentially, the same argument.

I do want -- there's one little question on Ericsson Mobitex, which is a little bit different than the acceptance

step.  I believe that's the key basis for which you should grant our motion in its entirety.  The one difference is on the M -- in the Ericsson prior art that identified this MPAK_received signal as a basically accepting step.

I want to emphasize -- I know this Court is concerned about where Dr. Acampora has spoken, and where he's not.  And I've been rigorous in identifying where he was silent.  He was silent in the acceptance step in the entirety of the piece of prior art.

And they refer to the MPAK signal.  First of all, the documentation that they've cited makes no explanation as to the word MPAK_received; but again, I cite you to the words "received."

And Claim 9 of the '917 Patent expressly deals with a situation where acceptance is sufficient.  There is no acceptance.  What they are, therefore, doing is asking this Court to read out the acceptance step.  And, in this particular piece of prior art, we believe they should not be able to do so.

And then, focusing finally, your Honor, on the Sybase piece of prior art, we have the same situation.  They argue that transmission plus execution must include acceptance.

Your Honor, and so, based on that, in the interest of efficiency, I rest my motion, and present it to the Court for consideration.

**THE COURT:**  Very well.  Give me your name again, Counsel.

**MR. CHARFOOS:**  Yes, your Honor.  My name is Aaron Charfoos.

Your Honor, I think you hit on a key issue with respect to Mformation's motion.  This is a highly intensive fact inquiry that does involve experts on both sides.  I will point out to you, your Honor, though, as we go through -- and we've pointed this out in our briefing -- that in many instances, Mformation's expert has offered no opinion in rebuttal to Dr. Acampora's opinion that particular claim limitations are there.  So, in many instances, Dr. Acampora's opinion will go unrebutted at trial by Mformation's expert.

In any event, your Honor, Mformation's motion should be denied.  There are a significant number of genuine issues of disputed fact.  And it suffers from two fundamental problems.

First, they misstate the law of corroboration.

And, second, as your Honor has identified, Dr. Acampora has submitted a declaration.  He has opinions that each of the four pieces of prior art that render the claims invalid.  And he has thousands of documents, and thousands of pages of documents -- excuse me -- in support of that opinion, which he reviewed, in addition to the testimony of the witnesses.

Mformation chose to take on four prior-art references

in a total of 14 limitations; in some instances, devoting no more than two sentences to their -- to their attack on Dr. Acampora's opinion.  The corroboration issue does not touch on all of the limitations in all of the patents; it's limited to a total of five, but the standard that Mformation is trying to put forward is not the right standard.  There is no impossible standard that absolutely everything that a witness says must be independently corroborated by a separate piece of evidence.

The rule-of-reason analysis, which we cited to your Honor in the *Lazare* court, looks to whether or not the pertinent evidence creates a sound determination of the credibility of the witness' story.  And if we look at the rule -- the eight factors of the rule-of-reason analysis, your Honor, which we have in the slide presentation before you, each of these factors weighs in RIM's favor.

In particular, I'd point you to Factor Number Four. There is no contradiction or impeachment by information that any one of these witnesses said anything that was incorrect. All of the testimony of these witnesses was correct.  It's consistent with the architecture.  It's consistent with the functionality.  And, very, very importantly, virtually everything these witnesses said is corroborated by documentary evidence.

I'll quickly go here to paragraph 399, your Honor,

which is one of the paragraphs that information suggests

Mformation suggests is not, in fact, corroborated and this

deals with remotely managing in the Unicenter TNG system.

Here we have the actual paragraph. And, to be sure, we do see citations to the deposition testimony of Sal Lazzaro; but the very next paragraph, your Honor, says,

"For additional evidence, see

Exhibit G."

I have on the next slide, your Honor, Exhibit G, which, on a limitation-by-limitation basis shows every document and, in many instances, the actual citation to that particular document, which support our -- support Dr. Acampora's opinion.

And here, just using this one as an example, we can see on the next slide that there are, in fact, a significant number of contemporaneous documents which show that Computer Associates was used to remotely manage wireless devices.

I won't belabor the point, your Honor, but continuing on, we provided an example for RemoteWare, where Mformation says that the paragraph in Dr. Acampora's report is not corroborated by evidence.

Once again, we pointed your Honor to the exhibits. And we have additional documents supporting that information.

**THE COURT:** Well, the challenge that the motion presents is for RIM to show the Court, because it's your burden of proof, right? They serve this up as a motion for summary

judgment, but it's RIM's defense.

MR. CHARFOOS:  Correct.

THE COURT:  And so RIM bears the burden to prove the defense by clear and convincing evidence.

MR. CHARFOOS:  Correct.

THE COURT:  And so, at the same time as I'm critical of the plaintiff here for not providing any information in response to the declaration of your expert, it is fair, if, indeed, there is a lack of basis for the opinion, that I don't need anything from their side in order to grant the motion.  Do you agree with that?

MR. CHARFOOS:  Correct, your Honor.

THE COURT:  All right.  So they don't have any burden at all.  You have the entire burden.

MR. CHARFOOS:  But all we need to show in response, your Honor, is that there would be a genuine issue of disputed fact upon which our expert could satisfy the burden of the clear and convincing evidence.  And --

THE COURT:  Right.  And if the -- if the evidence before the Court is simply the opinion -- in my opinion, it would satisfy this element -- that's insufficient.

MR. CHARFOOS:  Correct, your Honor.  And in fact, though, we never rely on just that.  We always rely -- and we have provided the Court with a significant 60 exhibits, which are just a sample of what Dr. Acampora relied on in the

documents, which actually corroborate the witnesses' testimony.

THE COURT:  So that's what I -- as I read through this, I was tempted to say,

"If I were designing the world of summary judgment, I would have those two people here in front of me.  And I'd listen to them hard.  And I'd listen to the two sides try to convince me that there is no issue here.  They're both agreeing on something; or they're not seeing something that is necessary to be seen."

It's quite difficult to do that.  That's what the trial's all about, but trials of these kind sometimes challenge lay jurors to figure this out.  So I do see some benefit in having this issue laid out -- the issue of anticipation -- because it requires a very careful technical analysis.

So I'm not -- I'm not satisfied that I have from either side a basis of doing anything, other than deferring this issue to a later point in time.

I realize that you're not making a motion for summary judgment of anticipation.

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  So that's not lost on me, but what I'm advised is, if I don't see a basis for that particular reference being cited and the jury having to study it, I can

kick it out of the case.  Is there some way for me to get there, short of having to study these very technical documents and figure it out for myself?  Because it's very difficult to essentially, even with the citations you're giving me -- to understand that.

Perhaps I should have a neutral expert go through this whole process, and advise the Court as to whether or not there is an anticipatory reference here.

**MR. CHARFOOS:**  And, your Honor, I'd like to make sure that we understand that there are two issues, I think, which are facing the Court.  The first is the corroboration issue, and whether or not the testimony of a noninterested third-party witness that's been sufficiently corroborated, such that Dr. Acampora can rely on this that testimony.

The second are a number of elements that Mformation contends are not found in the prior-art references.

And it's very telling, your Honor, that nearly all of Mformation's motion is solely attorney argument.  In fact, even their presentation they've provided to you is attorney argument.

Mr. Thakur suggested that the Howard Patent relates to Cloud computing, but he never provided you any indication that the Howard Patent does, in fact, relate to Cloud computing; and it doesn't.

It's not sufficient for Mformation simply to say --

their lawyers to come in and simply say, "It's just not there."

They still have to show that there is no genuine issue of disputed fact.

And in that case, on both points, the question of whether or not this evidence is corroborated -- again, there's no impossible standard.  You look at the witnesses' testimony as a whole to determine, under a rule of reason, whether it's corroborated.

We have provided this Court with significant corroborating evidence.  And Mformation has not challenged that anything that those witnesses say is incorrect.  So the Court can rely on the testimony of those witnesses as appropriate.

The question of whether or not whether that has been sufficiently corroborated is generally a question that's reserved for the jury.

On the other hand, your Honor, with respect to the actual claim elements, themselves -- and again, we've provided your Honor with slides that include everything; but Dr. -- or Mr. Thakur got up here, and he made a number of representations to your Honor about what is and is not in Dr. Acampora's report which are simply incorrect.  He finished, for example, by saying that Dr. Acampora has no -- no conclusion that the Mobitex reference accepts the contents of mailbox.

And if we can, switch to the Elmo, please.

I did -- in fact, we do have a copy, your Honor, of

Dr. Acampora's expert report, which has been previously submitted to this Court in support of *Daubert* motion.  And we can see here that it says -- and this is referring to the Mobitex network --

"This data, including DIE and LIVE commands, were accepted by the mobile terminal for execution."

And he provides several pages of discussion, in detail, of what happens when all of these things occur.  And, in fact, we have significant information to support his opinion.

**THE COURT:**  But you've got the same problem, though.  If I send a LIVE or DIE command, and the device lives or dies, depending upon what the command is, your argument is:  That means that that command was accepted, correct?

**MR. CHARFOOS:**  It's a little bit different than that, your Honor.

Can we turn to Slide 34, please?

And, your Honor, I realize that Mr. Thakur said -- this is a document which Dr. Acampora doesn't specifically cite.  He actually does include this document in his materials; but here, we see that not only is it transmitted, and not only do we know that the command is executed, but we also know that the device acknowledges that it received the command and accepted it.

**THE COURT:**  Why?  Because of the return?

**MR. CHARFOOS:**  Because it returned around MPAK_received notification back to the server.

**THE COURT:**  How do you know that's MPAK_received?

**MR. CHARFOOS:**  Because that's a command that we can see in this particular document going back to the network, your Honor.  I can provide a longer explanation of the document which we've provided in the materials.

**THE COURT:**  No.  I believe you could; it's just that that's code.  It's language that's at some level for purposes of instructing what happens in this device.  And again, it -- I think that, in some sense of the word, acceptance is presumed if you execute the demand.  If you have a device that has no choice but to execute the command, the question becomes:  Is that a device that has practiced acceptance?  Because if acceptance is given a definition of "able to accept, or able to reject," something that always executes the demand might not be practicing the process of acceptance.  That's -- that's why I say it's a claim-construction issue.

Now, I may be totally off base, because perhaps the inventors meant "acceptance" meaning "received," or they meant "execution," but they could have meant processing in some way to decide whether I need it, or not, or what I am going to do with it.  That's a claim-construction issue.

And so in neither case am I rejecting this as the

ultimate analysis.  I hesitate to suggest that there's more work to be done here by the Court or by you; but I'm just unable -- I'll tell you -- to look at this unaided by the assistance of experts to explain it to me.  And I realize that, in some sense, you've tried to do that, but you've tried -- both sides -- too much here, I think.

And it leaves me kind of wanting to wait and see how those two people play out, as opposed to deciding anything at this point.  That's actually to your favor.  I understand.  I'm talking to the wrong side in saying that.

MR. CHARFOOS:  Thank you, your Honor, very much. That is our point.  This is Mformation's motion.  To be sure, at trial we have to show by clear and convincing evidence that, in fact, the references are anticipated; but it is their motion.  And they have to show that there is no genuine issue of disputed fact.  And on all of these issues, there is at least a genuine issue of disputed fact.

And, in fact, if I could pick on one thing that your Honor said, you said, "in accepting processing."  And I realize it was sort of an off-the-cuff remark, but --

Could you turn to Slide 39?

And again, this is our expert.  Dr. Acampora has relied significantly on documents.  And we've tried to provide you with just an example here, but we can see that in one of the documents he relies on -- and this is, again, for the

RemoteWare reference -- for accepting, we see that in Step Eight we initiate a connection. In Step Nine we start processing ESD events; processing the events, themselves; determining what to do. And in Step Ten we see that they're executed. The three-step process which Dr. -- or Mr. Thakur suggested needed to occur -- we have exactly right here.

We also see in a number of other instances that things like -- without a request from the server establishing a mailbox, Dr. Acampora shows that the mailbox is the outgoing queue, and specifically shows that that's created at the time of installation. It could not be done with a request from the wireless device.

So with respect to Mformation's burden, your Honor, they cannot simply come in and say,

"They haven't shown it."

-- because we return and say,

"We have corroboration for each of these witnesses. And Dr. Acampora's opinions are supported by significant documentary evidence on each and every point."

**THE COURT:** But is a separate database the same as a mailbox?

**MR. CHARFOOS:** In this instance, the outgoing queue in the RemoteWare system -- and this is something, your Honor,

that Dr. Madisetti, with respect to the outgoing queue, did not challenge Dr. Acampora's opinion that the outgoing queue is a mailbox in the RemoteWare system; but this outgoing queue stores all of -- they're called "sessions" in RemoteWare, but it's essentially a command.  All of the commands going to the wireless device -- that outgoing queue unequivocally is created at the time of installation.  And Mformation hasn't challenged whether that is, in fact, true.

