Volume 1

Pages 1 – 139

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

```
------------------------------)
                              )
Mformation Technologies, Inc., )
                              )
                Plaintiff,    )
                              )
  vs.                         )        No. C 08-4990 (JW)
                              )
Research In Motion, Ltd.,     )
et al.                        )
                              )       San Francisco, California
                Defendant.    )       Thursday, June 14, 2012
------------------------------)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:


For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        LISA MARIE NOLLER
                        RUEBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO CTO

**APPEARANCES** (cont.):


For Defendant:          Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        ANDREW B. GROSSMAN
                        TIFFANY PATRICE CUNNINGHAM
                        MEREDITH ZINANNI
                        FERLILLA VICTORIA ROBERSON
                        MICHAEL DALEY KARSON

Also Present:           Ray Dikun, RIM Vice-President

Thursday, June 14, 2012

(9:40 a.m.)

(In open court)

(Jury venire enters the courtroom)

(Courtroom Deputy William Nobel takes the roll of the venire)

(Jury venire sworn/affirmed)

DEPUTY CLERK:  All rise.  This United States District Court is now in session, the Honorable Chief Judge James Ware presiding.

THE COURT:  Good morning.  Please be seated.

Call the case.

DEPUTY CLERK:  Calling case C 08-4990, Mformation Technologies, Incorporated, vs. Research in Motion, Limited.

Counsel, please rise and make your appearances for the record.

MR. THAKUR:  Good morning, your Honor.  I am Amar Thakur, here for Mformation Technologies, Inc., joined by Lisa Noller, Shawn McDonald.

At the end is Dr. Rakesh Kushwaha.  He's the inventor of the patent.

THE COURT:  Good morning.

MS. NOLLER:  Good morning.

THE COURT:  Good morning.

MR. MATUSCHAK:  Mark Matuschak, here for Research In motion, or RIM.  With me is Linda DeBruin, Andrew Grossman and Aaron Charfoos.

And in between Linda and Andrew is Ray Dikun. He's our corporate representative, vice-president from RIM.

THE COURT:  Good morning, Counsel, and your clients.

Good morning, ladies and gentlemen.

Oh, not too friendly are we?

(General laughter)

THE COURT:  You know, I come across the bridge from the East Bay also, and this morning was sort of like the perfect storm because not only was there a BART problem, there was an accident on the bridge, and there were people who otherwise don't come across the bridge, so the lanes where you pay for the toll was more impacted where you have kind of the FasTrak device.

And as I was coming across, I was thinking about you because -- because you've been summoned to this courtroom for determination whether or not you qualify to serve as jurors, but we've been involved in this case for awhile, but this is your first day and I wanted it to go very well for you to put you in the best frame of mind for deciding whether or not you can serve as jurors, and I

wanted to commiserate a little bit with you for the inconvenience, not only of having to come but also having to put up in the traffic.  I hope that in the course of the morning we can figure it all out and find it profitable for you.

I want to introduce two special guests that I have here, and they are Parker and Alani Swanthos, who are seated over there.

Would you stand for me, please.

(The two children are standing)

THE COURT:  Okay.  Actually, these are neighbors, and two children who I have seen grow up in the neighborhood, and they are here to observe democracy in action.

You may be seated.

One of the important things about this process is that something that our founders of the nation set up for the benefit of our democracy form of government.  And I always look to those who are going to be caring for the country in the future to judge whether or not we're doing a good job of caring for democracy for purposes of passing it on to their generation.  As I have watched them grow up, they watch what we do.  They take lessons from our conduct and how we care for ourselves, our own personal body and habits, is something they emulate, and how we

care for the nation is something that they emulate.

And I tell you, these kids, perhaps as an exception, because the last presidential election, they grew up through that, and there were some remarkable things that happened for our nation in that election that served to heighten their education.

But they observe us in times when we're not so vigilant about our rights, and so one of those things is jury service. One of the -- one of the unfortunate aspects of how busy we are in the nation in our personal lives is that we don't seem to care a lot about our civic responsibilities, unless it is a matter that has occupied our attention. And I want to start this morning by setting a tone of how important our conduct is for the future.

As you all know, you're about to be voir dired, asked questions about your qualifications as jurors. The right to a jury trial goes back to the very founding of our country, when the colonists, as they were, wrote the Declaration of Independence. One of the things they wrote in the Declaration of Independence, the reason they wanted to declare themselves independent of England, was that King George was denying them the right to have jury trials. They were being treated as though they had none of the civic rights they'd enjoyed as English citizens,

and jury trials were a part of the tradition that English citizens enjoyed. And the reason I say "enjoyed" is because the whole premise of the jury system is that some of the most important things that we do in our democracy is not done by the government. It's done by citizens.

We are a nation, we say, of the people, by the people, for the people. And so when we wrote into the Constitution the right to a jury trial, it's a part of our constitutional rights. We often think about the Bill of Rights and talk about them, but we don't often speak of the right to a jury trial as among those, and it is. It is the Seventh Amendment to the Constitution of the United States. And the reason we have it is because the founders of our country thought that power should be in the people.

When they wrote the Constitution, it doesn't start out, We the Congress, or We the President, or We the Judges of the Supreme Court. It starts out "We the people of the United States, in order to form a more perfect union..." They were the real sovereigns. And they wanted to keep that power in themselves.

And the way we do it, of course, as a nation, is that we vote, and we serve as trial jurors. You know the statistics. It's sad when we think about it, but half of the people who are eligible to vote don't even bother to register to vote. So they can't vote on election day.

And then on election day, less than half of the people who are registered actually go out to vote in major national elections.  We can have local school board elections, and 17 percent, 15 percent, you know the numbers, actually go out and vote on very important issues as to people and policies that will govern the education of our young people.

I travel a lot as a judge, and I've gone to countries where they've been thirsty to have a form of government in which they can participate, where they can vote.  They've been denied that right for many, many years.

I've gone to South Africa, which is one of my more memorable trips, and there at the Apartheid museum, they have stitched together as you walk through the museum this photograph of people, and as you get to the very end of the museum, before you leave, you realize that the photograph that they've stitched together are people standing, some sitting, some in wheelchairs, but they are in line to vote.  And that was a historic occasion because it was a time when those people got to vote for the very first time, when Apartheid ended and they had a democracy.  And it was a huge interest in voting.

We have elections and we've kind of become very apathetic about them.  And the reason I think it's

important is because I believe, I firmly believe, that if we lose our democratic form of government, it will not be because we are invaded by terrorists and democracy is stripped from us by force; it will be because as a nation we decide we don't want a democracy, we're too busy for a democracy.  Let the government be run by somebody else other than us.  Give us some professional who runs the government who knows best what we need and what we want.

And that'll be a sad day indeed.

So as a Judge of the federal court, I have made it my personal mission to pass on that enthusiasm for participation in government to every one of my fellow citizens who appear before me.  And I hope that today when your name is called, you will regard it as sacred as the duty some of our young people face when they are called upon to leave their homes, leave their country, and go and fight for democracy in foreign countries.  We make that call upon them and yet we sit back, and when democracy is in our hands, we don't give it that same degree of care that we demand of them.

So I realize that there are practical things that you have planned in your lives.  Some of you may be traveling because this trial will actually get very close to the 4th of July holiday, which ironically is a day when we should be most patriotic, but some of you might have

scheduled things around the holidays and will not -- it will not be inconvenient for you to serve as jurors given our schedule.  And I will respect that.

Some of you might have come to this country carrying a language that was not English as an original language and you have difficulty understanding the English language.  If you tell me about it, I will respect that.  Because we will -- I will urge the lawyers to go through this case with some speed just to keep it moving, and it will all be in English, so it's important that English be a language you're conversant with.

Some of you may be traveling in connection with your employment.  And I can excuse you for that.

The law gives me then certain obligations to excuse you if you have lawful cause, and I recognize it and I will do that.  Actually when your name is called and you take a seat, you'll find a calendar of the trial proceedings.  It's been my practice as a judge for a long time to schedule the trial so that jurors know when the trial will start and when we'll stop.  And so we have it fully scheduled.  It may go shorter than the schedule, but it won't go any longer than the schedule we've set up for you.

And so the first question I will ask after we become acquainted when you a little bit is whether or not

that schedule poses any hardship for you, and I will listen to that and excuse you for the hardship.

Now, you notice the one thing I haven't said much about is the case itself. And that's because, quite frankly, I don't know a lot about the case itself. This is the trial of a case that will be heard for the first time. I've had some preliminary proceedings in the case, but I don't know what happened here. This is a case where you, as the jury, will be deciding what happened here. In fact, that's your job. If you're selected as jurors, you will be listening to testimony and seeing documents about what happened with these companies.

This is a patent infringement case. I'll tell you that. We know that there are claims here about a patent which was issued by the United States Patent and Trademark Office, was infringed by the defendant company. And our job is to educate you about that. The patents are set up in the Constitution, a protection of inventors in the useful arts, and they're given protection by the government. And so the claim by the patent owners here is that another company infringed; that is, used the issued patent or some of the claims in the patent in a way that will be explained to you.

The other side denies that they infringed, and indeed, they will present evidence, as I understand it,

that the patent is not a valid patent.  Like many circumstances, there are times when the government will issue a patent and upon closer examination, if it turns out that it's not something that's new or novel, that should not have been patented in the first place, and that's the claim that is being made in this case.  But all of those -- the things that I can tell you are the claims by the parties.  But whether or not they are indeed valid claims or proved by the standard of proof is something that you will decide.

Even as I tell you it's a patent case, I don't want you to have any concern about that.  Because the way the system is set up is it's the responsibility of the Court and the lawyers to educate you totally about what the law with respect to patents are, and what this technology is.  I know that it has to do with a device that some of you might be familiar with, and that's called the BlackBerry.  That is a claim that is involved here. It's not the BlackBerry necessarily in all aspects of it, but there's some aspect of the BlackBerry that is involved in the case.

All of those are matters that we'll educate you fully about as jurors in the case.

So at this point, I'm going to ask Mr. Noble, our Clerk of the Court, to call your names.  We have numbered

cards in the seats.  As your name is called, we'll designate a seat to you, and we've put your -- you in numbered seats to speed up the process of trying to decide which people are qualified and which are not.

And although we got started late, it's my hope that either right at noon or close to halfway through the day, we will have a jury and the rest of you will be free to go.  If we don't make that goal, we'll be coming to that shortly after our lunch break.  Very well.

DEPUTY CLERK:  Seat Number 1, Susan King, K-i-n-g.  Will you please step forward and have a seat in the jury box.

Seat Number 2, Ronald Monce, M-o-n-c-e.

Seat Number 3, William Roscoe, R-o-s-c-o-e.

Seat Number 4, Angelica Granera, G-r-a-n-e-r-a.

Seat Number 5, Elizabeth Tom, T-o-m.

Seat Number 6, Elaine Zhang, Z-h-a-n-g.

Seat Number 7, Lisa Olson Dent, O-l-s-o-n, D-e-n-t.

Seat Number 8, Gayla Morris, M-o-r-r-i-s.

Seat Number 9, Sonia Read, R-e-a-d.

Seat Number 10, Brendon Woods, W-o-o-d-s.

Seat Number 11, Thavinh Phommachit, P-h-o-m-m-a-c-h-i-t.

Seat Number 12, Maria Najarro Miron,

N-a-j-a-r-r-o, M-i-r-o-n.

Seat number 13, Jeremy Maganito, M-a-g-a-n-i-t-o.

Seat number 14, Salvador Rodriguez, R-o-d-r-i-g-u-e-z.

Seat --

THE COURT:  Now, at this point all 14 of our seats in our jury box are filled.  We've actually added some seats here in front of the jury box so that we can take advantage of having a larger group from which to start this jury selection process.

DEPUTY CLERK:  Seat Number 15, Vincenzo Stornaiuuolo, S-t-o-r-n-a-i-u-o-l-o.

Seat Number 16, Georgia Langsam, L-a-n-g-s-a-m.

Seat Number 17, Pamela Kind, K-i-n-d.

Seat Number 18, Jessica Yuen.

Seat Number 19, Janice Podoll, P-o-d-o-l-l.

Seat Number 20, Teresa Ewell.

Seat Number 21, Gary Brodie, B-r-o-d-i-e.

Seat Number 22, Stephen Mau, M-a-u.

THE COURT:  Very well.  Before I start asking questions of you, let me explain our process a little bit. So we now have 22 of you all now called forward and seated, and there are some prospective jurors who have not been called forward.  As the process operates, I'm going to start asking questions, and if you have a positive

response to my questions, I want you to raise the number card that's been given to you.

So let me test that out. Raise your number card now so I can see everybody has their number card. Very well. Okay. Good.

And hold the number card up until I acknowledge it, so you get familiar with your number card so I know it.

And those of you who are not -- who have not been called forward yet, I'd ask that you pay attention to our process, because sometimes when I excuse a juror, I ask, Did you hear my questions? And I might go through the questions, but in a much more summary fashion. So I don't have to repeat the details of each question, and it would help if you paid attention and kind of think about how I would have answered that question if I had been in a seat.

And don't worry that you're not in a seat. Because let's see, Miss King, who's in Seat Number 1, for example, if I should excuse her, the next person that we call will go right to Seat Number 1. So you're just as eligible to sit and you might actually be in Seat Number 1. So I ask you to pay attention.

Next, I do want to be true to my statement to you about the first question. And that is, I want you to look, those of you who are seated, at the calendar that

has been placed in front of you there.  Let me get my copy here.  This is a calendar of our trial.

And let me just kind of explain it a little bit.  There are some days when there will be no trial proceedings.  And indeed, today will be the only day this week that we'll be involved in trial.  And you'll see that on the 14th we list there as jury selection.  So the only thing we're doing in the case today is jury selection.  There won't be a trial process tomorrow, on Friday the 15th.  Nor will there be on Monday, and indeed if you look, every Monday there's an indication that there's no trial.  The reason for that is because I have other proceedings that are already scheduled, and so my process is to have law and motion and some of those matters always on Mondays, leaving Tuesday to Friday for trial.

And so you'll see that if you are picked as a juror in this case, we will start on Tuesdays and work from 9:00 till noon and 1:00 to 4:00.  And each one of those sessions is numbered.  So you'll see Session 1, 2, 3, 4, for those days.

If you turn to the second page, which is the holiday comes on Wednesday of that week, there won't be any trial on Monday because of law and motion.  But because the only recognized holiday is the 4th, we will be in session on the 3rd and we'll come back on the 5th.  The

reason I wanted to call that out to you is that some people take advantage of the national holiday to schedule their vacations, and I want you to let me know whether or not you're available to us on the 3rd and 5th and 6th, because those are, as you can see, the last days of our evidence.

If you look then to the 10th, you'll see argument, submit to jury.  That is the day that we have scheduled that all of the evidence will be in, and so the lawyers will make their arguments, and I'll give you instructions on the law, and the case will then be yours. And we've allowed then for the balance of the day on the 10th all the way through the 13th for deliberations. Given the issues in the case and the length of the trial, it's my judgment that if you have the case for that period of time for deliberations, you will be able to have a sufficient time to make a decision in the case.  That's not to control what your decision is but just to give you time.

And so it means that if you are traveling during the week of the 16th, that shouldn't interfere with us. But if you have any scheduling problems all the way up through the 13th, I would want you to let me know.

And so the first question that I'm going to ask is a question that has to do with your availability.  If

there's anything that would interfere with your serving as a juror during the time period that we've now outlined on that calendar, please raise your number card and keep it up until I call your number.

So I see Number 4.  Number 5.  Number 7, Number 11, Number 17, 18, and 21.

Let's start with Prospective Juror Number 4, Miss Granera?

PROSPECTIVE JUROR:  Well, right now I have a scheduled camping trip with my family for the weekend of the 22nd, Friday the 22nd.  I am also a teacher at a summer program, so we are always offsite, we're always traveling with the kids to different field trips, so all week long, so each day of the week is a different outing for the children.

THE COURT:  And when did that program start?

PROSPECTIVE JUROR:  It started last week.

THE COURT:  Thank you.

Let's see, Miss Tom.

PROSPECTIVE JUROR:  My scheduling difficulty is that I'm a nurse, and when I leave court today I will be on call and I will be on call all night long, and I do a lot of overnight call, as far as that goes.  I don't know if that would be an issue for the Court.

THE COURT:  So is night shift, as I would call

it, is that your regular time?

PROSPECTIVE JUROR:  No, my regular shift is the day shift at one job and the evening shift at another, but the day shift, I work at two different hospitals.  So in one hospital I do the nighttime call.  Not every day but many times a week.

THE COURT:  Thank you, Miss Tom.

Number 7, Miss Olson Dent.  Do you use both or --

PROSPECTIVE JUROR:  You can just say "Miss Dent."

THE COURT:  Thank you very much.  Miss Dent?

PROSPECTIVE JUROR:  My only issue is that I live, it takes about a five-hour roundtrip for me to get to San Francisco and back.

THE COURT:  Where do you live?

PROSPECTIVE JUROR:  Up on the Russian River in Sonoma County.

THE COURT:  Lovely area.

