```
                                              Volume 2

                                              Page 140 - 346


                   UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

-------------------------------)
                               )
Mformation Technologies, Inc., )
                               )
                  Plaintiff,   )
                               )
       v.                      )   No. C  08-4990 (JW)
                               )
Research In Motion, Ltd.,      )
et al.,                        )
                               )
                  Defendants.  )   San Francisco, California
                               )   Tuesday, June 19, 2012
-------------------------------)




                  TRANSCRIPT OF PROCEEDINGS



APPEARANCES:



For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        RUEBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO
```

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        MEREDITH ZINANNI
                        FERLILLA VICTORIA ROBERSON
                        MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Tuesday, June 19, 2012

(9:00 a.m.)

(In open court; jury not present)

THE COURT:  Good morning.  Please be seated.

I'm not sure Mr. Noble got back up here, but I was told there were a couple of issues you wanted to discuss before we got started.  And I tried to limit you to any issue having to do with your opening statements, and I understood there was something having to do with the exhibits that were going to be shown.  Who has the objection?

MR. MATUSCHAK:  We've just reached agreement on that, your Honor.

THE COURT:  Perfect.

MR. THAKUR:  There was one other aspect of the exhibits.  The exhibits we had last Thursday you ruled on.  We actually need to move them into evidence.

THE COURT:  Very well.  I'm not sure what you mean, "move them into evidence."  You've reached a stipulation that, accepting my rulings, those exhibits may be regarded as in evidence without further authentication.

MR. MATUSCHAK:  That's fine, your Honor.

THE COURT:  Very well.

(Plaintiff's Exhibits 113, 185, 298, 314, 362, 634, 644, 880, 890, 1081 received in evidence)

MR. MATUSCHAK:  The other issue I wanted to raise is regarding willfulness.  At this point, that is an issue that rises in the opening, and we did file a briefing on that.

THE COURT:  I've read the case, and I guess I need to figure out how to frame the issue for the jury. As I understand it, the case does not take willfulness out of our case, but it does divide the labor between the Court and the jury with respect to that issue.  And I didn't have a chance, quite frankly, to go back to my opening instructions and see whether or not anything I say there needs to be modified in light of the decision.  It's similar to the obviousness kind of rubric where the jury has factual findings that can lead to a legal conclusion, and so if I'm reading the instructions and I find that I need to change the language based upon what I have now come to understand, I'll do that.  But otherwise, we'll save this for another time.

MR. MATUSCHAK:  Thank you, your Honor.

MR. THAKUR:  Thank you, your Honor.

MR. MATUSCHAK:  Your Honor, just one other thing. I guess you had asked us to address the priority date issue, because I think that was the issue also for your opening instructions, and I know the parties had submitted information to you on that.

THE COURT:  What I was thinking about just now is when I would give the opening instruction with respect to the meaning of the claims.  Do you intend in your openings to comment on the Court's findings with respect to the meaning of the claims?

MR. MATUSCHAK:  To use your constructions, yes, your Honor.

MR. THAKUR:  Your Honor, we plan to acknowledge them, yes.

THE COURT:  So I will probably refer to these then or actually read portions of it during the opening instructions.  That would free you then to use it as part of your opening statement.

Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Good morning.

JURORS:  Good morning.

THE COURT:  We're a little late in starting.  In fact, I can't see the clock because of our great screen, and I will always have my eye on the clock so that you understand we are moving apace.

Let me tell you a little bit about what we're going to do this morning.  In a moment I'm going to give

you opening instructions, and it is my practice to give you those instructions in writing. One of the problems with doing that is sometimes, even as I read the instructions, I'll find things that I want to correct about those instructions. And so you should be guided by the instructions that I give to you verbally, and I will always try to follow with any change that I make in my verbal instruction with a written instruction to that effect.

The other thing I should tell you, as I actually say during the opening instructions is, at this point I haven't heard the evidence; you haven't heard the evidence. And so some of the instructions that I give you will change based on the nature of the evidence in the case. And so these are opening instructions to help you kind of organize your thinking about the case so that you listen to the evidence with some idea of what the legal issues are. But they will change perhaps as the evidence comes in.

At this point I'll have Mr. Noble give you the opening instructions, also give to the jury the supplemental opening instructions as well as the sample patent.

Very well. Ladies and gentlemen, you are now the jury in this case, and I want to take a few minutes to

tell you some information about your duty as jurors and give you instructions.

At the end of the trial I will give you more instructions. During various points in the trial when I may find it appropriate, I will give you additional instructions. All of the instructions which I give to you are important. You must follow all of them.

As I have mentioned to you during jury selection, this is a patent infringement case. In every legal dispute there are two kinds of questions: Questions of law, and questions of fact. Let me give you examples of questions of law. I have told you that this is a patent infringement case. Two questions of law are:

Number 1, what does a claim mean?

Number 2, what must the plaintiff prove in order to recover damages for a defendant's alleged infringement?

In our legal system, the judge is responsible for deciding questions of law. In what we call "jury instructions" I will tell you the law that applies to this case. I will give you complete instructions on the law near the end of the case.

As I indicated, the second kind of questions involved in a legal dispute are questions of fact. In other words, what happened? In most lawsuits there's a dispute between the plaintiff and the defendant over

whether or not a particular event actually took place, and if it did take place, whether or not it caused economic or other types of harm. And if so, how much harm was caused. Under our system a jury is impaneled to listen to the evidence, and based on that evidence, the jury decides whether or not the disputed event took place, and the amount of damages, if any, which should be awarded.

Now, this case involves a dispute relating to a United States patent. Before summarizing the positions of the parties and the legal issues involved in the dispute, I am going to play a video that discusses some of these issues.

And away from my written text, you've been given a copy of a sample patent which is referred to in the video. And you might find it convenient as the commentator discusses the various parts of the patent to refer to that sample patent. It is a sample patent. It's not a real patent. And so it is there for illustration of various parts of a patent and some of the words that are going to be used.

Very well.

We might have to lower the lights a little bit, but let's see. We're now going to have this video played for you.

(Video, "An Introduction to the Patent System"

played.)

(Videotape froze.)

THE COURT:  We have a technical problem.

(Videotape resumed.)

THE COURT:  I think we can skip the credits.

Members of the jury, back to the text of my opening instructions, you'll see that I have summarized some of the provisions of the -- that you heard explained on the video in language that appears there on page 2, starting at line 15, and going through to page 4, line 8. I won't read those at this time, but I wanted to provide it to you in writing so as you listen to the evidence, if you have a question about a word that is used with respect to the patent application or prosecution process, you might find that discussed in greater detail in my instructions.

And I'm going to now resume reading the instructions on page 4 at line 11.

In this case, the plaintiff is Mformation Technologies, Inc.  The plaintiff is a manager of mobile device management solutions and software.

The defendants are Research In Motion, Limited, a Canadian corporation, and Research In Motion Corporation is a Delaware corporation.  For ease of reference, I will refer to the defendants as RIM.  RIM designs,

manufacturers and sells wireless solutions, including BlackBerry wireless communication devices and associated equipment, software and services.

The patent involved in this case is United States Patent 6,970,917. For convenience, the parties and I will often refer to this patent as the '917 patent, because 917 is the last three numbers in its patent number. The '917 patent claims as an invention "a system and method for remote control and management of wireless devices." In the "summary of the invention," the inventors disclose that the invention is "a method, system and computer program product that provides capacity to manage, control and reconfirm wireless devices remotely over a wireless network..."

In particular, plaintiff alleges that RIM indirectly infringes the Claims 1, 6, 21-25, and 27. We'll refer to those as "the asserted claims" of the '917 patent. And the patent itself will be put into evidence, and so you will have it as a document available to you.

Plaintiff alleged that RIM induced or contributed to infringement based on its customers' use of certain versions of the BlackBerry Enterprise Server, which we will refer to as B-E-S, or BES for short.

Further, plaintiff claims that RIM's infringement is willful.

Now, in response, RIM denies that it infringers any of the asserted claims of the '917 patent. In particular, it denies that any of its products, including the BES, infringes any of the asserted claims; it denies that it has contributed to the infringement of those claims; and it denies that it has induced any infringement of those claims. Further, it denies that any alleged infringement is willful. In addition, RIM alleges that the asserted claims of the '917 patent are invalid because it is anticipated by other patents or are obvious. I will give you further instructions as to these defenses.

Your job will be to decide whether the asserted claims of the '917 patent have been infringed, and whether those claims are invalid. If you decide that any of the asserted claims have been infringed and is not invalid, you will then need to decide any money damages to be awarded to plaintiff to compensate it for the infringement.

And I've changed the language a little bit. Based on your answers to questions they'll give to you in the verdict form, there'll be a series of interrogatories that you will have to answer. The Court will make a finding as to whether the infringement, if you find infringement, was willful. That's a change from the instruction that you have there in writing, and I will

provide that change to you in writing.

Before you decide whether RIM has infringed the asserted claims of the '917 patent or whether the claims are invalid, you will need to understand the patent claims. As I mentioned, the patent claims are numbered sentences at the end of the patent that describe the boundaries of the patent's protection. It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation. I will give you those instructions momentarily.

In a lawsuit such as this, the law provides that a party is entitled to a verdict in its favor only if that party presents a sufficient amount of evidence. We call this the burden of proof. In this case you will hear about preponderance of the evidence.

When a party has the burden of proving a claim by a preponderance of the evidence, that means that the party has to produce evidence which, considered in light of all the facts, leads you to believe that what that party claims is more likely true than not. During the trial you'll hear evidence from both sides. If you were to put the evidence on opposite sides of a scale, the party with the burden to prove a matter by a preponderance of the evidence would have to make the scale tip slightly on that party's side. If that party fails to meet this burden,

the verdict must be for the opposing party.

Some of you might have heard of the term "proof beyond a reasonable doubt."  That is a stricter standard. It applies only to a criminal case, and it requires more proof than a preponderance of the evidence.  The reasonable doubt standard does not apply to a civil case such as this, and you should therefore put it out of your minds.

In a lawsuit such as this, the law provides that a party is entitled to a verdict in favor only if that party presents -- that seems to be a repetition.

On other issues you must use a higher standard and decide whether it is highly probable that something is true.  This is called "clear and convincing evidence."  If you were to put the evidence on opposite sides of the scales, the party with the burden to prove a matter by clear and convincing evidence would have to make the scales tip more than slightly on that party's side.

Plaintiff will present its evidence on its contention that the asserted claims of the '917 patent has been and continues to be indirectly infringed by RIM and that of indirect infringement has been and continues to be willful.  To prove infringement of any claim, plaintiff must persuade you that it is more likely than not that RIM has infringed that patent.

And as I said, I've changed the instruction with respect to willful, and I'll make a change to that.

RIM will present evidence to support its assertion that the asserted claims of the '917 patent are invalid.  To prove invalidity of the asserted claims, RIM must persuade you that it is highly probable that the claim is invalid.

During the presentation of the evidence, the attorneys will be allowed brief opportunities to explain what they believe the evidence has shown or what they believe upcoming evidence will show.  Such comments are not evidence, and are being allowed solely for the purpose of helping you understand the evidence.

Because the evidence is introduced piecemeal, you need to keep an open mind as the evidence comes in and wait for all the evidence before you make any decisions. In other words, you should keep an open mind throughout the entire trial.

The evidence from which you are to decide what the facts are will include, one, the sworn testimony of witnesses, both on direct and cross-examination, regardless of who calls the witness; two, the exhibits which will be received into evidence; and three, any facts to which the lawyers agree or stipulate.

The following things are not evidence and you

must not consider them as evidence in deciding the facts of this case:

Number 1, statements and arguments of the attorneys;

Two, questions and objections of the attorneys;

Three, testimony that I instruct you to disregard;

And four, anything you may see or hear when court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial.  Direct evidence is testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which one can find another fact.  For example, if the question of fact in a given case is whether or not Johnny ate the cherry pie, testimony by a witness that he saw Johnny put the pie in his mouth and ate it would be direct evidence of this fact.  However, if the question of fact in another case is whether Jane ate the cherry pie, and in that case no one saw her eat it, but a witness testifies that he walked into the kitchen and saw Jane sitting at the table with the empty pie tin in her hands and cherry pie on her face, this would only be direct evidence that he was in the kitchen and that she had pie

on her face, but it would be circumstantial evidence from which a person could find that Jane ate the pie.  However, there could be other circumstances which would explain why she had the pie tin in her hands and pie on her face.

You must listen to all the facts and may draw reasonable conclusions from those facts.  Facts may be proved by either direct or circumstantial evidence; you are to consider both types of evidence.  The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and the lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and not guess what the answer would have been.

And sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case, you must not consider the evidence which I told you to disregard.

In deciding the facts of this case, you may have to decide which witnesses to believe and which witnesses not to believe.  You may believe everything a witness says, or only part of it, or none of it.

In deciding what to believe, you may consider a number of factors including the following:

(1) is the witness able to see or hear or know the things the witness testified to;

(2)  What is the quality of the witness's memory;

(3)  What is the witness's manner while testifying;

(4)  Does the witness have an interest in the outcome of the case or any motive, bias or prejudice;

(5) is the testimony of the witness contradicted by anything the witness has said or written before trial, or by other evidence;

(6)  How reasonable is the witness's testimony when considered in the light of other evidence which you believe?

Now, if you wish, you may take notes to help you remember what witnesses say.  If you do take notes, please keep them to yourselves until you and your fellow jurors go into the jury room to decide the case.  And do not let note-taking distract you so that you do not hear other answers by witnesses.  And when you leave at night, your

notes should be left in the jury room.

If you do not take notes, you should rely on your own memory of what was said and not be overly influenced by the notes of other jurors.

If you need to speak with me about anything, simply use your notepads to give a note to the Clerk of Court.

You may also use your notes to let us know if you're having difficulty hearing or understanding a particular part of the case.  It is the policy of the Court not to permit jurors to write questions for the witnesses, however.  If there is some aspect of the case which you find confusing, please write a note to me, and I will bring it to the attention of the attorneys.

Ordinarily, we will take a break in the middle of our sessions.  However, if any one of you should need a break before the scheduled time, simply raise your hand to get my attention and ask for a short recess, and we'll take one.  Feel free to stand if you need to stretch.  Also feel free at any time to go over to the watercooler here in the courtroom.

I'll say a few words about your conduct as jurors.

First, do not talk to each other or with anyone else about this case or about anyone who has anything to

do with it until the end of the case, when you go to the jury room to decide on your verdict.

"Anyone else" includes members of your family and your friends.  You may tell them that you are a juror, but don't tell them anything about the case until after you've been discharged by me.

Talking also includes sending e-mails, posting on message boards or social networking sites, sending messages on Twitter -- this list gets longer and longer and longer as time goes by -- or making any other form of written communication, whether public or private.

Second, do not let anyone talk to you about the case, or anyone who has anything to do with it.  If someone should try to talk to you, please report it to me immediately.

Third, do not read any news articles about the case or listen to any radio or television reports about the case.

Fourth, do not do any research, such as consulting dictionaries or other reference materials or performing Internet searches, whether on your computer or cell phone.  And do not make any investigation about the case on your own.

Fifth, do not make up your mind about what the verdict should be until after you've gone to the jury room

to decide the case and you and your fellow jurors have discussed the evidence.  Keep an open mind until then.

Now, I've ordered the parties to schedule any meeting with me at times other than those reserved for trial.  Sometimes it might be necessary to meet during the times reserved for trial, but if so, I will be doing my best to ensure that the purpose of the meeting is to advance the goal of prompt and efficient proceedings.

Now, before I give you that final instruction there on page 12, I'd like to have you turn to the supplemental opening instructions.  The reason I'm doing this is because having already given the parties the construction interpretation of the claims, they are free to refer to these instructions during their opening statements.  And so I want to draw your attention to it so that you may refer to it if you wish.

So before I alow the parties to make opening statements and call witnesses, there is this additional set of instructions which I give to you with respect to the '917 patent.  As stated in the previous instructions, it is my job as judge to explain to you the meaning of any language in the claim that needs interpretation.  In this case I've already determined the meaning of certain terms of the claims of the '917 patent.  In these instructions, I provide you with my definitions of the terms.  You are

to apply my definitions of these terms throughout this case. However, my interpretation of the language of the claims should not be taken as an indication that I have a view regarding issues such as infringement and invalidity. These issues are yours to decide. I will provide you with more detailed instructions on the meaning of the claims before you retire to deliberate your verdict.

In these instructions I've included the language of the asserted claims of the '917 patent. Rather than read the lengthy claim language to you, I am providing the text of the claims in this instruction. The asserted claims use words and phrases to describe what is covered. I have not defined every word or phrase used in the patent claims. Some of the words and phrases are ones which are commonly used in ordinary English. You are instructed to give to these words and phrases their commonly used meanings. However, sometimes even commonly used words are given special meaning in patent claims. Whenever I instruct you on the definition of a word or phrase, you must use the definition I give to you in deciding the issues in this case. If I have defined a word or phrase and it is used multiple times, unless I instruct you otherwise, you must apply the definition I've given to you, the word or phrase, each time it appears.

If I determine that it is necessary to give other

or additional definitions to words or phrases in the asserted claims, I will give you additional instructions.

And so you see following are the language of Claim 1 and the other claims that I have called the asserted claims, and I have placed, as to any word or phrase that is given, a definition, a footnote, and the meaning that I have given to you and the parties will refer to this, and perhaps there will be times when I will come back to it.

At the beginning of the trial, each side is allowed to make an opening statement. An opening statement is not evidence; it's simply an outline to help you understand what the party expects the evidence will show. A party is not required to make an opening statement.

And so I'm going to pause here to see whether or not the parties are already set up to make any opening statement. Let me inquire of plaintiff's counsel.

MR. THAKUR: We are, your Honor.

THE COURT: Very well. So I'm going to call on plaintiff's counsel for any opening statement.

MR. THAKUR: Good morning.

JURORS: Good morning.

MR. THAKUR: In this case you will see evidence like this. This is an e-mail from Mike Lazaridis to

Mr. Castell and Mr. Yach.  Who is Mr. Lazaridis?  The defendant Research In Motion is a company of thousands -- in fact, tens of thousands of employees.  Mr. Lazaridis is the co-chief executive officer of Research In Motion.  In other words, this is the man who runs the company.  In this e-mail he says:  "Okay.  Take control of the agent ASAP."

What is the agent?  Ladies and gentlemen, this is the agent.  This is Mformation software that would go on the wireless element.  And out of respect for being green, I only printed single-sided.  It is in fact double-sided.

What is Mr. Lazaridis responding to?

"Ray:  Ken and I are in agreement on a short-term course of action on the device management front.  While we aren't ruling out the potential for acquisition (Research In Motion, Synchrologic, etc.), the best quick-fix step in the short-term would be to take ownership over Research In Motion's agent, document it and call it our own over the air API 1.0."

THE COURT:  The word "own."

MR. THAKUR:  Call it our OTA API 1.0.

This was good enough for RIM to put their own name on it.

Mr. Castell also wrote: "Mformation's approach to management is better than others."

He also wrote:  "Mformation's traction with our carrier and government customers is quite likely going to end with us preloading this agent anyways."

And that was why Mr. Lazaridis instructed Mr. Castell and Mr. Yach to take control of Mformation's agent.

And just so you know who Mr. Yach is, Mr. Yach recently left Research In Motion as the chief technical officer of Research In Motion.

My name is Armar Thakur, and I represent Mformation Technologies, Inc.  They received a patent on wireless remote and this is that patent.

The defendant, Research In Motion, sells wireless products, specifically the BlackBerry, handheld and the BES software product.  This case is about a patent that was invented by two inventors.  The lead inventor is Dr. Rakesh Kushwaha.

Would you kindly stand up and say good morning to the jury?

DR. KUSHWAHA:  Good morning.

MR. THAKUR:  I know this is a patent infringement case, but it's actually quite a simple and straightforward case.

In this case you will see evidence that Dr. Kushwaha identified a problem with respect to security,

manageability and monitoring of wireless devices.

Dr. Kushwaha invented a solution to those problems.

A second inventor, Dr. Nath, added to the invention.

Following the conclusion of their invention, they filed a provisional patent application with the United States Patent and Trademark Office in Washington, D.C.

Pursuant to the rules with the assistance of a registered patent attorney, Mr. Michael Schwartz, they filed a non-provisional patent application.

And after four years -- in fact, over four years, the United States Patent and Trademark Office issued them with this patent.

You will also learn about what Research In Motion did in this case, and we will show you that evidence.

Research In Motion, as I said to you, is the defendant. You will see evidence that they tested the invention. You will see evidence that they entered into a confidentiality, nondisclosure agreement with Mformation, and as part of that process, they received confidential information about Mformation's agent, its product architecture and detailed information about this agent and its product.

You will see evidence from RIM's own documents

that they needed this invention.

You will see RIM's own documents that will tell you that they wanted this invention.

In fact, they wanted it enough that they entered into a negotiation with Mformation to obtain a license to that invention.

Unfortunately, those negotiations did not bear fruit.  But what did RIM do anyways?  They included the invention in their product, and they did it without obtaining a license from Mformation.  That is why we are here today.

This trial is about RIM recognizing and Mformation -- what it owes Mformation for infringing its patent.

I would like to bring you back to the beginning where this all started.  It started before this invention and what happened before this invention.  It was the year 1999.  In 1999, Bill Clinton was the President of the United States.  The American economy was booming.

"La Vida Loca" was the number one song in America.

"Who Wants to be a Millionaire" was the number one TV show in 1999.  And we were all worried after Y2K if our lights were going to come on.

At that time the Nokia 3210 was the number one

selling phone in America.  Dr. Kushwaha recognized that these phones are very capable of doing a lot more.  They could evolve into smartphones.  That means you would be able to get e-mail, use wireless Internet, you would put the applications on it as you see today.  But the driver of technology, such as cell phones that was very expensive at that time, were companies.  And companies had two concerns why they would not allow smartphones into the hands of their employees, and those two concerns were security and manageability.

Let me explain to you what I mean by that.

Cell phones and mobile phones are smart devices with company's confidential data.  When you leave your employer's office, you leave the computer behind.  But if you take phones with data out into the marketplace and it is lost or stolen, that information is accessible, and companies were not legally willing to allow their employees to take that information out.  If you were a member of the medical community, a patient's personal health care information may be on it.  If you are a salesperson, you may have pricing information.  If you are a member of the United States Department of Defense, you may have confidential information that we would not want to get in the hands of our adversaries.  That was the risk that was presented in 1999.

I have shown you, just for a way of ease of reference, an individual who is at the airport and notices that his smartphone is missing.  In 1999, there was no way to stop and lock and wipe -- what I mean, there was no way to stop the device from being used again; there was no way to get the data off that phone.  Not remotely.

I explained to you the second concern: Manageability.  On the left I have a picture of an IT administrator.  In 1999, if you wanted to manage your smartphone, you would have to send it to the IT administrator, the IT administrator would have to put it in a cradle and manage it one by one.

Think of a large corporation with an IT administrator in San Francisco, with an employee in New York.  They would buy the phone, ship it to the IT administrator, the IT administrator would put it in the cradle, manage it, put it off in the mail, and off to New York it goes.  Think of the time, think of the cost, think of the effort.  And please think of the IT administrator.  It becomes a whole lot more difficult when you're talking about lots of phones.

Think of a company that has thousands of employees.  Can you imagine the burden of having to do this one by one by one?

