**Volume 3**

**Page 347 – 543**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

```
------------------------------)
                              )
Mformation Technologies, Inc.,  )
                              )
               Plaintiff,  )
                              )
    v.                        )    No. C  08-4990 (JW)
                              )
Research In Motion, Ltd.,       )
et al.,                        )
                              )
               Defendants. )  San Francisco, California
                              )  Wednesday, June 20, 2012
------------------------------)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                  BY:   AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        RUEBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        MEREDITH ZINANNI
                        FERLILLA VICTORIA ROBERSON
                        MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Wednesday, June 20, 2012

(8:55 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Good morning.  Please be seated.

I realize -- we're on the record out of the presence of the jury -- that I cheated you out of the time you had asked for on documents, and the reason I did that is my law clerks and I conferred, and we decided that I could do it by having them review the documents.  And when we take our break, I can figure out what is different about this set than what we've gone through before.

But I was advised that there is yet another issue that you had before we resume.

MR. MATUSCHAK:  Just have some supplemental information on the Mike Lazaridis issue.  I think yesterday when we discussed this I think your Honor's concern was -- was -- would Mformation be unfairly surprised by any scope of Mr. Lazaridis's testimony beyond the e-mails.  And I believe Mr. Thakur said to the Court, This is the first time in this case I've ever heard of the word "Mobitex" associated with Mr. Lazaridis.

Your Honor, there are at least two trial exhibits

unobjected to that I have that have Mr. Lazaridis talking about Mobitex.  Trial Exhibit 4032, Mr. Lazaridis is quoted as saying:  "RIM's goal is to make global wireless data communications based on Mobitex standard a reality."

And it goes on.

There's another exhibit of RIM's RIM product in which the contact information, this is Trial Exhibit 4009, also unobjected to, the contact information is Mike Lazaridis, President of Research In Motion.

It also has come to my attention that after his deposition, so after they had the opportunity to depose him, Mformation put Mr. Lazaridis on their initial disclosures.  And they said Mr. Lazaridis has information relating to, among other things, RIM's business, business development, operations, projects, products, future products, sales, and corporate development and strategies.

And your Honor, we don't tender him for anything beyond what Mformation itself said they were going to use him for when they filed their initial disclosures.

THE COURT:  Counsel?

MR. THAKUR:  Your Honor, there are millions of pages that have been produced in this case.  Is it

reasonably fair for the first time to bring in the documents saying Mr. Lazaridis within 10 words of Mobitex and that is disclosure?  Your Honor, Rule 26 has a purpose.  The purpose is for you to disclose the witness, give the other party a fair opportunity to learn what there is.  Rule 37 exclusions are self-executing for a reason, your Honor.  The unfair surprise on us is overwhelming.

THE COURT:  What about your disclosure?

MR. THAKUR:  Your Honor, we asked for that witness.  We believed that witness had substantial knowledge about the developments in this case.  They told the Court they do not intend to bring him to trial. All we got was one-hour deposition.  Essentially, you saw the transcript, beyond those e-mails I got virtually nothing.

So now in the middle of trial after four years for me to have to prepare for Mr. Lazaridis, I mean, I can't think of a better example of unfair surprise, and Rule 37 is applicable.

MR. MATUSCHAK:  Your Honor --

THE COURT:  Very well.  I will allow him to testify as to any of the matters that you tender him as a witness.  To the extent that you would wish to ask the Court to allow you to have a pretrial proceeding where

you can examine him further, I'll entertain that. Not -- but at a later time. It just seems to me that given his position within the company and given the subject matter, that his involvement in this case, it seems that it would be anticipated that he could testify about how he came to develop the company in the way that it did.

One of my concerns, though, and let me just take another moment to say what I said yesterday a little more fully, one of my concerns that I have started to develop is the difference between this case, which is a single patent with a dependent -- with an independent claim and several dependent claims, and whether or not it is infringed. And what could turn out to be a trial to the jury between two companies who had much wider range of technologies between the two of them, sharing those technologies, and whether or not some part of that technology, but not the patent, was used. And so that can lead to jury confusion.

In other words, this should not be a case about RIM's use of technology other than the patent that is involved here, which is a method patent. It is not the agent, as I understand it, and I have found myself wondering why this jury should be taken through the story of the development of these companies and the

sharing of technologies, and particularly of the agent, because as I understand it, the agent wasn't patented. It is not the subject of the patent. And the method is what is involved here.

And to the extent that you're going through this because you're going to tie it to the patent, I can understand that. But ultimately, I'm going to be instructing the jury that it must ignore for purposes of patent infringement -- if they stole -- I won't use these words, but if -- to say this in a provocative way, if they stole all of your company confidential information, that would not make a difference with respect to patent infringement. Because the patent's not confidential. It is disclosed.

And so to the extent that we're spending time educating the jury about technologies and information that was shared and perhaps taken, that is not the patent, it's irrelevant. And so I'm saying this early enough so that the plaintiff has an opportunity to present the case of what it patented and what the accused process or device is.

MR. THAKUR: Mformation is a single product company, but we heed your advice and we will act upon it.

MS. DeBRUIN: Your Honor, that is the concern

that RIM had and the issue that RIM raised in three of its motions in limine.  So we appreciate your comments, and would like the opportunity if this continues to, you know, reraise those issues.

THE COURT:  I'm saying it early because I sometimes find that if I don't express these concerns when I'm then confronted with a motion for a judgment and I say, Why didn't I hear all this other -- it just seems to me hard for a jury already to deal with technology and to expose them to claims other than those that are involved with the patent can lead to a circumstance where it confuses them.

Enough said at this point.  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Members of the jury, we delayed just about 10 minutes getting started on a legal issue.  You have my continued assurance that whenever we delay our start it's to move us along.

May we have our witness?

Thank you.

(Mr. Basu resumes the stand.)

THE COURT:  You may resume your examination.

MS. NOLLER:  Thank you, your Honor.

DIRECT EXAMINATION (cont.)

BY MS. NOLLER:

Q. Sir, yesterday when we left off we were talking about preparations for a December 5th meeting between Mr. Castell, the CEO of your company, and Mr. Balsillie, the CEO of RIM. Do you recall that?

A. Yes, I do.

THE COURT: Counsel, pull that mic a little bit back.

MS. NOLLER: Yes.

BY MS. NOLLER:

Q. Where was that meeting?

A. The meeting was going to be held in Waterloo, Canada, at RIM's headquarters.

Q. And in advance of that meeting, did you try and prepare your CEO for that meeting?

A. Yes, I did.

MS. NOLLER: I'd like to put up on the screen joint exhibit admitted by stipulation, which is Number 635. Can you just call out the top portion, please.

BY MS. NOLLER:

Q. Sir, what is this document?

A. So, this document is an e-mail between me and my CEO Ron Pettengill, and the purpose of this document

basically is to communicate with my CEO that we are going together to visit the CEO of RIM, which is a very large corporation, and this is some of the key things we would like to accomplish.  The most important thing for us was that we wanted to get a partnership done.  The most important thing, a strategic partnership between RIM and Mformation to put our software on our phones.  That was by far the most important issue for us.  The other stuff which was technical was --

THE COURT:  You were speaking a little more quickly.

THE WITNESS:  Okay.  Sure.  The other things where we wanted to discuss some of the technical integration work we would need to do over the next few months to get our products to work together.

BY MS. NOLLER:

Q.  And that meeting in fact happened, correct?

A.  The meeting did happen.

Q.  So who actually attended the meeting?

A.  So the meeting from our side was me and my CEO, Mr. Ron Pettengill.

Q.  And from RIM's side?

A.  Mr. Balsillie, Mr. David Castell, who was a director for strategic partnerships, and they had two or three other senior executives in that meeting.

Q.   And what happened during that meeting?

A.   So, basically, we went with these objectives in mind, and the meeting turned to -- took an interesting turn. So my CEO, wanting to do the right thing, started the meeting with the topic which we had not initially planned to discuss, he started discussing the fact that he was hearing that RIM was planning to build a competitive solution to Mformation.  And he started the meeting with this topic.

The reaction from Mr. Balsillie was, Let's put it this way -- he went ballistic.  He got extremely defensive and angry, and he literally started shaking. To the extent -- and he's a very big guy, he's probably a six-foot-five gentleman.  He started shaking, and he picked up some documents and which said, an alliance partnership document, he took it out and started literally pounding the document with our name on it, saying, Look at this, Mformation.  Mformation is our partner.  We are not your competitors.  We are not your competitors.

And he got extremely shaken and flustered.  There was literally a pin drop silence in that room for a minute after that.  Clearly, the two CEOs had picked the topic in which they both did not get along on.

So I basically decided to take over the meeting,

and for the rest of the four hours -- the meeting went on for four hours -- I basically was running the meeting with Mr. Castell on the other side, and we decided to pick on these topics which we have listed here on how to move the relationship forward; how to get the technical stuff done.

Even though Mr. Balsillie was very agitated and angry, his message was very clear that, We were not competing. And I took that, the fact that he said that in front of so many people from his own company and us, and he's the CEO of a multi-billion-dollar company, I took that as literally as the word. In other words, I trusted that word. I presumed that if he said that, we should not worry about competition. And we freely discussed the next few hours how we would work together, and that was basically how that meeting ended.

Q. So the meeting continued with you and Mr. Balsillie?

A. Mr. Balsillie remained in that meeting for most of that duration, probably three-fourths of that time.

Q. Following this meeting, what's the next thing that happened to pursue the relationship?

A. So we left this meeting saying we'll keep on working together, and then delegated the technical discussion process to my technical team, which was headed by Dr. Kushwaha and his team. And over the next two

months, January and February, there was a lot of technology interchanged, primarily from Mformation side to RIM, in which information was shared, lots of ideas and thoughts on how Mformation's technology would be bundled into RIM's technology.  I personally was not going to these because they were technical meetings, but there was a lot of disclosure and I was kept fully informed of what was going on.

MS. NOLLER:  I'd like to put up on the screen Exhibit 638, which is admitted by stipulation as a joint exhibit.  The bottom of this exhibit, February 21st, 2002, at 2:15 p.m., did Mr. Castell e-mail you?

A.  Yes, he did.

Q.  What was the gist of this discussion?

A.  So, as I just mentioned, during January, February, there was a lot of interaction between our engineers and their team.  My last meeting with Mr. Castell was with Mr. Balsillie at their headquarters.  So we had decided that we would just let the technology group make progress before we met again.  And he contacted me, I did not contact him, so he basically unsolicited reached out to me saying he wanted to reengage with us on that partnership discussion.  And this basically summarizes that.

Q.  Some of the discussions in these documents relate to

Mformation's 1.0.  How is that going to work?

A.   So Dave said that, Look, we need this technology now. Our customers want a management solution.  You guys have the management server, and we would like to put your agent in our handsets.  And he called it Version 0.

So we discussed what does that really mean.  He said, Look, eventually we'll be able to build this ourselves.  We're going to build something on the phone ourselves, not on the server, in just on the phone, and we're going to call that Version 2, and we'll build it ourselves in the future, but I don't have engineers available at RIM to do this.  I have other things for my engineers to be doing.  I would rather you, Mformation, build it for us and license it to us, because you already have this.  But it's Version 1, and in future you keep the rights to something called Version 2.

And my response was, That's fine, you know. We're happy to license you Version 1.  It's our intellectual property.  It's our trade secrets.  We will license that to you.  Version 2 is to -- build it, feel free to build it on your own intellectual property, not our intellectual property.

So that was Version 1, and leading to Version 2.

Q.   Up on the screen is what's designated as a joint stipulated exhibit, Number 639.  What is this, just

generally?

A.   This is just a status update of our team internally, what was going on with various accounts within RIM.

MS. NOLLER:   And I'd like to publish Exhibit 640, which has been admitted by stipulation.

BY MS. NOLLER:

Q.   What is this document?

A.   This is another business update document, updating my internal team on what's going on with our partners.

Q.   Does it include an update on RIM?

A.   This one does not specifically mention RIM.

Q.   If you turn to page 2, does it include an update on RIM?

A.   The page 2 does include an update on RIM.

Q.   In these discussions you were having with Mr. Castell, did he ever tell you that RIM planned to build server side technology interaction with Mformation?

A.   Not once in my -- the entire day did he ever mention anything with server side technology or competitive technology with Mformation.  So when we were discussing agent technology, the understanding was, we're going to build it for Version 1, they're going to build it for Version 2, but the technology would remain with Mformation or our competitors would also have access to

those technologies, but it was always very clear from our side that anything we provide to RIM always remains our intellectual property.

MS. NOLLER:  I'm now going to ask you to turn, please, to Exhibit 335, 336, 337 and 536, which are admitted by stipulation as joint exhibits.

Please put the first page of the first exhibit on the screen.

BY MS. NOLLER:

Q.  So what are 335, 336, 337 and 536.

A.  So our goal, as I've mentioned, was to start a licensing relationship with RIM.  So RIM basically took it upon themselves to actually draft the first version of this agreement, which they call the Technology License Agreement, and the series of documents which we created by basically going back and forth, they would create one version, we would update that version, they would create one version, we would update that version. And the purpose from our side was we absolutely wanted a license agreement, but we wanted to ensure that our intellectual property was very well protected and that there was a means for us to get royalty payments from these agents, indirectly from our customers and partners.  So the fact we went to so many versions of the document was really because we were trying to --

both our sides were trying to write this in the right possible manner for each of our interests.

MS. NOLLER:  Now I'm going to ask to be placed on the screen a document admitted by stipulation as a Joint Exhibit Number 772.

If you could please call out the first section of it up to Version 1.0.

BY MS. NOLLER:

Q.  Mr. Basu, what is this document?

A.  So this is a communication between me and Dave Castell in April of 2002, and basically the purpose of this, this document is to say that things were really moving quickly in the -- with our customers.  Both enterprise customers and mobile operator customers were trying out for a solution like this, especially with an agent on their handset so these could be managed, was around 2002, the rollout of these devices had started going up quite a bit.  More and more of these devices were being rolled out in the industry.

And basically, my request to Dave was that let's get this partnership done quickly, and I sort of mentioned in this that we understand Version 1 is a short-term solution, Version 2 is a long-term solution, but we should start getting this thing now licensed in a proper contractual manner.

Q.   And what is Version 2.0?

A.   Version 2.0 is the version which RIM would release in which they would build an agent themselves using their own ID, but that agent would be open to Mformation's server as well as other servers.

MS. NOLLER:  Chris, if you could please call out the expire section under Version 1.0, please.

BY MS. NOLLER:

Q.   So this is writing to Mr. Castell, correct?

A.   Yes, it is.

Q.   And under the first bullet point, you write that: "Mformation will grant a royalty free license to RIM, to our agent to be embedded in all your devices."

What did you mean by that?

A.   In our technology, royalty free does not mean you're giving anything for free per se in the sense that the intellectual property does not come to you.  What we were giving to them was an agent on the phone which would be not live, would be a dead agent, which we did have the right to install on their phone, but they could not activate it.  So it was royalty-free in the sense that since the agent was not live, it was just installed as a passive agent on the phone.  We are not charging them to put that on.

The way we're going to make money is when those

things are activated, and they get activated from the server site, the activation could come from a mobile operator, from an enterprise, even a competitor of Mformation, but every time that was activated, we would be paid.  So it's royalty-free to install but not royalty-free to actually use.

Q.   If you go down to the seventh bullet point, it says: "Source code can be made available only if it is essential for integration under confidentiality and prohibition against reversing, decompiling, etc."

What were you conveying there?

A.   It was software information.  The source code recipe is the recipe through which you actually make your product.  That is the intellectual property of a company.  No one ever gives the source code away because if you give your source code away, you're giving your intellectual property away, and I had no desire to give our intellectual property away.

So basically, I said, I'm going to put a lot of emphasis on anything to do with source code, right?  You don't really need source code.  I give you what's called object, which is encrypted code which no one can see. What's happening so the recipe's hidden from you.  I'm happy to give you that.  I'm happy to work with you to make this object your own, but I'm not going to give you

source code.  I'll put a lot of restrictions on the
source code.

Q.  At any point in time during these back-and-forth
negotiations with Mr. Castell, did he tell you that
placing your object code and integrating it with RIM's
devices would compromise security of RIM?

A.  No, he did not.

Q.  And did he tell you at any time that providing your
source code would compromise the security of RIM?

A.  No, he did not.

Q.  Mr. Castell, did he respond to you?

A.  Yes, he did.

MS. NOLLER:  I'd like to put up on the screen,
please, what has been admitted by joint stipulation as
Exhibit 636.

Q.  It's a little tough to read, but is this his
response?

Yes or no.  You have to answer out loud.

A.  Yes.

MS. NOLLER:  And I would place up on the screen
Exhibit 642.  Which has been admitted by joint
stipulation.

BY MS. NOLLER:

Q.  Is this your response to him?

A.  This is David's response to me.

Q.  I apologize, thank you.

MS. NOLLER:  And then let's put up on the screen Exhibit 643, which is a joint exhibit admitted by stipulation.

BY MS. NOLLER:

Q.  What is this?

A.  One of my regular updates to my team on what was happening.

Q.  And what's the date of this document?

A.  June 30th, 2002.

Q.  And what's your status update with regard to RIM?

A.  Sent e-mail putting discussions on hold regarding client.

THE COURT:  Regarding client or --

THE WITNESS:  Regarding agent, sorry.

BY MS. NOLLER:

Q.  And are agent and client used interchangeably?

A.  Yes, it is.

Q.  And what was the state of your discussions at this point?

A.  So, we had a stalemate.  So we were making a lot of progress on the license agreement, but David kept on insisting that I give my source code to him.  And I kept on insisting, Source code is intellectual property, I'm not going to give you the source code.  I'll give you

everything, I'll even build special APIs, what we call application from programming, interfaces so my agent can talk to your agent or your phone, but you don't need the source code.

I was even giving limited access to the source code for what I call integration of our technology with their technology. He was not willing to accept that. He not only wanted our source code. He wanted it forever. And he said that, Well, now that my engineers have been tainted by your technology -- "tainted", meaning that they've got to see how technology works -- if you don't give it to me forever, we, you know, we will get exposed to your technology.

So I didn't understand what that really meant. I told him, Look, this is intellectual property. I'm not going to give it to you. And basically this stalled our relationship from moving forward on the business side.

Q.  So after this discussion was stalled, what happened to Mformation's business in June 2002?

A.  Our relationship cooled down substantially because RIM basically would not respond to us on the business side much. We kept on working with them on the technical side because we had an agreement, and we also had -- we still remained members of the Alliance Program. So from our side, we kept on desiring to work

with them, but they put their partnership discussions with us on hold.

Q.   Did your agent ever get preloaded on the RIM devices?

A.   It was not preloaded on their devices.

Q.   So let's fast-forward to the summer of 2003.  What happened to Mformation's business?

A.   So between June of 2002 and the summer of 2003, a lot of negative things basically happened.  We suddenly started noticing that our customer was using our product.  When we went to the last corporation, the same corporations weren't working with us.  They would say, Sorry, we are not going to license this from you, because we have something from RIM soon.

So again and again -- and I personally did some investigation, and the feedback was, Well, why are we going to buy this from you if it's going to be offered by RIM in the future anyway.

That puzzled me because Mr. Balsillie told me there was no competitive intent.  But the reality on the marketplace was that basically -- I said it stalled, this had a huge impact on our company, since we could not sell our product anymore, and since we were not getting cooperation from RIM, we literally had to fire two-thirds of our company, including Mr. Pettengill, Mr. Wolfson, and most of my department, to the extent

that what few people we had left basically took a huge salary cut.  Basically our business was destroyed.

MS. NOLLER:  I'm going to ask to be put on the screen one last exhibit, 2095, which has been admitted into evidence as joint exhibit by stipulation.

BY MS. NOLLER:

Q.  What is this?

A.  It's an announcement by RIM that they have released the device management solution in the marketplace.

Q.  Was this device management solution a wireless solution?

A.  This is a wireless solution.

Q.  What's the date of the release?

A.  It's May 18th, 2004.

MS. NOLLER:  Put up on the screen, if I could, from Plaintiff's Exhibit 1, slide 28.  And then 29.

BY MS. NOLLER:

Q.  Now, was this price announcement for May 18th of 2004 a surprise to you?

A.  It surprised and devastated me.

Q.  Why?

A.  It devastated me because Balsillie personally told me he had no desire to compete against me.  I trusted him. I let my engineers work with RIM on the presumption of that trust.  I talked to Mr. Castell for many, many

months, over many years.  And our entire relationship was based on this assumption of trust, that we were partners, and we had a confidentiality agreement with them.  And this announcement was a breach of that relationship and that trust which we had built over the last few years.

Q.  And what did this news do to your hopes of having RIM license Mformation's intellectual property?

A.  It completely eliminated any chance for us to work with them in the future.  It destroyed our trust of any relationship we could have in the future.

Q.  On November 29th, 2005, did the U.S. Patent and Trademark Office issue Mformation a patent for its technology?

A.  Yes, they did.

Q.  And is that the '917 patent?

A.  Yes, they issued the '917 patent.

Q.  Now, you didn't bring this lawsuit until October 31st, 2008.  How come?

A.  So we went to the patent 2005.  Around 2005, they were still 1,000 pound gorilla, most of the wireless devices in the market were RIM devices.  And there was not one day between 2005 and 2008 I did not think of suing them because of this breach they had created between us.  Every day I thought about it.  But the

reality was we were avoiding retaliation.  So many phones in the market, to decide to take on a small company like us, they could shut us down.  So we waited, we waited, we waited, every day for two years, till we reached a point in our business where the number of RIM devices which were supported had decreased.  At that time started supporting other devices such as Palm, Nokia phones, Motorola phones, and we were willing to take that risk at that point that if we sued them, even if they retaliated, the harm to our business would be very little.  So we waited for that time.  And that time -- really that time came in 2007, found someone to work with us.  It was 2008 before we actually started our litigation process.

          MS. NOLLER:  That's all, your Honor.

          THE COURT:  Very well.

          You may cross-examine.

          MS. DeBRUIN:  Your Honor, may I approach the witness to give him the binder?

