**Volume 4**

**Page 544 – 753**

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

```
------------------------------)
                              )
Mformation Technologies, Inc.,  )
                              )
             Plaintiff,  )
                              )
   v.                         )   No. C  08-4990 (JW)
                              )
Research In Motion, Ltd.,     )
et al.,                       )
                              )
           Defendants. )  San Francisco, California
                       )  Thursday, June 21, 2012
------------------------------)
```

### TRANSCRIPT OF PROCEEDINGS

<u>APPEARANCES:</u>

```
For Plaintiff:        Foley & Lardner, LLP
                      3579 Valley Centre Drive
                      Suite 300
                      San Diego, California 92130
                  BY: AMAR L. THAKUR
                      LISA MARIE NOLLER
                      SHAWN E. MCDONALD
                      ALLAN A. ARNTSEN
                      RUBEN RODRIGUES

Also Present:         Rakesh Kushwaha, MTO, CEO
```

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        MEREDITH ZINANNI
                        FERLILLA VICTORIA ROBERSON
                        MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Thursday, June 21, 2012

(9:00 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Good morning.  Please be seated.

You received a copy of the note that we had from one of the jurors.  And so this is the kind of thing that I presume can be clarified in due course and not call any special attention to the jurors.  It demonstrates how concerned a juror can be, to making sure that they understand chronologically what's happening, and I think the parties are doing a good job of keeping the dates and the chronology in front of the jury.

It highlights, however -- one of my concerns is that the juror's starting to focus on the product of the plaintiff as opposed to the product or practice of the defendant, which is ultimately what they will have to be judging the claim against.

But I'll leave that for further conversation later.

MR. MATUSCHAK:  Your Honor, just one suggestion on that.  I wonder if we might start by giving the -- if the jury had an instruction on that point, basically, that the case is not about product-to-product

comparison, what the plaintiff's burden is is to demonstrate that the defendant's product meets each element of the claim, and that's the job that they have to do.

THE COURT:  Well, the plaintiff's assured us that they will try the case in a fashion to that in their -- to carry their burden.  I'm leaving that alone at this point.

MR. MATUSCHAK:  I just think that given your concerns --

THE COURT:  I would have to go into a lot more detail of what are otherwise my own instructions at this point to get into that issue.  My goal is to guide your evidence so that it stays in the right way, rather than to give them more on the law at this point.  So thank you for the suggestion.  But I think I'll continue to express my concern if it continues to be a concern.

Summon the jury.

(Dr. Kushwaha resumes the stand.)

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Good morning, members of the jury.  One of your members read a note.  I have made it known to the parties, which I want to encourage you to continue to

write notes if you believe them to be helpful.
Sometimes your notes anticipate things that the lawyers
will bring up through other witnesses at other times.
So although I encourage you to do, I want you to
understand that the parties might not respond to them
immediately.  It might come at different times through
different witnesses.

You may resume your examination.

DIRECT EXAMINATION (continued)

BY MR. THAKUR:

Q.  Good morning, Dr. Kushwaha.

A.  Good morning.

Q.  I have some questions.  For purposes of clarity, you
mentioned that Mformation had Version 1.0 of the
software, correct?

A.  Yes.

Q.  Was Version 1.0 completed?

A.  Version 1.0 was completed but it was never released
to the market, and we kept on building on it to lead to
Version 1.4, which was the product which we released to
the market.

Q.  So the first commercial product released by
Mformation was Version 1.4?

A.  That's right.

Q.  And when was that released?

A.   That was in April of 2001.

Q.   And did Version 1 -- was Version 1.4 the version that was demonstrated in your meetings with RIM?

A.   Yes, Version 1.4 was our commercial product which we shared with all of our external customers and partners.

Q.   And did Version 1.4 implement every step of Claim 1 of the '917 patent?

A.   Yes.

MR. THAKUR:  I'd like to turn to Exhibit 603 that was marked yesterday, if we could do that.

BY MR. THAKUR:

Q.   Do you see this e-mail?  What date is it?

A.   That's January 24th, 2002.

Q.   And you testified yesterday that this was a presentation you made to RIM?

A.   That is correct.

Q.   Attached --

MR. THAKUR:  If you could scroll down to the next page.

Q.   -- what is this document?

A.   This is the document which we presented to RIM on that date.

Q.   And this was, included confidential information of Mformation?

A.   That is correct.

MR. THAKUR:  If you could turn to the last page of this document.

If we could go to the very top, please.

BY MR. THAKUR:

Q.  Could you read that line for the record on that title?

A.  "Gateway for SNMP trap forwarding action Version 1.0."

Q.  Dr. Kushwaha, why does that say "Version 1.0"?

A.  So version -- this is the version of the gateway. Let me just explain what gateway is.  At that time we had Version 1.4, which was our server product, and that server product was running, it was released to our customers.  And then on top of that was a separate code which we wrote which, as the name suggested, was a gateway.

So think of it as the Golden Gate Bridge, you have San Francisco on one side and Sausalito on the other side.  So we had -- already had our 1.4 product. And we wanted to connect that product to external systems.  So we build this gateway or we build this bridge, which was a separate software product, which will take the alerts and alarms from the Version 1.4 and forward it or connect it in a different format, which is a standard SNMP format, and it will take that and it

will send it to an external system.  So you had Version 1.4; you have this gateway; and this gateway is the code, separate code, which is referred to as Version 1.0 gateway.

And I really appreciate you asking this clarification question.  I'll be happy to answer any other clarification question.  I really do appreciate it.

Q.  Moving on, Dr. Kushwaha, is this something Mformation built separate and apart from Version 1.4?

A.  Yes, it was separate from Version 1.4, and it was built after Version 1.4 when Version 1.4 was released, and it was something which nobody had.  RIM didn't have it, nobody had.  To convert the messages into a standard space format which would be sent to external systems.

Q.  Thank you, Dr. Kushwaha.

MR. THAKUR:  You can take that off the screen.

Counsel, I'd like to refer to Exhibit 2254.  It is unobjected to.

MR. MATUSCHAK:  No objection, your Honor.

MR. THAKUR:  Thank you.

Would you kindly publish -- excuse me, move to admit Exhibit 2254.

THE COURT:  2254 is in evidence.

(Plaintiff's Exhibit 2254 received in evidence)

MR. THAKUR:  Thank you, your Honor.

Would you kindly publish 2254?

BY MR. THAKUR:

Q.  Could you read the date of this e-mail?

A.  December 6th, 2005.

Q.  If you could just read at the bottom of the e-mail, who it's from and who it's to.

A.  It is from Dr. Badri Nath, and it is going to Michelle, who's at the OMA.

Q.  And if you could read for the record what is being disclosed in subparagraph 2.

A.  This is the IPR configuration, what we talked about yesterday, to declare patents to OMA, the standard-based organization, and it says:  "System and method for remote control and management of wireless devices U.S. Patent No. 6,970,917."

Q.  And you see Miss Janata's response?

A.  Yes.  And she said, "Thank you."

Q.  Just to put the dates in context, this was sent on what date?

THE COURT:  We already have that.

BY MR. THAKUR:

Q.  When did your patent issue?

A.  Yes, so our patent was issued in November of 2005, and as, by the OMA guidelines, we had to declare any

change in the status of the patent application, so
after, following the guidelines of OMA, we informed OMA
that we have been issued the '917 patent.

MR. THAKUR:  You may take that off the screen.

BY MR. THAKUR:

Q.  Has Mformation licensed the '917 patent to anyone?

A.  No.  We are in the business of selling product, not
licensing IP.

Q.  Has Mformation ever sued anyone on any patent?

A.  No.

Q.  Have you personally been involved in any patent
infringement litigation?

A.  No.

Q.  One question from yesterday you testified that
Mr. Ken LeVine visited Mformation; is that correct?

A.  That is correct.

Q.  Do you recall the date?

A.  It was in August of 2001.

Q.  And when you met with Mr. Ken LeVine, what did you
discuss?

A.  Well, I discussed with him about welcoming him on
Mformation's advisory board, and as anyone would come on
an advisory board, I would meet with them.  I showed him
our demonstration.  I also shared with him that we just
filed the patent, because it was fresh in my mind, we

filed it about a week ago, so I remember mentioning that we had just filed for our patent.

Q. And did he review the patent?

A. He did not review the patent, but he wanted me to explain it to him, how it works and what does it do.

MR. THAKUR: The next exhibit, to counsel, we would like to introduce into evidence is 2078. It's not objected to.

MR. MATUSCHAK: No objection, your Honor.

THE COURT: Very well. 2078 is in evidence.

(Plaintiff's Exhibit 2078 received in evidence)

BY MR. THAKUR:

Q. Would you kindly look at the top of that document.

What is the title of that document?

A. It says: "Mformation Competitive Comparison (includes XcelleNet/Afaria, RIM BES 3.5) July 2002."

Q. And who created this document?

A. I created along with my team.

Q. And do you recall why this document was created?

A. It was created for sale organization, sales team, because our sales team was selling our products into the market and we wanted to help them understand who the competition was and what features we supported versus what features were available in the competitive products.

Q.   What does it sell?

A.   So XcelleNet is the name of the company, and Afaria was the name of their product, which was sold in the marketplace at that time to manage laptop and other type of handheld devices.

MR. THAKUR:  If you could just scroll down to the first paragraph of description in the middle column, "XcelleNet."

BY MR. THAKUR:

Q.   If you could read the first paragraph.

A.   "XcelleNet provides management software and services for smart mobile devices such as laptops, handhelds, smartphones and interactive pagers, as well as remote systems such as kiosks and point-of-sale devices."

MR. THAKUR:  If you could scroll to the third paragraph.

BY MR. THAKUR:

Q.   And look at Paragraph 1, just read that into the record.

A.   "XcelleNet consists of two organizations:  Mature RemoteWare division for remote access of fixed location devices; Afaria, focused completely on WIN 32 notebooks, handheld devices and pagers."

Q.   Is this RemoteWare the same RemoteWare you heard opposing counsel refer to in opening?

A.   Yes.

Q.   Could you explain what you mean by "mature RemoteWare division for remote access of fixed location devices"?

A.   So, RemoteWare was the product from XcelleNet, and it was managing laptops and devices which were not wireless, which were fixed lines so they were all connected with wires.

Q.   Was RemoteWare a competitor in 2002?

A.   Not RemoteWare, as such.  But Afaria was something which was there, another product division which was looking at managing wireless handheld devices.

MR. THAKUR:  If you could turn to page 4 of this document, please.

If you could turn to column, "Locate device over the air."  It's probably fourth from the bottom.

BY MR. THAKUR:

Q.   What is this about?

A.   This is a comparison of the feature of locating devices, their location, and finding that information over the air.  And what it says is that our product supported that feature, and the other two competitive products did not.

MR. THAKUR:  If you could turn to the first column of the -- says "General," please.

BY MR. THAKUR:

Q.   Could you read what it says on the middle column?

A.   "Part of asset tracking channel; accessed via web/e-mail/IP connection or when cradled or connected to companion PC (for Palm Pocket PC/Win CE devices); otherwise, BlackBerry asset tracking done in band."

Q.   And 2002, could XcelleNet do noncradle registration?

A.   No.

MR. THAKUR:  If you could turn to the last page of this document, which is page 9.

Highlight all of that, that would be great.

BY MR. THAKUR:

Q.   On the first column on the left, do you see where it says "lock/unlock devices"?

A.   Yes.

Q.   If you could read the middle column with respect to XcelleNet.

A.   "Yes, 'poison pill' enables user to lock their own device, available only via e-mail channel on BlackBerry."

Q.   Next column on the left, excuse me, "Product feature."

A.   "Zap - delete content of devices."

Q.   Again, read the middle column for XcelleNet.

A.   "No."

Q.   In 2002, your belief was XcelleNet could not zap content devices?

MR. MATUSCHAK:  Objection, leading.

BY MR. THAKUR:

Q.   What was your opinion in 2002 about the ability of XcelleNet in 2002 to zap content of devices?

A.   They --

MR. MATUSCHAK:  Objection, foundation.

THE COURT:  Overruled.

THE WITNESS:  Afaria, XcelleNet product, could not send a command over the air to the device to remove the contents from the device.

MR. THAKUR:  One last section.  Paragraph column on the left, "Remote Control."

BY MR. THAKUR:

Q.   Excuse me, do you see that "Remote Control"?

A.   Yes.

Q.   What was -- what does it say in the middle column with respect to XcelleNet Afaria?

A.   "Not available for wireless handhelds.  For Windows laptops, Afaria provides a special version of PCAnywhere to actually take control of the device."

MR. THAKUR:  Thank you.  I have no further questions on that.

Thank you, your Honor.  I have no further

questions.

THE COURT:  Very well.

You may cross-examine.

MR. MATUSCHAK:  Your Honor, I have a notebook for Dr. Kushwaha.  May I approach?

THE COURT:  Certainly.

CROSS-EXAMINATION

BY MR. MATUSCHAK:

Q.  Good morning, Dr. Kushwaha.

A.  Good morning.

MR. MATUSCHAK:  I'd like to start actually, if we could put that last exhibit back up on the screen.  That was 2078, please.  Before I forget about it.

BY MR. MATUSCHAK:

Q.  Now, Dr. Kushwaha, this was something that you prepared internally at Mformation, correct?

A.  Yes.

Q.  And this is what you call a competitive comparison, right?

A.  Yes.

Q.  And the only other company that you show as a competitor to Mformation on this document besides RIM is XcelleNet, correct?

A.  Yes.

Q.  They were your most significant competitor in this

business, right?

A.   They were one of the competitors.

Q.   They were the most significant one, right?  They're the only ones you mention beside RIM, right?

A.   They were the only ones we knew about.

Q.   Okay.  Now, you gave your opinion about what you think the XcelleNet Afaria product did, just now, correct?

A.   Yes.

Q.   Couldn't do.  But you never told the Patent and Trademark Office about the XcelleNet RemoteWare product; isn't that true, sir?

A.   It was not related to wireless --

Q.   Did you tell them or not, sir?  It's a yes or no question.

A.   No.

Q.   So you never gave the patent examiner the opportunity to look and decide for himself; isn't that right?

A.   Yes, because I felt they were not related to what our invention was, which was totally wireless, no cradles, and anything related to wireless we shared with the USPT office.  But anything to do with wired, since it had cradles, since it has -- the device has to be attached with the wires, it was not totally wireless solution.

              MR. MATUSCHAK:  Your Honor, I move to strike

everything to the witness's answer after the word "no."

THE COURT:  I will grant that motion.

Just as a matter of cross-examination, Dr. Kushwaha, the attorney will attempt to ask questions that call for a yes or no answer, and often in normal conversation, it's natural for us to want to explain our answer.  And there will be times when either this lawyer or some other lawyer will say, Explain your answer.  But you should simply answer the question and leave it for later.  If you're asked to explain your answer, do so.  Don't volunteer it, unless you're asked to do so.  Do you understand?

THE WITNESS:  Yes.

THE COURT:  Very well.

The jury will disregard the explanation.

MR. MATUSCHAK:  If we could get Exhibit 603 back up on the screen.

I'm sorry, you can take that down for now.

BY MR. MATUSCHAK:

Q.  You were asked, Dr. Kushwaha, this morning, about Mformation's Version 1.4.  Do you recall those questions?

A.  Yes.

Q.  And yesterday you said when you went to RIM, you demonstrated Version 1.4, correct?

A.   I went to RIM a lot of different times.  Which time are you referring to, Counsel?

Q.   The time you went in January 2002, you said, yes, that you demonstrated Version 1.4, correct?

A.   That is correct.

Q.   You didn't say anything yesterday about some gateway Version 1.0, did you?

A.   I did explain yesterday on the SNMP slide, which we talked about.

Q.   But you never said yesterday that was some detective thing called gateway 1.0, did you, sir?

A.   I clarified this morning.

Q.   You clarified this morning to say there was now two different things, right, that you showed to RIM?

A.   It has always been two different things.

Q.   All right.  Now, sir, there hasn't been much talk about the '917 patent, so I thought we might start here.  Do you believe that anyone who's doing mobile wireless device management infringes your patent?

A.   I can't answer that question.

Q.   You'd have to know more, right?

A.   Could you please repeat the question?

Q.   You'd have to have more information to know if they infringe, right?

A.   Yes.

Q.  You'd have to see if they use your -- the elements of your claim, correct?

A.  Yes.

MR. MATUSCHAK:  Okay.  If we can get Demonstrative 23.

BY MR. MATUSCHAK:

Q.  Now, I put up on the screen, Dr. Kushwaha, the preamble of Claim 1, and that's -- talks about at the beginning that it's "a method for remotely managing wireless device over a wireless network."  Do you see that?

A.  Yes.

Q.  But that by itself would not infringe your patent, would it?

A.  I don't know.

Q.  So you wouldn't be able to tell if somebody was infringing your patent or not just by knowing that they remotely manage a wireless device on a network, correct?

A.  Yes.

Q.  All right.  Because your claim goes on to say you have to do certain steps, right?

MR. THAKUR:  Your Honor, we object.  This relates to the claim itself, and that's the subject of expert testimony.  Dr. Kushwaha was limited yesterday.

MR. MATUSCHAK:  I'm not asking --

THE COURT:  Overruled.

MR. MATUSCHAK:   -- what the claim terms mean, your Honor.

THE COURT:  Overruled.

BY MR. MATUSCHAK:

Q.  Now, when you filed your application with the patent office, your initial application, it was a method for remotely managing a wireless device with six specific steps, correct?

A.  The actual claims were written by our registered patent attorneys, so he would know more details than I would.

Q.  All right.  You don't remember?

A.  No, I don't remember.

MR. MATUSCHAK:  Can you get Demonstrative 24, please?

BY MR. MATUSCHAK:

Q.  So I'm showing you, sir, on the screen Claim 1 as it was originally provided to the patent office.  Does that refresh your recollection about what your invention was or how you described it initially?

A.  No, I don't remember.

Q.  So you don't remember how you described your invention to the patent office when you first got there?

A.   I described it to our registered patent attorney,

Michael Schwartz, and he was the one who was constructing the claims.

Q. All right. Well, you will agree with me, sir, that the claim as set up here, as shown here, from the file history, shows six specific steps, right? Transmitting, verifying, establishing, placing, delivering, executing. That's six, right?

A. Yes. I see that.

Q. All right. And you know that the patent office said you're not entitled to get a patent on that, correct?

A. You would have to talk to my patent attorney for that.

Q. You weren't involved in discussing things with your patent attorney while your invention was being prosecuted at the patent office, sir?

A. Most of the interaction happened between my patent attorney and the USPT Office, and from time to time our patent attorney will come back and, on the phone call, discuss things. But I don't remember any details.

Q. Yesterday you remembered the details about going to the patent office, right?

A. Oh, yes, we booked a train and got a ticket. So when you're taking a trip, you remember that.

Q. You remember when you're taking a trip, but you don't remember when the patent office writes back to your

lawyer and says the thing that you said was your invention is not entitled to get patented.  You don't remember that?

A.   Well, as I said --

Q.   Do you remember that, sir, or not?

A.   Could you please ask the question.

Q.   Do you remember the hearing from your lawyer that the patent office had said that your claim, as originally filed, was not entitled to a patent?

A.   I don't remember that.

Q.   That wouldn't stand out in your memory?

A.   No, I don't remember.

        MR. THAKUR:  Asked and answered.

        THE COURT:  Sustained.

        MR. MATUSCHAK:  Can we go to Demonstrative 25, please?

BY MR. MATUSCHAK:

Q.   Now, the patent office said that you had to add some steps to your patent before you could get -- before it would be issued.  Do you recall that much?

A.   As I said, most of the communication was between --

        THE COURT:  No, you're just asked, do you remember that?

        THE WITNESS:  No.

BY MR. MATUSCHAK:

Q. Okay. So you don't remember that the patent office said you had to add this step, the "without a request" step?

A. No, I don't remember that.

Q. And you don't remember that the patent office said you had to add the "establishing a connection" step?

A. No, I don't remember that.

Q. And you don't remember the patent office said you had to add the "transmitting" step?

A. No, I don't remember that.

Q. And you don't remember that the patent office said you had to add this "wherein" step? You don't remember any of that?

A. No.

Q. But you do know that to infringe your patent, Claim 1 that's up on the screen, somebody has to perform each and every one of those steps; isn't that right?

A. That's something I cannot answer, because somebody has to look at that in detail.

Q. So you don't know?

A. I don't know.

Q. Okay. But you do know that there is a different way to manage wireless devices remotely that does not use all those steps, right?

A. I wouldn't know anybody else; I know what I did.

Q. All right. Well, let's go back a slide.

Now, if I managed a wireless device using this method, I wouldn't be infringing your patent?

A. It's not for me to decide.

Q. You don't know?

A. I don't know.

Q. But you don't know that what counts is what the patent office finally issued, correct?

A. What they issued is what it was awarded to us.

Q. Right. And if someone does what you originally described, but not what was issued, that's not infringement. You know that much, don't you, sir?

MR. THAKUR: Objection, asked and answered; calls for legal conclusion.

THE COURT: Well, the line between a legal conclusion with the inventor is a bit blurry, but I believe that the asked and answered objection is properly made. So I'll sustain that.

MR. MATUSCHAK: All right. You can take that down, please.

BY MR. MATUSCHAK:

Q. Now, Dr. Kushwaha, you said that in your meetings with RIM, you showed them demonstrations of how your product worked, correct?

A.  Yes, I did.

Q.  And at the time in 2001, in 2002, when you did those demonstrations, you believed that the product that you demonstrated had all the elements of Claim 1, correct?

A.  Well, in the meetings I had in 2002, January, yes, all the elements were present in Version 1.4.

Q.  But the three steps that we talked --

MR. MATUSCHAK:  If you could put that slide back up again, please, the -- I think it's 24.  I'm sorry, 23 -- 25, there we go.

BY MR. MATUSCHAK:

Q.  The three steps -- all right, let me back up.  I'll withdraw that.

So you've said that at the time when you met with RIM and demonstrated your product in 2002, it had all the elements of Claim 1, correct?

A.  In Version 1.4, yes.

Q.  But those three steps that are highlighted, sir, those weren't added to your patent until 2005; isn't that true?

A.  Could you please ask the question again?

Q.  Those three steps that are highlighted on the screen were not added to your patent until July of 2005; isn't that true?

MR. THAKUR:  Objection, foundation, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Please repeat the question.

BY MR. MATUSCHAK:

Q.  Those three steps that I've highlighted on the screen were not added to your patent until July of 2005; isn't that true, sir?

A.  No.

MR. MATUSCHAK:  Let's bring up Exhibit 510.

BY MR. MATUSCHAK:

Q.  It's in your binder, it's the file history from the '917 patent.  You recall the patent video, you understand the file history is the record of the proceeding before the patent office, right?

A.  Yes.

MR. MATUSCHAK:  And if we could go to page 107.

BY MR. MATUSCHAK:

Q.  And you see on page 107 there's something called "amendment."  Do you see that?

A.  Yes.

Q.  And it says:  "Dear Sir:  In response to the final office action issued on June 15th, please amend the application as follows:"

Do you see that?

