**Volume 5**

                                    **Page 754 — 920**

                **UNITED STATES DISTRICT COURT**

                **NORTHERN DISTRICT OF CALIFORNIA**

           **BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE**

```
------------------------------)
                              )
Mformation Technologies, Inc.,  )
                              )
                Plaintiff,  )
                              )
   v.                         )   No. C  08-4990 (JW)
                              )
Research In Motion, Ltd.,      )
et al.,                        )
                              )
                Defendants. )  San Francisco, California
                              )  Friday, June 22, 2012
------------------------------)
```

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        RUBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                BY:  MARK G. MATUSCHAK
                     ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                BY:  LINDA S. DeBRUIN
                     AARON D. CHARFOOS
                     TIFFANY PATRICE CUNNINGHAM
                     MEREDITH ZINANNI
                     FERLILLA VICTORIA ROBERSON
                     MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Friday, June 22, 2012

(9:00 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Thank you.  We're on the record out of the presence of the jury.

I was alerted that there is a concern with the first witness.  My law clerks came up and chatted with you a bit about what the nature of the concern is.  I had an opportunity to look at the slides that are proposed to be produced.

Let me just confirm my understanding, and that is, other than the headings on these slides, the screenshots are shots of the operation of the BlackBerry system without any of the titles being changed, other than inputs that are being made to illustrate?  Or these are actual screenshots of what is being done in the ordinary operation of the system?  In other words, was this a screenshot of the system as it is operated or a screenshot made for purposes of litigation with names and things put in that are not part of the ordinary operation?

MS. DeBRUIN:  Your Honor, it was for the purposes of litigation.  It was prepared last week, and it was prepared solely for the purpose of this litigation.

MR. McDONALD: Your Honor, if I could respond. It was prepared by the witness in the former fashion that you mentioned. He did it in the way he does it in the ordinary course of business. It's his name on there that he's registering his device with the BlackBerry. He took the screenshots for the use of -- in this case, but the text within those screenshots inside the box, nothing has been modified. There's highlighting but the text itself is how it is done in the ordinary course of business, by him, and he will testify as to all of this.

MS. DeBRUIN: The point is, your Honor, it was not done in the ordinary course of business. He had no reason to be activating his BlackBerry device last week other than to do it for the purpose of this litigation, so he could come here and testify as an employee of plaintiff's law firm about how our product operates. If they wanted somebody to do that, they should have produced the screenshots, during discovery, and they should have offered that witness up before the last week before discovery.

THE COURT: Well, that's a secondary concern. But I'm being told, I guess, two things, but maybe I can define what I've been told. In other words, this is Mr. Wilson.

MR. McDONALD: Correct, your Honor.

MS. DeBRUIN:  Yes, your Honor.

THE COURT:  And Mr. Wilson was already registered, I presume, and this doesn't record his actual registration, but he went back and for purposes of litigation, reregistered himself.

MR. McDONALD:  Correct, your Honor.

THE COURT:  And the screenshots are not of the actual circumstances as they had been previously done.

All right.  So let me move to the other part.  He was listed as a witness?

MR. McDONALD:  If I could address the first part, your Honor.  We're not seeking to enter these slides into evidence.

THE COURT:  Well, was he listed as a witness?

MR. McDONALD:  Yes, your Honor, he was.

THE COURT:  So he was listed as a witness, you knew he was going to --

MS. DeBRUIN:  Yes, your Honor.  We thought he was going to testify essentially to what had been submitted in a declaration that he submitted a week before the close of discovery.  He said in that declaration that he does certain actions, and if they want someone to testify to that -- I mean, that's what we've already heard yesterday from Mr. Hatcher, but if they want to get up on the stand and say, I have done a wireless

enterprise activation, I have sent a wireless IT command, we can do that.  But he shouldn't be permitted to sit up there and put on a dog and pony show about how RIM's product operates.  If they wanted an expert to do that, they should have designated someone as an expert to do that and complied with the discovery rules.

THE COURT:  That was what I guess I need to consider is whether or not he was disclosed and whether or not this is opinion testimony of an expert that should have been disclosed with a report and all of those kinds of things.

MR. McDONALD:  If I could comment on that, your Honor.

THE COURT:  Certainly.

MR. McDONALD:  The slides are a subset of the actions he described in his declaration.  It's as he does it in the ordinary course, not as an expert, he's just a user of RIM's product.  He's just an IT professional, like many other IT professionals who use these products.  He's not being disclosed as a technical expert of any kind.

THE COURT:  Well, I would overrule the objection to his testifying, insofar as his testimony would be limited to describing facts.  He will not be then permitted to say, In your opinion, is this something?

That then it seems to me would require that he be previously disclosed and giving a report and all kinds of other things.

It seems to me, though, that if he is limiting himself to saying, This is a screenshot and this is what shows up when I do action "X", this is result "Y."  When I do action "Y"...

But there is, with any technical witness -- and I can understand why a systems administrator who is a technical person would be the one called to do this -- that there is the potential that without being asked, In your opinion, this does this, that opinion testimony will somehow come out.  And so I'll have to listen hard, and you'll have to make objections if you believe that it goes beyond simply a description of one event and the resulting event.  Without explanations to why those things take place.

And with that, then, you're free to call him as a witness and have him testify about those events.  Seems to me it is like the testimony we got yesterday, but it goes a little further than the witness yesterday went.  It is helpful to the trier of fact to actually see the accused product as it would appear on a computer screen.  And I take it, then, all of these -- this commentary, user, activate, action screen on the device, enter their

e-mail, these are actual words that appear and nothing that he's added.

MR. McDONALD:  Correct, your Honor.

THE COURT:  That's the part I'm trying to confirm in it.  The only thing he's adding are those edits with respect to password names and those kinds of things.

MR. McDONALD:  That's exactly correct, your Honor.

MS. DeBRUIN:  He is adding the headings, or I should say the law firm is adding the headings, your Honor.

THE COURT:  I had heard that you all were prepared to remove the headings to the slides themselves so that all we would see on the screen are the screenshots.  Because in the headings, sending a command, whether or not these are commands is an issue for -- of fact in the case.  And are given a definition. I'm somewhat concerned that that will convert his testimony into opinion testimony.  Because it's only an expert who would understand the difference between a command and an e-mail message, for example, which might not be a command.

MR. McDONALD:  So, your Honor, I've been informed that because of the slow speed of the WiFi connection here, we've been unable to get the conversion without

titles.

THE COURT:  Well, I thought these were slides.

MR. McDONALD:  They are slides, your Honor.  But it's an electronic file.

THE COURT:  I'm sorry?

MR. McDONALD:  It's an electronic file sitting on our server back at the office.

MR. GILLESPIE:  We have it.

MR. McDONALD:  I just learned that we now have it without titles.

THE COURT:  See how technology can save you?

(General laughter)

THE COURT:  You will receive in the course of your morning the ruling -- you were up till midnight; so was I.  We gave you a ruling today on the matter on the measure of damages.  I understand it's a witness that's not coming till Tuesday anyway.  I was somewhat concerned about getting it to you quickly enough.

Well, enough said.  So summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

It's Friday.  You've now survived spring, and you're now well into the second or third day of summer. I hope you're all feeling better and hanging in there.

JUROR NUMBER 1:  Yeah.

THE COURT:  You look okay to me.

All right.  Call your next witness.

MR. McDONALD:  Your Honor, Mformation calls Matthew Wilson to the witness stand.

THE COURT:  Good morning, Mr. Wilson.  Come all the way here and be sworn by the Clerk of the Court.

DEPUTY CLERK:  Counsel, is it Matthew or James Wilson?

MR. McDONALD:  It's Matthew.

(Witness sworn)

DEPUTY CLERK:  Please be seated and speak clearly into the microphone.  Please state your full name and spell your last name.

THE WITNESS:  Matthew L. Wilson, W-i-l-s-o-n.

MATTHEW L. WILSON,

    called as a witness by the Plaintiff,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. McDONALD:

Q.  Good morning, Mr. Wilson.  What do you do for a living?

A.  I work as a systems operations manager for Foley & Lardner.

THE COURT:  Keep your voice up.  You're

soft-spoken.

THE WITNESS:  Sure, okay.

BY MR. McDONALD:

Q.  And how long have you been employed by Foley & Lardner?

A.  Since December 2004.

Q.  Within the scope of your job duties, do you work with RIM's BES server product?

A.  Yes.

Q.  What do you do with RIM's BES server product?

A.  In our group, we install, manage and configure the BES administrator to BlackBerry devices.

Q.  And before we go into the details of your job, I'd like to get a brief background.  Did you go to college, Mr. Wilson?

A.  Yes.

Q.  Where did --

A.  I attended University of Wisconsin, Milwaukee. Graduated 2001 with a bachelor's in management information systems.

Q.  Do you have any other degrees?

A.  I do.  I graduated from the Concordia University of Wisconsin with a master's in finance.

Q.  And I believe you said you joined Foley in 2004; is that --

A.   Correct.

Q.   What was your first position at Foley & Lardner when you joined in 2004?

A.   I started as a network engineer, Level 3.

Q.   Did your work in that position involve RIM's BES product?

A.   Yes.

Q.   How so?

A.   We had four BES 3.6 servers at that time.  And I was part of a team of two that administered the servers.

Q.   When you say "BES 3.6," what did that mean?

A.   That's the BlackBerry Enterprise Server Version 3.6.

Q.   Three-point-six?

A.   Yes.

Q.   Was there a time when Foley & Lardner transitioned from BES 3.6 to another version of BES?

A.   Yes.  2005 we installed 4.0.

Q.   And does your work today still involve the use of RIM's BES products?

A.   Yes.

Q.   What version of BES do you currently use?

A.   5.0.

Q.   And how many BlackBerry devices are you currently managing using BES 5.0?

A.   A little over 600.

Q.  Mr. Wilson, I'm going to ask you to constrain your answers to the time period from late 2008 to March of 2009.  Can you do that?

A.  Yes.

Q.  And the reason I do that is because that's before the time period that Foley & Lardner received this case and started representing Mformation Technologies.

Now, Mr. Wilson, do you perform enterprise activation -- did you perform enterprise activation in the time period late 2008 to March 2009?

A.  Yes.

Q.  And which version of BES did you use to do that?

A.  That would have been 4.1.

Q.  And do you remember whether you did so wirelessly?

A.  Yes.

Q.  How did you do registrations with BES 3.6 prior to that?

A.  It was through a USB cable, so a hard-wired cable.

Q.  You were able to do wireless enterprise activation with BES 3.6?

A.  I do not believe so, no.

Q.  Since you transitioned at Foley to BES 4.0 and -- have you performed wireless -- withdrawn, your Honor.

Taking BES 5.0, that's the version you're currently using?

A.  Yes.

Q.  Have you performed wireless enterprise activation using BES 5.0?

A.  Can you repeat the question?

Q.  Sure.  Have you performed wireless enterprise activation using BES 5.0?

A.  Yes.

Q.  How frequently do you do so?

A.  I would say in my current role it's maybe on a monthly basis.  But in previous roles, in the 2008 to 2009 timeframe, it was multiple times a week.

Q.  Okay.  And how many times total would you say you've done so?

A.  Over a hundred in the course of the eight years that I've been at Foley & Lardner.

Q.  Okay.  And using BES 5.0, have you ever done an enterprise activation with a hard-wired connection?

A.  No.

        MR. McDONALD:  Can we see the demonstrative, please.

        If we can enlarge the entire screen, Chris, make that a little bit larger.

BY MR. McDONALD:

Q.  Mr. Wilson, are you familiar with what's shown on the screen right now?

A.  Yes.

Q.  What is this?

A.  This is the BlackBerry administration console in 5.0.

Q.  Is that BES 5.0?

A.  Correct.

Q.  And how is it that you're familiar with this?

A.  This is the main portal page that is displayed once you log into the administration console.

Q.  And who took this image?

A.  I did.

Q.  And when did you do so?

A.  When did I?

Q.  Yes.

A.  June 13th.

Q.  Do you know any more specific date -- withdrawn.

I'd like you to please walk through the -- for the jury, the process of performing a wireless enterprise activation.  Can you do that starting with this slide?

A.  Sure.  The first thing that we would do, I click on "create a user."

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.  And is that the highlighted text under user?

A.  Yes.

Q.   Okay.  And then what happens next?

A.   It takes you to the next page where you would search for the user you're going to create on the BES.

MR. McDONALD:  Next slide, please.  Enlarge just the right-hand portion of that.

BY MR. McDONALD:

Q.   What is this, Mr. Wilson?

A.   This is the e-mail address search field, so I've -- in this screenshot I've typed in my e-mail address and clicked on "search" to search for the user account.

Q.   Why did you type in your e-mail address?

A.   I was in the process of attempting to enterprise activate my BlackBerry device.

Q.   I see.  So whichever one -- whichever device you wanted to activate, which e-mail, you would just put it in that search box; is that correct?

A.   Correct.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   What happens next, Mr. Wilson?

THE COURT:  Let me clarify, the question has been asked, I want to clarify for the jury, you're seeing an illustration of this witness is using the BlackBerry system for purposes of the litigation.  In other words, this is not a display of what was done during 2008 and

2009, which I thought was the restriction.  I'm not sure what that restriction relates to.  This is actually something he did a couple of days ago, and he did it as an illustration so you could appreciate how it operates.  So the user information that he's putting in are things that he put in for purposes of illustrating to you how the -- this system would operate when he puts in those various inputs.

And I've restricted him -- to anticipate the limitations, I've restricted him to describing what he does and what happens.  And I understand that will be the nature of the testimony.

Go ahead, Counsel.

MR. McDONALD:  Thank you, your Honor.

Next slide, please.

BY MR. McDONALD:

Q.  Now, what's the next step, Mr. Wilson?

A.  So it displays the results of the search.  As you can see, my e-mail address is highlighted there, so it found me within the messaging system.  The second highlighted item is the BES server that the account would be activated against, and we have four BES servers.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.  And what's it doing here, Mr. Wilson?

A.   This is just a screenshot showing that it found my account.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   And then what's happening here, Mr. Wilson?

A.   This, by default it selects the first BES.  In this example I left it as the default, but you could select any one of the BES servers to activate the device.

Q.   How do you select it?

A.   Simply by left-clicking on a mouse.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   And then what hoops here, Mr. Wilson?

A.   When you click on the "create a user" with activation password, it takes all the information on the current screen, and you go to the next screen where you can set the enterprise activation password.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   And what's happening here, Mr. Wilson?

A.   This is where we set the activation password that will be later entered on the device to wirelessly register.

Q.   And how do you choose the activation password?

A.   At Foley we have a standard activation password that

our technology users use.  That way it's common and familiar, but it's the same one, so I'm not going to disclose it today.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   Then what's happening here, Mr. Wilson?

A.   This is a summary screen of the user, and also indicates that there was a default IT policy applied, and when activating an account, by default, they will receive a policy, and the other highlighted items that indicate that -- the user has been created and added to the BlackBerry enterprise server, so the BES one, the previous screenshots, that's where the user is now present.

Q.   Next -- I'm sorry.

A.   The only thing I was going to add is the next step is going to the device, the enterprise activation screen, and that's the next screenshot that we have.

Q.   So this is still the same screen and this is just referring to that action of creating enabled user; is that correct?

A.   Yes.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   And you discussed this already.  Is that right,

Mr. Wilson?

A.   Yes.

MR. McDONALD:  Next slide, please.

Actually, let's go back one slide.

BY MR. McDONALD:

Q.   Do you see the IT policy default there?

A.   Yes.

Q.   What is that?

A.   The IT policy is a set of configurations wrapped up into a policy that are applied to a device.  For example, the policies that we apply at Foley are password-related, so the password, the number of characters, the type of characters that could be used, and also the time out of the device, so if it's not locked, when does it lock to protect the data on the device.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   What is that, Mr. Wilson?

A.   This is my BlackBerry where I have entered in the e-mail address, and the activation password that I entered on the BlackBerry Enterprise Server.

Q.   So this is now on the device?

A.   Yes.

Q.   And is the device connected in any way with a wire to

the server?

A.   No, this was one, this was a screenshot done at my house, and I was not at work, connected to anything.

Q.   And I think you already said the server -- is that activation password entered into the device?

A.   Yes.

Q.   And how do you get to this screen on the device to do so?

A.   That's under "Options" and "Advanced settings" and "Enterprise Activation."

Q.   Fairly straightforward menu?

A.   Yes.

        MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   What's happening here, Mr. Wilson?

A.   This is after I've clicked the "activate" button on the previous screen, and it's starting to activate the device.

        MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.   What's happening here, Mr. Wilson?

A.   In this slide I am searching for my account.

Q.   Let's stop for just a second.  The slides that we saw before this one, from the first slide up until the device slides, after the device has completed that

process, is wireless enterprise activation complete?

A.   Yes.

Q.   And when you did this, and in the course of your work, how long does it take you to enter those commands on the BES server?

A.   Five minutes.  Not that long.

Q.   And how did you know how to enter those commands? How did you learn how to do this?

A.   Through documentation, either the administration installation guides provided by -- on their website, KB articles, as well as user groups and sessions at the Wireless Enterprise Symposium.

Q.   So you do this in a way that you learned from RIM to do it?

A.   Yes.

Q.   Now, at Foley & Lardner, does your group have a service contract of some kind with Research In Motion, RIM?

A.   Yes.

Q.   To provide technical support?

A.   Yes.

Q.   And have you ever called RIM for technical support issues relating to use of the BES?

A.   Yes.

Q.   Have you ever called RIM's technical support service

in relation to wireless enterprise activation?

A.   Yes.

Q.   Have you done so in that time period from late 2008 to March 2009?

A.   Possibly.  I don't remember the dates.

Q.   Possibly?

A.   I have had probably over a hundred support calls over the past eight years, so...

Q.   Let's talk about just the support calls where you called RIM technical support with an issue with having wireless enterprise activation.  Do you remember making such calls?

        MS. DeBRUIN:  Objection, your Honor.  The witness just said he didn't recall whether that was in the period that we're speaking about.

        MR. McDONALD:  He was talking generally, your Honor.

        THE COURT:  I understand.  May I see counsel at the sidebar.

        (At the sidebar, out of the hearing of the jury and the court reporter.)

BY MR. McDONALD:

Q.   Mr. Wilson, how long does it take to do the entire process of enterprise activation as you've shown it here today?

A.   It depends on the volume of data within the user's account, such as items or tasks or e-mails, but typically it's anywhere from 10 minutes to 60 minutes.

