**Volume 6**

                                                    **Page 921 – 1175**

                    **UNITED STATES DISTRICT COURT**

                    **NORTHERN DISTRICT OF CALIFORNIA**

               **BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE**

**------------------------------)**
                              **)**
**Mformation Technologies, Inc., )**
                              **)**
                    **Plaintiff, )**
                              **)**
     **v.                       )    No. C  08-4990 (JW)**
                              **)**
**Research In Motion, Ltd.,      )**
**et al.,                        )**
                              **)**
                    **Defendants. )  San Francisco, California**
                              **)  Tuesday, June 26, 2012**
**------------------------------)**


                    **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**


**For Plaintiff:        Foley & Lardner, LLP**
                       **3579 Valley Centre Drive**
                       **Suite 300**
                       **San Diego, California 92130**
                  **BY:  AMAR L. THAKUR**
                       **LISA MARIE NOLLER**
                       **SHAWN E. MCDONALD**
                       **ALLAN A. ARNTSEN**
                       **RUBEN RODRIGUES**

**Also Present:         Rakesh Kushwaha, MTO, CEO**

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        MEREDITH ZINANNI
                        FERLILLA VICTORIA ROBERSON
                        MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Tuesday, June 26, 2012

(9:00 a.m.)

(In open court; jury not present)

THE COURT:  We're on the record, out of the presence of the jury.

I didn't understand some of these but some I did, and so let me give you back rulings on some of these materials.

Let me ask about the one that I was given immediately as I was about to come in having to do with the Madisetti slides.

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  Whose objection is this?

MR. MATUSCHAK:  My objection, your Honor.

THE COURT:  What is the objection?

MR. MATUSCHAK:  Three of the slides in there, slides 352, 353 and 357, probably the best way to look at it is the slide 352, if you have that.

THE COURT:  Yes.  352.

MR. MATUSCHAK:  So there it shows an opinion that Dr. Madisetti is planning to provide whenever RIM customer performs wireless enterprise activation, all the remaining steps of Claim 1 are performed.  That is, opinion is never disclosed in his expert report.  We've had a discussion about this, and what Mr. Thakur tells

me is, you know, that you can go into the expert report and you can find all the facts that support this opinion scattered around and you can infer that might be his opinion someday, but the fact is he never says -- that's not the standard for disclosure of expert testimony. The standard for disclosure of expert testimony is you say what your opinion is, and this opinion and the words that are on this slide and the two slides is simply not in his expert report.  It's a change in strategies.

THE COURT:  I heard you.

MR. THAKUR:  That is actually an incorrect statement.  In paragraph 84 of his report he specifically identifies RIM enterprise activation.  He specifically identifies the exchange.  He specifically identifies that they instruct customers to take the actions to complete the enterprise activation which yield the results.  Those words may not appear, but the opinion is there.

So the question is -- there's a two-step process. The customer enterprise registers, and then the server does the rest of the items themselves.  He has specifically identified that the customer does enterprise activation.  Once the customer does enterprise activation, in accordance with the user guides, the steps happen.

And he's heard the testimony of Mr. Hatcher and Mr. Wilson.

THE COURT:  Let me understand the opinion. First, he wishes to express the opinion that the enterprise activation alone performs all of the steps of the '917, Claim 1?

MR. THAKUR:  No.

THE COURT:  Well, it says here:  "Whenever performs enterprise activation, all the remaining steps are performed."  It sounds to me as though that's a statement that whenever you do one, you automatically do the other.

MR. THAKUR:  If you turn to the next slide.

THE COURT:  The objection is to this language. Do I understand that his opinion is not that enterprise activation performs all of the steps?

MR. THAKUR:  That is not his opinion.  His opinion is that --

THE COURT:  Is that your objection, that this -- I don't understand the slide.

MR. THAKUR:  I really do think the next slide, when tied together -- and I'm even willing to withdraw that slide if the next slide comes in.

MR. MATUSCHAK:  That's 53.  So here you see the problem is basically, again, what he's saying is, Okay,

you do wireless enterprise activation and then automatically everything else happens. Now, that opinion was not disclosed in his report. Are there bits and pieces of his report that if you stitch them altogether, he could have had that opinion and disclosed it? Perhaps, but he didn't -- he never said that was going to be his opinion at trial. And we shouldn't have to guess in the 300-and-some -- I mean, a huge report, look at all the facts and try to guess at what his opinions were going to be. He has opinions in his report. This is not one of them.

MR. THAKUR: Friday he expressed the opinion that once the customer does enterprise activation, the remainder of the steps are performed without a request from the wireless device, and those steps are performed by the server. So the customer only does Step 1 of 2. He's already expressed that opinion, your Honor.

MR. MATUSCHAK: That's a different opinion.

THE COURT: Well, I guess I don't understand the dispute, quite frankly. And I presume that the concern that is being expressed is whether or not the witness is intending to offer a new opinion that after enterprise activation, automatically everything else happens.

MR. THAKUR: That is not a new opinion, your Honor.

THE COURT:  Your answer would be, yes, that is his opinion that enterprise activation is the only step that needs to be performed, then, in order to infringe the patent.  Because everything else happens.

MR. THAKUR:  I guess maybe the right way to say it is enterprise activation is the only thing the customer needs to perform.

THE COURT:  That's not what this says.

MR. THAKUR:  That's why I'm willing to withdraw the slide.  Those two steps are the only two steps that are performed by the customer.  353 says what happens via the customer.  And then the remainder of the steps, what occur at the BES and the handheld.  He's going to explain that, your Honor.

THE COURT:  I see.  Well, that sound consistent with what you said, that you may wish to cross-examine him about whether or not the server does automatically do all of these things as opposed to being initiated. I'm not sure I understand the significance of the dispute at this point.

So I will permit, as long as it is accompanied by explanation, the use of the slides, because I don't think that it is new that he is of the opinion that the server, in combination with the wireless device, performs all of the steps of the method.  He has said

that on Friday.

What would be new is that somehow this might be done automatically, and that is the word that is new to me.  He didn't use the word "automatically" on Friday.  And to the extent maybe you should get him to say the opinion before you display the device to see whether or not there's an objection to the opinion.  And if that is overruled, then you can show the slide.  If it's sustained, then you can't.

MR. THAKUR:  Okay, your Honor.  But we will just explain the fact that those two steps are performed by the customer, and then the remainder of the steps are performed without a request.  I was not planning to use the word "automatically."

THE COURT:  That's why I guess the concern is expressed here.

So I'm done with that one.  This is perhaps invading the jury's time.  But I received a set of Weinstein slides with the red tabs with no explanation as to why they are red tabs.

MR. CHARFOOS:  Your Honor, we object -- well, I can give you explanations to several of them.  First of all, with respect to slide 16 and 17 -- just one clarification, your Honor, you sustained RIM's objection to 21, 24, this morning, and if you recall that's the

TD Newcrest, the third-party report.  You had overruled our objection the other day.

Now, of course, I would like it if you continued to sustain your objection that you maintain this morning.  That would take care of slide 16 and 17.  I can hand this back up to, your Honor, if you'd like to take a look at the document again.

THE COURT:  I'm sorry, why am I dealing with this now, though?

MR. CHARFOOS:  Mr. Weinstein is --

MR. ARNTSEN:  Going to go on today.  You could deal with it at the morning break.  Mr. Weinstein's going on today.

THE COURT:  You expect that in the course of between now and noon you'll finish with the current witness.  And at the morning break, then, this witness will come on.  So let me delay.

MR. ARNTSEN:  Certainly between now and 10:30, your Honor.

THE COURT:  Let's finish with this witness, who's the current focus of my attention.

And then I have IPVision.  What is this?

MR. CHARFOOS:  Correct, your Honor.  Your Honor granted the plaintiff's motion in limine on valuations of the patent.  That covered two categories of

documents:  The Mesirow financial documents, which valued the value of the patent, put a dollar value on it, and also the IPVision report, which was a substantive analysis of the patent in and of itself.  Is it a seminal patent, is it an important patent?  We're asking your Honor, in light of the information that has come to light in trial, in particular Mr. --
Dr. Kushwaha being asked what is the commercial value of Claims 25 and 27, and answering that question, that your Honor now allow us to introduce the Mesirow reports and correspondence, along with the IPVision report.  They've brought this issue into the trial.  Along with a host of other documents and testimony relating to the value of Mformation's stock.

THE COURT:  This would be something you would offer in as part of your case when they close?

MR. CHARFOOS:  I would likely cross-examine Mformation's damages expert today, because it's directly relevant to his opinion.

THE COURT:  But that's a separate witness than the current one.

MR. CHARFOOS:  Exactly, your Honor.

THE COURT:  We'll wait on that one then.  I'll hear you at that point.

MR. CHARFOOS:  That would also take care of the

Mesirow folder, which I think is probably underneath the IPVision one.

THE COURT:  This (indicating)?

MR. CHARFOOS:  You got it.

THE COURT:  So these two go together?

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  I'll wait on that.

And then I have a whole series of 2256 through 2260, it says:  "Defendants agree that these exhibits can be used for demonstrative purposes but not introduced into evidence."  They are exhibits from Mformation's expert report.

MR. ARNTSEN:  These are also Weinstein exhibits that could wait with the other ones.

THE COURT:  All right.  All of these summaries and those sorts of things, there's rules of evidence that govern summaries.  You may offer summaries, but slides and those sorts of things don't come into evidence unless they were produced at the time and weren't done for purposes of litigation and there's a proper foundation laid for them.

I'm not sure what these are, but I'll put that with the other two then.

Summon the jury.

MR. ARNTSEN:  Thank you.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Good morning.  Please be seated.

May we have our witness back?

(Witness resumes the stand.)

THE COURT:  You may resume your examination.

DIRECT EXAMINATION (cont.)

BY MR. THAKUR:

Q.  Good morning, Dr. Madisetti.

A.  Good morning, sir.

Q.  Where we left off on Friday was slide 264.  Do you recognize this document?

A.  Yes, I do.

Q.  Before we continue, perhaps you could re-summarize where we left off and then we'll continue from there.

A.  Yes, on Friday, I had discussed one example of a threshold condition.  And that had described all the steps of Claim 1.  So it was my opinion that:  "The use of RIM's BlackBerry Enterprise Server, Versions .40 and later, in combination with BlackBerry handheld practices, the step of establishing a connection between the wireless device and the server, wherein the connection is established based on a threshold condition."

And the threshold condition that I identified was

the least cost routing.

Q.  Thank you, Doctor.

MR. THAKUR:  I have one housekeeping item, and then we can continue.  There was two sets of slides that were objected to on the ground that the source code was identified by RIM that was not allegedly previously disclosed.  RIM has withdrawn both those objections. Maybe we could momentarily get both those source code exhibits into the record (we could).

Chris, would you kindly turn to slide 167, please?

BY MR. THAKUR:

Q.  Professor Madisetti, do you recognize the slide?

A.  Yes, it is page 1 of Exhibit No. 4209.  It describes the step of placing a command for the wireless device in the box.  It is RIM's source code, which describes adding updating and deleting ITAdminQueue entries in the database.

Q.  And this is RIM source code, correct?

A.  Yes.

Q.  If we could continue to the next slide, 168.  And what is this slide?

A.  Yes, this is a function called AddITAdminQueueItem, and it is exemplary code that adds a row or a command to a particular -- presenting a particular command at the

server to the mailbox, which is the ITAdminQueue.

Q.   And continuing on with the third slide.

A.   Yes.  This is an example of an address in memory where it is -- the different fields of the command are given values here.  So, for example, you'll notice the different fields on the left.  For example, the queue items, they talk about the device type, the device status, as well as GME transaction ID, and the command.  And so I have highlighted the command there, which is inserted at that address.

So that's an example of some pointers to some addresses in memory where the command settings sent into the mailbox.

Q.   The other slides are slides 220 to 222.

MR. THAKUR:  Chris, would you kindly turn to that page.

BY MR. THAKUR:

Q.   Dr. Madisetti, perhaps explain what these slides are about.

A.   Yes, this is the Exhibit 4214, the page 1.  This represents code that is on the device itself as opposed to the server.  And this is called "ITAdminTransmissionService.java."  So it shows the process by which the command is actually accepted on the device, so it's a RIM device code.

So if you go to the next slide.

So here is where -- which is Exhibit 4214, page 2 -- and it describes that the ITAdmin command must be off the GME datagram.  The GME is the protocol that is used to transcript the ITAdmin command.  It can only be sent from the BES and must be encrypted.

So there are these steps here where they find the GME datagram to make sure that the command is completely correct in terms of what it's trying to do and who is sending it.  And this function processes the overlayer datagram.  Which is the command.

So if you go to the next slide, this is Exhibit No. 4214, on page 10.  This is a function used to send acknowledgment back to the BES, the server, regarding the status of this overlayer command, and this function here, "sendAcknowledge," sends back an acknowledgment regarding the status of the OTA command.  So that is an example of sending an acknowledgment back on the GME collection.

Q.  So the acceptance occurs at the device, correct?

A.  Yes, the acceptance occurs at the device.

Q.  And the device has sometimes been referred to in this case as the agent code, correct?

A.  Yes.

Q.  And as part of your analysis, you did an analysis of

the RIM BES server code?

A. Yes.

Q. And you did an analysis of the RIM agent device server code?

A. Yes.

Q. So let's continue where we left off, I'm sorry, with slide 264.

So this was where we left off Friday, and you expressed your opinion on this slide to start with, so I won't have you repeat that.

If we could turn you back to slide 239. So you may recall this was where we started on the threshold conditions. You've identified the least cost routing has been covered. Perhaps you could talk us through the next threshold condition.

A. Yes, on Friday I discussed what was least cost routing as a threshold condition. In other words, given the choice between WiFi and cellular, it chooses the WiFi.

There are three other examples of threshold conditions that I've identified and I provide support for in this testimony. And I will cover them in that order.

The first is the backlog of command at the server. And the second one would be the attempted

delivery of the command five times from the server to the device. And then they show the device availability and how that is used to -- as a threshold condition.

Q. Okay. I believe that slides 239 through 248 cover the least cost routing.

MR. THAKUR: So, Chris, could you take us to 249?

THE WITNESS: Yes.

BY MR. THAKUR:

Q. Could you explain to us what we are seeing?

A. Yes, this is an example of the threshold condition, which I will explain. And this is Exhibit 4211 on page 1. So as you can see here, this is a code on the server in the scs.cpp. It described a function called PollDBQueueNewRequests.

Before showing the Court, I'll briefly explain what this function did. So there is a BES, which is a server, which is sending commands to the device. So in a typical large enterprise with 1,000 users or more, there would be a lot of commands that are being put in the main box. So what happens is that there are many issues with respect to performance. So the idea is that if there is -- if there are a certain number of commands already in the mailbox, it will check to see if the maximum has been reached. And if the maximum has been reached, then that command will not be in the process

because it may cause performance impact on the system. And those commands that are in that, that have been accepted for processing, will be proctored in the manner so that the load on the database is spread out over a period of time.  Otherwise, it can have at 12:00 in the night, if you have a few thousand or so commands suddenly being issued, they're would create a performance issue.

So there are two steps here.  One is the size of the batch that is accepted.  So if your command happens to be outsized, it waits.  Then, once you are in that batch, there is a throttling step that spreads out the load so that you don't impair the performance.

So this function is one of the functions that identifies how many new requests have been put in the queue, in the box.  And it finds out by polling them.

So if you look at the next page, you'll see that this is the declaration of the function.  It's called PollDBQueueNewRequests.

And the next slide, which is Exhibit 4211 --

Q.  Dr. -- no, that's fine.

A.  4211, page 21, goes into further detail on how this function works.

So, first, there is a maximum number of commands that are in the -- that are accepted for processing

after they are in the box.  And that is typically given a default value by RIM of around, say, 300.  And then there is a certain batch that is accepted for the BES, which is something like around a hundred.

And then there are a number of other constraints. For example, the number of keys that can be shot, which is about 50.  So once that checking is done, then there is this throttling which makes sure that only a certain number of commands are sent for processing permitted. So that way it evens out the load.

So you can see here these are the checks that are done.  So, for example, it may well decide that there's no available bandwidth to do anything this fully, so the command will be processed in the next full cycle, and for each full cycle, there's a trio of commands that is processed.

So this kind of thresholding determines the -- one of the conditions that I've used to show that a threshold condition exists in establishing the --

Q.   Dr. Madisetti, why is this a threshold condition?

A.   Yes.  We can look at the Court's construction of the threshold condition, and I can explain exactly how this meets it.

MR. THAKUR:  Could you turn us back to slide 239.

Actually, we'll need to go back to 237.

THE WITNESS:  Yes, so threshold condition has been constructed by His Honor as:  "Establishing a connection between the wireless device and the server, based on a predefined state of the server or the wireless device."

So the number of requests that are being processed, the number of requests -- the maximum number of requests that can be processed per poll, these are the state of the server.  So before you process a command, and establishing a connection to send the command, you are making these checks on the server state.  So this satisfies the requirement of the construction of the threshold condition.

MR. THAKUR:  Slide 252, please.

THE WITNESS:  So this is the -- a third example of a threshold condition that I have -- I'm offering here.  So this talks about attempting to tell you a command five times.  So after the command is in the queue, after it's been processed, packaged, at that point, if for some reason the command is not delivered within five times, it will stop.

So if you look at -- if you go back to the previous slide, if you look at Mr. Cherry's -- Mr. Cherry's deposition, he's the official RIM witness.  On page 243, lines 23, to page 244, lines 5, here is in

response to a question:

"Q   Okay, but as long as the server has not received

a receipt, it will continue to repush, correct?"

So Mr. Cherry answers:  "Yes, for a certain

number of pushes.

"Q   What is the number of pushes?

"A   I think -- I think five.  I think it will try

five times and then it will stop."

So that is an example of the state.  So it counts

the number of times it has tried, and there's the state

on the server, it's told locally on the server.

If you go to the next slide, it's further

confirmation from Mr. Cherry where he confirms that it

will, and for the question -- and the question is:  "And

it will send out the application each one of those five

times without any communication with the device?"

The answer:  "That's correct."

In Mr. Cherry's deposition transcript on

page 244, lines 9 through 12.

BY MR. THAKUR:

Q.   And this is your belief this is the third threshold

condition?

A.   Yes, this is the third example, third example of the

threshold condition.

MR. THAKUR:  If you could turn to slide 237,

please.

BY MR. THAKUR:

Q.   Perhaps, Dr. Madisetti, you could explain why that satisfies the -- excuse me, the attempted delivery of command five times satisfies the threshold condition construction by the Court?

A.   Yes.  As for the Court's construction, the threshold condition limitation says:  "Establishing a connection between the wireless device and the server based on a predefined state of the server or the wireless device other than solely the elapsing of time."

So the number 5 or similar number that is used to -- as an indication of state before you stop sending the command is an example that fits the construction.

MR. THAKUR:  If we could next turn to slide 265. Excuse me, the 254.

THE WITNESS:  Yes.  This is the fourth example of a threshold condition.  It is the device availability. So this is from Mr. Lewis, who's also a RIM witness, at his deposition transcript, page 54, lines 8, to page 55, lines 5.  In response to the questions here, he responds that, if you look at the line which starts with the "that component" where he answers the question.

So Mr. Lewis says:  "As with any message, again, all GME messages received, not specific to this command

even, but all messages received by the BES or from the BES to be delivered to the handheld, the component that received the message from the BES will send that message to the component it believes the device is associated with.

"That component will attempt to deliver to the device, but because the device is out of coverage, it will fail.  Or turned off, looks like out of coverage. And it will send the result code back to the component..."

So in this case what will happen is that if the device is turned off or out of coverage, that information is sent back to the BES.  And that becomes the local state on the BES, and the BES then will wait for an indication that the device is back in coverage.

So that further confirms that the BES is looking at the state, the local state, before sending the message.  And that is another example of a threshold condition.

And it's further confirmation in Mr. Lewis's deposition transcript on page 57, lines 2 to 9, where he says that:  "When it tries to send a packet, in this case a UDP packet, to that device and receives no acknowledgment, after some number of attempts to do this, it assumes the reason is because the device is out

of coverage."

And if you go to the next slide.  Further, Mr. Lewis in his deposition on page 62, lines 20, to page 63, lines 23, discusses how these -- I will not read this entire passage, but it will say that in response to this question:  "So is it fair to say that all GME messages sent from the wireless transport to the device will result in an acknowledgment if they have been received by the device?"

Answer, from Mr. Lewis:  "That's certainly how the system is supposed to work."

So the -- and so if the device does not respond, so what that means is that, as shown in the next slide, which is Mr. Lewis's deposition transcript on page 86, lines 22 to 25, in answer to the question:  "Is that handheld state indication passed from the relay back to the sender?"

The answer from Mr. Lewis:  Yes, it is sent back to the BES.

So it represents the state on the BES that is used to -- used as a threshold condition.

So if you go further, there are other examples of testimony, this is Lewis's deposition, page 89, lines 19, through 90, line 6.  It is again very similar to what I discussed.

There is also a document which is Exhibit 0266. This is the cover page. It is "SRP Protocol Specification." Gone from RIM.

And if you go to the next slide, it describes Exhibit 266, page 18, it talks about the state of unreachable, which is the device is out of coverage. So that confirms again that there's a state that is monitored that the device is in coverage or out of coverage that is then used as a threshold condition.

MR. THAKUR: Turn back to slide 237, please, Chris.

BY MR. THAKUR:

Q. So based on your analysis, is it your opinion that the claim construction device availability satisfies the last element of "wherein a connection is established based on a threshold condition"?

A. Yes, it is.

Q. And that's based on the Court's construction.

A. That is based on the Court construction as shown here.

MR. THAKUR: If you could turn back to slide 264.

BY MR. THAKUR:

Q. This slide re-summarizes where we left off on Friday, but the difference is we have now identified the other threshold conditions. Could you perhaps explain the

opinion once again for all four of them in a single sentence?

A.  Yes, so this establishes all the evidence for Claim 1.  Including the two pieces of source code that we discussed today.  So my opinion on Claim 1 is that: "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices Claim 1 of the '917 patent."

Q.  Thank you, Dr. Madisetti.

Dr. Madisetti, are you aware that there are actually in fact eight accused claims in this case?  Eight asserted claims in this case?

A.  Yes, sir.

Q.  I'd like to turn to the next asserted claim.  Do you see that claim number?

A.  Yes, I do.

Q.  Can you explain what Claim 6 is?

A.  Claim 6 is a dependent claim, and Claim 6 describes: "The method of Claim 1," so it means that it includes all the steps in Claim 1, "further comprising the step of," that means an additional step is required which is transmitting information relating to the execution of the command at the wireless device from the wireless device to the server.

So in addition to the steps of Claim 1, there is

an additional step of "transmitting information relating to the execution of the command at the wireless device from the wireless device to the server."

Q.   And did you arrive at a conclusion with respect to Claim 6?

A.   Yes, I have.

Q.   And what was the basis of your conclusion?

A.   Yes, I've -- as I've outlined in this demonstrative, I've relied on the following sources, which are the BlackBerry Enterprise Server Feature and Technical Overview.

The second document is the Policy Server Component Overview.

And the third is also some RIM source code.

Q.   To the next slide.  What is this document?

A.   So this is the cover page of Exhibit 350.  Which is the BlackBerry Enterprise Server for Microsoft Exchange, Version 5.0, Feature and Technical Overview.

And this is the description of the GME in Exhibit 350, page 106, that describes the GME protocol as the proprietary protocol that allows the transfer of compressed and encrypted data between the wireless network and BlackBerry devices.

So this is the second document which, is Exhibit No. 496, and this is the cover page of the Policy Server

Component Overview, Version 0.4.  And 2007.  And this is an excerpt from that document of Exhibit No. 496, page 19.

So here it describes that:  "When sending administrative control directives to devices, the Policy Server sends GME packets with the ITAdmin command type."

So this confirms that the GME protocol is used to send the ITAdmin commands.

And then in the next slide, in Exhibit 496, page number 7, so here you'll notice that I've highlighted the "Succeeded" step.  So, "When the Policy Server receives an application level ACK from the device for a successfully processed command, the Policy Server marks the associated work request's entry in the database with the 'succeeded' status."

So there is an acknowledgment, according to the -- from the command that describes the -- that the command has been successfully processed at the device.  And that is reflected at the server to the -- through this highlight on page 7 of Exhibit 496.

Q.  Professor Madisetti, when they use the word "ACK," that means "acknowledgment," correct?

A.  Yes, ACK stands for "acknowledgment."

And this is another excerpt from pages 21 and 22 from Exhibit 496, where here it describes in the

highlighted section:  "The device attempts to enact the command in the packet, and then if appropriate, sends back an application-level ACK to indicate the success or failure of the command."

So that means the handheld sends acknowledgment after execution.

Q.  And you said you looked at RIM source code as well?

A.  Yes.  This is an example of the source code that I relied on, which is Exhibit No. 4214, page 1, this is the ITAdminTransmissionService.java.  And this is RIM code that executes on the device.

And this again describes that the ITAdmin command is of the GME datagram type, and it can only be sent from the BES.  And it verifies the GME datagram with this particular function on page 1 of Exhibit 4214.

And on page 10 of Exhibit 4214, you notice that there is a description of eight functions used to send acknowledgment back to the BES regarding the status of this over-the-air command.  And the function is "SendAcknowledge," which is described here.

Q.  Dr. Madisetti, if I may point you to the word "acknowledgment" is in RIM source code itself; is that correct?

A.  Yes.

Q.  And based on the materials you've described, have you

arrived at an opinion with respect to Claim 6 of the '917 patent?

A.  Yes, I have.

Q.  And could you state that opinion, please?

A.  It is my opinion that:  "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices Claim 6 of the '917 patent."

And my support for all the remaining acceptance of Claim 1 have been incorporated from earlier testimony.  So when you combine that with the testimony I just provided for this additional step, that forms the basis for this opinion.

Q.  Could we perhaps move to the remaining claims.  The next claim is Claim 21.  Did you arrive at an opinion with respect to Claim 21?

A.  Yes, I have.

Q.  What is your opinion?

A.  "The method of Claim 1, wherein the command comprises enabling/disabling access of the wireless device to the server," this is again a dependent claim that depends on Claim 1, so all the steps of Claim 1 are carried out, plus the command is of a particular type.  It either enables or disables access of the wireless device to the server.

And I've relied on the following sources for my opinion, which is that the use of RIM's meets this claim, practices this claim.  So the sources that I relied upon include the BlackBerry Enterprise Server Feature and Technical Overview; and the Policy Server Component Overview.

So this is the Exhibit 2022, page 1, which is the cover page for the Feature and Technical Overview of BlackBerry Enterprise Server for Microsoft Exchange, Version 4.0.

And on pages 22 and 23 of Exhibit 2022, you'll notice there, there is highlight here for the "Kill handheld," which says that if a handheld is stolen or lost, you can send the "kill handheld" command to erase all information, and that makes it unavailable.  So that confirms that the kill handheld command makes the device unavailable.

If you go to the next demonstrative, which is from Exhibit 2022, page number 27, in the section on "IT Policies and IT Command," it describes the wireless IT command where it describes commands that can make a handheld unavailable and make a handheld unavailable, so that provides further confirmation that the "kill handheld" command makes the device unavailable.

So -- so another source of support is Exhibit

No. 139, which is on page 1, which is the cover page, is the Feature and Technical Overview, the BlackBerry Enterprise Server for Microsoft Exchange, Version 4.1.

Q.   So, Dr. Madisetti, it's the same concept as that you're relying on for 4.1 and 5.0?

A.   For all the versions of the BES.

Q.   They work the same way?

A.   They work in the same way, yes.

So this is Exhibit 0139 on page 34, it talks about how you can permanently delete the application data on the lost or stolen BlackBerry device, and one of the results is make the BlackBerry device unavailable for use.  So that is additional confirmation that such a command exists.

Now, here is another source of support for on Exhibit 350.  The cover page of BlackBerry Enterprise Server for Microsoft Exchange, Version 5.  And it's the Feature and Technical Overview.

And you'll notice that in the next slide, that on page 48 of Exhibit 350, there is again, as discussed earlier, in 5.0 as well, there is a command, "permanently delete application data on a lost or stolen BlackBerry device."  And that makes the BlackBerry device unavailable.

So there is additional support from Exhibit 496,

the cover page as shown here, page 1, which is the Policy Server Component Overview.  And in this particular document on Exhibit 496, page 15, there is a description of the "kill handheld" command.  And that describes -- that confirms that the "kill handheld" command exists and it performs that function.

Q.  So based on your review of the material, did you arrive at an opinion with respect to infringement of Claim 1?

A.  Yes, I have.

Q.  Could you please state that opinion?

A.  And the opinion is that:  "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with BlackBerry handhelds, practices Claim 21 of the '917 patent."

Q.  Did you also analyze Claim 22 in this case?

A.  Yes, I did.

Q.  And what was your -- did you arrive at an opinion with respect to infringement of Claim 22?

A.  Yes, I did.

Q.  And what is your opinion?

A.  The opinion is that:  "The use of RIM's products in association with the handhelds, Version 4.0 and higher, practices Claim 22."

