Volume 7

Page 1176 – 1401

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

------------------------------)
                              )
Mformation Technologies, Inc.,  )
                              )
                 Plaintiff,   )
                              )
    v.                        )    No. C  08-4990 (JW)
                              )
Research In Motion, Ltd.,      )
et al.,                       )
                              )
                 Defendants. )  San Francisco, California
                              )  Wednesday, June 27, 2012
------------------------------)


TRANSCRIPT OF PROCEEDINGS


<u>APPEARANCES:</u>


For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                    BY:  AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        RUBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO

**APPEARANCES** (cont.):


**For Defendant:**          **WilmerHale**
                            **305 South Grand Avenue**
                            **Suite 2100**
                            **Los Angeles, California 90071**
                     **BY:  MARK G. MATUSCHAK**
                            **ANDREW B. GROSSMAN**

                            **Kirkland & Ellis, LLP**
                            **300 North LaSalle**
                            **Chicago, Illinois 60654**
                     **BY:  LINDA S. DeBRUIN**
                            **AARON D. CHARFOOS**
                            **TIFFANY PATRICE CUNNINGHAM**
                            **FERLILLA VICTORIA ROBERSON**
                            **MARIA A. MARAS**


**Also Present:**           **Ray Dikun, RIM Vice-President**

Wednesday, June 27, 2012

(9:10 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Good morning.

ALL ATTORNEYS:  Good morning, your Honor.

THE COURT:  Ready to resume?

MR. THAKUR:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Good morning, members of the jury.

DIRECT EXAMINATION (continued)

BY MR. ARNTSEN:

Q.  Good morning, Mr. Weinstein.

A.  Good morning.

Q.  When we broke yesterday, we were going through your damage calculation using this table here.  And by the way, can you take a look at Exhibit 2253 in your binder?

A.  Okay, I have it.

Q.  Is that essentially that same table?

A.  Yes, that's the same table.

Q.  And I'm just going to step back a minute just for the calculations that led us to this table.

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

For your 50-cent-a-month number, you multiplied 7.59 times 7.7 percent, correct?

A.  Yes, that of the first step.

MR. ARNTSEN:  Yeah.  Slide 32, please.

BY MR. ARNTSEN:

Q.  Can you just explain to the jury again how you got the 7.7 percent?

A.  Right, the 7.7 percent was based on a calculation from Mformation's Trial Exhibit 113 placed on the screen.  What I did is divided the 50-dollar figure on the monitoring line by the total for all the components shown on that exhibit, and that was $650.  The result of that calculation is 7.7 percent.

Q.  Then I'll move it forward to the other number. The -- for the 7.59, where did you get that from?

A.  Right.  The 7.59 comes from Mformation Trial Exhibit 889.  That's the average of the monthly revenues that are shown for three years on this exhibit for the BES service.

Q.  Is that Exhibit 889?

A.  Yes, sir.

Q.  Then you multiply those two together to get the 58 cents per month, then you multiply that times 91 percent.  And where did you get that from?

A.  The 91 percent also came from Mformation Trial

Exhibit 889, that's shown as the service margin percentage for BES, and that's the average shown on that line, 91 percent.

Q. And then just take the calculations from there down to your 50 cents a month per device.

A. Right, so I took the 58 cents of the revenue contribution associated with Mformation from the RIM document. Multiply that times 91 percent to bring it down to a profit contribution, that was 53 cents, and then I rounded that down to 50 cents.

Q. Why did you round it down?

A. Be conservative.

Q. Back to Exhibit 37, first of all, where does that 50 cents show up in this slide?

A. It shows up in Column 5 under the quarterly Mformation fee. You'll see the first year fiscal year Quarter 3, it's 50 cents because there's only one month there, there's only one month in that quarter. And also in the last line, line 16, which is this month of June 2012, and there's only one month in that quarter as well. So for each of those entries, the 50 cents shows up in Column 5.

For the other quarters, there are three months. And so it's 50 times 3, or a 1.50 per quarter.

Q. And then going back to the table, the initial column,

which I believe you called the stub column, those are RIM's quarters, correct?

A.   Yes.

Q.   That's labeled in Column 1?

A.   New, nongovernment BES handheld.  Again, "nongovernment" means I have subtracted out 5 percent of device activations to reflect government sales.  That's based on testimony of one of the RIM's witnesses, Mr. Yersh.

Q.   Could you take a look for a moment to Exhibit 2252 in your pad right there.  Should be right before the one you were just looking at.

A.   (The witness complies.)

Q.   Are you there, sir?

A.   I am.

Q.   In Column 1, what's the total number of active devices in your calculation?

A.   In Exhibit 2252, it's approximately 53 --

Q.   No, the nongovernment BES devices.

A.   Okay.  18.4.

Q.   18.4 what?

A.   Million.

Q.   Is that what those numbers in Column 1 add up to?

A.   Yes, those are the same numbers.

Q.   And then what's -- then explain to the jury again

what you do with Column 2.

A.   Those are devices that come off use, and as I testified yesterday, industry convention is that a device remains on use for two years, and so what I do is I take those devices that are shown in Column 1 out two years later.  Numbers track.

Q.   And then what's Column 3?

A.   Column 3 is Column 1 minus Column 2.  So Column 3 allows for the devices that are coming out of use, it's a subtraction.  Column 1 minus Column 2.

Q.   Then what's in Column 4?

A.   Column 4, cumulative numbered devices that are still in use.  After subtracting out the ones that have lapsed.

Q.   And then you've already explained Column 5.  That's your device fee.  And then what is -- what's in Column 6?

A.   Column 6 is shown as the product you get by multiplying the cumulative number of devices in use in a month or in a quarter, times the quarterly technology fee of a 1.50, or 50 cents a month.  So what you'd put on the board is a computation for the first month, that would be November 2008.  It's the first shown in Column 4 times the figure shown in Column 5 equals the figure shown in Column 6.

Q.   And then is that what you did with each of the rows going down this table?

A.   Right.  That's correct.

You put one more on the board.  You put the next -- you put fiscal year 2009, Quarter 4.  So it's approximately 2.7 million cumulative devices in use, times a 1.50 for that quarter, equals approximately $4.1 million in revenue for that quarter, and then the final step is to add the revenue figures that are shown in Column 6.

Q.   And so is the 199,123,766 simply the sum of the numbers in Column 6?

A.   It is.

Q.   And is that your calculation of reasonable royalty damages?

A.   Yes, sir, it is.

Q.   Mr. Weinstein, after considering all of the Georgia-Pacific Factors, did you conclude that the calculated royalty of $199 million was reasonable and fair compensation to Mformation for RIM's infringement of the '917 patent?

A.   I did.

Q.   Do you have any reason to doubt the accuracy of your calculations or the reasonableness of your results?

A.   No, I'm comfortable with that result.

Q.   Thank you, sir.

THE COURT:  Very well.  You may cross-examine.

MR. CHARFOOS:  Yes, your Honor.  If I may just have a moment to set up.

CROSS-EXAMINATION

BY MR. CHARFOOS:

Q.  Good morning, Mr. Weinstein.  My name is Aaron Charfoos.

A.  Good morning.

MR. CHARFOOS:  Mr. Rudd, could we have slide 5 of Mr. Weinstein's presentation, please.

BY MR. CHARFOOS:

Q.  Mr. Weinstein, I would like to make sure that the jury understands what you're saying here today.  The first thing that I think the jury needs to understand is the hypothetical negotiation between Mformation and RIM did not actually occur, did it?

A.  That's correct, it's hypothetical.

Q.  So it's a made-up thing that you've done to help you to come to what you believe your reasonable royalty would be?

A.  Correct.

Q.  And you have made a number of assumptions as part of that hypothetical negotiation, correct?

A.  Yes, sir.

Q.   One of those is that the patent is invalid -- or that the patent is valid.

A.   Yes.  One of the assumptions is that the patent is valid, yes, sir.

Q.   And one of the assumptions is that the patent is infringed?

A.   Also correct.

Q.   Now, you understand, sir, that it is up to the jury to decide whether the patent is valid?

A.   I do.

Q.   And it is up to the jury to find out whether the patent is infringed?

A.   I so understand, yes.

Q.   And if in fact the jury finds that the patent is not infringed, then Mformation is not entitled to any damages in this case?

A.   As far as I know under the law, that's correct, yes, sir.

Q.   And as far as you know, if the patent is found to be invalid, then Mformation is not entitled to any damages in this case?

A.   Yes.

Q.   And you, sir, are not a technical expert.

A.   I am not.

Q.   You're not here to offer any opinion with respect to

whether or not the patent is infringed or invalid.

A.   That's correct.

Q.   Okay.  Your opinion --

MR. CHARFOOS:  And, Jason, you can take this down.

BY MR. CHARFOOS:

Q.   Your opinion is limited to the question of the reasonable royalty that may be owed to Mformation, correct?

A.   Yes, sir, that's correct.

Q.   You're not here to offer any opinions as to lost profits?

A.   Also correct.

Q.   And I know that we keep talking about this 50 cents per month per device, but just to make it clear, that is 50 cents per month, every month, for two years.  The average life span that you say a BlackBerry has, correct?

A.   That's fair.

Q.   And so ultimately what you're saying is that for each and every BlackBerry sold after November of 2008, Mformation is entitled to $12?

A.   No, that's not quite right.

Q.   Well, 50 cents?

A.   Yes.

Q.   Per month?

A.   Also true.

Q.   For 24 months?

A.   Also true.

Q.   Is $12.

A.   That's true.

Q.   We've heard a lot in this case about what happened between the parties in 2001 and 2002 and 2003, and you've heard that as well, haven't you, sir?

A.   Yes, sir, I have.

Q.   And you have been sitting in the courtroom for the entire trial?

A.   I have, sir, yes.

Q.   Now, you'd agree with me that you are not claiming any damages in this case for the year 2001?

A.   There are no 2001 damages claimed in my calculations, that's true.

Q.   And you're not claiming any damages for 2002?

A.   Also correct.

Q.   You're not claiming any damages for 2003, 2004, 2005, 2006 and 2007, correct?

A.   Also true.

Q.   And you're not claiming any damages up until November 2008 for the year 2008?

A.   Yes.  Yes, sir, that's correct.

Q.   Now, you'd agree with me, sir, that in the past you have worked with plaintiff's counsel's law firm either Foley & Lardner or Shephard Mullin?

A.   Yes, sir, I have.

Q.   Now, one thing that you mentioned yesterday, which I thought was a little bit interesting, and I'm going to give you the trial testimony from yesterday, you mentioned -- and I went back and I looked, and this, if you'd like to look, is on page 1127 beginning at line 20 -- you were talking about a panel that you sat on.  And Mr. Arntsen said, Well, that panel you're talking about, what sort of course was that in connection with?

And you answered:  "It dealt with patent damages, and actually the name of my panel, which I didn't assign but somebody associated with putting the convention together assigned, was called Weinstein's Nash Bargaining Theory, which relates to some of the work I've been doing in the calculation of patent damages over the last several years.  And I guess the work attracted enough interest that they put together a panel to address it.  So I spoke, and then there were others who spoke about it as well."

Do you remember that testimony, sir?

A.   I do.  It's spelled incorrectly in the transcript you

handed me, but you pronounced it correctly.  It's

Weinstein's Nash Bargaining Theory, yes, sir.

Q.  So I was curious about the panel that you sat on, and

so I went last night and took a look just to see what

that was about, and I pulled up the agenda for that

conference, and this is RIM Trial Exhibit 5013.

MR. CHARFOOS:  Your Honor, may I have permission

to publish this to the jury?

THE COURT:  Not yet.  You can show any document

to the witness for purposes of examination, but to offer

it, you need to lay a foundation through the witness.

BY MR. CHARFOOS:

Q.  Mr. Weinstein, is this in fact the agenda for the

conference that you spoke at?

A.  Well, I wasn't even there for the golf tournament.  I

wasn't there that day.  So that page isn't relevant.

But the conference that I attended started on Thursday,

June 14th.  And from that day forward, I was present,

yes.

Q.  And so does this appear to be the agenda for the

conference that you attended?

A.  Yes, beginning on the second page of this exhibit,

yes.

Q.  And you have no reason to dispute any of the

information in this document, do you?

A.   No, it's accurate.

Q.   And you understood that this was put up on the website as part of the promotional materials for the conference?

A.   I do.

MR. CHARFOOS:   Your Honor, we'd like to move 5013 into evidence.

THE COURT:   Very well.   5013 is in evidence.

(Defendant's Exhibit 5013 received in evidence).

MR. CHARFOOS:   Jason, can we have 5013 up on the screen, please.

BY MR. CHARFOOS:

Q.   You see here there are a number of sponsors, and I think you said you missed a couple of events.   But if we go to Day 3, June 15th, 2012, which is on page 5, and the 9:15 to 10:15 conference agenda, and I think we see here, "Roy Weinstein, Managing Director, ERS Group, Los Angeles."   Is that you?

A.   That's me.

Q.   I know that you mentioned the panel was called "Weinstein's Nash Bargaining Theory."   I wasn't able to find that.   But I was able to find at least one of the topics, "The Contrary View to Weinstein's Nash Bargaining Theory."

A.   Correct.

Q. Is it fair to say, Mr. Weinstein, that there were members of that panel who disagreed with your Nash Bargaining Theory and the way you calculated damages in patent cases?

A. I don't think so, no.

Q. They didn't provide a contrary view? Nobody provided a contrary view to the Weinstein Nash Bargaining principle?

A. They did not disagree with my approach, no.

Q. Did anybody provide a contrary view to your Nash Bargaining principle?

A. I do not believe so, no. I was there.

Q. And did you see the agenda before it was passed out to the individuals at the conference?

A. I did not. I had no idea they were going to call it "Contrary View to Weinstein's Nash Bargaining Theory." I saw it at the same time everyone else did.

Q. So everybody on that panel completely agreed with your Nash Bargaining position?

A. Nobody disagreed with the position I took. There were some who felt it would be difficult to do some of the things that I was suggesting could be done in some occasions. But nobody stood up and said to the group that use of the Nash Bargaining Solution is wrong or inappropriate or incorrect or unsound. Nobody disagreed

with it.

Q.   But possibly difficult?

A.   Oh, yes, some people said it might be difficult.

Q.   Now, you have in the past had your testimony excluded in other cases, correct?

A.   Sometimes portions of my testimony has been excluded, yes.

Q.   And you were an expert in the *Versata vs. SAP* case, correct?

A.   It's Versata.

Q.   Versata.  You were an expert in the Versata case?

A.   I was.

Q.   And Versata was the plaintiff in that case?

A.   It was.

Q.   And you calculated both lost profits and reasonable royalties?

A.   I did.

Q.   And the Court excluded your testimony regarding your reasonable royalty analysis, correct?

A.   Correct.

Q.   And you also in that case did not end up testifying about the Nash Bargaining Solution, correct?

A.   I did not.

Q.   You'd agree with me these are the Georgia-Pacific Factors you applied in this case, correct, sir?

A.  Yes.

MR. CHARFOOS:  Can you pull up the Georgia-Pacific Factors?

BY MR. CHARFOOS:

Q.  One of those you talked about yesterday was the commercial success and popularity.  Do you remember that?

A.  Correct, I do.

Q.  You focused on RIM's product, but that's the commercial success and popularity of the claimed invention?

A.  Yes, that's true.

Q.  And you'd agree with me that at least as far as Mformation is concerned, Mformation says that the '917 patent forms the foundation of Mformation's product?

A.  You know, I don't have that statement in mind.  But I don't have any reason to dispute it.  So I'm fine with it.

Q.  I can show you the testimony of Dr. Kushwaha at his deposition where he said that, but if you'll take --

A.  I'm fine with it, yes.

Q.  You're fine.

A.  Sure.

Q.  And we're going to talk a little bit later about Mformation's products.  But when we talked about Factor

No. 8, you spent a lot of time talking about the success of RIM product.

MR. CHARFOOS:  Jason, you can take that down. Thank you.

BY MR. CHARFOOS:

Q.  I want to ask you some questions about RIM's product. Now, you'd agree with me that RIM was formed about 15 years before Mformation?

A.  Correct.

Q.  And you'd agree with me that RIM is an innovative company?

A.  It certainly has been at times, I agree with that, yes.

Q.  Well, you would consider RIM to be an innovative company, fair to say?

A.  I'd say that at times in its history it was very innovative, yes.  So I accept that.

Q.  Well, my question is, do you consider RIM to be an innovative company, yes or no?

A.  Yes, for times in its history.

Q.  Mr. Weinstein, do you recall taking a deposition in this matter?

A.  I recall giving a deposition, yes, sir.

Q.  And that was May 18th, 2011.  I'm handing you a copy of your deposition.

MR. CHARFOOS:  Mr. Rudd, can we have page 209, lines 4 through 6.

BY MR. CHARFOOS:

Q.  Mr. Weinstein, do you recall being asked the question:

"Q  And you would consider RIM to be an innovative company; is that fair to say?

"A  Yes."

Do you recall giving that answer at your deposition, sir?

A.  I do.

Q.  Now, you'd agree with me that RIM had a number of products on the market before Mformation was even formed.

A.  Yes, I agree with that.

Q.  And one of those product was the BES product.

A.  Yes.

Q.  And one of those -- and a number of products, in fact, were RIM's handheld devices?

A.  Correct.

Q.  And you recognize that there are many aspects of the RIM products which have absolutely nothing to do with the '917 patent?

A.  Yes, I recognize that.

Q.  And you are -- you recognize that there are many

aspects of the BES product that have nothing to do with the '917 patent?

A.   Correct.

MR. CHARFOOS:   Mr. Rudd, can you bring up slide 11 to Weinstein's presentation?

BY MR. CHARFOOS:

Q.   Now, if you recall yesterday, we looked at Exhibit 383 and you focused on this wireless, cradleless activation and provisioning.  Do you recall that?

A.   Yes, I do.

Q.   And when your counsel asked you why is it important for us to look at press releases and documents, you answered, and you can find this if you'd like to follow along in the trial transcript, at 1148 beginning at 23.

He said:  "What's the significance in your analysis to the fact that RIM is highlighting this wireless activation feature?"

"Well, that's significant to me in that it indicates recognition on BlackBerry's part that this was a valuable feature, both to have and a feature to tell the public about, and this would be something that was good for RIM's business."

You said that yesterday?

A.   I did.

Q.   Now, one thing we didn't see was really the rest of

what this document said about RIM's solution.

MR. CHARFOOS:  Mr. Rudd, could you please bring up Exhibit 383.

BY MR. CHARFOOS:

Q.  And let's focus on that top paragraph.  And here it's talking about the BES, correct?

A.  Yes.

Q.  And RIM's own literature says that the BES provides wireless access to e-mail, enterprise data, phone, Internet, SMS and other organizer applications.

Do you see that?

A.  I do.

Q.  Do you agree with me that those are also important features of the RIM product?

A.  Sure.

Q.  It says:  Fully integrated enterprise solution that provides what organizations require to go wireless, innovative server platform, advanced wireless devices, wireless network service and essential support programs and services."

Do you see that?

A.  I do.

Q.  If we go to the second page of 383, you only focused on wireless, cradleless activation and provisioning in the far right-hand corner.  Do you see that?

A.  I do.

Q.  But there are a whole host of other features that are included in this document that you didn't tell the jury about.  The BlackBerry Enterprise Server supports multiple networks and applications.  Pushes information to users.  Supports device choice.  Centralized control.  Device asset reporting.  Device application control.  Scalable platform.  It has end-to-end triple DES or AES encryption.

MR. CHARFOOS:  And this is a little bit further down on the page, Mr. Rudd, in the center.

Q.  There's optional S/MIME support, device content protection, IT poll enforcement and commands.

And the list goes on and on, do you agree with me?

A.  I do.

Q.  And you also agree this indicates a recognition on RIM's part of the value of these additional features?

A.  Sure.

Q.  And you would concede, wouldn't you, that many of these features have nothing to do with the '917 patent?

A.  Many of the features do not have anything to do with the '917 patent, as far as I know, that's correct.

MR. CHARFOOS:  Can we have RIM Trial Exhibit 4172.

Your Honor, this has not been admitted, but there's no objection.  We'd move 4172 into evidence.

THE COURT:  It's admitted.

(Defendant's Exhibit 4172 received in evidence)

BY MR. CHARFOOS:

Q.  And 4172, Mr. Weinstein, if we look at the second page, this is the BlackBerry Enterprise Server for Microsoft Exchange feature comparison.

Do you see that?

A.  Yes.

Q.  And again, we see a whole bunch of features listed in this BES, correct?

A.  Correct.

Q.  The very first feature on the top left-hand corner is e-mail.  Do you see that?

A.  I do.

Q.  And you'd agree with me that RIM was a pioneer in wireless e-mail?

A.  That's fair.

Q.  And that wireless e-mail is very important to RIM's customers?

A.  I agree.

Q.  And in fact, I think I may have seen you in the hall before we came in this morning using a BlackBerry and I would assume sending some e-mails yourself?

A.  Receiving and sending, yes, sir.  More than I would have liked.

Q.  And you understand before BES 4.0 came out, which you're talking about in your opinion, there was BES 3.5 and 3.6, correct?

A.  Yes, sir.

Q.  And Exhibit 4172 lists a whole bunch of features for BES 3.5 and 3.6, correct?

A.  It does, yes, sir.

Q.  And if we go to the bottom right-hand section, the "Management and Administration," we can see "Wireless IT policies and commands."  Do you see that line, sir?

A.  I do.

Q.  And do you see that that was available in BES Version 3.5 and 3.6?

A.  Yes, I do.

Q.  So you understand that the wireless IT policies and command were something that RIM's products had before BES 4.0?

A.  I do, yes.

Q.  You would agree with me, Mr. Weinstein, that if there is a noninfringing alternative to the patent, all things being equal, this reduces the value of the patent?

A.  I agree with that, yes.

Q.  Because a licensee such as RIM could choose to use

the noninfringing alternative rather than paying a higher royalty rate for the patent?

A.   Yeah, the noninfringing alternative has to be commercially viable, but yes, I agree with that.

Q.   And Mformation has accused RIM's BES 4.0 of infringement?

A.   Yes, sir.

Q.   But as far as you know, did not accuse BES 3.5 of infringement?

A.   Correct.

Q.   Did you know that Mformation originally accused BES 3.6 of infringement, but subsequently dropped that?

A.   I don't have that in mind, no.

Q.   Now, you know that both of the earlier versions of RIM's BES, BES 3.5 and 3.6, had the ability to wirelessly lock and erase a lost device?

A.   That's my recollection, yes.

Q.   And you don't have any reason to dispute that?

A.   I don't.

Q.   And you were here for Mr. Thakur's opening statement, correct?

A.   I was.

MR. CHARFOOS:  Now, Mr. Rudd, could you please bring up Mr. Thakur's opening statement beginning at slide 47.

BY MR. CHARFOOS:

Q.   Do you remember this part of the opening, sir?

A.   You know, I remember at least the bottom part of the slide.  I don't quite remember the context.  But I remember seeing it, yes.

Q.   Well, let me see if I can refresh your recollection on the context.  Mr. Thakur got up and said, Well, one of the problems with these mobile devices is that, you know, somebody might lose them.  So someone might be in an airport and lose their device.

A.   Oh, yes.

Q.   Do you remember that?

A.   I do.

Q.   And he focused on this scenario as one of the important features of the patented invention.  We're going to look at it.

        MR. CHARFOOS:  Can we go to the next slide.

BY MR. CHARFOOS:

Q.   So the device owner calls up the IT professional.

        MR. CHARFOOS:  Next slide.

Q.   That IT professional issues a lock-and-wipe command.

        MR. CHARFOOS:  Next slide.

Q.   The server transmits the lock-and-wipe command.

        MR. CHARFOOS:  Next slide.

Q.   The device receives and acknowledges the command.

MR. CHARFOOS:  Next slide.

Q.  And the lock and wipe is complete and the device is dead.

Do you remember that?

A.  Generally, yes.

Q.  And he said that that was one of the most important features of the Mformation patent, we have it here in the slide, devoted six or seven slides to it.  Do you recall that?

A.  You know, I don't recall this specific -- what he said specifically, but generally, I recall seeing these slides.

Q.  And you'd agree with me that RIM's BES Version 3.5 and 3.6 had the lock-and-wipe feature?

A.  As far as I know, it did.

Q.  So the only thing that RIM had not yet added was the ability to wirelessly activate the device, correct?

A.  Well, I can't answer that question.

Q.  But you focused on the wireless activation in BES 4.0, correct?

A.  That's fair, yes.

Q.  You haven't really shown the jury any of the other new features of BES 4.0.  You focused on wireless activation?

A.  I have, yes, sir.

Q.   And you understand that in BES 3.5 and 3.6 that you could still activate the device, correct?

A.   Yes, but not wirelessly.

Q.   Correct, you had to put a cable?

A.   Sure.

Q.   And in BES 4.0 you could still use a cable?

A.   Correct, I understand that as well.

Q.   And you also understand that wireless activation isn't something that you have to do every day, right?

A.   By definition, that's true.

Q.   So you do it -- hopefully, if all works well, you only do it once on your device, when you first get it.

A.   That's fair.

Q.   And you'd agree with me that RIM would have known that their own products had the capability for lock and wipe in Version 3.5 and 3.6 during the hypothetical negotiation?