And it's important to remember, your Honor, that these are systems that we're talking about.  And, as Judge Rader said in the *IP Innovation* case, we can rely on multiple references to describe how the system worked.  And, based on all of those, we do know how the system worked.

Your Honor, if there's anything else in particular, I'd be happy to address it.

THE COURT:  No.  I'm pleased to have heard both arguments on this anticipation.  As you might anticipate from my comments, I'm bothered by, at this point, taking away from the trier of fact the question of anticipation, because I'm not satisfied at this point that, as a matter of law, I've found sufficient basis for finding that these references should not be put in front of the trier of fact.

This is -- this is tantamount to a motion to strike particular references.

The one question I had, because I didn't go back and

look, are these four that are being cited to me the only anticipating references?

MR. CHARFOOS:  Yes, your Honor, I believe that's correct.

THE COURT:  So any these that I get rid of, I can shorten the trial.  Is there any -- well, I should ask it over here.  Is there any one of the anticipating references that you find more forceful than the others?

MR. THAKUR:  That I find more forceful?  Your Honor, the more forceful argument -- it's completely missing an element.  Your Honor, I think the Unicenter has got an excluded list.

THE COURT:  The which?

MR. THAKUR:  The Unicenter has got an excluded list, which -- there's no way that constitutes --

THE COURT:  So if -- what I need to do just to do my work is -- so if I study Unicenter, that would be time well spent, in your opinion, as perhaps finding a reference that I can exclude, because it doesn't even address some of the elements?

MR. THAKUR:  Correct.  And I believe the other one is the Howard Patent, your Honor.

THE COURT:  Howard.  All right.  Well, so you got away with two.  And you're satisfied that you've done your best, through your expert, to set forth for the Court what

about Howard and Unicenter are anticipated?

**MR. CHARFOOS:**  Absolutely, your Honor.  And I would -- just following up on what Mr. Thakur said, there's really -- it's entirely attorney argument whether the excluded list is a verification, or not.  And that is an issue with which our expert has an opinion on, and which there is a dispute about.

**THE COURT:**  Thank you.

**MR. CHARFOOS:**  Thank you, your Honor.

**MR. THAKUR:**  Your Honor, I'll rest on this motion.

**THE COURT:**  Very well.  Let's move on to the second.

**MS. DE BRUIN:**  Good morning, your Honor.  Linda DeBruin.  And I'm going to address the public-use motions.  I'm going to address three particular points.

One, I'm going to talk about the admissions from Mformation that support RIM's motion for invalidity based on public use.

Two, I'm going to discuss the excuses that Mformation gives, as it tries to avoid those admissions.  Judge Lloyd has already heard that, and has rejected Mformation's attempts to withdraw those admissions.

And, third, I'm going to address another issue raised by Mformation; and that is that the provisional provides the priority date for the patent, so that escapes from the public-use invalidity.

First, starting with the admissions that we have from Mformation, there's a December 9, 2010, deposition; a 30(b)(6) deposition of Dr. Kushwaha.  At that deposition, Dr. Kushwaha was designated as Mformation's designee talking about reduction to practice.  One of the questions he was asked was,

"Did the prototype that was

demonstrated on July 24th, 2000, include

every element of Claim 1 of the

'917 Patent?"

He said that it did.

He was also asked when the first time was that every element of Claim 1 was in a prototype.

He said it was June of 2000.

He also provided other testimony necessary for our public-use defense; that is, that this was for commercial purposes, and that it was under no obligation of confidentiality.

Mformation has not raised any challenge to those two points.

**THE COURT:**  Now, Counsel, do you make a distinction between whether or not every element was present in a single public prototype as of a particular date, and whether or not every single element was demonstrated on a particular date?  Do you make a distinction between those two, or not?

**MS. DE BRUIN:**  We have testimony on both points,

your Honor.  And we have admissions from Mformation, including admissions in the briefing, that those were -- those elements were described at this demonstration, regardless of whether they were demonstrated or not.

THE COURT:  That's not my question.

I'm listening hard to see whether or not you make a distinction between a prototype in which every element is present for the public-use doctrine whether or not all of those elements have to be demonstrated, or would it be sufficient, in your argument, for them to be present, but not demonstrated, and yet be in public use?  That's the -- that's what I'm trying to hear.

MS. DE BRUIN:  One I believe it would be sufficient for them to be present, but not explicitly demonstrated; but, two, we have evidence that's undisputed that they were all demonstrated.

THE COURT:  That one's easy, if they're all demonstrated.

So present, alone, is sufficient under the public use -- you have a case that stands for that?

MS. DE BRUIN:  Well, similar to the corset case, where a corset was considered to be in public use, even though it certainly couldn't be seen when worn under a woman's undergarments.

THE COURT:  I'm sorry.  Was this a public

demonstration of the corset?

MS. DE BRUIN:  It was found to be a public demonstration of the corset.

THE COURT:  Any other authority?  I hesitate to go that far back.

MS. DE BRUIN:  Your Honor, the cases that we cited in our briefing -- in particular, on our reply briefing -- address this; address this point.

THE COURT:  Go ahead.

MS. DE BRUIN:  Moving to the next slide.

So, based on the admissions that we have from Dr. Kushwaha, there was an invalidating public use on July 24th of 2000.  And that comes before the critical date for the patent, which is August 10th of 2000.

Now, what does Mformation -- what did Mformation do and what did we do following this December 9th deposition?

First, on December 14th -- so, five days after the deposition -- RIM sent to Mformation some amended invalidity contentions, and asked for Mformation's approval to file them.

Mformation refused to give that approval, saying that Dr. Kushwaha needed to review the deposition transcript, and provide an errata.

Finally, more than 30 days later, on January 24th, Dr. Kushwaha and Mformation submitted an errata to Dr. Kushwaha's December 9th deposition.  That errata completely

rewrote Dr. Kushwaha's 30(b)(6) deposition testimony.

In addition, on that same day Mformation sent a revised -- a second amended six supplemental interrogatory response concerning RIM's interrogatory asking for the reduction-to-practice date. Although up until this date -- up until January 24th, 2011 -- Mformation had consistently, through six sets of interrogatory responses, said that the Claim 1 of the '917 Patent was reduced to practice by June of 2000, it now told RIM, along with Dr. Kushwaha's errata, that in this revised interrogatory response, the Claim 1 wasn't reduced to practice until sometime perhaps even as late as September of 2001, after the '917 Patent was even filed.

On February 3rd -- excuse me -- RIM took Dr. Kushwaha's individual deposition, asking about the errata sheet at that deposition. One thing that RIM learned was that Dr. Kushwaha had looked at some source code. That source code had never been produced to RIM in this litigation, despite having always been in Mformation's possession, and having been provided to Mformation's counsel back in November; at least as early as November of 2009.

Following Dr. Kushwaha's deposition, Mformation for the first time produced this source code to RIM, on February 8th.

And on February 14th, RIM moved to strike Dr. Kushwaha's errata sheet for the December 9th deposition.

Now, what did Mformation have to say in response to that motion to strike?  They argued to Magistrate Judge Lloyd that Dr. Kushwaha had been confused.

Magistrate Judge Lloyd, however, would have none of that.  And, in his order granting RIM's motion to strike the errata sheet, Magistrate Judge Lloyd said that Kushwaha did not equivocate or express confusion in providing the Federal Rule of Civil Procedure 30(b)(6) deposition testimony in question; and he granted RIM's motion to strike.  That was on July 20th.

Despite Magistrate Judge Lloyd's order -- and, your Honor, this order from Magistrate Judge Lloyd is sufficient basis to deny Mformation's motion for summary judgment because their motion relies on the errata sheet, on the testimony of Dr. Kushwaha being as it's stated in the errata; but despite Magistrate Judge Lloyd's order on August 1st, Mformation is still arguing to this Court, in opposition to RIM's motion, that Dr. Kushwaha was confused. That issue has already been addressed.

Now, Magistrate Judge Lloyd struck the errata sheet.

Mformation is trying to rely on other -- what it says to be contradictory -- statements by Dr. Kushwaha; trying to correct, still, his 30(b)(6) deposition from December 9th.

First, they point to certain statements that he made at an earlier deposition:  April 20th of 2010.  And they say those create a disputed issue of fact.

Well, we address those at the December 9th, 2010, deposition. And I have up on the board here -- and you do not have this slide -- I apologize -- in your packet, your Honor; but Dr. Kushwaha was asked by my colleague, Mr. Charfoos,

"So let me ask the question very
clearly, Dr. Kushwaha, because we've got
two different testimonies here today. My
question to you is: When was the first
time that every element of the Claim 1 of
the '917 Patent was present in a single
prototype?"

And he said,

"June of 2000."

He was carefully questioned at the December deposition. Any inconsistencies from his prior deposition were raised with him. And he had the opportunity to clear that up. What he said on December 9th should stand. And Mformation cannot create a disputed issue by looking back to the earlier testimony.

Mformation can also not create a disputed issue by looking at Dr. Kushwaha's testimony from his February individual dep., where he was asked about the errata sheet. That was merely questioning him about why he was making the errata-sheet changes. That information -- that deposition testimony -- should be struck, for the same reason that

Magistrate Judge Lloyd struck the errata.

Mformation's undisputed testimony is that June 2000, the prototype had all the claim limitations.  Now, Mformation raises an issue not only saying that Dr. Kushwaha's confused, but argues that Dr. Kushwaha's testimony -- its own 30(b)(6) designee on the topic of reduction to practice -- was not corroborated.

Well, in our brief, your Honor, we address why corroboration is not necessary for testimony such as Dr. Kushwaha's; but in any event, it was corroborated.  And it was corroborated by a contemporaneous document.  I have on the slide some deposition testimony from Dr. Kushwaha concerning a June 12, 2000, document.  He was asked about this also in his December 9th deposition, and he testified that that document showed that the prototype had all the claim limitations.

So RIM has come forward with undisputed evidence. And that evidence -- that testimony from Dr. Kushwaha -- is corroborated.

Next slide, please.

So Mformation's admissions concerning June of 2000 and later July demonstration should stand.

Now, one of the other excuses that Mformation gives is they point to this belatedly produced source code.  It's important to note that this source code is dated no later than May of 2000.  That simply is not inconsistent, and does not

create a disputed issue of fact with Dr. Kushwaha's testimony that the prototype did not include all of the limitations until June of 2000.

So we have public demonstration on July 24th; a prototype that includes all of the limitations on June 1st. And, as of May -- as of the end of May, we have the software that Mformation has now belatedly produced, including all but two of the limitations.

They're saying that the limitations on sending the information from the device to register, and also the establishing a connection based on a threshold condition are not precedent; but that's not inconsistent; doesn't create an issue of fact with Dr. Kushwaha's admissions.  And, indeed, it's a red herring.

Next slide, please.

**THE COURT:**  Was there, in the -- I have not read his deposition, but in that initial deposition, were there questions that went through each of the elements, and had him say, as a 30(b)(6) witness, that each particular element was present -- let's just use that term -- in the prototype?

**MS. DE BRUIN:**  Yes, your Honor.

Could we have the slide?

And what I'm going to do, your Honor, is hand up for the Court -- I think it would be helpful for the Court to have a full transcript of Dr. Kushwaha's December 9th, 2010,

deposition.

THE COURT:  Presuming it's not in all of these other papers, I'll take another piece of paper.

MS. DE BRUIN:  That's at least in one place, rather than moved around.

THE COURT:  Yes.

(Whereupon a document was tendered to the Court)

MS. DE BRUIN:  But I've put up on the board testimony from the December 9th deposition, at pages 213 to 214.  And he's asked,

"QUESTION:  At the time, July 24th, did the prototype have the ability to have the device register with the server?"

"ANSWER:  Yes.

"QUESTION:  Did the prototype that you showed also establish a mailbox for the wireless device?

"ANSWER:  Yes.

"QUESTION:  Did the prototype also establish a connection based on a threshold condition?

"ANSWER:  Yes."

Mformation cannot get away from these clear admissions by trying to create a dispute.

For example, they come forward with an affidavit from one of their employees in opposition to summary judgment.  And that

affidavit, as we explained in our briefing, cannot create a material issue of fact.  That affidavit should be struck as a sham affidavit, to the extent that it contradicts -- to the extent that it attempts to correct Dr. Kushwaha's testimony.