PROSPECTIVE JUROR:  It is beautiful.

THE COURT:  I should explain, this is a federal case in a federal court, and our court covers -- well, the Northern District goes all the way from the Monterey County up to Eureka, which is very far north, up to the Oregon border, but this court will reach San Mateo County all the way to the Oregon border, so we do summon people from within the district.  Sometimes we can make

accommodations for that here locally, but that would mean you wouldn't be able to go home during the course of the trial.

But I understand, Miss dent.  Thank you very much.

Juror Number 11, Miss Phommachit.

PROSPECTIVE JUROR:  My reason is that I schedule vacation on the second week of July.  To travel to Thailand, take my mom back to visit her hometown.

THE COURT:  Very well.  Thank you.

Number 17, Miss -- Miss Kind.

PROSPECTIVE JUROR:  I have a vacation scheduled also, the week of the 6th through the 15th of July.

THE COURT:  July 6th through 15th.  Thank you.

And next to you, Miss Yuen?

PROSPECTIVE JUROR:  On the 28th I have a paid continuing education class that I have to take.

THE COURT:  That's June 28th?

PROSPECTIVE JUROR:  Yes, June 28th.

THE COURT:  And that's the only day you have a conflict?

PROSPECTIVE JUROR:  Yes.

THE COURT:  But it's -- this is continuing education in what area?

PROSPECTIVE JUROR:  For my license requirement,

for my work.

THE COURT:  And what area do you work in?

PROSPECTIVE JUROR:  Physical therapy assistant.

THE COURT:  And Mr. Brodie?

PROSPECTIVE JUROR:  Thank you.  I'm a business owner in Petaluma.  I have 13 employees, automotive repair, and we have usually four people in the front sales office, I'm down to three.  And as service manager, as part of my workforce, I have both my service manager and one of my sales force on vacation as we speak for another week and a half.  So I have one person running my place of business for the next period, for this court date.  So it's pretty tough, difficult.

THE COURT:  All right.  And I can appreciate as a business owner how you would wish to be there.  I'm going to keep you for now, though.  Thank you, Mr. Brodie.

But that doesn't mean you're on the jury.  I'm just going to hold you there since I find other circumstances more compelling.  I'll let you go as we proceed, if I don't need you as much as others.

So let me go through -- those that haven't spoken up to now.  Sometimes it occurs to people that, Gee whiz, if that was a good excuse, I'm going to ask for an excuse.  Don't do that.  Stick with me now.

So I will thank and excuse Miss Granera, Juror

Number 4, and ask to have a replacement juror called for that seat.

DEPUTY CLERK:  Robin Gandhi, G-a-n-d-h-i.

THE COURT:  I'll thank and excuse Miss Tom, Juror Number 5.

DEPUTY CLERK:  Janelle Branagan, B-r-a-n-a-g-a-n.

THE COURT:  I'll thank and excuse Miss Dent, Juror Number 7.

DEPUTY CLERK:  Luis Escobar, E-s-c-o-b-a-r.

THE COURT:  I'll thank and excuse Juror Number 11, Miss Phommachit.

DEPUTY CLERK:  John Walton, W-a-l-t-o-n.

THE COURT:  I'll thank and excuse Juror Number 17, Miss Kind.

DEPUTY CLERK:  Theresa Lowe Chan, L-o-w-e, C-h-a-n.

THE COURT:  And I'll thank and excuse Miss Yuen, Juror Number 18.

DEPUTY CLERK:  Mitchel Magleby, M-a-g-l-e-b-y.

THE COURT:  Very well, I have a pencil mark by Mr. Brodie, but I want to see how we're doing in terms of having a time-qualified panel at this point.  I'll ask those of you who have just come forward, take a look at our calendar and raise your number card if service for just the period of time of the case would pose a hardship

on you.

Number 5, Number 3, Number 4, Number 6, Number 11, Number 14.

So I got some new people who were here the last time, that always happens -- I want to know about it because we do want to make certain we wouldn't have you seated and then put you in a difficult situation.

So I've got to go now to Mr. Roscoe, Juror Number 3.

PROSPECTIVE JUROR:  My employer will cover 10 days of jury duty.  This is a little bit more than that.

THE COURT:  All right.  Thank you, Mr. Roscoe. I'll keep you for now.  The lawyers promised me that although I've given them all this time, they'll use less. So our goal would be to keep you in the money.

Let's see, Mr. Gandhi, Number 4.

PROSPECTIVE JUROR:  Yes, so I have a flight out to Philadelphia on the 21st for a family wedding for the Thursday and Friday of that week.

THE COURT:  Thank you, Mr. Gandhi.

Let's see, Miss Branagan?

PROSPECTIVE JUROR:  I have a vacation planned to Vegas July 5th through 9th.

THE COURT:  We should keep you here so as to keep the money in your pocket.

(General laughter)

THE COURT:  The 5th through the 9th.  That's right as we're closing the case.  The 9th would be okay, but you would be needing to travel on Thursday the 5th; is that right?

PROSPECTIVE JUROR:  Yeah, and then I need daycare for my son.

THE COURT:  That is a lawful cause to excuse a juror, if you are responsible for the care of a minor child during the period of the trial, or of an aged or infirm person, you can ask to be excused, and if you can't make other arrangements, if you are the principal caregiver.

Miss Zhang, Number 6.

PROSPECTIVE JUROR:  I have two young kids at home.  No one's taking care of it.

THE COURT:  All right.  You're the primary caregiver?

PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  So who's caring for them today?

PROSPECTIVE JUROR:  My mom, she took off of work.

THE COURT:  Does she normally live with you and care for your children?

PROSPECTIVE JUROR:  No.

THE COURT:  So you made special arrangements for

her to come and care?

PROSPECTIVE JUROR:  Uh-huh.

THE COURT:  She would not be available for you during the period --

PROSPECTIVE JUROR:  She has her own job too.

THE COURT:  So she had to take the day off?

PROSPECTIVE JUROR:  Right.

THE COURT:  I see.

Let's see, Mr. Walton, Juror Number 11.

PROSPECTIVE JUROR:  Yes, I have a vacation planned for July -- I'm leaving on July 11th.

THE COURT:  July 11th.  That would be in our first day of deliberations.  And so it's a vacation that would extend for the rest of that period of time?

PROSPECTIVE JUROR:  Right.

THE COURT:  Thank you, Mr. Walton.

Mr. Rodriguez, Juror Number 14.

PROSPECTIVE JUROR:  My problem is I won't feel comfortable about the questions because my English is not a hundred percent.

THE COURT:  All right.  Have you understood what I've been saying up to now?

PROSPECTIVE JUROR:  Yeah, but not always what you're saying.

THE COURT:  What do you do for a living?

PROSPECTIVE JUROR:  I live in --

THE COURT:  What do you do for work?

PROSPECTIVE JUROR:  I work for Safeway.

THE COURT:  Safeway.  What do you do for Safeway?

PROSPECTIVE JUROR:  I -- driving.

THE COURT:  You're a driver?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Well, I didn't improve my circumstances with that row, so let's try that again.

All right, so I'll thank and excuse Mr. Gandhi.

DEPUTY CLERK:  Myrna Baesa, B-a-e-s-a.

THE COURT:  I'll thank and excuse Miss Branagan, Number 5.

DEPUTY CLERK:  Jeffrey Pettegrew, P-e-t-t-e-g-r-e-w.

THE COURT:  Miss Zhang, I'll excuse.

DEPUTY CLERK:  Hilda Ramos, R-a-m-o-s.

Number 11, Mr. Walton.

Scott Lykken, L-y-k-k-e-n.

THE COURT:  I should explain when I excuse jurors, that doesn't mean they're totally excused as jurors, just this case.  They'll remain open to subject to call on another case.  In case you are tempted to ask for an excuse, think about how important this case is.  This is a major patent that has been issued by the PTO.  It's

not a very long trial, it's only a couple of weeks. And you could be picked for a -- well, there's a nice juicy bankruptcy trial that is beginning.

(General laughter)

THE COURT: I'll thank and excuse Mr. Rodriguez, Juror Number 14.

DEPUTY CLERK: Richard Wherry, W-h-e-r-r-y.

THE COURT: And I still have Mr. Brodie's situation in mind.

Those of you now called forward, raise your number card if for some reason the time of the trial poses a hardship for you.

Hold those number cards until I call them.

Number 4, Number 5, Number 6, Number 9, Number 10, Number 11.

Do you want to be in the bankruptcy case?

(General laughter).

THE COURT: Number 5, I called.

Number 11. I called.

Okay. So let's go to Number 4.

PROSPECTIVE JUROR: We're leaving on vacation the 28th and we're coming back the 5th, after the 4th of July.

THE COURT: I kind of thought that travel would be a problem for us. Thank you, Miss Baesa.

Mr. Pettegrew?

PROSPECTIVE JUROR:  Your Honor, July 10th through July 13th, my board of trustees are meeting with the Director of Industrial Relations of the State of California, and the Director of Office of Self-Insurance Plans.  I run an agency which handles workers' compensation claims for the State.  And we have a four-day meeting in that period of time.  I'm free up until then.

THE COURT:  I'm sorry, so your position is what?

PROSPECTIVE JUROR:  I'm the executive director of the California Self-Insurers Security Fund.

THE COURT:  You're starting off with a board meeting.  Your board.

PROSPECTIVE JUROR:  The board is meeting with the State because of the responsibilities that we take.  The state legislature created us, and we're meeting with them because they're adding new responsibilities for our entity.  There's only three employees, and I'm expected to be at that meeting.

THE COURT:  All right.  You're a member of the board?

PROSPECTIVE JUROR:  I'm not a member of the -- I'm the executive director, I report to the board.

THE COURT:  So the board and the executive director would meet with them?

PROSPECTIVE JUROR:  That's right, sir.

Case 3:08-cv-04990-EMC   Document 989   Filed 07/02/12   Page 29 of 139   29

THE COURT:  Thank you, sir.

Miss Ramos?

PROSPECTIVE JUROR:  Good morning, your Honor.  I have a family trip scheduled from July 2nd till July 14th to Florida.

THE COURT:  Miss Read, Number 9?

PROSPECTIVE JUROR:  I am working -- I'm sorry, my poor English.  I'm single, and I'm the only one working, and that is my owner is not paying even one day.  I don't know if I'm going to be able to pay my rent.

THE COURT:  What kind of work do you do then?

PROSPECTIVE JUROR:  I'm in an eye doctor's office, an optician.

THE COURT:  I see.  And it's the -- you're not salaried so that if you're not there --

PROSPECTIVE JUROR:  It's hourly pay.

THE COURT:  You're hourly pay.  I understand. Thank you, ma'am.

Mr. Wood, Number 10?

PROSPECTIVE JUROR:  I'm sorry, your Honor, I'm 98 percent positive I'm available, and there's no conflicts. I just need to check my phone to make sure.

THE COURT:  Certainly.  Feel free.

PROSPECTIVE JUROR:  I have work meetings, board meetings, and a budget meeting, but I think people can

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

cover, so I think I'll be okay.

THE COURT:  In this world we don't allow phones to ring or interrupt our proceedings, but it certainly is a device we all count on.  So I regularly allow the lawyers to use their technology for purposes of the trial, and as jurors, you'd be free to keep your phones.  We'd just ask you to put them in a position so they didn't disturb us if you were sitting as jurors.  And sometimes when they're on vibrate, they vibrate -- they vibrate you so that sometimes disturbs us.  But most of the time we ask you to turn them off, but you're free to use them especially for these purposes.  So I'll wait for Mr. Woods to let us know.

Let's go to Mr. Lykken.

PROSPECTIVE JUROR:  I live in Sonoma County up on the Russian River as well.  It's about a five-hour trip, roundtrip here.  And also I have family coming to visit me actually, they're coming in today, and are leaving on the 22nd.

THE COURT:  And wouldn't you want to bring them along to see you?

PROSPECTIVE JUROR:  Oh, I don't want to argue.

THE COURT:  Thank you, Mr. Lykken.

So I think we're getting close.  So let's excuse Miss Baesa, Number 4.

DEPUTY CLERK:  Kent McKinney, M-c-K-i-n-n-e-y.

THE COURT:  Mr. Pettegrew, your situation is similar to Mr. Brodie's, maybe a little more urgency attached to it.  If I excuse you, I'm tempted to excuse you as well, but I will excuse you, Mr. Pettegrew.  We wouldn't want you to be here missing an important meeting, and especially one with the government, and having your attention divided to do that.

So let's replace him on Seat Number 5.

PROSPECTIVE JUROR:  Thank you, your Honor.

DEPUTY CLERK:  Laurie Fuller, F-u-l-l-e-r.

THE COURT:  The Court will thank and excuse Miss Ramos, Juror Number 6.

DEPUTY CLERK:  Jessica Boske, B-o-s-k-e.

THE COURT:  Miss Read is excused, Number 9.

DEPUTY CLERK:  Linda Fodrini, F-o-d-r-i-n-i.

THE COURT:  Mr. Woods, how did your calendar check out?

PROSPECTIVE JUROR:  It went fairly well.

THE COURT:  Fairly well.

PROSPECTIVE JUROR:  There's one issue on July 13th, but the trial probably will not go that long. I work for Alameda County, I'm part of an executive research and development program.  We have a meeting that day that goes from about 10:00 till 4:00.  But I think

they will make an exception for jury duty.

THE COURT:  Let me keep you for now then.  That doesn't mean you'll be seated on the jury.  I'll just keep you on our panel for now.

I'll thank and excuse Mr. Lykken, Juror Number 11.

DEPUTY CLERK:  Francisco Nunez, N-u-n-e-z.

THE COURT:  Mr. Brodie, are you still asking to be excused having to do with your business exigencies?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you.  I'll excuse you.  Perhaps that juicy bankruptcy trial would be better suited.

PROSPECTIVE JUROR:  Yes, you don't want to be in one.

DEPUTY CLERK:  Leang Kuoch, K-u-o-c-h.

THE COURT:  There will be other questions I'll ask of you that might require I excuse you because one of the requirements is that we have a fair, impartial jury.  And as I tell you a little bit about the people and the companies involved in this case, there may be some of you who are familiar with those people or companies and are somehow involved in ways that you don't know now, and I will have to excuse you.

So usually with respect to time, I try and keep you all together as much as I can to see whether or not I

can at least start out that process with as many people who are qualified for the time.

I've got some new people in the box now.  Let me pause and see if any of you would raise your number card that based purely on the schedule in the case you would ask to be excused for hardship.

Number 4, Number 6, Number 9, Number 11, Number 21.

Thank you.

Mr. McKinney?

PROSPECTIVE JUROR:  The case looks really interesting.  My time concern is my employer doesn't pay me anything and I don't get any time off for jury duty. So I'm going to lose a significant piece of salary in this time period.  I don't know if that's valid or not.

THE COURT:  It is.  It is.  Economic hardship is a valid excuse.  What do you do for a living?

PROSPECTIVE JUROR:  I'm a senior strategist at Cal State University, East Bay's Information Technology Department, and I'm working part-time, so I get no benefits.

THE COURT:  And being part-time, can you kind of schedule yourself around the trial?

PROSPECTIVE JUROR:  I could schedule it in July around the trial, and probably still collect that income.

But June's over as far as if I get on this trial.  So there's no way to schedule my last two weeks to get paid for anything.

THE COURT:  I understand.  Thank you.

Let's see, Miss Boske?

PROSPECTIVE JUROR:  I run my own boutique in Mill Valley, so I'm concerned with coverage, and I just lost a couple of coworkers, so I'm now trying to hire a new people.  So now I'm just opening and closing the store.

THE COURT:  What kind of a store is it?

PROSPECTIVE JUROR:  It's a boutique in Mill Valley.  So I run the store.  So I don't know.

THE COURT:  You're the owner?

PROSPECTIVE JUROR:  I'm not the owner.  Just the boutique proprietor.

THE COURT:  I see.

Number 9?  Miss Fodrini.

PROSPECTIVE JUROR:  This does sound like an interesting trial.  I do have tickets booked for Minneapolis on July 5th, return on the 9th.

THE COURT:  Thank you, Miss Fodrini.

Mr. Nunez, Number 11.

PROSPECTIVE JUROR:  I just recently started working and might have a conflict with those days, but I don't get paid time off.

THE COURT:  What kind of work do you do?

PROSPECTIVE JUROR:  I work at Bruce Automation, they're part -- vacuum units.

THE COURT:  It's an automation company?  What do they make?

PROSPECTIVE JUROR:  They're vacuums for -- it's like to clear all the, like debris, water, like for iPods.

THE COURT:  I see.  So for cleaning purposes?

PROSPECTIVE JUROR:  Yeah, it's cleaning.

THE COURT:  How many do I have left?  So I'm down to the Top 10 List.  And I'm reminded that I did not speak with Mr. Kuoch, is it?

PROSPECTIVE JUROR:  Yeah, I'm poor speak English.  And also poor understanding, and also sleepy, too.