Dr. Kushwaha set out to solve this problem.  And

in 1999, Dr. Kushwaha quit his job.  He took his over decade long experiences in the wireless communication area -- including his experience at AT&T, Bell Labs, where he was a researcher in wireless communications -- he took that experience and he set out to solve these problems. And you will see evidence that after months and months of effort, he did indeed come up with a solution to solve this problem.

After he came up with the solution, you will hear Dr. Kushwaha testify that he needed verification. Academics are prone to that.  They want to know that their invention is validated by someone else.  And Dr. Kushwaha met with a leader in the wireless industry named Dr. Nath. Dr. Nath carefully examined the invention and gave his opinions.

He also agreed to join Dr. Kushwaha to improve the invention.  And the two of them went on to become co-inventors in the patent.

As you heard earlier today, patents are a right that arise from the United States Constitution.  They're important.  And they're important for one reason:  They promote the progress of science and the useful arts.  In return, they get exclusivity for their invention.

Dr. Kushwaha and Dr. Nath filed a patent with the United States Patent Office.  After four years, after four

years, and in fact more than four years, the United States Patent and Trademark Office issued them -- they awarded them a patent. The patent, as I showed you, is United States Patent 6,970,917. I will refer to this as the '917 patent.

You will hear and see evidence in this case that RIM infringes eight of the claims of the '917 patent. But I would like to walk through just one of them. As I explained, Dr. Kushwaha and Dr. Nath were the inventors in the patent's system and method for remote control and management of wireless devices.

This is Claim 1 of the patent. I will walk you through this claim in an effort to help you understand it. On the left you see the claim.

The first step: "A method for remotely managing a wireless device over a wireless network comprising a server and the wireless device, the wireless network operable to communicatively connect the server and the wireless device, the method comprising the steps of...."

What does this mean? What this means is there is a server, a computer server at the company remote from the wireless device. And those wireless device have to wirelessly communicate. The two most common ways to wirelessly communicate is over the WiFi network, or over the cellular network.

As you see in this diagram, the server is managing the device over the WiFi network.  As an alternative, it will manage it over the cellular network.

The next step:  "Transmitting registration information relating to the wireless device from the wireless device to the server."

Registration information relating to the wireless device that is sent from the wireless device to the server.

Next step:  "Verifying the registration information at the server."

The server has its list of employees where the registration information is predetermined, and it will verify when the device sends the registration information as to whether registration should be completed.

Once that verification is completed, the device is registered with the remote server.

"The following steps must be performed without a request from the wireless device performing the steps of..."

What that means is, the following steps must now be performed at the server.

Step 1:  "Establishing a mailbox for the wireless device at the server."

The server has memory.  In that memory will be

mailboxes.

Next step:  "Placing a command for the wireless device in the box at the server."

There are commands that are put in.  Everyone understands in this computer age, every data in the computers are in ones and zeros at its core.  But those are commands that go into the memory of the server to be sent to the device.

The next step is delivering the command from the mailbox at the server to the wireless device.  You put the command in the server, you have to get to the device.  That is a three-step process.

First step:  Establishing a connection between the wireless device and the server.

The second step:  Transmitting the contents from the mailbox to the server to the wireless device.

The third step:  Accepting the contents of the mailbox at the wireless device.

What does establishing a connection between the wireless device and the server mean?  As you heard from the Court, the Court has construed a number of the terms.  For the first time through this claim I chose not to identify those for you.  However, you have them available to you.  I do want to point out this one:  The Court has construed "establishing a connection between the wireless

device and the server" means "initiating wireless communication between a wireless device and the server."

What that means is, at the server there is an initiating wireless communication step.

As I showed you visually, it is the server moving the command to be sent to the device.

I thought of an analogy that might help you. The analogy that follows: At your company you have a mailbox where you want to send a package to somewhere else. What you do is you pull that package, you wrap that package, you put the address of where it's going, you put the address of the sender. And then you pull from the shelf the alternatives: One option might be a FedEx box. Another option might be the United States Postal Service. You initiate the delivery of that device by picking that box up and getting it packaged for shipment. Shipping occurs once the United States Postal Service or the FedEx department has taken it.

That's the same way it works in this invention. You put the command in the wireless network -- excuse me, at the server, and then transmission will begin after that is completed.

And how does transmission begin?

It will go over the wireless network or the cell network, as I explained.

But at its core, the command now leaves the BlackBerry Enterprise Server, the BES, and is being transmitted out to the wireless device.

For ease of view, I've given you a command, which I know my kids play to no end, which is the Angry Birds game, but it's basically a software application. It's going to be sent to the wireless device. And it's transmitting over the WiFi or the cellular network.

The next step: Accepting the contents of the mailbox at the wireless device. The command's going to get to the device. But the device must do something to accept it. What must it do? It must look at the command before it executes.

For ease of view, an example, I've shown you a key in a lock, where the command comes in, the command is unwrapped, and then accepted. Think of a package that came in to you that was wrapped. You take the box out of the wrapper. So that is what acceptance in this scenario is.

And once that's done and unlocked, the command has accepted the device.

The next step and the final step is, once a command is accepted, execution begins. I've depicted to you a scenario where the game Angry Birds application is being loaded, execution has begun, but it's not yet been

loaded, and at some point, once the execution is complete, you will see the icon for that application.

Finally, you saw this limitation at the end.  It says:  "Wherein the connection is established based on a threshold condition."

Remember I explained to you earlier, connection has to be made.  But in wireless communications there are usually a few checks that are made before the connection is made.

One is, why would you send a command in the device is not available?  Number 2 is a term you'll see as a term of art in wireless communications:  "Least-cost routing."  It simply means you take the cheaper route first.  WiFi is usually free.  Cellular network requires payment and you pay for those minutes.  For that reason you will take the cheaper path first.

Number 3, the server has a backlog.  Every technology, every computer, everybody e-server can only handle so many.  When you are managing thousands of employees, that might leave too many devices.

Number 4, I gave you an example, a number of delivery attempts.  You try to deliver, it doesn't happen. You try to deliver again.  You know that for the United States Postal Service when they deliver a package to you, they try a certain number of times.  After that, they hold

it back at their warehouse.  Same thing, they try delivering the command; if the command is not delivered, they hold it at the server.

Now, what I said to you was, the problem was lost devices and managing devices.  Well, how did this invention solve that problem?  I gave you an example, an employee who lost his smartphone.  In this scenario the device is discovered, it's missing by the owner at an airport.  In this scenario with the invention, with a device that is registered at the company, the concerned employee can call the IT administrator.  The IT administrator can then go to the enterprise server where the server software is located and issue a command.

In this particular instance, for a device that's lost, the most commonly used term is "lock and wipe," and you will see that in this patent.  What that means is, once you get to the device, the device will be locked, the keys -- remotely, no one will be able to do anything with the device, and the data on it will be deleted.

The command is issued.  It is sent over one of the communication channels to the device.  The device receives the command.  The device sends an acknowledgment.  I've got the command.  I've ruled delete.  I will lock and wipe the device.  I will no longer allow anyone else to use it, and I will delete the data.  And it sends an

acknowledgment to the company.  And then it executes that command.

Now, the device that is lost or stolen no longer has that confidential information, and the person who lost the device has the peace of mind of knowing that that device with its confidential information cannot be accessed by someone else.  That is how this invention solves that problem.

I'll go through a little more quickly through the manageability.  The manageability that I explained to you was, you know, cradling the device before.  Now, here is a company with lots of employees.  And what companies will do with hots of employees is break them into groups: Management, field technicians, administration.  They may have different needs.  And they create IT policies for groups of them.

In this particular example, I've identified the field technicians.  They're out and about.  And what the company wants to do is deliver Google maps to those individuals so that those individuals can find their way around when they perform their job.

Now, the IT professional will go into the enterprise server, put a command in to send Google maps to all of them -- not one by one, to all of them -- and do it remotely.  Those are the communication channels.

Now, we all know at a given time all devices are not available.  They will provide Google maps to those individuals when it's available and will keep track.  When the last one becomes available, it will subsequently do that.  Again, the company's aware of what is being sent and is keeping track of exactly what the status of each one of its devices are.

Now, I told you a little bit about the invention.  You will hear a lot more over the course of this case and trial.

Let me tell you a little bit about the company Mformation.  Dr. Kushwaha will tell you how he built Mformation.  To build the company he needed partners and he needed money.  He joined up with two partners, Mr. Upal Basu and Mr. Gurinder Johar.  Mr. Basu was very experienced in his field.  He actually had an engineering degree from Stanford and had a master's in business administration from Harvard.  A well-educated person working on Wall Street.  And he quit his job to become one of the co-founders of Mformation.  His job was to help Mformation raise the money necessary to build the product.

I'm going to try to help you see that through a timeline.

Dr. Kushwaha conceived his invention in October of 1999.

As I explained, Mr. Basu became the third co-founder of Mformation. I also said earlier they needed money. You will see evidence that they went to Kingdom Capital and obtained an initial investment of $500,000. With that $500,000, the company hired its first three computer engineers. One of the goals of the company was to build a prototype so it could show the investors what the commercial product would look like. To build a commercial product of this nature takes many, many millions. So a $500,000 investment is not going to be sufficient.

So once they received that $500,000, they built the prototype. The prototype demonstrated some but not all of the features of that invention. In fact, we have the source code for this prototype just in case there's any dispute as to what date it was produced, which was May 30th, and as to what it could do and couldn't do.

They took this prototype to show to investors so they could raise sufficient money to build the commercial product.

They did a demonstration by way of example, they did an important demonstration to Deutsche Bank on July 31st, 2000. And as a result of these demonstrations, they raised in 2000 an additional $12.5 million.

Investors certainly believed in this invention.

Following that, as you heard about Dr. Kushwaha and Dr. Nath and their invention, they filed a provisional application. And you've seen the money that they raised, the $12.5 million. You will see evidence that they raised -- they created a commercial product. The first commercial product was completed April 2001. Again, we have the source code for that commercial product, and we will show you exactly what it does and can do. I already showed you the code for the Version 1.4. This is the software that will be on the device. There will also be software that will be resident on the remote server to manage that device. And again, we will show you that source code.

As I explained to you, after Mformation was built and its products were complete, you will see and hear evidence that Mformation demonstrated and showed that invention to Research In Motion. But let me talk to you a little bit about the products that RIM built.

You heard RIM, what RIM does is build two kinds of wireless products. The BlackBerry handhelds and the BlackBerry Enterprise Server software that is provided to companies.

So the customers we are talking about in this case are companies, enterprise customers. They take that BES software and load it at the hardware at their

companies.

Those -- that server will manage BlackBerry handhelds remotely.  This case is about those BlackBerry handhelds that are remotely connected to the server.  This case does not include BlackBerry handhelds that are individual and not managed by their employer.  So if you're using your own personal e-mail and your device is not managed by an employer, that is not an issue in this case.

You heard the patent video explain what infringement is.  Dr. Madisetti, Mformation's technical expert, will testify in this case.  He will show you how the use of RIM's products, the use of RIM's products that are BlackBerry handhelds that are connected to the BES, infringes the claim of the '917 patent.  Dr. Madisetti will not ask you to take him at his word.  Dr. Madisetti will show you the software.  Dr. Madisetti will show you Research In Motion's own documents explaining the invention and how they implement this invention in their devices.

We will show you testimony from Research In Motion's own witnesses, and at the conclusion of this evidence, we will be able to prove to you that it's more likely than not that the use of RIM's products infringes one or more claims of the '917 patent.

As you heard at the outset, this is not your everyday patent infringement case.  This is a patent infringement case where RIM willfully infringed Mformation's patent.

The evidence will show you that they were interested in Mformation's invention; they wanted Mformation's invention.  They entered into negotiations for that invention, and when negotiations broke down, they included it in their products anyway.

Now, as I explained to you earlier, Mformation visited and showed their products to Research In Motion.  And they showed it extensively, over multiple meetings.  And you will see evidence of that communication of Research In Motion and Mformation.

But you will see something else in this case.  You will see Research In Motion's communications behind the scenes.  You will see what they were doing and what their intent was with respect to Mformation's product.

Let us see one of those communications now.

As I explained to you earlier, Mr. Lazaridis is one of the two co-chief executive officers of the company.  You've already read what he said.

I also told you that there is a second chief executive officer at Research In Motion.  This is a company with two co-CEOs, two men that ran the company.

The other individual is Mr. Jim Balsillie.  These are these two individuals.  This is an e-mail, Friday night, January 18, 2002.  Between Mr. Balsillie and Mr. Lazaridis.

Mr. Balsillie asked Mr. Lazaridis, Is this product worth buying?  And we will show you the exhibit that this is discussing information.  Is this product worth buying?

Mr. Lazaridis responds:  "Yes.  Along with a group focused on this critical requirement from our customer base.  Absolutely."

This e-mail shows you not only what they thought of Mformation's product.  Remember I told you there's evidence that they needed it.  Well, you heard from the words, from the mouth of the chief executive officer of the company, this critical requirement from our customer base.

How does Mr. Balsillie respond?  "Doesn't like our company management."

And how did Mr. Lazaridis respond to this?  "Darn.  It will takes us too long to recreate.  And with them, we would have a lock on the corporate market."

As I said, they needed the invention.  They wanted this invention.

You will see more evidence like this.  After you

decide that the use of RIM's products infringes one or more claims of the '917 patent, you will be asked to make a decision as to what damages Mformation's entitled for such use. You will hear evidence that Mformation needed it, and as I promised you in this case, I am not going to tell you the evidence, I'm going to show you the evidence.

Let us hear from the most important individual involved in all of this: The actual customer. This is a survey by Research In Motion in June 2002. This is a survey of their own customers' IT administrators, the individuals who made the decisions with respect to purchasing the devices. They asked their customers in 2002 about the BlackBerry Enterprise Server.

These are the results of those survey. What was the specific questions that was asked? "Please help us evaluate potential new features for the BlackBerry Enterprise Server. New features will be designed to make the BlackBerry easier to manage and more powerful in its ability to tie into your corporate data application servers. How valuable do you consider each of the following potential features:"

The first one: "The ability to lock lost or stolen devices over the air." 73 percent thought it was extremely valuable. And 21 percent thought it was valuable. For a total of 94 percent.

The next question:  "Wireless IT policies allow IT to push out the policy," the group policy that I explained to you.  56 percent thought it was extremely valuable, and 35 percent thought it was valuable.  For a total of 91 percent.

The third was:  "Enhanced management console for managing users' policy."  53 percent thought it was valuable.  36 percent thought -- 53 percent thought it was extremely valuable and 36 percent thought it was valuable, for a total of 89 percent.

This is what RIM's customers told RIM in June of 2002.

Mformation's damages expert is a respected economist, Roy Weinstein, and he will testify in this case.  He will tell you what his calculations for damages are, what he believes Mformation's entitled to in this case.  But he will not make that -- express that opinion based on his own analysis without review of the documents in this case.  He will make his testimony based on RIM's own documents.  Again, what is remarkable in this case is every point that we are trying to make will be based on RIM's documents.

Let us see what RIM said in 2002 and 2001 about the value of Mformation's technology.

Excuse me, this technology isn't moving quite as

fast as I would like.

This is just a summary that they had, from this document, that basically they summarized the three features that I mentioned to you as the three most important.

But this is the document I was referring to. This is the notebook of Mr. Dave Castell. You may recall at the beginning of this e-mail I started with an e-mail from Mr. Castell to Mr. Lazaridis. That was an e-mail of 2002. Telling him what his advice was. What did he say in 2001 in his own notes as to the value of Mformation's technology?

From his own notes in August of 2001, he puts the value of Mformation's agent from 30 to $70. Per agent. Mr. Castell made a recommendation in January of 2002, many months after understanding what the price of that agent was and what the value of that invention was.

This is not the only document.

RIM did an analysis of its enterprise software platform overview. Look at the name of the individuals involved. I'd like you to particularly pay attention to Mr. Dave Castell, the person making the recommendation.

I'd also like you to take note of the name Mr. David Yach. This was the gentleman Mr. Lazaridis cc'd on that e-mail. He left recently as the chief technology

officer of Research In Motion.

This is their analysis:  Revenue without carrier contention.  They're talking about components in the software.  On the left are the components.  In the middle is the software.  And on the right column is the maintenance that would go annually with the software.  Take a look at the component on the bottom left.  They want Mformation's technology to do management and monitoring, but just for monitoring, they established a value.  It was worth $50 a seat.

So now you've heard 30, 50, 70.  There can be no doubt that RIM knew what the value and the cost of this invention was.

Now, you will hear Mr. Weinstein testify in this case.  And he will testify that he has done his own analysis as to what is the appropriate license fee at the time for the right to use Mformation's technology.  He will testify that it's 50 cents per device per month.  50 cents per BES-enabled device per month.  And we're talking about only to the devices that are connected to the BES.  Those devices not connected to the BES, those are not at issue.

And this is the box for the BlackBerry Enterprise Server software.  Now, we know that there have been a lot of BlackBerrys sold, and you will see the exact numbers.

And because of the success of the corporate customers for Research In Motion and the number of BlackBerrys that have been sold that are managed by the BES, you will hear Mr. Weinstein testify that the total damages to which Mformation is entitled is approximately $200 million.

Now, after I've finished my opening statement, you will hear from Research In Motion's lawyers. They will tell you they're not infringing this patent. They will tell you that this patent is invalid. And they will tell you, even if they're infringing and the patent is invalid, Mformation is not entitled to damages, or if they are, not too much.

First, with respect to Mformation's infringement. The evidence will show you that the use of the BlackBerry devices that are connected to the BES infringes.

What I commit to you is that we will show you that it infringes. We will not tell you, we will show you that it infringes.

You will also hear Research In Motion argue that the invention is not new. They will tell you that the United States Patent and Trademark Office got it wrong. Despite the fact that the patent was reviewed for over four hours -- excuse me, four years -- that they got it wrong. And they will say they didn't get it wrong once. They will tell you that they got it wrong each and every

time.  They will tell you each and every one of the eight claims are invalid.

You will have to ask yourself, Research In Motion, the leading company in wireless services, how is it that they did not know what the other technologies were?  And they will rely on -- that you will see with your own eyes that was well known to Research In Motion, and yet they still wanted to do business with Mformation.

RIM may also try to taint Mformation.  You heard that the patent issued in November 29, 2005.  The lawsuit was not filed till October 31, 2008.  Almost two-and-a-half, three years later.  Why wait?  You will hear evidence in this case as to why they waited.  They waited because of the risk associated with the company.  Research In Motion's release of the infringing product had almost killed Mformation once.  But they survived.  To do it again and file a lawsuit against Research In Motion could potentially be the end of them.  And they had to prepare themselves for that.  And they did put in mechanism a way to be in a situation to fight against Research In Motion in a patent infringement lawsuit and still stay alive as a company.  And they did just that on October 31, 2008.

And you will see from your own eyes what Research In Motion did to Mformation following that lawsuit.  And

you will have to judge for yourself.

In conclusion, when I started this presentation I told you that the case is actually quite simple and straightforward.  First, Mformation will prove that it is more likely than not that the use of RIM's products infringe the '917 patent.

I want to emphasize this point.  You may conclude that Research In Motion copied our invention.  You may conclude that they willfully infringed.  But that is not our burden.  Mformation's burden is simply to prove that the use of RIM's products more likely than not resulted in infringement of the '917 patent.  And we will meet that burden.

And then we will ask you to award Mformation damages in the amount of 50 cents per month for each BlackBerry handheld that is connected to this device.

We are here today to ask you to correct a wrong that has been done to Dr. Kushwaha and Mformation.  We ask for justice.

And before I sit down, I make a promise:  We're not going to tell you the evidence, we're going to show you the evidence.  Because seeing is believing.  This is that case.

THE COURT:  Very well.  I have it at about 10:40. We'll take a 15-minute break at this point, come back at

about five of the hour.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  I presume that during the break, the defense -- you're making an opening statement?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  You'll see the Court up, so as soon as we come back, I'll turn it over to you for your opening statement.  That will take us right up until noon.  If you contemplate that you would be able to finish in that amount of time.

MR. MATUSCHAK:  Yes, your Honor, I think I'll be a little bit under an hour.

THE COURT:  Very well.  All right.  We'll see you then.

(Recess)

DEPUTY CLERK:  Remain seated.  Come to order.

THE COURT:  Ready to resume?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  The Court will call on the defense for opening statement.

MR. MATUSCHAK:  Thank you, your Honor.

Good morning, ladies and gentlemen.

JURORS:  Good morning.

MR. MATUSCHAK:  My name is Mark Matuschak, and I represent Research In Motion, or RIM, the defendants in this case.  And you'll also be hearing from Linda DeBruin, Andrew Grossman and Aaron Charfoos, and I think I already introduced to you last Thursday Ray Dikun, who's here from RIM's headquarters in Texas, director of product development.  And in the back we have Tom Sanchez, who's RIM's chief patent officer.

I'd like to start by thanking you for your time sitting on this jury.  I know it's an imposition to your schedule to have to sit here and decide a dispute about two companies.  But this case is very important to RIM.

You've heard Mr. Thakur.  He says we're inducing people to infringe their patent by using one of our products.  He said we copied from them.  He says we're willful infringers.  He's not saying we infringe by accident.  He's saying we're bad people.  It's that simple.

Now, I don't know if any of you has ever been wrongfully accused of doing something that you didn't do, but if you have, you know how it feels and you know how it feels to sit through and listen and wait your turn, your

chance to speak. You know how you want to tell people that that's not true.

That's why we're here.

That's why Mr. Dikun is here, that's why Mr. Sanchez is here. We're not afraid to tell our story. And have you determine who's telling the truth. So we're very grateful for your service during this trial.

Now, whether you recognize the name RIM or Research In Motion, every one of you has probably heard the name BlackBerry. Or seen one in operation. My client, RIM, designed the BlackBerry, builds the BlackBerry, and sells the BlackBerry.

So how is it that RIM, a Canadian company that makes one of the most successful products in the world, finds itself sued here in the United States? What happened that brought us all to this come in San Francisco? Mformation says we're here because we stole their idea. We're infringing their patent without paying for it.

But the evidence in this case is going to tell a different story. The evidence is going to show that Mformation's patent, Mformation's product, Mformation the company, were a failure in the marketplace. The only reason we're here is because Dr. Kushwaha decided he needed someone else to blame. To do that, Mformation has

to convince you to give them the patent that's broader than what the patent office said they were entitled to get.

And make no mistake about it, they had this argument with the patent office. And they lost it. The patent office told them they had to add to the claims of their patent, add to the language in three very significant ways. RIM doesn't do any of those three things. Now they want you to give them in this courtroom what they couldn't get from the patent office. Now they want you to give them in this courtroom what they could not achieve in the marketplace. They want you to give them a share, a very big share, of RIM's success, even though they had nothing to do with it. And did nothing to earn it.

Now, as you know, this is a patent case. And you may wonder, you know, how are you going to understand all the issues and decide this case? You've already seen some pretty complicated slides. Why does our Constitution provide a right to trial by jury in complicated cases like this? Well, Judge Ware said last Thursday the framers decided that power should be in the people. They know that every one is capable of sorting out the truth. And you know, my grandparents were the first generation of my family to come to this country, and they worked in a coal

mine and they didn't have a lot of formal education, they had no formal education, and they didn't speak English very well, but they had good common sense.  And so do you.  And they could sort out the truth, and so can you.