          THE COURT:  Certainly.

CROSS-EXAMINATION

BY MS. DeBRUIN:

Q.  Good morning, Mr. Basu.

A.  Good morning.

Q.  Now, you talked in your direct testimony about how

Mr. Balsillie had said RIM would not compete with Mformation; is that right?

A. That is correct.

Q. Now, this isn't a case about companies competing, right?

A. This is a case about RIM breaching our trust.

Q. No. Isn't this a case, Mr. Basu, about patent infringement?

Isn't that right?

A. I guess so.

Q. Isn't this a case about a method patent claim and whether it's infringed?

A. Yes.

Q. And you understand that a method patent claim is like a recipe, correct?

A. I'm not a technology person, so I'm not able to answer that question in that kind of detail.

Q. Now, so you haven't looked at the claims of the '917 patent; is that right?

A. I have looked at the claims of the patent, but I did not write the patent. I'm not a technology person.

Q. Now, you testified that you didn't want to give RIM your source code, right?

A. That is correct. Except under very limited circumstances.

Q.   And you didn't give RIM your source code, did you?

A.   I never gave it to them.

Q.   You wanted to give RIM only object code, right?

A.   Object code purely for building Version 1.

Q.   And you told us on your direct examination that for an object code, the recipe is hidden; isn't that right, sir?

A.   An object code should have the recipe so that it is not visible.

Q.   Now, let's talk about your claim that RIM's CEO told you that he would not compete with Mformation.  You signed an alliance agreement with RIM, didn't you?

A.   I did.

        MS. DeBRUIN:  Okay, can I please have Joint Trial Exhibit 533 on the screen.  And I'd like to look at Section 1 -- Section 12.2.  If you could call that out, please.

BY MS. DeBRUIN:

Q.   Do you see Section 12.2 of the RIM Alliance Agreement that you signed on the screen?

A.   Yes, I do.

Q.   Now, in Section 12.2, the agreement says that the agreement is not exclusive in any respect.  Do you see that?

A.   Yes, I do.

Q.   And it goes on in the middle of that section and says:  "Nothing contained in this agreement will limit the right of each party to develop products and/or services similar to those of the other party..."

Do you see that?

A.   I do.

Q.   You signed that agreement, didn't you?

A.   I did.

Q.   And the parties agree, Mformation and RIM agreed, that as long as product development did not violate other terms of the parties' agreement, the parties could do their own work, correct?

A.   Yes, they could.

Q.   Mformation could develop products similar to what RIM made?

A.   Technically, yes.

Q.   RIM could develop product similar to what Mformation made?

A.   Technically, yes.

Q.   And indeed, that isn't what this case is about?

A.   Can I answer the question?

Q.   Let me put another question.

A.   When you become an Alliance Partner --

THE COURT:  This is cross-examination.  And so you have to wait for the question.  I take it the

question that was asked has been withdrawn.

MS. DeBRUIN:  Let me withdraw it.

THE COURT:  Why don't you wait for another question before you answer the withdrawn question.

BY MS. DeBRUIN:

Q.  Mr. Basu, this is a patent case, right?

Mformation does not claim that their patent covers every single way of doing wireless device management, does it?

A.  I would leave that to my technical team to answer.

Q.  You don't know the answer to that?

A.  That is not a question I am in a position to answer.

Q.  You understand that we're here to talk about patent infringement, correct?

A.  I have been called as a witness to answer questions from -- questions to which I have answers to.

Q.  Now, you talked about certain confidentiality agreements that you entered into with RIM.

A.  Yes.

Q.  You never sued RIM under those confidentiality agreements, right?

A.  We did not.

Q.  You never told RIM that Mformation had a pending patent application, did you?

A.  Any communication regarding patents was not within my

domain.  So I would not be the person to answer that question.

Q.  In 2005, after RIM had introduced BES 4.0 --

A.  Uh-huh.

Q.  -- you signed up for another RIM Alliance, didn't you?

A.  Yes, we did.

Q.  The '917 patent issued on November 29th, 2005; isn't that right?

A.  Yes.

Q.  And Mformation was still RIM's Alliance, still involved in RIM's BlackBerry Alliance at that time, right?

A.  Yes.

Q.  Did you pick up the phone and call Mr. Balsillie and tell him that the patent had issued?

A.  No, I did not.

Q.  Did you pick up the phone and call Mr. Castell?

A.  No, I did not.

Q.  Did you send them an e-mail?

A.  No, I did not.

Q.  Did you do anything to tell RIM that Mformation thought RIM was infringing its patent?

A.  I did not.

Q.  Let's go to another subject, you testified throughout

your direct examination about various interactions
between RIM and Mformation.

A.   Yes, I did.

Q.   Those interactions began in August of 2000?

A.   Yes, they did.

Q.   You wrote a letter to RIM?

A.   To Mr. Balsillie, yes.

Q.   You targeted RIM?

A.   What does "target" mean?

Q.   You specifically targeted Research In Motion as a
company for strategic partnership?

A.   We considered them as one of the more important
partners to work with.

Q.   Indeed, at the time RIM was in your top five of
priorities, right?

A.   It was one of the top five companies at that time.

Q.   Let's look at what Mformation wanted from RIM.

        MS. DeBRUIN:  If I could please have Joint Trial
Exhibit 623 on the screen.

BY MS. DeBRUIN:

Q.   This is a document that Miss Noller reviewed with you
yesterday.  There were a couple parts of this document
you looked at with Miss Noller.  For example, you looked
at the partnership objective.

        MS. DeBRUIN:  Could we call that section out,

please?

BY MS. DeBRUIN:

Q.   And you told us that you wanted to have Mformation's agent loaded on RIM's device; isn't that right?

A.   That's true.

Q.   You also looked at the value proposition for Mformation?

A.   Uh-huh.

MS. DeBRUIN:   Can we have that called out.

BY MS. DeBRUIN:

Q.   And you said -- for Mformation, I'm sorry.  That's the value proposition for RIM.

And you said that you wanted to gain access to RIM's APIs.  Is that right?

A.   That's right.

Q.   RIM's APIs are RIM's code that runs on the BlackBerry device; isn't that right, sir?

A.   That's right.

Q.   Now, you wanted access to that.  That was important because you needed access to that to gain more control over the BlackBerry device; isn't that right?

A.   Yes.

Q.   Now, there's one section in this document that Ms. Noller skipped.  And I'd like to take a look at it today.  That section is what Mformation needs from RIM.

And if we could focus first on the application management bullet.  Do you see that, sir?

A.  Yes, I do.

Q.  These are items that Mformation wanted from RIM, correct?

A.  These are the needs from RIM, yes.

Q.  What Mformation needed from RIM, right?

A.  Yes.  I think it's important for --

Q.  Please answer my question, sir.

A.  I did not draft the language, so I cannot answer the details behind these questions.

Q.  Well, let's see if you can answer this.  One of the questions -- I'm only going to ask you what's in the document -- one of the questions that Mformation had for RIM was how to deploy applications over the air.  Do you see that?

A.  Yes, I do.

Q.  So Mformation was asking RIM how to deploy applications over the air, correct?

A.  That's the question, yes.

Q.  That would include, for example, how to download Angry Birds over the air, right?

A.  I cannot answer that level of technical detail.

Q.  Let's look at something else that Mformation was asking RIM for.  In fact, if we could stay back on the

application management bullet for a second.

Mformation was also asking RIM -- wanting information from RIM on an application update over the air.  Isn't that right, Mr. Basu?

A.   That's under the question here, yes.

Q.   There's something else that Mformation wanted to know from RIM.  Let's look at that.  And that's in the device management bullet.

Now, you've told us that Mformation developed technology to do a wipe over the air, correct?

A.   Yes.

Q.   In this document, RIM is being asked by Mformation.  Mformation want to know from RIM how to implement all the programmer.exe commands:  Wipe, dir, etc., over the air, without being in the cradle.  Do you see that?

A.   Yes, so --

Q.   So that's something that Mformation wanted from RIM, right?

A.   No.

Q.   Mformation asked that question of RIM?

A.   So since we're talking about this section, there's a heading at the start of this, says More on API's ability to wireless load our agent onto device to perform the following.

So our intellectual property would do the

following by talking to their API, so we would do -- our intellectual property would do all of these things by using, talking to their agent.  RIM would not do these things.

Q.  Are you finished, sir?

A.  Yes.

Q.  One of the questions you asked RIM was this question that's set out in this document; isn't that right?  How to implement all the programmer.exe demands over the air; isn't that right?

A.  My company's technology team asked that question to link our agent to their device, to track the APIs.

Q.  Let's look at another document, sir.  Another one that Miss Noller showed you yesterday.  That is Joint Trial Exhibit 599.  You testified that your team had prepared this document, right, sir?

A.  Yes.

Q.  There's another section in this document that wasn't shown yesterday, and I'd like to look at it.  I'd like to page 19, please.  Are you with me on page 19?

A.  I am.

Q.  This is a presentation prepared by Mformation for RIM, right?

A.  Yes.

Q.  And here again, Mformation is asking RIM, How can we

deploy applications over the air?  Do you see that?

A.  I see that.

Q.  And asking RIM, Can an application update itself over the air?  Do you see that?

A.  I see that.

MS. DeBRUIN:  Would you turn to page 20, please.

BY MS. DeBRUIN:

Q.  Once again, Mformation is asking RIM, How can we implement all of the programmer.exe demands over the air without being in the cradle?  Do you see that?

A.  I see that.

MS. DeBRUIN:  If we could have that document down, please.

BY MS. DeBRUIN:

Q.  Now, Mformation not only wanted technical information from RIM, it targeted RIM because Mformation knew that RIM could serve as a sales channel.  Isn't that right?

A.  Yes.

Q.  RIM had a powerful sales channel in 2001.  Right?

A.  They had a large sales channel.

Q.  And Mformation wanted to piggyback on that?

A.  We wanted to do -- cross our sales with them.

Q.  If Mformation could piggyback on that powerful sales channel, its sales volume would increase significantly; isn't that right?

A.   If we were -- jointly, sales volume for RIM would increase significantly as well as Mformation.  It was a joint selling.  Their devices would sell more and we would also benefit.

Q.   RIM's sales were growing in 2001; isn't that right?

A.   They were growing nicely.

Q.   And Mformation wanted to piggyback on that growth; isn't that right?

A.   We felt the growth was actually not that significant to what it could be if they had management software from us.  And we thought that by working together in a joint sales, their sales would grow even more faster than they were.

Q.   So are you saying, sir, that you didn't want to piggyback on RIM's growth?

A.   We wanted to create a solution that both parties would benefit.  That was the whole point of this relationship.  They sell more devices, we sell more software.  It was not one way.

Q.   Now, there's a related topic I'd like to talk with you about, and you raised this yesterday.  You talked about a gentleman named Ken Levine.  Do you remember that?

A.   Yes, I do.

Q.   Miss Noller showed you Joint Trial Exhibit 627, and

let's take a look at that.

MS. DeBRUIN:  And if we could highlight the bottom e-mail, please.

BY MS. DeBRUIN:

Q.  This is an e-mail that you talked about yesterday where you invited Ken LeVine to serve on Mformation's technical advisory board.  Is that right?

A.  That's right.

Q.  And at the time you did that you knew that Ken LeVine was employed by RIM, by Research In Motion?

A.  We did.

Q.  And you told Mr. LeVine that Mformation appreciated his active championing of your product at SSB and RIM.  Is that right?

A.  That's right.  We knew him from way before them days, from Salomon Smith Barney.  So that relationship predates RIM.

Q.  And you appreciated the work that he did for you there and you appreciated what he was doing for you at RIM.  Is that right?

A.  We appreciated his knowledge of the industry and what the customer wanted, and we really wanted to benefit from that knowledge.

Q.  And you told him that you were -- that you looked forward to working with him to make Mformation's

products a huge success with RIM and its enterprise customers worldwide; isn't that right?

A.   Right.  RIM and its enterprise customers together.

Q.   And you told him one other thing.  You told him that you were offering him stock options in Mformation. Right?

A.   Yes, modest stock options, but no salary.

Q.   Some modest stock options?

A.   Yes.

Q.   Could you please turn to Trial Exhibit 771.

Your Honor, I'd ask permission to publish this to the jury.  It was stipulated as admissible.

THE COURT:  Certainly.  Anything that the parties have stipulated to, unless there's an objection, you're free to display.  So 771.

MS. DeBRUIN:  Thank you, your Honor.

BY MS. DeBRUIN:

Q.   Do you have 771 there in front of you?

A.   I do.

Q.   I know the print's kind of small.  But if you could please turn to page 2, and I'd like to highlight the line that refers to Ken LeVine.  Do you see where Mformation granted Ken LeVine 7,500 shares of stock options?

A.   I do.

Q.   Now, there's another gentleman who we're going to hear from in a little bit today, I think, and his name is Badri Nath, Dr. Nath.  Do you know who he is?

A.   Yes, I do.

Q.   He's one of the named inventors on the '917 patent; isn't that right?

A.   He is.

Q.   Let's look at how many shares he was awarded at this same time.

          MS. DeBRUIN:  If I could please move to page 1.

BY MS. DeBRUIN:

Q.   Do you see Mr. Nath's entry there?

A.   I do.

Q.   So Mformation awarded Dr. Nath 7,500 shares of stock options as well, correct?

A.   I see 10,000.

Q.   There's 7,500, he's above Paul Adkins, who has 10,000.

A.   Not in my document.  He's above John Wright and he got 10,000.

Q.   No, I'm on page 1.

A.   You asked me to turn to page 2.

          On page 1, I don't see Mr. Ken LeVine's name.

Q.   It's not Ken LeVine.  We're looking for Dr. Nath.

A.   Okay, Dr. Nath 7,500 on page 1 and 10,000 on page 2.

Q.  The initial award to Mr. Nath was 7,500, correct?

A.  That was the standard offer to all people who joined the advisory board.  It was standard package.

Q.  So you gave the same amount to the co-inventor as you did to Mr. LeVine, correct?

A.  All technical advisers got the same number of options, 7,500.  It was standard.

Q.  At the time you gave Mr. LeVine those stock options he was working for RIM; isn't that right?

A.  He was an employee of RIM.

Q.  You didn't tell Mr. Balsillie that you gave Mr. LeVine stock options, did you?

            MS. NOLLER:  Objection, relevance.

            THE COURT:  Overruled.

            THE WITNESS:  I had no relationship with Mr. Balsillie on my company's internal corporate matters, nor did I think there was any legal reason for me to disclose this information.

            THE COURT:  Technically, you're not responding. She asked whether you told him.  You might be explaining why you didn't tell him.  But you need to answer the question.

            THE WITNESS:  Okay, fair enough.  No, I didn't.

BY MS. DeBRUIN:

Q.  You didn't tell Mr. Castell that you gave stock

options to a RIM employee, Ken LeVine, did you?

A.  No, I did not.

Q.  In fact, you didn't tell anyone at RIM that you'd given Mr. LeVine these stock options, right?

A.  No, I did not.

Q.  You didn't tell anyone at RIM that the man who was championing your company at RIM --

THE COURT:  You're starting to be argumentative now, so move on to other matters.

MS. DeBRUIN:  Yes, your Honor.

BY MS. DeBRUIN:

Q.  In fact, right after you told Mr. LeVine that you were giving him those stock options, he wanted to arrange for a demonstration of your product at RIM; isn't that right?

A.  It was not related to the stock options.  As an advisory board member, he was going to arrange a demonstration for our product.

Q.  Now, you understood that Mr. LeVine wanted to demo Mformation's product because he wanted to do the right thing as an advisory board member for Mformation; isn't that right?

A.  No.

MS. DeBRUIN:  Counsel, I direct your attention, and your Honor, we're looking to play Basu dep,

page 176, 14 through 23.

THE COURT:  Before you do that, let me instruct the jury.

This is the first time we have had reference to a deposition.  Prior to a trial, the parties are able to take pretrial testimony from various people.  They can include parties, they can include third parties or other witnesses.  Those are taken down and sometimes they're video-recorded, and can be played during the trial.  The reason they're important is because during a deposition, the witness is sworn just as the witness is sworn here, so the testimony at a deposition has the same force and effect as testimony given here in the trial.  And so sometimes you might hear testimony given by a witness here in trial, and testimony given earlier at a deposition, and it's up to you to compare those to see whether or not you find that they affect the credibility of a witness.

So this is Mr. Basu's deposition, given earlier, that you're now going to see displayed, I presume as a videotape?

MS. DeBRUIN:  It's a video clip.

BY MS. DeBRUIN:

Q.  And, Mr. Basu, I have a few questions for you before.  You do recall giving a deposition in this case, right?

A.  I do.

Q.  My partner, Ms. Maras, asked you questions?

A.  Yes, she did.

Q.  And you took an oath and swore to tell the truth at that deposition, right?

A.  I did.

MS. DeBRUIN:  If we could please play Basu 16.

(Videotape played.)

BY MS. DeBRUIN:

Q.  Now, you were looking to Mr. LeVine to bring Mformation into RIM.  Isn't that right?

A.  No.  My desire was to have him advise us on improving our technology, for to benefit both RIM and Mformation customers.

MS. DeBRUIN:  Could we please have Joint Trial Exhibit 562 on the screen, please.  And if we could go to the bottom e-mail, third paragraph.

BY MS. DeBRUIN:

Q.  This bottom e-mail is an e-mail that I believe you testified about during your direct examination.

A.  Yeah.

Q.  And in this e-mail you talk about Ken LeVine's visit, correct?

A.  I do.

Q.  And you --

MS. DeBRUIN:  If we could go to the third paragraph.

BY MS. DeBRUIN:

Q.  You're talking about Ken bringing Mformation into RIM; isn't that right?

A.  By means of installing the software on his premises.

Q.  If you could impress RIM, there would be substantial sales and technology benefits to Mformation; isn't that right?

A.  It is in our interest to impress our partners so that they will install our product on their software.  So clearly we want to impress our partners.

MS. DeBRUIN:  If we could go to the top e-mail please, third paragraph.

BY MS. DeBRUIN:

Q.  If you could impress RIM, there could be substantial sales and technology benefits to Mformation; isn't that right, sir?

A.  That is correct.  You want to impress your partners because you want to work with them to do more business.

Q.  You thought the work you were doing with RIM through Mr. LeVine was a once-in-a-company-lifetime opportunity; isn't that right?

A.  A visit from a RIM executive is something extremely important at that time.  That was probably the most -- a

senior executive from RIM that had visited us, so at that stage in the company that was a big deal.

Q.   So you gave this most senior RIM executive stock options; is that right, sir?

A.   We gave him stock options like any other technology board member.

Q.   Now, let's talk for a minute about the discussions that you had with Mr. Castell concerning putting the agent on RIM's device.  Now, you told Mr. Castell that Mformation wasn't going to charge RIM as long as RIM embedded Mformation's software agent on RIM's devices; isn't that right?

A.   Yes, as explained, we would give them a royalty-free license to embed our technology.  Not activate it.

Q.   Now, you knew from the beginning that RIM intended to build its own agent.  Isn't that right?

A.   Only when Dave Castell himself told me that it was for Version 2.0.

MS. DeBRUIN:  If we could have Joint Trial Exhibit 636, please.

Q.   Mr. Castell was very clear that his intention was that RIM would build a device management agent from the ground up.  Isn't that right?

A.   Yes.  He wanted to -- in 2002 he informed me that he wanted to build a device management agent, not server,

from the ground up.

Q.  And you expressly confirmed this understanding in your summary to Mr. Castell at the end of --

MS. DeBRUIN:  If I could have Joint Trial Exhibit 772.

BY MS. DeBRUIN:

Q.  This is another e-mail that you looked at during your direct examination.  You confirmed the understanding that RIM intended to build its own agent?

A.  Yes, not only I do confirm; I said, Go ahead and build it, because we benefit from you building something on your phone because we manage it in the future.  To the extent that I even mention that if you need some guidance, we would be happy to help you with that.  But not with our intellectual property or source code.

Q.  Mr. Basu, you said that what you code belongs to you and what we code belongs to us.  Isn't that right?

A.  Absolutely.

Q.  And Mformation was not seeking royalties of any sort from RIM, right?

A.  Yes.  Just to put the agent without activating it.  As I said, the agent would be dead.  It would not be activated.

Q.  The agent doesn't have anything to do -- strike that.

The agent is not code that runs on the server,

right?

A.  The agent only functions when the server activates it, so by itself it has no value unless you switch it on the -- from the server center.

Q.  It's not quite my question.  Let me ask it again.  Perhaps it was poorly phrased.

When talking about the agent code --

A.  Uh-huh.

Q.  -- that is code that runs on the device; isn't that right, sir?

A.  That is right.

Q.  You didn't have any discussions about your code that runs on the server; isn't that right?

A.  I did in the sense that I told him that the server is the software that is going to activate that agent.

Q.  You weren't discussing with Mr. Castell providing that server site code, right?

A.  I was not, because I was not -- he had shown no intent or interest in server site software.

Q.  If we could please turn to Joint Exhibit 642.  Do you have that in front of you, sir?

A.  I do.

Q.  This is an e-mail that Mr. Castell wrote to you in June of 2002, correct?

A.  That is right.

Q.   In this e-mail Mr. Castell informed you that:  "I've already mentioned that your security model is flawed and we would need to do some development to fix this."

Do you see that?

A.   I do.

Q.   Mr. Castell wrote this to you in this e-mail?

A.   He did.

Q.   He told you that he believed Mformation's security model was flawed?

A.   He believe so.  I didn't agree with him.

Q.   But he told you that he believed this, right?

A.   He mentioned it.

Q.   And he told you that he needed -- if we were going to load Mformation's code on the RIM device, that was one reason that RIM would need the source code, right?