A.  Yes.

Q.  Let's go to page 123.  Do you see there, that this

document is dated July 6, 2005?

A.   Yes.

Q.   And is signed by Michael A. Schwartz, who is your
lawyer, correct?

A.   Yes.

MR. MATUSCHAK:   If we can go back a couple of
pages.   Keep going.   This would be about -- there we go,
great.   Page 2.

BY MR. MATUSCHAK:

Q.   Now, you understand when someone amends a patent
claim to explain to the patent examiner what they're
doing, they underline the new stuff so the patent
officer can see -- the patent examiner can see what the
change is, right?

A.   This is not the new stuff.   This was there in the
patent, must have been somewhere else --

Q.   Sir, can you answer my question?   You understand that
when someone sends an amendment to the patent office,
they underline the things that have changed from before
so that the patent examiner knows what has been changed.
Isn't that true?

A.   In that specific claim.

Q.   Yes.   And in this specific claim, the words,
"establishing a connection between the wireless device
and the server, transmitting the contents," etc., and

the "wherein," have all been underlined.  Do you see
that?

A.  Yes.

Q.  And that means those were things that were being
added to the claim on July 6th, 2005, correct?

A.  Was added to the claim, but they were already there
in the patent.

Q.  Now, you never had any meetings with RIM after
July 6, 2005, did you?

A.  I don't remember.

Q.  You certainly haven't testified about any so far,
right?

A.  Yes.

        MR. MATUSCHAK:  You can take that down.

BY MR. MATUSCHAK:

Q.  Now, I want to go back to something you said
yesterday about your invention, Dr. Kushwaha.  Yesterday
Mr. Thakur asked you, and he said:  "So, perhaps if you
could give us an example of how your invention would
save battery life" -- do you remember that question?

A.  Yes.

Q.  Okay.  And your response at the time started out:
"So we did not want to have a connection open all the
time."  Do you recall that answer?

A.  Yes.

MR. MATUSCHAK:  Okay.  Could we put up Demonstrative 25?

BY MR. MATUSCHAK:

Q.  Now, your invention, Claim 1, does require establishing a connection, right?

A.  Yes.

Q.  And to practice your invention, as the patent office allowed this claim, you always have to perform the step of establishing a connection, correct?

A.  Yes.

Q.  Not sometimes.  Not occasionally.  But always, right?

A.  In order to communicate, yes.

Q.  Okay, thank you.

MR. MATUSCHAK:  You can take that down, please.

BY MR. MATUSCHAK:

Q.  Now, yesterday, Dr. Kushwaha, you also showed the jury some source code.  Do you recall that?

A.  Yes.

Q.  And source code consists of the human readable instructions for how computer software works, correct?

A.  That's correct.

Q.  So if you give me the source codes to one of your products, I could copy that source code and I can make the same thing, right?

A.  You could.

Q.  And it would work just like your product, if I copied your source code, right?

A.  I don't know.

Q.  And source code is kind of like the formula for Coca-Cola, right, it's the secret recipe to make the software work?

A.  It implements the instructions to the computer.

Q.  Okay.  Now, we know that Mformation has source code for its products, right?

A.  Yes.

Q.  You put some up on the screen for us yesterday, correct?

A.  That's correct.

Q.  But back in 2001 and 2002, Mformation never gave RIM the source code for any Mformation product; isn't that true?

A.  Yes.

Q.  So if RIM never had the source code, RIM could not have copied the source code; isn't that right, sir?

A.  I don't know.

Q.  Well, you heard Mr. Basu yesterday called the source code the recipe?

A.  Yes.

Q.  Mformation never gave RIM the recipe, the source code, correct?

A.   Yes.

Q.   Now, you've hired an expert in this case,
Dr. Madisetti?

A.   I have heard the name.

Q.   And you know Dr. Madisetti can read the source code,
right?

A.   I would assume so.

Q.   But Mformation never gave its own expert,
Dr. Madisetti, your own source code before he wrote his
reports in this case, right?

          MR. THAKUR:  Objection, foundation, your Honor.

          THE COURT:  Sustained.

BY MR. MATUSCHAK:

Q.   Do you know, sir, whether Mformation ever gave its
own expert, Dr. Madisetti, your own source code before
he wrote his reports in this case?

A.   I don't know.

Q.   Do you know whether Mformation ever asked its own
expert, Dr. Madisetti, to compare your source code to
RIM's source code to see if it was copied before he
wrote his reports in this case?

          MR. THAKUR:  Objection, asked and answered.

          THE COURT:  Overruled.

          MR. MATUSCHAK:  Could you please ask the --

BY MR. MATUSCHAK:

Q.   Sure.  Are you aware, sir, whether Mformation ever asked its own expert, Dr. Madisetti, to compare your source code with RIM's source code to see if they copied before the time that he wrote his reports in this case?

A.   I'm not aware of that.

Q.   Can you think of any reason you wouldn't want him to do that?

A.   I don't know.

Q.   Now, Dr. Kushwaha, yesterday you said you came up with your invention in October of 1999.  Correct?

A.   Yes.

Q.   And you saw the patent video at the beginning of the trial, right?

A.   Yes.

Q.   And you remember the patent video talked about when an inventor conceives his or her idea, correct?

A.   Yes.

Q.   Do you remember the video says:  "Conception occurs when the idea occurs to the inventor clearly enough that he or she can write it down."  Do you remember that?

A.   No, I don't remember that.

Q.   Now, when this idea occurred to you in 1999, you never wrote it down then, correct?

A.   Well, it was all in my head.

Q.   It was in your head.  And the first time you wrote your invention down on paper was when you submitted your provisional application to the patent office in December of 2000, correct?

A.   I don't remember when I wrote it down first.

MR. MATUSCHAK:  Your Honor, may I approach to give the witness one of his deposition transcripts?

THE COURT:  Certainly.

BY MR. MATUSCHAK:

Q.   Dr. Kushwaha, I've handed you a Redwell that contains the pages of your deposition from December 9th of 2010.  Do you recall that deposition?

A.   Yes.

Q.   I'd like to ask you to look at page 161 of that deposition, sir.

A.   (The witness complies.)

Q.   Do you have that?

A.   Yes.

Q.   All right.  I'm going to direct -- unfortunately, these pages don't have line numbers, so I'll direct you to line 9.  Do you see where you were asked the question, I asked:  "When was the first time that you memorialized in writing all of the elements that you allegedly conceived of in October of 1999?"

Did I read that correctly, sir?

A. Yes.

Q. And your answer begins on line 13, that's: "This would be the first recollection when the provisional was being filed."

Do you see that, sir?

A. Yes.

Q. So the first time you wrote your invention down on paper was when you submitted the provisional; isn't that right, sir?

A. On an official -- in an official way, yes.

Q. All right. Now, when you asked Mr. Basu to start the company with you, you still had not written down your idea on paper, correct?

A. I had it at my poster board at my house.

Q. This was your whiteboard?

A. Yes.

Q. And then you erased it, right?

A. Yeah, it's been 12 years, yes, it has been erased.

Q. You didn't think this was important enough to put down on something that couldn't be erased easily?

A. I remember it. I spent a lot of time on it.

Q. All right. And when you sat down with Dr. Nath in 2000, you still had not written your idea down on paper, had you?

A. I had it memorized in my head.

Q.  Now, you took the time to write up a nondisclosure agreement for Dr. Nath to sign.  We saw that on the screen yesterday, remember that?

A.  That was the standard factors for any employee, anyone joining Mformation, sharing any information, it was a standard form.  I didn't write it.  Our attorneys did.

Q.  So a standard practice to write down a nondisclosure agreement, but not a standard practice to write down the invention we're talking about here today; is that correct?

A.  Well, I knew it by heart.

Q.  And for a year you carried this invention in your head without writing it down, correct?

MR. THAKUR:  Objection, asked and answered, your Honor.

THE COURT:  Overruled.

THE WITNESS:  I wrote it on the whiteboard in my office.  When I was trial and error, getting a solution.  This was one of the things which I wrote it on my poster boards in the house.

BY MR. MATUSCHAK:

Q.  So for a year -- good point.  Let me rephrase that.

So for a year you carried this idea around in your head without ever writing it down in a permanent

place, where it couldn't be erased?

A.   Permanent place was my brain.

Q.   Now, your provisional application that we're talking about, that was filed in December 2000, right?

A.   That is correct.

Q.   But your actual patent application wasn't filed until August 2001, correct?

A.   That is correct.

Q.   All right.  Let's take a little step back in time.  Now, RIM did not approach Mformation; Mformation approached RIM, correct?

A.   In what context?

Q.   You saw Mr. Wolfson's video yesterday.  He was talking about how he was lying in wait for Mr. Balsillie at that conference in New York, trying to get a word in, and hiring a limo so he could have a chance to talk to Mr. Balsillie.  Mr. Balsillie wasn't seeking out Mr. Wolfson; it was the other way around, right?

A.   For the business purposes, yes.

Q.   Yes.  Okay.  And Mformation wanted technical help from RIM, correct?

A.   Mformation wanted to help RIM.

Q.   And you wanted technical help from RIM too, right?

A.   It was a two-way street.  We would help them, they would help us.

Q.   All right.  So you wanted technical help from RIM?

A.   In order for --

Q.   Can you say that, yes or no, sir?

A.   Yes, yes.

Q.   And RIM provided technical help, right?

A.   As they provided to every --

Q.   Did they provide technical help to you or not, sir?

A.   Yes.

Q.   Thank you.  And you wanted separate access to APIs that RIM did not share with any other developers, correct?

A.   That's right.

Q.   And they gave you access to that, didn't they?

A.   Yes, because they --

Q.   They did you a special favor that they didn't do for anybody else, right?

A.   I guess so.

Q.   Now, the very first meeting with RIM was on May 3rd, 2001.  Do you recall that?

A.   Yes.

        MR. MATUSCHAK:  I'd like to admit 4460, if there's no objection.

        MR. THAKUR:  Okay.

        MR. MATUSCHAK:  Can you put that up on the screen, please.

BY MR. MATUSCHAK:

Q.   Now, up on the screen, Dr. Kushwaha, we have Exhibit 4460, and the first page is -- it's a series of PowerPoint slides, you saw that?

A.   Yes.

Q.   And these are PowerPoint slides that Mformation prepared?

A.   Yes.

THE COURT:  I have not marked that in evidence previously, so we have 4460 in evidence.

(Defendant's Exhibit 4460 received in evidence)

BY MR. MATUSCHAK:

Q.   And it shows the date of the meeting May 3rd, 2001, correct?

A.   Yes.

Q.   All right.  Now, do you believe the idea of doing remote kill, wirelessly, was new to RIM when you walked in the door on May 3rd, 2001?

A.   I don't know what they thought, but I knew it was a new invention.  I searched the Internet, and I knew nobody else was doing it.

MR. MATUSCHAK:  All right.  I'd like to move into evidence 4449.

MR. THAKUR:  No objection, your Honor.

THE COURT:  Without objection, 4449 is in

evidence.

(Defendant's Exhibit 4449 received in evidence)

Q.  You can watch the screen or turn to 4449 in your binder.

Dr. Kushwaha, this document is titled "BES 2.2 Development Plan."  Do you see that?

A.  Yes.

Q.  And it is dated March 29th, 2001.  Do you see that?

A.  Yes.

Q.  Now, that's before your first meeting with RIM, correct?

A.  Yes.

Q.  And the first line says:  "Here are some more detailed plans concerning the next version of the BES."

Do you see that?

MR. MATUSCHAK:  Let's go to Page 5 of 5.  The last page.

At the bottom, do you see there's this heading "Miscellaneous Functionality"?

A.  Yes.

Q.  And the second bullet point under that heading, do you see where it says:  "Remote kill of the device.  By sending a bullet encrypted using the user's key, the device can be instructed to erase its application data. This feature allows the administrator to respond to a

stolen device."

Do you see that?

A.  Yes.

Q.  So RIM knew about the concept of remote kill before you walked in the door; isn't that true, sir?

A.  I don't know.  I've never seen this document before.

Q.  Well, that's what this document suggests, doesn't it?

A.  I can read what it says.

Q.  Okay.  Thank you.

MR. MATUSCHAK:  Can we go back to 4460, please.  The next to last page.

BY MR. MATUSCHAK:

Q.  So now we're back to your presentation at RIM on May 3rd a couple of months after that BES document.

MR. MATUSCHAK:  And if we can highlight the bottom slide.

BY MR. MATUSCHAK:

Q.  And on the bottom slide it's entitled "What Mformation Needs From RIM - Technical."

Do you see that?

A.  Yes.

Q.  So these were areas where you wanted RIM's technical assistance, correct?

A.  Access to the APIs on the device.

Q.  And if you look at the third bullet point down, do

you see where you ask RIM:  "How can we deploy applications over the air?"  Do you see that?

A.  Yes.

Q.  Again, that's like the Angry Birds example from the opening that Mr. Thakur gave, "deploying application over the air," right?

A.  I assume so.

Q.  And here, you're asking RIM how to do it, aren't you?

A.  No, I'm not asking RIM how to do it.  I'm asking are there any APIs available on the RIM to do it.

Q.  That's not what it says, though, does it?

A.  Well, if the context was, we were asking for APIs available on the RIM -- we knew how to do the application deployment over the air, over-the-air locks, over-the-air wipe.  But every device has their own environment, their own APIs, and you have your agent which needs to talk to those APIs.

Q.  The only bullet point on this page that talks about APIs is the last one, "Open APIs to integrate mVision product," right?

A.  That's correct.

Q.  And the third bullet point, the letters API are not even used, are they, sir?

A.  The last bullet point relates to all the bullet points above.

Q.   Now, the next, fourth bullet point down, do you see where you're asking RIM for technical help:  "Can an application update itself over the air?"  Do you see that?

A.   Yes.

Q.   And here you're asking RIM is that possible, aren't you?

A.   On their specific device.

Q.   Well, it doesn't say, Can an application update itself over the air on BlackBerrys, does it?

A.   No, this is the a presentation for BlackBerrys.  So obviously all the material here is targeted towards their device and the APIs available on their device.

Q.   And this is a page that's saying what you need from RIM, correct?

A.   On their devices.

Q.   Okay.  If we go to the next page, top slide, you see that this also is entitled "What Mformation Needs From RIM – Technical (cont.)," right?

A.   Yes.

Q.   And there's a subtitle, "Device Management."  Do you see that?

A.   Yes.

Q.   The very first bullet point under that is, "How can we implement all the programmer.exe commands, wipe, dir,

etc., over the air, without being in cradle?"  Do you see that?

A.   Okay.

Q.   Do you see that, sir?

A.   Yes.

Q.   So you were asking RIM that question, were you not?

A.   I was not asking that question of how to.

Q.   It says "how," doesn't it, sir?

A.   How to -- it was very specific for --

Q.   Sir, does it say "how"?

A.   Yes, it says "how."

Q.   Thank you.

It was only after this meeting in May of 2001 that you filed your actual patent application in August; isn't that correct, sir?

A.   Yes.

Q.   All right.  Now, you testified yesterday about a demonstration that you gave to Deutsche Bank in late July 2000.  Do you remember that?

A.   Yes.

Q.   And you do not ask Deutsche Bank to sign any kind of confidentiality agreement before that, did you?

A.   No.

Q.   And Deutsche Bank was not the only potential investor or customer that you gave a demonstration to; is that

correct?

A.  That's correct.

Q.  You were trying to get people to invest in your company?

A.  Yes.

Q.  And actually one of the presentations you gave was to a group called Battery Ventures, right?

A.  Yes.

MR. MATUSCHAK:  Exhibit 543, please.

BY MR. MATUSCHAK:

Q.  I think we saw this document yesterday, Dr. Kushwaha. This is the cover page for that Battery Ventures presentation, right?

A.  Yes.

MR. MATUSCHAK:  All right.  If you could turn to the page -- it's got a little number on the bottom 0066674, please.

BY MR. MATUSCHAK:

Q.  Now, I had a little question I was confused about, Dr. Kushwaha.  Here it says that you have a PhD from Duke.  Do you see that?

A.  It was a typo.

Q.  Okay.  I just -- because I thought yesterday you said it was New Jersey Institute of Technology.

A.  Yeah.

Q.  All right.  So you didn't take any classes at Duke, right?

A.  I did.

Q.  Okay.  But you didn't get your PhD there?

A.  No, my advisor moved from NJIT to Duke, and he took me with him for the last part of my PhD.  And I spent about six months at Duke.

Q.  So is that why this says Duke PhD or is that a mistake?

A.  I don't remember why, how that word got in there.

Q.  But your PhD degree is not from Duke, is it?

A.  No, it's not from Duke; it's from NJIT.

Q.  Let's go back to the demos.  Pretty much every potential customer or investor wanted to see a demo, right?

A.  Yes.

Q.  And in those demos, you would show the customers the screens they would use to enter commands, right?

A.  Very limited.

Q.  You might even show them how you do a sample command, right?

A.  To show them the web console, press a button, and wanted to create this wow thing that, yes, you can lock the device over the air.  That's it.

Q.  Right.  And there was nothing secret about that kind

of information, correct?

A.   It was just visual, you know.

Q.   A demonstration is visual, right?

A.   Yeah.

Q.   Because you were not sharing with them the -- what Mr. Basu called the recipe, the source code, correct?

A.   No.

Q.   Now, you also gave some demonstrations to RIM of your --

A.   Yes.

Q.   You showed RIM the screens, right?

A.   I shared more stuff with RIM than the screens.

Q.   Did you show them the screens, sir?

A.   Yes.

Q.   And you showed them how to enter commands on the screens just like you described a few minutes ago?

A.   Yes.

Q.   And you might have even shown them how to do that simple command, right?  Press a button, all of a sudden the device is wiped, right?

A.   Yes.

Q.   But just like the demos you did for customers, none of that was a secret, was it?

A.   To RIM, it was more than just the demo, because they were -- used to ask me lots of questions of how this

worked, how it was implemented.  More details were shared with RIM.

Q.  And the detail that you say occurred, you don't have any piece of paper that shows what questions they asked or what information you gave them, do you, sir?

A.  No, I don't have anything in -- written, but we had extensive --

Q.  It's all up in your head?

A.  No, there were other folks who were in the meetings as well.

Q.  And none of them, none of the people from Mformation seem to have kept any notes about all these other technical discussions.  Have you seen any of those in the course of looking for things for this case?

A.  When we used to have --

Q.  Have you seen them, sir?

A.  No, I have not.

Q.  But you remember that there were these discussions even though those were 10 years ago?

A.  Because there were a lot of them.

Q.  Okay.  But in these discussions, even in the discussions you never shared with them the source code, correct?

A.  I don't remember.

Q.  You never -- what you showed them was the finished

cookie, not the recipe, right?

A.  I don't remember.

Q.  Now, Dr. Kushwaha, yesterday you talked about Mformation's relationship with Ken LeVine.  Do you remember that?

A.  Yes.

Q.  And you said yesterday that you decided to put Mr. LeVine on Mformation's technical advisory board when he was still at Salomon Smith Barney.  Do you recall that testimony?

A.  Yes.

        MR. MATUSCHAK:  May we have Exhibit 67, please.

BY MR. MATUSCHAK:

Q.  Let's look at the bottom e-mail.  And Exhibit 627, do you see that's an e-mail dated June 29th, 2001, on which you were copied, correct?

A.  Yes.

Q.  And the subject is, "Welcome to the Mformation technical advisory board."  Do you see that?

A.  Yes.

Q.  And it starts out:  "Dear Ken:  On behalf of the entire team at Mformation, I am delighted to welcome you to our technical advisory board."

        Do you see that?

A.  Yes.

Q.   And let's look back up and see where this was sent.
It was sent to klevine@rim.net.  Do you see that?

A.   Yes.

Q.   So when this e-mail was sent, you knew Ken LeVine was
not at Salomon Smith Barney, you knew that he was at
RIM, correct?

A.   This is the official e-mail.  We made the decision to
get him on advisory board way before this.

Q.   My question to you, sir, is when this e-mail was
sent, you knew that Mr. LeVine was an executive at RIM.
Correct or not?

A.   Yes, when officially the e-mail was sent.

Q.   All right.  Now, before you offered Mr. LeVine a
position on your board -- let me change this a little
bit.

       Before you sent this e-mail to Mr. LeVine
confirming, now he's at RIM and he's going to be on your
board, you didn't check with anybody at RIM to see if
that would be okay, did you?

A.   I did not send this e-mail.

Q.   And you didn't check with anybody at RIM to see if
this would be okay, did you?

A.   It was not my place.  All the advisory board
decisions to bring on Mr. LeVine was not my decision; it
was Upal's decision.

MR. MATUSCHAK:  Move to strike, your Honor.

THE COURT:  The motion is granted.

Again, you're just being asked whether you took certain action which calls for a yes or no answer.

BY MR. MATUSCHAK:

Q.  Did you check with anybody at RIM?

A.  I did not.

Q.  Just a few months before, you had been at RIM, right, for that meeting we just saw on the screen, correct, in May?

A.  Yes.

Q.  So there were people at RIM you could have called up and said, Hey, do you mind if we put Ken LeVine on our technical advisory board?  You knew people at RIM?

A.  I didn't know Ken would join RIM.  When I met him at Salomon Smith Barney, I really liked him.  He liked our product.  I wanted him to help us to see how we can roll our product out in the customer base.

MR. MATUSCHAK:  I move to strike, your Honor.

THE COURT:  Granted.  The jury will disregard the answer.

BY MR. MATUSCHAK:

Q.  Mr. Kushwaha, you knew people at RIM at this time in June of 2001, and you knew Mr. LeVine was at RIM in 2001.  My question is really simple:  Did you ask any

of those people that you already knew, Would it be okay if we offered Mr. LeVine this position?

A.  I did not.

Q.  Okay.  Now, at the time -- at this time when Mr. LeVine was employed at RIM, and you were putting him on your board, you were trying to enter into a business relationship with Mr. -- with RIM, correct?

A.  Our company was.

Q.  Yes.  So this has the potential to be a conflict of interest, wouldn't you say, sir?

A.  I don't know anything about it.

        MR. THAKUR:  Objection, your Honor, speculation.

        THE COURT:  Overruled.

BY MR. MATUSCHAK:

Q.  I'm sorry, I didn't hear you, sir.

A.  Could you please repeat the question?

Q.  Sure.  This has the potential of being a conflict of interest, doesn't it?

A.  I was a technology guy.  It was not my position to make decisions on those things.

Q.  Now, yesterday you also testified that as part of coming on your board, Mr. LeVine was granted an option to buy 7,500 shares of Mformation stock.  Do you recall that?

A.  Yes.

Q.   And you said that's not very much, right?

A.   You can do the math.

Q.   Well, do you invest in the stock market, sir?

A.   No.

Q.   You never buy or sell stock?

A.   My wife does.  I don't.

Q.   Okay.  Do you know -- does she usually buy 7,500 shares at a time?

A.   Could you please repeat the question?

Q.   Does she usually buy or sell 7,500 shares at a time?

A.   I don't know.

Q.   Okay.  Now, people often make money in a startup company when that company goes public, correct?

A.   Yes.

Q.   And then their shares are worth a lot more money, right?

        MR. THAKUR:  Objection, calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  Could you repeat that question?