Q.   What's an average time period for that process?

A.   Average is 15 to 20 minutes.

Q.   Have you also used the BES to send a command to a device?

A.   Yes.

Q.   Mr. Wilson, do you recognize this slide?

A.   Yes.  So the previous slide we were searching for my last name, you'll see the results of the search.  And there are several Wilsons.  I've selected my account so that I can change my IT policy from default to something else.

Q.   And how do you select these items?

A.   Simply by clicking on the link.

        MR. McDONALD:  Next slide, please.

Q.   And is that showing the item that you're going to select?

A.   Correct.

        MR. McDONALD:  Next slide, please.

        Next slide please.

BY MR. McDONALD:

Q.   And what's shown here, Mr. Wilson?

A.   So this is the summary screen for my account on the

BlackBerry Enterprise Server.  We're currently on the user information tab, and I've highlighted the policies tab because that's where you go to set an IT policy.

MR. McDONALD:  Next slide, please.

Next slide, please.

BY MR. McDONALD:

Q.  What's being shown here, Mr. Wilson?

A.  So here it shows the policy that's currently applied to my device, which is the default policy.  And I have chosen to edit the user so that I can change the policy applied to my user and my device.

MR. McDONALD:  Please enlarge the center portion of the screen, "IT Policy."

BY MR. McDONALD:

Q.  What's shown there, Mr. Wilson?

A.  This shows the policy that's currently applied to my user account.

Q.  And then did you click "edit user" to change that?

A.  Yes.

MR. McDONALD:  Next slide, please.

Next slide, please.

BY MR. McDONALD:

Q.  What's being shown here, Mr. Wilson?

A.  This shows the drop-down menu where you can select an IT policy.  I've chosen the Foley default, which has our

default configuration for our Foley policy of smartphones, and then also applies a configuration for a little bit faster lock.  So instead of the 60 minutes, which is the default, I have set to a lower amount, because I like it locking faster.  So...

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.  And what happens here, Mr. Wilson?

A.  This is where we save the configuration of the selected IT policy.

MR. McDONALD:  Next slide, please.

Next slide, please.

BY MR. McDONALD:

Q.  What's happening here, Mr. Wilson?

A.  This shows the user has been updated with the new IT policy of Foley default - fast lock.

Q.  Has that IT policy been sent from the server to the device?

A.  The user's been updated, the IT policy is sent once the device is under coverage, and that can take some time.

MR. McDONALD:  Next slide, please.

BY MR. McDONALD:

Q.  This portion of the slide, just where you were sending the command that we just saw for that IT policy,

how long did that take you to complete?

A.   Two minutes.

Q.   And is that typical for sending a command from the BES to a device?

A.   Yes.

Q.   And you don't have to have the device anywhere here the BES physically, is that fair to say?

A.   Correct.

Q.   So there doesn't have to be any wired connection or anything?

A.   No.

Q.   And, Mr. Wilson, have you in the relevant time period that I wanted to limit your testimony to, that late 2008 to March 2009, did you ever use BES to send a kill command?

A.   Yes.

Q.   What is a "kill command"?

A.   Basically allows you to wipe the device to protect the data that's on the device so it doesn't get into the wrong hands.

Q.   I see.  And how long does it take you to send a kill command using BES?

A.   Again, under two minutes.

          MR. McDONALD:  I have no further questions, your Honor.

THE COURT:  Very well.

You may cross-examine.

MS. DeBRUIN:  Thank you, your Honor.

CROSS EXAMINATION

BY MS. DeBRUIN:

Q.  Good morning, Mr. Wilson.

A.  Good morning.

Q.  Do you have a BlackBerry device?

A.  I do.

Q.  Do you use that for your e-mail?

A.  I do.

Q.  You can also use your BlackBerry device to keep your calendar.  Do you do that?

A.  Yes.

Q.  How about your contacts?

A.  Yes.

Q.  Do you ever use it to surf the Internet?

A.  I do.

Q.  Do you ever use the camera on the device?

A.  Yes.

Q.  What other features do you use on the BlackBerry device?

A.  Texting, various applications.

Q.  Do you use it as a cell phone?

A.  Yes.

Q.   Now, you testified that you've used wireless enterprise activation to activate devices at Foley; is that right?

A.   Correct.

Q.   You're aware that BES 4.0 can still support wired activation of BlackBerry devices, correct?

A.   Correct.

Q.   And you're aware that BES 5.0 still supports wired activation of BlackBerry devices, correct?

A.   I did not know that.  But I do now.

Q.   Now, let's talk about where you work.  You work for a law firm, right?

A.   Correct.

Q.   And I just want to make sure this is clear, because counsel went over it kind of quickly.  You work for a law firm called Foley & Lardner, right?

A.   Correct.

Q.   Are there any other people in this courtroom who work for Foley & Lardner?

A.   Yes.

Q.   Are those the individuals who are seated at counsel table here behind me?

A.   Yes, some of those individuals.

Q.   All of the individuals other than Dr. Kushwaha, correct?

A.  Yes.

Q.  Now, you live in Wisconsin; is that right?

A.  Yes.

Q.  You live in Mequon?

A.  Yes.

Q.  Do you work in Milwaukee?

A.  I do.

Q.  When did you travel here to California?

A.  Yesterday.

Q.  I take it that your law firm is paying for your travel here?

A.  Yes.

Q.  And I take it you're being paid as an employee of your law firm to be here?

A.  No, I'm not --

Q.  You hope so.

A.  I'm not being paid any extra than my normal salary.

Q.  But you're being paid your normal salary?

A.  Yes.

        MS. DeBRUIN:  May I have a moment, your Honor?

        THE COURT:  Certainly.

        MS. DeBRUIN:  Thank you, Mr. Wilson.  No more questions.

        THE COURT:  Very well.  I presume no redirect.

        MR. McDONALD:  I would like a short commentary on

the witness's testimony.

THE COURT:  Let's see whether or not he's excused.  Is the witness excused?

MS. DeBRUIN:  He is, your Honor.

THE COURT:  Very well.  The witness is excused.

Thank you very much, sir.  You're excused.

THE WITNESS:  Thank you.

(The witness exits the witness stand.)

THE COURT:  Very well.  You're free to comment.

MR. McDONALD:  Ladies and gentlemen of the jury, part of the reason I wanted Mr. Wilson to testify here today is to show you exactly what is done in the BES to manage devices to give you a feel for how easy it is to just click these menus and get things done, as you heard the witness testify, in a matter of minutes.

And as the Court will instruct you, part of my client's burden, Mformation's burden, is to prove that people in the real world do these things to directly infringe Mformation's patent.  Mr. Hatcher testified yesterday as to the account's actions he did.  Wireless enterprise activation, and sending command.  These are the same things that Mr. Wilson just showed you.  These are the acts that directly infringe the method claims asserted by Mformation in this case.

Thank you.

MS. DeBRUIN:  Good morning.  What you've heard today is how well the BlackBerry products work. Mr. Wilson told you that he can quickly use the BlackBerry products to do various functions.  That's because of RIM's hard work in making a good product that people like and that people use.

Now, counsel mentioned that he put on his testimony from his law firm's own employee trying to show that someone has directly infringed the patent. There's one thing you're going to be asked to consider at the end of the case, and we'll talk more about this later.  But you're going to be asked to look at whether RIM somehow contributed to that infringement.  And one thing I just want you to keep in mind is you can also do wired activation and wired commands using the BlackBerry system.  That's one thing -- it won't make very much sense right now, and I'm sure all the pieces that you need to put together aren't there yet for you, but just keep that in mind.  This witness told you that you could do wired activation.

Thank you very much.

THE COURT:  Very well.  Call your next witness.

MR. THAKUR:  Your Honor, we're going to play a couple of videotapes from RIM's employees.

The first videotape is, Mformation's going to be

playing portions of the videotaped deposition of Jeffrey

Schnurr, S-c-h-n-u-r-r.  At the time of the deposition,

Mr. Schnurr was vice-president/controller at Research In

Motion.

Additionally, Mformation will be publishing Trial

Exhibits 1027, 1028, 1029, 1030, 1031, 1032, 1033, 1035,

1036, which are all admitted by stipulation.

(Whereupon, excerpts of videotaped deposition of

Jeffrey Schnurr, held May 13, 2011, was played

for the jury.)

THE COURT:  How much longer is this?

MR. THAKUR:  Could you pause it real quick?

Your Honor, we believe it's about halfway.

THE COURT:  Part of the Court's concern, members

of the jury, is the use of time.  If this were to be

read, of course, we could read it much faster and not

necessarily have to wait through the pauses that

sometimes witnesses go through in discovery at a

deposition; and not before a jury, time is sometimes not

as precious because they have greater time.

So I am somewhat concerned with the amount of

time that this is taking just to watch the witness

reading, and I'm tempted to, if you have the transcript,

if this information is important, to have you just

simply read the testimony.  We can do that in a much

shorter period of time than is being taken watching the witness study these materials.

MR. THAKUR:  Your Honor, we will follow your lead.  So how would you like it done?

THE COURT:  Well, if you tell me we're only halfway, that's my lead.  Let's get this in and not spend the time that we're spending here having the witness do that.  You can even do it responsively; that is, put someone on the witness stand to read the portions that you otherwise would have -- we have a flavor for the witness and the kinds of questions that are being put to the witness.  But it just seems to me it's unduly consumptive of time to have it done in this way.

So if you have the transcript and we can do that, I would ask you to --

MR. THAKUR:  May I have 60 seconds to coordinate that?

THE COURT:  I'm hoping that the time taken to set it up isn't as long as...

MR. THAKUR:  Sorry about that.

Your Honor, I do have one additional request. May I be excused from this court?  In light of your suggestion, I think we may get done with our testimony this morning a little bit faster than we anticipated.

THE COURT:  Sure.

MR. THAKUR:  So I can get the afternoon witness.

Thank you.

THE COURT:  Are we ready to resume?

MR. ARNTSEN:  I'll be the witness.

THE COURT:  Just to give you a flavor of the questions and answers so we don't have to say "question" and say "answer," we'll have the questions read by one lawyer and the answers read by a different lawyer, and that way we have a flavor for that.

Go ahead.

MR. McDONALD:  Your Honor, we'll display the exhibit that's referred to.  Thank you, your Honor.

(Whereupon continued excerpted testimony of Mr. Schnurr were read to the jury by Messrs. McDonald and Arntsen:)

BY MR. McDONALD:

Q.  Going back to "new IT policy," you said, "It's a combination of configurations for BlackBerry handhelds."

Is it something that's sent out wirelessly to the handheld from the BES?

A.  I don't remember if this version had that capability.

Q.  Okay.  Ticket Number 2732182, that's a RIM support ticket number; is that right?

A.  Yes.

Q.   Okay, and this particular ticket was created by someone at -- because someone at Coca-Cola contacted RIM support stating the issue that's stated right here; isn't that right?

A.   I don't know what the customer stated when they called.

Q.   I understand that, but when we read this text, isn't the most reasonable interpretation that you would make that someone at Coca-Cola contacted RIM customer support and stated something that resulted in the creation of this ticket?

A.   There is a ticket and that is the way the issue is described.  I don't know how the ticket came to be.

Q.   But such a ticket is the standard way that an issue is worked on in RIM Customer Support, right?  There's an issue and a ticket is created.  Is that fair to say?

A.   Yes.

Q.   And this issue would be something that a customer had a concern about or a problem with?

A.   Yes.

Q.   Okay.  So isn't the most reasonable interpretation of this that someone at Coca-Cola sent out new IT policy to handhelds and there was slow sync?

     Let me withdraw that.  Let's take the "causing" part out of there.

Just the part, quote, "Sent out new IT policy to handhelds."  Don't you interpret that to mean that someone at Coca-Cola sent out new IT policy to handhelds?

A.  We have a ticket that says that, yes.

Q.  And that's the ticket we're looking at right now in Exhibit 1031, right?

A.  That's right.

Q.  Okay.  And is your interpretation of that ticket that someone at Coca-Cola sent out a new IT policy to handhelds?

A.  Yes.

Q.  Sure.  Is there a functionality within BES that allows an administrator at the BES to remove applications from a device wirelessly?

A.  I'm aware that an administrator, a BlackBerry Enterprise Server administrator can remove an application from a device without it being connected to a cable.  I don't know if that's the same thing you said.

Q.  There is some benefit to being able to remove an application from a device without it being connected to any cable.  Is that fair to say?

A.  Yes.

MR. McDONALD:  I would like to mark as

Exhibit 1032, a document bearing Production Numbers

RIM–MF2526701 through '6705.

BY MR. McDONALD:

Q.   Okay.  Mr. Schnurr, if you could please take a look

at the document marked as Exhibit 1032, that appears to

be an e-mail from you dated November 1, 2005, to several

people at RIM forwarding other e-mails.  Is that

correct?

A.   It appears to be, yes.

Q.   And the subject line is, "Re: Summary of the State

Farm Policy Key Issue for Sev1."  Do you see that?

A.   Yes.

Q.   Is that Sev1 referring to the Severity One meetings?

A.   Yes.

Q.   And at this time you were director of Premier

Support.  Is that right?

A.   I had many roles in this timeframe.  I don't recall

on this date what role I had.

Q.   Okay.  But it is your standard practice to include

your title in your signature line, right?

A.   Yes.

Q.   And in your e-mail you state:  "Brian, this is a

great summary, but for this audience I think it might be

too detailed."  Do you see that?

A.   Yes.

Q.   And in your e-mail, you state -- there's an error -- okay, so what would imply that you had read Brian's summary, which is pages two -- actually, it starts on page 2, and spans the remainder of Exhibit 1032.  Do you recall reading this, Brian Bernard's e-mail that begins on page 2 of Exhibit 1032?

A.   I don't remember writing this specific e-mail.

MR. McDONALD:  I would like to ask the court reporter to mark as Exhibit 1033 a document bearing Production Numbers RIM-MF 0517508 through 7512.

BY MR. McDONALD:

Q.   Mr. Schnurr, the document marked as Exhibit 1033 is a group of e-mails, the most recent of which was from Shaun Amyotte, dated November 23rd, 2006, and that forwards, two lines down, an e-mail from Anand Sinha, also dated November 23rd, 2006, that includes you as a cc recipient.  Do you see that?

A.   Uh-huh, yes.

Q.   Great.  Do you -- withdrawn.

Anand Sinha was one of the primary issued contacts, along with yourself mon the Coca-Cola concerns.  Is that correct?

A.   Yes.

Q.   And were you a primary issue contact with regard to Lehman Brothers' concerns around the time of

Exhibit 1033?

A.   I don't recall.

Q.   Could you please turn to page 2 of Exhibit 1033.

A.   Uh-huh.

Q.   There's an e-mail that starts around one-third of the page down from Sheila Montag to individuals including yourself as a cc recipient dated November 23rd, 2006. Do you see that?

A.   Yes.

Q.   Who's Sheila Montag?

A.   A support account management in Premier Support.

Q.   Did she report to you at this time?

A.   I don't remember.

Q.   The subject line of that e-mail read:  "Forward: SDT 00005826 BESX-4.x."  Do you see that?

A.   Yes.

Q.   What does "BESX" refer to?

A.   I don't remember what Sheila meant, but it would typically mean BlackBerry Enterprise Server for Microsoft Exchange.

Q.   Okay.  And the next text is "-4.x-."  Do you know what that -- do you know what's meant by that, typically?

A.   Typically, that's the version of the BlackBerry Enterprise Server software being referred to.

MR. McDONALD:  I would ask the court reporter to mark as Exhibit 1035 a document bearing Production Number RIM-MF0479682 through 9697.

THE WITNESS:  Thank you.

BY MR. McDONALD:

Q.  Mr. Schnurr, looking at the exhibit, the document marked 1035 --

A.  Uh-huh.

Q.  -- bears the title "Premier Support Customer Scorecard."  Do you see that?

A.  Yes.

Q.  Are you familiar with this document?

And while you're looking at that, I'm going to ask the court reporter to mark as Exhibit 1036 a document bearing Production Number RIM-MF047961.

(End of reading for live objection:)

MR. CHARFOOS:  I need to object.  There's an outstanding objection to a number of the exhibits despite Mr. Thakur's representation that there were not. In particular, 1036, RIM has objections to.  We have no problem with the testimony continuing, but I would ask that the -- that that exhibit not be published on the screen, not be admitted into evidence at this time.

THE COURT:  Do you have a quick response as to whether or not there has been stipulation with respect

to that?

MR. McDONALD:  I don't, your Honor.  We have no objection to not displaying that.

THE COURT:  Very well.

(Reading resumed:)

BY MR. McDONALD:

Q.  And the court reporter has just handed you the document marked Exhibit 1037 [sic].

A.  I have 1036 and 1035.

Q.  Correction.  Thank you.  The document marked Exhibit 1036, bearing Production Number RIM-MF0479681, is an e-mail from CSO Reporting & Analysis Admin dated December 25, 2006.  Do you see that?

A.  Yes.

Q.  Do you know what that means, "CSO Reporting and Analysis Admin"?

A.  It's an automated server.

Q.  At RIM?

A.  Yes.

Q.  What does "CSO" stand for?

A.  Customer support operations.

Q.  The recipients are ETPS – Premier Enterprise Support Group, and a list of individuals.  Do you see that?

A.  Yes.

Q.  At the time of this e-mail were you part of the ETPS

- Premier Enterprise Support Group e-mail list?

A. I don't recall.

Q. Do you recall if you were ever part of that group?

A. I was.

Q. Okay. Great. And I can represent to you that the document marked as Exhibit 1035, the spreadsheet that you have in your hand, is the attachment that was sent along with the e-mail marked as Exhibit 1036.

A. Okay.

Q. You stated that you didn't remember this particular document that has been marked as Exhibit 1035. Do you remember similar documents of this format?

A. Yes.

Q. Okay. And is this a standard report that's issued?

A. At the time this was a report that was issued regularly.

Q. Okay. What's the purpose of this Premier Support Customer Scorecard document that has been marked as Exhibit 1035?

A. The purpose is to summarize the status of Premier Support customers.

Q. If I could ask you to please turn to page 3 within Exhibit 1035.

A. Uh-huh.

Q. It has Production Number RIM-MF0479684. The row

number 1, "AT&T Corporate," do you see that in the customer column?

A.  Yes.

Q.  Then there's a column that has "ausmith" in it.  Do you see that?

A.  Yes.

Q.  Do you know what that column denotes?

A.  It's the name of the account support manager.

Q.  Within the Premier Support group?

A.  Yes.

Q.  And the next column I believe is labeled "Platform." Do you see that at the top?

A.  Yes.

Q.  And for instance, in the "AT&T Corporate" row, it reads, "MS Exchange."  Do you see that?

A.  Yes.

Q.  What does that designate?

A.  That's the version of the e-mail system software that the customer uses.

Q.  The next column reads "BES version."  Do you see that?

A.  Yes.

Q.  And for AT&T Corporate, the entry is "4.0."  Do you see that?

A.  Yes.

Q.   What does that designate?

A.   It designates the major code line of -- the major release of the BlackBerry Enterprise Server software.

Q.   And then the next column is "hot fix."  Do you see that?

Withdrawn.  The next column is "BES Service Packet."  Do you see that?