Q.  Dr. Madisetti, it might be helpful to explain the

difference between Claim 22 and 21.

A.   Yes.   They both are dependent claims, and they depend on the method of Claim 1.  And Claim 21 talks about enabling or disabling access of the device to the server.  So it's an access.  While Claim 22 describes a command that enables or disables applications that may be running on the wireless device.  For example, your camera could be disabled if you provide such a command.  So that's an example of how Claim 22 would be used.

Q.   Thank you.

Could you perhaps discuss the materials you relied on in arriving at this opinion?

A.   Yes.  In the previous slide I list the materials.  And so if you please turn to the previous slide.  Yes, the sources that I relied on are the BlackBerry Enterprise Server Feature and Technical Overview, and the Policy Server Component Overviews.

And I will describe the support from each of these.  So Exhibit 496, page 1, is the Policy Server Component Overview.  And the Version 0.4.  And in this particular document, if you go to the next slide, we have the command "Set IT Policy" that we discussed earlier.  The Set IT Policy in Exhibit 496, page 15, describes:  "An admin using the BB manager can instruct the Policy Server to send a new set of IT policy data to

the device."

So this means that they can, for example, send a set of policies that disable access of a particular function or enable or disable a particular function on the device.

And if you can go to the next slide.

So here is Exhibit 496, page 23.  This in Section 7.3, this is further support of rules regarding applications, when they're allowed or disallowed.  And here you can see here that there are -- I will not read the entire thing -- but it says:  "The BES administrator defines the application control policies for each device on the BES; and applications can be marked as optional, required or disallowed."

So that is further example of support for rules regarding whether certain applications are enabled or disabled at the device through command.

Q.  And RIM's own documents use the word "applications," correct?

A.  Yes, it does.  This is Exhibit 496, page 23.

Exhibit 2022, page 1, is the cover page of BlackBerry Enterprise Server for Microsoft Exchange, Version, 4.0, the Feature and Technical Overview.

And on page 13 of Exhibit 2022, it describes further rules regarding applications, so this is

highlighted here as a third-party application control. So here, it's clearly stated that: "If an application is permitted on the handheld, users can optionally load the application. If an application is not permitted, users cannot load the application."

So that's further support that there is a command for enabling or disabling applications on the device.

And Exhibit No. 139, reference to Version 4.1 of the BlackBerry Enterprise Server for Microsoft Exchange, the Feature and Technical Overview, and if you go further you'll see that in Exhibit 139 on page 28, as I've highlighted here, "Controlling third-party applications on BlackBerry devices," on Version 4.1 allows users to download and install third-party applications or prevent them from downloading applications.

You can also remove applications.

The additional document that I've used here is Exhibit 350, which on page 1, is the cover page of the BlackBerry Enterprise Server, Version 5, and this is the Feature and Technical Overview. And on page 7 of Exhibit 350, for Version 5.0, I've highlighted that: "You can use software configurations to specify which applications are required, optional, or are not permitted on BlackBerry devices." And that further

supports Claim 22 with respect to commands that establish rules for allowed and enabled and disabled applications.

Page 43 of Exhibit 350 also provides support in how you can use the BlackBerry Administration Service to install applications, and you can permit users to install third-party applications. You can also remove applications from BlackBerry devices. So RIM also uses the word "applications" and -- in the context of enabling and disabling them.

Q. And based on your review of the materials, did you arrive at an opinion with respect to Claim 22?

A. Yes, I have.

Q. And -- and what was your opinion with respect to Claim 22?

A. My opinion is that: "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with BlackBerry handhelds, practices Claim 22 of the '917 patent."

Q. Turn to Claim 23. Did you arrive at an opinion with respect to Claim 23?

A. Yes. Claim 23 is again a dependent claim. And it's "the method of Claim 1, wherein the command comprises erasing all or part of contents of the wireless device."

So this is another type of command that comprises

erasing or -- erasing all or part of contents of the wireless device.

Q.   And what did you rely on to arrive at that opinion?

A.   Here are the sources that I relied on, and the sources include the BlackBerry Enterprise Server Feature and Technical Overview.  And the Policy Server Component Overview.

And here is the cover page of Exhibit 2022, page 1, which is the Feature and Technical Overview of Version 4.0 of the BlackBerry Enterprise Server.

And if you look at the excerpts I've used here from Exhibit 2022, on pages 22 and 23, it describes the "kill handheld" command, and says that:  "If a handheld is lost -- stolen or lost, you can send the kill handheld command to erase all information and application data on the handheld."

So that is confirmation that there is a command that erases data.  All or some of the data, device data on the device.

So here is additional support from Exhibit 2022, on page 27, under "IT Policies and Command," where the wireless IT command can delete stored data, and also delete all applications and stored data.  So there are two citations of support in Exhibit 2022.

Q.   And just continuing on to the next two, Version 4.1

and 5.0.

A.   Yes, this is Exhibit 139, page 1, which is a similar document, Feature and Technical Overview for Version 4.1.  And again, this on page 34 of 0139, it describes how you can -- there's a command to delete all information and application data on page 34.  And I will not -- since it's very similar to 4.0, I will not describe it further.

Q.   Thank you.

A.   Again, on Exhibit 350 on page 1, which is the similar document, Feature and Technical Overview for BlackBerry Enterprise Server for Microsoft Exchange, Version 5.0.

So again here, I will cite support on -- for Exhibit 350 on page 48, the same information that you can -- "IT administration command to delete all information and application data," that command exists.

And if you go further, in Exhibit 496, page 1, which is the Policy Server Component Overview, Version 0.4.

And please go to the next page.

You'll see Exhibit 496, page 15, the "kill handheld" command is sent to the device.  The directive to wipe its user's personal information, and that is further confirmation that the "kill handheld" command erases device data.

Q.   Dr. Madisetti, I notice the word "wipe," while your earlier documents I see the word "erase."  Are they the same?

A.   Yes, they are the same.  "Wipe" and "erase" will be the same.

Q.   So based on your analysis of RIM's material, did you arrive at an opinion with respect to Claim 23?

A.   Yes.

Q.   And what is your opinion?

A.   With respect to Claim 23, it is my opinion that: "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices Claim 23 of the '917 patent."

Q.   Thank you.  Let's turn to Claim 24.  Did you review Claim 24?

A.   Yes, I did.

Q.   And do you have an opinion with respect to infringement of Claim 24?

A.   Yes, I have.

Q.   And what did you base your opinion on?

A.   Yes.  Claim 24 is a dependent claim, it depends on Claim 1.  And the command here "comprises transmitting new programs and data to the wireless device."  I relied on again the documents are BlackBerry Enterprise Server

Feature and Technical Overview and Policy Server

Component Overview.

Q.   Let's look at the materials you relied on.  Is this the first material document you relied on?

A.   Yes, this is 2022, the cover page of BlackBerry Enterprise Server for Microsoft Exchange, Version 4.0.

And on page 13 of Exhibit 2022, I've identified that there is, I've identified this section that confirms that, under the "Third-party Application Control," "If an application is required, it is sent to the handheld automatically."

And this confirms that you can send new applications to the handheld.

And if you look at page 27 of Exhibit 2022, again under "Third-party Application Control," I've highlighted the section that says:  "Send third-party applications to handhelds wirelessly (applications that are required for a particular user are pushed to the handheld wirelessly and are installed automatically."  Confirming there's a command for sending new applications to the handheld.

Q.   Dr. Madisetti, I see the word "third-party application."  Just explain, those are applications that are developed by other than the companies?  Google Maps would typically fall into something like that?

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

A.   Yes.

This is the second document for Version 4.1, which is Exhibit 139.  This is the cover page for the BlackBerry Enterprise Server 4.1, Feature and Technical Overview.  And here I cite support from, in the next slide, page 28 of Exhibit 139, where it describes:  "Wireless application delivery.  You can use software configurations to send BlackBerry Applications to the BlackBerry device over the wireless network."

So that confirms that you can send new applications to the handheld as per Claim 24.

And if you go further, this is for Exhibit 350, for the BlackBerry Enterprise Server Version 5.0, and this is again Feature and Technical Overview.  There is similar confirmation on the next slide, which is page 7 of Exhibit 0350, it confirms that:  "You can use the BlackBerry Administration Service to install and manage the BlackBerry device software and BlackBerry Java Applications on the BlackBerry device."

So that provides additional confirmation.

Similarly, on page 37 of Exhibit 350, you will see that on the BlackBerry Applications, I've highlighted the section that says:  "You can install and manage BlackBerry Java Applications on BlackBerry devices using the BlackBerry Administration Service."

So this further -- provides further confirmation that commands are there to send applications to the device.  Yes.

And Exhibit 350 on page 43, provides again additional support for installing applications on BlackBerry devices over the wireless network.

And then we have Exhibit 496, which is the cover page of the Policy Server Component Overview, Version 0.4.  And in this particular document, which is the next slide, we have page 16 of Exhibit 496, confirms that the "Send Application" command, the Policy Server should send a new application to the device.

And if you go further, on page 23 of the same Exhibit 496, the Section 7.3, "Sending applications to devices."  I've highlighted that:  "Required applications must be on the device, and the device's user can't delete them."

And it talks about optional applications to be sent to the device, so it provides additional confirmation of the ability to send applications to the device from the server through user formats.

Q.   Did you arrive at an opinion with respect to Claim 24?

A.   Yes, I have.

Q.   And what was -- and that was an opinion of

infringement, correct?

A.   Yes.

Q.   Could you state your opinion for the record?

A.   An opinion with respect to Claim 24 that:  "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices Claim 24 of the '917 patent."

Q.   If we could turn to the next claim.  The next claim is Claim 25.  Do you see that, sir?

A.   Yes, I do.

Q.   Did you arrive at an opinion with respect to infringement of Claim 25?

A.   Yes, I did.

Q.   What did you base your opinion on?

A.   Yes.  Claim 25 is again a dependent claim, "a method of Claim 1, wherein the command comprises querying a current state of the wireless device."

        And I relied on these two sources, which are the Policy Server Component Overview, and the BlackBerry Enterprise Server Policy Reference Guide.

Q.   Perhaps you could walk us through the first exhibit.

A.   Yes.  This is Exhibit 496, which is page 1, the cover page of Policy Server Component Overview.  And I've -- the next slide on page 15, I describe the command of "Set IT Policy" that is used to send a new set of IT

policy data to the device.

And similarly, in Exhibit 144, page 1, this is the Policy Reference Guide for -- the BlackBerry Enterprise Server Policy Reference Guide, Version 33, for Version 4.0.

Q.   4.1?

A.   4.1.  Sorry.

And here it talks about, in this specific section on page 92 of Exhibit 144, I've highlighted the section called, "Enable Enterprise Location Tracking IT policy rule."   So it describes here:  "This rule specifies whether the BlackBerry device can use the GPS feature to report its location to the BlackBerry Enterprise Server regularly."

So this represents the state of the device that is then reported back to -- so this represents the current state or its location that could be reported back to the server regularly and the BlackBerry user. So that's the section I've highlighted on page 92 of Exhibit 144.

Q.   I want to go back one slide.  I notice this is a document we haven't seen before.  It says the "Policy Reference Guide."  Do you know what the purpose of the Policy Reference Guide is?

A.   Yes.  There are a number of policies that RIM and

BlackBerry support.  There are over 400 policies.  And this is a -- the instruction to IT administrators and others as to what sort of policies are available to be used in Enterprise.  So it's -- this represents Version 4.1 of that document.

Q.  I'll skip the one you already answered.  Perhaps you can discuss this one.

A.  Yeah, in Exhibit 144 on page 93, there's additional support that the current state of the handheld or its location is monitored.  And this is highlighted in "Enterprise Location Tracking User Prompt Message IT policy rule."  So this is another example of an IT policy rule.  That allows you to track the current state of the handheld.  Tie at the server.

And the default state that the state is tracked.

And this is page 93 of Exhibit 144.  Which provides further support of the current state of the handheld.  Which is Enterprise Location Tracking.  And it's done at regular intervals of 15 minutes.

The other document that I relied on is Exhibit 354, which is the BlackBerry Enterprise Server, Version 5.0.  So this is again a new document.  This is the Policy Reference Guide.  Again, it talks about hundreds of policies that RIM had to provide IT administrators a guide on how to use them.

And so here in this particular section on Exhibit 354 on page 101, I highlight the section which says that the IT -- this rule -- there's a particular rule in the IT policy guide that says:  "This rule specifies whether a BlackBerry device can use the GPS feature to report its location to the BlackBerry Enterprise Server regularly."

And there's also confirmation on Exhibit 354 on page 102, which is essentially the same language with respect to Enterprise Location Tracking.

Q.  And based upon your analysis of these materials, did you arrive at an opinion for Claim 25?

A.  Yes.

Q.  What is your opinion, sir?

A.  With respect to Claim 25, it is my opinion that: "The use of the RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices Claim 25 of the '917 patent."

Q.  Mr. Madisetti, I'll turn to the next slide.  Is this Claim 27?

A.  Yes, it is.

Q.  And did you arrive at an opinion of infringement for Claim 27?

A.  Yes.

Q.   What did you rely on to provide an opinion for claim
of infringement for Claim 27?

A.   Claim 27 is a dependent claim depending on Claim 1,
describes:  "Wherein the command comprises monitoring
the location of the wireless device in the wireless
network."

So it's -- actually so I relied on the set of
documents Policy Server Component Overview and the
BlackBerry Enterprise Server Policy Reference Guide.

Q.   And monitoring the location of the very specific
essential term in comparison to the current state which
could be a part of it, right?

A.   That's right.  If you'll notice in Claim 25, we have
the notation of "Wherein the command comprises querying
the current state."  Whereas in Claim 27 there is what
is described as, "monitoring a location of the wireless
device."  So this is more specific than Claim 25.  And
I've cited the next few slides, which cite the same
support for Claim 27.  And this is Exhibit 496, page 1,
the Policy Server Component Overview.

And if you go to the next slide.  I cite "Set IT
Policy" from Exhibit 496 on page 15.  This is additional
support from Exhibit 144, page 1, for the Version 4.1 of
the Policy Reference Guide, which is BlackBerry
Enterprise Server Policy Reference Guide that is

provided to IT administrators.

And if you go to the next slide, it's Exhibit 144, page 92.  I've highlighted the section that describes "Enable Enterprise Location Tracking IT policy" that talks about monitoring location.  And how it's reported back to the server.

And if you go further --

Q.  Dr. Madisetti, I notice that the word "report the location."  That's the language from RIM's own documentation, correct?

A.  Yes, sir.

And again, from Exhibit 144 on page 93, I've highlighted the section "Enterprise Location Tracking User Prompt Message IT policy rule."  This is another rule that specifies the message that the BlackBerry device displays, that it notifies to the user that the BlackBerry Enterprise Server is tracking the location of the device.  So this provides additional confirmation that you can monitor the location of the handheld device.

So this is Exhibit 144 on page 93.

Go to the next slide.

So this is for Version 5.0, BlackBerry Enterprise Server, the Policy Reference Guide, Exhibit 354, page 1.

Here again, we have an Exhibit 354, page 101,

which talks about the section that enables Enterprise Location Tracking, and this is the same rule that allows a BlackBerry device -- that allows tracking of the location of the BlackBerry device by its server.

And if you go further, so there is again support in Exhibit 354 on page 102, there's another IT policy rule about Enterprise Location Tracking, and this confirms that:  "The rule specifies the message that a BlackBerry device displays that the BlackBerry Enterprise Server is tracking the location of the BlackBerry device."

And it's specified.

And this is additional support, on page 102 from Exhibit 354, about Enterprise Location Tracking of the location of the BlackBerry device.

Q.   Turn to the following page.  Did you arrive at an opinion with respect to Claim 27?

A.   Yes, I did.

Q.   And what was your opinion with respect to Claim 27?

A.   With respect to Claim 27, it is my opinion that:  "The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, in combination with the BlackBerry handhelds, practices Claim 27 of the '917 patent."

Q.   So based on the detailed analysis you did on all the

claims, did you arrive at an overall conclusion in this case?

A.   Yes.

Q.   Could you state for the record your overall conclusions for this case?

A.   Yes, I have prepared a demonstrative on this regarding my opinion concerning infringement of Claims 1, 6, 21 through 25 and 27.  It is my opinion that:
"The use of RIM's BlackBerry Enterprise Server, Versions 4.0 and later, including 4.0, 4.1 and 5.0, in combination with BlackBerry handhelds, practices all the steps of Claims 1, 6, 21 through 25, and 27 of the '917 patent."

And it is also my opinion that RIM specifically instructs and encourages its customers to take actions that practice these steps through its publicly available user guides, as discussed throughout my testimony.

Q.   And do you have another opinion?

A.   It's also my opinion that:  "The use of the RIM's BES 4.0, in combination with the BlackBerry handhelds, performs, practices the steps of Claims 1, 6, 21 through 25 and 27, and there is not any example of any noninfringing use.

Q.   Did you create a summary of the bases for your opinions in terms of evidence?

A.   Yes, this is a chart that I've created for the convenience of putting all the evidence into one place. Where I've aligned each step of the -- the preamble as well as the steps of the claims, along with the supporting evidence that I've cited in support that RIM's accused product practice these claims.

Q.   And you did that for independent and the dependent claims, correct?

A.   Yes, I've done that both for the independent Claim 1 and all the dependent claims discussed in my testimony.

Q.   So for Step 1, what did you rely on?

A.   As I've discussed in my testimony for the preamble, the limitation of Step 1, I've cited to Exhibit 0139, pages 110 and 111.  For Step 1, Exhibit 350, pages 1, 12, 44.  Exhibit 491, pages 4 -- 1, 4 and 5. Exhibit 2022, pages 1, 27 and 28.  I've cited Mr. Cherry's deposition on pages 40, lines 11, through pages 40, lines 24; and pages 41, lines 1, through page 41, lines 3.

        THE COURT:  The point of the demonstrative is not to have him go through each one of those boxes and read what's in the boxes.  Is that what you were intending to do?

        MR. THAKUR:  What I was hoping, to get a single place in the record where all the evidence can come in.

If Mr. Matuschak wouldn't mind, I'd actually like to offer --

THE COURT:  You can use it as a demonstrative but it's not evidence.  It can be used during argument.  It can be used during the testimony.  I'm just not wishing to allow the witness now, having created a demonstrative, to now read through each one of those boxes.  It's unduly consumptive of time.  If there's one particular one, maybe.  But a graphic is worth a thousand words.

MR. THAKUR:  Okay, your Honor.  I will -- I take your lead.  The point I think -- he's already presented all the evidence that is cited in that demonstrative over the course of his testimony.  What he had done for visual purposes here, identified all the trial exhibits that supported each one of the elements.  Since this will be repetitive of what he's already done, I'm actually going to go ahead and skip these two slides, your Honor.

BY MR. THAKUR:

Q.  Did you arrive at any additional opinions with respect to --

MR. MATUSCHAK:  Your Honor, I object.  It's the issue we talked about this morning.

THE COURT:  I thought we were going to do this

the other way around, we were going to go through his

testimony and then offer the demonstrative or the

exhibit after having laid the foundation.

MR. THAKUR:  I can do that, your Honor.

THE COURT:  So remove the exhibit.

BY MR. THAKUR:

Q.  Did you arrive at any -- did you perform any analysis

about how the steps of Claim 1 are performed and whether

they're performed by RIM customers or by RIM?

THE COURT:  And to satisfy the objection, you

need to take him to the disclosure and use that as the

basis of the question.  Because, otherwise, I can't tell

whether or not this is new.  In other words, turn to the

document and carry us through the document to get to the

opinion.

MR. THAKUR:  Could you kindly turn us to slide

105, please.

BY MR. THAKUR:

Q.  Dr. Madisetti --

MR. MATUSCHAK:  Your Honor, I'll just object,

because I thought the point was he was going to take us

back through the disclosure which was the expert report.

THE COURT:  I thought so too.  But this has been

displayed as part of what is going on here during his

testimony.  It might serve as a foundation to get to the

disclosure.  But it's really the language of the disclosure of the prior opinion that the Court would have you use as a foundation for the question.

MR. THAKUR:  Sure, your Honor.  What I might do is just quickly have him identify what it is we're going to be talking about.

THE COURT:  I understand.

BY MR. THAKUR:

Q.  Do you see this step of Claim 1 of the '917 patent?

A.  Yes, I do.

Q.  And this step relates to what?

A.  It relates to the transmitting registration information relating to the wireless device from the wireless device to the server.

Q.  And that is performed by a user or a customer of the material?

A.  It is performed by RIM's customer, and Enterprise.

Q.  And then the next step is -- I'll just go back to the main slide, lay the foundation.  The next step is?

A.  The next step is verifying the registration information at the server.

Q.  So the customer performs the transmitting step?

A.  Yes.

Q.  And the --

THE COURT:  Maybe we ought to have a protocol as

to whom we're referring to as the customer, because it could be that the enterprise is the customer. And the user of the device is different than the customer. So...

MR. THAKUR: Good point, your Honor.

THE COURT: I think it can be confusing.

MR. THAKUR: I will step back.

BY MR. THAKUR:

Q. Is the transmitting registration information performed by the user?

A. When we have an enterprise, we have a server. And we have a number of users. The transmitting registration information relating to the wireless device from the wireless device to the server is done from the device to the server.

Q. Okay. And then the next step of verifying occurs where?

A. The verifying the registration information at the server occurs at the BlackBerry Enterprise Server installed at the enterprise.

Q. Did you express an opinion in your report as to who performs the transmitting step?

A. Yes, the transmitting step, I've expressed the opinion that the wireless device performs the transmitting step.

Q.  Okay.  Would you --

THE COURT:  For our purposes, there are two transmitting limitations, so it's the transmitting registration, the step that we're talking about now, as opposed to the transmitting command step?

MR. THAKUR:  That's correct, your Honor.

Can we turn to slide 44, please.

BY MR. THAKUR:

Q.  And is this -- is this the document that explains how IT policies are sent?

A.  This is the BlackBerry Enterprise Server for Microsoft Exchange Version 4.2, Exhibit 2022.  This describes the Feature and Technical Overview that includes how the IT policies are sent.

Q.  And those IT policies are sent from the server, correct?

A.  Yes, on Exhibit 2022, on page 22, it confirms the wireless IT policies are sent from the server and at the enterprise to the user's handheld.

Q.  And this does not involve any actions by the user?

A.  This does not involve any action by the user.

MR. THAKUR:  Your Honor, we believe we've laid the foundation as to what is performed by the user and what is performed by the server, and we would like to have him express an opinion about what the steps and

elements of Claim 1 are performed by a user and what are performed by the server.

MR. MATUSCHAK:  We haven't even cracked the cover of the disclosure, your Honor.

THE COURT:  Sustained.

MR. THAKUR:  If we could turn to the expert report, please.

BY MR. THAKUR:

Q.  Dr. Madisetti, in the meantime I'm just going to read for you what is paragraph 84 of your report.

MR. MATUSCHAK:  I'm sorry, what was that?

MR. THAKUR:  Paragraph 84.

BY MR. THAKUR:

Q.  "During a process called 'enterprise activation' by RIM, the BlackBerry handheld is able to be activated on the server wirelessly."

During this process, registration information --

MR. THAKUR:  Actually if I may -- your Honor, may I approach the witness?

THE COURT:  Certainly.

BY MR. THAKUR:

Q.  So why don't I start from the beginning. Dr. Madisetti, do you recognize this document?

A.  Yes, it's my expert report.

Q.  If I could have you turn to page 26, paragraph 84 of

your report.

A.   Yes, I'm there.

MR. THAKUR:  Your Honor, actually I guess I will continue completing reading of that sentence into the record.

"During this process, registration information is transmitted from the BlackBerry handheld to the server, including a password associated with user name and information about the BlackBerry handheld, such as routing information and public keys for the BlackBerry handheld.  Registration information also includes the PIN of the device.  The registration information sent from the BlackBerry handheld to the server therefore includes information identifying the inactivated device through at least the PIN and password.  The registration information can be transmitted over WiFi or over the cellular network.  The receipt of the registration information is the BES computer.  RIM specifically instructs and encourages its customers to take actions that satisfy this element through its publicly available user guide."

Your Honor, this lays down the foundation that RIM's documents instruct the user how to perform those acts, and he has heard evidence and he will cite to evidence he's heard in this trial about users actually

performing these steps.

THE COURT:  I'm not sure what your proffer is at this point, but having read from the report, I heard no objection to your reading the report or having the jury hear what you read.  So we need to go to another question to see whether that provokes an objection.

MR. THAKUR:  Okay.

BY MR. THAKUR:

Q.  Based on what I read in the report, do you have an opinion -- does it inform you as to who performs that step?

A.  Yes, as I described in paragraph 84 of my first report, regarding the process of enterprise activation, the BlackBerry handheld provides the registration -- transmits the registration information to the server.

Q.  And that would be the user of the handheld, correct?

A.  The user of the handheld, yes.

Q.  And during slides 44 through the -- and you have testified already on Friday that this is a step performed by the users, correct?

A.  Yes.

Q.  Turn to slide 46.  Does this explain who performs the step of transmitting the registration for the device?

A.  Yes, this is from Exhibit 166 on page 5.

MR. THAKUR:  Your Honor, this testimony was

introduced.

THE COURT:  So far you haven't reached an objection.  So keep going until somebody tells you that they believe you can't.

MR. THAKUR:  All right.

BY MR. THAKUR:

Q.  So the transmission of registration step occurred from the wireless device to the server is performed by the user, correct?

A.  Yes.

Q.  Once the transmission of the registration device is performed by the user, what happens after that?

A.  It's --

MR. MATUSCHAK:  Your Honor, I think this is going to elicit the testimony that we were concerned about, your Honor.  I think -- he's asked him for an opinion.  I think the opinion is going to elicit the things that are not supported by that report.  Because that paragraph only talks about this element.

THE COURT:  Very well.  So you should now overcome that by going back to the report to see whether or not there's a disclosure that tells what happens next, I guess, which is the essence of your question.

MR. THAKUR:  Sure, I was hesitant just because the report is voluminous.

THE COURT:  I understand.  I thought that having gone through his testimony previously, this is kind of backing up and doing something that seems to me to be the same as you already have taken him through.  And there's been no cross-examination.  So it's not redirect.

But, I presume that the point of this is to have him state an opinion that he hasn't previously stated.

MR. THAKUR:  That is correct, your Honor.

THE COURT:  So that's why I'm inviting you to go to the report and say now, Let's go to a new opinion that we haven't heard before, and go to the report where that new opinion is disclosed, because there's an objection, as I understand it, that you are asking him questions about matters over which he's not previously expressed an opinion.

MR. THAKUR:  So this is slide 36 that is performed by the user.  If we could turn to slide 43.

BY MR. THAKUR:

Q.  So, after the user has performed the transmission step, does the user perform any other steps?

A.  Okay, on page 43 -- would you please repeat the question?

Q.  The first step is transmitting registration information.  That is performed by the user, correct?

A.   Yes.

Q.   Next step was verifying the registration information. That is not performed by the user, correct?

A.   It's performed -- as I've described in paragraph 87, it's performed at the server.

Q.   And once the -- once those two steps have been completed, where is the -- does the user perform any of the remainder of the steps?

A.   No, sir.

Q.   So it is your testimony that once the user performs the transmittal of the registration step --

THE COURT:  Apparently you're standing because of the way you're framing the question.

MR. MATUSCHAK:  Yes, sir, your Honor.

THE COURT:  If you have in mind where you're going with the question, you might refer to the report.

BY MR. THAKUR:

Q.   The user performs the transmission step?

A.   Yes, I explain that on page 84 -- sorry, in paragraph 84 of my report.

Q.   Does the user perform any of the remainder of the steps?

A.   The user does not.

Q.   And so if the user performs the transmission step, are the remainder of the steps actually performed?

A.   If the user performs the transmission of the registration information, the remainder of the steps are performed.

MR. THAKUR:  Your Honor, we believe that lays the foundation for the opinion he wants to express.

THE COURT:  I'm not sure what that is.  That's why I'm inviting you now to go to his report.  Because I haven't heard you ask him anything to which there is an objection.  So if you've laid a foundation for a new opinion, is that what I'm hearing?

MR. THAKUR:  Your Honor, we don't believe it's a new opinion.  It's the opinion that he explained in his report as, what is performed by the user, what is performed by the -- after the user has completed the performance.

THE COURT:  Members of the jury, can we use this as an early break so I can understand this better?  It's 10:24.  We'll come back to this matter at about 10:45.

I'll ask the parties to remain.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Please be seated.  Out of the presence of the jury.

Give me your proffer as to what opinion you are seeking to elicit from the witness.

MR. THAKUR:  He will render the following opinion:  That after the step of transmission -- transmitting registration information is performed by the user, the remainder of the steps of claim -- the user needs to perform nothing else to complete the remaining steps of Claim 1.

THE COURT:  All right.  Do you have an objection to that opinion?