A.   Yes.

Q.   I'd like to now turn to a document which you spent a fair amount of time on.  And that's Exhibit 113.

          MR. CHARFOOS:  Mr. Rudd, can we have slide 32 from Mr. Weinstein's examination.

BY MR. CHARFOOS:

Q.   Now, let's just be clear here.  What you did to get your 7.7 percent figure, which you then carry forward in

your calculations, is you looked at the line, $50 per seat for information. And you divided that by $650, which is just sort of the total of everything in the software dollar column; is that correct?

A. Yes.

MR. CHARFOOS: You can take that down, Mr. Rudd.

Can you bring up 113?

BY MR. CHARFOOS:

Q. And you get to that 7.7 percent, as you agreed yesterday, but making a number of assumptions about this particular document --

MR. CHARFOOS: And, Mr. Rudd, can we go to page 9? It's Bates No. 730.

Nope, next one.

Sorry, go back two. There you go.

BY MR. CHARFOOS:

Q. You make a number of assumptions to get to that 7.7 percent, don't you?

A. Well, let me hear your question.

Q. Your first assumption is that systems monitoring, the component, has something to do with the '917 patent?

A. Um.

Q. Yes or no?

A. That's fair. Yeah, that's fair.

Q. And if it turns out that systems monitoring -- that

your assumption that systems monitoring doesn't have anything to do with the '917 patent, then you'd agree with me that Mformation wouldn't be entitled to $50 a seat per systems monitoring, that it was just an additional feature that had nothing to do with the '917 patent?

A.   No, I wouldn't.

Q.   You wouldn't?

A.   No.

Q.   So you're claiming that Mformation would get $50 a seat even if systems monitoring had nothing to do with the '917 patent?

A.   I'm claiming that my use of this document in the way we've been through it is appropriate with respect to systems monitoring.

Q.   Well, that's not my question, sir.  That's because you assume that systems monitoring includes the claims of the '917 patent.  Let's actually look and see what the document itself says about systems monitoring.

        MR. CHARFOOS:  And if we could go to page 735.

BY MR. CHARFOOS:

Q.   The document says, what?  Unified monitoring.  Do you see that?

A.   I do.

Q.   And you see that monitoring is network and systems

performance monitoring, roundtrip delays and coverage analysis?  Do you see that?

A.  I do.

Q.  Now, Claim 1 of the '917 patent doesn't talk about network and systems performance monitoring.

A.  Well, I don't have it in front of me, and even having it in front of me might not help me, because I'm not a technical expert.

Q.  So you just don't know, you have to assume that that has something to do with the '917 patent?

A.  That's fair.

Q.  And you'd agree with me that monitoring is also described as logging?

A.  On this document, yes.

Q.  And this is the document you're relying on for monitoring, correct?

A.  Actually I'm relying on the other page that we looked at before, but, yes, this is part of the same document. It's a different page.

Q.  And monitoring is described as problem alerting, correct?

A.  Correct.

Q.  And monitoring is described as help desk management, correct?

A.  Also correct, yes.

Q.   And is it fair to say, just like you can't say whether or not network and systems performance monitoring is covered within the Claim 1 of the '917 patent, you can't tell the jury that logging, problem alerting or help desk management are covered by a Claim 1 of the '917 patent?

A.   Correct.

Q.   Again, you have to assume that.

A.   That's fair.

Q.   You also suggested that the $50 --

        MR. CHARFOOS:  And if we could go back to page 730, Mr. Rudd.

BY MR. CHARFOOS:

Q.   You suggested that the $50 was some sort of relative value within the chart, correct?

A.   Correct.

Q.   First of all, this chart was in 2001, correct?

A.   2001 or 2002, around that time period.

Q.   And that is four years, approximately, before the date of the hypothetical negotiation?

A.   True.

Q.   This is before BES 3.5 and 3.6 came out.

A.   Probably, yes.

Q.   And this chart, as far as we can tell, doesn't take into account all of the additional features that we saw

were included in BES 3.5 and 3.6.

A.   No, that's not true.

Q.   Well, do you see on this chart anything that talks about multi-network support?  Or choice of wireless devices?

A.   Not specifically.

Q.   Okay.  Now, you understand, Mr. Weinstein, that the $50 a seat is not actually a number that RIM came up with but a number that Mformation gave to RIM.  Correct?

A.   It's consistent with the Mformation numbers at about this time.  So that's true.  It's consistent with the number that we looked at on Mr. Castell's notebook yesterday.

Q.   Correct.  That was the price that Mformation was quoting to RIM at this time to purchase Mformation's product?

A.   Correct.

Q.   And isn't it true, Mr. Weinstein, that Mformation didn't actually believe that they could charge $50 per device for their product?

A.   I don't know that to be the case, no.

Q.   I'm going to hand you what is Mformation Trial Exhibit 2174.

        MR. CHARFOOS:  Your Honor, there are no objections to this document.  Stipulated.  Move it into

evidence?

THE COURT:  2174 is in evidence.

(Defendant's Exhibit 2174 received in evidence)

BY MR. CHARFOOS:

Q.  And if we look, this is an e-mail from November 16th, 2001.  Again 2001, around the same time that Exhibit 113, the chart you've been relying on, was made, correct?

A.  Yes, sir.

Q.  And it's from Upal Basu.  Do you recall Mr. Basu?

A.  I do.

Q.  He came and he testified in this case.

A.  He did.

Q.  And, whereas Dr. Kushwaha has sort of been described as the technical part of Mformation, Mr. Basu has sort of been described as the business or money side of Mformation, correct?

A.  That's fair.

Q.  And he sends an e-mail to three individuals who are the investors in Mformation, correct?

If you look at the battery.com, Battery Ventures was an investor in Mformation?

A.  As I sit here, I don't know that, but I can accept that.

Q.  And Mr. Basu tells them, he says:  "As we get ready

to start our pilot at BV, the question is being asked about our pricing to them.  We have dodged the issue so far, but clearly $50 a device one time, or $5 per month for 200,000 devices is going to face resistance."

Isn't that what Mr. Basu said in 2001?

A.   It is.

Q.   You did not show the jury any of Mformation's licenses, correct?

A.   That's correct.

Q.   In this case, the hypothetical negotiation would be for a patent license to the '917 patent?

A.   Yes, sir.

Q.   And the license for that patent would not include the purchase or licensing of a software product?

A.   As far as I know, that's true.

Q.   Well --

A.   It's a patent license.

Q.   It's a patent license?

A.   Correct.

Q.   As part of the hypothetical negotiation, RIM would not get any software, correct?

A.   No, it would get a license to use the '917 patent.

Q.   And it wouldn't get a license to Mformation's copyrights?

A.   Correct.

Q.   Wouldn't get any maintenance services?

A.   That's true.  And that is part of the license.

Q.   And it wouldn't get any support services?

A.   True.

Q.   I'm sorry, I forgot, one more thing on 113.  You never talked to anybody about Exhibit 113, did you?

A.   I didn't talk to anybody at RIM about it, that's true.

Q.   And in fact, if one of the authors of Exhibit 113 spoke about this, about this exhibit, you would defer to the author as to the meaning of the chart in Exhibit 113?

A.   I would consider whatever one of the authors said about it in the context in which it was said, yes.

Q.   You would let them speak for themselves as to the meaning of the document?

A.   Sure.

Q.   Because you don't have any independent knowledge of what "$50 a seat" means.  You've made a number of assumptions, but you don't have independent of that?

A.   No, that's not true.

Q.   Well, you have made a number of assumptions about $50 a seat, correct?

A.   Well, it's more than an assumption.  I saw it in the document, Exhibit 113.  And I saw it in Mr. Castell's

notebook.

Q.   You did not see "$50 a seat."

A.   No, I saw "30 to 70."

Q.   And the only information you have about $50 a seat comes from Exhibit 113?

A.   That's not quite true.

Q.   Well, we'll see what RIM's witnesses have to say when they come.  And we'll let them speak for themselves.

MR. ARNTSEN:  Object to the attorney commentary.

THE COURT:  Sustained.  Counsel, you should stick to questioning and not comment.

BY MR. CHARFOOS:

Q.   I'm going to hand you what I've marked as Exhibit 814, which has been already admitted into evidence.  And this is the Q22004 Mformation pricing recommendations.  Do you recall seeing this?

A.   I probably saw it.  I don't have it specifically in mind, though, so I can't answer.

Q.   If we go to the second page of Exhibit 814, "The Key Pricing Objectives," the first sentence:  "Price according to the perceived value to the customer."

Do you see that that's what Mformation said about their pricing in the second quarter of 2004?

A.   I see that, yes.

Q.   Now, I want to step through a couple of the license

agreements which you did not show the jury yesterday. And I'm going to hand up Exhibit 2021 [sic] and 2022.

MR. CHARFOOS:  Your Honor, there are no objections to 2021 [sic] and 2022.  We'd offer them into as stipulated exhibits.

THE COURT:  They both are received in evidence.

(Defendant's Exhibits 2201 and 2202 received in evidence)

BY MR. CHARFOOS:

Q.  And let's focus on 2201 to begin with.  This --

MR. CHARFOOS:  And, Mr. Rudd, if we could have 2201 up.

BY MR. CHARFOOS:

Q.  This is an agreement dated December 2007 between Intel Corporation and Mformation.  Do you see that?

A.  I do.

Q.  And this is one of the agreements that you reviewed as part of your analysis, correct?

A.  Correct.

Q.  And you'd agree with me that in this software agreement, Mformation sold to Intel software licenses to use the software and documentation for that software. Correct?

A.  Yes, correct.

Q.  And in fact, if we look at page 2, 3A -- I apologize

to everybody, we're going to have to read a little bit of legalese here.

But "The supplier" -- and you'd agree with me that the supplier is Mformation?

A.   Yes.

Q.   -- "grants to Intel for the term of this agreement a nonexclusive, perpetual, royalty-free, worldwide, multi-tenant, multi-client, with full APDO functionality, irrevocable license, for one production site, and the appropriate number of fail over, standby and disaster recovery sites, under all intellectual property rights owned or licensed by the supplier and embodied in the software to use, copy and distribute internally the software and associated documentation..."

You agree with me that that is the grant that Mformation gave Intel?

A.   I do.

Q.   That would have included a license to use the '917 patent?

A.   This is a software license, so I can't go beyond that.

Q.   You agreed with me earlier that Mformation contends that the '917 patent is the foundation of Mformation's product and software?

A.   I agree with that.

MR. CHARFOOS:  Mr. Rudd, if we could go to page 10 and look at the software description and fees.

BY MR. CHARFOOS:

Q.   The server software and object code form was $500,000.  Do you see that?

A.   I do.

Q.   And the client licenses per device activation were 50 cents per device activation from one to four million subscribers, and 20 cents per device activation for four million subscribers, do you see that?

A.   I do.

Q.   I'm going to go over here and move this a little bit. Let's see.

Mr. Weinstein, can you see that still?

A.   I can manage to, yes, thank you.

Q.   Hopefully, the jury can manage to see that as well (writing on easel).

I'm just going to write here "MF licenses."  And the first one is Intel, and you'd agree with me that if Intel had more than four million subscribers that they'd only pay 20 cents per device activation fee, correct?

A.   Well, not exactly.  They'd pay 20 cents after the four million.  They'd pay 50 cents up to the four million.

Q.   Okay.  But once they hit four million, it's 20 cents

per activation?

A.   That's correct, after the four million.

Q.   And that's a one-time fee, agreed?

A.   Yes, it's per activation.

Q.   It's per activation.

If we look at 2202, which is the Hughes information agreement, and we go to the price, which is on page 10 -- I'm sorry, it starts on page 9.  We see "base server license fee, $250,000."  Do you see that?

A.   I do.

Q.   And then on page 10, there's the block of licenses for use of the server software.

A.   I see that.

Q.   And that licenses goes from 40 cents down to 18 cents, depending on how many licenses there are?

A.   Correct.

Q.   And if we go down one more block, the client licenses, we see that that goes from 20 cents to 10 cents.

A.   Correct.  Depending on volume again.

Q.   So if the customer has greater than one million licenses, then they pay 28 cents per device.  18 cents plus 10 minutes?

A.   Correct.  At that volume.

Q.   28 cents a device.  And that, sir, is also a one-time

fee, correct?

A.  Yes, sir.

Q.  And it's your opinion in this case that RIM should be paying $12 per device; isn't that true?

A.  Correct.

Q.  There are also a number of agreements which you did not show the jury yesterday with several large cell phone carriers, correct?

A.  Yes, sir.

Q.  And we're going to look at two of them.  Exhibit 4256 is the agreement between Sprint and Mformation; and 4257 is the agreement between T-Mobile and Mformation.

MR. CHARFOOS:  Your Honor, these have not been objected to, by stipulation between the parties.  Move them into evidence?

THE COURT:  Very well.  4256 and '57 are in evidence.

(Defendant's Exhibits 4256 and 4257 received in evidence)

BY MR. CHARFOOS:

Q.  Mr. Weinstein, you reviewed these two agreements as part of your analysis in this case, did you not?

A.  I did.

Q.  And let's first look at 4256, the agreement between Sprint and Mformation Technologies.  And again, you'd

agree with me that Mformation gave to Sprint their software, their documentation, and a license to use that under Mformation's patents, copyrights and trademarks?

A.   Well, I haven't looked at the whole thing.  But yes, I agree this was a software license and Mformation conveyed rights associated with that software to Sprint.

Q.   Including intellectual property rights to the patents.

A.   I believe so.  Well, including intellectual property rights.

Q.   And the '917 patent forms the foundation of that software?

A.   That's my understanding.

Q.   And if we look at page 943, Sprint paid a lump sum for that license.  And that lump sum was $5,753,036.  Isn't that correct?

A.   Yes, sir.

Q.   And that was regardless of the number of subscribers using Sprint system, correct?

A.   I believe that's correct, yes, sir.

Q.   So we have Mformation carrier licenses.  We have Sprint 5.753; is that correct?

A.   Yes, it is.

Q.   And that's one-time fee for unlimited number of subscribers for a two-year license?

A.   Correct.

Q.   And did you know at the time that Mformation entered into this agreement that Sprint had more than 50 million customers?

A.   Actually I think your number is wrong.  The number I would have in mind would be a little different from that, about 27 million.

Q.   27 million?

A.   Yes, sir.

Q.   Now, let's look at the T-Mobile agreement, which is 4257.  And you'd agree with me, once again, that this is a license for Mformation software including the intellectual property, correct?

A.   It's a software license, yes, and conveys rights associated with the software.

Q.   And again, Mformation contends that the '917 patent formed the foundation of that software, correct?

A.   As far as I know, yes, sir.

Q.   But it could include other patents, trademarks, copyrights, that they may have as well?

A.   As part of this agreement, that's possible, yes.

MR. CHARFOOS:  If we could go to page 280, Mr. Rudd, which is 21 pages in.

BY MR. CHARFOOS:

Q.   And look at the total bundled price for a perpetual

unlimited software license, $5.65 million.  Is that correct?

A.   Yes.

Q.   So $5.65 million for T-Mobile; $5.753 million for Sprint for unlimited licenses, correct?

A.   Yes, sir.

Q.   And you are asking from RIM $199 million, correct?

A.   Well, I'm not asking for it, that's the damages number that I calculated.

Q.   The damages number that you calculated for a license for just the patent is $199.1 million?

A.   Correct.

Q.   I want you to assume for a minute that during the hypothetical negotiation, Intel was willing to grant to RIM a license to its patent similar to what it licensed Intel at, at 20 cents per device.

A.   I think there was a mistake in your question. Perhaps you could start it again.

Q.   You agree with me for over four million customers the Intel license agreement is 20 cents per device?

A.   I agree with that, yes.

Q.   I want you to assume, you're making some assumptions at that, that during the hypothetical negotiation, Mformation was willing to grant to RIM the reasonable royalty rate of 20 cents.

A.   I see.

Q.   Which is the actual royalty rate that it granted Intel for over four million devices.  You can follow me?

A.   Well, I understand the assumption you're asking me to make.

Q.   Good.  And you agree with me that RIM has -- does in fact have more than four million devices, which you have included in your royalty base?

A.   Right, I think the number in the base is 18.4 million.

Q.   18.4 million.

A.   Yes, sir.

Q.   So if the hypothetical negotiation occurred and they actually granted RIM 20 cents per device, not the $12 but 20 cents, which they had actually given to another customer, Intel, 20 cents times 18.4 million devices -- I have a calculator here.  Can we calculate out what that reasonable royalty would be?

A.   It would be about 3.6 million.  3.6.

Q.   You're a lot better with your math than I am.

A.   My parents are both accountants.

Q.   The reasonable royalty under that scenario -- and you were right on the money, $3.68 million -- if RIM got the 20 cents per device fee that Mformation actually gave to Intel, and again, that fee included software, correct?

A.   Yes.

Q.   Documentation?

A.   Yes.

Q.   And, as we saw, a grant to all of the intellectual property covered by the software?

A.   I think that's fair, yes.

Q.   A couple smaller issues that I would like to cover is, you did not do any surveys to determine whether or not the accused technology would attract any additional customers, did you?

A.   I did not do any surveys, that's true.

Q.   And you have no citations in your evidence or your report to indicate that the increase in the number of users is purportedly attributable to Mformation's technology?

A.   I didn't quite understand that question.

Q.   Do you have any evidence in your report whatsoever to indicate that the increase in the user base is purportedly attributable to Mformation's technology?

A.   Yes.

Q.   Mr. Weinstein, would you please look at your deposition at page 143.

        MR. CHARFOOS:  Mr. Rudd, can I have that up beginning at line 4.

BY MR. CHARFOOS:

Q.   Were you asked the question:

"Q   Now, you would agree that you cite no evidence in your report whatsoever to indicate that the increase in user base is purportedly attributable to Mformation's technology, correct?"

Answer:  "It's true.  There is no specific reference.  That's correct."

Did you -- were you asked that question and did you give that answer?

A.   Correct.  I did, yes.

Q.   In coming to your conclusion, you did not separately determine how much Mformation's reasonable royalty would be for strictly indirect infringement; is that correct?

A.   Correct.

Q.   I want to go back to the commercial success and popularity of the product on the Georgia-Pacific Factors.  I'd like to focus in a little bit on that.

As part of your analysis, the popularity of the product would also include what Mformation's customers thought of the product that embodied the '917 patent.  And you were here in the courtroom the other day when we looked at an e-mail from Credit Suisse First Boston in 2003, correct?

A.   I was.

Q.   And the Credit Suisse First Boston e-mail suggested that Credit Suisse was not happy with Mformation and its software, do you recall that?

A.   I recall that testimony, yes.

Q.   And in fact, the e-mail suggested that Mformation had misrepresented the capabilities of their software.  Do you recall that?

A.   Generally, yes.

Q.   And that Credit Suisse would never serve as a reference for Mformation, correct?

A.   I recall that, yes, sir.

Q.   I'm going to hand you what I'm going to mark as -- what's been marked as Trial Exhibit 874.

        MR. CHARFOOS:  Your Honor, RIM would ask that 874 be moved into evidence.

        THE COURT:  874 is in evidence.

        (Defendant's Exhibit 874 received in evidence)

BY MR. CHARFOOS:

Q.   And this is a series of e-mails which begin on the third page of 84 from Chuck Magniello.  Do you see that?

A.   I do.

Q.   And you understand that Mr. Magniello is an Mformation employee?

A.   Yes.

Q.   And he sent this e-mail to Mark Edwards, who was the

CEO at the time?

A.  I see that.

Q.  And Rakesh Kushwaha?

A.  I see that, yes.

Q.  And the date is October 1st, 2009?

A.  I see that.

Q.  And the subject is "Sprint Executive Escalation Expected"?

A.  Correct.

Q.  And Mr. Magniello says:  "Scott Rice, who is an executive over at Sprint, is planning to call Mark Edwards today or tomorrow concerning two things:  Software deliverables and similarity deliverables per the contract."

Do you see that's what Mr. Magniello said?

A.  I do.

Q.  And if we go to the first page, the second e-mail from the top, do you see that Mr. Rice did in fact call Mformation, he called Mr. Mark Effinger, who you understand is also an Mformation employee, correct?

A.  Yes, I see that.

Q.  And Mr. Effinger sent an e-mail to Mr. Edwards, Mr. Kushwaha, and says:  "Scott Rice called me tonight and left a voicemail message.  He asked me to call him tomorrow, which I will do.  Headline:  He threatened to

pull this crap out."

And he then goes on to list a number of concerns which Mr. Rice from Sprint suggested he had about Mformation's software product.

Isn't that what this document says?

A.   That's a fair characterization, yes.

Q.   That's in fact what it says, it in fact says that "Mr. Rice called and threatened to pull this crap out," correct?

A.   That's -- it does say that.

Q.   I'm also going to hand up to you Trial Exhibit 5007. And this is an Mformation Lessons Learned Session 1, February 13th, 2009.

MR. CHARFOOS:  Your Honor, we'd ask that Trial Exhibit 5007 be moved into evidence.

MR. ARNTSEN:  We object to no authentication, no foundation for it.

MR. CHARFOOS:  Your Honor, the parties have an agreement that documents from the parties are authenticated.

THE COURT:  Objection's overruled.  5007 is in evidence.

(Defendant's Exhibit 5007 received in evidence)

BY MR. CHARFOOS:

Q.   You did not review this document as part of your

analysis, did you, Dr. Weinstein?

A.   I don't recall seeing it, no.

Q.   And this document says that it's Mformation Lessons Learned Session 2, February 13th, 2009, do you see that?

A.   I do.

Q.   And if we go to page 5 of the presentation, we see objectives.  Number 1, compile a list of lessons learned.  Number 2, categorize the what and hypothesize about the why.  And Number 3, to set up improvement action items.  Do you see that?

A.   I do.

Q.   And let's take a look at what Mformation concluded based on its own assessment of its own software product that Mformation alleges are founded on the '917 patent.  And if we turn to page 16, please.

"The overall conclusion, measured by the PEA -- planned, estimate, actual -- metric, every project was late on at least one milestone."

Do you see that, Mr. Weinstein?

A.   I do.

Q.   "Due to real experiences, all projects feel we have poor software quality."  Do you see that, Mr. Weinstein?

A.   I do.

Q.   "Agent quality, not a professional product delivery on orange, DoCoMo and TDC."  Do you see that,

Mr. Weinstein?

A.  I see it.

Q.  Mformation's own assessment of its own product, as we see from Exhibit 5007, that "due to real experiences, all projects feel we have poor quality assessment." Isn't that what the document says?

THE COURT:  You said "poor quality assessment."

BY MR. CHARFOOS:

Q.  Poor software quality.

A.  That's what it says, yes.

MR. CHARFOOS:  One minute, your Honor.

(Pause in the proceedings)

MR. CHARFOOS:  No more questions, your Honor. Thank you very much.

THE COURT:  Very well.

Any redirect?

REDIRECT EXAMINATION

BY MR. ARNTSEN:

Q.  Mr. Weinstein, Attorney Charfoos was just asking you some questions about customer complaints.  Do those in any way affect your calculation of what is an appropriate royalty for patent infringement in this case?

A.  No.

Q.  Can you explain why?

A.   Well, the hypothetical negotiation takes place in 2005.  It's for the '917 patent.  The customer complaints with respect to various software licenses are not relevant to the hypothetical negotiation.

Q.   Why not?

A.   Because at the hypothetical negotiation, what you're doing is addressing the assumptions in the first instance that RIM infringes, the patent is valid and enforceable against RIM.  And the customer complaints pertained to various software licenses, not to the '917 patent.

Q.   Now, just cover -- do you recall Mr. Charfoos asked you near the start of your cross-examination about your opinions in the Versata litigation?

A.   I do.

Q.   And did you offer damage opinions in the Versata case?

A.   I did.

Q.   And what was -- and what was the reason -- who did you represent in the --

A.   I represented Versata, the plaintiff in that case, against SAP, the defendant.

Q.   And was Versata seeking damages for patent infringement?

A.   It was.

Q.   And what was the amount of the award in that case?

A.   The ultimate award was in excess of $345 million.
Not including interest.

Q.   And has that been affirmed by the trial court?

A.   It was.

Q.   Now, you were shown a number of Mformation software
agreements, do you recall that?

A.   I was.  Yes, sir, I do.

Q.   Did you review those agreements in the process of
developing your opinions?

A.   I reviewed many agreements in connection with my
opinions, yes, sir.

Q.   Including Mformation software agreements?

A.   Yes.

Q.   Do you consider those agreements comparable to the
patent license that you were asked to opine to?

A.   No, sir, they're not comparable.

Q.   And why not?

A.   They're software agreements.  And they're not the
same as a patent license.  My understanding as to how
one goes about this, based on my years of experience, is
that if you're going to use agreements as benchmarks, as
was done here, they have to be comparable.  And these
are for the comparable.  And so I was aware of these
agreements, but they're not pertinent benchmarks for

determining fair compensation for an infringement by RIM to Mformation for its '917 patent.

Q. And why aren't they comparable?

A. They're software licenses. A software license is not the same as a patent license.

Furthermore, as far as I can recall, even in those licenses, not all of Mformation's modules were licensed. Specific software was licensed, not all of it was licensed.