**THE COURT:**  Were there other witnesses to the demonstration who testified consistently that these elements were demonstrated, or do I have a circumstance where this is the only evidence that I have on this point?

**MS. DE BRUIN:**  This is the only witness that testified with respect to each of the elements being present.

There's certainly corroborating evidence:  The document that we reviewed and that we've outlined in our brief.  And there's also other witnesses that have testified that the demonstrations occurred, but were not testifying in detail about what specifically was shown *vis-à-vis* the claim limitations.

This came into play in particular with Dr. Kushwaha because on December 9th, he was put forward by Mformation to specifically testify on reduction to practice.  So he was to be prepared to testify about when each of the claim limitations of the various claims were present in Mformation's products.

**THE COURT:**  Are you also addressing the provisional application, or is that someone else?

**MS. DE BRUIN:**  I am addressing that.  And I will turn to that right now, your Honor.

Mformation's final excuse is that the provisional application supports Claim 1 of the '917 Patent.  Mformation has the burden to prove that, your Honor.  And they haven't come forward with proof sufficient for a jury to conclude that.

There are at least two limitations missing from the provision.

One, establishing a connection between the wireless device and the server, wherein the connection is established based on a threshold condition -- that's not disclosed by the provisional.

Two, without a request from the wireless device, performing the steps of establishing a mailbox for the wireless device at the server -- that's also not disclosed by the provisional.

Now, with respect to the establishing a connection based on the threshold condition -- there's no disagreement that the provisional does not explicitly disclose that.  So that means that Mformation must show that it was implicitly disclosed.  And to do that under the case law, they have to show that it's necessarily disclosed in the provisional.

They've failed to come forward with any evidence that could support that finding.  They have three different arguments they've made.  None of them work.

First, they argue that the words "threshold condition" appear in the provisional, but those words appear

talking about communication in the other direction; not talking about establishing a connection, but rather, talking about the device, when responding to certain demands, sending information back to the server based on the threshold condition.  That does not disclose establishing a connection based on a threshold condition.  It goes the wrong direction.  We're not looking for coming back from the device to the server.  We're looking for sending -- establishing a connection, so we can send a command from the server to the wireless device.

Now, they also look at some language in the provisional:

-- "till the client accepts them."

Now, this language relates to the language that we were just talking about on the anticipation motion:  Accepting the contents of the mailbox at the wireless device.  It doesn't relate to establishing a connection based on a threshold condition.  It doesn't say anything about establishing a connection.  Doesn't say anything about a threshold condition.

Next slide, please.

And finally, Mformation argues that the threshold condition must be inherent in every wireless network.  Well, your Honor, that simply makes no sense.

Mformation was required by the Patent Office to add this particular language of:

"Wherein the connection is established

based on a threshold condition."

They were required to add that language to Claim 1, in order to overcome prior art.  If, indeed, that is implicit in any wireless system, there would be no need to add that language.  And it certainly wouldn't distinguish over the prior art.  That argument also fails.

Moving on to the second item that's missing -- and remember, only one has to be missing for RIM to prevail. Without a request, establishing the mailbox for the wireless device is also not disclosed.

First of all, the parties agree -- there's no dispute -- it's not explicitly disclosed.

Mformation offers several reasons, again, on why it must be implicitly disclosed, but as with the other, all of those reasons fail.

First, Mformation argues that the absence of saying that a mailbox must be established with a request must then mean that the mailbox is established without a request.

That's simply not the case, your Honor.  That just doesn't tell you which way it happens.  It does not necessarily disclose establishing a mailbox without a request from the wireless device.

Second, Mformation points to reference in the provisional to complete control of the device over the air.

Now, that doesn't say anything about a mailbox;

anything about a establishing a mailbox.  There's nothing in the provisional that precludes the device from asking that a mailbox be established for it, and then it submits to complete control by the server following that.  There's just nothing in the provisional.  It's silent.  That does not necessarily disclose this.

And finally, Mformation argues that reference in the provisional to "push" and "pull" must mean, for push devices, that the mailbox is established without a request from the wireless device.

That also simply is not supported by the language in the provisional.  "Push" is referred to in the provisional. And the language is that if it is a push device, the commands are pushed to the device.  This is talking about communicating data to the device.  That, indeed, is done, and is described in the provisional as being done without a request from the wireless device when it's a push system, but that says nothing. It has nothing to do with establishing a mailbox, and whether that is established without a request from the wireless device. They're mixing apples and oranges.

Finally, with respect to this limitation, Mformation offers some testimony from its expert, Dr. Madisetti, which confuses what has to support what.  He points to disclosure in the '917 Patent and various steps that happened to provide further support for the provisional.

That's not the way it goes.  The provisional has to provide support for the '917 Patent; not the other way around.

And with respect to your Honor's question from the beginning of my argument concerning some cases, we were talking about the corset case, and you asked for some others.  Two that I draw your attention to are the *Lockwood* case, in the *Clock Spring* case, both of which are cited in our briefing.

THE COURT:  Thank you.

MS. DE BRUIN:  In summary, the undisputed facts show that Mformation publicly demonstrated Claim 1 of the '917 Patent before the critical date of the patent.  Therefore, Claim 1 is invalid.  And I'll note that Claim 1 is the only standing independent claim for the '917 Patent.

We believe the resolution of this for Claim 1 should resolve the issues for the rest of the claims.  There's no genuine issue of material fact precluding RIM's motion.  As I mentioned with respect to Mformation's motion, Magistrate Judge Lloyd's order addresses that one.  And RIM is entitled to summary judgment that Claim 1 is invalid due to public use as a matter of law.

THE COURT:  Very well.

MS. DE BRUIN:  Thank you.

MR. THAKUR:  Thank you, your Honor, for giving us a chance to respond.

When I heard this motion, it sort of reminded of me

of the Republicans and Democrats in Congress, where they're so diametrically opposed, it's:  Did we see the same thing?  And I think you will see this motion and our argument, and then you will say:  Did I hear the same thing?

And so the key point I make, your Honor, is:  Our motion is -- your Honor, we believe that RIM cannot show that there was a genuine issue as to whether the July 2000 demonstration by RIM actually practiced that step.  And I think for that reason, we believe Mformation's motion for summary judgment on it should be granted, and RIM's motions would then be moot.

But before I started that, I wanted to quickly highlight for you.  You did ask one case from RIM's counsel as to whether all of the elements should be present, or whether all of the elements needed to be demonstrated.  I will just put the case under the Elmo for your consideration.

Your Honor, this is the *Motionless Keyboard versus Microsoft* case that's cited in RIM's brief.  And the case law is on point.  The disclosure needs to not just be a visual presentation, but it must actually show an implementation; a demonstration of each of those elements.  In that particular case, the Court denied summary judgment from public use, based on that very issue that you requested.

And even correctly, as a matter of fact, I think you were right on.  The fact that even if Mformation's product had

actually demonstrated it was wirelessly registered, and had threshold conditions, the observer -- and these are investors they were not for sale.  If these investors had observed it, they would still not have been able to -- that still would not have constituted public use; but maybe I can come back to RIM's argument after I've had a chance to give you a sense of what are the real-world facts of this case that are really present.

THE COURT:  Let me see if I understand that.  So if all of the elements were present, but were not demonstrated, your argument is that there is no public use?  Or -- well, state your argument.

MR. THAKUR:  That is correct.

Sorry.  My apologies.  I interrupted.

That is correct.  Even if all of the elements are present, if they're not demonstrated, that is not public use. And there's dispositive federal circuit law on that point.

THE COURT:  And this is your authority for that?

MR. THAKUR:  Correct.

THE COURT:  Okay.  Go ahead.

MR. THAKUR:  Your Honor, but let me turn to what is our motion for summary judgment.  And I will also return to Judge Lloyd's argument -- Judge Lloyd's ruling, because that's essentially the central point of what RIM argues.  They asked a lot of Judge Lloyd.

The only thing Judge Lloyd said was,

"Hey, on December 9th you didn't get it right.  All of the deposition comes in."

And they asked to exclude the Provsys code; and the Court said "No."

(Reporter requests clarification)

**MR. THAKUR:**  And they asked to exclude the Provsys code:  The prototype code.  And the Judge said,

"No.  All of the evidence comes before the jury.  If you've got it wrong on one day, then you need to explain that."

And I will come back, why that explanation, by itself, should not be a basis for denying our motion.

But this is the key time line, your Honor.  This is really important, because if we -- in a public use, the facts matter.

The facts are:  Dr. Kushwaha, a Ph.D., quit his job, and started the company, Mformation.  He conceived of the invention.  Once you conceive of the invention, you need a prototype.  He got financing from Kingdon Capital to develop that prototype.

On April 30th -- he couldn't code it, himself -- he hired three programmers to code it; help him code that prototype.  Your Honor, those three programmers are something I would ask you to pay attention to.  We'll talk about a little bit about them.  This is really important.  Mr. Beltramino,

Mr. Sahni, and Mr. Magam -- these are the guys who helped Dr. Kushwaha write the prototype.

On May 30th, the prototype is created. Obviously, this is the most important fact in this motion. There is a prototype. There is plenty of evidence in the record from numerous witnesses that there was only one prototype. The prototype was a continuous development. And it stopped when it was done. And it was done on May 30th of 2000. And there wasn't this two-month lag.

Your Honor, what is typical in a scenario like this is, when a company develops a prototype, it goes on a fund-raising road show. The road show began almost a matter of days later. They started with Kingdon Capital. They -- the key demonstration that they went to the West Coast to demonstrate in Silicon Valley on Sand Hill Road was on January 4th, 2000, to Deutsche Bank.

But a prototype was funded. It was developed. It was completed. It went on the road show. And there was no unrebutted evidence that there was one prototype. And they made an effort to request Judge Lloyd to exclude the prototype. And he made it abundantly clear that the prototype code has been produced, and that will be entered as evidence in this case.

So we have a prototype. The prototype is missing three elements.

Your Honor, as I was talking earlier about what is truth and what is not truth -- well, there are two ways to truth tell the truth.  We could argue whether the bus is blue or whether the bus is black.  We could ask somebody what they remembered.  And there are lots of witnesses here.  And we'll talk to -- Dr. Kushwaha is not only one.  We could talk to what they remembered about ten years ago.  The issue is moot, if I could just bring the bus in.  I have the bus.  We produced the bus to them.  They have the Provsys code.

And what happened with the Provsys code?

Your Honor, it was produced to them.

Dr. Magam, who -- Mr. Magam, who is the lead prototype coder, told them what the code -- when the code was developed, he testified that it was only one version of the code.  There was no multiple versions.  It was a continuous development.  And that code was produced to them.

RIM's lawyers and their experts reviewed the code for two days.

Then, on the 14th, they received a hard-copy printout of the code.

As I explained, your Honor, there are three code writers in this code:  Mr. Magam, Mr. Beltramino, Mr. Sahni; all in our initial disclosures; all who would be available to testify at trial.

What did they do?

They had gotten Dr. Kushwaha's erroneous testimony and confused testimony on December 9th.  They had deposed -- noticed their depositions before the -- before the code was reviewed.  They called, and they canceled these depositions.  Your Honor, this is striking.  As far as I can recall, dozens of depositions in the entire case.  They canceled the deposition of the two code writers for the prototype.

Another striking element that -- in this case is, your Honor, when they went to Judge Lloyd, they asked to seek to have the Provsys code excluded.  Judge Lloyd denied that, and he asked Ms. DeBruin,

"Have you looked at the code?  Are these element present in the code?"

-- even though RIM's lawyers had done that.

Her response:

"I have not personally looked at the code."

His response:

"It's probably because you don't want to know what's in that code."

And that's what we have here.  There is a prototype code that speaks the truth, and they don't want to look at the code.  Yes, it was delayed in production; but that was resolved in discovery.  Months were made available.  We gave them plenty of opportunity to look at the code, and give them extra time if

they needed it, but they have the code.

And the code --

THE COURT:  So, as I understand this motion, it depends upon whether or not there was a public demonstration of the -- of a device that practiced every element of the Claim 1.

The one or maybe more steps that are in dispute has to do with whether or not the registration step --

MR. THAKUR:  Correct.  Wireless.

THE COURT:  -- was present and done?  And wireless, as I see, is perhaps the term, because Dr. Kushwaha was asked whether or not it had the ability to have the device registered, but the word "wireless" wasn't in the question.

He said, "Yes."

And so, to solve this problem, you're inviting me to look at the code that had been developed prior to July 24, 2000?

MR. THAKUR:  I would say I'm not inviting you to look at the code.

THE COURT:  Right, but it's there?