THE COURT:  You're sleepy?

PROSPECTIVE JUROR:  Because --

THE COURT:  Did he say "sleepy"?

PROSPECTIVE JUROR:  Because newspaper, midnight.

THE COURT:  So you work at a shift, where?

PROSPECTIVE JUROR:  For newspaper.

THE COURT:  For a newspaper.  And so you are fatigued as a result of having worked till midnight?

PROSPECTIVE JUROR:  Just deliver.

THE COURT:  Oh, delivery.  Thank you, sir.

Let's try our last hand here.  And so I will

thank and excuse Mr. McKinney.

PROSPECTIVE JUROR:  Kevin Oshiro, O-s-h-i-r-o.

THE COURT:  Miss Boske is excused, Number 6.

DEPUTY CLERK:  Mark Meyer, M-e-y-e-r.

THE COURT:  Miss Fodrini, Number 9, is excused.

DEPUTY CLERK:  Candace Creasy, C-r-e-a-s-y.

THE COURT:  Number 11, Mr. Nunez, is excused.

DEPUTY CLERK:  Michael Cocadiz, C-o-c-a-d-i-z.

THE COURT:  Number 21, Mr. Kuoch, is excused.

PROSPECTIVE JUROR:  Sarah Crosat, C-r-o-s-a-t.

THE COURT:  I appreciated the time we're going through, especially for those that are not raising your numbers, but it's very important that we have a jury that's time-qualified at least before we start the more substantive questions.

Those of you just called forward, raise your number cards if for any reason the schedule alone is a problem for you.

I see Number 9.  Very well.  Miss Creasy?

PROSPECTIVE JUROR:  I'm self-employed, and so there's no pay for me if I don't work.  In addition, my husband has multiple sclerosis, and although he's not disabled, he does require my help.

THE COURT:  So what work do you do?

PROSPECTIVE JUROR:  I'm -- used to be a

typesetter.  Now I'm a graphic production artist, working out of my home.

THE COURT:  At your home.  And because you work out of your home, you kind of share your work with caregiving for your husband?

PROSPECTIVE JUROR:  That's correct.

THE COURT:  Thank you, Miss Creasy.  I'll excuse you.

Let's try to fill the hot seat.  Seat Number 9.

PROSPECTIVE JUROR:  Naomi Azriel, A-z-r-i-e-l.

THE COURT:  Thank you, Miss Azriel, for coming forward.  I'd ask you to give your immediate attention to our schedule.  You've already raised your number card.

(General laughter)

PROSPECTIVE JUROR:  Your Honor, I'm self-employed as well, as a private practice psychotherapist.  I work full-time seeing clients throughout the day, so it would be a major hardship.

THE COURT:  You've already scheduled yourself?

PROSPECTIVE JUROR:  I have a regular schedule, I see people at the same time on a weekly basis.

THE COURT:  I see.  You could be good for the jury because they're going to need a lot of help, but I will excuse you, Miss Azriel.  I wouldn't want you sacrificing the care of your clients.

Let's see if we have someone who is not conflicted in that way.

DEPUTY CLERK:  Alison Altman, A-l-t-m-a-n.

THE COURT:  Good morning, Miss Altman.

PROSPECTIVE JUROR:  I'm good.

THE COURT:  You were all right?

PROSPECTIVE JUROR:  Good.

THE COURT:  Excellent.  I'm going to give you a break in a little bit, because I know that sometimes the human element catches up with us, and I want to give you an opportunity to use the restroom.

But let me do one thing before I do that, just to give you a little bit of a flavor, because sometimes I lose people based upon the case itself.  Let me have you -- let me have the lawyers reintroduce themselves, because I want to know whether or not you know any of these lawyers, their law firms or their clients.  That's very important.

I'd have the lawyers say something about themselves, their firm and the companies they represent.

Please.

MR. THAKUR:  I'm with the law firm of Foley & Lardner.  With me is Lisa Noller.

MS. NOLLER:  Good morning.

MR. THAKUR:  Good morning.

MR. McDONALD:  Good morning.

MR. THAKUR:  Alan Arntsen.

And as I have explained earlier, we represent Mformation Technologies, Inc.  Dr. Kushwaha is the Chief Technical Officer, and --

THE COURT:  And Mformation is spelled with the letter M and "formation" Technologies, Inc.  I have it down as a company incorporated in Delaware.

Is there anything more you would say to our panel to acquaint them?

MR. THAKUR:  Sure.  It's incorporated in Delaware; however, they're based out of New Jersey in the telecon corridor of New Jersey, and my firm's name is Foley & Lardner.

THE COURT:  Thank you.  Very well.

Counsel?

MR. MATUSCHAK:  Ladies and gentlemen, my name is Mark Matuschak.  My law firm is Wilmer, Hale.  And we represent Research in Motion, or RIM.  The parent company of Research in Motion is a Canadian company.  It's outside of Toronto, a town called Waterloo, Ontario.  Research In Motion Corporation also has a U.S. headquarters in Irving, Texas, and facilities also here in California.

And let me introduce Mr. Ray Dikun.

MR. DIKUN:  How are you?

THE COURT:  Good morning.

MR. MATUSCHAK:  Mr. Dikun is vice-president of products and works out of the headquarters in Irving, Texas.

With me is Linda DeBruin.

MS. DeBRUIN:  Good morning.

MR. MATUSCHAK:  Law firm of Kirkland & Ellis.

And he's Andrew Grossman, who's also from Wilmer, Hale.

MR. GROSSMAN:  Good morning.

THE COURT:  Good morning.

MR. MATUSCHAK:  And Aaron Charfoos, also from Kirkland & Ellis.

MR. CHARFOOS:  Good morning.

THE COURT:  Raise your number card if you believe you know any of these lawyers, their law firms or their companies?

PROSPECTIVE JUROR:  Companies.

THE COURT:  If you know any of the companies of Mformation or Research in Motion.

So, Number 16.  Who is it that you believe you're acquainted with, Miss Langsam?

PROSPECTIVE JUROR:  It's not that I'm really acquainted.  My husband's hermetically sealed to his CrackBerry.

(General laughter)

PROSPECTIVE JUROR:  So I'm familiar with the product.

THE COURT:  All right.  Very well.  I don't consider that disqualifying because we try lots of cases where the products themselves are used because they are consumer or commercial products.  But thank you very much for bringing that to our attention.  I did notice that you call it a "CrackBerry."  One of the things that the lawyers always and I are concerned is to make sure there are no negative feelings that are associated with the products even as you use them.

PROSPECTIVE JUROR:  No, I mean his whole company IT department gives them to everybody because they're so good for e-mail.  I mean he's addicted.  He travels and he's on it.

THE COURT:  Very well.  Thank you very much, ma'am.

It goes without saying if any of you owned stock in any of these companies or were employed with any of these companies, any association whatsoever other than maybe having heard of their products.

Very well.

It's about 10 after 11:00.  Can I give you a 10-minute break and have us all back in the same seats at

exactly 11:20 to continue with the process.

(The jury venire exits the courtroom.)

(Recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Please be seated.  Thank you for coming back so promptly.

I'm going to ask some questions having to do with issues that are involved in the case.  We'll have usually enough time.  I'll allow the lawyers to ask brief questions to supplement my questions.  Sometimes I'll ask you questions and have you raise your number card; other times I'll come to you and have you say more about it.

As I indicated, this is a case where there are claims having to do with a patent.  Patents are issued to inventors.  I want to know whether any of you are inventors?  Is there any one of you or members of your immediate family who invented -- well, let's say invented anything that has been patented?  Because I come up with lots of ideas that are no good.  But I do come up with the ideas.  Any of you have patents?

Number 1, Juror Number 1.

Now, that's one where I would follow up a little bit.  Miss King, tell me a little bit about that.

PROSPECTIVE JUROR:  My husband was a computer architect.  He holds somewhere between 30 and 40 patents.

THE COURT:  Very well.  Has he had the occasion of having someone or made a claim against someone for infringing his patents, any of those patents?

PROSPECTIVE JUROR:  Not yet.

THE COURT:  All right.  And does he hold them personally or has he assigned them to a company?

PROSPECTIVE JUROR:  His earlier ones were co-owned with NCR Corporation.  The latter ones, my husband and I owned a high tech company for 20, 21 years, so they're held technically in the name of the corporation.

THE COURT:  All right.  Very well.

Is there anything about the case, where the owner of a patent, actually that has also been assigned to a company, filing a claim against another company for infringement and claims having to do with the validity of the patent, anything about those issues that would make you feel you couldn't be a fair juror in this case?

PROSPECTIVE JUROR:  I definitely have opinions about the patent process.  I'm very familiar with it.  We have a longstanding policy, which our lawyers basically advised us over the years, we patent very few of our innovations.  We're very choosy about what we patent, because once you patent them, they do become public knowledge.  And are available.  So from that perspective,

I have opinions.

THE COURT:  All right.

PROSPECTIVE JUROR:  I also work for small companies in the high tech world, and we have been mostly -- we do work with eTODs.  We're engaged with very large corporations.  And I have opinions about the way small companies are held as far as the playing field.

THE COURT:  All right.  Well, those are helpful -- I didn't quite get to any feelings one way or the other about the case itself.  And it is true that the reason for the patent system is to disclose the invention.  There are lots of times when inventors come up with ideas that they want to keep secret.  Probably one of the most famous secrets is the formula for Coca-Cola.  I'm not sure the formula itself is subject to being patented, but perhaps the process to make Coca-Cola and those sorts of things can be the subject of a patent or they can be held as a trade secret.  And once you file a patent, you have to disclose your invention, and the reason for that is so that other people can learn from the invention.  But the government gives you a franchise, an exclusive right to practice the patent, if you do disclose it, for a period of time.

And so what Miss King is saying is she's familiar with that process.

I'm not sure the process of issuing the patent will be anything of moment in the case.  I will explain it.  But I wanted to have you tell me whether or not your statements about being familiar with the process and companies involved in it, if that would make you feel that you couldn't be fair to the inventor and that company, or to the alleged infringer or that company, in this case?

PROSPECTIVE JUROR:  I would hope I could be fair.

THE COURT:  All right.

Now, I mentioned other intellectual property rights.  Let me ask whether any of you are owners of other intellectual property:  Trademarks, trade secrets, copyrights, any of that kind?

Number 1 and Number 3.

Miss King, is that in the same areas?

PROSPECTIVE JUROR:  Yes, because we own our companies.  We do a lot of copyright, trademark work.

THE COURT:  Mr. Roscoe?  Tell me about your intellectual property that prompted you to raise your number card.

PROSPECTIVE JUROR:  (3)  I've published 10 copyrighted books.

THE COURT:  Have you ever had an occasion to be involved in any controversy over someone violating your copyright?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And was that resolved satisfactorily?

PROSPECTIVE JUROR:  Not really.

THE COURT:  Is there anything about that dispute that would make you feel that you couldn't be fair to the parties in this case if you were selected as a juror?

PROSPECTIVE JUROR:  No.

THE COURT:  Is that an ongoing dispute, the one that you mentioned?

PROSPECTIVE JUROR:  No, the particular dispute is not ongoing at this time.  I have questions about several of my publishers, but they're not ongoing disputes.

THE COURT:  Thank you, sir.

As I mentioned, you will hear and understand in this case about the manufacturer of the BlackBerry device, which is a mobile computing device, as I would describe it more generally, and various servers or larger computers that are used in conjunction with that.

Raise your number card if you or any member of your immediate family is involved in the manufacture, service, marketing of mobile computer devices or servers associated with those.

Raise your number card if any of you use a mobile computing device such as a smartphone or -- okay.

Okay, put them down.  Raise your number card if

you do not use a smartphone or mobile communicating device, such as an iPad or --

So Number 8 and Number 12.  Thank you.

Now, I want to know whether or not those who do not, Miss Morris, and -- is it Najarro Miron?  Is there a particular reason you don't, Miss Morris?

PROSPECTIVE JUROR:  (8)  No, no, it isn't.  It's just the phone that I have, I'm just satisfied with what I have.  Something simple.

THE COURT:  Yes, all right.  You don't consider your phone to be a smartphone?

PROSPECTIVE JUROR:  I mean, I just really use it just to receive calls and make calls, basically that's all I do.

THE COURT:  All right.  Thank you.

And Miss Miron, is there any particular reason why you do not use a mobile computer device?

PROSPECTIVE JUROR:  (12)  Not -- we don't need it.

THE COURT:  You don't need it?

PROSPECTIVE JUROR:  We don't need that.

THE COURT:  Thank you.

You might hear the background of both of these companies, both had an origin at some point and could be described as startup companies.  Raise your number card if

any of you have ever worked for a startup company or owned or managed your own business that kind of started from scratch and grew from there.

(Number 1, Number 16 raised cards.)

THE COURT:  Number 1, which I think I heard a little bit about.  Number 11.  Number 16.  Number 22.  Number 5.  And Number 14.

Thank you.  So Miss King, is that the company you've described to me previously?

PROSPECTIVE JUROR:  There was that one, and then we left there about two years ago and started another company.  So we're definitely still in the startup phase.

THE COURT:  Thank you.

I do note Miss Fuller, Number 5.  Pass the microphone to her.

Tell me a little bit about the startup company that you are involved in.

PROSPECTIVE JUROR:  I was involved, I was CFO for a startup, for a very short period of time.

THE COURT:  And --

PROSPECTIVE JUROR:  About seven years ago.

THE COURT:  Anything about that experience that makes you feel you wouldn't be fair here?

PROSPECTIVE JUROR:  None.

THE COURT:  Pass the microphone down to Juror

Number 11.

PROSPECTIVE JUROR:  (11)  Early days, in a clothing company.

THE COURT:  And you're involved in that now?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you, sir.

Let's see, the next one I have is Juror Number 14, Mr. Wherry.

PROSPECTIVE JUROR:  (14)  I've been involved with a startup company, food service company, and I believe we might be the food service company for Foley & Burke.

THE COURT:  The food service company for...?

PROSPECTIVE JUROR:  For Foley & Burke.

THE COURT:  So it's a service company that might service their law firm?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Do you -- you called it Foley & Burke?

MR. THAKUR:  It's actually Foley & Lardner.

PROSPECTIVE JUROR:  I thought it was Foley & Burke.  I'm sorry.

THE COURT:  Thank you.

Miss Langsam, Number 16?

PROSPECTIVE JUROR:  (16)  I was involved as a family member with my father who started up -- he's now

deceased, but he started up a company that became quite large. And then I also started a law firm.

THE COURT: All right.

PROSPECTIVE JUROR: Long time ago.

THE COURT: What was the nature of the company that your father started?

PROSPECTIVE JUROR: It was commercial air-conditioning, and it's now a division of American Building & Maintenance.

THE COURT: Thank you.

Number 22.

PROSPECTIVE JUROR: (22) Several years back, I was co-owner of an automotive shop.

THE COURT: Thank you.

Let's see, one of you have already indicated that you or a member of your immediate family used a particular device called a BlackBerry mobile phone or something of that kind. Raise your number card if you or any member of your family have a BlackBerry mobile phone.

UNIDENTIFIED WOMAN: (5) Now or in the past?

THE COURT: Now. I might expand that later, but let me see those who are current users.

So I have Number 13, 14, 15, 16, 17, 18, 19. Let's see, I called 13 and 14. Thank you.

As I said in response to the earlier juror, it's

not disqualifying to have the device.  What we're interested in is having a fair jury, that is a jury who knows nothing about the case but will listen to the evidence, and may evaluate the case and decide the questions of fact that I will ask you to decide based on the evidence that you hear here, and the law as I instruct you.  That would be your job as jurors.

And so I ask about things like ownership of a BlackBerry because I want to know whether or not any of you would be influenced going into the case based upon that.  And that could be that you're so with it that the company that makes BlackBerry would get a little bit of favorable treatment from you just because you're happy with your device.  And that's not the proper way for you to serve as a juror.  Or you are frustrated with it or you have problems with it and the company that owns the technology would get -- have a little bit more trouble with you in meeting the burden of proof because of that personal experience.

Anyone who is involved with BlackBerrys as an owner or user that has a feeling that they would not be fair and impartial based upon that?

I see no cards.

I asked about owning stock.  You, of course, will let me know if you have owned stocks or shares or anything

with the companies that are involved here.

I had one juror who indicated she started a law firm. Any of the others of you have training in the law. Raise your number card.

Number 10. And Mr. Woods, what's the nature of your legal training?

PROSPECTIVE JUROR: (10) I'm a senior Assistant Public Defender, Alameda County.

THE COURT: All right. This is not a case that would otherwise involve criminal law, which is what public defenders are mainly concerned with. But sometimes even those who are involved in criminal law are looked upon as experts in the law. You would have to assure me that as a juror, you would not say, Well, the judge wasn't very clear about the law, I'm a lawyer, let me explain to you.

PROSPECTIVE JUROR: I would never do that, your Honor.

THE COURT: And you indicated you started a law firm but you didn't raise your card.