And you're allowed to use your common sense to help figure out what's really going on here as you hear the evidence.

Now, how's your common sense going to help you in a complicated patent case?  Let me give you an example.  As you hear the evidence, your common sense is going to tell you when something just doesn't sound right.  Now, you heard Mformation claim that their patent is being used by something called the BlackBerry Enterprise Server.  It's something that companies use to manage all their employees' Blackberrys, and Mformation says we started using their idea back in 2004.  Let's put aside for a moment that they didn't come out till 2005.

Let's go back to 2001, when Mformation joined something called the BlackBerry Alliance Program.  It's basically a group of companies that do business with RIM.  They join the Alliance Program because they get special benefits from RIM.  They get help making their products work better with BlackBerry.  They get technical help from RIM's engineers.  RIM's sales force actually tries to go out and help them sell their products.  And they get

inside information about what RIM is doing.  Secret information the general public doesn't get -- doesn't know, doesn't have access to.

So Mformation joins the BlackBerry Alliance in July of 2001.  Mformation knew all about what RIM was doing.  In fact, they signed an agreement in 2001, a nondisclosure agreement, a written contract.  And that agreement said that neither of them could use anything that the other told them about without permission.

Now, RIM's BlackBerry Enterprise Server, Version 4.0, came out in 2004.  And that's the first RIM product that Mformation says infringes their patent, or uses their idea.

Now, when Mformation says RIM started using their idea in 2004, what would your common sense tell you to expect?  Well, your common sense tells you if someone steals your idea and starts using it without your permission, you'll say something about it.  And you'll say something about it right away.  Your common sense tells you that if Mformation really thought RIM had taken anything of theirs, they would have sued RIM back in 2004 when the accused BlackBerry Enterprise Server 4.0 first came out.  And they could have.  There wasn't a patent, but they had that nondisclosure agreement.  If they thought they took anything they told us, they could have

sued us right then.

But Mformation did not sue them in 2004 for stealing their invention or using something without permission. Mformation did not sue RIM in 2005 when its patent came out or in 2006. Or in 2007. They didn't sue RIM until the end of October 2008. Four years later. For four years, they did nothing. They didn't write us a letter. They didn't send us an e-mail. They didn't even pick up the phone to complain. For four years. And throughout those four years, they were a member of the BlackBerry Alliance Program. They were dealing with people from RIM all the time, and they didn't say a word.

And even when Mformation did sue RIM for patent infringement, they never sued us for violating that nondisclosure agreement. Mr. Thakur talked about it, but he didn't tell you they'd never sued us on that, because Mformation knew that RIM had not used any of the stuff that they had told them.

Now, think about it. 2008 Mformation sued us for patent infringement. If they really thought that back in those early days of 2001, 2002, we had taken something they told us in violation of that nondisclosure agreement, why wouldn't they have sued us for that too? Don't you think they'd be standing here making that claim in this courtroom?

So as you hear the evidence in this case, ask yourself, does it make any sense that a company who really believed their ideas had been stolen would sit back and stay quiet day after day after day for four years while someone else is using their stolen products?  Your common sense tells you that makes no sense at all.

So what really happened.  RIM and Mformation did have some discussions starting in 2001, that's correct. Mformation came to RIM for help.  You'll see that Mformation needed RIM's technical help.  You'll hear that they wanted help selling the products.  And during the course of those discussions the parties did talk about whether to put a piece of software on RIM's Blackberrys.

Now, Mformation is about software for the servers back at the company headquarters.  These things.  Back in 2001 and 2002, Mformation and RIM were talking about this other kind of software that goes on a smartphone. Not the server stuff.  Never talked about that.  The companies were never able to reach an agreement.

One reason is the two CEOs of the company didn't get along very well.  You've seen a little bit of an e-mail about that already.  But Mr. Balsillie at RIM was not the only person that didn't like the CEO. Mformation's own board fired him in 2003.

But the most important reason why this deal never

happened is because Mformation wanted to do something that would have threatened the security of the BlackBerry. That's why the deal fell apart.  And the parties went their separate ways.

Let's take a step back.  You all know that BlackBerry is a very successful wireless product.  It's the first device that made possible e-mail in your pocket. It radically changed the way people lived.  Before the BlackBerry, if you wanted to check your e-mail, you were tied to your house, tied to your computer, tied to your office.  We aren't tied to our computers to see e-mail anymore.  We can receive e-mail wherever we are.  And whether you have a BlackBerry or an iPhone or an Android or whatever kind of phone you have, the people to thank for that are the people at RIM because they came up with that idea and they came up with it first.

And Mr. Thakur said Dr. Kushwaha could see that the cell phones would eventually evolve into smartphones when he started his company in 1999.  Well, he didn't have to see too far.  Because before he started the company, RIM had come out with its BlackBerry.

RIM became very successful because of the BlackBerry.  There's no disputing that.  And Mr. Thakur is right, today we have a lot of employees and we're proud of it.  There are 16,000 employees worldwide.  And today,

although founded in Canada, RIM has 19 U.S. offices, four of them here in California, and U.S. headquarters in Texas.

But it wasn't always this way.  RIM didn't start out with 16,000 employees.  In 1984 it had only two. Their names were Michael Lazaridis and Doug Freegin, and they'd been friends since grade school and they loved to tinker with radios and electronics.

Michael Lazaridis had come to Canada with his parents from Turkey and Germany seeking a better life. And from the time he was a kid, he loved playing, he was fascinated with electronics.  But when he graduated from high school, he didn't even think he could go to university.  But he did.  He got a scholarship and he got a scholarship to the best engineering school in Canada, the University of Waterloo, right outside of Toronto.  And he worked his way through that school on the co-op program.

In 1984 he was about to graduate at the best school in the country, but Canada was in a recession.  His classmates were worried about getting jobs, even though they were the top engineers.  And Mike Lazaridis and Doug Freegin thought, Why can't we do it?  Why can't we create jobs instead of waiting around for someone else to give it to us?  And that's when they founded RIM.  And they

started RIM a lot more humbly than Dr. Kushwaha with about a $15,000 student grant and a loan from Mike's dad. Their first office that you see pictured here was on the second floor of a strip mall above a bagel shop.

Now, they got a big break when they were hired to set up a network to install signs in a General Motors plant outside of Toronto. But even then, to make ends meet they had to do all kinds of project. But some of the projects they worked on, the work they did was so innovative that RIM in its early years was actually able to win an Oscar from Hollywood. You don't see those on TV. They do give out technical awards, and RIM won two of them.

One day in 1988, RIM was contacted by the biggest cell phone company in Canada: Rogers. They needed help with a new network that the company had just bought, and that network was called Mobitex. And it was one of the first networks that allowed you to send data wirelessly. Now, today we take wireless for granted. But this was back in 1988. That was more than 10 years before Mformation was even founded. Mformation, as you see, was founded in September of '99.

And the cell phone company had bought this network, didn't know how to make it work. They needed help. And Mike Lazaridis and his team from RIM went

there, they actually unpacked the crates, they read the manuals, and they got it up and running.  And from then on, RIM was the company that was dedicated to making computers and wireless technology work together.

Now, computers working with wireless, what's new about that?  You can go into any Starbucks, connect up your laptop, your phone, your tablet, communicate with people all over the world.  But in 1988, wireless and computers were two separate technologies.  They didn't work together.  Remember the first IBM PC had only come out in 1981.  AT&T came out with the first cell phone in 1983.

Mr. Thakur talked about Bill Clinton, to bring you back, to when Mformation was formed.  Well, RIM was working with wireless networks two presidents before that during Ronald Reagan's term in office.  The biggest cell phone company in Canada in 1988 didn't even know how to make a wireless data network work.

Mr. Lazaridis and RIM helped them to make that wireless data network a reality.

RIM saw that was the future.  So they started developing products to make those two technologies, wireless and computers, work together.  One of RIM's early products was something called RIMGate.  It came out in 1993 seven years before Mformation claims to have had its

idea.  And RIMGate basically was just a way of attaching a wireless computer network, which is this X-25 thing down here (indicating) to a wireless network, which is the Mobitex network up here (indicating).  So that people connected to the Mobitex network would have their computer online to this wireless network, you could still get to CompuServe and Dow Jones, places likes that.  As I said, that was in 1993.

Three years later in 1996, RIM introduced the interactive pager.  That also worked on the Mobitex wireless data network.

Now, you heard Mr. Thakur talk about a way to manage devices wirelessly by killing a device if it's lost, wiping it.  That wasn't anything new in 1999.  You could do that on that old Mobitex network.  And in fact, you'll see in this case, a manual from the Mobitex network in 1990, and you'll see right there a command that said they had something called "die" that it could send to a device wirelessly.  And Mobitex wasn't the only company working in that area.  You'll hear about others like a company called XcelleNet that had a product called RemoteWare to manage devices wirelessly.

So what Mformation claims as its big idea, wireless management and remote kill, that was known long before Dr. Kushwaha ever sat down to put pen to paper.

Mr. Lazaridis and RIM were the experts at wireless long before he started this company.  They had been working on wireless networks for more than 10 years at that time.

Now, the biggest wireless product was introduced January of 1999.  That was the first BlackBerry.  And as hard as it is to believe, in 1999 many people said no one wanted a device like this and nobody would buy it.  RIM was still a small company back then.  They had to take a big risk.  They gave away many of those first BlackBerrys for free and said to people, You know, if you don't like it, give it back.

Not a surprise now, now we all know what happened.  People didn't give them back.  People kept their BlackBerrys, and it became one of the most popular consumer electronics products of all time.  The first BlackBerry was so famous, it's in the Smithsonian Museum in Washington, D.C.  And it's a little hard to see, but pictured right above it is Alexander Graham Bell's telephone on the website at the Smithsonian.  That's how much of a breakthrough this device was.

RIM is not a company that copies.  RIM is a company that works hard, has earned its success.  We wouldn't employ 6,000 engineers if all we wanted to do was copy other people.

RIM hasn't obtained over 2,300 patents of its own by copying what other people do.  RIM doesn't need to copy anything.  We invent things that people haven't done before.

All right.  We've heard a little bit about RIM. What about Mformation?  Well, Mformation's a company based in New Jersey.  They've got offices in England, Japan, China, other places around the world.  And they were not founded in the early days of computers and networks like RIM.  They were founded in September 1999, about 10 years, a little over 10 years ago, 15 years after RIM. Mformation was not involved in the development of Mobitex in the early days.  Mformation was not involved in the development of the BlackBerry.  In fact, the BlackBerry came out nine months before Mformation was founded.

Now, Mformation says that RIM's BlackBerry Enterprise Server infringes its patent, but Mformation was not involved in the development of RIM's BlackBerry Enterprise Server.  The first version of RIM's BlackBerry Enterprise Server came out in May 1999.  Four months before Mformation was founded.

Now, Mformation does own a patent, the '917 patent that we've heard about.  The patent issued 2005, six years after the BlackBerry came out.  And a patent that RIM never knew about before the lawsuit.  A patent

that no engineer at RIM ever saw.  Nevertheless, Mformation says RIM copied that patent.

Now, the patent's kind of interesting, all by itself.  Mr. Thakur made it seem like in his opening, at least it was my impression, that Mformation invented the idea of wireless remote device management.  Well, let's take a look at Mformation's actual invention that you have to deal with, Claim 1 of the '917 patent.

Now, all I've done so far is put up the preamble or the introduction to that claim.  And it talks about remotely managing a wireless device over network.  Well, Mformation wants you to believe that's what their invention is, this broad concept of remotely managing a device over a wireless network.  But that's not what they told the patent office they invented.  When they went to the patent office they told them they invented this: That's the first claim.  Not remote device management. That had been done before.  Not wireless remote device management.  That had been done before.

But only wireless remote device management done in this particular way with these six steps.  Even then, the patent office said, That's been done before too.  The patent office said they could get a patent only if they agreed to add three more things to their specific way of doing things.  And there are those three things.

Now, there are very few things that Mformation and we agree upon in this case, but here's one of them: We all agree that Mformation's claimed invention requires each and every one of those steps to be performed. Why is that? Well, let's say you invent a new recipe for making chocolate chip cookies. Now, clearly, you're not going to be the first person to make chocolate chip cookies. It's been done before. So it wouldn't be fair to give you a patent on all chocolate chip cookies, all the ways to make it, because you didn't invent that. You would get a patent on your specific recipe. And you would have protection for your specific recipe only.

So if someone else made chocolate chip cookies a different way, they're entitled to do that. You can only stop people from making chocolate chip cookies the way you came up with. And if you think about it, that's fair. That gives you protection for what you actually come up with, but it doesn't let you stop innovation from other people to come up with new and different and better ways to do something.

Claim 1 is a method claim. Starts out at the beginning, "a method for..." It's a method claim, and a method claim is just like a recipe. It covers the specific steps that are listed there just like a recipe. And Mformation has to prove that each and every one of

those steps of their recipe is used by the BlackBerry Enterprise Server.  And what you will find out in this case is that each of those three things the patent office said they had to add to get a patent, well, guess what, those are the three things that we don't do.

What they are trying to get you to do, and what they will be trying to get you to do from now until we finish this case, is to believe and to get from you what the patent office told them they could not have, which is the original claim that they filed.

Now, we talked about this patent has steps like a recipe that have to be performed.  These are the keys ones.  You have to establish a connection between the wireless device and the server.  That connection has to be established based upon something called "threshold conditions."  Then you transmit the contents of the mailbox to the device.  And all that has to be done without a request from the BlackBerry, from me.

And under Judge Ware's orders, and you have them in the materials that were handed out today, that first step, establishing a connection, that has to be completed before the step of transmitting.  That's like if your parents ever told you you have to finish your dinner before you get dessert.  That's what this is.  You don't get to have dessert first, not in the middle of dinner.

You don't get to have it at the same time, dinner first, then dessert. Connection first, then transmit.

Now, one of the secrets of RIM's success is that we never establish a connection over a cell network before transmitting data. Now, you say, how can that be? Well, let's say one of your friends is out someplace and you want to tell him or her to meet you for dinner. In the context of the patent, that's like sending a command: Meet me for dinner. You can call them on your cell phone. That's like establishing a connection.

Judge Ware has said that "establishing a connection means initiating a wireless communication between a wireless device and the server." And that happens in my example: When you're finished, you hit "send." When you finish, you have the connection. That connection is established with the answer, and then you transmit the command: Let's meet for dinner. That's what this patent requires. First, you establish, then you transmit.

Now, getting in touch with your friends that way ties up your phone, it costs money and it uses up your battery. And it works well only if you're calling a few friends. If you have 10 friends you want to meet for dinner, it's not going to work too well. You've got to make 10 separate phone calls, one or the other. Establish

that connection.  Tell each of them to meet you for dinner.  And by the time you're done with that, you have no dinner reservation.  Remember there's more than 10 people who have BlackBerrys.  There's millions of BlackBerrys being used, and companies have tens of thousands of employees with a BlackBerry.

Now, there's another way you can get in touch with your friends.  Either way that doesn't tie up your phone, it's less expensive, and it doesn't require as much battery power.  You text them.  You can text all of them at once because you're not establishing a connection with each one.  That's different from the patent, and that's a really important difference because it's what has made the BlackBerry successful and why it works.  So what they're telling you here, what they're telling you here, we're doing what we could not be doing.  If we did that, the BlackBerry would not be successful.

When you text, you don't use up much bandwidth. You know what bandwidth is, it's like driving down the Highway 101 down to San Jose.  The more cars on the highway, the slower the traffic is.  And the cell connections for data are just like that.  The more data that's being sent, the slower it is, and I have no doubt we've all experienced that.

Establishing connection like a phone call ties up

more bandwidth.  So it slows the network down.  It costs you more money because you're on the network longer.  It drains your battery faster while you're trying to keep that connection open.

The BlackBerry was successful because it did not slow down the network because it did not keep you on the network a long time, because it did not drain your battery as fast, and it was easy to use with lots of people.  It scaled very well.

Now, those are still important things today for all of us.  But remember back in 1999 when the BlackBerry first came out, cellular data connections back then were even slower, way slower.  The original BlackBerry's powered by one double A battery.  RIM had to do everything it could not to drain that battery, because no one's going to buy a BlackBerry if you had to put a new battery in every single day.

So from the start the BlackBerry was designed to work differently from Mformation's patent, and if the BlackBerry actually used what they say is their idea, it would never have been successful.  So despite all the complicated testimony you're going to hear about patent claims, and you'll hear hours of it, it's really going to be that simple at the end of the day.  The patent requires establishing a connection before transmitting information,

and we just don't do it.

That's the first point.  About why we don't infringe.

Now, you don't have to take my word for all of this.  You're going to hear a very distinguished professor from the University of California at San Diego.  His name is Dr. Tony Acampora.  That's his picture.  Dr. Acampora is probably one of the most distinguished professors you're going to meet.  He's a professor of electrical and computer engineering at UCSD.  But Tony's a Brooklyn kid, so he knows the real world too.  He spent 20 years as a research scientist at AT&T Bell Labs.  He was the head at the center for telecommunications research at Columbia University in New York.  And he was the founding director of the Center for Wireless Communications at UCSD.  The issues in this case are what Dr. Acampora has been dealing with for his entire professional life.

And, he knows patents.  He's got 30 of them on which he's a named inventor.

Dr. Acampora will explain to you in detail why RIM does not use Mformation's patent.  Why we simply do things a different way.

Now, Mformation is going to have their expert too.  His name is Dr. Vijay Madisetti.  Some professors just teach.  Some do research.  Some write papers.  You'll

hear that Dr. Madisetti does something in addition to those things:  He goes out and he looks for lawsuits.  He actually goes on his computer to see who's suing whom, and then he calls up the lawyers and he offers his services for hire.  Without knowing anything about the case.  And that's how he got hired here.  He agreed to be Mformation's expert before he knew anything about the case.

So it's not surprising he's going to say that RIM infringes.

But despite what Dr. Madisetti says, you're going to see with your own eyes that Mformation itself knows that what we are saying is true.  How's that?  Well, Dr. Acampora is going to tell you that RIM does not establish a connection because it uses something called the UDP protocol.  UDP.  I won't teach you about what that is, but he will say that UDP is a way of sending things that don't require a connection to be made first. Remember, that's a critical part of Judge Ware's construction of what this patent means.  Just like the text message example I gave you.

So Dr. Acampora is going to say that; Dr. Madisetti will say something else.  How are you going to decide?  Remember there are two inventors on the '917 patent.  One is Dr. Kushwaha sitting over there.  Another

is a Dr. Nath who teaches at Rutgers.  Dr. Nath teaches his students about networks and wireless technologies. And you will see that Dr. Nath, one of the inventors of this '917 patent, teaches his students exactly what Dr. Acampora is going to tell you.  This is from his teaching notes for his students.  When he's out there teaching his students, Dr. Nath says -- talks about the UDP protocol.  He says, Why UDP?  And is his first bullet point.  No connection needs to be set up.

That's exactly what I'm saying.  That's exactly what RIM is saying.  That's exactly what Dr. Acampora is going to say.  Mformation is going to try to fool you into believing something different.  But that is what the co-inventor of this patent says when he's outside the courtroom doors.

The bottom line is, RIM's BlackBerry Enterprise Server is successful because it is not complicated, it does not tie up bandwidth, it's not expensive and it doesn't drain your battery.  It's completely different from Mformation's claimed invention.

Now, we expect Dr. Madisetti is going to say, Well, you can also send commands over WiFi networks. He'll say RIM is establishing a connection when they transmit over a WiFi network.  And for WiFi, you know what, he's right.  But he still has a big problem.

Because, remember, the claim requires that all of this has to happen without a request from the wireless device. And for WiFi, for WiFi, RIM never initiates any kind connection. There's no connection established without the BlackBerry making that request first. It's the exact opposite of what their patent says.

That's the second point. We don't establish a connection without a request from the BlackBerry.

Finally, you'll hear Dr. Acampora describe RIM doesn't perform the third of those things that the patent office made Mformation put in their patent: Make a connection be established based on threshold conditions. And again, he'll teach you about threshold conditions, in order to establish a connection. We also did not have these threshold conditions. So that's the third point. Don't establish a connection based on a threshold condition.

Three things that the patent office said Mformation had to add to their patent to be something new, and those are the same three things that we don't do.

Now, Mformation knows this. They know that if you really look at the technology, if you really follow along, that you're going to see that RIM doesn't infringe. That it's different. So what do they do? Well, they have and they will put up a whole bunch of e-mails from people

at RIM that have nothing to do with whether RIM's BES infringes the patent.  E-mails that were written years before Mformation even had a patent.  E-mails that have nothing to do, as you'll see by the end of this case, with anything that we're talking about.

Now, my old high school football coach used to tell me, The key is keeping your eye on the ball.  Right.  People will try to fake you out.  Keep your eye on the ball.  If you keep your eye on the ball, you'll be able to tell and you can react and you'll realize what's really going on.

Mformation is going to be trying to take your eye off the ball.  The ball is whether RIM uses their patent, and we don't.  They'll try to confuse you with these supposedly secret e-mails that they say demonstrate RIM was trying to steal their ideas.  But when you actually look at these e-mails, and you will, you will see that it's nothing of the sort.

And let me give you just one example.  You saw this one before.  This was the first thing that Mr. Thakur showed you when he got up to talk to you.  This was the most important thing that he wanted to tell you today.  That Mr. Lazaridis, the CEO of RIM, sent an e-mail saying, Okay, to take control of the agent ASAP.  And they want to suggest to you, Oh, this is bad, something nefarious going

on here.  They didn't show you the whole e-mail chain, did they?  And there's a reason for that.

Let's look at the last paragraph of the prior e-mail, please.

In this last paragraph, this is what Mr. Lazaridis is responding to, he gets an e-mail from Mr. Castell of RIM, who says:  "Mformation has expressed willingness in the past to let RIM take ownership of the agent."

Well, now we know what Lazaridis was saying. He's saying, Okay, let's do what Mformation is proposing.

Mformation is trying to mislead you, feeding you little bits and pieces of e-mails and documents taken out of context.  Trying to paint Mr. Lazaridis and Mr. Balsillie as bad people so that you don't pay attention to the real facts at issue here.  They want you to take your eyes off the ball.

But the framers of our Constitution put their faith in you.  That the jury would not fall for that kind of thing.  And this is just one example.  You'll see more as the case progresses.

The fact is, Mformation knew exactly what RIM was doing and had no problem with it.

If you can get the Exhibit 772, please.  Thank you.

This is an e-mail, people call it the "to" and "from," Mr. Basu, he was there as one of their co-founders, and he was writing to Mr. Castell at RIM. And he says here:  "We understood that you wanted to use our device management agent as a stop-gap solution, Version 1.0, till you built your own standalone standards-based device management agent from the ground up, Version 2.0."

They knew all along that RIM was going to be building its own products.  That's what Mr. Basu is saying right here.  Fine, you want to use ours a little while while you're coming up with your own ideas and developing them.  And they were fine with that.

If we can go down to the next part.

Mr. Basu says:  "In exchange for RIM agreeing to put their agent" that's the software that goes on this device, right, on all new BlackBerrys -- "Mformation will bring a royalty-free license to RIM to our agent to embed on all your devices."

Now, "royalty-free," Mr. Basu puts in capital letters.  "Royalty-free" means free.  No cost to RIM.  Not $30 or $50 or $70.  You'll see those things had nothing to do with the agent.  Mformation wanted to give this to us for free.