A.   Yes.  And I think the discussion here was, do you really need the source code to fix any security issues, if there are any?  And I did not agree with the source code having to be given for this purpose.

Q.   You disagreed with Mr. Castell?

A.   I disagreed with his interpretation that you needed source code to fix this issue.

Q.   I'd like to move on to a completely different subject.  You testified during your direct examination that the XcelleNet solution was not wireless.  Do you

recall that testimony?

A.   Yes.  In around 2000 timeframe, XcelleNet, and was focused on the retail industry, like target, and was primarily for a solution.

Q.   You were familiar with XcelleNet, right?

A.   Superficially.  I had never met them.

Q.   We're going to hear throughout this trial about an XcelleNet product RemoteWare.  Are you familiar with that product?

A.   12 years from now, I'm not familiar with that name.

Q.   If we could please have --

THE COURT:  I'm sorry, did you say 12 years from now?

THE WITNESS:  No, sorry, 12 years have gone by. I don't recall that name.

BY MS. DeBRUIN:

Q.   Do you know -- did you know that the XcelleNet RemoteWare product was wireless as far back as 1995?

A.   No, I did not.

Q.   Mr. Basu, you're a venture capitalist, right?

A.   Yes, I am.

Q.   You read a lot of financial statements?

A.   I read financial statements as part of my business. That's not what I do.

Q.   You've read Mformation's financial statements over

the years, right, sir?

A.   Yes, I have.

Q.   We've created a demonstrative based on a summary that our damages expert created in this case.

A.   Uh-huh.

Q.   That summary was based on Mformation's financial documents that were produced to us.

A.   Uh-huh.

Q.   Mformation has lost millions of dollars each year that it's been in business; isn't that right?

A.   I have only tracked Mformation -- I'm sorry, I only have limited information on this product.

Q.   I'm sorry, you only tracked Mformation till when?

A.   When I left.

Q.   You haven't kept in touch with Mformation since then?

A.   Not of our financial data, no.  I'm no longer an employee of Mformation.

       MS. DeBRUIN:  If we could please have slide demonstrative 101 on the screen, please.

BY MS. DeBRUIN:

Q.   Were you aware that Mformation had lost $111 million to date, through 2010?

A.   No, I would not be aware of that.

Q.   Now, you talked about things that happened with respect to Mformation starting in 2004 when RIM

announced BES Version 4.0.  Is that right?

A.   That's right.

Q.   If you look at demonstrative 101, Mformation was losing money every year leading up to 2004.  Correct?

A.   We were investing money.  Since I'm a venture capitalist -- can I answer that question or --

THE COURT:  Well, you can answer that yes or no as to whether they were losing money.  If there's a question in your mind to see what the words mean, you can ask for clarification.

THE WITNESS:  We were investing the money to build our product.  But that shows up as a loss on our statement.

BY MS. DeBRUIN:

Q.   You said that your initial targets were RIM, IBM and Palm.  Is that right?

A.   And a few others, yes.

Q.   You didn't succeed with RIM, right?  You did not succeed with RIM?

A.   Well, they chose not to work with us.

Q.   You didn't succeed with Palm?

A.   Palm went out of business.

Q.   You didn't succeed with IBM?

A.   We have a relationship with IBM.

Q.   You testified yesterday about various Mformation

business plans; is that right?

A.  Yes.

Q.  Those business plans included pricing or revenue models?

A.  Yes.

Q.  For Mformation's product, right?

A.  Yes.

Q.  They showed a price that Mformation hoped to get for its software?

A.  That was our pricing plan.

Q.  What Mformation hoped to get, right?

A.  No, that was the expectation, what we wanted to charge our customers.

        I don't know what "hope" means.  Can you clarify?

Q.  I can rephrase.  They showed what you wanted to charge your customers, right?  I'm using your words.

A.  My words are that was our pricing to our salespeople, that's what they were supposed to charge.

Q.  They don't show the prices that Mformation actually received, right?

A.  No.

Q.  Let's look at them.  For example, if we could please have Exhibit 2182.  This is one of the documents that we looked at yesterday.  This was prepared for a presentation with a potential investor; isn't that

right?

A.   Yes.

Q.   Mformation didn't even have any paying customers at that time; isn't that right?

A.   I do not recall.

Q.   But Mformation had to convince investors to give it hundreds of thousands, if not millions, of dollars; isn't that right?

A.   A business plan has to show the potential of the product, and that's exactly what this presentation is.

Q.   So you want to make the business model seem attractive, right?

A.   We wanted to present a business model which was our view of the future, and these venture capitalists are very smart people.  They know what to do as far as work.  So this was our view on the future.

Q.   But at the time no one had paid Mformation any of the amounts you showed yesterday with respect to this document, right?

A.   As of July 31st, 2000, we did not have that -- we did not have live customers at that time.

Q.   You also testified about Exhibit 720.

        MS. DeBRUIN:  If we could have that on the screen please.

BY MS. DeBRUIN:

Q.   This was also another presentation to try to convince companies to give Mformation large sums of money, right?

A.   Yes, institutional funds, investors, yes.

Q.   And you testified about page 9 of this presentation?

A.   Uh-huh.

Q.   When you gave that presentation, Mformation was not being paid under any of these revenue models, correct?

A.   No, we had three employees.

Q.   So the answer to my question is that you were not being paid under any of these revenue models, correct?

A.   That's correct.

Q.   This is what Mformation was targeting to get from customers, right?

A.   That was the framework under which we would charge our customers, that's correct, in the future, once the product was billed.

         MS. DeBRUIN:   Exhibit 543, if we could have that on the screen.

BY MS. DeBRUIN:

Q.   This was another presentation that you talked about yesterday.  Again, this was a presentation to investors, right?

A.   That's correct.

Q.   And again, you hadn't received any of the payments

that were talked about in this document, right?

A.  We were a startup.  We wanted to build our product.
How can we have payments?

Q.  If you could turn to Exhibit 2175.  This is another
document you talked about yesterday, and it concerns a
company called YadaYada.

A.  That's right.

Q.  Yesterday you talked about a number of the different
financial terms in this document, right?

A.  Yes.

Q.  But there's some questions that you weren't asked
about YadaYada.  YadaYada was a startup company back in
2000, right?

A.  It was a funded company, it was larger than us, it
had many employees.

Q.  YadaYada was never a customer of Mformation; isn't
that right?

A.  I do not recollect if they finally became a customer
or not.  I think they went out of business at some
point.

Q.  Did -- they went out of business within a year of
your presentation to them, right?

A.  I don't know exactly when they went out of business.
But that's one reason they could not license our
product.

Q.  Now, you also looked at Exhibits 2180 and 2181.

MS. DeBRUIN:  If we could have up on the screen 2180, please.

THE WITNESS:  Uh-huh.

BY MS. DeBRUIN:

Q.  This was a pricing structure that you testified about yesterday?

A.  I did.

Q.  And this was created by a consultant hired by Mformation, right?

A.  Yes, he was working for me.

Q.  And this doesn't say anything about whether any company ever agreed to these terms, right?

A.  The -- that's not the purpose of this document.  It is a pricing plan.  Not our contracts with our customers.

Q.  It's what you're looking to get, correct?

A.  That's our list price for our products, yes.

Q.  It's not what you get?

A.  That's what you tell your salespeople to get.

Q.  But it's not what they actually do get, right?

A.  Every deal is different.  Everyone does discounting.

Q.  Now, Mr. Basu, you no longer work at Mformation; isn't that right?

A.  That's right.

Q.   You work for a company you told us yesterday, Nokia Growth Partners; is that right?

A.   That's right.

Q.   That's a fund formed by Nokia Corporation?

A.   It's an off-balance-sheet fund funded by Nokia Corporation.

Q.   Are you aware that Nokia Corporation is a major competitor of RIM?

A.   I don't work with Nokia Corporation.  I work at a separate fund, which is, in which we are called general partners.  I draw my salary not from Nokia but Nokia Growth Partners.

Q.   That's not my question, sir.  My question is, are you aware -- you're familiar with this --

A.   As one of our -- as an investor in our --

         THE COURT:  I'm going to interrupt you and you need to allow her to finish your question before you try to answer.  Because you might be wrong about what question you're answering.

         THE WITNESS:  Fair enough.

BY MS. DeBRUIN:

Q.   Are you aware that Nokia Corporation is a major competitor of Research In Motion?

A.   I am aware.

         MS. DeBRUIN:  Your Honor, can I have a moment?

THE COURT:  Certainly.

(Pause in the proceedings.)

MS. DeBRUIN:  No further questions.

THE COURT:  Very well.  Ordinarily I'd break at about 10:30.  We've got about 10 minutes of that.  Are you requesting redirect?

MS. NOLLER:  Yes, please, your Honor.

THE COURT:  Could you get it done in 10 minutes?

MS. NOLLER:  I think I might be able to.

THE COURT:  Then we'll go to redirect and then we'll take our break.

REDIRECT EXAMINATION

BY MS. NOLLER:

Q.  You were just asked a few questions by Ms. DeBruin relating to what you testified about yesterday.

A.  Sure.

Q.  And one thing that you were asked about --

MS. NOLLER:  I'd like to put Exhibit 623 up, please.

BY MS. NOLLER:

Q.  In particular, this (indicating), "our needs from our partner technical section."  And you were asked whether these were things that you were asking RIM to tell you how to do.

Can you explain what is really reflected in this

document?

A.   So we have built an intellectual property on the software which would sit on the phone, and it would talk to the device.  So all the functions, all the work would be done by our agent, which would talk to our server. All we were asking for APIs to talking to the device, because I had mentioned their software was a closed environment.  No software company could work with their technology because they had built it in such a closed manner.

So we were not asking for answers to our problems.  We were looking for APIs so we could talk into that phone, send the information out, send it back to our server.

Q.   And in fact, did Mformation know how to deploy applications over the air?

A.   Mformation knew all the things listed on the agent on the air, the APIs to finish the connection.

MS. NOLLER:  Can you put up Exhibit 559, page 19, please.

BY MS. NOLLER:

Q.   Same thing for this document.  Did Mformation know how to do everything in this document?

A.   Mformation knew how to do all of these things for all devices, including the RIM and other company products.

Q.   You were also asked questions about Ken LeVine's stock in Mformation.  Do you recall that?

A.   I do.

Q.   And the $7500 investment is worth about $300; is that right?

A.   Yes, $300, the 7500 options were worth that, $300.

Q.   Which is about 0.0005 percent of Mformation, right?

A.   It would not even be a rounding of our company's overall stock options.

Q.   And what is the $300 worth now?

A.   It's probably worth zero.

Q.   And was Ken LeVine at any of the face-to-face meetings with Mformation's CEO and RIM's CEO?

A.   No, he was not, because he was not a -- he was not the executive who made introductions to Mr. Balsillie for me.

Q.   You were asked a couple of questions about Mr. Castell, and you said Castell had shown no intent or interest in the server side software.  Do you remember saying that?

A.   Yes, I do.

Q.   And RIM actually wanted Mformation's agents so the customers could use Mformation's server, right?

A.   That's right.

Q.   You were also shown a graph, and I don't know if we

have this exhibit.

MS. NOLLER:  Linda, could you please -- would you mind putting up your Demonstrative 100.  Thank you very much.

MS. DeBRUIN:  It's 101.

BY MS. NOLLER:

Q.   101.  I'm sorry.  This is the graph that Ms. DeBruin showed you about the losses that Mformation's incurred; is that correct?

A.   Uh-huh.

Q.   And just in the year, can you just explain why the trajectory gets worse and then gets better and then gets worse again, please?

A.   Sure.  So any startup, whether Facebook, Zynga, us, they go through many, many years of losses.  And it's not a loss, it's an investment.  You're putting @up money to hire engineers before your revenues come in.  So it's a natural thing for a company to lose money, that's why you need capital to bridge that timeframe.  That timeframe can be five years, ten years.  For some companies in biotechnology industry it can even be 20 years because you're building anti-cancer drug.  You invest those years with your intellectual property, and once the revenue starts coming in, your losses turn into profit.

So our business is very similar to any other venture capital-backed business. We are not losing money in the sort of definite sense. You're investing the money so in the future you can harvest that money. So what you're going to see here is from, we raised $30 million, and we invested that from 2000, 2002, and as you can see, you can see a sudden dip in 2003 in our losses, our losses are decreasing. You wonder what's happening here, this is the time when we're actually starting to sell our products to RIM's customers. RIM's customers actually were starting to buy our product. Around 2003. And that's -- and our losses started declining.

Then what you see, 2005, there's a sudden dropoff again. So this is very consistent with what actually happened in our relationship with RIM. RIM cut us off 2004, they released a competitive product, and they shut off our entire market, and we went back into the market. So as an enterprise company from 2002, our performance is improving. If RIM had remained a partner, not our competitor, our value would have kept on improving.

At 2004, we realized these guys are our competitors. They've shut us off the entire enterprise business market. So we restart the company. The

company basically got rebuilt from scratch.  We fired most of our employees because we had no money.  And we started a new product, which are called -- it's called information service manager for the mobile industry. It's a brand-new product.  We started investing in 2003 and '4, and basically get the brand-new product.  So what you see is from '4 to end is an investment.  A different industry telecom industry.  So these are consistent with a venture-backed company.  It is quite significant.  The company's revenues were $50 million in that time.

Q.   And that would offset some of the losses, correct?

A.   They would offset some of the losses, but the point here really is that this is a natural part of the startup history.  This is how most startup companies are created.

Q.   I have one other short question about this exhibit. Is this the year, at the end of this year when BES 4.0 was announced (indicating)?

A.   Yes.

Q.   Where you see that sharp drop?

A.   Yes.

Q.   Last question of you, sir, is you actually started your cross-examination by being asked questions about why you stayed a member of RIM's ISV Alliance even after

you believed that they were competing with you.  Can you explain to the jury why you did that?

A.  I didn't have a choice.  Majority of the devices in the market at that time were RIM BlackBerry devices.  And if we didn't support those devices, we would be out of business.  So we had to be in a program.

What we did was, instead of putting a lot of money to be in an program, we joined a lower down program.  More most simple membership program you could to keep on supporting our customers.  It was not for RIM's benefit; it was for the customers who kept on using RIM devices.  We had to keep on supporting them.  So we had to remain in some kind of an alliance partnership.

Q.  And was that in part in an effort to mitigate some of the losses you were suffering after BES 4.0?

A.  Yes, it was.

MS. NOLLER:  I have no further questions.  We would like to make a brief statement in accord with your pretrial order.  I don't know if you want to do that right now or after.

THE COURT:  Let me see if there's any request for recross.

MS. DeBRUIN:  No, your Honor.

THE COURT:  Let's do that when we come back.

Because sometimes if you request, the other side requests, and that would take us longer.  And I'll have to explain to the jury what's going on.

It's about 10:30.  So we'll come back at 10 10:45.

(The jury exits the courtroom.)

THE COURT:  I take it that Mr. Basu is excused as a witness then?

MS. NOLLER:  We're not recalling him.

THE COURT:  Very well.  You may be excused.

Thank you.

(Witness excused.)

THE COURT:  We'll stand in recess until 10:45.

(Recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. THAKUR:  Yes, your Honor.

THE COURT:  Summon the jury.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Members of the jury, before we call our next witness, there's been a request for comment.  One of the processes that we follow in the trial of a case like this is, we present evidence to the jury, and then the lawyers are allowed to, at the end of the case, argue.

Argument is a good word in the law, because what it means is, it's an opportunity for the lawyers to address you to try and persuade you about the importance or the significance of the testimony.

For the longest time, I've had a practice of allowing the lawyers to comment on the evidence to the jury as the trial has gone along, rather than waiting to the very end, because although I might have various witnesses in mind for a two-week trial, the comment about Mr. Basu next week might not be as informative to you about what the parties believe about his testimony as if it were done immediately after his testimony.  So the rules I've established are as follows:

First of all, the witness must be excused from testimony.  Because I didn't want comment on a witness who might later come back and testify they know again.

Secondly, the lawyers are allowed only five minutes of commentary.  They might comment in the same way they make closing argument about the witness.  Both sides don't have to comment.  The person who calls the witness can comment; the other side can comment if they wish, or can decline.

If the person who calls the witness declines to comment, then there is no commentary.  I don't allow commentary unless it's opened by the side who calls the

witness.

And I heard as the witness was being excused that the plaintiff would wish to comment on the testimony of Mr. Basu.

MS. NOLLER:  Very briefly, your Honor.  Thank you.

Ladies and gentlemen, yesterday in our opening statement, my cocounsel explained to you that you would hear evidence during this case that RIM tested the software, learned confidential information, needed the software, wanted it and negotiated for it.  And over the last day and a half we've presented evidence to you on that point.  You saw that evidence with Mr. Basu.  Sometimes the evidence drags a little bit because it's in the form of documents.  But the Judge has instructed you, and I'm sure he will again at the end of the case, that the evidence you are to consider is not just the testimony from the witness's mouth but also the corroborating documents that are introduced through the course of the trial.  So we want to thank you very much for your patience in that regard.

A couple of other things we wanted to mention to you is there was a lot of dialogue in Mr. Basu's testimony about the server side of the software and the agent side of the software.  And you will hear as we get

into some of the more technical witnesses that both of those were demonstrated to RIM.  And you'll hear from witnesses coming up, including Dr. Kushwaha that the patented method that we have alleged infringed in this case, that that patented method was in fact demonstrated to RIM during those demonstrations, so when you saw the demo plan come into evidence and when you heard Mr. Basu testify about the demonstrations, you'll hear that that entailed Mformation's patented technology.

We're going to play a brief deposition clip next, but after that, I wanted to give you just a little preview of what the next witness will testify about. His name is Gabriel Beltramino, and here's also some of the evidence that Mr. Thakur referred to during opening. We told you that we would show you that Mformation's prototype did not include all of the requirements of Claim 1 in the '917 patent.  So this is that prototype that Mr. Basu explained was the sample of the future commercial product.

Mr. Beltramino wrote Mformation's software prototype code.  He knows what is in that code.  He knows what was in that code.  And he can explain to you and will explain to you that it lacks wireless registration.  And because it lacks wireless registration, and that's one of the elements of Claim 1,

you will see that the entire claim was not in fact shown through that prototype demonstration that was in the summer of 2000.

Thank you for your patience.

THE COURT:  Very well.  Do you choose to comment?

MS. DeBRUIN:  Thank you, your Honor.

Good morning.  Mr. Basu admitted that Mformation never gave RIM any source code.  Never gave RIM the recipe.  Mr. Basu also told you about a relationship of trust with RIM.  Just think about that.  In that relationship of trust, why didn't Mr. Basu tell RIM that Mformation had given stock options to Ken LeVine, a senior RIM employee?

Now, Mr. Basu admits that Mr. Castell told him that there were security flaws with Mformation's product.  But in the end, the important point for you to take away is what Mr. Basu talked about has nothing to do with what you are to decide.  This is a patent case. This is a case about whether the use of RIM's products would perform all the steps of the claimed method. Mr. Basu didn't have anything to say about that.

Also at issue is whether Mformation's patent is new.  Mr. Basu didn't say anything about that either.

Those are the things that you need to decide. You'll hear from other witnesses about those topics.

For now, I'd ask you just keep your eye on the ball and focus on the work that you need to do. Thank you.

THE COURT: Very well. You may call your next witness, or do I understand you're going to display video?

MR. THAKUR: Your Honor, we're going to play a video from Mr. Wolfson. He was the business development director at Mformation. You heard his name mentioned a couple of times. And it's a very short video, I believe it's only three or four minutes.

THE COURT: Very well. I've explained a deposition to you. Sometimes witnesses are not available to us at the time of trial. Because often the lawyers will go to them to take their depositions. And when that occurs, under certain procedures in our rules, the deposition that is taken, or portions of it that are relevant, can be played to you, and it has the same force and effect as the witness testifying. And when a deposition is taken of that kind, the other side can play other portions of the deposition.

But in addition, they're not foreclosed from actually trying to persuade the witness to come voluntarily to testify at trial.

So let's -- tell us -- unless it's evident on the

videotape itself, introduce who the witness is and that information.

MR. THAKUR:  Yes, the witness is Mr. Craig Wolfson.  He was the business development director at Mformation.  What you heard from Mr. Basu was that he was working at Mformation and he was the primary contact with Research In Motion, some of the dealings.  I think his name came up as someone who drove to the airport with the chief executive, Mr. Balsillie.  And you also heard that he left the company in 2003 when he was laid off following the company's layoffs.

THE COURT:  How long do you anticipate this playback is?

MR. THAKUR:  Your Honor, I believe we have -- it's two separate designations.  It's about three to four minutes.

THE COURT:  All right.  Go ahead.

(Whereupon, excerpt from videotape deposition of
Craig Wolfson dated April 21st, 2010, played)

MR. THAKUR:  Your Honor, that is all.

THE COURT:  Very well.  I understand that was both designations.

MR. THAKUR:  That is correct, your Honor.

THE COURT:  Call your next witness.

MR. McDONALD:  Your Honor, Mformation calls

Gabriel Beltramino to the stand.

(Witness sworn)

DEPUTY CLERK:  Please be seated.  Speak clearly into the microphone.  Please state your full name and spell your last name.

THE WITNESS:  My name is Gabriel Beltramino, G-a-b-r-i-e-l; Beltramino is spelled B-e-l-t-r-a-m-i-n-o.

MR. McDONALD:  Your Honor, I'm approaching the witness with a binder of exhibits.  I have a copy for the Court as well.

THE COURT:  You're somewhat soft-spoken.  Make sure you speak directly into the microphone for our court reporter and us.

GABRIEL BELTRAMINO,

   called as a witness by the Plaintiff,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McDONALD:

Q.  What do you do for a living, Mr. Beltramino?

A.  I'm a system engineer at Mformation.  I design and write software.

Q.  How long have you been working at Mformation?

A.  I've been working there since April 2000.

Q.  Were you one of the first employees hired by

Mformation?