BY MR. MATUSCHAK:

Q.   When a startup goes public, suddenly their shares become very valuable, don't they?

A.   It depends.

Q.   That's why people create startups, right, and go public?

A.   Sure.

Q.   And Apple and Google were once startup companies once upon a time, correct?

A.   That is correct.

Q.   And the shares of those companies are trading in the hundreds of dollars a share today, right?

A.   I don't know what the stock price is.

Q.   So if Mformation went public, those 7,500 shares that you gave Mr. LeVine could be worth a lot of money, right?

A.   I don't know.

Q.   If Mformation entered into a deal with RIM that benefitted Mformation, those shares would be more valuable, wouldn't they?

A.   Possibly could be.

Q.   But you did not tell anybody from RIM that you were giving stock to Mr. LeVine, correct?

A.   I personally did not.

Q.   So when you were sitting there in a room with them after July 29th -- and you did sit in a room with people from RIM after July 29th, correct?

A.   My interactions with RIM were totally technical.

Q.   But you sat in a room with people from RIM on multiple occasions after July of 2001, correct?

A.   On technical discussions only.

Q.  And when you were negotiating with them about a business relationship, you did not say anything to them about the fact that Mr. LeVine was on the board and that you had given him stock, correct?

A.  I was not involved in any business relationships.

THE COURT:  I hope your turning the page means we're turning to a new subject.

MR. MATUSCHAK:  Partly, your Honor.

BY MR. MATUSCHAK:

Q.  After you put Mr. LeVine on your board, he arranged a business contact for you to -- Mformation to RIM, didn't he?

A.  Yes.

MR. MATUSCHAK:  Can we have Exhibit 562, please.

BY MR. MATUSCHAK:

Q.  In August of 2001, shortly after you put him on the board, do you see that we have an e-mail from Craig Wolfson to a bunch of people, including you?

A.  Yes.

Q.  All right.  And in the text it says:  "Here's the situation with RIM."  Do you see that?

A.  Yes.

Q.  And first, there's a meeting scheduled with Ken LeVine who's going to come to see you, right?

A.  Come to Mformation.

Q.  Right.  And then you guys -- you were going to go and visit RIM a few days after that, correct?

A.  Mformation would, yes.

Q.  And so the e-mail from Mr. Wolfson says:  "Ken says he's visiting us on August 16th, before our visit to RIM on August 21, in order to understand the maturity of our product before he gets everyone excited at RIM."

        Do you see that?

A.  Yes, I read that.

Q.  And his job was to get everyone excited at RIM, wasn't it?

A.  I don't know what his job was.  But definitely he was somebody who was going to be at that meeting.

Q.  And you say:  "We must give Ken the necessary assurances that the product works and that he will not embarrass himself (before) bringing Mformation into RIM."

A.  Craig Wolfson said that.

        THE COURT:  You added a word there.

        MR. MATUSCHAK:  I apologize for that, your Honor.

BY MR. MATUSCHAK:

Q.  And you did go to RIM on August 21st, right?

A.  Yes.

Q.  Mformation knew in April of 2002 that RIM was developing its own management solution for the

BlackBerry; isn't that right, sir?

A.   I don't remember.

Q.   Exhibit 772 is an e-mail from your co-founder Mr. Basu to Dave Castell at RIM, do you see that?

A.   Yes.

Q.   And you interacted with Mr. Castell all the time, right?

A.   No, Mr. Basu interacted with Mr. Castell more than I.

Q.   You interacted with him sometimes?

A.   Yeah.

Q.   All right.

        MR. MATUSCHAK:  If you can highlight the part "we understand," in that paragraph.

BY MR. MATUSCHAK:

Q.   So Mr. Basu is saying:  "We understand that you wanted to use our device management agent as a stopgap ... till you built your own standards device management agent from the ground up."

        Do you see that?

A.   Yes.

Q.   So Mformation knew that if an agreement was reached with RIM, your device management agent was just a stopgap, right?

A.   I don't know what this means.  It was not my words.

Q.   Well, you knew that RIM was going to build its own

agent from the ground up.  That's what Mr. Basu says right here, correct?

A.  This is from him, so you will ask him what he meant.

Q.  He didn't tell you that when he came back from when this e-mail was sent?

A.  I didn't understand, really.

Q.  You never had a discussion with Mr. Basu in which he told you RIM was going to build their own device management agent from the ground up?

A.  It's a very long time ago, so I don't remember details.

Q.  But you certainly never said to Mr. Basu, Well, tell RIM they can't do that, did you?

A.  I don't remember.

        MR. MATUSCHAK:  If we can take that down.

BY MR. MATUSCHAK:

Q.  There's a part, "We agreed to the following."  Do you see that?

        And then underneath it says:  "In exchange for RIM's obligation to embed our agent on all new devices and to distribute our agent through service packs to the existing installed user base, Mformation will grant a royalty-free license to RIM for our agent to embed on all your devices."

        Do you see that?

A.   Yes.

Q.   So you wanted RIM to put your agent on all its BlackBerrys, correct?

A.   I think Mr. Basu's e-mail, I think he already testified what that meant yesterday.

Q.   You wanted that too.  I mean, you said that in your deposition, you remember that, right?  You wanted it right out of the factory, correct?

A.   Yeah, we wanted to be there, you know, not active, so that it gets rolled out.

Q.   "Royalty-free" means free to RIM, correct?

A.   It didn't -- yeah, I think you asked Upal that question.

Q.   Whether those devices were activated or not, RIM was not going to pay anything.  Somebody else might pay to activate it but not RIM; it was going to be royalty-free to RIM, correct?

A.   I don't know what that meant.

Q.   All right, so you can't figure that out.

All right.  So here -- strike that.

MR. MATUSCHAK:  Let's put up Mformation opening slide 7.

BY MR. MATUSCHAK:

Q.   You remember seeing this at the very beginning of the case, right, Dr. Kushwaha?

A.   Yes.

Q.   And you were here when Mr. Thakur put this slide up in his opening, right?

A.   Yes.

Q.   And this part that's taken out from that slide says, has Mr. Lazaridis at RIM saying:  "Okay to take control of their agent, ASAP," right?

A.   Yes.

Q.   And that's the very same agent that Mr. Basu in the e-mail we just looked at was offering to give to RIM royalty-free, correct?

A.   I don't know.

Q.   How many agents did you have?

A.   We had, you know, agents for various devices.

Q.   How many agents for RIM did you have?

A.   We started with 1.0 and we built 1.4.

Q.   Let's go back to 772, please.  Down in the bullet points, the one that says:  "License will be to use object code only."  Do you see that sir?

A.   Yes.

Q.   So you were not willing to give RIM the source code for the software that you wanted RIM to put on its BlackBerrys, correct?

A.   I don't know.  I was a technical guy.  Most of the business relationship was handled with Upal and RIM.

Q.   Let's go down to the -- if we can, the "In summary" line at the bottom.

You see where Mr. Basu says:  "In summary, what you code belongs to you; what we code belongs to us.  We are not seeking royalties of any sort from RIM."

Do you see that?

A.   Yes.

Q.   And that as his co-founder at Mformation, that was your company's position, right?

A.   Once again, I was a technical guy.  Most of the business relationship, I left it to Upal.

Q.   Now, Mr. Basu does not say here what RIM code belongs to Mformation, does he?

A.   I don't read that.

MR. MATUSCHAK:  Let's look at Exhibit 642.

BY MR. MATUSCHAK:

Q.   Now, here we are in June of 2002, Dr. Kushwaha, and Mr. Castell is writing to Mr. Basu.

MR. MATUSCHAK:  And we can go down to the number 1, highlight that 1.

BY MR. MATUSCHAK:

Q.   Do you see where he says, Mr. Castell at RIM says: "I've already mentioned that your security model is flawed and we would need to do some development to fix this."

Do you see that?

A.    Yes.

Q.    Then he says:  "Also, you are simultaneously giving me a warranty that says that if the code is buggy, it's my problem, while preventing me from modifying the source code."

Do you see that?

A.    Yes.

Q.    And you did have a flawed security model in June of 2002, didn't you, sir?

A.    No, we did not.

Q.    RIM thought you did, though, didn't they?

A.    I don't know what they said.  It's not even coming to me, the e-mail.

Q.    So when Mr. Basu gets an e-mail from RIM saying we have a big problem here that we need to fix for this deal to go forward, he doesn't come to you and say anything about what RIM told him?

A.    Well, might have, but I don't remember.

Q.    Okay, all right.  But you can see that the deal fell apart from RIM's side because they were worried about the security of their BlackBerrys?

MR. THAKUR:  Objection.  Foundation, your Honor.

THE COURT:  Sustained.

BY MR. MATUSCHAK:

Q.   Now, sir, you said yesterday that you didn't sue RIM under the nondisclosure agreement when you found out about BES 4.0 because you were afraid of RIM.  Is that right?

THE COURT:  This sounds like it might take a bit of time unless you tell me you'll be done --

MR. MATUSCHAK:  It will take a bit of time, your Honor.

THE COURT:  It's 10:30.  Let's take our break at this point and come back at 10:45.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Summon the jury.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may resume your cross-examination.

MR. MATUSCHAK:  Thank you, your Honor.

BY MR. MATUSCHAK:

Q.   Now, Dr. Kushwaha, I think where we left off is, you said yesterday, I believe, that you didn't sue RIM under the nondisclosure agreements that the jury saw after BES 4.0 came out because you were afraid of RIM; is that correct?

A.  Yes, and at the same time, we were given legal advice till we get our patent issued --

Q.  I don't want to ask you about your legal advice that's protected by the attorney/client privilege.  I don't want you to disclose that in open court.

So your testimony is you didn't sue because you were afraid of RIM, correct?

MR. THAKUR:  Your Honor, it's the client's privilege to waive.

MR. MATUSCHAK:  Well, if they're waiving attorney/client privilege.

THE COURT:  I don't want to get into that colloquy in front of the jury.  But I thought you were trying to restrict your question to a particular motivation.

MR. MATUSCHAK:  I was, your Honor.

BY MR. MATUSCHAK:

Q.  Sir, you said, I believe yesterday, at least one of the reasons why you didn't sue RIM under the nondisclosure agreement when BES 4.0 came out was because you were afraid of RIM; is that right?

A.  That was one of the reasons.

Q.  But in 2008 you weren't afraid of them anymore, correct?

A.  Yes.

Q.   That's when you brought the lawsuit, right?

A.   Afraid --

Q.   Did you bring the lawsuit in 2008, sir?

A.   Yes.

Q.   But even when you brought the lawsuit, you did not sue RIM for violating any of those nondisclosure agreements that you put up on the screen yesterday, did you?

A.   I have no comment on that.

Q.   You didn't sue RIM for violating the nondisclosure agreements because you knew that RIM did not improperly use any information you gave them in 2001 and 2002; isn't that true?

A.   No.

Q.   Now, you did sue RIM for patent infringement, right?

A.   Yes.

Q.   Now, and you'll agree with me, sir, there's something in between suing someone and being completely quiet, correct?

A.   I don't know what you mean.

Q.   Well, you didn't have your lawyers write a letter to RIM saying, We have a little problem we want to discuss with you, did you?

A.   As I said, we were scared they might sue us back.

Q.   You didn't send an e-mail to any of the folks you had

been working with at RIM through those years and say,

Hey, what are you doing?  Can we talk about this?  Did

you?

A.   We were afraid of --

Q.   Did you do that, sir, or no?

A.   No.

Q.   You didn't even reach out on the phone to say to any

of the technical people you talked to, Hey, guys, I'm a

little upset by what you're doing.  Can you just explain

it to me?  You didn't do that, did you?

A.   As I said, we were scared of those guys.

Q.   You had never suggested to anyone at RIM, even in the

most innocuous fashion you could possibly think of that

there was the slightest issue, did you?

A.   We were just scared of their retaliation.

Q.   Now -- let me actually go back to one thing we were

talking about, the source code.

        MR. MATUSCHAK:  Could we have Exhibit 2226,

page 9163.  If you could blow that up a little bit.

BY MR. MATUSCHAK:

Q.   In the middle of the page, Dr. -- strike that.

        Dr. Kushwaha, yesterday we went through some of

your source code.  Do you remember that?

A.   Yes.

Q.   So I was looking at some of this last night, I can't

read source code very well, but sometimes I can pick out a word or two.  I saw something I wanted to ask you about.  In the middle of the page there's something that says "Mobitex."  Do you see that?

A.  Yes.

Q.  Now, you know what Mobitex was, right, sir?

A.  A network.

Q.  Right.  Mobitex was a wireless data network, correct?

A.  Yes.

Q.  And you knew about Mobitex because you even have things in your code that talk about Mobitex, right?

A.  Yeah, we used it as a network to communicate to the device.

Q.  So you even used Mobitex with your own product, correct?

A.  Yeah, we send a message to the Mobitex network, and that delivered that message to the device.

Q.  When you went to the patent office, I think you were asked yesterday or today about the prior art that you gave to them.  Do you remember that testimony?

A.  Yes.

Q.  And you remember the patent video we saw in court talking about the inventor providing information to the patent office about relevant things that happened before, you remember that, right?

A.  Yes.

Q.  And at no time did you ever provide to the patent office any information about Mobitex, did you?

A.  No, Mobitex was not doing remote wireless device management.

MR. MATUSCHAK:  You can take that down, please.

BY MR. MATUSCHAK:

Q.  Now, Mformation is a private company, correct?

A.  Yes.

Q.  It doesn't have stock currently traded on any exchange like the New York Stock Exchange or NASDAQ or anything, right?

A.  Yes.

Q.  But Mformation does have investors, correct?

A.  Yes.

Q.  People who put their money into your company, right?

A.  Yes.

Q.  And I think you talked about some of those, somebody put in like 12-and-a-half million in that first year, right?

A.  Yes.

Q.  Somebody else put in like 500,000?

A.  Correct.

MR. MATUSCHAK:  If we could put up Demonstrative 100.

BY MR. MATUSCHAK:

Q.  So, sir, by 2008, your investors were seeing this, correct (indicating)?

A.  No.

Q.  They were seeing the losses, weren't they?

A.  They were seeing our revenues as well, which is not part of this slide.

Q.  Right, these were your net losses.  So let's make sure we're talking about the same thing.  Any company brings in money, right?  Hopefully.

A.  Could you repeat that question?

Q.  Every company brings in money, correct?

A.  Yeah, to build product.

Q.  That's called revenue?

A.  Right.

Q.  And every company spends money, right?

A.  Right.

Q.  Paying for research, paying for employees, paying for whatever the -- you know, the newspaper, the office, all those things, right?

A.  Correct.

Q.  So when somebody says "net losses," that means you've compared those two things and you've lost money for that year, comparing revenue, what comes in the door, and what goes out the door, right?

A.  Right.

Q.  So in 2008, your investors were seeing that every year that you had been in business, your company had lost money, correct?

A.  That's what it says there.

Q.  Nine straight years, right?  By 2008.

A.  Yeah, I can see that.

Q.  They were getting a little nervous, weren't they, sir?

A.  No, not necessarily.  They always believed in our product, our technology.  We have AT&T, T-Mobile, Vodafone, one of the world's largest carrier, customer.  Vodafone owns 45, 40 percent of the Verizon, so a lot of mobile operators are using our products today.

        MR. MATUSCHAK:  Your Honor, I move to strike everything after the word "no."

        THE COURT:  Yes, the motion to strike is granted.  The jury will disregard the remainder of the answer.

BY MR. MATUSCHAK:

Q.  In 2008, after nine straight years of losses, that's when you decided to blame your problems on RIM; isn't that true, sir?

A.  No.

        MR. MATUSCHAK:  Let's get to slide 19.

BY MR. MATUSCHAK:

Q.   Sir, here's a slide that we received from your lawyers in connection with this case, and that says --

MR. THAKUR:  Objection, foundation, your Honor.

THE COURT:  Overruled.

BY MR. MATUSCHAK:

Q.   And this says:  "Spring, fall, 2003, sales pipeline dry up."  Do you see that?

A.   Enterprise sales.

Q.   Sales pipeline.  But I'll take that.  You're talking about enterprise sales.  All right.  In the spring of 2003, you did not have a patent, did you?

A.   No.

Q.   We can see on the timeline that came out in 2005, correct?

A.   Yes.

Q.   And in the spring of 2003, RIM was more than a year away from coming out with BES 4.0, correct?

A.   Yes.

Q.   So whatever caused the sales pipeline to dry up in the spring of 2000 -- beginning in spring of 2003, had nothing to do with your patent, right?

A.   It had to do with the --

Q.   It had nothing to do with your patent, did it?

A.   No.

Q.   And it had nothing to do with RIM, did it?  RIM BES 4.0?

A.   It had to do with RIM, yes, it had to do with RIM.

Q.   Didn't have to do with RIM BES 4.0, though, did it?

A.   In a technology area --

Q.   Did it or not, sir?

A.   Would you please repeat that question?

Q.   Are you telling the jury that the reason your sales pipeline dried up beginning in the spring of 2003 was because of a RIM product BES 4.0 that wasn't released, according to this timeline, until May of 2004?

A.   Yes, it had to do with it.

Q.   Now, most of your device management customers for enterprises left in 2003, correct?

A.   I don't know exactly when, but yes, they did.

Q.   I think you still have the transcript up there -- I'm sorry, I need to get it.

        MR. MATUSCHAK:  Your Honor, may I approach?

        THE COURT:  Yes.

BY MR. MATUSCHAK:

Q.   Dr. Kushwaha, I've handed you your deposition transcript from April of 2010.  Do you have that, sir?

A.   Yes.

Q.   And would you turn with me, please, to page 72.

A.   (The witness complies.)

Q.   Do you have that page?

A.   Yes.

Q.   And do you see at line 5 you're asked the question:
"Approximately when was that?"  Do you see that?

A.   Yes.

Q.   And do you see at line 6 your answer was:  "At that
time, I don't remember the timeframe, but most of our
customers left in 2003."

     Did I read that correctly?

A.   Yes.

Q.   And that's true, isn't it?

A.   Oh.

Q.   Is it true, sir, did you testify truthfully on
April 24th, 2010?

A.   At that time, I don't know the context of the
question.

Q.   So you don't know if that was true or not?

A.   In that timeframe, yes.

Q.   The fact is, you lost your customers because you
couldn't compete in the marketplace; isn't that right?

A.   No.

Q.   Well, would you agree with me, sir, that losing
$111 million over 11 years suggests that you're not
doing very well in the marketplace?

A.   We are doing very well in the marketplace --

Q.  All right.  So your testimony then --

THE COURT:  That sounds like it's going to be argumentative.

BY MR. MATUSCHAK:

Q.  Now, when Mformation started in 1999, it did not have any business relationship with RIM, did it?

A.  No.

Q.  And in 2010, the last year for which we have data, Mformation did not have any business relationship with RIM, did it?

A.  No.

Q.  So Mformation lost money before, during and after the time that it had a relationship with RIM; isn't that true, sir?

MR. THAKUR:  Objection, argumentative.

THE COURT:  Overruled.

THE WITNESS:  Could you please repeat the question?

BY MR. MATUSCHAK:

Q.  Yes.  Mformation lost money before, during and after the time that it had a business relationship with RIM; isn't that true?

A.  I would assume so.

Q.  Now, the product that Mformation accuses of infringing its patent is called the BlackBerry

Enterprise Server, right?

A.   Yes.

Q.   And "enterprise" refers to companies that have a lot of devices to manage, right?

A.   Yes.

Q.   And the marketplace of all those companies is called the "enterprise market," right?

A.   Yes.

Q.   There's also something called the "service provider market," correct?

A.   Yes.

Q.   That's a different market, right?

A.   Different customers, yes.

Q.   What's the service provider market?

A.   Service providers are like operators like Verizon, AT&T, T-Mobile.

Q.   It's like cell carriers?

A.   Cell phone carriers, yes.

Q.   Now, in 2007 you had some discussions by e-mail with Mr. Richard Hovey at your company, do you recall that, sir?

A.   No, I don't recall.

Q.   Mr. Hovey was a senior director of software engineering for Mformation in 2007, correct?

A.   The name rings a bell, yes.

Q.   Is he still employed there?

A.   No.

MR. MATUSCHAK:  Your Honor, I'd move to admit Exhibit 788.  I don't think there's any objection.

MR. THAKUR:  No objection.

THE COURT:  No objection.  So 788 is in evidence.

(Defendant's Exhibit 788 received in evidence)

BY MR. MATUSCHAK:

Q.   If we look at the bottom of the page, you see there's an e-mail from Mr. Hovey to you on July 4th, 2007.  Do you see that, sir?

A.   Yes.

Q.   And if we go down to the very last paragraph, I think it's the last sentence there, it says:  "In my opinion" -- this is him to you -- "that's the reason Mformation failed to get into the enterprise market before, we didn't offer sufficient value or from the enterprise perspective, they didn't see cost-saving benefits in the features we were offering to DM."

Do you see that?

A.   I read that.

Q.   And "DM" means device management, right?

A.   Yes.

Q.   Mr. Hovey seemed to -- strike that.

Now, you responded to Mr. Hovey on July 5th,

right?  This would be the top e-mail.  "Looks like you did it after the fireworks," says 12:51 a.m.  That's your e-mail to him, is it not, sir?

A.  Yes.

Q.  At the beginning you quote that line that we just read, do you see that?

A.  Yes.

Q.  And then you respond to him, do you not?

A.  Yes.

Q.  And you say:  "First of all, IMHO" -- and to my understanding" --

A.  "In my humble opinion."

Q.  -- "we never failed to get in the enterprise market, we were very successful and had an install base of more than a dozen happy customers."

Do you see that?

A.  Yes.

Q.  So you thought having a total of more than 12 customers in the enterprise market is a success, is that so?

A.  If you have a startup company, 12 customers is a lot.

Q.  Then you say:  "We had a DM product in the year 2000."  Do you see that?

A.  Yes.

Q.  And you're referring there to the prototype you

showed Deutsche Bank?

A.   I think I'm referring to 1.0.

Q.   1.0 was never on sale, was it?

A.   But we had a product.

Q.   And it then says, you then say to Mr. Hovey:  "It was unfortunate that 9/11 and sluggishness of enterprise markets made us focus towards service providers where we succeeded as well."

     Do you see that?

A.   Yes.

Q.   So when you're e-mailing back and forth with Mr. Hovey, you blamed 9/11 and the sluggish market for your problems in enterprise, with enterprise customers, correct?

A.   That was one of the factors.

Q.   And nowhere in the e-mail to Mr. Hovey do you attribute any problem in the marketplace to RIM, do you?

A.   Sluggishness suggests that.

Q.   You don't mention RIM or BlackBerry anywhere in this e-mail, do you, sir?

A.   Mr. Hovey was there --

Q.   Do you, sir?

A.   No.

Q.   Now, one of your first paying customers was a company called Credit Suisse First Boston, right?

A.   Yes.

Q.   And they were one of those happy 12 enterprise customers you were talking about in this e-mail?

A.   We had some issues, but Credit Suisse was one of our first customers, we had some rough patches and some issues.

Q.   You had some rough patches with them, all right.

MR. MATUSCHAK:  I move to enter into evidence Exhibit 803, your Honor.