A.   Yes.

Q.   What does that mean?

A.   That's the minor version of the same software referred to by BES version.

Q.   So in the "AT&T Corporate" row, that column has the entry "4."  Do you see that?

A.   Yes.

Q.   What does that designate?

A.   They have Service Pack 4.

Q.   So within this document that we have marked as Exhibit 1035, for each customer that's listed in that row, you can determine what version of the BES they were using by looking at that column within their row; is that correct?

A.   Yes.

Q.   And the period for this particular version of the customer support score card is shown at the top of each of the pages as, quote:  Period:  November 25, 2006, to

December 25, 2006.  Do you see that?

A.  Yes.

Q.  What does that indicate?

A.  That's the -- those are the boundary dates for the report, so customers on file during that period would show up in the report.

Q.  Okay.  And at the bottom of each page within Exhibit 1035, on the left, in the footer, there's the text:  "Process information date:  December 25, 2006; Time:  11:40:17 p.m."  Do you see that?

A.  Yes.

Q.  Does that indicate the date and time that this report was run?

A.  Yes.

Q.  If you could please turn to page 10 within Exhibit 1035.  Toward the bottom, row 36, indicates: "Customer:  JPMorgan Chase."  Do you see that?

A.  Yes.

Q.  This indicates they were running BES 4.0 as of December 2006.  Is that correct?

A.  Yes.

Q.  But enterprise activation is inherently wireless, isn't it?

A.  Enterprise activation can be achieved with or without the use of a cable.

Q.   When you personally use the term "enterprise activation," are you referring to a function that can be achieved with or without the use of a cable?

A.   Yes.

Q.   Okay.  Are you aware of anyone at RIM other than yourself who, when using the term "enterprise activation," refers to a function that includes a wired connection to the device?

A.   The nature of the enterprise activation process can be achieved through, with or without using a cable, and I'm quite sure that there are others who would agree with that.

Q.   You stated, "The nature of the enterprise activation process."  What does that mean, "the nature of"?

A.   I think that's an extra word that doesn't change the meaning.  The enterprise activation process can be accomplished by using a cable or not using a cable.

Q.   If I understand the testimony correctly, you're saying enterprise activation can be done with a wired connection to the device; is that correct?

A.   Yes.

          (End of reading)

          MR. McDONALD:  Nothing further, your Honor.

          May I make a short comment on the video and the testimony?

THE COURT:  Certainly.  I presume that both designations were included there.

MR. McDONALD:  They were, your Honor.

Ladies and gentlemen of the jury, that clip, I thought it was important for you to see that clip in part because you heard Mr. Hatcher and Mr. Wilson talk about wireless enterprise activation as opposed to putting a wire into the device.  And one of RIM's defenses is that their product can be activated using a wire, and they're going to tell you that that's just as good as doing it wireless.  Or that they don't know that people do it wirelessly.

You saw on Exhibit 1031 that Mr. Schnurr testified about that when Coca-Cola was talking about enterprise activation, they thought just nine times out of ten would be okay.  And one of RIM's arguments is, a wired connection to the device is more reliable.  So to get that wireless connection, Coca-Cola was willing to put up with a 10 percent failure rate.  Only nine times out of ten is good enough.  Just so it could be wirelessly activated instead of having a wire attached to it.

And another purpose of these clips was to show you that every software company has customer service issues.  RIM's lawyers put documents in front of

Mr. Basu and Dr. Kushwaha showing customers that were unhappy.  Well, you know what, every company has customers who need help and are dissatisfied.

Thank you.

THE COURT:  You wish to comment?

MS. DeBRUIN:  Yes, your Honor.

First, with respect to the comment concerning Coca-Cola and the 90 percent success rate, that was when they were working on a trial.  Coca-Cola wanted to achieve 90 percent for the trial.  That's not what they wanted for their final use of the product.

Second, with respect to customers complaining, customers complain.  I think every company has some customer complaints.  RIM takes care of those customer complaints.  It doesn't blame other companies for their customer complaints, as Mformation is doing here.

Most importantly, you just heard from Mr. Hatcher, you've heard from Mr. Wilson, and now you've heard from Mr. Schnurr.  What you need to decide is whether RIM's products when used by people such as Mr. Wilson, an attorney from the plaintiff's law firm, were used by Mr. Hatcher, whether those products practice the recipe of the claims.

None of those witnesses, Mr. Hatcher, Mr. Wilson, or Mr. Schnurr, testified at all about performing the

recipe, performing the steps of the recipe.  What they were talking about was the final cookie that was baked.  And how you operate the RIM system.  But none of those witnesses had anything to say about performing the actual steps of the plaintiff's claim, which is what you are here to decide.

Thank you.

MR. McDONALD:  One minor point of clarification.  I believe Ms. DeBruin said Mr. Wilson was an attorney from Foley.  He's not an attorney.  He's just an IT administrator.

THE COURT:  It's now about 10:30.  We'll take our mid-morning break.  Come back at 10:45.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

DEPUTY CLERK:  Come to order.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may call your next witness.

MR. THAKUR:  Your Honor, just to sort of give you a direction where we're going with this, what we're trying to do is put all the fact evidence in.  We've put Mformation's fact evidence in.  We'll put fact evidence

in from what RIM said.  Be patient with us on the video because we'll get all the fact testimony from RIM in today.  So we're going to start with the next video.

THE COURT:  Very well.

Now, members of the jury, you should understand that often when witnesses are involved in a case of this kind, deposition testimony is the way that we have to present it because they might otherwise not be available to us.  So we're listening to deposition testimony, and sometimes that's very different in its feel than having a live witness on the stand.

You'll also understand that there are elements of these various claims, and I haven't given you my full instructions on the law, but I'm going to go through -- through those elements with you, and so the parties, knowing that, may present evidence on very precise issues that might not be obvious to you at this time. But I will continue to be concerned about the speed of the process because our job is to make sure it moves expeditiously for you.

And so if I find that material is not as relevant or is not coming in as quickly as we could otherwise get it in, I'll try and do it a different way.

So what is your next presentation?

MR. THAKUR:  The videotaped deposition of

Mr. Carl Cherry.  At the time of his deposition, Mr. Cherry was the director of the BlackBerry Enterprise Server Architecture Group at Research In Motion.

Additionally, we'll be publishing Trial Exhibit 496, which is admitted by stipulation.

Trial Exhibit 496, that's admitted by stipulation, correct?

MS. DeBRUIN:  That's correct.

THE COURT:  And sometimes, folks, our attention span -- we'd like to know a little bit about how long this can be so we can sort of plan ourselves.

(General laughter)

MR. THAKUR:  Well, I'll give you two directions, your Honor.  Mr. Cherry is the person at RIM who testified about the product, so he's actually been deposed multiple times.  In fact, he was deposed three times.  So we'll play deposition clips of each one.

THE COURT:  I understand, but how long?

MR. THAKUR:  28, 23 and 7, so that's what, 40, 50 minutes?

THE COURT:  Very well.  About 50 minutes.  Go ahead.

(Whereupon, excerpt of videotaped deposition of Mr. Carl Lloyd Cherry played for the jury.)

MR. THAKUR:  Your Honor, that concludes our first

video.

THE COURT:  Okay.

(Whereupon, excerpt of videotaped deposition of Mr. Carl L. Cherry were played for the jury.)

MR. THAKUR:  Your Honor, that concludes the second videotaped deposition of Mr. Cherry.

Just to explain the duplication, the first deposition primarily focused on 4.0; the second one, 5.0.

The third one is much shorter.  Only about 10 minutes.

(Whereupon, excerpt of videotaped deposition of Mr. Carl L. Cherry played for the jury.)

MR. THAKUR:  That is the end of Mr. Cherry.

We have only a couple of minutes left before noon for the lunch hour.  I was hoping to make one brief argument.  Would you prefer me to do that after lunch or should we go now and start five minutes later?

THE COURT:  Perhaps it would be more meaningful now than later, so I'll allow you to comment.

MR. THAKUR:  Thank you.  I'll keep my comments very brief.  I know it's the lunch hour.

When I started my opening statement, what I told you was:  Don't listen to what the lawyers say.  See the evidence.  Hear the evidence.  Okay.  What you saw was

evidence.  Not made-up defenses.

Number one, one of the things we've heard today is the device does wired activation.  I'm not going to argue, I want to tell you what Mr. Cherry said.  So let's go through option to enterprise activation. Enterprise activation is where the user is able to activate the device without connecting it to the PC of any kind.

Now, there is a theoretical possibility it may be wired.  But is RIM a wired company or are they the wireless company?

The second defense that we've heard today or over the course of this case is that they don't establish a connection.  Listen to the words of Mr. Carl Cherry. Enterprise activation is where the user is able to activate that device without connecting it to a PC of any kind.

The second time when he was asked about a connection, he testified as follows:

"Question:  And it's going to get pushed out preferably through the WiFi network to meet the least cost routing options, but if the WiFi is not available, then it will use the wireless network, correct?"

"A decision would be made, the router, the rest of the system has no knowledge of where the device is,

but the router will take the least cost routing if the device was connected to the BlackBerry Router by any means."

"Wherein, the connections is established based on a threshold condition is what they're saying here, least cost routing."

Second thing they said is if the device was connected if a BlackBerry Router by -- and I'll show the question where he answers that directly.

Okay.  That a WiFi connection is a least cost routing solution in comparison to the wireless network.

"WiFi is one of the ways the devices can connect out to the BlackBerry Router to perform least cost routing."

He didn't say, We do not connect.

That's all I have.

THE COURT:  Would you care to comment?

MR. MATUSCHAK:  Ladies and gentlemen, just a couple of quick points.  I know we all want to have lunch.  I know I do.

One, nothing you've seen today, nothing you've seen so far in this case, establishes the fundamental question you'll have to deal with, and that is, Do we practice their recipe?  Do we use their recipe?  There's bits and pieces of, yes, we do this here, we do this

there.  Nothing that you've seen so far has taken you through and shown in practice that recipe, and you won't see that.

On this issue of connection, and this is important because it's going to come up when their expert, who I think eventually is going to get on the stand, will try to go through this recipe.  What you'll see, what they've tried to do -- now, the Judge has told you he construes the claims with the words of what the claim mean, because it's important to understand those words in the context of the patent.  "Connection" has a special meaning in the context of the patent.  And that's what the Judge has said, and that's what we're going to be focusing on.

What they're going to do, what they've just done and what they'll do with the expert, is find every place in the RIM, whether it's an e-mail or a document or somebody says the word "connection," and say, See, they do a connection.  That's not the same thing.  That's not using check the way it was meant in the patent.  And you'll hear that from our expert, and you'll see it on Dr. Madisetti's cross-examination.

Thank you.

THE COURT:  Very well.

Members of the jury, we're letting you out a

little after noon, but we'll come back to the matter at about 1 o'clock.  Remember my admonitions.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

(Luncheon recess)

DEPUTY CLERK:  Come to order.

THE COURT:  Ready to proceed?

Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  Call your next witness.

MR. THAKUR:  Mformation calls Dr. Vijay Madisetti.

(Witness sworn)

DEPUTY CLERK:  Please be seated.  Speak clearly into the microphone.  State your full name and spell your last name.

THE WITNESS:  Vijay Madisetti, M-a-d-i-s-e-t-t-i.

VIJAY MADISETTI,

   called as a witness by the Plaintiff,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THAKUR:

   Q.  Good afternoon, Dr. Madisetti.

A.  Good afternoon, sir.

Q.  Before we get started with your testimony...

MR. THAKUR:  I have three exhibits I'd like move into evidence:  Exhibit 144, 860 and 865.  Any objection?

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  What are they?

MR. THAKUR:  144 --

THE COURT:  I know.  What are they?

MR. THAKUR:  They're technical documents that I'm going to use with the witness.

THE COURT:  Very well.  They're in evidence.

(Plaintiff's Exhibits 144, 860, 865 received in evidence)

BY MR. THAKUR:

Q.  Dr. Madisetti, what do you do for a living?

A.  I'm a professor at Georgia Tech.

Q.  And have you been asked to provide an opinion in this case?

A.  Yes, I have.

Q.  And briefly explain what you've been asked to opine on in this case?

A.  I've been asked to opine on whether the use of RIM's products infringe the '917 patent.  And whether the '917 patent is valid.

Q.   And have you arrived at a conclusion?

A.   Yes.

Q.   And what is your opinion?

A.   I have prepared a demonstrative.

THE COURT:  Let me interrupt.  Before we go to that, members of the jury, there are two or maybe more kind of witnesses who may testify in a case, and I should explain, you're about to hear opinion testimony from someone who is tendered as an expert in a particular field.  Ordinarily, witnesses are restricted to things that they observe, with their senses.  Facts. And there are some limited things to which laypeople can testify by way of an opinion, but ordinarily, they are limited to facts.

However, in a case like this, which involves a technical matter, as I've commented before, the parties are entitled to call for opinions in a particular field, and the person who's an expert in that field is able to express opinions about matters that you have to decide. One of the issues you will have to decide in this case is whether or not the patent, as I construe it, has been infringed by the defendant's product or service.

An expert can express an opinion about those matters.  Now, based upon the expert's background and qualifications and how they come to their opinion, you

should judge whether or not to give that opinion weight in making your own decision.  Experts in that regard are just like any other witness:  You can give their opinion great weight, little weight or no weight at all.  That's always a matter for you to decide.  It's not uncommon in cases of this kind for both sides to have expert witnesses and to give you the opportunity to evaluate the testimony of two different experts who are looking at the same thing and rendering contrary opinions.

Very well.  You may proceed.

MR. THAKUR:  Thank you, your Honor.

THE COURT:  And by the way, what is the area that you're tendering Dr. Madisetti as an expert, what field?

MR. THAKUR:  Your Honor, I was actually going to lay down the foundation, but we're tendering him in the area -- an expert in the area of wireless communication and specifically wireless device remote management.

THE COURT:  So wireless communication.  Very well.

MR. THAKUR:  Thank you, your Honor.

BY MR. THAKUR:

Q.  You said you have prepared a demonstrative.  Is this it (indicating)?

Is this the demonstrative you have prepared?

A.  Yes, this is the set of demonstratives I have

prepared for this matter, yes.

Q.  So you said that -- I'll go ahead and try to move along the demonstrative for ease of presentation.  You said you had provided an opinion on infringement.  What is that opinion?

A.  Yes, as noted in this demonstrative that I have prepared, my opinion on infringement is that the use of Research In Motion's BlackBerry Enterprise Server, Versions 4 and later, which is 4.0, 4.1 and 5.0, in combination with RIM's BlackBerry handhelds, infringes Claims 1, 6, 21 through 25, and 27 of the U.S. Patent 6,970,917, which is the '917 patent.

Q.  Before we go on, would you kindly explain what is meant there by "Versions 4.0 and later"?

A.  Refers to version release numbers.  So, for example, Version 4 has a certain set of features.  And Version 5 is some upgrade of the same product but with a new set of features.  So -- and typically, 4.0, 4.1 are smaller changes that are usually eliminating bugs or adding some smaller set of features.

So the major changes would be between 4 and 5.

Q.  Thank you.

So before I come back to this, perhaps we could talk a little bit about your background and what you've done to prepare for this.

Where are you currently employed?

A.   Would you please repeat.

Q.   By whom are you currently employed?

A.   Professor at Georgia Institute of Technology in Atlanta, Georgia.

Q.   What is your position?

A.   I'm a professor of electrical and computer engineering.

Q.   And how long have you been there?

A.   I've been teaching since 1989, which is about 23 years.

Q.   How many courses do you teach a year?

A.   Typically, three courses.

Q.   And have you received any teaching awards in the past?

A.   Yes.  I've received several teaching awards.  I received "Great Teacher" awards in 2008 and 2010.

Q.   And you said you were teaching courses.  Are you teaching courses this year?

A.   This year, yes, I'm teaching courses this year.  I usually teach three courses a year.

Q.   In addition to teaching, do you do anything else?

A.   Yes, in addition to teaching, I do research and advise PhD students.

Q.   And how many PhD students do you advise?

A.   I have graduated about two dozen PhD students, and I currently supervise half a dozen PhD students.

Q.   When they graduate, they take the title "doctor," correct?

A.   Yes, they get a PhD and they go to teach or join the industry.

Q.   And have you written, authored articles in the field of wireless communications?

A.   Uh-huh, yes.  I've authored more than a hundred peer-reviewed papers over the past 20 years.

Q.   And out of these, how many relate to wireless communications?

A.   A majority, I would say 50 to 60 percent, relate to wireless communications and associated hardware and software.

Q.   Have you written some papers -- withdraw that.

        Have you published any papers?

A.   Yes.  As I mentioned, I've published over a hundred peer-reviewed papers, and I've published five or six papers in the past few months.

Q.   Would you describe what one in the field of wireless communications?

A.   Yes, last month I published a paper in the area of -- in a journal called *Proceedings Of The IEEE*, and this is called "The Future of Cellular and Wireless

Applications."  And what we may expect to see new applications do in using 4G and other types of methods. This was published last month in the *Proceedings Of The IEEE*.

Q.  And you mention I-triple-E.  What is I-triple-E?

A.  IEEE is one of the largest engineering organizations in the world.  It has about 400,000 members throughout the world.  And it's the main organization for electrical and computer engineers.

Q.  And you are a member of the IEEE?

A.  Yes, I'm a fellow of the IEEE.

Q.  What is a "fellow"?

A.  A fellow is the highest grade of membership, and it's usually awarded to one percent of -- one-tenth of one percent each year.  So every year 300 to 400 members are elected to the membership grade of a fellow.  Based on their accomplishments.

Q.  Have you been recognized in other capacities in your profession?

A.  Yes.  I have received several awards, and one of them that I'm particularly proud of is the Frederick Emmons Terman Award from the American Society of Engineering Education and Hewlett-Packard Corporation in 2006, that recognizes contributions to electrical engineering while under the age of 45.

Q.   And have you written any books?

A.   Yes.  I've written, starting in 1995, I've authored more than half a dozen books, and in the area of signal processing, communications, hardware, software, and most recently I completed editing a handbook on signal processing, three volumes, published by CRC Press in 2011.

MR. THAKUR:  860, please.