MR. MATUSCHAK:  Well, your Honor, he's already testified to that.  So we can just go on.  I mean he said the user performs the transmitting step and doesn't perform the other steps.

What -- the opinion that we object to is the idea that all this stuff happens automatically.

THE COURT:  And I didn't -- I thought that had been testified to; and, therefore, when you just made your proffer, that didn't sound anything new to me.  So the -- I'm not sure what the slide you're trying to get to, but the one with the word "automatically" is the objection.  So if he's expressing an opinion that the other things happen automatically, then you need to preface that by a disclosure.  And if not, let's drop this and go someplace else.  Because I'm not sure I understand, when you say, I'm now -- I've laid a foundation for, I'm not understanding what you believe

you've laid a foundation for.

MR. THAKUR:  Perhaps I could have you turn to slide 353, Chris.

So I believe this is what I believe we have laid the foundation for, that he has already testified.  But with summarizing, crystallizing in the mind of the jury exactly who performs what.

THE COURT:  If you were to delete "automatically by" and simply have "BES," that might overcome the objection, because I understand that the objection is that he has not previously rendered an opinion that the steps that you've labeled "automatically by" are performed automatically.  Whatever that word means.  I have not defined "automatically" because no one's asked me to and it's not used in a claim.  So -- and I don't know that anyone's asked me to construe the claim in a fashion that would cause me to say anything's done automatically.

But -- so if that is the only matter that is holding us up, that's a simple correction that can be made.

MR. THAKUR:  That is correct, your Honor.  We can make that.

THE COURT:  All right.

In fairness to the witness, I think that I might

have introduced ambiguity by saying we need to distinguish between a customer and a user.  But as I understand it, there might be even a further distinction because of his hesitation between the enterprise, the user, and the handheld device.  Because there are some things that are done, as I understand it, at the handheld device that do not involve actions by the user.

And so he -- to keep the jury from misunderstanding what's going on here, I thought that that -- the language, as to the difference between the server; the administrator, who is a human being operating the server; the handheld device; and the user, who is a human being operating the handheld device, might all need to be words that we've somehow put out, and used those consistently throughout this.

MR. THAKUR:  Your Honor, I think he can explain it as soon as we get the word "automatically" out, and I think that will satisfy everybody --

THE COURT:  Do you have a further objection if that language is taken out?

MR. MATUSCHAK:  We take out "automatically" and we're okay, your Honor.

THE COURT:  Very well.  All right.  So...

MR. MATUSCHAK:  As long as the witness doesn't then testify to automatically.

THE COURT:  I will instruct you not to unless you lay a foundation that he's made that opinion before.

I'm surprised that we've taken as much time with this because we're expecting another witness, so I'm presuming you all have control of the timing of this. It's now about 10:30, so we'll take our break here, come back at 10:45.

(Recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  You may resume.

DIRECT EXAMINATION (continued)

BY MR. THAKUR:

Q.  Dr. Madisetti, we've actually never resolved our dispute on this slide, so perhaps I could have you take a look at it.

On the left side you will note that it's the Claim 1 elements.  And the on the right side, I've identified what the steps are and where they're performed.

With respect to the transmitting registration information, who performs that step?

A.   So to set the stage, we have a customer of RIM which is an enterprise.  At the customer site there is a server.  And then there is users who use handheld devices.  So the transmitting registration information relating to the wireless device from the wireless device to the server is performed by the device.  In the hands of the user.

Q.   Upon action by the user, correct?

A.   Yes.

Q.   After the user takes that action, does the user need to perform any action to complete the step of verifying the registration information with the server?

A.   The user of the device does not need to take any further action after causing the device to perform the transmitting the registration information step.

Q.   And will each one of the remaining steps be performed with no further action from the user?

A.   Yes, without any further action from the user of the device, yes.

Q.   Thank you.

        So based on that, the other question we have is, with respect to RIM's documentation.  Does RIM make available customer documents with respect to the use of its BES to its customers and end-users?

A.   Yes, RIM makes available to its customers user guides

and other documents that instruct its customers to perform wireless enterprise activation, and to send IT policies and IT administration commands from the BES server to the BlackBerry handheld.

MR. THAKUR:  Could I just have Chris bring up quickly some of these trial exhibits?  Exhibit 139.

BY MR. THAKUR:

Q.  Do you recognize this document?

A.  Yes.

Q.  What is this document?

A.  This is a BlackBerry Enterprise Server for Microsoft Exchange, Version 4.1, Feature and Technical Overview.

Q.  And this is a document provided by BlackBerry?

A.  By RIM, yes.

Q.  By RIM?

A.  Yes.

Q.  And this is a public document?

A.  Yes, I believe so.

Q.  And what is the purpose of this document?

A.  To advise IT administration -- IT administrators on the features and the technology relating to the use -- installation and use of BlackBerry Enterprise Server.

MR. THAKUR:  Chris, could you pull up Exhibit 355, please -- excuse me, 350.

BY MR. THAKUR:

Q.   And what is this document?

A.   This is the cover page of the BlackBerry Enterprise Server for Microsoft Exchange, Version 5.0, the Feature and Technical Overview.

Q.   And Version 5.0 is the product that was released after the filing of this lawsuit, correct?

A.   It was released, yes, after the filing of this lawsuit.

MR. THAKUR:  Chris, could you bring up page 112, please.

BY MR. THAKUR:

Q.   Do you see the copyright notice on this document?

A.   Yes, it's copyright 2009, Research In Motion.

Q.   And is this document available on Research In Motion's website?

A.   Yes.

MR. THAKUR:  Could you pull up Exhibit 354, Chris, please.

BY MR. THAKUR:

Q.   Could you tell me what is this document?

A.   This is the BlackBerry Enterprise Server, Version 5.0, the Policy Reference Guide.

MR. THAKUR:  Chris, would you kindly turn on this exhibit to page 291.

BY MR. THAKUR:

Q.   Do you see the copyright notice on this?

A.   Yes, it's copyright 2009.  Research In Motion.

Q.   And is this document available on Research In Motion's website?

A.   Yes.

Q.   And BES 5.0 is the product that was released after the filing of this lawsuit?

A.   Yes.

        MR. THAKUR:  One last one, Chris, could you kindly pull up Exhibit 353, please.

BY MR. THAKUR:

Q.   What is this document?

A.   This is a BlackBerry Enterprise Server for Microsoft Exchange, Version 5.0, the Administration Guide.

Q.   What is the purpose of the Administration Guide?

A.   Usually to advise, guide and instruct IT administrators on the use of the BES as well as how to configure the handhelds and control the handhelds.

Q.   And when you say "the IT administrators," those would be RIM's customers, correct?

A.   Yes, they would be employed by RIM's customers.

        MR. THAKUR:  Could you kindly turn to Page 365 of that document.

BY MR. THAKUR:

Q.  Do you see the copyright on that document?

A.  Yes, I do.  It's copyrighted in 2009.  Research In Motion.

Q.  And this is done after the filing of this lawsuit, correct?

A.  Yes.

Q.  And to your knowledge, is this document available on the RIM website?

A.  Yes.

MR. THAKUR:  If you could bring the PowerPoint back up.

BY MR. THAKUR:

Q.  Did you read or hear testimony of Mr. Mark Hatcher during this case?

A.  Yes, I read it.

Q.  And did you read or hear testimony of Mr. Wilson during this case?

A.  Yes, I did.  I read it.

Q.  And based on that, did you develop an understanding of how to use the BES graphical interfaces?

A.  Yes.

Q.  And what did you understand?

A.  That the RIM's BES graphical user interface is a menu-driven interface and it provides helpful guidance

that makes wireless enterprise activation a simple process that is completed in minutes with a few mouse clicks.

Q.  That would be the case if it's performed wirelessly, correct?

A.  Yes.

Q.  And based on your testimony over the course of Friday and today, do you have a final opinion to express today with respect to infringement?

A.  Yes, I do.

Q.  Could you please express that?

A.  Yes.  Summarized:  "The use of Research In Motion's BlackBerry Enterprise Server, Versions 4.0 and later, including 4.0, 4.1 and 5.0, in combination with RIM's BlackBerry handhelds, infringes Claims 1, 6, 21 through 25, and 27 of the U.S. Patent No. 6,970,917."

          MR. THAKUR:  Your Honor, I have a handful of exhibits that Dr. Madisetti referenced that are not objected to.  I'd like to take the time to move them into evidence at this time.

          THE COURT:  Certainly.  How long is your list?

          MR. THAKUR:  It's about 15 items.

          THE COURT:  Certainly.

          MR. THAKUR:  139, 166, 350, 0491, 2022, 0496, 4207, 4209, 0147, 0353, 0493, 4208, 4212, 4214, 1019,

0266, 4211, 0144, 0354.

Do you have any objection?

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  Very well.  In the future you can delete the beginning zeros, that will save us a little time.

MR. THAKUR:  Your Honor --

THE COURT:  They're in evidence.

MR. THAKUR:  Thank you, your Honor.

(Plaintiff's Exhibits 139, 166, 350, 0491, 2022, 0496, 4207, 4209, 0147, 0353, 0493, 4208, 4212, 4214, 1019, 0266, 4211, 0144, 0354 received in evidence)

MR. THAKUR:  I have eight or ten other exhibits that have not been objected to and have been used.  I thought it might be a great time to get the opportunity to bring them into evidence as well.

THE COURT:  I have no concern about whether you use this time for that purpose if you now want to offer exhibits -- what's the difference between the two?

MR. THAKUR:  The first set were actually used in Dr. Madisetti's presentation.  Some of the other ones have been used by other witnesses, as I understand it.

THE COURT:  Let's do that at another time.

MR. THAKUR:  Sure.  Your Honor, we have no further questions.

Thank you, Dr. Madisetti.

THE COURT:  You may cross-examine.

MR. MATUSCHAK:  Thank you, your Honor.

I'd like to move the easel back where Dr. Madisetti can use it.

THE COURT:  You might want to move it to a different position.  Maybe by the door.  Because it blocked the public where it was before.

MR. MATUSCHAK:  Your Honor, I also have a binder of exhibits, if I might hand them to the witness.

THE COURT:  Certainly.

MR. MATUSCHAK:  Can we get slide 210, please.

CROSS-EXAMINATION

BY MR. MATUSCHAK:

Q.  Dr. Madisetti, good morning.

A.  Good morning, sir.

Q.  Sir, during your direct testimony on Friday, you used this picture to describe how RIM's BlackBerry Enterprise Server works.  Did you not?

A.  Yes, a similar picture.

Q.  And you said that everything in this box with the dotted lines is the BlackBerry Enterprise Server, correct?

A.  Yes, it's labeled the "BlackBerry Enterprise Server."

Q.  Everything that's now outlined in red, do you see

that?

A.   Yes.

Q.   That's the BES, right?

A.   That's right.

Q.   And then over here on the right we have the BlackBerry device, right?

A.   Yes.

Q.   And then there's some things in between, the wireless network, the Internet and the company firewall, right?

A.   They're labeled the "wireless Internet," the "firewall" and the "Internet."

Q.   Now, when talking about how a command gets from the BlackBerry Enterprise Server, this box, to the BlackBerry device, you left out something, didn't you, sir?

MR. THAKUR:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  I don't believe so.

MR. MATUSCHAK:  Can we get slide 216, please.

BY MR. MATUSCHAK:

Q.   You left out the RIM Relay, didn't you, sir?

A.   No, sir.

Q.   Let's go back to the previous slide.

Sir, would you tell the jury, please, where the RIM Relay appears on the slide that you used.

A.   In my slide, this entire system between the device and the server is the wireless network.  So this whole --

Q.   And where do you show the relay, sir?

A.   This is -- I did not use my diagram, sir.  This is from RIM's diagram.

Q.   This is the diagram you used on Friday, correct?

A.   Yes, I did.

Q.   This is the diagram you used in your report, correct?

A.   Yes.

Q.   Where's the Relay?

A.   Again, this diagram is a high level schematic.

Q.   Can you show the jury the Relay or not, sir?

A.   The Relay is not described in this diagram.

Q.   Thank you, sir.

        MR. MATUSCHAK:  Go back to slide 210, please.

        216, I apologize.

BY MR. MATUSCHAK:

Q.   Now, the BlackBerry Enterprise Server, or the BES, is located at a company.  I think you used the example ABC Company or General Motors or some other company, correct?

A.   Yes.

Q.   And that company owns its own servers, right?

A.   Yes.

Q.  And uses the BlackBerry Enterprise Server software, correct?

A.  It downloads and installs the BlackBerry Enterprise Server software, yes.

Q.  Now, the Relay is not part of the BES, is it?

A.  The Relay is not part of the BES.

Q.  Okay.  The Relay is a separate computer entirely, correct?

A.  I am not offering any opinion on the RIM Relay so far.

Q.  So you don't know if the Relay is a separate series of computers in some other location or not?

A.  Maybe it is.  I mean, I'm not sure.  I've not --

Q.  The Relay you do know is owned by RIM, not by a company like General Motors or ABC, correct?

A.  Again, I have no information to base that opinion.

Q.  Well, you know there's something called a Relay, right?

A.  As I said, I do not have an opinion on the Relay. I've construed the entire portion from the BlackBerry enterprise --

        THE COURT:  The question is, whether you know there is something called that.

        THE WITNESS:  As I said, I don't have any authority to -- opinion on the RIM Relay.

BY MR. MATUSCHAK:

Q.  But you know it exists, don't you?

A.  I assume it exists.

Q.  You know it exists, don't you?

A.  I'm assuming it exists.  I don't have any independent confirmation.

        MR. MATUSCHAK:  Your Honor, I'd like to play a clip from Dr. Madisetti's May 2nd, 2011 deposition.  It's from page 178, lines 1 to 4.

        Play clip 7, please.

        (Whereupon, the excerpt of videotaped deposition of Dr. Madisetti, taken May 2, 2011, was played.)

BY MR. MATUSCHAK:

Q.  So you know that there is a Relay, don't you, sir?

A.  As I said, I know the Relay communicates with the -- some portion of the RIM infrastructure communicates with the device.

Q.  All right.  And you know that every one of those GME packets that you talked about arrives at the router in the BlackBerry Enterprise Server, either goes out through some serial bypass to the WiFi network, or is sent on to the Relay, correct?

A.  As I've opined, it is sent either through WiFi or the cellular network, yes.

Q.  And if it is sent through the cellular network, every

single message or command goes through the Relay, correct?

A.  I assume it does.

Q.  All right.  And this line from the BES to the Relay, that's a wired line, is it not, sir?

A.  Yes, it is.  It's a wired line.

Q.  Now, the Relay is one of the reasons why the BlackBerry solution is so secure; isn't that true?

MR. THAKUR:  Objection, foundation, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Again, you have to be more specific.

BY MR. MATUSCHAK:

Q.  You can't answer that question?

A.  No.

Q.  Okay.  All right.  Let's go back to 210.

So we talked about there's no Relay on this demonstrative you used.  Let's take a look at your drawing from Friday.

Sir, can you look at your drawing from Friday on the easel and tell me if you pictured the Relay anywhere on that drawing?

A.  The Relay is not on the drawing.  I've pictured the two ports, one to the cellular network and one to the WiFi.

Q.  Now, we went over I think between Friday and today something like 300 or so slides.  Is that right, sir, in your testimony?

A.  I guess so.

Q.  And in your discussion of all those slides over two days, you never mentioned the word "Relay," did you?

A.  There was no need to.

THE COURT:  You have to answer the question whether you did or --

THE WITNESS:  I did not.

MR. MATUSCHAK:  Let's go to slide 213, please.

BY MR. MATUSCHAK:

Q.  Now, here's the Court's construction for establishing a connection.  Do you see that, sir?

A.  Yes, sir.

Q.  And you understand you're bound by that construction, right?

A.  Yes.

Q.  And the Court's construction is:  "For establishing a connection between the wireless device absent server" is, "initiating wireless communication between a wireless device and the server."  Do you see that?

A.  I do.

Q.  Let's go back to 216.  The wireless connection over the cell network in RIM's system starts at the Relay,

correct?

A.  That's not the wireless network of the claimed element.

Q.  Well, you said this is wired, right?

A.  No, sir.  As per the -- as per the '917 patent, if you look at column 3, lines 35 to 45, the wired network can include wired as well as wireless networks.

Q.  I understand that, sir.  What I'm asking you, though, is, you agreed with me, I thought earlier, that this portion of the communication path is wired, right?

A.  Yes, it is wired within the wireless network.

Q.  All right.  And there's nothing that happens wirelessly until you get to the Relay, correct?

A.  I don't agree.

Q.  You don't agree?

A.  No.

Q.  So even though this is a wired connection -- well, let me ask you this:  Before it happens to the Relay, where is there anything happening that's wireless?

A.  If you look at the Court's construction, it's the initiation of the wireless communication takes place here.

Q.  Well, there's no -- there's nothing wireless there though, sir, is there?

A.  That is fine.  It is just the initiation of the

wireless communication.  For instance, if I give you an example, if you have a --

Q.  Sir, my question was:  There's nothing wireless between the BES and the Relay, is there?

A.  But that's not the construction, sir.

Q.  Is there anything wireless between the BES and the Relay?

A.  Yes.

Q.  This is a wired line, I thought you testified.

A.  You're talking the cable?  That is wired, but --

Q.  That's wired, so the first time you get anything that's wireless is after the command gets to the Relay, correct?

A.  No.

Q.  Well, just tell me on this diagram where there is a wireless line before the Relay.

A.  A wireless line?

Q.  Yes.  A wireless transmission before the Relay.

A.  I have adopted, sir, the Court's construction of what initiating --

Q.  My question is, can you tell me or the jury where there is a wireless transmission anywhere before the Relay?

A.  In that figure, the wireless transmission is right thereto (indicating).

Q.   And that's after the Relay, correct?

A.   In that figure it is after the Relay.

Q.   All right.  And there's no wireless transmission in RIM's system until after the Relay, correct?

A.   Again, you're not referring to the claim.  I'm looking at the picture --

Q.   I'm talking about how RIM's system works, sir.  I want to know, am I correct, that there is no wireless transmission in RIM's system as pictured here until after you get to the Relay?

A.   Could you clarify what you mean by "wireless transmission"?

Q.   Well -- yes, sir.  Transmitting something over the air without a wire.

A.   Okay.  So that's the portion from here to here (indicating) that is carrying packets over the air.

Q.   And that's the first time in this system where there's a wireless transmission, correct?

A.   Again, not referring to the claim or initiating wireless, I would say that the wireless transmission occurs between the cell phone tower and the BlackBerry.

Q.   And the wireless transmission is initiated by the Relay, isn't it, sir?

A.   No, sir.

        MR. MATUSCHAK:  Let's see 219, please.

BY MR. MATUSCHAK:

Q.  Now, the slide that I have up on the screen talks about the establishing and transmitting steps and how they relate to each other.  Do you see that, sir?

A.  Yes, I do.

Q.  And you know that the Judge says that you have to do the establishing first, then the transmitting, correct?

A.  Yes.

Q.  And completing the establishing step requires you to establish a connection, does it not?

A.  I would refer to the Court's construction, sir.

Q.  I'm just asking you, using the Court's construction, do you not have to complete the establishing step before -- doesn't completion of the establishing step require you to establish a connection?

A.  No, sir.  The Court's construction requires that establishing a connection is initiating wireless communications.  The key is initiating.  And that initiating step has to be completed before transmitting can commence.

        And that is His Honor's construction.

Q.  Now, you talked in your direct testimony on Friday about whether RIM establishes a connection.  Do you recall that testimony?

A.  I don't understand the question.

Q.   Well, you went through a bunch of RIM's documents that happen to use the word "connection."  You pointed that out to the jury, do you remember that?

A.   I was describing the establishing connection.

Q.   And you pointed out every place you could where RIM documents said "connection," right?

A.   Among other things, yes.

Q.   Okay.  But the words "establishing the connection" have a specific meaning in the context of Claim 1, do they not?

A.   Yes, as per the Court's construction, "establishing connection means initiating wireless communications."

Q.   And we have to understand and apply those words that are in Claim 1, not as we might use them in our ordinary lives, but as Judge Ware has defined them, correct?

A.   Yes, I agree completely.

Q.   All right.  And now I think as you said, the Judge has said that the words "establishing a connection," that step, means "initiating a wireless communication between the wireless device and the server," correct?

A.   I don't think that's exactly the language, it's "initiating wireless communications," not a wireless communication.

Q.   "Initiating wireless communication between the wireless device and the server."

A.  Yes.

Q.  Okay.  Now, not every connection initiates a wireless communication, right?

A.  I'm not sure what your question is.

Q.  Well, it has to be wireless, first of all, right?

A connection that's not wireless doesn't initiate a wireless connection, correct?

A.  The construction read:  Initiating a wireless connection -- "initiating wireless communications."

Q.  And so a connection to initiate a wireless communication has to be wireless, right?

A.  I don't see the connection again with connection -- the construction is, "initiating wireless communication."

Q.  So that connection can be a wired connection?  Is that your testimony, sir?

Yes or no?

A.  I don't understand the question with respect to connection.  The claim step is, initiating -- is establishing a connection, which is construed by His Honor as initiating wireless communications.  That's all.

Q.  I understand that.  So I'm trying to understand -- my point is that you can have connections that don't meet that definition.  And for example, a connection to meet

that definition would have to be wireless, right?

A.  As long as you're initiating wireless communications, that step is satisfied.  I have no other opinions.

Q.  So -- you don't have an opinion about whether it has to be wireless?

A.  As long as initiating wireless communications is satisfied, for that particular substep, which is what I have shown and offered an opinion on.

Q.  Well, you will agree with me at least that to initiate a wireless communication, you have to initiate something, right?

A.  If you're initiating wireless communications, you initiate wireless communications.

Q.  So just saying something is a connection, doesn't mean anything has been initiated, correct?

A.  Again, I have just applied His Honor's construction.

Q.  And His Honor's construction is initiate?

A.  Initiating wireless communications.

Q.  Right.  Now, there's no dispute --

        MR. MATUSCHAK:  If we can go back to slide 216, please.

BY MR. MATUSCHAK:

Q.  There's no dispute, right, that RIM sends commands from the Relay here to the BlackBerry device over the cell network using the UDP protocol, correct?

A.   I don't understand what you mean by "RIM sends commands."

Q.   Well, the transmission from the Relay to the BlackBerry device uses the UDP protocol, correct?

A.   For the claimed transmitting step --

Q.   No, sir, I want to know from the Relay to the BlackBerry device, in RIM's system, it uses the UDP protocol, correct?

A.   Yes.

Q.   There are other protocols in the world that can be used to send commands or messages, right?

A.   Yes.

Q.   And one of those is called the TCP protocol, correct?

A.   Yes.

Q.   So we have TCP and we have UDP, right?

A.   Yes.

Q.   Okay.  Now, on Friday you testified that they operate in the same way.  Do you recall that, sir?

A.   With respect to the claim, yes.

Q.   Okay.  Now, I don't think you were in the courtroom when Dr. Nath testified, were you, sir?

A.   I reviewed his testimony.

Q.   Were you here in the courtroom when he testified?

A.   I reviewed his testimony.  I wasn't here.

Q.   Thank you.

You know who Dr. Nath is, though, right?

A.  He's one of the inventors.

Q.  He's one of the inventors on the patent that this case is about, correct?

A.  Yes.

Q.  And he teaches a class on Internet protocols, right?

A.  I don't know firsthand, yes.

Q.  You say you read his testimony, you saw that in his testimony, didn't you?

A.  He said he was, yes.

Q.  And Dr. Nath testified that a TCP protocol involves a handshaking process.

A.  Could you show his testimony?

Q.  You don't remember that?

A.  I don't remember the specific language.

Q.  Okay.  But you agree with that, though, yourself, don't you, initiating a TCP connection involves a handshaking process, right?

A.  Again, it's too vague.

MR. MATUSCHAK:  If we could play, your Honor, from Dr. Madisetti's May 2nd, 2011 deposition, it's transcript page 194, lines 21 to 25.

(Whereupon, the videotaped deposition excerpt of Dr. Madisetti, taken May 2nd, 2011, was played.)

BY MR. MATUSCHAK:

Q.  So you will agree with me, Dr. Madisetti, that a TCP connection sets up the connection using a handshake, correct?

A.  It is not the claimed connection --

Q.  Sir, will you agree with me on that or not?

A.  I agree that it's a protocol that requires a handshake.

Q.  Thank you.

Now, UDP does not require a handshake, does it, sir?

A.  UDP does not require a handshake, yes.

Q.  All right.

MR. MATUSCHAK:  And Exhibit 4736, please.

BY MR. MATUSCHAK:

Q.  When you reviewed Dr. Nath's testimony, you saw that he referred to this document, Exhibit 4736, did you not, sir?

A.  I did not review this document.

Q.  You said you reviewed his testimony, right?

A.  Yes, I reviewed the transcript, yes.

Q.  Okay.  And the transcript referred to Exhibit 4736, right?

A.  I believe so, but I did not review this exhibit.

Q.  You didn't think it was important when the company

inventor of the patent referred to a specific document

in connection with this case that you ought to review it

before you came and testified?

A.   No, sir, I relied on the patent and its intrinsic

specification and the history.

Q.   All right.  Well, you know, though, from reading the

testimony that Dr. Nath says he teaches a class at

Rutgers, right?

A.   That's what he said, yes.

Q.   And he said that Exhibit 4736, what we have up on the

screen, are his teaching notes for his class at Rutgers,

correct?

A.   Yes.

Q.   And if we can turn to page 3, please.

You see on page 3 of his teaching notes, Dr. Nath

says:  "UDP is an unreliable transport protocol."  Do

you see that?

A.   That's what it says, yes.

Q.   And you agree with that, don't you?

A.   Again, it's a loose definition, but I agree with

that, yes.

Q.   And further down on the page, Dr. Nath says:  "UDP

does not provide connection management."  Do you see

that?

A.   That's what the slide says.

Q.   And you agree with that too, don't you, sir?

A.   It says it doesn't require control of the connection.

Q.   And you agree with what it says on the slide, don't you?

A.   Again, I have no idea what's --

Q.   Do you agree or not, sir?

A.   I don't have enough information to make that answer because I don't know what he means by "connection management above and beyond control."

Q.   All right.  You're not sure about that one?

A.   Yeah, I don't know what he means by "connection management."

Q.   All right.  Let's turn to page 4, please.

        Now, you see on page 4 of his teaching notes, he has a heading called "Why UDP," with a question mark.  Do you see that?

A.   Yes.

Q.   And under that heading, his first bullet point says: "No connection needs to be set up."  Do you see that?

A.   Yes.

Q.   And you agree with that, don't you, sir?

A.   No, sir.

Q.   So you disagree with a document used by one of the co-inventors of this patent when he's teaching his engineering students; is that correct, sir?

A.   Again, I don't understand the context he made this description.  And I believe that the patent and its specification suffices to understand the patent and its claims.

Q.   You disagree with what the co-inventor of this patent teaches to his students that's shown in that first bullet point; isn't that true, sir?

A.   Um.

Q.   Yes or no?

A.   Since I do not understand the context, I disagree.

Q.   Okay.  Now, let's turn to page 9, please.

On page 9, Dr. Nath in his teaching note talks about TCP.  Do you see that?

A.   Yes.

Q.   And he says:  "TCP provides the end-to-end reliable connection that IP alone cannot support."  Do you see that?

A.   Yes.

Q.   Do you agree with that, sir?

A.   I generally agree with that, yes.

Q.   And under the protocol he says that TCP provides connection management, do you see that?

A.   Yes, I do.

Q.   You agree with that, don't you?

A.   Again, I have no -- it requires a more detailed

understanding of what he meant by "connection

management."

Q.   Now, we know that Dr. Nath is a co-inventor, correct?

A.   Yes.

Q.   And at anytime from the time you were hired for this

case until today, did you ever go speak with Dr. Nath,

Mformation's co-inventor, and ask, What did you mean by

this?

A.   There was no need to, sir.

Q.   So you never did, did you?

A.   No.  I looked at the patent, the file history and its

specification and the claims, to understand what the

patent meant.

Q.   You didn't think there was any need to talk to the

inventor of the patent to understand what he was saying

in his teaching notes, correct?

A.   I don't believe these relate to the patent.  Nor have

any implication on it.

        MR. MATUSCHAK:  I move to strike the witness's

answer, your Honor.

        THE COURT:  Well I was thinking there ought to be

an argumentative objection with respect to the question

itself, but the motion to strike is denied.

        MR. MATUSCHAK:  If we turn to page 11 in this

document, please.

BY MR. MATUSCHAK:

Q. Dr. Madisetti, do you see here Dr. Nath is teaching how a TCP connection is established through a three-way handshake? Do you see that?

A. Yes, that's what he says here.

Q. All right. And you remember when you read Dr. Nath's testimony that he compared TCP to saying hello in person. Do you remember that?

A. Yes, I looked at that portion of the testimony.

Q. And he said you have to make an appointment and tell the person you're going to be there, meet on a street corner and say hello, correct?