But I don't think that's the most important point. The most important point is that they're software licenses, not a patent license. And that's very different. Very different circumstances.

And, therefore, they're not comparable.

Q. Now, do you remember Mr. Charfoos asking you some questions about BES 3.5 and 3.6 as noninfringing alternatives?

A. He asked me about those two versions, yes, sir.

Q. And I believe you pointed out that they have to be a commercially acceptable noninfringing alternative; is that correct?

A. Yes. In looking at noninfringing alternatives, you have to consider those that are commercially viable or commercially acceptable.

Q. And did you -- and did you view wired activation as a

commercially viable noninfringing alternative?

MR. CHARFOOS:  Object, your Honor, foundation.

THE COURT:  Well, if you add the word "assumed"

in that, it will overcome the objection.

BY MR. ARNTSEN:

Q.  Do you -- what is your assumption with regard to why
wired activation is a commercially acceptable
noninfringing alternative?

A.  I assume it is not.

Q.  And why not?

A.  It's basically a step backwards.  And especially with
respect to technology, you don't go backward.  You go
forward.  And so wired activation would be a step
backwards relative to wireless activation.  And,
therefore, it would not be a commercially acceptable,
commercially viable noninfringing alternative.  That
doesn't mean it can't be done on occasion for one reason
or another.  But in the big picture it's not a viable
noninfringing alternative.

Q.  Did RIM go back to wired activation after this
lawsuit was filed?

THE COURT:  Well, I won't allow him to speculate
about that.  Unless this is a fact question that you're
asking.

MR. ARNTSEN:  Let me lay a foundation.

BY MR. ARNTSEN:

Q.   You were here in trial yesterday with Dr. Madisetti --

THE COURT:   That won't help you get him on the stand to testify as a fact witness.

MR. ARNTSEN:   I'm sorry.

BY MR. ARNTSEN:

Q.   What's your understanding of whether RIM went back to wired activation after this lawsuit was filed?

A.   I have assumed that it did not.

Q.   Thank you.

Now, I put -- did I -- I did give you a binder of exhibits.

Is that starting on 2196?

A.   Yes.

Q.   I want to talk a little bit about some of the RIM -- or I mean some of the Mformation software exhibits, or software licenses.  Did you have a chance to review those?

A.   I did.

Q.   Can you take a look -- you recall Attorney Charfoos talking about the software license with Credit Suisse First Boston?

A.   I do.

Q.   Can you take a look at Exhibit 2200.

A.   I have it.

Q.   Is that that software license?

A.   Yes.

Q.   And what is the per device fee in Exhibit 2200?

A.   Depending upon volume, the per device fee ranges from $15 up to $25.

Q.   Is that per device?

A.   Yes, per device.  Depending upon volume purchased.

Q.   Can you take a look at Exhibit 2197, which is a software license with GTSI.

A.   I have it.

Q.   And is that an Mformation software license?

A.   Yes.

Q.   And what is the per device fee for the GTSI license?

A.   It's shown as 50 to $70 per device.  $50 at the low end, $70 at the high end per device, and those are subject to a 20 percent discount.

     So that would be 40 to $56 per device after allowing for the discount.

Q.   And can you take a look at Exhibit 2199?

A.   I have it.

Q.   Who's that a license with, for Mformation software?

A.   That's Mformation and COBY.

Q.   And what is the per device fee in that license?

A.   Again, depending upon quantity, it's a low of $6 per

month, which would be $72 per year per device, to a high of $8 per month, which would be $96 per device per year.

Q.   And is it your understanding that Colgate still has licenses licensed under that agreement -- devices licensed under that agreement?

A.   Yes.

MR. ARNTSEN:   Chris, could you pull up Exhibit 814, which Attorney Charfoos discussed with Mr. Weinstein.  And can you go to page 814 -- strike that.

BY MR. ARNTSEN:

Q.   You see that this is the Mformation pricing recommendations?

A.   I see it.

MR. ARNTSEN:   And can you go to page 9, please.

And can you highlight the device-based pricing.

BY MR. ARNTSEN:

Q.   Mr. Weinstein, what's the -- what's Mformation's device-based pricing as shown as its price point?

A.   Three to $4 per device.

Q.   Per what?

A.   Per month.

Q.   And?

A.   And that would be 12 to $48 per year.

Q.   How does that relate to your reasonable royalty

calculation?

A.  My calculation is $12 per device per year.

MR. ARNTSEN:  And, Chris, can you take a look at -- can you pull up Exhibit 113?  Which Attorney Charfoos covered with Mr. Weinstein.

And can you go to -- first of all, can you go to page 9.  And can you blow that up a little bit.

BY MR. ARNTSEN:

Q.  And that's the chart that we've been referring to both yesterday afternoon and today, correct?

A.  It is.

Q.  And Mr. Charfoos showed you the -- another slide relating to the systems monitor device, correct?

A.  Correct.

MR. ARNTSEN:  Chris, can you pull up page 5, please.  Can you blow that up.  And can you highlight the first bullet point.

BY MR. ARNTSEN:

Q.  And this is under the manageability portion, correct?

A.  It is.

Q.  Similar to Mr. Charfoos showing you the section under the monitoring portion, correct?

A.  Correct.  Correct.

Q.  And is it your assumption that under this management portion that that covers the invention of the '917

patent?

A.   Yes, sir, it is.

MR. ARNTSEN:   And now can we go back to the prior page, page 9, I believe it is.  Can you blow that up again.

BY MR. ARNTSEN:

Q.   What are the numbers on this chart relating to the systems management box?

A.   Systems management box appears right above the systems monitoring box, and the numbers for that one are a hundred dollars per seat.  So it's twice as much as systems monitoring.

Q.   Mr. Charfoos showed you earlier some Mformation licenses with Intel and Hughes.  Do you recall that?

A.   I do.

Q.   Are those competitors of Mformation?

A.   Not really, no.

Q.   Now, the one other thing I want you to take a look at are the telephone company licenses, the carrier licenses.  Do you recall that?

A.   I do.

Q.   And do you recall Mr. Charfoos doing a calculation that came out somewhere -- or showing somewhere around 20 cents -- first of all, those were lump sum payments, correct?

A.  Yes.

Q.  And then there was a calculation divided by the number of customers, do you recall that?

A.  I do.

Q.  Do you believe that that is an accurate calculation in order to determine a per device value, an appropriate per device royalty for the Mformation patent for the '917 patent?

A.  No.  It's not.

Q.  Why not?

A.  Well, first of all, that was a software license.  So it's not comparable to begin with.  But --

Q.  Why is it not comparable, software license?

A.  Well, because a software license, as I said, is not the same thing as a patent license.  It's two different things.  Software license has limited applications that are associated with the use of the software.  Whereas, a patent license allows you to use the patented technology in any way you want, so it's broader.  Well, that's the answer to that question.

Q.  And then putting aside its non-comparability, what problem did you have with the calculation?

        MR. CHARFOOS:  Objection, your Honor, beyond the scope of the cross.  I never asked what the calculation is.

THE COURT:  Overruled.

THE WITNESS:  Well, the calculation was flawed, and the reason the calculation was flawed is the way he got to the 20 cents, which was not presented, is he divided that lump sum payment into the number of customers to get the job list per customer.

But the reason that's flawed is back at the time of this license agreement, maybe only 5 percent of the phones were smartphones.  95 percent of Sprint's customers at the time were not smartphones.  So he's spreading that lump sum payment over 27 million phones, which represents Sprint's customer base, when in fact the smartphone component of that was about 1.5 million.  So it should have been a much smaller base that would have been relevant to the information technology, and when you do that, you wind up with about $4 per device, not 20 cents.

So the computation was completely flawed.

Q.  And are there other ways that this software agreement, that its rate is not consistent with the rate that you would use in a hypothetical negotiation?

A.  Well, actually, there are two.  First of all, in my prior answer, I didn't even get to the fact that you have to also back out RIM's share of Sprint's smartphone customers.  And at the time they might have had about a

35 percent share, so you would back that out too, and what that would leave you with is about $6 per device for Sprint's non-RIM smartphone customers based on the lump sum payment of 5.7 million that I was asked about.

Q.  And does that software, by the way, cover all of the, everything that could be done under the '917 patent, the full scope?

A.  No, it's limited to software.  So it's not -- it's narrower.  That $6 is for narrower.

Q.  Are there other reasons why that rate is not appropriate in the context of the hypothetical negotiation?

A.  Right.  So the initial computation is flawed.  It's a software license, not a license to the '917 patent.

The other thing is, again, when you come back to the hypothetical negotiation, you have assumptions that the parties make about validity, infringement, enforceability, which favor Mformation in the hypothetical negotiation, in a way that Mformation isn't favored entering into this real world actual deal with Sprint.

Q.  What is your opinion as to a reasonable royalty owed by RIM to Mformation for infringement of the '917 patent?

A.  $12 per device, which comes to $199 million for the

four-year period that I've calculated damages.

MR. ARNTSEN:  Thank you, sir.

THE COURT:  Any request for recross?

MR. CHARFOOS:  Yes, your Honor.

THE COURT:  What matters?

MR. CHARFOOS:  The requests for assumptions on the commercially viable noninfringing alternative. Question on whether or not the patent is limited to smartphones.

THE COURT:  Granted.

RECROSS-EXAMINATION

BY MR. CHARFOOS:

Q.  Mr. Weinstein, you'd agree with me -- well, you just testified that you didn't believe that Version 3.5 and 3.6 of the BES were commercially viable noninfringing alternatives because they had cabled provisioning; is that correct?

A.  I'm fine with that, yes.

Q.  Now, you have not conducted any surveys to determine whether or not BES 3.5 and 3.6 are in fact commercially viable noninfringing alternatives.

A.  That's true.

Q.  And you didn't talk to any RIM individuals to ask that, did you?

A.  That's true, I did not.

Q.   Now, you just testified that the Sprint population of devices was much smaller than what I represented because you said only a smaller portion of those were smartphones.

A.   Correct.

Q.   Is it your understanding that the claims of the '917 patent cover only smartphones?

A.   No.

Q.   So they could cover regular cellular telephones?

A.   Yes, they could.

Q.   But you excluded that in your base?

A.   In the computations I just did, yes.

Q.   You looked -- you talked to the jury a little bit about some of Mformation's early software agreements with Credit Suisse, GTSI and Colgate.  Do you recall that?

A.   I do.

Q.   Now, you understand that the Credit Suisse First Boston had a total of 4,000 users?

A.   I do.

Q.   And you understand that GTSI had a smaller number of users as well?

A.   Yes, I did.

Q.   And you understand that the Colgate agreements had 50 devices initially authorized and then 400 devices beyond

that, correct?

A.   Correct.

Q.   And so all total, for example, for Credit Suisse
First Boston, they agreed to pay $86,000 for their
installation?

A.   You know, I don't have that number in mind.  But I
can accept it.

Q.   And they're a relatively small enterprise customer,
correct?

A.   Correct.

Q.   Far smaller than RIM, who would have purchased
18 million device licenses?

A.   They're far smaller than RIM, yes.

Q.   The last questions that I have, you talked about how
the software license agreements were not comparable
because they're software license agreements.

A.   Yes.

Q.   And I'd like to go back to Exhibit 2201.  And again,
sir, you understand that Mformation contends that
the '917 patent forms the foundation of Mformation's
software?

A.   Generally, yes, I do.

Q.   And I wanted to turn to page 2, and again look at the
license grants for the Intel agreement.  And by the way,
this Intel agreement, again, is December of 2007, so

several years after Credit Suisse First Boston; isn't that true?

A.   True.

Q.   And you would agree with me that Mformation's prices have generally fallen over time?

A.   Yes.

Q.   Going back to the license granted.  The grant of the license under the Intel agreement is that Intel would receive a license to all intellectual property rights -- so that would be any patents, copyrights, trademarks, trade secrets -- that Mformation has, or licensed by the supplier and embodied in the software to use, copy, distribute internally the software and associated documentation.

        That was the license grant?

A.   I see that, yes.

Q.   And they did not just get a bare patent license, they got the software, correct?

A.   Correct.

Q.   Intel got the documentation?

A.   Correct.

Q.   And Intel got the rights to use that software in any manner in which it chose consistent with the license agreement?

A.   Yes.

MR. CHARFOOS:  No further questions, your Honor.

THE COURT:  Any further questions?

MR. ARNTSEN:  Just one on smartphones.

THE COURT:  Please.

REDIRECT EXAMINATION

BY MR. ARNTSEN:

Q.  Why did you exclude non-smartphones from your base in evaluating the carrier licenses?

A.  Well, it's a completely different value proposition for the old basic handset than it is for a smartphone. So you wouldn't include smartphones in the kind of calculations that I was being asked to make.

Q.  What do you mean, "a completely different value proposition"?

A.  Well, the real value associated with this technology is for smartphones as opposed to the old kind of phone. It doesn't mean there's no value for the old kind of phone.  But it's a totally different value proposition.

MR. ARNTSEN:  Thank you, sir.

THE COURT:  Very well, the witness is excused.

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you very much, sir.

It's about 10:42.  We'll take our break at this point.  We'll come back at 11 o'clock.  Remember my admonition.

Counsel, remain briefly.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  You may step down.

THE WITNESS:  Thank you sir.

(The witness exits the witness stand.)

THE COURT:  This is out of the presence of the jury.

I want to understand the timing of the need for the Court to rule on these objections with respect to Christopher Foley.  When is he likely to be called as a witness?

MR. CHARFOOS:  Your Honor, we believe if Mformation rests their case, that he may be called today.  Later this afternoon.

THE COURT:  This afternoon.  So this is something we can come to then at the end of the morning?

MR. CHARFOOS:  That's correct, your Honor.

THE COURT:  Okay.  So I won't take it up now.

All right, so I'll see you at 11 o'clock.

MR. McDONALD:  Thank you, your Honor.

(Morning recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Very well.  We're on the record out of the presence of the jury.  I understand that there's

more to the plaintiff's case?

MR. ARNTSEN:  One more video clip, your Honor, about a 40-minute video clip.  One other thing I'd like to do is move into evidence --

THE COURT:  Tell me about that first.

MR. ARNTSEN:  The video clip?

THE COURT:  Yes.

MR. ARNTSEN:  It's David Castell, 40 minutes.

THE COURT:  Remind me who Mr. Castell is.

MR. ARNTSEN:  Mr. Castell is RIM's director of strategy.  He's shown up in -- a number of these exhibits relate to him.

THE COURT:  And this is relevant to?

MR. ARNTSEN:  This is relevant to RIM's dealings with Mformation and the value of the Mformation product.  It's largely relevant to the damage prong.

THE COURT:  Very well.  And then there's some documents to be moved in?

MR. ARNTSEN:  Yes.

THE COURT:  Summon the jury.

MR. ARNTSEN:  We'll just do that with them in here or --

THE COURT:  We'll do that in the presence of the jury.

MR. ARNTSEN:  Okay.

Your Honor, and then we'll be done.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  I understand the plaintiff is offering additional exhibits and then has a videotape of a deposition.

MR. ARNTSEN:  Yes, your Honor.  With regard to exhibits, and these are all exhibits that are either unobjected to or the Court has ruled may be admissible.

153, 174, 197, 200, 327, 328, 329, 361, 364, 2233, 2239, 1036, 2127, 2122, 364, 383, 399, 892, 2069.

And then there are six other exhibits which Mr. Weinstein testified to that were summaries of information that he has reviewed for his calculations, and these -- it's my understanding that defendant may have an objection to it; we'll talk about that.  But those numbers are 2252, 2253, 2256, 2257, 2258, and 2259.  And with regard to those six exhibits, I guess we'll talk about it.

MR. CHARFOOS:  We'll talk about them later, your Honor, on a break.

THE COURT:  Very well.  The ones, other than those six, are in evidence by stipulation.

(Plaintiff's Exhibits 153, 174, 197, 200, 327,

328, 329, 361, 364, 2233, 2239, 1036, 2127, 2122, 364, 383, 399, 892, 2069 received in evidence))

MR. ARNTSEN:  Thank you.

THE COURT:  And you want to introduce the deposition that we're about to see and hear?

MR. ARNTSEN:  I'll leave that to my colleague, Mr. Rodriguez.

THE COURT:  Very well, Mr. Rodrigues.

MR. RODRIGUES:  Thank you, your Honor.

Mformation will be presenting excerpts of the videotape deposition of Mr. David Castell.  Mr. Castell was formerly director of strategic alliances at RIM.

Additionally, Mformation will be publishing trial exhibits and certain pages of Exhibit 314 and Trial Exhibit 319, 326, 330, 331, and 332, which are admitted by stipulation.

(Whereupon, excerpts of the videotaped deposition of Mr. David Castell, taken September 15, 2010, were played.)

MR. THAKUR:  Your Honor, just a couple of housekeeping items.

THE COURT:  Yes.

MR. THAKUR:  The first one was Exhibit 319.

THE COURT:  Say again?

MR. THAKUR:  Exhibit 319, 326, 330, 331, and 332,

those were exhibits used during Mr. Castell's video deposition, we'd like to move them into evidence.

THE COURT:  Very well.  You didn't mention 314, but that was in the list that I was given just a moment ago, but any objection to 319, 326, 330, 331, 332?

MR. MATUSCHAK:  No, your Honor.

(Plaintiff's Exhibits 319, 326, 330, 331, 332 received in evidence)

MR. THAKUR:  We have a handful of stipulations, we'd just like to read them into evidence.  I don't think they'll take very long.

THE COURT:  Very well.  It would also be helpful if they are factual stipulations to provide us in writing so we have them.

MR. THAKUR:  If you don't have any objection, we could agree to provide them in writing if we could introduce them.

MR. MATUSCHAK:  That's fine, your Honor.

THE COURT:  Very well.

MR. THAKUR:  Your Honor, with that -- ladies and gentlemen, your Honor, the plaintiff rests its case in chief.

THE COURT:  Very well.  Subject to the factual stipulations, plaintiff rests.

Members of the jury, it's about noon, and there's

some matters I want to take up with the lawyers. Because I am going to keep our court reporter here, I'd like to take a little longer break, and so let's agree that we'll start at 1:30 rather than 1 o'clock. That will -- that way my court reporter will get a break, equal to ours.

And so we'll resume at 1:30. Remember my admonitions.

DEPUTY CLERK: All rise.

(The jury exits the courtroom.)

THE COURT: We're out of the presence of the jury.

Do you have a motion?

MR. MATUSCHAK: We do, your Honor. We have a written one, your Honor. We can also address it orally. I'd like to focus on one, and I think Ms. DeBruin will read some of the other items that are part of our motion.

THE COURT: Very well. Where is the written?

MR. MATUSCHAK: I think, your Honor, it's in the process of being finalized.

THE COURT: Very well.

MR. MATUSCHAK: It should be ready very shortly.

THE COURT: You don't have it yet?

MS. DeBRUIN: I have a draft right here, your

Honor.

THE COURT:  I don't want a draft, you may change things I rely on.  Rather than argue it, perhaps it would be helpful to the Court to have a postcard version of your motion, simply tell me your grounds.

MR. MATUSCHAK:  Well, there is one area.

THE COURT:  Come up to the microphone.  Go ahead.

MR. MATUSCHAK:  Thank you, your Honor.  There is one area where we'd like to focus.  We can just list off the other ones if you'd like orally, but there's one part that is very critical to our motion.  I'd like to briefly in three or four minutes address that, if I can.

THE COURT:  Certainly.

MR. MATUSCHAK:  Your Honor, one ground for our motion for judgment as a matter of law is on this issue that the plaintiff has failed to establish that the accused RIM product establishes a connection within the meaning of Claim 1 of the '917 patent.  Their case is built on a fundamental and fatal flaw in applying the Court's claim construction, and that is:  That the establishing a connection element of Claim 1 does not require a connection actually be established.

That is not the Court's construction.  And there are at least three reasons for that.

First, the Court's construction is initiating a

communication between a wireless device and the server. Between a wireless device and a server. That alone demonstrates that there has to be a connection between those two elements before you can move on to the next step of transmitting the information.

Two. The Court has clarified that instruction by saying that establishing a connection step has to be before the transmitting step can begin. And completing the establishing and connection step has to mean, it does mean, establishing a connection.

Three. If there were any doubt about that, the "wherein" clause confirms this. Because the "wherein" clause says: "Wherein the connection is established based upon a threshold condition."

And I would point out also that the only part of the specification of this patent that talks about the establishment of the connection columns says a connection is established.

Dr. Madisetti's theory is that a connection is initiated when a GME package is created in the BES. And/or when the router from the BES decides whether to take the WiFi path or the cell network path. But even if you could say that that's initiating, and we think that clearly you cannot, there is no evidence that any connection in the evidence that's been presented, that

any connection is established before the transmitting step.  It is a whole -- a complete absence of evidence and analysis in Dr. Madisetti's testimony, because he says that a connection does not need to be established.  He was quite clear about that yesterday.  He said you could establish a connection, you could meet that element with a nonexistent device.  And that establishing a connection does not mean that you have to establish a connection.  Those are direct quotes from his testimony.

And so as a result, of course, he has provided no evidence that a connection is established, and that missing piece of his analysis is fatal to Mformation's infringement claim, and there is simply no issue for the jury on that point, your Honor.

I think Miss DeBruin will address our other items.

MS. DeBRUIN:  Your Honor, RIM moves for judgment as a matter of law on Mformation's claims for contributory infringement and induced infringement.  Those are all of Mformation's remaining infringement claims.

On willful infringement, reasonable royalty damages, a permanent injunction, and also on Mformation's claim that the '917 patent is entitled to

claim priority to Provisional Application No. 60/251034.

RIM is entitled to judgment as a matter of law when each of these items, because Mformation has not met its evidentiary burdens.  I will go through our ground for requesting judgment as a matter of law for each of these claims.

With regard to both contributory infringement and induced infringement, RIM is entitled to judgment as a matter of law on these claims for four reasons:

First, Mformation did not provide sufficient evidence to meet its burden proving that use of RIM's accused products can practice each and every step of Claim 1 of the '917 patent in accordance with the Court's constructions.

Specifically, Mformation did not provide evidence that use of the accused products meets several limitations as construed by the Court.  My co-counsel just went through one of those limitations.

In addition, Mformation did not provide evidence that use of the accused products meet the additional limitations of server -- first, server; second, placing a command for the wireless device in the box at the server.

Two, without a request from the wireless device delivering the command from the mailbox at the server to

the wireless device.

Three, without a request from the wireless device establishing a connection between the wireless device and the server.

Four, without a request from the wireless device transmitting the contents of the mailbox from the server to the wireless device.

Also, wherein the connection is established based on a threshold condition.

Second, Mformation did not provide any evidence supporting its claim that use of RIM's products infringes under the doctrine of equivalence.  Since they had the burden on that and did not present any evidence, RIM is entitled to judgment as a matter of law on that claim.

RIM previously moved for summary judgment on the doctrine of equivalence, and Mformation elected not to present the evidence it pointed to during summary judgment and has abandoned that theory.

Third, since Mformation's claims are for direct infringement, Mformation had the burden to prove each instance of underlying direct infringement by a third party to support those claims.  Mformation did not provide substantial evidence of any instance of direct infringement.  Mformation called Mr. Hatcher and

Mr. Wilson to testify about their use of the BES, but neither of them testified that they had used an accused version of the BES in the specific manner that Mformation contends infringes.  So Mformation has not presented substantial evidence of any third party performing each and every step of the claimed method.

Fourth, to prove both contributory and inducing infringement, it was Mformation's burden to show that RIM had knowledge of the '917 patent prior to this lawsuit.  Mformation did not provide substantial evidence to meet that burden.

These four grounds entitle RIM to judgment as a matter of law on Mformation's claims for both contributory infringement and induced infringement.

With regard to Mformation's claim for contributory infringement, RIM is further entitled to judgment as a matter of law on an additional ground, which is that Mformation did not provide substantial evidence to meet its burden of showing that the accused products do not have a -- have substantial noninfringing uses.

THE COURT:  Let me anticipate the rest of your argument and say that I have a flavor for argument, and I will look forward to reading it.  And --

MS. DeBRUIN:  Thank you, your Honor.

THE COURT:  And actually, I thought that your colleague's presentation with respect to the establishing a connection step is something that I've been listening to, so I'd be interested to hear any verbal response from the plaintiff.

MS. DeBRUIN:  And, your Honor, we'll preserve our rights as to everything when we submit our briefing later this afternoon.

THE COURT:  Yes.  Of course.

MS. DeBRUIN:  Thank you, your Honor.

MR. THAKUR:  Thank you, your Honor.  Your Honor, this Court has construed the claim term of "establishing a connection" as initiating wireless communication between the server and the wireless device.  You heard Dr. Madisetti testify extensively about how that step is performed.  In fact, he got on the board and actually elaborated in writing using a pen to explain how that is completed.

What RIM's counsel is arguing is trying to go back to the words as not construed -- as if they were not construed.  What Dr. Madisetti didn't understand is to use the term as construed by this Court, and we believe he met his burden.

THE COURT:  You agree, however, that his opinion is that the step, the limitation, of establishing a

connection may be infringed if there is no connection?

MR. THAKUR:  Your Honor, that's not correct. Your connection is initiating wireless communication. And he said that is what is done.