MR. THAKUR:  It's there.

THE COURT:  Somebody has got to look at it, and decide whether or not the code instructs some wireless registration.

MR. THAKUR:  Correct.

THE COURT:  And your tender is that the code does

not?

            MR. THAKUR:  Correct.

            THE COURT:  Does it describe registration at all?

            MR. THAKUR:  It describes -- it has the ability to
hard-code the registration.  It does not have the ability to
wireless register.

            THE COURT:  It has the ability.  The code is code.
It doesn't do anything.  It just says something.

            MR. THAKUR:  Correct.

            THE COURT:  Does the code disclose registration?

            MR. THAKUR:  It -- no, it does not disclose
registration.

            THE COURT:  All right.

            MR. THAKUR:  It simply recognizes a pin of a device
that is hard-coded in.

            So it's -- you have -- there is a way to register it.
The way to register it is to actually have the ability.  You
have to have a destination address to send a piece of data to.
So the destination-address capability is hard-coded, without
having a module that would sit in front, where the device would
wirelessly provide its pin; there would be a key exchange; and
then the device would become registered.

            None of those capabilities are present in the --

            THE COURT:  None of those capabilities were present
in the prototype?

**MR. THAKUR:**  Correct.

**THE COURT:**  Had the inventor conceived of wireless registration prior to building the prototype?

**MR. THAKUR:**  Correct.  Yes.

**THE COURT:**  But the prototype -- why wasn't that present in the prototype?

**MR. THAKUR:**  Because you're out to raise funds.  And all you need to do is to be able to show them that this device can be managed.  The details of how the device would be managed would be based on a product that would be built.  You obviously want to show -- this inspection, as I understand it from the -- from the investor, lasted about three minutes.  All they showed to him was:

> Here's a wireless device.  You've got your data.  Assume it's been lost at the airport.  I can wipe it remotely, so you have secure capability.

And they pressed a button.  And it wiped it.  And that was the extent of the demonstration.

**THE COURT:**  That showed that feature, because that's an impressive feature; but the registration wasn't shown?

**MR. THAKUR:**  Correct.

**THE COURT:**  And wasn't discussed?

**MR. THAKUR:**  Wasn't discussed.

**THE COURT:**  But -- and the prototype had not been

configured to allow itself to wirelessly register?

**MR. THAKUR:**  Correct.  And we know that as a matter of fact, because the code says so, which -- they haven't reviewed the code, and they don't dispute that.

**THE COURT:**  So when was it wirelessly -- when was the feature of wireless registration first, if ever, put into a prototype?

**MR. THAKUR:**  It was never put into a prototype.  It was put into a commercial product that actually Mformation sold almost a year and a half later.

**THE COURT:**  All right.  So when the witness said that it had the ability to have the device registered with a server, when he did his errata, what did he say about that?

**MR. THAKUR:**  He simply did not explain it.  He just simply said it could not wirelessly register.  So he just reversed -- he corrected the testimony, yes -- from "Yes" to "No" in his December testimony, but your Honor, in his April testimony --

**THE COURT:**  So it didn't have the ability to wirelessly register at that point --

**MR. THAKUR:**  Correct.

**THE COURT:**  -- but it had wireless capabilities?

**MR. THAKUR:**  It had the ability to wirelessly deliver a command, correct.

**THE COURT:**  Well, what would be the difference in its

Case 3:08-cv-04990-EMC   Document 690   Filed 10/02/11   Page 67 of 126
67

wireless functionality if it had the wireless ability to receive a command, from the wireless ability to register? What -- what feature would be missing?

MR. THAKUR: Oh, a very important feature, your Honor. What happens in wireless registration is the device sends information to the server. It identifies its pin -- unique information -- to which then it can then yield control. Then the server verifies, through an encryption process and a key-authentication process: I know the device it could send to. And then it knows that it's taken control of the right device.

THE COURT: All right, but as I understood the invention --

MR. THAKUR: Right.

THE COURT: -- you need it to know the device before you could send a command.

MR. THAKUR: Correct.

THE COURT: So the prototype, as demonstrated, could send a demand to an unregistered device?

MR. THAKUR: An unregistered device, in the sense that, in the code, as Exhibit 5 had mentioned, you could go in and put the pin into the software device. And there's deposition testimony that's not been cited --

THE COURT: All right.

MR. THAKUR: There were only demo devices.

Official Reporter - U.S. District Court
(415) 531-6587

**THE COURT:**  Two?

**MR. THAKUR:**  There were two handsets.  That's all they had in their entirety for the prototype.  And they could manually put the pin in for that.

Why would you spend the time to write this whole module for wireless registration, when you could just simply put the pin in to demonstrate what you needed to do?

**THE COURT:**  So I understand the problem, your position is not contrary to what Judge Lloyd has ordered; namely, the deposition stands.  The testimony -- the exhibits stand.  In fact, you rely on exhibits.  You want the testimony. You want the exhibit in, so you can explain the inconsistency, if there's deemed to be an inconsistency.

**MR. THAKUR:**  Correct, your Honor, but the key point we keep saying is:  There is a code.  The code speaks the truth.

They have reviewed the code.  Even though Ms. DeBruin might not have personally reviewed the code, the engineer or the expert who reviewed the code has presented no argument to the contrary that these elements are missing.

So the dispute -- it -- to me, it's the same argument that they were -- you know, that we were making to Judge Lloyd. What they're asking this Court to do is adopt a known falsehood.  We know -- the truth is not in dispute.  The truth is:  There was no demonstration.  This code could not do

wireless registration.  It could not do threshold condition. That code was shown to them in a two-minute demonstration.  And we know for a fact that it couldn't be.  What they're asking this Court is to adopt a known falsehood.

**THE COURT:**  All right.

**MR. THAKUR:**  Your Honor, so may I turn -- let's assume you decide the code's not enough.  I have to consider all of the evidence in this case.  And -- beyond the code.

Then let's talk about what other testimony exists, because clearly Ms. DeBruin seems to suggest is that all we have is this December 9 testimony.

Dr. Kushwaha testified on April 20th as a 30(b)(6) witness; as a 30(b)(6) witness on the very issue of wireless, of reduction to practice, and demonstrations, and things of that nature.  I want to clarify.  He testified on reduction-to-practice issues; not necessarily the demonstration to Deutsche Bank; but the key point was he was a 30(b)(6) witness there.

On December 9th, he testified again in a 30(b)(6) capacity on additional topics.

On May 14th, earlier, the CEO, Upal Basu, testified. And then February 3rd, he testified again, following December 9th, but this time, he did a code-by-code -- line-by-line review of the code.

And the declaration of Harish Magam, as the person

who was the lead software writer on this stuff -- on the code -- the process code.  And he has testified there was one code; what the prototype could do.  And he did a line-by-line review on it.

And again I mention there are two other code writers who would be available to testify at trial what RIM did was, once they realized they had this confused testimony, the code -- they didn't want to know the code.  They canceled those two depositions.  And clearly, those two were the only two depositions in this case that were canceled of Mformation employees.

Your Honor, let's talk quickly about what CEO said. The CEO was asked about wireless registration.  And he said.

"I do not recall the specific feature on that device."

So that's what the CEO said.

Secondly, when the CEO was asked about the document that's Exhibit 5 that they -- the PowerPoint, he made it very clear.  It was an ambition document.  It was about the vision of the company.  It has nothing to do with what the device actually was doing at that time.  And then we'll get to that exhibit, because it is telling that that exhibit says nothing of those two elements.

But this is the most important part, your Honor. April 20th 30(b)(6) deposition testimony, Dr. Kushwaha is

asked,

"Did the alpha prototype establish connection based on a threshold condition?"

"No."

So the actual threshold condition did not exist prior to Version 1.0.  There's no dispute Version 1.0 is a commercial product that was developed the next year.  So he has testified on the record.

And if RIM's own argument used against them, which is the *Radobenko* case, that the first 30(b)(6) testimony holds, well, this is the testimony.  There's no such thing as a threshold condition in the prototype.  In the Q1 of 2000, there's only one alpha prototype.  There are no multiple prototypes.

**THE COURT:**  But that prototype was in existence at the earlier deposition.

**MR. THAKUR:**  Your Honor, it was not.  And that was the one reason that led to the confusion.  Counsel had inadvertently not produced the prototype code until after the deposition.  And that was what led to their motion before Judge Lloyd saying,

"Why didn't you produce it?"

We recognize that the code should have been produced, but we produced it.  We did acknowledge and apologize to the Court that we should have produced it earlier.  And we offered

to give them whatever extra time they may have wanted to review the code.  And they spent days and weeks actually doing it.  So it was well before discovery cutoff, but it would not matter as to whether they had the code or not.

The question is:  Did Dr. Kushwaha testify correctly?

And on April 3rd, he testified correctly.

And actually, they got the code after the December 9th testimony.

**THE COURT:**  And there's no dispute here that the code was created on the date it says it was created?  That's not a factual issue here that has to be decided?

**MR. THAKUR:**  That is correct, your Honor.  So, quickly turning April 20th, he makes the testimony --

**THE COURT:**  Can I interrupt you; go back to your opponent?

Counsel, do you acknowledge -- do you acknowledge that the code does not disclose the threshold-condition limitation, nor does it disclose the wireless registration?  The code, itself?

**MS. DE BRUIN:**  For the purposes of this motion, your Honor, we concede that.  The code was dated no later than May.

And, if your Honor will give me an opportunity for rebuttal to respond to some of the things that were said about the code --

THE COURT: You can address other things. I was just trying to see whether or not that is true, or not, because it does seem to me that this could be a well-made motion for sanctions for all of the trouble that you went through. And maybe that's something that Judge Lloyd has already done, but for purposes of the motion, it seems to be the most important issue, is whether or not the prototype actually demonstrated the claim.

And if I have two sources -- the deposition testimony as well as the code -- the code seems to be the objective basis that I could look at. And if you agree that it's accurate and dated properly, it's genuine, it's authenticated, then that sends me down an entirely different road than if I'm just relying on deposition testimony.

Finish up your argument. I'll give you some time.

MR. THAKUR: We recognize that they did request Judge Lloyd for sanctions. And, you know, it was a mistake. In a case this complicated, errors happen. We delayed the --

THE COURT: I'm not worried about the sanctions.

MR. THAKUR: You can imagine I am.

So quickly turning to the next point, your Honor, December 9th testimony, how did Dr. Kushwaha get it wrong?

This is sort of what's sort of, you know, misleading. During the course of the day, he's asked about what is demonstrated. Later on, he's asked about what is implemented.

During the day he's asked about what has been --

"Have you ever provided a demonstration of the product where you mocked up certain steps?"

He said, "Maybe."

He was asked about sending data; whether it was dummy data.  What was clearly happening, your Honor, in the course of this deposition was:  Experienced counsel was leading him to confuse between demonstration and implementation.

THE COURT:  I don't think there's any -- when you've got an expert and it's a 30(b)(6) situation, there's no misleading on the part of the lawyers that I see in these questions.  They're perfectly legitimate questions.

MR. THAKUR:  My understanding, your Honor, is whether there were -- the question is not what was happening.  What happened was he got confused.

THE COURT:  He might have been.  He might have been.  That's why you pay him the big bucks.

MR. THAKUR:  Your Honor, he's not paid.

THE COURT:  Well, you should have paid him the big bucks.

MR. THAKUR:  He's not an expert.  He's an employee, your Honor.  And this is the first time he's been deposed.  This is not a scenario -- or first case he's ever been deposed in.

THE COURT:  Then he wasn't properly prepared to listen to the questions, and answer only if he knew the answer; but I don't find any fault on the part of lawyers by using different words as they asked the questions.

MR. THAKUR:  And I'll withdraw that, your Honor.

But the point is on December 9th, he didn't get it right; but on February 3rd, he made it explicitly clear he was confused between distinguishing between demonstration and implementation.  And it was very important to understand that what implementation -- implementation is what goes to the code.

And a devices with respect to registration information, it was hard coded.

So, yes, on April 3rd he recalled it correctly.

In December 9th -- excusable or inexcusable -- he got a little confused.

But when he got to the December -- February 3rd, your Honor, it was my job to make sure he was perfectly prepared.

THE COURT:  And I guess I shouldn't spend too much time trying to understand this, because you all will do this later, but what does it mean to be hard-coded registration information?

MR. THAKUR:  It's when you put the pin into the code, in terms of an ability to have a destination address.  The Exhibit 5 that --

**THE COURT:**  In other words, they're like dip switches, or something?  What do you mean, it's hard coded?

**MR. THAKUR:**  It's like having an address.  So you need to mail a letter.  One way is to provide a wireless registration to give you the destination address as to where the letter goes.  What is hard coded is hard-coding the destination address for the device.