PROSPECTIVE JUROR: (16) You said if there's anybody else.

THE COURT: What is the nature of your legal background?

PROSPECTIVE JUROR: I'm a member of the California State Bar.

THE COURT:  What's the nature of your practice?

PROSPECTIVE JUROR:  I am retired.

THE COURT:  When you practiced, what area of law did you practice in?

PROSPECTIVE JUROR:  I was a civil litigator, and I was -- I'm supposedly one of the 44 longest certified family law specialists in the state of California.

THE COURT:  Let me give the lawyers an opportunity to ask some questions of you.  There may be others that I would want to ask, but I wanted to give them an opportunity -- I usually limit it to about 10 minutes each.

The reason I'm doing that, I thought if I allowed them that opportunity now as we approach the noon hour, I might -- they might be in a position to advise the Court whether they have any challenges to those of you who have been called forward.  The law allows them to issue challenges to ask the Court to consider excusing you if there's any legal cause for doing so.

And beyond that, the law allows them to exercise what we call peremptory challenges where they can excuse some number of you based upon just trying to mix the jury up, based upon your background and experience -- we appreciate that you've filled out the biographical information on the form that the lawyers had provided.  So

I allow them to ask follow-on questions about that.

I don't allow them to ask, Well, will you decide this case in my favor if I present this kind of evidence? That's not part of this process. This is to see more about your background.

And so I wanted you to listen to their questions, and let me call on plaintiffs.

MS. NOLLER: Thank you, your Honor.

Good morning, everybody. I just have a couple of questions for you guys to follow up on some of the things that the Judge asked you.

And I'm going to start with Mr. Woods because you're most familiar with the courtroom, right?

PROSPECTIVE JUROR: Yes.

MS. NOLLER: But as you know, in criminal cases the burden of proof is a lot higher than in a civil case. It's beyond a reasonable doubt. But in a civil case the plaintiff only has to prove their evidence by a preponderance of the evidence. So something is more likely true than not true.

Would you have any trouble applying that standard in this case if you were to sit as a juror?

PROSPECTIVE JUROR: Not at all.

MS. NOLLER: Would anybody have an issue with that concept of the lower burden of proof in a civil case

than in a criminal case?  Anybody?  I guess raise your --
I should say raise your number if you have an issue.

Okay.  And then we have basically the whole middle section of the jury I think had said that you guys have BlackBerrys.  Can I see your number again for those of you who currently have a BlackBerry?

And for each of you, I'm going to have you go through actually, can you let me know if your BlackBerry is supported by your employer so it's provided by your employer and you can check your work e-mail, or is it something you bought on your own?  And we'll just go one at a time.

So, Mr. Maganito?

PROSPECTIVE JUROR:  I just have it at home.  I don't really use it -- I have it at home, I don't use it.  I just have my iPhone.

MS. NOLLER:  So it's not supported by work?

PROSPECTIVE JUROR:  No.

MS. NOLLER:  Mr. Wherry.

PROSPECTIVE JUROR:  Mine is supported by work.

MS. NOLLER:  Is supported.

Then I think we've got Mr. -- how do you say your name?

PROSPECTIVE JUROR:  (15)  Stornaiuuolo.  Mine is at home.

MS. NOLLER:  Your employer doesn't provide it?

PROSPECTIVE JUROR:  No.

MS. NOLLER:  Thank you.

Miss Langsam?

PROSPECTIVE JUROR:  My husband has one through his employer.  But it's -- no, I have an iPhone.  It's easier.  But it's not as good for e-mail.

MS. NOLLER:  Fair enough.  And Ms. Lowe Chan, I think you said you have a BlackBerry.

PROSPECTIVE JUROR:  Yes, Mine's provided by my employer.

MS. NOLLER:  So they picked out the kind that you would use.

PROSPECTIVE JUROR:  Yes, they gave us all BlackBerrys.

MS. NOLLER:  Yeah, that happens.  Thank you.

Mr. Magleby.

PROSPECTIVE JUROR:  Mine's work-issued.

MS. NOLLER:  Okay.  And then Miss Podoll.

PROSPECTIVE JUROR:  Mine's also provided by my employer.

MS. NOLLER:  Okay.

Then I think I have just one more question just to get to know you a little bit better.  The Judge does a pretty good job of giving us some background, but if

you'll indulge me for one minute, I'd like to go through and tell me what your favorite TV show is, if that's all right.

And you can self-censor if you're embarrassed.  I watch a lot of reality TV.

So, Miss King?

PROSPECTIVE JUROR:  CSI New York.

PROS. JUROR 2:  World's Dumbest.

PROS. JUROR 3:  Glee.

PROS. JUROR 4:  Game of Thrones.

PROS. JUROR 5:  Modern Family.

PROS. JUROR 6:  Law & Order.

PROS. JUROR 7:  Pawn Stars and SportsCenter.

PROS JUROR 14:  NCIS.

PROS JUROR 13:  I don't really watch TV.

MS. NOLLER:  Good for you.

PROS. JUROR 12:  Everything, when I have time.

PROS. JUROR 11:  Game of Thrones.

PROS. JUROR 10:  Game of Thrones.

PROS. JUROR 9:  I watch two shows:  Entourage and Criminal Minds.

DPROS. JUROR 8:  Basketball Wives.

PROS. JUROR 15:  Game of Thrones.

PROS.. JUROR 16:  Same, ditto.  And I also like East West 101.

MS. NOLLER:  I don't know what that is.

PROS. JUROR 16:  It's about Australian policemen, and one of the policemen is Muslim, and then he's got a Samoan partner, and there's a lot of racial discrimination in Australia -- according to this show.  I don't know.

PROS. JUROR 17:  I try to watch Nightline every night.

PROS. JUROR 18:  Deadliest Catch.

PROS. JUROR 19:  Downton Abbey.

PROS. JUROR 20:  Modern Family.

PROS. JUROR 21:  Modern Family.

PROS. JUROR 22:  Two Broke Girls.

MS. NOLLER:  I think that's it.  Thank you for indulging me.

THE COURT:  Counsel?

MR. MATUSCHAK:  Good morning, ladies and gentlemen.  Mark Matuschak.  I'm representing RIM.  I know it's kind of awkward to have to answer questions about your personal lives to a bunch of strangers.  Thank you for bearing with us on this.

I want to ask a little bit about employment. Before I start with that, actually, how many of you enjoy working with creative things like art, music, photography, things like that?  Raise your numbers?

(Juror Numbers 4, 5, 9, 10, 11, 14)

MR. MARUSCHAK:  Miss Altman, what do you do?

PROSPECTIVE JUROR:  (9)  I work for the Deejay company, and I'm also in the media industry, that's kind of artsy.  I do makeup.

MR. MARTUSCHAK:  What do you do in the media industry?

PROSPECTIVE JUROR:  Well, just music.  I work for the Deejay Company, little events.  I work -- I'm a party motivator at bar and bot mizvahs.

THE COURT:  That's the job I want.

(General laughter)

PROSPECTIVE JUROR:  Hey, it pays to party.

MR. MATUSCHAK:  Mr. Woods?

PROSPECTIVE JUROR:  (10)  I'm thinking it through right now, and I think I enjoy most what you guys are doing now, that's the creative part.  You get to go to trial with your arguments and you get to think about a case and analyze it.  So that's what I love.  My passion, so, yeah.

MR. MATUSCHAK:  Who else raised their hands?

Go back right behind you.

PROSPECTIVE JUROR:  (4)  The arts are a hobby.  I play saxophone and song-write.

MR. MATUSCHAK:  Have you recorded or --

PROSPECTIVE JUROR:  Not professionally.

MR. MATUSCHAK:  Do you do like gigs or have, you know -- or else just for yourself and your family?

PROSPECTIVE JUROR:  Occasionally, but yeah, again, just kind of ad hoc.

MR. MATUSCHAK:  Have you ever had an issue with somebody like taking, somebody playing your song or something like that?

PROSPECTIVE JUROR:  No.

MR. MATUSCHAK:  Miss Fuller?

PROSPECTIVE JUROR:  Arts, crafts, just a hobby. I'm a quilter.

MR. MATUSCHAK:  What kinds of things?

PROSPECTIVE JUROR:  Mostly bed quilts, baby quilts, lots of arts and crafts.

MR. MATUSCHAK:  Is this just for your family and friends, or --

PROSPECTIVE JUROR:  Oh, no -- family and friends, yes.

MR. MATUSCHAK:  Did I miss anybody?  I'm sorry.

PROSPECTIVE JUROR:  (16)  Langsam.

MR. MATUSCHAK:  Yes, Miss Langsam.

PROSPECTIVE JUROR:  I'm creative.  I like to make gardens, mostly do that at home.  I also do photography.

MR. MATUSCHAK:  Have you ever shown any of your photography anywhere?

PROSPECTIVE JUROR:  No, it ends up on my website.

MR. MATUSCHAK:  Thank you.  Have any of you ever had a job where you were at a supervisory position so there's other people that you're telling what to do?

(Lots of numbers)

MR. MARUSCHAK:  Mr. Stornaiuolo?

PROSPECTIVE JUROR:  (15)  I run a family business, with 50 employees.  I'm general manager.

MR. MATUSCHAK:  Okay.  And who else?  I think I know what you do.

PROSPECTIVE JUROR:  (16)  I was a lawyer.  I had 15 employees.

MR. MATUSCHAK:  Okay.  And Miss Podoll?

PROSPECTIVE JUROR:  (19)  I work for an insurance company and I just manage my assistants.  So...

MR. MATUSCHAK:  Okay.

PROSPECTIVE JUROR:  (20)  I work for Solano County, supervisor for Women and Infants and Children Program.

MR. MATUSCHAK:  How many people do you supervise?

PROSPECTIVE JUROR:  Eleven.

MR. MATUSCHAK:  Miss Crosat?

PROSPECTIVE JUROR:  (21)  Account executive for Benefit Cosmetics.  I have about 21 employees.

MR. MATUSCHAK:  How many of you have worked for

the same company for more than five years?

Anybody worked -- so we have, could you do that again for a second?  15, 16, 17, 20, 22, 8, 10, 14.

How many for 10 years?

(Jury panel indicating)

MR. MARUSCHAK:  Still quite a bit.  Anybody work for the same company for 20 years?

MR. MATUSCHAK:  Miss Morris, where did you work?

PROSPECTIVE JUROR:  (8) I worked for 41 years, and that was at Union Bank.

MR. MATUSCHAK:  What did you do at Union Bank?

PROSPECTIVE JUROR:  I was customer service rep.

MR. MATUSCHAK:  Anyone work in a company longer than Miss Morris?

PROSPECTIVE JUROR:  (15)  Not yet.

MR. MATUSCHAK:  Have any of you worked for big companies larger than two or 300 people?

PROSPECTIVE JUROR:  (16)  Ever?

MR. MATUSCHAK:  Ever, yes.  How about companies that have 500 or more employees?

You were working --

PROSPECTIVE JUROR:  (16)  Pillsbury, Madison & Sutro.  I think I was the 287th attorney or something. That was when they were little.

MR. MATUSCHAK:  Miss Chan?

PROSPECTIVE JUROR:  (17)  Kaiser Permanente.

MR. MATUSCHAK:  Who else?

And Mr. Mau?

PROSPECTIVE JUROR:  (22)  I work for the human service agency, the welfare department, for the systems program.

MR. MATUSCHAK:  Other people?  I think some of you I know.

Mr. Meyer?

PROSPECTIVE JUROR:  I work for the Clorox Company.  And they have about 8,000 employees.

MR. MATUSCHAK:  Okay.  Now, how many have worked for, either now or previously, small companies?  I think we know a few, companies of like 50 or less.

So, Miss Fuller, you've been on both sides of that?

PROSPECTIVE JUROR:  Yes.

MR. MATUSCHAK:  Thank you.

And Mr. Maganito.

PROSPECTIVE JUROR:  (13)  Policy technician at Howard Shrumsom.

MR. MATUSCHAK:  Miss King, I think we know about you.

Anybody else?  Who's worked for a small company, 50 or less?  And we know about you.

And Mr. Roscoe?  What do you do?

PROSPECTIVE JUROR:  (3)  Currently?

MR. MATUSCHAK:  Yes.

PROSPECTIVE JUROR:  I work for an educational research and development company.

MR. MATUSCHAK:  And is that -- do you write the books that you were talking about earlier?  Are those things you do for them?

PROSPECTIVE JUROR:  No, that was a previous career.

MR. MATUSCHAK:  What do you do for the educational research company?

PROSPECTIVE JUROR:  My job title is research assistant.

MR. MATUSCHAK:  All right.  Now, it seems like we look at the newspaper every day some company or somebody at some company who's done something wrong, and I lot of people just for some reason don't trust people from companies that are large companies.

Is there anybody here that would say you just don't trust large corporations?

Mr. Roscoe?  Why is that?

PROSPECTIVE JUROR:  I'm not saying that I could not be objective.  But I fundamentally don't trust large corporations.

MR. MATUSCHAK:  Fair enough.

And Miss King, it sounds like you had some bad experiences.

PROSPECTIVE JUROR:  I wouldn't say bad experiences.  And I don't know if it makes me unable to be fair.  But I think large companies basically do what they want and then ask for forgiveness later.

MR. MATUSCHAK:  Okay.

Now I want to ask a couple of questions about just patent issues.  Now, I think as Judge Ware has explained, in this case my client, RIM, we're going to be explaining to you why we don't use the technology of the patent that Mformation has.  But we're also going to tell you that we don't believe this patent, they were the first people to do this.  And I think those of you who know about patents, you understand it has to be something new.

Now, the patent office does issue patents, so I want to ask, although the law and the Constitution provide that you have the opportunity to say, and we have the opportunity to come to you and say, We don't think that patent should have issued, that patent is not valid, does anybody have a problem saying, Gee, how can I do something different than what the patent office did?  Anybody see a problem with that?  Okay.

Does anybody think that the jury's not the right

group of people, that you're just not the right folks, to decide those issues?  As the Judge said, that's where the law puts the responsibility on your shoulders.  Are you okay with that?

Some of you I know have served on juries before, and I'd like to see a show of hands of who's been on a jury before.

Okay.  Any of you been a foreperson?  No?  Okay.

I guess the last thing I would say is, you know sometimes you sit there and we're asking questions and there's something on your mind and you sort of wish I would ask it, but I haven't thought of the right question.

I won't get to ask this question again, so I'll ask you now, is there something else that you think, anything in the back of your mind, as to whether you would have a problem with any of the issues in this case, being a fair and impartial juror and giving, you know, both sides their due and making sure you're not favoring one side or the other, just out of the box?  Anybody have anything that they want to tell me right now before we move on?

Yes, sir?  Mr. Meyer?

PROSPECTIVE JUROR:  (6)  I believe I could be impartial, but working for Clorox, we've been sued quite often, and I have been deposed in an intellectual property

case.

MR. MATUSCHAK:  Not the most positive experience, I take it.

PROSPECTIVE JUROR:  It was not pleasant at all.

MR. MARUSCHAK:  Anybody else been deposed before, have to give a deposition?

You've been deposed and taken depositions, I guess.

PROSPECTIVE JUROR:  (16) (Nods head)

MR. MATUSCHAK:  So you know all about the process.

Your Honor, that's all I have.  Thank you.

THE COURT:  It's about 10 of noon.  I'll have a brief conversation with the attorneys at the sidebar, and I'll come back to you momentarily.

Counsel, please approach.

(At the sidebar out of the hearing of the courtroom and the court reporter.)

THE COURT:  We're close to the point where I will allow the lawyers to exercise their peremptory challenges, but I wanted to follow up, as a result of my conversation with the sidebar with the lawyers, on a couple of issues.

First of all, a number of you indicated that you or members of your family owned BlackBerrys.  Although this is a case where you will hear about the BlackBerry

device, it's not disqualifying, as I indicated, to be a consumer who uses a BlackBerry because this case will involve very technical aspects with respect to the operation of a certain generation of BlackBerrys, not all the BlackBerrys.

But it is of concern to the Court if you were the owner of a BlackBerry, and I think I kind of asked this earlier, and you have strong feelings one way or the other. We want to start this case out with each side having a level playing field. No attitudes one way or the other as to who should win or lose or which company is better, because we don't have any evidence at this point.

So any of you who have BlackBerrys, particularly those whose BlackBerrys were issued to them through their employer, have any strong feelings one way or the other that you could not be fair to both sides in this case because of your relationship with your BlackBerry, the fact that you love it or the fact that you don't find it to be as useful as you want it to, either side of that, raise your number card.

All right. So Number 14, say more about your feelings, Mr. Wherry.

PROSPECTIVE JUROR: (14) I think it's a great device, I love it. I play with it with all the time. I spend a lot of time with my BlackBerry.

THE COURT:  Technology has improved to the point where that is -- that's a common feeling, that you have a device and you use it.  It's very useful.  That isn't disqualifying, but is it your feeling that I am so fond of my device that the company that makes that device, if they're sued in a lawsuit, I'm going to side with them at the very beginning and favor them over someone who says that that device infringes a patent or is somehow defective in some way?