Now, if there is anything that this agent

software has nothing to do with a case, this should be it. Because they wanted to give this away to us for free, and here they're telling you they want you to give them $200 million.  It can't be the same thing.  And it's not.

Mformation wanted RIM to put this agent software on their BlackBerrys because it would give them an edge over their competition when they went in to sell their other products.  But that deal never happened.

If we can go down to the next part, please.

Mformation told RIM, they said, Well, we'll let you do this, but the license would be to use object code only.

Now, you may know that object code is like the software you get when you buy it at the store.  You can't change it.  You can't see how it works behind the scenes. A human being can't even read it.

That's an example of object code.  It's a bunch of zeros and ones, because that's the only language the computer understands.

Now, there's something else called source code. Humans can read source code.  And source code is what humans use to program computers.

And it looks something like that.  Still pretty complicated, but humans can use it.

Mformation told RIM, You can't see our source

code.  It's too secret.  For this agent they were going to put on here.  And RIM said, You know, that's a problem.  Because security for the BlackBerry is one of our greatest strengths.  If RIM put someone else's software on the BlackBerry and doesn't know how it works, all they see are zeros and ones, RIM can't be sure that that software is safe, that people can't hack into the BlackBerry.  The President of the United States uses a BlackBerry.  The defense department uses BlackBerrys.  Police departments use BlackBerrys.  RIM couldn't take the chance that someone would be able to hack into a BlackBerry.  Imagine if somebody unauthorized got into the President's BlackBerry or the National Security Advisor's BlackBerry and did a remote wipe.

RIM built its reputation on security and reliability.  So RIM said, We can't take a chance with our customers' security.  We're not going to do this deal if you don't let us have the source code.  They said, No, it's too secret, you can't see it.

That's where things fell apart.  RIM never did get the source code from Mformation.  They didn't get the source code from the agent.  They didn't get the source code from the server.  This big pile of paper that Mr. Thakur put on the table, we never had.  We never had.

Now, you may ask yourself, Well, all right, if

RIM was such an expert in wireless, they've been working on wireless for 10 years before Mformation was founded, why didn't RIM start out with wireless management on the BlackBerrys to begin with?

We know it had already been done.  We saw the Mobitex document.  There were other people out there doing wireless remote management at the time.  That's why we had to negotiate with the patent office.  Why didn't RIM do it from the start?  Well, the answer is, it would not have worked well for the BlackBerry at the beginning.  For the same reasons we already discussed.  At that time, there was not very much wireless bandwidth available.  It was slow.  It was really expensive.  If you think your cell phone is expensive now, it was even more expensive back then and it ate up the battery.

RIM knew about wireless remote management from its work on Mobitex.  But RIM didn't do wireless remote management out of the box when the BlackBerry first came out because it would have used up too much bandwidth, it would have been too expensive, and it would have used up the battery too quickly.

Now, technology grew.  Bandwidth grew, speeds are faster, technology improved at least a little bit, and RIM's competitors started to use this against RIM and offered wireless management and saying, We have it and RIM

doesn't.  So RIM did not do wireless management because it was new and exciting.  They did so only when they could do it without harming their customers.

And you're going to hear from Carl Cherry at RIM, you'll see some video clips in the plaintiff's case, but we'll bring him here live also.  He worked on the BlackBerry Enterprise Server 4.0.  That's the first product that Mformation says infringes their patent. Mr. Cherry will tell you that wasn't the first version of a BlackBerry Enterprise Server that had a wireless remote wipe.  It wasn't the first one that had wireless management.  RIM had wireless remote kill to the BlackBerry Enterprise Server Version 3.5.  A version that Mformation doesn't even claim infringes.

He's also going to tell you that at the time he was working on that original wireless management feature, and the later version that they do claim infringes, he didn't know who Mformation was.  He never saw Mformation's patents.  He never met anyone from Mformation.  He and a group of 16 engineers built the BlackBerry Enterprise Server 4.0 on their own, and it took them two years to do it.

Now, here's another place where common sense comes into play.  Do you assign 16 engineers to work on something for two years if all you're going to do is copy

something?  It took 16 engineers two years to do the work because they did it on their own.  Mformation wants you to pay them for the work that our 16 engineers did, day in and day out for two years.  While they sat back and did not lift a finger.

Mr. Cherry and the other engineers at RIM worked on this project, did what engineers have done at RIM ever since Mr. Lazaridis started the company.  They worked hard.  They made the product better.  And that, ladies and gentlemen, is not patent infringement.

Now, normally I won't talk about damages because you never get to damages unless you find that the patent was valid and it's infringed.  And the evidence is going to show you the patent is not valid and it's not infringed.  But in this case, and this is a rare exception for me, in this case I do have to say something about damages.

Because Mformation is going to have an expert walk into those doors back there and say their one patent is worth 50 cents per month, which turns out to be $12 for every BlackBerry.  $12.  When all that happened outside those courtroom doors, Mformation licensed this patent and other technology for Sprint for 20 cents per subscriber.

So when you hear those big numbers, just remember, when you walk through the doors of the

courtroom, their patent is solidly worth 60 times more.

Now, your common sense should be a good guide for you here too.  Their patent is not worth 60 times more inside the courtroom than it is outside the courtroom.

Mr. Thakur says, Yes, but look how valuable remote kill is.  He showed you that survey, 94 percent of customers like this feature.  Of course, it's been around since the early '90s, Mobitex.  Mr. Thakur made it seem like this survey was talking about BlackBerry Enterprise Server 4.0.  Why would he put it up?  That's the accused product.

But that survey was not talking about the accused product at all.

In the slide that Mformation gave you, this portion here you couldn't see.  So we decided to blow it up so you could see it better.  And what you'll see when you look there about what they did not want you to see is that this was about BES 3.5.  They don't claim that BES 3.5 infringes their patent.  They never did.  They claim infringement didn't start till 4.0.

So what does this tell you?  This tells you -- so this case is not about protecting patent rights.  This case isn't about stolen technology.  This case is about nothing more than confusing you with complicated technology, trying to show you bits and pieces of

documents while hiding the rest, and hoping that you'll miss the ball, hoping that you'll give them $200 million that they did nothing to earn.

Now, as I think you know or heard from the patent video, there's two kind of questions you have to deal with in this case:  One set of cases, did RIM use the same recipe?  Was there patent infringement?  We've already talked about that, and the answer would be no.

But there's a second set of questions that you'll have to decide, and that's whether the patent is valid or invalid.  Now, you've seen the patent video, so you know a little bit about that process of how it's supposed to work when someone applies to a patent.  When a patent is granted, the presumption is that the process runs the way it's supposed to go.  The person trying to get the patent gave the patent office all it needed, and the patent office was able to find all the stuff that they should look at.  Because you can only get a patent if you've done something new.

Sometimes, though, that process doesn't go the way it's supposed to go.  Sometimes the patent office is not told about all the products that existed before.  Or the patent examiner doesn't find it on his own.  When that happens, the law says that you, the jury, have to stand in the shoes of the patent examiner, and you have to do his

or her job.  You have to look at the information that the patent examiner did not have, that the patent examiner never had to look at, to decide whether the patent would have been granted or not.

You're the safety valve for our patent system. And you know why?  Because if someone gets a patent she shouldn't have, they could run around and sue other companies for hundreds of millions of dollars, as is happening right here, for something that they were not the first to invent.  And that's wrong.

Now, we know that the patent office did not know about the Mobitex document when Mformation applied for its patent.  Mformation's going to claim that they did, but we'll show you that they did not.

We know that RemoteWare came out before Mformation.  This product was out in 1996.  Three years before Mformation existed.  We know that the patent office had no idea about RemoteWare, which could do the same exact things that are claimed in Mformation's patent.

Now, how do we know that?  Well, you heard in the patent video that there's a place called "References cited."  It's a pretty small list on the '917 patent.  But when a patent gets issued, the examiner refers to all the references cited regarding that patent.  There's no reference there to Mobitex.  There's no reference there to

RemoteWare.  The patent examiner did not have all the facts.  But by the end of this case, you will have all the facts, and that's why our patent system allows you to decide.

Dr. Acampora is going to show you that what is claimed by Mformation is not new.  That Mformation is not entitled to a patent on the same old recipe.  You will have the facts that the patent examiner did not have, and you will have the responsibility under our law to protect the integrity of the patent system.  And to find that Mformation's patent is not valid.

Now, there's another reason why Mformation's patent is not valid.  Let me just preview what that's about.  Patent law has a rule:  You can't get a patent if you show your invention to someone publicly more than a year before you filed for your patent.  Why is that?  Well, patents are supposed to be about something new.  This is about public use.  And the rule is you have one year to get your patent on file, plenty of time.  Not a year and a day, not a year and a month.  It's black and white.  Like a red light and a green light.  There's no yellow here.

Dr. Kushwaha will get on the witness stand, and I tell you he's going to change his sworn testimony.  He said one thing outside the courtroom at his deposition

under oath that if you were to believe, it would mean that his patent is invalid, because he showed his product nearly one year before he filed for the patent. But he's going to get up there under oath and tell you something different. If you believe what Dr. Kushwaha said first, then his patent is invalid because it didn't follow the rules.

Now, ladies and gentlemen, as you listen to the evidence in this case, I'll ask you to keep in mind that the truth does not stop at those courthouse doors. You will hear in this case time and time again Mformation will tell you one thing here, but you will understand that they are saying or doing something else once they walk through those doors. On the other side of those doors.

Inside the courtroom, they're going to tell you that that protocol used by RIM's BlackBerry Enterprise Server, UDP protocol, creates a connection. I guarantee they'll tell you that. Out there they're telling the world something different. And you saw that already.

Inside the courtroom, they're going to tell you we copied. And Mr. Thakur said that, in his opening.

Out there, they wouldn't even give us the source code so we never had anything to copy from. It's a big pile of paper, but we never saw it.

Inside the courtroom, they're going to say that

all the elements of their patent were in this big demonstration you're going to hear about the first time Dr. Kushwaha shows his invention to Deutsche Bank in July of 2000. And he'll tell you, he will show you, that everything in his demonstration was part of that claim.

He's going to say, in here, that not all the elements of his invention were part of that demonstration. But out there, he admits that it was.

Inside the courtroom, they're going to tell you that their technology, their patent was $12 for every BlackBerry. Outside the courtroom, they're selling it for 20 cents.

Inside the courtroom, they blame RIM. Out there, they will admit and you'll see the documents. They will admit that they were not doing well in the marketplace.

You will see that this case is not about protecting patent rights. It is not about stolen technology. This case is about Mformation wanting you to give them something that they could not get from the patent office. They don't like all the extra details the patent office made them have. So they want to pretend in this courtroom that those details don't matter, but they do. The evidence will show you that they don't like to be told no.

Just like the patent office said, No, you don't

get your patent until you add those three things.  Just like RIM said, No, we're not going to do a deal with you that will compromise our customers' security.

At the end of this case, I will also ask you to tell them no.  No, this patent is not infringed.  No, this patent is not valid.  No, you can't say one thing in this courtroom and something else when you leave.  And no, if you want to get a lot of money, then go out and earn it in the marketplace by making better products, the old-fashioned, honest way, like Mr. Lazaridis and RIM did.

Thank you very much.

THE COURT:  Very well.  Members of the jury, it's a little before noon, so we'll take our midday break at this point.  We'll come back promptly at 1 o'clock.  Remember my admonitions.  I'll see you at 1 o'clock.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  We're meeting out of the presence of the jury.

Any matters that you need to bring up just as we make this transition out to calling the first witness?

MR. THAKUR:  Yes, your Honor, we spoke right at the beginning about getting a specific number of exhibits admitted.  We didn't get the numbers in.  I thought it might be good to get them into the record.

THE COURT:  You can supply that to the court reporter in writing rather than simply recite it or you can recite it.

MR. THAKUR:  Would this be sufficient writing or does it have to be typed?

THE COURT:  No, it doesn't have to be typed.  For our purposes.  Simply the court reporter wanted to make sure that we have the list, and if you're going to do it that way, perhaps you should recite them.  It doesn't look like a very long list.

Is there anything else other than that?

MS. NOLLER:  Quick clarification, we already sent the list to the clerk.  This is the list of documents we submitted yesterday, many of which were used in the openings by the parties, and we submitted that for your consideration to ask for a ruling that they be submitted for trial.

THE COURT:  We just want to make sure the clerk's record is correct and that the transcript is the same, and so it doesn't look like a very long list.

MR. MATUSCHAK:  We can agree to the list over the break.

THE COURT:  Very well.

MR. MATUSCHAK:  I have one thing, we don't have to deal with it right now, but based upon the openings,

RIM ought to be able to call Mr. Lazaridis as a witness in this case, and I request that the Court grant leave to call Mr. Lazaridis as a witness for all purposes as a fact witness.

THE COURT:  But that doesn't have to be done between now and 4 o'clock.

MR. MATUSCHAK:  No, it does not.

THE COURT:  All right.  So -- because I want to give you time to bring me back up to speed.  This sounds like something that we've already discussed, but you're citing changed circumstances, so I want to make sure what we did before and what the change is.  So perhaps as we get through the day.

I'll see you at 1 o'clock.

MR. MATUSCHAK:  Thank you.

MR. THAKUR:  Thank you.

(Luncheon recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

ALL ATTORNEYS:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  Call your fist witness.

MS. NOLLER:  Thank you, your Honor.  Mformation calls Upal Basu.

(Witness sworn)

DEPUTY CLERK:  Please be seated.  Speak clearly into the microphone, and please state your full name, and spell your last name.

THE WITNESS:  Upal Basu, U-p-a-l, B-a-s-u.

MS. NOLLER:  I think you need to move the microphone just a little closer to you.

UPAL BASU,
    called as a witness by the Plaintiff,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. NOLLER:

Q.  Let's try that again.

A.  Upal Basu, last name B-a-s-u.

Q.  All right.  Mr. Basu, welcome.

What do you do for a living?

A.  I'm a venture capital investor.

Q.  And where do you work?

A.  I work with a fund called Nokia Growth Partners.

Q.  And what is that fund called?

A.  The fund is called Nokia Growth Partners.

Q.  And what does Nokia Growth Partners do?

A.  It's a fund funded by Nokia Corporation to invest in

entrepreneurs and startups which are trying to introduce technologies in the mobile industry.

Q. And Nokia I think is a name people know in that -- the mobile industry?

A. Yes, it is.

Q. What are your day-to-day responsibilities at Nokia Growth Partners?

A. My job is to identify the entrepreneurs who's trying to create wonderful new companies in the technology industry and fund them so that they can build these businesses.

Q. Where is Nokia Growth Partners' global headquarters?

A. Nokia Growth Partners is headquartered in Menlo Park and Pasadena in California.

Q. Sir, how far did you go in school?

A. I have two graduate degrees.

Q. What are they?

A. One's an MBA, a master's in business administration; and one's an MS in engineering.

Q. Where did you get your Master's of Science in engineering?

A. I got my Master's of Science in engineering in from Stanford University.

Q. And where did you get your MBA?

A. Harvard University.

Q.   And did you go straight through school to earn your degrees?

A.   No, I worked for a number of years prior to getting my master's degree.

Q.   And where did you work before you got your master's degree?

A.   I worked as an engineer in a company called Degenkolb Associates, and as a product manager in a software company called Risk Management Solutions.

Q.   And what kind company is Degenkolb Associates?

A.   They're based in San Francisco, it's a structural engineering firm which helps design buildings against earthquakes.

Q.   And where is Risk Management software located?

A.   Risk Management Solutions is located in Menlo Park, California.

Q.   What kind of a company is it?

A.   It is a software company which provides software to help figure out losses in events like earthquakes and hurricanes.

Q.   After you got your Master of Science in engineering and your MBA from Harvard, where did you go to work?

A.   I've been to -- with a job consulting company called McKinsey & Company.

Q.   What did you do for McKinsey & Company?

A.   I was what's called a strategy consultant.  As a strategy consultant, my job was to help large companies improve their businesses.

Q.   At some point did you leave McKinsey & Company to found Mformation Technologies, Inc.?

A.   Yes, I did.

Q.   When did you do that?

A.   In 2000.  April 2000.

Q.   Why did you leave McKinsey to join Mformation?

A.   Even though McKinsey is a very prestigious firm, and it was a decision I made because I analyzed the opportunity of starting Mformation, and I thought the opportunity was huge to build a company in this space, and decided it was the risk.

Q.   Who convinced you to do that?

A.   I convinced myself by doing a lot of analysis about the market opportunity and decided this was the right thing to do.

Q.   Did you speak to anybody before you decided to leave McKinsey and join Mformation?

A.   I spoke to my wife.

Q.   Did you also speak to Dr. Rakesh Kushwaha?

A.   Yeah.  So before I joined full-time, I was in active discussions with Dr. Kushwaha, who was a friend of mine for many years.

Q.   And did he tell you what he was planning to do at Mformation?

A.   He had a sense that the industry was shifting away from pure Internet to mobile and wireless.  And at a high level we had an understanding that this was going to be big, so we thought this was a good time to do something.

Q.   Now, you said that you began at Mformation in April of 2000.  Did you spend any time with Mformation before that date?

A.   Yes, I was moonlighting for the few months before I joined, basically when I was in evenings and weekends, I would work with Rakesh to find out what we should actually do when we start this company.

Q.   And when you say "Rakesh," is that Dr. Kushwaha?

A.   Yes, Dr. Kushwaha.

Q.   In front of you there's a binder of exhibits, and I'll ask you to turn to an exhibit marked 712.  Tell me when you're there.

     Are you there?

A.   Yes.

Q.   Just flip through these documents.  Have you seen these before?

A.   Yes, I have.

Q.   And what is it?

A.   These are corporation documents of Mformation
Technology.

Q.   And are these documents maintained in the ordinary
course of Mformation Technologies' business?

A.   Yes, they are.

MS. NOLLER:  I'll move for admission of
Exhibit 712.

MS. DeBRUIN:  No objection, your Honor.

THE COURT:  That number doesn't coincide with --
I have 712, but is that -- let me just assume I need to
reconcile my numbers with that.  So 712's in evidence
without objection.

MS. NOLLER:  Thank you, your Honor.

(Plaintiff's Exhibit 712 received in evidence)

BY MS. NOLLER:

Q.   If you turn please to page 11 of Exhibit 712.

MS. NOLLER:  And, your Honor, I request
permission to publish exhibits once they're admitted into
evidence?

THE COURT:  Yes, you may.

MS. NOLLER:  Thank you.

Can you put that on the screen?

BY MS. NOLLER:

Q.   All right, sir, what is this document?

A.   This is a corporate document from Mformation

Technologies admitting Dr. Kushwaha, me, Mr. Basu, and another person, Mr. Gurinder Johar in Mformation Technologies.

Q.   If you could focus on the date.

A.   February 1st, 2000.

Q.   Can you turn to page 12, please?

A.   Yes.

Q.   What is the date of this document?

A.   The date is February 1st, 2000.

MS. NOLLER:  And could you please blow up Paragraph 1.

Q.   Mr. Basu, what does Paragraph 1 reflect?

A.   Paragraph 1 reflects that I was offered shares worth $1,290 to become a shareholder in the company.

Q.   Is that as of February 1st, 2000?

A.   That is correct.

Q.   How long did you work for Mformation?

A.   I was at Mformation from 2000 to middle of 2008.

Q.   I'll ask you, Mr. Basu, to turn over to a timeline --

MS. NOLLER:  Which I understand is not objected to, your Honor, and request permission to also publish from the timeline.

THE COURT:  Periodically, members of the jury, you may see displayed what are called demonstrative exhibits.  They're not documents that are produced at or

about the time of the events, but documents that the lawyers put together to help you understand the case and the testimony. And those are demonstratives. Sometimes we'll give a number to them because we want to keep track of them. Other times they may not have a number.

But you are permitted, unless you know there's an objection, to use your demonstrative.

MS. NOLLER: My understanding is there are no objections, and we will identify this as Plaintiff's Exhibit 1 for the record.

THE COURT: Very well.

MS. NOLLER: Can you please publish slide Number 2. Then place it on the timeline of slide Number 3.

BY MS. NOLLER:

Q. How long did you work for Mformation?

A. For eight years.

Q. And when you co-founded Mformation in 2000, how many employees worked there?

A. It was just me, Dr. Kushwaha and Mr. Johar.

Q. Who were the next employees to join Mformation?

A. We hired three engineers. The three engineers were Mr. Beltramino, Mr. Sahni, and Mr. Magam.

Q. In April of 2000 what was Dr. Kushwaha's position with the company?

Basu – Direct

A.    His position was as chief technology officer.

Q.    What was Mr. Johar's position at the company?

A.    His position was engineering.

Q.    What was your position?

A.    I was the chief executive officer, the CEO.

Q.    When the company was founded, where did you guys work out of?

A.    We worked out of our hotel room, literally a hotel suite in a hotel in New Jersey.

Q.    Was it a big fancy office?

A.    It was a tiny office, 10 foot by 15 feet.

Q.    And can you describe the Mformation atmosphere when you first started?

A.    It was a high energy entrepreneurial.  We were all working together for a dream, and it was a lot of fun. Even though we had a very tiny office, we were all very focused on building something big.

Q.    And during your tenure at Mformation, you said you started at CEO, did you have any other positions while you were there?

A.    Over those eight years I had a number of positions. I had positions such as VP of product development, VP of business development, VP of corporate development.  So I had many positions.

Q.    I want to talk for a moment about the product that

Mformation was developing.  When you joined the company in 2000, did Mformation have a commercial product that it could sell?

A.  No, it did not.

Q.  What was Mformation's idea or its technology when you joined the company?

A.  Our vision was that we would manage every wireless device on the planet remotely in a way which would make it easy for both businesses and consumers to adopt these things.  Adopt these devices.  And grow this industry quickly.

Q.  You mentioned a word in there, "devices."  What's a device?

A.  A "device" is a term which we use to refer to a mobile phone or a cell phone.  With both voice and data connections.  So a smartphone would also be a device.

Q.  Now, you explained the technology, but can you describe for the jury the different pieces of the technology?

A.  So our technology had two key components.  One was what we call the agent side technology, sometimes referred to as the client technology or the device technology.  It's the software which we built inside the phone.

        And then we had what's called the service side

technology.  A service side technology is a technical term to explain something that sat inside the premises off the enterprise or business.

So there were two limits to our technology, and these two technologies talked to each other throughout.

Q.  And was Mformation developing both sides of that technology?

A.  Mformation was developing both the client's side as well as the service side technology.

Q.  I'd like you to turn in your binder, please, to an exhibit marked Mformation Trial Exhibit 2191.

Have you seen this document before?

A.  Yes, I have.

Q.  Who created this document?

A.  I created this document.

Q.  I'm sorry?

A.  I created this document.

Q.  And is this a record that was maintained in the ordinary course of Mformation's business?

A.  Yes, it was.

MS. NOLLER:  At this time I move Exhibit 2191 into evidence.

MS. DeBRUIN:  No objection.

THE COURT:  2191 is in evidence.

(Plaintiff's Exhibit 2191 received in evidence)

MS. NOLLER:  If you could please publish the first page.  And call out the first section with the title, please.

BY MS. NOLLER:

Q.  What is in document, Mr. Basu?

A.  This document is an executive summary of our business plan, which basically summarizes the vision and the plan for this company.