A.   Yes, I was.   I was one of the three software developers hired back in April 2000.

Q.   Who were the other two software engineers hired in April 2000 at Mformation?

A.   Saran Sahni and Harish Magam.

Q.   Mr. Beltramino, let's talk a little bit about what you did before working for Mformation.   Did you go to college, sir?

A.   Yes, I did.

Q.   Where did you get your undergraduate degree?

A.   I earned my Bachelor's of Science degree in industrial engineering from Pratt Institute.   In '82.

Q.   What did you do after that?

A.   After that, I went to Columbia University in New York City.   I earned my Master of Science in industrial engineering in '84.

Q.   Where did you work before you joined Mformation?

A.   Before I joined Mformation, I worked at Deutsche Bank.

Q.   What sort of work did you do there?

A.   I was a software developer working for the auditing department.

Q.   Do you remember any projects you worked on at Deutsche Bank?

A.   Yes, I was hired by Deutsche Bank to work on their online banking system, their personal banking system that they were developing at the time.

Q.   Do you remember when you first considered joining Mformation?

A.   Yes, I do.

Q.   Please explain that to the jury.

A.   Yes, a colleague of mine, Johar, spoke to me about a friend, Rakesh Kushwaha, who was interested in starting a new company in wireless device management, and that kind of caught my interest.

Q.   Did you meet with anyone from Mformation before joining them?

A.   Yes, I did.

Q.   Who did you meet with?

A.   I first met with Dr. Kushwaha and Upal Basu in New York City at a place close to my Deutsche Bank office.

Q.   I'm sorry, did you say Dr. Kushwaha and Upal Basu?

A.   Yes.

Q.   When did this meeting occur?

A.   This meeting occurred one month before I took the job, so it was around March 2000.

Q.   Did you have any other meetings with Mformation before you joined them?

A.   Yes, I did.

Q.   When did that meeting occur?

A.   The second meeting happened in New Jersey, and Dr. Kushwaha had rented out two rooms at the Hilton Hotel in Jersey where we met and we discussed the -- what the company was going to do and its interests.

Q.   Who did you meet with during that second meeting?

A.   I met with Dr. Kushwaha and Upal Basu.

Q.   Do you remember what you thought about Mformation and Dr. Kushwaha after those two meetings?

A.   I was very impressed with Dr. Kushwaha and Upal Basu. And also I -- the idea that he was going to focus the company in wireless device management was something that caught my interest at the time.

Q.   Why did you decide to accept the job offer from Mformation?

A.   Several reasons.  I wanted to innovate.  I wanted to build new software.  And I wanted to do this in a tech startup.  And I wanted to be there from the very beginning.  I was also very impressed with Dr. Kushwaha and Upal Basu's vision and knowledge.  And quite frankly, I thought he was brilliant.

And the fact that the company was going to focus in this wireless device management, I thought it was a great idea at the time.

Q.   And do you remember when you joined Mformation?

A.   Yes, I do.

Q.   When was that?

A.   I joined Mformation in late April of 2000.

Q.   Do you remember what the working environment was like at Mformation then?

A.   Yes, I remember very well.

Q.   Could you please explain it for the jury.

A.   Yes.  It was a very small company.  It was just starting out.  And the offices were at the Hilton Hotel.  These were rooms that were converted into offices.  One of the offices were shared by Dr. Kushwaha, Upal Basu and Johar.  I remember that that office had a computer rack which was very noisy and was right next to Upal Basu's desk.  The other room was a little bit better, it had a view.  And on one wall we had a big light board on which we used to design and sketch out the system that we were going to build.

        I also remember Dr. Kushwaha's wife coming in sometimes to bring us lunch, so it was a great time.

Q.   Do you remember the first major project you worked on at Mformation?

A.   Yes, I do, yes.

Q.   And what was that project?

        THE COURT:  We need to move quickly to more

relevant matters rather than --

MR. McDONALD:  Sure, your Honor.  We're about to get to the prototype.

THE COURT:  Good.

BY MR. McDONALD:

Q.  Do you remember the first major project that you worked on?

A.  Yes, I do.

Q.  And what was that project?

A.  The first project worked on was a prototype that was going to be demonstrated to potential investors.

Q.  Do you remember if that prototype had a name?

A.  Yes, it did.  It was called Provsys.

Q.  Did anyone else at Mformation work on that Provsys prototype?

A.  Yes.  Magam, he worked on the user interface with the screens for the prototype, and I worked on the server or back end part of the prototype.

Q.  Was there someone who led the team?

A.  Yes, Dr. Kushwaha always led the design meetings that we had at the time.  And he would explain to us exactly how he wanted this prototype to be built.

Q.  Do you remember what computer language you used to write the Provsys prototype?

A.  Yes, this prototype was entirely written in PERL.

Q.   Why did you use PERL instead of some other language?

A.   Well, because PERL is a very good language for rapid development.  It's a scripting language, but it allows you to develop prototypes very fast.

Q.   Now, do you remember any of the wireless devices used with the prototype?

A.   Yes, I do.  We didn't have any device at the time, but I remember that we had a yellow AT&T phone that we used, and also an old Nextel phone.

Q.   Did you personally type and design portions of the Provsys prototype code?

A.   Yes, I did.

Q.   Were there portions of the Provsys prototype code that someone else typed in?

A.   Like I said before, Harish Magam, he was running the user interface or the construction for the prototype.

Q.   Did you ever read those portions of the Provsys code that you did not personally write?

A.   Yes, I had to because the user interface and the back end had to work together very well for this to work properly.  So, yes, we constantly were reviewing each other's work.

Q.   Do you remember what functionality the Provsys prototype had?

A.   Yes, the prototype had some basic device management

functions, and what we could do with the prototype, we could disable a phone.

Q.   When you say "disable a phone," what do you mean?

A.   Well, disabling a phone meant that the phone could no longer access the Internet.  You would try to go through the browser of the phone, try to connect to the Internet and you would get a blank screen.  So, in other words, it would no longer access the Internet, and we referred to that as locking the device.

Q.   Mr. Beltramino, do you remember whether the Provsys prototype included wireless registration of the device on the server?

A.   The Provsys prototype did not include wireless registration.

Q.   Why is that?

A.   At the time only Harish Magan and myself were working with the prototype, and there was really no need to have wireless registration included in the prototype.

Q.   Why didn't you need to include wireless registration in your prototype?

A.   Well, you see the prototype was for demonstration purposes only.  It was not intended for any commercial use.  So there was no need to have wireless registration as part of the prototype.

Q.   How did you include registration type information

about the devices in the Provsys code then?

A.   Well, we manually registered the device.

Q.   What do you mean by that, Mr. Beltramino?

A.   Well, in order for the prototype to manage the device, there was information about the device that needed to be available on the prototype.  So what I did was to manually copy that information into the prototype.

Q.   Mr. Beltramino, I placed a binder of exhibits in front of you, sir.  If you could please turn to the first exhibit, 2193.

A.   (The witness complies.)

Q.   Do you recognize this exhibit, Mr. Beltramino?

A.   Yes, I do.

Q.   What is this exhibit?

A.   This is the Provsys prototype.

       MR. McDONALD:  Your Honor, Mformation moves to admit into evidence Exhibit 2193.  It is not objected to.

       MR. GROSSMAN:  No objection, your Honor.

       THE COURT:  Very well.  2193 is in evidence.

       (Plaintiff's Exhibit 2193 received in evidence)

       THE COURT:  I take it there was only one, so we don't have to worry about a date or where this fits?

       MR. McDONALD:  I would say that's correct, your

Honor.

THE COURT:  Very well.

MR. McDONALD:  Chris, if you could please publish for the jury Exhibit 2193 at page 14.

BY MR. McDONALD:

Q.  Mr. Beltramino, looking at Exhibit 2193, how is it you recognize this to be the Provsys prototype?

A.  I wrote this prototype, and I recognize that this package, which you can see there, is called "Get @@Professor Phone," that references the Provsys prototype.  And I also can recognize some of the functions that I wrote as well.

Q.  If you could go to page 107, do you recognize this page?

A.  Yes, I do.

Q.  What is this page?

A.  This is the data that I had to copy directly into the Provsys prototype.

Q.  I notice that there are 11 rows.  Is that correct?

A.  That's correct.  Because this is a list of the 11 devices.

Q.  Is that one row per device?

A.  That is correct.

Q.  If you could, please, take the first row, and I'd like to walk the jury through the items on that row one

by one.

So starting at the left, the number 1, do you know what that signifies?

A.   Yeah, that first item is the device ID.

Q.   And the second item, that "I 1000-plus," Do you know what that signifies?

A.   Yes, that is the model of the device.

Q.   And the next entry is "IMEI," do you know what that means?

A.   IMEI is an acronym, stands for International Mobile Equipment Identity.

Q.   Then there's a long number starting 0001.  Do you see that?

A.   Yes, this is the actual serial number of the device.

Q.   Is that unique to the device?

A.   Yes, it is.

Q.   And the final entry on row 1 is assigned.  Do you know what that means?

A.   Yes.  "Assigned" means that this device was assigned to a user.

Q.   How is this information shown on this page of Exhibit 2193 used in the Provsys prototype?

A.   This information was copied directly into the Provsys prototype so that we could manage the device.

MR. McDONALD:  And, Chris, if you could please

advance two pages to 109 within Exhibit 2193.

BY MR. McDONALD:

Q.   Mr. Beltramino, do you recognize what's on this page?

A.   Yes, I do.

Q.   What is this?

A.   This is some additional information about the device.

Q.   Can you please walk the jury through the first row starting with the number 1.

Withdrawn.

First row, on page 109 of Exhibit 2193, that number 1, do you know what that means?

A.   Yeah.  That refers to the device ID.

Q.   And then the next entry on that row is "CDPD."  Do you know what that means?

A.   That is the network type, stands for Cellular Digital Packet Data.

Q.   And then there's a numerical entry starting with 166, do you know what that means?

A.   Yes, this is the IP address of the device.

Q.   And then there's an entry, 1.  Do you know what that stands for?

A.   That references to the carrier ID that this device belongs to.

Q.   What does that mean, a carrier ID?

A.   Well, the carrier ID would be like an AT&T or

T-Mobile, the operator that is servicing the phone.

Q.   And the next entry is 5.

A.   That is the reference to the subscriber of the user.

Q.   And then there's an entry, "active," do you know what that means?

A.   Yes, "active" means that this phone was enabled to use the Internet, so it was active.

MR. McDONALD:  If you could show Exhibit 1 of 2193, please.

BY MR. McDONALD:

Q.   Do you recognize what's shown on that page of Exhibit 2193?

A.   Yes, I do.

Q.   What is this?

A.   This is the utility that we had to copy that information directly into the prototype.  You can see the first letters there, BCP, that stands for bulk copy. So we would bulk copy the information in those files into a table that the prototype would use.

Q.   Mr. Beltramino, did the Provsys prototype ever include wireless registration?

A.   The Provsys prototype never included wireless registration.

Q.   Did Mformation ever have a prototype that includes wireless registration?

A.   There was only one prototype, and that was Provsys.

Q.   You said Provsys was written in PERL?

A.   Entirely in PERL.

Q.   What languages are used for commercial software products?

A.   We use Java and C++.

Q.   Why do you use Java and C++ and not PERL for the commercial products?

A.   Well, because PERL is a scripting language.  It's a good, long, rapid development.  But it's not well suited for production.  It doesn't scale as well as Java or C++.  So for commercial use, we used Java and C++.

Q.   Do you remember the first Mformation product that did include wireless registration?

A.   Yes, I do.

Q.   What product was that?

A.   The first product was 1.0, also code named @Wirebuster.

Q.   Did you work in writing that Version 1.0?

A.   Yes, I did.

Q.   And do you remember whether that Version 1.0 work occurred and when it was concluded?

A.   Well, we started working on the version around October 2000.  And it got completed around December 2000, January 2001.

Q.   How is it that you remember that work started on
Version 1 in October of 2000?

A.   Because in order for us to build a commercial
product, we needed more software to help us out, so we
hired in early October, Tom Nobin, Amit Shah, and later
on Hent Swetswani, who were software developers and
helped the company build this new commercial version.

Q.   Do you remember what language that Version 1.0 source
code was in?

A.   That one was written in Java.

Q.   Mr. Beltramino, if you could please turn to tab 2194
in your binder.

        MR. McDONALD:  And your Honor, Mformation --
withdrawn.

BY MR. McDONALD:

Q.   Mr. Beltramino, looking at the first page, do you
recognize Exhibit 2194?

A.   Yes, I do recognize this.

Q.   What is Exhibit 2194?

A.   2194.

Q.   Do you know what it is?

A.   Yes, I know, this is the Wirebuster Version 1.0 code.

        MR. McDONALD:  Your Honor, Mformation moves into
evidence Exhibit 2194.  I understand there's no
objection.

MR. GROSSMAN:  No objection, your Honor.

THE COURT:  2194 is in evidence.

(Plaintiff's Exhibit 2194 received in evidence)

MR. McDONALD:  Chris.  Could you please display the first page of 2194 -- I'm sorry, the 17th page.

BY MR. McDONALD:

Q.  Mr. Beltramino, looking at the entry on that page, do you recognize that?

A.  Yes, this is the Wirebuster code.

Q.  How is it that you recognize that?

A.  Well, you see the first line starts with WB, that was our reference to Wirebuster at the time, and I recognize also the files, because I worked on some of these files.

MR. McDONALD:  Chris, could you please turn to page 1753 within Exhibit 2194.

BY MR. McDONALD:

Q.  Mr. Beltramino, looking at this page, do you recognize anything on this page?

A.  Yes, I do.

Q.  What portion is it that you recognize in particular?

A.  If you look at the fifth line, it says "registration inbox."

Q.  Is that the text?

A.  Yes, "registration inbox."

Q.  And how is it that you recognize this text?

A.   This refers to the mailbox that was used when a wireless device would register over the air as part of wireless registration.  As part of wireless registration.  So when the device registered, it would send information about itself, and it would be stored in this mailbox, or queue, as we used to implement it.  And then it was a process that would read it from this queue and update our system.

MR. McDONALD:  Chris, if you could please showcase 1772 of Exhibit 2194.

BY MR. McDONALD:

Q.   Mr. Beltramino, do you recognize this page?

A.   Yes, I do.

Q.   What is this?

A.   Well, if you go down to where you see "de queue," this function here, method here.

Q.   What is that, Mr. Beltramino?

A.   This part of the code would read the information that is in the box and return it so it can be stored in the system.

Q.   So was this part of wireless registration?

A.   Yes, it was.

Q.   Do you remember -- withdrawn.

Mr. Beltramino, did any of Mformation's products include server software that only transmits to the

device if some condition of the server or device is satisfied?

A.   Yes.

Q.   When was the first Mformation software that included that feature?

A.   That would be 1.4.

Q.   Do you remember Version 1.4?

A.   Version 1.4, sorry.

Q.   If you could please turn to Exhibit 2195 in your exhibit binder.  Do you recognize this page?

A.   Yes, I do.

Q.   And what is this Exhibit 2195?

A.   This is a code for Version 1.4.

            MR. McDONALD:  Your Honor, Mformation moves for admission into evidence Exhibit 2195.

            THE COURT:  2195 is in evidence.

            (Plaintiff's Exhibit 2195 received in evidence)

            MR. McDONALD:  And, Chris, if you could please display page 1 of 2195.

            I apologize, it's a very large exhibit.

            THE COURT:  Is there a date for it?

            MR. McDONALD:  If we look at the page here, sir.

            Chris, if you could blow up the first two lines.

BY MR. McDONALD:

Q.   Mr. Beltramino, do you recognize this?

A.   Yes, I do.

Q.   What is this?

A.   So this is a file, in technical terms, what's used to build, rebuild the software.  And you see the very last, in the very last line, there's a Version 1-4.  This indicates that this code is from Version 1.4.

MR. McDONALD:  Chris, if you could please turn to page 5363 of Exhibit 2195.  If you could please enlarge the center section of the page.

BY MR. McDONALD:

Q.   Mr. Beltramino, do you recognize this?

A.   Yes, I do.

Q.   What is this?

A.   So this is the part of the code that would read the data from the device that it was trying to register. And it would read it from the Mobitex network.  At the time we were using devices with Mobitex network.  So this part of the code would listen for the network, for that message to come from the device.

Q.   What functionality was this portion of the code related to?

A.   This is part of wireless registration.

MR. McDONALD:  Chris, if you could please display page 5275 of 2195.  And if you could enlarge the top section, please.

BY MR. McDONALD:

Q.   Mr. Beltramino, do you recognize this?

A.   Yes, I do.

Q.   What is this?

A.   This is the part of the code where we took that data, we would take that data from the device it was registering, and we would store it in the box or in the queue.

MR. McDONALD:  Chris, if you could please turn to -- withdrawn.

BY MR. McDONALD:

Q.   Mr. Beltramino, what functionality was that portion of the code related to?

A.   This is part of wireless registration.

MR. McDONALD:  If you could turn please to page 2177 of Exhibit 2195.  And enlarge the bottom section, please.

BY MR. McDONALD:

Q.   Do you recognize this, Mr. Beltramino?

A.   Yes, I do.

Q.   What is this?

A.   This is a part of the code that completes the wireless registration process.

MR. McDONALD:  If you could turn to page 2017 of Exhibit 2195, Chris, and enlarge the bottom section,

please.

BY MR. McDONALD:

Q.  Mr. Beltramino, do you recognize this?

A.  Yes, I do.

Q.  What is this?

A.  In the bottom, it reads:  "RIM server queue for
Mobitex rims."

If you could just go to the bottom of the page.
A little bit further down.

Q.  Do you need the next page?

A.  Yeah, I'll need the next page.  It starts here but it
ends on the next page.

Okay.  So, yes, that's better.

So this is the way that we would implement a
mailbox in the system, with a queue.

MR. McDONALD:  If you could turn to page 2107 and
enlarge the middle section, please.

BY MR. McDONALD:

Q.  Mr. Beltramino, do you recognize this?

A.  Yes, I do.

Q.  What is this?

A.  So this is a part of the code that would handle the
acknowledgment coming back on the device.  Whenever you
send a command to a device, the device would respond
back with an acknowledgment, and this is the part of the

code that would process that information.

MR. McDONALD:  And, Chris, could you please turn to page 4003 of Exhibit 2195.  And enlarge the bottom section, please.

BY MR. McDONALD:

Q.  Do you recognize this, Mr. Beltramino?

A.  Yes, I do.

Q.  What is this?

A.  So this is a part of the code that handles the command that's being transmitted to the device.  Before the command was transmitted, we would do some checks, and in this case we would check certain conditions, and this part of the code, we're checking if the e-mail was available for that device.  And if it was available, you would send a command out.  Otherwise, we would not send it out.

MR. McDONALD:  Chris, can you please turn to page 5366 of Exhibit 2195.

And enlarge the top section, please.

BY MR. McDONALD:

Q.  Do you recognize this?

A.  Yes, I do.

Q.  What is this?

A.  This is another condition that was being checked. Before we sent it out, we would check whether the

communication between the server and the Mobitex network

was still active.

MR. McDONALD:  Chris, can you turn to 4002 of

2195, and enlarge the bottom section, please.

BY MR. McDONALD:

Q.  Mr. Beltramino, do you recognize this?

A.  Yes, I do.

Q.  What is this?

A.  This is a part of the code that was sent out to

command the device.

MR. McDONALD:  Chris, can you turn to page 2107.

And enlarge the middle section, please.

BY MR. McDONALD:

Q.  Mr. Beltramino, do you recognize this?  Does this

relate to the acknowledgment that you referred to?

A.  Yes, I'm sorry, yes.  I thought we went through this

before.  Yes, this relates to the acknowledgment coming

back from the device.  Whenever we send out command to

the device, the device would respond back with an

acknowledgment, so this part of the code would process

that acknowledgment.

MR. McDONALD:  Thank you, your Honor.  No further

questions at this time for Mr. Beltramino.

THE COURT:  Very well.

You may cross-examine.

MR. GROSSMAN:  May I provide a witness binder?

THE COURT:  Surely.

CROSS-EXAMINATION

BY MR. GROSSMAN:

Q.  Good morning, Mr. Beltramino.

A.  Good morning.

Q.  Now, you told us a little bit about the commercial code in your direct testimony.  I want to go back, talk about the Provsys, the prototype code.  Do you recall that?

A.  Yes, that's correct.

Q.  And that prototype code you were developing for investors; is that right?

A.  That's correct.

Q.  And one of those meetings we heard Mr. Basu testify was a meeting with Deutsche Bank in July 2000; is that right?

MR. McDONALD:  Objection.  Mr. Beltramino was not present for the testimony.

MR. GROSSMAN:  Rephrase the question.

BY MR. GROSSMAN:

Q.  Do you know why you were preparing prototypes?

A.  I'm sorry, can you repeat?

Q.  Do you know why you were preparing prototype code?

A.  The prototype code, yes, was used for demonstrating

to potential investors.

Q.   And in order to -- it was important to get the prototype code right to present to potential investors, right?

A.   That's correct.

Q.   If you wanted to impress the investors with the product, correct?

A.   That's correct.

Q.   So you'd stay up late making changes to the code, make sure you got it right, right?

A.   Yes, that's correct.

Q.   So the week before the presentation, you'd be making changes to the code, making sure everything was in the format you wanted, right?

A.   Well, we stopped making changes to the code in around May 30, so, you know, the idea was to keep the prototype as stable as possible at the time.  So I remember working on the code, and around May 30, we had it in good shape, presentable, and I remember that Dr. Kushwaha didn't want us to make any more changes to it because he wanted it always to work properly.  So we stopped making changes to the code at around that time, May 30th, 2000.