THE COURT:  Without objection, 803 is received.

MR. THAKUR:  Your Honor, we actually object.  Let me quickly look at the exhibit.

THE COURT:  I'm sorry, are you objecting?

MR. THAKUR:  Your Honor, we believe we are.  I just need to run through the exhibit list.

THE COURT:  So I won't receive it, but you're free to use it to see if you can lay a foundation for its admission.

MR. MATUSCHAK:  All right.

BY MR. MATUSCHAK:

Q.   Dr. Kushwaha, could you turn to Exhibit 803 in your binder, please.

And, sir, if you could turn to the second page of that exhibit, do you see there is an e-mail dated November 3rd, I believe.  Of 2003.  On the bottom of the

second page, I think that starts the e-mail chain.  Do you see that?

A.  Yes.

Q.  Do you see where it says "original message"?

A.  Yes.

Q.  Okay.  And this is an e-mail from Jon Herttua, do you see that?

A.  Yes.

Q.  Mr. Herttua was employed by Mformation at the time of this e-mail; is that correct?

A.  Yes.

Q.  And he sends it to Mark Edwards, do you see that?

A.  Yes.

Q.  And Mark Edwards was the CEO of Mformation at the time of this e-mail, correct?

A.  Yes.

Q.  And it's a cc to executivemanagement@mformation.com, do you see that?

A.  Yes.

Q.  Are you on that e-mail list of executivemanagement@mformation.com?

A.  Yes.

Q.  So you received this e-mail as well, did you not, sir?

A.  I must have.  I don't remember it.

Q.   Okay.  And this is about a customer that you were just describing, Credit Suisse First Boston, correct?

A.   Yes.

Q.   And Mr. Herttua is reporting to you something about that customer, correct?

A.   Yes.

Q.   And this is something you'd expect Mr. Herttua to do in the ordinary course of his business; is that correct?

A.   I would guess so.

MR. MATUSCHAK:  Your Honor, I offer it into evidence.

MR. THAKUR:  We object as it's being irrelevant to the issues.

THE COURT:  803 is in evidence.  The objection is overruled.

(Defendant's Exhibit 803 received in evidence)

MR. MATUSCHAK:  Put that up on the screen, please.

BY MR. MATUSCHAK:

Q.   Let's go to that e-mail we were just talking about to Mr. Herttua.  It starts out with Mr. Herttua saying:  "I went to CSFB and got the full treatment of abuse from a dissatisfied customer."

Do you see that?

A.   Yes.

Q.   And this is one of your first customers, right?

A.   One of our first customers, yes.

Q.   And it goes on to say that:  "The software was to be installed by July '02 and is still not due, according to CSFB, because of the following about our company."

     Do you see that?

A.   Yes.

Q.   And it goes to a list of complaints that CSFB has about your company, do you see that?

A.   Every customer has complaints with the software writing.

Q.   These complaints are a little bit worse than your average complaints, aren't they, sir?

A.   The deployment, and when we are going through it, the software, deploying it in any large customer, small customers, they all have issues.

Q.   He said that they thought your company was unprofessional, right?

A.   No, it was not.

Q.   But that's what the customer thought, right?

A.   I don't know what the customer thought.

Q.   Well, Mr. Herttua reported that the customer said there was a lack of continuity in your staff, right?

A.   We had to let go a lot of people in the company, yes.

Q.   Mr. Herttua said that the customer believed that you

had misrepresented the capabilities of your software. Do you see that, for lock and zap?

A. That's what it says.

Q. The customer thought your software was filled with bugs, do you see that?

A. That's what it reads.

Q. And he says: "Long story short, forget about ever using them as a reference. They thought we would be out of business by now."

Do you see that?

A. Those are his words.

Q. Do you still say, sir, that Credit Suisse First Boston was one of those happy 12 customers?

A. You haven't spoken about U.S. Air Force or U.S. House of Representatives, those were happy customers.

Q. Were these one of your 12 happy customers?

A. Just one of the unhappy ones.

Q. By the way, Mr. Edward, one of the guys who received this, he was the CEO at that time?

A. Yes.

Q. In 2003, he was the third CEO in four years, correct?

A. Um.

Q. You had Mr. Basu, you had Mr. Pettengill, and you had Mr. Edwards, three in four years; is that right?

A. Mr. Basu was a founder, and then we had an external

CEO, Mr. Ron Pettengill, our first external CEO.  And then second CEO was Mr. Mark Edwards.

Q.  Now, this e-mail from Credit Suisse was in 2003, right?

A.  That's correct.

Q.  That's before BES 4.0 came out, right?

A.  There were rumblings in the market that it will be coming out in 2004.

Q.  And your sales pipeline dried up because your software was full of bugs, right?

A.  No.

Q.  Your sales pipeline dried up because you misrepresented the capabilities of your software; isn't that right, sir?

A.  No.

Q.  Your sales pipeline dried up because people couldn't install it properly?

A.  No.

Q.  Your sales pipeline dried up because customers found your employees unprofessional, and not because of anything RIM did; isn't that right?

A.  No, it's because of what RIM did to us.

MR. MATUSCHAK:  You can take that down.

BY MR. MATUSCHAK:

Q.  Now, there's been some discussion about Mformation's

agent in this case, right?

We saw the e-mail before, Mr. Lazaridis and the agent and all that.  I want to ask you about all that.

MR. MATUSCHAK:  Can we go to demonstrative double 07, please.

BY MR. MATUSCHAK:

Q.  And you remember this from the opening, right, Dr. Kushwaha?

A.  Yes.

Q.  Okay.  And the agent is what goes on the device like a smartphone, correct?

A.  That's correct.

Q.  And Mformation's invention is about what goes on the server, right?

A.  No, the invention is how server communicates with the device.

MR. MATUSCHAK:  Let's look at Mformation's opening slide 30, please.

BY MR. MATUSCHAK:

Q.  In this slide from Mr. Thakur, your lawyer, he points out all the steps of the patent have to be done without receiving a request from the device.  Do you remember that?

A.  Yeah, if you're locking a device, you don't want somebody to say, Lock my device, if it is lost and

stolen.

Q.   Everything has to be done without receiving a request from the device, correct?

MR. THAKUR:  Actually, your Honor, mischaracterizes the document.

MR. MATUSCHAK:  I'll rephrase it.

BY MR. MATUSCHAK:

Q.   Everything that follows the phrase, "without a request from the wireless device," has to be done without a request from the wireless device, correct?

A.   That's what it says.

MR. MATUSCHAK:  All right.  Let's go to opening slide 32 from Mformation.

BY MR. MATUSCHAK:

Q.   And Mr. Thakur talked about a mailbox, do you remember that?

A.   Yes.

Q.   The mailbox is established at the server, right?

A.   Yes.

MR. MATUSCHAK:  Go to slide 034.

BY MR. MATUSCHAK:

Q.   Mr. Thakur talked about the memory.  Do you remember that?

A.   Yes.

Q.   And that's at the server, correct?

A.  Yes.

MR. MATUSCHAK:  Next slide.

BY MR. MATUSCHAK:

Q.  Mr. Thakur talked about establishing a connection, right?

A.  Yes.

Q.  And the server is what establishes the connection, right?

A.  It says:  "Remains initiating wireless communication between wireless device and the server."

Q.  And the server is the one that has to initiate that, not the device, correct?

MR. THAKUR:  Your Honor, this is subject matter of expert testimony.  As to what you ruled on yesterday.

THE COURT:  It might be, but -- Counsel, approach.

(At the sidebar, out of the hearing of the jury and the court reporter.)

BY MR. MATUSCHAK:

Q.  Dr. Kushwaha, as shown on the slide that you saw on the opening, your invention had the server establishing the connection, not the wireless device, correct?

A.  The connection is established between the two parties.

Q.  And you don't know which one has to do it?

A.   Anyone can do it.

Q.   So you think your invention, either the wireless device or the server can establish the connection?

A.   Connection just -- when you're communicating, it needs to be established between the two entities.

THE COURT:  Let me interrupt.  Members of the jury, maybe I should clarify an issue here.  As I told you earlier, one of my responsibilities is to interpret the language of the claim, and I've given you definitions that do that.  It could be that I might need to give you further clarification, and there are instances where I've done that.  And if I do decide to give you further definitions, I'm going to do that.

So with respect to what the claims mean, that's my job.  But any witness who was competent to testify can testify about matters other than the meaning of the claims.  For example, how the invention works or how a particular product works.  Those are not matters of claims interpretation.  Those are matters of how products do the things that they do.

Now, we're sort of in a borderline here, because the lawyer is asking questions with respect to what the language of the claim in front of you, whether certain things have to be done by particular devices.  And as I'm looking at it, the question of what device initiates

the wireless connection between a wireless device and a server is not said there. There is a prior clause that I have interpreted, which is without a request from the wireless device performing the steps of...," and perhaps if I find it necessary, I might need to further define that so as to leave no doubt as to which device does the steps that are enumerated there, because there is a step called, "executing the command at the wireless device." And of course, that is a step that is performed at the wireless device.

So one of the things I need to review is whether or not I need to add further language to my definition with respect to whether or not the earlier steps are performed at the wireless device or at the server.

And I believe I had done that. But since the question is being asked, I wanted to interrupt and try and give you a division of labor between what this witness can do and what a court would be required to do.

Give me one moment.

Unless you want to go to know a different area.

MR. MATUSCHAK:  I don't mind waiting, your Honor. I think this needs some clarity.

Or I could ask some more questions if that's easier.

THE COURT:  Give me a moment.

(Pause in the proceedings.)

THE COURT:  Well, it would be my instruction now, and I need to follow this with a written instruction to you, members of the jury, but there are several times in this claim where the phrase "at the server" is used, and it's the Court's interpretation that "at the server" means it is a step that is performed by the server, or someone who's operating the server.

And so it is the Court's instruction that all of the steps that follow:  "Without a request for the wireless device" up to "executing the command at the wireless device" -- and I should probably modify it -- "accepting the contents at the wireless device must be performed at the server, and must be performed without a request from the wireless device and be accepting the contents of the box at the wireless device must also be performed without a request from the wireless device, and executing the command at the wireless device must be performed without a prior request from the wireless device."

But those are at least steps that have to be performed at the wireless device.

I think it would be helpful for the jury to actually have a copy of the patent in writing in front of them so that this will be meaningful.  I've given you

the language in my supplemental instruction, but I think that having the entire patent in front of you, perhaps with the claims that are not at issue redacted, might be helpful.

So I will follow up on that.

MS. DeBRUIN:  Your Honor, can we approach for a moment just for a point of clarification?

THE COURT:  Certainly.

(At the sidebar, out of the hearing of the jury and the court reporter.)

THE COURT:  I think the parties are going to give me the benefit of time to write this instruction for you better, and we can move on to some other area for about a half hour till our break.

BY MR. MATUSCHAK:

Q.  Dr. Kushwaha, you understand the Court is the one that says what those claims mean, right?

A.  Yes.

Q.  And you don't have any problem with the Court's constructions, correct?

A.  No.

Q.  Now, yesterday you testified about a standards group called the Open Mobile Alliance.  Do you remember that?

A.  Yes.

Q.  And you testified that Mformation was a member of the

Open Mobile Alliance, right?

A.   Not the Open Mobile Alliance but the device management group that is in the Alliance.

Q.   Because the OMA was founded by about 200 companies, right?

A.   Yes, they're a lot of member wireless companies in the standard group.

Q.   And you said Mformation disclosed the '917 patent to the OMA, right?

A.   Yes.

MR. MATUSCHAK:  Let's have Exhibit 1081 on the screen, please.

BY MR. MATUSCHAK:

Q.   The first thing you referred to was the meeting minutes from a meeting in 2004.  Do you remember that?

A.   Yes.

MR. MATUSCHAK:  And if we can go to page 643363.  And it's about the middle of the page, there's something that says "Rakesh."  And you pointed -- you'll have to go down -- I'm sorry, 643365.  There we go.

BY MR. MATUSCHAK:

Q.   It says "Rakesh presented this document," do you see that?

A.   Yes.

Q.   And above it, it gives a document, "OMA-DM

Performance and Fault Reporting."  Do you see that?

A.  Yes.

Q.  And then two lines underneath:  "Rakesh presented this document."  It says:  "Device traps are the main subjects of this proposal."  Do you see that?

A.  Yes.

Q.  The word "device traps" are not mentioned in Claim 1 of the '917 patent, are they, sir?

A.  This document had nothing to do with '917.

Q.  So this had nothing to do with the '917 patent, is that your testimony?

A.  Yes.  It relates to some other material within the standards.

Q.  So what you were asked about yesterday, at least on this page, has nothing to do with this case, right?

A.  It just means that I was there.

Q.  Okay.  If we can go to 10643369.  There's an intellectual property rights considerations.  Do you see that section, sir?

There it says "Mformation declared IPR" -- and then a bunch of numbers?

A.  Yes.

Q.  It doesn't say what IPR Mformation disclosed, does it?

A.  It says the IPR, which is on OMA DM's website --

Q.    That "OMA DM 2004 012 device wipe lock," that was something IBM had submitted, not something of Mformation's, correct?

A.    That is correct.

Q.    Okay.  And you testified yesterday that declaring IPR means raising your hand, right?

A.    Raising your hand and pointing them towards the IPR, which you have declared to OMA.

Q.    Now, yesterday you were asked, and I thought that this was interesting, you were asked, What were you thinking in terms of Mformation's intellectual property rights when you said that?  Do you remember that question?

A.    Yes.

Q.    You said:  "I was thinking of the '917 patent."  Do you remember that answer?

A.    I was thinking of the IPR, which led to '917.

Q.    So when you raised your hand, you were thinking of the '917 patent, you say, correct?

A.    Yes, the application for '917.

Q.    But you never said that out loud at the meeting, did you?

A.    No, I did.

Q.    You said "'917 patent" when you raised your hand?

A.    No.

Q.   Because there was no '917 patent when you raised your hand, was there?

A.   It was an application for '917 patent.

Q.   And the application for the '917 patent at that time was private, it was not publicly available, was it?

A.   It was disclosed to OMA as an application.

Q.   Not when you raised your hand?

A.   We declared our application, we submitted our application to OMA when we joined OMA.

Q.   And there was no -- but what we can agree on is you didn't say anything about the '917 patent because it hadn't been issued yet, correct?

A.   I talked about patent --

Q.   Is that correct or not, sir?

A.   '917 was not issued at that time, would be --

Q.   Right, and the '917 patent claims changed between the time that you were at this OMA meeting and the time that the patent was issued.  We already saw that this morning, right?

A.   It didn't change.  It moved around.

Q.   So someone from RIM in the crowd, that he couldn't have known you were talking about the claims of the '917 patent because those claims didn't exist yet, right?

A.   We declared our application.  We declared our intended invention.  And when IBM submitted lock and

wipe, they didn't submit the details.  But the objective was, anyone submitting anything which relates to your invention, you should raise your hand and declare that.

Q.   You also talked about -- yesterday about the patents disclosed on the OMA's website, do you remember that?

A.   Yes.

Q.   And the Alliance has lots of members, right?

A.   Yes.

Q.   And many of those members have disclosed patents to the Alliance, correct?

A.   Yes.

Q.   The exhibit you showed yesterday that was a website printed out for members whose names that start with just J to M, right?

A.   I guess I saw that.

Q.   If you could look at 474.

        MR. MATUSCHAK:   The second page, highlight that part at the very top.

BY MR. MATUSCHAK:

Q.   There you can see the J to M, that's the pages that we're talking about here, right?

A.   Yes.

Q.   And if we look down to the first company that's identified there, it's one that starts with a K.  Do you see that?  Somebody coming from the Netherlands.  Do you

see that?

A.   Yes.

Q.   All right, if you go back, show the whole page.  This is the first page on that J to M part of the website that lists patents and patent applications, correct?

A.   Yes.

Q.   Let's go to the next page.  There's a lot more, right?

A.   The way --

Q.   There's a lot more on that page, right, sir?

A.   But that's all OMA, not device management.  Device management is a subgroup, and any IPR declared in device management group is a much smaller subset.

Q.   This was the exhibit that you used yesterday in your testimony, wasn't it, sir?

A.   Yes.

Q.   You didn't use some other list of patents, did you?

A.   Well, I --

Q.   This is the list you put up on the screen in front of the jury yesterday, right?

A.   Yes.

Q.   And on this list -- on that next page, there's a list of a whole bunch more patents, right?

A.   Yes.

          MR. THAKUR:  This is argumentative, your Honor.

THE COURT:  Say again?

MR. THAKUR:  Argumentative.

THE COURT:  Overruled.

BY MR. MATUSCHAK:

Q.  Let's go to the next page.  There's more patents, correct?

A.  They don't --

Q.  Are there more patents, sir?

A.  This is for the whole OMA.  The device management is a very small subset.  There are 20 other groups in the OMA, so what you're looking at is the entire OMA, not the device management.

THE COURT:  I can understand the urgency to explain, but it will speed us up to say, Yep, there's another list, and wait till later until you're asked to explain why certain things are there.  Go ahead and just answer the question.

BY MR. MATUSCHAK:

Q.  And we go to the next page.  And the next page after that.  There's still more patents, correct?

A.  Yes.

Q.  And this is just the part from J to M, right?

A.  Yes.

Q.  There's more pages for A to L and N to P, and there's two whole sets of pages for companies that start with O

for some reason, right?

If we go back to the second page of the document -- go up to the top again.  See, there's O Number 1 and O Number 2.  I guess there's a lot of computer companies with the name O.

A.   I don't know.

Q.   And there's more R to Z as well.

A.   I see that.

Q.   And those lists of patents are just about as long as the ones we've been looking at for the J to M.  Correct?

A.   Yes.

Q.   I counted them up last night, and I counted 1,340 patents and patent applications on that list.  Does that sound about right, sir?

MR. THAKUR:  Your Honor, he's making closing argument.  It's argumentative.

MR. MATUSCHAK:  They are the ones who say they disclosed this to us by putting it on this list of 1,340 patents.

THE COURT:  I won't allow the witness to speculate as to how you're counting those.  The objection is sustained.

BY MR. MATUSCHAK:

Q.   Have you read all of the patents and patent applications on the OMA website?

A.   Whenever anybody in the device management group raises their hands --

THE COURT:  You need to answer whether you've read them.

THE WITNESS:  I read the device management-related patents.

BY MR. MATUSCHAK:

Q.   So you have not read all the patents and applications on the website, have you, sir?

A.   Only read the device management.

Q.   And you don't know whether anyone at RIM has ever read every single one of those patents and applications on the website, do you?

A.   I don't know.

Q.   Now, you discussed with Mr. Thakur yesterday that you demonstrated a prototype of your invention in July 2000. Do you recall that?

A.   Yes.

Q.   And that was a presentation you gave to Deutsche Bank, right?

A.   Yes.

Q.   That was a very significant event for your company, correct?

A.   It was one of the meetings that we -- potential investors.

Q.  It was very significant, wasn't it?

A.  Every meeting was significant in those days.

Q.  All right.  And you gave a presentation to them because you wanted them to invest in your company, am I right?

A.  Yes.

Q.  And at that presentation to Deutsche Bank in July of 2000, isn't it true, sir, that the prototype you demonstrated had every element of Claim 1 of the '917 patent in it?

A.  No.

Q.  Well, sir, you recall when my colleague Mr. Charfoos took your deposition in this case, right?

A.  I have been deposed four times in this case, so...

Q.  All right.  And each one of those times you swore to tell the truth, did you not?

A.  Yes.

Q.  And in your December 2010 deposition, Mr. Charfoos asked you about that July 2000 demonstration, do you remember?

A.  Yes.

MR. MATUSCHAK:  Your Honor, I'd like to play a clip of that deposition, that would be Clip 4.

I was going to say for the record, this was a deposition, December 9th, 2010, beginning at page 227,

line 3, through 228, line 7.

(Videotape excerpt played.)

BY MR. MATUSCHAK:

Q. Dr. Kushwaha, when you testified in December 2010, before you answered the question, you looked at Claim 1 and considered that question very carefully, did you not, sir?

A. I was confused during that deposition, as I told you yesterday. In my prior deposition, I said the claim --

Q. Sir, my question was: Did you consider that question very carefully and look at Claim 1 before you answered?

A. I looked at it, but I was confused.

Q. You didn't say you were confused when the question was asked, did you, sir?

A. No, but I realized it, the way the questions were being asked, I was thoroughly confused. And I'm sorry, I've said that yesterday, you know, that our four days of deposition I had in this, that was the only mistake, I'm sorry for that.

Q. At your deposition when you were asked a question, you didn't say, I'm not sure, did you?

A. I said that in my earlier deposition. And then after that deposition, I went back and looked at the code with Mr. Beltramino, showed it to you, and then in my third deposition, my fourth deposition, I said the truth, and

the truth is, that Claim 1 was not implemented in the prototype.

Q.   When you were asked a question in December 2010, you didn't say that you had to look at anything other than Claim 1 to figure out the answer to that question, did you, sir?  Yes or no?

A.   In hindsight, I should have looked at the source code.  Which I did after that.

Q.   But you didn't say, when you were asked the question, I need to look at the source code, did you?

A.   No, but I should have looked at the source code.

Q.   All right.  Well, your deposition in December 2010 wasn't the first time that Mformation said the prototype had all the elements of Claim 1 in June 2000, was it, sir?

A.   I don't remember any time -- I don't remember.

Q.   Exhibit 973, these are the interrogatory answers from --

            MR. THAKUR:  Your Honor, we object.

            THE COURT:  What's the basis of the objection?

            MR. THAKUR:  The deposition testimony of April 5th would have clarified the dates.  So the deposition testimony supersedes the --

            THE COURT:  No, the objection's overruled on that ground.

Members of the jury, apparently you're about to be shown interrogatories and responses. Let me explain that one. Depositions are oral statements. The witness is called in, sworn by a court reporter, asked questions and that's taken down. And any person with information can be deposed.

But uniquely in the pretrial process, one party can ask questions in writing of the other party. They can't put interrogatories to third-party witnesses, but they can exchange those questions between the two sides. And those questions can include factual questions as well as legal questions. And the answer to those questions are under oath. The parties are given as much as 30 days or more to answer the question, and write their response. Now, sometimes those responses include objections to parts of the question, but when the answer is given, it is given under oath, and may be considered by you just as any other sworn testimony in trial.

Now, what the plaintiff's lawyer is pointing out is that after answers to interrogatories are given, of course there could be other proceedings where those answers are called into question, and it's up to you to decide ultimately how much weight to give to an interrogatory answer.

But you may proceed to display or otherwise

present to the jury an interrogatory that was propounded to a party, and what the response was.

BY MR. MATUSCHAK:

Q.  Now, these, Exhibit 973, Dr. Kushwaha, are answers to interrogatories.  And you had some role in preparing those, did you not?

A.  Yes.

Q.  Okay.  And you understood that when you prepared answers to interrogatories that they were to be provided under oath, correct?