BY MR. THAKUR:

Q.   What is this document?

A.   This is my CV that I provided for this matter.

Q.   And CV being the same as resume?

A.   Yes, it's my resume.

Q.   Can we take a look at page 6, please.

You mentioned your publishing books.  Are these some of the books you've published?

A.   Yes, these are some of the books that I published, and one of them is actually an electronic book, which is a CD-ROM that was also published by IEEE, which is the professional organization.  So these are some of the books that I've published and co-authored in the past few years.

Q.   Prior to teaching at Georgia Tech, what did you do?

A.   I studied at UC-Berkeley, got my PhD in 1989, so I spent five years in the Bay Area.

Q.   And what did you focus on at University of California Berkeley?

A.   It was on synchronization of signal processing applications, which is making sure they work correctly.

Q.   Perhaps I could quickly have you summarize your educational background.

A.   Yes.  Over the past 35 years I have taught and done research in the area of communications, hardware and software in communications, chip design, software design, and I've also done significant work in the mode of product development for commercial companies in the area of cellular and wireless software.

Q.   And did you receive any awards related to your education, in particular at UC-Berkeley?

A.   Yes, I received the Demetri Angelakos Outstanding Award in 1989, outstanding graduate student award, and -- in 1989.

     I also received the Georgia Tech Outstanding PhD Dissertation Advisor Award several years ago for guidance of PhD students.

Q.   And as part of your teaching research, do you write software at --

A.   I teach several courses at the graduate level and undergraduate level.  I teach both hardware and software design and languages for the same.  So I teach courses

in software design.  For example, ECE 6276 is a course I teach in DSP software systems every year.  And it focuses on algorithms and software for signal processing and wireless communications.

I also teach single courses, RC 6276.  That's hardware design, chip design, and that involves languages as well.  So the languages I typically use are HTML, Java, C++ and UML.

Q.  Have you developed any patents yourself?

A.  Yes, I have been working over the past 10 years with several wireless companies.  For example, I've developed many of the speech codecs that are sitting in Sony Ericsson phones.  And I've also developed user IP products for Cisco phones.  And mainly for their enterprise phones.

And I've also been working with, in the hardware side, I have done a product of -- product development for companies like Boeing and Lockheed Martin where they have small chips that do avionics and guidance systems for the U.S. Navy and Department of Defense programs since around 1995.

Q.  So this is a patent case.  Do you know what a patent is?

A.  Yes.

Q.  What do you know based upon your experience of

patents?

A.   I have -- I've -- over the past 10 years I have filed about 20 provisional and patent applications, and I've been named company inventor on over 30 invention disclosures at Georgia Tech based on these.  And patents typically describe -- is a document that describes the scope of a particular invention, and in a form that people can evaluate what is novel and how to implement it.

Q.   And at Georgia Tech do you make a decision whether to file a patent or is that made by Georgia Tech?

A.   Georgia Tech makes the decision.

Q.   And you said you are the named inventor on some of these patents?

A.   No, Georgia Tech has to file them, and because of cost they make a decision on which patents to proceed further.

Q.   Okay.  Have you testified as an expert in a patent infringement case before?

A.   Yes.

Q.   How many times?

A.   I have testified at trial about eight times.

Q.   Do you testify for plaintiff or the defendant or both?

A.   For both.

Q.   So who have you testified for on behalf of the plaintiff?

MR. MATUSCHAK:  I'm going to object, your Honor. I don't think we should be getting into the names of litigants in other cases.  I think we've established that he's testified before.  We should be satisfied with that.  We're going to then try some other case here.

MR. THAKUR:  We're not trying another case, but just laying down the foundation that he's an expert in the field of wireless communications.

THE COURT:  The question has to do with for whom; namely, the company or the lawyers or what.

MR. THAKUR:  I'm going to ask him which companies he's testified for as an expert to establish that those companies --

THE COURT:  Overruled for now.

MR. THAKUR:  I'll be quick.

BY MR. THAKUR:

Q.   Who have you testify on behalf of the plaintiff?

A.   In four trials I've worked twice for Motorola and then once for the subsidiary of SanDisk, and then once for Mformation, this trial.

Q.   And have you represented a defendant in any case?

A.   Yes, in four trials, I've represented Acer, Asus, Kodak, and Vizio.

Q.   And have you worked for Foley & Lardner before?

A.   Before this case?

Q.   Yes.

A.   No.  This is the first time I'm working for Foley & Lardner.

Q.   And have you ever worked for Kirkland & Ellis law firm prior to this case?

A.   Yes, several times.

Q.   How many cases have you worked for RIM's lawyers in this case before?

A.   You mean for Kirkland?

Q.   Kirkland, sorry.  How many times have you been retained as an expert by Kirkland & Ellis?

A.   At least two times.

Q.   I see.  Any time since this case has been filed?

A.   No.

Q.   How did you get hired by Kirkland & Ellis?

        MR. MATUSCHAK:  Object, your Honor.

        THE COURT:  Sustained.

BY MR. THAKUR:

Q.   Have you ever done any work for RIM's other lawyers, Wilmer & Hale?

A.   No, sir.

        MR. THAKUR:  Your Honor, we would like to qualify Dr. Madisetti as an expert based upon his education and

experience.

THE COURT:  Yes, the Court's earlier judgment that we would recognize him, I thought you were tendering him in wireless communications, and it does seem that there are fields in which the Court would recognize him as an expert.  Go ahead.

MR. THAKUR:  Thank you, your Honor.

BY MR. THAKUR:

Q.   Now that we have gotten back to -- ready to get back to your testimony in this case, could you tell us how you first heard about this case?

A.   Yes.  I was preparing a presentation on patent law and how patents are awarded and how technology patents are used in the U.S. in early 2009, and this was a presentation I was giving in Europe on patent law, on patent technology, how technology in patents work together.  And I was looking at some online databases, one of them is called Pacer, and I was looking at how many cases are filed, what cases are filed, and then I stumbled on -- in around October or November of 2008, I stumbled on recertified cases.  There was one called Mformation, and I thought there was a typo in the name or something, and then I clicked on it and then I found that it was working from device management, and that's an area I worked in since the middle of 2004, 2005, and

I thought it would be a great case of -- in the area of my interest.  And so I sent you an e-mail message, I think sometime in end of October or early November, saying that this is an area that I'm qualified in.

Q.  Except for this case, have you reached out to counsel where you've been retained in any other cases?

A.  No.

Q.  So this is the first and only case where you have reached out to counsel where you have been retained as an expert?

A.  That's right, yes.

Q.  What did Mformation ask you to do for them in this case?

A.  They asked me to apply my knowledge and experience in evaluating the code's constructions and applying them to the '917 patent, and analyzing the use of RIM's products, and providing an opinion on infringement and methodology.

Q.  Were you deposed in this case as well?

A.  Yes, I was deposed twice.

Q.  So you mentioned that you were -- you prepared a demonstrative.  Is this the demonstrative that you have prepared (indicating)?

A.  Yes, I prepared a set of demonstratives, and this is it.  We can go to the demonstratives.

Q.  So let's talk a little bit about your opinion that you have formed here.  What was the basis of your opinion?

A.  Yes, I have.  The next will describe the basis for the opinion.  The first step I did was I reviewed the '917 patent, looked at the prosecution history, looked at the specification, the claims, and also the code construction, which is the Court's claim construction.

Then I reviewed RIM's technology, how they were, how they were designed, what were the features.  To do that I looked at the source code, I looked at the user manuals.  I looked at the specifications and also the deposition witness testimony, like, for example, Mr. Cherry that we just saw.

Then I applied the Court's construction and the claims, the language in the claims of the '917 patent, to provide an analysis of how the use of RIM's products applied to the claims of this patent.

Q.  You mentioned "claim construction."  What did you mean by that?

A.  That's the -- this Court has provided the claim construction that credits certain terms in the claims, and provided language on how they should be interpreted.

Q.  And did you use that interpretation?

A.   Yes, I accepted and used those in my analysis.

Q.   What else did you rely on in forming your opinion?

A.   Relied on my knowledge and experience in the field.

Q.   And did you review RIM's product in this case?

A.   Yes, I did.

Q.   Did you review the source code for RIM's products in this case?

A.   Yes, I did review the source code as well.

Q.   And did you rely on witness testimony in this case?

A.   Yes, I did.

Q.   And which witness testimony did you rely on?

A.   I will identify them as we go through the demonstratives, but I relied on Mr. Cherry, Mr. Allan and others.

Q.   So you mean RIM's witnesses?

A.   RIM's official witnesses.

Q.   And are you being compensated for your efforts?

A.   Yes, I am.

Q.   What is your hourly rate?

A.   It's my usual rate is $400 an hour.

Q.   That's the same rate you charge all your other times?

A.   Yes, it is.

Q.   How long have you spent on this case?

A.   In the past four years I've spent about a total of around 500 hours.

Q.   That seems like a lot of time.  Why has it taken you 500 hours?

A.   Over four years, there was a lot of source code that was produced, thousands of lines of source code.  There were lots of documentation.  There's a lot of testimony. I also prepared several reports and in preparation for the trial and so on.

Q.   Does your compensation depend whatsoever on the outcome of this case?

A.   No, it does not.

Q.   And for your work that has been performed, have you been paid in full?

A.   Yes, so far, yes.

Q.   I'd like to turn to this document.  What is that?

A.   That is the cover page of the '917 patent that's at issue in this matter.

Q.   And did you arrive at an understanding of the '917 patent claims?

A.   Yes, I did.

Q.   What did you do to arrive at that understanding?

A.   As I mentioned, I reviewed the '917 patent, the claims and the specification.  I reviewed the prosecution history.  As it was processed by the U.S. Patent office.  I also reviewed the Court's claim constructions and accepted them in my analysis.

Q.   Is that the claim on the left-hand side?

A.   Yes, it is.  That's Claim 1 of the '917 patent.
That's one of the asserted claims.

Q.   Perhaps you could walk us through the claim steps.  I
don't necessarily need you to repeat them but walk us
through what the steps are.

A.   Yes, this claim is a method claim.  A method claim is
something that prescribes a series of steps, so in some
sense it is a set of steps that this claim requires to
be practiced.  And in this case, the Court has construed
that remotely managing a wireless device over a wireless
network means using a server that is physically
separated from the wireless device to wirelessly control
the functionality of a wireless device, and the Court
has also construed a server, which is a device or
computer in a network that is dedicated to providing the
resources to the wireless device.

Q.   Is that the next step?

A.   Yes, that's the first step.  And describes -- the
first step is transmitting registration information
relating to running this device, from the wireless
device to the server.

Q.   This is the next step?

A.   Yes.  That is.  It's very fine for verifying the
registration.

Q.   And that is -- perhaps you could explain that to me.

A.   Yes.  Here, this is a term that has been construed by the Court as their construction.  It says:  "'Without a request from a wireless device' means that performing an enumerated step without transmission from the wireless device of a code, signal or any other form of request that initiates the commencement of the performance of the step."

Q.   What is the next step?

A.   The next steps again have the understanding that these are done without a request from the wireless device.

     And the next step is called "Establishing step or establishing a mailbox for the device at the server." And that was also construed by His Honor and the Court. It means creating an address in memory of the server that can store information intended for delivery to the wireless device.

Q.   The next step.

A.   This step is again done without request from the wireless device.  Another placing a command for the wireless device in the box at the server, which is construed by the Court as "storing at the server in the box associated with the wireless device a code or signal that is intended to cause the wireless device to take or

cease an action with respect to its functionality and other data for use by the wireless device."

Q.   Next step?

A.   The next step is the delivery step, and this delivery step has three substeps.  And you'll see here that the delivery, delivering the command from the mailbox at the server to the wireless device by establishing a connection between the wireless device and the server; transmitting the contents of the mailbox from the server to the wireless device; and accepting the contents of the mailbox at the wireless device.

These are three substeps that constitute delivery.

Q.   What is the next step?

A.   And here, what is done is that I've put in the Court's constructions for each of these substeps.  So the Court has construed:  "Establishing a connection between the wireless device and the server means initiating wireless communications between a wireless device and the server."

So that's how the Court has construed that.

And establishing a connection substep must be completed before the -- transmitting the contents of the mailbox substep can commence.

And finally, the Court has construed:

"Establishing a connection between the wireless device and the server wherein the connection is established based on a threshold condition."  And this means establishing a connection between the wireless device and the server based on a predefined state of the server or the wireless device other than solely the elapsing of time.

Q.  And what is the next step?

A.  This is the transmitting substep of the delivery step.  It says -- the Court's construction says: "'Transmitting the contents of the mailbox from the server to the wireless device' means wirelessly sending from the server to the wireless device the contents of the mailbox."

Q.  What is the next step?

A.  That is, it's a substep of accepting the contents of the mailbox at the wireless device.

Q.  And the next step?

A.  And it's executing the command at the wireless device.

Q.  So those are the steps to Claim 1 of the patent, correct?

A.  Yes, they are.

Q.  And how many claims did you analyze in this case?

A.  As I said earlier, it's Claim 1 and Claim 6 and

Claims 21 through 25, and Claim 27.

Q.   Perhaps if we could take a look at the next claim.

A.   Yes.  So Claim 6 is a dependent claim.  It's dependent on Claim 1, which is an independent claim.  So it means that it does everything that Claim 1 does, but in addition, it adds the limitation that information -- that transmitting information relating to the execution of a command at the wireless device -- from the wireless device to the server.

Q.   Could you walk us through Claims 21 through 27, please.

A.   Yes, Claims 21 through 27 are -- with the exception of 26 -- 21, 22, 23, 24, 25 and 27 are all dependent claims.  They all depend on Claim 1.  And they have these additional steps.  So Claim 21 says:  "The method of Claim 1, wherein the command comprises enabling/disabling access of the wireless device to the server."

And Claim 22 is again a dependent claim, wherein the command comprises enabling/disabling applications that you may run on the wireless device.

Q.   Claim 23 is?

A.   Claim 23 is, "The method of Claim 1, wherein the command comprises erasing all or part of contents of the wireless device."

Q.   And Claim 24, please.

A.   Claim 24 describes "the method of Claim 1, wherein the command comprises transmitting new programs and data to the wireless device."

Q.   Claim 25, please.

A.   Claim 25 is again dependent on Claim 1, "wherein the command comprises querying the current state of the wireless device."

Q.   And finally, Claim 27.

A.   And the Claim 27 is dependent on Claim 1, it's "the method of Claim 1, wherein the command comprises monitoring the location of the wireless device in the wireless network."

Q.   Okay.  Beside reviewing the patent, did you also review RIM's products?

A.   Yes, I did.

Q.   Could you tell us which RIM products you reviewed?

A.   The two, as exhibited in this demonstrative, I reviewed RIM's products that included the BlackBerry Enterprise Server, commonly called the BES, or B-E-S, which is Versions 4.0 and later.  That included 4.0, 4.1 and 5.0.

        And also BlackBerry handhelds that are used with the BES.

        So here's a graphic that describes how the BES

and the handheld work together so that the BES can
manage the handheld.

Q.   Could you give us an example of the BlackBerry
handheld?

A.   Yes.  Some examples, the product of the BlackBerry
handheld include the BlackBerry Bold, the BlackBerry
Torch, the BlackBerry Curve, the BlackBerry Storm 2, the
BlackBerry Pearl, as well as the BlackBerry Style.

Q.   Before I get into detail how the BlackBerry BES works
with the devices, perhaps you can explain to us the
documents that you reviewed to arrive at some of these
conclusions.

A.   Yes, I can.  There's a demonstrative on it.  So the
Trial Exhibit 2022 is a cover page document called
"BlackBerry Enterprise Server for Microsoft Exchange
Version 4.0 Feature and Technical Overview."  And it's
publicly available.

         The next document that is -- that I've reviewed
is Exhibit No. 0139.  And this is the cover page of the
BlackBerry Enterprise Server for Microsoft Exchange,
Version 4.1, Feature and Technical Overview," which is
also publicly available.

         And there is Exhibit 0144.  The cover page is
policy reference guide, "BlackBerry Enterprise Server
Policy Reference Guide, Version 33, Version 4.1."  This

is also publicly available document.

And this is Exhibit No. 0350, cover page is "BlackBerry Enterprise Server for Microsoft Exchange, Version 5.0," which is also publicly available.  And it's the feature and technical overview.

And there is Exhibit No. 0354, the cover page is the policy reference guide for the BlackBerry Enterprise Server, Version 5.0, and that is also publicly available.

And here are some documents that are internal RIM documents, and Exhibit No. 166 is "BlackBerry Wireless Enterprise Activation, Release 4.0."  The technical overview.

And then you have Exhibit No. 0496, which is the cover page of "Policy Server Component Overview, Version 0.4."  That's also a RIM internal document.

Q.  So based on these documents, did you arrive at an understanding of how that enterprise server works with the BlackBerry handhelds?

A.  Yes, based on these documents, as well as examination of the testimony, I have come to an opinion on how RIM's products work, and I can speak to them in the context of the claims.

Q.  Perhaps you could explain to us how the BES is to install.

A.   Yes, this is again a set of graphics that I've prepared that provide an illustration of how these products operate.  So let's assume there's a company called ABC Inc. that is trying to establish, install a BES.  It downloads the BES to a single package, a BES installer.  And they went onto its company's network and it's downloaded from RIM's location.

Q.   And the BES installer is a software product, right?

A.   The BES installer is a software product as outlined by Mr. Cherry earlier today.

Q.   Explain how a user would be added to the BES.

A.   Yes, let's say we're adding a user, a user's phone or a user's device to the BES server.  So the IP administrator of ABC Inc. provides a one-time device registration password that's only for that device.  And provides that over the phone or some other thing.  And that password here is for exemplary purposes, one, two, three, four.  And that's the first step, to provide that password.

          And then what the employee or the user of that device does is they open up this application on the phone called "enterprise activation," where they have the name there, and they also have the password provided by the IT administrator, and then click "activate."  Then it's showing the Exhibit No. 0166 on page 5.  So at

that point the user on the device activates it.  Presses "activate."

And so what is done on the phone on the device at that point is that the original 1234 is transformed to an -- that we'll explain in detail in a few minutes, so it's transformed to something that is QXTY, for purposes of so no one else can compromise that device by using the same password.  So that's transformed to QXZY, and that is sent down on the device.

And the next slide shows that this password, this transformed password, is sent from the device to the BES server.  So here it can use both WiFi or the cellular link.  So from BES Version 4.1, the cellular network -- sorry, the WiFi network would be used from 4.0 onwards, the cellular network could be used.  So you have two possible options of using network communication options, WiFi or cellular, to send the information back to the BES.