A. That looked like a very general example. It is not a definition of TCP.

Q. Do you agree with that analogy or not?

A. No, I don't have details.

Q. And he said that UDP is like writing "hello" on a piece of paper, putting it in an envelope, writing the address and name, and sending it off. Do you remember that testimony?

A. I don't think he said that.

Q. So you wouldn't agree with that analogy, would you, sir?

A. No, you said TCP, not UDP.

Q. All right. Sir, you talked on Friday about some of

the courses that you teach, do you recall that?

A.   Yes.

Q.   And I wrote down hardware and software design and languages was one.

A.   No, it was -- there were two courses.  One was hardware of signal processing and communication applications.  The second one was the software of signal processing and communication applications.  There are two different courses.  One on hardware, one on --

Q.   You don't teach a class on networking, do you?

A.   I teach that as a part of the courses.

Q.   Then you would be familiar with the Tanenbaum's book on computer networks, would you not, sir (indicating)?

A.   Yes, there are many versions of that, yes.

Q.   And this, people call this the bible of computer networking; isn't that fair?

        MR. THAKUR:  Objection, foundation, your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Again, I would say this is widely used.  I'm not sure about the bible.

BY MR. MATUSCHAK:

Q.   Do you use this book, sir?

A.   I've referred to it sometimes, yes.

Q.   So this is a book that you use sometimes and that is widely used amongst teachers in the field, correct?

A.   That's one of the books, yes.

          MR. MATUSCHAK:  Your Honor, may I approach?

          THE COURT:  Certainly.

BY MR. MATUSCHAK:

Q.   Could you turn with me, please, Dr. Madisetti to page 542 of that book.

A.   Yes, I am there.

Q.   Do you see where there's a section that's entitled "6.4.8"?

A.   Yes, I do.

Q.   And do you see the second sentence, the one that starts "UDP"?

A.   Yes, I do.

Q.   And it says:  "UDP provides a way for applications to send encapsulated raw IP datagrams and send them without having to establish a connection," does it not, sir?

A.   That's what it says here.

Q.   And are you telling the jury that that book is wrong?

A.   I'm not.  It is not in the context of the claim.

Q.   We're talking about what UDP does, correct?

A.   UDP establishes -- the correct way to say that, UDP establishes a connection over which it sends data.  It does not -- this is a more cryptic manner of describing it.

Q.   A more cryptic manner that says that UDP -- the UDP

protocol, you can send datagrams without having to establish a connection, you find cryptic?

A.   The word "connection" describes here control.  It is not specifically the data transfer.  So that's what's implicit.

Q.   Now, if we can go back to the prior exhibit, I think it was 4736.  And back to page 4, please.

You said, I think, you disagree with the first bullet point that no connection need to be set up for UDP, correct?

A.   Because it is too general.

Q.   Okay.  And you think UDP does set up a connection, correct?

A.   According to the claimed step, both UDP and TCP use exactly the same way.  They initiate wireless communications by writing or by sending to a port, and an IP address.  They are indistinguishable.  They both establish and initiate a wireless communication by creating a socket.

Q.   Under even your theory, Dr. Madisetti, UDP establishes a connection and transmits data at the same time.  Isn't that so?

A.   I have interpreted the construction that you --

Q.   Is that so or not?  It's a yes or no question, sir.

A.   Could you please repeat it?

Q.   Yes.  Under your theory about UDP establishing a connection, you say it establishes a connection and transmits data at the same time, don't you?

A.   No, sir.

MR. MATUSCHAK:  All right.  I'd like to play a clip from Dr. Madisetti's deposition, same deposition, page 195, lines 7 to 11.

Clip 2, please.

(Whereupon, the excerpt of videotaped deposition of Dr. Madisetti, taken may 2, 2011, was played.)

BY MR. MATUSCHAK:

Q.   Does that refresh your recollection, Dr. Madisetti, that you believe that UDP establishes a connection and transmits at the same time?

A.   It is with respect to --

Q.   Does that refresh your recollection or not?

A.   It is not --

MR. THAKUR:  Objection, argumentative.

THE WITNESS:  It refreshes my recollection, yes.

BY MR. MATUSCHAK:

Q.   And you do recall testifying when you were deposed previously that UDP establishes a connection and transmits data at the same time, do you not?

You recall that testimony, right?

A.   That is testimony with respect to how the UDP worked.

It was not with respect to the claim step.

Q.   Well, UDP is what RIM uses, right?

A.   I have not identified UDP.  I have identified how the initiating wireless communication works, via the GME protocol.

Q.   When you were deposed, did you not testify that UDP establishes a connection and transmits at the same time?

         Did you say those words or not, sir?

A.   It depends on -- as you have just shown, I have said that there is a connection established, and --

Q.   And data is transmitted at the same time, right?

A.   Data is transmitted when the connection is established.

Q.   At the same time, that's what your words were then, weren't they, sir?

A.   That's right.  The word "data" has to be clarified, yes.

Q.   And you knew you were under oath at that time, correct?

A.   Yes.

Q.   Just like you're under oath today?

A.   Yes.  And I can explain what "data" means.

Q.   And you will agree with me, sir, that if UDP sets up a connection and transmits data at the same time, that UDP does not meet Judge Ware's claim construction?

A.  No, sir.

Q.  All right.  Let's find out about that.

MR. MATUSCHAK:  Can we get slide 213, please.

BY MR. MATUSCHAK:

Q.  In this slide we have the Judge's claim construction about establishing a connection, correct?

A.  Yes, sir.

Q.  And Judge Ware said:  "The establishing a connection substep must be completed before the transmitting the content of the mailbox substep can commence."  Right?

A.  I couldn't agree more.

Q.  All right.  That means one after the other, correct?

A.  The first -- the initiating wireless communication substep and then the transmitting substep.

Q.  One after the other, correct?

A.  When one completes, yes.

Q.  First you establish a connection, then you transfer, correct?

A.  Yes, first you initiate wireless communications and then you transmit.

Q.  So if the jury believes your earlier testimony that UDP sets up a connection and transmits at the same time, then using the UDP protocol cannot infringe Claim 1; isn't that true, sir?

A.  No, sir.  I can explain.

Q.   All right.

A.   The first --

Q.   Sir, let's look at -- back to Claim 1 of the patent.

        MR. MATUSCHAK:  Can we see slide 207, please.

BY MR. MATUSCHAK:

Q.   Now, you're certainly familiar with Claim 1, right?

A.   Yes, I am.

Q.   And you talked this morning about the -- about a whole bunch of other claims that you call dependent claims.  Do you remember that?

A.   Yes.

Q.   Now, you understand that Claim 1 is what's called an independent claim, correct?

A.   Yes.

Q.   And the rest of those -- all the rest of those claims, those seven claims you went through, are called dependent claims, right?

A.   Yes.

Q.   All right.  And you know that each dependent claim requires everything in Claim 1 to be performed also, correct?

A.   Yes, that's what I understand.

Q.   Okay.  So if the jury finds that Claim 1 is not infringed, then none of those dependent claims could be infringed, correct?

A.   Yes.

Q.   All right.  Now, this is a method claim, right?

A.   Yes.

Q.   And a method claim, I think you said this yourself on Friday, is like a recipe, correct?

A.   Yes.

Q.   And to prove infringement of a method claim, you have to prove that someone uses the BES to perform each and every one of the steps that's up there on the screen, correct?

A.   The use of the BES along with BlackBerry handhelds, yes.

Q.   And every one of those steps has to be performed by the same person, correct?

A.   I don't understand.

Q.   Well, have you ever heard of the concept of divided infringement, sir?

A.   I'm not a legal expert.

Q.   So you never heard of that before?

          MR. THAKUR:  Objection, beyond the scope.

          THE COURT:  Sustained.

          THE WITNESS:  I --

          THE COURT:  Just a moment.  Wait for a new question.

BY MR. MATUSCHAK:

Q.  So you don't know whether every one of those steps has to be performed by the same user or not; is that correct?

THE COURT:  You may inquire about the fact of whether or not various things are done by a single person.  But the legal conclusion as to whether they have to be done for purposes of infringement, unless he's qualified to testify in those areas, I'll have you stay away from.

MR. THAKUR:  Move to strike.

MR. MATUSCHAK:  I'll move on, your Honor.

MR. THAKUR:  There's no defense in their answer with respect to divided infringement.

THE COURT:  Objection overruled.  Motion to strike is denied.

BY MR. MATUSCHAK:

Q.  Dr. Madisetti -- I think we all do agree someone has to perform all the steps of the claim to find infringement, correct?

A.  I would agree that the steps have to be performed.  But -- to practice the claim.

Q.  All right.  And if the RIM system that you've been describing to the jury for two days uses one of those steps in a way that's different from what the claim

requires, then there would be no infringement, correct?

A.   If the RIM system does not practice one of the steps,
there won't be any infringement, yes.

Q.   That would be a different recipe, right?

A.   It would be a different step, yes.

         MR. MATUSCHAK:  Okay.  Now, if we can see
Exhibit 4208, please.

BY MR. MATUSCHAK:

Q.   And this slide, Dr. Madisetti, just shows the
preamble of Claim 1, correct?

A.   Yes.

Q.   And it talks about remotely managing a wireless
device over a wireless network, etc.  Do you see that?

A.   Yes.

Q.   But if someone said that this invention was just
remotely managing a wireless device over a wireless
network, without more, that wouldn't be a complete
description of the invention, would it?

A.   I didn't hear the last part.

Q.   Fair enough.  If someone said this invention was just
remotely managing a wireless device over a wireless
network, without anything else, that would not be a
complete description of the invention that's at issue in
this case, correct?

A.   I mean that's not an opinion that I have offered.

Q.  Right, because -- and you wouldn't offer that opinion, would you, sir?

A.  Again, I have to understand what the legal issues are.  I'm not a legal expert.

Q.  If you go back to slide 209.

Just doing the preamble isn't enough to find infringement, correct?  Under your analysis?

A.  No, sir.

Q.  Okay.

MR. THAKUR:  Your Honor, objection, relevance.  The preamble is not a step in the claim.

MR. MATUSCHAK:  Actually --

THE COURT:  The objection is overruled.  I've construed the preamble as limiting.  And so it is improper to suggest that it doesn't pose a limitation.

MR. MATUSCHAK:  Let me take that down.  Thank you.

BY MR. MATUSCHAK:

Q.  Now, Dr. Madisetti, you were not involved in the initial decision to bring this lawsuit, were you?

A.  No, sir.

Q.  Mformation decided to sue RIM before you had ever been contacted, before you had any contact with Mformation, correct?

A.  Again, I don't have firsthand knowledge.

Q.  Well, it was before you were hired, right?

A.  Yes.

Q.  Okay.  So Mformation did not have the benefit of any of your opinions or analysis before it sued RIM, correct?

A.  No, sir.

Q.  Okay.

THE COURT:  Correct, "no, sir" means, no, it's not correct or, no, they didn't have the benefit?  Sometimes I lose track of where the "no" goes.

BY MR. MATUSCHAK:

Q.  They did not have the benefit of any of your opinions before Mformation sued RIM, correct?

A.  They did not have the benefit of any of my opinions.

Q.  Thank you.

Now, Mr. Kushwaha -- Dr. Kushwaha from Mformation never sought you out as an expert based upon your experience and credentials, did he, sir?

A.  No, sir.

Q.  And Mformation's lawyers did not seek you out based upon your experience and credentials, did they, sir?

A.  No, sir.

Q.  You were the one who reached out to Mformation's lawyers, correct?

A.  Yes, as I explained earlier, yes.

Q.   And I think you said you sent Mr. Thakur an e-mail saying you'd be interested in working on the case, right?

A.   I said I am familiar with the technology, and I would be interested, yes.

Q.   Did you know Mr. Thakur before you sent him the e-mail?

A.   No, sir.

Q.   Now, you found out about this case by looking it up on something called Pacer; is that right?

A.   Yes, it's an online database.

Q.   And Pacer, it's a database where you can go on the Internet and look up information about lawsuits, correct?

A.   Yes, it provides a variety of statistics.

Q.   Now, I believe you testified on direct that this was the only time that you've ever reached out to a lawyer about being an expert?

A.   I get calls all the time.  And I discuss cases with some of the lawyers, yes.

Q.   But this is the -- you said I think on Friday this was the only time you actually reached out to the lawyer rather than the other way around, right?

A.   This is the only -- in all the cases that -- out of eight trials, this was the only case where I reached

out.

Q.  But you work for a accompany called the National Expert Witness Network, do you not, sir?

A.  They do all the paperwork and they do the accounting and marketing, yes.

Q.  And that company reaches out to lawyers on your behalf, doesn't it?

A.  They -- I mean I'm not affiliated with them, nor do I own them, but they -- lawyers contact them, and they have a network of lawyers they reach out to.  So I'm not sure.

Q.  You said you're not affiliated with them.  Did I hear that correctly?

A.  No, no, I meant that I don't own them.

Q.  You are affiliated with them, right?

A.  No, they represent several thousand witnesses in their list.  And I am one of them.

MR. MATUSCHAK:  All right.  Let's look at slide 202, please.

BY MR. MATUSCHAK:

Q.  Now, here, sir, we have part of the home page of what's this National Expert Witness Network.  Do you see that?

A.  Yes.

Q.  And they have a toll-free number at the top you can

call.  Do you see that?

A.  Yes.

Q.  And they have a button in the middle, "Find an expert," that a lawyer can press to find an expert, do you see that?

A.  Yes.

Q.  All right.  And I did a search for your name on this website, sir, and I came up --

MR. MATUSCHAK:  We can go to the next slide, 203.

BY MR. MATUSCHAK:

Q.  I came up with you.  See, there's the search, Madisetti.  I came up with "Expert witness 3242," do you see that?

A.  Yes.

Q.  That's you, right?

A.  Yes.

Q.  Okay.  And if we click on the link to 3242 --

MR. MATUSCHAK:  Can we go to the next slide?

BY MR. MATUSCHAK:

Q.  -- that takes you to this page of the website.  Do you see that, sir?

A.  Yes.

Q.  And that's describing you?

A.  It's a biography, yes.

MR. MATUSCHAK:  And if we can go down to the next

slide, it's the bottom part of the page.

BY MR. MATUSCHAK:

Q. And it says:  "To hire this expert, call 1-866" --
and it continues, do you see that?

A. Yes.

Q. So there's a toll-free number somebody can call to
hire you.  Is that correct, sir?

A. Yes.

Q. Now, no one called that number to hire you for this
case, right?

A. No.

Q. You had to e-mail the lawyers to offer your services,
correct?

A. For this case, yes.  As I mentioned earlier.

MR. MATUSCHAK:  All right.  You can take that
down, please.

BY MR. MATUSCHAK:

Q. Now, you said you did this because this case is about
wireless device management and you've had experience in
that field; is that true?

A. Yes, sir.

Q. But you also said on Friday that you've been working
in that field only since 2004 or 2005.  Do you recall
that, sir?

A. No, sir, I said I published papers in that area.

MR. MATUSCHAK:  Your Honor, may I have a minute?

Your Honor, may I approach?

THE COURT:  Certainly.

BY MR. MATUSCHAK:

Q.  Dr. Madisetti, I have the trial transcript from last Friday for you, and I turn you to page 824.  Do you see that, sir?

Do you have page 824?

A.  Yes, I have, yes.  As I mention in my --

Q.  I haven't asked you a question yet, sir.

A.  Oh, okay.

Q.  Do you see at line 21, where you testified:  "There was one called Mformation, and I thought that there was a typo in the name or something, and then I clicked on it, and then I found that it was working from device management.  And that's an area I worked in since the middle of 2004, 2005, and I thought it would be a great case of -- in the area of my interest."

Did I read that correctly?

A.  Yes, but it should say, I meant that I worked in it, I published papers in 2000, 2004, 2005, but I've been working in it, as I was explaining in deposition, since quite some time.

Q.  So on Friday you said you started working in this field in 2004 or 2005, and now you'd like to change that

testimony; is that true?

A.   No, sir.  I was just clarifying that, in middle of -- actually 2003, 2004, 2005, I published a number of papers on software upgrades, block-based upgrade for mobile devices.  And -- but I've been working in the area of mobile devices and associated software for quite some time.  Since early 2000.

Q.   Now, sometime after your e-mail to Mr. Thakur, he came to Atlanta to meet with you, correct?

A.   Yes.

Q.   And at that meeting, you did not discuss the patent in this case at all, did you?

A.   No, I reviewed the patent.

Q.   And at that meeting, did you discuss the patent with the Mr. Thakur or not?

A.   We did not discuss the patent.

Q.   Thank you.  And Mr. Thakur told you nothing much about the case; isn't that right?

A.   Not with infringement, anything else.

Q.   All right.  There was no discussion about the case except that it existed, correct?

A.   Yes, there was not much discussion about the case. Yes.

Q.   The next thing that happened was you got a letter from Mr. Thakur proposing that you become Mformation's

expert, correct?

A.   Yes.

Q.   And you signed that letter, and you agreed to become Mformation's expert, correct?

A.   Yes.  I had reviewed the patent and I'm comfortable with the technology.

Q.   You didn't need to know anything more about the case before you agreed to become Mformation's expert, am I right, sir?

A.   Yes, I could offer an objective opinion that way.

Q.   You think you could have an objective opinion about the issues in this case having read the patent and knowing nothing about how RIM's systems work; is that correct?

A.   Yes, that is how I would be able to offer an objective opinion.

Q.   You also testified, sir, about some source code this morning.  Do you recall that?

A.   Yes.

Q.   And you put up various examples of source code up on the screen.  Do you remember that?

A.   Yes.

Q.   And humans program computers using source code, correct?

A.   It's a general statement, yes.

Q.   You know how to read source code, do you not?

A.   Yes.

Q.   And you consider yourself an expert when it comes to reading source code, correct?

A.   Yes.

Q.   Now, in this case my client RIM actually provided its source code so you could review it, correct?

A.   Yes.

Q.   So you could see how RIM programs the BlackBerry Enterprise Server to make it work, correct?

A.   Yes.

Q.   Now, if you had had Mformation's source code, you could have compared it to RIM's source code to try to see if RIM copied anything, right?

A.   I was not asked to do that, sir.

Q.   Right.  Mformation's lawyers never gave you Mformation's own source code before you wrote your reports, did they?

A.   I was not -- yes, they did not, yes.

Q.   So no one asked you to actually look at the source code, Mformation source code and RIM source code, and see if RIM copied anything, did they?

A.   Nobody asked me to do that.

Q.   Okay.  Sir, I know you weren't in the court -- I believe you were not in the court for the entire trial;

is that correct?

A.   No, sir.

Q.   Have you read the transcripts for all the prior days of testimony?

A.   Some relevant ones, yes.

Q.   Well, so I'm not sure, but could you tell me, did you read in the transcript for the case before you got here that talked about source code for a demonstration of a prototype by Mformation to Deutsche Bank in July of 2000?  Did you read about that part?

A.   I don't think so.

Q.   Okay.  Are you aware, sir, that there's an issue about what was in the source code for that demo?

MR. THAKUR:  Objection, your Honor, beyond the scope.  This witness has not testified to that.

THE COURT:  Does sound as though there's no foundation laid for fact or expert testimony in this area.  So unless you are offering to lay a foundation.

MR. MATUSCHAK:  That was my efforts, your Honor, was to ask him whether he was aware that was an issue in the case or not.

THE COURT:  I'll allow that.  Do you know whether that issue was in the case?

Are you aware one way or the other?

THE WITNESS:  A long time ago I heard something

about -- I mean, again, I'm not a legal expert, I didn't understand what the impact of it was, but I understand there was some investors involved and so on.

BY MR. MATUSCHAK:

Q. All right. Well, let me skip ahead. Mformation never asked you to take a look back at the source code for that demo and try to figure out what was in it or not, did they?

MR. THAKUR: Asked and answered, beyond the scope.

THE COURT: Overruled.

THE WITNESS: No, sir, they never asked me.

BY MR. MATUSCHAK:

Q. Now, I think we talked about whether you'd spoken with Dr. Nath, and you said no, correct?

A. Yes, sir, I did not speak with Dr. Nath.

Q. All right. But you understand that Dr. Kushwaha, the other named inventor, still works at Mformation, correct?

A. Yes, I understand, sir.

Q. And he was available to speak with you about your analysis if you had chosen to do so, correct?

A. Again, I did not see the need, because I looked at the patent and the specification, and I don't believe I need to talk to him.

Q.  So you didn't think it was important in forming your opinions to speak with either of the two inventors of this patent; is that true, sir?

A.  Again, I'm not legal expert.

Q.  Is that true or not?

A.  I did not see the need to speak to.

Q.  You did speak with Mformation's lawyers before you formed your opinions, though, didn't you?

A.  You mean Counsel Thakur and others?

Q.  Yes.

A.  Which opinion, sir?

Q.  Your opinions in this case, the ones you've testified to.

A.  Okay, could you please repeat the question?

Q.  You did speak with Mformation's lawyers before forming your opinions, did you not?

A.  I mean I formed opinions myself.  I did speak to them, yes.

Q.  So you spoke to the lawyers before you formed your opinions but not to the inventors; is that right?

A.  No, I said I formed opinions myself, and then spoke to the lawyers while writing the report, yes.

Q.  So you didn't speak to the lawyers about your opinions anytime before you wrote it down?

A.  Not my opinions.  I was writing my reports.

Q.   Now, you say that you've been in the wireless field for awhile; is that true?

A.   Yes, since I joined Georgia Tech in 1989.

Q.   And as someone in that field, you follow important developments, do you not?

A.   It's a general question, but I try to, yes.

Q.   You read scientific journals to see what's new and important; is that true?

A.   It's a very general question, I do read journals.

Q.   And you read the trade press and the industry magazines to see what's new in your field of expertise, correct?

A.   Yes.

Q.   That's one way you stay current, right?

A.   Yes.

Q.   And that's one way you hear about important new developments in the field, correct?

A.   That's one of the possible ways, yes.

Q.   Now, prior to the time that you were hired to be an expert in this case, you had heard about RIM, had you not?

A.   Yes, sir.

Q.   You had heard about the BlackBerry before you were hired in this case, correct?

A.   Yes, sir.

Q.   But before you were hired in this case, you had never heard of Mformation, am I right?

A.   Yes, I have not heard of Mformation.

Q.   And prior to the time you were hired in this case, you had never heard of Mformation's product, either, had you?

A.   No, I had not.

Q.   And prior to the time you were hired in this case, you had never heard of Dr. Kushwaha, correct?

A.   No, sir, I have not heard of Dr. Kushwaha.

Q.   And prior to the time you were hired to be an expert for this case, you had never heard of the '917 patent; is that true?

A.   Yes, I have not heard of what the -- the '917 patent.

MR. MATUSCHAK:  Your Honor, this would be a good time to break.

THE COURT:  Certainly.  So about noon, so we'll take our midday break.  We'll come back to this matter at 1 o'clock.  And in case you are wondering, we are on time, we're moving along.  I can see some of the long faces, but progress is being made, I assure you.

I'll see you at 1 o'clock.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Please be seated.  I wanted a moment

out of the presence of the jury, I need to give it further study, but some of the questions of the witness, it seemed to me might require further claim construction by the Court.  Because -- and I'll wait before I do anything further, but I had -- I began to wonder about our conversation that we had earlier in the case when I was offering to give further construction, and the parties both expressed satisfaction with the constructions as they now stood.  And so this is only an opportunity for the parties to raise that question, if you wish.

In the good old days, the jury did all of that work, they did the construction and everything.  And it seems to me that there is always the opportunity prior to submission of the case to the jury for the Court to give further construction.

So I wanted to raise the opportunity, not that I would agree to it, but there were some circumstances where I heard testimony that raised questions as to whether or not the Court needed to define terms more.

I also wanted to get an idea with respect to these matters having to do with the other witness.  As I now see it, this witness will be under examination when we come back.  And what is your estimation with respect to when you will now turn to this witness who was

involved in the other documents?

MR. THAKUR:  Your Honor, we have to see their cross, but certainly most likely this afternoon.

THE COURT:  I understand that.  But how much longer do you think you'll have this witness on cross?

MR. MATUSCHAK:  I think I'm about halfway done, your Honor.

THE COURT:  So that means another hour?

MR. MATUSCHAK:  I think that's right.

THE COURT:  All right.  So then perhaps we could --

MR. MATUSCHAK:  Maybe a little longer.  I don't want to promise an hour and not be able to meet it.

THE COURT:  You can use your time as you wish.  I was trying to figure out a time when I would not take up the jury's time to deal with these documents.  Sounds like if the witness is coming this afternoon, I do need to make space for that.  Perhaps what I could do is to have us come back maybe a little early, quarter to 1:00, and have the clerk tell the jury we won't start until a little after 1:00, so maybe 1:15, 1:30.  And that would give us some space to understand what's going on here.

Because if we turn quickly to the other witness and we only have a 15-minute break, I need to give a break to the staff.  I won't have had an opportunity to

deal with this.  And I don't understand what the problem is yet.  So if we came back at a quarter of and stayed a little longer, I think maybe that would give me an opportunity.  All right?  So I'll see you at quarter of.

MR. MATUSCHAK:  Thank you, your Honor.

(Luncheon recess)

DEPUTY CLERK:  Remain seated.  Come to order.

THE COURT:  We're on the record out of the presence of the jury.

And this is the time to educate the Court about the problem you're having with several documents.

MR. CHARFOOS:  Yes, your Honor.  I think the first issue, which might be one, may or may not be easy to resolve, is on Exhibit 2124, you had originally overruled RIM's objections.

THE COURT:  Do I have that?

MR. CHARFOOS:  You actually gave us the folders back, and just this morning you sustained our objections.

MR. ARNTSEN:  Both were this morning.

MR. CHARFOOS:  That's right, both were this morning.  2124 is the TD Newcrest document written by a third party, RIM has numerous objections to it.  And we ask that your Honor sustain those objections with respect to hearsay and relevance.

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

THE COURT:  2124?

MR. CHARFOOS:  That's correct.

THE COURT:  The objection is currently sustained. And what you're telling me is I previously had overruled the objection?

MR. ARNTSEN:  Yes, I believe that's in the other folder.  But I don't know what the order is.  We got both folders this morning.

MR. CHARFOOS:  Two ships passing in the night.

THE COURT:  Well, what happened was I held back some, and -- all right.  So let's deal with it as a de novo matter then.

What is this document?

MR. ARNTSEN:  This an analyst's report talking about -- that talks about RIM.  And it's also the subject of slides 16 and 17 of Mr. Weinstein's report. And what we want to use it for is for Mr. Weinstein to -- our damage expert says, "I relied on this in part for my damage opinion."  So that's what we want to use it for.

THE COURT:  All right.  So it's -- when you say it's a report, what does it report?

MR. ARNTSEN:  It reports sort of the status of RIM as of that point in time.  It's like a stock analyst's report of RIM.  And what's relevant to this

case, it's set in 2004, and it talks about wired activation leveling the playing field with another competitor -- wireless activation leveling the playing field with another competitor, and we redacted the report to eliminate a lot of RIM financial information. Mr. Weinstein relied on it.

THE COURT:  My first question would be, why does that relate to whether or not wireless management, which is the alleged patent --

MR. ARNTSEN:  This is wireless activation which is a component of wireless.

THE COURT:  So prior to 2004 there was no wireless activation, so this is a report saying the value of this company has just changed based purely on wireless activation?

MR. ARNTSEN:  It's not that stark, but they're saying wireless activation helps RIM -- which was new on BES 4.0 -- helps RIM compete with a competitor.

THE COURT:  And what's wrong with that?

MR. CHARFOOS:  Absolute hearsay, your Honor. Third party, coming in.  They're using the statements not just to say that Mr. Weinstein relied on them, but that the industry did in fact change their mind about the importance of wireless enterprise activation. There's hearsay within hearsay within this document with

respect to different function amounts, with all the competitors.  There's also numbers in here which --

THE COURT:  I agree that's hearsay, but experts can rely upon hearsay if it's the type of information that those in this technology field regularly -- because it's reliable.

Who's Mr. Weinstein?

MR. ARNTSEN:  It's our damage expert.

THE COURT:  But what field is he in?

MR. ARNTSEN:  Economics.  He's an economist.

THE COURT:  An economist.  So he's expressing an opinion with respect to the value of the RIM or the value of the technology?

MR. ARNTSEN:  The value of the technology.  He's expressing an opinion as to the hypothetical negotiation.

THE COURT:  And this is the kind of information you're tendering to the Court that economists would use to value the technology?

MR. ARNTSEN:  Exactly, and put themselves in the place --

THE COURT:  Why wouldn't I allow that?  The document doesn't come into evidence.  Just because an expert relies upon information -- it's their opinion that comes in.  But I don't allow the expert to say, I

looked at the book; therefore, the book goes into evidence. It's just a basis for the opinion. And so if your concern is that the document goes into evidence, I would sustain that objection.

MR. CHARFOOS: Your Honor, that was the position of Mformation, that the document would come into evidence.