THE COURT:  I'm not sure that we're on the same page.  In other words, do you believe that the evidence has established so that a reasonable juror could conclude that the RIM product practices the "wherein" clause, which requires that a connection be established, in the past tense?

MR. THAKUR:  Your Honor, I do believe he has testified to that effect.

THE COURT:  All right.  And so your claim is that a connection must be established?

MR. THAKUR:  Correct.  That step is complete.

THE COURT:  Say again.

MR. THAKUR:  That step is performed.

THE COURT:  All right.  And do you tender to the Court that you believe the evidence establishes that that is done before the transmission of the command?

MR. THAKUR:  Absolutely, your Honor.

THE COURT:  So I guess I can get a copy of the transcript of his testimony.  I am a little bit confused because of the way the case has developed with respect to, first, how the RIM device operates.  As I understand

it, this UDP protocol should be the focus of the Court's consideration as to whether or not the use of that protocol meets the limitations of the claim.

MR. THAKUR:  Your Honor, that's correct.  We believe we've presented plentiful evidence.

THE COURT:  And there were various explanations of the UDP protocol.  Some of which characterize it as not requiring a connection.

MR. THAKUR:  Your Honor, that's not correct.  UDP is a connectionless protocol.  It does not say it does not require a connection.

THE COURT:  But there have been slides that I've seen where it says you don't require a connection.  But I understand.  The more precise question I have is whether or not it requires a connection as the Court has understood the term as used by the inventor, inventors, prior to the transmission of the command?

MR. THAKUR:  That is correct, your Honor.

THE COURT:  And I thought that what I was hearing is that the protocol is the transmission of the command simultaneously with the -- what the witness testified as the act of establishing a connection.

MR. THAKUR:  Your Honor, that's not what he testified.  What he testified is establishing a connection is completed and that transmission begins.

THE COURT:  Right, but I'm trying to understand whether or not you believe that you have presented evidence, not that the initiation has been completed prior to the transmission.  But the connection has been established in the threshold condition use of the word prior to the transmission of the command, as opposed to simultaneously with the transmission of the command.

MR. THAKUR:  Your Honor, we do, and I specifically identified that diagram where he expressed not only initiating wireless communication, but the selection of the port, which would be the "wherein" the connections are established, based on threshold condition.

THE COURT:  But is the selection of a port a process that is completed after a connection is established?  Or before a connection is established?

MR. THAKUR:  The element requires wherein the connection is established --

THE COURT:  I didn't ask that.  I asked, is a selection of a port in the RIM device something that is done before or after a connection is established?

MR. THAKUR:  Your Honor, the connection's established based on that.  So when that is done, that is when connection's established.

THE COURT:  And how are you defining "connection"

in that regard that can that go the ability to send the -- transmit the command out of the BES to the handheld?

Do you have in mind a legal definition of "connection"?

MR. THAKUR:  Your Honor, actually I have your construction, which is --

THE COURT:  I do define "connection."

MR. THAKUR:  You did, your Honor.

THE COURT:  What did I define "connection" as?

MR. THAKUR:  You said "establishing a connection."

THE COURT:  I do define "connection."

MR. THAKUR:  Not the word, solely, by itself.

THE COURT:  I've several times asked if further instruction is requested.  The word "connection" has not been asked to be construed by itself, nor have I construed it, but maybe I have.  That's why I asked the question.

MR. THAKUR:  You have not, your Honor.

THE COURT:  And then so your proffer is that the word "connection," which is a common term, has a meaning, and what is the meaning to which you wish the Court to use in determining whether or not your evidence satisfies the requirement that it approve that the RIM

device practices that --

MR. THAKUR:  Your Honor, undefined, the word "connection" means -- I'm saying without a Court's claim construction, I believe the plain and ordinary meaning of "connection" is connection, and we have shown adequate RIM documentation to show that they actually adopt that word, they used it in their source code, their documents, in their own literature.

MR. MATUSCHAK:  Your Honor, I have about just a couple of quick responses.

THE COURT:  Just a moment.  Let me finish here.

You agree that the threshold conditions are conditions on the connection?

MR. THAKUR:  That is correct, your Honor.

THE COURT:  And so they are things that have to be satisfied before there's -- before there is a connection.

MR. THAKUR:  Before a connection is established, correct.

THE COURT:  And before there is a connection, it says, Whereas, the -- not before -- whatever establishing connection.  I remember in the pretrial portions of this case, you very elegantly argued that "establish a connection" is different from "having established a connection."  That is an early phase of

the connection process, and that -- but -- and it doesn't necessarily speak to the end of the process where the connection is established.

And so I'm trying to listen hard to your words to -- because sometimes I think you are still referring to the early phase; that is, initiating as being synonymous with having made it. And it seems to me that there is a difference between initiating a connection, which is what you convinced me to use for establishing, and the connection being established, which you argued is something that comes with reference to the threshold condition, and it sounds as though you are at this point accepting the notion that in order to practice this patent, a connection does have to come into existence. It has to move beyond the initiating to the point of actually having a connection.

MR. THAKUR: Your Honor, we concede that, correct.

THE COURT: And you -- do you accept that that condition of being connected has to be satisfied in the patent before the transmission?

MR. THAKUR: We do, your Honor.

THE COURT: And so --

MR. THAKUR: Let me be clear about that. We do based on the Court's claim construction.

THE COURT:  You may be arguing about my claim construction.

And so your response to the motion is, if I read the evidence, upon which the motion was based, I will find an opinion by the technical expert that you've tendered that the process has progressed to the point where a connection is enough in existence prior to the transmission of the command?

MR. THAKUR:  That is correct, your Honor.  And I specifically refer you to that diagram that Professor Madisetti drew, where he showed establishing a connection, and he showed the threshold condition where the connection's established before transmission began. The command leaves -- the server software, that's when transmission is occurring.  Before that the two steps are establishing a connection, initiating wireless communication, and the threshold condition have been satisfied.

THE COURT:  I've observed several other things about this that are not pertinent necessarily to the motion, but I wanted to at least observe that I've heard testimony with respect to the handshake technology. That is, the TCP, I guess.  And there are other aspects of this that I am puzzling through with respect to the requirement that certain of the steps be done without a

request from the wireless device.  This is a patent as I have come to understand it, which does not require as one of its steps the acknowledgment by the handheld device that it has received the command.

MR. THAKUR:  Your Honor, that's a dependent claim to that effect.

THE COURT:  I know.  But I'm talking Claim 1.

MR. THAKUR:  Correct.

THE COURT:  I know that Claim 6 talks about execution, but in execution, I'm not sure that execution is necessarily acknowledgment that you received the command.  Because that seem to me to come before execution.  But I am just trying to --

MR. THAKUR:  Maybe I could clarify.  There are two acknowledgements:  The handheld gets the command, and the accused product doesn't perform an acknowledgment saying they got the command.  That isn't relevant to the issues in this case.

THE COURT:  I'm talking about the patent itself. There is no step in the patent that discloses acknowledgment of the command prior to execution.

MR. THAKUR:  Your Honor, I just use the phrase a little bit differently.  I say there is no acknowledgment prior to execution in the claims of the patent, correct.

THE COURT:  Right.  Well, that's where it would have to come.

MR. THAKUR:  Right, that's where it would have to come.

THE COURT:  And in Claim 1, there is no feedback at all with respect to the receipt or the execution.

MR. THAKUR:  That is correct, Claim 1 does not require that.

MR. MATUSCHAK:  Your Honor, just briefly, I think you put your finger right in the soft spot of the plaintiff's case, and that is, their definition, Dr. Madisetti's definition of establishing a connection always stops with initiating.  If the plaintiff pointed to that diagram, no matter how long you look at it, you will not see the BlackBerry device.  It stops at the server.

And the Court has said -- I don't think there's any need to construe anything else.  The Court has already said that you have to complete that establishing a connection step before you go on to transmission.  And that's -- that's where they fail.

And when he talks about that "wherein" clause, he uses the same definition.  He said, Dr. Madisetti used the same definition of, well, establishing connection needs initiating.  Initiating happens.  And therefore

that step is met too.

THE COURT:  I understand that from your argument.

And I understand that from your argument, it sounds as though your argument is that since establishing a connection is initiating, the threshold condition is always satisfied in your argument at initiating.

MR. THAKUR:  No, that is not -- the threshold condition is satisfied before transmission begins.  So the connection is established before the transmission begins.

THE COURT:  And what is the -- what was the evidence with respect to how the RIM device satisfied that?

MR. THAKUR:  The selection -- your Honor, we saw four least -- excuse me, four threshold conditions.  And those were checked before transmission began.  So the specific one that he drew on the board was those two ports where you selected the least cost routing.

THE COURT:  You said "before transmission began." But had a connection been established?

MR. THAKUR:  That's the thing, your Honor, connection's established when the threshold condition has been satisfied so transmission can begin.

THE COURT:  All right.  So let me ask it this

way:  If, as I understand it, one of the examples given in the evidence as to the threshold condition is whether to use WiFi or cellular, that is a decision that is made at the server or router.  I can't remember which.

MR. THAKUR:  At the server.

THE COURT:  So the server says, I'm going to do one or the other.

MR. THAKUR:  Correct.

THE COURT:  Why is it necessary for the server to have connected with the device if, for example, the document says to use cellular --

MR. THAKUR:  Your Honor, because that's the -- the connection is completed there.  When you pick the cellular network, at that point the connection has been established and transmission can begin.

THE COURT:  So that again takes me back to what you mean by "connection."  Because if you send it out cellularly, the very sending is the connection.

MR. THAKUR:  The sending is the connection, going over the network is the transmitting.

THE COURT:  I understand.  So sending is a connection.

MR. THAKUR:  Correct.

THE COURT:  So you're defining "connection" as the act of sending.  Thank you.

MR. MATUSCHAK:  I would just point out, your Honor, that Dr. Madisetti also testified with respect to this UDP protocol, that sending and the connection remained --

THE COURT:  I thought that's what I heard, just based on the nature of the technology.

MR. THAKUR:  Your Honor, that --

MR. MATUSCHAK:  That's exactly what you heard, your Honor, and that's why he doesn't meet your Honor's construction, that the establishing step has to come before transmit.

MR. THAKUR:  Your Honor, they're taking one sentence out of context that he explained in his deposition, and that was done before the Court issued its claim construction.  So to use that -- those words from where he did not have an opportunity to fully explain why he did not have the benefit of Court's claim construction will be highly improper.

THE COURT:  I guess I should have had a tutorial for the trial on UDP versus TCP, and I had a little bit of knowledge about that, but as I understood the UDP protocol, the command is packaged with a header.  You don't send something and then later send the command. It seemed to me that, as I understood it, the information that you want to send is sent at the same

time as the address to which you want to send it.

MR. THAKUR:  That's true for all, your Honor, both TCP and -- you take the command --

THE COURT:  Well, no, my understanding with TCP is before you send a command you do this handshake, Are you there, it says I'm here, comes back, then you send it.  But there is something previous to the transmission of the command.  Now, maybe I'm wrong, but that's the difference as I understand it.

MR. THAKUR:  The TCP involves a quick check to make sure someone's available, but neither the header nor the payload is involved in that process.

THE COURT:  I don't know about headers and payloads, but there is what you would understand and as I understand to be a connection.  There's a different kind of connection, but the TCP makes a connection, and holds on to it once it's made.

MR. THAKUR:  You may have hit the spot.  The TCP's a connection; UDP's a connection.

THE COURT:  Well, I understand they're both ways of transmitting.  The question becomes, whether or not UDP makes its connection prior to the transmission of the information that it wants to send and -- the command.  Or whether it's done simultaneously.

Now, I don't know enough to know whether it's

sent on the same channel or in the same medium.  It just seemed to me that as I understood UDP, there is a package, and the package includes the place to which it wants to be sent and the information that is being sent.  It's part of a package.  As opposed to, when I say "prior to" and "completed it," I'm trying to differentiate between TCP, where you establish a connection and you hold onto it, and then in a separate step, you send the information as opposed to at the same time.

Do you understand the difference?

MR. THAKUR:  Your Honor, yes, and I think it's very important and it will become very clear during the course of RIM's case, that the patent unambiguously covers both those structures.  Where you hold onto it or you don't hold onto it.  It's in the patent itself.

THE COURT:  I'm making my judgment based on your case, if the question that I'm asked to decide on this motion is really whether or not the UDP protocol practices the step of having established a connection based on a threshold condition prior to the transmission of the command.  That's really what it seems to me it comes down there.

And the issue that is troubling to the Court, quite frankly, is that the establishing a connection

substep, although presumably requiring some initiation of it, also presumably requires some end, and the end has to be the existence of a connection.

And the question then becomes, whether the existence of a connection, however that's defined, must be presented prior to the transmission of the data as this inventor has put it together, because if you say that threshold conditions have to be met prior to the connection, then it seems to me that that implies a connection.

There's no step -- contrary to the motion, quite frankly, there is no step, separate step, that recites making a connection.

MR. MATUSCHAK:  Well --

THE COURT:  But it is implied in the language of the claim that there is a connection, because you cannot know whether or not your threshold conditions are satisfied based on preconditions -- you can't know whether the connection is established based on preconditions, unless you know there is a connection. And so there is a connection that is implied in that.

And so then the question becomes, what is a connection?

MR. THAKUR:  Your Honor, you actually said this in your own claim construction.  It is not -- in fact,

your Honor, in the claim construction order you said, it is not setting up a connection path, it is using existing communication channels.  I would have preferred it if you had actually --

THE COURT:  I understand that, but that was my construction of "establishing."  Not of "connection." In other words, I used the phrase "establishing a connection," but I was trying to answer the question the parties put to me of, well, if the inventor uses the term "establishing a connection" at one limitation and uses the phrase "established" in another phrase, shouldn't you give the inventor the benefit of saying this doesn't -- the establishing step can actually be something that initiates and started to use it, but at the same time, you can't say that that is satisfied, that satisfies the connection being established. Because this can happen without the connection coming into existence.  But the other must always have the connection in existence because you need to measure whether the threshold condition has come before or after that point.

MR. THAKUR:  Your Honor, I personally felt that you had it right in your claim construction order when you said it is using communication channels.  When you say it is using and establishing.  What I would have

thought would have been ideal was to have said using communication channels and where the threshold condition is --

THE COURT:  Say again?

MR. THAKUR:  If you had said, Wherein, establishing a connection is using an existing communication channel, and wherein, a threshold condition established is using an existing communication channel.  So you would have gone from the act of doing something to having done something.

THE COURT:  That's why your definition of "connection" is send.  In other words, that I want to study because perhaps you have met your burden of proving that they do send something.

MR. THAKUR:  Yes.

THE COURT:  But the question then becomes whether or not the sending is -- practices the patent.

MR. MATUSCHAK:  And, your Honor, on that point, patent claims are always drafted with the "ing," but I think as your claim construction already says, there has to be an end point to the establishing step before you transmit.  And that's all that the patent discloses.

The patent says -- there's about three lines in the patent that says all there is to say about this.  And that is, a connection is established.  That's what

you have to do.  Otherwise, if you don't have a connection actually established with the device, and I think all these things are hard enough with claim constructions already, then you end up with the absurd result, which is you are establishing a connection with something that doesn't exist, as Mr. Madisetti testified to.

And I would point out with respect to the UDP protocol, whether that protocol transmits and establishes at the same time does not depend on the Court's claim construction.  It is a matter of science.  And to suggest that Dr. Madisetti's opinion would change from the Court's claim construction, I think he should be allowed to do.  And the doctor, whatever he says, cannot create a triable issue of fact by contradicting his own deposition testimony.  I think there's established law for that proposition.

THE COURT:  Just for planning purposes, I'm the beneficiary of a public education.  So I can tell you now it will take me awhile to think about this.  You should plan on opening your case with the motion under submission.

MR. MATUSCHAK:  Thank you, your Honor.

MR. THAKUR:  Thank you, your Honor.

(Luncheon recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Please be seated.

Before we bring the jury out, the Clerk of the Court reminded me that I had raised the question of Mr. Foley and said we would deal with it at the end of the morning, and then it went out of my mind.

I take it from the paper that I read that he was not disclosed as an expert witness, and the objection is to his giving expert testimony, and I take it that there is no dispute that he wasn't disclosed as an expert witness and should not be called upon to give expert testimony.

MR. CHARFOOS:  That's correct, your Honor.  We do not intend calling him as an expert in any way.

THE COURT:  All right.  So, because -- what part of his testimony is the objection directed?

MR. McDONALD:  Sure.  So, your Honor, Mr. Foley, based upon his deposition and based upon the demonstratives that RIM has disclosed, I believe they're going to have him present testimony as to the internal operations of the RemoteWare software.

THE COURT:  What does that mean, "internal operatives"?

MR. McDONALD:  Sure.

Chris, could you please bring up Exhibit B to our

brief.

MR. CHARFOOS:  Here are the demonstratives, your Honor.

THE COURT:  All right.

MR. McDONALD:  These same demonstratives are in RIM's technical expert's demonstratives about their RemoteWare product depicting inside of that box labeled "RemoteWare server."  Section 1, 2 and 3.  And Section 1 is broken down to Events 1, 2 and 3.

Mr. Foley seeks to testify as to the internal workings of what's going on inside the software.  It's admitted he never reviewed the source code.  He doesn't know what's going on in there.  He described the internal machinations of the system as, quote, gobbledygook, during his deposition, and we think presenting such testimony to the jury would be an invitation -- it would be an invitation to decide the anticipation issue on a legally erroneous ground.  He cannot testify as to what's going on inside of the RemoteWare product.  At most, he could testify to what he saw as it was operating on screen.

THE COURT:  Let me hear a response.

MR. CHARFOOS:  Yes, your Honor.  It's not true that Mr. Foley doesn't know what's going on.  Mr. Foley worked for the company at XcelleNet for 11 years.  He

began as a systems architect.  Became a product line manager and then on.  In that role, both technical and in product development, he became very familiar with the RemoteWare product.  Both how it worked, how it functioned and the inner workings of it, as he was the product line manager, he was in charge of helping to develop further generations of the RemoteWare product. He explains that he had to know the DNA, he had to know the bones and he had to know now it worked inside.  He is going to testify as to what he rationally perceived in the system.

There's no requirement that he review the source code to understand that.

THE COURT:  Let me say, if I can parse this out quickly, the question of whether or not he has to look at source code isn't determinative.  The question becomes whether or not what you're proffering him for is technical scientific or whatever that needs to have him qualified.

Now, we have had from the plaintiff witnesses who have testified as lay people, as I understand it, how things operate.  They see screenshots, they explain what happens next.  And so if one part of his testimony is simply to say how RemoteWare operated in the same sense as how the RIM software operated, I don't hear an

objection to that.

MR. McDONALD:  I do have an objection to that, your Honor.  The issue of inducement is a -- for plaintiff's infringement claim.  And what Mr. Hatcher and Mr. Wilson described is how easy it is to perform enterprise activation wirelessly using the graphical user interface.

THE COURT:  They said how it was done, and then they were allowed to testify as a matter of opinion, they made an opinion that it was easy.

MR. McDONALD:  The facts of their testimony to the steps taken, and the system as it was constructed by RIM to naturally lead them through the process with click menus and drop-down bars, that goes to inducement, how easy it is to perform the steps.

THE COURT:  But that's lay testimony.

MR. McDONALD:  Correct, your Honor.

THE COURT:  So I don't know whether or not you were interrupting me to say you have an objection to this witness doing the same thing with respect to RemoteWare.  Because if he is, he's free to do that.  That objection is overruled.

MR. McDONALD:  If I could explain briefly, your Honor, his attempt in that regard would be objectionable because the issue of inducement is not at issue with

regard to the prior art.  It's merely the contents of the system, and the steps that occur inside the RemoteWare server.

What he sees on the screen is completely irrelevant to whether the RemoteWare system anticipates the claim.  The claim is to a method.  And as described in the key case on this, it's the case we cite in our brief, *Hilgrade v. McAfee*, they sought to present testimony almost exactly to what Mr. Foley will provide.  What was seen on the screen.

The Court excluded that testimony, or chose not to rely upon it, and this was affirmed by the Federal Circuit in that point, stating that what the user sees on the screen is completely irrelevant to whether a method claim is practiced for steps inside the software.  Mr. Foley has no idea what happens inside the software.

MR. CHARFOOS:  Your Honor, that's just not correct.

THE COURT:  I'm not sure that I need to hear more argument now with respect to this.  Is he going to testify as your first witness?

MR. CHARFOOS:  He will not be our first witness, but he will be one of our first witnesses.

THE COURT:  What I'll do, in fairness to the jury, since they're standing by, is listen to the

questions.  As far as I'm concerned, a layperson can, who works at XcelleNet -- is XcelleNet the owner of RemoteWare?

MR. CHARFOOS:  It's been through a bunch of name changes, but the answer is essentially yes.

THE COURT:  All right.  So I am concerned to have someone who is technically trained tendered as a lay witness.  It just seems to me that it's fraught with peril because they always will go in and out with respect to opinion testimony, which is what the rules -- the rules are designed to avoid without disclosure.  And fact testimony.  And I think even some fact testimony about technical matters needs to be qualified because it's imbued with opinion.

But if he limits himself as I have indicated as the other witnesses, to simply say what I can do with the system -- now, the fact that this is a method claim, it seems to me makes it relevant to have someone say whether they can wirelessly register, whether they can wirelessly do various things.  That is something someone can testify about.

Now, to the extent the questions go into, well, what is the software that causes it to do those things?  So far as I am concerned, that's -- and I've said this before -- that's not what this case is about.  This case

is a method claim.  It's not a copying claim of software, it's not a copyright claim.  It's whether or not this method as disclosed in the patent is done by the various devices and in the various times and places as disclosed in the patent.  And if there is a prior system that does these various things, that's pertinent evidence the jury ought to see.

And so to the extent you have an objection to his rendering of an opinion, make it at the time, and I'll listen and by the end make up some decision.

It seems to me also that if you have an expert who has already studied the RemoteWare, I worry about the cumulative nature of someone now coming in and saying, Let me now tell you again that.  But I'll worry about that when the time comes.

MR. McDONALD:  So we have a continuing objection, then, for the use with Mr. Foley of this demonstrative because he has no knowledge of what's occurring inside the RemoteWare server which is depicted inside that server box.

MR. CHARFOOS:  Your Honor, if I could just be permitted to read a section of his deposition, he made it very clear that he could actually go in, without looking at the source code, he could go into the session logs and go into the directory structure, and he could

see what was going on in these queues.  And he does understand how the system operates and how it works.

THE COURT:  I would prefer if those were expressed in what he did.  That makes it facts.  As opposed to what he could do, which is opinion.

And I'll listen, as I said, to what comes in. You're bringing this to me in the middle of trial, and I'm not going to take much more time at this point.  If he hasn't come on by the end of the day, I'll bring it up.  If you had brought this back to my mind before we took our lunch break, I would give you more time.  But with the jury waiting, let's get started.

Summon the jury.

MR. McDONALD:  Thank you, your Honor.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  The plaintiff has rested.

I will call on the defense to call their first witness.

MR. MATUSCHAK:  Your Honor, RIM calls Carl Cherry.

(Witness sworn)

DEPUTY CLERK:  Please be seated.

Please state full name and spell your last name.

THE WITNESS:  Full is Carl Lloyd Cherry,

C-h-e-r-r-y.

MR. MATUSCHAK:  Your Honor, may I approach?

THE COURT:  Sure.

CARL LLOYD CHERRY,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MATUSCHAK:

Q.  Good afternoon, Mr. Cherry.

A.  Good afternoon.

Q.  How old are you, sir?

A.  I'm 54.

Q.  Where do you live?

A.  I live in Waterloo, Ontario, Canada.

Q.  Are you currently employed?

A.  Yes, I am.

Q.  And by whom are you employed?

A.  By Research In Motion.

Q.  What's your current position at Research In Motion?

A.  My current position is a technical director of the
strategic research group.

Q.  And what are your responsibilities as technical
director of strategic research?

A.  My responsibilities are to research new technologies

and to potentially research new product ideas, and to also at times write up prototypes to demonstrate those ideas.

Q.  How long have you been employed by RIM?

A.  I've been employed by RIM for slightly over 12-and-a-half years.

Q.  So when did you start?

A.  I started in early November of 1999.

Q.  Why did you join RIM at that time?

A.  Well, I had already been a software developer for approximately eight years at that point.  And I'm one of those software developers, I love to write software, love the challenge of solving problems, and I was looking around for a new opportunity, and I happened to notice on the web that Research In Motion had a lot of job opportunities, and it looked like a very exciting company.  They had jobs, they had hardware engineering jobs and they had operating systems jobs and they had server engineer jobs.  So it just looked like a great place to work, a great new challenge for myself.

Q.  Was there any particular incident that caused you to decide to join RIM?

A.  Well, I had a former colleague of mine, I had been e-mailing him, and he responded in one of his e-mails that said that he was at the dentist's office and that

he would have to get back to me later and I noticed the signature at the bottom of his e-mail saying, "sent from my BlackBerry handheld." and it's the  first I'd really seen the evidence of what the product did at Research In Motion.  And it was just, it seemed like something very exciting.  Everyone at the company got a BlackBerry and great work to do.  So that's when I decided to send my resume in and try to get a job there.

Q.  Now, we're all used to sending e-mails from our mobile devices or from wherever we are today.  Why did that have such an impact on you back in 1999?