**THE COURT:**  Well, you're using the word to define it.  I'm not sure what is done that is done different for hard coded versus when it's wirelessly registered.

**MR. THAKUR:**  When you are wirelessly registering, you send -- the device sends itself, as an authentication -- it says,

> "Here's my address.  Here's my pin.
> Here is my password that verifies that I'm
> the right person."

**THE COURT:**  Sends that to the server?

**MR. THAKUR:**  Server.  And the server verifies that; says,

> "You're right.  Now I have a way to
> communicate with you."

-- and sets up a registration.

What is hard coded is -- I don't go through any of that process.  I just simply say -- when I want to send a command, I just put in the destination address into a field

where it would be.

THE COURT:  Right, but the destination address I know, because I already know it.

MR. THAKUR:  Because I have the device sitting in front of me.

THE COURT:  All right.  So it has been registered?

MR. THAKUR:  It is registered, in the sense that it is a place where you go.  It's not wireless registration, correct.

Registration involves, essentially, two steps.  One is the ability of having a destination address.

Number two:  Verifying that the device that is communicating with you is actually the one you want to communicate with; versus when you have a hard coded, you're just putting in the destination address.  You don't do that verification.

THE COURT:  Well, I don't understand that totally, but I'll learn more as I move along.

I'm satisfied that I understand your position.

Do you want to speak to the provisional issue?

MR. THAKUR:  Yes.  Sure, your Honor.

The issue is -- the question is, as we said, before -- even if this Court -- RIM can show a general issue of a demonstration, we believe that Mformation can show that there is at least a genuine issue as to the '034 provisional.

Your Honor, the law on claim priority is pretty self-explanatory adequate description.  The first element is "without a request."  The device -- setting up the mailbox; that the provisional discloses "push" and "pull" devices.  We believe that "push" means complete server control.

What is the evidence we have to support?  Dr. Nath, Ph.D. at Rutgers University, co-inventor.  Dr. Kushwaha talks about complete control.  The co-inventor.  Dr. Madisetti, professor of electrical engineering at Georgia Tech, has given a detailed explanation about why that element is satisfied.

And then the second element, your Honor -- again, the threshold condition.  '034 actually expressly uses the word information that can be sent based on a threshold condition.

And what they're saying is:  Well, that's only from the device to the server.  He should have expressly mentioned the word server to the device.

Well, clearly, your Honor, if there's going to be a threshold condition that's going to control the device sending communication to the server, it's common sense that a threshold condition would be applied when the server is sending information back to the device.

So, your Honor, we believe that that same thing we have -- we have our expert, who's opined on that.  And, at a minimum, it should create an issue of genuine fact as to whether they're provisional.

And, your Honor, I just want to talk one last issue about the sham affidavit. The sham-affidavit case that they talk about in *Radobenko* is a scenario where one witness -- only one witness -- testified. And it was the first time he testified; and immediately following that, there was an affidavit that rebutted it.

The case situation here is clearly different. It was dispositive code. He has done a line-by-line review. It confirms his prior testimony. And we have not only the testimony of Mr. Basu and Mr. Magam, if this managed to go to trial, we have the testimony of additional two witnesses who actually wrote the code.

And then the last issue -- and this will be my last slide, your Honor -- is the only evidence -- you know, one of the key things about this is even if they were correct -- let's assume their facts. Dr. Kushwaha's testimony December 9th is the only testimony in the record. Okay? Let's give them that presumption.

There's no question of doubt that testimony needs to be verified. It needs to be corroborated.

They do cite to a case that says corroboration's not required; but in fact, a subsequent federal circuit case of *Finnigan Corporation versus the ITC*, 180 Fed. 3d. 1354, actually deals with the exact case that they're talking about: The *Thompson* case. And the Court wrote,

"Thompson did not involve

uncorroborated testimony of a single

witness."

And it goes on to say,

"Those cases, however, do not stand for

the proposition that only an interested

witness' testimony requires corroboration.

In any event, corroboration is required of

any witness whose testimony, alone, is

asserted to invalidate a patent."

So it -- regardless of whether Dr. Kushwaha was an interested witness or not, they need corroboration.  And what they is cite for corroboration is Exhibit 5, your Honor.  And I would challenge RIM's counsel to show me anywhere in that document where wireless registration -- and I repeat the word "wireless registration" -- was shown, or in wherein a connection is -- excuse me -- wherein a connection is established based on threshold condition.

That PowerPoint says nothing about those words.  And the only basis they have to say that PowerPoint actually says those things is they go back to Dr. Kushwaha's testimony where he explained how that could mean it.  And uncorroborated witness testimony cannot corroborate its own witness testimony.

**THE COURT:**  One last question on this area.  If the doctor had conceived of wireless registration, but built a

prototype that didn't demonstrate it, but during the demonstration referred to it, described it, and says,

              "Well, for ease, we've wired this one

        already, so we don't have to go through

        registration, because once it's registered,

        it's registered,"

        -- does that satisfy public use?

        **MR. THAKUR:**  No, your Honor.  Public use deals with the product, itself.  And I refer you back to --

        **THE COURT:**  All right.  I'm going to ask that of your opponent.  Thank you very much.

        **MR. THAKUR:**  Thank you, your Honor.

        **MS. DE BRUIN:**  Your Honor.

        **THE COURT:**  We've had some comments, but I also wanted to ask that same question of you.

        In other words, if the document had conceived of wireless registration, but had not set up the prototype to actually perform it, because of convenience of doing it for these potential customers, and demonstrated the device without the step of wireless registration, would that satisfy public use?

        **MS. DE BRUIN:**  Yes, it would, your Honor.  And the *Clock Spring* case that I drew your attention to previously, at the end of my argument, supports that.

        Whatever is obvious from what's demonstrated can be

Lydia Zinn, CSR,  RPR
Official Reporter - U.S. District Court
(415)  531-6587

an invalidating public use.

And the cases also look at the fact that you have -- you may have technically competent people observing the public use.  And here we had two Stanford computer-science professors that Dr. Kushwaha testified were observing it.

So his telling them that -- assuming that it were the case that they had hard-coded, we believe that the evidence shows otherwise; but assume that they had hard-coded the registration process, and he had said,

"Well, we would do the registration

wirelessly in the final system."

-- that, combined with the prototype showing everything else, would be an invalidating prior use.  And our support for that is the *Clock Spring* case.

**THE COURT:**  All right.  Go back to your other points, then.

**MS. DE BRUIN:**  A lot of Mr. Thakur's argument related to the may Provsys prototype code; the source code that wasn't produced to RIM until February.

Now, let me just --

(Document displayed)

**MS. DE BRUIN:**  Mr. Magam -- this is Exhibit G to Mformation's motion -- Mformation's opposition -- I'm sorry -- to RIM's motion.

Mr. Magam specifically testified that the source code

for the Provsys prototype was revised and expanded by him and other team members throughout the year 2000.  Counsel stood up here and said that that prototype ended May, and that was it; so therefore, that was necessarily what was demonstrated in July.

There's simply not facts in the record that support that.  And their own declaration supports RIM's position that it's entirely consistent that the prototype did not include, in May, particular limitations; but those limitations were added, and finally, demonstrated in the July version of the prototype. There's no evidence in the record that work on the prototype stopped in May.  Indeed, there's evidence in the record that that work continued throughout the year 2000.

**THE COURT:**  What's the evidence that the wireless registration was demonstrated in July?

**MS. DE BRUIN:**  Dr. Kushwaha's testimony that all limitations of Claim 1 were present.

**THE COURT:**  Right, I have that; but he wasn't specifically asked about wireless registration, as I had noted. So what -- is there anything else?

**MS. DE BRUIN:**  With respect to the way that registration is being referred to throughout the deposition, registration is referring to wireless registration.  There's no discussion, as Counsel would lead you to believe, that,

"Oh, well, we were talking about

registration; therefore, it wasn't wireless registration."

That was the way that the parties talked about wireless registration, as it's called for in the patent. The patent language, itself, doesn't refer to wireless registration; but it's understood to be the case, because, based on the Court's claim construction, we're talking about a wireless system.

THE COURT: Was there any witness who was ever asked, "Was wireless registration demonstrated," who said, "Yes"?

MS. DE BRUIN: I was looking for certain testimony from Dr. Kushwaha while I was sitting back, listening to Mr. Thakur's argument; or I should say I asked my colleague to look for it.

I would like the opportunity to submit to your Honor -- draw your attention to that testimony. I was not able to find it during the time that we were looking.

So the important point with the prototype is: It's truly a red herring, your Honor. Mformation points to it as identifying what was present in June or in July. And it's simply not prototype code that's dated that late.

RIM, as I said, for the purposes of this motion, will concede that the code, in May, didn't include certain limitations.

THE COURT: When did it first show up, to your

satisfaction?

MS. DE BRUIN:  To our satisfaction, based on Dr. Kushwaha's undisputed testimony, it showed up in.  June he testified that in June, all --

THE COURT:  But you haven't seen a June version of the code?

MS. DE BRUIN:  No, we haven't seen a June version of the code.

And I'd like to talk about looking at the code, because I found it interesting that Mr. Thakur called us up; challenged us on not having examined the code.  And I'd like to remind the Court that Mformation had this code from the very beginning of the this case.  Mformation's counsel had this code from November of 2009.

Despite having this code, Mformation's counsel and Mformation continued repeatedly to provide interrogatory responses saying that Claim 1 of the '917 Patent was reduced to practice in June of 2000.

THE COURT:  What was their incentive for doing that at that time?

MS. DE BRUIN:  I don't know, your Honor.  I -- I -- but I know that they did it.  I know that they said, consistently, "June 2000," even though they had the code.  They hadn't given us the code, but they had the code, and presumably, had looked at the code, but yet gave interrogatory

responses of June 2000, when they're coming here and telling you that once you have the code and once you look at the code, you can't possibly find that there's a reduction to practice in June of 2000.

If they had the code, and that's the result of that, how -- how could they be providing an interrogatory response saying, "June of 2000"?

THE COURT:  Unless you surprise me with something new, I've heard enough on this, and want to move on to the other parts.

MS. DE BRUIN:  All right, your Honor.  One final point that I'd like to mention, because Counsel said that Magistrate Judge Lloyd had resolved this issue as far as the Provsys code.  I'd just like to note that that wasn't entirely correct.

What Magistrate Judge Lloyd said is he was deferring this issue to you, and, depending on further developments in this case, his order was without prejudice to RIM to seeking evidentiary sanctions, as may be appropriate, from you.

Thank you, your Honor.

MS. DE BRUIN:  Oh, your Honor.  I'm sorry.  One quick, quick --

THE COURT:  This is the Columbo technique.

MS. DE BRUIN:  It's me fumbling with my papers.

The *Motionless Keyboard* case --

THE COURT: Yes.

MS. DE BRUIN: -- does not say what Counsel said it said.

In the *Motionless Keyboard* case, the device was not publicly used at all. There was one use of the device by a typist, who was under a confidentiality agreement, but the other uses that were public weren't even uses at all. What the Court explained was that the device was shown without even being operated. It basically -- I don't think it was even plugged in, but it was just shown as a device, without any demonstration of its use, and without it being used for its intended purpose.

That's different THAN the case we have here, where the prototype was used for its intended purpose.

Thank you, your Honor.

THE COURT: Very well. We're moving to the 112 motion.

MR. MC DONALD: Good morning, your Honor. Shawn McDonald, for Plaintiff, Mformation Technologies. I'll be addressing the 112 motion this morning. Time is very limited, so obviously, stop me at any point. I'll try to move through this.

THE COURT: And, by the way, I did not have the hard copy of the slides from -- I guess, on the last motion, but --

MR. THAKUR: Sorry. On the public use?

**THE COURT:**  Are they all in one book?

**MR. THAKUR:**  No, they're not.  I believe we provided them separately, but there's an extra copy on the public use.

(Whereupon a document was tendered to the Court)

**THE COURT:**  Thank you.

**MR. MC DONALD:**  So, your Honor, there are four terms at issue.  Mformation's motion addresses both RIM's defenses as to indefiniteness and also as to enablement, and written description.

The four terms.

Mailbox, establishing a mailbox for the wireless device at the server -- those are present in each of the claims.

The contents of the mailbox -- also present in each of the claims.

Enabling/disabling -- that's only in Dependent Claims 5, 21, and 22.  The idea that the connection between the server and the device is established based on both a threshold condition and periodically applies to only Dependent Claim 4.