PROSPECTIVE JUROR:  I don't know.  I really don't know.

THE COURT:  All right.  Now, the reason that is of concern to me is that means that we'll have to take a chance.  In other words, your answer is not a clear, No, I could be fair in listening to the evidence having to do with it.  When you say "I don't know," it could mean that once the case starts, you say, Objection, I'm not going to be fair.  And then we wouldn't know.  Because there's no occasion for you to raise your hand and say, I've stopped being fair at this point in time.  Do you understand?

PROSPECTIVE JUROR:  I understand.

THE COURT:  So say again what your feelings are, starting out.  Is this a case where you're of a mind that maybe as you start to hear this evidence you will favor the BlackBerry company?

PROSPECTIVE JUROR:  I could.  I could, yeah.

THE COURT:  Based not on the evidence but based on your feelings about your BlackBerry?

PROSPECTIVE JUROR:  I like the BlackBerry, yes, I like it very much.

THE COURT:  Thank you, sir.

And the -- anyone else who wishes to speak to that?

The other concern that I noted was Miss King's and Mr. Roscoe's comment about large companies.  Under the law, all people are equal, and companies are citizens for purposes of the law.  And so we would not wish any litigant to come into court and face a claim and have a jury that would make the decision, not based on the evidence but based on the size of the company.

Your statements were both, I could be fair, but that you have feelings about large companies as opposed to small companies that might call their conduct into question at the beginning of the case.  And so you both expressed some concerns about the conduct of large companies.  And I'd ask you to say more.

First, Miss King, say more about your feelings.  You expressed the notion that they do whatever they want and then they justify it.  If you come to learn -- I don't actually know the sizes of these companies in any way.

But if you come to learn that one of the parties is a large company, will that play in your mind and make you feel, call into question the credibility of the witnesses from that company or the conduct of that company because of their size?

PROSPECTIVE JUROR:  (1)  I would say yes, because they have the resources, the monetary resources.

THE COURT:  All right.

PROSPECTIVE JUROR:  They have the monetary resources to essentially stranglehold the smaller company.

THE COURT:  All right.  This is not an antitrust case where --

PROSPECTIVE JUROR:  I understand.

THE COURT:  -- the companies are in competition, those kind of matters.  But I understand your feelings.

Let's see.  Mr. Roscoe, would you say more about your feelings with respect to large companies and how you start out in the day and your feelings in that regard?

PROSPECTIVE JUROR:  (3)  I guess the way that she stated it, so succinctly, kind of reflects my attitude. There's a predisposition to think, as she said, that because of their power and resources, I would have an inclination to trust them less.  I would be listening to hear why I should trust them.

THE COURT:  All right.  Very well.  Healthy

skepticism is not bad as a juror.  It's already having a feeling one way or another at the beginning of the case that the Court is concerned about.

So thank you very much, Mr. Roscoe.

Anyone else want to express feelings with regard to that?

May I see counsel at the sidebar?

(At the sidebar, out of the hearing of the courtroom and the court reporter.)

THE COURT:  Very well.  The Clerk of the Court, Mr. Noble, is now going to carry the lawyers through what we call challenges.  And the way we do that, in the old days, the lawyers would stand up and point to a jury and say, I thank and excuse that juror.  And I used to allow that.  But I became concerned that some of you might have come to be fond of one another, and that I didn't want you to feel that because one side or the other was excusing somebody that that would have an effect on your decision in the case.  It should have nothing to do with the case.

So what Mr. Noble does, and you should start process now, is he takes a list of names and the lawyers secretly write their challenge on that list, and it passes back and forth, and at the end of the process they will have exercised all of their challenges, and it's blind to you.  And then we will see who remains and is not stricken

as a result of that process.

We will only have -- I haven't said this up to now because I wanted to keep all of you interested -- this is a civil case. You might have seen cases where there are 12 jurors and sometimes alternate jurors. We don't use those in civil cases in federal court. In federal court there are no alternate jurors. Any juror who is seated is a member of the jury, and deliberates on the case. We also don't use 12-person juries in civil cases. Sometimes we do. In this case there will only be eight of you who are chosen as jurors. So as the lawyers exercise their challenges, many of you will be thanked and excused, so the eight who remain.

Now, before I let all the rest of you go, though, at the end of that process I'm sometimes confronted by jurors who don't believe they're going to be selected, and once they're selected, all of a sudden I start to hear about excuses I haven't heard about till now. So before I inform you are allowed to go, including those who have not even been called forward, I need to come to a point where I have eight jurors who take our oath and are found by the Court to be qualified before I allow others to go.

Now, that whole process we should be able to accomplish in the next 10 minutes or so. If you need to excuse yourselves, go ahead and do so. I might leave the

bench for a part of that.  But it also helps the lawyers to see your smiling faces as they exercise their challenges, so I'll ask you if you don't need to go to the restroom or -- to remain in place.

So, as Mr. Noble conducts that process, we'll just take a pause.

(Pause in the proceedings)

THE COURT:  Very well.  Here's how I'd like to do this part.  I'd like to have all of you leave the number cards and your calendar in your seats and take a seat in the audience.  That way I'll call forward the unchallenged jurors to new seats.

Very well.  Mr. Noble will now call forward the eight unchallenged jurors.

DEPUTY CLERK:  Ronald Monce, M-o-n-c-e.

THE COURT:  So, Mr. Monce, you become Juror Number 1.  Come forward, sir.

DEPUTY CLERK:  Kevin Oshiro, O-s-h-i-r-o.

THE COURT:  Juror Number 2.

DEPUTY CLERK:  Alison Altman, A-l-t-m-a-n.

THE COURT:  Miss Altman is Juror Number 3.

DEPUTY CLERK:  Michael Cocadiz, C-o-c-a-d-i-z.

THE COURT:  Juror Number 4.

DEPUTY CLERK:  Jeremy Maganito, M-a-g-a-n-i-t-o.

THE COURT:  Mr. Maganito then is Juror Number 5,

and we'll put him in the front, first seat in the front row.

DEPUTY CLERK:  Vincenzo Stornaiuolo, S-t-o-r-n-a-i-u-o-l-o.

THE COURT:  You are Juror Number 6.

DEPUTY CLERK:  Theresa Lowe Chan, L-o-w-e, C-h-a-n.

THE COURT:  That's Juror Number 7.

DEPUTY CLERK:  Mitchel Magleby, M-a-g-l-e-b-y.

THE COURT:  You are Juror Number 8.

Now, in a moment I'll ask Mr. Noble to have you take an oath.  It is the oath that is worded very historically.  It's the same oath that jurors have been taking since the founding of the republic.  It requires that you swear or affirm that you will well and truly try the case that is before you and render a true verdict according to the law and the evidence.  In other words, you would take the oath to attend to us during the schedule, and I would want you to let me know if there's any reason why you can't keep to the schedule we've set up.  And you'd be fair to both sides, listen to the evidence and decide this case purely on the law and the evidence.  If there's some reason you can't take that oath, let me know now.

Very well.  Swear the jury.

DEPUTY CLERK:  Please stand and raise your right hand.

(Whereupon, the jury panel is sworn/affirmed.)

DEPUTY CLERK:  Please be seated.

THE COURT:  Very well.  Now, those of you who have not been seated, I really appreciate your attention to this process.  And one of the things that we do for one another is we pass on the word:  How was it?  You know, what was it like?  And I sometimes hear people talk about jury service in very negative ways.  And other times people do appreciate it.  It is a -- not an easy thing to do, to be involved in the kind of government we set up for ourselves.  But I hope that you will go forward from this day, appreciating that I did pull you away from your family and your work and other things, but an important part of the process of having a democracy.

So thank you very much for your attention.  You all should report back to the jury office that you were not used in our case.  Thank you very much.

Those of you who have been selected, I'm going to excuse you for the day.  But before I do, I want you to accompany Mr. Noble back to the jury room.  He will want to give you some instructions on the logistics now that you are the jury in the case about coming and going from our process.  We won't actually require that you start

your work as a jury until next Tuesday.  We want you to stay happy and healthy until then.  He'll also provide you with some information if something should occur that you should need to talk with me or members of my staff, a way for you to notify us.

So at this point I'll ask you to accompany Mr. Noble to the jury room for purposes of those conversations.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  We're out of the presence of the jury.

There are some legal issues that we've scheduled to talk about.  Since we're starting a little bit late into our lunch hour, I'll come back here at about 2 o'clock for purposes of discussing some of the matters that we have that are before the Court.  So you're excused until 2 o'clock.

(Luncheon recess)

(In open court; jury not present)

DEPUTY CLERK:  Come to order.

THE COURT:  Please, be seated.

You don't have to be nice to me this afternoon. There's no jury here.

(General laughter)

THE COURT:  Very well.  We're on the record, out of the presence of the jury.

And if you want to make appearances so as to introduce individuals who weren't previously introduced, you're welcome to do so.

MR. THAKUR:  Your Honor, we have no additional individuals.

MR. MATUSCHAK:  Well, we do, your Honor.  I'll let them introduce themselves.

MS. DeBRUIN:  I'd like to introduce Meredith Zinanni.

MS. ZINANNI:  Good afternoon, your Honor.

MS. DeBRUIN:  And Tiffany Cunningham.

MS. CUNNINGHAM:  Good afternoon, your Honor.

MS. DeBRUIN:  Ryan Pohlman.

MR.. POHLMAN:  Good afternoon.

MS. DeBRUIN:  And Michael Karson.

MR. KARSON:  Good afternoon.

MS. DeBRUIN:  And Anthony Kim was already here, I believe, this morning.

MR. KIM:  Good afternoon.

MS. DeBRUIN:  And he's from Research In Motion. And Frank Geng behind him.

THE COURT:  Good afternoon.

So I had set aside this time to deal with some of

the legal issues that came up in our final pretrial conference.  I gave you some additional duties, and you indicated that the parties were working on some of those matters, and would continue to work and submit either -- the result of your work and deadlines that we had set up, I'm not going to necessarily remember all of the matters that are before us, and so I'll rely upon the parties to bring to my attention any of those questions that we left for this afternoon.

Since we are now in trial, I will not necessarily follow with written orders on the matters that will come up in these kinds of proceedings.  In other words, I'll simply make an order from the bench, that will be the order of the Court.  You, of course, can get a transcript to have that.  Perhaps the Clerk of Court will sometimes make a minute about the motions and those sorts of things, but that won't necessarily take place because I don't have the clerk keep minutes of evidentiary rulings.  Those are simply matters that you raise, objections are stated, I'll ask for explanation if I find it helpful, and give you a ruling.  And so the transcript might become your best resource for purposes of keeping track during the course of the trial of any matters where you would wish to argue that's already been ruled on by the Court.

And given the long history of the case, there may

be instances where a resort will have to be made to prior orders of the Court, and I may or may not have those in mind.  So you should be prepared to educate me or reeducate me about those matters.

I was maybe -- William, you could give me those two binders that came up.

I did take a quick look at the binders that have been submitted to the Court.  Perhaps you could explain to the Court what these are.

MR. THAKUR:  Your Honor, I'm not sure exactly what you have, but perhaps we -- potentially one of three things.  First, your Honor, the exhibits, the situation is that plaintiff and defendant have been trying to work through exhibits, but the reality is, at least on the important documents, we have not made any significant progress.  And so we ask this Court to rule on the admissibility of 15 documents.

THE COURT:  15?

MR. THAKUR:  15.

THE COURT:  One-five.

MR. THAKUR:  One-five.

THE COURT:  How will I know what 15 documents you're asking me to rule on?

MR. THAKUR:  Your Honor, I believe in the motion we've already identified, and you got the objections set

aside separately to you, with the documents.

THE COURT:  What's that called?

MR. THAKUR:  The motion was called --

MS. NOLLER:  Here you go.

MR. THAKUR:  It was called a "Notice of Exhibits for Court's Determination Regarding Admissibility."

THE COURT:  Can I have a copy of it?

MR. THAKUR:  Sure.

THE COURT:  That's the other thing.  Since we're going to be filing things, I won't always have resort to the document getting paper copies, so you should be prepared to supply me with paper copies of the various things you're filing, during, of course, the trial.

MR. THAKUR:  So maybe I can bring up the exhibits issue first, your Honor.  The way the situation stands is we have -- the parties have discussed, and there's a certain number of exhibits that both sides have designated as joint.  I understood that we were going to move by stipulation today for admission of all those documents.

MR. CHARFOOS:  That's correct, your Honor.

THE COURT:  So do you have a stipulation?

MR. THAKUR:  We have.

THE COURT:  Who has that?

MS. NOLLER:  It actually hasn't been filed because there's one paragraph that's still in contention,

but -- that portion of it as to joint exhibits, neither side had changed, and we can submit a written stipulation today on that joint admissibility stipulation.

THE COURT:  Very well.  I don't understand this, so help me out.  This is a "Notice of Exhibits for the Court's Determination Regarding Admissibility."  I read the language, and it appears that the parties will be filing a stipulation before June 14th.  However, as to certain exhibits, the parties have not been able to reach agreement.  Because Mformation intends to publish 17 of those exhibits to the jury during its opening statement or through the testimony of the witnesses of Mformation, respectfully request this Court review the exhibits.

Where are they?

MR. THAKUR:  Your Honor, we have filed them.  We can make them available.  We have them.

MS. NOLLER:  They were delivered yesterday.

THE COURT:  That's why I was -- I've got binders. I've got more binders in my life than Carter has little liver pills.  So I need to know which binders I should look to to find the exhibits that you want me to review.

MR. THAKUR:  If we could see what you have.

THE COURT:  These are not yours?  You don't recognize them?

MR. THAKUR:  We don't know who --

MS. NOLLER:  No, these are RIM's objections.  We brought you a -- here you go.  They're right here (indicating).

THE COURT:  All right.

MR. CHARFOOS:  And, your Honor, in addition to the documents Mformation has identified, RIM has asked that the Court also rule on some of the documents that Mformation has objected to.  And unfortunately, as you can see from the number of boxes in the back row, Mformation has objected to substantially all of RIM's prior art.

Now, it's not as daunting as it appears because there are four pieces of prior art, three of which we have declarations from the companies authenticating and establishing as business records, which we believe that the Court can handle in groups.  But we would also like for our own purposes moving forward with openings and things like that, to see if the Court would entertain ruling on those objections as well.

THE COURT:  Well, let's stick with this side first, and then I'll do that.

So I now have what is identified as the 17 exhibits.

MR. THAKUR:  Correct, your Honor.  And it's become simpler.  They're now down to 15, of which five, I was just advised just before this hearing, are

unopposed --

THE COURT:  You're agreeing that those five can be admitted or --

MR. CHARFOOS:  No, no, no.  Your Honor, there are two groups of agreed-to exhibits.  There is a joint list of exhibits, which we stipulate may be admitted by the Court today.  There's a second group of exhibits which neither side has any objections to but actually are going to be used at trial before they're grouped into evidence.

The five exhibits that we are removing our objections to today fall into the second category.  We're removing our objections to Mformation using them at trial.  They can be moved into evidence.  But in order to keep the record slightly smaller and not so cluttered, we didn't -- didn't agree to move them into evidence automatically today as joint exhibits.

THE COURT:  I assume that someplace there's a list of a -- list of the exhibits, by number.  Do I have that?

MS. NOLLER:  Your Honor, other than the withdraws that we just found, which I can mark on here by hand if you want, we can hand you what is a draft.

MR. CHARFOOS:  Basically --

THE COURT:  Drafts work.  I just want to see a list, because the next thing I'm going to do is to ask you

to somehow identify for me on a list any documents in the categories you've now described.

Those that are -- you stipulate come into evidence without further testimony or foundation.

Those that you believe are admissible subject to their use in trial and, therefore, no further foundation need be laid, but you don't want to put into evidence documents that you may otherwise never have any reference to and, therefore, would create some confusion.

And then the final category I understood you to tender are those for which you have objections to their even being included in that category and there needs to be a foundation laid.

MR. CHARFOOS:  There are just objections, hearsay, authenticity -- all the objections would attach to those particular exhibits, your Honor.

THE COURT:  Right.

MR. CHARFOOS:  And we would have them in the normal course.  Now, the stipulation that you will receive will lay that out for you, the three different categories, on the chart.  You'll have that information by exhibit number and it will be much clearer.

THE COURT:  It's the future tense that bothers me.  I wanted to do all this now.  It looks like it would be helpful to you to have it done now.  And so, if we

leave it for later, you may find yourselves in a position where you won't have a ruling before the opening statement.

MS. NOLLER:  So, your Honor, the way that is organized is you'll see for the first -- it's double-sided -- for the first couple of pages the exhibits are marked "Joint."  Mr. Charfoos was just referring to the fact that right now, the parties agree why don't we stipulate in open court, we request that those are admitted.

THE COURT:  Do you have any objection to that?

MR. THAKUR:  No, your Honor.

THE COURT:  So everything that is joint I will regard as in evidence pursuant to stipulation.