Q.  Can you read into the record, please, what it says under "Vision of Mformation"?

A.  "Mformation wants enterprises to communicate and collaborate untethered to wires.  We are building the first comprehensive mobile commerce infrastructure platform that will enable real-time enterprise wide collaboration on any mobile device running on any wireless network."

Q.  I'd like to you continue on, if we can go to a paragraph called "The Opportunity:  Explosive Growth and Wireless Devices and Data" -- go to the paragraph there, please.

A.  "Wireless device usage is exploding worldwide.  Estimates project that there will be millions of mobile phones in use worldwide with at least 153 million in the U.S. by the end of 2003.  A substantial number of these phones will be data-enabled.  Estimates of the numbering

of wireless data subscribers worldwide is going to be very large, from X to Y, at least 30 to 60 million in the United States."

Q.   Now, why did you write into your executive summary the "Vision of Mformation" in this opportunity that you saw?

A.   The purpose of this document was we need to communicate with investors from whom we would later on seek to raise capital.

Q.   And did you use this as a plan as you moved forward to recruit investors?

A.   That is correct.

        MS. NOLLER:   I'd like to turn to page 2, please. If you'd cull out the paragraph under "Solution Information."

BY MS. NOLLER:

Q.   Could you please read that into the record?

A.   "Mformation is building a comprehensive mobile commerce infrastructure platform that will enable enterprise-wide communication and collaboration on any mobile device running on any wireless network.  It will address the scalability, integrity, reliability and security requirements of large corporations.  Unlike other applications in the marketplace, our platform will allow users to pull, push and most distinctively share

data amongst each other.  The outcome would be a hugely more productive mobile workforce."

Q.  Did you write that paragraph as well?

A.  I did.

Q.  How was Mformation going to accomplish that solution?

A.  So we were going to accomplish this solution through building a proprietary technology on the server and science side which would allow us to remotely manage millions of devices.

Q.  When you say do it remotely, what do you mean?

A.  We would be able to talk to those devices even though they have to connect to the building premises.

Q.  At the time you created this document in 2000, who did Mformation view as its biggest single competitor?

A.  During this time there was a lot of companies trying to -- thinking about creating technologies, but none of them had a similar technology.  There was a company by the name of XcelleNet Afaria, which had a solution, but it was not wireless.  There were companies such as IBM, HP, and a number of other companies like CIA, Computer Associates, which were all thinking about this but could not do this technology properly.

Q.  I'm actually going to hand you the next exhibit, Exhibit 370.

        Sir, do you recognize that exhibit?

A.   Yes, I do.

Q.   What is it?

A.   It is a United States patent.

Q.   And is that a patent owned by Mformation Technologies?

A.   Yes, it is.

            MS. NOLLER:   At this time I move to admit Exhibit 370, which is the patent at issue in this case.

            MS. DeBRUIN:   No objection, your Honor.

            THE COURT:   370 is in evidence.

            (Plaintiff's Exhibit 370 received in evidence)

BY MS. NOLLER:

Q.   Sir, what is a patent?

A.   A patent is a certification by the United States government that an inventor rightfully owns an invention or idea.

Q.   And I'll focus on a couple of different pieces of this particular patent.

            MS. NOLLER:   Mr. Gillespie, you can focus on the whole top half, if you will.

BY MS. NOLLER:

Q.   Mr. Basu, what is the patent number?

A.   The patent number is 6,970,917.

Q.   Is that sometimes referred to as the '917 patent?

A.   Yes, it is.

Q.   Who were the inventors of this patent?

A.   The inventors were Rakesh Kushwaha and Badri Nath.

Q.   And who was the assignee of this patent?

A.   The assignee is Mformation Technologies, Inc.

Q.   I'm going to have you read from the first sentence of the abstract or summary for this patent, please.

A.   "A method, system and computer program product that provides the capability to manage, control and reconfigure wireless devices remotely over a wireless network with acceptable reliability and security."

Q.   Thank you, sir.

     Now, were you involved in filing this patent?

A.   I was not.

Q.   Who was?

A.   It was Dr. Kushwaha and Badri Nath.

Q.   Thank you.

A.   Dr. Nath.

Q.   I want to talk for a little bit now about your eight years working for Mformation and what you accomplished there.  You said your position at the beginning was CEO.  What were your duties and responsibilities as CEO?

A.   As a CEO, I had many responsibilities.  The primary one was to create the vision and strategy for the company.  The other -- and bring them into the same vision and strategy.

The next most important one was to raise funds for the company, because we were a young company with a great idea but we needed money to build this company.

Q.  Did you play any role in the strategy and budgeting for the company?

A.  Yes, I did.

Q.  Did you play any role with respect to strategic partnership development?

A.  I was responsible for all partnership and partnership development for the company.

Q.  And when Mformation was founded in the spring of 2000, who did you target for strategic partnerships?

A.  So, at this time, when we founded the company, we focused on companies which would be the most complementary companies to us; in other words, companies which did not compete against us but had technologies, a combination of which together we would be able to get better products for the marketplace.  So some of the companies we targeted, one of them was Research In Motion, which we called RIM.  We also targeted companies such as IBM and Bond.

Q.  Now, who is RIM?

A.  RIM is a company headquartered in Canada, which stands for Research In Motion.

Q.  And what did they build that was relevant to your

business?

A.   They built wireless devices for -- primarily for corporate customers, and the device was later on called BlackBerry.  And so we looked at them as a company which was a complementary company to us.

Q.   Were you also a customer of RIM?

A.   We were also users and customers of RIM technology.  So we used to use RIM devices ourselves.

Q.   And to your knowledge, did RIM also make the software server that ran the BlackBerry?

A.   RIM had the software solution for e-mail management called BlackBerry Enterprise Server, used to call it BES, B-E-S.

Q.   Did that have different versions, to your knowledge?

A.   Yes, every year they would come up with an updated version.

Q.   So if I used the term "BES 4.0," what does that mean?

A.   That would mean it was the fourth generation of the BES server technology.

Q.   Now, as CEO, you said you were also responsible for raising money for Mformation.  In general, can you explain to the jury what your strategy was for raising funds.

A.   So we realized our vision was big, and to build a vision and a company which would work, we needed a lot

of money.  And we wanted to target two types of investors.  One type of investors we called Angels and the others we called "institutional investors."

Q.   What's an Angel investor?

A.   Angel investors are people who are wealthy individuals who want to put their money to work in investing in technology companies.

Q.   And when you talk about "institutional investors," who are you talking about?

A.   Institutional investors are large funds which have been given a lot of money to invest in very big breakthrough technology ideas.

Q.   And by February of 2000, when you joined the company, did you have any fundraising meeting with institutional investors?

A.   We started -- yes, we started with meetings with institutional investors in February of 2000.

Q.   Who was the first institutional investor you met with?

A.   It was a company called Kingdon Capital.

Q.   Where were they located?

A.   Located in New York.

Q.   When you met with them -- well, when did you meet with them?

A.   We met with them around February 2000.

Q.   Who met with them?

A.   It was me and Dr. Kushwaha, my co-founder.

Q.   I'm going to ask you to turn in your binder, please, to exhibit marked 2183.

Have you seen this before?

A.   Yes, I have.

Q.   And did you play any role in creating this document?

A.   I created this document.

Q.   And why was it created?

A.   This was a presentation we created to explain our vision and our business plan to investors.

Q.   And was this document maintained in the ordinary course of Mformation's business?

A.   Yes, it was.

MS. NOLLER:   I move for admission of 2183.

THE COURT:   Without objection, 2183 is in evidence.

MS. DeBRUIN:   Your Honor --

THE COURT:   Sorry?

MS. DeBRUIN:   -- we do have an objection to the exhibit.

THE COURT:   What's your objection?

MS. DeBRUIN:   Our objection is it does not appear to be a final or complete document.

THE COURT:   In the sense that some portion of the

page is missing or --

MS. DeBRUIN:  In the sense that it appears to be a draft.

MS. NOLLER:  It was previously unobjected to.  He testified that he wrote it.  The fact that it's a draft goes to its weight, not its admissibility, your Honor.

THE COURT:  The objection is overruled to its admissibility on the grounds that it's a preliminary copy.  But, of course, she can ask questions about that of the witness.  So 2183 is in evidence.

(Plaintiff's Exhibit 2183 received in evidence)

MS. NOLLER:  Thank you, your Honor.

Will you please publish?

BY MS. NOLLER:

Q.  You said that you created the document.  Why did you create this document, sir?

A.  We created this document so that we could explain our vision and our plans for the future to investors.

Q.  And just to be clear, we'll look through some of this, but was this meant to be something you handed out or was it published?

A.  It was something that we put on a presentation on PowerPoint on a screen.

Q.  So is this a printed version of something that was displayed to the investors?

A.  Yes, it was.

Q.  Now, I'd like you to turn, please, to page 5.

Can you please explain this slide to the jury.

A.  So, what we are trying to explain here to investors is that the wireless world is very complex, and enterprises have the need to get access to data such as e-mail and other things, but there's so many networks out there, there's CDMA, GPRS, AT&T, Verizon, Sprint, and connecting the two is very complicated, and you need software technology to do that.  And what we're showing in that puzzle is all the key features which are required to connect the corporation data to the network to the end-user's device, and those were the things which we were planning to build.

Q.  And why is "synchronization" a different color than the other pieces of the jigsaw puzzle?

A.  Because synchronization is a key technology.  By "synchronization" we mean any given time the information which is on the device and the information which is on the server needs to be constantly updated and connected at the same time.  And we were going to provide the synchronization technology.

Q.  I'd like you to turn to page 7, please.  This slide is titled "Mformation Value Proposition to Corporations."

Can you focus on the "Target Market" section and please explain that.

A.   The "target market" means that the customer base we're going to focus on, there's a huge market out there.  We can't go after everybody so we have to narrow our focus, and the target market, which is customers that have many mobile users, customers who have many offices around the country who constantly use by sophistication have this, these are what we'd call the target market, the focus of our marketing.

Q.   The second part marked "Value Proposition," what were you trying to convey here?

A.   "Value proposition" is an industry jargon.  What that means is what are the key benefits the customer gets.  So what are the key benefits these customers receive from using our technology.  And the key benefits, the people who work with these jobs with these wireless devices, they become more productive, and at the same time the company is going to save a lot of money on IT at telecom costs.

Q.   Now, after you presented the vision in these slides to Kingdon Capital, did you receive financing?

A.   Yes, we did.

Q.   How much money did you receive?

A.   We received $500,000.

Q.   Is that what you'd asked them for?

A.   Yes, it was.

Q.   I'd like to go back to Exhibit 712, page 19.  You can look on the screen.

MS. NOLLER:  Can you please zoom in on Paragraph 1?

BY MS. NOLLER:

Q.   What does this reflect?

A.   This reflects that Kingdon Capital gave us $500,000 and got $526,000 shares in return.

Q.   And what was the dates that they made this investment?

A.   The date is March 6, 2000.

Q.   What did Mformation do with the initial $500,000 it received from Kingdon Capital?

A.   We invested that money to hire more employees and starting to focus on the technologies.

Q.   Were those employees engineers?

A.   Yes, they were.

Q.   And what were they doing with that money?

A.   They were starting to start creating the technology to build the product.

Q.   After Kingdon Capital's first investment and before its second investment, did Mformation develop a plan for building and demonstrating a prototype?

A.  Yes, we did.

Q.  And what is a prototype, sir?

A.  A prototype is an example of a product.  To give an analogy as my building background, if you wanted to build a new building in San Francisco, we could build it in a prototype made of wood to show the end-user what the building would look like once it was built.  That's how I define a "prototype."

Q.  And is that what the engineers were working at at this stage of the company?

A.  Yes.

MS. NOLLER:  I'm going to ask to publish Exhibit 693, which has been jointly stipulated as admitted in evidence.

THE COURT:  Very well.  693.

BY MS. NOLLER:

Q.  693.  If you could focus, please, on the top portion of this exhibit.

Sir, have you seen this exhibit before?

A.  Yes, I have.

Q.  And did you create this exhibit?

A.  Yes, I did.

Q.  Can you please explain what this exhibit is?

A.  So around this time in 2000, we were pitching our company as a vision to many investors and we wanted to

create a consistent demo to show these investors.  So this was a memo which I had written for my team so that we would show the demo in a consistent manner to all investors.

Q.  Can you please read the introductory sentence in the first paragraph sentence.  Starting with "the purpose" all the way through "actual code."

A.  "The purpose of the demo should be to blow the venture capital audience away with the possibilities of the Mformation platform.

"It is meant to show potential rather than actual reality.  Our demo should not be hampered by a lack of actual software code."

Q.  What does "our demo should not be hampered by a lack of actual code" mean?

A.  We didn't have enough engineers or money to build a full product, so we had to build prototypes just like I explained.  We had to show the potential of the product because we could not really show the reality because we didn't have the engineers or the money to actually have the complete product.

Q.  Read the second paragraph, please.

A.  "It should highlight user behavior over technology. We need to be able to demonstrate that we understand the core user, the CTO, the chief technology officer, the IT

manager, and the system administrator.  It is best to assume that none of these individuals understands or wants to understand wireless and telecom technicalities."

Q.   Why did you write that?

A.   We wanted to make it really simple.  We wanted our demonstration to be so simple that people would instantly understand what we were trying to do.  So we had to make it really simple and hide any complexity from the end-user.  So that people would understand the value of this.

Q.   And lastly, can you please read the fourth paragraph into the record.

A.   "Let us assume that we will only have 15 to 30 minutes to actually do a live demo.  We should aim to be crisp and concise like Steve Jobs or Larry Ellison."

Q.   Could you now call out the portion of this document under "Demo Process"?

A.   Do I read that?

Q.   You don't need to read that, it speaks for itself. But can you explain the demo process that you were envisioning here?

A.   Here I'm assuming we only have 30 minutes to make an impression on the investors, so how do we divide that limited amount of time.  So we broke that into four

steps.  We're going to make a business case setup, which means we'll explain to our customer what the business benefits are for five minutes.  Then we do a technical case setup, which is where we explain what the technology behind this is.  Then we actually spend 20 minutes doing the demonstration of the prototype.  And then we'll summarize at the end what we just showed them.

Q.  And you keep saying "we."  Who was going to be meeting with these investors and doing the demo plan?

A.  The demos were always done by Dr. Kushwaha, my CEO.

Q.  And what was your role in the plan?

A.  My role was to do the business setup, to set up division and the business for the company.

Q.  So after you developed this demonstration plan that was Exhibit 693, did you attend another meeting with Kingdon Capital?

A.  Yes, I did.

Q.  And when was that?

A.  That was in the middle of 2000.

Q.  And where was that meeting?

A.  That was also in New York City.

Q.  And what was the purpose of that meeting?

A.  That was to show the progress we were making with our vision and our focus on what we wanted to do eventually.

Q.   And after that meeting, did Kingdon Capital provide additional financing to Mformation?

A.   Yes, they did.

          MS. NOLLER:  I'll ask to publish, please, Exhibit 712 in evidence, page 31.

BY MS. NOLLER:

Q.   If you focus on the top paragraph of the "whereas" clause, what does that reflect, sir?

A.   That reflects that Kingdon Capital bought an additional 384,000 shares in our company for another $500,000.

Q.   And what was the date of that investment?

A.   The date is September 1st, 2000.

Q.   And what did you do with that additional Kingdon Capital investment amount?

A.   Again, we put the money back to work to hire more engineers, and also hire more administration and human resource folks.

Q.   Did you also use some of that money to make pitches and demonstrations to other venture capitalists?

A.   Yes, we used to travel a lot and we used to have to spend a lot of this money to travel around the country making pitches to investors.

Q.   Who were the other investors that you pitched to?

A.   We pitched to a number of venture investors, names

such as Northbridge Venture Partners, Battery Venture Partners, Polaris Ventures, DB Alex. Brown, for example.

Q. Does "DB Alex. Brown" stand for Deutsche Bank Alex. Brown?

A. Yes, it does.

Q. I'm going to ask you to turn, please, in your binder to an exhibit labeled 2182.

Have you seen this before?

A. Yes, I have.

Q. And who prepared this document?

A. I did.

Q. What is the date of the document?

A. July 31, 2000.

Q. And is this document maintained in the ordinary course of Mformation Technologies' business?

A. Yes, it is.

MS. NOLLER: Move for admission of 2182.

MS. DeBRUIN: No objection.

THE COURT: 2182 is admitted.

(Plaintiff's Exhibit 2182 received in evidence)

BY MS. NOLLER:

Q. Why did Mformation create this document?

A. This was created to make a presentation to this fund called DB Alex. Brown.

Q. I'll ask you to turn to page 5, please.

MS. NOLLER:  Please have enlarged the section of the box.

BY MS. NOLLER:

Q.  This is on a slide titled "Mformation Modular Solution."  Can you please explain what's being reflected here?

A.  Yes.  So this summarizes some of the key capabilities of our project that's going to be built.  It will support as many as four million users, which would be -- carrier class would be extremely robust.  It could be hosted externally or internally.  "Over-the-air management" means that we will never need anything to manage these mobile devices.  And the rest of the information basically summarizes some of the technical features of our technology.

Q.  Where it says "over-the-air management," is that sometimes called OTA?

A.  Yes, "over the air" is sometimes called OTA.

Q.  I'll ask you to turn to page 8, please.

A.  (The witness complies.)

Q.  This is a slide titled "Clear Value Proposition."  Can you please explain what is being presented in this slide?

A.  As I mentioned, our new proposition is a business for benefits, what are three sets of benefits our customers

would receive, and we summarize that as offers; significant cost savings; and control and security, which was critical.

Q. And let's focus on control and security. What are you identifying in this presentation to an investor as the key features that you could offer as a value proposition?

A. When I think in terms of a business or a corporation or an employer, they want to give devices to employees, but they want to know where those devices are, who's using them, what are they doing with it. So it was very important for a corporation to be in real time, which means as it's happening, knowing what each employee's doing. So they should be able to track the devices, whether the device is working on AT&T or Sprint. They should be able to know about they're using the e-mail service or browsing the web. So they're basically controlling it, which is very important to the corporation.

Q. Can I ask you to turn now to page 11.

A. (The witness complies.)

Q. This is a slide marked "Revenue Model."

A. Uh-huh.

Q. And there are three items: Annual licensing fees, usage-based fees and royalties. Are these alternates or

are they cumulative?

A.  So "revenue model" stands for how we make money.  How does a business make money.  In our case, these are cumulative in the sense that we have annual licensing fees plus usage-based fees plus royalties.

Q.  Let's focus on the annual licensing fees first, please.  Explain how you would make money under that model?

A.  So, when we talk about annual licensing fees, it's basically the right for a customer to use our products.  That means we will charge them $200,000 per year just for the right to use the product.  But that's just the right to use.  In addition, if you look at the bullet point Number 3, we charge them for the number of people on the solution, called users, the number of devices being managed, the number of applications being managed and the number of networks they are on.  So that would be in addition to the $200,000.

Q.  Let's go to usage-based fees, can you explain that part of the revenue model to our jury?

A.  Our usage-based fee is an option in the sense that you can host it internally inside your corporation or in this one you can actually host it -- we can host it for you, so if your company does not want to host it, we host it, but we charge a slightly different pricing plan

for that.  We charge $2200 per user to buy, so the corporation puts the charge out –- and the technologies for the devices, we charge something from 20 to a hundred dollars.

Q.   Can you go to the royalty revenue model, please?

A.   So the royalty revenue model is an option which is offered to tell, so it could be a company such as an AT&T or someone else who wants to basically manage our –- our technology themselves.  We don't need to do any of the management.  In that case the pricing would be slightly different, it would be slightly less because all the hard work of managing our software is being done by somebody else, so it would be 10 to $50 per user annum.

Q.   "Per annum" stands for "per year"?

A.   Yes, stands for "per year."

Q.   Do any of these revenue options include giving away Mformation's intellectual property?

A.   No, never.

Q.   Why not?

A.   Because the whole core of our business is intellectual property, and we would never give that away.

Q.   I'd like you to turn to in your binder Exhibit 720. Tell me if you recognize this document.

A.   Yes, I do.

Q.   Who prepared this document?

A.   I did.

Q.   When was it prepared?

A.   After the -- 2000.

Q.   Is this document maintained in the ordinary course of Mformation Technologies' business?

A.   Yes, it is.

MS. NOLLER:  Mformation moves the admission of Exhibit 720.

MS. DeBRUIN:  No objection.

THE COURT:  720's in evidence.

(Plaintiff's Exhibit 720 received in evidence)

BY MS. NOLLER:

Q.   Why did Mformation create this document?

A.   This is just updated presentation for investors. Every month our thinking was if there's a presentation to get them through -- so this was a presentation for investors.

Q.   I'd like you to turn to page 9, please.  This slide is titled "Multiple Revenue Models for Different Segments," and it's slightly different from the last slide we saw.  Can you explain how?

A.   As I was mentioning, every month as we started talking to customers, I think we had more to what they

are willing to pay for and what kind of news varied for each customer.  So here what we've done is taken the same three ideas, and the user-based fees, annual fees, and classified them based on the key kind of customer who would like that kind of a pricing.  So annual licensing fee is something which mobile operators would like.  On the other hand, users-based fees is something large corporations would prefer.  And OEM-based technologies would be preferred by Hanson manufacturers as a segment.

Q.   What does "OEM" stand for?

A.   OEM is short for saying original equipment manufacturer.

Q.   What's an original equipment manufacturer?

A.   An original equipment manufacturer is an entity, could be a Hanson manufacturer such as RIM or Apple.  They basically take technologies from other companies and put it into a phone and then offer it to the end-user.

Q.   Do any of these revenue models that you are identifying in Exhibit 720 contemplate giving away Mformation's intellectual property?

A.   No, it does not.

Q.   I'd like you to turn in your binder, please, to Mformation Trial Exhibit 543.  What is this?

A.   This is a presentation made to one institutional investor called Battery Ventures.

Q.   Who prepared this document?

A.   I did.

Q.   Is it maintained in the ordinary course of Mformation Technologies' business?

A.   Yes, it is.

MS. NOLLER:  Mformation moves for admission of Exhibit 543.

MS. DeBRUIN:  No objection.

THE COURT:  543 is in evidence.

(Plaintiff's Exhibit 543 received in evidence)

BY MS. NOLLER:

Q.   What is the date of this document?

A.   It's October 18th, 2000.

Q.   And what is Battery Ventures?

A.   Battery Ventures is one of the larger institutional investors in venture capital and entrepreneurial businesses.

Q.   Turn to page 10, please.

This is a little bit hard to read, but what is being reflected here?

A.   The focus of this slide is on the pricing, and I think we charge for the different segments.

Q.   Do any of these pricing models contemplate giving

away Mformation Technology for free?

A.   No, it does not.

Q.   And in the series of presentations you made from February to October of 2000, what was the result?

A.   The result of all these investor meetings was that we were able to raise more than $13 million for our company.

Q.   I'd like you to turn to Exhibit 2224.

Have you seen this document before?

A.   Yes, I have.

Q.   What is this document?

A.   It is the -- a stock purchase agreement, which is a contract between the investor and the company.

Q.   Is this a corporate record of Mformation Technologies'?

A.   Yes, it is.

Q.   And is it maintained in the ordinary course of Mformation Technologies' business?

A.   Yes, it is.

MS. NOLLER:  I move for admission of Exhibit 2224.

MS. DeBRUIN:  No objection.