Q.   You stopped making changes to the code around May 30th, 2000?

A.   That's correct.

Q.   So even though you were at a startup company and you're just getting your first product going, you didn't want to make any changes to the code on the fly.  Is that right?

A.   The purpose of the prototype was to, like you said, impress investors.  And we wanted to have a working product at all times.  We didn't want to risk having a product that would break in the middle of administration.

Q.   So the purpose was to impress investors; is that --

A.   That's correct.

Q.   It had to work, right?

A.   It had to work, it had to work properly.

Q.   That's important, right?

          THE COURT:  Let's move on.

          MR. GROSSMAN:  So if I could get -- if you could display trial exhibit -- RIM Trial Exhibit 2036, I understand it's not objected to.

          THE WITNESS:  I'm sorry?

BY MR. GROSSMAN:

Q.   It's in your binder, tab 3.

A.   2036, right.

Q.   Yes.

          THE COURT:  You are offering that into evidence?

MR. GROSSMAN:  Yes, your Honor.

DEPUTY CLERK:  It's a joint exhibit.

MR. McDONALD:  No objection.

THE COURT:  Very well.  2036 is in evidence.

(Joint Exhibit 2036 received in evidence)

MR. GROSSMAN:  If you could blow up -- thank you.

BY MR. GROSSMAN:

Q.  This is an e-mail from Gurinder Johar to, among other people, you, dated July 24th, 2000; is that right?

Do you see that?

A.  Yes.

Q.  The subject is "New Feature Request."  Do you see that?

A.  Yes, I do.

Q.  And second paragraph says:  "Please let me know what you think, and if you can hack this together for a demo here."

A.  Yes, I see that.

Q.  And you testified just prior to this -- seeing this e-mail that you didn't make any changes after May 2000; is that right?

A.  That's right.

Q.  And you didn't keep any change log for the process, right?

A.  No.

Q.   So you wouldn't be able to go back and see if any changes to the code were made between May 2000 and July 24th, 2000; is that right?

A.   That's right, yeah.

Q.   So you can't be absolutely certain sitting here today inside the courtroom that no changes were made between May 2000 and July 2000; is that right?

A.   As far as I know, the process prototype that was finished on May 30, that was the prototype that we were using to demonstrate to investors, and we didn't change it later.

Q.   So for two solid months, from the end of May to the end of July, no one at your startup did anything with the source code to improve the product; is that right?

A.   I don't remember anybody changing it.

Q.   But you don't have a change log to confirm that one way or another?

A.   Repeat that, please?

Q.   You don't have a change log to confirm that one way or the other, right?

A.   No, I don't.

Q.   Now, I think you testified earlier that the only other person other than you writing the Provsys code was a gentleman named Harish Magan; is that right?

A.   That's correct.

Q.   And as far as you know, Mformation hasn't asked Harish Magam to come and testify here today, right?

A.   That's correct.

Q.   But he did submit a declaration in this case, didn't he?

A.   That's correct.

Q.   And that declaration was sworn under penalty of perjury; is that right?

A.   I don't know.

Q.   Have you seen that declaration?

A.   Yes, I have, yes.

Q.   Did you read it?

A.   Yes, I have.

MR. GROSSMAN:  I'd like to offer into evidence, your Honor, the declaration of Harish Magam that was submitted in connection with this case.

THE COURT:  What number is it?

MR. GROSSMAN:  It's not an exhibit number, your Honor.

THE COURT:  It needs to have one.

MR. GROSSMAN:  We can give it an exhibit number. It wasn't on the parties' exhibit list.  It's a declaration from Mformation.  They wrote it, they know what it says.

DEPUTY CLERK:  4838.

MR. McDONALD:  Your Honor, this is news to us that this was to be offered into evidence.  I understand that this is a cross-examination.  I didn't understand that there would be documents offered into evidence affirmatively, including this one.  This is the first we've heard of this.

THE COURT:  At this point I'm simply getting it marked so we have a number.

And so are you intending to have the witness look at 4838?

MR. GROSSMAN:  Yes.

THE COURT:  You can do that.  I won't receive it into evidence at this point because there's apparently an objection, but you can show any witness any document that you think will help to further the testimony of a witness.  If you have 4838 and want to show it to the witness, feel free to do so.

MR. GROSSMAN:  Thank you, your Honor.

MR. McDONALD:  Your Honor, if it's not in evidence, we can't display it on the screen.

THE COURT:  You can show it to the witness.

BY MR. GROSSMAN:

Q.  So tab 4 of your binder, Mr. Beltramino.

And if you turn to page 1.  Do you see the end of line 8?  Do you see there it says --

THE COURT:  Don't read it out loud.  You can ask the witness to read it, however.

BY MR. GROSSMAN:

Q.  Could you read the -- starting at the end of line 8, on page 1 of that declaration, Mr. Beltramino?

A.  Starting at line 1 --

Q.  Page 1, the end of line 8, the sentence ending at the --

A.  December 2010, that one?  Starting "December 2010 and January 2011"?

THE COURT:  You can approach the witness so you both are on the same page so we don't waste time.

THE WITNESS:  Yeah.

MR. GROSSMAN:  Thank you, your Honor.

BY MR. GROSSMAN:

Q.  Starting right there (indicating).

A.  Okay, I thought you said -- oh, line.

Q.  Yep.

Could you read that out loud, Mr. Beltramino?

A.  Where it says:  "This prototype software was named Provsys at that time"?

MR. McDONALD:  Actually, your Honor, we have an objection to doing this.  It's similar to publishing it on the screen.  The witness did not write this declaration.

THE COURT:  Sustained.

MR. McDONALD:  The declaration is not in evidence.

MR. GROSSMAN:  We'll move on.

BY MR. GROSSMAN:

Q.  Now, Mr. Beltramino, you weren't actually demonstrating Provsys to potential customers; is that right?

A.  I was not.

Q.  So without the code that was actually demoed, you don't have any way of confirming what was actually presented during the demonstration; is that right?

A.  Can you repeat that question, please?

Q.  You weren't at the demonstration?

A.  That's correct.

Q.  So you don't have any way of knowing what was presented at the demonstration; is that right?

A.  Well, you see, the -- in order to demonstrate a process, you had to log in through the Internet to our server.  So actually the coding in our server, Dr. Kushwaha, I assume, demonstrating using the laptops, open up the browser and connect to our server and demonstrate the prototype.  So the process always was starting in our server.

Q.  Okay, I think I understand.

So I just want to ask you a few questions here. You're here today, but you've testified earlier that you were one of the first three developers hired by Mformation?

A.   That's correct.

Q.   And you were hired by Dr. Kushwaha here, right?

A.   That's correct.

Q.   And you're here today because Dr. Kushwaha, your boss, asked you to come here to court to testify, right?

A.   That's correct.

Q.   And you've worked for Mformation for more than 12 years now, right?

A.   That's correct.

Q.   So you've worked for Dr. Kushwaha here for more than 12 years?

A.   That's correct.

Q.   And you're aware that Dr. Kushwaha testified at his deposition in this case that all of the elements of the claim, including wireless registration that you told us, was not in the Provsys code, actually was in the Provsys code?

A.   I don't remember.

Q.   You don't remember?

A.   I don't remember him saying that.

Q.   Well, you gave a deposition in this case, right,

Mr. Beltramino?

A.  Can you repeat that question, please?

Q.  You gave a deposition in this case?

A.  Yes, I did.

Q.  And you spoke to Dr. Kushwaha in preparation for that deposition, right?

A.  I spoke to my attorneys in preparation for that deposition.

MR. GROSSMAN:  Well, if we could get on the screen, please, the excerpt from Mr. Beltramino's deposition, it's the transcript at page 22, line 7.

BY MR. GROSSMAN:

Q.  The question, as you can see, you can highlight:

"Did you have any discussions with anyone other than Mr. McDonald to prepare for this deposition?

"A  Yes.

"Q  With whom did you have those discussions?

"A  I had discussions with Rakesh Kushwaha and with Harish Magam.

"Q  And when did you have discussions with Dr. Kushwaha to prepare for this deposition?

"A  Yes, I had a discussion with him."

Do you see that?

A.  Yes, I do.

Q.  So you did actually have a discussion with

Dr. Kushwaha before?

A.   Yes, I did have some discussions before that I had my deposition, yes.

Q.   Now, when you had those discussions with Dr. Kushwaha prior to your deposition, did you understand that he had testified at his deposition that wireless registration was included in the Provsys prototype?

A.   Yes, what happened was --

THE COURT:  No, he just asked did you have that knowledge.

THE WITNESS:  I'm sorry, could you repeat that question again?

MR. GROSSMAN:  Sure.

BY MR. GROSSMAN:

Q.   Did you understand that Dr. Kushwaha had testified at a deposition that the Provsys prototype did have wireless registration?

A.   Yes.

Q.   And you are here today testifying that the Provsys prototype did not have wireless registration; is that right?

A.   That's correct.  Because it didn't have wireless registration.

Q.   So your boss for 12 years, Dr. Kushwaha, asked you to come here to court --

THE COURT:  Oh, this sounds like it's going to be argumentative just by the tone.

MR. GROSSMAN:  Okay, I'll withdraw, your Honor.

BY MR. GROSSMAN:

Q.  And you came here today to testify that the Provsys code did not have wireless registration, right?

MR. McDONALD:  Objection, your Honor.  Asked and answered repeatedly.

THE COURT:  Sustained.

BY MR. GROSSMAN:

Q.  Are you aware that Mformation hired a university professor to serve as an expert witness in this case?

A.  No, I don't -- I'm not aware.

Q.  You're not aware.

A.  I'm sorry, repeat that question again.  Can you repeat that question again?

Q.  Sure.  My question is, are you aware that your company, Mformation, hired a university professor to come and testify in this case?

A.  I'm not sure if you're referring to -- you mean outside of Mformation?

Q.  Yes.

A.  Oh, no, I'm not aware.  I'm sorry.

Q.  Are you aware -- have you ever heard the name Dr. Vijay Madisetti?

A.   No, I haven't.

Q.   Now, you are aware that your company did have an independent third-party review of the Provsys source code, right?

A.   There was a third-party review, yes, that I'm aware of, yes.

Q.   And Dr. Kushwaha, to the best of your knowledge, didn't ask that independent third party to come here today, did he?

A.   I don't know.

Q.   To the best of your knowledge.

A.   Yeah, I don't know, to the best of my knowledge.

Q.   Dr. Kushwaha asked you to come here and testify, right?

        MR. McDONALD:   Objection.

        THE WITNESS:   Yes.

        MR. McDONALD:   Asked and answered.

        THE COURT:   Sustained.

BY MR. GROSSMAN:

Q.   And you knew that he expected you to confirm his testimony that we expect to hear that Mr. Thakur told us in the opening that did not have wireless registration, right?

        MR. McDONALD:   Compound and argumentative.

        THE COURT:   It does seem to ask him to speculate

about his intent.

You can ask about conversation and words, but I won't allow you to ask him to speculate about intent.

MR. GROSSMAN:  Okay.

BY MR. GROSSMAN:

Q.  Did you have a conversation with Dr. Kushwaha before you appeared here today?

A.  No, I did not.

Q.  Do you know why Dr. Kushwaha asked you to testify here today?

A.  Yes, I know.  Because I've been working for the company for 12 years.  And I wrote Provsys.  I know what it has.  And I came here to tell the truth.  And the truth is that Provsys did not have wireless registration.

MR. GROSSMAN:  Thank you.  Nothing further.

THE COURT:  Any redirect?

MR. McDONALD:  Just one very quick question, your Honor.

REDIRECT EXAMINATION

BY MR. McDONALD:

Q.  Mr. Beltramino, during my colleague's questions just now you mentioned a date, I believe it was May 2000, for Provsys.  Do you remember that?

A.  Right, that's correct.

Q.   How is it that you know that date in relation to the Provsys code?

A.   Well, because that was the date that was timestamped in the files of Provsys prototype.

Q.   Is that inside the code itself?

A.   It's not inside the code itself.  But the files have a time stamp indicating when they were last modified.  And that is the actual date of those files, May 30.

Q.   And you confirmed that yourself?

A.   Yes, I did.

MR. McDONALD:  Thank you, your Honor.  We reserve the right to call Mr. Beltramino in rebuttal, but no further questions at this time.

THE COURT:  Very well.

Any request for recross?

MR. GROSSMAN:  No, your Honor.

THE COURT:  Very well.  You're subject to recall, so I'll allow you to be excused at this time, Mr. Beltramino.  You may step down.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  We've got about eight minutes till lunch.  Can you use it profitably or shall we lunch early?

MR. McDONALD:  I believe, your Honor, lunch may

be more profitable than anything I could say.

(General laughter)

THE COURT:  We'll take our midday break, come back at 1 o'clock.  Remember my admonitions.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  You're free to go.

(Luncheon recess)

(after lunch, Take 3)

DEPUTY CLERK:  Remain seated.  Come to order.

THE COURT:  Ready to resume?

MR. THAKUR:  Yes, your Honor.

THE COURT:  I understand you're going to have more video deposition and then you're following with a live witness.

MR. THAKUR:  That's correct, your Honor.

THE COURT:  Summon the jury.

MR. THAKUR:  I had a quick request.  I actually was going to have one of my associates introduced in the deposition.  It just occurred to me that he is not pro hac.

THE COURT:  That's fine.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  Are we ready to resume?

MR. THAKUR:  We're going to introduce some video depositions presented by my associate Rueben Rodrigues.

THE COURT:  Good afternoon.

MR. RODRIGUES:  Mformation will be playing portions of the videotaped deposition of Mr. Tyler Lessard.  Mr. Lessard was vice-president for global alliances at RIM.  Additionally we'll be publishing Exhibit 255, which has been admitted by stipulation.

THE COURT:  Very well.

(Whereupon, excerpt of videotaped deposition of Tyler Lessard, held date unknown, played for the jury).

MR. THAKUR:  Thank you.  We'd like to get that admitted into evidence.

THE COURT:  I'm sorry?

MR. THAKUR:  Your Honor, we would like to get that into the record, and I notice it was not reflected in the record.

THE COURT:  Yeah, when we're playing deposition or when depositions are being read back, it's like testimony, but it's different in the sense that we don't have a court reporter trying to keep track of that

through the -- through our record.

Now, we should discuss the protocol, if you wish to establish one, with respect to whether or not the jury would need to have it replayed or whether or not a transcript of the testimony will be made available to them.  But I don't ordinarily mark that as an exhibit.  You make a record that testimonial evidence has been presented in some form, but we don't mark it as an exhibit.

So you have no cross-designations, I take it.

MR. MATUSCHAK:  They were included, your Honor.

THE COURT:  They were included.  Very well.  Call your next witness.

MR. THAKUR:  We have two more video depositions, your Honor.

THE COURT:  Very well.

MR. RODRIGUES:  We will now present the videotaped portions of the deposition of Mr. Allan Lewis.  At the time of his deposition, Mr. Allan Lewis was vice-president of consumer software.

(Whereupon, excerpt of videotaped deposition of Mr. Allan Lewis, held June 25th, 2010, played for the jury:)

MR. MATUSCHAK:  Your Honor, could we be heard very briefly at the sidebar?

THE COURT: Certainly. Counsel, approach?

(At the sidebar, out of the hearing of the jury and the court reporter).

THE COURT: Very well. I understand there are others that might be played, but we have a live witness that's to be called next?

MR. THAKUR: Good afternoon, your Honor. We call Dr. Rakesh Kushwaha to the stand.

THE COURT: Very well.

(Witness sworn)

DEPUTY CLERK: Please be seated. Speak clearly into the microphone. Please state your full name and spell your last name.

THE WITNESS: My name is Rakesh Kushwaha. First name, Rakesh, R-a-k-e-s-h. Last name, Kushwaha, K-u-s-h-w-a-h-a.

THE COURT: You may inquire.

MR. THAKUR: We have exhibits for the Court.

May I approach the witness?

THE COURT: Certainly.

///

RAKESH KUSHWAHA,

     called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THAKUR:

Q.   Dr. Kushwaha, are you currently employed?

A.   Yes.

Q.   And who are you currently employed by?

A.   I'm currently employed with Mformation Technologies, Incorporated.

Q.   And what is your title at Mformation?

A.   I'm the chief technology officer.

Q.   And how long have you been with Mformation?

A.   Since it was created in 1999.

Q.   And who created Mformation?

A.   I created Mformation along with two of my co-founders.

Q.   And who are they?

A.   My other two co-founders were Mr. Upal Basu and Mr. Gurinder Johar.

Q.   Do you recognize this document, Exhibit 730?

A.   Yes, I do.

Q.   What is it?

A.   That's the patent referred to in this case as '917.

Q.   Could you highlight the name of the inventors?

Could you state the name of the inventors for the record?

A.   The name of the inventors are Rakesh Kushwaha and Badri Nath.

Q.   And you are that same Rakesh Kushwaha, correct?

A.   That is correct.

Q.   Do you recall receiving this patent?

A.   Yes.

Q.   Actually, what was your reaction when you received the patent?

A.   I was very excited.  That was my lifetime achievement, it seemed to me like.  I was very excited.  So was everybody at Mformation.  It was one of the most exciting days for the company.  And I enjoyed that day a lot.

Q.   Before I delve into your testimony, we've heard some things in the first couple of days I thought we might address with you.

     First, who is Mr. Ron Pettengill?

A.   Mr. Ron Pettengill was our first CEO.

Q.   Did you hear in opening statement that he was fired for cause?

A.   When you say "fired," to me, "fired" means when somebody's not doing their job.  He was let go as a part of the restructuring of the company back in 2003 when we didn't have any more business in the enterprise area, RIM shut us down.  We had to lay off a lot of people in

the company, including Ron Pettengill.

Q.   Have you been in trial from the beginning?

Have you been in this trial from the beginning of the trial?

A.   That is correct, yes.

Q.   Do you recall seeing this morning a demonstrative with respect to Mformation's income statement?

A.   That was the first time I saw this slide.

MR. THAKUR:  Can we bring that slide up?

THE COURT:  Do you have the reference number?

MR. THAKUR:  I believe it was Demonstrative 2, correct?  The income statement?

MS. DeBRUIN:  101.

MR. THAKUR:  Was it 101?  I apologize.

BY MR. THAKUR:

Q.   Did you see that this morning?

A.   Yes, I did.

Q.   Do you see that a year is missing?

A.   Yes.

Q.   What year is that?

A.   2011.

Q.   Did you make -- did you lose money in 2011?

A.   No, the operational business of the company was profitable.

Q.   Thank you.

MR. MATUSCHAK:  Your Honor, I'm going to object and move to strike.  I don't believe the documents for 2011 have been provided to us.

THE COURT:  Well, I'll have that under reservation.  Otherwise, the motion to strike is denied.

Go ahead.

BY MR. THAKUR:

Q.  Do you recall hearing testimony that the BES 4.0 was released in 2004?

A.  That is correct.

Q.  You heard questioning that -- that Mformation did not sue RIM in 2004 for the breach of the NDA.  Do you recall that?

A.  Yes.

Q.  Why did Mformation not sue RIM for the breach of the NDA in 2004?

A.  In 2004 when BES 4.0 came out, we still haven't received our patent, our patent was not awarded to us.  Our patent was awarded in 2005.  And our legal advice was to wait, wait till the patent was granted to us, and then take some action.

Q.  Do you recall seeing RIM's opening slide, the four years passed from BES 4.0 till they were sued?

A.  Yes, I did.

Q.  So the patent issued when?

A.   November of 2005.

Q.   And why did you not sue them in November of 2005?

A.   To be honest, we were very scared of RIM.  They have already destroyed us once by bundling the device management in their BES 4.0.  And we were starting customers -- RIM was still a very dominant device for even our operating customers, and we were already scared that if we file a lawsuit they will just stop giving us access to APIs, and that will completely kill our company.

So we decided that we should think about supporting other end points, other devices.  We worked hard to make relationship with Nokia, Motorola, and then we built our product in 2006 to support those.

In 2007, when the RIM portion was not that significant, we felt comfortable that if -- even if RIM retaliate, the company will still survive, because RIM was not at that point, was not the majority of the devices.

And so in 2007, you know, when we felt comfortable that even if we go after RIM, our company would still survive.

We also have to save money.  I mean, a lawsuit costs millions and millions of dollars, if you're a small company.  We saved money over those years.

And then in 2007, we decided we felt comfortable that, yes, now it's the point, we have some money, and then in 2007, we engaged with attorneys and law firm, and then we filed the lawsuit in 2008.

Q.  I'd like to bring up Exhibit 4291.  Do you recognize this document?

Perhaps you could get the date and the heading.

A.  Yes, I do.

Q.  What is this document, sir?

A.  This is a document announcing the termination of our software lines with RIM.

Q.  And what were the consequences of this termination?

A.  The consequence of this termination was that all attractions, all technical attractions were stopped, and we could no longer get access to the APIs for the new devices, which were coming in the market from RIM.  We could not support them.

Q.  Was this the retaliation you were afraid of?

A.  Yes.

MR. THAKUR:  Your Honor, we would request your permission to move Exhibit 4291 into evidence.

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  Is that the one that's been displayed?

MR. THAKUR:  That is correct, your Honor.  Sorry.

THE COURT:  I presume it's in evidence if it's being displayed.

MR. THAKUR:  My apologies.  I'll be more careful.

(Plaintiff's Exhibit 4291 received in evidence)

BY MR. THAKUR:

Q.  We heard some discussion about Mr. Ken LeVine this morning.  Who is Mr. Ken LeVine?

A.  Mr. Ken LeVine used to work at Salomon and Smith Barney, and -- in New York, and he was a very smart guy. And he helped us defining our product, what our product should look like from the customer's perspective.