A.  Yes.

Q.  Now, if we can turn to page 19.

Here it says at line 7:  "Dr. Kushwaha, with the assistance of others at Mformation, reduced to practice inventions claimed in each of the Mformation patents in or about February 2000."

Do you see that?

A.  Yes.

Q.  And if we look down to line 17, it says:  "In or around June 2000, in connection with soliciting investment partners, Mformation disclosed a similar prototype system to Kingdon Capital in New York."

Do you see that?

A.  Yes.

Q.  June of 2000.  Is that correct, sir?

A.   Yes.

Q.   Then on page 23, line 18, you say:  "Not later than June 2000, they developed a prototype system that could register the device on the server and assign a command mailbox for the device.  That prototype allowed commands to be wirelessly issued to the device to lock the device and erase the contents of its memory."

     Do you see that?

A.   Yes.

Q.   And the next to the last page, 24, it shows that Claim 1 was first reduced to practice in June 2000.  Do you see that?

A.   Some elements of Claim 1 were --

Q.   That's not what it says, is it, sir?

A.   Well, some claims, we were giving demonstrations to over-the-air lock the device, and as Mr. Beltramino testified yesterday, that the -- we did not have wireless restriction.  We could not possibly build it. It takes a lot of time to build that stuff.  We only have three guys.  On the server stuff.

Q.   So Mr. Beltramino testified yesterday that the reason that you didn't have everything in claim at that demonstration in July 2000 was because you couldn't do wireless registration, right?

A.   We could not implement.

Q.   Let's go back to page 23, please.

Do you see here Mformation is telling us under oath that not later than June of 2000, they developed a prototype that could "register the device on a server and assign a command mailbox for the device and allow the commands to be wirelessly issued to the device to lock it and erase the contents of its memory."

Are you telling me that interrogatory was also wrong, sir?

A.   Will you please repeat the question?

Q.   Was that interrogatory answer also wrong?

A.   It is the interrogatory response, I can read that.

Q.   The interrogatory answer that was just read, is that wrong?

A.   We built a prototype, yes.

Q.   And it could register the device?

A.   Register means we hard-code register the device, we put in the serial numbers of the device on the server. As Mr. Beltramino showed you, 10 devices, we registered them, hard-coded them, and then issued the command. There was no wireless registration.

MR. MATUSCHAK:  Your Honor, I'd like to play another clip from the December 9th deposition.  It's transcript page 213, line 20, to 214, line 13.

(Video excerpt played.)

BY MR. MATUSCHAK:

Q.  Now, you answered differently back in December than what you said yesterday and today, correct, sir?

A.  I said it repeatedly that I made a mistake.  I had 30 hours of deposition, and that was the only time I was confused.  And --

Q.  And you understand this is an important issue, don't you?

A.  I realized it.

Q.  Do you understand this is a really important issue, sir?

A.  I don't know the law.  All I can tell you is what I did, what I didn't do.  What I said.

Q.  Do you understand, sir, that if your original testimony was correct, then you displayed a prototype with all of the elements of the claim more than one year before you filed your patent application?

THE COURT:  Is that a complete question?  You might want to rephrase that.

MR. MATUSCHAK:  I'm sorry, your Honor.

BY MR. MATUSCHAK:

Q.  Do you understand that if your original testimony was correct, then you displayed a prototype with all of the elements of Claim 1 more than one year before you filed your patent application?

MR. THAKUR:  Your Honor, the statement is erroneous as a matter of law.

THE COURT:  Overruled.

THE WITNESS:  I don't know the law.

BY MR. MATUSCHAK:

Q.  Well, you know you filed your patent application on August 10th, 2001, correct?

A.  Yes.

Q.  And you know the demonstration was July 24th, 2000, correct?

A.  Using the prototype, which Mr. Beltramino explained yesterday.

Q.  And you know that the patent law says that you have to file your application less than a year before you publicly demonstrate it, correct?

A.  Again, I'm not a lawyer, I don't know the law.  All I know is what I did, what I didn't do.

Q.  So you don't know that.  You've never heard that before?

A.  No.

MR. THAKUR:  Your Honor, we renew our objection.  He's ignoring the provisional patent application.

THE COURT:  Well, that's argument that you can make.  But --

MR. THAKUR:  Okay.

THE COURT:  -- it's an improper objection.

BY MR. MATUSCHAK:

Q.  And if the jury believes what you said in your December 2010 deposition as opposed to your testimony now in court, then your patent is invalid, sir, isn't it?

A.  We filed our provisional patent in August -- or in December of 2000, which was about three, four months later than what we gave our demonstrations.

Q.  Now, before you had your deposition, although you testified you didn't look at the source code, you did actually test the prototype, didn't you?

A.  Will you please reask the question?

Q.  Yes.  Before that deposition that we saw up on the screen, you actually tested the prototype so you were -- so you could be sure what was in it and what wasn't in it, right?

A.  No, I tested it from the sense that I opened a browser, flicked a command, device is locked.  That's all.  Everything was done by Mr. Beltramino and Mr. Magam.

MR. MATUSCHAK:  Your Honor, I'd like to play a clip from the same deposition, December 9th, 2010, page 164, lines 10 to 15.

(Videotape excerpt played.)

BY MR. MATUSCHAK:

Q.   And you actually spoke to people who wrote the source code like Mr. Beltramino, right?  Before your deposition?

A.   He works with me, so, yeah, I speak to him.

Q.   And he told you that each and every element of Claim 1 was in the prototype, correct?

       MR. THAKUR:  Objection, hearsay, your Honor.

       THE WITNESS:  No.

       THE COURT:  I'm sorry, I thought this was within the company.  The objection's overruled.

BY MR. MATUSCHAK:

Q.   Dr. Kushwaha, I can -- you have the December 9th deposition in front of you there, sir.  I'm sorry, you've got a lot of paper there.

       Do you have that one, sir?

A.   Yes.

Q.   If you could turn with me, please, to page 204.  And at the bottom of page 204 at line 25, do you see where you were asked:  "And you said the time that you prepared the interrogatory response or assisted your attorneys in preparing interrogatory response, you looked at the actual code at the time to confirm that every element of Claim 1 was present in the September 2000 prototype code?

Your answer was:  "I did not looked at the code, but I did speak to the developers who wrote the code."

Do you see that?

A.  Yes.

Q.  I read that correctly, sir?

A.  Could you please ask the question?

Q.  I read that correctly?

A.  Line number?

Q.  The ones we just went through, 25 on page 204 to 10 on page 205.

A.  Yes.

Q.  All right.  And then at line 11, you were asked the question:  "And who were these developers?"

Do you see that, sir?

A.  Yes.

Q.  And your answer was:  "Harish Magam, Gabe Beltramino were the two server site developers."

Did I read that correctly?

A.  Yes.

Q.  And then you were asked at line 14:  "And what did they tell you?"

Do you see that, sir?

A.  Yes.

Q.  And your answer at line 15 was:  "They told me what was in the prototype."

Do you see that?

A.   Yes.

Q.   And you were then asked:  "And did you go element by element through the claim to ensure that each element of the Claim 1 was in the prototype?

Do you see that question?

A.   Yes.

Q.   And at line 21, you said:  "Yeah, I know what's in the Claim 1, so I asked them about registration, verification, sending a command, locking a device, and getting information back from the device."

Do you see that?

A.   Yeah, but "registration" didn't mean wireless registration.

THE COURT:  Just a moment.  Just, do you see that?

THE WITNESS:  Yeah, I see that.

BY MR. MATUSCHAK:

Q.   All right.  And they actually -- you asked them these questions.  They didn't give you the answer off the cuff, did they?

A.   I don't know.

Q.   Let's turn to the next page, 206.  At line 6, do you see you were asked:  "I guess, sir, was it just one conversation where they said, Yeah, it was?  Or did you

ask them and they came back to you later?"

Do I read that correctly?

A.  Yes.

Q.  And your answer was:  "I asked them, and then they came back later."

Do you see that?

A.  Yes.

Q.  So you asked the developers, including Mr. Beltramino, who testified yesterday, Is everything in Claim 1 in that prototype, and they went off and they came back and they told you, Yes, didn't they?

A.  Yes, it was hard-coded registration, which was a part of the prototype.

THE COURT:  It's noon.  Is this a convenient point for us to break?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  We'll take our midday break at this point, members of the jury.  We'll come back promptly at 1 o'clock.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Counsel, remain briefly.

You may step down.

Out of the presence of the jury, I had thought that maybe I should revisit the question that came up

during the examination of Dr. Kushwaha and that we had a brief discussion at the sidebar with respect to the question of whether or not it is necessary for the Court to construe the steps as to whether or not certain of them are performed at the server, and whether certain of them are performed at some other place. Particularly, because of the preamble -- this is an internal preamble -- that requires that some of the steps be performed without a request from the wireless device.

Now, the conversation we had at the sidebar was whether or not any of the steps that follow that can be performed with a request from the wireless device. It seems to me that even though some of the steps are performed by the wireless device, it is the Court's understanding of the language that the inventor intended that all of those steps be performed without a prior request from the wireless device, and I thought there was some disagreement about that.

MS. DeBRUIN: We agree, your Honor.

MR. MATUSCHAK: I think we're all okay with that.

MR. THAKUR: Your Honor, I think there's agreement. I think the question might have been less clear, but...

MR. MATUSCHAK: I think we're all on the same page.

THE COURT:  All right.  Now here is my concern. When I define the various terms, let's just take one example, "establishing a connection between the wireless device and the server," I say that means:  "Initiating wireless communication between a wireless device and the server."  It seems to me that that doesn't say where that initiation takes place.  If you put the two phrases together.  Namely, there's a request for the wireless device -- you would imply that that is done at the server, but it doesn't say that it's performed at the server.

MR. MATUSCHAK:  I think, your Honor, that the "without a request from the wireless device" is sufficiently clear.  I think that's really the point we were trying to get, it's without a request from the wireless device.  So that's the point.

THE COURT:  Here's the question:  Are the two sides satisfied that I don't need to say more?  Because a request for the -- from the wireless device or the lack of one doesn't preclude any of these steps from being performed by the wireless device.  And so it seems to me that I might have to say to this jury, based upon what you argue about the case whether or not a step that is performed is performed at the server or at the wireless device, because an argument can be made is this

patent is infringed if that step is done at the wireless device, or initiated by the wireless device, as long as there was no request made.

MR. MATUSCHAK: I don't think that's the plaintiff's -- I don't think we're going to hear that testimony, your Honor. But I think your Honor is right that we can revisit this as we hear the experts.

MR. THAKUR: Your Honor, stating where a particular step must be performed seems to be importing a limitation that's not necessary.

THE COURT: That's the question. In other words, it seems to me that a matter of claim construction is whether or not a particular step must necessarily be performed at the server. And if you're saying the parties are stipulating that they will not argue that a particular step must be performed at the server, and that everybody's in agreement, and maybe I ought to make you reduce your agreement to something that I can examine, because this is a matter of law, then I might withdraw from my question about giving further construction. Because some are clear, because they say, at the server.

And I do recall this coming up in some of the pretrial proceedings. And the actual language that I ultimately adopted does not necessarily speak to this.

And I became a little concerned about it based upon the question that was put to the witness who declined to say that that step had to be performed at the server.  So that raised a question of fact, which to me is a question of law.

MR. MATUSCHAK:  I think, your Honor, for now -- I don't know what Mr. Thakur thinks, but I think we're satisfied with the Court's current constructions, with the potential that if something comes up with the experts, we can always revisit that if we need to.

THE COURT:  That's what I don't want to get into. The experts should be testifying with no question with respect to the meaning of the claims.  And it might be late in the day if I say, Whoop, now when I've heard from the expert makes it necessary for me to do something.  I'd much rather avoid that.  But I'll take your assurances that this is a matter of noncontroversy.

And let me state it again:  It is my construction, as I said in the oral comments, that: "All of the steps that follow the preamble, without a request from the wireless device, must be performed without there being a request from the wireless device."

There are some steps that are listed that are performed by the wireless device.  But all of those steps have to be done without a request from the

wireless device.  And I have not construed, and you're asking me not to construe, which steps must be performed at the server.

MR. THAKUR:  Correct.

MR. MATUSCHAK:  Yes.

MR. McDONALD:  There's one other issue, your Honor.

THE COURT:  Oh, I'm sorry.

MR. McDONALD:  Mr. Matuschak asked the witness if he understood that, as a matter of law, if the prototype included all of the elements of Claim 1 and was demonstrated on July 24th that the patent would be invalid.  That's actually incorrect as a matter of law, because this is a method claim.  Each of the steps would have to be demonstrated.  It is not sufficient that the product itself has those capabilities.  The steps have to be demonstrated.  We outlined this in our summary judgment briefing on public use.  The case cite that's most informative is --

THE COURT:  You don't have to say that to me.  My concern from Day 1 in this case, but it's been introduced by the plaintiff.  The plaintiff has spent most of the time in this trial proving that the prototype and the software practices the claim.

MR. McDONALD:  The prototype does not.

THE COURT:  Well, that --

MR. McDONALD:  One point --

THE COURT:  I don't agree with you, that I haven't heard testimony that the prototype does not practice the claim.  What I heard is a disputed fact, we had only one witness say the registration was done wired.  But that's a controversy.  We don't take that as accepted.  The jury has to decide that.  Because there's been testimony both ways that it was done with all the steps, which means wirelessly, and one witness has testified, I did it through wires.  And another witness, maybe the same witness testified, As I look at that source code, that means that I did it as wired.

But someone else could contradict that.  So that's a matter of controversy as to whether or not all the steps were practiced.  So I'm not ready at this point to make any definitive rulings one way or the other on that.

MR. McDONALD:  I don't think there's any dispute that at the July 31st demonstration, the act of wireless registration called out in Claim 1 was not demonstrated.  Their --

MR. MATUSCHAK:  Yes --

MR. McDONALD:  Their only allegation is that the Provsys prototype contained the capability to do so.

There's no testimony in the record at all that wireless registration, the act as specified in the method claim, was performed during the demonstrations.

MR. MATUSCHAK:  We disagree with that, your Honor.  We think that the deposition testimony of the witness is that there's a clear imprint that that's exactly what he's saying.

THE COURT:  That's why I'm not going to make a ruling at this point.  This becomes a controversy as to what happens with respect to that.

Some of this is probably lost on the jury, quite frankly, because I haven't given them instructions that would lead them to understand why they need to worry about these time periods.  And so I'll restrict you to facts.  What actually happened.  And I will direct you not to -- it's problematic to say, That means your patent is invalid.  That is a legal conclusion.  And it is improper.

MR. THAKUR:  Your Honor, we ask that that particular statement about the legal conclusion be stricken.  That's what we were asking.

THE COURT:  Well, it's too late to strike it. I'll give instructions that will clarify the matter.

MR. McDONALD:  Thank you, your Honor.

(Luncheon recess)

DEPUTY CLERK:  Remain seated.  Come to order.

THE COURT:  Please be seated.

On the record, out of the presence of the jury.  Mr. Noble advised you we have a juror, Mr. Monce, who's Juror Number 1, who is expressing some medical difficulties and expressed it to the clerk, I need to go home.  I perhaps ought to call him out from, out of the presence of the other jurors, and voir dire him a little about that.  Any objection?

MR. THAKUR:  No, your Honor.

MR. MATUSCHAK:  No, your Honor.

THE COURT:  So ask him to come in.

DEPUTY CLERK:  All rise.

(Juror Number 1 enters the courtroom.)

THE COURT:  Please be seated.

Mr. Monce, I always hesitate to single out any juror for any purpose, but I was advised by Mr. Noble that you're having some medical difficulties, and I apologize for asking you to discuss those kinds of matters in front of the parties, but I do need to ask you some questions and just kind of figure out what your state of health are.

Can you describe for me what's going on, sir?

JUROR:  I have my notes over there.

THE COURT:  Your notes?  I'm talking about your

physical condition.

JUROR:  Oh, me?

THE COURT:  Yes.

JUROR:  My nose is kind of itchy or -- and I keep sneezing here.

THE COURT:  All right.  I haven't noticed that disturbing us, so other than that irritation, it might be, did I understand you are wishing to be excused for the day or --

JUROR:  Yes, for today.

THE COURT:  Or to be excused?

JUROR:  Yes.

THE COURT:  Since time is very critical to us, you can understand how if we excuse you for the day, we have to stop the whole trial for the day.  We can't get along without you.  Is it something that is so bothering you you feel you can't give us your attention?

JUROR:  No.

THE COURT:  No.  You're willing to hang in there for the day?

JUROR:  Yeah, sure.

THE COURT:  And see how it goes in the future?

JUROR:  Yeah.

THE COURT:  All right.  Thank you, sir.  Feel free to use Kleenex or whatever to make yourself

comfortable.  There's nothing wrong with that, because we're all human beings and sometimes irritations like that occur.  To the extent you don't have tissues available to you, the clerk can make those available.

JUROR:  I've got it.

THE COURT:  Sometimes those are more irritating than tissues, and don't have any hesitation, of course, to use the water fountain or if you need breaks more frequently than we're taking them, just raise your hand, get our attention and we'll take a break.  @@(paper towel).

JUROR:  Thank you.

THE COURT:  I'll let you return to your colleagues and come out with the rest of the jurors.

(Juror Number 1 exits the courtroom.)

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well, you may resume your examination.

MR. MATUSCHAK:  Thank you, your Honor.

BY MR. MATUSCHAK:

Q.  Dr. Kushwaha, welcome back.

A.  Thank you.

Q.  Now, after you were deposed, I believe you went to

look at the source code for the demo, correct?

A.   Yes, I did.

Q.   Okay.  And you say that when you looked at that source code, that showed that it was missing certain of the steps that were in Claim 1, correct?

A.   Yes.

Q.   Now, when you looked at that source code, it had a date, right?

A.   Yes.

Q.   And the date of the source code that you reviewed was the end of May 2000, correct?

A.   Yes.

Q.   Now, the meeting with Deutsche Bank was at the end of July 2000, right?

A.   That is correct.

Q.   And you wanted to make the demo as compelling as possible, did you not?

A.   It was always the same demo we gave everyone.

Q.   I think Mr. Basu, at one of the e-mail we saw yesterday, used the term "blow the audience away."  That's what you were hoping to achieve, correct?

A.   That was the object of the prototype.

Q.   Okay.  But you say that in the two months about this demo, no one at Mformation touched the source code to tweak it in any way at all; is that correct?

A.   Yes, my instructions to my programmers was not to touch it, because once it did what it was supposed to do, just don't touch it because it works, it works. It's very easy when you tinker with things, the bugs creep in, and we didn't want to do any of that stuff. And we just -- once it did what it did, we just froze it and we used it like that after that.

Q.   Now, you testified yesterday that after the prototype, you moved to developing a commercial product, correct?

A.   Yes.

Q.   So after the demo in July, end of July 2000, you start to develop your commercial product, correct?

A.   We were thinking of developing the commercial product all along when the prototype was completed.

Q.   You were thinking about it, but you didn't start doing it until after the prototype, right?

A.   I don't remember when exactly we started.

        MR. MATUSCHAK:  Your Honor, I'd like to hand up to the witness a page from yesterday's trial transcript, if I may?

        THE COURT:  Certainly.

BY MR. MATUSCHAK:

Q.   Dr. Kushwaha, I've handed you page 491 from the transcript of proceedings here in court yesterday.  You

have that, sir?

A.  Yes.

Q.  You see at line 7, you were asked the following question:  "After the prototype, did you move to developing a commercial product?"

    Do you see that, sir?

A.  Yes.

Q.  And your answer beginning at line 9 was:  "Yes, we started building commercial products after that."

    Did I read that correctly?

A.  Yes.

Q.  So you didn't start building commercial products until after the prototype, correct?

A.  Yes.

Q.  So for two months from the end of May to the end of July 2000, it's your testimony that programmers were sitting around doing nothing; is that correct?

A.  Not true.

Q.  Well, they weren't working on the prototype and they weren't making a commercial product, were they?

A.  They were helping me recruit more engines.  We have to identify what technologies we would use, whether we would use Oracle database or any other tools.  So there's a lot of ground work we have to do to select the commercial technologies which we would use in our

commercial products, and there were only three guys we had.  They were starting to think about what other software products and tools we would use to build a commercial product.

Q.  But for two months there was no coding work being done at Mformation, because the prototype was done and the commercial work hadn't started yet, right?

          MR. THAKUR:  Objection, asked and answered, your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Commercial product requires a lot of ground work.

BY MR. MATUSCHAK:

Q.  Sir, the question is a yes or no question.

A.  We started working on the commercial product after the prototype was done.

Q.  And the prototype wasn't -- strike that.

          You know a gentleman by the name of Harish Magam?

A.  Yes.

Q.  And Mr. Magam works for your company, does he not?

A.  Yes.

Q.  He is director of engineering at Mformation Technologies, is he not, sir?

A.  Yes.

Q.  And you're aware that Mr. Magam submitted an

affidavit to this court on July 27th, 2011, are you not?

A.   I don't remember that.

Q.   Well, if Mr. Magam submitted an affidavit to the Court in this case, he did it on behalf of your company, correct?

A.   Yes, he would have.

MR. MATUSCHAK:  Your Honor, I offer what previously was marked in evidence for identification as Exhibit 4838, the Declaration of Harish Magam, dated July 27th, 2011.

MR. THAKUR:  Your Honor, we object for the same reason we objected with Mr. Beltramino, that's a statement by a third party -- of an independent witness who is not present, so it would be hearsay.

MR. MATUSCHAK:  It's an admission, your Honor.

THE COURT:  The objection is overruled.  It can be received.  It's 4-A?

MR. MATUSCHAK:  4838, your Honor.  I believe that was the -- I marked it for identification yesterday.

THE COURT:  Oh, I see, yes.  4838 is how we marked it.  It's received.

(Defendant's Exhibit 4838 received in evidence)

BY MR. MATUSCHAK:

Q.   I'm sorry, I apologize, Dr. Kushwaha, if you could turn to the last tab in the white notebook that I handed

you at the beginning.

MR. MATUSCHAK:  And, your Honor, may I approach to clear some of the material?

THE COURT:  Okay.

BY MR. MATUSCHAK:

Q.  It will make this a little easier for you.

You turn to the very back, the very last tab, sir.

And you see that that is a Declaration of Harish Magam?

A.  Yes.

Q.  Now, you see, sir, that he was one of the people at Mformation who worked on the source code for that Provsys demo, correct?

A.  Yes.

Q.  And in paragraph -- if you look with me on the second page of the document --

MR. MATUSCHAK:  And you can put that up on the screen.

BY MR. MATUSCHAK:

Q.  -- in Paragraph 3, at about line 10 -- actually let me go back.  Let's start at the beginning.

So he says in 2000, he worked as part of a small team at Mformation to develop a prototype of Mformation's remote management software.  Do you see

that?

A.   Yes.

Q.   And that was what we've been calling Provsys, right?

A.   Yes.

Q.   That was the only prototype you had, correct?

A.   Yes.

Q.   And he says:  "The source code with the Provsys prototype was revised and expanded by me and the other team members throughout the year 2000."

Do you see that?