Q.  Clarify that.  So Version 4.0, you could do that only over the cellular network, correct?

A.  Yes, over the cellular network to the cellular communication network to -- for Versions 4.0 and higher.

Q.  And --

A.  And for WiFi, it's 4.1 and higher.

Q.  Thank you.  So what's the next step?

A.  So at that point the server receives this transformed password, and the server performs a verification of that.

Q.  And?

A.  And verification is a step where you verify the information against something that -- to confirm that it is allowed to do it.  So, for instance, I mean you could be at the White House at dinner, as an example, and you go and present yourself at the White House with your passport saying, I'm so-and-so.  Even though it establishes you're so-and-so, it does not verify you're actually invited to the dinner.  So the person at the gate would look at the list and say, Yes, you're on the list, so you're verified.

So what the server does is that it verifies it against some information that it already has because it provided that information to the device.  And thereafter, the verification, the transformed, is checked for possible matches.

Q.  What does it -- that it matches?

A.  At that point the employee's device is activated or registered with the BES.

Q.  And what happens after it's activated?

A.  After activation, ideally the IT policy command is sent.  As soon as it's registered, the IT prompt is

sent, and it's a command that tells if you're an employee of this particular company, they expect you to you have these applications, these security features, and send that directly to the device.

Q.   Is there a RIM document that explains that?

A.   This IT policy is sent over either the WiFi or the cellular network to established links.

Q.   Okay.  So what is RIM's document there?

A.   I think you need to take a step back.

Q.   Oh, sorry.

A.   So this is -- so, now, so we can step back one more slide.

Q.   Oh, sure.

A.   Yes.  So this step is described further in the next document, which is -- go to the next slide please.

You'll see it's Exhibit 2022, this is the "BlackBerry Enterprise Server for Microsoft Exchange Feature and Technical Overview."

Q.   And what is --

A.   Next slide.

This shows that there is an initial policy, IT policy command, that is sent, that allows you to customize your device for various types of -- so if you're in the system, you have a certain type of device compilation that is different from other types of

deploys.

Q.   Can you explain to us what is IT administration?

A.   So in addition to the IT policy command, there are other examples of commands that were also testified by Mr. Cherry.  They include the kill handheld, which wipes the device.  It includes send applications, to get password, and also set owner info.

Q.   And the next slide?

A.   And these are some of the documents that provide evidence that these are the plans that are supported. This is 4096, the cover page, which describes the policy server component overview.

So here, RIM's Exhibit 496 on page 15, provides confirmation that these commands are sent by the BES. So it talks about set IT policy, kill handheld, set owner info, and set password.  These are the commands that are confirmed in the documents.

So these are some of the specific examples of commands.  For example, Exhibit 496, on pages 1 and 16, talks about the send application.  And how the policy server sends a new application to the device.

Q.   Could you explain to us how these commands are sent?

A.   Yes.  So now that we have completed the enterprise activation -- in other words, the device is registered with the server -- there is an ITAdminQueue, and this

ITAdminQueue is a table that is resident at the BES. And at that point you have -- and this ITAdminQueue is created when the BES is first installed on this server.

And so here's an example of ITAdminQueue. Again, it's an example, so some of the language may be represented by Bates or by numbers -- so you have a PIN, which is an identification of the device. A PIN is an identification of the device. And you have the middle column is an example of a command. And then you have a status, which tells you -- status, that tells you what is the status of the processing of that command? Is it new, has it been sent, has it been received, has it been completed and so on.

We take an example of adding a new command. So at the BES we add a set IT policy command. Then it's given a status of new, which could be a number. And there's also PIN, 7890, that's associated with the device for which -- to whom this command is being sent.

Then what happens is, this command is packaged with a protocol, which is an end-to-end protocol, which is RIM's GME protocol, or gateway message envelope protocol. So the GME protocol adds a header, which has a source and a destination, to this command. And there's a component of the BES that does that. And that packaged command is then processed further.

Madisetti - Direct

Q.   And?

A.   And support for the GME protocol is in several RIM documents, and one of them is Exhibit No. 0350.  That is the document that we just discussed a bit earlier, "Featured and Technical Overview, Version 5.0."

Q.   And does this document explain what is a GME?

A.   Yes, it describes, it's one of the documents explains the GME protocol.  And you notice yet on page 106, the RIM documentation confirms that gateway message and rule out protocol or GME protocol is a proprietary protocol that allows the transfer of compressed and encrypted data between the wireless network and BlackBerry device.  And so it defines the routing layer, it defines the types of message -- it specifies the types of message contents allowed and the addressing information.

So it -- and the protocol is a set of rules and -- that allow two end points to come together.  So GME's a type of protocol.

Q.   So are there any other documents that help explain that?

A.   Yes, Exhibit No. 0865.  This is the "Payload Development Guide," again published by RIM, and it's about GME-based applications.

Q.   Could you explain how the GME's used at the server, the device?

A.   Yes, 865 on page 6, RIM confirms that the server, as on the left, is actually sending some -- a special content.  If I can use the pointer.

So there's some special content here, which could be a command, and it encapsulates it with a GME -- this is called a "GME load," which is encapsulated with some sort of GME header, and there are other encapsulations, different other protocols where it's sent over the wireless network, and the process goes on at the handheld where your handheld then processes the GME header first, then recovers the payload and sends that content to appropriate processing.  For example, if it's an ITAdmin command, it's sent to the command processor. So it's been handled accordingly.

Q.   Is there a document that describes GME protocol detail?

A.   Yes, this is the document that I've cited that is Exhibit 865, which is on page 1, which describes the RIM gateway message envelope protocol detail.

And in Exhibit 865 on page 1, again it describes the GME protocol as enabling the transfer of opaque, which are commands, between wireless services and wireless clients.  And GME is an end-to-end protocol, so it communicates all the way from the server to the device.

And what is interesting is that the information that, regarding on how too -- the header information need not be encrypted. So you can move the information from one point to another while the content itself is protected. So intermediate routers and gateways need not know what's inside of that payload.

Q. What's the next step?

A. The next step is -- so at this point, when the packaging is done, as you can see, it was originally called new here. Now it's updated a state of processing, because you've packaged the command with the GME protocol.

And then we can go to the next step.

So here at this point, once it has packaged the protocol with the GME header, it again goes to a router where it decides on which path to choose. Should it be a WiFi path or should it be a cellular path? So depending on, if there is a WiFi path, then it will choose the WiFi path because it snowballs. And if it is -- if the WiFi path were not available, then they'd choose the wireless cellular path as well to the BlackBerry.

And at that point, it starts processing the command and sends them out of the door of one of those two different paths, and then you have this, you have

this end-to-end GME protocol where the command is now transmitted from the server to the employee's device.

Q.  Does the BES keep track of that?

A.  Yes.  At that point, ITAdminQueue, the status of that particular command, has been updated to send to the device.

Q.  What happens with that command?

A.  Yeah, at that point, once it reaches the device, the device again uses the GME protocol and decrypts and verifies the content of the command and shows the command is correct for this and correct BES, for which BES would have sent it.  And then it does that, sort of -- the steps.

Q.  Okay.

A.  And then after that, it acknowledges that it has accepted that particular comment.  And that is sent using the GME protocol, and it's sent on the WiFi or the cellular path.

Q.  And what happens at the BES?

A.  At the BES, you have this updated status, which is the command 7890.  It's now classified as received, so that the administrator knows that the device has now executed the comment, and it's now going back.

Q.  And what happens to the command if it's accepted the device?

A.   The device would then execute the command.  And at
this point, we're just showing the device is now
accepting the plan.  It has now executed it.

Q.   What does the device do after executing the command?

A.   GME protocol also allows you to acknowledge the
execution of the command.  And it uses again the GME
protocol and sends back an acknowledgment that that
command has been successfully executed or it failed,
depending on what happens.

Q.   And did the BES keep track?

A.   Yes, the BES keeps track of the state, and it says
here that this command has succeeded or it's in code,
which shows that the command has been successfully
executed.

Q.   I'd like to turn now to the BES and talk about the
software that's at the server.  So you heard testimony
earlier that the server installs components.  Can you
explain what that means?

A.   Yes, the BES actually contains a number of processors
that all work together to make this happen.  And so I've
prepared some demonstratives that this -- what exactly
is inside the BES.  This is both from public and
internal documentation and testimony and so forth.

So here is a picture, again from RIM's
documentation, an application of RIM's documents in the

sense that only color is added.  So if you look at the BlackBerry and BES server, it has a number of components, but of interest to this particular matter are these components that I highlighted in yellow.

So you have a BlackBerry Manager complement.  You have a database, a Configuration Database that has the ITAdminQueue and user data.  You also have a Policy Service that operates on this database and starts processing the commands off a dispatcher that actually matches these commands with GME.

And then you also have a router that is taking these commands using the GME header.  And then using between one of two different -- one of many different wireless paths, say WiFi or a wireless communication, cellular communication, to send command.

Q.  And just to repeat, I want to be certain, that the yellow highlight is what you've added.  There's nothing else you've added to this document?

A.  Yes, nothing else added.  And yellow is added just to show that these components of the BES played a role.

Q.  So perhaps you could explain to me how the different components work.

A.  Yes, the path is shown here, and I've listed here how the progression of the command from the manager, the BlackBerry Configuration Database, the Policy Service

and the BlackBerry Dispatcher to the Router.

And now we will describe from RIM's own documentation what each of these components does.

Q. Let's take a look.

A. So the BlackBerry Manager is shown here, outlined in yellow. So the BlackBerry Manager is that component here that again I show here, put on the picture, that the BES interacts with the handheld using the GME protocol.

So if you go to the next slide.

This is RIM's description of what the BlackBerry Manager does in 4.0, the BES 4.0. It says it applies IT policies and IT administration commands. So the word "command" is presented in this documentation, which is Joint Exhibit 2022. And you'll see here that the BlackBerry Manager applies IT policies and IT administration commands.

Q. Is that the same as Version 5.0?

A. Yes, for Version 5.0 we have the same, except that the BlackBerry Manager is now part of the BlackBerry Administration Service.

So if we go to the next slide. We will see that in Exhibit No. 350, for BES 5.0, the BlackBerry Administration Service includes three functionalities. But exactly the same features that you can use to

control BlackBerry devices.  The difference is that the BlackBerry Admin Service is accessible over the REM.

And then the next competent of interest is the BlackBerry Configuration Database that is shown in highlight here.  And that is described again in RIM's documents in the next demonstrative.

As that BlackBerry Configuration Database is a configuration database that contains configuration information that the BES components use.  So this includes PINs and the details and the network and so on.

And this is the Exhibit No. -- if you go back, this is Exhibit No. 350.

Q.  What's the next --

A.  The next demonstrative, that is the BlackBerry Policy Service which plays a role in IT commands.  And that is described again both in 4.0 and 5.0 documents; for example, the 350, where it's described as sending IT policies and IT administration command.  So the BlackBerry Policy Service sends IT policies and IT administration commands.

Q.  And where do you see that?

A.  It is in Joint Exhibit 350.

Q.  What is the next component?

A.  The next component is further down the chain here. It's the BlackBerry Dispatcher.  And the BlackBerry

Dispatcher's functionality, as described in RIM's own documents, is described here, in Exhibit 350. It is described that the BlackBerry Dispatcher compresses and encrypts all data that BlackBerry device users send and receive. And it uses -- and the BlackBerry Dispatcher sends the data through the BlackBerry Router to and from the wireless network. And this is Exhibit 350.

Q. What is the next component?

A. The last component of the BES here is the BlackBerry Router, that again is described in RIM's own documentation for 4.0 and higher, in the next slides. So in Exhibit 350, for instance, it says that the BlackBerry Router connects to the wireless network to send data to and from BlackBerry devices. So it connects. It uses the word "connects." And it also sends data over your organization's network to BlackBerry devices.

Q. Now that you have explained to us your analysis of the patent and the products, perhaps you can explain to us if you've arrived at an opinion.

A. Yes, I have.

Q. So with respect to the use of BlackBerry handheld connected to the BES 4.0 and higher, do they perform the -- this step?

A. Yes. Now (indicating) we will go through all the

steps of Claim 1 and then go through detailed evidence
for each of the user products practicing each of these
elements of Claim 1.

So here we're talking about the first claim
preamble, which is the --

Q.  Since you've already read this, I'll skip to the next
slide.

A.  So to show that this preamble is met, I've relied on
the following set of evidence:  The first is the
"BlackBerry Enterprise Server Feature and Technical
Overview," and the testimony of RIM's witness Carl
Cherry.

Q.  Let's look at the feature and the technical overview.

A.  Yes.  This is Exhibit No. 2022.  Which is the RIM
document that describes the "BlackBerry Enterprise
Server for Microsoft Exchange, Version 4.0."

Q.  What does that document say?

A.  On page 27 of Exhibit 2022, it describes wireless IT
commands as:  "Wireless IT commands enable you to send
commands wirelessly to handhelds to manage handheld
security.  The commands enable you to respond
immediately to a lost or stolen handheld..."  This is
drawn from page 27 of the exhibit.

Now, from page 28 of the same exhibit, 2022, is
RIM's illustration of how the remote device management

works here.  So you have the wireless network, and you
have the server component of the wireless network, which
is the BlackBerry Enterprise Server.  These are the same
set of components we just discussed.  For example,
Dispatcher, the Router and the Policy Service, the
Configuration Database, the Manager or the
Administration consultant.  So that is the server
components of the wireless network.  And it's Exhibit
No. 2022 on page 28.

Q.  And everything in that red colored box is the
BlackBerry Enterprise Server?

A.  Yes, that's the BES 4.0.

Q.  And what happens -- what is the wireless device?

A.  The wireless device portion of the wireless network
is shown on the extreme right here, so this is the
BlackBerry device handheld.  And that describes the --
that described the device being managed by the BES.

Q.  And these are documents for BES 4.0.  Did you review
the same for BES 4.1?

A.  Yes, BES 4.1 is described in Exhibit No. 0139, and
this is the cover page of the documents for Version 4.1,
which is a feature and technical overview for BES 4.1.

Q.  And did you do the same analysis -- let's take a look
at the language of 4.1.

A.  That's right.  On Exhibit 139 on page 29 of 4.1,

BES 4.1, it's describing BlackBerry device management that you can use BES, or the BlackBerry Enterprise Server, to control how you implement, maintain and upgrade BlackBerry devices across your organization, confirming that the BES does the remote management.

Q.   And did you do the same analysis for BES -- take a look, these are the architectural diagrams; is that right?

A.   Yes, as I described here, that this is the technical overview diagrams for 4.1, Exhibit 139, and this shows the same illustration that we saw for 4.0.

Q.   So on the left is what's included in the BES, correct?

A.   Yes.  The left is the server component of the wireless network, and on the right is the device component of the wireless network.

Q.   Did you arrive at a single opinion for BES?

A.   Yes, I did, as I will describe in my next demonstrative, Exhibit 350, which is the feature and technical overview of BES 5.0.

The next slide provides the exact citation.  On page 44 of Exhibit 350.  RIM confirms that the BES 5.0 does provide device management, and by saying here that you can use the BlackBerry Enterprise Server to control how you implement, maintain and upgrade BlackBerry

devices across your organization.

This is a figure from Exhibit No. 350 on page 12. That has the same figure. And you'll notice here that these are the components of the BES. On the left. Which is the BES server. And on the right, you will see -- on the next exhibit, you will see the components, the device and how the wireless network is comprising the server and the device so that the server can manage the device.

Q. Dr. Madisetti, in the interest of efficiency, you've identified documents for 4.0, 4.1 and 5.0 for future elements. I may just have you read the 4.1, 5.0 into the record, but just provide the detail for 4.0, so we're not repeating it three times.

A. That sounds very good.

Q. You also said you relied on Mr. Cherry's testimony?

A. Yes. I relied on Mr. Cherry's testimony. Here, for instance, is Mr. Cherry's deposition testimony on page 70 and page 71. Lines 18 on page 70 to line 7 on page 71.

So to look at his deposition, I think that's something that says, the question says: "What is the current maximum number of users an enterprise can run on a BES server box?"

"A There's a suggested number of 2,000 as the

maximum.

"Q   Why is this number only suggested?

"A   Customers could find that they might be able to run, in their environment, with 3,000.  We weren't saying it was limited to 2,000; just that it was suggested not to go beyond 2,000.

"Q   Why was it suggested not to go beyond 2,000?

"A   Due to the APIs we're using talking to Microsoft Exchange and Domino, it was -- it -- the APIs were not very stable, so it was deemed to be better to limit the number of users on a single box."

And similarly, Mr. Cherry's deposition that you witnessed on page 40, and lines 11 through 24, and page 41, lines 1 through 3, talk about downloading to a single server.

The question is:  "So going back to our situation, we have a company that has downloaded the BES Version 5.0.  They obviously must have had the minimum requirements for Windows to comply.  When they download the BES, you mentioned that it contains numerous software processes.  Must they download the BES in its entirety or can they download a portion of those processes?

"A   The -- the BlackBerry Enterprise Server would -- the components would be combined in an installer

program.  So they would all be -- all be there together.

"Q  So a company would install the BES and essentially get all the numerous software processes because it is a single product?"

Mr. Cherry, THE WITNESS:  "They -- all the processes are a part of the installer, yes.  They are all part of the same installer."

And Mr. Cherry's deposition again on page 40 and page 41, describes in answer to the question that:  "So let's explore that a little bit.  I am the company, I'm downloading the BES installer of the core product. We'll ignore the extra optional alternatives, and I can download that in its entirety to a single server if I choose?

"A  I think the way it's bundled, you'd have to download it to a single server.

"Q  Okay.  So you are saying as Step 1, no matter what, you have to download it to a single server?

"A  Yes."

Q.  Did you cite any additional documents?

A.  Yes, this is BlackBerry Policy Server demand for remotely managing a wireless device, which is the "BlackBerry Administration Service – Policy Server Connector Detailed Design."  So this is an internal

document that confirms that the BES performs the device management.

Q.   And this is the BES 5.0?

A.   Yes, BES 5.0, yes.

So here is an example of the Set IT Policy command that we discussed in Exhibit 491 on page 8 in Section 4.5.1.  The Set IT column command is described here is with a signal that describes what the command is, which is 03 in this particular case, in addition to other information about the Set IT Policy command.

Now, the next demonstrative that I've prepared, which is Exhibit 491 on page 1, the delivery, Section 4.2:  "The BAS must use the Policy Server to send updates to the device.  And the Policy Server queues requests via the ITAdminQueue table in the BES management database.  The Policy Server also monitors several tables and internally queues requests."

Q.   So based upon your analysis of RIM's documentation and testimony of Mr. Cherry, do you arrive at an opinion with respect to the preamble?