THE COURT: No. The document does not come into evidence. Experts can testify. It's their opinion that comes in. He can list it, he can show it, he can describe it, he can do everything that informs his opinion, he can be cross-examined based upon documents that he relies upon, but the documents themselves don't come into evidence as substantive proof of anything because he's not of the opinion that this is true, he's expressing the opinion that this informs my opinion. And therefore -- if that solves the problem?

MR. ARNTSEN: Then we'll probably get to the slides.

MR. CHARFOOS: Yes, your Honor.

THE COURT: So he's free to rely upon information that economists rely upon, but they don't come into evidence as things that the jury now sits down and tries to figure out themselves, because it's really the expert that does that work.

So is there another document?

MR. ARNTSEN:  There's an issue with -- RIM objects to some of Mr. Weinstein's slides.  You've gotten a number of documents relating to those slides.

MR. CHARFOOS:  Your Honor, this goes back to what Mr. Matuschak was talking about this morning, we've come full circle.  Apparently over the weekend Mformation has started to change their theories around a little bit to conform maybe with some holes in their case, and we have seen a greater emphasis on enterprise activation.

And you'll see even from the document that was provided to you by Mformation's counsel, the Weinstein slides, RIM's conclusion is that they are quoting from documents and portions of documents which Mr. Weinstein didn't quote from for that particular purpose.

So if your Honor will indulge me for one minute, the very first slide, slide 9, Mformation quotes from unobjected-to Exhibit 399, a two-page RIM marketing brochure, and they reference -- and I believe they have a copy of Mr. Weinstein's report -- was that submitted to you by Mformation's counsel?

MR. ARNTSEN:  It should be there, yes.

THE COURT:  I have a binder that has "Weinstein Expert Reports."

MR. ARNTSEN:  And this is the initial report.

The bigger one.

MR. CHARFOOS:  And your Honor, do you have slide 9?

THE COURT:  Yes.

MR. CHARFOOS:  If you look at Paragraph 135, and this can be found on page 45 of the report --

THE COURT:  Yes.

MR. CHARFOOS:  -- and you look at, it's the third paragraph.  "Wireless IT policies can be instantly pushed to the BlackBerry devices enabling administrators to quickly change password, lock devices or wipe data."

THE COURT:  Hold on.

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  You said paragraph --

MR. CHARFOOS:  135.  This goes between pages 44 and 45.

THE COURT:  All right.

MR. CHARFOOS:  Specifically looking at page 45, your Honor.

THE COURT:  Yes.

MR. CHARFOOS:  It begins "simplified administration enhanced security."

THE COURT:  Yes.

MR. CHARFOOS:  And there are three paragraphs that are listed there.  Those are not the three

paragraphs that Mformation is pointing to in their slide presentation for this document. They've changed their reliance on this document to the enterprise activation aspect of it, whereas before Mr. Weinstein's opinion was with respect to a different part of what is going on in the claims.

And we would object as to all of these slides, that it really is a misrepresentation of what parts of the documents and why he relied on those documents.

THE COURT: What's your response?

MR. ARNTSEN: Your Honor, first of all, each of these documents is referenced in Mr. Weinstein's report. And Mr. Weinstein's report extensively talks about the benefits of wireless activation. If you go back --

THE COURT: What's an economist know about that?

MR. ARNTSEN: Because he was informed about it. And it's one of the Georgia-Pacific factors. I mean he is putting himself in in the hypothetical negotiation. So he is -- it's one of the Georgia-Pacific factors.

THE COURT: Right, but he's not making that analysis that this is important. He's just simply assuming certain things.

MR. ARNTSEN: He's saying RIM says it's important. Right.

MR. CHARFOOS: And your Honor, he's not even --

in his report he didn't even say that wireless activation was important with respect to this document.

MR. ARNTSEN:  But he does --

MR. CHARFOOS:  I will concede that the documents are referenced in his report.  But the issue is, the documents which he uses to support wireless activation are not these particular documents.  He's citing to different portions for different reasons.

THE COURT:  Well, seems to me that if he were tendering a different opinion, the objection would get closer to what I am concerned with always when experts come in.  Because there's got to be full disclosure, so, you know, exactly what they're going to say and you can cross-examine them.  So his opinion doesn't change.

Now, if he is now citing to different portions but that is supporting the same opinion, it's less of a concern with the Court, because you can on cross-examine point out that he didn't use this previously, and presumably he's going to say, Well, I didn't list it, but there are lots of things I didn't list.

So I understand your concern.  It depends how different this is from what he did rely upon.  And if you tell me it comes from something that you had no basis for looking at to see and to examine him with respect to this, or it served to change his opinion,

you're closer to what I would be concerned with.

So say again what your objection is.

MR. CHARFOOS:  Your Honor, in this section of the report in which he talks about the individual -- the parts of the patent, the sales brochures and other marketing materials that trumpeted the benefits of Mformation's technology, he does not refer to the enterprise activation with respect to any of these documents.  He refers to all sorts of other things. Simplified management.  Advanced security features. Simplified administration.

And now Mformation is coming back and providing a more significant emphasis on the enterprise activation when they hadn't done it before.  And it is in that instance, in that sense, it is new opinion testimony.

MR. ARNTSEN:  Your Honor, may I respond?

THE COURT:  Certainly.

MR. ARNTSEN:  If you go back to Paragraph 133, just on page 43, two pages before, and this is one of the documents, if you look at the second paragraph, from the bottom, "Simplified Deployment and Maintenance: BlackBerry Enterprise Server enables users to quickly connect their handheld with cradleless, wireless provisioning, making it easier for IT departments to deploy BlackBerry throughout the company."

132 references simplified deployment.  In its kind of introductory -- earlier on in his report talking generally about the benefits of the patents, he had mentioned in paragraph 24, it says:  "It is my understanding that the benefits of the patented invention over the prior art include the use of, number one, over-the-air secure registration of the device with the central server."

THE COURT:  Whose document is this slide 9?

MR. ARNTSEN:  RIM.  It's a RIM --

THE COURT:  I'm going to overrule the objection.  It seems to me fair to allow the expert to rely upon portions of the document that he's listed that weren't otherwise -- if it doesn't serve to change his opinion or to introduce a new opinion, I'm satisfied that enterprise software provisioning wirelessly was an assumption to be made as a basis for the opinion, and so this doesn't change it.

And so -- but that won't apply to any other slide, so take me to another one that you feel violates the rule that I'm trying to establish.  In other words, he's free if he has identified any document to rely upon any part of it as long as it's not a new opinion.  For example, if he hadn't said anything about cradleless before, and now he's bringing in one of the things that

I relied upon was the fact that this was cradleless, then that would be a concern.

MR. CHARFOOS:  I believe all the objections we made were related to documents where he was pointing to different portions of it and emphasizing different positions, but given the Court's ruling...

THE COURT:  You can cross-examine him on that, but as I'm now understanding it, with purely assumptions on his part, some of these may or may not be proper assumptions, that's the essence of cross-examination.

All right?  Anything else?

MR. CHARFOOS:  The last issue, your Honor, is with respect to the third-party valuations, the Mesirow documents and the IPVision.

THE COURT:  Where is that?

MR. CHARFOOS:  There's -- correct, and there's also a grouping of Mesirow documents which we provided to you -- it's probably the largest folder that you have.  With some pages of the transcript.

THE COURT:  Very well.  Yes.

MR. CHARFOOS:  And we provided your Honor two cases.  That's right (indicating).

THE COURT:  All right.

MR. CHARFOOS:  Your Honor, you granted the Plaintiff's Motion in Limine Number 5 with respect to

valuations.  But throughout the course of this case, the value of Mformation and the value of its technology and the question of whether or not these are foundational patents for the mobile device management industry has been extensively brought in by plaintiffs.

We provided you testimony from Dr. Kushwaha that -- one of the named inventors, where he was asked what is the commercial value of Claim 25 and Claim 27 of the '917 patent.  We also saw with their very first witness, Mr. Basu, included the Articles of Incorporation, stock purchase agreements, which included stock prices.  Exactly what the value is of each of the individual shares.

We therefore believe, your Honor, that they have opened the door to introducing the valuations conducted by Mesirow, which is a financial valuation of the value of the patent, and the IPVision report, which is a report conducted by a third party, on the question of whether or not the strength of the patented portfolio at the time the '917 patent was the only issued patent.

We directed your Honor to the Oracle case, which we had cited before, that recognized that the valuation of the patent in suit, even if it was dated four years after the hypothetical negotiation, can shed light on the reasonableness of royalty estimates by the parties'

experts, and indeed both sides have -- both experts have discussed the Mesirow financial report, and both experts have relied on documentation both before and after the hypothetical negotiation.

Your Honor has seen at length the kinds of documentation they're putting in from 2001 and 2002 regarding the parties' negotiation.  The fact that they're asking for $50 a seat, they're putting in all sorts of pricing information.  They're trying to value their patent that way.  RIM should be permitted to challenge the values placed on that, on the patent by using their own evaluation of the value of that patent to shed light for the jury on what Mformation truly thought for tax purposes the patents were really worth.

THE COURT:  And with whom would you tender these documents?

MR. CHARFOOS:  Well, your Honor, to be honest with you, they were going to call Miss Daddato last week and the morning of they decided not to call her.  She actually was their corporate representative on that.  We can certainly play her deposition next week.  But I was intending to question Mr. Weinstein about it.  He actually reviewed them as part of his opinion testimony. And concluded that he didn't think they were relevant. I think it's certainly relevant for the jury to see what

these valuations were and how they are completely out of line with what his valuation of the reasonable royalty is today.

THE COURT:  All right.

MR. ARNTSEN:  Your Honor, you already ruled on this.  I'm reading from Docket 903, your decision on our Motion in Limine Number 5, which was focused on this very issue and which the parties briefed extensively.

And you state:  "The Court finds that the third-party valuations at issue are not relevant and thus are inadmissible."

In particular, none of the reports at issue attempted to assess the value of the '917 patent at the time infringement began, and none assumed that the patent was both valid and infringed.

That remains just as true today.

Thus, admission of these reports is likely to confuse the jury by introducing a basis for evaluating damages that differs entirely from that that the jury is being asked to apply.  And that is just as true today. And in support of its decision, the Court cited the recent Federal Circuit decision in Unilock in terms of the measure of damages and the way to go about damages for patent infringement.

There's absolutely no basis for the Court

revisiting its decision.

We first heard about this issue last night.

If you could hand this to the Court.

THE COURT:  Well, I guess I need a better understanding of what is new.  Because as I reconsider whether or not there's some change, your tender is that they have now put into evidence something that should change the Court's analysis.

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  And if I go through the material in this folder, I'll see what they've done.

MR. CHARFOOS:  You'll see some of the testimony that we provided to your Honor to suggest that they have put the valuation into evidence.

THE COURT:  So I'll allow my ruling to stand unless I have an opportunity to visit this before your cross-examination of the witness.  You may end up losing the ability to use it with this witness and may have to go through some other route to get it before the jury, if I allow it at all.

But I can't -- I'm not convinced yet that I have a circumstance that would change the law with respect to what the jury ought to hear as the measure that should be used for valuating the kind of royalty negotiation that ordinarily takes place.  This all started in 2004,

as I understand it.  Are these valuations later in time or earlier in time?

MR. CHARFOOS:  Well, the Mesirow evaluation, your Honor, is in 2009.  But the Oracle case suggests that that's not inappropriate.  And in fact, Mr. Weinstein himself has testified that he has relied on valuations in other cases, and as your Honor will see from the different schedules which we discussed this morning, both experts are looking at agreements and things that happened both before and after the date of the hypothetical negotiation.

THE COURT:  The *Oracle vs. Google* opinion you've given me, I do see the word "may be helpful."  Let me read through this, and I'll come back to it at another time, and if you get to the point where you need a ruling, ask me whether or not I've had the chance to do it.

I find the testimony to be so riveting in this case that I can't read up here other things while the testimony is going on.  And so I'll try and get to this as quickly as I can.

Why did you give me this (indicating)?

MR. ARNTSEN:  Because he mentioned this morning -- first, this just came up at 8 o'clock last night.  He mentioned this morning some testimony from

Dr. Kushwaha, and I asked him what material he was relying on, and there was nothing from Kushwaha in the materials.  So I don't know what's been given to you.

THE COURT:  Somebody just handed me this.

MR. ARNTSEN:  I gave that -- I handed that to you in terms of -- I mean, and a different argument was we think this was just unfair surprise, this came up at 8:30 last night.

MR. CHARFOOS:  Your Honor, if I may, I believe that thereto may be one or two other documents which have been introduced into evidence which I'd like to get your Honor as well, and while you're making your consideration of your ruling, in addition to the small packet I gave you.

THE COURT:  You want to give me more to read?

MR. CHARFOOS:  I'll represent to you, and I think counsel will agree with me, that the stock purchase agreement includes the price of the stock.

THE COURT:  This is litigation and that's why I tell parties to settle.  Anything can happen, and so what's happening is I'll do as best I can.  So you want this back so you can add to it?

MR. CHARFOOS:  Yeah, thank you, your Honor.

THE COURT:  Give them all of this back.

Moving it off of my desk and back to yours is one

of the great pleasures.

So I'll give you back this entire folder.  I'll give you this entire notebook you just handed me.  And this, the 220 --

MR. CHARFOOS:  You already ruled on that, your Honor.

THE COURT:  All right, perfect.

MR. ARNTSEN:  You might want to keep Mr. Weinstein's report and deposition up there.

THE COURT:  He's not here yet.

MR. ARNTSEN:  Okay.

THE COURT:  All right.  Thank you.

MR. ARNTSEN:  Thank you.

THE COURT:  How are we doing on time?  We're a little early.  You might poll them to see if they're ready to go.  We can start early if you all are ready to go.

MR. ARNTSEN:  We were going to move into evidence some of the things that Mr. Thakur talked about, but we can wait on that.

DEPUTY CLERK:  The jurors are all present.

THE COURT:  The jurors are all present.  Counsel are present.  The witness is present.  Summon the jury.

MR. MATUSCHAK:  Thank you, your Honor.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may resume your cross-examination.

MR. MATUSCHAK:  Thank you, your Honor.

CROSS-EXAMINATION (resumed)

BY MR. MATUSCHAK:

Q.  Dr. Madisetti, this morning, I asked you a little bit about Relay.  Do you remember that?

A.  Yes.

Q.  And I believe that you said the Relay was not relevant or important to your analysis; is that fair?

A.  I meant that --

Q.  Is that fair or not, sir?

A.  Yes, that's fair.

Q.  Okay.  Your job as an expert here is to see if the language of the claim applies to RIM's system, correct?

A.  Yes, the claim and its construction, yes.

Q.  And to do that job, you have to understand how commands are transmitted to a BlackBerry, correct?

A.  I have to understand the claim, the limitations, the construction, and apply it to the accused products, yes.

Q.  And the Relay is part of RIM's system that transmits command to a BlackBerry, correct?

A.  The claim requires that the command be transmitted over a wireless network.

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

Q.   Right.  And the Relay is part of RIM's system to
transmit commands to a BlackBerry, correct?

A.   I would not use the word "transmit."

Q.   So the RIM's Relay is in the middle there, but it has
nothing to do with the transmission of commands to the
BlackBerry, is that your testimony?

A.   As per the claim language, it has nothing to do with
the transmitting step of the claim.

Q.   You drew a diagram for us last Friday, I'm not going
to ask questions about it right now, so I'm not going to
move it, but do you agree that that diagram is an
accurate and complete description of the functional
elements of RIM's BlackBerry Enterprise Server?

A.   I was -- I used the diagram only to explain the
establishing -- if I have the patent claim, it was
initializing -- initiating wireless communication state.

Q.   I just want to know, is your diagram accurate?  Are
you satisfied that your diagram is accurate?

A.   Yes, for purposes of explaining the initiating the
wireless communication state.

Q.   Thank you.

        MR. MATUSCHAK:  Slide 210, please.

BY MR. MATUSCHAK:

Q.   We saw this slide a little earlier, correct, sir?

A.   Yes.

Q.   And we know that this big square is the BES, and the BlackBerry is over here (indicating), right?

A.   Yes.

Q.   Okay.  Now, so I want to talk about how a command gets to the BlackBerry.  Because that's where the action happens, right?

A.   Let's look at how the command gets there.

Q.   Okay.  So the first thing that happens is somebody in the IT department who wants to send a command to the BlackBerry will be in this particular diagram using what's called the BlackBerry Manager, right?

A.   Yes, in some versions of the BES, yes.

Q.   So let's assume that the user's BlackBerry has already been activated and they have a user account on the system.  If that person, the IT person sitting down at the BlackBerry Manager software, he's going to interact with that software to send the command, yes?

A.   That's generally true, yes.

Q.   Okay.  And the next thing that happens is that command is stored in a part of what on this diagram is called the BlackBerry Configuration Database, correct?

A.   Yes, the command is stored in the ITAdminQueue.

Q.   And that's somewhere in this little cylinder here, right?

A.   Yes.

Q.   And the ITAdminQueue is just a table with columns and rows, correct?

A.   The ITAdminQueue is a data structure with certain schema that are identified in my report.

Q.   And you identify in your report that it has columns and row, correct?

A.   That's a graphical description, but, technically, it's called a schema.  There's nothing called a column and a row.

Q.   But a graphical description would be columns and row, correct?

A.   That's a depiction, yes.

Q.   And the commands for specific BlackBerry devices are stored in that ITAdminQueue, correct?

A.   Yes.

Q.   So now the next thing that happens, as I understand it, is that the BlackBerry Policy Service, right here (indicating), looks periodically at an ITAdminQueue to see if there are any new commands that need to be sent out, right?

A.   Yes, that's one of the things it does.

Q.   And then the Policy Service takes the command from the ITAdminQueue, correct?

A.   That's again loose language, but it's a general way of stating it.

Q.  And the Policy Service packages that command into something called the GME protocol, correct?

A.  The Policy Service and the dispatcher together, the dispatcher component -- the Policy Service converts that into some sort of payload that is then packaged with the GME header in the dispatcher.

Q.  So the GME protocol -- strike that.

The Policy Service does not package it into the GME protocol?

A.  No, no.  The Policy Service coordinates with the dispatcher to create the package, the command with the GME header.

MR. MATUSCHAK:  Your Honor, I'd like to play a clip from Dr. Madisetti's deposition on February 2nd. It's page 183, lines 8 to 12.

(Whereupon, an excerpt of the videotaped deposition of Dr. Madisetti, taken February 2, 2011, was played.)

BY MR. MATUSCHAK:

Q.  So on May 2nd, 2011, you told us that the Policy Service packages, the command, into the GME protocol, correct?

A.  I had said a portion of it is done there.  And in my report I described the entire process.

Q.  We just heard your testimony, sir.  You didn't say "a

portion," did you?

A.   The --

Q.   You said it was in the Policy Service, right?

A.   Which is not untrue.  But there's additional work done by the dispatcher.

          MR. MATUSCHAK:  Your Honor, I'd like to move the diagram so that the jury can see it.

          THE COURT:  Certainly.

BY MR. MATUSCHAK:

Q.   Can you see this?

A.   Yes, sir.

Q.   So on May 2nd of 2011, you told us that the Policy Service packages that GME protocol, but on your diagram from last Friday, you didn't even draw the Policy Service, did you?

A.   As I meant, both worked together --

Q.   Did you draw the Policy Service on your diagram, sir?  I'm not seeing it.

A.   This was a representation --

Q.   Did you draw the Policy Service on your diagram, sir?

A.   I did not draw the Policy Service here, which is also part of the BES.

Q.   Thank you.

          When you drew that diagram on Friday, you said that the GME protocol -- that the command is packaged

into the GME protocol at the dispatcher, correct?

A.   Yes.  The dispatch, it's processed by the Policy
Server, created into a payload, packaged, and a GME
header is added at the dispatcher.

Q.   So is the command -- is the GME packet created at the
Policy Service or the dispatcher?

A.   At the dispatch.  It's finalized at the dispatch.

Q.   The GME protocol's like an envelope, right?

A.   The GME protocol is an end-to-end communication
protocol.

Q.   It's like an envelope, right?

A.   It's much more.

Q.   Doesn't that name stand for "Gateway Messaging
Envelope"?

A.   That's what the name means, but it's much more.

Q.   Okay.  And the GME protocol adds address information
like you would put on an envelope, who a letter is from,
for example, right?  Or -- and who a command is to?

A.   Yes.  It categorizes the type of content, the
payload, it provides header data, it provides
destination, it adds some verification, CRC checks.
There's a whole bunch of stuff it does.

Q.   And so that we've gone from the Policy Service to the
dispatcher, right?

A.   Yes, sir.

Q.   All right.  And so after the dispatcher then sends
the command off to the BlackBerry Router -- that's your
opinion, sir?

A.   They are all a part of the BES, yes.

Q.   Right.  And then the Router decides whether to send
this command out over WiFi or over the cell network,
correct?

A.   It's important to distinguish that the command is now
packaged.  It decides to send this package to GME over
WiFi or the cellular connection.  And the header goes
first.

Q.   So the Router decides whether to send that GME
package to cell network or to the WiFi network, right?

A.   Roughly, yes.

Q.   Okay.  And if it goes over the WiFi, I think
yesterday you said it goes through Port 3101, right?

A.   Yes.

Q.   And if it goes over that port, over WiFi, it uses the
TCP connection, correct, protocol?

A.   Yes.

Q.   And if it goes to the cell network, it goes through
port -- what you said is 4101, correct?

A.   Yes.  Both of them use the GME protocol.

Q.   But so the jury can understand, if it goes to 3101,
that's WiFi, right?

A.   Yes.

Q.   And 4101 is cell network, right?

A.   That's right.

Q.   Okay.  And if it goes over the cell network, it goes from 4101 to the Relay, correct?

A.   Again, it goes over the wireless network, header first.

Q.   It goes from 4101 to the Relay, correct?

A.   As I said, it goes over the cellular connection.  I have not identified it as a Relay.

MR. MATUSCHAK:  Can we see slide 216, please.

BY MR. MATUSCHAK:

Q.   When a command going over the cell network over that Port 4101, in this direction (indicating), the next stop is the Relay, correct?

A.   Again, I have interpreted in terms of patent claims, the wireless network as per the specification, and include reliable interfaces.

Q.   This is a yes or no question, sir.  When it goes over the cell network from Port 4101, does the command go into the RIM Relay or not, yes or no?

A.   The RIM Relay is part of the wireless network.  In that sense it goes to the RIM Relay, which is part of the wireless network.

Q.   Thank you.

And for this part of the -- when it goes from the BES to the Relay, it's using the TCP protocol also, is it not?

A.   It uses the GME protocol, yes, and it can use a TCP protocol.

Q.   Okay.  But when the command is sent on from the Relay to the BlackBerry, it's using the UDP protocol, correct?

A.   You mean from the Relay?

Q.   Yes.

A.   It could use the UDP, yes.

MR. MATUSCHAK:  All right.  You can take that down.  Thank you.

BY MR. MATUSCHAK:

Q.   Now, you say that the ITAdminQueue that we talked about a minute ago is what the patent calls a mailbox, right?

A.   It's one of the three examples of a mailbox that I've cited in support of the limitation.

Q.   I was just about to ask you about that.  I think on Friday you actually said there were three things that could be the mailbox, right?

A.   Yes, sir.

Q.   Okay.  What were those three things again?

A.   The -- I can refer to my slide.

Q.   No, you can just tell the jury, if you can.

A.   It was the ITAdminQueue, it was a single record or row in an ITAdminQueue table, and it would also include the user config database.

Q.   Okay.  So for purposes of this case, though, and RIM's system, which one is it?  Where's the mailbox, ITAdminQueue?  Is it a single row in the ITAdminQueue or is it something else in the user Configuration Database?

A.   As per the Court's construction, which describes the mailbox as an address in memory that can store a code or a signal, again, the construction in front of me, all three, each of them satisfies that construction.

Q.   So you're saying there are three mailboxes?

A.   I said for purposes of satisfying the construction, you could call the ITAdminQueue as a mailbox, a single row as a mailbox, or the user config table as a mailbox.

Q.   I understand that, but there's only one mailbox, right?

A.   I don't understand the question.

Q.   The claim only refers to one mailbox, right?

A.   I've provided evidence of at least one mailbox, and I did.

Q.   Which of those three things is the mailbox of the claim?

A.   We can have -- we have three options.  We have three structures that I've identified as the mailbox.

Q.  So if the jury doesn't believe it's the ITAdminQueue, then it could be a single row in the ITAdminQueue; and if they don't believe it's that, then it could be something in the user Configuration Database, is that your testimony?

A.  Yes, I've provided support for each of them, as per the Court's construction.

MR. MATUSCHAK:  Can we get slide 207, please.

BY MR. MATUSCHAK:

Q.  One of the limitations of Claim 1, I'll find it here, is transmitting the contents of the mailbox.  From the server to the wireless device.  Do you see that?

A.  Yes, I do, it's the transmitting the contents of mailbox from the server to the wireless device.

Q.  And the BES never transfers all of the many different rows in the ITAdminQueue to a single BlackBerry device, does it?

A.  I have applied the Court's construction, sir.  The Court has construed that language specifically, and I've applied it, and if I could look at the construction, I can read it to you.

Q.  I know what the construction says, sir.  What I want to know is how RIM's system interacts with that construction.  So I want to know if you're saying, or not -- strike that.

I believe that what you are saying is that the contents of the mailbox, which you said could be all those rows, that entire contents is never transmitted to a single BlackBerry device, correct?

A.   The entire contents are not.

Q.   Okay.  So when it says, "transmitting the contents of the mailbox from the server to the wireless device," you think that means some of the contents of the mailbox; is that right, sir?

A.   No, sir.  I've applied the Court's construction, which if you'll permit me to look at...

Q.   I just want to know, sir --

A.   Yes.

Q.   -- whether you're saying that the words "some of" should be inserted into Claim 1 at that space before the words "contents of the mailbox"?

A.   No, sir.  I've interpreted it as transmitting the contents of the mailbox from the server to the wireless device, means wirelessly sending from the server to the wireless device the contents of the mailbox.  The command represents a code or a signal along with the contents, with the header.

Q.   I know that's the construction, but that still doesn't get us to the question of, are you saying it's got to be all the contents of the mailbox, or just some

of the contents of the mailbox?

MR. THAKUR:  Your Honor, we object.  It calls for a legal conclusion as to claim construction.

THE COURT:  Well, I lost the sense of your question, because you went back and forth between whether his interpretation of how the RIM product operates or what the Court's construction is.  So why don't you phrase your question with the full header.

MR. MATUSCHAK:  Thank you, your Honor.

BY MR. MATUSCHAK:

Q.  Dr. Madisetti, is it your opinion that this element is met if some of the contents of the mailbox are transmitted?

A.  In my opinion, that element is met if the command is transmitted from the mailbox along with the header.

Q.  Does that mean some of the contents or all of the contents?

A.  I recall it as the contents.  I wouldn't want to qualify it as -- I would call it as the contents of the mailbox.

Q.  You don't know one way or the other?

A.  I believe those are the -- the command and the header are the contents of the mailbox.

Q.  You said the mailbox, one mailbox, at least, was the ITAdminQueue that has lots of commands, right?

A.   It can store many commands, yes.

Q.   And all of those commands aren't sent to a single wireless device.  Are they?

A.   In RIM's products?  In RIM's product?

Q.   Yes, sir.

A.   If they are all addressed to the same device, they could.

Q.   Now, is it your testimony, sir, that the -- an entire row of the table in the ITAdminQueue is ever transmitted to a single BlackBerry device?

A.   The Court construction, sir, is transfer -- the command is a code or the signal.  So what is stored in that mailbox is a code of the signal.  And the code of the signal implies that it represents an action.

Q.   I understand that, but you have said one of the mailboxes might be just a row in the ITAdminQueue, correct?

A.   One possible mailbox, one mailbox that I've already defined is a single row, yes.

Q.   I'm asking you, is everything in that single row ever transmitted to a single BlackBerry device?

A.   I don't understand what you mean "everything in a row."  It is a code or a signal that is stored there.

Q.   Well, you would agree that a row -- I mean, you've seen the table before, right?

A.   It's a code or a signal that's --

Q.   Have you seen the signal, sir?

          MR. THAKUR:  Your Honor, argumentative.  It's going outside the scope of the direct.

          THE COURT:  Overruled.

BY MR. MATUSCHAK:

Q.   You've seen a table before, haven't you?

A.   Which table?

Q.   A table that has columns and rows?

A.   I said this is schema, this is a databased schema.

Q.   That's not my question, sir.  Have you ever seen a table?

A.   Yes.

Q.   You know tables have columns and rows?

A.   Yes.

Q.   And your opinion is that one of those rows might be the mailbox, right?

A.   One row, a row or a card that's added to the table is a mailbox, yes.

Q.   I want to know is all of that row, all the information in that row ever transmitted to a single BlackBerry device?

A.   The information that is stored in the row --

Q.   No, everything in that row.

A.   There could be some index and other types of things.

It's the command or the code or the signal that is stored in that row that is transmitted along with the header.