A.  Well, it is true today that most people it seems like have a device that has a data plan on it, perhaps they can get e-mail, they can browse the web.  And that seems pretty common today.

But back in 1999, there was no such -- in fact, the carrier members didn't even have data plans.  This was prior to all of that.  Research In Motion was the pioneer in creating mobile e-mail such that, you know, a small device people can carry with them in the airport or wherever they were, so it was really exciting and innovative and I really wanted to work there.

Q.  All right.  Now, let's talk a little bit about background.  Would you please briefly describe for the jury your educational background.

A.  I have a Bachelor of Theology degree.  I also have a Bachelor of Arts with a major in computing.

Q.  Where did you obtain those degrees?

A.  Bachelor of Theology from London Baptist Bible College in London, Ontario, and Bachelor of Arts, Wilfrid Laurier University in Waterloo, Ontario.

Q.  Sounds like you had a change in career there?

A.  Yes, I did.  Sometimes things don't work out in life the way you want.

Q.  You said you were involved in software with another company before you joined RIM.  Do you write software?

A.  I do write software, yes.

Q.  What does that entail at a general level?

A.  I suppose at the simplest level, I would say writing software entails editing something we call source code, and to try and solve a problem or try to expose a feature, and that source code is then compiled into machine language code, which then will run on someone's computer or BlackBerry or what-have-you.

Q.  You said "compiled."  What does that mean?

A.  Well, compiled, essentially taking the source code and has to interpret it from an English written language or, you know, a text file that's written, that's human readable, and then convert that to something that's machine readable.

Q.   And when you say "machine readable," you're talking about like the zeros and ones that a computer will understand?

A.   Yes, I am.

Q.   Now, let's go back to 1999.  You decide to join RIM.  What was your job when you joined RIM?

A.   When I first started at RIM I was a software developer, and I joined the BlackBerry Enterprise Server team.

Q.   And how long did you work on the BlackBerry Enterprise Server team?

A.   Over the course of my 12-and-a-half years at RIM, I've spent approximately 10 years on the BlackBerry Enterprise Server team.

Q.   And have you worked on -- what was the BlackBerry Enterprise Server version when you started?

A.   When I first started the version was 1.6.

Q.   And have you worked on all the versions of the BlackBerry Enterprise Server from that -- at least 5.0?

A.   I have, yes.

        MR. MATUSCHAK:  Now, if we can get the slide up, please.  304.

BY MR. MATUSCHAK:

Q.   Now, sir, I put up on the screen a demonstrative.  I know we've been talking about the BES, BlackBerry

Enterprise Server.  Is that the BES on the left?

A.   Yes, it is.

Q.   Can you give the jury, please, just a high level overview of what is depicted on this slide?

A.   Well, what this slide is depicting is a simplified view of how the BlackBerry system works, including the BlackBerry Enterprise Server on the far left, and a system in the middle called a BlackBerry Relay, and then ultimately on the far right we have a BlackBerry device which is what the users of the system actually are more involved with.

Q.   And is this how messages are sent from the BES to the BlackBerry device over the cell network?

A.   Yes, this is a demonstration of that, yes.

Q.   So the BES on the left, where physically is that located in real life?

A.   The BES is physically located in a customer's server.  Like installed on one of their servers.  And in whatever -- sometimes they call it a server farm or a room that has servers.

Q.   And who owns those servers?

A.   Those servers are owned by the corporation that has purchased the BlackBerry server.

Q.   So like if it's Bank of America, these would be Bank of America servers?

A.   That's correct.

Q.   With the Enterprise Server software?

A.   That is correct.

Q.   Okay.  Now, above the BES you have an envelope with "GME" written on it.  First of all, what does "GME" stand for?

A.   Stands for "Gateway Message Envelope."  It is a protocol that was developed by Research In Motion.

Q.   And what happens -- could you just describe, what is the envelope with "GME" on it supposed to signify above the BES there?

A.   Well, the envelope is -- I'm showing it here to indicate something similar to a letter, so in older days -- I shouldn't say in the old days -- but in past times people used to write a letter, they would fold that letter up, they would put it in an envelope, and then they would write addressing information on the outside of the envelope.  Who the message is to and who the message is from.

     And this is a protocol that does something very similar to that.  You know, the message itself is encrypted, which would, you know, be similar to be when you close the envelope and you seal it so now no one else can read it.  And then again on the outside of the GME packet, there is header information which would be

who it's to and who it's from.

Q.  And what happens with this GME envelope when it leaves the BES?

A.  The BES then will send that GME envelope to the BlackBerry Relay service over the TCP protocol.

Q.  Is that the blue line that you have there?

A.  That's correct, the blue line, TCP protocol.

Q.  Is that a wired or wireless line from the BES to the Relay?

A.  That is wired.

Q.  And can you tell the jury, please, what is the Relay.

A.  The Relay is a set of services that are owned and operated and created by Research In Motion.

Q.  Is the Relay located in the same place as the BES?

A.  It is not.

Q.  And who owns the Relay?

A.  The Relay's owned by Research In Motion.

Q.  And could you explain what the purpose of the Relay is?

A.  The purpose of the Relay is to do several things.  I can touch on a few of them.  One is to provide some security to our system.  Just like you don't like to get spam e-mail now in your inbox, you wouldn't want to get unsolicited messages sent to your BlackBerry device.  So the Relay is the only way to get information to the

BlackBerry, to have information pushed to the BlackBerry device.  And the Relay only allows BES servers that in fact are authorized to connect to send data through it.  So that's the one purpose.

Second purpose would be that the Relay over the years has been able to hide the complexity of communicating with all the various carrier networks such as those operated by AT&T and Verizon, and earlier on the Mobitex network.

Q.   Why would you want to hide the complexity?

A.   Well, especially in the earlier days, there was different protocols that might be used to talk to the various networks.  We used the Mobitex network and the Datatech network, and then the other carriers such as, again, AT&T and Verizon were starting to add data capabilities to their networks.  So all the protocols were slightly different.  And so this hides that complexity so corporations don't have to worry about it.

Q.   All right.  And I'm sorry, I interrupted you.  Were there any other major purposes --

A.   Other purpose then sort of the direct sending and receiving of datagrams between the Relay on the device.

Q.   Does any message or command sent from a BES to a BlackBerry over the cell network have to go through the Relay?

A.   Yes, it does.

Q.   Okay.  Now, on the slide, the GME envelope above the Relay, there's a blue circle around it that says "UDP protocol."  Do you see that?

A.   Yes.

Q.   What is that supposed to signify?

A.   It basically signifies that the way that the BlackBerry and the device send packets to each other is such that they use the UDP protocol.

Q.   And what does "UDP" mean?

A.   UDP stands for "User Datagram Protocol."

Q.   Now, you talked about the GME protocol, the UDP protocol.  I see actually you have the TCP protocol up there too.

A.   Right.

Q.   Is it common to use different protocols for different things?

A.   Yes, it is common.  It's referred to as a protocol stack.

Q.   What do you mean by protocol stack?

A.   Just different layers of -- a stack is something where you stack things up like a stack of books.  And depending on where you are in the stack, there's different protocols being used.

Q.   So at the Relay, now you're using how many protocols

in that circle?

A.   In the circle it's showing two protocols.

Q.   How is the -- what's shown as the GME envelope transmitted to the device from the Relay?

A.   The Relay essentially sends the packet directly to the device using UDP, because UDP is a connectionless-based protocol that is able to send the packet directly to the device.

Q.   There's one thing in between there looks like a little tower.  Can you explain what that is?

A.   Again, the Relay is -- this has service that are connecting to the wireless networks.  Until the -- you know, ultimately the -- when the packet does get sent to the device, it is going through all the various carrier networks in the world.

Q.   Now, does the Relay do anything to let the BlackBerry device know that a message is coming?

A.   No.

Q.   What difference does that make?

A.   It's -- again, it's very important from the device perspective, because to create persistent connections such as you might do with the TCP protocol, that would use resources on the device, and by "resources," I mean it would use your battery and you would use the central processing unit on the device.  And every time you use

battery, you're draining it, and as we all know with our cell phones, we like our cell phones to last as long as they can, so this protocol allows us to get to use the resources more efficiently on the device.

MR. MATUSCHAK:  You can take that down please. Thank you.

BY MR. MATUSCHAK:

Q.   Let's go back to when you started.  I think you said Version 1.6 of the BES was when you started, correct?

A.   That's correct, yes.

Q.   Was that the first release of the BES to the public?

A.   It was, yes.

Q.   Did BES 1.6 have wireless functions?

A.   It had wireless functions, yes.

Q.   And what wireless functions did it have?

A.   The 1.6 version shipped with e-mail functions.  The ability to send and receive e-mails to and from the device.

Q.   Was wireless e-mail something new or old in 1999, at the time?

A.   It was brand new in 1999.  From what I know, Research In Motion was the first company to be able to put the system together such that major corporations and governments would install it and trust this wireless e-mail device.

Q.   What were you asked to do for the BES when you first joined RIM?

A.   I'm not sure I understand your question.

Q.   What was your job?  You said you were working on the BES.  What were you asked to do for --

A.   My job, my title was software developer.  It was a fairly flat organization, so even though I was a software developer I did come in as a fairly senior member of the team.  I was asked to do some research on new technologies.  Right around that time, Windows 2000 was in beta and coming out soon, and also Microsoft Exchange 2000 was also in beta.  So I did some research on that.

It was also my job to learn about the BlackBerry system itself to understand the source code, and one of the ways to do that would be to work on smaller features, also to work on software bugs that had been reported by customers.

Q.   When you talked about smaller features or software bugs, for which product?

A.   For the BlackBerry Enterprise Server, for Microsoft Exchange.

MR. MATUSCHAK:  Could we bring up Exhibit 4449, please.

BY MR. MATUSCHAK:

Q.  Mr. Cherry, showing you what's been marked as Exhibit 4449, it's titled "BES 2.2 Development Plan" dated March 29, 2001.  Do you see that, sir?

A.  I do, yes.

Q.  Is that a document that you yourself received back in 2001?

A.  Yes, I did.  The author, Allan Lewis, was my supervisor at the time.

MR. MATUSCHAK:  If we can turn to the last page, please.  And the bottom of the last page.  If we can highlight -- yeah, that's fine.

BY MR. MATUSCHAK:

Q.  So under "Miscellaneous Functionality" at the bottom of that page, Mr. Cherry, do you see where it says, "Remote kill of the device"?  "By sending a bullet encrypted using the user's key, the device can be instructed to erase its application data.  This feature allows the administrator to respond to a stolen device."

Do you see that?

A.  Yes, I do.

Q.  And was RIM planning to add wireless kill/wipe at this time in March of 2001?

A.  Yes.

MR. MATUSCHAK:  If we can put the timeline up.

BY MR. MATUSCHAK:

Q.   I have a little timeline to help with these different versions, Mr. Cherry.  See BES 1.6, that's the one that was in existence when you joined the company?

A.   That's correct.

Q.   And does this timeline show when other versions of the BES were released?

A.   This shows the high level that, sort of the major version release of the BES for the decade between late 2009 -- or 1999 and 2009.

Q.   And what do these version numbers mean?

A.   Version numbers, they typically start from a lower number and work to a higher number.  They signified typically to a customer then that the earlier the version, then the functionality might be less.  And as version numbers get higher, then more functionality is added to the product.

     And secondly, would indicate to IT administrators, especially, that when moving from a Version 1 to a 2, that could possibly be a significant event and would take planning to upgrade from one version to the other.

Q.   And did you work on all the versions of the BES between 1.6 and 5.0?

A.   I did, yes.

Cherry - Direct

Q.   Now, when you were working on these new versions,
what was the first step in developing a new version?

A.   Well, the first step would be, which is an ongoing
step, and let me describe this first as it's an
iterative process and it's happening sort of in
parallel.  Different teams are working on parallel
timelines.  But the first step would be that you are --
the product management team would be working with
customers and different people to determine a feature,
you know, a list of features that we might want to add
to the product.  And they would have a long list, that
could be what we might call future backlog.

         MR. MATUSCHAK:  You can take that slide down for
now.

BY MR. MATUSCHAK:

Q.   So once you have this long list of feature backlog,
what was the next step?

A.   As we had developers freeing up from previous
versions, because again they're all on different
timelines, certain developers might free up at different
times.  As a developer freed up, they could pull a
feature from the back of the backlog list and start
working with the product manager to further define what
that feature really means, to dig deeper, you know,
several more layers to figure out what do you exactly

mean by this feature.

At the same time, they would be preparing a response document to that feature.  So they would be writing up a document to say, Hey, we understand what the feature is in detail.  And here's our proposed plan to solve that problem.  And perhaps even create prototypes of it.  If user interface components were involved, we might write up prototypes at that point to show to product management.

Q.  So you write up your response to the product management request and maybe a prototype.  What happens then?

A.  Then that if he -- if you are needing to go to a more detailed design as you're thinking about solving it, now you have a high level plan to it.  Now you have to sort of figure out the details of that software plan and write a design document.  And then at that point the developers start writing code, writing the source code.

Q.  And when you say "writing the source code," what do you mean?

A.  Well, they're actually implementing the software plan, writing source code, which would then get compiled and again turn into the software.

Q.  And once they -- now, are all these -- is all the source code being written at the same time?

A.   Pardon me?

Q.   Is all the source code being written at the same time?

A.   No.  As I said, it's -- with all the different timelines you have certain features being worked on now starting here, ending here, others starting later.  It's different developments at various times on the various features, and as they work on those features, at a certain point the feature gets ready enough, they deliver that feature to a testing group.  And even before that they would work with a testing group to tell them about the feature and how it works.  So the testing group can plan -- you know, basically they call them test plans.

Q.   So now have got the source code written, you've got it off to the testing group, and presumably they test it, and then what happens?

A.   Well, all the features are all done, and the whole product is -- what we want to ship in this version, we would then usually go to a beta cycle with customers. We would have several customers join a beta program, and we would send them various beta releases so the customer can test it.

Q.   What do you mean by "beta program" or "beta releases"?

A.   This is something that customers volunteer for.  If they're very interested in our product, and they want to see the version before they have -- before they have to install it.  And also the customers may want to be involved in the process to suggest ideas.  So that's our beta program.

Q.   And once you send it out to the customers for beta program, what's the next step of the development of a new version?

A.   The next step would be to gather feedback from them.  Perhaps iterated through, you know, a second beta, third beta, depending on how many we need.  And then at the end of that, the product is done and we would make it available to the public.

Q.   And would this same development process be -- would you go through that same development process for each of the versions that we had up on the timeline?

A.   Yes.

         MR. MATUSCHAK:  If we can put the timeline back up again.

BY MR. MATUSCHAK:

Q.   According to this, the next version of the BES was 2.0 in April of 2000.  Do you see that?

A.   That's correct.

Q.   Did you add more wireless features to BES 2.0?

A.   Yes, so the wireless synchronization of calendars added at 2.0.

Q.   The next version is 3.5.  How long did the development process take to get from 2.0 to 3.5?

A.   It was, you know, normally our releases could be from one year to two years, on average it was an 18-month process.  In between 2.0 and 3.5, we might have had -- we also have two other releases, I believe.  So I would assume around the 18-month mark for 3.5.

Q.   And how many engineers or software developers were working on the process at RIM to get from 2.0 to 3.5?

A.   The -- during this development for 3.5, there was six software engineers working on BlackBerry for Exchange, as well as a team lead and technical lead.

Q.   And were those I think eight people that you described, were they working full-time on the project or part-time on the project?

A.   They were full-time on the project.

Q.   And how long did the process take to get from a 3.5 to a 4.0?

A.   It took, you know, a little over two years between the release of those two products.

Q.   And was it the same software developers that were working on the 3.5 release?

A.   For the most part, it was certainly those same.  But

we grew quite substantially over that time and -- and by halfway through the 4.0 release, we had around 15 or 16 software developers and about 16 lead or technical leads.

Q.  So now those 20 or so people that you just described, were they working part-time or full-time ongoing from 3.5 to 4.0?

A.  They were working full-time.

Q.  Now, was wireless activation added in BES 4.0?

A.  It was, yes.

Q.  And how easy or difficult was that to develop?

A.  Well, the design of the wireless activation was fairly difficult to design.  The actual writing on the source code was not a terribly different process.  It was mainly the design of a secure way to do it.

Q.  And what do you mean, a design of a secure way to do it was difficult?

A.  Well, the way our system had been designed right from the beginning and the reason why we were able to become popular was that the BlackBerry Enterprise Server always connects out from the corporation, it connects out to the -- outside of the corporation.  So no device actually connects in to the organization.  Which IT administrators like that because of the security.  But it then made a big challenge as to how do I activate a

device -- let's say I go to a AT&T store and buy a
BlackBerry.  How do I get the very first packet into the
organization?  And so that was the challenge.

Q.  And how was that solved?

A.  Well, we gave the problem over to our security team.
We had the team, at the time, and -- I'd say five
software engineers, and a director who worked on our
security software.  So they did some research into how
we might be able to do that.  And also they needed to
figure out a plan such that it would be easy for the
user to do and it would be very secure and that the IT
administrators would be happy with it.

Q.  And how was that problem solved by the security team?

A.  Well, they used a protocol that is called "Speak,"
which is a way of creating where two independent ends,
like in this case the server and the device, were able
to create a master key that was the same, and yet they
never sent that master key over the air.

Q.  How were they able to do that?

A.  Well, you know, again, the complication in this,
which is why we have the security team do it, is it
requires a fair amount of mathematics, something called
an eclectic curve, which I'm not too familiar with, so
basically what they were doing is try to find an easy
way, and in this case they decided that user would know

their e-mail address and a password that the administrator gave them.  Then all the math would be able to, you know, figure out the master key on both ends.

Q.  I think we've already seen some slide with that complicated math.  I'm not going to ask you about that, sir.  But who came up with those complicated math formulas?

A.  The Speak protocol, from my understanding.  In fact, I've heard it actually -- it's a patented protocol from, I think, the early '90s.  I think it's very early '90s.

Q.  And that's something RIM licensed?

A.  I think the license had run out on that patent.  It was 20 years old.

Q.  Now, I think you said there were how many people on the security team?

A.  There was five developers and a director.

Q.  All right.  So if I understand correctly, you were involved in the development of the BES from 1999 till 2009?

A.  I was involved in the BES for a little longer than that.  I was involved for a full decade, but over an 11-year period.

Q.  Fair enough.  And who did all the work on the development of BES from 1.6 to 5.0?

A.   Besides the items that were sort of farmed out to our security team, all the development was done by the people inside the teams, software engineers and the various team leads inside the BES group.

Q.   The people you were working with?

A.   That's correct, yes.

Q.   How many features roughly does BES 4.0 contain?

A.   By the time we got to BES 4.0, there were too many features for me to list here, so I suppose hundreds of features.

          MR. MATUSCHAK:  If we could look at 4172, please. The second page.

          And if we highlight the top.  A little bit farther down.  Maybe show the first -- okay, that's good thank you.

BY MR. MATUSCHAK:

Q.   So this document is entitled "BlackBerry Enterprise Server for Microsoft Exchange Feature Comparisons."  Do you see that?

A.   Yes.

Q.   And it lists a bunch of versions across the top, 1.6 -- this one goes to 4.0, do you see that?

A.   Yes.

Q.   And does this exhibit illustrate the features that were added to different versions of the BES?

A.  Yes, it does.

MR. MATUSCHAK:  You can take it down.  Thank you.

BY MR. MATUSCHAK:

Q.  Mr. Cherry, have you heard -- had you heard of Mformation prior to this case?

A.  No.

Q.  Have you ever read the Mformation patent?

A.  I have not, no.

Q.  Do you -- did anyone ever give you any materials from Mformation?

A.  No.

Q.  Did you ever meet with the Mformation inventors?

A.  No.

Q.  Did you ever meet with anyone from Mformation?

A.  No.

Q.  Did you or the other engineers or software developers at RIM use any device you had from Mformation to develop in the BES?

A.  No.

Q.  How can you be sure about that, sir?

A.  Well, I can be -- first of all, I'm -- I can speak personally for myself that I would not copy someone else's work.  If I was asked to copy someone else's work, I would resign the company.

I worked with -- the second thing I would say is

I worked with this team of developers for 10 years on this server. Some of them were colleagues I had worked with at previous companies, so I'd known them for a long time. I was the team lead of the BlackBerry Exchange Server, so I actually supervised many of the people on the team and I worked as a senior person helping to design some of the features. So I -- you know, it was just from being on the team working that I can say we didn't copy from anyone else.

Q. Did you do your own work?

A. We did do our own work, yes.

MR. MATUSCHAK: No further questions, your Honor.

THE COURT: Very well.

You may cross-examine.

MR. McDONALD: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. McDONALD:

Q. Good afternoon, Mr. Cherry.

A. Good afternoon.

Q. I have just a couple of quick questions. You're familiar with the process of enterprise activation, right?

A. I am, yes.

Q. And when you use the term "enterprise activation," you mean activation done wirelessly, correct?

A.   The -- yes.

Q.   Are you aware that BlackBerry has user guides for its BES products?

A.   Yes.

Q.   And are you aware there was a user guide for the BES 4.1?

A.   Yes.

Q.   And are you aware that that user guide instructed users to perform enterprise activation wirelessly?

A.   I'm not sure I'm aware of that specific part of the document.

Q.   Let me see if I can help you, sir.

MR. McDONALD:  I've handed Mr. Cherry a copy of a RIM BlackBerry 71i, Version 4.1 User Guide.  It's been marked as Trial Exhibit 2122.

BY MR. McDONALD:

Q.   Mr. Cherry, are you familiar with this document?

A.   No, I'm not familiar with this document, no.

Q.   Okay.  Mr. Cherry, if you could please turn to page 9, it bears the number P 2122.009 at the bottom.

A.   0009?

Q.   Correct, at the lower left corner of the page.

MR. McDONALD:  Your Honor, this document is not objected to.  It's admissible by stipulation.  Mformation moves for its admission into evidence.

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  Exhibit 2122 is in evidence.

(Plaintiff's Exhibit 2122 received in evidence)

MR. McDONALD:  Chris, if you could please enlarge the left column there at the bottom.

BY MR. McDONALD:

Q.  On page 9 of this document, Mr. Cherry, is this describing "enterprise activation"?

A.  You mean the highlighted area?

Q.  That page itself, the entire page of page 9.

A.  It appears to describe "enterprise activation," yes.

Q.  And it's doing so to, quote, activate the device over the wireless network.  Do you see that?

A.  Yes, I do.

Q.  This process that's described in these six steps --

MR. McDONALD:  You can remove the enlargement, Chris.

BY MR. McDONALD:

Q.  The six steps shown on page 9 of this document tell the user how to perform enterprise activation wirelessly, correct?

A.  Yes, they do.

Q.  And nowhere on this page is there any meaning of performing activation with a hard wire connection, correct?

A.   Correct.

Q.   Okay.  And feel free to look at the table of contents.  I don't see anywhere in this entire user guide where RIM even mentioned enterprise activation with a wired connected, do you?

A.   Uh, I'm not sure I can determine that from the table of contents.  But...

     The only thing described in the contents is "enterprise activation."

Q.   And that's the page you already looked at, right, page 9?

A.   Correct.

Q.   Are you listed, Mr. Cherry, as an inventor on United States patents?

A.   I am, yes.

Q.   How many?

A.   I'm not a hundred percent sure.  I think there might be two.  But I'm not a hundred percent sure.

Q.   And are these patents relating to your work with Research In Motion?

A.   They are, yes.

Q.   And you're involved in the drafting of this patent application, correct?

A.   I am involved in -- I'm involved in the process, yes.

Q.   You signed this under oath, correct?

A.  I did, yes.

Q.  Attesting that you have reviewed the application and confirmed it to be correct?

A.  Yes.

MR. McDONALD:  I've handed up the Patent Application U.S. 2008/0016,359.  Mformation would like this marked for identification as Plaintiff's Exhibit 2261, please.

THE COURT:  So marked.

(Plaintiff's Exhibit 2261 marked for identification)

BY MR. McDONALD:

Q.  Mr. Cherry, your name is listed here as an inventor on this patent application, correct?

A.  Correct.

Q.  And this is a patent application that you worked on regarding your work for Research In Motion, correct?

A.  That's correct, yes.

MR. McDONALD:  Your Honor, Mformation moves for admission into evidence of Plaintiff's Trial Exhibit 2261.

MR. MATUSCHAK:  Objection, we're here about the '917 patent, your Honor.  I don't want to get into what this patent's about.

MR. McDONALD:  This line of inquiry will take

five minutes at most, your Honor.

THE COURT:  Once you do five, it might cause another person to do another five or more.  What's the relevance of this?

MR. McDONALD:  In this patent application --

THE COURT:  Just tell me the issue that's relevant, not the substance of it.

MR. McDONALD:  The meaning of the UDP connection.  And the witness's use of that phrase.

THE COURT:  Very well.  To the extent that -- I won't admit the document into evidence at this point, but you may use the document to examine the witness with respect to the issue of his testimony about UDP.

MR. McDONALD:  Thank you, your Honor.