Now, the test for indefiniteness is whether the claims, read in light of the specification, reasonably apprise those skilled in the art of the scope of invention.  And there are two ideas in this quote.  You have to look at it through the eyes of those skilled in the art, and you also -- as the text continues, you have to consider it as a function of the

nature of the subject matter.

So here the terms at issue are basic terms, such as "mailbox" and "establishing a mailbox," or "contents of the mailbox."  These are not limitations upon which Mformation relied as a basis for patentability.  The idea of a mailbox and a server was well known in the art, as RIM's expert concedes.

And another key point is:  If the Court can construe a claim, it is not indefinite, by definition.  And that's from Federal Circuit case.

The other aspect of the motion is the other part of Section 112; the idea that this specification has to provide a written description providing, you know, such detail that the future claims can be determined to be encompassed within the original invention.  And at the end of that description enables one of skill in the art to use the invention without undue experimentation.  So the case law recognizes there may even be a requirement of experimentation, but the law only requires that that experimentation not be undue.

Now, the Court has construed the phrase "establishing a mailbox for the wireless device at the server."  And I've underlined the word "mailbox," and the text that corresponds to mailbox in the Court's construction of that claim.  It's simply an address in memory of the server that can store information intended for delivery to the wireless device.  And under the case law, because that is amenable to construction, it cannot

be indefinite.

And a great case for that is the *Aero Products* case, which we cite in our briefing.  In that case, there was an air mattress.  And the claim recited a seal that was substantially hermetic.  The specification only disclosed completely hermetic seals that wouldn't allow any leakage.  Similar to this case, the defendant in *Aero* said,

"Well, we don't understand -- and it's unclear -- what 'substantially hermetic' means."

The Court in that case expressly held -- and the Federal Circuit affirmed -- substantially hermetic allows some leakage, and is not identical to completely hermetic; but the claim was not held indefinite, even though the patent said nothing about the degree of leakage that would be allowed under that seal.

As to written description and enablement, RIM's own expert, Dr. Acampora, in his expert report, which we've cited as Exhibit A -- he stated that one of skill in the art would understand that there are a limitless number of ways to implement these claim elements.  So one of skill in the art can build an address in memory to store data.  And that's the definition of a mailbox.

Again, that was not relied upon as a point of novelty.  This is something one of skill in the art would

readily understand.

As to a mailbox, that contains demands for several devices.  Dr. Acampora again stated,

"One of skill in the art would understand there are many known algorithms, many ways one could select which commands in that mailbox could be sent to each individual device."

**THE COURT:**  But is there -- I agree with you that one proposition that courts should observe with respect to the adequacy of a claim is whether the terms can be construed, but these are words and phrases that are intended to limit.  And so, if the construction is one that is so broad as to be ambiguous, even though it can be construed, that could, under the law that exists for the construction of patents, lead to indefiniteness.

Say, I don't think that just because the court gives -- I don't want to accept the proposition that just because the Court gives a construction, that means it can't ever be indefinite.  You can give a construction, but it could be one which does lead to confusion and ambiguity and other matters.  Sometimes, courts decline to construe because of that.  So your proposition is good, but not universal.

**MR. MC DONALD:**  And, your Honor, just if I could quickly put this up on the Elmo, Mr. Karson.

This is from a recent Federal Circuit decision we just found.  I don't have a Westlaw cite for it, but for your clerks, it's *Star Scientific, Inc. v. R.J. Reynolds,* issued August 26th, 2011, Federal Circuit Docket Number 2010, 1183.

In this case one of the claim limitations was a, quote, "controlled environment," where you could cure tobacco leaves.  The specification provided no guidance as to humidity, temperature, air flow, anything like that, and just recited a controlled environment.

The Federal Circuit reversed the District Court's invalidation of the claim for indefiniteness, stating that one of skill in the art would understand which variables you need to address and how you should address them, because one of skill in the art knows how to cure tobacco.

I think that's a great example of:  You have to look at the claim language in the context of what one of skill in the art already knows.

And how do we know that?

We know that not only from Dr. Acampora's statements.  We know this because the patent Examiner at the Patent Office who reviewed the '917 Patent application didn't have any trouble understanding what mailbox was.  She went out and said that the mailbox was shown in prior-art references.

Now, the contents of the mailbox.  RIM's argument basically boils down to:  Well, if there's anything in the

mailbox other than what is sent to the device, the claim must be indefinite.

That just doesn't make any sense, your Honor, because one of skill in the art, based on the patent's disclosure here, Exhibit C, attached to our brief, knows that a single mailbox can store commands for multiple devices.

The Court, in ruling on RIM's summary-judgment motion, refused to impose the condition of a one-to-one correspondence between mailboxes and devices.  And again, RIM's expert Dr. Acampora said one of skill would know how to pick and choose amongst what's in the mailbox, and send it to the device to accomplish remote management.  And, under the case law, that's all that is required.

In reading the claims, one of skill would understand what you need to send to the device to effect the command; and that is, at least the command should be sent.

**THE COURT:**  All of these are backwards.

In other words, your standing to move that the patent claims are not indefinite.  So you're anticipating a motion on the other side that they are.

You don't have a burden here, but you're making -- so it's always -- I'm trying to -- it's like talking to the mirror -- this whole thing.

And so I perhaps would be better served by hearing the argument on why it's indefinite, and then this would be the

rebuttal to that; rather than hearing the rebuttal first; but I understand.

MR. MC DONALD:  I'm happy to --

THE COURT:  I understand how you all have done this. I'm just trying to point out that you're carrying a burden that you don't need to carry.

MR. MC DONALD:  It doesn't feel that heavy, your Honor.

THE COURT:  Very well.  Go ahead.  I'll remember what you said when I hear the other side.

MR. MC DONALD:  I should say that I would like the chance to respond, your Honor, to what they say.  I'll try to go quickly, though, given the time.

Let's jump right into enabling/disabling.  This one's easy.  Enabling/disabling -- it's recited in Claim 21.

"The method of Claim 1, wherein the command comprises enabling/disabling access of the wireless device to the server."

Now, in the context of remote management, it wouldn't make sense to enable the device's access to the server, and then to immediately disable it.

Now, RIM points to the fact that -- they say -- well, let me back up.  I'm going too quickly.  I'm sorry, your Honor.

If we look at what the PTO did, this is what the Examiner of the '917 Patent application wrote about a claim

reciting enabling/disabling.  She found a prior-art reference -- LoVasco -- that she interpreted to disclose disabling.  She didn't find a reference that she interpreted to be enabling and disabling; she just found disabling.

So, from her rejection of the claims based on LoVasco, it's clear that she interpreted enabling/disabling to mean enabling or disabling.

And if I could have the Elmo, Mr. Karson, RIM's going to show you a slide with perhaps the worst picture our expert has ever had taken, where -- and they make much of the fact that in his expert report, in one section, he talks about enabling or disabling.  That's true.  All these words are in his report.

In this other section, he says that RIM's accused products can both enable and disable applications.

Well, this is his infringement report, your Honor. RIM can do A or RIM can do B to infringe.  We are just showing that, in fact, they do both.  If they just enabled that, we infringe.  If they just disabled, they would infringe; but as a matter of fact, they do both.  So you know, there's no provision in the law for double infringement, but they infringe both ways.  And his presenting evidence as to their enabling access and also disabling access is not inconsistent with his opinion that enable/disable is an "or" construction.

THE COURT:  Isn't that a matter of claim

construction, though?

MR. MC DONALD: It is, your Honor.

THE COURT: So why shouldn't this be a matter where the Court gives its construction of that slash, and then we see where we are? That was the impression I had as I read this. And it does seem to me that there is a way to get there very easily, by the Court giving its construction, if it can, from what the parties say.

What worried me, though, was the command "disabling" being inconsistent with registration, or "enabling" being inconsistent with registration.

MR. MC DONALD: Sure. I'll take the first one, your Honor. The greatest example is if your device is stolen. It's been registered some time ago. You've been using it for days, weeks, months. It's lost or stolen. At that point, you would want to disable its access to the server.

THE COURT: That being a separate step, after it has been registered?

MR. MC DONALD: Correct. That's right.

The final issue on this motion is Claim 4. And I'll address this very quickly. Claim 1 recites clearly that, at the bottom limitation, the connection between the server and the device is established based on a threshold condition.

Claim 4 depends, adding to that, wherein the connection is established periodically.

Now, we know from your construction of "based on a threshold condition," that that means based on a predefined state of the server or wireless device, other than solely the elapsing of time.  So the connection can be conditioned on the elapsing of time; it just can't solely be conditioned on that.

And Claim 4 is providing for that case.  The example we use in our brief, and that RIM did not respond to, was that the device could connect to the server, or the server -- I should say the server would connect to the device at the top of every hour, but only if there's no backlog at the server.

And with that, I'll just reserve the remainder of my time for a short rebuttal.

THE COURT:  Very well.

MR. MC DONALD:  The purpose of moving on this motion is, your Honor, the parties have stipulated to five days for trial.  And we thought that it would clear up issues for the --

THE COURT:  Wait.  That's news I've heard.  What?

MR. MC DONALD:  Some time ago, the parties stipulated that trial would only be five days, and that's why we have vigorously tried to clear issues off the table, to avoid jury confusion.

THE COURT:  Well, you didn't do a very good job of clearing issues off the table, but I like the five days.  Very well.  Counsel.

MR. CHARFOOS:  Yes, your Honor.  And I may even have

better news for you.  If you grant RIM's motion that the contents of the mailbox is indefinite, you won't have any trial, because that will be case dispositive.

As your Honor noted -- and we've focused on Mformation's motion here.  And Mformation has raised five limitations.

RIM also has a motion for summary judgment of 112 invalidity.  It was not in your Honor's order to be argued today, which is why we all haven't focused on it; but there's necessarily some overlap, because RIM moved that the contents of the mailbox and enabling/disabling are invalid, or claims including those are invalid.

I'm going to start with the contents of the mailbox, because, as I said, this is, in fact, case dispositive.  This issue arises, your Honor, because Mformation, during claim construction, asked the Court to construe that claim limitation not to require the transmission of all things stored in the mailbox.

Your Honor did not directly address that issue in the claim-construction order.  In fact, the contents of the mailbox shows unconstrued at the end of phrase, but in the comments that you have in the order, you did say that you're not going to require that all contents be transmitted.

And if that is the case that the scope of the claim doesn't require that, then Mformation's own position has

invalidated the patent.  And we know, from the *Alza* case, that, in fact, a patentee can advocate a position which does, in fact, end up invalidating their case.

The problem with the contents of the mailbox are twofold.  Number one, it lacks an antecedent basis.  And, number two, there is no indication in the patent of what to transmit if it's something less than everything in the mailbox.

Now, of course, your Honor knows the law of lack of antecedent basis quite well.  And clearly, if the patentees knew the law of lack of the antecedent basis, they have "a command" repeatedly followed by "the command"; but when it comes to the contents of the mailbox, they only have the contents of the mailbox, and they never once have contents of the mailbox before that.

Now, it's true -- and both parties have provided law -- that lack of -- or that antecedent basis can be provided implicitly; but here there is no implicit antecedent basis because, in fact, neither the claims nor the specification described in any way what to transmit if it's anything less than the contents of the mailbox.  And therefore, the contents of the mailbox, as a whole, is indefinite.

If, for example, we had a claim that included the area of a circle, that phrase, "the area of a circle," has a defined meaning; a known meaning.  It's $\P\ r^2$, but if the Court had construed that to be something less than the area of a

circle, it wouldn't be clear what portion of that the Court would be talking about. And the specification doesn't give us any additional understanding of what is transmitted if it's not everything in the mailbox. We have "transmitting the contents," and "the contents of the mailbox" merely parroted back in a number of places in the specification. That doesn't provide us any understanding of that phrase.

The patent also only describes placing demands in the mailbox or other information, and then transmitting everything that was in the mailbox to the wireless device, because the claims, themselves, don't describe what is transmitted if it is anything less than everything, and the specification does not do so. The claims -- or that particular limitation is, therefore, indefinite.

THE COURT: Well, if the threshold condition is not met, what happens?

MR. CHARFOOS: If the threshold is not met, there's no connection established, whatever.

THE COURT: Is that the only step modified by lack of threshold condition?

MR. CHARFOOS: Well, currently, your Honor, we're on the contents of the mailbox, and so whether or not there's a threshold --

THE COURT: No, but doesn't that -- doesn't that limitation, based on threshold condition, apply to each of the

steps?

MR. CHARFOOS:  "Without a request from the wireless device" relates to each the steps, your Honor.