MS. NOLLER:  Yes, your Honor.  And then the next two categories you will see carted throughout because it then resumes numerical order from 1 to 5000, or whatever it is, and if -- on the far right column you will see a category called "Objection."  After the joint exhibits, some of those are filled in, and some of those are not.  Where there is nothing there, that is an unobjected-to exhibit that Mr. Charfoos referred to earlier.  If it has the objections identified, from our position, 15 of those need to be determined today, and from RIM's position, "X" number of those need to be determined today.

MR. CHARFOOS:  Essentially the category of prior art documents.

And, your Honor, in addition to that, in the joint pretrial conference statement, there is a mechanism in place where three days before either a demonstrative is used or a witness hits the stand, we get the demonstratives and exchange the lists of exhibits.  And that allows the parties to actually sit down with the exhibit list and really decide at the end of the day what's being used, what do we really need to object to given what's going on at trial, so we can avoid burdening the Court with bringing too many discovery issues to your attention.

Related to that issue, we had sent an e-mail a couple of days ago, I think, on deposition designations. We would like to also enter into a stipulation with the Court's permission that, once again, we aren't going to burden the Court with all the responses and all the objections to absolutely every piece of designated testimony.

We followed the same rule:  Three days before that testimony is to be read in court, the parties are going to exchange the name of the witness and the specific line numbers to which we are going to actually play in court.  The parties will once again try to work through

any particular objections which we may continue to have at that point in time. It gives us significant enough time to raise it to the Court's attention before disrupting the jury in any way.

MS. NOLLER: And we would stipulate to that process as well, your Honor.

THE COURT: Very well.

MS. NOLLER: And then that leaves for today those 15 that we submitted yesterday, and whatever you guys submitted last night as well.

MR. CHARFOOS: The four categories of --

THE COURT: That I'll find over there (indicating)?

MS. NOLLER: Correct.

THE COURT: 15 that got reduced to --

MR. THAKUR: -- 10 now. Just to be clear.

THE COURT: Why don't you take those back and give me 10. I'd much rather work with the 10 so I'm not guessing about whether or not I'm working with what I need to work with.

MS. NOLLER: I can do that.

THE COURT: Now, if someone can reduce it to 10 and other people can attend to another topic, I'll move to that other topic.

MR. THAKUR: We did have one recommendation on

the 10.  I think at the pretrial conference you suggested that the option of all in, all out.  And it was cursorily addressed, but the concept was all party documents would go in without objection, and we had proposed that -- or we do propose that as something for their consideration. Where all Mformation documents and all RIM documents would be deemed as admitted.

THE COURT:  I don't broker deals, so if you two have a stipulation, I'll accept the stipulation.  If it gets to a point where I need to make a ruling because it's bothering the trial process, I'll do that.  But if it helps you beneficiaries of this process and work out what you can work out, and leave to me less to do, so that the things that I am asked to do are more important.

MR. THAKUR:  I think if you address these 10, I think there's a substantial likelihood that we will be able to resolve the remaining issues.

THE COURT:  I'll turn my attention to the 10 in a moment.

MR. CHARFOOS:  And we also need to address their objections to substantially all of RIM's prior art as well.

THE COURT:  Okay.

MR. CHARFOOS:  Again, we can group those together for the assistance of the Court.  Essentially we would

really only be talking about seven different topics.

MS. NOLLER:  Your Honor, we're not sure what those binders are.  Both of us together are not sure what those are.

THE COURT:  Join the club.

MS. NOLLER:  The 10 exhibits of Mformation are now in those red ones.

THE COURT:  I understand.  I turned my attention to these because I had looked at these before I came up.  These are Mformation's objections to RIM's trial exhibits -- and actually, I gave them to you.  I thought that a case that I had pulled out was interleagued in here.  Did one of you remove my case?

MS. NOLLER:  I did not, your Honor.

THE COURT:  You deny responsibility?

MS. NOLLER:  I do.  Vociferously.

THE COURT:  Actually, I did.  Here it is.

The reason I picked these up is because I looked at what were these -- because my staff said we have all these binders, and I am always curious, so I looked, and I thought that maybe as a general matter, I could propose two things:

One, and maybe you've already done this, it would help the Court to categorize the objections so that I don't have to look at every document.  I could deal with

the categories of objections that are being made, because it seemed to me that they were subject to that.

For example, the first one I looked at, I just asked my law clerk to just bring me one and she brought me an objection to Exhibit 4043. The objection I read was that this exhibit relates to a third-party prior art product asserted by RIM for purposes of its invalidity defenses, and the exhibit was objected to on hearsay grounds.

I turn to the exhibit and it is a remote ware client for Windows NT and Windows 95 Users Guide.

And my ruling with respect to this or any similar document would be that this is not hearsay and, therefore, the Court would not recognize a hearsay objection to a document that is tendered as prior art for purposes of understanding what those in the field would know or should know about the state of the technology at any particular point in time.

That is to say, if the objection is that this is a nonauthentic document -- that is, it's not authenticated as something that really existed in 1996 or whenever it's publication date is, this one appears to have a number of dates associated with it, and something that someone made up to create what appears to be prior art but is not -- that the Court would be prepared to listen to. But the

issue would not be whether or not the remote ware client for Windows NT and Windows 95 actually operated in the fashion that this document says it operated, that is being offered for the truth of what is asserted in the document, that would not be the Court's concern.

But if the objection is, there's no evidence that this technology or what is described here existed at the time, that would draw the Court's attention, and so I would -- I wish to hear that.

So the reason I use this as an example is the Court would overrule any objection to prior art documents that are tendered as published, and in the public domain as of a particular date, on hearsay grounds. I will listen to any objection that you might want to tender on another ground.

Let me give you one other example.

This was a series of e-mails. This was Exhibit 325. And the objection is to -- this exhibit is an e-mail exchange concerning a third-party company on its face. This exhibit does not have any tendency to make a fact of consequence more likely probable. It is, therefore, inadmissible under Federal Rule of Evidence 402. Any presentation of this exhibit at trial will confuse the pertinent issues and waste time, making this exhibit inadmissible under Federal Rule of Evidence 403.

There's also a combined hearsay objection to it.

It's hard for me to know the relevance objection this early in the case. The -- it appeared to be a series of e-mail starting May 17, 2001, between John Danpour and David Castell, with others being copied. Every other's e-mail appears to be a response to that. So they become authenticated by virtue of the fact that they reference to the prior e-mail and are in the subject line of the prior e-mail.

So the real question becomes whether or not the subject matter of the e-mail has to do with the technology that the jury has to decide and adds to these kinds of matters. I don't think that I'll be in a position to give you any prior ruling until I hear who these people are, why they would be writing about these things, what it has to do with the questions that the jury has to decide.

MR. THAKUR: Your Honor, I think it probably would be easier for me -- because I think there's a lot more potential for agreement on some of these pieces of -- some of these objections, and I think we got their motion last night, what I would like to do is, your Honor, perhaps after we get resolution on ours, maybe take a 10-minute break and see if we can make some progress.

MR. CHARFOOS: I think with your hearsay ruling, your Honor, you may have eviscerated most of the issues

with the documents in the boxes.  There may still be some, but...

THE COURT:  Well, okay.  That's why I wanted to make the comments.  I think if you're going to tender objections to me that are as to a group of things, all consistently on a particular ground, it would help me to have you do the work of putting those categories together, and that will allow me -- of course, if something happens during the course of trial that removes a document, because there can be things said within a document that can be problematic, even if I've given you a rule as to the documents on this general basis.

So you keep wanting me to go to these 10.  I'll come back to this later.  Because I want to look at them. I don't want to take the time with you here present to look at them right now.  I'll do that in a moment.

Other than the documents -- is there anything else having to do with the documents other than the question having to do with this 10?

MR. THAKUR:  Other than those 10, no, your Honor.

MR. CHARFOOS:  I think as long as the parties have stipulated with respect to exhibits and deposition designations to be played at trial, I think that resolved most of the outstanding issues we were wanting to talk to the Court today in terms of as well.

THE COURT:  Even though I won't be reducing my rulings necessarily into writing, I would encourage you, to the extent that you have the resources, to reduce your stipulations to writing so you won't have any disputes once you have come to your stipulation.

Next issue that I had on my list had to do with either witnesses or depositions or something.  The expert report.  Bring me up to speed on that.

MR. ARNTSEN:  Your Honor, I think you have got the -- there were briefs filed yesterday, briefs filed this morning.  Again, what this relates to is the -- Mr. Weinstein served a supplemental report pursuant to a process that the parties had agreed to.  We moved to strike the supplemental report.  The Court entered an order last week saying, I'm going to strike it because you didn't get leave of court.  But if you lay a foundation for the supplemental report and show that RIM isn't prejudiced, we can revisit the issue.

We then yesterday filed a supplemental brief essentially saying, Okay, we're laying in foundation here, and this is why RIM isn't prejudiced.

THE COURT:  All right.  Hold it.  Too much information.  Let's start from -- give me a smaller chunk.  Who are you?

MS. CUNNINGHAM:  Tiffany Cunningham of Kirkland &

Ellis.

THE COURT:  Miss Cunningham, you are representing the defendant here?

MS. CUNNINGHAM:  Yes, that's correct.

THE COURT:  Is it your motion?

MS. CUNNINGHAM:  Yes, it is.

THE COURT:  What's your motion?

MS. CUNNINGHAM:  To strike Mr. Weinstein's supplemental report.

THE COURT:  Where is the supplemental report?

MS. CUNNINGHAM:  It's attached as an exhibit.  If you have a copy, and in fact I can get you a copy of it.  It's an exhibit to my declaration, and in particular, it's Exhibit No. 4 to the declaration submitted on June 4th.

THE COURT:  That's in my material right here.  If you can get me a copy, even if I have to give it back to you, that would help.

MS. CUNNINGHAM:  I can get you a copy.

MR. ARNTSEN:  I've got the supplemental report.

THE COURT:  It's her motion, let me get this first.

MS. CUNNINGHAM:  So, your Honor, here is the supplemental report, and the addition to that would be Exhibit No. 4 to my supplemental declaration.

THE COURT:  I have Exhibit 4 to your paper.

And -- all right.  And so what's the basis of your motion to strike this?

MS. CUNNINGHAM:  Basically, your Honor, their supplemental report was actually in violation to this Court's prior rulings.  In particular, this Court already ruled that Mformation cannot get damages before the filing of this lawsuit.  Your Honor, you granted our motion to limit presuit damages because Mformation failed to mark its products.  Consequently, in this supplemental report what Mr. Weinstein tries to do is make an end run around this Court's summary judgment ruling.

And in particular, I think what would illustrate this, your Honor, if you're open to it, is a copy of Exhibit 2 to Mr. Weinstein's supplemental report.  I have a marked-up copy that I'd love to hand up to your Honor, if that's possible.

THE COURT:  All right.  I have the marked-up Exhibit 2.

MS. CUNNINGHAM:  Okay.  And if you look at what would be page 2 to that, your Honor, you can see there are a few red boxes that fit together here to really illustrate the point that Mformation's trying to get damages that would be before this lawsuit was filed.

For example, if you look at the first box which is near the top of the page, it demonstrates that

Mr. Weinstein calculated up the number of devices, for use with the BES, from November 2006 to October 2008. That's essentially Fiscal Year 2007, Q3, through Fiscal Year 2009, Q2.

THE COURT: Okay.

MS. CUNNINGHAM: And that would all be before the damages cut off. This Court set the damages cutoff as October 27th, 2008. Which is essentially the filing date of the lawsuit.

It would be improper to try and seek damages that would predate the filing date of this lawsuit, and consequently, that's the basis for us moving to at least strike in part the supplemental report.

There's another basis as well that I can also address that was in my motion.

THE COURT: What's that?

MS. CUNNINGHAM: The second basis, your Honor, really relates to a violation of this Court's Daubert ruling. And this really focuses on them seeking the entire value of the BES and CAL. In particular, if you look at the supplemental report, you'll see that again they take 3 percent of the entire revenue of the BES and CAL. However --

THE COURT: Where would I find that?

MS. CUNNINGHAM: Sure, I can get that for you as

well.  So that's going to be another point from my declaration.  We'll be in Exhibit 4 to my declaration filed June 4th.

THE COURT:  Yes.

MS. CUNNINGHAM:  And if you look at -- it appears to be in Exhibit 3 to that declaration, as well as I think probably the best illustration would be in Exhibit 5 there.  You can see Exhibit 5, Mr. Weinstein's supplemental report shows the BES and CAL revenue and multiplying it by 3 percent.  So, again, using the entire revenue for BES and CAL, which is in direct contradiction of this Court's order on Daubert where you said that the entire market value is not applicable because they failed to make the proper showing to get the entire value of any of defendant's accused products.

THE COURT:  All right.  Let's hear from your opposition to the motion to strike on those two grounds.

MR. ARNTSEN:  Your Honor, as to the first ground, what would be helpful -- the first ground, where Mr. Weinstein's report doesn't claim damages prior to the date of suit, and the best way to see that is in a supplemental report, if you look at Exhibit 4 to his supplemental report, and that is --

THE COURT:  Isn't that the same document as Cunningham showed me?

MR. ARNTSEN:  No, no.

MS. CUNNINGHAM:  Exhibit 4 to my declaration also contains Exhibit 4 to Mr. Weinstein's supplemental report.

MR. ARNTSEN:  Right.

THE COURT:  Let me -- where do I look to see what you want me to look at?

MR. ARNTSEN:  You look at Exhibit 4 to Miss Cunningham's declaration, which is the supplemental report of Roy Weinstein.  Do you have that?

THE COURT:  He has a number of exhibits to his report.

MR. ARNTSEN:  He has four exhibits to his report.

THE COURT:  And I'm now turning to what is marked.

MR. ARNTSEN:  Exhibit 4 to his report.

THE COURT:  I have Exhibit 2, then I have what's marked Exhibit 5.  And what I had with the red marked areas was what I thought was Exhibit 4.

MR. ARNTSEN:  To simplify things, I'm handing up a copy of Mr. Weinstein's report and it's open to Exhibit 4, to his report.

THE COURT:  All right.

MR. ARNTSEN:  And as you can see from his report -- and this is the table showing his methodology.  And if you look here, the first -- and you see on the far

right column is where the damages are listed that then accrue to his 276 million-dollar number.  Do you see what I'm referring to?

THE COURT:  Yes.

MR. ARNTSEN:  And those damages start fiscal year 2009, Q3, which because of how RIM keeps track of its fiscal years, Q3 of year 2009 starts in September 2008.  And so then as you can see with regard to that FY2009, Q3, if you look at the second right column, "Quarterly Technology Fee" -- do you see what I'm referring to?

THE COURT:  Yes.

MR. ARNTSEN:  -- his calculation -- the methodology this court approved was his 50 cents per month per device running royalty.  That's what the Court said he could testify to.  With regard to that first quarter, Fiscal Year 2009, Quarter 3, he's just using 50 cents because he's just using the last month of that quarter.  That's what's going on right there.

And so that is the first month for which he is counting damages, is November 2008.

THE COURT:  I understand the difference between the two charts.  Both charts go back to Fiscal Year 2007, Quarter 3.  But you're telling me that this exhibit that you're now pointing to is to be used and not the one that Miss Cunningham was concerned about?

MR. ARNTSEN:  That's his opinion.  If you turn back to the actual --

THE COURT:  Is the answer to that question "yes" or "no"?

MR. ARNTSEN:  Yes.  Yes.

THE COURT:  And so this earlier one with the blocked-out portion that she's concerned with, will that be used as part of any of -- part of his testimony?

MR. ARNTSEN:  I guess I need to look at it again.  I don't think so.

MS. CUNNINGHAM:  Your Honor, when I get an opportunity I'd like to address that.

MR. ARNTSEN:  No, it won't be.  Exhibit 4 is his calculation.

THE COURT:  So why are you concerned with the portion that it blocked out that it goes back to 2007, Quarter 3, if it has not been used for purposes of his opinion on damages?

MS. CUNNINGHAM:  I'd like to speak to that.  So in our reply that was filed this morning, we actually have case law that says what Mr. Arntsen just said Mr. Weinstein's doing is not appropriate, not allowed.  So basically what he's trying to do is change the damages theory.  What he's effectively doing, rather than he's had Mr. Weinstein do throughout the course of this case, and

focus on when the sale occurred, he's trying to change it to basically coming up with a cumulative number of devices and focus on use.  He's basically trying to come up with some sort of accrual theory to come up with the number of devices that would be subject to the royalty.

What I handed to you, you could see that he really has two different device totals that he comes up with.  Total devices subject to a monthly royalty is almost double the total devices sold after the date of suit.

THE COURT:  Show me those numbers.

MS. CUNNINGHAM:  Okay.  So what would be 25 and 26 of the marked out --

THE COURT:  Yes, I see that.

MS. CUNNINGHAM:  You can see he's applying a monthly royalty on many more devices than the devices that were sold post date of suit.  He is using these numbers in that other exhibit that you were talking about with Mformation's counsel to really inflate the damages to get millions of dollars more than they're entitled to, and there is case law that is definitely directly contradictory to the approach that's put forth here.