THE COURT:  It's in evidence.

(Plaintiff's Exhibit 2224 received in evidence)

BY MS. NOLLER:

Q.   Can you turn to page 2, please.

A.   (The witness complies.)

Q.   What is the date of this exhibit?

A.   December 27th, 2000.

Q.   Turn to page 12, please.

MS. NOLLER:   I'd like you to blow up the section marked "Intellectual Property 3.1(1)(A)".

BY MS. NOLLER:

Q.   Mr. Basu, if a shareholder purchased shares with a stock purchase agreement in Mformation Technologies, who owned the company's intellectual property?

A.   The people who invested in the company -- the company continues to own the intellectual property.

Q.   Now, if we turned to page 24, please.

MS. NOLLER:   Blow up the top part.

BY MS. NOLLER:

Q.   What is reflected on Exhibit A of page 24?

A.   This is a list of investors who invested in our company in December, and the amounts of shares they got and the amount of money they invested in our company.

Q.   Is this $12.5 million in addition to the money you'd gotten from Kingdon Capital?

A.   Yes, it is.

Q.   And would you turn to page 76 of the document.

A.   (The witness complies.)

Q.   What does this reflect?

A.   This reflects the list of all investors who have invested in the company including individuals, companies and Angels.

Q.   Did these individuals all invest after you shared the information, vision and plan with them?

A.   Yes, they did.

MS. NOLLER:   I'd like to turn to the demonstrative timeline, please.   And display slide 4.

And then slide 5.

BY MS. NOLLER:

Q.   We just talked about revenue models.   I'd like to spend a minute talking about pricing.   As the CEO of Mformation Technologies, Inc., were you involved in creating various pricing models for your product?

A.   Yes, I was.

Q.   What was the general pricing model that you were developing in 2000 to 2002?

A.   The general pricing was that we would charge for each device which was activated in our enterprise.   And we would be paid a fair amount for that management software.

Q.   Was that the management software that was embedded on the device?

A.   Well, the pricing is a function of both what sits on the phone and what sits on the server, an interaction between them.  So the purpose was to capture the total value from the customer for managing relationship between the server, which sits in the building, and the device.

Q.   I'd like you to turn in your binder, please, to Exhibit 2175.

A.   Okay.

Q.   Have you seen this document before?

A.   Yes, I have.

Q.   Did you play a role in creating this document?

A.   My teams, the team working for me, created this document.

Q.   And did you review and approve this document?

A.   Yes, I did.

Q.   Was this document maintained in the ordinary course of Mformation Technologies' business?

A.   Yes, it was.

        MS. NOLLER:  Move to admit Exhibit 2175.

        MS. DeBRUIN:  No objection.

        THE COURT:  2175 is in evidence.

        (Plaintiff's Exhibit 2175 received in evidence)

BY MS. NOLLER:

Q.   What is the date of this document?

A.   December 13th, 2000.

Q.   And what is it?

A.   It's what we call the pricing and terms proposal to a customer.  In this case the customer is a company by the name of YadaYada.

Q.   And what kind of a company was YadaYada?

A.   YadaYada was an innovative wireless service provider which was providing solutions to the market using wireless technology.

Q.   Turn to page 3, please.

A.   (The witness complies.)

        MS. NOLLER:  Please call out Section 2, "License Fees."

Q.   Mr. Basu, can you please explain what a license fee is and how it works?

A.   So a license fee is like a room in a hotel.  You have the right to use the property, but you don't own it.  Similarly, the license fee is a license to a customer that uses the software but they never own the actual.  What this describes is the actual terms of that license.

Q.   This particular license says it's perpetual.  What would that mean?

A.   That means that it would not have a term limit.  It would keep on continuing every year.  As long as the customer kept on paying the fees for it.

Q.   And did Mformation also contemplated use and enter into term license agreements?

A.   Yes, we did.

Q.   Can you please turn to page 4.

MS. NOLLER:  Call out the box in the middle, please.

BY MS. NOLLER:

Q.   Please explain this pricing as explained in this document.

A.   So here we break down our pricing into three buckets. The first is number of end-user devices.  And the license price per device.  So if you look at the price, you're going to see that as the number of devices which the customer uses goes up, we start giving them the discount.  But at no time is it less than $45 a year. And it can be as high as $95 a year.

Q.   And then under "license price per seat" -- first of all, what does "seat" mean?

A.   A seat is the individual who sits and managing our software, so this is the employee side of the company who would actually sit and control on these devices, so it's a person who's like a call center employee.  And each person who sits on the call center side of our software, which is the server side, we will charge them as well 600 to $750 per year().

Q.   Third one is "license price per platform."  Please explain that.

A.   Right, so this is where -- this is the cost we are charging them to actually use our server technology, so this is a platform we are charging, so based on how many seats they have and how many end-users they have, the fee is different.  So the fee can be as low as $24,000 a year, it can be as high as $34,000 a year.  And by the way, this cost is in addition to the number of seats cost, which is in addition to the end-user device cost.

Q.   So those three categories all just described under list price, those are cumulative?

A.   Yes, they are cumulative.

Q.   And does this pricing proposal contemplate giving away Mformation's intellectual property?

A.   No, they do not.

Q.   In fact, if you turn to page 5 of this exhibit, under "Intellectual Property Rights," can you please read the first sentence there?

A.   "Mformation maintains the intellectual property rights to all software supplied and/or developed."

Q.   Thank you.

        Ask you now to turn to two exhibits and look at them together.  Number 2181 and 2180.

        What are these exhibits?

A.   These are different pricing plans we have.

Q.   Actually let's do them one at a time.  What is 2181?

A.   2181 is our product pricing document.

          MS. NOLLER:  May I approach the witness, your Honor?

          THE COURT:  Sure.

BY MS. NOLLER:

Q.   Focused on this page, which is at the bottom says 2181, what is that?

A.   It's an e-mail of an employee's to me.

Q.   Is the employee Deepak Thakran?

A.   Yes.

Q.   Who is that?

A.   Deepak Thakran was a consultant I had brought on to my team to help me with my pricing plan.

Q.   And if you look at Exhibit 2180, is that an attachment to 2181?

A.   Yes, it is.

Q.   In general, without getting into the detail of it, have you seen this document before?

A.   Yes, I have.

Q.   What is it?

A.   It's the pricing structure for our product.

Q.   And were both of these documents prepared for you?

A.   Yes, they were.

Q.   And were they maintained in the ordinary course of Mformation's business?

A.   Yes, it was.

MS. NOLLER:  Move into evidence 2175.

MS. DeBRUIN:  No objection.

THE COURT:  75 or --

MS. NOLLER:  I'm sorry, -80 and -81.  Sorry, Judge.

THE COURT:  They are admitted.

(Plaintiff's Exhibits 2180 and 2181 received in evidence)

MS. NOLLER:  And can you please display 2180.

BY MS. NOLLER:

Q.   That's the e-mail cover page, correct?

A.   Yes.

MS. NOLLER:  That's 2181.  Can we look at 2180. Thank you very much.

BY MS. NOLLER:

Q.   So you said this was a pricing plan.  How is this pricing plan structured?

A.   So in this one (indicating, there are three distinctive pricing plans, Pricing Model A, Pricing Model B -- well, actually, two distinctive ones.  A and B.  And the third one is a hybrid of.

In this one, we break it down, our pricing down

by what we call device tiers, which means customers can license up to 1,999 devices; 2000 to 4,999 devices; and 5,000 devices and more, and the annual per device is a number which raised from $15 to $30. In addition, there would be a one-time server fee from a number between $10,000 to $50,000 per year.

Q. And even though these are per device, are these the pricing models presented to enterprise customers?

A. Yes, it was.

Q. Turn to, please, Exhibit 2174. Have you seen this before?

A. Yes, I have.

Q. And what is it?

A. It's an e-mail communication between my company investors and me.

Q. And was this document maintained in the ordinary course of Mformation's business?

A. Yes, it was.

MS. NOLLER: We move to admit Exhibit 2175 -- 74.

MS. DeBRUIN: No objection.

THE COURT: 2174 is in evidence.

(Plaintiff's Exhibit 2174 received in evidence)

BY MS. NOLLER:

Q. What is the date of this document?

A. November 16, 2001.

Q.  Can you please read the first sentence of this document.

A.  "As we get ready to start our pilot at BT, the question is being asked about our pricing to them."

Q.  The next sentence.

A.  "We have dodged the issue so far, but clearly $50 a device one time or $5 per month for 200,000 devices is going to face resistance."

Q.  Now, was this the plan that you had in place, the pricing plan you had in place in November of 2001?

A.  Yes, it was.

Q.  Was it consistent with the other pricing plans we just looked at?

A.  Yes, it was.

Q.  Did this pricing proposal face resistance because they wanted to take control of your IP?

A.  No.  We don't license our IP.

Q.  So what was the resistance being faced there?

A.  They were tough negotiators, they were negotiating their pricing with us.

Q.  So which pieces of it were they negotiating?

A.  They were negotiating the amount they would pay per device.

Q.  I'd like you to turn in your binder to Mformation Exhibit 814.  What is this?

A.   Pricing recommendations we had as of second quarter 2004.

Q.   And have you seen this document before?

A.   Yes, I have.

Q.   And is this document maintained in the ordinary course of Mformation's business?

A.   Yes.

          MS. NOLLER:   We move into evidence Exhibit 814.

          MS. DeBRUIN:   No objection, your Honor.

          THE COURT:   814 is in evidence.

          (Plaintiff's Exhibit 814 received in evidence)

          THE COURT:   I'm becoming concerned we're spending a great deal more time than I thought might be helpful for the questions the jury has to decide on the details of these various pricing formulas.  But I understand it might tie into something later, so it's a soft concern.

          MS. NOLLER:   This is the last one, your Honor, and it does indeed tie in.

BY MS. NOLLER:

Q.   Turn to page 6, please.

A.   (The witness complies.)

Q.   This slide and actually the next three slides that follow are titled "Pricing Recommendation," on four different pieces of the software; is that correct?

A.   Yes, it is.

Q. I'm going to -- actually, with the Judge's concern, I'll skip over the first one and the second one, and go straight to the third one, which is at page 8. If you could please explain this piece of the pricing recommendation framework for the diagnostics manager.

A. So the framework license is the license we will charge to -- for the minimum we will charge to install our product. The diagnostics server is a subcomponent of the softwares we had created by 2004, so for that we would charge another $250,000. So then we had the base pricing, so for each active user we would charge a price between eight to $10 per year per sub. But the minimum was $250,000 -- 250,000 users. And the bottom we mentioned a bunch of others, we had included testing, installation, training, which are additional costs.

Q. And if you could turn to page 9, please.

A. (The witness complies.)

Q. It's pricing recommendation for the enterprise manager. Can you explain this model?

A. Yes. So the pricing recommendation for the enterprise manager is significantly higher. So in this one we are charging $20,000 per month for hosting. But the device-based pricing is much higher, it's 3- to $4 per device per month. Reflecting the critical nature of this technology for enterprises.

And in addition, we charged the maintenance, customization, training, and any software costs borne by the operators.

Q.   Did you give the per device or per year or per month pricing model to RIM?

A.   Yes, we did.

Q.   Let's talk about the pursuit of that strategic partnership with RIM.  I'd like you to turn to 2255 [sic] in your binder.  Have you seen this before?

A.   Yes, I have.

Q.   What is it?

A.   It's a communication between me and Phil, the CEO of RIM.

Q.   Is this document maintained in the ordinary business records of Mformation Technologies?

A.   Yes, it is.

MS. NOLLER:  Move to admit Exhibit 2225.

MS. DeBRUIN:  No objection.

THE COURT:  2225 or 2255?

MS. NOLLER:  2225, your Honor.

THE COURT:  It's in evidence.

(Plaintiff's Exhibit 2225 received in evidence)

MS. NOLLER:  And can you please blow up the bottom e-mail?

BY MS. NOLLER:

Q.   This is an e-mail dated August 2nd, 2000, and at 2:49 p.m. from Upal Basu to J. Balsillie at RIM?

A.   J. Balsillie is Jim Balsillie, who was the chairman and, of course, CEO of RIM.

Q.   And what were you doing in this e-mail from you to Jim Balsillie?

A.   To -- a common connection, I introduce to Jim Balsillie, and I was reaching out to him in this e-mail seeking a meeting with him, and also to explain to him what a significantly useful technology I thought it was and how it could really help RIM become more successful as a company.

Q.   And in particular, could you please read the bottom paragraph into evidence.

A.   "I believe that our system can substantially cut your BlackBerry subscriber support costs while simultaneously providing tools to allow your enterprise customers to manage their user base directly.  I look forward to discussing these ideas with you.  At your convenience, we can visit your offices and present our product demo."

Q.   Please call out the response e-mail.  Please read what Mr. Balsillie said in response to you?

A.   "Upal, look forward to chatting.  Please coordinate this first phase of information exchange with Valdis

Martinsons.  Sounds interesting.  Jim."

MS. NOLLER:  Please go back to Exhibit 1, slide 6.

BY MS. NOLLER:

Q.  Does this date reflect when you approached RIM as a potential strategic partner?

A.  Yes, it does.

MS. NOLLER:  Put up slide 7 of the demonstrative, please.

BY MS. NOLLER:

Q.  Mr. Basu, why did you send this introductory e-mail to RIM's CEO in August of 2000?

A.  We had spent substantial time developing and focusing on technology by that time, and we had come to the conclusion that our technology was going to be hugely valuable to RIM as a partner, and we wanted to move forward with that relationship because we thought RIM would really benefit from this partnership.

Q.  Why did you think that RIM would benefit from the partnership?

A.  Because we were users of RIM devices ourselves internally, and we had also been talking to a lot of people using RIM devices, and it was very apparent, that to us especially, that their technology did not have management to scale up in the field, and we thought that

gap, which was quite significant, could only be filled by technology such as ours.

Q.  Technology such as yours, is that what you said?

A.  Yes.

Q.  The e-mail from Mr. Balsillie asked you to follow up with a fellow named Valdis Martinsons.  Did you follow up as the CEO suggested?

A.  Yes, I did.

Q.  I'd like you to turn in your binder, please, to Exhibit 552, and the attachment, 553.

A.  (The witness complies.)

Q.  Have you seen these documents before?

A.  Yes, I have.

Q.  What are they?

A.  These are e-mail communications between my team, my executive team.

Q.  And were these documents maintained in the ordinary course of Mformation Technologies' business?

A.  Yes, it was.

        MS. NOLLER:  Mformation moves Exhibits 552 and 553 into evidence.

        MS. DeBRUIN:  No objection.

        THE COURT:  Very well.  Both are in evidence.

        (Plaintiff's Exhibits 552 and 553 received in evidence)

BY MS. NOLLER:

Q.  Let's look at Exhibit 552, please.

This is an e-mail chain.  Would you read from the bottom up?  But let's look at the April 10th, 2001 e-mail, 2:15 p.m.  It's from C. Wolfson at IMCingular.com.  Who is C. Wolfson?

A.  C. Wolfson stands for Craig Wolfson.  He's the director of business at my company Mformation and he reported in to me.

Q.  And it's to a D. Castell at RIM.net.  Who is that?

A.  D. Castell stands for Dave Castell, who was the director of strategic partnerships at Research In Motion, RIM.

Q.  And were you copied on this e-mail?

A.  Yes, I was.

Q.  And what was Mr. Wolfson trying to accomplish in this e-mail to Dave Castell, cc'ing you?

A.  Mr. Wolfson was setting up a meeting with Dave Castell in Canada -- Waterloo, Canada -- to further our relationship on the partnership side.

MS. NOLLER:  And I'd like you to please call out the middle two e-mails.

BY MS. NOLLER:

Q.  So there's a "from" on top of that from D. Castell. Did he respond?

A.  Yes, he did.

MS. NOLLER:  And let's go to the e-mail above that, please.

Starts with "Hi, guys."  Thanks.

BY MS. NOLLER:

Q.  What did Mr. Wolfson then forward to the internal team at Mformation?

A.  Mr. Wolfson sent an e-mail to the executive team at Mformation saying that we are confirmed for a meeting with Mr. Castell.  And we should plan to visit them. And talk about our working with them.

Q.  Attached to Exhibit 552 is an exhibit numbered 553, which is now in evidence.  What is this document?

A.  This is an internal memo which we created which we believed would make RIM's customers, RIM's enterprise customers happy, happy satisfied with a joint solution from Mformation and RIM together.

Q.  And is this a technical document or a business document?

A.  It is primarily a technical document.

Q.  I'd like you to turn in your binder to Exhibit 376K. Have you seen this before?

A.  Yes, I have.

Q.  And what is this?

A.  This is an updated version of the document between --

just presented which talks about the features which would make RIM's business customers happy.

Q.   And who created this document?

A.   I was part of the team which was involved in the creation of this document.

Q.   And is this a business record that was maintained in Mformation Technologies' records?

A.   Yes, it was.

MS. NOLLER:  Mformation moves to admit Exhibit 376K.

MS. DeBRUIN:  Your Honor, we had an objection to this document subject to their laying the foundation for it.

MS. NOLLER:  I believe we've just done that.  He helped create this document, your Honor, and he's recognized it, that it is what it is.

THE COURT:  Perhaps clarify that in your question, since there was an objection.  As to his role.

MS. NOLLER:  Sure.

BY MS. NOLLER:

Q.   Mr. Basu, what was your role in creating this document?

A.   So, I was focused on the "Customer Requirement" section of this document, which is what does the customer want.  And my technical team was focused on the

technology to be used to solve this customer need, so it was a jointly created document between me and my team.

MS. NOLLER:  Mformation moves for admission of 376K.

THE COURT:  It's in evidence.

(Plaintiff's Exhibit 376K received in evidence)

BY MS. NOLLER:

Q.  Now, you said you were focused on and you created the "Customer Requirement" column, so I'd actually like to focus on that column, please.

This is still things which would make RIM customers; is that correct?

A.  Yes.

Q.  And what were the requirements that you were identifying that would be of particular use to RIM?

A.  So we had spent an enormous amount of our time interviewing customers, potential customers, of wireless devices, trying to understand what is it that they need to purchase mobile wireless devices for their employees. What is it that stops them from buying more devices. What kind of things would make them buy more of these things.  So we spent a lot of time talking to corporate customers, interviewing them.  We also spent a lot of time using these devices internally.  And once we had done all that, we came to a list of key -- what we call

"Customer Requirements."  Which would make -- which we would need to fulfill to make the business customers happy.

Q.  Was this a customer requirement that Mformation believed its technology could apply?

A.  Yes, we did.

Q.  I'd like to focus on a couple of these features.  Can you read Number 2 into the record?

A.  "Enterprises would like that their employees and customers should not tamper with management software on the device."

Q.  And I'd like you to read Number 5, please.

A.  "Enterprises would like to prolong the battery life of the device."

Q.  It goes on to the next page.

A.  "In the field."

So, "Enterprises would like to prolong the battery life of the device in the field."

Q.  Was that a piece of technology that Mformation would offer to RIM?

A.  Yes, it would.

MS. NOLLER:  I'd like to publish on the screen what has been stipulated as in evidence, Mformation Trial Exhibit 623.

BY MS. NOLLER:

Q.   Upper right-hand corner.  What was the date of this document?

A.   April 22nd, 2001.

Q.   What is this document?

A.   This is a summary of our relationship with -- so we had different pages to summarize a different relationship with partners.  This page summarizes our partner relationship with RIM.

MS. NOLLER:  If you could please call out the partner summary down through the row that is called "Value Proposition for RIM," please.  The whole top up to there.

BY MS. NOLLER:

Q.   Under "Partnership Objective," please read the bullet points that you have there.

A.   First bullet point is:  "Become the de facto infrastructure support software for RIM devices and have the agent load it on the devices."

Second bullet point is:  "Explore OEM opportunities with BlackBerry."

Third was:  "Develop the technology relationship."

Q.   And let's talk about that first one and second one together, please.  What was Mformation trying to convey with this document?

A.   Our plan was, as we had stated, that there was a gap in the existing technologies to manage wireless devices, and RIM did not have a solution to that problem.  We had the solution to this problem.  So our plan was to basically work together to create a win-win solution where our technology and their devices would work together for the benefit of the end consumers.

Q.   The next row is titled "Value Proposition for Mformation."  Can you read that into the record, please?

A.   "To gain access to their APIs in order to gain more control over the device, we would develop RIM as a sales referral channel, and develop technical relationships to gain access to RIM's APIs."

Q.   What is an API?

A.   API stands for Application Programming Interface.

Q.   And what is it in layperson terms?

A.   It allows two separate companies' products to talk to each other.  So without exposing each other's software and trade secrets and intellectual property, the two companies are still able to communicate using software with each other, using these channels called APIs.

Q.   Could the APIs communicate with each other without creating security concerns?

A.   If designed properly, APIs can communicate with each other without any security concerns.

Q.   The first bullet point says:  "Develop RIM as a sales referral channel."  What does that mean?

A.   RIM had a very large number of the people all over the United States.  We were a small company.  So one of the things we wanted to get for working with them was access to their salespeople so we could get referrals through them.

Q.   The next piece of this document on page 1 is:  "Technical needs from the partner."  I'd like you to switch to page 2 and read the row that says "Business Needs From Our Partner."At the top.

MS. NOLLER:  You can just call out that whole section.

Thank you.

BY MS. NOLLER:

Q.   Under business, where it says "Referral and cross-selling with their direct and indirect sales channels," what does that mean?

A.   That means that Mformation would be their new partner and we would sell to their customer base, so together the customer would get the benefit of two companies instead of one.

Q.   What were the key issues you defined at this time?

A.   The key issues are what we call challenges or concerns we had.  One was the RIM environment was a

difficult environment to work on because it was closed to external software programmers. So it was closed for that reason. And the second was they also had an ongoing relationship with a competitor of ours called Afaria.

Q. And is that the same competitor that you mentioned earlier, I think you called it XcelleNet Afaria?

A. Yes.

Q. I'd like you to turn in your binder, please, to a pair of exhibits, 4454 and 559. Have you seen these before?

A. Yes, I have.

Q. And in general, what are they?

A. These are documents, presentations and brochures which explain what Mformation products do.

Q. And for Exhibit 4454, page 2 through 26, who created that?

A. This was created by the team which was with me in marketing and business and reporting to me.

Q. And did you approve the content of this exhibit?

A. Yes, I did.

Q. And for 559, is that basically half of the exhibit that is 4454?

A. Yes, it is.

Q. And were these -- other than page 1, were pages 2

through 26 of Exhibit 4454 and Exhibit 559 maintained in the ordinary course of Mformation's business?

A.   Yes, it was.

MS. NOLLER:  At this time, your Honor, I move into admission 4454 and 559 but without page 1 of 4454.

MS. DeBRUIN:  No objection, your Honor.

THE COURT:  Very well.  They are received.

(Plaintiff's Exhibits 559 and 4454 received in evidence)

MS. NOLLER:  And I'll publish 559, please.

Page 2.

BY MS. NOLLER:

Q.   What is this document?

A.   This is a presentation which we made to Research In Motion, RIM, on May 3rd, 2001.

Q.   And when you say "we," who was "we"?

A.   This was my colleagues, Dr. Kushwaha and Mr. Wolfson.

Q.   Where was this meetings?

A.   This meeting was held in Waterloo, in Canada.

Q.   And in preparation for that meeting, I think you said you prepared 559; is that correct?

A.   Yes.

Q.   I'd like to turn to page 3 of this document.

Is this document a PowerPoint that was a presentation or a document that was handed out to the

folks at RIM?