Q.  Did you eventually make a decision to add Mr. LeVine to the board of advisors?

A.  Yes, we did.

Q.  And did you make that decision when he was at Salomon Smith Barney?

A.  Yes, he was still at Salomon Smith Barney.  We were deploying our product, and he really liked it, and he really provided us with invaluable feedback in terms of how it should be deployed and how it should work.

Q.  And was he still at Salomon Smith Barney when he actually joined the board of advisors?

A.  I don't remember where he was.  Most of the interactions was with Mr. Basu for him joining the advisory board.

Q.   Did you hear testimony this morning that he received 7500 options to be on your board of advisors?

A.   Yes, I did.

Q.   And is that a significant portion of Mformation's stock?

A.   No, not at all.  That's like somebody giving you a gift card to go for dinner as an appreciation token.  It was .0005 percent of the company, equating to $300.

Q.   Who's Mr. Gabe Beltramino?

A.   Gabe Beltramino was one of our first programmers we hired at Mformation.

Q.   And he was the gentleman who testified this morning, correct?

A.   Correct.

Q.   And he reports to you?

A.   He used to report to me, but now he reports to somebody else.

Q.   Did you hear him testify about a Provsys prototype this morning?

A.   Yes.

Q.   Did you hear him testify that the Provsys prototype did not include wireless registration?

A.   Yes.

Q.   And did you hear his attorney bring up the issue of your deposition?

A.   Yes, I did.

Q.   Dr. Kushwaha, could you explain what that was all about?

A.   Yes.  So I've been deposed in this case four times. And in my earlier testimony, first testimony, I had in April, I testified that the prototype, which is the Provsys, did not have all the elements of Claim 1.

In the second deposition in December, I was confused by the questioning, and I'm sorry that I did a mistake, that I said that all the claims are -- all the elements of Claim 1 was in Provsys.  However, immediately after that deposition, I went back, I called my attorney and I wanted to understand how the questions were asked, and I went and I looked at the code in detail.

And in my third testimony, I testified the truth, that Claim 1 was not presented in Provsys code, and I did the same thing in my fourth deposition as well.

Q.   And have you seen this Provsys code?

A.   Yes, I have seen the Provsys code.

Q.   And when did you see -- excuse me.  Did you see the Provsys code in preparation for your first deposition?

A.   No, I did not.

Q.   Did you see the Provsys code in preparation for your second deposition?

A.  No, I did not.

Q.  Did you see the Provsys code in preparation for your third deposition?

A.  Yes, I did.

Q.  Is the Provsys code dated?

A.  Yes, it is.

Q.  What is the date of the Provsys code?

A.  Provsys code has a time stamp of May 30th, 2000.

Q.  And was that Provsys code provided to Mformation's lawyers in this case?

A.  Yes.  The -- we provided all the source code, including Provsys code, to our attorneys when the trial was started, and I understand that was shared with RIM lawyers as well.

Q.  We heard this morning testimony about -- from Mr. Basu -- sorry for jumping around -- but we heard some testimony this morning about RIM's agent 1.0.  And then RIM's agent 2.0.  What was your understanding of what that was going to involve in relation to Mformation?

A.  Agent sits on the device, the handset, and it communicates and talks to the server which sits in the enterprise, IT infrastructure.  And both agent and server communicate with each other.

Q.  I see.  Do you recall doing some demonstrations of

your product at Research In Motion?

A.   Yes.

Q.   When you demonstrated your product, did you demonstrate just the agent?

A.   No, I demonstrated both sides.  I had an agent on the device.  I had the access to the server to my laptop, to the Internet, and I accessed -- I demonstrated both the server side as well as the client side.

Q.   Is there such a thing as a demonstration of just the agent?

A.   No, agent wouldn't work without server.

Q.   I see.  We heard the videotaped deposition of Mr. Lessard.  Who is Mr. Lessard?

A.   I just saw the the deposition, but I remember him meeting, in various meetings during 2001, 2002 timeframe.

Q.   And you heard him say that Mformation was provided private APIs, correct?

A.   That's correct.

Q.   You heard him say Mformation was provided APIs that were not provided to anyone else to his knowledge, correct?

A.   That is correct.

Q.   What is he referring to?

A.   He's referring to some APIs which are not publicly

available to other vendors.  So there are two startup APIs:  One was available to everyone, and then there were other APIs which were not available to everyone unless you have some extra permission to access those APIs.

Q.  And you were granted such access?

A.  Yes.

Q.  And what did you do with such access?

A.  We integrated those APIs with our agent or the client software.  So that would create the product onto the device.

Q.  All right.  I'm going to return to sort of, some background questioning.  You said you were currently the chief technology officer of Mformation, correct?

A.  That's correct.

Q.  And what does that involve?

A.  My responsibility includes developing technology for Mformation, and then work with engineering department to make sure that technology gets built into Mformation products.

Q.  Could we turn briefly to your education background. Could you tell me what education you received after high school?

A.  After high school I earned my Bachelor's in engineering in 1986, and then I did my master's in

computer science from New Jersey Institute of Technology in 1989.  And then I earned my doctorate degree in -- from New Jersey Institute of Technology in 1993.

Q.  And could you briefly describe your employment history since obtaining -- actually, withdrawn.

You said you received a doctorate.  Is that why you're referred to by the name "doctor"?

A.  That's correct.

Q.  So you're not actually a medical doctor?

A.  No, I'm not.

Q.  Could you tell us a little bit about your professional experience since graduating with your doctorate?

A.  So after -- when I was doing my PhD, I was a lecturer.  I taught computer science classes from 1990 to 1993.  And after 1993, when I got my PhD, I became an assistant professor at New Jersey Institute of Technology, and I taught computer science courses to masters students.

Q.  And did you leave New Jersey Institute of Technology as a professor?

A.  Yes, I left New Jersey Institute of Technology in 1995.

Q.  And where did you go?

A.  I joined AT&T Bell Labs, and I worked at Bell Labs

from 1995 to 1997.

Q. And did you hear in RIM's opening them refer to their expert witness as a researcher with AT&T Bell Labs?

A. Yes, I did.

Q. And that's the same AT&T Bell Labs where you were a researcher?

A. Yes.

Q. Where did -- actually, could you tell us what you did at AT&T Bell Labs?

A. AT&T Bell Labs, the research institution, research arm of AT&T, and AT&T I think everyone knows is the largest phone company in the U.S. As a part of the research, I worked on quite a few projects. One of the projects I worked on was to provide Internet over satellite. And we were working on our project at that time to the deliver P1 connection, which is a 1.5 megabits per second from United States to Malaysia over an interszat, satellite, and I really -- I ended up really enjoying that project. It was very cutting edge. I designed the equipment which was sitting on both sides of the satellite, and it connected the United States with Malaysia for the Internet. At that time the cables, underground cables were not there, so we were delivering that internet over the satellite.

Q. And did you leave AT&T Bell Labs?

A.   Yes, I did.  I left AT&T Bell Labs in 1997.

Q.   And where did you go?

A.   I left AT&T Bell Labs in 1997 and went to a startup company called Savera Systems.

Q.   And what did Savera Systems do?

A.   Savera Systems was building software products in the area of wireless billing systems that would allow operators like Verizon, AT&T, T-Mobile, to send bills to their customers.

Q.   Savera was not actually involved in wireless device from a management?

A.   No, Savera was focused on wireless billing systems.

Q.   Where did you go from Savera?

A.   I left Savera in '99.  It was being acquired by another big company.  And the focus was moving away from wireless billing into wiring the billing, and my interests were always in wireless.  So I left Savera. And I had some thoughts of starting up a business at that time, so I left Savera in '99.

Q.   So perhaps you can take us from Savera to the formation of Mformation.  Would you, please?

A.   I left Savera, and at that time more Internet was being talked about, but there was lot of cell phones. And I realized that these cell phones, one day they would communicate, you can get your e-mails on them, you

can get your Internet on these devices, and I really thought that wireless packet networks and wireless Internet will succeed one day.  And I wanted to do research in that area.

Q.   And did you in fact do research in that area?

A.   Yes, so I did research.  I left Savera, I started looking at the wireless base, and the more I looked into it, I researched, I realized that, you know, security is going to be a big issue because if these wireless devices will succeed, everyone them in their pocket, they will be carrying these devices everywhere, and if these devices are being used by employees, then, you know, there'll be more confidential information on them at that point, or the devices.  And if these devices gets lost or stolen, then this information will get into the hands of wrong individuals.  So really I focused on seeing how we can secure these devices.

Q.   Were you focused on the site security?

A.   I looked at this area of security and saw that this was a thing which is required for wireless to succeed, or wireless to really, you know, take off.

I also realized that manageability was an issue.  So if anything goes wrong, you know, you either have to send the device back to the office or to the IP administrator to fix it or to load some application on

it, and if the employees of the company are all over the world, all over the globe, it is very expensive and time-consuming to ship these devices all over the place.

So the other area was, how can -- you know, how can we help IP administrators to manage these devices in groups, not one by one, because that was a very expensive proposition. How can you do it, over the air? How you can send applications over the air? How can you configure these and how can you send @policies to these devices?

Q. And did you come up with a solution to these security manageability issues?

A. Yes, I did. I came up with a solution for managing these devices over the air, and securing these devices over the air.

Q. Tell me your process for coming up with this solution.

A. So I had left my job at Savera, and I was sitting in my house. I had a spare bedroom where I moved my books, my computer. I had posted boards, I remember, around my room, and I mapped the problem, the problem on the boards. I trial-and-errored a lot of different solutions, and some solutions created more issues than the other. Finally, I came up with a solution which was based on client and server technology to secure these

devices and to have manageability on these devices.

Q.  And is this the solution that is claimed in the '917 patent?

A.  That is correct.

THE COURT:  When was this?  I have lost track of time.

MR. THAKUR:  I was just about to ask that question, your Honor.

BY MR. THAKUR:

Q.  When was the this, when did you think you came up with the solution?

A.  I came up with the solution in October of '99.  I distinctly remember that month or period of the year because I remember going to Mr -- Upal, who used to live in New York, and I remember the Halloween decorations were all over the place.

Q.  So what did you do after coming up with this solution?

A.  After I came up with the solution, I met with Upal Basu and Gurinder Johar, and I formed Mformation.

Q.  We saw in the patent Dr. Badri Nath was identified as a co-inventor; is that correct?

A.  That is correct.

Q.  Who is Dr. Badri Nath?

A.  Dr. Badri Nath is a tenured full-time professor at

Rutgers University, and he's one of the -- a leader in the wireless space.

Q.   And how did you come about to meet Dr. Nath?

A.   Dr. Nath was introduced to me by some of our common friends at AT&T Bell Labs.

Q.   Was he introduced to you before you came up with your conception in October '99 or was it after?

A.   It was after.

Q.   So you met him after the invention?

A.   Yes.  I met him in June of 2000.

Q.   And please describe what occurred during those meetings.

A.   So I reached out to Dr. Nath, and Dr. Nath came to our small offices.  We were still in the Hilton Hotel suite.  And I spoke to him.  I told him about what Mformation would do in the area of wireless devices. More management.  And obviously he was a very smart and technical guy, and he wanted me to tell him more about my invention.  I asked him to sign the confidentiality agreement, which he did.  And after he signed the agreement, I told him about my invention, and I told him about how the invention would work.  He was actually very intrigued, he was excited.  And he thought that he could add some more.

          MR. MATUSCHAK:  Objection, your Honor, hearsay.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  Dr. Kushwaha, when you met with Dr. Nath, did he contribute to the patent?

A.  I met Dr. Nath in June, and we had -- after the first greeting, and then I explained to him, he did have some ideas which contributed to the invention.

Q.  Perhaps you could tell us what ideas he contributed.

A.  So my ideas were -- obviously were total wireless.  I wanted the solution to be completely wireless.  I did not want anybody to come and cradle the device or connect it to the computer.  I wanted it to be, you know, need to be registered over the year, wireless, and securely, and once it gets registered, then the owner can send commands such as lock, wipe, the other thing.

Dr. Nath came and looked at that invention, and then he added some of the things like, Hey, you should also monitor battery life on this.  These devices.  Because they're very important.  You should also monitor the location of these devices.  So that if you need to send large applications, you make sure the device is not roaming anywhere or that could be very expensive.  And then you should also check the device to see what the state of the device is in case it's not working for some reason.

Q.  Dr. Kushwaha, you mentioned the issue of battery life.  Tell me a little bit about how important is battery life to a cell phone and why.

A.  Battery life was very important.  And I think still is, right?  Everybody wants to conserve battery.  And you don't want it to run out by the end of the day.

Obviously at that point, also conserving battery on these mobile handsets was a very key element.  And we always thought about doing things to the device such that we can improve the battery life on these devices.

Q.  So perhaps if you could give us an example of how your invention would save battery life.

A.  So we did not want to have connection open all the time to have a push technology, so that, you know, you can just push a command to lock, and then have the device execute that command.

Q.  You mentioned the word "roaming."  Perhaps you could explain to us what "roaming" means.

A.  "Roaming" was when the device is, roaming either outside the country, and if it is, or roaming on some other network.  It was very important to understand the roaming because the roaming charges are pretty high.

MR. MATUSCHAK:  Objection, your Honor.  The question was, What's roaming?

MR. THAKUR:  Your Honor, this is just background

information.  I'm happy to break down --

THE COURT:  Yes, you should -- he should be directed to respond only to the questions that are asked and -- because then it makes it difficult to know when to make an objection.

So you should restrict yourself to just the question that's asked of you.

THE WITNESS:  Thank you.

BY MR. THAKUR:

Q.  Perhaps you could tell us what is "roaming."

A.  "Roaming" in wireless means when the device is passed to other network.  For example, if the device is roaming in Europe or if you're in Europe, then the device would be roaming on a foreign network.

Q.  And why do we care about roaming?

A.  We care about roaming because of the cost.  The phone calls you make when you are roaming, data connection that you make when you are roaming, they're all more expensive than when you are in your home coverage.

Q.  And do you regard Dr. Nath's contribution to your patent as significant?

MR. MATUSCHAK:  Objection, your Honor.  Leading.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  Was Dr. Nath's contribution significant, in your

mind?

A.  Yes.

Q.  Let's talk a little bit about the formation of
Mformation.

MR. THAKUR:  Could we have Exhibit 712?  If you
could just circle the date.

BY MR. THAKUR:

Q.  What is that date?

A.  That's the date when Mformation was formed in October
of 1999.  Maxerm was the original name of Mformation.

Q.  And did you at some point add additional co-founders?

A.  Yes.

Q.  Who were the additional co-founders?

A.  The additional two co-founders were Mr. Gurinder
Johar and Mr. Upal Basu.

Q.  Thank you.

Why was Mr. Basu added to Mformation?  Take your
time.

A.  Mr. Basu -- I invited Mr. Basu to join Mformation
because I thought he will help us raise money for the
company, and help on the business side of the company.

Q.  And did Mr. Basu join Mformation?

A.  Yes, he did.

Q.  What was his initial title?

A.  His initial title was CEO.

Q.   And what were his initial responsibilities?

A.   His initial responsibilities were to arrange meetings with the investors and try to raise money for the company.

Q.   Did Mformation actually --

THE COURT:  Can I interrupt just a moment?  Maybe I could speed this up a little bit if I had a little bit of time with the lawyers out of your presence.  Would you excuse me just a moment, members of the jury?  It's about 2:19.  Don't go away.  We're not quite ready for our break.  I'll call you back.  I think it will only take me about five minutes to have a conversation.  So I ask the jury to exit the jury room.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  You can remain on the stand.

Please be seated.

The reason I wanted to interrupt, I was tempted to call you to the sidebar, but I thought it might be helpful to put this on the record.  It is always unfortunate when a major witness such as this is called second, but because it sounds as though there is a potential that you're going to carry him over the same kind of information that's already been established,

what a witness like Mr. Basu has already testified, it doesn't seem to me that it's going to be helpful to the jury to have this witness now describe him and when he joined.

And so the reason I wanted to interrupt is, certain facts haven been established through a previous witness. You can just simply say to the jury, For the record, we've heard from Mr. Basu that he was hired by the company on certain dates, and I'm going to assume that you have that information in mind because it's already been presented; and, therefore, you don't need to get from this witness his recollection on that because those kinds of details are not important. And because it's unduly consumptive of time to take him through that.

And on the greater subject matter of the founding of the company and all of those matters, I've already expressed my concern that -- the Court is concerned that carrying the jury through that level of detail on matters of that kind are not going to enable them to decide whether or not a product infringes a patent. And it does seem to me that at some point I need a proffer from the plaintiff, a formal proffer, as to in what respect the overall technology of the company, whatever it was, related to the claims that are before the jury.

Because I'm having some difficulty, being concerned that -- for example, in the examination of this witness, you talk about his invention.  Now, I know because of the pretrial proceedings that he invented more than this one claim, and I'm not sure whether or not when he describes his invention he's talking about Claim 1 or whether he's talking about something else.

And so the precision that I'm asking for, you need to do; otherwise, I'm going to continue to interrupt.  Because at the end of the day, it's going to be my obligation to instruct them on the meaning of the claim, compare that to the product, and that's the question they're going to be asked to answer.  And I am increasingly concerned that the issue that is being presented by the plaintiff is whether or not they had a software product, not a method for management, which was somehow taken prior to the patent being issued.  And that is not going to be an issue the jury will be asked to decide.

MR. THAKUR:  Your Honor, actually, I appreciate your concern, and I can assure you that we will accelerate through the issues so that we don't duplicate what Mr. Basu has covered.

We will, however, quickly have him finish the software product testimony that Mformation has because

the software implements Claim 1, and so to the extent that software was demonstrated to RIM, indeed that is evidence of copying which is relevant to the second indicia of nonobviousness.

THE COURT: See, that's maybe the chicken-and-egg situation I have. I don't have any evidence of the Mformation product being the patent. And in my world, the product that's at issue is the one by the defendant. And you don't compare product to product. You compare the patent to a product.

MR. THAKUR: Right.

THE COURT: And I've said this before.

Now, to the extent you prove that a product practices all of the claims of a patent, that might be relevant. But that's not what infringement is. And so it does seem to me that, I guess, maybe at some point in time we ought to have a longer conversation about this than the five minutes I've given myself with the jury. But I was more concerned that now we have yet another witness who's going to go through history of the development and the relationship with RIM, which is not as relevant as the -- I haven't heard any evidence yet about the claims and how they pertain. So, I mean, it may be circumstance evidence that they had access to some technology that might practice the invention, but

we haven't made that connection yet.

But it sounds like you're aware of my concern.

MR. THAKUR:  Your Honor, I understand and appreciate your concern, and we will make sure relevant matters will be addressed.

THE COURT:  I hope it was a helpful interruption. So, summon the jury.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Thank you, members of the jury.  We'll continue at this point, and I always want us to recognize our court reporter, she's working even when we all take a break because she has responsibilities to prepare the record of these proceedings.  And I always take a break, sometimes she'll give me a nod that I'll take a break even before you're ready.

So you may resume your examination.

MR. THAKUR:  Thank you, your Honor.

BY MR. THAKUR:

Q.  Dr. Kushwaha, we heard this testimony this morning about a prototype.  Did Mformation make a prototype?

A.  Yes.

Q.  Did the prototype include all the elements of Claim 1 of the '917 patent?

A.  No, it did not.

Q.   What did it not include?

A.   So, prototype was built just for demonstration, as Mr. Basu illustrated in his testimony.  There was, you know, the example of the small prototype.  It did not include wireless registration.  It did not include special conditions.

Q.   After the prototype, did you move to developing a commercial product?

A.   Yes, we started building commercial products after that.

Q.   And what was your first commercial product?

A.   Our first commercial product was Version 1.0.  Which was targeted towards a customer who had Palm handheld devices.

Q.   And when was Version 1.0 developed?

A.   Version 1.0 was released somewhere in -- I don't remember the exact date, but somewhere in -- I don't remember the exact date when Version 1.0 was released.

Q.   What was the first commercial product that was actually released?

A.   The first commercial product which we shipped out the door to the external customers was not till Version 1.4.  That I remember was in April of 2001.

Q.   Will you talk quickly about Provsys obtaining the '917 patent.  Who wrote -- actually, was there a

provisional file?

A.   Yes, we filed the provisional patent in December of 2000.

Q.   And was there a regular patent application filed?

A.   Yes, we filed the regular patent application in August of 2001.

Q.   Who prepared the provisional patent application?

A.   I worked with Dr. Nath to prepare the provisional patent, and at that time we had also engaged with a registered patent attorney, attorney Michael Schwartz, and Dr. Nath and I wrote the first draft, and working with Michael Schwartz, he reviewed it and he filed with the United States Patent and Trademark Office.

Q.   And did you file a regular patent application?

A.   Yes, we filed a regular patent application after eight months.

Q.   And who wrote that patent application?

A.   The regular patent application is quite a bit of work, and it is being looked at by USPT office very carefully.  So we had already engaged our attorney, Michael Schwartz, who wrote that, and we reviewed it. Dr. Nath and myself reviewed it.

Q.   Are you familiar with the term "prior art"?

A.   Yes.

Q.   What do you understand "prior art" to mean?

A.  Prior art is any patents or any related work to your invention which is close or related to your invention which you have come across.

Q.  Did you search for any prior art before you filed your provisional patent application?

A.  Yes, we did.  We searched on the Internet and any related prior art or any related patents we found, we gave it to the USPT office.

Q.  And when you say "we gave it to the USPT office," you mean you gave it to your registered patent attorney?

A.  Yeah, we -- Dr. Nath and I did the search and we gave it to a registered patent attorney, who then provided it to the USPT office.

Q.  Did you find a lot of prior art?

A.  No.  At that time, there was not much going on in the wireless device remote management area.  But whatever we found, we handed over to our attorney.

Q.  Do you recall whether the USPTO, this is the United States Patent and Trademark Office, found any additional prior art?