A.   I read what it says.

Q.   And he says in the last, line 12:  "During the development of the Provsys prototype in 2000, features and capabilities were added to the prototype over time, but features and capabilities were not removed."

Do you see that?

A.   Yes, I see that.

Q.   Now, Mr. Magam in this declaration doesn't say anything about a two-month period from May to July when no work was being done on the prototype, does he?

A.   I don't know what he meant when he was writing this or what he said.

Q.   No, he said that work was being done throughout 2000, correct?

A.   That's what I read here, yeah.

Q.   And if work was being done throughout 2000, then there's no way to be sure that the prototype source code that you reviewed that was dated in May is the same source code that was used to run the demonstration at Deutsche Bank; isn't that correct?

A.   No, it was the same code.  I remember distinctly saying to all my engineers, Please don't touch this, because both Mr. Basu and I were on the road, and we would give demonstrations throughout the country, and we didn't want any hiccups.  We had two minutes at the end of the presentation, and when we press that button on that website and the device locked, we always wanted it to work the same way.

Q.   Mr. Magam was one of the two people who was working on that code, right?

A.   Yes.

Q.   Did you forget to tell him not to do something?

A.   No, I told him not to do something.

Q.   Well, he didn't listen to you, did he, if this --

THE COURT:  That calls for speculation.

BY MR. MATUSCHAK:

Q.   Now, you had at your disposal in this case an expert named Dr. Madisetti, who I think you testified you assumed could read source code, right?

A.   I believe so.  I never met him.

Q.   And so you could have asked him to look and see if the source code, this Provsys source code, contained all the elements of Claim 1 and include his conclusions in his reports, right?

A.   I had no communications with Dr. Madisetti.

Q.   It's true, is it not, sir, that you never gave your own expert, Dr. Madisetti, the Provsys source code so that he could look at this issue and address it in his report; isn't that true?

A.   Mformation gave it to our attorneys.  And then you can ask them what they did after that.  I had no interactions with Dr. Madisetti.

          MR. MATUSCHAK:  I have no further questions, your Honor.

          THE COURT:  Very well.

          Any redirect?

          MR. THAKUR:  I do, your Honor.

REDIRECT EXAMINATION

BY MR. THAKUR:

Q.   So I think I have a couple of issues I'd like to cover.  The first one is the issue of patent prosecution.

          MR. THAKUR:  If we could take a look at Demonstrative 25.

          THE COURT:  Can I interrupt?  I had copies of the

patent or the claims that are at issue in this case, unredacted. Did the parties get a chance to see that?

And so although we are showing the patent to the jurors, at sometime that's convenient for them to have it and look at it on their own, I intend at this point to give to them a copy of the patent. It is already in evidence, but it's in evidence fully, and it doesn't -- it occurs to me that we should not have the jury considering claims that are not at issue here, so that's why I've redacted it.

So please pass that out to the jurors.

Members of the jury, you might put your juror number or something on this document because you can write on it and use it, but if you should write and make notes on it, be careful not to lose control of it because it will be your personal copy, and by putting your juror number on it, it's a way of ensuring that you don't mistake it for someone else's copy.

You may proceed, Counsel.

BY MR. THAKUR:

Q. Do you recall being questioned about whether this was added to the patent in June of 2005 -- excuse me, July of 2005?

A. Yes.

Q. Was this in fact added in July of 2005?

MR. MATUSCHAK:  Objection, your Honor.

MR. THAKUR:  I'll rephrase that question.

THE COURT:  All right.

BY MR. THAKUR:

Q.   Were these elements already present in your original patent application?

A.   Yes, they were.

MR. THAKUR:  I'd like to turn to page 2 of 107.

Patent specification, page 107.

It is Exhibit 510.

Could you turn to page 107.

I'm sorry, that would be page 21.

Could you circle the portion at the top where it says "Claim 5"?

Could you highlight the portion where it says "establishing a connection between the wireless device and the server."

BY MR. THAKUR:

Q.   Dr. Kushwaha, do you see that?

A.   Yes.

Q.   And that element was in the original patent application?

A.   Yes.

MR. THAKUR:  Would you highlight the portion that says "without the request from the wireless device"?

MR. MATUSCHAK:  I object.  I think they withdrew Claim 5 from this case.

MR. THAKUR:  I'm not using it for that purpose, your Honor.

THE COURT:  I'll explain I think a little bit what's going on to the members of the jury.  You'll recall there is a process called a "patent application" that takes place before the Patent and Trademark Office.  And as part of that process, an original application might have been filed here that changed over time.  And what you're seeing here is language that is, as you see in Claim 5, which has some of the elements that are now in Claim 1.  They were not part of Claim 1 because, as you can see, it says:  "A method of Claim 1, wherein the delivering step comprises the steps of...," so this is not the same as Claim 1.  This is a later claim.  And what I understand the dispute might be about is to whether or not somewhere in the patent application this step was mentioned.

The issue in this case is whether it was part of the invention as issued.  And it is fair for the parties to talk about what was the invention as originally filed because in time that might have had relevance to some of the events going on between the parties.

It's not the same to say that something was part

of Claim 5 and part of a dependent claim to say that it originally was part of Claim 1. That was the process that can take place through amendment. So I don't want you to be confused about this. It is true that that language appears in the application, but not in the same place as it was required to appear, as it turned out, in the final patent.

Now, I'm not sure all of that language was adopted in the final application, but it is fair for the parties to point out that initially, when the -- is this the utility application or the provisional application?

MR. THAKUR: Your Honor, this is the regular patent application.

THE COURT: So this is the utility application. There was an earlier application with different language. And so maybe it would be important for you to understand that the parties will refer to an application that was filed earlier in time that's called a "provisional application." And I'll give you further instructions on this later.

Later, the inventors filed a utility application, with more information, and it was the utility application that became the subject of the prosecution and changed over time, ultimately results in a patent being issued.

One of the things I've noticed as the parties have talked about it, it's common for inventors to refer to "my patent" when they're really referring to their application for a patent.  It's only after the patent is issued that it's really their patent.  But in human language, sometimes they'll refer to "my patent" when they're really referring to their patent application, which isn't a patent at that point; it's merely an application.

All right.

MR. THAKUR:  Thank you, your Honor.

BY MR. THAKUR:

Q.   I wanted to clarify that the language "establishing a connection between the wireless device and server" was present in your original application?

A.   Yes, it was.

Q.   Was the language "without a request for the wireless device" present in your original application as filed?

A.   Yes, it was.

MR. THAKUR:  I'd like you to turn to page 25. Highlight Claim 24.

BY MR. THAKUR:

Q.   It reads:  "The system of Claim 22, wherein the connection is established based on a threshold condition."

Do you see that?

A. Yes.

Q. Do you see that the language "wherein the connection is established based on a threshold condition" is there?

A. Yes.

Q. Was this language present in your original application as filed?

A. Yes.

Q. One of the questions that was asked was, Version 1.4, with respect to these elements, did Version 1.4, which is the commercial software that Mformation demonstrated to RIM, did it perform some of the steps without a request from the wireless device?

A. Yes.

Q. Did it establish a connection between the wireless device and the server?

A. Yes.

Q. Did it establish that connection based on threshold conditions?

A. Yes.

MR. THAKUR: I'd like to turn to Exhibit 4449. Could you publish that, please.

If you could turn to the page 5 where the lock -- yes, could you circle at the bottom where the remote kill section is.

BY MR. THAKUR:

Q. Do you recall Mr. Matuschak referring to that earlier today?

A. Yes.

Q. Could you read that into the record, please.

A. "Remote kill of the device. By sending a 'bullet' encrypted using the user's key, the device can be instructed to erase its application data. This feature allows the administrator to respond to a stolen device."

Q. I'd like you to identify the title. It says "Miscellaneous"...

A. "Miscellaneous Functionality."

Q. So what is referred to there, remote kill of the device, is miscellaneous functionality?

A. Miscellaneous functionality.

Q. Do you see any description in there describing how to implement that functionality?

A. No.

Q. I'd like to turn to page 2 of that document.

This is the document Mr. Matuschak showed you to say that RIM had this before, correct?

A. Yes, he showed it to me.

MR. THAKUR: Could we highlight the portion that says, "there has been"?

I'm sorry, the middle of the page. There we go.

Thank you.  Right there.

BY MR. THAKUR:

Q.  "There has also been," could you read that?

A.  "There has also been discussion about implementing IT policy settings over the air in order to address those users that never plug into their desktop.  This feature requires further thought to decide how it might be implemented and when it will be feasible to add to the product."

Q.  Do you understand this to mean that that capability is not yet implemented?

A.  That's correct.

MR. THAKUR:  I'd like to go to the page 1 of the document, please.

Could you highlight the date again, please?

BY MR. THAKUR:

Q.  Could you read the date?

A.  March 29, 2001.

Q.  Is it your understanding that functionality of the remote kill was not implemented as of this date?

A.  Yes.

Q.  And this was the document that Mr. Matuschak pointed you to; is that correct?

A.  That is correct.

MR. THAKUR:  I'd like to turn to Exhibit 603,

please.

BY MR. THAKUR:

Q.  Do you see that exhibit?

A.  Yes.

Q.  I'd like you to read the date.

A.  January 24, 2002.

Q.  And your presentation to the RIM folks was on January 25th, correct?

A.  That's correct.

Q.  I'd like to read the names of the people in the "to" line who received this presentation:  Alan Panezic, Matthew Manteyne, Scott Williams, James Godfrey, Andrew MacLeod, Shawn Kahandaliyanage, Ray Depaul, Allan Lewis, Dave Castell.

         Do you recognize these names?

A.  Some of them.

Q.  And were these people also involved -- were these people also among those who received information from Mformation?

A.  Yes.

Q.  So your disclosure to RIM was not just to Ken LeVine, correct?

A.  That is correct.

         MR. THAKUR:  I'd like to turn to Exhibit 772.

         Can you highlight the discussion about

Version 1.0.

BY MR. THAKUR:

Q.  Is this the Version 1.0 -- excuse me.  Is this referring to RIM using Mformation's agent?

A.  Yes.

Q.  Could one -- Version 1.0 of the agent work -- could Version 1.0 of the agent for RIM work with the server software?

MR. MATUSCHAK:  Objection, foundation.

THE COURT:  I'm not sure which server software you're referring to.

BY MR. THAKUR:

Q.  Could the agent work without a corresponding server agent?

MR. MATUSCHAK:  Objection, foundation.  The witness testified he didn't know anything about this document.

THE COURT:  Overruled.

BY MR. THAKUR:

Q.  Please answer.

A.  The agent on the device will not work without the server on the other side.  Both of them have to communicate with each other.

Q.  So you see that this document refers to 1.0 of the agent.  Do you recall it working with any RIM agent --

excuse me.

So Version 1.0, was it going to work with Mformation server software or RIM's server software?

A.   This was supposed to work with Mformation's server software.

Q.   Let's go to agent software Version 2.0.

Do you see that the first sentence says:  "RIM will build its own standards-based service device management agent using its own source code"?

Do you see that?

A.   Yes.

Q.   Do you see any mention there whatsoever of RIM building its own server software?

A.   No.

Q.   Was it your understanding that RIM's Version 2.0 of the agent software would still work with Mformation's server software?

MR. MATUSCHAK:  Objection, foundation.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.   Did RIM ever give you any indication that they were building their own server software during your meetings?

A.   No.

Q.   Mr. Matuschak asked you questions about BES 4.0.  Do you recall that?

A.   Yes.

Q.   Do you recall BES 4.0 was released May 2004?

A.   Yes.

Q.   Do you recall Mr. Matuschak saying that your business went down in 2003?

A.   Right.

Q.   You did not get a chance to fully explain that.  So please explain why your business went down in 2003.

A.   So, we were not -- our customers have stopped buying from us, and as you know in a software industry, people announce like, Apple announces what's going to come in, iOS 5.0, iOS 6.0, so people have anticipation.

So when BES had anticipation in the marketplace that BES 4.0 will come out and they'll have these device manageability and security features, that's the reason why in 2003 our customers just refused to buy anything from us, because they were waiting for servers from BES to come and have these features bundled into that BES. That was the reason why in 2003 our customers stopped buying from us.

MR. THAKUR:  I'd like you to turn to Exhibit 803, please.

BY MR. THAKUR:

Q.   You saw RIM was -- there were issues with respect to customer satisfaction working with Credit Suisse; is

that right?

A.   Yes.

Q.   Were all your customers always satisfied?

A.   We made every effort to satisfy all of our customers.

Q.   In your professional work experience have you had customers, dissatisfied customers outside of Mformation?

A.   Yes, all the software companies that are -- in building their first versions, they always -- there's one or two of them that will have issues, but you need to work with them to make sure that you resolve those issues and make the customer happy.

Q.   So not all of your customers are not happy all the time?

A.   Yes.

THE COURT:   That's a double negative, "not all your customers are not happy."

BY MR. THAKUR:

Q.   Yes, you can not satisfy all of the people all of the time, correct?

A.   That is correct.

MR. THAKUR:   I'd like you to highlight where the document says -- I think I'm looking for the next page, please.  That is correct.  Could we highlight the portion -- no, down below, halfway, the date.

BY MR. THAKUR:

Q. What is the date?

A. November 3rd, 2003.

MR. THAKUR: Could you go the portion of the e-mail that was not highlighted by Mr. Matuschak, "Misrepresentation," if we could just highlight all of it. That paragraph. Thank you.

BY MR. THAKUR:

Q. I'd like you to read all of the paragraph to yourself.

A. "Misrepresentations in the capabilities of the software breach of contract to install the software as sold RIM now has the key capabilities Lock & Zap available for free. The requirements for Oracle, Web Logic and their firewall kept changing. We couldn't install software correctly."

Q. Let's go through each piece of that e-mail real quickly. It says the portion that was not discussed was the software as sold, "RIM now has the capabilities Lock & Zap available for free."

This is before BES 1.4; is that correct?

A. Yes.

Q. Is this the customer impact you were referring to in 2003?

A. Yes.

Q.    The last part of the e-mail:  "The requirements for Oracle, Web Logic and their firewall kept changing.  We couldn't install the software correctly."

Would you explain what happened there?

A.    Yes.  So, as you know, when we deploy software in any customer's premise, we have to work with their infrastructure and their firewalls and their product, and if -- those are the requirements for our product to work.  But if they keep changing, then we would also have to make modifications and changes to our side.  So it's always a give and take with the customers in order to deploy product in their infrastructure.

Q.    So is it your testimony that some of the troubles you were having with Credit Suisse First Boston is a result of their changes?

MR. MATUSCHAK:  Objection, leading.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.    Could you perhaps state for the record what were the causes of the troubles in deploying the software at Credit Suisse First Boston?

A.    It had to do with their infrastructure and their environment, which was changing constantly as well.  And that was one of the reasons why we were having problems installing the software.

Q.  Let's go to Exhibit 474.  You heard Mr. Matuschak talk about something like 1,000-plus patents and patent applications for OMA.  Could you explain what is the difference, OMA, OMA DM?

A.  Yeah, so, what I was trying to explain was that OMA is the parent body.  And within that parent body you have different working groups.  Device management was one of the 20, 25 working groups.  So these thousand patents were related to all the working groups.  So if, you know, one working group was smaller, so I would say one working group, that's the device management group where we were a member of, would have less than 50 or 60 patents issued or declared.

And as a part of the process, and in every meeting, when there was an IPR called -- it's a process. Whenever you start the meeting, the chairman of the meeting will come and say, These are the documents which are recommended by these companies.  Does anyone have an IPR related to these?  And in that working group, which was a much smaller group, you raise your hand that, yes, we have an IPR, and as a process, all the companies in that working group, you go and look up the patents just related to that working group, which is a much smaller subset of the patents than the entire list of patents which you see there.

Q.   And is it your practice to read patents relating to device management that are listed there?

A.   Yes, that's what I was trying to explain, that in the device management group, when anyone, not just us, anyone raises their hand, it's an obligation from all the companies to go and look at the --

MR. MATUSCHAK:  I object, your Honor.  Hearsay.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.   Perhaps you could explain what you do.

A.   Yes, so whenever somebody announced an IPR, we would come back to the office and we'd look at those patents in the device management group, which was declared on those meetings, and we would go and we would look at what IPR those companies have.

Q.   Thank you.

     Mr. Matuschak also spoke with you briefly about the public use and the demonstrations.  Could we just walk through that.

     First of all, at the demonstrations, could you restate for the record what was demonstrated?

A.   So, yeah, as I mentioned before, the demonstration, we used to have one hour with our investors, and Mr. Basu would present the business case, and during the last five minutes or two minutes of that, I would show

this demonstration where I will open my laptop, which was connected to Internet.  I will open the browser.  I will pick the command, "Lock."  And I will just push a button.  And I would have a device in my hand which would be locked.

Q.   And that service software was Mformation, correct?

A.   All was residence at Mformation, I was accessing it through web browsers.

Q.   During the demonstration did you ever register -- demonstrate registration?

A.   No, always demonstrated device, server, send a command, and it locks.

Q.   During the demonstration, did you even demonstrate the hard-coded registration?

A.   No, we did not talk about registration at all.

Q.   And the registration, in terms of actually behind the scenes software, you said was hard-coded.  Could you explain that?

A.   Yeah, sure.  I think as you saw from Mr. Beltramino yesterday, "hard-coded" means -- we used to have this handful of devices when we were starting.  We just opened the device, see the number, and just go on the server side and hard-code that information or put it in a file, and then the server will read that file so that those were some of the device information, we will code

it by hand on the server.

Q. Mr. Matuschak played some of your deposition where they asked you to -- asked you the question, the December deposition, Did the device register. Do you remember that?

A. Yes.

Q. You saw the interrogatory response where they asked you whether the device registered, do you recall that?

A. Yes.

Q. Did they ever ask you whether it was wirelessly registered?

A. No, because it was never wirelessly, as you saw from the code yesterday as well.

Q. You testified that you were deposed four times in this case, correct?

A. Yes.

Q. I'd like to talk about the deposition, the first deposition, before the December deposition. Do you recall that?

A. Yes.

Q. So I'd like to have read into the record what you said during the first deposition.

        MR. MATUSCHAK:  I object, your Honor.

        MR. THAKUR:  Your Honor, it's prior consistent statement.  Under 801(d)(1)(B).

THE COURT:  The objection is overruled.  You're going to read what was stated by him in a deposition that was taken prior to the one that has been shown.

MR. THAKUR:  Thank you, your Honor.

MR. MATUSCHAK:  Excuse me, your Honor, I just want to grab my depositions here.

THE COURT:  Sure.

MR. THAKUR:  Sorry.

MR. MATUSCHAK:  Sorry.

BY MR. THAKUR:

Q.  What was read.  Question --

MR. MATUSCHAK:  What page are you on?

MR. THAKUR:  Page 155.

BY MR. THAKUR:

"Q  I'm going to hand you what I'm going to mark as Deposition Exhibit 542.  Defendant's Exhibit 542, document marked for identification.  Do you recognize Exhibit 542?"

MR. THAKUR:  Could you post 542, please.

BY MR. THAKUR:

"Do you recognize Exhibit 542?

"A  Yes.

"Q  What is it?

"A  That's the demo that we gave to Deutsche Bank, Deutsche Bank Alex. Brown.

"Q  So Exhibit 542 is an e-mail regarding a July 2000 demo at Stanford University made -- and some Stanford University professors; is that correct?

"A  That is correct..

"Q  And that was the beta version" --

MR. THAKUR:  Oh, actually, perhaps I'll make this easier.  I didn't know the exhibit actually was available.  Perhaps you could post it.  It's on page 155.

It's a lot less monotonous to see it.

THE COURT:  Proceed.

MR. THAKUR:  Thank you, your Honor.

Page 155, line 13 through 25.

THE COURT:  You might zoom in.

BY MR. THAKUR:

Q.  Dr. Kushwaha, do you see the date of that deposition?

A.  Yes.

Q.  What is the date of that deposition?

A.  April 20, 2010.

Q.  And that was your first deposition?

A.  That's correct.

Q.  I started reading at line 13 on this page.  I did conclude to the bottom.  But I will give the jury a moment to catch up with me.  So it starts at line 13 to the end of that.

MR. THAKUR:  Could we go to the next page, please?

THE COURT:  And you're going to read?

MR. THAKUR:  I'll read where I left off.

THE COURT:  Go ahead.

BY MR. THAKUR:

"Q  And that was the beta version of the product or the prototype that was demoed in July of 2000?

"A  The prototype, if I'm -- if I remember correctly.

"Q  What functionality was in the prototype?

"A  Lock & Wipe for sure.

"Q  What else?

"A  General asset management.  Monitoring performance.

"Q  How did the device agent register with the server in the prototype?

"A  It didn't really register, it was hard-coded.

"Q  And when you say 'hard-coded,' what do you mean?

"A  Put a client on the device, by handing in the server, write the device, where it is running on, like there was no security exchange, key exchange in the other thing, so it was to show and demonstrate the capabilities, not to -- not to have a full-pledged software product, which we would sell."

MR. THAKUR:  Thank you, Mr. McDonald.

Oh, sorry.

The next excerpt is on page -- you were asked later in the day a question which I have marked on page 179.

BY MR. THAKUR:

"Q  What was the first prototype that established a connection based on a threshold condition?

"A  Version 1.0.  Yeah, Version 1.0.

"Q  So prior to Version 1.0, Mformation did not have a prototype that established a connection based on a threshold condition?

"A  That's correct."

Correct?  Did you say that?

A.  Yes.

Q.  Do you agree with that testimony as you testify today?

A.  Yes.

Q.  And is this consistent with what Mr. Beltramino explained with respect to hard-coding of wireless device for the prototype?

MR. MATUSCHAK:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  Do you recall Mr. Beltramino's testimony with respect to --

A.   Yes.

Q.   Excuse me.  Do you recall Mr. Beltramino's testimony with respect to registration of wireless devices in the --

A.   Yes, it was hard-coded --

MR. MATUSCHAK:  Objection, your Honor.

THE COURT:  You can answer the question.  I'm just worried always about one witness commenting on the credibility of another witness.

MR. THAKUR:  Correct.

BY MR. THAKUR:

Q.   Do you recall being deposed a third time in this case?

A.   Yes.

Q.   Do you recall testifying that the device did not wirelessly register?

MR. MATUSCHAK:  I object, your Honor.  I ask that I be heard on this at the sidebar.

MR. THAKUR:  Your Honor, I'll withdraw the question.  We can move on.

BY MR. THAKUR:

Q.   Do you recall the December 9th deposition testimony that was asked -- that was played here today?

A.   Yes.

Q.   Do you recall them asking you whether the device

registered?

A.   Yes.

Q.   And do you recall saying that the device registered in December 9th?

A.   Yeah, it was registered, hard-coded registered, so that server knows what device was sending.

Q.   Did they ask you on December 9, 2010, whether the device wirelessly registered?

A.   No.

MR. THAKUR:  Thank you, your Honor.  That's all I have.

THE COURT:  Any request for recross?

MR. MATUSCHAK:  Yes.

THE COURT:  What issue?

MR. MATUSCHAK:  On the issue of his change in testimony, just a couple of questions.  On the issue of this BES 4.0 from Exhibit 803.