A.   Yes, based on the -- I just cited.  The:  "Use of RIM's BlackBerry Enterprise Server Version 4.0 and later, in combination with BlackBerry handheld, practices a method for remotely managing a wireless device over a wireless network comprising a server and

the wireless device, the wireless network operable to communicatively connect the server and the wireless device."

Q.  And when you use the word "server," are you referring to the BlackBerry handheld?

A.  Yes, as applying the whole construction to the BlackBerry Enterprise Server.

Q.  And with respect to the device, that would be BlackBerry handheld?

A.  Would be BlackBerry handheld, yes.

Q.  So it's your conclusion that this element is satisfied, correct?

A.  Yes, I've checked the green box on the left, so we'll go through all the elements and check them as soon as we provide evidence for them.

Q.  Okay.  Could you explain the next step.

A.  Yes.  The next step is the step of "transmitting registration information relating to the wireless device from the wireless device to the server."

And I'm relying on these sources here that I've listed, which are the "BlackBerry Enterprise Server Feature and Technical Overview" and "BlackBerry Wireless Enterprise Activation Technical Overview."

Q.  And those are Research In Motion documents, yes?

A.  These are Research In Motion documents describing the

products.

Q.   Is this one of the documents?

A.   Yes, this is Exhibit 2022, cover page for the Version 4.0, the BES, the feature and technical overview.

And as noted on page 11 of Exhibit 2022, "transmitting registration information," it is noted as "new" in this release of 4.0, and what is new is that wireless enterprise activation.  For the first time in BES 4.0:  "Users can activate a handheld on the BlackBerry Enterprise Server without a physical network connected.  For example, users who are away from the office can purchase a replacement for a lost or stolen handheld, contact the administrator to receive a shared secret password, and then activate the handheld wirelessly by starting the enterprise activation application and providing the password and the corporate e-mail address."

That's on page 11 of Exhibit 2022.

Q.   And this is the first time wireless registration was available?

A.   It's new in this release, yes, BES 4.0.

Now, on page 42 of the same exhibit, there's a section called "Wireless enterprise activation," and in that there is Steps 3 and 4, which describes that a user

initiates the wireless activation, and Step 4 is handheld sends activation request.  So you'll see here that the user opens the wireless activation on the handheld, types in the appropriate e-mail address and the wireless activation password, and then the handheld sends the activation request message to the e-mail account, and the message contains information about the handheld such as routing information and the handheld activation public keys.

Q.  And that is exactly how you described it in your slides earlier, correct?

A.  Yes, that is it exactly.  This is page 42 of Exhibit 2022.

Q.  How about Version 4.1?

A.  In 4.1 there is again supporting documentation from RIM, which is Exhibit 139, "4.1 Feature and Technical Overview."

Q.  And?

A.  And I've cited to page number 60 of Exhibit 139. Again, as we discussed earlier, Steps 3 and 4 out of the process flow of activating the BlackBerry device over the wireless network, described the same steps that were described earlier.

Q.  So 4.1 work the same way as 4.0?

A.  That's right.

Q.  How about 5.0?

A.  That's described in Exhibit 350, page 1.  Describes the same flow.  In a similar manner to 4.0 and 4.1.  As we see in the next slide.

Here it is on page 91 and 92.  RIM's document confirms the wireless activation procedure is the same in Steps 3 and 4.

Q.  Is there another document that you relied upon to analyze wireless activation?

A.  Yes.  This is our other document, which is Exhibit 166.  This is technical overview, so it provides more information and technical details.  It's called for "Release 4.0.  BlackBerry Wireless Enterprise Activation."

Q.  What is the Exhibit No.?

A.  It's Exhibit No. 166.  And that's the cover page of that.

And so here, on Exhibit 166 on page 2, in the section entitled "Enabling Wireless Enterprise Activation," I've highlighted that.  "The password applies to the user's account only.  The password is invalidated after five unsuccessful activation attempts and if the user does not activate the handheld within 48 hours after the password is created, the password expires and cannot be used.  When the handheld is

successfully activated, the password is removed from the BlackBerry Enterprise Server."

So that is from the technical overview.

Q. If I understand this correctly, when I get a device, I have five tries to put the password in correctly?

A. Four tries. Five tries to -- only five tries for it to work.

Q. And I have two days to do it, and if I don't do it in two days, I have to call back for a new password?

A. That's right.

Q. Please continue with the description of how it works.

A. Yes, so as outlined in the technical overview, Exhibit 166 on page 3: "The user on the device initiates wireless enterprise activation. The user opens the enterprise activation program on the handheld and types the appropriate corporate e-mail address and activation password," which is shown there.

And as seen in the next slide, you will see that they have an option here on 166, page 4, they can click to activate that option, and the handheld sends this information related to the device. "The handheld sends the activation request. The handheld sends an activation request e-mail to the user's corporate e-mail account. This e-mail contains information about the handheld such as routing information and the handheld's

activation public keys."

And as noted in Exhibit 166 on page 4.

Q.   What is the next one?

A.   Now we will describe some more details about enterprise activation.  How exactly it -- so this is again from 166, page 10.

So what is done, this is the Appendix A, which is the "BlackBerry's initial key establishment."  So protocol is the initial password provided by the system administrator.  So this goes through a number of steps on the handheld.  So let us look at what these steps are.

So if you go to the next slide.  This looks somewhat busy, but it is not too difficult.  So what happens is that the handheld, you have this small $s$, which was provided by the administrator to the user on the device.  This $s$ is converted to capital S by some transformation.  And this capital S is then converted to a value $X$ that is called -- that is based on some random number, so you can see that $X$ is related to $S$, which is related to small $s$.  So the original key is transformed from small $s$ to capital S to $X$.

And then if you go to the next slide, and again from the same -- if you go to the next slide, you will see that -- if you see this 166 on pages 10 and 11,

there is a sort of key or code computed here called *Ha*. This *Ha* is obtained in this sort of hashing operation that involves *X*, and so what is done is that this *Ha* is then sent to the server.

So even though *s* is converted to -- in these three, four steps to something called *Ha*, and then *Ha* is then sent to the BES server as a part of the enterprise activation.

Q.   Dr. Madisetti, just to be clear, in your earlier testimony you described password 1234 turning to QXZY. Why?  Are what you showing here is that the small *s* is transformed to *Ha* similar to 1234 converted to QXZY?

A.   Yes, that's right.

Q.   So based upon your analysis of RIM's documentation, have you arrived at a conclusion with respect to the second element of the '917 patent?

A.   Yes, the second element says that "the transmitting registration administration relating to the wireless device to the server," "The use of the RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with BlackBerry handhelds, practices the step of transmitting registration information relating to the wireless device from the wireless device to the server."

Q.   Perhaps we could now move to the next step.

A.   Yes, so I've checked off the second step.  So if you look at the claim as a recipe, we have provided evidence of the transmitting step.

Now we go to the verifying step.  And the verifying step says:  "Verifying the registration information at the server."

Q.   What did you rely on to arrive at that conclusion?

A.   I relied on the sources that are listed in this demonstrative, which are the "BlackBerry Enterprise Server Feature and Technical Overview" and the "BlackBerry Wireless Enterprise Activation Technical Overview."

Q.   Okay.  What is this document?

A.   Yes, I will again describe the documents that I've used to confirm that 4.0 -- BES 4.0, 4.1 and 5.0 provide support for this step.  And here is Exhibit 2022, which is the cover page for Version 4.0's feature and technical overview.

Q.   Okay.

A.   And in the same section on "Wireless enterprise activation," I've outlined Step 6, which confirms that the server establishes and confirms keys:  "The BlackBerry Enterprise Server and the handheld establish a master encryption key.  Both the BlackBerry Enterprise Server and the handheld confirm the knowledge of the

master key to one another.  If the key confirmation succeeds, the activation proceed, and the further communication is encrypted."

That allows them both to be tied to each other. And now look at this section was excerpted from page 42 of Exhibit 2022 of RIM's documentation.

Q.  I'll turn you to the 4.1 and 5.0 documentation for the record.  Explain to us only if there's any difference.

A.  As noted in Exhibit 139, 4.1, the same process flows with Step 6 on page 60.  4.1.

And then the next slide.  Which is for Version 5.0, which is Exhibit 350, which is the feature and technical overview of 5.0, and again -- and page numbers 91 to 92 describe the same process.  Where the server verifies the information relating to the device that was sent by the device.

Q.  Based on your analysis of the RIM documentation, is this one of the other documents you reviewed?

A.  Yes, to continue that analysis with *Ha*, we will see what happens on the server to confirm that it's the same *Ha* that is verified.

So as we described earlier, in Exhibit 166, on page 4, this is the establish and verify keys.  RIM confirms that the BlackBerry and enterprise server and

the handheld established a master encryption key.  Both the BlackBerry Enterprise Server and the handheld verify their knowledge of the master key to each other.

That's the verifying step.

And here, going back to the document, in Exhibit 166, *s* is going to a password, the 1234, and we discuss what happened to connect *s* to *Ha*.

You go to the next step.  This is the complimentary action happening on the server.  So you notice on the server that it takes the same key *s*; it computes the same capital *S*.  And if you go further down, it will compute a *Y* that is dependent on *S*.  So small *s*, capital *S*, general decs, *Y*.  And then if you go down, you'll notice that as soon as the server receives *Ha*, it verifies and says that if *Ha* is not to its own information based on *Y*, so this is a hashing out or queues based on these files here.  Put along side by side.

So here is the verification step where it verifies that if *Ha* is the computer, if they are not equal, then the handheld is called fail, and it allows a certain number of failed items.

Q.  So what you testified earlier was the 1234 is converted to QXZY, and those -- that same password is checked at the server?

A.   That's right, that is *Ha*.  And that *Ha* is then verified by a similar calculation that is at the server based on the same, which is the small.

Q.   So it's a combination of the transformed password?

A.   That's right.  It's a verification step that confirms that registration was successful.

Q.   And this is a complicated mathematical checking that Mr. Cherry talked about this morning?

A.   Yes, that is what he talked about.  The trade secret key.

Q.   So based upon your analysis, what was your opinion with respect to this data?

A.   Yes, if you go back to Claim 1, you'll notice that I checked off the second step, which is verifying the registration information.  And it is convenient that: "The user of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with BlackBerry handhelds, practices the step of transmitting registration information relating to the wireless device from the wireless device to the server."

THE COURT:  Let's move this, use this change to take our -- it's about 2:30 -- to take our break.  We'll come back at 2:45.

DEPUTY CLERK:  All rise.

(Recess)

DEPUTY CLERK:  All rise.

(The jury entered the courtroom.)

BY MR. THAKUR:

Q.  I'd like to now turn to the next claim.  Could you explain this element, please?

A.  Yes.  We have the element as shown in the left in highlights.  It's "Without a request from the wireless device, performing the steps of:  Establishing a mailbox for the wireless device at the server."

So we'll be looking at evidence for establishing a mailbox for the wireless device at the server without a request from the wireless device.

Q.  And you applied the Court's construction?

A.  Yes, I've adopted the Court's construction, which says here that:  "'Without a request from the wireless device' means performing an enumerated step without the transmission from the wireless device of a code or signal or any other form of request that initiates the commencement of the performance of the step."

Second is:  "'Establishing a mailbox for the wireless device at the server' means creating an address in memory of the server that can store information intended for delivery to the wireless device."

Q.  What did you do to evaluate this step?

A.  Yes, I relied on the following sources, which include

the "Policy Server Component Overview," which is a

document.  I've also relied on the "RIM Source Code" for

this element.

Q.  What's -- the mailbox, did you identify?

A.  So based on my analysis, there are three structures

in the B-E-S, or the BES, whether it's 4.0, 4.1 or 5.0,

that satisfy the mailbox limitation.

First is the ITAdminQueue.

Second is the single row in the ITAdminQueue.

The third is a row in the user config table.

These are the three elements, the stricture in

the BES that satisfy the mailbox limitation.

Q.  Earlier today we looked at some slides.  You showed a

box where there was a PIN command in status.

A.  Yes.

Q.  And there were individual rows, correct?

A.  That's right.

Q.  So what was recommended in the ITAdminQueue?

A.  In my example, the ITAdminQueue is the entire table

and each row is one of the elements, so either you can

construct the mailbox as the entire table or a row of

that table.

There's also a user configure database, a row in

a user configure database that corresponds to a

particular device.  That can also be -- that can also

satisfy the requirement of the mailbox.

Q.   So what is this showing?

A.   As I cited earlier, I relied on Exhibit 496.  This is the cover page of the "Policy Server Component Overview," and it describes some support for this quick element.

So as you can see here on page 7 of Exhibit 496 of RIM's documentation, in Section 4.1, it describes the database tables in the BES and it identifies the ITAdminQueue.  So the presence, an ITAdminQueue, and it describes it as:  "Each row in this table contains a specific task for the Policy Server which creates the command which packages the command to work through.

So this is the section that I relied on.

And furthermore, on page 11 of Exhibit 496 entitled "4.1.5, User Config Table:  Each registered BES user has an entry in this table."

So table is stored in memory.  It has an location, it has an address, as confirmed by Mr. Cherry. In this particular case, this table is called a "user config table," and "each registered BES user has an entry in this table.  Changes to a user's list of required applications, IT policies and service books prompt the Policy Server to form appropriate work requests to update the device."

So that is from page 11.

Now, we can also look at the source code because the construction adopted by the -- construed by this Court requires a memory and an address. So I've looked at the source code, and this exhibit is 4207, page 1. This is tables are SQL script, an SQL script that creates the initial BlackBerry Admin Server tables. So when you install your BES, it creates the table and this table is created at the installation.

So here is an example of -- here is an excerpt from the Court that says in the comments: Create the ITAdminQueue table if it doesn't already exist." And the instruction reads: "If not exists, select name from sysobects tables." In other words, this instruction says if existing list of tables does not have an ITAdminQueue, then create one. And that's exactly what is done when you install the BES.

And these are some of the fields in the table, so these could be more technical description of the columns that I showed earlier in my simplified graphic.

So there are many columns here and you'll notice that there's a column for a PIN. There's a column also for a command. So a word command is also used in the code to describe the command that will be sent to the device. And the device is identified by the PIN.

And we also saw the status field, and the status field is also a particular element.  And also he mentioned the GME protocol many times.  And the GME transaction ID is also described there in that particular scheme element.

So you'll notice there that these are the so-called columns of information related to the columns of the table.

As we go to the next slide, you will see that this is again the creation of the table, under the excerpt from Exhibit 4207, page 9.  And if you go further, you'll notice that under the source code that I've identified here, in Exhibit 4209, on page 1, here this is the code that adds a row to this particular table.  So first we saw the code that establishes the table; now we have seen the code that adds a single row to the table.

And that is called this particular function.

And here you'll notice that these parameters that are -- these are the command parameters that are being filled in through these, and these parameters correspond to the same fields that we identified earlier.  So you can see that, if you go back to the slide -- you'll see here that this P stands for the pointer, which is some sort of address in memory.  And you'll notice that the

parameters are, for example, here, "GMETransactionID," things like the command and so on. All these are pointers to addresses in memory that are used to create the row of the ITAdminQueue.

And this is in Exhibit 4209, page 5.

So if you go to the next slide.

Q. So based upon your analysis of the RIM documentation and source code, did you arrive at a conclusion with respect to this element?

A. Yes. As I mentioned, in the left you'll see the highlighted box there, I've checkmarked "establishing a mailbox." And I've shown code and documentation support for three types of structures: The ITAdminQueue, the row and ITAdminQueue, and the user config table, and my opinion is that: Use of BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices the step of establishing a mailbox for the wireless device at the server, without a request from the wireless device."

But the wireless device is not involved in this process. The tables are created when there's a command being put in. So there's no request from the wireless device for any of these cases.

So there's a checkmark on that limitation of Claim 1.

Q.   Dr. Madisetti, just to be clear, would any of those three elements satisfy the mailbox?

A.   Yes, any of them and all of them satisfy the requirements of that step.

Q.   What's the next step?

A.   "Placing a command for the wireless device in the box at the server."  You'll notice I have also highlighted "without a request" because that also satisfies this.

The Court's construction for this term:

"'Placing a command for the wireless device in the box at the server' means storing at the server in the mailbox associated with the wireless device a code or signal that is intended to cause the wireless device to take or cease an action with respect to its functionality and other data for use by the wireless device."

So let us see how this construction is made. These are the sources that I relied upon, and in this case I have listed the "Policy Server Component Overview" document from RIM.  And there's another document from RIM called "BES Tips and Tricks – the BlackBerry Policy Service."  Then there's also the "BlackBerry Administration Service" – for 5.0, the "Policy Server Connector Detailed Design."  I will also provide evidence from RIM source code.  And I've also

cited RIM official witness Carl Cherry's deposition testimony to show that this step is practiced by the user of RIM's products.

So this is the cover page of Exhibit 0496, which describes the document I've used, it's called the "Policy Server Component Overview."

And in Section 4.1, which is "The database tables the Policy Server watches" on 496, page 7, you'll see that when there's a new request -- what a work request is first placed in the ITAdminQueue, it's marked as a new request, and it's stated as marked in the table. So this illustrates the practice of the step placing the command for the wireless device in the box, because we've identified the mailbox and the ITAdminQueue, and this step shows that the work request is placed in the ITAdminQueue, which is the mailbox.

So if you'll also look at page 15 of Exhibit 496 in Section 5.2.2.4, "Check for user config changes."

So the Policy Server, also here:  "The worker thread looks for any changes to a user's UserConfig entry that would require sending new IT policies, service book data, or P2P keys to one or more users. Any such change prompts the worker thread to create work requests in the ITAdminQueue."

So what is done here is the Policy Server

automatically creates commands to be placed in the box in response to changes in the user profile.  So the user, for instance, changes to a section of the organization that's automatically detected, and a new command is automatically entered.

And if you look at 496 and page 16, 5.4.1.1, the "Set IT Policy," so "When the Policy Server detects a change in the service's IT policies, it can generate a work request to send a new set of IT policy data to the device."

So here is another excerpt from Exhibit 496, page 17.  It's Section 5.4.1.4, which talks about how the Policy Server again detects changes in a service application's control policy.  And it can generate a work request to send this new policy.  So a command is now created and placed according to these descriptions.

Now, we refer to the second document, which is Exhibit 147.  And this is the cover of the document called "BES Tips and Tricks – the BlackBerry Policy Service."  And here there is explicit reference to the ITAdminQueue table, and it is also mentioned here, RIM mentioned here that this table, the ITAdminQueue table, stores commands and interactions related to the following:  IT polices and ITAdmin commands on page 31.