Q. So, again, it would be some of the contents of that mailbox that's transmitted to the device; is that correct, sir?

A. No. I call that as the contents of the mailbox, because the purpose of the mailbox is to store commands, and the commands are sent.

Q. Now, the actual command that's stored in whatever of the mailboxes you want to pick is never actually physically moved from the mailbox to the Policy Service, is it?

A. The code or signal is moved. It's exactly the same.

Q. Is it physically transferred?

A. As per the Court's construction, the command --

Q. I'm not asking you about the Court's construction now. I want to know how the BlackBerry system works. And I want to know, in that system, which you have studied, does the command physically move from the mailbox to the Policy Service?

A. The command -- the bits corresponding to the command -- the command is a code or a signal. It is moved by the GME protocol to the device.

Q. I'm talking about before we ever get to the GME

protocol.

MR. MATUSCHAK:  Can we get 210 back up again, please?

BY MR. MATUSCHAK:

Q.  So you say the mailbox is somewhere in here, correct?

A.  Yes, sir.

Q.  And the next thing it goes to is the BlackBerry Policy Service, right?

A.  Yes.

Q.  So I want to know, does that command physically ever go out of the mailbox and into the Policy Service?

A.  Yes, it is copied and moved over, yes.

Q.  Well, copied and moved over are two different things. Is it copied in the BlackBerry Policy Service and recreated or is it actually --

A.  It is moved in the sense that you're reading it and transmitting the code or signal.

Q.  So the BlackBerry Policy Service reads what's in the box, right?

A.  Which is a code or a signal.

Q.  And the BlackBerry Policy Service recreates that, right?

A.  No, it reads it as a code or a signal and it stores it as a code or a signal.

Q.  Well, one thing that we do know --

MR. MATUSCHAK:  If you can reduce that slide again.

BY MR. MATUSCHAK:

Q.  -- is that the transmitting the contents of the mailbox step has to start at the mailbox, right?

A.  I don't agree.

I mean, I didn't understand the question.

Q.  Well, let me ask it this way.

A.  Yeah.

Q.  Have you ever used a mailbox to mail a letter?

A.  Again, I don't understand the question.  We are talking about claimed mailbox.

Q.  My question is very simple, sir.  Have you ever used a mailbox to mail a letter?

A.  You mean for the postal service?

Q.  Yes, the U.S. Postal Service.  Those big blue things on the corner.  I know people don't use them as much anymore, but they're still there, right?

A.  Yes.

Q.  Have you ever dropped a letter into a mailbox?

A.  Yes.

Q.  And transmitting the contents of a mailbox is like when the post office truck comes and picks those letters out and sends them on their way, correct?

MR. THAKUR:  Your Honor, are we talking about the

patent or the United States Postal Service?

THE COURT:  The objection's overruled, to the extent that is an objection.  Sounds like a speaking objection.

THE WITNESS:  Again, you're saying that -- somehow I missed the question.

BY MR. MATUSCHAK:

Q.  All right.  Transmitting the contents of that mailbox is like when the mailman comes and picks it up to put it on his truck and moves it off to his intended destination, correct?

A.  Not for the purposes of the claim.

Q.  So you think for the purposes of the claim it's different?

A.  No, I explained exactly how it works.  You have the initiating wireless communication step.  After that initiating wireless communication step is completed, which is when you select the code, you send the header out, following which the contents are transmitted from the server, so the server -- the claim requires, from the server.

Q.  So if I understand correctly, Dr. Madisetti, the transmitting contents of the mailbox does not start at the mailbox.  Is that your testimony?

A.  It is my testimony that the -- could I look at the

claim for a minute?

Q.  Sure.

MR. MATUSCHAK:  Let's put up 213.

THE WITNESS:  Yes, sir, it is my opinion that the transmitting the contents of the mailbox from the server is identified at, as I point out, as when it exits -- when it's transmitted from the BES, which is the router component of the BES.  That's the requirement of the claim.

MR. MATUSCHAK:  Let's go back to the 210, please.

BY MR. MATUSCHAK:

Q.  So you say that the transmitting the contents of the mailbox doesn't start until you're over here at the router?

A.  The claim requires transmitting the contents of the mailbox from the server.

Q.  And that transmitting step starts at the mailbox, doesn't it?

A.  No, sir.

Q.  And because if that transmitting step started at the mailbox, if transmitting the contents of the mailbox started at the mailbox, then you have a problem, don't you?

A.  I don't think I agree.  I said --

Q.  If the -- it starts at the mailbox, and you start

with transmitting the contents of the mailbox, you say you initiate the connection in here, and then you keep transmitting, right?

A.   I didn't offer that opinion.  I said transmitting starts from the server.

MR. MATUSCHAK:  Can we go to 213?

BY MR. MATUSCHAK:

Q.   Because you know you have to complete the establishing the connection step before the transmitting the content of the mailbox step can commence, right?

A.   That's the Court's construction.

Q.   Right.  And if under your analysis this transmitting step commences, before this establishing step is complete, then there's no infringement, correct?

A.   That's the Court's construction.  The mailbox contents are sent at the router, transmitted from the router, from the BES.

Q.   All right.  Now, let's talk a little bit more about what you say establishes a connection.  You point to two things, I think, that you say establishes a connection. One is, you talk about packaging the command in the GME protocol, correct?

A.   Yes.

Q.   Okay.  And that's done in the Policy Service or the dispatch or some combination of the two, correct?

A.  Yes.

Q.  And the second is when the router chooses WiFi or --
4101 or 3101, right?

A.  Yes, sir.

Q.  Let's take them one at a time.  The Judge's order
requires the establishing step, just establishing a
connection means initiating a communication, right?

A.  Initiating wireless communication.

Q.  Initiating wireless communication.  Thank you.

And putting something in the GME protocol,
packaging in that protocol, is like putting something in
that envelope, isn't it?

A.  A GME header, yes.  You're adding a GME header, and a
route and a destination, and a source, yes, and you're
picking the right part.

Q.  Now, if you write a letter and you put it in the
envelope and you put it on your desk, and you don't do
anything else, you haven't initiated anything, have you?

A.  The way you initiate wireless communications is --

Q.  Can you answer my question, sir?  If you write a
letter, you put it in an envelope and you stick it in
your desk and you leave it there, you have not initiated
anything, have you?

A.  It depends on where you put your envelope.  You can
put it on -- inside the mailbox, you can put it,

somebody picks it up.

Q.   No, I'm just putting it in the envelope, that's all I've done.  I put the address on there, but I leave it on my desk, and I never do anything more.  That doesn't initiate anything, does it?

A.   It can -- it can initiate communication.

Q.   It's going to rise off of my desk and go to the mailbox?

A.   It is the initiation which is the beginning of the process.  It's the first step in a long process.

Q.   Now, you also say that the choice at the BlackBerry Router between WiFi or cell, 3101 or 4101, also establishes a connection, correct?

A.   It's initiating wireless communications because you have to decide the path on which connection -- on which path you're sending your header.

Q.   So let's say I want to call a friend of mine, and I'm trying to decide whether to call their cell or work phone.  And in my mind I decide I'm going to call the cell phone.  But I don't do anything else.  Have I initiated a communication, a wireless communication with that person?

A.   I don't understand.  Are you trying to call your friend?  I was talking about choosing a header that is sent over the wire, either on this port or that port.

So the header goes over the door.

Q.   You're talking about making a choice.  You said it was a choice between WiFi or cell network.  3101 or 4101.

So what I want to know in my example is, just like the router, I'm trying to decide where to call my friend.  At work or on his cell phone.  And I decide I'm going to call his cell phone.  Is it your testimony that just making that decision, without doing anything more, is initiating a wireless communication?

A.   Yes.  If it is done in a router and not in a person.  A router cannot think.  A router is programmed to carry out a task.  The router doesn't think because there are series of instructions that decide, Okay, I'm now going to initiate a WiFi link.  I'll send the header along and then send the command after the header.  Or I'll go over the cellular connection, and that means I'll fire up the cellular connection, send the header there, send the command off to that.

So the -- the difference between a person and a device is that the device is programmed to do something, it doesn't think.  It makes the decision and moves forward.

Q.   Well, I want to talk about something else that you mentioned before we broke for lunch when we talked about

establishing a connection.  And I wanted to make sure I heard you correctly.  I think you said that the step of establishing a connection can be complete even if no connection is ever established.  Did I hear you correctly?

A.  I don't understand the question.

Q.  Is it your opinion, sir, that the step of establishing a connection can be completed without a connection actually being established?

A.  The connection has -- again, it's a very -- I don't understand the context I made that in.  But according to the claim, there is a threshold condition.  There has to be a threshold condition that it remains which way the connection goes.  So I'm not sure in which context this is.

Q.  I'm just asking in general, in RIM's system does the BES actually have to make a connection before the establishing the connection step is complete?

A.  That is -- I don't see the connection between what you're saying and the claim.

Q.  So your answer would be no?

A.  No, I didn't understand which step you're referring to.  Because there's nothing called "making a connection."

Q.  Well, there's a --

MR. MATUSCHAK:  Can we put the -- let's see, I think -- let's try 213.  I'm sorry, 218.  There we go.  Thank you.

THE WITNESS:  Yep.

BY MR. MATUSCHAK:

Q.  You see the one I'm talking about is the one that says "establishing a connection between the wireless device and the server"?

A.  Yes, I do.

Q.  What I want to know is, is that step complete when the connection is actually established?  In your opinion?

A.  My opinion is that that substep is already defined clearly as it is.  It is saying that when you're -- when you're done with initialing wireless communications between a wireless device and a server, that substep is done.  There's nothing else for it.

Q.  So you don't actually have to establish a connection, all you have to do is initiate it?

A.  As I said, anything else you could do, but the requirements is that establishing a connection between a wireless device and the server is the substep of initiating wireless communication between a wireless device and the server.  If you have completed that initiation, as I said, the selection between WiFi and

this and setting it out, you are done with that step.

Q.   I'll ask it one more time, sir, very, very carefully, and I'd like you to answer me yes or no.

Is it your testimony that the establishing a connection between the wireless device and the server step is completed when the connection to the wireless device is actually established or not?  Yes or no?

A.   I mean, I rely on the claim.  It says "establishing a connection."

Q.   Do you agree with that or not?

A.   It has to be interpreted in the language of the Court.

Q.   I understand that, but when you interpret it in the language of the Court, do you agree with that or not?

A.   I agree with the language of the Court.

MR. THAKUR:  Argumentative, your Honor.

THE COURT:  Overruled.

THE WITNESS:  I agree with the language of the Court.

BY MR. MATUSCHAK:

Q.   Can you answer that question yes or no, sir?

A.   Please rephrase the question.

Q.   Is it your opinion that the establishing a connection between the wireless device and the server is completed when a connection to a BlackBerry device has actually

been made?  Yes or no?

A.  No, my opinion is that it should follow the Court's construction.

Q.  Let's talk about this for a second, sir.  I'll give you a little hypothetical and see if I can follow this correctly.

Let's say I'm hiking in the Grand Canyon, and I drop my BlackBerry down off the side of one of the trails.  And I'm not sure what happened to it.  So I call my IT department or my company and tell them I lost my BlackBerry.  Are you with me so far?

A.  Yes.

Q.  Okay.  And my IT department wants to send a kill command or whatever, they want to wipe all the data off of my BlackBerry.  Okay?

A.  Yes.  How did you call them if your lost your BlackBerry?

Q.  I used my friend's cell phone.

(General laughter)

BY MR. MATUSCHAK:

Q.  Now, they perform all the steps that we've talked about, some guy's sitting at the terminal and he enters the command and does all this stuff that you talked about, but it turns out my BlackBerry is at the bottom of this canyon in a million pieces, okay?  But the IT

commander has entered the command that's gone through the router and the dispatcher and all the places that you talked about.  But my BlackBerry's incapable of receiving anything.

Are you with me so far?

A.  Yes.

Q.  In that circumstance, are you telling us that the establishing, establishing a connection between the wireless device and the server has been made?

A.  Yes.  It satisfies the initiating wireless communication between the wireless device and the server.

Q.  So you believe you can establish a connection with a device that doesn't exist; is that right?

A.  Yes, as per the Court's construction, your initiating wireless communications -- the key word is "initiating.

Q.  All right.  Now, in your --

MR. MATUSCHAK:  Let's look at slide 25, please.

BY MR. MATUSCHAK:

Q.  Now, the step of establishing a connection has to be performed without a request from the wireless device, right?

A.  Yes, sir.

Q.  And so for infringement to take place here, the BlackBerry cannot be the one initiating the

communication, correct?

A.   If you look at the Court's construction, the BlackBerry cannot initiate the communication, initiating the start of the performance of that particular step.

Q.   Okay.

A.   If I just send a message at some point in the day, it doesn't make a difference.  It has -- and if I can refer to the Court's construction, and --

Q.   I think you've answered my question, sir.  Because I want to ask you something a little different.  I wanted to ask you about what happened when we go out of 3101, the WiFi connection.

Are you with me?

A.   Yes, sir.

Q.   Okay.  That's this one over here (indicating), correct?

A.   Yeah.

Q.   Okay.  And for WiFi, for the WiFi network, there's a TCP connection the whole way from the BES to the BlackBerry, right?

A.   It's a GME protocol that uses TCP, yes.

Q.   Okay.  But you will agree with me if the BlackBerry initiates that TCP connection, then there's no infringement, correct?

A.   No, I don't agree with that.

Q.   So you're saying if the TCP connection is established with a request from the BlackBerry, there could still be infringement?

A.   Because the Judge's construction is very clear:  The request should request the performance of that particular step.  I mean, if two days ago somebody initiated a TCP connection and today I issue a command, there's no relationship.  It has to be -- there are two requirements of that.  First is that -- it has to be -- let me read --

Q.   Let me ask you this question, sir:  I think we have it down, but you're saying that if the BlackBerry initiates the TCP connection with the BES, then there's still infringement even though there's no request from the -- even though there is a request from the BlackBerry --

A.   There is no request for the BlackBerry for performance of that particular subset.

Q.   What I'm talking about is the establishing a connection substep, sir.

A.   No, that is -- no, that is establishing connection for the delivery of the command.  It is not related -- it's an unrelated connection that is the connection that is established.

Q.   I thought you agreed with me that the command that

goes out through Port 3101 over the WiFi uses the TCP protocol, correct?

A.   It uses the GME protocol with -- using a TCP port, yes.

Q.   Right.  And if the TCP protocol that was used to communicate that command out of Port 3101 is done at the request of the wireless device, there's no infringement, correct?

A.   No, I don't agree.  It doesn't satisfy the Judge's construction.

Q.   Now, Dr. Madisetti, you're aware that the BES versions that you accuse in this case of infringement also support a wired connection, correct?

A.   Why would he use it, I mean from what to --

Q.   Can you answer that question yes or no, sir?

A.   Yes, they can support a wired connection.

Q.   Those versions also support sending IT command using a USB cable, correct?

A.   They can, yes.

Q.   And if a BES was using a wired connection to activate a BlackBerry, that would not infringe the patent, correct?

A.   By "activate," you mean the first couple of steps?

Q.   Yes.

A.   Yes, they would not.

Q.  So once a BlackBerry device is activated using a wire, there's no infringement.

A.  If it doesn't satisfy the first two steps, it won't.

Q.  So to satisfy those two steps, the BlackBerry has to have been activated wirelessly?

A.  Correct.

Q.  And this is the Administration Guide for BES 5.0.

MR. MATUSCHAK:  And if we could turn to page 55, please.  And highlight the shaded part.  Thank you.

BY MR. MATUSCHAK:

Q.  Do you see there's a heading that says "Assigning BlackBerry Devices to User Accounts"?

A.  Yes, I do.

Q.  And it lists five methods underneath that, do you see that?

A.  Yes, there are five of them.

Q.  And three of those five methods are done with a wire, correct?

A.  Which are the five?  If you could remind me.

Q.  The first one is BlackBerry Administration Service. Do you see that?

A.  It doesn't describe --

Q.  Let me -- do you see that, sir?  Just work with me on this.

A.  Okay.

Q.   Under description it says:  "You can activate BlackBerry devices before you distribute them to users by connecting the BlackBerry device to a computer and locking into the BlackBerry Administration Service."

Do you see that?

A.   You're assuming that they're connected without wireless?

Q.   I am.

A.   Okay.  In that case, that's a wired activation.

Q.   But the second one is over the wireless network, right?

A.   Yes.

Q.   Okay.  And then the third one is over the LAN.  Do you see that?

A.   Yes.

Q.   And that would be a wired connection, right?

A.   If LAN is a wired checks, that could be a wired activation.

Q.   And the fourth one is BlackBerry Device Manager, that one would also be wired, correct?

A.   Let's look at the right, right side of that.

Q.   Talking about connecting it to a computer, do you see that?

A.   Yes, if that's the wired connection, then that would be a wired one.

Q.   And then the fifth one is over WiFi, so that's wireless, correct?

A.   Yes, based -- that sort of WiFi wireless.

Q.   Okay.  Now, you don't have any opinion in any of the reports you have prepared in this case about which ones of those methods of activating a BlackBerry device are used more than others, do you?

A.   Without reviewing my report, I can't answer with the document.

Q.   You don't remember ever saying anything about that in your report, do you, sir?

A.   No, I think in my testimony I said it was --

Q.   I'm asking about your report.

A.   Reports.  Sir, I've looked through, I don't recall where I said it.

Q.   Fair enough.  We'll move on.

         Dr. Madisetti, I just want to make sure I understand that you are only claiming that BlackBerry Enterprise Server, Versions 4.0 or above, infringe, correct?

A.   Yes, in my opinion, BlackBerry servers 4.0, 4.1 and higher, and 5.0, in conjunction with the BlackBerry handhelds, infringed the --

Q.   And you do not have any opinion in your reports about whether any version of the BES before 4.0 infringes,

correct?

A.   I have not offered such an opinion.

Q.   Now, Dr. Madisetti, we talked a little earlier about source code.  Do you remember that?

A.   Yes, sir.

Q.   And if I want to modify the way a computer program works, what I need is control of the source code, correct?

A.   Yes, that's a general statement, but it sounds right.

Q.   And if I want to understand how a software program works, what I need is to have control of the source code so I can open it up and look at it, right?

A.   Yes, that's one of the ways.

Q.   And in your long career, sir, you've seen or heard about software programs that have security vulnerabilities, correct?

A.   Again, it's a very general statement.  Could you clarify?

Q.   Well, we read about it every day, read about computer programs that have flaws or vulnerabilities that let other people do malicious things, correct?

A.   Yes, if there are -- there could be, yes.

Q.   And flaws in the source code can sometimes allow people to manipulate a software program for improper or illegal purposes, correct?

A.   Could you please repeat that?

Q.   Yeah.  A flaw or a vulnerability in source code can sometimes allow people to manipulate a software program for an improper or even illegal purpose, correct?

A.   That's a fair statement, yes.

Q.   And if there's a problem with how a software program works, the way to fix that problem is to fix the source code, correct?

A.   If it is a minor problem, yes.

Q.   And you can't fix a problem with a source code unless you have control of the source code, correct?

A.   How do you define "control"?

Q.   Having the access and ability to open it up and modify it.

A.   Yes, if you have complete control over the source code, yes.

Q.   All right.

       MR. MATUSCHAK:  Now, can I have Exhibit 614, please.

BY MR. MATUSCHAK:

Q.   Dr. Madisetti, this is an e-mail from David Castell at RIM to Mr. Upal Basu of Mformation in 2002.  Do you see that?

A.   I've never seen this.

Q.   Do you see it now?

MR. THAKUR:  Your Honor, it's beyond the scope.

THE COURT:  Well, let's see.  Maybe it's going to something that is within the scope.

BY MR. MATUSCHAK:

Q.  Do you see that, sir?

A.  I see that now, yes.

Q.  And do you see if we go down to this Section 1 --

MR. MATUSCHAK:  If you can highlight that.  Thank you.

BY MR. MATUSCHAK:

Q.  Do you see where it says:  "For example, I've already mentioned that your security model is flawed, and we would need to do some development to fix this"?

Do you see that?

A.  I read:  "For example, I've already mentioned that your security model is flawed, and we would need to do some development to fix this."  Yes.  That is what is written in this e-mail.

Q.  All right.  If you assume with me, sir, that that's correct, then what RIM would need to fix it would be access and control of the source code, correct?

A.  Not necessarily.  I mean, you could put it in a container to make sure that the flaws in the security model are not utilized.

Q.  Now, you've used a BlackBerry before, have you not,

sir?

A.   Yes, sir, many of them.

Q.   And you agree with me that the BlackBerry provides secure data, correct?

A.   Yes, it does provide secure data.

Q.   And in fact, you liked your BlackBerry because of its security, correct?

A.   Yes.

Q.   And I believe you testified that security is a vital asset of the BlackBerry software.  Those are your words, aren't they, sir?

A.   Yes.

Q.   And you would agree with me that if RIM did something which might compromise the security of the BlackBerry, it could destroy what you called that vital asset, am I right?

A.   Could you please repeat that?

Q.   If RIM did something which compromised the security of the BlackBerry, it could destroy what you called a vital asset.  Right?

A.   If it willingly did it, yes.

Q.   Now, you know the President of the United States uses a BlackBerry, right?

A.   Again, I heard news reports.  I'm not sure.

Q.   You know the Department of Defense uses BlackBerrys,

 right?

A.   Again, I heard that in the newspapers, yes.

Q.   If RIM introduced software to a BlackBerry that had security flaws, it could be disastrous for our country; isn't that right, sir?

A.   That's a fair statement.

Q.   And it would certainly be disastrous for RIM's reputation; isn't that right, sir?

A.   Yes, if it willingly inserted flaws, yes.

        MR. MATUSCHAK:  I have no further questions, your Honor.

        THE COURT:  Very well.

        Any redirect?

        MR. THAKUR:  Just a few questions.

REDIRECT EXAMINATION

BY MR. THAKUR:

Q.   Professor Madisetti, thank you.  Do you recall that counsel started with you pointing you to a diagram and saying -- accused you of hiding something on the diagram?

A.   I didn't hear the question.

        MR. THAKUR:  Actually I can bring up the slide. Slide 92.

BY MR. THAKUR:

Q.   Do you recall counsel showing you this diagram?

A.  Yes, sir.

Q.  Do you recall being accused of hiding something in this diagram?

Perhaps I could help you.  Do you recall being accused of hiding the Relay from this diagram?

A.  I see.  Yes, sir.  The Relay was not mentioned in the diagram.

Q.  But do you recall counsel saying to you that you were hiding the Relay from this diagram?  Do you recall that, sir?

A.  In general terms, yes.

Q.  Do you see the trial exhibit?

A.  Yes, sir.

Q.  Do you know who produced that document?

A.  That's RIM's own document.

Q.  Do you see the word "Relay" anywhere in this document?

A.  I don't see it, sir.

Q.  Okay.  So it's not you that was omitting the Relay from this document.  It was actually Research In Motion that was omitting the Relay from this document, correct?

A.  Yes.

MR. THAKUR:  If we could turn to the Claim 1 of the PowerPoint.

If I can have you turn to slide 6, please.

BY MR. THAKUR:

Q.   Do you recall the slide from your presentation?

A.   Yes, sir.

Q.   Do you recall making a presentation of which elements were met by the accused product?

A.   Yes.

MR. THAKUR:  Can we turn to slide 353, please.

Continue on, please.

Actually take me to the last slide.

BY MR. THAKUR:

Q.   Do you recall this opinion you expressed earlier today?

A.   In the slide 352?

Q.   Yes, sir.

A.   Yes, sir.

Q.   Do you recall expressing where these particular steps were performed?

A.   Yes.

Q.   Were any of the steps at the -- performed at the Relay?

A.   No.

Q.   Is there any reason for Relay to be in your analysis?

A.   There's no reason that I believe RIM's Relay is relevant to my analysis.

MR. THAKUR:  If you can kindly show the slide of

the Relay.

BY MR. THAKUR:

Q.  Do you recall seeing this slide for counsel's presentation?

A.  Yes.

Q.  Do you have any reason to know why RIM's Relay is relevant to their presentation today?

A.  No.

Q.  I noticed we see the BES, we see the Relay, we see the cell phone tower and the BlackBerry.  In the communication pathway, there is a communication pathway from here to there, correct?

A.  Yes, a wireless communication spot.

Q.  Is the Relay the next thing you would see after you left the BES?

A.  You could, yes.

Q.  What I'm saying is, are there other things that would come along the way, for example, the public switch network?

A.  Yes, it could be a public Internet, it could be your Comcast Internet provider.  So many other components.

Q.  So there's a lot of other things that go in between, correct?

A.  They could be placed anywhere in that path.

Q.  And you don't see those on their slide, correct?

A.   Again, it seems to be a simplification of the figure. And as I mentioned, in the patent --

MR. MATUSCHAK:  If you can put up the patent please, Column 3?

THE WITNESS:  Column 3, please.

Yes, if you go to line number 35, which is slightly above this.  From 35 to 45.  Yeah, from line 35, please.  All the way down.

If you see there, it says that the wireless network, one or two, may include one or more local area networks, one or more wide area networks, or both LANs and WANs, and one or more networks that may be included in the wireless network, 102, and may include both public networks such as Internet and private networks, which could be the Relay in RIM infrastructure, and using any protocols such as ethernet, token ring, thermamission control, protocol, etc., so the -- as given by the patentee to the wireless network is that it can include one or more wired connections and wireless connections, both public and private.

So it's consistent with my definition of my identification of the wireless network as checking the server and the device.

Q.   Perhaps you could explain to me how a wireless phone works.  If I wanted to make a wireless phone call from

here to a person in Boston, perhaps you could just talk me in little steps along the way.  What happens?

MR. MATUSCHAK:  Your Honor, I think we're beyond the scope of cross-examination.

MR. THAKUR:  They introduced the issue of wire lines being involved in the wireless network, and I'll be very brief on a couple of questions.

THE COURT:  The objection is overruled.

BY MR. THAKUR:

Q.  Just quickly.

A.  For example, if you were calling someone on the wireless network, the call from a desk would first go through a wire, all the way to some sort of a gateway, which would then link to a wireless network, which would reach the wireless subscriber to a wireless network.

If I was making a call from a wireless phone myself, there could be a portion that goes to the bay station on the wireless network, and then there's a long wired connection that connects to the bay station infrastructure, I'd say the end-to-end wireless consumer, before it goes back on a wireless network.

So there's a mixture of wireless and wired paths in every wireless network.  It is only the access portions that are typically wireless.

Q.  Actually before I turn away from that, do you

recognize that in the patent itself, it actually allows for a use of different communication protocols?

A.  Yes.  It clearly says that you can use any networking technology or protocol, and you can use TCP, you can use UDP, you can use ethernet, token ring, etc.

Q.  We're hearing a lot about this TCP, UDP connection protocol.  I think it would be helpful if I could take a few minutes of your time, clearly set up what each one is.

What is a TCP protocol?

A.  A TCP protocol is the -- works in the following manner:  If you were sending video or a song to somebody across the network, there's a sequence or a stream that, of bytes that are sending across.  It is not just a single sound bite or a single video segment.  You want to send a stream.

So what you can do is, if you're watching some video or something on Netflix and so on, you would send the sequence of bytes, and after the byte's received, the receiver will say, I received this packet, please send me the next one.  Or I received this packet, please continue sending me.  Or send it a bit slower.  Because you may have a wireless device at home, you may have -- need power to the wired receiver at your TV.  In any case, you want there to be constant exchange of

information.  So that's when a TCP is used.

So in that sense, there is some sort of acknowledgment that a packet is received.  But you can always send a message or packet using a TCP, just by saying that you write to a certain IP address and a certain quote and the packet goes there and it's accepted.

Q.  And the other protocol we mentioned is UDP.  What is that?

A.  UDP is again the same type of protocol, and UDP is typically used when you write to a certain port, the packet gets there, but the other side does not tell you that the packet reached.  You keep on sending packets knowing that you have addressed them correctly and they will get there.  If they're lost, it doesn't matter because in some cases like speech, if you lose a portion of a speech from 10 minutes ago, you don't want to replay.  So you simply let it go.

So you use the UDP protocol in the sense that you don't have this back and forth saying, I got a packet, I got a packet, I got a packet, send more, send less, or flow control.  But for the purposes of this patent, TCP and UDP work exactly the same way.  You write, you take an IP address, write over to a port, 4101, 3101, and then you send the message, or the command, in a

datagram.

And what is done is that RIM has written a new protocol, a GME protocol that does the work of acknowledgement. So you don't need something that does the acknowledgment. So that's an additional that it's gone there and is acknowledged.

Q. The issue is whether TCP and both UDP can satisfy the issue of establishing a connection which, as you've explained is, what is construed by the Court as initiating wireless connection?

A. Yes, both TCP and UDP satisfy the establishing of wireless connection.

Q. And that is what you explained on that diagram?

A. Yes, and to do that -- they do that without a request from the device.

So, for instance, in the case of a TCP -- if you'd like, I can draw a diagram.