BY MR. McDONALD:

Q.   Mr. Cherry, if you could please turn to page 3 of 2261, there's a "3" at the top of the column.

A.   So after all the diagrams?

Q.   Beyond all the diagrams, sir.

A.   Okay.

Q.   And just so the jury understands, this is a patent application that was filed in the United States Patent Office naming you as an inventor.  But the patent has not yet issued.  Correct?

A.   That is my understanding, yes.

Q.  Mr. Cherry, looking in Column 3 --

THE COURT:  Since this has not been received, just to be fair to the witness, he's listed among the inventors.  He's not the sole inventor.  So I understand that to be the tenor of your question.

MR. McDONALD:  Thank you, your Honor, for the clarification.

BY MR. McDONALD:

Q.  Mr. Cherry, looking at -- each paragraph is numbered.  There's a paragraph number 40.  Do you see that?

A.  Yes.

Q.  Now, earlier today you testified --

MR. McDONALD:  And actually can we bring up your demonstratives DEM 0304, please.

Right.

BY MR. McDONALD:

Q.  So I think you described that this GME packet being transmitted to -- from the cellular tower to the device is being sent using a UDP protocol?

A.  That's correct.

Q.  Now, UDP involves a connection, correct?

A.  No, it does not.  Depends how we define the word "connection."

Q.  So you sometimes refer to UDP as a connection, correct?

A.   As a software engineer, we don't refer to --
typically refer to UDP as a connection.  UDP is a
protocol.

Q.   Mr. Cherry, could you please read for the jury --

THE COURT:  No, since it's not in evidence.
You've got to try this as prior inconsistent statement
or something of that kind.  You'll have him read it and
see whether or not it influences his testimony.  There
may be an occasion for you to offer it into evidence if
it can be impeaching, but first you have to have him
read it.

BY MR. McDONALD:

Q.   Mr. Cherry, if you could please read the final
sentence of paragraph 39, and let me know when you're
done.

A.   The final sentence.

Q.   In paragraph 39, it's right above the start of
paragraph 40?

A.   VPN --

THE COURT:  No, read it to yourself.

Q.   That's what I said.  And let me know when you're
done.

A.   I'm sorry.

(Witness peruses document.)

A.   I have read it.

Q.   Seeing that text, "UDP connection," does that cause you to want to clarify your answer to the question of whether you sometimes refer to transmission from a VPN connection or a tower to a wireless device as being done using a UDP connection to deliver messages directly to a mobile device?

A.   No, I don't -- what was the question?  I'm sorry.  If you can just repeat the first part of the question for me.

Q.   I believe you testified, sir, that transmission of data using a GME protocol as shown in this demonstrative from a cell tower to a wireless device done using UDP is not a connection.  Is that what you testified to here today?

A.   Yes.

Q.   Have you ever said outside of this courtroom that transmitting from a tower or a VPN, virtual network, to deliver messages directly to a mobile device may be done using a UDP connection?  Have you ever said that?

A.   I don't recall saying that.

Q.   Would you say that UDP, to send data from a tower to a wireless device, is not a connection?

A.   I would say it depends on the definition of "connection."

          Again, as a -- strictly speaking, in looking at

the protocols, UDP is a connectionless protocol.

MR. McDONALD:  Your Honor, the witness's use of the language is inconsistent.  We wish to publish it to the jury as an inconsistent statement.

THE COURT:  Well, I was waiting for your drawing the witness's attention to this and saying these are his words as opposed to someone else's words, and if he adopts them, because this is part of the document that he's a part of, you are then able to read that portion into the record.  But would you establish that foundation for us, please?

MR. McDONALD:  Absolutely, your Honor.

BY MR. McDONALD:

Q.  Mr. Cherry, I believe that you testified that you signed an oath as inventor when you filed this patent application; is that correct?

A.  That's correct.

Q.  And did you understand that that oath was:  "I hereby state that I have reviewed and understand the contents of the above-identified application, including the claims I have identified in request of said application" -- actually, let me hand this to you.

So you don't have to take my word for it, sir.

Mr. Cherry, looking about halfway down the page, do you see the text:  "I hereby declare that all

statements made herein of my own knowledge are true, and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon"?

Do you see that?

A.   Yes.

Q.   And that is the oath you signed for this application, correct, sir?

A.   Yes, sir.

MR. McDONALD:   Your Honor, I believe the witness has stated that these words were attested to by him as part of the inventor oath.

MR. MATUSCHAK:   I'm going to object, your Honor. That oath just says he understood the application. Doesn't say he's the one that wrote these words.

THE COURT:   That's what I was trying to get to. I thought the point of your question was he's made a prior inconsistent statement, not that the document contains a use -- and so I was inviting you to see if you could lay a foundation that he has made these words

before.

It is -- I'm not ruling that you can't put it into evidence if it's contained in this.  If it's something that he would adopt as a true statement here today.  Because I don't know whether he would or not.  But it seems to me that if you're trying to impeach him because he's said it differently before, you need to lay a foundation that these are his words.

MR. McDONALD:  My foundation is that he signed this oath saying, "I hereby declare that all statements made herein are true."

THE COURT:  I understand that, but that means that he signed the oath.  And if he now says that these are not true, that's impeaching, and I would put it into evidence.

So can I see counsel at the sidebar.

MR. McDONALD:  Sure.

(At the sidebar, out of the hearing of the jury and the court reporter.)

BY MR. McDONALD:

Q.  Mr. Cherry, when you signed this oath of inventorship, you were an adopting the words or attesting to the words of the patent application; is that correct?

A.  I'm not sure I quite understand that phrase,

"adopting the words."

Q.  I didn't mean to interrupt you, sir.  Let me ask you a simpler question.  Before you signed the oath -- the oath of inventorship -- it's a serious oath, correct?

A.  Yes.

Q.  And before you were to sign it, you would have reviewed the application, correct?

A.  Correct.

Q.  And by signing it, you were attesting to the application, as you understood it, the statements therein, correct?

A.  Yes.

MR. McDONALD:  Your Honor, I wish to publish this application as --

MR. MATUSCHAK:  Objection, your Honor.  He still hasn't laid the foundation.

THE COURT:  Well, members of the jury, I'm going to allow it to be read with this limitation:  Counsel has not established that every word in this document was said by this witness previously.  As a co-inventor, the possibility is that some other person said it, and he's attesting to a joint enterprise and these are joint statements.  But it seems important to me to -- if the witness has attested to it, to allow you to hear the document so that you can make a judgment whether or not

it is relevant or not relevant, but it has value to some issue you have to decide.

But the limitation I'm placing at this point is that so far as the Court is concerned, it has not been established to this point that these are his words previously, that indeed might be contradicted here in court, but they are words to which he attested previously, and he may be examined about whether or not there's something about that attestation that he continues to affirm or wishes to distance himself from.

All right?  With that limitation, go ahead.  And read the words that you wish from the document.

MR. McDONALD:  May I publish them on the screen, your Honor?

THE COURT:  Certainly.

MR. McDONALD:  Can you please put up the exhibit, Chris?

BY MR. McDONALD:

Q.  The patent application, just to give the ladies and gentlemen of the jury some context, this is the document --

THE COURT:  You've gone beyond what I allowed you to do, but that's okay, I allowed you to do that.  I wanted you to read the words that you were trying to use to impeach him because the document has not been

received into evidence.

MR. McDONALD:  I'm sorry, your Honor.  My apologies.

THE COURT:  Since it's there, that might help them see what it is that we're talking about.

MR. McDONALD:  Before I overstay my welcome, Chris, let's go directly to Column 3, Paragraph 40.

BY MR. McDONALD:

Q.  This is the highlighted sentence, Mr. Cherry.  Would you please read that aloud for the jury.

A.  "A VPN connection would most likely use a TCP/IP or User Datagram Protocol, UDP/IP, connection to deliver messages directly to a mobile device."

Q.  And this User Datagram Protocol, that's the UDP that you referred to earlier in your testimony for RIM's attorney, correct?

A.  That is correct.

Q.  And that word "connection," it's a UDP/IP connection to deliver messages directly to a mobile device, correct?

A.  In this context, yes, it's a -- that's what this sentence says, yes.

Q.  And mobile device, in this context, would include a RIM BlackBerry device, correct?

A.  It could include a -- well, it includes any mobile

device.

Q.   Okay.  So it would include a BlackBerry device?

A.   That's correct.

MR. McDONALD:  Chris, could you please go to Column 19?

THE COURT:  Let's -- this is further to that same part?

MR. McDONALD:  That's fine, your Honor.

THE COURT:  All right.  I'll allow that to be displayed.

MR. McDONALD:  I'm sorry, you will allow Column 19?

THE COURT:  I thought you were going to other portions of this document.

MR. McDONALD:  I am.

THE COURT:  I'm allowing you to display it as you read it because I thought you were asking that it be displayed.

MR. McDONALD:  Yes, sir.

Column 19, please, Chris.

BY MR. McDONALD:

Q.   This is part of Column 19 of the document, Mr. Cherry, your patent application.

A.   Yes.

Q.   And the Paragraph 165, we've blown up or enlarged

that paragraph.  Could you please read the final sentence, it starts "a VPN connection."

A.    "A VPN connection may use a Transmission Control Protocol over IP (TCP/IP) or User Datagram Protocol over IP (UDP/IP) connection to deliver messages directly to and from a mobile device."

Q.    Just so the ladies and gentlemen of the jury can hear it, that User Datagram Protocol over UDP/IP, that's what you referred to earlier in your testimony about as the protocol by which RIM's Relay communicates with the BlackBerry devices, correct?

A.    Yes.

Q.    And this language, "UDP/IP connection to deliver messages directly to and from a mobile device," do you see that?

A.    Yes.

Q.    Do you think -- withdrawn.

My first question, mobile devices would refer to mobile devices including RIM's BlackBerry devices, correct?

A.    Yes.

Q.    Is there anything about this sentence you just read or the prior sentence that you believe to be incorrect?

A.    No.

Q.    So you were going to take no steps at any time to

contact the patent office and correct this in any way; is that fair to say?

MR. MATUSCHAK:  Objection, your Honor.

THE COURT:  Sustained.

MR. McDONALD:  No further questions, your Honor.

THE COURT:  Any redirect?

MR. MATUSCHAK:  Yes, sir.

REDIRECT EXAMINATION

BY MR. MATUSCHAK:

Q.  Mr. Cherry, what's been marked as 2261 for identification, is that the '917 patent that's involved in this case?

A.  No, it is not.

Q.  Does this patent application have anything to do with the '917 patent that's involved in this case, as far as you know?

A.  No.

Q.  When the word "connection" was written in this application, it looks like -- strike that.

This application has a filing date of July 11, 2007.  Do you see that?

It's under --

A.  Yes.

Q.  And do you know, sir, whether at the time that application was filed Judge Ware had issued his claim

construction order in this case about the claims in this case?

A.  No, I don't.

Q.  And when you were reviewing this application at the patent office, did anyone give you a copy of the '917 patent or the claims?

A.  No.

MR. McDONALD:  Objection, assumes facts not in evidence.

BY MR. MATUSCHAK:

Q.  When you were -- when you had submitted this application to the patent office, did you have in your hand Judge Ware's claim construction for the patent in this case?

A.  No.

Q.  Have you ever seen the '917 patent?

A.  No.

Q.  Have you ever seen the Judge's claim construction for what the words of the '917 patent mean?

A.  No.

Q.  So can you tell the jury if you used the words in this patent application the same way that the Judge has construed the words of the '917 patent in this case?

A.  No.

Q.  Now, what we do know is in the portions that you were

shown, you differentiate between TCP and UDP; is that correct, sir?

A.   That's correct, yes.

Q.   Would you please explain to the jury the difference between the two?

A.   Well, TCP, the TCP protocol is what's called, referred to as a connection-oriented protocol.  It handles establishing and maintaining of connections.  It also handles things such as error management.  It also handles things such as ordering of packets within the transmission.

The User Datagram Protocol referred to as UDP is referred to as a connectionless protocol.  There is no establishing of the connection before you send a packet to another host.  It does not handle any error correction.  Sometimes it's referred to as unreliable, because you fire a packet off to another server on another port and that packet may or may not get there.

Q.   Does the TCP protocol involve any handshaking, sir?

A.   It does, yes.

Q.   Does the UDP protocol involve any handshaking?

A.   No.

MR. MATUSCHAK:  Can we get the slide up for the RIM system again, please.

BY MR. MATUSCHAK:

Q.   Now, this slide shows that RIM uses the TCP protocol on wired connection to the Relay and the UDP protocol on the wireless connection to the BlackBerry device; is that correct?

A.   That is correct.

Q.   Why didn't RIM just use TCP over here too?

A.   Because as I stated earlier in my testimony, to set up a -- if you use TCP, you're forced to set up a connection first.  And then the device would have to persist that connection, which would cause the battery to drain more.

What would be worse would be if all of the applications on the device, e-mail, calendar, and all various applications all have their own TCP connection, then you'd have multiple connections open.  And that would cause the radio to stay on, it would cause the battery to be drained.  It would cause the CPU on the device to stay powered out.  And all that would go to draining battery power on the device.  So UDP is a much more efficient protocol in the wireless network.

MR. MATUSCHAK:  All right.  Let me take that down.  Thank you.

Could we see Exhibit 2122, please.

I'm sorry, we don't have that one.  It was the

same page, I think it was Bates No. 590 that the witness was shown.

Thank you.  Great.  Would you mind just highlighting the paragraph right above the one that says "activate the device over the wireless network."  Thank you very much.  Appreciate that.

BY MR. MATUSCHAK:

Q.  Now, one portion that you were not directed to in this document, Mr. Cherry, was this paragraph which says:  "If you do not have access to a BlackBerry Enterprise Server Version 4.0 or later, see the printed documentation that accompanied your device for more information about integrating your device with an e-mail account."

Do you see that?

A.  Yes, I do.

Q.  And do you know whether that additional documentation talks about wired activation?

MR. McDONALD:  Objection, lack of foundation.

THE COURT:  Well, that is foundational.  He can answer that yes or no.  Whether he knows.

Do you know whether or not is the question.

THE WITNESS:  Yes.

BY MR. MATUSCHAK:

Q.  And does it talk about how you can establish a wired

enterprise activation?

THE COURT:  I'm not hearing a best evidence objection, but that does seem to me to fall within the best evidence rule as to what the document contains.

MR. MATUSCHAK:  I'll ask a different question, your Honor.

BY MR. MATUSCHAK:

Q.  Mr. Cherry, you've been working on the BES for 10 years.  Can you do today a wired activation of the BES?

A.  Yes, you can.

Q.  Is there any point in the 10 years that you have been working on that project that you could not do a wired activation of the BES?

A.  No.

MR. MATUSCHAK:  I have nothing further, your Honor.

MR. McDONALD:  Just one question to correct the record, your Honor.

THE COURT:  Yes.

RECROSS-EXAMINATION

BY MR. McDONALD:

Q.  Mr. Cherry, if you could please look at the first page of that patent.  The file date says July 11, 2007.  Do you see that?

A.  Yes, I do.

Q.   Below that it says:  "Related U.S. application data, continuation of an application filed on December 11, 2003."  Do you see that?

A.   Yes, I do.

MR. McDONALD:  No further questions, your Honor.

MR. MATUSCHAK:  Your Honor, I need to establish one point.

THE COURT:  Certainly.

REDIRECT EXAMINATION

BY MR. MATUSCHAK:

Q.   Mr. Cherry, December 11 of 2003 was before this case was ever brought, correct?

A.   Correct.

Q.   And so there was no way you could have had Judge Ware's claim construction in front of you when you were writing the words of this application or reviewing the words of this application; isn't that correct, sir?

A.   That's correct.

MR. MATUSCHAK:  Thank you.  Nothing further, your Honor.

THE COURT:  Very well.  The witness is excused. Thank you, Mr. Cherry.

Call your next witness.

Wait, we're a little off schedule.  I want to make sure I'm fair to the jury.  How much time do you

think this next witness will require?

MR. MATUSCHAK:  Probably about an hour on direct, your Honor.

THE COURT:  So just to get ourselves a little back on schedule, why don't we take our break at this point.  That way we'll start up again about 3 o'clock.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

(Recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  I understand there's a dispute with respect to a video deposition.

MS. DeBRUIN:  We were going to play a video before this next witness, and we decided to hold that back and start with our next witness.

THE COURT:  Summon the jury.

MR. MATUSCHAK:  Actually, I'd like to start with a comment, if I can.

THE COURT:  Yes.

MS. DeBRUIN:  Your Honor, we will need your assistance on the video, but it doesn't have to be done right now.

THE COURT:  Okay.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  Mr. Cherry, having been excused, you wish to comment?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  Very well.

MR. MATUSCHAK:  Ladies and gentlemen, I finally get to give you my comments.  I think you can tell I have been waiting to do that for awhile.  I wanted to talk to you after Dr. Kushwaha's testimony.  I wanted to talk to you after Dr. Madisetti's testimony.  Because I want you to understand how everything is fitting together.

I think that after having seen Mr. Cherry, you now see why the Relay is so important.  You can see why Dr. Madisetti did not even mention the Relay after two days and 300 slides of direct testimony.  Relay uses that UDP protocol to communicate with the BlackBerry.

Now, the Court, Judge Ware, has said establishing and transmitting steps in this patent have to go in order.  And even Dr. Madisetti said that with UDP that doesn't happen.  With UDP, he said, everything goes at the same time.

The Court's construction is, you eat your dinner, then your desert.  Dr. Madisetti says you can have your dessert with your dinner.  Those are two different

things.  That means we don't use the patent, we don't use their recipe.

This is not a little technical detail.  UDP doesn't have the overhead, the cost or the battery problems, as Mr. Cherry testified about, that other protocols have.

Now, you know that they're going to be trying to muddy the waters as they have been every time the word "connection" appears in any document.  If a piece of paper falls out of one of the pockets in a hallway that has "connections" on it, you'll see it.  But that's not what's important.  It's the connection in the context of their patent, as the Judge has construed the words of those patents.  That's what's important.

Because people use different words in different ways all the time.  And here, the Judge has told you and will tell you, for this patent, you have to follow his construction.  That's what's important.  Not what's in some manual.  Not what's in some other patent that was done before this case even existed.

UDP was the reason or one of the reasons why the BlackBerry was successful.  Mike Lazaridis, the founder of RIM and a developer of the BlackBerry, will be here on Friday to help explain that to you.  Now he can't be here today or tomorrow because he's in a board meeting

for his company.  But he will be here on Friday.

The Relay is a big problem for them.  UDP is a big problem for them.  That's why they didn't want you to know.  That's why they didn't tell you about it. It's sort of like now that it's out of the box, now that UDP is in the case, now that we all know it's important, now that we know about the Relay, what did Dr. Madisetti say?  Pay no attention to the Relay behind the curtain, like the Wizard of Oz, the guy with the strings.  But it is there.  But it is important.  They want you to be confused.

I want you to understand, because I know that if you understand how this works, you will know that we do not use their recipe, that we do something different, and that difference is really important to the success of the BlackBerry.

Now, Dr. Basu said when he first started this case, he said in one of his e-mails, what RIM code belongs to RIM.  Mr. Cherry has said he's worked for the last 10 years on this product.  They say he just copied. They didn't even ask him, Dr. Madisetti -- didn't even ask Dr. Madisetti to look at that.  They just say copied.  Whatever it takes.

But Mr. Cherry and the group of engineers he worked with spent 10 years working to build this

product.  It is his.  It is not theirs.  And it's different.

Thank you.

THE COURT:  You wish to comment?

MR. McDONALD:  I do, your Honor.  Thank you.

RIM's lawyers like the food-based analogies.  I always get a little bit hungrier when he's speaking.

I think the most important parts of Mr. Cherry's testimony, you can tell, he's a careful man.  He cares about his job.  He's worked at RIM a long time.  Outside of this courtroom, when he refers to UDP, he uses it in the context of connection.  You saw that in his patent application that he filed with the U.S. Patent and Trademark Office.

Another thing you saw, RIM's own documentation regarding the accused product, BES 4.1.  In this entire document, this user guide, they don't mention anything about registering it with enterprise activation using a wire.  They give you a one-page sheet on how to do it wirelessly.

Now, there was some talk about you can go off and look at the documentation if you wanted to use a wire.  Well, who does that?  I don't even know where the documentation is for my devices.  I do what they tell you in these little user guides.

So I think that's what you need to take away from Mr. Cherry's testimony.  Thank you very much.

THE COURT:  Very well.  Call your next witness.

MR. CHARFOOS:  Yes, your Honor.  Next witness is Mr. Chris Foley.  If I can have a minute to set up.

THE COURT:  Good afternoon, Mr. Foley.  Come all the way up here and be sworn by the Clerk of the Court.

(Witness sworn)

DEPUTY CLERK:  Please be seated and speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  My full name is Christopher Edward Foley, F-o-l-e-y.

CHRISTOPHER FOLEY,

   called as a witness by the Defendant,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CHARFOOS:

Q.  Good afternoon, Mr. Foley.

A.  Good afternoon.

Q.  Mr. Foley, where do you live?

A.  I live in Alpharetta, Georgia.

Q.  And could you tell the jury what you're here to tell them.

A.   I'm here to tell of my experiences with and my training on RemoteWare.

Q.   And is that sometimes known as the XcelleNet RemoteWare product?

A.   Correct.

Q.   And how is it that you have any knowledge of the RemoteWare product?

A.   I was employed by XcelleNet, the people who manufactured and sold RemoteWare.

Q.   And how many years were you employed by them?

A.   I was employed for just short of 11 years by the company.

Q.   And I know you've mentioned the fact that you were employed by XcelleNet.  Now, did they ever change their name?

A.   Yes.  In fact, upon my initial employment, XcelleNet had just been acquired by Sterline Commerce, who was subsequently spun out by Sterline Commerce, went private again under the ownership of Francisco Partners, as XcelleNet, then was acquired by Sybase.

Q.   Same company?

A.   Same company, same building.

Q.   Just the name changed on the outside?

A.   Correct.

Q.   You mentioned the fact that you worked at -- can we

just call it XcelleNet just to make it easier?

A.  Yeah.

Q.  Worked at XcelleNet essentially 11 years; is that right?

A.  That's right.

Q.  And of those 11 years, how many years did you have some sort of work or responsibility with the RemoteWare product?

A.  Between four and five of those years.

Q.  And when did you -- what year did you begin working at XcelleNet?

A.  1998.

Q.  Do you remember what month that was?

A.  Yes, in November.

Q.  Can you describe for the jury the first position that you held at XcelleNet?

A.  Yeah, I was hired into the consulting practice as a systems architect.

Q.  And what does that mean?

A.  It means that my job was to assist RemoteWare customers with their implementations, whether that be troubleshooting or enhancing.

Q.  And when you first started working at XcelleNet, had you ever worked on the product before?

A.  No, I had not.

Q.   So did they just send you out in the field or did you get some training, or what were your first weeks and months like?

A.   I first had to attend the classroom training on both RemoteWare and the product that then became known as Afaria.  And then I had to build in the lab a complete RemoteWare installation, and once it was built, my bosses would come and tell me to build other things on top of it.

Q.   And when you say you had to build a complete RemoteWare installation in the lab, what did that sort of look like?

A.   If you can picture kind of a bank of PCs and monitors over them, probably had eight or ten of those machines side by side.  Some represented what we called the server piece of RemoteWare.  Some represented clients.  So you could really see both ends of the transaction, so to speak, in one place.

Q.   As you were getting your training as a systems architect, did you sort of use the RemoteWare product in the same way that an administrator would or did you get an opportunity to do more with the product than just that?

A.   I had to use it both as an administrator in terms of installing, configuring, verifying the operation, but

then part of our training with our bosses, who were our mentors, was to go under the covers, look in directories, look in registries, and to see the telltale signs of successful and unsuccessful installations of configurations.

Q.   Once you completed your training, did you go out in the field?

A.   Yes, I did.

Q.   What kind of things did you do in the field?

A.   Again, they were mostly either troubleshooting or building new functionality on top of the system.

Q.   Did you specifically work with customers in the field?

A.   Yes, I did.

Q.   From that point forward, what was your next position?

A.   My next position was as product line manager of the product that became known as Afaria.  It was a derivative of RemoteWare.

Q.   What else did you do over the rest of your 11 years at XcelleNet?

A.   Sure.  After moving out of the product management, product strategy group on Afaria, I was then tasked with scouting out and eventually writing a business plan for a third product for the company, which eventually became known as RFID Anywhere, and was placed in charge of that

product.

Q. Eventually did you end up leaving XcelleNet?

A. In 2009, and I guess I jumped over -- so after I had run out the course of that product, then I wound up on the sales side of the fence, and that was my last position.

Q. And then I think you said in 2009 you left?

A. In July of 2009, correct.

Q. And what did you do after that?

A. I once again went into the consulting business and started Foley Consultancy, which is my firm, company.

Q. Can you briefly describe to the jury a little bit about what Foley Consultancy does?

A. Sure. Foley Consultancy is a business process and technology consulting company. And I specialize in remote computing, mobile computing, and this RFID technology, radio frequency ID technology, that I developed this product around.

Q. And are you here as a consultant to RIM?

A. Yes, I am.

Q. And are you being paid for your time?

A. Yes, I am.

Q. What is the rate that you're being paid at?

A. $250 an hour.

Q. How does the rate compare to the rate for all of your

other clients?