The threshold condition states wherein -- thank you -- wherein the connection is established based on a threshold condition.

I have Claim 1 up on the board here, your Honor, for your convenience.

THE COURT:  Right, but -- okay.  I'm trying to get back to this.  It's been a while since I looked at the construction of that --

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  -- but if there is no connection --

MR. CHARFOOS:  Correct.

THE COURT:  -- based on a threshold condition, there is still a commands in the mailbox?

MR. CHARFOOS:  Yes, there is.  Well, there could be.  There could be.

THE COURT:  It could be.  It's not delivered.  It could be.

MR. CHARFOOS:  Yes.

THE COURT:  All right.  So if there is a command, and the threshold condition is established, the contents would be transmitted, according to this claim?

MR. CHARFOOS:  Correct.

THE COURT:  All right.  Could there be commands in the mailbox for whom threshold conditions are established, and for whom threshold conditions are not established?  Could both be there?

MR. CHARFOOS:  Your Honor, there's no description in the patent, whatsoever.

THE COURT:  Right, but is there a limitation that requires that the contents all satisfy the threshold condition?

MR. CHARFOOS:  Well, I'm not sure that the contents really satisfy the threshold condition.  The threshold condition is a predefined state of the server or wireless device.  And that would determine whether a connection is established.

Now, once the connection's established, the contents of the mailbox -- and because it uses the -- it's got to be defined.

And as, of course, we know from the *Helmsderfer* case, because the patent uses a different term -- "command" -- and a different term -- "the contents of the mailbox" -- those are presumed to have different meanings.

So what is presented to the Court is not necessarily a question of, I think, whether the patent discloses a particular threshold for particular demands which are in a mailbox.  The issue here is -- and this does get to it in a particular way, but whether there was a threshold or not, what

is transmitted?

And the patent never suggests that any subset of what is in the mailbox is transmitted versus on the other subset.

**THE COURT:**  Are there any dependent claims that split it out?

**MR. CHARFOOS:**  No, your Honor.

**THE COURT:**  This content, as opposed to some other contents?

**MR. CHARFOOS:**  It is always "the contents of the mailbox" are transmitted.  And patent repeatedly describes, as we saw here, that "the contents" is always everything that's in the mailbox.

**THE COURT:**  So in my construction, I could have said "all of the contents," but I didn't.

**MR. CHARFOOS:**  That is correct.  Well, the construction just leaves the contents of the mailbox as it is.

And -- and I can go back to your construction here, your Honor.  The computer's not quite moving as fast as I'm punching the button.

So your construction just says, "wirelessly transmitting from the server to the wireless device the contents of the mailbox."That has not been construed.

You do have a comment in the claims-construction order which says, "I'm not going to require transmitting all contents of the mailbox."

And, because Mformation advocated for that position, that's where this invalidity issue arises from.

Had this Court said "everything in the mailbox," it would have been clear based on patent and entirely consistent with the specification that all of the contents of the mailbox are transmitted; but the patent says not just "contents"; not "any contents." It says "the contents." It must be something that we know. And, simply, that's not described anywhere else in the patent.

**THE COURT:** All right. I see. I understand your position.

**MR. CHARFOOS:** Thank you.

Can we go to 11?

Your Honor, we now get to enable/disable. And in this instance, it's very interesting. There's a lot of hypotheticals coming from Mformation's counsel.

The fact of the matter is, is enable/disable could mean two different things. It could mean "enable and disable." It could mean "enable or disable." The patent doesn't tell us in any way, shape, or form which it is. And the patent claims must provide fair notice of the metes and bounds of the claimed invention. We have to know what that those metes and bounds are. And "enable and disable" has a different scope than "enable or disable."

You asked, your Honor, if this could be just a mere

issue of claim construction.  And it would be possible, but the patent doesn't tell us which of those two to choose.

THE COURT:  Well, that's up to me.

In other words, if it's a construction issue, and I say I can't construe it, that might lead to this motion; but until I say one way or the other what the inventor meant by slash, how can we -- how can I make -- I need to, of necessity, define what that term means.

MR. CHARFOOS:  And, your Honor, I would suggest to the Court -- obviously, this is your decision, but I would suggest to the Court that if you look at the patent, itself, the patent doesn't lend itself to any one or other of the interpretations.

In every instance -- this is not limited to just Claim 21.  This is found in Claim 5, 21, and 22.  It's always "enabling/disabling."

Now, Mr. McDonald came up with a very imaginative hypothetical, where he said,

"Well, why would you ever have
something which enabled and disabled access
to the server?"

And it's certainly possible, your Honor, that one of ordinary skill in the art would look at this and think:

A server has limited resources.  And so
we don't want that devices constantly

contacting the server.  So I'm going to send one command that enables access of a wireless device to the server for the purposes of downloading one program, and immediately disables access right -- once that's finished.  And then the server's free to go work on other wireless devices.

That's certainly a possible understanding from this, as plausible and possible as the hypothetical that Mr. McDonald gave you; but because those are equal understandings of the slash, the Court should not simply pick one, without being able to determine what the patentee meant.

And if you look at the specification, the specification doesn't provide any indication of what they meant.  It's always --

THE COURT:  Has the -- you know, has -- have there been cases where the slash has been construed by the Circuit?

MR. CHARFOOS:  Mformation actually cites two cases to you, your Honor:  The *Netflix* and the *Bushnell* case.  Neither case is applicable here.

THE COURT:  Well, but has the slash been construed?

MR. CHARFOOS:  Not in this context, your Honor.

THE COURT:  I'm not asking in this context.  Has it been construed?

MR. CHARFOOS:  Not that I'm aware of, your Honor.

**THE COURT:** So this is a matter of first impression. I like times when I can say for the first time. It would surprise me, though, if that's the case. It is a common punctuation.

**MR. CHARFOOS:** Indeed, but in many instance -- for example, in *Netflix*, which they cite to you, both parties agreed it was "or"; but the issue in claim construction there didn't relate to what the meaning of the slash was. It meant to how that was implemented in a queue.

In the *Bushnell* case, the claim actually said "and/or."

And the Court said, "Well, it could be both, and it doesn't make any difference to the claims scope which it is," but we have not found a case, your Honor, that is merely just the slash, where there's no description anywhere in the specification or the patent to provide any additional information.

**THE COURT:** Well, but there, you have a use of the slash. Why do you need it?

**MR. CHARFOOS:** Why do you need it: And/or?

That's what the patentee chose in that instance, your Honor.

And the patent -- and the Court found in that instance that actually, they really didn't need it, because there was no difference in claim scope depending on whether it

was "and" or "or."

THE COURT: So you think "and" space "or" means the space as "and/or"?

MR. CHARFOOS: I would have to see what the specification laid out, your Honor.

THE COURT: Appropriate caution. All right. Go ahead. Finish up.

MR. CHARFOOS: I'll skip past what Dr. Madisetti said. And it's clear from the slide he's using it inconsistently. These are his terms. And he does say "enable and disable applications."

We will now turn to mailbox, and establishing mailbox, which is an issue that was raised in Mformation's motion. Your Honor, it was interesting when Mr. McDonald got up here, too, he actually had a slide in his presentation where he had a bunch of underlining.

That doesn't look so good. I know it's set to auto focus.

Your Honor, this would be on Slide 5 from their presentation. He underlines an address in memory that can store information here. That underlining is not in your Honor's Court order. The Court order construed the entire phrase as, "establishing a mailbox for the wireless device at the server." The Court did not specifically address mailbox within that.

In addition -- and this will come up in a few minutes -- in a motion for summary judgment which Mr. McDonald also referenced, the Court declined to add the additional one-to-one requirement. And we'll also see -- and that was at Mformation's request. And we'll see how that impacts things.

The issue with mailbox and establishing a mailbox, your Honor, is that our expert did say that there are a limitless number of ways that that could possibly be implemented.

And the patent, although a patent can be broadly claimed, must still set the metes and bounds of what is included within the patent limitation, itself. And because it is absolutely limitless, it is therefore unclear to one of ordinary skill in the art what the boundaries of the patent are.

The patent, itself, doesn't provide any description of what the mailbox is. It simply says it's established by the management server, and it stores commands.

And, in fact, Dr. Kushwaha, in his deposition, admitted that the patent doesn't disclose any particular kind of limitation.

And, looking at the patent and looking at Dr. Kushwaha's testimony, Dr. Acampora concluded that because there was a limitless number of possibilities, that this claim term was, in fact, in the case of mailbox, indefinite; lacking

written description; and not enabled; and "establishing a mailbox" lacking written description and not enabled.

And I mentioned your Honor had a comment in your summary-judgment order which said that you declined to include a one-to-one limitation. And that goes to the issue of whether or not a single mailbox can store separate commands for separate devices. And this may have gone a little bit to your threshold condition going to particular commands within the mailbox.

Your Honor, there's no disclosure in the patent, itself, which describes a situation where a mailbox stores commands for multiple devices, selects one of those commands within the mailbox, and transmits only one of those commands to a particular wireless device.

The claims talk about transmitting the contents to the wireless device. We can see that on the bottom, a connection's established, and commands are transmitted to the wireless device.

Now, it's true in the middle paragraph, as Mformation points out, the commands can be stored for multiple devices; but that doesn't mean that they're selecting one command among that group to go to just one device. Could be a broadcast mailbox, for example, where we send five commands; put five commands in the mailbox. All five commands go to every device that's on the network, but the important thing is -- is even

the section that they point to which talks about a mailbox storing commands for multiple devices doesn't disclose in any way how you would select just one going to just one device.

Your Honor, I'll quickly move through Claim 4. Claim 4. The invalidity position here is similar to the one that your Honor faced in the with and without a request. Well, your Honor already invalidated two-thirds of the '917 Patent. We see here that independent Claim 1 includes,

"Wherein the connection's established based on a threshold condition."

Claim 4 says,

"Wherein the connection's established periodically."

Now, how did this come about?

Well, if we go back to the prosecution history, you can see that "wherein the connection is established periodically" and "wherein the connection is established based on a threshold condition" were two separate dependent limitations. And in your claim-construction order, at page 17, you noted that the specification of the patent, itself, disclosed two contrasting ways to establish a connection either based on the threshold condition, or periodically.

At no point in the prosecution history or in the patent, itself, does it ever disclose as Mformation is now putting forward to the Court some sort of combined periodic

threshold limitation.

The Examiner rejected the claims.  And Mformation was forced to take independent claim or -- sorry -- Dependent Claim 7, and move it into the independent claim; but they forgot to clean up Dependent Claim Number 6, which included periodic connection.

Your Court's construction of "threshold condition" includes a predefined state of the server or the wireless device, other than solely the elapsing of time.  When we place Claim 1 with a construction contrasted with Claim 4, we see that Claim 1 requires that it's solely the elapsing of time. Claim 4 requires that it's periodically.  And those two are inconsistent and nonsensical, especially when viewed in light of the specification, which always contrasts establishing a connection based on one or the other only.

Your Honor, for the following reasons, we would actually ask that you grant RIM's motion for 112 invalidity for summary judgment.  There's no genuine issue of disputed fact. The contents of the mailbox and enabling/disabling render the claims invalid.  And we would, of course, ask that you deny Mformation's motion for summary judgment.

**THE COURT:**  All right.  Is there one more?

**MR. MC DONALD:**  Your Honor, if I could have a brief --

**THE COURT:**  Oh, certainly, certainly.

**MR. MC DONALD:**  Thank you very much, sir.

I'm going to focus.  As to the contents of the mailbox, and whether they have to be the entire contents, it feels like Groundhog Day, because this was argued vigorously during claim construction.  And I would, with respect, refer the Court to that briefing; but one of points we made in our briefing and that I believe the Court relied upon is that, in Claim 1, as you can see either on the screen or on the placard, it recites "transmitting the contents of the mailbox."

Now, when the patentee -- the inventors -- wanted to specify all contents of the mailbox, they did so expressly in Claim 5, when they said "erasing all or part of contents in mailbox"; and likewise, in Claims 11, 15, 19, 23, and 30.  And then --

**THE COURT:**  Well, 5 doesn't have to do with the mailbox.  It has to do with the device.

**MR. MC DONALD:**  That's correct, your Honor; but they didn't draw a distinction between the contents as to whether it would be all contents, or a part for that.