It's also contradictory to the policies of the various -- marking statute.  The marking statute is all about notice.  By no means should RIM be held liable for

any sort of damages before it had notice of the patent in suit. RIM didn't have any notice until suit was filed in this case. Consequently, it's improper to include devices sold prior to suit being filed.

THE COURT: So that's the question that I need to have you respond to is whether or not, even though the quarter starts 2009, Quarter 3, are the devices included in those numbers devices that were sold prior to the marking?

MR. ARNTSEN: Yes, your Honor.

MS. CUNNINGHAM: Yes.

THE COURT: So the objection is sustained.

MR. ARNTSEN: Your Honor, the reason why the objection should be denied is, again, it's not -- their expert, Ms. Davis, uses a royalty on date of sale. Mr. Weinstein doesn't use a date of sale royalty; he uses a running royalty per month of use.

Again, what we have here is a method patent being in -- the inducement is by RIM Services. So what you have here is, once the -- and, again, the patent issued in 2005. We can't get damages for prior to 2008. But in November of 2008, there are devices out there that are being used. They've been sold already. But they are still being used months after that. And Mr. Weinstein said we're entitled to a monthly royalty.

THE COURT:  I guess I need to have a better understanding of the relationship between the marking policy that I thought Miss Cunningham accurately summarized and a method patent.  Because it sounds like your argument is that, even though you sell a device that is unmarked and you otherwise can't get damages on it, because it's a method patent and you continue to use the method with respect to that device, you can get damages on it even if it's unmarked.

MR. ARNTSEN:  For the period after the date of suit.  Correct.

THE COURT:  All right.  Now, what is your basis for that argument?

MR. ARNTSEN:  Because again --

THE COURT:  Legal basis, I should say.  Has anybody else bought that argument?  Because I'd love to read another judge who said it.  If you say, no, this is the first time this has been voiced in a court, you've got to decide it, I'll decide it.  But her objection is a legal objection, so I need to know whether or not there's a legal basis for it.  It's not a question of opinion from the expert.  It's then converted into something that as a matter of law I need to make sure that you don't get around the marking statute in this way, if indeed it is.  Or the marking statute doesn't apply to a method patent

because the method continues to be used allegedly after the date of suit, and on every device on which it's used, you ought to be able to recover damages.

So that's what I understand to be the dispute here.

MR. ARNTSEN:  Right, because Mr. Weinstein's royalty is 50 cents a month per device in use.

THE COURT:  But not per marked device in use.

MR. ARNTSEN:  There are no marked devices.  This is a method patent.

THE COURT:  That's why I raised the first question, how the marking requirements apply to a method patent.  But these are patents that define the method by device.  The device has a limitation because it mentioned a server, and it mentions a remote device.

Now, I haven't looked at the question of whether marking applies or how marking applies to a method patent, the limitation of which requires a device.  This is not a method independent of the devices.  It's a method that requires as an essential element the use of the devices.

MR. ARNTSEN:  But all of that use is after the date of suit.

THE COURT:  Well, yes, and so that's what you need.  Is you need a case which says use after the date of suit -- an unmarked product in a method patent is still

recoverable.

MR. ARNTSEN:  Correct, because there still are no marked products.  The issue is the damage period -- our argument is the damages relate to the period of time after the date of suit.

THE COURT:  And I'll have to go back in time because I do recall having not this issue but a related question when I was looking at the marking problem, in the first place, because it did bring me -- I had that very question in mind, having to do with a method patent as to whether marking applied, and I was convinced, based upon my research at that point, that it did apply.

And so now the question becomes, if it does apply, what do you do in a circumstance where the inventor claims damages on unmarked patents, unmarked products? And so --

MR. ARNTSEN:  Would it help if we filed a supplemental brief tomorrow?

MS. CUNNINGHAM:  We've filed a number of supplemental briefs, and I actually have case law that supports my position that they do not get the damages backdated that far.  It's in the reply brief filed this morning, and I can also hand up copies.

THE COURT:  Have you seen the reply?

MR. ARNTSEN:  I had a quick minute to look at it.

I've been in court all morning.  I don't believe that the cases they cite stand for the propositions they cite them for.  Where they talk about use, it's interpreting a settlement.

THE COURT:  Beliefs are important in religion only.  I need to have you give me something other than your belief.  So I'll assume that I have from the defendant a basis for the motion, based upon the legal position the marking statute precludes your method.  I need to have something from you that calls that into question; otherwise, the ruling striking the use of anything prior to Fiscal Year '09, Quarter 3, is sustained.  And once I -- I presume this is important enough that we ought to come back to this sooner than later.

MR. ARNTSEN:  Yep.

MS. CUNNINGHAM:  May I also give one more point of clarification.  To be clear, you've also ruled that RIM is not a direct infringer.  So, consequently, RIM's use is not in play in this case.  It's only a case left of indirect infringement.

So what would be key here would be when the sale occurred by RIM.  That's going to be another key touch point, which is also discussed in the reply briefing that was filed this morning, and that I'm happy to hand up.

THE COURT:  I assume that's assumed within your objection.  In other words, if the -- well, I don't know, maybe it's not.  In an indirect infringement case, would use by another change the legal status with respect to this marking limitation on damages?  And did you already anticipate that and address that in the paper you already filed?

MS. CUNNINGHAM:  I tried to anticipate that, your Honor, and it's on the page that I just handed to your clerk.

THE COURT:  I have this now, right?  I haven't read it, but it's part of this reply that you've done.

MS. CUNNINGHAM:  That's correct, your Honor.  I filed it with the Court.

THE COURT:  I'll give you this back so I don't confuse thinking that's something new.

Now, so, your work is cut out for you.

MR. ARNTSEN:  Do you want to set a time or just file it tomorrow morning?

THE COURT:  Well, as I said, sooner than later.  In other words, you made my ruling.  It's up to you now to get yourself back in the position where you can convince me to change the ruling.  At this point you need to go to your expert and say, Take out of your calculation, and notify the other party accordingly anything that is prior

to 2009, Quarter 3.

MR. ARNTSEN:  When you say "anything," again --
because it's our position that's when the damages start.

THE COURT:  That's why I said prior to.  Prior
to.

MR. ARNTSEN:  Right, but that's what Exhibit 4
shows, is that the damages that he's counting start in the
third quarter of 2009.

MS. CUNNINGHAM:  However, your Honor --

THE COURT:  His calculations start then.  But his
sale, he has included in that -- I didn't think we needed
to go over this again.

MR. ARNTSEN:  So in terms of goods sold before
but used after?

THE COURT:  Correct.

MR. ARNTSEN:  Okay.

MS. CUNNINGHAM:  And, your Honor, to the extent
you give them opportunity to write anything else, I would
appreciate also the opportunity to either argue or speak
to any response that they write.

THE COURT:  I simply at this point need to see a
better exposition on the law in this area, if there is
any.  I'm opening up the possibility that this is not
something that has been directly addressed in a case, and
it is going to come down sort of what should reasonably be

done based upon the policies as the law has established for us.

Did you solve the problem with respect to the testimony of the witness that we were talking about in the final pretrial conference?

MR. MATUSCHAK: No, your Honor.

THE COURT: Remind me what that problem is.

MR. MATUSCHAK: It's our witness, your Honor. The issue was that your Honor had issued an order excluding Mr. Lazaridis from testifying subject to the right to use his testimony in rebuttal. And the point that we had made at the final pretrial conference was that, no, the plaintiff is going to do one or maybe two things at trial. And that is either play Mr. Lazaridis's deposition, or show e-mails to and from Mr. Lazaridis for the purpose of showing that, you know, this was a -- for purposes of basically attacking his character and his credibility and showing that there was a willful royalty or -- willful copying as infringers, and essentially we ask the Court to rule now that Mr. Lazaridis can testify, because if he can't, then we'd have to do a whole series of things with different witnesses. And he's --

THE COURT: Well, no. Let me bring myself up to speed. My understanding is that the basis of -- the original basis of the objection, basis of the objection is

that there were objections during the discovery phase of the trial to his testifying, and though late in the case, he was tendered by court order for a limited deposition on a limited number of subject matters; that he was now being called or contemplated to be called or listed to be called to testify more broadly, and there was an objection to that. And I was somewhat confused by what it was that he was testifying about in his deposition and why this was -- why there were objections originally. He is a former officer, as I understand it.

MR. MATUSCHAK: Correct, your Honor. He's the founder and former CEO of the company. He's still on the board.

THE COURT: All right. So there's still a business connection.

MR. MATUSCHAK: Yes, your Honor.

THE COURT: And am I correct that he was -- there were depositions requested of him with respect to the subject matter of these e-mails or any other subject matter relevant, and there were objections to his testifying?

MR. MATUSCHAK: That's correct, your Honor. The objection was that we didn't think then and we don't think now that the e-mails are really relevant to any issue. They're years before the patent at issue. And they're

about a different subject matter.

THE COURT:  But relevance is not a proper discovery objection.  Just seems to me that discovery is of things that are relevant or can lead to relevant information, and, therefore, relevance is problematic when it's used to object to giving the deposition in the first place.

But I'm ahead of myself still.

What is it that -- you're intending to call this person as a witness?

MR. THAKUR:  We're not intending to call him or use his deposition testimony.

THE COURT:  But you're intending to put his e-mail into evidence?

MR. THAKUR:  That's correct.  But as your Honor noted at the pretrial conference, e-mails speak for themselves.

THE COURT:  No, I didn't say that.  But if you put in a document and he's a recipient or author of it, knowing that you sought to get his testimony prior to trial about what he would say about that.

MR. THAKUR:  Correct, your Honor.

THE COURT:  And you objected.

MR. MATUSCHAK:  We did, and the Court ordered that there be a deposition.

THE COURT:  About that?

MR. MATUSCHAK:  About -- they were given the opportunity to have it -- it was a limited deposition, but there was no subject matter limitation.

THE COURT:  It was just limited in time.

MR. MATUSCHAK:  Time.  Correct, your Honor.  They did not ask for more time after the deposition.

THE COURT:  So his deposition was taken.  You asked him about the e-mails.

MR. THAKUR:  We asked him during the course of one hour, which it was limited to one hour, but what he said was he didn't remember information, he didn't remember the e-mail.

MR. MATUSCHAK:  We have a little dispute about whether that's his testimony, your Honor.

THE COURT:  Well, it ought to be in writing.

MR. MATUSCHAK:  I'm sorry?

THE COURT:  There ought to be a transcript of what he says so there shouldn't be any dispute about what he says.

MR. MATUSCHAK:  There is.

THE COURT:  There is a dispute?

MR. MATUSCHAK:  There's a transcript.  The characterization that he said he didn't know anything is I think a little overstating the testimony.

THE COURT:  So he didn't testify to that?

MR. THAKUR:  Your Honor, I think the right way to address it is the way you've addressed it in your order, which is that Mr. Lazaridis may testify, he may testify as a rebuttal witness, but he may testify as a rebuttal witness with leave of court.  So I believe the right thing to do is to stick with your order rather than reverse it, and after we have presented our case, they may bring Mr. Lazaridis as a rebuttal witness with leave of court.

THE COURT:  I should clarify.  My understanding earlier was there was an objection to his giving a deposition that knew there was no deposition.  Now, I can -- maybe someone told me differently, but I don't remember that now.  So I am disposed -- once I heard about this at the final pretrial conference, I became disposed to allow him to be called as part of the defense case if you put into evidence matters that relate to him during your case, and he was tendered as a witness during discovery about those matters, and you had a chance to examine him so you know what he would say.

Now, it sounds like there may be a basis to impeach him if he goes beyond what he said.  But impeachment is the ordinary -- in the ordinary course of things happens during trial.

So it seems to me that you're reaffirming -- and

it sounds to me as though these were important enough documents that I would reconsider keeping him off the stand with respect to those matters for which he was tendered, and examined, during a deposition. Because that changes my understanding as to the pretrial discovery availability of him.

MR. THAKUR: Just a couple of things. One, they're proposing not just to bring him to testimony -- they're proposing to bring him to the case in chief, not just limiting it to the dealings with limitations but generically.

What happened during the pretrial proceeding was we saw the deposition. They refused to produce him as a witness. They specifically advised -- they wrote the Court that he will not be called to testify at trial. So they specifically told the Court that. Based on that reliance, we agreed to a one-hour deposition.

THE COURT: That's new. I hadn't heard that before. In other words, your limitation, the Court's limitation of him to one-hour was based upon their representation to the Court that even though he would be someone whose name would come up, he would not be a witness, and you were simply, just as a precautionary matter, limited to an hour or -- just to understand that.

MR. THAKUR: I do not remember off the top of my

head to see whether they told us that he will not be called at trial or whether they advised the Court. It was actually --

UNIDENTIFIED MAN: In the writings.

MR. THAKUR: It's in writing to both of us that they would not be called. That is correct. It is in the brief to the Court that he would not be called to testify at trial.

THE COURT: What about that?

MR. MATUSCHAK: What we said, your Honor, is that we don't think these e-mails are relevant. We did actually move to exclude all of these e-mails from evidence, and if these e-mails were not in evidence, we would not call him. The Court disagreed with us. And did allow them to take a deposition. And the e-mails are -- and our motion to exclude the e-mails has been overruled.

And so, yes, that's true. If the e-mails were not in, we wouldn't be calling him. But that's not what the situation that we have now is. And so we didn't anticipate that we would call him because we thought, at the time, that we were right with respect to the e-mails. The Court has disagreed with us. We respect that. But if they're going to put those e-mails in, fundamental fairness demands Mr. Lazaridis be able to respond to those.

MR. THAKUR:  Your Honor, in your own court document 238, they specifically said they do not intend to call Mr. Lazaridis at trial.  They told us that, based on that that we get a limited deposition one-hour.

THE COURT:  They modified their statement as to what they said.  How do you respond to that?  If the e-mails aren't coming in, we don't intend to call him.  The situation is changed with the e-mails.  And that -- I guess those orders were before a different judge.  I don't remember making a ruling with respect to his availability at a deposition.

MR. THAKUR:  You did not, your Honor.  That was Judge Lloyd.  But what you did rule was that he could be called, but on the -- even on those e-mails, he could be called as a rebuttal witness, not in the case in chief. We're still fine with him coming as a rebuttal witness.

THE COURT:  Well, what do you mean by "as a rebuttal witness"?

MR. THAKUR:  Your Honor, if we present evidence, for example, those e-mails, and in fact, the Court has already ruled those e-mails are admissible in the motion in limine.  So those e-mails are admissible pursuant to the Court's order.  We would produce them.  If they thought that the appropriate course of action was to call him as a rebuttal witness, this Court has already

expressly provided for him to come as a rebuttal witness with leave of court.  And we think that's the right --

THE COURT:  But in other words, what I said was -- you're the first up here.

MR. THAKUR:  Right.

THE COURT:  You get to put your case in chief.  The documents come in.

MR. THAKUR:  Yes.

THE COURT:  They rest.  They call Dr. Lazaridis as their first witness.  He is then a rebuttal witness for purposes of how I use the term "rebuttal," because they're not calling him after they've rested, they've called him after you've rested.

MR. THAKUR:  Your Honor, that's something they should be able to do with leave of court.  We wouldn't object to that.

THE COURT:  I thought you said you don't object to him being called as a rebuttal witness.

MR. THAKUR:  I don't object to them seeking leave of court, as this Court has provided, as a rebuttal witness.  I don't think that's something we need to decide today, but, again, rebuttal witness is limited to the scope of what we present, not generically about whatever they want to -- he may want to --

THE COURT:  I can understand that concern.  In

other words, if you proffer him as a witness in response to their case, that's one thing.  But if you now wish to call him as an expert on other matters beyond that, they are expressing some concern.  What about that?

MR. THAKUR:  I think, your Honor, we may have reached agreement.  We'll agree to limit --

THE COURT:  I'm asking him a question.

MR. THAKUR:  We would say -- but we're willing to -- if we use his e-mails and not use his deposition, he may come as a rebuttal witness, limited to those e-mails.

THE COURT:  I thought that was your position, not an agreement.

MR. THAKUR:  That was an agreement that they'd be willing to reach, if they would, his rebuttal testimony is limited to the e-mails.

MR. MATUSCHAK:  That's fine, your Honor.  The question is, what's rebuttal testimony?  So, for example, the purpose of using these e-mails is to show that he was a nefarious man who had this plan to steal their technology.  So we ought to be allowed to put in some background information about Mr. Lazaridis, he founded the company, background information about the company anyway, basically saying, Yes, here's my background information, here's what I did for the company, and now let me tell you about these e-mails.

That's what our plan is, is to be --

THE COURT:  Any objection?

MR. THAKUR:  Your Honor, what they're saying is background is essentially trying to lay down the company from 1986 to 2002 about all the development of the products.  The exhibits showed this expansive plan, if he is a witness, I founded the company, and he's giving 10 minutes of background and he's allowed to go into e-mails, your Honor, we'd be fine with that.  But what they're trying to do is --

THE COURT:  I'm going to be in a difficult role to try and judge whether or not it's within or without what sounds like a resolution of this.  You could try to put together a proffer so that they can see the proffer and then we will know.  Or tender him up for a further deposition during the course of trial where you carry him through what you're going to carry him through, then they can see it, figure out whether or not there are any objections to that, and let me know.