A.   This was a presentation made to RIM on the screen.

MS. DeBRUIN:  Objection, your Honor, lack of foundation.

THE COURT:  In what respect?

MS. DeBRUIN:  In the respect that he did not attend this meeting and he's now testifying about what happened at this meeting.

THE COURT:  I see.  I had understood that he was involved, so perhaps you could clarify.

MS. NOLLER:  Sure.

BY MS. NOLLER:

Q.   You prepared the documents for this meeting, correct?

A.   Yes, I did.

Q.   And when you prepared these documents, did you intend that they be in the form of a PowerPoint that was presented?

A.   Yes, it was.

MS. NOLLER:  I think, your Honor, he prepared the documents and he does have a foundation to testify about their content.

THE COURT:  I guess the concern, as I understand the objection, is he can't testify that this was actually presented because sometimes slides can be skipped or -- so that he can testify as to what was intended to be

presented, which was his last knowledge.

MS. NOLLER:  Thank you, your Honor.

BY MS. NOLLER:

Q.  What was the agenda for this meeting?

A.  The agenda for this meeting was for Mformation to give a detailed presentation of what features and products it could provide to RIM as a partner.  And it was for RIM to give an update on what RIM's requirements were.

Q.  I'd like to turn to page 6 of this document, please.

A.  (The witness complies.)

Q.  What is mVision?

A.  MVision was just the name of our product.

Q.  Can you please read what it is into the record.

A.  "mVision, the first carry-class, web-based wireless infrastructure management software platform intended to enable service providers and enterprises to control and manage a rapidly growing global wireless data application usage across multiple devices and networks."

Q.  If you could turn to page 7.  This page identifies mVision key features.  What were those?

A.  We categorize these features into four buckets.  The first, performance monitoring and fault localization.  The second one is security management.  The third one is asset management.  And the fourth one is configuration

management.

Q. What is performance monitoring?

A. Performance monitoring means that in any given moment we can track how the network and the wireless device are actually performing. If it's breaking down, we find out instantly.

Q. What is security management?

A. We can lock the device remotely if it's lost or stolen. We can redelete the content in the device, for example.

Q. Turn to page 13, please.

This is titled "What Customers Want: Security." What were you conveying when you created this slide?

A. So we wanted to communicate to RIM that based on all the extensive surveys we had done that these were key issues which enterprise customers were having. And this summarize the key points behind it.

Q. You said earlier that Mformation was a customer of RIM. Were you yourself encountering these issues?

A. Yes, we were.

Q. And what were those issues in particular?

A. The first one was that there was a problem with actually having applications by enterprise to actually sit on the device. People could bring their devices onto the device and applications, so we wanted to be

able to control and we could control and see that only approved devices and applications would be on the device.

The second one was, they wanted to constantly track when an employee brought the device back to the office, and they wanted us to be able to ensure that the device was secure, so we could do that too.

And the third one was they wanted to ensure that the customers are not able to move the software put onto the device because if you remove the software on the device, it cannot be managed. So we would help with that as well.

Q. And the second caret point on this slide, it mentions a term, "cradles the device." What does that mean?

A. So "cradles the device" means when an employer takes the device into an office and connects it using a wire to the network, that's called "cradled."

"Uncradled" means when you can track the employee performance over the air without the benefit of a cradle.

Q. Turn to page 14. This is a slide titled "What Customers Want," and it's got I think a continuation of the last one. Can you talk about provisioning, please. What does that mean?

A. "Provisioning" means basically connecting a device to the network and starting it up for usage. So a device

provisioning means actually activating a device on the network.

Application provisioning is activating an application to work on that device.

Q.   When it says "information can build," what were you conveying there?

A.   So we said information can build over the air, or OTA.  So everything we would do would be without cradles, we would be over-the-air activation of different kinds of networks, datatac, GPRS, and any kind of network without the benefit of cradle activators.

Q.   Turn to page 15, please.  Under "What Customers Want," what is "fault localization"?

A.   "Fault" means when a device, when your device stops working, it's very hard for a base to know what's causing it to stop working.  Where is the problem happening?  Is it on my side, the enterprise?  Is it the employee's fault?  Is it AT&T's fault?  Isolating that problem is a big technology issue.  We could figure out exactly where that problem was coming from.

Q.   Turn to page 16, please.

A.   (The witness complies.)

Q.   This slide is entitled "Potential RIM Information Partnership Benefits for Customers."  What were those benefits?

A.   So for the corporate customers we would join, derive the benefit from this partnership, they would be able to buy more devices, activate them themselves without having to call RIM, or the AT&T networks, and then port over the air download, the application which only the enterprise wants to use.

Second, the enterprise would have full control, and over the device pan be able to actually provision the application of the device exactly the way the corporation wants the employees to have access.

The third is, as I've just mentioned, they could do end-to-end monitoring, they could figure out exactly where the fault was happening if there was a breakdown.

The fourth was security and control, which means they would have full security.  This is very important for corporations because they have a lot of sensitive data, they have full security about these devices and what was inside these devices.

And finally, they would be able to monitor this entire network of wireless devices, an extension of their existing PC and laptop.  So this technology would just feed to the existing network where they have PCs and servers and laptops.

Q.   If you turn to page 17.  Which is "What information needs from RIM on the business side."  Can you just

generally explain that?

A.   So all these benefits which we'd be offering to RIM's customers, we wanted help with selling and marketing our product.  With few employees, we didn't have a lot of salespeople and we needed some help there.

We wanted to start working with them on this new network, the CDMA/GPRS, which had just been launched in the United States, and we needed some partnership to get that done properly, but most importantly for us was the sales networking.

Q.   Turn to page 18 where it says "Next steps."  What were those next steps?

A.   So the next steps was how deep this partnership would be.  We had to work together to figure out how important this relationship would be for both the companies.  The second one was we wanted to assign key people, both on RIM side and Mformation's side, to move this relationship forward.  Both on the technical side as well as the business side.

And finally, we wanted to set up some next steps, follow-up steps for the next few weeks to this relationship forward.

MS. NOLLER:  So then going to Plaintiff's Exhibit 1, the timeline, if you could please display slide 8 and then slide 9.

Your Honor, I know you like to take an afternoon break.  This would actually be a good time if you are so inclined.

THE COURT:  It's about 2:33.  We'll come back about 2:45.

DEPUTY CLERK:  All rise.

THE COURT:  Counsel remain briefly.

(The jury exits the courtroom.)

THE COURT:  I expressed some concern as to the length of time we spent on some of the pricing issues, and I presume that that will be time that will tie into something else.  I'm becoming a little bit concerned that as to a product-to-product comparison, infringement requires a comparison of the accused device with the patent as opposed to a product.

So I know that you're aware of that.  So I just wanted to make sure that I don't find myself in a position where I have to interrupt and give the jury further instructions because I don't want this to become a case where whatever is the product that is being made becomes the basis of the infringement as opposed to the claim that was allowed by the PTO.

MS. NOLLER:  Understood.

THE COURT:  I should also tell you that I have a meeting at 4 o'clock, so I'll need to quit just a little

bit early, and so as I find -- we find ourselves in this next session, so around 3:45 or so, I'll look for a place to quit just a little bit early. So I'll see you at about 2:45.

MS. NOLLER: Thank you, your Honor.

(Afternoon recess)

DEPUTY CLERK: Remain seated. Come to order.

THE COURT: Ready to resume?

MS. NOLLER: Yes, your Honor.

THE COURT: Summon the jury.

(The jury enters the courtroom.)

THE COURT: Please be seated.

Very well, you may resume your examination.

MS. NOLLER: Thank you, your Honor.

BY MS. NOLLER:

Q. Mr. Basu, during this time did you work with somebody named Craig Wolfson?

A. Yes, I did.

Q. And what were the things that you know that he did with respect to the RIM/Mformation relationship?

A. Mr. Wolfson reported in to me, and his job was to basically executed on this relationship between RIM and Mformation under guidance from me.

Q. And was there anything in particular that he did in the summer of 2001 that advanced that relationship?

A.   He set up meetings with RIM and he also was able to meet the CEO of RIM himself, Mr. Balsillie.

Q.   How was he able to do that?

A.   He attended a conference in New York and -- where Jim Balsillie was speaking, and at the end of the conference, he offered to give Mr. Balsillie a drive back to the airport, and, which Mr. Balsillie accepted, so Mr. Wolfson and Mr. Balsillie drove to the airport together.

Q.   I'd like you to go back to Plaintiff's Exhibit 1, up on the screen.

        MS. NOLLER:  Can we publish slides 10 and 11, please?

BY MS. NOLLER:

Q.   I'd like you to now turn in your binder to Exhibit 2136?

A.   (The witness complies.)

        MS. NOLLER:  I understand that this is admitted by stipulation.

        THE COURT:  You may proceed.

        MS. NOLLER:  Thank you.

        So I move 2136 into evidence.

        THE COURT:  Very well.

        (Plaintiff's Exhibit 2136 received in evidence)

BY MS. NOLLER:

Q.   Sir, what is this document?

A.   It's a communication between me and my team.

Q.   Let's go to the bottom e-mail, please.  So that is e-mail from you on May 18th, 2001, to Peter@Mformation.com.  Who is Peter?

A.   Peter was in sales at that time.

Q.   The forward says Jim Balsillie and Bruce Fador. Who's Bruce Fador?

A.   Bruce Fador was an individual who was referred to us.

Q.   What did you say in this e-mail?

A.   "Peter, please help me with a crisp analysis of our status today with RIM.  This could be a great opportunity."

          MS. NOLLER:  Please call out the top two e-mails.

BY MS. NOLLER:

Q.   And what did Peter Graffman write?

A.   Peter Graffman wrote:  "Rakesh, if you could add your two cents, that would be helpful."

Q.   And what did Dr. Kushwaha respond?

A.   Dr. Kushwaha responded that he met the following people in Canada:  Dave Castell, Director Strategic Alliances; Atul Asthana, Director of Strategic Alliances.

          As well as he made met the following people in a

conference in Las Vegas: Sassan Sanei, as well as an individual by the name of Andrew Mcloud from RIM.

Q. And at the end of this e-mail what did he write?

A. "Just spoke to Castell this morning. He said he would give us a go-ahead to exchange technical information, and it is not related to the ISV program."

Q. Were you e-mailing your team with respect to RIM?

A. RIM, as I mentioned, was a very important relationship. This was the largest company, the largest data space at that time, and I was -- I wanted to know, on the technical partnership side and how things were going.

Q. This e-mail on May 18th at 1:38 p.m. says there is a go-ahead to exchange technical information unrelated to ISV. What technology did Mformation share with RIM?

A. Information shared are service site and client site technology.

Q. Did it also exchange those APIs we talked about earlier?

A. I would not be aware.

Q. Who would be?

A. My technology team would be explaining that.

MS. NOLLER: Now, I'll ask to publish on the screen Exhibit 2137, which is a joint exhibit admitted into evidence. By stipulation.

BY MS. NOLLER:

Q.   What is this?

A.   This is a communication within our executive team over e-mail.

Q.   And in particular, for the bottom e-mail.

A.   That is a communication between Craig Wolfson and Paul Donald, who was a partnership manager at RIM.

Q.   And could you please read the first paragraph.

A.   "Hi, Paul.  Thanks again for meeting me in Waterloo a few weeks ago and inviting Mformation to join your partner program at the select level.  I'll sign the paperwork as soon as I receive it."

Q.   And can you go to the top e-mail in response, please.

A.   "Hi, Paul.  First of all, I would like to thank you and your colleagues at RIM for all the support they are providing to developers at Mformation."

Q.   Keep going.

A.   "Besides Craig Wolfson's request, I would like to discuss with you some other Wall Street customers, such as Goldman who have expressed their opinion that what Mformation provides in the area of security, asset management, performance, should be provided as a part of service by RIM.  They would like to have both the e-mail service and the service management capabilities coming from the same vendor."

Q.  Now, following this, the spring and summer discussions with RIM, did Mformation continue to meet with some of RIM's executives?

A.  Yes, we did.

Q.  And was one of those individuals a person named Ken LeVine?

A.  Yes, it was.

MS. NOLLER:  I'll ask to publish what's jointly stipulated into evidence as Exhibit 627.

BY MS. NOLLER:

Q.  What is this, sir?

A.  This is an invitation from -- this is a communication between me and Ken LeVine inviting him to join an advisory board in our company.

Q.  What is -- when you say an advisory board with your company, was there a particular advisory board he was asked to join?

A.  An advisory board is -- basically consists of not people who are outside our company who give us guidance on what kind of technologies customers want.  Ken LeVine used to work in a large IT department of a large corporation, so we thought he had a lot of insights into what the customers would want.

Q.  And did Mformation pay him any compensation to join your --

A.   We made no financial compensation, we gave him a small amount of stock options in our company instead.

Q.   What services did you ask him to perform?

A.   Basically we were looking for his guidance on -- because of the deep understanding of IT industry of what kind of features we should be building for RIM's customers.

Q.   And what was Mr. LeVine's position at RIM?

A.   He was the director of client implementation, which basically means he was responsible for implementing RIM solutions in corporations.

      MS. NOLLER:   And I'd like to publish what has been jointly admitted into evidence as Exhibit 560.

BY MS. NOLLER:

Q.   Generally, what is this document?

A.   This is a communication of -- between Ken LeVine and Mr. Wolfson.  And then a follow-up communication between Mr. Wolfson and the executive team at Mformation.

Q.   And can you go to page 3, please.

      MS. NOLLER:   Can you blow that up?

BY MS. NOLLER:

Q.   So in this e-mail from Craig Wolfson to Ken LeVine and copying you, what is being discussed?

A.   Basically what we are discussing with Ken is how we can better work together to support our end customers.

We both have the same desire:  To make enterprise customers more successful.  And the discussion here centers around both introductions and referrals to customers, as well as some technical issues we need to resolve to satisfy those customers.

Q.  Can you go to page 2, please.

And Wednesday, July 4th, at 10:07 a.m.  What does Ken LeVine e-mail to Craig Wolfson at Mformation?

A.  He basically tells Craig that RIM was very interested to install our Mformation product in Waterloo, Canada.  And they have already arranged for their internal IT department to install Mformation product on -- in RIM's premises in Waterloo, Canada.  He wanted to know how we can move forward with this.

Q.  If you could go to page 1, please.

Following this dialogue at the top, what is Dr. Rakesh Kushwaha saying to Craig Wolfson, cc-ing you.

A.  Dr. Kushwaha sends an e-mail to Mr. Wolfson and me saying that this seems like the first step towards an o e m deal, which says the OEM partnership, as well as a trial with RIM on RIM's premises, has to be taken very seriously.  And then he talks about some of the logistics to make that happen.

Q.  At some point in this e-mail it also notes that RIM has Mformation to join its Alliance Program.

A.   Uh-huh.

MS. NOLLER:   I'm going to ask you, please, to publish Exhibit 533, which has been admitted into evidence by stipulation.

BY MS. NOLLER:

Q.   What is this document?

A.   This is RIM's BlackBerry ISV Alliance Program.  ISV stands for independent software vendor.  So it's a partnership program between RIM and some of its key partners.

Q.   And if you go to page 6, please.  What is the effective date of this agreement?

A.   July 18th, 2001.

Q.   If you go to page 7, please.

A.   Yes.

Q.   Who signed this agreement?

A.   On behalf of RIM by Jim Balsillie, he was the chairman and co-CEO of RIM, and on behalf of Mformation by me.

Q.   Can you describe the process for joining the ISV Alliance?

A.   The ISV Alliance is a program in which a select number of key partners are invited to work with RIM closely to satisfy what the customers want.  We were invited to a deep level of partnership because they

believed that we were good partners for them.

Q. And what level of partnership did you join?

A. It was a level called the "select partnership level."

Q. And how much did you have to pay for the privilege of being that member?

A. We had to pay a considerable amount of money, I would say about $10,000.

Q. And why did you pay the money and join the alliance?

A. First, it was a requirement by RIM that if you're going to work closely together, this was something RIM required us to be a part of.

From our side, it was important to be on this program because then we would get access to their support staff in case we had any questions with RIM devices and products.

Q. I'd like you to turn to Plaintiff's Exhibit 1.

MS. NOLLER: And publish slide 12 and 13, please.

BY MS. NOLLER:

Q. Now, as part of the BlackBerry ISV Alliance, did you sign a nondisclosure agreement with RIM?

A. Yes, I did.

Q. Can you go back to the Exhibit 553, page 28, please.

A. Yes.

Q. What is this?

A. This is a nondisclosure agreement.

Q.   What's a nondisclosure agreement?

A.   It basically is a confidentiality agreement.  It reads that each of our companies' trade secrets and intellectual property, we will promise not to disclose it to anybody else or use it for any purposes other than for the business purpose we have signed up for.

Q.   And following the --

THE COURT:  Just for the record, I heard 553, and that's what the court reporter caught, but this is 533.

MS. NOLLER:  Thank you, Judge.  That is the correct exhibit.  533.  Thank you.

BY MS. NOLLER:

Q.   Following the execution of this nondisclosure agreement, did Mformation share technical information with RIM?

A.   Yes, we did.  Because we believed the information was protected under this confidentiality agreement.

Q.   I'd like you to turn, please --

MS. NOLLER:  And publish Exhibit 629, which is a joint exhibit admitted by stipulation.

BY MS. NOLLER:

Q.   What is this?

A.   There is a summary document from Mformation to its board members just giving us a status update on the relationship with various companies.

Q.   And what is the date of this agreement?

A.   July 9th, 2001.

Q.   Please turn to page 4.

MS. NOLLER:  And publish the portion regarding business development status by Upal Basu.

BY MS. NOLLER:

Q.   What is reflected here?

A.   So at this time we were making significant progress in our relationship RIM, and we were extremely heavily engaged in the company on both the technical and the business level, and this summarizes some of the things we were doing with them, including working with them at the network technology level.  We were working with them on the network side as well as joined the alliance program.  This is a summary of the high level of engagement we had with them at that time.

MS. NOLLER:  I'd like to go to Exhibit 2101, which has been admitted by stipulation as a joint exhibit. If you could call out the first two-thirds of that document, please.

BY MS. NOLLER:

Q.   What is this document, Mr. Basu?

A.   This is a business development update to Ron, which I did when he joined the company, giving him an update on all the activities that were happening with the company

at that time.

Q.  I think the "to" is Ron Pettengill?

A.  Yes.

Q.  He was who?

A.  He was the CEO who had just joined Mformation as the new CEO to replace me as --

Q.  Why were you replaced as CEO?

A.  As part of our fundraising, we had agreed that we would bring in an experienced industry CEO to run the company after we had raised the funds.

Q.  And what is reflected in your business development update for the week ending August 10th, 2001?

A.  Fundamentally, we wanted to highlight the fact that RIM's relationship was going very well on many fronts, both technical and sales.  And RIM, as a matter of fact, they had a day up in their headquarters called the Mformation day in which they would spend the entire day with us focusing on our relationship.  There was an interchange, their executives visiting our offices, our executives visiting their relationship.  Basically it's a summary of the relationship, which was very positive at that time.

Q.  Did that exchange include technical information?

A.  Yes, it did.

Q.  This document refers to demonstration to Ken LeVine

on August 16, 2001.  Did you see Mr. LeVine at
Mformation on that date?

A.   Yes, I visited him on the 16th.

Q.   Turn to Plaintiff's Exhibit 1.

MS. NOLLER:  And publish slides 14 and 15.

BY MS. NOLLER:

Q.   That exhibit also mentioned a late August 2001
meeting with RIM.  Did that meeting also occur?

A.   Yes, it did.

MS. NOLLER:  I'd like to publish slides 16 and
17.  I'd like to turn now and publish Exhibit 562.  Which
is a joint exhibit admitted by stipulation.

BY MS. NOLLER:

Q.   What is this?

A.   This is an e-mail between me and my executive team at
Mformation.

Q.   And in the bottom e-mail, what was Mr. Wolfson
conveying to the executive team?

A.   Mr. Wolfson was conveying that the status of some of
the engagements we had with him at that point,
specifically that Mr. Ken LeVine was visiting us on
August 16, and that we were visiting him at the end of
August as well.  And Ken wanted to get to know our
product before he had it deployed and -- with RIM, and a
discussion of the technical issues which have to be

fixed before we can install our product.

Q.   And what did you respond?

A.   So I just wanted to know that in a company lifetime opportunity, because RIM at that point was the largest wireless device company by far.  And so it was very important for us to have a very successful relationship with RIM, because RIM, being the largest company in wireless data, that means if you had a good relationship with RIM, there could be lots of sales and technology benefits for our company.

Q.   And just to be clear, did you think that RIM were bad guys?

A.   No.

        MS. NOLLER:  Let's turn to Exhibit 2140, which is admitted by stipulation.

BY MS. NOLLER:

Q.   What is this?

A.   This is an e-mail communication between Craig Wolfson and me in which he mentions that we should now set up a meeting with Mr. Balsillie in Waterloo, Canada, between Mr. Balsillie and our new CEO, Ron Pettengill.

Q.   What did you respond to his question when that occurred?

A.   I agreed with him because it was time to get our CEOs to meet.  The relationship had moved significantly in

the last few months, both on the technical and business side, and we thought it was the right time for the two business leaders of either company to get together and try to reach some kind of strategic partnership.

Q.   And so did you work towards that goal?

A.   Yes, I did.

MS. NOLLER:  I'd like you to turn to Exhibit 719, which can be published.  It is admitted by stipulation as a joint exhibit.

BY MS. NOLLER:

Q.   What is this?

A.   This is a debriefing call.  A "debriefing" means a discussion after the meeting which our team had at RIM's offices in Waterloo.  A number of our employees went to visit Waterloo the day before, and there was a call scheduled on August 31st to discuss what transpired at that meeting between the executives of Mformation.

Q.   Can you go to page 2, please.  The top e-mail. Identified comments to the RIM meeting.  Did you receive this e-mail?

A.   Yes, I did.

Q.   Could you please read Paragraph 2.

A.   "Castell said they can build it themselves.  Is this a threat?  Is this RIM's SOP" -- which stands for standard operating procedure -- "way of conducting

business?  I could imagine so due to the immaturity of the company.  LRW Digital in Maryland has a similar feature.  Could RIM be talking about incorporating their feature?"

Q.  And can you look and read Paragraph 3, please?

A.  "RIM would assume responsibility for future R&D of the agent.  Are they talking about our agents?  When does it cross over the line to be theirs?  Gonna cost somebody something."

Q.  What does "agent" refer to?

A.  Agent is the software that sits inside the mobile phone.  Which we had that.

Q.  Can you read Paragraph 4?

A.  "RIM would permit Mformation to promote our solution to their BES customers.  RIM would allow us to jointly market with them.  This is spelled out as part of what we get for $10,000 @and Select Alliance membership fee, and the 25,000 marketing funds.  Nothing outside the box here."

Q.  Lastly, can you read Paragraph 6?

A.  "I agree with Ted and Upal's assessment that we enable the agent for payment from the customer."

Q.  There it refers to your assessment that Mformation enable the agent for payment from the customer.  What does that mean?