A.  Most of those interactions happened between USPT office and our attorney, Michael Schwartz.  I understand they did find something.

Q.  Do you acknowledge that was disclosed?

A.  We -- everything that we found was disclosed.

Q.   Do you know how long it took to get the patent?

A.   Well, we filed in 2001.  August.  And we got it in 2005.  So four years.  More than four years.

Q.   I'd like to take a look at what is Exhibit 4147.

     What is Exhibit 4147?

A.   Looking at an e-mail, Dr. Nath to Michelle.

Q.   I'm not sure you're looking at the right document. It is a tab that would say "4147," and at the bottom right hand it would say "trial exhibit."

A.   Oh, I'm sorry.  Yes, I'm looking at the Exhibit 4147.

Q.   What is this document?

A.   This document is from USPT office.  It was.  It's a communication with USPT office and Michael Schwartz.

Q.   I'd like you to turn to what is page 4 of this document.  Do you see the page titled "Interview Record"?

A.   No.

Q.   On the bottom left-hand corner, it would say page 4. 0004.

     THE COURT:  Maybe you could use this, so you two might be on the same page, is an opportunity to take a break.  It's about 2:35.  And so we'll take a 15-minute break or so.  Come back in about 15 minutes.

     DEPUTY CLERK:  All rise.

     (The jury exits the courtroom.)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Summon the jury.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  The break's ended up being a little longer than I expected.  I went down to my office and they had two matters that I had to attend to.

You may resume your examination.

MR. THAKUR:  Thank you, your Honor.

BY MR. THAKUR:

Q.  You were looking at Trial Exhibit 4147.  I asked you to look at the fourth page.

A.  Yes.

Q.  What is this document?

A.  This is a communication with the United States Patent Office and our registered patent attorney, Michael Schwartz.

Q.  And what is that page on the left referring to?

A.  That page is referring to a meeting which myself, Dr. Nath and Michael Schwartz had with the USPTO examiner.

Q.  And you were personally present there?

A.  Yes, I was.

MR. THAKUR:  Permission to admit this exhibit?

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  Very well.  You're offering the entire 4147?

MR. THAKUR:  Correct, your Honor.

THE COURT:  Very well.  It's in evidence.

(Defendant's Exhibit 4147 received in evidence)

MR. THAKUR:  Would you put page 4 on the screen? If we could just highlight the --

BY MR. THAKUR:

Q.  Dr. Kushwaha, could you explain to me what this was and what your role at the interview was?

A.  The interview or the meeting was arranged by our patent attorney, Michael Schwartz.  Dr. Nath and myself went down to Washington, D.C.  It was an hour meeting where they discussed our invention, and there was some discussion about prior art.  It really felt like a final exam that we had to pass to get our patent approved.

Q.  I'd like you to look at the third line starting with "demonstration," if you could read that into the record, please.  Starting with the third sentence "a demonstration."

A.  "A demonstration of a wireless device incorporating the present invention was shown to the examiner."

Q.  What was the demonstration?

A.  That was the demonstration of our product.

Q.  And why did you demonstrate your invention to the

examiner?

A.   Well, I thought it would be easier to visualize the invention, rather than explaining in words, just show them the screen and show the device.

Q.   Was this version what ended up for the software?

A.   I don't remember.

Q.   Did the PTO actually approve the patent?

A.   Yes, they did.

Q.   And that is the '917 patent, correct?

A.   That's correct.

MR. THAKUR:  I'd like you to turn to Exhibit 370, if you could publish that.

MR. MATUSCHAK:  I'm sorry, the number?

MR. THAKUR:  Exhibit 370, the patent.  If you could turn to Claim 1.

BY MR. THAKUR:

Q.   Do you know what this is?

A.   Yes.

Q.   What is this?

A.   This is Claim 1 of '917.

Q.   And is this what you believe was your invention?

A.   Claim 1 is the core of the invention.  There are other claims in the '917 that adds to this.

Q.   Could you please explain to me what your understanding of the steps of the method are?

MR. MATUSCHAK:  Objection, your Honor.

THE COURT:  Well, it always is problematic because the Court's job is to interpret the language. But I'm not sure I understand what you're asking the witness to do.

MR. THAKUR:  Your Honor, what my objective was to actually have information, the inventor just discussed at a high level what he understood that to me.  Not construe the terms.  I did not provide him the supplemental opening instructions, but I thought it might be helpful for the jury to just hear what generally the steps were.

MR. MATUSCHAK:  I think inevitably, your Honor, it sounds like he's going to be asked to characterize what the meaning of the claims is, which is up to your Honor.

THE COURT:  Well, perhaps let's get started.

Members of the jury, I am somewhat concerned on two levels with someone taking a written document such as this and explaining it, because the best evidence rule allows the document itself to be the evidence of what the document says.  Now, if there is a word in that document that needs explanation, it's my job to give you an explanation of what that is, and that's what I give you in the supplemental instructions.

And -- but it is permissible, as I understand that the witness has testified that he made up a commercial product that practices this invention, to go to his commercial product and show how it does all of those things. And in an infringement case, it's permissible for the plaintiff to go through a defendant's product and show how that product does those things. And in doing that, he has to explain how the product does the verifying or does the establishing or does the placing steps that are listed there. So I'm not refusing to allow you to do that. It's there, so why don't you rein your question.

MR. THAKUR: That's what I was going to do. So I will switch the order and do exactly that, your Honor.

But I should just lay the foundation with the rest of the claims.

BY MR. THAKUR:

Q. Could you take a look at Claim 6 of this patent?

A. (The witness complies.)

Q. Is this -- can you read this?

A. Yes.

Q. Is this one of the assorted claims in this case?

A. Yes.

Q. Again, I hope I'm being expedient, could we quickly go through Claim 21?

THE COURT:  It's okay to have that said out loud so you reinforce for the jury what those steps or claims are.

And I should explain to you, members of the jury, there are two kinds of claims in a patent.  There are independent claims, everything is contained in the claim itself.  And the claims that are being shown now are called dependent claims.  You'll notice that it says the method of Claim 1.  So it takes Claim 1 and it assumes something else, something in addition to what is in Claim 1 as a further limitation on what this invention is.

So go ahead.

MR. THAKUR:  Your Honor, with permission, I'd actually like to go back to Claim 6 and get that into the record.  Thank you.

BY MR. THAKUR:

Q.  Could you turn back to Claim 6, please.

This is Claim 6 where it states:  "The method of Claim 1, further comprising the step of:  Transmitting information relating to execution of the command at the wireless device, from the wireless device to the server."

Do you see that?

A.  Yes.

Q.   Is this one of the asserted claims in this case?

A.   Yes.

Q.   If you could do that for Claim 21, please.

It reads:  "The method of Claim 1, wherein the command comprises enabling/disabling access of the wireless device to the server."

Do you see that?

A.   Yes.

Q.   Is this one of the asserted claims in this case?

A.   Yes.

Q.   Would you please turn to Claim 22.

It reads:  "The method of Claim 1, wherein the command comprises enabling/disabling applications that may run on the wireless device."

Do you see Claim 22?

A.   Yes.

Q.   Is it one of the asserted claims in this case?

A.   Yes.

Q.   Claim 23, please.  "The method of Claim 1, wherein the command comprises erasing all or part of contents of the wireless device."

Do you see that Claim 23?

A.   Yes.

Q.   Is it one of the asserted claims in this case?

A.   Yes.

Q.   Would you turn to Claim 24, please.

Claim 24 reads:  "The method of Claim 1, wherein the command comprises transmitting new programs and data to the wireless device."

Do you see that?

A.   Yes.

Q.   Is that one of the asserted claims?

A.   Yes.

Q.   And lastly, Claim 25.  "The method of Claim 1, wherein the command comprises querying a current state of the wireless device."

Do you see that?

A.   Yes.

Q.   Is that one of the asserted claims?

A.   Yes.

Q.   So of the claims I mentioned, could you identify -- which, if any, of these claims were actually Dr. Nath's invention?

A.   The Claim 25, "wherein the command comprises querying a current state of the wireless device."

Q.   And I think I have one last claim left, Claim 27. Which reads:  "The method of Claim 1, wherein the command comprises monitoring a location of the wireless device in the wireless network."

Do you see that?

A.   Yes.

Q.   Is that one of the asserted claims?

A.   Yes.

Q.   And who contributed -- who conceived of this claim?

A.   Dr. Nath.

Q.   So it is your testimony that Dr. Nath conceived Claims 25 and 27?

A.   That's correct.

Q.   And is there a -- what is the commercial value of monitoring a location of a wireless device?

A.   The commercial value of monitoring a location is when you are sending a large amount of data or information to the device, and if the device is roaming on a foreign network and if you did the location, then you will wait till the device comes back, and then you can load the applications or something on the device, which will be cheaper for the user.

Q.   Could you turn back to 25, quick, as well.

"The method of Claim 1, wherein the command comprises querying a current state of the wireless device."

What is the commercial value of this claim?

A.   It is to query the current state.  So if you are experiencing a problem in your device and you call the help desk or call someone to help you, they can query

the state of the device to see what is wrong with the device.

Q.   One last one I'll turn you back to is Claim 6.

"The method of Claim 1, further comprising the step of:  Transmitting information relating to the execution of the command at the wireless device, from the wireless device to the server."

What is the commercial application of this?

A.   This is actually the acknowledgment when you send a command to the device, such as if you send a lock command to a hundred employees, and then you want peace of mind, how many received it, how many acknowledged back, how many devices being knowledged back and said yes, I executed a log command.  So this is the person sitting on the console, can see which commands were successful and which commands failed.

MR. THAKUR:  Your Honor, I would like to turn to Mformation's commercial code, Version 1.4.  Just need to get the exhibit number.

Sorry, could you publish Exhibit 2226?

I'm sorry, apparently, I don't believe this has yet been published.

Your Honor, I apologize.  We have to go back for a couple of documents.

Your Honor, Exhibit 2226 is not objected to.

With your consent, it may be admitted into evidence?

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  2226 --

MR. THAKUR:  Correct.

THE COURT:  -- is in evidence.

MR. THAKUR:  Thank you.

(Plaintiff's Exhibit 2226 received in evidence)

MR. THAKUR:  Would you kindly bring that up?

Thank you.

BY MR. THAKUR:

Q.  What is this document?

A.  This is the -- one of the files from the code off our agent software which runs on devices.

Q.  Don't want to be repetitive but "agent code" is what?

A.  Agent code is the code which runs on the -- it's an agent code or time code which runs on the handheld, or on the smartphone.

Q.  So this is the agent code that would be resident on the device?

A.  That is correct.

Q.  Do you know what version of the code this is?

A.  This is a code for Version 1.4.

MR. THAKUR:  Would you kindly bring up page 0061 and highlight the middle portion, please.

BY MR. THAKUR:

Q.   Would you identify what this is?

A.   This is the code which demonstrates or implements the registration message or the registration information sent from the wireless device for the wireless server.

MR. THAKUR:   Would you kindly bring up page 703.

BY MR. THAKUR:

Q.   Do you recognize this document?

A.   Yes.

Q.   What's this document?

A.   This is the source code, which implements a receiving of the message on the device, from the server, and the handle radio means you get the message from the radio, and then the -- and it receives the message on the handset.

Q.   So this is the receipt or the command from the server, correct?

A.   That is correct.

Q.   And does the receiving process involve more than just receiving?  Does it look at the code?

A.   Yes.  After it receives it, it goes through a decryption process to accept it because the command could be coming from anywhere else, you want to make sure it's coming from a dedicated server.

Q.   It's authenticated for acceptance purposes?

A.   Yes.

MR. THAKUR:  Could we turn to page 714.

Could we just circle the top.

BY MR. THAKUR:

Q.   What is this code?

A.   This is the code which you process to accept the message which is received, which has been received.

MR. THAKUR:  If we could go down toward the bottom of the document.  There you go, bottom quarter.

If I could just highlight the third from the bottom line.

BY MR. THAKUR:

Q.   What is occurring here?

A.   It is, as I was mentioning, when you receive the message, after you receive it, you -- in order to accept it, you need to decrypt it.  So this is the decryption phase of this.

Q.   Most people know what -- if you could quickly explain what is "decryption"?

A.   You want the communication to be secure over the air, and so you want to encrypt your message or command that you send from the server, so it goes securely over the air, and it comes on the device, you want to decrypt it and open it up to understand what the command is.

Q.   And this must be done prior to execution?

A.   That is correct.

MR. THAKUR:  Would you kindly turn to page 738. I'd like you to highlight the middle portion of the page.  There you go.

BY MR. THAKUR:

Q.   What is this code?

A.   After you have received it, accepted it, by decrypting it, then you want to execute it.  The command could be a number of commands, so once you know what it is, then you will do the actual execution of the command on the device.

MR. THAKUR:  If you'd kindly turn to page 745. If you could highlight maybe the middle quarter, middle half, okay.

If you could highlight the case "CMDZAP."  A little bit below, it says "CMDZAP."  Thank you.

BY MR. THAKUR:

Q.   So what's this relating to?

A.   This is one of the commands, when you see it, accept it, decrypt it, then you know what's in the command. And that's one of the commands, which was "zap" we used to call it.  It's wiping the contents of the device and removing all the information from the device.

THE COURT:  I lost track of -- am I looking at code that would be resident in the server or resident in

the device?

MR. THAKUR:  It's the device portion, your Honor.

THE COURT:  This is the device.

MR. THAKUR:  Nice segue to the second half of the question.

BY MR. THAKUR:

Q.  So this is the code, the steps that are performed at the agent?

A.  That is correct.

Q.  On the device?

A.  That is correct.

Q.  This morning you heard Mr. Beltramino -- just repeat for one last time this is Version 1.4 agent code?

A.  That is correct.

Q.  You heard Mr. Beltramino this morning testify about the Version 1.4 server?

A.  Yes.

Q.  Did you hear him say that the server has the ability to verify registration?

A.  That is correct.

Q.  The server establishes mailbox informing the queues?

A.  Correct.

MR. MATUSCHAK:  Leading, your Honor.

THE COURT:  Yes, it is.

BY MR. THAKUR:

Q.   So did Mr. Beltramino talk about what the capabilities of this server were?

A.   Yes.

Q.   Did the server include capabilities with respect to commands?

A.   Could you please reask the question.

Q.   I'm sorry, did the server have the ability to respond to commands?

A.   Yes.

Q.   Did the server have the ability to deliver commands?

A.   Yes.

Q.   Is it your testimony that combining the server code 1.4 with the agent code 1.4, the 1.4 version of Mformation software could perform every element of Claim 1 of '917?

         MR. MATUSCHAK:  Objection, your Honor.  Expert opinion for which no expert report has been provided.

         MR. THAKUR:  This is explaining his opinion as to whether it could or not, which is the basis to establishing the nexus.

         MR. MATUSCHAK:  He's reading the embodiment. He's reading a product.  The plain language on a product.  No more proper for him to do it with our product than his own.  Without an expert disclosure.

THE COURT:  Was this witness tendered as an expert?

MR. THAKUR:  This witness was not tendered as an expert.  But this witness is the inventor.

THE COURT:  I understand.  But even inventors need to be properly tendered to express opinion testimony.

Can you go to other areas?  I hesitate to invite that because that leaves us with something major to come back to.  But this is an area that the Court has some concern, so that all of the opinions that are going to be expressed in the case are previously disclosed.

The jury may or may not hear from expert witnesses in the case.  And these are individuals who have been tendered by the parties to express opinions about various matters.  And sometimes even owners of enterprises can express opinions, but whether they become expert opinions, the rules require that they be disclosed previously and that those opinions be disclosed prior to trial so that they can be fairly examined.

And it could be that I'm going to be satisfied that there has been a previous disclosure, but without discussing that with the attorneys out of your presence, I can't do that.  That's why I was inviting to see

whether there was something else we could go to so we could have that conversation later.

MR. THAKUR:  I'm sure, your Honor.

BY MR. THAKUR:

Q.  What is the OMA?

A.  OMA stands for "Open Mobile Alliance."

Q.  And what is OMA?

A.  Open Mobile Alliance is a standards organization, wireless standards organization.

Q.  And have you heard the term OMA DM?

A.  Yes.  DM stands for "device management," so OMA is the Open Mobile Alliance standards body and device management is a subgroup of OMA.

Q.  I see.  And are you a member of the OMA?

A.  Yes, we are -- we were one of the founding members of OMA.

Q.  And are there other members of the OMA DM?

A.  Yes, other members of OMA includes RIM, IBM, Ericsson, and others.

Q.  So Research In Motion, to your knowledge, is a member of the OMA DM?

A.  Yes.

Q.  Let me put up Exhibit 1081.  That has already been admitted.

Do you know what this document -- actually, let's

perhaps circle the top.  Do you know what this is?

A.   Yes, this is the meeting minutes of one of the OMA DM

face-to-face meetings in February of 2004.

Q.   Did you attend that meeting?

A.   Yes.

MR. THAKUR:  Perhaps if we turn to page 8 of this

document.  If we could just scroll, right in the middle,

it says "Rakesh."  Right in the middle.

BY MR. THAKUR:

Q.   Do you see the word "OMA DM 2004 Performance and

Fault Reporting"?

A.   Yes.

Q.   It says below it "Rakesh presented this document."

A.   Yes, I did.

Q.   Can you explain to us what occurred there?

A.   Yes.  So I presented every member company of –- the

standards, can present it in terms of how standard

bodies should harmonize a solution.

Q.   If we could turn to page 12 of this document.  The

portion that says "Intellectual Property Rights."  If

you could read that into the record, please.

A.   "Mformation (Dr. Rakesh Kushwaha) declared IPR on

OMA-DM-2004-0012-device wipe and lock (submitted by

IBM)."

Q.   What do the words "submitted by IBM" mean?

A.   IBM is another member company of the standard body. They presented a document in the standard body to introduce over-the-air lock and wipe to the standards body.

Q.   And perhaps you could explain the rest of the sentence, as to why you did that?

A.   So effort -- in every face-to-face meeting, when somebody submits a document that is an IPR where the chair of the device manager @discloses there are any relating IPR in this area, and if there are, then the member company must raise their hands and declare that they have IP, or intellectual property, in that area.

Q.   When you said "IPR," what does that mean?

A.   Intellectual property.

Q.   Intellectual property ...?

A.   Rights.

Q.   What were you thinking of in terms of Mformation's intellectual property rights when you said that?

A.   I was thinking of the '917 patent.

        MR. THAKUR:   Could you turn to page 2 of this document.  The top.

BY MR. THAKUR:

Q.   Every one with the last name starting with A's.  Do you recognize a last name of Alfano there?

A.   Yes.

Q.   And perhaps you can explain to me who this individual Nick Alfano is?

A.   Nick Alfano is the representative pending the OMA meeting with RIM.

Q.   And he was present at that meeting?

A.   Yes, he was.

Q.   And when you said he disclosed the IPR, perhaps you could just say with a little more clarity exactly what was this process.

A.   So I raised my hands in the OMA DM meeting, and I told every member of -- that was present in that meeting that Mformation has intellectual property and Mformation had a patent in this area of over-the-air lock and -- over the air.

Q.   And do you know if Mr. Alfano was there when you disclosed that?

A.   Yes, he was there.

Q.   How do you know that he was there?

A.   I saw him.

Q.   I'd like you to take a look at Exhibit 474, please. It's not admitted.

A.   What was the number?

Q.   It's Exhibit 474.

     Do you recognize this document?

A.   Yes.

Q.   What is this document?

A.   This is the document which lists all the configurations from a member company of the OMA, of their intellectual property and patents.

Q.   And you have seen this document before?

A.   Yes.

Q.   And you have -- you're aware of other disclosures and patents?

A.   Yes.

Q.   To your knowledge, this is something that you maintain in the ordinary course of business?

A.   Yes.

MR. THAKUR:  Your Honor, we move Exhibit 474 into evidence.

MR. MATUSCHAK:  I have no objection, as long as it's only for a certain alphabetical list of companies. So if we're going to admit a list, it either should be the whole list, not just the -- he testified it was the whole list.  It's only to something else.

THE COURT:  Why is this relevant?

MR. THAKUR:  Your Honor, this is where Mformation disclosed the patent to a standards organization in which Research In Motion was present, and as a result, it constitutes notice of the patent to Research In Motion as of this date.

MR. MATUSCHAK:  That's not what this is, your Honor.  This is something that's printed off a website.  It has nothing to do with what occurred on a particular date.  This is just a website list and it's a partial website list.  We have no objection as long as the entire website list is free to come in.

THE COURT:  Very well.  Perhaps it would be helpful to clarify for the jury why we're concerned with this.  Apparently, these companies are members of a standards setting board.  And when a standards setting board is set up, members of various companies try and set standards that everybody will adhere to.

And it's my rough understanding, as I'm listening to this for the first time, is that when you are sitting on a standards board, you want to disclose your intellectual property rights because, well, you want to @dart against a couple of things.  First, you want to be on the standards board and you don't want to have people think you're setting the standard to protect yourself.  So by disclosing all your own intellectual property rights, everybody who was there and the industry in general will know where you have intellectual property rights, so your standards are set fairly so that it's not designed to protect one company or another.

Am I correct that that's what is going on here?

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

MR. THAKUR:  That is correct.

THE COURT:  So what this is being tendered for, it's a partial document, but it might be helpful to you in deciding an issue in this case, and so I will receive 474 in evidence as a document with a portion of the members of this organization who are disclosing to whom this would be issued, what intellectual property issues they may have as standards.

(Plaintiff's Exhibit 474 received in evidence))

MR. THAKUR:  Thank you, your Honor.

Would you please bring up page 1, just clarification, please.