THE COURT:  Granted.  Go ahead.

MR. MATUSCHAK:  Pardon me?

THE COURT:  Go ahead.

RECROSS-EXAMINATION

BY MR. MATUSCHAK:

Q.   Dr. Kushwaha, now you said -- you testified one way in April 2010, correct?

A.   Yes.

Q.  And you said something different in December 20, 2010, correct?

A.  I said I was sorry and I got confused.

Q.  And now you're changing your testimony again; is that right, sir?

A.  I'm being consistent with my April representation.

MR. MATUSCHAK:  If we can have Exhibit 803 back up on the screen.  If we could -- I'm sorry.

It's the next page.  There we go, the bottom part.

Now, if we can highlight the "misrepresentation" part.

BY MR. MATUSCHAK:

Q.  I think that's the part you were testifying about.

Now, you said, Dr. Kushwaha, that this was an example of how you were losing business because RIM was doing things, right?

A.  One of the reasons, yes.

Q.  I think Mr. Thakur pointed out that the date on this is November 2003, correct?

A.  Yes.

Q.  And BES 4.0 does not come out till the next year, 2004, correct?

A.  Yes.

Q.  And this says:  "RIM now has the key capabilities

Lock & Zap available for free."  Do you see that?

A.  Yes.

Q.  So that means RIM had those capabilities already in November of 2003 in a different product, right?

A.  I don't know what he meant, which version or what version, so...

Q.  Well, RIM had a version before Version 4.0, right?

A.  Yeah.

Q.  And they had one called Version 3.5, didn't they?

A.  I guess so, yeah.

Q.  And Version 3.5 had remote Lock & Wipe, didn't it?

A.  I don't know.

Q.  And what you do know is that you're not accusing Version 3.5 of infringing your patent; isn't that right?

        MR. THAKUR:  Objection, your Honor.  The patent didn't issue till November 2005.

        THE COURT:  I'm sorry, the objection has to be to the question.

        MR. THAKUR:  Sorry.  The question relates to -- that they have not accused a product that predates the existence of the patent.  We cannot do that as a matter of law.

        THE COURT:  So it's a relevancy objection?

        MR. THAKUR:  That's correct.  I'm sorry.  It's irrelevant because --

THE COURT:  Sustained.

MR. MATUSCHAK:  Well, your Honor, may I be heard?

THE COURT:  Certainly.

MR. MATUSCHAK:  People are using that product after November of 2005, of course, they could have brought a claim.

THE COURT:  Well, I'm sustaining the objection just on the date of issue and the patent.  I am encouraging you all to stick with the patent and the alleged infringement.

MR. MATUSCHAK:  That's what I'm trying to focus on, your Honor.  Thank you.

BY MR. MATUSCHAK:

Q.  You did have a nondisclosure agreement with RIM as of this time, correct?  November of 2003?

A.  Yes.

Q.  So when RIM came out with Version 3.5, with Lock & Zap available for free, you could have gone to them right then and said, That's a violation of my agreement, right?

MR. THAKUR:  Objection, your Honor, irrelevant; beyond the scope of the claim.

THE COURT:  Sustained.

BY MR. MATUSCHAK:

Q.  You also testified, Dr. Kushwaha, that the problem we

were seeing in this e-mail was a problem at Credit Suisse, correct?

A.   Seems like they were, most of the issues were there.

Q.   So it wasn't all Credit Suisse's fault, was it?

A.   At least the deployment and unhappiness is related to -- because we couldn't deploy it in the CSFB's infrastructure.

Q.   But the statement that the software is filled with bugs is not something that was Credit Suisse's fault, was it, sir?

A.   Bugs could be anything --

Q.   Was that Credit Suisse's fault or not, sir?

A.   It could be if they are changing their infrastructure, they could relate those faults to bugs in our software.

Q.   So you don't take responsibility for any of the problems that Credit Suisse identified in this e-mail, is that so?

A.   No, it's software.  Software has bugs.

MR. MATUSCHAK:  Let me see Exhibit 772, please. The summary portion.

BY MR. MATUSCHAK:

Q.   And in that last line, Dr. Kushwaha, your partner, your co-founder, Mr. Basu, says:  "What you code belongs to you, and what we code belongs to us."  That's what he

said, right?

A.   That's what it reads.

Q.   And that's fair, isn't it?

A.   Yes.

MR. MATUSCHAK:  No further questions, your Honor.

THE COURT:  Any questions?

MR. THAKUR:  I have no additional questions.  I just want to move into evidence the April deposition that was shown to the Court.

THE COURT:  Ordinarily I don't put in depositions as exhibits.  So let's take that up at another time.

I also -- you showed an interrogatory to the jury, but sometimes the parties will separate out a question and answer in an interrogatory and offer it as an exhibit.  But these matters serve as testimonial kind of information, and ordinarily I don't mark them as exhibits.  You have reference to them in the transcript.

But let's take that up out of the presence of the jury.

If you're done with this witness, you may step down at this time.

(The witness exits the stand.)

THE COURT:  Maybe there's no request to comment on his testimony.

MR. THAKUR:  We're not going to comment.

MR. MATUSCHAK:  We'd like to comment on his testimony, your Honor.

THE COURT:  But my rule is if they don't open the commentary since they called the witness, there is no commentary allowed.  You have to wait.

Call your next witness.

MR. McDONALD:  Your Honor, Mformation calls as its next witness Mark Hatcher.

THE COURT:  Come all the way up and be sworn, sir.

(Witness sworn)

DEPUTY CLERK:  Please be seated and speak clearly into the microphone.

Please state your full name, and spell your last name.

THE WITNESS:  Mark Hatcher, H-a-t-c-h-e-r.

MARK HATCHER,

   called as a witness by the Plaintiff,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McDONALD:

Q.  Good afternoon, Mr. Hatcher.

A.  Good afternoon.

Q.  Mr. Hatcher, did you work for a company named EveryNetwork, Inc.?

A.   I did.

Q.   When did you begin working with EveryNetwork?

A.   February of 2003.

Q.   And when did you end your time with EveryNetwork?

A.   I actually just tendered my resignation recently and Friday was my last day.

Q.   And what was your position before you --

A.   Senior consultant.

Q.   During your time at EveryNetwork, what was the general scope of your responsibilities?

A.   There was a wide range of responsibilities from desktop support to server administration to IT management.

Q.   Did your work include the use of RIM's BES server software?

A.   Yes.

Q.   Did it include the use of RIM's BES server software substantially the entire time of your employment with EveryNetwork?

A.   Yes.

Q.   And did it include the use of BES to manage RIM's BlackBerry devices?

A.   Yes.

Q.   Am I your lawyer, Mr. Hatcher?

A.   No.

Q.  Are you represented by any of Mformation's lawyers?

A.  No.

Q.  Are you represented by anyone at Foley & Lardner?

A.  No.

Q.  Please take a look at the table for RIM, including RIM's lawyers and RIM's corporate representative.  Do you recognize any of those people?

A.  I do not.

Q.  Do you have any ill feelings towards anyone at RIM?

A.  No, not at all.

Q.  Do you have an opinion of RIM's products?

A.  Yes, I continued to use their handheld device until last Friday.  I turned in my company-issued BlackBerry.  And I still recommend their services, product and services to companies.

Q.  So why are you here today to testify, sir?

A.  I received a subpoena in the mail, and the first line of which said:  "You are commanded to appear in U.S. District Court on this date."

MS. DeBRUIN:  Your Honor, could we be heard at sidebar, please?

THE COURT:  Oh, my goodness, I knew that was going to happen.

(At the sidebar, out of the hearing of the jury and the court reporter.)

THE COURT:  Very well.  You may proceed.

BY MR. McDONALD:

Q.  Mr. Hatcher, do you understand that Mformation is asserting a patent against RIM in this litigation?

A.  Yes.

Q.  And I'd like to talk a little bit about your background.  Before you worked at EveryNetwork, did you attend college?

A.  I did, I went to Bentley College, now Bentley University, Waltham, Massachusetts.

Q.  When did you graduate?

A.  1988.

Q.  And what was your degree in?

A.  Computer information systems.

Q.  And how long have you been working as someone in the IT industry?

A.  23, 24 years.

Q.  Mr. Hatcher, when you joined EveryNetwork, do you remember which version of the BES server software was in use at EveryNetwork?

A.  I don't remember the exact version that I started using, probably 3.6.

Q.  Was it prior to 4.0?

A.  Yes.

Q.  Could you please describe for the jury briefly what

portion of your job duties at EveryNetwork involved use of BES server software to manage BlackBerry devices?

A.  As part of my server administration responsibilities, pretty wide range of responsibilities, actually, anything that has anything to do with technology, we take care of for our clients.  And that includes the use of handheld devices including BlackBerrys.  So my responsibility was to make sure that the BlackBerry server was up and running and that users were getting their, you know, messages and calendar invites on their handheld device.

Q.  Mr. Hatcher, I'd like to limit my questions and your answers, if possible, to the use of BES to manage BlackBerry devices.  Do you understand that?

A.  Yes.

Q.  And Mr. Hatcher, are you familiar with a process called "enterprise activation"?

A.  Yes.

Q.  What is enterprise activation?

A.  Enterprise activation is the process of provisioning a handheld with the BlackBerry administrative server, which ultimately serves as the gateway between the e-mail server and the handheld device.

Q.  And what does that allow you to do with the BES?

A.  With the BES?  So it -- you activate the handheld

device, which establishes communication with the BlackBerry Enterprise Server.  The BlackBerry Enterprise Server establishes communication with the exchange server, in my case, and then e-mail messages are directed to the handheld.

Q.  And did you personally use the BES 3-dot-whatever version to manage BlackBerry devices?

MS. DeBRUIN:  Objection, your Honor.  You ruled previously that we could not speak about 3.5.  Counsel is now asking this witness to talk about 3.6.

THE COURT:  Perhaps we can establish timelines. It does occur to me that since I don't know when various versions were introduced, if you establish the time, it will tell us.

MR. McDONALD:  I will try to do so, your Honor.

BY MR. McDONALD:

Q.  Mr. Hatcher, do you remember when BES 4.0 was introduced?

A.  I don't remember the timeline myself actually.  It's been at least five years, I would say, maybe 2005, 2006?

Q.  Do you remember when you personally started using BES 4.0?

A.  I can remember using it as far back as 2007. Probably before then.  Maybe 2006.

Q.  Let's take the time you're sure of, 2007.  Do you

have in mind a time that you used enterprise activation in BES 4.0?

A.   Yes.  So specifically there was a big deal in 2006 with -- surrounding daylight savings time.  I don't know if you're aware of it.  But the dates of daylight savings time actually changed.

MS. DeBRUIN:  Objection, your Honor, nonresponsive.  I move to strike.

THE COURT:  Overruled.

THE WITNESS:  The dates of daylight savings time changed, which was significant for technology, because most pieces of technology with an operating system automatically update with daylight savings time.  And because of that they're hard-coded with specific dates and those dates had changed, so we had to go through the process of updating operating systems, Windows operating system in handheld devices like BlackBerrys.

So I remember going through the process of applying a patch to Windows and also to BlackBerry, which was pretty significant, because with Version 4, you had the ability to centrally see the distribution of these patches over the air, as opposed to Version 3.6.

THE COURT:  Let's wait for another question because it's now becoming a narrative.

BY MR. McDONALD:

Q.   And, Mr. Hatcher, when you performed enterprise activation in BES 4.0, could you please just walk the jury through what steps are required to do that, if you do remember?

A.   Yes.  So the first step is, if the user wasn't already a member of the BlackBerry Enterprise Server, you would add them to the BlackBerry Enterprise Server. And then you would create an activation password.  And that's pretty much all you have to do on the BlackBerry Enterprise Server.

The next step is to, with the handheld, me as the administrator or the end-user could do it themselves, walk them through the process.  And there were basically options, advanced options, enterprise activation, prompt them for their e-mail address and prompt them for a PIN that I had previously set.  They'd enter that information, click "activate."  And it would activate, provision the handheld, and then within a mattered of 10, 20, 30 minutes, they would start receiving e-mail messages on their handheld device.

Q.   And as a party of that process, would a default IT policy be sent from the BES to the device?

A.   It's part of the process, yes.

Q.   And, Mr. Hatcher, that process that you've just

described in BES 4.0, would you say that's hard for you to accomplish?

A.   No, it's very easy.  It's minutes.  Seconds even.

Q.   How did you learn how to do it?

A.   Um, so probably the first time I did it, I was looking over somebody's shoulder.  They went through the process, said, you know, Right click on this, click on "add," click on this section that says "set activation password."  It wasn't that difficult.  You watch somebody, do it once, you're pretty much an expert on it.

Q.   Is it a visual menu-driven process?

A.   Yes.

Q.   Fairly easy to follow?

A.   Yes.

Q.   And is this all done wirelessly in BES 4.0?

A.   Yes, so the setting, the -- adding the user and setting the activation password is done directly on the BlackBerry Enterprise Server, and then the actual enterprise activation is done wirelessly.

Q.   So do you have to have the BlackBerry device with you physically to complete this process?

A.   No, in a lot of cases we actually didn't have it. We'd provide support to remote users quite a bit.  So I would have a Boston office, we may support users in a

San Francisco office or London office, for example. And, you know, physically getting the handheld device into my hand is a fairly cumbersome process. So the easiest thing for me to do is just to walk them through the process of activating it themselves. Takes a matter of seconds, minutes, as opposed to having them shipping the device. You know, even if they spend the money to have it overnight, we're talking two or three days turnaround as opposed to 20 minutes. Which is a big deal. Everybody wants instant gratification when it comes to technology.

Q. So in BES 4.0 or later, approximately how many times would you say you personally did this process?

A. The enterprise activation?

Q. Yes.

A. A hundred, maybe.

Q. Okay. Was there a time before BES 4.0 when you would do activation that wasn't wireless?

A. You had to do a wired activation.

Q. On the BES?

A. On the BES, yes.

Q. And could you please describe your experience with that process relative to the wireless enterprise activation?

A. Well, like I said, it's much more convoluted and time

consuming. There's additional steps. So you'd have to physically connect the handheld to a computer running desktop manager, and do the enterprise activation that way. Probably the biggest thing is, you know, getting the digital device in your hand.

Q. So when you personally did this prior BES, did you have the device physically with you?

MS. DeBRUIN: Your Honor, we're getting into what happened in the earlier product and we were not permitted to inquire with respect to Dr. Kushwaha.

THE COURT: Sustained.

BY MR. McDONALD:

Q. Mr. Hatcher, let's talk about BES 4.0 and later. You described a wireless enterprise activation process. Is it also possible to do enterprise activation with a hard-wired connection like in prior versions?

A. Yes. It's possible. I don't know of anybody who has ever done it since 4.0 came out.

Q. So you've never done it that way?

A. I have never done it that way.

Q. Why have you never done it with a hard-wired connection?

A. The question is, why would I? It's just an extra step. Why would I plug a cable into a computer to do an enterprise activation when I could do it wirelessly.

Q.   How would it affect your view of RIM's products if they eliminated that wireless enterprise activation feature?

THE COURT:   That seems to call for speculation, doesn't it?

MR. McDONALD:   It's relevant to damages, your Honor.

MS. DeBRUIN:   Agree, your Honor.

THE COURT:   But if he doesn't know what's likely to happen if he hasn't done it, it's asking him to speculate about what he would think if the world were different, and that's speculation.

MR. McDONALD:   Fair point, your Honor.   Thank you.

BY MR. McDONALD:

Q.   Mr. Hatcher, are you familiar with a kill command --

A.   Yes.

Q.   -- in the BES?

What is that?

A.   It is a command that allows you to remotely render a handheld device useless.  So, they're small, they're portable, they're easily lost.  And they contain e-mail and contact information which is potentially sensitive.  You don't want it falling into the wrong hands.  So if you were to lose one of these devices, you have the

ability to basically wipe all the data and render the handheld useless, remotely, through the BlackBerry device.

Q.   Is that a command that you personally issued through the BlackBerry Enterprise Server?

A.   Yes.

Q.   Do you also use a command called "force password" in the BlackBerry Enterprise Server?

A.   Yes.  So with a lot of the compliance iterations that are going on right now, we've tried to increase security.  And one of the steps that we've done is to force people to use, to require passwords, to access the data on the handheld devices.  Again, the device falls into the wrong hands, it could take, you know, an hour, couple hours, maybe even a day for us to issue kill command.  You know.  Taking into consideration the time that it takes for the user to realize that it's been lost and to contact us and us to issue the kill.  So there's that window of opportunity for somebody to access the data.

        But if you're required to enter a password in order to access the data, then we can eliminate that risk, so we do that through an IT policy, push out the IT policy, and then after doing that, from that point on, the user would be required to use a password.

Q.   Mr. Hatcher, during your time at EveryNetwork, was EveryNetwork a customer of RIM?

A.   Yes.  So like I said, I turned in my company-issued BlackBerry last Friday.  My last day.  So we had a BlackBerry Enterprise Server and a bunch of BlackBerry handheld devices.

Q.   As part of your work at EveryNetwork administering the BES, did you ever have occasion to contact RIM's technical support?

A.   Yes.  So RIM has a support service called TSupport. Which is an annual subscription, you pay upfront, and then you have complete access to their support services. So I would take advantage of that whenever I had any questions or needed help troubleshooting an issue with either BlackBerry Enterprise Server or handheld device.

Q.   Did you ever call this TSupport line with a problem with enterprise activation?

A.   Yes, so it's fairly common to initiate, somewhat common to initiate enterprise activation and have it either get hung up or not get activate properly, in which case there's a number of troubleshooting systems. Like I said, with TSupport, you're paying for it, and they're really good.  Their support services are really good, so I wouldn't hesitate to call them with an issue like that.

Q.   Did they help you with every issue that you called them?

A.   Yeah, just about every issue.  There's some really crazy issues where one calendar entry disappears and you never really get an answer to it.  But, you know, those are rare.

Q.   When you called them about these enterprise activation issues, I think you mentioned the process hanging up.  Is that a problem you have with wireless enterprise activation?

A.   Yes.

Q.   Mr. Hatcher, did you ever consult RIM's technical documents about the BES to help you with problems you had?

A.   Yes.  So as part of the troubleshooting steps, like I said, I wouldn't hesitate to call TSupport.  Sometimes you would be on hold.  Sometimes I would do a Google search to troubleshoot a problem.  And more often than not, it would bring me to a document that was on RIM's knowledge base.  Or I would go directly to their support site for best practices on operating from 4.0 to 5.0, things like that.

Q.   You mentioned RIM's knowledge base.  What is that?

A.   It's a section of their website where they have case information, previous case information, so if -- they

try to document all of the troubleshooting steps that they go through based on the premise that a lot of these things end up being repetitive.  Instead of reinventing the wheel every time, if you can just refer to a previous case, then it's a lot easier.

Q.  Would you say that you operated RIM's BES products in accordance with their instructions on how to use them?

A.  Yes.

Q.  Mr. Hatcher, you've been talking about your actions.  Is anything you've said today -- withdrawn.

The Court is interested in timelines.  And I'd like to establish that your comments today, would they be applicable to your actions and valid about actions from 2008 till last week?  Is that fair to say?

A.  Yes.

MR. McDONALD:  No further questions, your Honor.

THE COURT:  Very well.  You may cross-examine.

MS. DeBRUIN:  Your Honor, may I approach to give the witness the binder?

THE COURT:  Certainly.

CROSS-EXAMINATION

BY MS. DeBRUIN:

Q.  Good afternoon, Mr. Hatcher.

A.  Good afternoon.

Q.  We've never met before, right?

A. Correct.

Q. Now, you mentioned that you received a subpoena to come here and testify.

A. That's correct.

Q. When did you receive that subpoena?

A. Maybe three weeks ago.

Q. That wasn't your first communication with Mformation's lawyers, was it?

A. No, it wasn't. They contacted me in May of 2011. Asked me some questions. And asked me to sign a declaration.

Q. Now, the declaration that you refer to, that was something that Mformation's lawyers wrote; isn't that right?

A. I believe so.

Q. You signed it, correct?

A. I signed it, yes.

Q. Now, you weren't under subpoena to provide that information, correct?

A. That's correct.

Q. Did you have any discussions with Mformation's lawyers about your testimony here today?

A. Yes.

Q. Did you have -- did you talk at all with RIM's lawyers about your testimony here today?

A.  No.

Q.  Now, you're based in Boston, right?

A.  Correct.

Q.  So you live in the Boston area?

A.  That's correct.

Q.  How did you end up in San Francisco?

A.  The -- again, referring to the subpoena, it said: "You are commanded to appear in U.S. District Court," and the Court just happened to be in San Francisco.

Q.  Did Mformation or its lawyers pay for you to come here?

A.  Yes.

Q.  They paid your airfare to come here?

A.  Yes.

Q.  They paid your hotel?

A.  Yes.

Q.  Any other payments?

A.  No.

Q.  Now, you have never worked for RIM; isn't that right?

A.  That's correct.

Q.  And you haven't ever designed any software for the BlackBerry Enterprise Server, right?

A.  That's correct.

Q.  You're not here today to testify about how the BES software was designed, right?

A.  Correct.

Q.  You're not here to testify about how the internal workings of the BES go, correct?

A.  Internal workings, I assume you mean coding.  So internal workings, how to do an enterprise activation, how to add a user, yes.  Coding, no.

Q.  Just how someone would use --

A.  Correct.

Q.  -- the product, correct?

A.  Yes, and administrate the product.

MS. DeBRUIN:  Can I have a moment, your Honor?

THE COURT:  Yes.

MS. DeBRUIN:  No more questions, thank you.

THE COURT:  Very well.

MR. McDONALD:  Your Honor, just one minor point of clarification.

THE COURT:  Certainly.

REDIRECT EXAMINATION

BY MR. McDONALD:

Q.  Mr. Hatcher, we discussed specifically BES 4.0.  But you've also used BES 5.0 in similar ways; is that fair to say?

A.  That's fair.

MR. McDONALD:  No further questions, your Honor.

THE COURT:  Any further questions?

MS. DeBRUIN:  No, your Honor.

THE COURT:  Very well.  The witness is excused?
Yes.  The witness is excused.

Thank you very much, sir.

(The witness exits the stand.)

THE COURT:  It's almost 2:30.  Why don't we take
our break at this point.  We'll come back at about 2:45.

DEPUTY CLERK:  All rise.

THE COURT:  Counsel remain briefly.

(The jury exits the courtroom.)

THE COURT:  Out of the presence of the jury.

There was an objection at the sidebar with
respect to the subpoena.  The way that the objection was
worded, I overruled it, it was not -- well, my
understanding is that a witness in Boston is not subject
to a subpoena from this court.  But a witness can come
voluntarily under a subpoena, but I wanted the record to
reflect that this is a circumstance where the witness
came as a result of a subpoena being issued but
voluntarily undertook to come.  I'm somewhat concerned
about the impression that the Court has subpoena power
to that level.

MR. McDONALD:  If I could comment, your Honor?
This is the first I've heard that that's the reason he
showed up.  We issued it as sort of a safety backup.  He

always volunteered.