If you go to the next --

MR. MATUSCHAK:  Can I be heard at sidebar, please?

THE COURT:  Certainly.

(At the sidebar, out of the hearing of the jury and the court reporter.)

BY MR. THAKUR:

Q.  Dr. Madisetti, please continue.

A.  To illustrate the step, this is the second document that I have cited, Exhibit 491, the cover of "BlackBerry Administration Service, Policy Server Connector Detailed Design," for BES 5.0.

Q.  Excuse me for just a moment.

Continue.

A.  If you go to the next slide, this describes on page 8 of Exhibit 491 an example of placing a command of the wireless -- for the wireless device in the box.  So here the Set IT Policy command with Code 03 is stored in the ITAdminQueue in Section 4.5.1, Set IT Policy.  Policy Server sends a new set of IT policy data to the device. And the command is the Set IT Policy command with code or signal 03.

And if you go to the next slide, there is another example of a kill handheld.  This is 491, pages 8 and 9, where the kill handheld command with Code 06.

And this command wipes the device.  As shown in

the previous slide.

And on page 9, this is in Section 4.5.4, the "Set Password" IT command, and the Policy Server sends a new password to the device and the command is called the "Set Password" command.

And then we have a send application command, so this is code or signal 80 that is stored in ITAdminQueue and Section 4.5.10 that's on page 10 of Exhibit 491. The Policy Server sends new APC application to the device. And the command name is called "Send APC App."

Q. Continue on.

A. So in addition to those supporting documents, I've also identified source code here that --

MR. MATUSCHAK: Your Honor --

MR. THAKUR: Since that's a confidential source code, we'll just identify the source code that you reviewed. We'll skip through the slides so we don't disclose that confidential source code.

MR. MATUSCHAK: My objection stands, your Honor.

THE COURT: I'll sustain the objection. It's not so much the confidentiality of it, but you need to identify from his report or his deposition a previous disclosure of reliance on the source code. And since it appears to me we won't finish with his testimony, maybe you ought to go on to another matter and come back to

this after you've satisfied the Court that that disclosure has been --

MR. THAKUR:  We'll make sure by Monday morning, if it hasn't been made, that it will be made.

THE COURT:  Tuesday, please.  I have other matters.

BY MR. THAKUR:

Q.  We'll continue on.  This is duplicative, sir.

Could you also talk -- what else did you rely on?

A.  I also relied on RIM's official witness Carl Cherry's testimony.  And here is excerpt from Cherry's deposition, page 138, lines 16 to 23.  Where he describes:  "The kill command entered through the BlackBerry Manager in the ITAdminQueue will be stored as a record in the BlackBerry Configuration Database, correct?"

The answer is:  "Correct."

And the question is:  "The BlackBerry Configuration Database stores that information on a disk...?"

The answer is:  "Yes."

Q.  Continuing on.

A.  Continuing on with Mr. Cherry's deposition transcript at 318, lines 11 to 25, the question put forth is:

"Q  Okay, that's what I was asking you.  The storage

of the command itself is in the BlackBerry

Configuration Database, not in the BlackBerry

Administration Service.

        Mr. Cherry, THE DEPONENT:  That's -- yeah, the

kill command is stored in the Configuration Database."

        And by Mr. Thakur:

"Q   Okay.  Is the ITAdminQueue a database table

stored within the BlackBerry Configuration Database?"

        Mr. Cherry's answer:  "Yes, it is."

        And question:  "Okay.  Does the ITAdminQueue

include numerous commands that can be entered into a

table?"

        From Mr. Cherry:  "It does, yes."

        The question:  "In that table, is one of the

policy commands the kill handheld command?"

        Answer from Mr. Cherry:  "Yes, it is."

Q.   So have you come to a conclusion on this slide?

A.   Yes, as to this particular slide, an element for

placing the wireless device in the box, I have

identified supporting evidence from documentation source

code as well as from deposition testimony of Mr. Cherry,

that the use of RIM's BlackBerry Enterprise Server,

Versions 4.0 and 4.1 and later, including 5.0, in

combination with BlackBerry handhelds, practices the

step of placing a command for the wireless device in the

box at the server.  And this is done without a request from the wireless device.

Q.  Could you explain the next step, please?

A.  Yes.  So now comes the step that is highlighted here, that is the delivering step.  And this is again done without a request from the wireless device.  It is: "Delivering the command from the mailbox at the server to the wireless device by establishing a connection between the wireless device and the server, transmitting the contents of the mailbox from the server to the wireless device, and accepting the contents of the mailbox at the wireless device."

We'll break this into a three substeps and provide evidence of each of these three substeps.

The first substep that I've identified here is the establishing substep, which says:  "Establishing a connection between the wireless device and the server."

The Court's construction is for:  "'Establishing a connection between a wireless device and the server' means initiating wireless communication between the wireless device and the server."

And the establishing a connection substep must be completed before the transmitting the contents of the mailbox substep can commence.

So these are the two constructions that I've

adopted.

And in this particular demonstrative, I've provided the sources that I relied upon, which are RIM documentation such as the "BlackBerry Enterprise Server Administration Guide."

RIM's documentation on the "Gateway Message Envelope Protocol."

The BlackBerry website documentation.

RIM source code.

As well as testimony from RIM's official witness, Mr. Carl Cherry.

So here, I cite in Mr. Cherry's deposition testimony at 58, lines 4 through 10, the question is: "When the BES sends IT administration commands to a device, is the GME protocol used?"

"Yes," from Mr. Cherry.

The question is:  "So an IT administration command is packaged in a GME protocol?"

The answer from Mr. Cherry:  "That is correct."

And Mr. Cherry's deposition continues at 60, lines 22, to 61, lines 10.

The question is:  "After the device and the BES agree on a particular encryption key, is all data sent from the BES to the device encrypted using that encryption key?"

Mr. Cherry's answer:  "Yes."

And the question is:  "And that includes IT administration commands?"

"A  Yes.

"Q  How does the BES determine what data should be compressed before it's sent to a device?"

Mr. Cherry Answers:  "Similar to encryption, it attempts to compress all data."

And the next question is:  "So regardless of size, it attempts to compress all data?"

"A  Correct."

So Mr. Cherry's deposition --

MR. MATUSCHAK:  I hate to interrupt, but we just heard Mr. Cherry and we're just reading his same testimony.

THE COURT:  It has occurred to me that some of this is beyond the witness's opinion, and he is reciting what the testimony is.  So it might move us along, unless there's some particular portion that he wants to highlight, not to have him simply read it but to say what words or phrases he finds significant to support his opinion.

But if you want him to read through it, because that is important to your presentation, I will allow it.

MR. THAKUR:  Your Honor, the key is to -- this is

the basis of his opinion, but I will lead Dr. Madisetti to sort of focus on the key questions.

BY MR. THAKUR:

Q.  If you could.

A.  So the question of -- the idea is that the BlackBerry kill command is a packet.

Answer from Mr. Cherry is:  "Yes."

And the question says:  "Okay, what is included in the packet?"

And Mr. Cherry's answer says that -- in line number 10, says:  "The command would be wrapped in another protocol which we call the GME protocol, and that -- that packet would be sent to the device."

Q.  We can move on from that.

A.  That's right.

Q.  So what else do you rely on?

A.  Also the source code in Exhibit 4208, page 6.

And this is the same exhibit, 4208, on page 6.

Q.  Since none of us can read source code, can you explain what we're reading on source code?

A.  So I can talk about source code.

Q.  Yes, you can.  It was just that one piece of source code.

A.  I see.  I see.  Okay.  So maybe we can go back then.

Q.  Okay.

A.   Okay, so here is evidence from RIM source code, Exhibit 4208, on page 6, that describes source code on the server where, in the next slide, business action there is this description of the GME header that is used to encapsulate or package the command.

So I wanted to identify how the GME header includes the address of the destination of the device. And so this is just an excerpt to show that the GME header includes the addressing information of the device.

And this is a source code that is on the device, and not on the server, that also confirms that the device itself uses the GME protocol.  And as a complement to the server, and you'll notice that it is called a GME route connection.  And it is a type of connection, so you'll notice that even in the context of device, there's this description of the GME protocol as adding a connection.

Q.   So the word "connection" is in RIM's source code?

A.   That's right.  So it's a type of connection.  So the GME protocol is a type of connection, according to the source code.

And if you look at Exhibit No. 493 on page 1, that is the cover of a detailed specification of the RIM Gateway Message Envelope Protocol on the GME protocol.

And if you go to the next slide, so this is the cover of the RIM Gateway Message Envelope, or GME protocol.

And then if you go forward, please.

You'll see the description of that, the GME and the RIM protocol stack, on page 17, the Gateway Message Envelope or the GME protocol enables the transfer of opaque, that means compressed or encrypted, data between wireless services and wireless clients.

So it's an end-to-end protocol where it takes the command at the datagram and sends it from the server to the device.  And the final destination is called a GME end point.  And it adds a header.  For instance, here: "The GME helps gateways identify the type of data, the 'sender' of the data, and the appropriate destination service to which to route the data.  In addition, the GME protocol provides optional header fields to track data corruption and also acknowledge the receipt of datagrams.  As this information is contained outside the datagram payload, it is seen" -- so there's a time code here -- "it is... seen by the gateways and the routing components."

So, in other words, when the GME packet is received, it allows the device to acknowledge that it has been received and accepted.

So this is another citation from Exhibit 493 on page 19 that also describes what the GME does, and it's very similar to what we just saw.  Where here, the typo is there, so it describes that outside the payroll is not encrypted and can be seen, so this is the correct version of the description, that the header can be seen.

Now, in the GME document, Exhibit 493 on page 40, there's an explicit disclosure of the datagram, which is a command, the datagram, that is acknowledged with this particular code that describes how the GME datagram is received, is acknowledged.

Now -- now, Exhibit 493 at page 72, you also have the description in this particular table where it's shown that the content type, which is an ITAdmin command, is carried by the GME transporter here, and the description of the content carried by the GME is described as, "identifies packets carrying the ITAdmin information to the handheld device."

Q.   What is this document?

A.   This document is from Exhibit 353, page 1.  It is the "BlackBerry Enterprise Server for Microsoft Exchange," the "Administration Guide."

Q.   What are we seeing here?

A.   So here, what I'm citing here is that RIM in its own software and its documentation describes different types

of collections.  So here is an example of a PCP, you can see there is a column here called a connection type, and the connection type is called TCP.  And if -- this is on page 337 of Exhibit 353.  And it describes different types of data connections, and TCP type is called -- expressed by this particular row, and there is something called a port number.  So 3101 and 4101 are different ports used as addresses for this particular connection.

If you go further down, you'll notice that RIM's technical documentation describes UDP as a connection type with its own port for outgoing types of connections.  So both TCP and UDP are called connections within RIM's documents and also the core.

Q.  Do you mind if I bring you back to these between slides?  The word "connection" is so important.  These are RIM's documents, right?

A.  Yes, RIM's documents, Exhibit 353 on page 337.

Q.  And I want to identify that word.  What does that word say?

A.  It says "connection type" in that particular column that I've highlighted.

Q.  So RIM used the word "connection," right?

A.  Yes.

Q.  What is this?

A.  It says "TCP."

Q.   What is TCP?

A.   TCP is an internet protocol.

Q.   What do you use TCP for?

A.   TCP is just used to send messages to a certain destination and a certain port.

Q.   So if you were using a cellular network, you'd use a TCP?

A.   You could use it, but you can also use another protocol called UDP.

Q.   This is the other protocol you're referring to, correct?

A.   That's correct, another connection type on Exhibit 353, pages 338, which refers to a connection type, or UDP, and using UDP and a certain port.  So you can send -- so UDP and TCP are for the purposes of this matter, for the purposes of this matter, operate in the same way.  You have an address and a port.  So you send a GME packet, either by TCP connection or via UDP connection, and that's confirmed both in the court and the documentation.

Q.   So the -- also here you were talking about port connections.  Since this is a key issue, perhaps you can identify also in the left column what is being shown.

A.   Yeah.  Here, for example, there is the description of the type of connection, this particular type.  So it

says the TCP connection is an outgoing data connection that uses a protocol called Sudden Relay Protocol from the BlackBerry Dispatcher.  So the BES uses a protocol in its -- that use SRP to send it to the wireless structure.

Q.  It's your opinion that the document shows that the connection is made whether it is TCP or UDP?

A.  That's correct.  Both of connection types, according to RIM, have different code numbers where you can send data.

Q.  Besides RIM's source code and RIM's actual documentation, what else did you look at?

A.  I also looked at additional API, or Application Programming Interface reference documents, distributed by BlackBerry.  As a part of the Java application development.  They describe a connector class out of which the website link is shown below, where they describe different types of connectors.  And in that page there are eight -- seven or eight references to UDP connections.  And how they should be opened.

So the technical term is to open a UDP connection or open a TCP connection.  And once it is opened, you can send data simply by -- in the case of TCP, all you would do in case of a TCP connection is you would say, "write or read."  In the case of UDP, you'd say "send

to" or "receive from."  So they're exactly the same, they operate the same way.

There may be some features that allow TCP to acknowledge that a packet was received, but that is handled by the GME protocol.  So then you use a UDP connector, you can get a confirmation back from GME. And if you use the TCP to GME, you can get an acknowledgment back from GME as well as from TCP.  So both are identical in terms of use with respect to the initiating wireless communications.

Q.  So RIM source code uses the word "connection"?

A.  RIM source code, RIM's documentation, RIM's API documentation, all use the word "connection."  And they use both UDP and TCP symmetrically and equally for establishing connection.

Q.  Perhaps you can explain.

A.  With respect to this particular step, with establishing connection, it is important to me to try to explain how this initiating wireless communications happens according to the Court's construction.  And as noted in the '917 packet specification, there is this path called "Local Area Network," which is the WiFi path.  There's also a path called the "Wide Area Network," which is the similar path.

So I'd like to describe how this establishing is

done by using maybe the easel and showing how this process is supported in the user operation product -- or practices in the used products.

MR. THAKUR:  Any objection?

THE COURT:  No, witness's are permitted to use easels.  My only concern is it's difficult for all of us to see it.  And I presume we have a handheld microphone so the witness can be heard.  And so feel free to move.

MR. MATUSCHAK:  Thank you, your Honor.

THE COURT:  So you can observe whatever's being done.

MR. MATUSCHAK:  If I might, I think I missed the description of what he's going to do.  This comes from the specification of the patent.  So I'm not sure if he's describing a patent or the product.

THE COURT:  He can make that clear.  Thank you.

For the purpose of the -- members of the jury, the witness is going to go to the easel apparently and use that to illustrate his testimony.

THE WITNESS:  Thank you.

BY MR. THAKUR:

Q.  You can proceed.

A.  So I will first draw the broad outline of the BES.  And then there's a specific structure that I mention here, which is the ITAdminQueue.  So that is the

ITAdminQueue.

So in this ITAdminQueue, the command is placed. So let's say this command is a kill command.  So that's the command placed in the ITAdminQueue.

And now there's a separate component of the BES, which is the dispatcher, that takes this command and creates the command with a header, and that is the GME header.  Which are a bunch of bits that define the source and the destination.  So this is the GME header which presents a number of bits that describe the source and the destination.

So this dispatcher takes this command and adds this GME header, and provides this new command here.

At that point there is a router, which is under component of the BES, so all this is the BES.  It takes this particular structure, and what the router does is that there are two ports that are in the BES to send a message, to send a command.  One of them is a WiFi connection, and the other one is a cellular connection or a cellular path.

So the router, as you've heard from Mr. Cherry, if there's a WiFi path, it will take that command that is encapsulated or packaged with the GME header -- and this is the kill command, and some other IP headers, and it will send the bits to the WiFi path if the WiFi path

exists, because it's cheap.

          If the WiFi path does not exist, then the bits in the GME header, they go through the cellular path.

          So this router component has information that tells it that the WiFi path exists, or the cellular path exists.

          So the moment these bits are -- you choose and you decide which path to take, and you start initiating the wireless communications on either of these paths, that completes the step of initiating wireless communications to transmit -- to -- that completes the initial step of initiating wireless communications that we were trying to illustrate.

          And all this is now supported as part of the documentation code as well as the testimony that I presented.

Q.   Doctor, could you identify on the WiFi over there what's the port number and what's the -- the actual port numbers?

A.   Yeah, these are -- I think these are either 3101 and 4101.

Q.   Perhaps if you look at the --

A.   Yeah, sorry.  This is 4101 and this is 3101.

Q.   And 3101 is for?

A.   The WiFi and 4101 is for the cellular.

So now what it does is that when you want to send data on or bits on any of these paths, all you do is, you put the destination address of the device, which is the IP address, and the phone number, and then you write to it, if it's a connection here, or you send it to, if it's a connection here.

And once you do that, and the bits start leaving the BES, at that point you have completed -- initiating the communication step as per the Court's construction.

THE COURT:  All right.  So you're going to return to the witness stand, and we'll all resume our positions.

THE WITNESS:  Yes, your Honor.  Sorry for the inconvenience.

(Witness returns to the witness stand.)

THE COURT:  No inconvenience at all.

BY MR. THAKUR:

Q.  Dr. Madisetti, based on your review of RIM's source code, RIM's documentation, RIM's website, have you arrived at a conclusion with respect to whether the BES performs -- the use of a BlackBerry handheld is connected to the BES performance step?

A.  Yes.  As shown in this particular demonstrative, the step of establishing a connection between the wireless device and the server, which is -- which was construed

by the Court as initiating wireless communications, it is my opinion that "the use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices the step of establishing a connection between the wireless device and the server, without a request from the wireless device."

Q.   Doctor, proceed to the next step.

Is this the next step?

A.   Yes.

Q.   And what is the next step?

A.   Now, the next step is the substep of transmitting the contents of the mailbox from the server to the wireless device.  And the Court has construed this as, "wirelessly sending from the server to the wireless device the contents of the mailbox."

Q.   And what was the bases of your opinion?

A.   I relied on the "BlackBerry Enterprise Server Feature and Technical Overview" and also the "Policy Server Component Overview" to establish the step is practiced by RIM's products.  And Exhibit 2022 shows the cover page of the 4.0 version, the feature and technical overview of the BES for Microsoft Exchange.

And the section of interest is on page 27 of Exhibit 2022, titled "IT Policies and IT Commands."

Describes here as:  "Wireless IT commands enable you to send the commands wirelessly to handhelds to manage handheld security."

So this is confirmed by RIM's documentation.

Q.  Is that the same true for what you've outlined?

A.  Yes, in Exhibit 139, on page 1, the feature and technical overview of Version 4.1, also confirms that it's the same for Version 4.1.