Q. Before I turn to that, I would like you to take a --

MR. THAKUR: Turn to Exhibit 188. Slide 188.

BY MR. THAKUR:

Q. Do you recall this document?

A. Yes, sir.

Q. This is RIM's document, correct?

A. It's Exhibit 358, page 1, of the cover page of BlackBerry Enterprise Server for Microsoft Exchange.

Q.   So this is RIM's own document?

A.   Yes.

Q.   Do you see that document where they refer to a connection type?

A.   Yes, I do.

Q.   And it refers to what kind of protocol?

A.   It refers to a TCP as being the connection type.

Q.   Do you see this page?

A.   Yes, I do.

Q.   This is RIM's own document?

A.   Yes, it's page 338 of Exhibit 353.

Q.   And do you see the connection type there?

A.   Yes, it's the UDP connection type.

Q.   So these are RIM's own document referring to these connection types, correct?

A.   Yes, the documents and the code both refer to these.

Q.   And that's the source code that you showed earlier?

A.   Yes, the source code that -- the functionality, yes.

Q.   But in your opinion, establishing a connection which has initiated a wireless connection is satisfied in a diagram showing that?

A.   Yes.

          MR. MATUSCHAK:  Objection to the diagram.

          THE COURT:  Overruled.

          THE WITNESS:  And it's done without the request

both in the case, UDP and TCP.

BY MR. THAKUR:

Q.   So actually that's the second.  And the last issue, I heard opposing counsel refer to an issue without a request as to basically why the WiFi did not establish a connection.  Did you hear that?

A.   Yes.

Q.   What is your opinion with respect to WiFi ports satisfying the infringement claims without a request from a wireless device?

A.   My opinion is that whether you use WiFi or UDP or TCP, both of them satisfy establishing the connection without a request from the wireless device.

Q.   How does using a WiFi satisfy the element of establishing the connection without a request from the wireless device?

A.   So let us say the WiFi with the GME protocol is using the TCP connection.  So what happens initially is that say at 8:00 a.m., the user of the BlackBerry walks into some location that has WiFi, and then, as a result of switching on the phone, it -- what it does is that the -- with the TCP protocol, it says, at 9:00 a.m., say in the morning, that I'm wired now.  That's all.

Now, a number of things can happen during the day.  They do other types of work on the BlackBerry and

so on.  Say at 2:00 p.m., the BlackBerry administrator decides to change the password.  At that point, the BlackBerry administrator puts the command in the box, and the BES goes through all these steps, decides how to send this command, and initiates the wireless communications.  It realizes that this user is connected by WiFi.  At that point it sends the command over WiFi using the GME protocol.

Now, the fact that the person in the morning at 9:00 a.m. somehow just switched on the phone, has nothing to do with the performance of the step of either wiping or changing the password.  If you remember His Honor's construction, it says that without a request doesn't mean any communications.  It says communications that initiate.  That particular step.  So if you can put the particular construction of without a request, of the Court, it would be much clearer.

So it's the construction.

Q.  I think I know --

MR. THAKUR:  Do you know what slide it is?  Thank you.  There you go.

THE WITNESS:  Yeah.  So you can see His Honor has construed:  "Without a request from the wireless device means 'performing a step of the claim, an enumerated step, without transmission from the wireless device of a

code or a signal," and it goes on, "or any other form of request that initiates the commencement of the performance of the step."

So when the administrator at 2:00 p.m. decided to send a command, it had nothing related to what happened in the 9:00 a.m. when this guy switched on the phone. It had nothing to do with putting the command or packaging the command or sending the command to the device.  See, there's no relationship.  So in that sense, the use of the TCP doesn't make any difference to this claim.  All we are saying is that by initiating wireless communications, the BES has operated independently of any request from the user for the performance of that step.  Because the IT administrator decided to wipe the device or change the password, without any request from the device.  The fact that someone says "I'm here" doesn't mean anything.  What you ask them to do later has nothing to do with the fact that they say "I'm here."  They didn't ask for that thing to be done to them.

So that's exactly what it means.  So the TCP vs. UDP is a nonissue.

Q.  And to infringe, this needs to establish a connection via WiFi or cellular, correct?

A.  That's correct, WiFi or cellular.

Q.  Either one or the other would suffice?

A.  That's correct.  And if in any case the UDP has a connection that established the same at the same -- the data transfer and UDP established the same time as the connection or something that I referred to in my deposition, the header is sent first and that initiates --

MR. MATUSCHAK:  I object.  This was never disclosed in his expert testimony.  It only came out now because we saw him contradict himself on tape.

MR. THAKUR:  He's explained himself, your Honor. We'll withdraw the question.

THE COURT:  Very well.  The question is withdrawn.  The jury will disregard the partial answer.

BY MR. THAKUR:

Q.  The key points I want to close up, you heard counsel explain Version 4.0 was the first product accused of infringement, correct?

A.  Yes.

Q.  And you've heard this before, Version 4.0 was released when?

A.  I think it was in 2004.

Q.  That timeframe?

A.  That timeframe.

Q.  Well before the lawsuit was filed?

A.   Yes.

Q.   You understand the lawsuit was filed October 30, 2008?

A.   Yes.

Q.   And, therefore, it would be as a matter of law to accuse a product predating the lawsuit?

        MR. MATUSCHAK:  Objection, your Honor.

        THE COURT:  Sustained.

BY MR. THAKUR:

Q.   You did not complete analysis of a product other than 4.0 that predated 4.0?

A.   I did not analyze any product that predated 4.0.

Q.   You also heard some testimony about needing the source code to copy an idea.  Did you hear that today?

A.   Yes.

Q.   Okay.  If I showed you Claim 1 of the '917 patent, would you need the source code of that to implement that claim?

A.   No, sir.

Q.   Would it be sufficient for you to -- someone to show you a demonstration of a product implementing that claim for you to understand how that claim would work?

A.   No.

Q.   So what you would need is the access to the actual invention, correct?

A.   Yes.

Q.   Not the source code?

A.   No.

        MR. THAKUR:  Thank you.  I have no further
questions.

        THE COURT:  Any request for recross?

        MR. MATUSCHAK:  Yes, your Honor.  Just on the
topics of the Relay on the TCP, UDP.

        THE COURT:  Very well.

RECROSS-EXAMINATION

BY MR. MATUSCHAK:

Q.   Dr. Madisetti, you gave us a little tutorial on TCP
and UDP, but you didn't say anything about them in their
direct testimony, did you, sir?  Before I got up to
cross-examine you?

A.   I believe I did that.

Q.   Okay, now you gave your own description of TCP and
UDP, correct?

A.   I did provide a description, yes, of what is --

        MR. MATUSCHAK:  I'm sorry?

        THE COURT:  I didn't say a word.

        MR. MATUSCHAK:  I thought I heard something, your
Honor.

        THE COURT:  I looked like I'm saying something.

        (General laughter)

MR. MATUSCHAK:  I apologize, your Honor.

BY MR. MATUSCHAK:

Q.  You gave your own description because you wouldn't find any description of UDP in the patent, would you?

A.  Indeed.  The patent says it works with any protocol, UDP or TCP, so there's no reason for UDP to be described.

Q.  There's a reference in the patent to TCP, is there not?

A.  No, it says --

Q.  There's a reference in the patent to TCP, yes or no?

A.  It's one of the examples cited, yes.

Q.  And is UDP ever cited -- UDP, those letters -- anywhere in the patent?

A.  UDP is not cited anywhere in the patent.

Q.  Now, you gave your own description also because you don't understand -- don't agree with Dr. Nath's description, correct?

A.  That is not fair.  I said I didn't understand the context of his definition.

MR. MATUSCHAK:  Well, if we just briefly put up 4736, page 4.

BY MR. MATUSCHAK:

Q.  You said that you disagreed that with UDP, no connection needs to be set up.  Was that not your

testimony, sir?

A.   Yes, because I didn't understand what it meant.

Q.   All right.  So you disagree with what Dr. Nath -- how Dr. Nath describes UDP when he's teaching outside the courtroom the next generation of our computing engineer scientists; isn't that true, sir?

A.   No, sir.

MR. MATUSCHAK:  Now, can we put up 210, please? Slide 210?

BY MR. MATUSCHAK:

Q.   You said this was a RIM document, right?

A.   Yes, it is.

Q.   There are lots and lots of RIM documents that you looked at, aren't there, sir?

A.   Yes.

Q.   You chose that document to show the jury, didn't you?

A.   Yes, I chose this document, yes.

Q.   And you testified for the better part of two days about your opinions, correct?

A.   Yes.

Q.   And until I stood up and asked you questions, you never mentioned the word "Relay," did you, sir?

A.   As I said, it does not matter to the claim.

Q.   And if I hadn't stood up to cross-examine you, the jury would never know that there was something called

the Relay; isn't that right, sir?

A.   Again, I cannot speak for the jury.

MR. MATUSCHAK:  I have no further questions, your Honor.

THE COURT:  Further questions?

MR. THAKUR:  One last question.

REDIRECT EXAMINATION

BY MR. THAKUR:

Q.   Is the Relay, at all, whatsoever relevant to the issues in this case?

A.   Not at all.

MR. THAKUR:  Thank you, your Honor.

THE COURT:  The witness is excused?

MR. THAKUR:  Yes, your Honor.

THE COURT:  Thank you very much.  You're excused.

(The witness exits the stand.)

THE COURT:  Any request for a commentary on the witness?

MR. THAKUR:  No commentary, your Honor.

MR. MATUSCHAK:  Yes.

THE COURT:  Very well.  My rule is that if the party calling the witness doesn't open commentary, then there's no commentary, and when the defense, if they decide to call witnesses, have the privilege, then they can control whether there's commentary.

So we'll take our mid-afternoon break.  It's 2:30.  We'll come back at 2:45.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

(Recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. ARNTSEN:  Yes, your Honor.

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Call your next witness.

MR. ARNTSEN:  Plaintiff calls Roy Weinstein.

THE COURT:  Come forward, Mr. Weinstein.

(Witness sworn)

DEPUTY CLERK:  Please be seated, speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  Roy Weinstein, W-e-i-n-s-t-e-i-n.

ROY WEINSTEIN,

   called as a witness by the Plaintiff,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARNTSEN:

Q.   Good morning, Mr. Weinstein -- good afternoon, Mr. Weinstein?

A.   Good afternoon.

Q.   What do you do for a living?

A.   I'm an economist.

Q.   Where do you live?

A.   I live in Los Angeles, California.

Q.   And why are you here today?

A.   I'm here today because I was asked to calculate damages owed by RIM to Mformation in connection with infringement of the '917 patent.

Q.   Can you summarize the opinions you've reached in this matter?

A.   Yes.  I have concluded that damages adequate to compensate Mformation for an infringement by RIM of the '917 patent amount to $199 million.  This is equivalent to 50 cents per each infringing device during the damage period.

Q.   Thank you.

     What is it that you do that enables you to come up with that figure?

A.   Well, I'm an economist by training and occupation. Economists study how prices are determined in the

market.  And essentially that's what my assignment is here, to determine a fair price to be paid by RIM for infringement of Mformation's patent.

Economists also study things like competition between companies.  How markets operate.  Issues of industrial organization.  The economic impact of various types of conduct.  And things of that sort.

Q.  By whom are you currently employed?

A.  I'm employed in Los Angeles by an entity called Micronomics.

Q.  What kind of work do you do there?

A.  Both my firm Micronomics and I are engaged in various types of economic research and consulting activities, including the kind of assignment that I have today, as well as investigations in antitrust economics, sports economics, economic impact studies.  And most generally, the collection, tabulation and analysis of various types of economic, statistical and financial data.

Q.  How long have you been at Micronomics?

A.  I co-founded Micronomics in 1988, so we're coming up on our 25th anniversary.

Q.  What did you do before you co-founded Micronomics?

A.  Before I co-founded Micronomics, I was at another economic research company called National Economic Research Associates, also known as NERA.  I'd been there

19 years when I started Micronomics.

Q.  Can you tell the jury about your educational background?

A.  Yes, I attended City College of New York and graduated with a Bachelor of Business Administration degree with honors in economics.  From there I attended the University of Chicago and obtained a Master of Arts degree also in economics.

Q.  Did you receive any honors or awards in connection with your education?

A.  I did, I received various honors at City College and fellowships at University of Chicago, and most recently -- well, a couple of years ago, I received a special award from the Business and Economics Alumni Society at City College called the Career Achievement Award.  I was actually the first recipient.

Q.  Have you authored any articles or publications in your field?

A.  I have.  Over the years I've authored, oh, a dozen or so articles.

Q.  Any of them specific to patent damages?

        MS. DeBRUIN:  Yes.  The first one I published was in the *Journal of the U.S. Patent and Trademark Office* back in 1988.  And I subsequently have published articles on patent damages in intellectual property

journal called Le Nouvel.  Also a journal called *IDEA*, *The Journal of Law and Technology*, and a journal called *The Licensing Journal*.

Q.  Did you ever -- were any of your articles published in *The Journal of the Patent and Trademark Office Society*?

A.  Yes, that was the first one.  That was the one I did back in 1988.  It dealt with the calculation of damages and other issues in patent cases.

Q.  Have you ever taught or given lectures on how to calculate damages for patent infringement?

A.  Well, from time to time, I've given talks to attorneys in connection with their mandatory continuing legal education requirements that attorneys have to satisfy every few years.  So I've done those.

And most recently, actually a couple of weeks ago, I appeared in a panel in Dallas, Texas, on the calculation of patent damages in connection with intellectual property and infringement issues.

Q.  That panel you're talking about, what sort of course was that in connection with?

A.  It dealt with patent damages, and actually the name of my panel, which I didn't assign but which somebody associated with putting the convention together assigned, was called, "Weinstein's Niche Bargaining

Theory."  Which relates to some of the work I've been doing in the calculation of patent damages over the last several years, and I guess the work attracted enough interest that they put together a panel to address it. So I spoke, and then there were others who spoke about it as well.

Q.   How long was this program for?

A.   Well, the program was over the course of two days. But my panel was an hour or an hour and 15 minutes, something like that.

Q.   How long have you been offering expert opinions?

A.   The first time I testified was back in 1973.  So I guess it's close to four decades now.

Q.   And how long have you been offering damages opinions in patent cases?

A.   That first article I wrote was back in 1988, so that's 25 years ago, and I had to have been working on patent damages for some time before I wrote the article. So it would be something, somewhat in excess of 25 years.

Q.   About how many cases, patent damages?

A.   I think I've worked on over the years, probably a hundred different patent damage cases.

Q.   What kinds of industries?

A.   Industries included semiconductors, software patents,

auction patents, medical devices, energy, telecommunications.

So a variety of industries.

Q.  Can you take a look at Exhibit 892 in the exhibit binder that's in front of you.  It's got different tabs.

A.  Yes, I do.

Q.  Can you identify what that is?

A.  Yes, that's my resume.  It's a five or so page summary of my educational background and experience, speeches I've given, the articles I've written.

Q.  Thank you.  How many times have you been qualified by a court as an expert to testify at trial?

A.  Again, over the 40 years that I've been doing this, I think I've testified in probably 80 different trials.  Not all of them are patent trials.  But a substantial number are.

Q.  And just looking at the patent cases, about what portion of those are on behalf of a plaintiff versus on behalf of a defendant?

A.  Over the years, it's 50/50.  So roughly half the time I'm engaged by counsel for plaintiffs and half the time for defendants.

Q.  Can you identify some of the clients on whose behalf you've rendered damage opinions?

A.  In connection with patents cases, I've been engaged

by eBay, Ericsson, Dell Computer, Intel, Medtronic, a number of others.

Q. And what kinds of assignments have you been asked to undertake as an economist in the course of your career?

A. In connection with patent cases, I've been asked to calculate damages or provide opinions about damages associated with an infringement. Sometimes also deal with antitrust issues related to intellectual property. I've also worked on a fair number of motion picture industry cases, sports economics. Most recently I've done a series of economic impact studies in connection with what it means to have an all star game in your city, or in Los Angeles, the "X" Games in LA, in terms of incremental business for the community.

I also was commissioned by the presiding judge of the Los Angeles Superior Court to do a fairly detailed investigation of the economic impacts of budget cuts on the judiciary.

Q. Any particular interesting assignments come to light?

A. Well, you know, for me, they're all interesting. But one of the ones that attracted some attention was the valuation that I did of Spock's ears.

Q. That's kind of intriguing, tell us about it.

A. Spock is the Star Tech character played by Leonard Nimoy, and he received fairly significant royalties from

appearances that he'd make at conventions or voiceovers that he'd do in the Spock character.

There came a time when he and his wife were separating, and California is a community property stated, so it was necessary for someone to value the franchise associated with what I call Spock's ears, the Star Trek character, and I was the one who did that so that individuals could have an opportunity to see what the value of that franchise was worth.

Q.  Focusing on the matter at hand, what assignment were you given in this case?

A.  In this case I was asked to calculate damages adequate to compensate -- to compensate damages for an infringement of the '917 patent.

Q.  And undertaking this task, were you assisted by your colleagues at Micronomics?

A.  Yes, I was.

Q.  And is Micronomics being compensated for you and your colleagues' time?

A.  Yes, Micronomics compensates for our time and the time that I spend and my staff spends.

Q.  At what rate?

A.  My billing rate is 775 -- excuse me, $750 an hour, and rates for our staff vary from 160 to approximately $425 per hour.

Q.   How much time have you spent on this engagement?

A.   I personally have spent something in the neighborhood of 200 hours.

Q.   And how about Micronomics' staff?

A.   Our staff has spent considerably more time than that. When you put all the individuals together collectively, we had to review thousands of documents, and so that's what we did.

Q.   Can you tell the jury some of the materials you considered in coming up with your opinion?

A.   Yes, I can.  I actually prepared a summary. Basically the kind of materials that I looked at here are similar to the kinds of materials that I look at in any patent case that I do.  I looked at the patent, and then I looked at documents that were made available by the parties, documents made available from Mformation, and RIM, and then there were documents that I collected on my own.  So there are three categories of documents that I looked at here.  From Mformation, again, I looked at the patent, the websites.  There was some testimony I reviewed.  Interrogatory answers.  And I spoke with Dr. Madisetti on the phone.

From RIM, RIM furnished enormous amounts of financial information, correspondence, e-mails, license agreements -- by the way, I looked at Mformation license

agreements as well.  Documents about competition and things of that sort, in addition to the financial data.

Then, finally, when I do an engagement such as this, I correct material on my own.  So I examined industry analyst reports and articles and other websites, and as always, reviewed the academic literature on issues that relate to this as well as any license agreements that were in the public domain that might be relevant here.  And press releases, things of that sort.

Q.  Does your compensation at all depend on the substance of your opinions and conclusions or the outcome of this case?

A.  It does not.

Q.  Is there a name for agreements reached between patent holders and entities that seek access to patents?

A.  Yes, there is.

Q.  And what are they called?

A.  They're called "patent license agreements."

Q.  And how are -- how do those typically come about?

A.  Well, patent license agreements are negotiated between the patent holder and the entity that's interested in obtaining access to or use of the patent. So they're freely negotiated by the parties.

Q.  Do they typically contain payment terms?

A.   They do.  In exchange for rights to the patent, the licensee typically will pay the patent holder either some lump sum upfront payment or what are referred to as running royalties, which are payments over time, in exchange for use of the patent.  Or it could be a combination of both.

Q.   All right, Mr. Weinstein, so how did you go about determining what constitutes fair compensation to Mformation for use -- for RIM's use of the '917 patent?

A.   Well, in addition to looking at all of those materials that I just referenced, what we do in these kinds of engagements is we put the parties together, Mformation and RIM, and we have them conduct what's called a hypothetical negotiation for a patent license.  The reason it's called "a hypothetical negotiation" is that they weren't actually ever successful at negotiating the patent license, but what we do is we put them across from one another, hypothetically, and we see what the outcome would be, had they conducted such a negotiation in fact for a license to the '917 patent.

The one other thing I would say about this process is that in conducting with hypothetical negotiation, we follow a template that the courts have given economists and financial analysts like myself to adhere to.  And that template is called a

Georgia-Pacific Analysis.  And so we put the parties together, we have them conduct this hypothetical negotiation, and we adhere to what's referenced as a Georgia-Pacific Analysis.

Q.  We'll get to the Georgia-Pacific Analysis in just a minute.  When does this hypothetical negotiation occur?  How do you select the date for that?

A.  The date coincides with the date of first infringement.  And so in this case, since the patent issued in November 2005, that would be the date that the hypothetical negotiation would take place.  Typically the hypothetical negotiation is intended to take place shortly before infringement occurs.  The idea is put the parties together, have them negotiate a license before infringement.

Q.  Are there certain assumptions that underlie this hypothetical negotiation?

A.  Yes, there are.

Q.  What are they?

A.  The assumptions for a hypothetical negotiation are different from the assumptions that cover a real world negotiation.  With a hypothetical negotiation, the parties that are sitting across the table from one another agree that the patent that's being negotiated for is valid, it's infringed and it's enforceable.

And the other assumption that's part of this is that, unlike real world negotiators, hypothetical negotiators can't get up and leave.  They have to stay there until they reach an agreement.  There needs to be an outcome associated with this hypothetical negotiation.

So those are the assumptions that govern this kind of situation.

Q.   And what body of information do the hypothetical negotiators have available to them?

A.   Well, they have the existing history of the entities. That is, they know about the patent.  They know about the past, their respective financial performance.

But there's something else they have available which real world negotiators don't have available, and that's sometimes referred to as the "Book of Wisdom." And the Book of Wisdom comes from another court case that goes way back, to the '20s, actually, but the Book of Wisdom puts in the minds of these hypothetical negotiators information about the future that hasn't taken place yet.  But that's partly why it's called the hypothetical negotiation, because that's the way you do it.

So both of these negotiators know something about the history, the future history, with respect to the

patent and the businesses and the enterprises and their sales and things like that. And much of that information would not be available to real world negotiators. But it's part of this hypothetical negotiation construct, and it's one of the assumptions that I adhere to and other, as I say, financial analysts and economists who do this, do these estimates, have access to. That is, future information as well.

Q. And at what other ways does this hypothetical negotiation that you're describing differ from what we, you know, normally think of as the real world negotiations?

A. Well, with the real world negotiation, the negotiators are free to argue and push back about all of the terms. Obviously each side wants the best term they can get. And so if you're the potential licensee, one of the things that you might do in a real world negotiation is assert that the patent is invalid or assert that you don't use it, you don't infringe. Or assert that for various reasons it wouldn't be enforceable.

But in a hypothetical negotiation, again, the parties agree that the patent's valid, infringed and enforceable. So what that does is, just other things equal, those assumptions tend to favor the licensor in a

hypothetical negotiation relative to a real world one, because there's no dispute about validity, infringement and enforceability.

Q.   And are the hypothetical negotiators free to walk away from the deal?

A.   No, they basically have to reach an outcome.  That's the whole purpose of this construct is so that at the end of the hypothetical negotiation, one winds up with figures that reflect fair payment for damages adequate to compensate for infringement.  And that has to happen before the negotiation has been completed.

Q.   Now, for what period of time have you calculated damages in this case?

A.   I've calculated damages from November 2008, when the complaint in this case issued, through the present, through June 2012.  Basically throughout the end of this month.  So it's close to four years.

Q.   And, again, in your opinion, what are adequate damages to compensate Mformation for RIM's infringement in this case?

A.   I've concluded based on the work that I did here, that damages adequate to compensate for infringement amount to $199 million, or 50 cents per device.

Q.   Per month?

A.   Per month.  Yes, sir.

Q.   How did you go about forming that opinion?

A.   I started by reviewing these materials that I identified before.  But having done that, on -- by the way, that's an ongoing process, but having done that, I then undertook to complete what's called this Georgia-Pacific Analysis.  And that's the kind of analysis that we're asked to undertake when we calculate damages adequate to compensate for an infringement.

Q.   Okay.  And when you undertake what's called the Georgia-Pacific Analysis -- we'll put a slide up in front of you -- can you explain to the jury what that analysis involves, and what we'll be calling the Georgia-Pacific Factors?

A.   Yes.  The Georgia-Pacific Factors come from this case that was decided back, I think, in 1970.  And in the -- it was a patent infringement case.  And in that case, one of the things that the Court did in this opinion -- and the first page of the opinion is shown on the right-hand side of the slide -- but it was later in the opinion that the court enumerated 15 factors that are set out as a checklist for us to consider as we go through this hypothetical negotiation.

       And so each time I've done an engagement that involves the calculation of patent infringement damages, I've gone through a Georgia-Pacific Analysis and looked

at these 15 factors.

What I've put on the left side of the slide is sort of a shorthand for those factors.  Each one of those factors is actually a sentence or two.  But what I've tried to do, without changing the meaning of that sentence or two, is just very briefly paraphrase what each one of those factors is about.

Q.  Did you consider these factors in developing your 199-million-dollar reasonable royalties measure of damages in this case?

A.  Yes, sir, I did.

Q.  And are they all equally important?

A.  No, they're not.  Each time I have done a Georgia-Pacific Analysis, certain factors turn out to be more important than others, and in some instances some factors really have no relevance at all.  So it varies.

Q.  Which one typically do you consider the most important?

A.  Well, the finish line to all of this is Factor 15, which is the hypothetical negotiation, and that's basically the outcome, so there's a sense in which that's the most important.

But when possible, with that in mind, I really start with Georgia-Pacific Factor 1.

Q.  Okay.  And can you explain what Georgia-Pacific

Factor 1 is and how -- what you did in connection with it?

A.   Right.  Well, Georgia-Pacific Factor 1, that is the first factor on this checklist, says, look at the patent in suit.  In this case, the '917 patent.  And see if it's ever been licensed before.

And the reason that's an important factor to an economist is that what I'm trying to do here is determine what's fair compensation for a license to that patent.  And so a logical place to begin would be to see if somebody's ever licensed that patent in the past.  And so that's typically a very good starting point.

Q.   And did you find any such patent licenses for this '917 patent?

A.   No, I did not.

Q.   And why not?

A.   It had never been licensed before, and I think if it had been, my job would be easier, but it hadn't been.  So I had to turn to other factors.

Q.   So then what factors did you look at next?

A.   Well, I stayed on the subject of prices, and so I looked at Georgia-Pacific Factor 2, which would be rates paid for what are called comparable patents, technology that's comparable to the patent in suit.

And I also looked at the Georgia-Pacific

Factor 12, which referred to customary rates, and that would be if there are comparable patents in the industry that have rates that have been assigned to them in the past or licensed in the past, then I would be interested in those as well.

So then I went to Georgia-Pacific 2 and 12.

Q.   Can you take a look in your exhibit book and take a look at 2256, 2257, 2258, and 2259, just tell the jury what those are.

A.   Exhibit 2256 is a 65-page list of the materials that I reviewed in connection with my work on this case.  So it's a detailed summary of that previous demonstrative that we looked at.  So it's a long list of everything that I considered in connection with my work.  That's 2256.

Exhibits 2257, 2258, and 2259 are summaries of various license agreements that involved RIM and Mformation, and I see a portion of the summary's been redacted, but basically these summaries identify each actual RIM or Mformation license agreement that I looked at in connection with my work.

Q.   Did you find any that were comparable?

A.   I did not.  In all those agreements, there were no comparable RIM or Mformation licenses that I could use for purposes of this hypothetical negotiation.

Q.   And why not?

A.   Well, you know, each patent has certain unique attributes.  And so we spent the last week or so hearing about the attributes of the '917 patent.  And in looking at these other license agreements, the '917 patent was not involved in any way, and so these other agreements were sometimes agreements with enterprises, sometimes agreements with telephone carriers.  But none of the agreements involved patents that were comparable, in my view, with the '917.  Also many of the agreements were for software as opposed to patent licenses.  And those two are different.

Q.   Okay.  So since you didn't -- how are software licenses different from patent licenses?

A.   Again, each one is different, and I hate to generalize, but basically software licenses relate to specific software that's being made available to the licensee.  Whereas, patent licenses can be broader in the sense that once a patent is licensed, the uses of that patent, depending upon the agreement, are not limited in quite the same way that software might be.  But each situation is different.

Q.   So since you didn't find any comparable licenses, what Georgia-Pacific Factors did you look at next?

A.   All right.  So I've eliminated 1, 2 and 12 for

purposes of the -- of figuring out where these hypothetical negotiators would wind up.

So next, really, I turned to a group of factors that are similar.  But it's really 8, 9, 10 and 11.  In the sense that these factors relate to the importance of the invention, both in this case to RIM, as well as to the marketplace.

Q.  So, for instance, how did Georgia-Pacific Factor 8, dealing with commercial success and popularity, affect your analysis?

A.  Well, I was interested in seeing how successful RIM was in selling products that included the '917 patent technology.  And so I examined RIM's sales of devices during the period for which I had information.  And found that RIM was tremendously successful in selling these products.  So you would have to say that with respect to Factor 8, the sale of patented products was a success, commercial success.

Q.  And how would that fact influence the royalty rate that would come out of the hypothetical negotiation?

A.  Well, that would be a positive factor for the royalty rate.  Other things equal.  If you're dealing with a product that's successful, then that's going to make you willing, make you desirous of paying more for the use of that product.  So that would be a plus factor.