A.  That's a blended rate.  I initially quoted my on-site rates, which are higher.  And my telephone or remote rates, which were lower.  And was prepared -- that's typically what I would do with the client is, depending upon the type of work, but in this instance, RIM had requested, Well, can we just have a blended rate for both.  So I picked a number in the middle.

Q.  And the number in the middle, is that consistent with the rates that you do charge your other clients?

A.  Yes.

Q.  And is your testimony here today in any way contingent on the outcome of this litigation in any way?

A.  No, I have no interest in the outcome.

Q.  I want to talk a little bit about the customers that you are aware of that use the RemoteWare system.  Tell me a little bit about the customers that you are aware of or you worked with that use the RemoteWare system.

A.  In consulting, I work with and became aware of installations at accounts like Burger King, the corporate offices in Miami; Albertson's, in Boise Idaho; TAP Pharmaceuticals, in Chicago; Jack in the Box, down in San Diego.  That would be the typical -- there are others, Alpha Insurance in Birmingham, Alabama.  A variety of customers.

Q.   Did you ever work with any partners of RemoteWare?

A.   Yes, I did.

Q.   What were those?

A.   People like Padcom in Pennsylvania.  They specialized in public service, police, fire, and communicating with the cruisers and the fire trucks while they rolled.

Q.   Were you ever aware of any RemoteWare's customers that used RemoteWare wirelessly?

A.   Yes.

Q.   Were you ever aware of any RemoteWare customers that used RemoteWare Version 3.0 or 3.1?

A.   Yes.

Q.   And were you aware of any RemoteWare customers that used RemoteWare wireless prior to October of 1999?

A.   Yes.

        MR. CHARFOOS:  Could you bring up Demonstrative 503, please.

BY MR. CHARFOOS:

Q.   Could you describe to the jury what Demonstrative 503 is showing?

A.   Yes.  It's a timeline beginning in 1996 with the release of RemoteWare 3.1.  Going through the date of my employment in 1998.  And the blue box represents the period in which I was in consulting, the position we mentioned, the systems architect, working with customers

and partners as we described.

Q. And again, you're aware that some of the partners or customers used RemoteWare wirelessly, correct?

A. Yes.

Q. Which ones?

A. Wendy's, for instance, used it over satellite. Jack in the Box used it over satellite, not shown on there. Shoney's used it over a satellite. And Padcom had partners -- you know, they were partners of ours, so they would be the ones to sell our software and implement the software, and they were in turn the customers that I was aware of.

Q. And how did Padcom use it wirelessly?

A. Well, again, their vertical was police, fire, so their customers were -- are police departments, and in these cruisers there'd typically be a laptop and it would be communications between the station and the cruisers using RemoteWare and their own software to facilitate the data transfer and the management tasks.

MR. CHARFOOS: Thank you, Mr. Rudd.

BY MR. CHARFOOS:

Q. Now, I want to talk a little bit at a very high level about your observations about the different components of the RemoteWare system. What were the main components of RemoteWare?

A.   Primary components were the server, which is a computer that sat at the headquarter site, and client which sat on a remote machine, whether that be a desktop, a laptop, a PC of sorts.

Q.   And you actually observed servers and clients both in the lab and at customer locations?

A.   Yes.  I not only observed, but I was hands on in both the lab environment and in the field.

Q.   When you say "clients," what do you mean about client?

A.   Here I'm talking about a piece of software that sits on a remote computer.

Q.   What did you refer to the person that actually used that computer as?

A.   We would call them the user or the end-user.

Q.   I think you mentioned the fact that the server and the client were separate pieces of equipment?

A.   That's correct.

Q.   Were they connected in any way?

A.   Yes, they would connect to each other over a network, either wired or wirelessly.

Q.   And some of the wireless networks that we talked about were some of the ones that you were aware of?

A.   Yeah, the ones that I talked about I believe were all customers of Hughes, who operates the satellite links,

and the technology's called VSAT, v-s-a-t.

Q.   Now, if in fact the server wanted to communicate something to the clients, is there a way the server could go about doing that?

A.   Yes, the server would talk, so to speak, to the clients through what we call the session.

Q.   And what was your experience with the sessions of the RemoteWare system?

A.   I did about everything you could do with a session. I built sessions, I ran sessions, I was troubleshooting sessions, so it was hands on, both in the lab and in the field, and you know in helping even over the telephone sometimes, customers, you know, troubleshoot what might be wrong with a given session.

Q.   Was there some sort of location where the session sat at the server?

A.   Yeah.  They would stack up in what we call the outbound queue.

Q.   How do you know what the outbound queue is?

A.   It's visible in the interface of the product.  I observed it in the schedule manager interface where they're stacked up in chronological order with the next to run on top.

Q.   Is there any other way you're aware of the outbound queue?

A.   Yeah, the -- we'll get into this, I'm sure, but some of the things that we would do to manage would be to send files, and there was a specific view into what we called the file cache, think of that as a staging area, for all the files that are associated in part of the outbound queue are moved and become part of what eventually gets put into a master work list.  So you could see them in the product themselves.  You could also go behind the scenes into the file and directory structures and observe that they were showing up in the right locations.

Q.   You actually observed that in your work?

A.   Yes, I did.

         MR. CHARFOOS:  Your Honor, I'd like to show the jury Demonstrative 501.

         MR. McDONALD:  Objection, your Honor.  This isn't in the realm of expert testimony as far as what is existing in the server.

         THE COURT:  Well, a demonstrative is not in evidence.  It's to help the jury understand the testimony.  So is this the demonstrative I saw earlier?

         MR. CHARFOOS:  Yes, it is, your Honor.

         THE COURT:  I'll allow this.  But you may, as the examination proceeds, find occasions when you believe that it has gone beyond what he's been disclosed to

testify.

You might want to move that back.

THE WITNESS:  Can you see that, your Honor?

THE COURT:  No, I could see it.

THE WITNESS:  Okay.

BY MR. CHARFOOS:

Q.   Mr. Foley, I think you testified a minute ago that there was a server and some clients, and just to orient the jury, can you explain what Demonstrative 501, the different components you had talked about earlier?

A.   Sure.  On the left-hand side of the diagram you see the computer that represents the server.  That typically sits at headquarters, especially in these retail restaurant, hospitality-type clients.

Then out here on the right-hand side, that would be the other piece of software, that would be the client piece of RemoteWare, and that would be in the field, either stationary or mobile.  What's depicted here is them communicating with the server over the various wireless communication types.  The one on the top showing an air card, you can see a tiny little antenna sticking out of the top.  That gives it its wireless capability.

Over here we have it tethered to a telephone that uses a cellular network to transmit the data back and

forth between client and server.  And down here on the bottom we see the satellite down-link portion, the Burger King store -- I'm sorry, the Wendy's store, the Jack in the Box store, the Shoney's store.  We have one of these on the roof and back at headquarters, they would have it on the other side of that, hook up to the server.

Q.   This is the kind of implementation of 3.0 or 3.1 that you were aware of at the time?

A.   Absolutely.

Q.   I want to start with the very first time on the -- on the right-hand side, wants to -- before it can talk to the server, does anything have to happen?  Did you have to do anything to allow it to talk to the server?

A.   Yes, when I or an administrator would be setting up a client for the first time, we had to perform what we called "client registration."

Q.   And what was "client registration"?

A.   Client registration was where the client machine that had the client's software already installed at this point, would pass information over the network to the server, and the server would then have to validate that client as being legitimate before he's talked to it on an ongoing basis.

Q.   Let's maybe see how this would have worked for you in

practice or did work for you in practice.

MR. CHARFOOS:  And I would ask -- Trial Exhibit 733, your Honor, there's no objection, and by stipulation we request it be moved into evidence.

THE COURT:  733 is in by stipulation.

MR. McDONALD:  No objection.

(Defendant's Exhibit 733 received in evidence)

BY MR. CHARFOOS:

Q.  Can you focus in on the title there?  It says "RemoteWare Windows Client User's Guide."

First of all, is that the same kind of client you're talking about on the right-hand side of your demonstrative there?

A.  Yes, it is.

Q.  And it says "user's guide."  What's the user again?

A.  The user, in the case of Burger King, might be the restaurant manager, or if he went out, I would sometimes be the one, I would be the user to put the diskette in the machine.  And install the client software.

MR. CHARFOOS:  Mr. Rudd, if you could focus in the lower left-hand corner of the guide.

BY MR. CHARFOOS:

Q.  It says there "XcelleNet."  Is that the company that sold the RemoteWare product?

A.  That's correct.

Q.   And I believe right next to that it says "United States."  And you used this product and saw this product and were aware of this product in the United States?

A.   Yes.

Q.   Is this the kind of guide that you would find out in the field and that you in fact used in your work?

A.   Yes, it is.

        MR. CHARFOOS:  If we could go to the second page, Mr. Rudd.  And if we could pull out the version.

BY MR. CHARFOOS:

Q.   Can you describe to the jury what version of RemoteWare this is?

A.   Yes, this is the RemoteWare for Windows NT Client User Guide, for Version 3.1.  And again, the Windows NT would be the server in this case.  And the 16-bit Windows would be the version of the operating system that would be on the client machine.

Q.   And what's the copyright date?

A.   It is 1996.

Q.   And based on your work at XcelleNet over 11 years, does that appear to be correct?

A.   Yes, it is.

Q.   Now, that we got through sort of the bothering part about the document, I want to take a look at page 13.

        MR. CHARFOOS:  And if you could pull out -- there

you are.

BY MR. CHARFOOS:

Q.   Can you describe to the jury what is this that they're looking at?

A.   This is a screen that comes up as part of the client registration process.

Q.   And that's the process that you described where some information was sent from the clients to the server?

A.   That's correct.

Q.   And could you describe for the jury, for example, what kind of piece of information would be sent?

A.   The --

MR. McDONALD:  Objection, your Honor.  This calls for expert testimony as to the flow of information, rather than what is input into the screen itself.

THE COURT:  Well, I'm not sure.  But you did use "what kind of piece of information."  So maybe rephrase your question, we'll see whether or not it also draws an objection.

BY MR. CHARFOOS:

Q.   Mr. Foley, what kind of information is input into Step 2 of 12 of client registration?

A.   The user or the consultant, in my case, would type in the name of the client.

MR. CHARFOOS:  And, Mr. Rudd, if we could go back

out just a little bit and highlight the client name at
the bottom.

BY MR. CHARFOOS:

Q.   There's a definition of a client name there, it says:
"Type the client name as given to you by the server
administrator."  Is that the client name that you're
talking about?

A.   That's what I'm referring to, yes.

Q.   Is that the client name that you and other users of
RemoteWare put into that client registration box?

A.   Yes, it is.

Q.   Now, once that was done --

        MR. CHARFOOS:  If we could go to page 557, which
is seven pages more into it.

        And if we could blow out Step 1 at the top.

BY MR. CHARFOOS:

Q.   So client registration Step 11 of 12 then says:
"Click 'yes' when set up asks you if you want to
establish a connection with the RemoteWare server."

        Do you see that?

A.   Yes.

Q.   Can you describe to the jury when you got that system
what happened with the RemoteWare system?

A.   Upon clicking that button, a communication session
would be initiated, this time from the client to the

server for the purposes of registering or validating the client against the server.

Q.   And what kind of information would be sent as part of that registration and validation process?

MR. McDONALD:  Objection, your Honor, lack of foundation.  The witness does not know what information is sent inside the system.  He only knows what he puts in the box.

THE COURT:  Overruled.

THE WITNESS:  Okay.  What would be transferred would be the client name that was entered into that box.

BY MR. CHARFOOS:

Q.   And how do you know that the client name was sent?

A.   Because on the server there is a corresponding listing of all the valid clients known as the client profile.  And that name would have to match up with what is in the listing for a successful registration.

MR. CHARFOOS:  And, Mr. Rudd, if we could go back to page 13 again and pull out the client name definition.

BY MR. CHARFOOS:

Q.   There's something in there that says:  "An incorrect client name will cause the registration to fail."  Did you ever see a registration fail like that?

A.   Yes, and sometimes we deliberately made them fail.

Q.   And what happens when a registration fails?

A.   Then the client is not eligible to conduct day-to-day communication, management sessions with the server.

Q.   And did you yourself do registrations?

A.   Yes, I did do registrations on behalf of our customers.  I also did registrations in the lab environment.

Q.   Once the clients on the right-hand side have registered with the server on the left, what kinds of things could you do with the RemoteWare system?  What kind of things did you do with the RemoteWare system at that point?

A.   Then what we would do or what customers would do was production or day-to-day sessions would be created, and then run -- between the client and the server, typically with the server initiating the connection to the client. And running what we called a session.

Q.   I know you mentioned "session" before, but can you describe to the jury what a session is?

A.   Yeah, a session is a container, for lack of a better word, that contains management tasks in it.  So essentially the server is saying to the client, Here's things I'd like you to do that are going to help facilitate the end-user on the machine or the processes on that machine.

Q.   And what -- is there a name for those tasks that go in the session?

A.   Yeah, the tasks, the discrete management functions, the individual management functions are called events.

Q.   How is it that you know that events make up sessions?

A.   Because I created sessions myself, both in the lab and in the field.  And I've used virtually every event eligible.

MR. CHARFOOS:  Your Honor --

Mr. Rudd, can we have Demonstrative 502 brought up, please.

BY MR. CHARFOOS:

Q.   And I think that what we've got here, we've got the outbound, the server with the outbound queue and a session is blown up here.  Can you describe to the jury what you're showing?

A.   Yes, we're showing the relationship between a particular session, in this case we're looking inside of what's inside Session 1, and we're seeing in this instance three specific events, each of which performed unique management functions.

Q.   Can you describe to the jury what kinds of events would be used with the RemoteWare system?

A.   Sure.  I would use probably most often the send file event.  Which would send a file from the server to the

client, and place it on the file system on the client. I would do the inverse of that, get a file from a client event.

I would do a check disk event, that would give me a health status check on the hard disk, typically of the client machine. I would use a directory event to bring back the entire contents of the hard disk and all the folder and subfolder underneath them.

Q. Is there some sort of listing somewhere of the different events that were available that you used the RemoteWare system?

A. Yes, I used the event list. It's in the manual. It's also in the -- you know, where I would actually grab them would be in the program interface in the session editor where there's a drop-down list with all of these events, and you could pick them and choose them as you go to the session.

MR. CHARFOOS: Your Honor, we would move Exhibit 7034 into evidence by stipulation.

THE COURT: 7034 is in evidence.

(Defendant's Exhibit 7034 received in evidence)

MR. CHARFOOS: Thank you. Can you highlight the title.

BY MR. CHARFOOS:

Q. This is the RemoteWare server for Windows NT

reference manual, and again, the server reference there is the RemoteWare server we see on your chart?

A.   Yes, it is.

Q.   Demonstrative 501, again, if we could focus on the bottom, XcelleNet again is the company that sold it?

A.   Yes, it is.

Q.   And it was available in the United States?

A.   Yes, it was.

Q.   I will ask you to go to the next page.  What version and copyright date?

A.   This is RemoteWare Version 3.1.  This is the server reference manual, typically the book that the administrator back at headquarters would have on his or her shelf.

Q.   And what's the copyright date?

A.   1996.

Q.   And is this the kind of document that you both used and found in the field during your work on the RemoteWare system?

A.   Yes, it was both in the lab and in the field.

Q.   That would be prior to October of 1999?

A.   Yes.

Q.   And I neglected to ask you, when you talked about the registration, did you actually register clients with the RemoteWare server?

A.   Yes, I did.

Q.   And you are, of course, aware that registration occurred remotely -- I'm sorry, wirelessly?

A.   Yes, in the field.  In the lab we didn't have the wireless setup back to the lab.  But we had it in the field at customers.  And we had the customers' side of it in the lab where we could actually hit customers satellite installations in the field.

     MR. CHARFOOS:  And I'd like to turn in Exhibit 7034 to page 344.  Big manual.  And if we could blow up Table 1.

BY MR. CHARFOOS:

Q.   There's a lot on this table, but I know I talked about it a little bit already.  But could you just highlight some of the events for the jury that you've already explained?

A.   Sure.  Once again, the send file event sends a file from the server to the client.  The ones I didn't talk about, for instance, the make directory, will create a directory on the file system of the client.  There's a remove directory, which is kind of a destructive event that would actually remove not only a folder but maybe all the file or subfolders underneath that folder.

     And there's a procedural event that I don't talk about in here called "wait for file to exist."  This was

a very powerful tool because that would enable us to
conditionally run other events, depending upon whether a
given file existed or not.

MR. CHARFOOS:  Mr. Rudd, you can take that down.
Thank you.

BY MR. CHARFOOS:

Q.  Had you ever heard of something called ESD, or
Electronic Software Distribution?

A.  Yes.

Q.  And what is that in the RemoteWare system?

A.  ESD is the RemoteWare term for delivering and
installing software package from the server to the
client machine, such as Microsoft Word or any production
application.

Q.  Now, I've heard of a "poison pill" before.

A.  Correct.

Q.  Could RemoteWare do a poison pill?

A.  Yes, and so at TAP Pharmaceutical in Chicago.

Q.  And what is a "poison pill"?

A.  A poison pill is a session that contains specific
events such as remove directory, delete file, that would
enable you to delete some or all of the client machine's
functionality.  For instance, I could delete an entire
application, I could delete the operating system which
would effectively make the computer nonfunctional.  And

in the case of TAP, we actually deleted the RemoteWare

subsystem.  Because we converted it to Afaria.

Q.  Now, going back to Demonstrative 501, which is your

high level picture of the RemoteWare system there, you

got the Sessions 1, 2, and I think the dot, dot, dot

stand for many other sessions; is that right?

A.  That's correct.

Q.  Now, you got the sessions in the outbound queue.  Do

the sessions begin in the outbound queue?

A.  Sessions don't originate there, they get staged

there.  They first have to be created by the

administrator, or I would create such a session in the

lab or on behalf of the customer.

Q.  And taking you even one step farther back, how does

the outbound queue get into the RemoteWare server?

MR. McDONALD:  Objection, your Honor.  This calls

for expert testimony regarding the internal structure

and algorithms of the RemoteWare server product.

Mr. Foley has not been tendered as an expert witness of

any kind.  There's nothing he perceived.

THE COURT:  I'll sustain the objection unless

there is something that the witness is testifying to

that appears on screen or something that can be

observed.

BY MR. CHARFOOS:

Q.   Mr. Foley, did you ever install a RemoteWare server?

A.   Yes, I did.

Q.   And as part of that RemoteWare server installation, did it also put the file for the outbound queue on the server?

A.   It placed onto the server the location which is observable in the product interface and which I did observe in the schedule manager.

Q.   And when you installed the RemoteWare server onto the box itself, did you have any option not to put the outbound queue in there?

A.   No.  You couldn't run a session if it wasn't created. It also created the file cache location where all of the files associated with the outbound queue that were tied to the sessions, that was observable in the product interface as well.

Q.   And now you mentioned a file cache.  Can you explain to the jury what the file cache is?

A.   Cache is a technical term for more or less staging area.

Q.   And was that staging area used for a whole bunch of stuff in the RemoteWare system?

A.   No, it was only used to bring in the files that were to be transmitted from the server to the client.

Q.   All right.  So if I understand your testimony correctly, was it possible to install the RemoteWare server without putting the outbound queue in?

A.   No.

Q.   And at the time the RemoteWare server was installed, were there any clients that are there on the system?

A.   There's only one client on the system.  After the initial install of the server.  And that's a special client that's used for a special type of session.

Q.   But that occurs after the installation of the server, correct?

A.   Correct, you have to have a server up and functioning.

Q.   So we talked a little bit about the outbound queue and when it was created.  Let's talk a bit about how those sessions get into the outbound queue.  How did you get a session into the outbound queue?

A.   I would create the session using a tool called the "Session Editor."

Q.   What's the first step in creating a session?

A.   To give it a name.

Q.   What's the next step you used to create a session?

A.   Then you compose, as we saw earlier, the session using these events.  You would put one or more events into that bucket known as a session.

MR. CHARFOOS:  If we could bring out Demonstrative 502.

BY MR. CHARFOOS:

Q.  So you had a session and then you'd put some events into it?

A.  Correct.

Q.  And then what happens next with the session?

A.  Well, then, the next step in the process would be to decide when and under what conditions that session would run.  In terms of giving it a schedule or a conditional.

Q.  And how would you do that?

A.  You would go into the schedule -- scheduling interface where you could -- there's -- it's a busy, busy place where you could set virtually any perimeter you want to determine when and under what conditions a session would run.

Q.  Okay.  Unfortunately, I think we're going to have to look at that busy, busy place.

MR. CHARFOOS:  Could you bring up Exhibit 7034, page 170, is it?  And could you blow up --

BY MR. CHARFOOS:

Q.  You weren't kidding -- there are a lot of buttons and everything.  I don't want to focus on absolutely every single one of them.  But could you describe to the jury what they're seeing right now?

A.  What you're seeing are the options that were available to me as a consultant or to an administrator of one of our customers.  For scheduling, sequencing the sessions.  So our customers really weren't concerned about when these sessions would run.

Q.  And I see in the upper left-hand corner something called a "session type."  Can you describe for the jury what that means?

A.  Sure.  There are four types of sessions in RemoteWare.  Outbound, once again, would be a session that is -- where the communication link is initiated at the server and taps the client on the shoulder.  And then runs the command that are contained in that session.

Inbound would be the inverse of that.  That would be the -- where the client machine would contact the server, and then people do the same thing.  They would run the management tasks and events that were in that session.

Both cases that you could create a session which could run in either direction.  So it really didn't matter who initiated the communication, the link, the same session would run.

And process only, that gets back to that special client I talked about that was installed on the server.

A process only session ran that special client on the server against the RemoteWare server, so literally you have the client and the server on the same PC.

Q.  And did you use outbound sessions prior to October of 1999?

A.  Yes, I did.

Q.  And did you use outbound sessions after that time?

A.  Yes, I did.

Q.  Now, there's something called the "schedule type" right under the session type.  Can you describe to the jury what the schedule type is?

A.  All right.  A fixed schedule would be one run on a periodic basis.  Every Wednesday, every Friday, etc.  A calendar schedule would be very date-specific, time-specific, I want to run this session on the 25th at 10:00 p.m.  A dependent session is one that wouldn't have any fixed time or calendar-based time and date, but it would run only upon the successful completion of another session.  It's conditional.

Q.  So if we go back to our Demonstrative 501, I see Session 1 and Session 2.  So can you describe to the jury again how the dependent session would work if we have those two sessions?

A.  Sure.  If Session 1 were the -- the session upon which Session 2 depended, Session 1 would have to

complete successfully before we'd even attempt to run Session 2.  Session 1 failed, Session 2 doesn't run at all.

Q.  And I'm not going to ask Mr. Rudd to bring it back up again, but I thought I saw something on there about retries.  What was that?

A.  Retries was one of those facilities in the product that allowed for technical difficulties with the connection on a satellite connected.  For instance, if you got interrupted, say in the middle of running Session 1, but you had set the number of retries to say four, it would attempt three additional times to make that physical connection over the network and run the session through to completing.

Q.  Have you ever heard of something called the "maximum number of concurrent sessions"?

A.  Yes.  That was a setting that I did in the lab and in the field, and administrators in the field would set that, would restrict the number of simultaneous sessions that a RemoteWare server could entertain with RemoteWare clients.

Q.  And I believe that before you mentioned the "wait for file to exist" event.  Did you use the "wait for the file to exist" event to somehow schedule a session to run?

A.   Yes, that was particularly helpful when you were depending upon some outside process that the RemoteWare didn't control, but the end product of that process was to place a file in a telltale location where you could constantly look for its presence.

Q.   So we've built, put the event in the session, you've scheduled the session.  What's the next step?

A.   The next step after scheduling the session is to assign that session to specific clients.

MR. CHARFOOS:  And if we could go -- if we could pull up 4045.

Again, your Honor, we would move to admit Exhibit 4045 into evidence, stipulated, no objections.

THE COURT:  Very well.  4045 is in evidence.

(Defendant's Exhibit 4045 received in evidence)

BY MR. CHARFOOS:

Q.   Before we get to the page with information on it, we'll unfortunately have to ask you, this is again a RemoteWare server guide?

A.   Yes, this is the administrator's guide.

Q.   It's a little bit of the one we saw the last time.

A.   This is a reference manual if I had to look up a particular event.  Administrator's guide is more like a how-to, step-by-step guide.

Q.   If we could get the version and copyright date.

Version 3.1 and copyright 1996?

A.   Version 3.1 for Windows NT.  That would be the operating system on the server in this case.  And the copyright date is, once again, 1996.

MR. CHARFOOS:  And if we could go to page 167.

BY MR. CHARFOOS:

Q.   And could you describe to the jury what this shows?

A.   Yeah, this shows the interface where I as a consultant or the customer's administrator of the RemoteWare system would go to pick and choose which clients were assigned which sessions.

Q.   And once the client was assigned to the session, what happened next?

A.   The next thing that would happen is, once you saved all this, once you have completed all these steps, based upon what you put into the schedule interface, the session would then take its place in the outbound queue and be, you know, wherever it fell chronologically in that queue.  If you set it for five minutes from now, it might be at the top of the list.  If you set it for next Wednesday, it might go to the bottom of that list.