**THE COURT:**  Well, all right.  Five doesn't relate to this problem, but the others might.

**MR. MC DONALD:**  Well, the use of the word "contents" within the claims -- under the law, the use of a term or phrase is --

**THE COURT:**  I see.

**MR. MC DONALD:**  -- presumed to have a common meaning and a consistent meaning within the claims.

RIM's counsel, Mr. Charfoos -- he relies on this case, *Alza*, for an indefinite, saying that our claims are indefinite.  I still can't figure out why *Alza* is appropriate, because in *Alza* the claim language was deemed definite, or there was no dispute as to indefiniteness.  The claims were invalidated for lack of enablement.  I've looked.  The word "indefinite" appears nowhere in the *Alza* decision.

Now, if you look at the case law RIM does rely upon for indefiniteness, including the *Halliburton* case, the Phase 4 case goes solely to the idea of antecedent basis, as does *Uniram*.  All of these involve high-technology inventions, where the claim term held to be indefinite was not known or decipherable to one of skill in the art.  In *Halliburton*, it was a fragile gel.  The Court held that it was indefinite, because there was no way to figure out how fragile the gel could be, and still be within the scope of the claims.  Each of the other cases is likewise distinguishable, your Honor.

And I know we're running short on time, so if you have any other questions, I'm happy to answer them.  Otherwise, our motion is submitted.

**THE COURT:**  So we have one last motion, but I want to get my staff a break, especially the court reporter here.  And so we'll come back right at noon and hear the last part.

(Whereupon there was a recess in the proceedings from 11:54 a.m. until 12:02 p.m.)

**THE CLERK:**  Please remain seated and come to order.

**THE COURT:**  Ordinarily, my staff keeps track of the time, and they say this is the last time they will yield that responsibility to counsel.  Very well.  We have one other area to cover.

**MS. DE BRUIN:**  Your Honor, our final motion is RIM's motion for summary judgment to limit presuit damages.  There are no disputed issues of fact on this motion.

The only issue for you to consider is a legal one; and that reduces down to whether this Court, in granting summary judgment to RIM on the non-method claims, of the '917 patent, has somehow avoided the need for Mformation to comply with the marketing requirement.

Under the applicable law, as we will see, Mformation is required to comply with the marking requirement, and is therefore limited to presuit -- they have no right to presuit damages.  Their damages basically start when they filed a lawsuit, because they agree they didn't mark completely until October 27th.

Now, the marking requirement applies when both method and apparatus claims are asserted in a case, and there's something to mark.  Here, apparatus and method claims are asserted, and there is something to mark.  Mformation started

to mark at the time that it filed this suit.

Under *American Medical*, therefore --

Can we go back to the *American Medical* slide?

Under *American Medical*, therefore, marking is required.  And it's undisputed Mformation failed to mark.

What Mformation does is they try to rely on an exception to this requirement, but this exception only applies when only method claims are asserted in a case.  That's not the case we have here.

They rely on *Hanson* and *Crown Packaging*.  Those are cases in which only method claims are asserted.

Here, both method and apparatus claims are asserted.

**THE COURT:**  Now, I understand your argument.  And, actually, I find it very compelling; but has a case said explicitly that you only need to mark if both types of claims are asserted?

**MS. DE BRUIN:**  Well, the *Hanson* case and the *Crown Packaging* case say a complementary point to that.  They say that if only method claims are asserted, you do not need to mark.  If just apparatus claims are asserted, you do need to mark.

**THE COURT:**  So we get to your proposition by implication.  We've not had an explicit holding to that effect?

**MS. DE BRUIN:**  Well, we do, in the *American Medical* case, have the requirement that if both method and apparatus

claims are asserted and there's something to be marked, which is the case here, then you have to mark.  That's what *American Medical* stands for.  If you have both apparatus and method claims, and you have something that's capable of being marked, then you have to mark.

THE COURT:  All right.

MS. DE BRUIN:  We also looked to the *Osteotech* case, which is a District Court case.  And in *Osteotech*, a plaintiff, much like Mformation, tried to avoid the marking requirement by, while summary judgment was pending, dropping their non-method claims.  The Court didn't allow that to avoid the marking requirement.

Here, we still have Mformation's non-method claims asserted in this case.  They haven't dropped those claims. They haven't dismissed them.  I mean, we'd be arguing, in any event, that even if they dismissed them, they still should be required with the marking requirement, but here the facts are: Those claims are still in the case.  They just stand invalidated under summary judgment.  There are still claims that Mformation can challenge on appeal, and can seek to have the Federal Circuit overturn the Court's invalidity ruling on those.

THE COURT:  All right.  Let me hear from your opponent.

MS. DE BRUIN:  Thank you, your Honor.

**MR. ARNSTEN:** Actually, your Honor, I think on this one, you do get your case of first impression, because the issue is whether apparatus claims are asserted in this case.

The law is clear that, where you've got a patent that has both method and apparatus claims, if the patentee just asserts the method claim, they're entitled to presuit damages, even if they -- even if they didn't mark.

Well, here, we've got a case where, initially, when we filed the action, we asserted all of the claims under the '917 Patent, but we're only going to trial on the method claims. As of November 18th when this Court invalidated the apparatus claims, the only claims asserted are method claims. And again, the law is that the language in the federal circuit, law -- the bulk of the language uses claims asserted.

Now, in the *Hanson* case --

Can you click to Slide 4? Oh, I've got the clicker here. There we go.

We believe that the *Crown Packaging* and *Hanson* cases are the cases that set forth the law. And in *Hanson*, on that same page, the Court says because the only claims that were found infringed were method claims, the notice requirement doesn't apply.

So what you have here is a situation where -- where initially, method and -- both method and apparatus claims were asserted; but as of now and as of going to trial, we are only

asserting method claims.

THE COURT:  Do you have any authority that that makes a difference; that you asserted initially both apparatus and method claims, and that that relieves you of the notice requirement?

MR. ARNSTEN:  We would only be relieved of the notice requirements if we are not asserting method -- both method and apparatus claims.  So really the issue, is, I think --

THE COURT:  Is there anything that says that "asserted" means at trial?

MR. ARNSTEN:  No.  The best we have -- no, there is nothing.

THE COURT:  So is there anything that says "asserted" means at any point?

MR. ARNSTEN:  Well, it -- no, there is -- there is not, your Honor.  Again, the *Hanson* case used different language found infringed, although again, in *Hanson*, only method claims were at issue.  Just -- I'm serious.  This really is a case of first impression here with you.

But the one case, the *Osteotech* case that RIM relies on, is -- it's a Southern District of Texas case.  It's probably closest on the facts, because that was a case where the plaintiff brought both method and apparatus claims, and then dropped the -- dropped the apparatus claims.  And the Court says, "Well, no.  We're still going to bar presuit

damages"; but *Osteotech* got the law wrong.  *Osteotech* was relying on an -- another District Court decision called *"Philips."*  And we talked about this in our brief, where *Philips* was operating under the assumption that *American Medical* held that if the patent contains both method and apparatus claims, you've got a mark.  And that's not the law.

*Crown Packaging* is very clear that even if a patentee cannot mark, and can assert a patent that contains both method and apparatus claims, but if they're just asserting the method claims, they get presuit damages.

And so what it comes back down to again here is, you know -- is:  What does "assert" mean, in terms of the progress of the case?

Now, RIM's contending -- I think they're contending if it's in your complaint -- although they also talk about, you know, interrogatory responses and asserted claims, you know. And again, up until November 18th, system claims were in here; but we're only going to trial on method claims, your Honor.

And I think there's -- you could make good public-policy arguments why your line ought to be at trial. You don't want to encourage, say, somebody that's got a patent that contains both method and apparatus claims.  They're not sure what claim construction's going to come up.  You're not sure what discovery's going to show.  You want them to assert it in the same lawsuit, without being -- don't want them to

say,

"Oh, I had to split those into two lawsuits, because I didn't mark, and so then, with my method claims, I can get presuit damages here."

I think -- I think that, just in terms of what makes sense for a case, you draw the line at what you're going to trial on.

**THE COURT:** Well, I understand as a policy matter -- and I often, when I watch Congress at work, wish I were a legislator, but I've got to follow what's going on here in the Circuit. And you would I agree that *American Medical* applies, but your argument is that we don't know what the Circuit might have done there, because both claims were before the Court at the time of trial, and we don't know what would have happened if it was prior to trial that one set dropped out?

**MR. ARNSTEN:** Yeah. Actually, there, in *American Medical*, the parties stipulated that both sets of claims were infringed, so that, yeah, it went through the -- there wasn't the issue of -- of only the method claims being asserted.

You really do -- you've got -- again, aside from possibly the *Osteotech* case, which, I submit, if you take a close look the at it, they just got the law wrong -- you really do have a case of first impression as to where you -- what period of time you look to see asserted. Is it at trial? Is

it at the complaint?  Is it somewhere in between?

And we submit it should be at trial.

**THE COURT:**  You don't make the argument that whatever product was the apparatus here to which marking could have been applied does not practice the invention, right?  It did --

**MR. ARNSTEN:**  Right.

**THE COURT:**  -- practice the invention, and could have included the method claims in the marking that was applied to it.

**MR. ARNSTEN:**  We're not disputing that we could have marked.  And, in fact, after the lawsuit was filed, we did.

**THE COURT:**  You did.  All right.  Thank you.  I understand the force of your argument, but perhaps that's one of those kinds of legal doctrines that needs to be established on appeal, rather than by the trial court.  So you can anticipate that the Court will find, at least as to this motion, that the failure to mark has an effect on damages.  I'll address it fully in my order.

Is there anything else?

I did find intriguing the idea that you -- because I asked my staff:  Had I received this five-day trial stipulation?  And no one could remember having received it.  So this is something that you've done, that you intend to tender at a case-management conference?

**MS. DE BRUIN:**  Your Honor, this is something that I

did want to address, and didn't get to.  I was going to raise it on the marking issue, and didn't get to the point where I would mention that.

We did not stipulate to a five-day trial.

We have, in the past, entered case-management statement to the Court, indicating that we project a five-day trial.  And we'll certainly work with Mformation to limit the trial as much as possible; but contrary to Counsel's representations, we never did stipulate --

THE COURT:  Well --

MS. DE BRUIN:  -- to it.

THE COURT:  -- that's the kind of stipulation that would require the Court's involvement, because, given the nature of this case, it would be incredible to get it done in five days.  I often think jurors would love it if you were able to make stipulations that would reduce the work that they would have to do to something that could be done in five days.  And maybe that would be a useful exercise:  To split the case up into something that could be done in a shorter period of time.  It would leave other matters for later, but that's the subject of a case-management conference.

And what I prefer to do is to take this under submission; suggest a date for us to come back together to talk about that.  In the interim, you all can be thinking with your clients about all of that.  I'm sure you would want to have the

Court's order on these matters.

I'm in a little -- I'm at a bit of an advantage, in the sense that I would like to narrow the case, but if I find that I can't, I don't have to write as much in denying the motions for summary judgment and leaving you to go forward.  I often am attempted to give you something that will say why, so as to help you out as you get to trial, but I'm not sure that would be as beneficial.

Where are you, in terms of your discovery?  All done?

**MR. THAKUR:**  All done.

**MS. DE BRUIN:**  We think --

**THE COURT:**  So you're otherwise ready to try the case.  Have you --

**MS. DE BRUIN:**  Your Honor.

**THE COURT:**  Yes.

**MS. DE BRUIN:**  The one exception would be the Provsys source code.  If you look at Magistrate Judge Lloyd's order, he does provide that RIM might seek additional discovery with respect to that.  We were waiting to see if the public-use motion would be dispositive of all issues, and eliminate any need of for that; but there may be some further discovery that's needed because of that, based on Magistrate Judge Lloyd's order.

**THE COURT:**  All right.  You won't find any difficulty in setting your schedule in a way that you like.  And so that

sounds like you want to have at least that motion decided, so that you can intelligently talk about what your schedule is in terms of whether you need more discovery.

**MS. DE BRUIN:**  Yes, your Honor.

**THE COURT:**  Very well.  I'll bring you back together quickly, so that we can talk about that.

That means I'll have to do my work here more quickly than perhaps I otherwise would, but thank you for that information.  I'll have the matter under submission.

**MR. CHARFOOS:**  I received an e-mail while we were in the hearing.  Sybase does not have any objection to us using their confidential information at the hearing today, so we don't need to deal with the confidentiality issues.  Both third parties have agreed.

**THE COURT:**  All right.  So the preliminary order to seal the appropriate is not imposed.

**MR. CHARFOOS:**  Thank you, your Honor.  I.

**THE COURT:**  Thank you all.  Thank your clients.

(At 12:18 p.m. the proceedings were adjourned)

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C.08-04990 JW, Mformation Technologies, Inc., v. Research in Motion Corporation, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Sunday, October 2, 2011