But, otherwise, then it sounds as though -- I don't know if a reversal is necessary because I don't remember the precise wording of my order.  Is it Dr. Lazaridis?

MR. MATUSCHAK:  Mr. Lazaridis.

THE COURT:  Mr. Lazaridis may testify as part of

the defense case, if the plaintiff as part of its case in chief puts into evidence documents authored or sent to him. And about which he has been deposed.

MR. MATUSCHAK: May I ask one further question, your Honor?

THE COURT: Certainly.

MR. MATUSCHAK: A part of this is a little bit of trial strategy. We know they're going to use the e-mails. So I'm going to, in my opening -- and not knowing whether I can call Mr. Lazaridis, based upon if they haven't used the e-mails in their opening, puts us in a very difficult position. I'll promise the jury he's going to be there, he's not.

But on the other hand, I don't want to say he's not going to be there if he is going to be there, because he will be the chief person to rebut those. And I think my brother knows right now --

THE COURT: That's why they call this apart. So you will have to make up your own mind as to what you say in opening statement based on the rulings of the Court. And often I will say to the jury, What is said in opening statement is not evidence, and so you will sometimes find yourself in a position where you'll have to say, Who we call will depend upon the plaintiff's case, and do whatever you want to do in that regard. But I can't do

anything more about that.

MR. MATUSCHAK:  Thank you, your Honor.

THE COURT:  Okay.  So where are we?  Do you have any other matter that we left open last week?

MR. THAKUR:  Actually, a couple of ones that were less of a disagreement.  One was we talked about shortening the trial.  Your Honor, the parties spoke and we did tentatively reach agreement that we could stick with the same trial schedule and allow the jury to rest on July 3rd, 2012.  If that was something this Court was inclined to do.

THE COURT:  Well, you can't say stick to the same schedule when you give me a different schedule.  But it does seem to me that I won't say anything now if you're going up to July 3rd until I'm further along in this whole process because I don't want to create expectations that we can't satisfy.  July 3rd would mean that they would have the case, then they'd go away for the holiday and come back and start their deliberations.  Well, whether we do it that way, I'll leave for later.  But I appreciate your continuing to work on packaging your case in a concise, expedited fashion, and we'll be talking about that as we move along.

MR. THAKUR:  Your Honor, the other thing you asked about was the issue of videotaping trial.  We're

fine with videotaping trial.  We think it's a great idea. Give you a chance to respond.

MR. MATUSCHAK:  Unfortunately, your Honor, we can't agree to that.  There's a lot of confidential material for my client that will be at issue in the trial. And while we'd like to do it to -- for the educational purpose, I think, unfortunately, our client can't agree.

THE COURT:  I hadn't investigated setting it up further anyway, so I appreciate that.

Do you stand to address that issue?

MS. ZINANNI:  No, I stood to address that additional issue, your Honor, but I wanted to make sure counsel was finished first.

MR. THAKUR:  One piece of information to advise the Court, I think we've just received the opening instructions.  The parties have agreed to withdraw Claims 4 and 5.

THE COURT:  Say again.

MR. THAKUR:  We've agreed to withdraw Claims 4 and 5.

THE COURT:  I'm actually --

MR. THAKUR:  It would apply to this Court's opening instructions.

THE COURT:  Any objection?

MS. DeBRUIN:  Your Honor, no objection.  We have

one additional change needs to be made, though, to supplemental opening instructions.

THE COURT:  So I will regard Claims 4 and 5 as having been withdrawn as matters to which evidence will be presented.

What I was about to comment on is, I looked at these dependent claims, many of which, including the two withdrawn claims, have to do with further characterization of the command.  And further limitation on the command.  In fact, all of them do.  I was somewhat concerned that these had not been the subject of the Court's scrutiny, and even though the parties may say they have no disagreement with respect to the terms, sometimes it -- since these are matters of law, the Court will go ahead and give consideration to it, even though the parties stipulate to a meeting or say there is no dispute about it, because I find that I'm somewhat surprised sometimes about what is really in dispute.

Having said that, do I understand that the particular nature of the various commands, the reason these other dependent claims are left in, is that, treated as a separate claim, there's an argument that the device or the system of the defendant might violate one of the dependents claims, whereas -- over another of the dependent claims.

MR. THAKUR:  Your Honor, I think -- we believe they violate each and every one of those dependent claims. That's why they remain asserted.  We took Claim 5 out because Claim 5 is written -- really a duplicate of the other dependent claims.  Our position is they violate the independent claim and each one of the dependent claims.

MS. DeBRUIN:  It's our position that we do not infringe Claim 1, and thereby do not infringe any of the other claims.  We have to show that -- if we were going to prevail on invalidity, we'd have to show that all the claims were invalid, which is why I believe they're leaving the claims in the case.

THE COURT:  Very well.

MS. DeBRUIN:  I do have one additional comment, your Honor, on --

THE COURT:  Yes.

MS. DeBRUIN:  -- on the language from the third claim construction order, the bold language at the very end, which talked about the establishing a connection, substep must be completed before the transmitting the content of the -- box, substep can commence.

We need to include that in the supplemental opening instructions, one.  Would you like me to hand up the third claim construction order?

THE COURT:  No, I have it.  And it was my intent

to put in the instruction all of the Court's construction, so I will -- any objection to that?

MR. THAKUR:  Your Honor, I don't recall that being part of the construction.  It was just that was something that, you know, they were actually moved to say that the portion limits it to the construction.  I believe the instructions are in the footnotes.  I don't recall that being expressly set forth as a construction.

MS. DeBRUIN:  It's not a construction.  It's set out in bold at the very end of the third claim construction order.  It says:  "Accordingly, the Court finds that, as used in Claim 1 of the '917 patent, the establishing and connection substep must be completed before transmitting the content mailbox substep."

THE COURT:  I guess maybe the nomenclature construction divides us.  It does seem to me that construction is to construe limitations.  In a method claim, one of the limitations might be the order in which the steps are to be performed.  And I understood there was a dispute between the parties with respect to the order in which at least this substep had to be performed.  And to -- and that is resolved as a matter of law.

And so it would be my intent to not leave the jury without the information that this is a limitation, this is what it means, and the order of it is something

that has been given attention by the Court.  And you want me to do that, because it sounds to me as though, to the extent the argument might be that this is a matter of law, you want it clearly laid out so that there's no question that that is the Court's ruling with respect to the order of that substep.

So I would intend to include that in my instruction to the jury.

MS. DeBRUIN:  Thank you, your Honor.

THE COURT:  I understand that that doesn't leave you at a position where you all find that it's -- there are still some questions about that.

Let me -- while we're on this, let me ask a question that, I went back to the '917 patent to see if I could clarify for myself that indeed this is a patent that was allowed, which among its novelty was the fact that this was allowed as a patent for the management of a wireless device, whereas in the past the prior art all related to local area networks and wired devices.  And that this patent was allowed because it, as a matter of novelty, related to remote devices that were not part of the LAN, not part of the local area networks, and were not hard-wired, but allowed management of a wireless device remotely.  And that's redundant, because if it's wireless, it is remote, but am I saying something that you would

agree with?

MR. THAKUR:  Conceptually, your Honor.  I believe that managing wireless devices is a substantial advancement over managing wired devices, absolutely.  At a conceptual level, we absolutely agree.

MR. MATUSCHAK:  That's the nature of our invalidity argument, your Honor, will basically be things that were in the wireless field before their invention.

THE COURT:  That's why I thought the next step -- and I do appreciate you all providing me with a technical assistant.  I asked him whether or not he might go back to the application and look and give me a better background, and maybe you should do more on this if you wish, on the state of the art with respect to enterprise management of wireless devices and what relevant dates -- it was a 2004, 2005 patent.  It goes back, however, to an earlier filing date.

MR. THAKUR:  Correct, your Honor, 2000.

THE COURT:  Which was 2000.  And one of the challenges that we will put to the jury is understanding the state of technology in 2000.  And what was the state of the art as understood by a person of ordinary skill in the art in 2000 with respect to the management -- enterprise management of wireless devices.

MS. DeBRUIN:  And your Honor, I arise because

there is some dispute as to the date for the patent.  The patent relies on a provisional application that was filed in December of 2000.  And we would assert that the date is actually 2001, because they don't have the benefit of the provisional.

THE COURT:  Does that come up pretrial?

MS. DeBRUIN:  It came up in some of the summary judgment motions, but I'm afraid it might have seemed like a side issue when it really should be an issue for your Honor to address.

THE COURT:  I will have to tell the jury the relevant dates here.  And so perhaps the parties should advise me if there is a dispute about that, and put it in a place where I can decide it.  Because that's not -- that would not be a matter for the jury to decide, as my understanding of patent law, and if you think that it is, let me know that as well.

MS. DeBRUIN:  Thank you, your Honor.

MR. THAKUR:  Thank you.

THE COURT:  Let me finish that last thought.  My last thought would be, then, I would have him then go back through the prosecution history and get as close as he could and have him educate me about it so I could understand it.  I assume your experts and those that would be testifying would be doing that.  And if I -- if I could

have your help in that process as to what that -- what the prior state of the prior art was as of the relevant date, whatever that date you claim to be, that would be very helpful.  So as I wouldn't then have to rely so much on his time to plow through that.  Some of you might have done that already.  And if you have that in some fashion, you can supply it to us between now and Tuesday, that would be helpful.

Anything further?

MS. ZINANNI:  Yes, your Honor.  There's one issue that I thought would come up in the context of the exhibits, but because we've deferred that for another day, but I do think it's worth raising to the Court today.  This morning the Federal Circuit issued a new opinion regarding willfulness.  And in particular, regarding the objective prong of willfulness.  Specifically finding that this was a question of law for the court to decide that's based solely on objective evidence of whether or not the defenses raised by the defendant are credible or not.

We think that applies in this case, in particular related to the exhibits, because approximately 9 of the 10 exhibits the plaintiff is asking to be resolved, you know, before trial, willfulness is one of the grounds by which they are asserting relevance.  Because this has now been identified as an issue to be resolved by the Court, we

believe that the information that was provided in RIM's motion in limine regarding willfulness sets forth the full issues, but we'd be open to providing the explanation of this case and how it applies, why we think that under this new Federal Circuit law, again that just came out this morning, willfulness is not properly a part of this case.

THE COURT:  Why do they do that to me?

(General laughter)

THE COURT:  Well, I guess I should read the case. My general understanding is that knowledge of prior art doesn't necessarily help you on willfulness, unless it's knowledge of prior art that leads to a decision at the point and time of infringement, that we don't infringe and, therefore, we're going to do it.  So it seems to me that those objective things -- that is, what really happened or -- when you say "objective," I'm not sure what you mean I'm going to listen to.  If you mean that this is not something that the jury should hear, I'd like to hear more about that.  But to the extent that you're saying, this may be a circumstance once you hear all the evidence, you will say to the jury, you don't have to decide this issue, I've taken it away.  That's a different argument.

MS. ZINANNI:  Your Honor, in this instance we think it's an issue that should never go to the jury at all.  We've significantly streamlined the trial in our

position, and what the Federal Circuit set forth in the *Powell vs. Home Depot* case from November 2011 is that the objective prong of willfulness, you know, the overall standard for whether or not there's willful infringement, is objective recklessness.

But there are two parts to that. The first is the completely objective standard in which the defendant's state of mind has no relevance; it's solely whether or not the defense is raised; whether infringement or invalidity, by the defendant, were credible.

There was a recent decision in the District of Delaware where simply putting forth a closely contested claim construction issue was sufficient to grant a summary judgment of no willful infringement. So that purely objective question, we think it's been resolved here by the Court's summary judgment orders invalidating 35 of the 48 claims of the '917 patent at issue, granting RIM summary judgment of no direct infringement. And denying the plaintiff's motion for summary judgment of no anticipation.

All of those demonstrate the objective standard of willfulness that Mformation cannot, by its clear and convincing evidence burden, establish that there is any objective likelihood that RIM was infringing a valid patent. And until that threshold issue, and that

threshold issue is what the Federal Circuit had said is solely within the Court's area to determine, the subjective issues, whether or not RIM had knowledge of the patent, the allegations of copying, etc., which go to the jury.

MR. McDONALD:  Your Honor, I must confess I have not read the decision that Ms. Zinanni is referring to. It sounds like RIM would like to have another motion for summary judgment or something, and just because something is a question of law does not mean that the jury does not get -- does not hear it as a matter of course.  Things like obviousness are questions of law, but those are submitted to the jury all the time.

So I'm not sure that some ruling from the Federal Circuit would automatically take the willfulness question out of the jury, out of the jury's consideration.  But I still don't know what RIM is proposing we do, so until I know what RIM is proposing be done --

THE COURT:  Are you seeking reconsideration of some prior order?

MS. ZINANNI:  Your Honor, that would be one tool by which we would do it.  We'd like to put this additional case in with our Motion in Limine Number 5.

THE COURT:  I can read the case.  So that's not --

MS. ZINANNI:  I have a copy of the case right here.  There's, unfortunately, a typo on the front of it, so I've provided a copy --

THE COURT:  Is that a Federal Circuit error?  I'd love to see that.

MS. ZINANNI:  It's got an incorrect date on it.  But I assure you it issued this morning.

THE COURT:  Who wrote this?

(General laughter)

THE COURT:  Well, it's too late in the day for me to be doing this.  Because I'm -- my current state of mind will be, let me just read the case and think about what I already have and let you know whether I need anything more.  And so I think I'll do that, without putting you to work doing more, without having done that -- that would sometimes be wasteful of your time.

So let me thank you for bringing this to the attention of the Court.  I'll take a look at it.  And --

MS. ZINANNI:  Yes, your Honor.  We feel that this case further supports, you know, our Motion in Limine Number 5.  If there's any background, factual issues or other legal issues relevant to this, the briefing on that motion would cover it.

THE COURT:  I like the start of this.  This is Judge Gajarsa, who, one of our now magistrate judges, was

a law clerk for him and he came and spoke at his investiture.  He said:  "In deciding the present appeal, this Court determined that the U.S. District Court was correct..."

Thank you.

MS. ZINANNI:  Thank you.

THE COURT:  Anything else?

MR. THAKUR:  Your Honor, no, just those 10 exhibits.

THE COURT:  So I'm going to take a look at these 10 documents and let you know in due course about those.

And I will otherwise see you on Tuesday morning at 9 o'clock.

MR. CHARFOOS:  Your Honor, because some of our exhibits also would be used in our opening, similar to the reason that Mr. Thakur was wanting to have clarity of what was to be used in his opening, I know that, I think that your hearsay ruling resolved the issue on their hearsay objections to the documents.  I think they had lodged authenticity objections as well.  I'm not sure where that leaves us on that issue.

THE COURT:  Well, it would surprise me greatly if any prior art submission is -- if there's a basis for arguing that it's not authentic.  And so any to which they make that objection, you may not use during your opening

statement.  Any that they withdraw that objection, you may use.

I'll order the parties to meet and confer about that.  And to the extent that you believe that they are being disingenuous with respect to an authentication objection, let me know tomorrow.  I will be out of the courthouse tomorrow, I've got to attend a meeting.  But my staff will be here and somehow word can get to me.  And maybe we'll get on the phone and discuss it.

MR. CHARFOOS:  Your Honor, I will say at this point in time we have declarations from --

THE COURT:  I understand.  I saw that in the response to the ones that I looked at.  So to the extent that you have those, it would be the Court's pretrial ruling that that is sufficient, and it just seemed to me on the face, many of those appear to be prior publications.  That's why I phrased it as I did.

Since I don't know this as a matter of fact until I actually hear it, it just seems to me that if there's a genuine objection that these are not genuine documents, they violate the rules, that they aren't what they purport to be, they ought to be able to put them in as part of their opening statement.

It sometimes concerns the Court that too many exhibits, too much evidence is used during opening

statement because it deprives the jury from hearing the case then because they've heard it during the opening statement.  So why should we sit around listening to this at all?  Let's go decide it.

On the other hand, say we're going to put this in, you'll see how important it is at that point in time, so I do encourage the parties to use exhibits over which there is no genuine objection during the opening statement, and particularly since you've been so kind as to stipulate to joint exhibits.

But any prior art, since that's a key defense, you ought to be able to use during your opening statement.

MR. CHARFOOS:  Thank you, your Honor.

THE COURT:  Anything further?

MR. THAKUR:  On those 10, would you like to entertain oral argument, or you'll just let us know?

THE COURT:  No, I need to look at them.  And you can go away.  I'll let you know if I need anything more on these.

MR. THAKUR:  Thank you.

THE COURT:  You wanted to know because you plan to use these during your opening statement as well?

MR. THAKUR:  At least -- most of them, yes, your Honor, or some of them.

THE COURT:  Stand by.  Give me 10 minutes.

MR. THAKUR:  Okay.  Thank you.

(Recess)

(Off the record discussion)

(Adjourned)

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Thursday, June 14, 2012