A.   What that means is that we will install the agent inside the RIM device, but the -- there would be no payment done to install the product.  It's basically like a software which is sitting inside the phone, but it's dead, it's not alive yet.  The way it becomes live is when the server pings that device and switches it on.  What we were going to do is charge the payment from the service site; in other words, the customer or any other company which talked to that device and switched it from a dead state to a live state, that's when the royalty or the payment would be made.

Q.   And who would be making that royalty payment?

A.   The payment would be any company which switched on the server or whichever company, whether it's a partner, enterprise customer, whether it's a mobile operator customer, anyone who switched on that dead agent and made it alive would have to make that payment.

Q.   And who would the payment go to?

A.   The payment would come straight to Mformation.

Q.   Let's turn to page 4, please.

So the fourth page of this document is a discussion:  "Term Sheet, Mformation/RIM Partnership."  Who created this?

A.   I created this.

Q.   What's reflected in this document?

A.   So the columns reflect the contributions.  In other words, the things Mformation would make to make the partnership move forward.  And RIM contributions, the contributions that RIM would make to make the partnership move forward, because we were trying to create a win-win solution together.

The different rows talk about the different technologies and businesses where you would partner together.  Such as agent technology, infrastructure, sales and marketing, and the financial terms.

Q.   Under agent technology development?

A.   Uh-huh.

Q.   Can you please read Mformation's contributions?

A.   "Mformation develops and maintains the agent code according to RIM's criteria.  Intellectual property for the code belongs to RIM."

Q.   No, I think you misread that.

A.   Oh, sorry.  "Intellectual property for code belongs to Mformation."  IP for the code belongs to Mformation, us.  "Mformation dedicates full-time engineering resource uses to agent, upgrade and maintenance."

Q.   Under financial terms, can you read Mformation's terms under that document?

A.   As I explained just now, Mformation would get a dollar royalty every time the agent is activated by a

competitive server.  It could be anybody.  Could be IBM, could be -- and we would in addition get a maintenance fee, but it would all come every time -- the royalty fee would come every time this agent was switched on.

And the second point we made was to co-opt RIM, we may consider offering them 5 percent of the royalty which we received so that they do not have any desire to compete against us.

Q.  I think instead of compete against us, it actually says "to replicate technology."  What does that mean?

A.  Replicate basically means to imitate our technology or make it do exactly what we do.

Q.  How did these financial terms identified on Exhibit 719 compare to the per device per year pricing model?

A.  They are consistent with the per device pricing model.  The pricing remains the same, except that the pricing gets initiated the moment these lines get switched on by the server.

Q.  Now, Exhibit 719 is dated Friday, August 31st, 2001.  How did negotiations proceed in the fall of 2001?

A.  Negotiations were progressing well.  We had signed the confidentiality agreement, so we had no doubts that we were working under that agreement.  So we were happy initiating a lot of technical and business information

between the two companies.

Q.   And did Mformation schedule a meeting with RIM's chief executive officer?

A.   Yes, we did.

Q.   Was that for December 5th, 2001?

A.   Yes, it was.

Q.   Before that meeting, was there another execution of the ISV Alliances agreement?

A.   Yes, there was.

        MS. NOLLER:  Move into evidence by joint stipulation Mformation Trial Exhibit 5034.

        (Plaintiff's Exhibit 5034 received in evidence)

BY MS. NOLLER:

Q.   I'd like you to turn to page 6, please.

A.   (The witness complies.)

Q.   What is the effective date of this ISV Alliance agreement?

A.   It's 8th of November, 2001.

Q.   Who signed this agreement?

A.   On behalf of RIM, it was Jim Balsillie, chairman and co-CEO.  On behalf of Mformation, it was me.

Q.   If you look at the last page of Exhibit 5034, what is this?

A.   It's the nondisclosure agreement or the confidentiality agreement between the two companies.

And it's dated November 8th.

Q.   2001?

A.   2001.

MS. NOLLER:  Going back to Plaintiff's Exhibit 1, I'd like to publish slide 18 and slide 19.

BY MS. NOLLER:

Q.   Do you know why there was a second ISV Alliance agreement and nondisclosure agreement executed by the parties?

A.   There was some language updates to the ISV Alliance agreement, so from a legal perspective, we had to re-sign a new agreement with a new start date just to be in compliance with some of the language in this.

Q.   Was your intellectual property still protected?

A.   Yes, it was.

Q.   I'm going to turn to Exhibit 6034, and ask you to look at this one in your binder.

MS. NOLLER:  Actually, this one is also admitted by stipulation between the parties, so it can be published on the screen.

BY MS. NOLLER:

Q.   So on November 27th, 2001, you received this e-mail. If you could please read the last portion of the first paragraph starting "just last week."

A.   So this e-mail is from one of our sales executives,

Paola Vecchiolla.  She writes to the executive team:

"Just last week, attended a RIM user group meeting, and

Balsillie spoke and mentioned that by March the new

software release will provide lock, zap for security and

better monitoring facilities.  What does this exactly

mean?  I don't know."

Q.  Can you read the last paragraph, please?

A.  "If we in the field don't know what RIM is

specifically saying to their users, it will slow down or

crush further momentum in the sales process for us.

What can you senior folks find out?"

Q.  And for "lock, zap and security and better monitoring

facilities," was that your technology, or is that

technology that you provide?

A.  We were the only company which could provide that

technology at that time.

Q.  And how -- actually look at the November 27th e-mail

at 1700, the middle one.

A.  Yes.

Q.  What did Mr. Wolfson communicate to the team?

A.  Mr. Wolfson communicated to the time saying:  Ron,

could this be one of the topics of discussion during

your visit with Mr. Balsillie next week?"

Q.  And how did you respond?

A.  I responded that, to Mr. -- Dr. Kushwaha saying:

"Rakesh, you and Badri must patent our lock, zap feature as soon as possible for both in band and out of band (see below)."

Q.  Why did you write that?

A.  I was starting to get concerned that RIM had competitive intentions and was planning to replicate this technology in-house.  And to prevent that from happening, even though I was hoping that was really not the case, it was very important that all intellectual property be protected under patent.  So I was just encouraging Dr. Kushwaha, Dr. Nath, in case they have not already done so, to get every patent they could in this space.

Q.  And was that something you were handling or something Dr. Nath and Dr. Kushwaha were handling?

A.  Anything having to do with Dr. Nath and Dr. Kushwaha.

          MS. NOLLER:  I'd like to move to Exhibit 632.

          THE COURT:  Can we use that as a place we start tomorrow?  There are some legal issues I want to take up with the parties.  It's about 3:32.

          MS. NOLLER:  Sure.

          THE COURT:  Unless you want to go --

          MS. NOLLER:  This is fine.

          THE COURT:  Members of the jury, we're stopping a little bit early, but the time still remains on the clock.

We'll just use it for a different purpose than having evidence presented. We'll resume this matter tomorrow morning at 9 o'clock. Remember my admonitions. You may be excused.

DEPUTY CLERK: All rise.

(The jury exits the courtroom.)

MS. NOLLER: Judge, shall we excuse the witness?

THE COURT: Yes, you may step down.

MS. NOLLER: Should he leave the courtroom?

THE COURT: Otherwise witnesses are excluded unless he's a client. So he should be excused.

MS. NOLLER: Thanks.

THE COURT: Thank you, sir.

(Witness exits the courtroom.)

THE COURT: We're out of the presence of the jury.

I wanted to at least see whether or not there was some of the legal issues you mentioned at the beginning of our day that I could take care of in summary fashion here, although my understanding is that none of them are involved with the current witness or -- but just for planning purposes, the issue of Mr. Lazaridis, I had a chance to have you give me a copy of his transcript. As I recall when we last visited this subject, I left open the question of whether or not he would testified as a witness

based upon how the plaintiff presented the matter.  And I was also concerned with an earlier issue as to whether or not he was deposed or there were objections.

I learned a little bit about that.  Actually reading the short transcript helps me, some.  But if you want to speak further to your request, which I took it to be a request made based upon the opening statement.

MR. MATUSCHAK:  Yes, your Honor.  So I think last Thursday, your Honor, I think where we left it, just to bring us up to speed, was your Honor had said --

THE COURT:  Please be seated in the court.  I'm sorry.

MR. MATUSCHAK:  I apologize.  My eyes are not so good to be reading the transcript, but I think last Thursday your Honor said that Mr. Lazaridis may testify as part of the defense case if the plaintiff in their case in chief puts in evidence of the e-mails.  And that's the first thing out of Mr. Thakur's mouth as he stood up in front of the jury today.

So I think the issue as to whether he can come and testify in rebuttal to the e-mails is -- should be clear.  I think your Honor has already stated, and I think we actually had an agreement on that point last Thursday, that he ought to be allowed to.  I mean, at the end ought to be allowed to defend himself.

In addition, I believe that issues that were raised in the opening would permit Mr. Lazaridis to give testimony as any other witness ought to be allowed to give.  For example, one of the plaintiff's allegations is that RIM induced infringement.  Inducement has an intent aspect to it.  And you have to intend to encourage other people to actually infringe the patent.

Now, Mr. Lazaridis will testify, as I said in my opening, that he worked with this Mobitex network going back years and years.  He was aware of this, so he was aware this was not new technology.  So that testimony is directly in rebuttal to Mformation's claim that we induced -- the intent element of inducement.

THE COURT:  Let me divide those.  What is your responses to the motion to permit him to testify now that the plaintiff has opened its case and indeed did, as I observed it, feature Mr. Lazaridis's memo or something that had his name on it as part of his opening, as a basis for allowing him to testify as a witness about those matters?

MR. THAKUR:  Your Honor, as a general matter, we do not object.

THE COURT:  All right.  So the motion is granted.

Now, I don't know the answer to the second question, you'll have to help me.  In other words, the

parties are free to call anyone as witnesses, and ordinarily in the pretrial process, you would notify each other that you're going to call various witnesses. And give them an opportunity to depose those witnesses. I had thought that there was some restriction on Mr. Lazaridis with respect to how he would be called, whether he would be called, and so this is otherwise something I wouldn't get involved in unless the objection is, we knew they might want to put him in on the issue. We asked for his deposition and they refused.

Or, something like that.

So, what would be your objection to him testifying as a witness on any other issue that he's competent to testify about?

MR. THAKUR: Your Honor, we did ask the -- they did not identify Mr. Lazaridis on their Rule 26. We asked for his deposition. They specifically advised the Court that he will not testify at trial. Based on that, despite their initial -- we requested a deposition from the Court, and it was granted. And we have limited -- our deposition was limited to one hour. And we asked questions --

THE COURT: It's that first part I need to have more about. What did you request and what did they object to?

MR. THAKUR: Your Honor, Mr. Lazaridis was not on

their Rule 26 disclosures, so nothing over text, nothing over inducement, despite the fact that we asked for his deposition really because of these e-mails.

THE COURT:  So he was not listed as a potential trial witness in their disclosure.  When you say -- he's obviously been identified during the case as someone who has knowledge about events that are subject to this lawsuit.

MR. THAKUR:  That's correct.  The Rule 26 requires you to disclose the witness and the topic.  He was not disclosed, so the Rule 37 sanctions are self-executing.

However, plaintiff believed he would have relevant information and requested his deposition.  And we've held that deposition, relating to just the dealings between the parties.

THE COURT:  Was there at that time -- because I didn't handle that, was there at that time an objection to the effect that, okay, we'll make him available but only on these limited areas?

MR. THAKUR:  No, the objection was we will not make him available and he will not testify at trial.

THE COURT:  No, no, no.  I'm talking about now when he is now being identified as someone who's being deposed.  Was there a representation made to the judge

that he would be limited in the areas to which he can testify?  Because in your deposition -- you took a deposition of him, to my understanding.

MR. THAKUR:  That's correct.

THE COURT:  You could have asked him, what about the Mobitex situation, unless you were under some constraint about that.  That's what I'm trying to figure out.

MR. THAKUR:  Perhaps think of it the other way. We were seeking to compel the deposition, and we sought to compel the deposition on the sole topic that we thought we would have relevant information, which was dealings between RIM and Mformation.  So we believe that's all we were asking for, because he would never identify Mobitex, for example.  We sought that deposition; the Court granted the limited deposition of one hour.  If you saw my deposition -- this is the first I ever heard that he would know anything about Mobitex.

THE COURT:  All right.  So handle that.  Surprise is what I'm hearing.

MR. MATUSCHAK:  There's no surprise here.  First of all, there was no limitation on the subjects to which Mr. Thakur inquired at the deposition.  Had he inquired like you do with any witness, give me something about your background, when did you start working, what did you work

on, these are standard questions.  If your Honor has looked at the transcript, you can see what happened.  They used their hour by asking him not questions like that, but please read into the record the following e-mail.

THE COURT:  I'm glad to hear lawyers thinking, I always have a lot of time on these matters.  It's usually kicking and screaming there's not enough time.

But what is your response to the question about whether or not this is a surprise that he was involved with this Mobitex technology?

MR. MATUSCHAK:  It's not a surprise for a number of reasons.  One, they have to ask him questions about his background and his work at RIM when they deposed him.  They chose not to use their time that way.  Two, if they thought their time was insufficient, they could have gone back and said, We'd like more time.  They did not do that.  Three, we put him on our witness list.  They made no further inquiry, they just moved to strike him.  I asked Mr. Thakur to take a deposition of Mr. Lazaridis.  He's declined.  So -- there hasn't been any declining.  There's books on the shelf at Barnes & Noble about the founding of RIM that has this information in it.  I find it incredible --

THE COURT:  Is this Mobitex technology cited as prior art?

MR. MATUSCHAK: Yes, it is, your Honor. It's in our expert report. It's in our invalidity contentions.

THE COURT: What about that?

MR. THAKUR: Number one, how am I suppose to do dream that he's involved with Mobitex? This is the first time in this case I've ever heard of the word "Mobitex" associated with Mr. Lazaridis. Second, he's been at the company over 20 years. I got one hour of a deposition.

I gave him his deposition notice. He read the signature page on it. The signature page. I didn't even get into my deposition six minutes in. He said you could ask for more hours. In fact, I asked for two hours. They insisted on asking the Court to limit me to one hour. In one hour, I couldn't even get through five of these e-mails. How am I supposed to dream about topics like Mobitex?

MR. MATUSCHAK: Your Honor, I would just point out that our production included lots of documents about RIM's involvement with Mobitex. Mr. Lazaridis was known to be the founder of the company and the guy who built this company. So the fact that they chose that hour to have him read into the record -- and that's what the deposition is. It's, Sir, could you please read this e-mail from beginning to end into the record. Let me show you the next e-mail. Could you please read that into the

record.

They were taking this deposition so they could play it at trial. They had no interest in finding out about Mr. Lazaridis, his work, his life, much less his work on Mobitex. That was their choice.

MR. THAKUR: Your Honor, Mobitex is a carrier system. How am I supposed to dream that Mr. Lazaridis would testify as his prior art witness at trial? I can honestly say this is the first time I've ever heard the word "Mr. Lazaridis" in context with this.

THE COURT: Let me think about that. My inclination is to limit him to the question that it seems he was tendered for, and that has to do with these e-mails and to restrict him to that.

I am somewhat concerned that if he's listed as a witness and there's no restriction on that listing, that should serve as notice that there's potential for him to testify more generally. I'm also concerned that, given the characterization of him by the plaintiff, that I don't want to have a thumb on the scale in any way with respect to the jury having a full understanding of who these people are and what they've done. The -- this is the only factor that weighs more heavily on me because I do believe parties ought to have full disclosure of what's going on during the pretrial phase so that you don't have surprises

in trial.  So let me think overnight about the last part of this.

The other question that was put to me had to do with the provisional patent application as far as the date that is involved there.  And I haven't studied this fully enough to give you a final answer, but here's my current thinking, and that is, these are matters where the events will decide what effect, legal effect, the Court would give to the breach of the patent application filing date, and whether or not the provisional application becomes relevant to -- I presume it has to do with prior art of something.  I haven't totally understood the papers.

MR. CHARFOOS:  It has to do with public use, your Honor.

THE COURT:  Public use.  So that came up during the summary judgment phase.

MR. CHARFOOS:  That's right, your Honor.  The parties, Dr. Kushwaha's obviously changed his testimony on the July 24th, 2000 disclosure to the Deutsche Bank Partners, but his original testimony was that that particular claim, one, was fully reduced to practice and then included prototype shown to Deutsche Bank.

THE COURT:  I remember hearing this.  This sounds like deja vu now.

MR. CHARFOOS:  He tried to change his testimony.

That errata sheet was stricken by the magistrate judge. And we believe it will be very telling at trial, as Mr. Matuschak said during his opening, how much he has changed his testimony.

One of the issues with respect to the public use defense, your Honor, is whether or not the non-provisional application that led to the '917, the patent, is entitled to claim priority back to do provisional application. And I understand your Honor's comment about events coming forward at trial, but really the issue here is, and the law provides, this is a question of law for the Court to decide.

There are no events which will come forward at trial which will change the facts that this Court needs to consider determining whether or not to provide the provisional application as the earlier priority date for the non-provisional. It's strictly a question of law at this point. Do the three things or four things that information points to, for example, disclose the threshold condition? Are those legally sufficient? We say that they're not. And it truly is a question of law, as we said in our motion. Two of those issues are --

THE COURT: Let me interrupt you. What difference will it make with respect to what you present to the jury?

MR. CHARFOOS:  Well, your Honor, we would potentially need to present to the jury the information with respect to whether or not any of the individuals believe, for example, Dr. Kushwaha, who wrote the disclosure, whether or not that disclosure includes the limitations, certainly comes into play when experts come. And the public use defense is certainly in that at this point in time, your Honor, and we believe that it should be in play.

THE COURT:  And so what would my ruling do?

MR. CHARFOOS:  Your ruling would change the scope of our cross-examination of potential witnesses.  For example, for sure I would assume that plaintiff bears the burden to show that they're entitled to the earlier priority date.  So they're going to put that evidence on during their case at some point in time, I anticipate that evidence will come in with Dr. Kushwaha.

THE COURT:  Let me think about this.  In other words, this is a renewal of a motion to summary judgment?

MR. CHARFOOS:  It's not a renewal, your Honor. As you said in the motion for summary judgment, and we gave this to you in our reply brief, because in terms of -- you asked us on Friday --

THE COURT:  Maybe not renewal.  But this is asking me to rule as a matter of law that the provisional

application does not become the effective date for looking at public use or prior art.

MR. CHARFOOS:  That's correct, your Honor.  In the footnote --

THE COURT:  And how's that done in a jury trial?  That's what I'm asking.  Why do I need to do this now?  I can't listen to the case, hear whatever I hear, let the jury decide their matters and I decide my matters.

MR. CHARFOOS:  Because, your Honor, it's effectively going to be putting claim construction in front of the jury.  The experts --

THE COURT:  Why do you need to put in any claim construction?  If the provisional application says what it says, and I come to learn as a result of the trial what the patent says, the related issue I have to decide is whether or not the provisional application, the inventor had possessed the same invention as in the past.

And so that will come as a result of my learning what the patent is, and what it covers.  The experts will testify about that as compared to the infringing, the accused product here.  So I'm not sure I need to say or do anything with respect to the jury.  That's what I need a better understanding of.  What it is that -- how do you want the trial to be shaped differently based upon this ruling?

MR. CHARFOOS:  We would ask the Court rule as a matter of law, as the case law provides, that is not @entitled to the provisional.

THE COURT:  What would make a difference?

MR. CHARFOOS:  Because Dr. Kushwaha would not come in and testify that the phrase, "until the client accepts them in a provisional application" should be excluded to cover a threshold condition.  The experts won't be coming in to talk about how phrases within the additional application should be construed to cover initial things.

THE COURT:  So it's an in limine type of motion to say they should not be able to testify that way.

MR. CHARFOOS:  We're seeking your ruling as a matter of law, as we did during summary judgment, and your Honor reserved this issue -- the footnote reserved this issue for determination later.  We're seeking your ruling as a matter of law that they're not entitled to this.

The defense -- to be candid, your Honor, the defense of public use, because that July 24th presentation occurred during that window of the provisional, that would give clarity to the parties, and the public use defense in addition to everything else.

But the fundamental issue is that they are precluded from arguing certain things -- inherency of the

wireless system in the provisional application is precluded under prosecution history estoppel.  They had to add the threshold conditions, as you saw it today, in order to get around the prior art.  But they're arguing that that's inherent, and therefore the provisional inherently does it.

THE COURT:  Let me give you just a brief moment to respond, but this does sound to me like a motion for judgment on some issue at the close of plaintiff's case as opposed to something that I can give you a ruling on during the course of trial.  It sounds like a good pretrial motion.  When I say I reserved it, I must have had in mind, and I'll have to get back into it, because there were a number of issues before me of -- as to what I would need now to know to give you a ruling on this matter.

And quite frankly, given all the other issues that are going on here, I'm not prepared to stop whatever I'm doing now, which is the trial on infringement, and give thought to some legal issue unless it, as I hear from you, becomes a matter that will curtail certain evidence.  That's why I'm trying to understand how the trial will be different, and maybe if I had kind of an outline of, If you granted this, then they won't be able to say that.  That is the kind of thing.  And then that would help me to

understand it.

You want a brief time to respond to this question?  As part of the plaintiff's case?

MR. THAKUR:  Your Honor, what you heard from Mr. Charfoos is not what the law is; it's what he would wish the law to be.  This is not a matter of law.  This is a matter of fact.

Your Honor, we've briefed this issue, so I think the right thing to do is at the conclusion of evidence, we revisit this issue, and I think you will conclude that the issue of whether a provisional support is supported by the regular patent application is an issue of fact, and we should allow the jury to decide that.

THE COURT:  Well, at least at the close of your case, which is the way I see it, as opposed to probably opening theirs.  Let me think about this as well.  I hated circling more things to think about.  But this sounds like one where I want to go back to my previous ruling on this matter, as well as read your current papers.

Thank you.  See you tomorrow morning.

You wanted to have some documentary matter, I told the clerk to give you 10 minutes.  You're doing so well on the documents.  To the extent you wanted me here to read off exhibit numbers, I don't want to be here, but if there's something that you have that is a dispute over

particular documents, that I'll come 10 minutes early.

MR. MATUSCHAK:  Thank you, your Honor.

MR. ARNTSEN:  Your Honor, there's the pending issue with regard to Mr. Weinstein's supplemental report where the Court invited further briefing on that, and the parties submitted briefs.

THE COURT:  I have that one.  And I asked my law clerks to pull out the cases that you cited so I can read them.  As I said the last time, I'm not sure there is a clear answer to this problem.  But I have it under submission.

Thank you.

(Adjourned)

oOo

INDEX OF EXHIBITS

| Exhibit No. | Received: |
|---|---|
| 113, 185, 298, 314, 362, | |
| 634, 880, 890, 1081 | 142 |
| 712 | 237 |
| 2191 | 242 |
| 370 | 246 |
| 2183 | 252 |
| 2182 | 261 |
| 720 | 266 |
| 543 | 268 |
| 2224 | 269 |
| 2175 | 272 |
| 2180 and 2181 | 277 |
| 2174 | 278 |
| 814 | 280 |
| 2225 | 282 |
| 552 and 553 | 285 |
| 376K | 289 |
| 559 and 4454 | 295 |
| 2136 | 305 |
| 5034 | 324 |

oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

INDEX OF EXAMINATION

Witness:

UPAL BASU

Direct By Ms. Noller . . . . . . . . . . . . . 232

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Tuesday, June 19, 2012