BY MR. THAKUR:

Q.  Do you recognize that name?  OMA?

A.  Yes.

Q.  And this is the standards organization you were referring to?

A.  Yes, that's the Open Mobile Alliance.

Q.  And it is your understanding that you could disclose the patents on their website?

A.  Yes.

Q.  Is there a standard process for doing so?

A.  Yes.

Q.  What is the standard process?

A.  The standard process is when you join the OMA as a

member, any intellectual property that is relating to the work which is going on in the standards body are supposed to declare that, and then if there is any update -- so, for example, when we joined, we just declared our patent application, but then when the patent was issued, we send a notification to them that this patent has been granted.  And then the OMA and the presenters of the OMA, the system administrators, update this website.

MR. THAKUR:  I'd like you to turn to page 5.  If you could find the name "Mformation," about a third of the way down.  Fourth of the way down.

You may want to go a little bit higher up.

BY MR. THAKUR:

Q.  Do you see the name "Mformation"?

A.  Yes.

Q.  Do you see the third name, time Mformation's disclosed?

A.  Yes.

MR. THAKUR:  If you could highlight that, please.

BY MR. THAKUR:

Q.  What is that disclosing?

A.  That is the '917 patent.

Q.  And that was disclosed in accordance with the OMA procedures; is that correct?

A.   That is correct.

Q.   We've heard substantial testimony about meetings with Research in Motion, so I will avoid the duplication, but I just want to focus on the ones you were involved in. So if we could turn to you August -- excuse me, exhibit -- wait.

MR. THAKUR:  Would you kindly turn to Exhibit 4464.

BY MR. THAKUR:

Q.   What is this document?

A.   This is the 4.2 presentation which I delivered when I went to Waterloo, Canada, on August 30th, 2001.

Q.   And you were personally present?

A.   Yes.

MR. THAKUR:  Your Honor, we'd move to admit this into evidence.

MR. MATUSCHAK:  No objection.

THE COURT:  What number is that?

MR. THAKUR:  4464.

THE COURT:  Very well.

(Plaintiff's Exhibit 4464 received in evidence)

BY MR. THAKUR:

Q.   You -- I think the doctor has been seen, so all I would like you to do is explain what occurred at that meeting.

A.   So if you look at this document, this discloses what Mformation products are -- Mformation is a company, and what Mformation products can do.

Q.   Did you demonstrate your product at this meeting?

A.   Yes, I did.

Q.   Had you received RIM's APIs -- had you received RIM's private APIs by this date?

A.   Yes, I did.

Q.   Who attended this meeting with you?

A.   I think it was Craig Wolfson.

MR. THAKUR:  Your Honor, I would like to display Exhibit 2223.  May it be admitted in evidence, your Honor?

MR. MATUSCHAK:  No objection, your Honor.

(Plaintiff's Exhibit 2223 received in evidence)

MR. THAKUR:  Would you please publish Exhibit 2223.  Would you scroll down to the bottom, please.

BY MR. THAKUR:

Q.   Do you see the date?

A.   Yes.

Q.   What is the date?

A.   That's November 8, 2001.

Q.   What do you understand this document to be?

A.   That's a non -- it's the document signed with RIM and

Mformation.

Q.  Would you turn to Exhibit 566, please.

A.  What was the number, Counsel?

Q.  Exhibit 566.

MR. THAKUR:  Your Honor, I will use it just to refresh the recollection.

BY MR. THAKUR:

Q.  Do you recall there was a follow-up meeting in Waterloo, Canada?

A.  Yes.

Q.  And when did that meeting occur?

A.  There were quite a few meetings that -- which are you referring to?

Q.  Did you have a meeting with RIM in Canada on January 11, 2002?

A.  Yes.

Q.  Who attended that meeting?

A.  That meeting was attended by myself and the director of business, Craig Wolfson.

Q.  What was the -- occurred at this meeting?

A.  At this meeting I demonstrated our technology demo or product.  And there was detailed technical discussions. A lot of technical information were exchanged, and I provided everything what -- how our technology works, how our server works, how our line works.  So I gave all

the technical information of that.

Q.   And that was disclosed pursuant to the NDA?

A.   That is correct.

Q.   Do you know who from RIM attended that meeting?

A.   I remember it was Dave Castell and there were other individuals there as well.  And Allan Lessard as well.

Q.   That's the same Mr. Lessard we saw the videotape deposition from earlier today?

A.   That is correct.

MR. THAKUR:  May we admit Exhibit 603 into evidence?

MR. MATUSCHAK:  I'm sorry, which number?

MR. THAKUR:  603.

THE COURT:  Very well, by stipulation 603 is in evidence.

(Plaintiff's Exhibit 603 received in evidence)

BY MR. THAKUR:

Q.   What is 603?

Perhaps I could have you look at the date.  That might help.

A.   Yes, it's the e-mail from Ken LeVine on January 24th, 2002.

Q.   And what was the purpose of this e-mail?

THE COURT:  Well, you can read it.

BY MR. THAKUR:

Q.  Yep -- yes.

A.  This was the follow-on meeting from January 11th, where there was a lot of detailed questions were asked, and I provided all the answers.  But they wanted to understand more technical details, which I was not being able to answer.  So I arranged a follow-on meeting with Mr. Amit Shah, who's our VP of engineering.

Q.  First of all, I apologize.  I interrupted you to do that.

Was there a meeting that occurred on January 25th?

A.  Yes.

Q.  If you could quickly scroll to page 12.  What are you disclosing in this structure, Doctor?

A.  I can't read it very well, but from my recollection, it was our -- the architecture of how we integrate, as how our product scales, and what are the functionalities of the products.

MR. THAKUR:  Would you please go to page 18.

BY MR. THAKUR:

Q.  Do you know what this document is?

A.  Yes.

Q.  What is it?

A.  This is the document which describes screenshots from

a work product and architecture as of the -- how the screenshots, we can integrate it with other systems.

MR. THAKUR:  Would you kindly turn to page 19.

BY MR. THAKUR:

Q.  What is this document?

A.  This is a screenshot from our product which shows how you can monitor and manage devices.

Q.  And this is on your server side, correct?

A.  That is correct.  This is a server side screenshot.

Q.  If you could turn to page 23.  What is this document?

A.  This is more details on how the Mformation platform can talk to the devices and how it can collect information from the devices and how it can control it.

Q.  Perhaps turn to page 26.  What does this relate to?

A.  This is -- can get technical, but it is the different messages which we can forward to third-party system of any details of any event which we had.

Q.  And all of this technical information relates to information server?

A.  That is correct.

Q.  All of this was relating to Version 1.4 of Mformation?

A.  That is correct.

Q.  So it's your position that you demonstrated that both the server and the agent versions wound up for -- to

RIM?

A.  Yes.

Q.  I'd like you to turn back to Exhibit 370.

That is the patent.

MR. THAKUR:  Please publish it.

If you could highlight the invention, the title.

BY MR. THAKUR:

Q.  "System and met" -- what does the title say?

A.  "System and method for remote control and management
of wireless devices."

MR. THAKUR:  If you could scroll down to the
right side.  If you could actually maybe take the whole
prior art section.

BY MR. THAKUR:

Q.  On the top right side, do you see a certain list of
documents?

A.  Yes.

Q.  What are those documents?

A.  Those documents are all prior art related to the
invention.

MR. THAKUR:  If you could scroll to Column 3 at
the bottom.  Sorry, the other direction.  Column 1.

BY MR. THAKUR:

Q.  Do you see "additional prior art" at the bottom of
Column 1?

A.   Yes.

Q.   And is this prior art that was found during the prosecution of the file history?

A.   I don't remember when it was found, because the patent prosecution was done by my attorney, Michael Schwartz.

MR. THAKUR:  I'd like you to highlight what is line 60.  Up above 60, "Provisional Application."

BY MR. THAKUR:

Q.   What is this provisional application?

A.   That is the provisional application which Mformation filed in December 2000.

Q.   And that was written by who?

A.   That was drafted by myself and Dr. Nath, and it was then reviewed by our attorney, Michael Schwartz.

Q.   I'd like to talk a little bit about 2003, 2004, without covering -- repeating ground.  From a technical standpoint, how did your business change -- I'll withdraw it.

In 2000 did you ever have any dealings, negotiations with wireless carriers?

A.   2003 is where we were -- the enterprise market, none of the enterprise customers would buy our product, because RIM was still --

MR. MATUSCHAK:  Objection.

THE COURT:  Just a moment.  I'm a little concerned as to have you explain why they wouldn't do certain things.  So let's wait to establish a foundation as to how you might know that.  It could be that they told you that.  It could be that somehow that might also garner an objection as well.  So let's be careful about that.

MR. THAKUR:  Fair enough, your Honor.

BY MR. THAKUR:

Q.  Perhaps we can just answer the question a little bit smaller.  To a limited extent.

So did Mformation have dealings with wireless carriers?

A.  Yes.

Q.  Could you identify some of those wireless carriers, please?

A.  T-Mobile, in the United States, and O2 and Vodafone in Europe.

Q.  And Vodafone is a wireless carrier as well?

A.  Yes, Vodfafone is the wireless carrier in Europe.

Q.  Could you explain to me your relationship with T-Mobile?

A.  So, with the T-Mobile, we were positioning our product to sell to them so that they could manage consumer device uses, and that was the proposition we

were working with the carriers.

Q.   And when you were working with the carriers for individual customers, can you explain the difference between an individual customer and enterprise customer?

A.   There is a huge difference between the requirements of an enterprise versus the consumer.  An enterprise as a corporation wants to secure the data which is on these devices, so they put a high value on that feature.

Also, in the case of managing these devices in bulk or volume was one of the requirements for the enterprise.  However, those type of needs were not there for the consumer type of devices.

Q.   So did you develop a different product for the consumer market?

A.   Yes, we did.

Q.   And what were the fundamental product capabilities differences between the enterprise product on the consumer market?

A.   There was huge difference, because security was not something which was a requirement from operators.  Also, from the manageability perspective, it was very limited.  We could just provide information to carriers just on a -- just to just have their devices in a database so that they can know which devices they have on there network, but very limited security and manageability

features.

Q.   And when did you turn to the individual enterprises -- excuse me.  I'll withdraw that question.

You used the word "operator."  Perhaps you could explains what the operator is.

A.   Operator is like the T-Mobile, AT&T, Verizon, wireless operators.

Q.   And we've learned earlier how you would deal with RIM.  How does the Mformation business model work with carriers?

A.   So as the value proposition, it's not as valuable for consumers; the security and manageability is more valuable for enterprise.  We would not charge the same amount of money to the operators because the features they were using were very limited.  And so the business model, the pricing, it was huge difference between the two.  It was much, much less and much, much lower for the consumers.

Q.   And have you -- is your business model mostly in the individual customer or are you still continuing to compete in the enterprise space?

A.   No, we don't compete in the enterprise space at all. We only work in the consumer spaces.

Q.   One of the questions I had in your research coming up with your invention, where did you do all of this

research?

A.   I did that research in my house.

Q.   And what did you look at to come up with solutions for your invention?

A.   I focused on enterprise.  I focused on the security and manageability because those were the high value features, and we could charge more for that, and obviously we couldn't charge as much for managing consumer devices.

Q.   A couple of quick questions about --

MR. THAKUR:  I'm trying to wrap up, but I think I may need a few minutes in the morning.

THE COURT:  Certainly, and there's a pending objection I need to deal with.  Let's quit for today. We'll come back to this matter tomorrow morning at 9 o'clock.

Remember my admonition.

I'll ask the lawyers to remain.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  You may step down, Doctor.

Out of the presence of the jury, I don't want to keep you long, but I wanted to first clarify this issue having an objection being made with respect to certain opinion testimony.  Can you bring me back to the area

that to which you're making an objection?

MR. MATUSCHAK:  Yeah, and I can simplify it, your Honor.  My concern was he was going to go through on an element-by-element basis comparing this product to the claims, which I think is expert testimony.  But if all that Mr. Thakur wants to do is to say, Were all the elements of this claim present in your commercial embodiment, I have no objection to that.  I just didn't know what the scope was that he was going into.

MR. THAKUR:  And that was one of the few questions I was going to finish up with, if I can do that first thing in the morning.

THE COURT:  Please be seated.  It makes me nervous, you might rush the bench.

(General laughter)

THE COURT:  All right.  Then so I think maybe we can overcome the concern then.  So you don't have any objection.

One concern that the Court has -- it might be that I'm starting to say this more than I need to -- is there's nothing wrong with an inventor commercializing his or her own invention.  And so you can practice your own invention, but even as you practice your own invention, it seems to me to be improper to then take your product and then compare it to someone else's

product, because that does violate the requirement that

you prove that your claim is present in their product.

So one of the concerns that I have as I'm

listening to this is, as you have described the

plaintiff's practice of the invention by the plaintiff,

you have described various codes as the way to do it.

Is it your proffer that those codes are going to be

showing up in the accused product so that that will be a

way the jury can figure out that the defendant is

practicing the invention?

MR. THAKUR:  Your Honor, so actually, this is the

last witness where we turn to effectively our

infringement case coming up where we are going to be

presenting RIM's products through our expert, who indeed

is going to look at RIM's code and say -- he's going to

go through the formal steps you would expect of

infringement -- of the claim, the construction, and he

shows you the --

THE COURT:  That's what I'm asking more

precisely, if their invention is this code, which is

which came first, and then they put the patent together,

because a patent is both on a method and a system.  And

the system claims there are descriptions of various

codes and ways of operating.  But if the code came first

and then the patent is the code, I'm asking is your

proffer that that code, which we now put in in the form of our patent, is going to show up over here? Not that they have their own code that have the same thing as the claims do, but showing our code, when we go look at their code, because our code is our patent, and we see their code, we're going to see the same thing.

MR. THAKUR: We're not saying it's a copyright infringement case.

THE COURT: I'm not asking about copyright infringement. I'm asking whether the code is there.

MR. THAKUR: Your Honor, we were saying the structure of our code is basically our patent. And the structure of their code is infringing the patent.

MR. MATUSCHAK: They're not going to compare the code, your Honor.

MR. THAKUR: We're not comparing the code.

THE COURT: Let me hold my thought then until I see what it is, because up to now I haven't heard any claim of infringement. I haven't heard what it is that they're doing, their practice is. I've heard what you're doing to practice it, and that seems to me to not be as on point.

The second thing that I became concerned with is things like encryption. You spent some time with this witness showing how that is done. As I looked at the

method, I didn't see that as being one of the steps in the method. And so I became concerned that the broadness of the product is not matching the limitations of the claim.

And so I will continue to be concerned about that, because I don't want the jury to find, well, they encrypt; and, therefore, they are infringing. That's -- I'm not sure I find that to be as helpful, and when you're starting to show these various routines without tying to something that is a step in the method.

And then, this last area having to do with lost sales, do I understand that the plaintiffs wish to show that their business fell off and they lost sales as a -- that that will be tendered to the jury as a way of looking at damages?

MR. THAKUR: No, your Honor.

THE COURT: Why is it relevant then?

MR. THAKUR: Why it's relevant is that what defendant is arguing is that we licensed our software to individual customers at a far lower value than what the price intended to do with enterprise customers. Dr. Kushwaha, laying down the ground work, is that individual customers have far different needs, and as a result, value it differently. And actually you basically have the extent of the testimony.

THE COURT:  So this is really rebuttal to a defense that hasn't been made yet, trying to anticipate that defense by now laying some -- so that is why it was confusing to me.  I mean why am I hearing about this was the question that I -- so I try to put myself in that chair to figure out how to process this information.  And so it is always strategy to anticipate a defense and try to lay the ground work, so I'll leave it -- that helps me.  I was somewhat concerned about that.

Let me see if there was one other one.

I thought I wanted clarification with respect to this 1.4.  And when that product was invented.  And that code was written.  I didn't get that date.

MR. THAKUR:  I'm sorry, Dr. Kushwaha did testify it was April 2001.

THE COURT:  April.  All right.

Very well.  Any other matters out of the presence of the jury?

MR. MATUSCHAK:  Yeah, your Honor, I have three.  I'll be fast.  I have three issues that relate to this particular witness.  Well, one actually doesn't.  The motion you'll recall with Mr. Basu, they asked -- no, actually it was this witness, I'm sorry -- they asked him, Okay, well, we saw 11 straight years of losses, but what about 2011?  And they answered that out before I

could get up.  They have not produced the 2011 material to us, and I renew my motion to strike, and I think the jury should be instructed that that is subject to --

THE COURT:  And I wanted to give you a chance to respond.

MR. THAKUR:  I don't know when I stand here as to whether he received the financials or not, but the easiest solution will be to provide them to them on an expeditious basis.

THE COURT:  Well, the -- I didn't understand all of this in terms of why there is this concern about 2011.  But I understand your objection to be if it wasn't provided pretrial, it doesn't help you to get it now because it sort of puts you in a different position.

MR. MATUSCHAK:  Right.

THE COURT:  So when you put together the chart that was shown to the jury, was that based upon the limit that the parties had agreed to would be the window for purposes of damages or whatever?

MR. MATUSCHAK:  It was the limit of what they produced to us.

THE COURT:  I see.

MR. THAKUR:  It may have been a discovery cutoff date.  I will acknowledge when I stand here it was probably due to the discovery cutoff date.

THE COURT:  So I would otherwise sustain the objection.  So you need to govern yourselves accordingly or reach a stipulation as to which, beyond what was disclosed, you will be allowed to present.  I presume that your experts don't go into that.

MR. THAKUR:  They do not, your Honor.

THE COURT:  Very well.  I have given you some of my rulings on some of these documents, there was another set that I held back that I wanted to read overnight, and it had two concerns for me.

First of all, although I appreciate that e-mail is a large part of this case and many cases, I was trying to be careful with the objections that were being raised not to simply allow an e-mail because it is done by -- in a business method, as a business, to come in, without satisfying myself that it qualified for exceptions to the hearsay rule.  Because people can write all kinds of things in e-mails that aren't necessarily regularly recorded activity by someone whose job is to just kind of do it neutrally.  And I was particularly concerned, once a dispute arose between these two companies, to separate out e-mails that were taking positions with respect to the dispute as opposed to regularly recorded activity.  So I was going to look to do that.

To the extent I don't know enough based upon what's in the file, I'll maybe ask you to address that later.  And, because that is a concern that was raised by the objection that I couldn't figure out without further input.  And maybe I'll just bring that up at some point.  I didn't know when you were needing these exhibits in the course of your examination, but if you come up to one that I'm holding on to and you need it, let me know ahead of time and I'll try and let you address the Court on that so that I can figure it out.

MR. MATUSCHAK:  So, your Honor, if I can inquire on that issue of the 2000 -- we have the situation where the witness actually did provide the testimony about information that has not been produced in discovery.  So we would like that stricken from the record.

THE COURT:  The only statement made by the witness was things turned around for reasons that I didn't quite capture.  But if I strike it, you're going to actually invite the jury now to go back to it and think about it again.  You sure you want me to try and recall for them what it is I'm striking?

MR. MATUSCHAK:  Your Honor --

THE COURT:  If there's nothing further said, I'll decline the motion to strike at this point because it was not -- he didn't go into it in any greater detail

than saying, We turned around a little bit in 2011.  And unless I learn more about why that's important to strike, I won't strike it at this point.  I'll leave it as something that there was limited testimony on.

MR. MATUSCHAK:  There is one document that we have on our list of documents or exhibits that we may use for cross to which there's an objection.  I guess we can wait till tomorrow and see.  I can wait.

THE COURT:  That I have or --

MR. MATUSCHAK:  I don't think you have that one. I'll just wait.

There is one last issue, and that is, on direct examination, Mr. Kushwaha -- Dr. Kushwaha was asked, you know, Why didn't you sue?  No, it was too expensive for us to sue.  These lawsuits cost a lot of money.

Your Honor, it's already been disclosed in the case that Mformation's being represented on a contingent fee.  I think the door has been opened that this lawsuit costs a lot of money and that's why he didn't sue, that I ought to be allowed to inquire about that, but I wanted to raise it with the Court before I did that, not in front of the jury.

MR. THAKUR:  Your Honor, that's actually a misrepresentation.  There is not a contingency fee in this case.  There's actually a fee-for-service case,

where there is, if you will, a certain reward.  I'm not sure you want to do that either.

THE COURT:  Here's my concern:  You raised the issue of delay in your opening statement, so I thought it was fair for the plaintiff to respond to that by explaining why there was a timing difference between all of this.  I also know that this is not a case for emotional distress damages.  So I was somewhat concerned that it became very emotional.  This is not about that.  So I am concerned to have further testimony about the effect that it had on the people.

This is a money case.  That's why you ought to settle.  And so since you raised the question, asking the jury to use their common sense, as you put it, to figure out why they didn't do certain things within a timely manner, the objection's overruled.

MR. MATUSCHAK:  Thank you, your Honor.

MR. THAKUR:  Thank you, your Honor.

(Adjourned)

oOo

INDEX OF EXAMINATION


Witness:                                          Page:

UPAL BASU

Direct By Ms. Noller (cont.) . . . . . . . . . 355

Cross By Ms. DeBruin . . . . . . . . . . . . . 372

Redirect By Ms. Noller . . . . . . . . . . . . 406

**Gabriel Beltramino**

Direct By Mr. McDonald . . . . . . . . . . . . 420

Cross By Mr. Grossman  . . . . . . . . . . . . 443

Redirect By Mr. McDonald . . . . . . . . . . . 457

RAKESH KUSHWAHA

Direct By Mr. Thakur . . . . . . . . . . . . . 463

                                 oOo

INDEX OF EXHIBITS

| Exhibit No. | Received: |
|---|---|
| 2193 | 428 |
| 2194 | 435 |
| 2195 | 437 |
| 4291 | 469 |
| 2226 | 505 |
| 474 | 518 |
| 4464 | 520 |
| 2223 | 521 |
| 603 | 523 |
| 2036 | 446 |
| 4147 | 496 |

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Wednesday, June 20, 2012

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC   (415) 431–2020