THE COURT:  Well, it just seemed that, I simply wanted to make it a point for the record.

Thank you all.  See you at 2:45.

(Recess)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Please be seated.

Mr. Noble brought you the note from the jury.  I didn't intend to comment on this matter until I had the note, and I perhaps don't need to comment any further here, but I wonder whether or not the parties would like to use this as an opportunity to comment on his testimony and address these issues.

MR. McDONALD:  I just stood because I figured you'd have a question for me.  But I can sit down.

THE COURT:  I did.  That's my question.

MR. THAKUR:  We are going to comment in light of the question.

THE COURT:  So you'll open commentary, and then if I feel I need to give any instructions, I will.

Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  As I understand it, the parties wish to comment on the testimony of the dismissed witness.

MR. McDONALD:  Yes, your Honor, we've been passed a note from the jury, and the question was:  Why did Mr. Hatcher have to come from Boston to testify?

Second question:  Why was he selected as a witness?

Third question:  Why not somebody local?

The first question:  Why did Mr. Hatcher have to come from Boston to testify?  That's where he lives and works.

Why was he selected as a witness?  Mr. Hatcher has a mutual third-party acquaintance who knows people at Mformation.  Mr. Hatcher was asked by this third party to assisted in the litigation by providing a sworn declaration, which he was shown on the stand, and by appearing here to testify today.

And why not someone local?  We thought Mr. Hatcher would be a good witness to explain his use of the products.  We didn't want to discriminate against anyone local.  We just did not have a local candidate available.

THE COURT:  Very well.  You wish to comment?

MS. DeBRUIN:  Yes, your Honor.

Good afternoon.  The point is Mr. Hatcher did not

have to come here and testify.  He came here in order to help Mformation.  The third party who knows Mr. Hatcher and knows Mformation, we don't know who that third party even is.

Second, why was he selected as a witness?  We don't know.  He gave a declaration early in the case.

Why not someone local?  Counsel told you they couldn't find anyone local to come and talk to you.

Thank you.

THE COURT:  Perhaps I should instruct you, members of the jury, I'm not sure that this is responsive to your question, but I wanted to tell you as a matter of law the nature of subpoenas.  A subpoena is a document that is issued by the Court which requires witnesses to attend court proceeding.  However, because in civil cases, the Court has given the parties the ability to do so, a subpoena can actually be issued by a party to the case under the name of the court to ask someone to come to court.

Ordinarily, subpoenas are limited in their geographic reach.  They're limited to the district in which the court sits.  We sit in the Northern District. So that we can command to come to this court anyone that appears, who lives, a resident, in Northern California. We don't have subpoena power to require anyone to come

from Boston.  And so if a person in Boston is going to be needed for trial, either they have to be voluntarily asked to do so or they can be subpoenaed to come to a place where they live and their deposition can be taken, and that deposition can be used during the course of trial.

So although the witness testified that he came in response to a subpoena, technically, he voluntarily came after he received a subpoena, because this court was not involved in ordering him to travel.  And it's frequently the case that parties will make those arrangements, ask someone to come, pay their transportation and lodging while they're here so they're available as live witnesses as opposed to appearing for a deposition.

Call your next witness.

MR. THAKUR:  Your Honor, may -- we heard opposing counsel make a statement that we believe needs to be responded to.

THE COURT:  I'm sorry?

MR. THAKUR:  We heard opposing counsel say that we could not find anyone.

THE COURT:  What's your objection?

MR. THAKUR:  Our objection is that that's not accurate.

THE COURT:  Which statement?

MR. THAKUR:  Opposing counsel responded to the third question.

MR. MATUSCHAK:  I would suggest this not be heard in front of the jury.

THE COURT:  All right.  Sidebar.

(At the sidebar, out of the hearing of the jury and the court reporter).

THE COURT:  I appreciate your questions.  It shows that you're paying attention, and that's good.

How are we going to dazzle the jury this afternoon?  Who's next?

MR. THAKUR:  We're going to be somewhat quicker. I know the other inventor, Dr. Nath, is going to testify next.

THE COURT:  Very well.

MR. THAKUR:  I'm sorry, we have a six-minute video from one of the RIM witnesses, and then we're going to hear Dr. Nath.

THE COURT:  So we'll hear more video, and then hear from a live witness to conclude our day.

Go ahead.

MR. THAKUR:  We're playing the video deposition of Mr. Panezic.  At the time of his deposition Mr. Panezic was vice-president of product management at Research In Motion.

(Whereupon, the excerpt of videotaped deposition of Mr. Alan Panezic, held June 25, 2010, was played for the jury:)

MR. McDONALD:  We have no commentary on that witness, your Honor.

THE COURT:  Very well.  Call your next witness.

MR. McDONALD:  Mformation calls as its next witness Dr. Badri Nath.

THE COURT:  Good afternoon, Dr. Nath.  Come all the way forward and be sworn here by the clerk.

(Witness sworn)

DEPUTY CLERK:  Please be seated.  And speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  My name is Badri Nath, B-a-d-r-i, last name is Nath, N-a-t-h.

BADRI NATH,
     called as a witness by the Plaintiff,
     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McDONALD:

Q.  Good afternoon, Dr. Nath.  What do you do for a living?

A.  I'm an instructor in computer science at Rutgers

University.

Q.   Is that Rutgers in New Jersey?

A.   That's correct.

Q.   Do you also work with Mformation?

A.   I am a consulting scientist at Mformation.

Q.   How long have you been a consulting scientist with Mformation?

A.   From 2000 to 2002, for about three years; and then since 2005.

Q.   How much time have you spent consulting with Mformation?

A.   I'm expected to do one day a week.

Q.   During the summer do you spend more time with them?

A.   Summer I work more time.

Q.   Why is that?

A.   Because I'm out one day a week in the year.

Q.   Where did you go to college for your undergraduate degree, Dr. Nath?

A.   Bangalor University, India.

Q.   What was that degree in?

A.   Electronics engineering.

Q.   What year did you gain your undergraduate degree?

A.   1981.

Q.   What did you do after that?

A.   I got master's in computer science at the Indian

Institute of Science in Bangalore, India.

Q.   I'm sorry, sir, what was that degree?

A.   Master's in computer science.

Q.   What did you do after that?

A.   I came to Amherst, U-Mass, to do my PhD.

Q.   Is that the University of Massachusetts?

A.   Yes, University of Massachusetts at Amherst.

Q.   Did you earn your PhD?

A.   Yes, I did.

Q.   What year did you earn your PhD in computer science?

A.   1989.

Q.   Then what did you do?

A.   Then I joined as assistant professor in the
Department of Computer Science at Rutgers University.

Q.   What is your current position at Rutgers?

A.   I'm a full professor in the department.

Q.   You have tenure, sir?

A.   Yes.

Q.   Dr. Nath, are you an inventor of the '917 patent?

A.   Yes.

Q.   Dr. Nath, how did you come to work at Mformation as a
consultant?

A.   During the summer of 2000, I believe, Dr. Kushwaha at
Rutgers told me that he was starting a company in the
area of wireless device management.  And I was very

excited in that area.  I was working in the wireless, so I decided to join him.

Q.  After you joined Mformation, did Dr. Kushwaha describe his invention to you?

A.  Yes, he did.

Q.  What was your impression of that?

A.  I was very excited about the idea of remote management, because managing devices in a remote environment like the wireless was very interesting to me.

MR. McDONALD:  Thank you, Dr. Nath.

We have no further questions, your Honor.

THE COURT:  Any cross?

MS. DeBRUIN:  Yes, your Honor.

Your Honor, may I approach the witness?

THE COURT:  Certainly, you may approach witnesses for any lawful purpose.

MS. DeBRUIN:  Thank you.

MR. McDONALD:  Permission to be heard at sidebar, your Honor?

THE COURT:  Denied.

CROSS-EXAMINATION

BY MS. DeBRUIN:

Q.  Good afternoon, Dr. Nath.

A.  Good afternoon.

Q.  When you filed your patent with the U.S. Patent Office, you took an oath that everything that you said was true; isn't that right?

A.  That is correct.

Q.  Just like the oath that you took here today, right?

A.  That is correct.

Q.  So being honest with the patent office was very important, right?

A.  That's correct.

Q.  You -- what you said in your patent was true?

A.  That is correct.

Q.  Let's look at the '917 patent.

        MS. DeBRUIN:  If I could have Exhibit 370 on the screen, please.

        Let's turn to Column 1, line 46.

BY MS. DeBRUIN:

Q.  Are you with me, sir?  You can find it in your -- or you can see it on the screen or you can find it in your binder, whichever would be most convenient for you.

A.  Column?

Q.  Column 1.  Line 46.

        Are you with me?

A.  One moment.

        Yes, I am.

Q.  You said in your patent that:  "A need arises for a

technique that provides the capability to manage, control and reconfigure wireless devices remotely over a wireless network with acceptable reliability and security."

Did I read that right?

A.   That's correct.

Q.   Acceptable reliability was important; isn't that right?

A.   That is correct.

Q.   In fact, in the very next sentence in the summary of invention, you say that your method of remote device management is directed to acceptable reliability and security, correct?

A.   That's correct.

Q.   Let's look at the claim -- let's look at Claim 1 of the '917 patent.  Claim 1 is a series of steps, right?

A.   That is correct.

Q.   To infringe Claim 1 you have to perform each of the steps, correct?

MR. McDONALD:  Objection, your Honor.  This is far beyond the scope of direct under Rule 611(b).

THE COURT:  I anticipated that's why you wanted to approach because having testified that he's a co-inventor, it does occur to me that I can allow more latitude than simply the questions that were put to him.

I am somewhat concerned about the current question, though, having to do with infringement.  So the practice is probably a better way to describe it, rather than infringement, because that would be a legal conclusion.

MS. DeBRUIN:  Thank you, your Honor.  That's a better phrasing of the question.

BY MS. DeBRUIN:

Q.  Do you agree, Dr. Nath, that to practice Claim 1 of your patent you must perform all of the steps?

A.  That's true.

Q.  That would include the step of establishing a connection from the wireless device to the server; is that right?

A.  In Claim 1?

Q.  In Claim 1.  Do you see it there?  Line 37.

A.  It's a connection established between the wireless device and the server.  It goes both ways.

Q.  So you have to establish a connection between the wireless device and the server, right?

A.  That's right.

Q.  And you're certainly familiar with protocols that are used to establish connections, right?

A.  That's true.

Q.  You're familiar with the TCP protocol, correct?

A.  That's correct.

Q.   You're familiar with another protocol that's called the UDP protocol; is that right?

A.   That is correct.

MR. McDONALD:  Objection, your Honor, beyond the scope of direct.

THE COURT:  Overruled.

BY MS. DeBRUIN:

Q.   Now, UDP is one of the protocols that can be used to transmit messages over the Internet?

A.   That is correct.

Q.   You know all about Internet protocols because you teach a course at Rutgers about them.

A.   That's correct.

MS. DeBRUIN:  If I could please have -- and we may have an objection to this, your Honor.

BY MS. DeBRUIN:

Q.   If you could please turn to RIM Trial Exhibit 4736 in your binder.

A.   (The witness complies.)

Q.   Are you there, sir?

A.   Yes.

Q.   Do you recognize the document that's marked as RIM Trial Exhibit 4736?

A.   Sort of.

Q.   Is this a copy of class notes that you prepared for

your class at Rutgers?

A.   Yes.

Q.   So this is one of your lectures?

A.   Yes.

Q.   This is a document that you created?

A.   Um, I did not create it fully because when you teach a course, the textbook itself offers some slides.  So I cannot claim that it is mine.

Q.   You're not going to put a copyright notice on it; is that right?

A.   That's right.  It's not mine.  The textbook provides slides for faculty members to teach.

Q.   But this is a document that you prepared as part of your work as a professor at Rutgers?

A.   Correct.  Probably on ITS as well, Internet technology.

Q.   You know this document was produced in this case by Mformation, right?

A.   I do not know Mformation -- I don't know that.

Q.   You can tell that from the little Bates number at the bottom, it has an M Bates number, do you see that?

A.   Okay, all right.

        MS. DeBRUIN:  We'd move for admission, your Honor, of RIM Trial Exhibit 4736.

        MR. McDONALD:  No objection, your Honor.

THE COURT:  Very well.  4736 is in evidence.

(Defendant's Exhibit 4736 received in evidence)

BY MS. DeBRUIN:

Q.  You teach your students about the two different protocols, TCP and UDP; is that right?

A.  That is correct.

Q.  Now one of the first things you tell your students about UDP is that it does not provide connection management.  Is that correct?

A.  That is correct.

MS. DeBRUIN:  And if we could turn, please, to page 3.

BY MS. DeBRUIN:

Q.  So there in your notes you say, UDP does not provide connection management.  Correct?

A.  That is correct.

Q.  Because there is no connection?

A.  That is not true.

Q.  Well, let's look at page 4.  You also tell your students that for UDP, no connection needs to be set up.  Is that right?

A.  Yes.  That means -- in fact, I tell my students all the time --

Q.  You can answer my question.  If you have further questions, if you think you need to clarify, your

counsel will be able to ask you some questions after I'm
finished.

A.   Okay.

Q.   You contrast UDP with TCP in your notes, right?

A.   That's correct.

Q.   And you tell your students that TCP provides an
end-to-end reliable connection; isn't that right?

A.   I would say end-to-end reliable protocol.

Q.   Let's look at page 9 and see what you said.  "TCP
provides the end-to-end reliable connection that IP
alone cannot support."

A.   That's correct.

Q.   That's what you tell your students, right?

A.   Yes.

Q.   And that's one of the core differences between UDP
and TCP, right?

A.   No.

Q.   UDP transmits information without having to set up a
connection, right?

A.   No.  No.  You still need to open a socket.  Whether
it's UDP or TCP, you still need to open a socket.  The
fundamental difference is there is no handshake in UDP,
whereas there's a handshake in TCP.  You still need to
open a socket.  You can't communicate without knowing
the person's parameters.  So if you looked at --

MS. DeBRUIN:  Your Honor, I'd move to strike the witness's answer.

THE COURT:  Well, with a professor on the stand you're going to get a lecture.  So we're going to try to limit you, though.  Because this is not the classroom.

(General laughter)

THE COURT:  So listen hard to the question.  And it's okay for you to say no, as you have done, if you don't adopt the proposition stated in the question.  But don't go on to tell us why at this point.  You might be asked later, but go ahead.

THE WITNESS:  Okay.

MS. DeBRUIN:  Thank you, your Honor.

BY MS. DeBRUIN:

Q.  Let's turn to slide 11.  You raised a good point, Dr. Nath.  You were talking about a handshake.  Now, in TCP, a connection gets established with a handshaking arrangement between the two things or ends that are being connected, right?

A.  No.

Q.  We have on slide 11, "TCP connection established," right?

A.  Yes, that is the handshake.

Q.  That's the handshake?

A.  Uh-huh.

Q.   You have it here as a three-way handshake?

A.   That's correct.

Q.   And that's for TCP?

A.   That's right.

Q.   That's for the -- provided for in UDP; is that right?

A.   That's correct.

Q.   Have you ever met with Mformation's expert in this case, Dr. Vijay Madisetti?

A.   Nope.

Q.   So you haven't shared with him your lecture on UDP?

A.   Nope.

          MS. DeBRUIN:  If I could have just a moment, your Honor?

          THE COURT:  Certainly.

          (Pause in the proceedings.)

          MS. DeBRUIN:  No further questions, your Honor.

          THE COURT:  Any redirect?

          MR. McDONALD:  I'll try to be brief, your Honor.

          Can we please display cross Exhibit 4736 at page 4.

REDIRECT EXAMINATION

BY MR. McDONALD:

Q.   My colleague asked you questions about the statement, "no connection need to be set up."  Can you please explain what is meant by that statement?

A.   That means no handshake is needed.  For example, let's say I want to say -- send a message, or hello to somebody.  I can write "hello" on a piece of paper, put it in an envelope, write that address and name, and send it away.  It will go away.

On the other hand, let's say I want to say hello in person.  Then I have to make an appointment, tell that person I'm going to be there, and say hello.

That's how the TCP is.  You need to know the sequence number.  You need the flow window.  That's why you need the handshake.  The UDP is like sending it over the mail.  But you still need to know the other person's name and address.  In Internet terminology, you need the port number over which you need to talk.

MR. McDONALD:  Thank you, your Honor.  No further questions.

THE COURT:  Any further questions?

MS. DeBRUIN:  No questions, your Honor.

THE COURT:  Thank you.  You may be excused, Doctor.

THE WITNESS:  Thank you.

(The witness exits the stand.)

THE COURT:  Call your next witness.

MR. THAKUR:  Your Honor, we're going to play some videos for the rest of the afternoon.

THE COURT:  Oh.

MR. THAKUR:  Mformation will be playing the portions of the videotaped deposition of Mr. David Yach. At the time of his deposition, Mr. Yach was Research In Motion's chief technology officer.

(Whereupon, the excerpt of videotaped deposition of David Yach was played for the jury, date taken unknown.)

MR. THAKUR:  We think this would be a good time to break for the day, your Honor.

THE COURT:  You have more of this?

MR. THAKUR:  Not this witness, we have a couple more video depositions, but they are of a length that I think would be better to wait till tomorrow.

THE COURT:  We'll quit a little bit early.  It's 3:53.  We'll tax you the time.

Ladies and gentlemen, we'll see you tomorrow. Remember my admonitions.  We'll see you tomorrow at 9 o'clock.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Any matters out of the presence of the jury?

MR. THAKUR:  I have one to start with.  The first matter I have, your Honor, is the issue of

Mr. Lazaridis. You decided yesterday that Mr. Lazaridis may be presented on all the topics, he's been redesignated. You expanded his role as to what he could testify to at trial.

Mr. Matuschak a couple of days ago represented to the Court that if we felt that we needed more -- didn't get an opportunity to fully depose Mr. Lazaridis, we could do so. I just asked him this afternoon if I may complete the deposition of Mr. Lazaridis before trial as he had just offered to the Court two days ago and he advised me, no, I may not.

MR. MATUSCHAK: Your Honor, we offered it -- I offered Mr. Lazaridis for deposition first, I think it was when we were here for the pretrial conference. He turned it down. I offered him last Thursday when we were here for the jury instructions. He didn't turn me down, but he said, I'll think about it. But he did not get back to me. It's been two weeks now.

Mr. Lazaridis has a schedule he has to keep. And trying to arrange his schedule now, and I'll be frank with your Honor, he'll be our first witness because he can only be here on certain days next week and trying to arrange a deposition between now and then I think is going to be impossible. If they had asked before, I would have been happy to provide it, but they waited

over a week, actually two weeks, since I made that offer.

THE COURT:  When are you planning to rest?

MR. THAKUR:  Your Honor, we're planning to rest Tuesday probably by noon.

THE COURT:  Tuesday.  So you'll use all of tomorrow for your case in chief?

MR. THAKUR:  Correct, your Honor.

THE COURT:  Assuming cross-examination.

MR. THAKUR:  Yes.

THE COURT:  And what is tomorrow?  Is tomorrow Friday?  And half of the day on Tuesday or --

MR. THAKUR:  That's about what we're estimating, your Honor.  We're expecting to put one fact witness, our technical expert on.

THE COURT:  So that would leave Monday as the only day that would be unoccupied for purposes of this deposition.

MR. THAKUR:  Your Honor, yes, but we would do it over the weekend if they so proposed.

THE COURT:  If he's available.  So I'll leave it at that.  It is understandable that parties can be working on cases during the weekend.  But that deprives the parties of the ability to work on the case as they have prepared it, as opposed to doing something new and

different.

So I won't at this point order you to work over the weekend to accomplish this deposition, unless you find that you can do it at the convenience of counsel and the witness, and do both.

I'll remind you that some similar step like this might happen when you have the case. And so it is always the circumstance that you have to anticipate that you might find yourselves needing the same kind of courtesy from the other side. I've come to expect a high degree of advocacy on both sides, so I'll expect that you'll manage this circumstance accordingly.

This does come during the point of trial, I said I would entertain the request that was made, and given the fact that we're now talking about potentially Tuesday when he's going to testify, that does cause me to wonder about it.

Is there any particular subject matter that you would wish to depose him on so that even as you try to make these arrangements, it could focus your inquiry?

MR. THAKUR: Your Honor, yes, the accused product and the development of the accused products. The BES 3.5, 3.6, 4.0, and the functionalities therein.

MR. MATUSCHAK: If that's what he wants, your Honor, Mr. Lazaridis is not testifying about that stuff.

I don't frankly think he knows a whole lot about that stuff. But he's not going to testify about functionality --

THE COURT: That might be a helpful exchange if you would tender what it is you're going to call him on. Although I increased the scope of his examination, because of the surprise you were using as a basis for objecting, I didn't think you should have been surprised @. You yourself had listed him. That doesn't mean that all he will be testifying to or that you will examine him on those areas because you're limited to the scope of direct examination.

So you have a conversation about that and figure it out. We'll be here tomorrow. You can let us know how your conversations go.

MR. ARNTSEN: As Mr. Thakur represented, he'll be resting on Tuesday, which means Mr. Weinstein will go on Tuesday. With regard to our motion about the supplemental reports he may testify to, what we need to do per our agreements is exchange the exhibits on demonstratives on Saturday night. So if we could know that answer by tomorrow, that would be very helpful.

THE COURT: Very well. That is fair. This has to do with the measure of damages for products sold prior to the --

MR. ARNTSEN:  It has to do, yes, whether Mr. Weinstein can include direct infringement of the method induced after the filing date using products sold before the filing date.

And the parties submitted supplemental briefs.

THE COURT:  Yeah, I know.  Thank you.

Is that all?  I'll let you know in the morning.

MR. ARNTSEN:  Thank you, your Honor.

THE COURT:  See you in the morning.

(Adjourned)

oOo

INDEX OF EXAMINATION

Witness:                                        Page:

RAKESH KUSHWAHA

Direct By Mr. Thakur (cont.) . . . . . . . . . 548

Cross By Mr. Matuschak . . . . . . . . . . . . 559

Redirect By Mr. Thakur . . . . . . . . . . . . 676

Recross By Mr. Matuschak . . . . . . . . . . . 701

MARK HATCHER

Direct By Mr. McDonald . . . . . . . . . . . . 707

Cross By Ms. DeBruin . . . . . . . . . . . . . 722

Redirect By Mr. McDonald . . . . . . . . . . . 725

BADRI NATH

Direct By Mr. McDonald . . . . . . . . . . . . 732

Cross By Ms. DeBruin . . . . . . . . . . . . . 735

Redirect By Mr. McDonald . . . . . . . . . . . 744

oOo

                        INDEX OF EXHIBITS:

Index No.                                    Received:

 2254                                           551

 2078                                           554

 4460                                           582

 4449                                           583

 788                                            619

 803                                            624

 4838                                           672

 4736                                           741

                            oOo


                    CERTIFICATE OF REPORTER


        I, Connie Kuhl, Official Reporter for the United
States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by
me, a certified shorthand reporter, and were thereafter
transcribed under my direction into written form.

                    _____

                     Connie Kuhl, RMR, CRR
                    Thursday, June 21, 2012