And relevant section of Exhibit 139 is page 34.

Q.  We'll go on to -- is the same true for 5.0?

A.  Yes, as confirmed in Exhibit 350, the cover page of BES 5.0 feature and technical overview.

In the next slide, I list the page number, which is 15.  It confirms that the BES sends these IT administration commands to the device.

Q.  And this?

A.  Additional confirmation is obtained from Exhibit 496, page 1.  Which is the cover title of "Policy Server Component Overview," 0.4.  And Section 4.1 on page 7 of Exhibit 496 describes the transmitting step:  "Send. When a worker thread sends a packet to a device to fulfill a work request."

And you'll also notice that in ITAdminQueue, the feed for status is changed to "sent" at that point, indicating that the BES has initiated and transmitting,

performed both the initiation step, establishing step as well as the transmitting step.

Q.  Did you have a conclusion with respect to the transmitting step?

A.  Question as with the checked box noted on the left, I'm of the opinion that:  "The use of the RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices the step of transmitting the contents of the mailbox from the server to the wireless device without a request from the wireless device."

Q.  Thank you.

What was the basis of your conclusion?

A.  As I described earlier, it was based on the documents that I have listed.  This is for the next step.

Q.  Right.  So if the next step is of accepting these, these are on this line?

A.  Yes.  For the next substep of the command comes "accepting the contents of the mailbox at the wireless device."  These are the sources that I've relied on that include the "BlackBerry Enterprise Server Feature and Technical Overview."

The "Policy Server Component Overview."

The "BlackBerry Enterprise Server – Information Session."

The deposition testimony of RIM's official witness, Mr. Carl Cherry.

And RIM's source code.

MR. MATUSCHAK:  We object to that, your Honor, same basis.

THE COURT:  Item Number 5?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  I'll have you avoid that until we can clarify that part.

MR. THAKUR:  We'll skip the source code.

BY MR. THAKUR:

Q.  Let's look at Item 1.

A.  Yes, this is the exhibit, Trial Exhibit 2022, the cover page for "BES Version 4.0, the Feature and Technical Overview of BlackBerry Enterprise Server for Microsoft Exchange."

And this shows that in the section on "Wireless enterprise activation," Item 7 describes on page 42 that:  "The BlackBerry Enterprise Server sends the user's IT polices that apply to the handheld, and the handheld accepts them."

So this is additional confirmation of the accepting step.

Q.  Those are RIM's words, correct?

A.  Yes, those are RIM's internal documentation.

Q.  What else does this show?

A.  Also Exhibit 139 on page 1, which is the feature and technical overview of BES Version 4.1, there is in the next page, the next demonstrated, I cite to the similar section on page 62 of Exhibit 139, the same Step 10, where:  "The BlackBerry device decrypts and decompresses the application data, and installs the BlackBerry Java application."

This is under the set of evidence supporting the practice of this step.

Q.  And I think I skipped a couple of cites.  Just a moment.

A.  Yes, up to this one.  We are here (indicating).

Q.  Okay.

A.  So if you go to the next exhibit, which is Exhibit 350, BES Version 5.2, the Feature and Technical Overview, this is the cover page for that particular document.

On the next slide, on page 106 of Exhibit 350, the GME protocol that we discussed is again described here, and it shows that both the BES and the handheld use the GME protocol.

And in the next slide, which is support from the Exhibit 496, which is the cover page of the Policy Server Component Overview, 0.4, photograph.

There is a section on page 19 that talks about: "When sending administrative control directives to device, the Policy Server sends GME packets with the ITAdmin content type."

And put together with the GME documentation, this shows that there's a specific step which involves @decryption and checking of the component.

And in Exhibit 496, page 7, the GME level transaction is highlighted under the "Received" phrase. It says here:  "Received.  When the Policy Server receives a GME-level ACK from the device for a received packet..."

So as I mentioned earlier, in the case of TCP, you get an acknowledgment back.  In the case of UDP, the GME provides the acknowledgment, so there's no need for any acknowledgement from UDP.

So in that sense the GME protocol confirms that the message is accepted, and identifies it.

Q.   What is this document?

A.   This document is Exhibit No. 1019, and it's the cover page of a presentation called "BlackBerry Enterprise Server for Microsoft Exchange - Information Session."

And you'll notice on page 16, it says that: "When data is sent to the BlackBerry smartphone, it decrypts, decompresses and displays it."

Q.   Were you also relying on the testimony of Mr. Cherry?

A.   Yes.  And as I cited earlier, Mr. Cherry, the official witness, RIM witness, and his deposition on page 98, lines 9 through 13, in response to the query that:  "Is it your understanding that when a device receives an IT administration command, the device sends an acknowledgment of receipt back to the BES?"

He confirms that:  "Yes, that is my understanding."

Q.   I'll skip the source code slides for now.

A.   Yeah, the source code is cited from Exhibit 4214.

Q.   Thank you.

So based upon your analysis of the materials, what was your conclusion with respect to the step of accepting the contents of the mailbox at the wireless device?

A.   Yes.  With respect to the step of accepting the contents of the mailbox at the wireless device, it is my opinion, and without a request from the wireless device, it is my opinion that:  "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices the step of accepting the contents of the mailbox at the wireless device without a request from the wireless device."

Q.  So based upon your analysis of that third step, what was your conclusion with respect to the entire step of delivery?

A.  Yes, if you look at the entire step of delivering the command from the mailbox at the server, which is comprised of these three substeps, it is my opinion that:  "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with BlackBerry handhelds, practices the step of delivering the command from the mailbox at the server to the wireless device without a request from the wireless device."

Q.  Okay.  Let's go to the next step.

A.  So the next step here is, as indicated on the left, is "executing the command at the wireless device."  And this is done without the request from the wireless device.  So the sources that I relied on to support the evidence that RIM practices this step are the "Policy Server Component Overview" and RIM source code.

And the document, Exhibit No. 496, page 1, is the cover page of the "Policy Server Component Overview, Version 0.4."

And the next slide on page 7 describes that, confirms that, in RIM's documentation Exhibit 496 on page 7:  "Succeeded.  When the Policy Server receives an application level acknowledgment" -- or ACK -- "from the

device for a successfully processed command, the Policy Server marks the associated work request's entry in the database with the 'succeeded' status."

So this provides evidence that the command was actually executed at the device because it has sent back an acknowledgment saying that it was executed.

So that illustrates that the command was actually executed at the wireless device.

And this is again in Exhibit No. 496, pages 21 to 22, RIM's documentation confirms that:  "The device attempts to enact the command in the packet, and then if appropriate, sends back an application level ACK to indicate the success or failure of the command."

So that indicates the command is executed at the wireless device.

Now, here refers to source code that is sitting on the device.  And this is Exhibit 4214 on page 1, and it talks about the device code, not the server.

And this particular file is called "ITTransmissionService.java."  It's a Java file.  And it describes the -- in this particular slide, page 1 of Exhibit 4214, describes the code of each of these commands.  For example, the set password, the Set IT Policy and the kill command and the associated code values are decoded by processing the GME packet at the

device.

And there is additional code that shows that in the case of -- in the case of what is done is that there is a statement called a "switch statement." A switch statement says if the command is of a certain type, so in this case the command is of a type called "set password." Then it jumps to a function that processes the set password. If it's a kill, it goes to a separate section on the code.

So this is an example, this is an excerpt of the code for the case where the command is "set password." And this confirms that the command is actually executed at the device through inspection of the device code.

And so this also talks about on page 5 of this Exhibit 4214, it talks about what happens when there's a failure of execution of command, and so on.

So this is -- if you go back to the previous slide. Here is another case of the switch statement, where the command is of "kill handheld." So we saw that for the previous command. This is another command. So if the command is "kill handheld," then it does other things with this code, that is different. In this case, again, it confirms that the -- that particular command is executed and acknowledges.

And when you see the acknowledgment from the

device, you will see that it uses the GME protocol.  And it uses a sending connection, so again, RIM's code confirms that the acknowledgment of the handheld is using a send connection, and a datagram connection using the GME protocol, so RIM's code confirms that it's a GME protocol that creates a datagram connection over the cellular network and the WiFi network.

Q.  Will you confirm the page number for this exhibit?

A.  Exhibit 4214 on page 10, and the lines that are excerpted are shown there, describing datagram connection.

Q.  So based upon your analysis, does the use of BlackBerry handhelds connected to the BES 4.0 and later meet this element?

A.  Yes.  Refer to the element of "executing the command at the wireless device," I have cited support for the performance of the step, and it is my opinion that: "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with BlackBerry handhelds, practices the step of executing the command at the wireless device without a request from the wireless device."

Q.  Finally, with respect to the "wherein the connection is established based on a threshold condition," what -- could you read the Court's claim construction?

A.   Yes.  So this is a limitation on the claim.  So it says:  "Wherein the connection is established based on a threshold condition."  And the Court has constructed this phrase as, this phrase means "establishing a connection between the wireless device and the server based on a predefined state of the server or the wireless device other than solely the elapsing of time."

     And if you go to the next slide, I have offered evidence here that RIM practices the step and relied on the following sources, which are:

     The "BlackBerry Enterprise Server Feature and Technical Overview."

     "BES – Information Session."

     "SRP Protocol Specification," which is the server relay protocol from RIM.

     The testimony of RIM's official witness, Mr. Carl Cherry.

     And the testimony of another RIM witness, Allan Lewis.

     And also by examination and analysis of RIM's source code.

Q.   Did you identify one or more threshold conditions?

A.   I have identified several threshold conditions.  I provided four such conditions here, four threshold conditions.  These conditions are described as least

cost routing.  I will explain what each of these mean and how they are supported by RIM.

First is "least cost routing."

Second is "backlog of commands at the server."

The third is "attempted delivery of a command five times."

And the fourth is "device availability."

And I will now provide support for each of these threshold conditions.

Q.  For purposes of clarity, it would meet this claim if only one of these were present?

A.  Yes.  Any of them would satisfy the practice of this step.  In my opinion, all these four conditions satisfy the performance of the step.

Q.  What was your analysis based on?

A.  With respect to "least cost routing," I relied on Exhibit 350, page 1, which is the BlackBerry Enterprise Server version.

And you'll notice here that on page 100 of Exhibit 350, there is a "priority for connections." Again, the word "connections" is used in RIM's, all internal documentation.  And in this case, public documentation for this case.

"Priority for connections that the BlackBerry devices make over a WiFi network."

So "WiFi-enabled BlackBerry devices connect over a WiFi network to the BlackBerry Router or BlackBerry Infrastructure, in the following order:"

So if you choose the wireless paths, the connection to the BlackBerry Router from a WiFi network is preferred over --

Q.   My apologies, continue.

A.   So what is happening there is that there is a connection to a BlackBerry Router from a WiFi network with or without a virtual private network connection. So that is preferred over a connection to the BlackBerry Infrastructure, which is the cellular connection.  Which is also called a GME that uses UDP.

So in both cases it is called a "connection." Connection to a WiFi TCP networks.  And a connection to the cellular wireless service provider that could be based on the UDP protocol that is based on UDP protocol. So both of these are positive, and the connection on the WiFi is preferred over the connection on the cellular level.

And the order of the connection is what is called the "least cost routing."  Because when you connect to a WiFi network, it is cheaper than connecting over a cellular network, especially if you're roaming nationally or internationally.

So that is proof that this "least cost routing" depends on the state of the server. The server knows that there's a WiFi path. So the decision is made to use the WiFi path based on the stake. It is not based on waiting for a certain period of time. The command just doesn't go right away. It is initiated based on knowledge of the state of the WiFi connection.

Q. Did you rely on additional --

A. Additional support is Exhibit 1019, which is the Information Session for the BES Microsoft Exchange, and this confirms again that organizations can reduce wireless traffic, and also associated financial charges by routing data through the LAN, which is another name for the WiFi connection.

So this is another confirmation that "least cost routing" is used as opposed to just sending the packet or sending the command.

Additional support is from the deposition of Mr. Cherry, and Mr. Cherry, as you heard today, I will not read the entire portion from is deposition, which is on page 330 from lines 1 to 22. But what is important for you to know is that in response to the question: "And when do you use the term 'least cost routing,' what do you mean?"

It means that in case where the WiFi connection

is made, there's no complication through the cell network. So that is confirmation from Mr. Cherry that RIM uses least cost routing, and that is another example of a threshold condition, which depends on the state of the server.

And here is additional deposition testimony that is cited from page 334, where it confirms what I described in my presentation -- in my -- on the easel here, that the router component decides on which path to send the it -- are they on the WiFi? Are they on the cellular -- to initiate the wireless communications.

Q. And Mr. Cherry did not contest the issue of least cost routing?

A. That's correct, and he has not contested it and says it's one of the ways to connect to the BlackBerry Router to perform least cost routing.

And additional support is from the source code, which is Exhibit No. 4208, and this is just a description of the header on page 1.

And as you go through here, you'll notice that the RIM code on the server keeps track of whether the device is in coverage or not. So it figures out if the device is available, if it's switched off or if it's roaming, and then it uses that information to do certain things. And that is state of the server.

Here is additional -- so that is the support that I provided to you with respect to the least cost routing as an example of a threshold condition.

The second example of a threshold condition says the so-called backlog of commands.

Q.   And what exhibit is that?

I'm sorry, are you looking at the source code, Dr. Madisetti, for that?

A.   Yes, is there something before this?

I think we jumped.  Yeah.  So we are here, so we go to the next slide.  And here we are describing the support for the second threshold condition which is called "backlog of commands."  So, in other words, rather than go through the code and explain what it does, the server looks at the current number of issued requests that are pending.  If there are more than 2,000 or 4,000 commands that are pending, it will not accept a new command for transmission.

Q.   Dr. Madisetti, could you just identify the exhibit and page number.

A.   Yes, exhibit is Exhibit No. 4211 on page 1, which is the function PollDBQueueNewRequests.

So it keeps track of how many new requests are being created, and it decides to -- decides to take a command for processing steps, if the server is not

roaming.  And that means that it is looking at the state of the server.

So if you go back --

Q.  I'm actually -- so before we go on to other threshold conditions, we're arriving at the end of the day, what I wanted to get in the record was if least cost routing satisfied the threshold condition, just one, which would be sufficient, would all the elements of Claim 1 in your opinion have been satisfied?

A.  Yes.  In my opinion, any one of these conditions is sufficient to satisfy the -- that -- to support my opinion that the use of RIM's products would satisfy that step, which is "wherein the connection is established based on a threshold condition."

Q.  And that step is satisfied, as we've discussed above, is it your opinion that the use of BlackBerry handhelds connected to BES 4.0 or higher would infringe the nine -- every step of the '917 patent?

A.  Yes, that is my opinion.

MR. THAKUR:  Your Honor, this would be a good breaking point.

THE COURT:  Very well.  This is the end of our day.  We'll stop now.  I'll remind the members of the jury, we won't come back to this matter until Tuesday morning at 9 o'clock.  Remember my admonitions.  Get

well.  I'll see you on Tuesday morning at 9 o'clock.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Please be seated.  I wanted to check if you had any matters out of the presence of the jury.

Sounds like what you planned to start on Tuesday, you started today.  That should have moved us ahead a bit.  And these matters having to do with the -- whether the witness relied and disclosed his reliance on the source code, I presume you can work out between the two, and let me know if you need any involvement of the Court.

MR. MATUSCHAK:  I think we'll be okay.  I actually -- your Honor, I apologize, I think we did find it in one of the appendices, so I'm going to withdraw one of my objections, but we'll stand on the other. We'll talk about it.

MR. THAKUR:  We have only one other issue, and that's the one that keeps coming up the other day, which is the appearance of Mr. Lazaridis as a witness.  We had discussed yesterday, and you invited the parties to figure out what to do.  You suggested perhaps they could proffer the evidence of what he's coming about.  And maybe I should give context, I'd ask for a deposition once you decided that he could testify at trial.  And

where we left yesterday was perhaps they could proffer the evidence. I asked for the proffer of the evidence. I didn't get that.

What I got was, We will give you him for a deposition, but there's a condition attached, which is essentially a poison pill. They agreed to offer him for a deposition on machine, but they insist that he come on Tuesday morning, even though we have not finished, and that will put the witness in the middle of our case in chief.

MR. MATUSCHAK: Here's what we actually proposed, your Honor: Here's the situation. Mr. Lazaridis, although he's no longer the CEO, is still on the board of directors of RIM. They're having a board meeting next week. And so what we said is, Look, even though this will interfere with our trial preparation, we will give you him for a deposition on Monday. But he's got problems on Wednesday and Thursday. And so as a condition of giving you that deposition, can you let us put him on, not in the middle of the expert, but after the expert goes. Because the only thing we have after that is more videotape and their damages expert. We said, Would you just let Mr. Lazaridis then go on at that point so we can get him out of here and off to his board meeting.

They said they were unwilling to do that.  So we're now trying to figure out when we can arrange to get Mr. Lazaridis to testify.

We'd like to be able to have him, we'd like -- we're giving him for the deposition on Monday.  But all we ask is that the first new witness that comes on on Tuesday, instead of being more video, that we just take into account the issues that he has with his schedule.

THE COURT:  Well, this is perhaps an easy one to solve.  My order would be that he be deposed whether he's here to testify.  It won't require that he come to the district to testify, go back home, and then come here to testify.  It seems to me it's a courtesy to allow you to have an opportunity to hear him so that any matters he's going to be testifying about can be handled while he's here.  The proffer as to what he's going to be testifying to, that can happen now.  So do that.

MR. THAKUR:  Your Honor, we're waiting for the proffer.

MR. MATUSCHAK:  I think the proffer is exactly what it was in the initial disclosures that we talked about before.

THE COURT:  Well, put it in writing, and that way they can do a little check sheet whether he's testifying as to whether or not it's on the list.

MR. MATUSCHAK:  Thank you, your Honor.

THE COURT:  Very well.

(Adjourned)

oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

INDEX OF EXAMINATION

Witness:

                                                          Page:

MATTHEW L. WILSON

Direct By Mr. McDonald . . . . . . . . . . . . 763

Cross By Ms. DeBruin . . . . . . . . . . . . . 781

VIJAY MADISETTI

Direct By Mr. Thakur . . . . . . . . . . . . . 810

                              oOo


INDEX OF EXHIBITS

Exhibit No.                              Received:

 144, 860, 865 . . . . . . . . . . . . . . . . 811

                              oOo


CERTIFICATE OF REPORTER


        I, Connie Kuhl, Official Reporter for the United
States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by
me, a certified shorthand reporter, and were thereafter
transcribed under my direction into written form.

                    _____

                         Connie Kuhl, RMR, CRR
                         Friday, June 22, 2012


Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020