Q.   Okay.   What did you do with Georgia-Pacific Factors 9 and 10 relating to the advantages and benefits of the patented invention?

A.   With respect to those, I was interested in seeing how the parties, both RIM and Mformation but especially RIM, felt about the patented technology during the relevant period.   In other words, it could be the patented technology is seen to produce advantages for RIM that it would be interested in having, or not.   And so if there were advantages, that would be a plus factor.   And if not, it would be a negative.

Q.   And did you see any information that indicated to you that features provided by the '917 patent were important to RIM?

A.   I did.

Q.   What are you referring to?

A.   As part of the examination of various materials that were made available to me, I had an opportunity to look at numerous internal RIM documents, marketing documents, e-mails, press releases, things of that sort, and some of those had information about technologies associated with the '917 patent.

Q.   Show you the next slide, it's Exhibit 399 in your packet.   Is this one of the documents you're referring to?

A.   Yes, this is one of the RIM documents, talking about BlackBerry Enterprise Software Version 4.0.  So it would be around 2004 time period.

Q.   And then can you explain to the jury this portion that we've highlighted out of the document and the significance of that?

A.   Yes.  This is a -- it's a one-page document, and in the middle of the page it talks about the importance of distributed, cradleless provisioning capabilities.  And what that would mean in the sense that it would remove the need for significant IT involvement with respect to deployments.  So this was one of the things that RIM was saying in a document that was -- referenced reasons to upgrade to Version 4.0.

Q.   Have you been here during this trial and listened to some of the testimony in this trial?

A.   Yes, sir, I have.

Q.   And have you heard discussions about the concept that's been referred to as "wireless activation"?

A.   I have.

Q.   And what is that?

A.   That allows the IT administrator to activate a phone wirelessly without having to connect it to a computer.

Q.   And how does that relate to what's referred to here as distributed cradleless provisioning?

A.   That's what the language here is referring to.  And this was recognized as a reason to upgrade to Version 4.0.  This was the positive aspect of going to that version.

Q.   And is it your understanding from what you've heard and what you've reviewed that cradleless provisioning or wireless activation is a feature covered by the '917 patent?

A.   Yes.

Q.   I'm showing you another document, can you identify this?

A.   Yes, this is another RIM document titled "BlackBerry Enterprise Solution."  Again, describing various BlackBerry features.

Q.   I've pulled out a section.

A.   Right, and this is in the section that's titled "Why Choose BlackBerry Enterprise Server?"  The document says:  "Wireless, cradleless activation and provisioning, streamline deployments, etc."

So, again, it's touting this particular feature; namely, wireless, cradleless activation and provisioning.

Q.   Did you look at any RIM press releases?

A.   I did.

Q.   Showing you –– just stepping back a minute for the

record.  That last document you looked at, is that Exhibit 383?

A.  Yes.

Q.  Now, coming back to the press releases.  Show you what's been marked Exhibit 2095.  Can you identify what that is?

A.  Yes, that's a RIM press release dated May 18, 2004.  Again, it's in advance of Version 4.

Q.  And what's the significance of this press release?

A.  Once again, on the first page of the press release, RIM is referencing simplified deployment associated with BlackBerry Enterprise Server Version 4.  And the press release just goes on to indicate that it will enable users to quickly connect to the BlackBerry Enterprise Server for wireless provision.

Q.  Is this another press release you used?

A.  Yes, this is November 30th, 2004.  This is right about the time that Version 4 was actually released and made available to the public.  And once again, what's highlighted here is the fact that BlackBerry Enterprise Server Version 4 enables users to quickly connect their handhelds to the server.

Q.  And what's the significance in your analysis to the fact that RIM is highlighting this wireless activation feature?

A.   Well, that's significant to me in that it indicates recognition on BlackBerry's part that this was a valuable feature, both to have and a feature to tell the public about, that this would be something that was good for RIM's business.

Q.   You also identified industry reports describing the benefits of RIM's patented technology.  Is there a particular report you've got in mind?

A.   Yes, one of the reports I looked at was prepared by a Canadian investment banking firm -- BlackBerry's a Canadian company so I wasn't surprised it would be a Canadian firm -- called TD Newcrest, and this report was prepared, or at least published December 2004.  So it's, again, right around the time of the release of BlackBerry Version 4.0.

Q.   What portion of this report is significant to your analysis?

A.   Well, it's highlighted here, I think it was on -- oh, about the third page of the report, and once again, the reference is to cradleless provisioning, and the importance of that feature, RIM in order to -- the terms in the report are, "level the playing field against one of RIM's competitors here," which is a company called Good.  And their product which was called GoodLink.

Q.   And what's the significance of that?  How does that

play into your analysis?

A.   Well, this investment analyst felt that this was an important feature for BlackBerry, for RIM to have, so once again, it suggests that, if you go back to that negotiation where they're sitting across the table from one another, the RIM negotiator would very much want to have a license to the '917 patent, and other things equal to that means that would be a plus factor from the standpoint of Mformation in this negotiation.

Q.   So when you say "a plus factor," what do you mean in terms of what it would do in connection with the royalty rate that you would expect to result from this hypothetical negotiation?

A.   Well, negotiators are always looking to bargain, to improve their own position.  And so the plus factor here would mean it's a plus factor for Mformation.  And so it would be, other things equal, tend to cause the royalty rate to go up.

Q.   Okay.  Mr. Weinstein, we've covered Factors 1, 2, and 8 through 12.  We're making progress here.

     Did the other Georgia-Pacific Factors also inform your analysis?

A.   Well, I looked at them, but I'd say in the context of my work here, they were less important.

Q.   Can you --

A.   But I did look at each one.

Q.   Can you just summarize for the jury the various other factors you considered and how they affected your analysis.

A.   No. 3, nature and scope of the license, refers to whether it would be exclusive, whether it would be worldwide, whether it would be limited to the U.S.  The way this would work with the hypothetical negotiation is that it would be only for a U.S. patent.  And so that's a more limited, more restricted geographic area than a worldwide license.  And it would not be exclusive, as far as I know.  So both of those factors tend to push the royalty rate down.  The factors I've been talking about so far sort of pushed it up.  This one would push it down, because it's not an exclusive license and it's not worldwide.

Licensing policy, as we've said, Mformation has never licensed this before.  And so there's really not much you can say about that in terms of its licensing policy.

No. 5, commercial relationship is a little bit important.  And really what that refers to is whether or not the license or and the licensee are competitors.  And other things equal, if they're perceived as competitors in some market, that's going to be a factor

that pushes the royalty rate up.  And that's because other things equal, you don't want to give your technology to a competitor.  If you're going to give your technology to someone, even for payment, you want to give it to someone who's not competing with you so that it doesn't have any impact on your business.

Q.  So did you review some documents that gave you some information in connection with this?

A.  I did.  And the one you put on the screen happens to be an Mformation document.

Q.  Exhibit 2078?

A.  2078, yes.

Q.  And what's the significance of this document?

A.  The document was titled "Mformation – Competitive Comparison," so it's a document that Mformation put together.  And on the document, down the left-hand side, it had various features, and then across the top it had Mformation, XcelleNet, which is actually the parent of Afaria, which is a company that we may talk about in a bit.  So that's in the middle.  And then RIM on the right.

So this is a document prepared at Mformation in 2002 where it's going down various features and laying out the components of those features associated with each of these other two companies, actually all three

side by side.  So with respect to Mformation at least, it perceived RIM BES Version 3.5 to be competitive to it.  I mean, Mformation doesn't make phones, so it doesn't compete with RIM to make handset devices, but it does compete with RIM with respect to this kind of technology.

Q.  Turning back to the Georgia-Pacific Factors, I think we're down to No. 6.

A.  Yes.  No. 6 is sometimes referred to as whether or not there are so-called convoyed sales.  A convoyed sale is, if you sell a razor, do you also tend to sell razor blades that fit in it.  The razor blades would be convoyed.  Other things being equal, if you have a product that produces convoyed sales, then that product is going to be more valuable than if it doesn't.

So in this case I was looking to see if with the sale of BlackBerrys there were other convoyed product, like holsters for the belt or cables, batteries, things like that.  And there are convoyed sales.  So that would be a plus factor for this hypothetical negotiation.  But I didn't consider that very heavily.  It would be a plus factor, but I don't think that would be determinative in a significant way.

Q.  By the way, just turning back a moment to Exhibit 2078, do you know about what time period this

was generated?

A.  Yes, this document was 2002.

Q.  Okay.  Thank you.  All right.  Factor 7.

A.  Duration of the patent.  Other things equal, a patent that has a long life ahead of it is more valuable than one that's about to expire.  This patent doesn't expire until I think around 2023.  So it has a long life ahead.  Certainly relative to the kind of a hypothetical negotiation even today.  So that would be a plus factor.  That would make it more valuable.

Q.  All right.  You've already discussed Factors 8 through 10 and 12.  How about Factor 11?

A.  11 is really related to 8 in the sense that it deals with the extent of use, how much has it been sold, how important is it, and in sense, I've discussed that one.

Q.  And I think we'll get on, moving forward, we'll talk about 13, 14 and 15.

So did you review any internal RIM documents discussing Mformation?

A.  I did.

Q.  What sorts of documents?

A.  Occasionally there were e-mails that I recall reviewing where RIM was talking about Mformation.  I also reviewed a notebook that a RIM employee had put together, and there was a portion of that notebook in

which he documented a meeting with Mformation personnel.

Q.   And how did these documents affect your analysis?

A.   Well, to the extent there was relevant information about the '917 patent, I considered that information.

Q.   Okay.  You mentioned some notes.

MR. ARNTSEN:  On the screen, there we go.

BY MR. ARNTSEN:

Q.   Are these the notes you're referring to?

A.   Yes.  This is a portion of the notebook that was maintained by a RIM employee.  It's Exhibit 314, and the relevant page here is back in the middle of the notebook.  You can see -- let me try this pointer.  You can see, it's hard to read, but the word "Mformation" appears at the top of the page and "August 30th" also appears at the top.

So as I understand it, what Mr. Castell was doing was calling a meeting that he had that day or on or about that day with representatives of Mformation.

Q.   Okay.  We'll highlight the portion of this document.  Can you explain to the jury the significance of this?

A.   Yes.  This part of the page, again the word "Mformation" is there, although it's difficult to read.  After you look at it for awhile you see that's what it is, "Mformation," plus when you read his deposition testimony, as I did.

And he's talking about Mformation's pricing model that was provided to him in connection with -- in the course of this meeting that he had just had.  And over on the -- well, in the middle he's talking about the server.  $50,000.  But what I was interested in is the price for the agent, which is the per-device price.  And what he wrote down there is $70 to $30 per agent.  In other words, a selling price range of 30 to $70, depending upon volume, and also highlighted another way, another reference to the price, and here it's ASP, which I understand refers to "average selling price," of $3 per month, wholesale, and that will be $36 a year per agent.

Q.  And how do those numbers compare with your opinion here in this case?

A.  Well, I wound up with reasonable royalties equal to 50 cents per device per month.  So that would be $6 per year, $12 for the two-year life of the phone.  So the number that I wound up with, the $12 for two years of the phone, which is based on 50 cents a month, is considerably below the price that had been given to Mr. Castell back in 2001 by Mformation.

Q.  Okay.  And we'll hear some deposition testimony from Mr. Castell that will explain this in a little more detail.

You mentioned reviewing e-mails as well.  Is this one of those e-mails?

A.   Yes, this is a RIM e-mail from Mr. Lazaridis dated January 18th, 2002.  It's Mformation Trial Exhibit 364.

Q.   Okay.  And what was significant about this e-mail?

A.   Well, he's talking about some of the functionality that relates to '917 patent.  And I highlighted a portion of this e-mail.

Q.   Okay.  What's this first reference on the first page related to?

A.   The reference is, quote, Our customers can't provision and manage our products.  Which again relates to the '917 patent.  This is back in 2002.

Q.   Then you're on the second page.

A.   Here he's referencing the fact that there are other entities in the marketplace -- he characterizes them as competitors -- which have recognized what he states to be RIM's weakness and are targeting it, and when I read this e-mail, the last sentence there, companies like Mformation have built a whole business around our weakness, what he's saying is that Mformation and companies like it --

        MR. CHARFOOS:  Objection, your Honor, foundation.

        THE COURT:  Sustained.

        THE WITNESS:  Okay.

BY MR. ARNTSEN:

Q. And who is Mike Lazaridis?

A. He's the CEO and he's one of the co-founders of RIM.

Q. So did you also review financial information regarding RIM's accused BlackBerry products?

A. I did.

Q. And how did you go about your damage calculation?

A. I used RIM's actual financial information, which was made available to me in order to calculate the damages.

Q. Is this one of the documents you relied on?

A. Yes, it is.

Q. And what does this show?

A. This is a RIM document that was attached to an e-mail around 2001, and what it shows is RIM's perception at the time of functionality associated with --

MR. CHARFOOS: Objection, your Honor, foundation.

THE COURT: Well, I'll permit him to say what's on the document. But I do need to have you lay a better foundation as to what it means or its significance.

MR. ARNTSEN: Okay.

BY MR. ARNTSEN:

Q. First of all, what Georgia-Pacific factor does this document relate to in your analysis?

A. Well, this would come in under Georgia-Pacific 9 and 10. That is, the -- related to the usefulness, the

importance of the technology.

Q.   Would it also relate to 13?

A.   Which one's 13?

Q.   Georgia-Pacific 13?

A.   Yeah, but which one, what is that?

Q.   The profitability.

A.   Yes.  Well, the profitability is related to the usefulness, so the two kind of go together.

Q.   Okay.  Showing you the next slide, and again this is all Exhibit 113, can you tell the jury what this is?

A.   Yes, this is the first page of the document that contained the page that we just have been looking at that had those various components down the sides.

So that was a multi-page document.  This is the first page, and so you can see there are a number of RIM individuals who were associated with the preparation of this document.

Q.   Okay.  And then turning back to the page we were looking at earlier, how did you use this in your analysis?

A.   Well, first, I reviewed Mr. Panezic's deposition testimony about the document, and he testified a little bit about it.  I reviewed other testimony about the document, including testimony from RIM's damages expert, Ms. Julie Davis.  And basically my understanding is that

this document sets forth RIM's valuation of each of these various components.

MR. CHARFOOS:  Objection, your Honor, foundation.

THE COURT:  Sustained.

MR. ARNTSEN:  Your Honor, I believe he -- I'll just move on.

BY MR. ARNTSEN:

Q.  Is Mformation mentioned on this document?

A.  It is.

Q.  And where is it shown?

A.  It's shown in the box toward the bottom that's been highlighted under "Systems Monitoring," and it says "$50 a seat, Mformation."

Q.  So how did you use this information?

A.  Well I, understood that to be the -- well, I --

THE COURT:  How did you use it?

THE WITNESS:  Yes, I used it as a representative of the systems monitoring function at, both in terms of cost and relative value to RIM.

BY MR. ARNTSEN:

Q.  When you say "relative value," what do you mean?

A.  It appears as one component, one of many components, and each component has a cost to RIM associated with it. And so when I say "relative value," what I mean is the cost of the systems monitoring component to RIM relative

to the cost of all of the components shown on the
document.

Q.   And so is this the only value attributable to
Mformation's products, as you understand it, that are
shown on this document?

A.   No.

Q.   What else?

A.   I also have concluded that Mformation also provides
value in the systems management component.

MR. CHARFOOS:  Objection, your Honor, foundation.

THE COURT:  As an expert witness, I will permit
you to make assumptions.  And the reason I believe the
objections are well stated is because you are making
these statements as though they are things you know as a
matter of fact.  And so if you would -- maybe you'll get
an objection on this as well, but at least as far as the
Court is now concerned, if you say, "I'm assuming that
this document means "X," as opposed to this document
means "X."

In other words, there's a difference between your
assuming certain facts and basing your opinion on those,
as they may turn out to be true or not, and saying, I
was there, I know what this document means, I was at the
meeting, I heard them say these things, which is
different, because I don't understand what you were

there and you can't lay a foundation as to what was said or what was meant or those kinds of things.

Do you understand the difference?

THE WITNESS:  I do.  Thank you, sir.

THE COURT:  Very well.

BY MR. ARNTSEN:

Q.  Looking over in the left-hand column, you see where it says "System Management"?

A.  I do.

Q.  And you've been here during this trial, correct?

A.  I have.

Q.  And is it your understanding that from what you have heard at this trial, that Mformation's '917 patent involves systems management?

A.  Well, I'm assuming that it does, yes.

Q.  So how does that affect your analysis?

A.  Well, assuming that the '917 patent involves systems management, what it means is that some of the value to RIM would be shown on the systems management component line.

Q.  And how does that affect your -- you were talking about, you know, looking at both absolute values and relative values.  How does that affect your relative value analysis?

A.  Well, assuming that there's some value on the systems

management line to RIM from the '917 patent, it means that the relative value would include not just the systems monitoring relative value but also systems management as well.

Q.   But in your actual calculations, did you include the systems management value?

A.   I did not.

Q.   Okay.  So then what did you do?

A.   Well, I was interested in measuring the relative value of systems monitoring as set forth in this document, and so what I did is calculate the systems monitoring cost of $50 relative to the total cost shown in the document of $650.  And when I make that calculation, the relative value of Mformation's systems monitoring functionality based on that calculation is 7.7 percent.

Q.   Relative to what?

A.   Relative to the total functionality that's shown associated with the components on this document.

Q.   And does that relate to software?

A.   Yes.

Q.   Okay.  So then when you came up with this 7.7 percent from this RIM document, did you then take a look at another RIM document?

A.   I did.

Q.   I'll show you what's been marked Exhibit 889, and I'll represent to you this is a RIM document.  It's been redacted to block out some confidential RIM financial information.  But to leave in the information that you've identified as relevant to your analysis.

So can you explain to the jury what this is?

A.   Yes.  This is a RIM financial document, and the parts that are not blocked out reference RIM BlackBerry Enterprise Server that's BES revenues, beginning in the first quarter of 2006, and that's RIM's fiscal year, which really is November of 2005.

Q.   Just step back, just explain to the jury how RIM's fiscal year works.

A.   Yes, RIM's fiscal year begins in March.  So RIM's fiscal 2013 began in March of 2012.  So we're already into RIM's fiscal 2013.

So here, this document begins in the first quarter of RIM's fiscal 2006.

Q.   So that would be the spring of 2005?

A.   Correct.

Q.   And how's that relevant in -- how's that date relevant to your hypothetical negotiation?

A.   Well, this is a document that was prepared back in the spring of 2005.  So it's just before the hypothetical negotiation.  And actually, even though it

was prepared then, it had forecasts going forward all the way out to the fourth quarter of 2008.

Q.   And why is that significant?

A.   Well, that's information that under this hypothetical negotiation construct would have been available to the negotiators, both RIM and Mformation.  And so they would have had this information available to them as they sat across the table from one another.

Q.   And is -- why would forecasted information be relevant?

A.   Well, that would relate to this, what I called the Book of Wisdom before.  But that is future events.  But it's also relevant because it says something about the future of the product.  And that's important for purpose of this negotiation.

Q.   So then looking at this top line that we've got pulled up, what is that?

A.   That's RIM, both actual and forecast, BES, average revenue per unit, that's average monthly revenue per device that RIM receives, during the period shown.  RIM receives this revenue from the telephone carriers.

Q.   So what did you do with this information?

A.   What I did is I calculated an average.  So there are 12 observations that are shown on this document.  And the average of these observations is $7.59.

Q.   Was there another portion of this document that's relevant to your analysis?

A.   Yes, a little bit further down, the document contains both actual and forecasted profit margin figures for BES.

Q.   And is that over that similar period of time?

A.   Yes, it's over the same period.  It's just further down on the document.

Q.   And what did you do with that information?

A.   I also calculated an average for those 12 observations, and so the average there was 91 percent.

Q.   And again, is that the average starting in the left side from 88.5 percent, and then it appears to increase over to the right to 93 percent?

A.   Correct.

Q.   Okay.  So now, having analyzed these RIM financial documents, how did you go about calculating damages in this case?

A.   Well, I took the information that we just looked at, the average BES revenue and the profitability, and I went back and applied that to the 7.7 percent figure that I calculated previously.

Q.   And let me just back up just a second.  What's the term you use for the type of damages you're calculating?  Is it "reasonable royalty"?

A.   Yes, it's a "reasonable royalty."

Q.   And just tell the jury what a "reasonable royalty" means.

A.   A reasonable royalty reflects the payments that the parties would have arrived at upon completion of the hypothetical negotiation using the Georgia-Pacific Analysis that I've just described.  And in this case, the reasonable royalty would be the running royalties, the payments over time, that would be made by RIM to Mformation for use of the '917 patent.

Q.   And on approximately how many occasions have you calculated reasonable royalties in patent cases?

A.   Probably 75 times.

Q.   Okay.  So in this case, based on the information that you've seen to date -- let's se.

A.   So I made a computation in order to come up with a reasonable royalty.  And the first thing I did is I took that $7.59 average monthly BES service revenue per user, and I multiplied it times the 7.7 percent, which was the relative contribution on the RIM document associated with Mformation's technology in the systems monitoring line.  And that was a 7.7 figure.

So having those two, what that means is that 58 cents of that average monthly $7.59 revenue is attributable to Mformation's technology.  That's

58 cents a month.

Q. Can we just back up just a second? Can you explain to the jury why you believe that these are the two appropriate numbers to use, the $7.59 number that you've calculated earlier, and the 7.7 number?

A. Yes. The $7.59 number is RIM's own estimate of its actual and anticipated BES revenues, and those would be associated with the use of the '917 patent. All right. And so I start with RIM's own estimate of what those revenues are. For the period shown. And then multiply that estimate by the relative contribution of Mformation's '917 patent. Again, as reflected by RIM's own document.

Q. That 58 cents per month, is that revenue?

A. That's revenue. So we're near the finish there. Because what we're primarily interested in here is profits, not revenue. So I go back to the average profit margin that I calculated previously, and that was 91 percent. So that leaves me with profits of about 53 cents attributable to Mformation's patent for this period.

Q. Was that on a per-device-per-month basis?

A. It is.

Q. And then what did you do with that?

A. I rounded that down to 50 cents per device per month.

Q.   And what was the next step in your calculation?

A.   So the 50 cents per device per month is the reasonable royalty, but now I have to see how many devices there are in order to apply that royalty to the number of devices.

Q.   Okay.  Showing you the next exhibit, which I believe is Exhibit 2253, or based on Exhibit 2253, can you explain to the jury how you went about your -- what's shown in this exhibit and how you went about your calculation?

A.   This is the final calculation where I apply that 50 cents per device per month to the number of infringing devices.

Q.   Can you tell the jury what's shown -- this is a table -- what's shown in the various columns here?

A.   Down the left-hand side, what you call the stub, is the time period.  And the time period begins in November of 2008.  That's the date the complaint was filed.  Actually I think the complaint was filed October 31st.  So November 1st is where we start.

And that goes forward.  All the way down to -- through June of this year.  Whenever we're in the second quarter of RIM's fiscal 2013, since RIM's fiscal year begins in March.

That's what's the time period.

Q.  And then the column labeled "Newly Active" or --

A.  These are the number of new activations during each one of these quarters.

Q.  New activations of what?

A.  Of cell phones.  RIM BlackBerrys.

Q.  And are these just BlackBerrys connected to BES?

A.  No, these are -- yeah, these are BlackBerrys connected to BES.  The damage base is limited to BlackBerrys connected to BES, and also you'll see at the top it says "Nongovernment BES handheld devices."  And an adjustment's been made.  We take out, based on a RIM employee, Mr. Yersh, based on his testimony, 5 percent of the BlackBerry sales have been removed to reflect government business.  So these are the nongovernment BlackBerry handheld devices that are activated during each of the quarters that are shown.

Q.  And so you excluded government devices from your royalty base?

A.  I did, I took out 5 percent.  An estimate of government sales.

Q.  And then this information in the "Newly active" column, where did you get that information from?

A.  It comes from RIM.  It's directly from the financial statements RIM provided.

Q.  And now what's shown in the second column, Column 2,

called?

A.   Second column is called "Lapsed."  And the industry standard useful life for a cell phone is two years.  In other words, after two years, the assumption is that the phone is retired or comes off contract.  And so the assumptions that I've made here is that these new activations last two years, and after that they lapse.

Q.   And can you take a look at Exhibits 2097 through '99 in your book, and just tell us what those are with regard to this two-year device life.

A.   Yes.  Those are articles in what I call the trade press, *Washington Post, The New York Times*, and MSNBC, articles about the fact that cell phone useful life tends to be two years.  It's pretty much an industry standard.

Q.   And then what's in Column 3?

A.   So just to finish Column 2.

Q.   I'm sorry.

A.   You'll notice that the numbers that appear in Column 1 as new activations, two years later, are shown as lapsed.  And the idea is we take them out of the database two years later.  Because they lapsed.  We subtract them out after two years.  And so you'll always see a number in Column 1 and two years later, being the same entry in Column 2 as lapsed.  You can just work

your way down and see how that works.

Q.  Okay.

        MR. ARNTSEN:  Your Honor, I notice it's about five after 4:00.  Do you want to take a break and we can --

        THE COURT:  I was thinking that it might be profitable, though, to let you finish, but it's always equally profitable to have our full attention.  So it's a little after 4:00.  Let's quit for the day.  We'll come back to this matter tomorrow morning at 9 o'clock.

        Remember my admonitions.

        DEPUTY CLERK:  All rise.

        (The jury exits the courtroom.)

        THE COURT:  Please be seated.  You may step down.

        THE WITNESS:  Thank you.

        THE COURT:  I just wanted to pause to see if there were any matters out of the presence of the jury?

        MS. DeBRUIN:  Your Honor, we will have a motion that we want to present, our JMOL motion after plaintiff's close their case.  Do you have any guidance to us on how you'd like to receive that?

        THE COURT:  Well, the timing depends upon the jury, and so I will consider at the close, since you've alerted me to it, that you will have made your motion. And you can rise and say, Your Honor, we have legal

motions we'd like to have the Court see, or words to that effect.  You don't have to go into the details, and do I presume this is a motion that you are otherwise making in writing or are you intending to make it orally?

MS. DeBRUIN:  We can -- either way that you would prefer, your Honor.

THE COURT:  I don't prefer those motions.

MS. DeBRUIN:  The form of the motion we're looking for your guidance.

THE COURT:  Well, in other words, if I say I want it in writing, that's equally -- you're equally capable of doing that as opposed to my saying I'll listen to oral argument on it.

MS. DeBRUIN:  We are, your Honor.

THE COURT:  That makes it easier for me to say put it in writing.  Have you seen the motion?  Are you anticipating the motion?

MR. THAKUR:  This is the first we've heard of it, your Honor.  And -- let me restate that.  This is the first we've heard of it in court.  You may recall some pretrial proceedings they mentioned.

THE COURT:  Yes.  Well, yeah, so it could be that I will stop and hear it if -- it depends on what the motion is.  And so I'll give you a brief moment when we

have a break to articulate the ground, because if it's serious, and it means that the trial needs to stop and deal with it, that's something I want to give serious consideration to.  To give your motion the dignity that it deserves.  But it is the kind of motion that I have in my experience found can be dealt with at a more convenient time than simply stopping everything.  So maybe at the end of the day or specially scheduled.

So if you put a summary of it or otherwise in writing, that would be beneficial to the Court.  And I'll receive it.  But to preserve your timing, of course, I'll consider that you will wish to make your motion at the close of the plaintiff's case.

MS. DeBRUIN:  Thank you, your Honor.

THE COURT:  Very well.  All right, so see you tomorrow morning at 9 o'clock.

MR. THAKUR:  Thank you, your Honor.

(Adjourned)

oOo

INDEX OF EXAMINATION

 Witness:                                              Page:

Direct By Mr. Thakur (cont.) . . . . . . . . . 932

Cross By Mr. Matuschak . . . . . . . . . . . . 996

Redirect By Mr. Thakur . . . . . . . . . . . .1104

Recross By Mr. Matuschak . . . . . . . . . . .1119

Further Redirect By Mr. Thakur . . . . . . . .1122

ROY WEINSTEIN

Direct By Mr. Arntsen  . . . . . . . . . . . .1124

                           oOo


INDEX OF EXHIBITS

Exhibit No.                            Received:

 139, 166, 350, 0491, 2022, 0496, 4207

 4209, 0147, 0353, 0493, 4208, 4212,

 4214, 1019, 0266, 4211, 0144, 0354 . . . . . 995

                           oOo



CERTIFICATE OF REPORTER


        I, Connie Kuhl, Official Reporter for the United
States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by
me, a certified shorthand reporter, and were thereafter
transcribed under my direction into written form.

                    _____

                    Connie Kuhl, RMR, CRR
                    Tuesday, June 26, 2012

            Connie Kuhl, Certified Realtime Reporter
            Official Reporter – USDC  (415) 431–2020