Q.   How do you know that the sessions were placed in the outbound queue?

A.   Because you could see them in the schedule manager interface.

MR. CHARFOOS: And if we go to Exhibit 7034 at page 189.

BY MR. CHARFOOS:

Q. And again, this is going back to our server reference manual. Page 189. It's a very colorful table here. Can you describe to the jury what that shows?

A. Yes. This shows the outbound queue.

Q. And can you describe what kinds of information is in that -- what really are those things that are being depicted?

A. Each line in this listing is a specific session that's going to run against the clients that you assign to it, and you'll see the start time column, and that indicates when the communication link will be attempted to bring up.

You see the client's list that will run against. And then you see a status, you see the top ones happen to be active in this case. Those are the ones that are currently running.

Q. And I think that you mentioned earlier that you had the opportunity to go look and under the covers, I think you mentioned, into the outbound queue, and it's a file cache for it?

A. Yeah.

Q. Were these -- what we're looking at here in the

schedule manager, is this just sort of a little bit of
information or was this session itself placed into the
outbound queue?

A.   The -- the session itself was placed into the
outbound queue, and there is some prep work that took
place before the queue would actually activate the
communication out to the client.  What we did
effectively was build a master, what we called a master
work list.  So I might have many events, I might -- in
that session.  They may involve sending many different
files that are scattered throughout my server
environment across many network conditions, or else
before.  And building the master word list would bring
all of these events into one big list as if it was a
single thing.

       So I'm taking multiple events and bringing them
all into one master list, and I'm bringing those files
over and putting them in that cache that I referenced
earlier because that cache is tied to the queue.

Q.   And we're going to talk a minute about the connection
with the server and the clients, but ultimately was the
information and date that was in the session, was that
sent over to the client?

A.   Yes.

Q.   So once all the session builds itself up and gets the

files in it and the information in it, what's the next step in the process?

A.   The next step is to then activate that communication link.

Q.   And is there some sort of guide or stepwise list that you looked at or referenced when you were in the field to see how it works?

A.   Yes, we would go through all our manuals and training, everybody who had the product had these manuals.  And there's this 14-point list of all these things that happened, including the ones that I just described in building the master work list.  And then it describes everything that happens through the execution of the session all the way to the end of the session.

          MR. CHARFOOS:  Okay.  If we could bring up Exhibit 7034 at page 165.

BY MR. CHARFOOS:

Q.   Is this the 14-point list you were talking about?

A.   That's correct.

Q.   Now, we're not going to require the jury to go through absolutely every step of the 14-point list.  Maybe we can group a couple of them together.  Can you describe for the jury when you are a consultant, what happens with the first five steps?

A.   The first five steps were this:  It was this

gathering of all the different pieces of the puzzle, so to speak, into what we call the master word list.  So this was where those activities I just described all took place, and then we get to Step No. 6, which is to build the master word list.

Q.  Is that what you were talking about when you were talking about the actual session, that was sort of building itself in the outbound queue?

A.  Correct.  1 through 5 is kind of the gathering and sorting stage.  And 6 then becomes the building stage for that work list.

Q.  Okay.  The next step, Step 7, is to build the before event.  What does that mean?

A.  You -- you mean the execute?

Q.  I'm sorry, yes, the execute before events.

A.  Execute before events are special events that you might want to run before you bring up a costly satellite or some type of wireless connection where you're paying by the minute or by the byte.  Back in these days, it was by the minute.  It wasn't by the byte.  So you'd want to get as much set up and staging done beforehand so some of these events would run prior to the communication link coming up, and we called those "before event."  So before the session, so to speak.

Q.  And the next step, Step No. 8, is to initiate a

connection to the client.  What happened there?

A.   That's bringing up the communication link.

Q.   And when you talk about the communication link, can you describe to the jury how the communication between the RemoteWare server and the clients would -- well, first of all, could you observe that yourself?

A.   Yes, you could.

Q.   And how was that?

A.   And I did.  There's in the interface a utility called "network status."  Also you saw previously those in the outbound queue in the schedule that said "active," so that's one indication to me that things are running.

I can also go into the network status which is going to show me in a little more detail all of the events as they're running.  And if you so enabled it, there was even a facility in a room over a client where, especially for troubleshooting, if you wanted to expose all the events as they're running to the end-user, it couldn't be observed there.

And in setting up my lab environment as part of my training, the beauty of having both the client and the server in the same place is if I could actually have all these open statements to make sure things were working.

Q.   And so Step No. 8 in the process is to initiate a

connection so the server initiates a connection to the client; is that correct?

A.   Correct, to create an outbound session.

Q.   How does it go about doing that?

A.   There's basically three phases to what happens around that connection.  So once our ducks are in a row, so to speak, we've done all these prep events.  The server first tries to verify once again that this is a legitimate client.  So the server has an address for the client, goes over the network, wakes up the client, the client then sends information back and responds to the request to identify himself.  Validates, yes, this is indeed the client name.

Q.   And this is before any of the session is sent?

A.   This is before the session events start executing.

Q.   Okay.  So I interrupted you.  Making sure the client names are verified?

A.   Sure, so now we know it's okay to talk, so to speak, between client and server.  Then the during events take place.

Q.   And I think that we see that as No. 10:  "Execute during events once the connection is established."  Is that what you're talking about?

A.   Correct.

Q.   And what does that -- what happens there?

A.   Those are the events that the administrator or such as the consultant such as myself placed into that session, and then they execute top to bottom Event No. 1, Event No. 2, Event No. 3, etc., and perform those management tasks.

Q.   And were those events actually sent from the server to the client during that period?

A.   Yes, they were.  And everything on or about them. For instance, if I'm sending a send file event, the send file event has to specify what file I'm sending, where it lives in the server environment, meaning the entire directory path and location and name of the file.  That information, along with the command that I am sending you a file, and I would like you to place this at the following location.  And once again, we would have a very specific, direct, you know, directory and path of where that file was to be placed.  So all of that, the command itself and all of the parameters are specific to that command to get passed to the client, the client receives and acknowledges.  And then executes its end of that track.

Q.   You mention the fact that the client receives and acknowledges it.  How did you as a systems architect know that the event had been received and acknowledged by the client?

A.  That was visible on the server side through the network status interface.  You could literally see the event by event, blow by blow.  And it was visible on the client side in that comparable utility that I talked about where you could enable the visible to the end-user of what's going on right now.  And then once -- I know we haven't gotten to the end of the session yet, but once you got to the end, both the client and the server would have a log that would show you the blow by blow, and if a certain event was not acknowledged successfully in that view, you would actually see red for the unsuccessful completion of that.

Q.  Let's quickly look at the client's side.

MR. CHARFOOS:  If we could go to Exhibit 733 at page 58.

BY MR. CHARFOOS:

Q.  And pick out the ESD arrived, and there's -- looks like some sort of window there.  What's that showing?

A.  This is a notification on the client's side.  Remember, ESD was our shorthand for software installation.  To send and install a software package.  This would be an indication to an end-user if there was one on the client machine that your Microsoft has arrived.  Or your, you know, Lotus Notes client has arrived.  And would then allow for a later installation

Foley - Direct

of those files.

Q.   So the file arrives and this is before anything is done with that file, correct?

A.   Yes, nothing's been installed.

MR. CHARFOOS:   And if we could go to Exhibit 7034, which is the server guide, at page 244.

And if we could pull up that top dialogue box.

BY MR. CHARFOOS:

Q.   And I think you had mentioned that there was a session log on the server side as well?

A.   Correct.

And what you're seeing here is, each one of these lines -- actually, you see the three lines that are grouped together in red here, these are all the details of what happened during one specific event within this session.  So each group of two or three here represents the success, the failure, the time that it took to execute, the time of day that it transpired, and you can see they say "during, during, during," so obviously these all played out while the connection was up.

Q.   And in terms of, you mentioned "execution," how do you know that a particular event executed at the client's side?

A.   It shows up in a client version of this, the client log, which is very identical.  Typically we in the

field, if we were sitting at a remote site at a Burger King manager's, you know, cubical, which are the smallest rooms in the world, you would bring up this interface and look at the client log, and if it was in red, as this one was, you would indicate that that event failed.  You would look in here, troubleshoot it to find out why it failed.  Or if it took an unusually long time to try and execute before it failed.  We developed a feel for how long a file to send or a file request should take, and if you saw an unusual time here, this was our recourse.

Q.  If you could go back to Exhibit 174, which was the reference guide, and look at page 165.  I think you jumped the gun a little bit on me.

A.  All right, sorry.

Q.  Step No. 14 says:  "The server terminates the communication link."  What does that mean again?

A.  That means we call this technically the tear down the link.  So we had the initiation, we had the playing out of all the during events, and then we had the teardown of the connection.  It's basically the polite hanging up and saying goodbye.

Q.  And then this was good, that was all done wirelessly with Versions 3.0 and 3.1?

A.  Yes, it was.

Q.   And you were aware of clients who did that prior to October of 1999?

A.   Yes.

MR. CHARFOOS:  Your Honor it's slightly after 4 o'clock.  It's a good breaking point in the direct.

THE COURT:  Very well.

We'll stop for the day, we'll come back to this matter tomorrow morning at 9 o'clock.  Remember my admonition.

DEPUTY CLERK:  All rise.

THE COURT:  Counsel, remain briefly.

You may step down.

THE WITNESS:  Thank you.

(The jury exits the courtroom.)

THE COURT:  Very well.  I'll hold our court reporter briefly, it's been a long day, but remind me if there are matters that are still pending out of the presence of the jury.

Be seated.

MR. McDONALD:  There's one item, your Honor, defendants would like to play the video deposition of Joe Owen, a witness who I believe was formerly employed by XcelleNet.  We have objected to specific designations made by defendant because they are rank hearsay about the actions of others and speculation regarding wireless

use of RemoteWare.

Under the Court's order, we are compelled to bring this to the Court's attention because we do not believe those specific designations should be played to the jury, and I'm happy to discuss things specifically if you would like, your Honor.

THE COURT:  Is there something to look at?

MR. McDONALD:  Absolutely.

MS. MARAS:  Yes, your Honor.

MR. McDONALD:  Start with page 75 of Mr. Owen's transcript.  The question starting at line 12:  "If you could expand that through the bottom and for those companies prior to 1999 that we've been discussing" --

THE COURT:  Let me just read it rather than...

MR. McDONALD:  Sure, I'm sorry.

And then the answer continues on the next page at the top.

(Pause in the proceedings.)

MS. MARAS:  Your Honor, you'll see on page 76, lines 4 through 7, that the witness specifically testified about the RemoteWare and how it could wirelessly manage the system through a remote device. The witness has over 20 years of experience in this industry.  And in particular from 1989 to 1997, he worked at XcelleNet.  In positions ranging from product

manager up to VP of engineering.  Then he worked at Sterline Commerce.  We heard about how those companies transitioned over time.  And then from 2000 to 2004, he was the CTO of XcelleNet.

So he has extensive personal experience in this industry, in particular, extensive personal experience, regarding RemoteWare, hands-on experience developed over a period of a decade working on this product.

MR. McDONALD:  There's no dispute that the man's experienced, but he was asked if other people used it wirelessly and he said, quote:  "I can tell you that they claim that capability.  I did not independently validate that capability."

He has no basis for testifying.

THE COURT:  Well, you say hearsay, but isn't this nonassertive conduct?  If someone is using something that's not intended as a statement, it's intended as a description of what they're doing.  I don't understand why I should be concerned if someone took the -- unless the claim is, that this is a controversy because the product was, as we see it, incapable of doing that, and the fact that someone claims they did it becomes asserted that they did it.  Based upon what I'm hearing now, I don't understand there to be a claim that the product was incapable of this process.  So whether he

saw it or not as opposed to knowing someone can do it doesn't seem to me to be controversial.

MR. McDONALD:  Both points, your Honor, on the assertive conduct point, he didn't say, I saw people do it; he said, They told me that they had done it.

On the point of whether the system is capable of it, frankly, Mr. Foley's testimony and this deposition is the only evidence in this case that this product was ever used wirelessly.  We don't think it was used wirelessly.

THE COURT:  My question is, whether it could be. In other words, this has to do with the technical capability, and although someone can say, I use it wirelessly, that becomes important if there's a controversy over whether it could be.  Is the only evidence of its technical capability the testimony of a witness?

MR. McDONALD:  Their expert, Dr. Acampora, did not use the RemoteWare system or try to operate it in any way.  He's relying on the testimony of Mr. Foley and Mr. Owen.

MR. CHARFOOS:  Your Honor, if I may, once again, this is a reargument of summary judgment and Daubert motions.  As far as Dr. Acampora goes, he relied on the testimony at the deposition of Mr. Foley, the deposition

of Mr. Owen, and his independent review of all of the documentation, the user's manuals, press releases from the time --

THE COURT:  See, I'm confused.  What I just saw were what appeared to me to be portions of user manuals and reference guides that illustrated that the product was useful wirelessly.

MR. McDONALD:  I disagree.

THE COURT:  Is there something about that that you want to argue was not done wirelessly?

MR. McDONALD:  Absolutely, your Honor.

THE COURT:  What?

MR. McDONALD:  The only reason --

THE COURT:  Tell me what.

MR. McDONALD:  There's no evidence that it was used wirelessly.  Those manuals never refer to wireless use.  That's why Mr. Foley's here testifying.

THE COURT:  I see.  So the manuals, if I were to read the manuals, never speak of satellites or anything of that kind.

MR. McDONALD:  Absolutely not, your Honor.

MR. CHARFOOS:  The manuals themselves do support the capability to be used wirelessly.

THE COURT:  What do you mean, that -- they never mention use over a satellite.  What do you mean they

support it?

MR. CHARFOOS:  Use over a satellite allows a particular kind of protocol.  And those protocols are discussed in the particular manuals.  And then it is clear from the testimony of Mr. Foley and Mr. Owen that it was in fact used wirelessly, and there are press releases that talk about --

THE COURT:  I'm only concerned with the first part, because whether it was or not, the prior art that can serve as relevant information for the jury is not how people did it, because that's not in the public domain.  What is in the public domain is something that's written or published, and so I am concerned if you aren't answering a -- responding to his answer that the written material does disclose wireless use of RemoteWare to manage.

And so that's why then his objection is well made.  If then the only evidence is someone saying they did it, and I'm not even sure that would qualify as prior art unless that is put in the public domain.  So I'm somewhat concerned about the proffer.

MR. CHARFOOS:  Your Honor, what we have demonstrated is that the system itself, RemoteWare, was publicly used more than one year prior to the filing date of the provisional application.

THE COURT:  Got that.

MR. CHARFOOS:  And therefore, because it was publicly used, it can serve to invalidate the patent. It's not just the collection of the manuals in and of itself that invalidates.

THE COURT:  Publicly used wirelessly.

MR. CHARFOOS:  Publicly used wirelessly.

THE COURT:  How do we know that?

MR. CHARFOOS:  Mr. Foley testified about it. Mr. Owen testified about it.  We have press releases, your Honor, going back to 1995 which talk about it.

THE COURT:  Oh, you see, that's what I'm asking for.  Show me a document which says in writing that this is a system that can be done wirelessly.

MR. McDONALD:  Exhibit number?

MR. CHARFOOS:  5 23.

MR. McDONALD:  Again, your Honor --

THE COURT:  Just a moment; I'm reading.  There are multitasking judges.  I'm not one of them.

MR. McDONALD:  Sorry, your Honor.

THE COURT:  Well, I haven't finished this, but I am satisfied that this is a document which discusses the use of RemoteWare wirelessly through air data, SM and various other technologies that are being described here.

So tell me why this document would not be a document that would be available in the public that would describe RemoteWare as having wireless communication capabilities.

Whether it meets all the claims of the patent is different.  The only issue I'm concerned with at this point is an objection that there's no evidence to show that RemoteWare operated wirelessly.

MR. McDONALD:  So, your Honor, we are not disputing that this was a public document.  I dispute that the language refers to any use.  It's all future conditional.  The headline, and because air data will be able to remotely query databases.

In the body the second paragraph, final sentence: "Will be able to remotely query databases."

It's all in the future.  It's things that they are planning to do.  There's no evidence that this has actually been done.  This is at best a business plan.

THE COURT:  Well, it talks about various things they would be able to do wirelessly.  But it seems to me that, I don't read this as saying that the use of wireless communication is new.  It seems to expand on the kinds of things that wireless communication can be used for.

MR. CHARFOOS:  And, again, your Honor, Mr. Owen's

deposition, he affirmed the fact that they did in fact work with McCaw and they did in fact do this wirelessly.

THE COURT:  I have his testimony in mind.  But if you have to rely upon testimony only, I was -- I am concerned with the objection.  I didn't understand that his testimony is the basis for the wireless capability, and so I hadn't looked for that word in a manual.  You didn't draw that out, that word, to me in the manual.  I presume that word doesn't appear, "satellite, wireless." "Remote" appears but not the way you get to it, because remote just means sending.

MR. CHARFOOS:  Correct, your Honor.  Remote does mean recepting.

THE COURT:  Well, this is the kind of thing that maybe you brought to me in limine, but it's a -- it's one of those foundational facts that would not be left to the jury, it's for the Court to decide.  And if I have to decide right now, I would decide that this satisfies the Court that there is documented proof that RemoteWare could operate wirelessly, and the plaintiff could cross-examine this evidence and call this into doubt, but I consider this sufficient to at least raise in a way that if the jury believes that this is a wireless system, and so it seems to me that someone saying that it was used wirelessly is confirming the

noncontroversial matter.

Now, once you bring evidence, in rebuttal, I presume, that impeaches these witnesses with respect to its wireless capability, then that will have an impact on the jury.  But I will permit witnesses to testify about various things that they know about the program and its wireless capabilities without requiring that they actually observe it at a remote location.  They can observe it wirelessly functionality at the server, at the development stage at various things that they know create wireless functionality.

Does that answer the objection with respect to at least part of this, Mr. Owen's deposition?

MR. McDONALD:  One point, your Honor.  I would submit that this document, Exhibit 523, cannot possibly corroborate the alleged public use because it actually predates that public use.  The date is March 14th, 1995, and Mr. Foley has been asked -- repeatedly been asked to testify to events in 1999, not 1995.  For a document to corroborate it must be dated at or after.

THE COURT:  I would think that your objection would have more force if this is something that occurred after he was there.  But something that occurred before he was there means that it could have been wireless before he joined.  He didn't say that he joined and that

was the first time -- there was a version that was in existence when he started to work. When it first became wireless wasn't asked.

MR. McDONALD: I'm sorry if my point wasn't clear, your Honor. The combination of the date predating the alleged activity combined with the future conditional language, talking about plans, something they may be able to do, this doesn't corroborate anything other than a hope that they might be able to do it.

THE COURT: Well, you know, and I understand that point, that's a great point of cross-examination. If it was all future hopes. So if you can establish that -- I just won't use this as a basis for keeping out evidence by people who were involved in the design of the software and observed only a part of its use, that there has not been a sufficient foundation of its wireless capability.

But that doesn't mean that -- that just means the jury can hear it. It's up to you to convince them that what they are hearing is not true. All right?

Anything further on this Owen deposition?

MR. McDONALD: Your Honor, the testimony of Mr. Owen as to what others told him about doing wireless use, we would still seek that exclusion. It is not

corroborated by any documents.

THE COURT:  That's what I start off with, I thought that's where we were.  In other words, hearsay is designed because you can't cross-examine the statement that is being made.  So the statement you're seeking to make, the declarant, is I used it wirelessly.  It seemed to me that that's not the relevant purpose for which this is being offered because it's not an assertion, the truth of which matters.  The fact is that if someone designs a software to operate wirelessly and they're in the development stage, and someone says, I used it wirelessly, seems to me to be confirming something that they know of their own knowledge based on their involvement in the design.

It would be different if it weren't designed to be wireless and someone was establishing for the first time, Hey, I got a surprise for you, I can use this thing wirelessly.  Then that is something then that perhaps I would be concerned about as coming into evidence because that is what establishes the wireless capability, not the witness's own knowledge of its capabilities.

MR. McDONALD:  The issue, your Honor, is they're seeking to invalidate our patent based upon these statements about what others have done.  Those are the

public uses they're pointing to, so it does matter for the truth of the matter asserted. It's not a state of mind issue. They are relying on these alleged public uses as invalidating uses, to invalidate the patent. They have to prove the fact of that.

THE COURT: I haven't disagreed with you on any of that. They've got to prove it. But this is a threshold issue as to whether or not the jury can hear this witness testify about that fact. That, I built something wireless and people told me they used it wireless. All right. So that I'm allowing. But without prejudice to your -- the witness will be here, right?

MR. McDONALD: No, Mr. Owen is only by deposition.

THE COURT: So you had an opportunity to cross-examine him at that time. It's the same as his being here. In other words, if he lied, you can impeach him. And you had the opportunity to cross-examine him on that issue. Or you can call another witness for that purpose. And I understand the problem that it sounds like both sides are having, in that there's nobody here who can demonstrate RemoteWare today.

MR. McDONALD: I don't believe that's true. I believe defendants have chosen not to do so, your Honor.

MR. THAKUR:  That's correct, your Honor.

THE COURT:  But you are the one who's calling it into question so you could put it on.

MR. McDONALD:  It's their burden, your Honor.

THE COURT:  No, you're objecting to the evidence. They're trying to satisfy it in one way.  You can argue it's weak.  But if you're trying to say it doesn't work, one of the ways you can impeach a witness is to say, Do it.

MR. McDONALD:  That is absolutely correct, your Honor.

THE COURT:  Or I've got it, I haven't been able to do it.  How can you do it?  So, all right.

Enough said.  See you in the morning.

MS. MARAS:  We have one other issue -- I'm sorry, your Honor.  We have one other issue related to deposition testimony, your Honor.  We are planning to play the videotape of Atul Asthana, a witness that the plaintiff already played in their case in chief. They've counter-designated and are trying to counter-designate testimony to admit two exhibits that are objected to.  And one of them is -- and both of them are completely irrelevant to the case, and we object to their attempt to insert objectionable exhibits into our case.

THE COURT:  Well, deposition use is just like testimony.  So the question I would ask is, are the questions that are being asked with respect to the documents used as cross-examination, would be to call into question the credibility or the reliability or something of the witness.  And if it is, they can do it.

If not, they can't now anticipate their own rebuttal case and start something new.  But if it is in the nature of what would be cross-examination, and the witness is not otherwise here to testify, they ought to be able to say, if you're going to play that as part of your case in chief, I want to -- they can do it then or later, I wanted to play this part that cross-examines the witness or impeaches the witness.

MS. MARAS:  The issue is it's beyond the scope of our testimony, and the main example is that --

THE COURT:  That's a good one.  In other words, if they go beyond the scope of what you're putting in.  That's a good objection.  I would sustain that during the use of the witness if the witness were here live.

MS. MARAS:  I understand, your Honor.  And the example is that they are trying to present a printout of OMA disclosures for letters R through Z.  And in particular, those are RIM's IPR disclosures to the OMA, and when the witness was asked about those disclosures,

he said he had never seen the document before, he'd never seen the IPR disclosure page.  We believe it would be prejudicial to present that to the jury, and the witness has no foundation or basis to testify about it.

THE COURT:  I'm sorry, I didn't get that.  RNA.

MS. MARAS:  It's a printout from the OMA website.

THE COURT:  What's OMA?

MS. MARAS:  Open Mobile Alliance, the standards body that's at issue in the case.

THE COURT:  I got that now.  And so who is the witness?

MR. McDONALD:  If I may be heard, your Honor, given the late hour, and your guidance was crystal clear, I believe that we can meet and confer about this.

THE COURT:  I like that.

MR. McDONALD:  And hopefully we can solve it.

THE COURT:  Let me know in the morning if you still have problems.

MS. MARAS:  That's fine, your Honor.

(Adjourned)

oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

INDEX OF EXAMINATION

Witness:                                              Page:

ROY WEINSTEIN

Direct By Mr. Arntsen . . . . . . . . . . . .1178

Cross By Mr. Charfoos . . . . . . . . . . . .1184

Redirect By Mr. Arntsen . . . . . . . . . . .1229

Recross By Mr. Charfoos . . . . . . . . . . .1242

Redirect By Mr. Arntsen . . . . . . . . . . .1246

CARL LLOYD CHERRY

Direct By Mr. Matuschak . . . . . . . . . . .1286

Cross By Mr. McDonald . . . . . . . . . . . .1311

Redirect By Mr. Matuschak . . . . . . . . . .1328

Recross By Mr. McDonald . . . . . . . . . . .1333

Redirect By Mr. Matuschak . . . . . . . . . .1334

CHRISTOPHER FOLEY

Direct By Mr. Charfoos . . . . . . . . . . . .1340

oOo

INDEX OF EXHIBITS

| Exhibit No. | Received |
|---|---|
| 5013 | 1190 |
| 4172 | 1199 |
| 2174 | 1210 |
| 2201 and 2202 | 1214 |
| 4256 and 4257 | 1218 |
| 874 | 1225 |
| 5007 | 1227 |
| 733 | 1354 |
| 7034 | 1361 |
| 4045 | 1372 |
| 319, 326, 330, 331, 332 | 1251 |
| 2122 | 1313 |

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Wednesday, June 27, 2012

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020