Volume 8

Page 1402 – 1632

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

```
------------------------------)
                              )
Mformation Technologies, Inc., )
                              )
              Plaintiff,      )
                              )
     v.                       )    No. C 08-4990 (JW)
                              )
Research In Motion, Ltd.,      )
et al.,                       )
                              )
              Defendants.  )    San Francisco, California
                              )    Thursday, June 28, 2012
------------------------------)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        RUBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO

**APPEARANCES** (cont.):


**For Defendant:**          WilmerHale
                            305 South Grand Avenue
                            Suite 2100
                            Los Angeles, California 90071
                    BY:    MARK G. MATUSCHAK
                           ANDREW B. GROSSMAN

                           Kirkland & Ellis, LLP
                           300 North LaSalle
                           Chicago, Illinois 60654
                    BY:    LINDA S. DeBRUIN
                           AARON D. CHARFOOS
                           TIFFANY PATRICE CUNNINGHAM
                           FERLILLA VICTORIA ROBERSON
                           MARIA A. MARAS
                           MICHAEL DALEY KARSON


**Also Present:**           Ray Dikun, RIM Vice-President

Thursday, June 28, 2012

(9:10 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Good morning.

MR. MATUSCHAK:  Good morning, your Honor.

MR. McDONALD:  Good morning, your Honor.

MR. THAKUR:  Good morning, your Honor.

MR. CHARFOOS:  Good morning, your Honor.

THE COURT:  On the record, out of the presence of the jury.

My BART train was late and I'm late.  But I understand there's a question with respect to some testimony that's going to be exhibited in a proposed deposition.

MR. CHARFOOS:  That's correct.

THE COURT:  When is that happening?

MR. CHARFOOS:  We can bring the jury in, that can wait, and we'd like to get it resolved at some point this morning so we can get the video cut and over to the plaintiffs to approve the video to play.  It doesn't have to be resolved right now.

THE COURT:  I should tell you that overnight I was rethinking the problem that was being presented yesterday with respect to whether or not the RemoteWare

program operates wirelessly, and as I understood the presentation of the problem to the Court, there is no place where, in writing, the RemoteWare document says that it operates wirelessly.  That's how I heard it.

MR. CHARFOOS:  If I may interrupt.

THE COURT:  Yes.

MR. CHARFOOS:  That will be resolved this morning.

THE COURT:  How?

MR. CHARFOOS:  Because there are incidences in the documents of it being described as being used wirelessly.

THE COURT:  Oh, okay.  That will solve that problem.

MR. McDONALD:  This is news to me.

THE COURT:  I lost a lot of sleep for nothing.

(General laughter)

MR. McDONALD:  Actually, your Honor, if we could expand upon that, I was shown an e-mail dated 2002, if that's what counsel is referring to, it would not resolve the problem.  Because it postdates the critical date for determining whether RemoteWare could be used wirelessly.  Further, that document does not refer to --

THE COURT:  Maybe if you could share with each other how it's been resolved.

MR. CHARFOOS:  We haven't spoken at all about it yet.  The issue is, your Honor, there are references in the three documents --

THE COURT:  Let me do it this way then.  What I'll do is I'll hold in abeyance and reverse myself with respect to the witness saying a customer told him that it had the news wirelessly, because I'm somewhat concerned, first, as I said yesterday, that that doesn't qualify in my view as prior art.  Because it's not publicly available.  And so it does raise for me a concern as to whether or not, if that is the basis for claiming that it practices part of the art that is at issue here, that's insufficient.

And then so let me wait then, because you have a witness on the stand who observed it that way.  Maybe it will change as a result of this.  But if you have something in the documents of the company with respect to the RemoteWare, that would be publicly available, that discloses its wireless functionality, I'd like to see that.

So let's defer all of this because we've got the jury waiting now.

MR. CHARFOOS:  May I make one comment, though, your Honor.  I believe that we were going to play the deposition testimony of Mr. Owen immediately following

Mr. Foley.

THE COURT:  Yes.

MR. CHARFOOS:  If the Court is satisfied once Mr. Foley gets off the stand, which I believe that you will, that the documentation discloses the wireless usage of RemoteWare, we would request that we be allowed to play the full deposition transcript of Mr. Owen.

THE COURT:  Why would it be relevant that a customer says that they've used it wirelessly if the documentation shows that it can be used wirelessly?

MR. CHARFOOS:  Because the testimony establishes the fact that it was actually known and used prior to October of 1999, which in and of itself is invalidating. And, therefore, we would present that evidence as further corroboration and as independent corroboration of other customers who used the product in the manner in which it was sold.

MR. McDONALD:  If I could comment, your Honor.

THE COURT:  Let me finish.  Here's the Court's concern, as I puzzled it through last night:  I'm concerned as to whether or not the RemoteWare qualifies as relevant prior art.  That's a question for the jury to decide in some instance, but there's a preliminary question the Court has to decide as to how you are -- what evidence you put in to prove that.

Now, if, as I was reasoning through with myself last night, the only witness who says that it operates wirelessly is this witness, and there's no other witness, that would allow the plaintiff to argue the weakness of that position.

The -- now, you say, Well, I have another witness who someone told they used it wirelessly. The objection was hearsay. I was somewhat puzzled by the objection, but indeed it could be hearsay if, for example, that is why it's being offered, to prove that it could be used wirelessly.

Now -- and I was trying to figure out what exception would apply. And I'm not sure that I have the benefit of an exception in mind that would apply. The reason it's important to the defense, of course, is then you'd have two witnesses who would be able to testify that it could be used wirelessly, but the declarant is not here who can be cross-examined.

And so it seems to me important to know whether or not this is something that is noncontroversial, because the company designed it to be used wirelessly and it was regularly used wirelessly, and if the only way you can establish that is by someone saying someone told me that, that becomes important to the Court to figure out.

MR. CHARFOOS:  In 15 minutes, your Honor, I think that you'll understand that the company itself in the written manuals promoted it as being used wirelessly.

THE COURT:  But, again, why is it --

MR. McDONALD:  If I could comment, your Honor.

THE COURT:  Yes.

MR. McDONALD:  Everything he's talking about is three or four years later than the critical date, when the company perhaps thought it might be able to be used wirelessly.  This issue of the Owen deposition, it's critically important, as your Honor has recognized.  We shouldn't be rushed into playing it.  This requires further analysis by the Court.  They have several depositions queued up ready to play, agreed to.  After Mr. Foley's done testifying, they can proceed to those depositions, and we can address this with the attention it requires afterwards.

THE COURT:  So it's a timing issue -- this witness who saw it and went to the various sites, Burger King and the Shoney's, the ones that he called out, I don't know when that took place, I guess, because the challenge is that might have taken place at a different point in time, so that might be one way to help me understand this as you examine this witness.

I am going to terminate this discussion.  I

will -- if you believe that the next thing you would wish to present would be this deposition testimony, uninterrupted by the Court saying, No, play this part, then you need to go on to something else until I solve this problem.

MR. CHARFOOS:  Your Honor, we can delay the playing of the deposition.

THE COURT:  All right.

MR. MATUSCHAK:  One quick thing, we have a slightly corrected JMOL motion, it just puts it in the -- the only correction is we put in the actual correct transcript sites.

DEPUTY CLERK:  Was that sent to me via e-mail this morning?

MR. MATUSCHAK:  Yes.

DEPUTY CLERK:  It's already been sent to chambers.

MR. MATUSCHAK:  Okay, thank you.

THE COURT:  Summon the jury.

May we have the witness back?

(Mr. Foley resumes the stand.)

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may resume your examination.

MR. CHARFOOS: We've switched easels, your Honor, hopefully the board won't attack the jury again today.

(Pause in the proceedings)

DIRECT EXAMINATION (continued)

BY MR. CHARFOOS:

Q. Mr. Foley, welcome back this morning.

A. Good morning.

Q. Before we get into a little bit of new information, why don't we just quickly summarize for the jury what we ended up with yesterday. And I believe that we ended up with the fact that the RemoteWare system, Version 3.0 and 3.1, was available prior to October of 1999. Is that correct?

A. That's correct.

Q. And RemoteWare was used wirelessly prior to October of 1999?

A. That's correct.

Q. And RemoteWare had a server, and clients, correct?

A. That's correct.

Q. And that server had an outbound queue which stored sessions, correct?

MR. McDONALD: Objection, your Honor, lack of foundation.

THE COURT: Overruled.

THE WITNESS: That's correct.

BY MR. CHARFOOS:

Q.   And then those sessions, based on different criteria, such as perhaps a file being ready to exist or another session finishing up, would ultimately come to the top of the outbound queue, be sent across to clients; is that right?

A.   That's correct.

MR. McDONALD:  Objection, your Honor, lack of foundation.

THE COURT:  Well, I'm overruling the objection because, as I understood the testimony, that is what displayed on a window that could be observed, and I have restricted the witness to what could be observed on the screen.  The earlier objection I thought had to do with the source code and how it operated, to which the witness has not testified.

MR. McDONALD:  It's a similar objection, your Honor.  He was not asked if he saw on the screen, he's saying where data came from.  He has no idea where the data comes from.  He only knows what he sees.

THE COURT:  But the word was "stored," and the word "stored" to me is listed in some queue, and so the objection is overruled.

BY MR. CHARFOOS:

Q.   And once those sessions were transmitted from the

server to the client, you observed them being received on the client side; is that correct?

MR. McDONALD:  Objection, lack of foundation as to "transmitted from server to client."

THE COURT:  Overruled.

THE WITNESS:  That's correct.

BY MR. CHARFOOS:

Q.  And then how did you know they were received on the client side?

A.  It was visible in the network status utility on the server, and if the administrator enabled it, there was also a comparable facility on the client machine, and in our lab environment we could see both of these at the same time.  And after it was done, we could go into the logs on either the server or the client and see the evidence of that.

Q.  And then once it was received on the client's side, at that point in time the event would be executed on the client's?

A.  Correct.  As evidenced in the log on the client, or the server.

Q.  Now, Mr. Foley, you've testified that RemoteWare Version 3.0 and 3.1 were used wirelessly prior to October of 1999.  Do you have any documentary evidence of that?

A.   Yes.

MR. CHARFOOS:  Mr. Rudd, can we go to Exhibit 733, which is the RemoteWare Windows Client User's Guide, and if we could go to page 31, which is Bates ending 571, and we can pull out the top paragraph.

BY MR. CHARFOOS:

Q.   And that says "the retransmit time out -- indicates the number of seconds to wait before retransmitting unacknowledged data -- "should be set to higher values on links with high delays such as slow networks or satellite links."

What does that mean to you, Mr. Foley?

A.   What that means, this is a tuning parameter, and both in my training and in the field, when there were satellite customers, this and two or three other, the window size and the number of packets, number of bytes in each packet, were the elements that you had to tune for satellite-specific communications because of the latency or the delays that satellites introduce.

Q.   And is this consistent with your experiences --

A.   Yes, it is.

Q.    -- with RemoteWare clients?

A.   Yes, it is.  And with my training.

Q.   And the date on this document was copyright 1996?

A.   Yes, it is.

Q.   And again, you found these documents in the field with RemoteWare customers who were using 3.0 and 3.1?

A.   Yes, I did.

MR. CHARFOOS:  Mr. Rudd, could we please go to Exhibit 4045, which again is the RemoteWare Server for Windows NT Guide, and please go to page 111, which is Bates number ending 512.  And if we could pick out the Topic Number 6.

BY MR. CHARFOOS:

Q.   And I think this might be somewhat duplicative, but on the server side, select "a retransmit time out."

"Although the default is sufficient for most installations of the selected resource, you may want to adjust the value for special conditions.  For example, clients linked by satellite may need this value increased, while very fast networks may acknowledge data quickly and need a smaller value."

Again, Mr. Foley, what does this mean to you as a practitioner who has used RemoteWare prior to October of 1999?

A.   It's essentially, it's the same parameter that we discussed earlier, and it's in this case that we're getting a little bit more specific about what to do with this parameter in terms of increasing it to increase the tolerance for these delays.

Q.   And again, this is a document copyright 1996, which you found out in the field with clients who had been using RemoteWare Version 3.0 and 3.1 prior to October of 1999?

A.   That is correct.

MR. CHARFOOS:   And, Mr. Rudd, finally, could we go to Exhibit 7034, which is another server reference manual, and if we could go to page 419.  To 39.  And if we could focus on the example protocol ECF at the bottom.

And focus then on protocol:  "A sync – cellular."

BY MR. CHARFOOS:

Q.   Can you please describe to the jury what that means to you?

A.   What this means to me -- by the way, this whole block of information is a communication profile.  When you're setting up for a modem.  Unlike a satellite, modems in those days went wirelessly over cellular networks.  So once again, you had to -- and they were a little bit flakier than land lines.  So once again, you had to tune or create special profile when you knew it was going over a cellular carrier as opposed to a land line.

MR. McDONALD:   Objection, lack of foundation. Move to strike the prior question and answer as undisclosed expert testimony.

THE COURT:  Denied.

BY MR. CHARFOOS:

Q.  And, Mr. Foley, this particular document is also copyrighted 1996?

A.  Yes, it is.

Q.  And this manual, along with Version 3.0, was what you found in the field?

A.  Yes, it is.

Q.  And again, all three descriptions of satellite and cellular use are consistent with your experiences with the RemoteWare system?

A.  Yes.  I configured, you know, the retransmit time out personally, and again, was trained in how to tune those by my bosses.

Q.  And I want to focus back on Demonstrative 501 here for a minute, and limit your testimony to experiences that you had creating an outbound connection.

A.  Okay.

Q.  In terms of creating a session and then transmitting the session over to the clients, was that something that the administrator themselves did or was there any request by the clients, the actual client software in the computer, to do so?

A.  An outbound connection was totally under the control of the administrator.

Q. So under no circumstances in an outbound connection do those clients request that anything be done to them?

A. No. Frequently, we had unattended client machines. That Burger King example that I spoke about yesterday, while at Burger King restaurant you have multiple managers over the various shifts. They're out front, behind the counter 90 percent of the time, while the RemoteWare client is sitting back in their cubicle, the closet type of an office, with the RemoteWare client in a kind of a listen mode. So no one's really there to do anything.

Q. And again, can you remind the jury the time period in which you were either training or out in the field as a systems architect?

A. Yes. That would be from November of 1998 through around September of 1999.

Q. One last question on Demonstrative 501, and then we'll move on to a different topic, but I see that you -- we have the server here and all it says is "RemoteWare" on it. Do you put anything else on the RemoteWare server?

A. That was our installation recommendation, that you put nothing else on that server. We had customers that tried to put the database -- for instance, there's a database that supports RemoteWare. We told them not to

put it on the server.

Q.  And were you aware of instances where clients followed those instructions and only put the RemoteWare server on that one box?

A.  Yes.  If they wanted to maximize the performance of their RemoteWare server, all of the resources, because RemoteWare, remember, was limited to 64 concurrent connections on a box.  So anything else that you put on that box or attempted to put on that box would slow the RemoteWare server down.

Q.  Now, I want to take a step forward from when you were a systems architect and talk a little bit more when you were product line manager and director of technical planning for XcelleNet.  At that time did you work with RIM in any way, shape or form?

A.  Yes, I did.

Q.  And can you describe to the jury the kind of relationship that you and XcelleNet had with RIM during the 2000, 2001, 2002 time period?

A.  Yes, we were partners with RIM.  The product line that I was managing, subsequently became named as Afaria, after we were showed by Sterling Commerce under which it was called "CONNECT:Manage."  We supported the original BlackBerry pagers, as they were called in the day.

And so it was our goal -- we supported BlackBerry, we supported Windows CE/Pocket PC. We supported Palm devices. We supported Symbian devices. So it was our goal to have as much functionality on all the supported platforms as possible.

And with RIM in particular, they were making a transition on their devices from one operating system, so to speak, I believe it's referred to as their C or C++ platform, to a Java-based system. So when they were making that jump, we were very concerned that we were going to lose functionality. Up till then, we could do a lockdown or the poison pill and an inventory scan, which brought back tower information. Very important to one of our joint customers with RIM, Salomon Smith Barney. We were afraid we were going to lose that.

So we approached RIM and said, What do we have to do to get in your best partner program so that we remain -- continue to have access to the APIs that are necessary for us to be able to deliver software and do other management functionalities to your next generation of devices? And at that time we decided -- we were told that the way to do that was to enter the ISV Alliance Program.

Q.  And just to be clear, the work that you were doing on the BlackBerry devices, that did not begin until

approximately October of 2000; is that correct?

A. That's correct. I mean that was only as a product line manager.

Q. And you mentioned becoming a member of the ISV Alliance. What was your understanding of what the ISV Alliance was?

A. The ISV Alliance would give us both access on the technical side to the APIs -- again, to keep the product current with the next generation of BlackBerrys. It also gave us marketing support and --

Q. And were you the only member of the ISV Alliance as far as you know?

A. No, we weren't. I could tell because you go to the ISV Alliance member page and you see our logo and the other partners' logos.

Q. You mentioned market benefits, what kind of benefits did you receive as part of the ISV Alliance?

A. The ability to put our logo side by side with the RIM logo on web pages, on collateral, for marketing, joint webinars and seminars in the field, trade shows, and other such events. You know, basically to put your name out there side by side with RIM. And, you know, we had joint customers, and we wanted more of them.

Q. And what kind of technical assistance did you receive from RIM?

A.   We got the API support that we sought on their new Java platform, and continued to derive those benefits.

Q.   And did you ever hear of anything called "code signing"?

A.   Yes.

Q.   And what was code signing?

A.   Code signing is basically where if you're putting your code on a partner's hardware/software platform, they needed to more or less bless your code.  That it wasn't going to cause issues or problems for their network, for their device.  And so in order to be resident, the code had to be signed.  So this is the kind of an under-the-covers thing that allowed our code to run on their device.

Q.   And you yourself worked personally with RIM in your position, didn't you?

A.   Yes, I did.  I had one visit to Waterloo.  And meetings with Andrew Vardon and others that were in the Alliance Program.

        MR. CHARFOOS:  Your Honor, RIM would like to move into evidence RIM Trial Exhibit 4021.  I believe there's no objection to it.

        MR. McDONALD:  No objection, your Honor.

        THE COURT:  4021 is in evidence.

        (Defendant's Exhibit 4021 received in evidence)

BY MR. CHARFOOS:

Q.  If we go down to the e-mail from Chris Foley to Ali Asaria, A. Vardon, Don Hinds and Mark McCurry, you mentioned the fact that you worked with RIM to ensure that the RemoteWare system could work with the RIM system.  Is this the kind of correspondence you had with RIM with respect to that?

A.  Yes, it is.

Q.  And this is a 2002 e-mail?

A.  Yes, it is.

Q.  Prior to 2000, was -- to the best of your knowledge, did RemoteWare consider Mformation a competitor in the mobile device manager market?

A.  RemoteWare?  No.

Q.  Had you ever heard of Mformation prior to that?

A.  No.

        MR. CHARFOOS:  No further questions, your Honor.

        THE COURT:  You may cross-examine.

CROSS-EXAMINATION

BY MR. McDONALD:

Q.  Good morning, Mr. Foley.

A.  Good morning.

Q.  I believe yesterday you testified that you're being paid by RIM as a consultant a blended rate of $250 an hour; is that correct?

A.   That is correct.

Q.   And now that is blended between your $200 an hour rate that you typically charge for work you can do in your office, correct?

A.   Yeah, for phone consulting.

Q.   Okay.

A.   I mean there's rates below that.

Q.   Okay.  So there's rates even lower?

A.   Correct.  If we're just doing documentation research or something like that that I can farm out, where it doesn't require my presence on the phone.  See, phone consulting is like me going to your office, and you picking my brain and me giving you advice.  But I'm not getting on a jet and I'm not, you know, coming to your office.  If I have to do that, that's 300.

Q.   I see.  So to come here for trial, you would have charged $300?

A.   That is correct.

Q.   For a typical client.  But under the arrangement you have with RIM for over a year and a half now, all of your time is billed at a blended $250-an-hour rate, correct?

A.   Correct.  So when I go on site, it's lower.  When I'm doing this remotely, it's higher.  You know, so that's where the 250 comes in.

Q.   And other than coming out here to attend trial from the East Coast, all of the work you did with RIM wouldn't qualify for the $300-an-hour site visit, correct?

A.   Not the stuff that I did remotely, but I would say the lion's share has been attending depositions or coming here or meeting with the attorneys.  When those are face to face, that would always be at the higher rate.

Q.   You reviewed all these documents you testified about, right?

A.   I reviewed the relevant portions of these documents.

Q.   For a typical client, you would have charged $200 an hour to review that in your office, correct?

A.   Depends on what I was looking for.  In this case, yeah, if it was office and it was, you know, top tier consulting and the information, if they wanted me to analyze this or identify key pieces in the documentation, and it's happening in my office, yeah, normally I would charge $200 for that.

Q.   And it was RIM that said, Why don't we just pay you 250 an hour, correct?

A.   Correct.  I didn't come up with that figure, that was RIM's proposition, and I said, Okay, fine.

Q.   Just so it's clear for the jury, you talked a lot

about a RemoteWare server and clients and your use of those things, but you have never reviewed the source code for RemoteWare, correct?

A. That's correct.

Q. Okay. And you don't have any knowledge of how the RemoteWare software was actually written by the developers; is that correct?

A. That's correct, it wasn't part of my job function.

Q. You talked several times about looking -- I think you used the phrase "under the covers" at certain things; is that correct?

A. Correct.

Q. When you look under the covers, that's all just gobbledygook to you, right?

A. No.

Q. Let's play Mr. Foley -- withdrawn.

Mr. Foley, you were deposed in this case, correct?

A. Yes.

Q. RIM's lawyer asked you questions, I asked you questions, about -- I think it was 18 months ago. You understood that you were under oath at that time, correct?

A. Correct.

Q. And you understood that it was important to tell the

truth?

A.   Can we clarify the use of the word "gobbledygook"?

THE COURT:   Just a moment.

BY MR. McDONALD:

Q.   No.   Let's play your deposition transcript?

A.   I use it a lot.

THE COURT:   Just a moment, just a moment.

MR. McDONALD:   Clip Number 4.

(Whereupon, an excerpt from the videotaped deposition of Christopher Foley was played)

BY MR. McDONALD:

Q.   Mr. Foley, you are not a computer programmer, correct?

A.   Not currently.

Q.   And you do not write source code, correct?

A.   I do not.

Q.   Now, when you first started working with RIM's attorneys on this case, they told you that they wanted your help to invalidate Mformation's patent, correct?

A.   They told me that they wanted to know about the use and the functionality of RemoteWare and that they were involved in a lawsuit with Mformation.  I know very little -- nothing, actually -- about any patents.

Q.   They didn't tell you that they wanted to use your testimony to invalidate Mformation's patent?

A.   They told me that the -- they were in a lawsuit where they were being sued by Mformation for patent violation.

Again, you're connecting the dots here, and it seems like a logical connection of the dots, but they didn't tell me explicitly what my testimony was to do, A or B or C.

Q.   Let's play clip 10 from your deposition.  I believe the dots are already connected, sir.

A.   Okay.

(Whereupon, and excerpt from the videotaped deposition of Christopher Foley was played)

BY MR. McDONALD:

Q.   Now, Mr. Foley, you're here today testifying in front of the jury in open court about all these actions.  Did you describe this as a worst case scenario, the fact that you would have to come and testify?

A.   I was trying to understand the time constraints involved.  And if I did describe it as a worst case scenario, it was trying to quantify, not like, Oh, my God, I have to go to a trial somewhere.  I had no idea how much time the deposition would take, how much time trial would take, if there would be a trial.  So I tried to scope it out like any other project that I would quote, and figure out, Okay, how much of my time are they looking for here?  That's the purpose.

So worst case scenario doesn't mean, you know, a bad thing. It's kind of like a ballpark figure of the constraints on my time.

Q.  So worst case scenario is not bad.

A.  It's not bad or good.

Q.  Let's play --

A.  It's -- you know, it's a ballpark figure. Ballpark is probably, you know -- I was looking -- I was scoping. I was looking for a measurement of time.

Q.  I'm sorry that I interrupted you, sir. I thought you were done with your answer.

Let's play clip 11 from your deposition.

A.  Okay.

(Whereupon, an excerpt from the videotaped deposition of Christopher Foley was played)

BY MR. McDONALD:

Q.  Mr. Foley, you testified that you worked for Sybase, correct?

A.  I worked for many different company names in the same building, because of the series of mergers and acquisitions. So, yeah, I definitely worked for Sybase at one point.

Q.  And you worked for Sybase until they fired you for unsatisfactory performance; is that correct?

A.  If you think not meeting a sales quota is

unsatisfactory, that's correct.

Q.   Let's play clip 14 from your deposition.

(Whereupon, an excerpt from the videotaped

deposition of Christopher Foley was played)

BY MR. McDONALD:

Q.   Now, Mr. Foley, you testified that you were a systems

architect from November 1998 to September 1999; is that

correct?

A.   That's correct.

Q.   And as part of your duties, you would go out to visit

customers who were using RemoteWare and see how they

installed the system; is that correct?

A.   Yes, some cases we had to install them for them.

Q.   I see.

MR. McDONALD:   Chris, can we have the Elmo,

please?

BY MR. McDONALD:

Q.   And I believe these are some of the companies that

you testified you went out and saw them using the

RemoteWare system:  Burger King, Jack in the Box, the

others shown; is that correct?

A.   Each one of these companies I had knowledge of their

use of RemoteWare.  Some I visited as a consultant, some

I visited in other capacities, some I never went on

premises.

Q.   Did you ever visit Burger King?

A.   Yes, I did.

Q.   When did you do that?

A.   That would have been that same timeframe, the November '98 to September '99.

Q.   Correct, sir, I see the diagram.  I want to know what days did you visit Burger King and see their facility?

A.   I made multiple trips to Miami.  I want to say three trips.  I don't have the exact dates of those trips. But they would put us up in this nice art deco hotel in Coconut Grove.  It was a good gig if you get to go down to Burger King.

Q.   Sounds like it, sir.  How about Jack in the Box? What dates did you visit Jack in the Box?

A.   Jack in the Box was in my second go-round in consulting, when I went out to San Diego.  I was trained and told during my training about their use of RemoteWare.  I went out -- I'm guessing at the date here.  We can get my resume up here and I can place it on my resume for you.

Q.   But you don't have any specific date that you visited any of these clients, correct?

A.   Oh, I can tell you a specific date I went to Albertson's.  That was a long -- in Boise, Idaho.  I specifically remember being there in the middle of the

winter and watching my spit crackle when I spit.  And I remember being there over a July 4th weekend when I went up to Ketchum, because I had two consecutive weeks of work and I decided to just stay the weekend out in Idaho.

Q.  You don't remember any specific day that you observed someone use a client computer to interact with the RemoteWare server, correct?

A.  I remember some of the dates that I was at the specific clients.

Q.  Which dates are those, sir?

A.  What I'm saying, around the July 4th weekend, for example.  When I've got something else to kind of hook it to, like the 4th of July, you know, that's easy to remember.  When it's, you know, Wednesday, February 12th, of, you know, 13, 14 years ago, I'm not going to remember something like that.

Q.  Perhaps it would be easier this way, sir.  Did you keep a calendar of your appointments, your business appointments?

A.  I kept my e-mail and Outlook and stuff like that.  My corporate stuff.

Q.  And RIM didn't ask you for any of those documents, correct?

A.  I didn't have any of those documents.

Q.   So you don't have those documents anymore?

A.   No.  I had to hand in my laptop when I left Sybase.
And, again, I went through about seven or eight laptops
at Sybase, and each time you got a new laptop you kind
of lost your old stuff.

Q.   I see.  So you're going by your memory for all these
events?

A.   I'm going from my memory and the books that have been
put in front of me.  The only thing I've reviewed are
the things that I've been presented with here.  And
going through the manuals again.

Q.   Those manual -- I'm sorry, sir.

A.   Going through the manuals again has been -- in some
cases will refresh my memory about, oh, yeah, I went to
this customer, or, oh, yeah, we used to tune this.
That's what brings this stuff back.

Q.   So those manuals written in 1996 are what you use to
refresh your recollection as to things that you think
happened between November of '98 and September of '99,
correct?

A.   Correct, because all of the facilities that are in
the '96 manuals were in the product at the time, and if
you look at Friendly's Ice Cream, for instance, they
were still on RemoteWare 3.1.  It was these manuals.

Q.   I'm sorry, I didn't mean to interrupt you.

A.   Okay.

Q.   Is that a satellite downlink dish on there next to the bottom client on Demonstrative 501?

A.   Yeah, that's what it's trying to depict.

Q.   And I believe you testified that RemoteWare, you think it was used with a Hughes satellite network; is that correct?

A.   That was, again, Ray Reno and Bob Belkin, who were my bosses and my trainers in consulting.  They were the satellite gurus within the company.  So during my training, in November, December of '98, they -- in going through some of the areas of the manuals that Mr. Charfoos referenced, you know, the retransmit, the window, the number of bytes in a packet, when they trained on those specific parameters that were applicable to satellite customers, they read me the laundry list of all the RemoteWare implementations that were on satellite because they said, If you wind up going out to Jack in the Box, if you wind up going out to Wendy's, which I never did, if you wind up going out to these, these are going to be critical, and this is probably where the problem's going to be.

Q.   So you never actually went out and saw the satellite dishes in use?

A.   I did at Jack in the Box.

Q.   Oh, you did.  And this was in the time --

A.   And by the way, we had a satellite hookup in the lab that Ray Reno -- part of the lab was for training and experimentation, part of the lab was to replicate customer environments.  So from time to time we would get point-of-sale equipment, we would get satellite equipment.  I recall hearing a comical scenario about Ray trying to get the guys to go up on the roof and put a dish up there.

Q.   To adjust the dish?

A.   To adjust the dish.  I didn't go up on the roof.  But what I did see is the satellite transceiver that plugged physically into the remote box.

Q.   And that's to transmit and to receive, it does both, correct?

A.   Correct.  I'm not the satellite expert, but --

Q.   You're going by your memory on all of this?

A.   That is correct, except what we see in the manuals.

Q.   Of course.  Now, this transceiver for the Hughes satellite system, do you remember a hard-wired telephone connection going into the back?

A.   No.  A satellite transceiver would go into a -- typically a serial port on the back.

Q.   Not a telephone line.  So that the transceiver could be connected to the Internet?

A.   No, this was not -- this was a TCP/IP connection over a satellite, so the way it hooked up to the RemoteWare box was through a serial port, and then from that point on it communicated with the TCP/IP protocol, through the satellite.

Q.   I see.

A.   To the corporate headquarters location.

Q.   Are you familiar with the concept of a satellite downlink and a satellite uplink?

A.   Yeah, the --

Q.   That's just a yes/no question, sir.  It will be quicker.

A.   Again, I'm not a satellite expert.  Yes.  I know that the basics of the difference between uplink and downlink, I know that the -- one is more expensive than the other, for instance, for the customer.

Q.   Okay.  And a satellite downlink is where the transceiver, as you call it, the box at the client site, receives transmission from the satellite, correct? That's a downlink?

A.   To the best of my knowledge.  I'm not a satellite expert.

Q.   Okay.  And an uplink would be where that transceiver box communicates up and sends information up to the satellite, correct?

A.   That's my understanding.

Q.   Okay.  Now, I want to use your drawing that you've used during the testimony.  I apologize for doing it over here, but I don't want to draw on counsel's demonstratives.

Let's take the satellite dish.

A.   Okay.

Q.   Now, this right here (indicating) is what you say communicates with the satellite, correct, up in the sky?

A.   Yeah, you have to have the dish on both ends.

Q.   So let's draw a little satellite in here.  I'm no artist.  But can that be the satellite?

A.   Oh, yeah, in the sky, sure.

Q.   Sure.  Okay.  Now, this Hughes system that you remember from the time period of '98 and '99, that would have a downlink where the satellite sends data to the dish that goes allegedly to the client, correct?

A.   Yeah, my understanding is it could send data both up and down to the satellite.  It was not a unidirectional thing; otherwise, how could you have a conversation?

Q.   Well, you know, I think back then, are you sure it wasn't the case that there was a telephone connection at the client where it actually communicated over a hard-wired telephone connection to go back to the Internet, because satellite technology -- whatever.  I

think it was the fact -- are you sure it wasn't the fact that there was a hard line telephone connection so that this computer could somehow communicate back to the server?

A.  I never saw any evidence of that.  When I went to Jack in the Box, for instance.

Q.  Uh-huh.

A.  So now I'm in San Diego, corporate headquarters.  I'm seeing the big dish that's out in their yard.  And then I'm seeing client machines inside in their lab.  That simulated the Jack in the Box stores.  I never saw any phone lines as part of that.

And, again, remember with RemoteWare, both in satellite, cellular and even in dial-up situations, we were always concerned about latency.  We were always concerned about noisy, you know, any electronic interference that could disrupt a RemoteWare session.  I never recall anybody saying -- you know, all I remember people saying is, We're having trouble with the satellite.  I never heard anybody say, I'm having trouble with phone lines and the satellite or it must be the phone line.  It was always referred to by the customers, and in my training by Bob and Ray, Bob Belkin and Ray Reno, as being a satellite communication session.  I never saw any lines, any modems, any of that

stuff.  It was always a satellite setup.

Q.  Your knowledge of use of satellite is based on what you saw, you saw a dish and a transceiver?

A.  Exactly.

Q.  And people told you things?

A.  People told me things about costs.  There was a facility called IP multicast, so I am familiar with TCP/IP networking, and I understand if you're sending stuff out that -- and one part of that link is costing you "X" amount, you know, per byte or per minute, and another one is costing you less, that you'd want to maximize that.

So when I was a product line manager, Sherry Freeman was the RemoteWare product line manager.  She and I had conversations about which RemoteWare accounts that were starting to get RIM devices, starting to get Palm, starting to get Pocket PCs, would be eligible to transfer over to Afaria, because, again, Afaria could do the stuff, if not all the stuff, that RemoteWare could do.

But then the satellite customers became like, Okay, don't go after these customers, because Afaria doesn't support that IP multicast, and IP multicast, which eventually became a feature function of RemoteWare, but back in these days, people had to go to

their satellite provider or a third party to get the multicast capability, which would save them money on their satellite connection.

So I found out about that after my tenure in consulting and in my tenure -- so my knowledge of satellites is kind of limited to everything I just explained.  I've never installed a satellite.  I've never configured anything other than RemoteWare to work on a satellite.

Q.   Now, Mr. Foley, you have no knowledge as to a communication from a client back to the server stating that something has been executed in RemoteWare, correct?

A.   That's not correct.

Q.   You have that knowledge?

A.   I have physical evidence that that communication took place.

Q.   You saw it with your eyes on the computer screen, correct?

A.   I saw it in the logs and I saw it during the network status, you know, UI that you bring up while sessions are going on.  Remember in the lab, we get to see both the client and the server at the same time.  It was ideal for training, it was ideal for troubleshooting, to see both ends.  And in order to do that, what you want to do is watch it real time.  Watch each and every event

execute, and then if some glitch happened on the connection or if some event failed, we could actually see why it is taking so long in this file send, why is it taking so long to do this.  It was very helpful to watch it play out in real time.

And our forensics, so to speak, after the fact would be to dive into the logs, which would give us greater detail about why these discrete events, how long did it take to play out, what was the throughput at the time, and was it successful, did it fail.  If it failed, what was the failure.  The logs were very helpful in that.

Q.  When you were working on the client interface screen, that's where you would create these sessions inside the server, right?

A.  No.  Clients don't create sessions.  Administrators create sessions on the server.

Q.  I see.  And that's what's depicted here?

A.  Correct.  That's why the session buckets are on the left on the server.  The contents of the sessions get transmitted to the client for playing out on the client machine.  They are created by the administrator, as explained yesterday, on the server.

Q.  But you've never seen the source code that you think does that, correct?

A.   I have not seen RemoteWare source code.

Q.   Okay.

MR. McDONALD:   Chris, can you show Exhibit 4021?

BY MR. McDONALD:

Q.   Mr. Foley, this is a document that RIM's lawyer asked you about --

MR. McDONALD:   Chris, can we enlarge the top portion, just that.   Thank you.

BY MR. McDONALD:

Q.   The date on this is April 11, 2002.   Is that correct?

A.   That's correct.

Q.   Okay.   And this is after the time period where you were system architect November '98 to September '99, correct?

A.   That's correct.

Q.   Okay, great.

MR. McDONALD:   No further questions.

THE COURT:   Any redirect?

MR. CHARFOOS:   Brief redirect, your Honor.

REDIRECT EXAMINATION

BY MR. CHARFOOS:

Q.   Mr. Foley, you were repeatedly asked whether or not you had seen the source code.   For everything you have testified about yesterday and today, was it necessary to see the source code to understand what was going on in

the RemoteWare system?

MR. McDONALD:  Objection, lack of foundation, and compound.

THE COURT:  Well, I'm going to sustain the objection.  Because I'm not sure I understand the question as to whether it's necessary to understand. His understanding is what he's testified to.  So I'm not sure I understand the question.  So sustained for vagueness.

MR. CHARFOOS:  See if I can do a better job, your Honor.

BY MR. CHARFOOS:

Q.  Mr. Foley, did you ever see the RemoteWare source code?

A.  No, I did not.

Q.  Does that mean you don't understand how RemoteWare works?

MR. McDONALD:  Objection, vague; lack of foundation.

THE COURT:  Well, calls for a conclusion from the witness.  I'm not sure where that conclusion leads.  But I'll overrule the objection.  He can say whether or not he understands how RemoteWare works.

THE WITNESS:  No, it's not necessary to understand how the product functions.

BY MR. CHARFOOS:

Q. And can you remind the jury how it is that you came to your knowledge of how RemoteWare works?

A. My knowledge was based upon my training and my experience in the field with clients. Customers. I don't want cross --

Q. Clients and customers, keep that -- it's tough.

Counsel played a clip where you called part of the system "gobbledygook."

A. Correct.

Q. Didn't let you explain what you meant by the word "gobbledygook." Does that mean that you didn't understand what you were seeing?

A. No. Gobbledygook meant that when we went under the covers in the file systems, for RemoteWare, whether it be the session listings or whether it be, you know, any of the internal elements that normally get exposed in a nice clean way in the interface for the users, they don't -- they're not plain text files. They have what we call extended ASCII characters in it, little hearts, little diamonds, things that to an average person would be gobbledygook.

For us, what was important was not really what was in the file but what's the name of the file and is it in the right directory. So it wasn't the -- the

gobbledygook part didn't matter to me, I could see that in the user interface.  What mattered to me was the right file showed up in the right directory.

Q.  Now, counsel also asked you if you were fired and played a very lengthy clip from your deposition.  It's true that you were fired from Sybase, correct?

A.  Yeah, I was terminated.

Q.  And were you --

        (Interrupting in the proceedings by alarm.)

        THE COURT:  Sometimes that's a test and sometimes it's serious.

        DEPUTY CLERK:  It's the test.

        THE COURT:  Oh, it's the monthly test.

        MR. CHARFOOS:  Your Honor, if you wanted me to stop, you could have just asked.

BY MR. CHARFOOS:

Q.  Were you in a technical or development position all the way up to the last position you had at Sybase?

A.  I was in a technical, product management, product development, created a product -- if you want to call that technical; it kind of straddles the line.  Once I had created the RFID platform where I had to hire developers and get the product out the door, I then jumped to the sales side of the fence, and initially in sales I still need my technical knowledge, not of

RemoteWare, not of Afaria anymore, but of this new product.

But my role, you could have described it more as business development, and at the very tail end of my career, after the solutions group that I ran the RFID component, was dissolved, and our executive VP sponsor left the company, I was more or less left stranded in a group called the channel sales, having nothing to do with any of my technical knowledge, having nothing to do with any of the product that I had worked on -- that was the only time that now I'm being evaluated for not how many sales I can make but how many partners I can recruit, and then encourage them and turn to sell one specific database product.  That was not my cup of tea.

So that was my last position at Sybase.  I was stripped of my director's title by the new boss that had come in.  He told me two weeks after my hiring that, I don't need a director of business development, so I'm stripping your title.  Being told by HR that you can't just do it like that.  You have to wait till January 1st.  So he systematically got rid of my boss, my colleague and myself inside of a year.

Q.  Now, going back to Demonstrative 501, I know that counsel focused on the satellite quite a bit, and didn't focus too much on the cellular clients.  You were aware

of cellular clients in the wireless system as well; isn't that correct?

A. Yes.

Q. And did any question that he asked you change the testimony with respect to the satellite clients that you worked with?

A. No.

Q. Do you have any doubt in your mind that RemoteWare Version 3.0 and 3.1 were used wirelessly prior to October of 1999 in the manner in which you were presented it?

A. I have no doubts.

MR. CHARFOOS:  No further questions, your Honor.

THE COURT:  Very well.  The witness is excused.

Thank you very much, sir.

THE WITNESS:  Thank you.

(The witness exits the stand.)

MR. CHARFOOS:  Your Honor, may I have a short summary?

THE COURT:  Certainly.

MR. CHARFOOS:  Ladies and gentlemen of the jury, I can only imagine what you're thinking right now. You've been here a little over a week.  We started with Mformation, their technology and their patents.  We've gone to RIM, their technology and their patents.  And

now we're asking you to think about RemoteWare and its technology. And you must be thinking, do I really have to keep all three of these in my mind?

And if you remember at the very beginning of the case, the Judge showed you the patent video. And said that when the patent examiner reviews the patent file, they bring forth all of their knowledge and all of the information that is before them at the time to determine whether or not the patent is a valid patent.

But, of course, the patent examiner doesn't have everything in front of them. And the patent video said that a piece of prior art that wasn't available before the patent examiner could invalidate the patent. And RemoteWare does invalidate the '917 patent. And you as the jury have the power and the responsibility to step in and assist the Patent and Trademark Office when they couldn't make that link.

You have heard the testimony of Mr. Foley. You will soon hear the testimony of RIM's technical expert, Mr. Tony Acampora, who will take the system as it was described by Mr. Foley and in the documents themselves and apply it to the claims and show you how RemoteWare invalidates the patent.

You can see that there's a server. The server connects to wireless devices over a wireless network.

The outbound queue is created when it is installed on the RemoteWare server. The outbound queue stores the sessions. The sessions are sent over to the wireless devices. They're accepted. And executed on the wireless devices.

Functionality of that system is very robust. You could erase, you could send applications over, you could send software over. And you could ask those clients to send back information about the disks, about the health of the system. That is all what Mformation has claimed in the '917 patent.

Mr. Rudd, could you please bring up Exhibit 2078?

I don't know if you remember seeing this, but this is a competitive comparison that Mformation put up on the screen. And they said, Well, here are our main competitors: Mformation, XcelleNet and Research In Motion. They said, You know what, don't worry about XcelleNet because they couldn't do it wirelessly. They couldn't do a wireless registration. They didn't have the capability to do it wirelessly.

Well, Mr. Foley told you that they could. He was aware of it and he saw it. And the documents we saw today specifically talk about satellites and cellular systems as far back as 1996.

So remember, ladies and gentlemen of the jury, as

you're listening to Dr. Acampora's testimony, that the ware system very clearly invalidates the '917 patent, and that's why we brought Mr. Foley here to testify to you today.

THE COURT:  Do you wish to comment?

MR. McDONALD:  I do, your Honor.  I'll try to be brief.

Ladies and gentlemen, I probably don't have to say this to you, but for each witness who goes up there, you should ask yourself, why did they bring the witness?  Well, with Mr. Foley, I was asking myself that as well.  The man has no documents to back up any of these things he claims to remember.  They showed him some books to try to jog his memory.  He admitted he's never reviewed the server source code.

You heard RIM's attorney, Mr. Matuschak, two days ago tell you, If you want to know how something works, you have to look at the source code.  Mr. Foley never looked at the source code.  All he did was see things on a screen.  He doesn't know the inner workings at the server, at the client.  He doesn't know these things.

The Court is going to instruct you and has instructed you that the claims require certain steps be performed at the server, and certain steps be performed at the device.  These are critical distinctions.

Mr. Foley doesn't know where things happen.  He just knows what he sees on the screen.

Now, they brought Mr. Foley despite his lack of record.  Despite his lack of any -- he said he had a calendar back then, but he didn't keep it.  So we have to take his word for things 12 years ago.

The reason they brought him is because the information they need to invalidate the patent is nowhere to be found in these big books they showed him.  You saw him flipping through them.  If the books were sufficient, they wouldn't have brought Mr. Foley.  They wouldn't have paid him $250 an hour to look through old books and fly out here and tell you his memories of going to Vons and Burger King and things like that.

So I invite you to think about why you saw him, and remember he has no documents to back up any of this.  And he also testified that he doesn't remember the dates where any of these things occurred.

Thank you.

THE COURT:  Very well.  Call your next witness.

MR. CHARFOOS:  Your Honor, in light of the testimony, we would ask to be able to play the videotaped deposition of Joe Owen.

THE COURT:  I'm sorry, I thought we were going to defer that until the Court had a chance to rule on

certain legal issues.

MR. CHARFOOS:  We can defer, your Honor.

THE COURT:  Very well.  So let's go on to something else.

MS. DeBRUIN:  RIM calls its next witness, Dr. Anthony Acampora to the stand.

Your Honor, may I have just a minute to set up.

THE COURT:  Certainly.

(Witness sworn)

DEPUTY CLERK:  Please be seated and speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  Anthony Acampora, A-c-a-m-p-o-r-a.

ANTHONY ACAMPORA,

   called as a witness by the Defendant,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DeBRUIN:

Q.  Good morning, Dr. Acampora.

A.  Good morning.

Q.  Would you please introduce yourself to the jury.

A.  Sure.  My name is Tony Acampora.  I was born in Brooklyn, New York, a long time ago.  That's where I met my wife, we've been married for 44 years.  For the past

17 years we've lived in Southern California, although I just spent a good Deal of time in San Francisco because my daughter lives in Berkeley.

Q.   Briefly describe your educational background, please.

A.   I received a Bachelor in Science, Master of Science and PhD in electrical engineering from the Polytechnic Institute of Brooklyn.

Q.   Please tell us about your work experience at a high level.

A.   I spent the first 20 years of my career at AT&T Bell Laboratories in New Jersey.  I was recruited by Columbia University in 1988, and spent seven years as a faculty member there.  And in 1995 I was recruited by the University of California San Diego, which is where I currently am.

Q.   Before we talk more about your background and experience, I'd like you to tell us why you're here to testify today.

A.   I was asked to form opinions concerning validity and infringement of the asserted claims of the '917 patent.

Q.   Did you reach an opinion?

A.   I have.

Q.   And what were your opinions?

A.   My opinions are that the asserted claims are not infringed by the use of the RIM products.  And I believe

that the '917 patent is not valid.

Q.  Have you prepared a slide summarizing those opinions?

A.  I have.

MS. DeBRUIN:  Could we have Demonstrative 1101, please.

BY MS. DeBRUIN:

Q.  Is this your summary?

A.  It is.

Q.  Before we continue with the details of your analysis and conclusions, I'd like to talk a little bit more about your experience.  Could you tell us about your 20 years at AT&T Bell Labs?

A.  Sure.  So I began my professional career at Bell Labs in 1968 at the bachelors level.  Bell Labs actually supported my MS and PhD, so they supported my graduate studies.  And I was working initially in the field of ballistic missile defense, basically antiballistic radar systems.  That was the first thing I did.

When I received my PhD, I went to basic research at Bell Laboratories.  That's where I spent most of my career initially in the technical working in the field of domestic satellite communications, satellites being these earth-orbiting repeaters that accept the radio transmission, the uplink and rebroadcast, those transmissions on the downlink.

I was promoted 1981 to supervise the data theory group, and that group basically performed very theoretical studies in basic digital communications. We also worked on local area data networks, the topic at that time was brand new.

In 1984 I was promoted once again to head the network systems research department. And there I was supervising about 15 PhDs working in Internet technologies, multi-wavelength optical fiber communications, technologies that allowed tremendous amounts of information to be carried over these hair thin strands of glass. Sort of the backbone of modern telecommunications infrastructure these days. And we did a good deal of work in wireless communications, both wireless telephony and wireless data as well.

I was promoted one more time at Bell Labs to supervise -- actually to direct the transmission technology laboratory, and there once again was working, working on fiberoptic communications and Internet technologies.

Q.   When did you leave Bell Labs?

A.   I left Bell Labs in 1988.

Q.   Where did you work after that?

A.   Well, at that time I was being pretty heavily recruited by Columbia University to join its faculty as

an -- a professor of electrical engineering but also to direct the Center for Telecommunications Research at Columbia University.

Q.   What was that center?

A.   In the mid-1980s the National Science Foundation, part of the federal government, realized it was investing about $2 billion annually in basic research at American universities, and while there were a number of notable commercial successes coming out of that research, NSF was looking for a more direct mechanism to couple the research it was funding to commercial practice to enhance the nation's economic competitiveness, and it started a program known as the Engineering Research Center Program.  That first year I think 200 proposals were committed, six centers were created.  The Center at Columbia in telecommunications was the only one devoted to that field.

So while it was very appealing to me to get an opportunity to teach -- and at Bell Laboratories was basic research but no teaching -- at Columbia, as an academic, one must teach.  As appealing as that was, the opportunity to direct the center and work with industry is what convinced me I would leave Bell Labs.

Q.   What was your role as director of the center?

A.   Basically it was my role to set the vision of the

center, to define the research that would be done.  So knowing the skill set of the faculty, knowing the types of research the faculty was interested in, working very closely with industry where I had just left, and having an understanding of industrial need and how research might be coupled into commercial practice, 5, 10, 15 years downstream, I pulled together the research program and worked closely with industry then to transfer technology from the technical platform that we were creating, the knowledge platform we created, off to subsequent commercialization.

Q.  You said you also taught at Columbia.  What classes did you teach?

A.  I taught an undergraduate course in digital communications and I taught a very senior graduate level course in selected topics in telecommunications.  About half of those topics were in the field of wireless communications.

Q.  Did you also do your own individual research at Columbia?

A.  I did.

Q.  What were your areas of research?

A.  Fiber optic communications, network management and control, and wireless communications.

Q.  Where did you work next after leaving Columbia?

A.   In 1995 I was recruited by University of California San Diego to serve as the founding director of UCSD's Center for Wireless Communications.  So similar to the NSF center that I was directing at Columbia, UCSD wanted to emerge as a center of excellence in wireless communications.  So that was very attractive to me, and I left Columbia University to found that center, this centered being focused exclusively on wireless. Wireless telephony, wireless data, wireless access to the Internet in general.

Q.   What kind of work have you done at the university in San Diego?

A.   All the work, all of my work at UCSD has been devoted to wireless communication.  I also teach a course in wireless networks.  And similarly to what I did at Columbia University, I basically defined the research program center.

Q.   Have you written or published any papers?

A.   I have.

Q.   About how many papers have you published?

A.   About 170 papers in the peer-reviewed journals.  And peer-reviewed conferences.

Q.   Do any of those relate to wireless communications?

A.   More than half.

Q.   Have you written or published any books?

A.   I have.

Q.   Have you authored any books yourself?

A.   I have.

Q.   What book did you author?

A.   *An Introduction to Broadband Networks*.  At the time
it was one of the first books on this relatively new
subject, integrated multimedia, telecom.  Up to that
point, telecom basically meant telephony, and as we all
know, telecom is a lot more than that.  Image, video,
lots of data communications, e-mail, Internet browsers.
But I wrote one of the first textbooks providing the
technical foundation for these new services that are
ubiquitous today.

Q.   Have you also authored or co-authored any chapters of
books?

A.   I have.

Q.   Tell us about those.

A.   Most of the those are in -- I think there are two or
three, and they're in the field of wireless
communications.

Q.   Are you an inventor of any granted U.S. patents?

A.   33.

Q.   Those are patents that you actually, that the patent
office actually issued; is that right?

A.   That's correct.

Q.  Are you a member of any professional organizations?

A.  The Institute of Electrical and Electronic Engineers, I'm a fellow of the IEEE.

Q.  And was there a particular area that you were nominated to be a fellow for?

A.  Satellite communications and local data networks.

MS. DeBRUIN:  Your Honor, RIM would tender Dr. Acampora as an expert in wireless communications, in data communications, and wireless data networks.

THE COURT:  Very well.  The Court will recognize Dr. Acampora in those areas.

And I've already given you my instruction with respect to expert witnesses.  They are able to express opinions even on matters that you have to decide in this case.  But you can, based on the background and experience and the reason for those opinions, accept them, reject them, or reject some and accept others.

Go ahead.

BY MS. DeBRUIN:

Q.  Have you ever worked with attorneys from my firm, Kirkland & Ellis, or my colleague's firm WilmerHale before?

A.  I have.  With regard to Kirkland & Ellis, I have been engaged in several matters on behalf of Kirkland & Ellis clients.  I've also been engaged in opposition to

Kirkland & Ellis.

And with regard to WilmerHale, I was engaged on behalf of Hale & Dorr, a predecessor, and I've also been engaged in opposition to WilmerHale.  In fact, Mr. Grossman over there, sitting at defense table, took my deposition last year.

Q.  How about my client, Research In Motion?  Have you ever served as an expert for Research In Motion before?

A.  No.

Q.  Was RIM a corporate member of any of the centers that you spoke about, either at Columbia or in San Diego?

A.  No.

Q.  Are you being paid for your work on this case?

A.  I am.

Q.  How much are you being paid an hour?

A.  $575 an hour.  Which was three and-a-half years ago at the time that I signed my engagement, that was my standard and customary rate.

Q.  Has your rate changed since then?

A.  It's now $600 an hour.  But it's been my practice, if I sign an engagement to hold that rate for the duration of that engagement.  And that's what I've done.

Q.  Is your payment dependent at all on the conclusions you reach?

A.  Not at all.

Q.   Is your payment dependent at all on the outcome of the case?

A.   Not at all the.

Q.   About how many hours have you billed to this case?

A.   Up until today, and I just did this calculation last night, it's been about 670 hours, thereabouts.

Q.   Now, we're done with all the introductory items.

I'd like to turn to the process that you applied in coming to your conclusions.  What did you do to come to the conclusions that you've reached?

A.   Well, I read the patents.  I read the provisional application, you've heard about.  I've read the prosecution history.  I read deposition transcripts authored by RIM employees.  I read Mformation's infringement contentions.  I read Dr. Madisetti's reports.  I read lots and lots of RIM documentation.  I read various court filings.

Q.   Did those include the Court's claim construction orders?

A.   I read the Court's claim construction orders, yes. More than once.

Q.   And I should mention, what we're going to focus on first is your opinion regarding noninfringement.  And then, after we're finished with that opinion, we'll move to your opinion relating to the invalidity of the '917

patent.

A.   Fine.

Q.   Did you speak with any RIM engineers to confirm your understanding of how the RIM products work?

A.   I did.  I read, as I mentioned, a lot of RIM documentation.  I read deposition testimony.  I began to form an understanding of how the RIM parts fit together and how they operate.  And afterward I did speak with employees of RIM by phone to confirm that I had gotten it right.  So I didn't base my opinions on those discussions, but I did gain reassurance that the opinions that I was forming, at least with regard to how the RIM products operate, were in fact correct.

I did speak with one, Ron Davidson, that was a little different, and actually I needed to learn from Mr. Davidson how a particular element of RIM operates that Dr. Madisetti had pointed to and gotten it wrong. So I did speak with him to get an understanding of how that actually works.

Q.   We'll talk a little bit more about that later.

A.   Sure.

Q.   First, to provide a basis for your discussion of some of your conclusions, I'd like to talk about the terminology that we've been using.  What technology is the '917 patent directed to?

A.  It's -- the patent is directed to remote management of wireless devices.  Wireless remote management.

Q.  How do you know that?

A.  Well, it's in the title of the patent, it's in the summary of the invention.  It's all over the patent.

MS. DeBRUIN:  Can we please have Trial Exhibit 370 on the screen, please.  I'd like to focus on Column 1, lines 51 to 57.

BY MS. DeBRUIN:

Q.  Dr. Acampora, did you review this section of the patent in coming to a conclusion of what the patent's directed to?

A.  I did.  And as it says, I won't read all of this, but just the highlighted portions:  "To manage, control and reconfigure wireless devices."  That's what the present invention relates to.  "A method and system to manage, control and reconfigure wireless devices remotely over a wireless network."

Q.  Is that sometimes referred to as device management?

A.  Wireless device management, yes.

Q.  What is device management or wireless device management?

A.  Okay, I've got a slide to illustrate that.

MS. DeBRUIN:  Can we please have Demonstrative 1102.

BY MS. DeBRUIN:

Q.  Is this the slide?

A.  Yes.  So what I've drawn here, this is a hypothetical corporation.  Acme Corporation.  Headquartered in San Jose.  With a branch location here in San Francisco.  And we see that inside of Acme Corporation is -- on the second from the top level, there's the IT department.  There's a system administrator sitting behind a desk.  We also see the IT department is networked to a bunch of devices both at corporate headquarters and in the branch location in San Francisco.  That's what the red lines indicate.  That's network.

And the -- the network are devices, both wireless devices and physically attached devices, devices attached by wire.  We even see a server in the remote location, that green box.  And it's the job of the IT department to manage all the devices that were attached to the network, including the network itself, to make sure that it's running, to make sure that it's current.

So as an example, the IT department might be running some diagnostic routines continuously, making sure that the various devices attached to the network are functioning correctly.

Better the IT department determines there's something wrong with the CEO's laptop before the CEO

disconnects the laptop and comes down to the IT department and says, Hey, what's wrong?  Fix it.  So one of the jobs of device management is to -- it is what we call fault management, maintenance, diagnostics, recovery from various things of this type.  And also, as part of this, the devices may need to report back with status information.

And finally, the IT department needs to be sure that the devices are running the proper version of software.  Make the software upgrades that need to be distributed.  Rather than have people from the San Francisco branch location bring the laptops down to San Jose to have new software installed, that software can be installed remotely.

That in general is device management.  And here we see some of the devices are being managed wirelessly.  There's no difference between wire line and wireless except for the fact that in wireless, some of the links are radio links and they present some special problems.

Q.  So you said this relates to a wireless network.  What is a wireless network?

A.  Wireless network is one where radio links are involved.  There is radio communications involved.

Q.  Could you give us some examples of wireless networks?

A.  Sure.  Satellite networks, as I described earlier,

are wireless networks.  The cellular network, the network operated by AT&T, Verizon Wireless, T-Mobile, they're wireless networks.  WiFi hotspots are wireless networks.  These wireless routers that are often found in homes or office environments, in Starbucks, those are wireless networks.

MS. DeBRUIN:  Could we have the '917 patent, Trial Exhibit 370, back up on the screen, please.

BY MS. DeBRUIN:

Q.  And I'd like to focus again on Column 1, lines 51 to 57.  Was there any specific reference in the '917 patent to wireless networks?

A.  Yes.  Highlighted right here (indicating).  And we saw this before.  Remotely over a wireless network with acceptable reliability.

Q.  Why was it important to focus on acceptable reliability in a wireless network?

A.  Well, as I mentioned earlier, the device management over wired line and wireless, is basically the same, but some of what we do over wireless network, because wireless links are inherent -- notoriously unreliable.  And in fact, most of the research in wireless networks today really deal with how to overcome inherent unreliability of the network.

Q.  Is there any way to enhance the reliability of a

wireless network?

A.  Over the decades a number of technologies have been discovered that deal with this fundamental problem with wireless.  Wireless network unreliability.

Q.  Are there any ways of enhancing reliability in a wireless network that you saw mentioned in the '917 patent?

A.  Yes.  Establishing the connection is one way to improve the reliability of a wireless network.

Q.  Well, isn't there always a connection if two devices are communicating?

A.  No.

Q.  Why not?

A.  Well, you can simply transmit.  You can all do that, just transmit.  Or you can first establish a connection and then transmit.  These are two fundamentally different modes of communications.  Transmit, or establish a connection, then transmit.

Q.  Let's break this down a bit.  So can you give us some examples of communicating by establishing a connection before transmitting?

A.  Sure.  Simple example might be just a telephone call.  You pick up the phone.  You dial some digits.  The network does some things.  I won't bore you with what goes on inside the network.  And eventually the

telephone rings.  The telephone that you dialed rings.
Assume the person you dialed picks up.  Now you can
talk.

So there was a process that took place before you
communicated.  Then you get a chance to communicate.
Your intent was to speak.  There was a lot of prespeech
dialogue taking place within the network.  Telephone
rings, then you speak.  That would be an example of a
connection before transmitting.

Q.  Now, you said there was another way of doing this
that you could have, you could communicate without
establishing a connection.  Could you give us an example
of that?

A.  Yeah.  Let me give you an example by analogy first.
And this analogy we teach to our students all the time.
It is the model of connectionless communications.  If I
want to send a letter to Miss DeBruin, I write the
letter, I put it in an envelope, I write Miss DeBruin's
address on it, I affix postage, and I drop it in the
box.  I didn't first establish a connection with
Miss DeBruin before I sent a letter.  I simply addressed
the letter, put it in the box, keep my fingers crossed
that it doesn't get lost along the way, and hopefully,
if all goes well, Miss DeBruin will get my letter.

That would be an analogy to connectionless

communication.  Like I said, I use this analogies in instructing my students all the time.

Second example would be SMS, something closer to telecommunications.  Texting is -- I said SMS.  Technical name.  Texting is connection.  You're simply texting.  It goes.  You don't first establish a connection, then text.

Q.  In a context of a data networks, could you give us some examples of those two types, two ways of communicating?

A.  Yes.  Okay.  So as it turns out, over the Internet today, both of these ways of communicating are used.  There are two protocols.  You've heard about these protocols fairly extensively over the past week and a half.  One of these protocols is known as TCP, Transmission Control Protocol.  And again, the other was UDP, User Datagram Protocol.  Essentially all communications over the Internet use one or the other of these two protocols.

TCP is a connection-oriented protocol.  What that means is, before the information that needs to be transmitted is transmitted, there's first a dialogue, a handshake, between the two end points of the communication.  There's this vast network which may range over hundreds or thousands of miles between the

two end points.  One end point might be a laptop computer, the other might be a web server halfway around the world.  These two end points actually conduct what's called a three-way handshake to establish a check.  Make each other aware of the fact that they need to communicate.  Each side sets aside resources to allow the communication.  And each side agrees to have the ability to detect and recover from network impairments along the way.

And this is especially important in wireless communications.  All of this is done during this handshake procedure.  By the way, once the connection is established, and now the information that needs to be transmitted is transmitted over that connection, there's maintenance involved in keeping the connection alive.  It's not a one-time upfront process of handshaking.  There's some maintenance involved as well.

Q.  So that was your example of establishing a connection and then transmitting?

A.  That's an example of establishing a connection and then transmitting.  And both -- associated with that, to set up a connection and to maintain the connection during its life.  There may be instances -- but, again, rely on the connection when that happens.  The reason it's done is to provide reliable connections.

Or use a UDP, you can simply transmit.  Don't go through the process of agreeing upon how to detect and recover from network or event, don't be concerned about maintaining anything.  Maybe don't want to expend the overhead associated with doing that.  Maybe you just don't need that type of reliable connection.

In telecom, you can always just transmit.  You don't have to first set up a connection.  You can simply transmit.

Now, somewhere else, something else might need to worry about the network unreliability.  Doesn't mean that the services will always be unreliable.  If UDP is used.  But something else you have to worry about, detecting and recovery from network failures.  The TCP connection, when UDP is not used, ensures that the connection is reliable.  That's why it's done.

Q.  What are the tradeoffs to consider when determining whether to establish a connection or not?

A.  Okay.  As I mentioned, there's a penalty associated with establishing a connection.  And in wireless communications, that penalty takes the form of two things:  Since there is some communications taking place having nothing to do with the message that needed to be transmitted, more bandwidth is being used.  So, and wireless data.  You're going to be charged -- if you pay

for wireless data, you'll be charged more because the network is being used more often. You say there's more bandwidth being used. And battery goes very fast. Every time the radio turns on, whether it's sending useful information or some of this connection management information, the battery is being drained. So in some instances, that would be an unacceptable penalty.

Q. So are communications and connections the same thing?

A. No.

Q. Why not?

A. Communications is simply sending the -- well, as I said before, communications are technically in two forms. The less reliable form is to simply transmit. Don't set up a connection. Just transmit. The network will cause harm. Somewhere else, that harm will be -- if it's important, for some applications the harm is important. And some applications the harm is quite important. But maybe the harm is occurring not too frequently, so somewhere else you'd be willing to take the time, figure out, this isn't right, and determine how to recover. That's one way of communicating.

Second way is to establish a connection first. Guarantee that between Point A and Point B there's the appearance of, not the reality of, but the appearance of a reliable pipe and how is that appearance maintained?

The two sides agree to in order to detect and recover from network events, but you always have to do that, you have to maintain that connection, even if the network's reliable, you still have to pay the expense of maintaining the connection. So you can communicate by establishing a connection, and then transmitting, that's reliable. Or you simply transmit, it's unreliable.

Q. Is the term "connection" always used with technical precision to refer only to the case where you establish a connection and then transmit?

A. No. It's perhaps unfortunate but true. The word "colloquial," especially in the technical field, we very often refer to that colloquial use, colloquial use.

One of the carriers -- I'm not sure if it's T-Mobile or -- but as part of their marketing they buy our service and get connected. There's no connection. You just bought a phone and sign a service contract. Or suppose there's a major sporting event and very difficult to get tickets, so somebody might say, Hey, I got a connection. I can get tickets. It doesn't mean anything.

In telecommunications, it's something very precise. But as technology, especially as technology, when we communicate among ourselves, we'll very often use as colloquial, almost meaningless word, "connection"

because we know on the basis of the context what we're saying, whether we mean a real telecom connection, like the fact that I have been describing the TCP, or if it's simply a colloquialism.

Q. Yesterday during Mr. Cherry's cross-examination we saw a reference in the patent to a UDP connection. Is that a technically precise use of the term "connection"?

A. No, it's not. That might mean -- as I said, maybe somebody bought service from AT&T and they've got connected. UDP is connectionless. There's no handshake. There's no reliable initiation of the end points. There's simply transmission.

Q. Does that relate at all to the phrase "establishing a connection" as construed by the Court in this case?

A. Well, no. We now know what it means to establish a connection in the context of the '917 patent. And UDP doesn't do it.

Q. During Dr. Madisetti's testimony, he referred to random uses of the word "connection" in RIM's documents. Do you remember that testimony?

A. I do.

Q. You sat in the courtroom through the entire trial so far, correct?

A. Well, except for the -- a half a day of damages, I was here for the whole time, yes.

Q.  Did you review the uses of the word "connection" that Dr. Madisetti referred to?

A.  These were the connection types that were mentioned in some RIM documents?

Q.  Yes.

A.  Yes, I'm very aware of that.

Q.  Do they indicate that the use of RIM's products practice the step of establishing a connection from Claim 1 of the '917 patent?

A.  No, in my opinion, that usage is simply colloquial. In fact, that's part of the Java program language. That's not even RIM.  That's Java.  I think that's colloquial.  And in any event, it doesn't relate at all to what the Court construed "establishing a connection" to mean in the context of this patent.

        MS. DeBRUIN:  Your Honor, we're at a good breaking point if you'd like to take the morning break.

        THE COURT:  Sure.  It's about 10:45.  We'll come back at 11 o'clock.

        (The jury exits the courtroom)

        (Morning recess)

        DEPUTY CLERK:  Remain seated and come to order.

        THE COURT:  Ready to resume?

        MS. DeBRUIN:  Yes, I am, your Honor.

        THE COURT:  Can I make one request?  And that is

to have someone from the defense put in one place all of the RemoteWare documents.  I know that there are paper copies, so if someone would just gather those for me, I would appreciate it.

MR. MATUSCHAK:  We can do that, your Honor.

MR. CHARFOOS:  Yes, your Honor.  And your Honor, I believe that the parties have narrowed the dispute as to Mr. Owen as well.  It's now limited to a single page of testimony.

THE COURT:  I understand.  And so you would want to interrupt this witness to have that --

MR. CHARFOOS:  No, Sir.  No, Sir.

THE COURT:  All right.  Summon the jury.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  You may resume your examination.

MS. DeBRUIN:  Thank you, your Honor.

BY MS. DeBRUIN:

Q.  Before the morning break we were talking about connections and about establishing a connection.

MS. DeBRUIN:  If I could please have Demonstrative 1113 on the screen.

BY MS. DeBRUIN:

Q.  One of the things the Court construed in this case was the language "establishing a connection from the

wireless device to the server."

Dr. Acampora, what was that language construed to mean?

A. The Court construed that phrase, highlighted phrase, to mean, "initiating wireless communications between the wireless device and the server, and the establishing a connection substep must be completed before the transmitting the contents of the mailbox substep can commence."

So if we look at the claim language on the right, you'll see immediately following the establishing a connection between the wireless device and the server substep is the transmitting the contents substep. That's an A-B relationship. First establish connection, then transmit the contents.

Q. Is that consistent with what you were just describing to us as connections and establishing a connection?

A. Yes, it is.

Q. I'd like to discuss now the '917 patent a bit more specifically. Did you focus on only Claim 1 for your analysis with respect to noninfringement?

A. That's why I paused over -- yes, with respect to noninfringement, I focused only on Claim 1.

Q. Why did you focus only on Claim 1?

A. Claim 1 is the only independent claim that's being

asserted.  The other claims are dependent claims, and as I understand it, a dependent claim includes all of the elements of the independent claim plus some additional limitations.

So for the purposes of noninfringement, if I find one or more elements of the independent claim are not met, one more step is not performed, then the dependent claim could not be performed either because to perform the dependent claim, all of the steps of the independent claim plus the additional steps must be performed.

Q.  And what were your conclusions with respect to Claim 1?

A.  My conclusion that all of the steps of Claim 1 are not performed by the use of the accused RIM products.

Q.  What was your conclusion, then, with respect to all the asserted claims of the '917 patent?

A.  And accordingly, none of the claims of the -- none of the asserted claims are infringed.

Q.  You mentioned that you had read -- in preparing your opinions, you had read the file history or prosecution history for the '917 patent.

A.  I did.

Q.  What is that?

A.  Well, I have actually undergone this process numerous times myself.  When a patent application -- when an

inventor submits a patent application to the U.S. Patent and Trademark Office, occasionally the patent examiner might conclude, I will allow all of these claims.  More likely, the examiner finds something objectionable.  And there'll be a dialogue between the inventor and the patent office.  And there'll be some clarification made, and the examiner might even ask for certain claims to be changed.  This is all known as the prosecution history.

And eventually, what results is one of two things.  Either the inventor abandons the application, or claims modified from what were originally submitted eventually issue as the claims of the patent.

Q.  Did you review the patent application as it was originally submitted to the patent office?

A.  I did.

Q.  Was there a Claim 1 in that patent application?

A.  There was.

Q.  Did Claim 1, did the language of Claim 1 change during the prosecution?

A.  Twice.

Q.  Did you prepare a slide to depict that?

A.  I have.

MS. DeBRUIN:  Can we have Demonstrative 1103, please.

BY MS. DeBRUIN:

Q. Would you please describe Demonstrative 1103.

A. Okay, in the leftmost column is Claim 1 as it was filed in the original application back in August of 2001.

In the middle column is what resulted from the first modification, and what I did was highlighted in red its additional language that was added. So the examiner had some objections, the examiner had some prior art that the examiner felt would invalidate the original Claim 1. And the inventor tried to circumvent that objection by adding some additional language, specifically, "without a request from the wireless device performing the steps of...," and in addition, "at the server" was added to the "placing a command" step.

Q. Were there further changes made?

A. Yes, one more time. So...

Q. Please describe those.

A. The examiner still wasn't happy. And there was some more dialogue, and eventually by adding the red language, the delivering the command substep was now further specified. That means by -- so how do we deliver the command? By establishing a connection between the wireless device and the server, transmitting the contents of the mailbox, and accepting the contents

of the mailbox at the wireless device.

And notice right at the bottom, "wherein the connection is established...," so the establishing the connection substep, the resulting connection, the connection resulted by establishing a connection, was established based on a threshold condition.

So this additional language that was added, the examiner was happy and the claim was allowed.

Q.   To practice Claim 1 of the '917 patent, do you have to perform each and every step of the claim as it was issued from the patent office?

A.   Yes.

Q.   Does that include the steps the patent office made Mformation add to the claim?

A.   Yes, the original filed Claim 1 is not the invention. It's the right column, that's the invention.  That's the issued patent.

Q.   I'd like to turn to the operation of the products that are involved in this case.  The RIM products.

First, what RIM products are involved in Mformation's infringement allegations in this case?

A.   There are three products:  The BES, the BlackBerry Enterprise Server; the BlackBerry handheld device itself; and the RIM Relay.

MS. DeBRUIN:  If we could please have

Demonstrative 1104 on the screen.

BY MS. DeBRUIN:

Q.   Is Demonstrative 1104 a slide that you prepared?

A.   Yes, it is.

Q.   Would you please describe Demonstrative 1104 for us?

A.   What I show here are the three parts of the BlackBerry system that are involved in the infringement contentions.

Q.   Let's take them one at a time.  If you could start with the BlackBerry Enterprise Server, what is that?

A.   The BlackBerry Enterprise Server is a software product that's installed on one or more server computers on corporate premises.  So that enterprise server, the box that's shown there, as being a corporate server, upon which is installed the BlackBerry Enterprise Server software.  So that's one or more computers holding the BES software.  And that's corporately owned, corporately operated.

Q.   Is that sometimes referred to as the BES?

A.   That's the BES.

Q.   Turning to the item labeled the "RIM Relay, what is the RIM Relay?

A.   That's more software installed on more computers.  But not on corporate premises.  That's software that's installed on RIM premises.  That's installed in the RIM

network operations center, probably hundreds of miles away from the BES. So that's RIM equipment. That's RIM-owned, RIM-operated. That's at the RIM network operations center.

Q. Does each BES have its own Relay?

A. No.

Q. Could you explain the relationship?

A. The Relay is basically a concentration point providing the interface from a multiple -- a multiplicity of BESes into the cellular environment. So many BESes use the services of one Relay.

Q. Was the RIM Relay relevant to your infringement analysis?

A. Yes, it is.

Q. We'll get to that in a few months.

The last piece, the BlackBerry, what is that?

A. That's the ubiquitous BlackBerry handheld device that's what we use to send an e-mail, receive e-mail, surf the Internet, make phone calls, things like that.

Q. We've heard that the claims at issue are method claims. Are RIM's products accused of infringing the claim of the '917 patent?

A. No.

Q. What is the infringement allegation?

A. The infringement allegation is that the use of the

RIM products infringe the asserted claims.

Q.   Have you reviewed Dr. Madisetti's analysis of the use of RIM's products?

A.   I have.

Q.   Are there any particular types of wireless networks that are involved in Dr. Madisetti's infringement analysis?

A.   There were two.

Q.   What are those?

A.   The cellular network and WiFi networks.  So the cellular network, again, being the network operated by a service provider like AT&T or T-Mobile or Verizon Wireless.  And the WiFi network being a WiFi hotspot like in Starbucks.

Q.   You told us earlier that it was your conclusion that use of a BES and a BlackBerry handheld device do not infringe the asserted claims.  Is that true for communications both over the cell network and over a WiFi network?

A.   Yes.

Q.   Is there a different analysis for the two types of communication?

A.   Yes.

        MS. DeBRUIN:  If we could take 1103 off the screen.

If I could have Demonstrative 1116 on the screen, please.

BY MS. DeBRUIN:

Q.  I've placed on the screen some claim language that we're going to be addressing in your infringement analysis now.  You've already addressed the establishing a connection step and explained what that construction meant.

Is this also some additional language that you'll be referring to, that "without a request from the wireless device"?

A.  Yes.  That's the second part of Claim 1 highlighted, and on the left-hand side, we see the Court's claim construction for the "without a request" language.  And we see the Court's claim construction from the "establishing connection" language.  And I'll be applying the Court's claim construction.

Q.  Thank you.

MS. DeBRUIN:  If we could have that slide down, please.

BY MS. DeBRUIN:

Q.  I'd like to start with the cell network.  Have you compared the claims as the Judge has construed them, to the operation of RIM's products over the cell network?

A.  I have.

Q. Have you prepared a demonstrative to illustrate that?

A. I have.

MS. DeBRUIN: At this time I'd request, if Mr. Karson could come forward to assist us with some boards?

THE COURT: Sure.

THE WITNESS: And I'd like to request an opportunity to stand down to the board.

THE COURT: Sure. My only concern always is making sure we can hear you. There's a handheld microphone. And always that, so everyone can see what -- or at least the jury particularly, can see what it is you're referring to.

THE WITNESS: Sure.

Can everybody see?

BY MS. DeBRUIN:

Q. What is depicted on Demonstrative Exhibit 1117?

A. Okay, so I split this into two parts. On the left-hand side is a diagrammatic representation of the Court's claim construction for the establishing connection construction. On the right-hand side are the three parts of the RIM system that are important for my analysis of operation over the cellular network.

Q. Could you explain first the left-hand side and how you've depicted the Court's claim construction?

A.  Well, as I testified just a little while ago, the Court's claim construction tells us that the establishing a connection substep must be completed before the transmitting substep can begin.  So as I tried to illustrate here, first this, then this (indicating).  First a connection is established, then data is transmitted over that established connection.

Q.  Would you please describe with reference to what you have illustrated on the right side of the board how the RIM system sends messages from a BES to a BlackBerry handheld device over a cell network?

A.  Yes.  Okay.  Let me shift to the other side.

THE WITNESS:  I'm sorry, your Honor.

THE COURT:  That's okay, I can see.

THE WITNESS:  Okay.  So what happens is, when the BES software is installed, and begins to execute, one of the first things that it does is establish a connection between itself and the RIM Relay.  It establishes a connection between here and here (indicating).

Then, when it has something it wants to send to the BlackBerry, using that connection, it transmits over that connection.  That's actually a TCP connection.  So -- that connection is intended to be permanent.  Barring equipment failure that connection would remain in existence forever.  So.

The BES establishes a connection to the Relay. And when it has something it wants to send to the BlackBerry, it transmits that message to the Relay as a GME packet. The RIM Relay uses the wireless network, and as the name suggests, it submits that message to the BlackBerry using UDP. No connection out here. There is a TCP connection here, but the operation, as I said, that connection is brought up and maintained forever.

And using that virtual pipe, that reliable pipe, whenever the BES wants to send to the BlackBerry, it transmits a message to the Relay. The Relay collects the message, packages it in UDP, and without making any further connection, simply sends the package out to the BlackBerry.

Q.   Let's break that up and take it piece by piece, Dr. Acampora. You said that the BES transmits messages to the RIM Relay. You also said that there's a TCP connection setup between the BlackBerry Enterprise Server, the BES, and the RIM Relay.

A.   That's correct.

Q.   Does that TCP connection, was that TCP connection established?

MS. DeBRUIN:   And if we could please have on the screen the claim construction for establishing a connection.

THE WITNESS:  That's what I was looking around for.

BY MS. DeBRUIN:

Q.  Does that TCP connection between the BES and the RIM Relay satisfy the claims, the Court's construction for establishing a connection between the wireless device and the server?

A.  No, it doesn't.

Q.  Why not?

A.  Well, the Court's claim constructions for establishing a connection between the wireless device and the server reads:  "Initiating wireless communications between a wireless device and the server."

In other words, between here and here (indicating), but that's not done.  TCP is established when the BES is installed, and when it's turned on, is between here and here (indicating).  It does not extend to the BlackBerry.  In fact, the wireless network, the cellular network isn't involved in that whatsoever.

The claimed step of establishing a connection, initiating a wireless connection between a wireless device and the server, must be between the server and the device.  That TCP connection has nothing to do with the device.  It's between the BES and the RIM Relay.  It

doesn't send out to the device.

Q.  Getting a little bit ahead of ourselves.  But there's a final term, final limitation in Claim 1.  "Wherein the connection is established based on a threshold condition."  Is that met with respect to that connection between the BES and the RIM Relay?

A.  No.  This happens as part of the initial operation of the BES.  Software's installed, it begins to -- one of the first instructions that the BES will then comply with is to establish that TCP connection to the Relay.  So there's no threshold condition involved in establishing that connection at all.

Q.  Does Dr. Madisetti's claim that establishing that connection between the BES and the RIM Relay satisfy the establishing a connection step?

A.  He does not.

Q.  Did Dr. Madisetti talk at all about the RIM Relay?

A.  Not with regard to his infringement analysis or over the cellular, he did not.

Q.  Does the BES initiate wireless communications between itself and the BlackBerry device before sending the message to the RIM Relay?

A.  No.  No.  So this connection is always there.  It's simply used whenever the BES wants to transmit to the BlackBerry.  The BES transmits a GME message down to the

Relay, so the message has already left the BES, it's been transmitted. It's now sitting in the Relay. The cellular network still is not -- hasn't been involved at all. The message is simply sitting here at the Relay. It's left the BES. It's been transmitted. And then the Relay will then forward the message without making any connection out to the BlackBerry.

Q. That was going to be my next question. Once the message gets to the Relay, what happens?

A. The Relay forwards the message using UDP. It simply transmits.

Q. Does the Relay first initiate wireless communication with the BlackBerry device before transmitting?

A. It does not. It uses UDP. Simply transmits.

Q. Now, we heard some testimony from Dr. Madisetti that UDP, even though it's connectionless, establishes a connection. Do you recall that testimony?

A. I do.

Q. If you would assume with me for a moment that UDP did establish a connection -- I know you disagree with that -- but assume with me for a moment that UDP did initiate a connection, would that change your analysis?

A. Okay, let me see if I understand the question.

Q. Sure.

A. The only place that UDP is used in this drawing is

here (indicating).

Q.  Yes.

A.  You're asking me to suspend disbelief and pretend
that somehow UDP establishes a connection here?

Q.  Exactly.

A.  That will not change my analysis one bit.  Because,
if we look at the Court's claim construction, not only
does wireless communications need to be initiated
between the device and the server, but that step has to
be completed.  Look at the second part of the
limitation, the establishing a connection substep, must
be completed before transmitting the contents of the
mailbox substep can commence.

So independently of what's happening down here
over the cellular network, the transmitting step has
already begun.  The message is already sitting at the
Relay.  And that's why I have this two-step process
shown on the left side of the board:  First establish a
connection; then transmit.  The wireless network is not
involved at the point in time that the transmission from
the BES to the Relay has already occurred.  On the basis
of that alone, it's impossible for operation of the RIM
system to infringe this claim.

The Court's claim construction says:  Establish a
connection; then transmit.  Even if this were a

connection, which it's not, the transmission happened before the wireless network -- before UDP was used to transport from the Relay -- from the RIM Relay to the BlackBerry.

Q.  Did you hear Dr. Madisetti assert that UDP sets up a connection and the data transfer is done at the same time?

A.  I did.

Q.  I know you disagree, but assuming that Dr. Madisetti were correct and using UDP sets up a connection and the data transfer is done at the same time, would that satisfy the Court's construction of establishing a connection between the wireless device and the server?

A.  It could not.  Because the Court's claim construction said, do A to completion; then do B.  Establish a connection; then transmit.  If they happen at the same time, the two-step process that's mandated by the Court's claim construction could not be done.

Q.  What is your conclusion, Dr. Acampora, with respect to infringement by use of RIM's products over a cell network?  Did use of RIM's products over a cell network infringe the asserted claims of the '917 patent?

A.  No.

Q.  You told us there was another network we need to look at and that's WiFi.

A.   That's correct.

          MS. DeBRUIN:   Can we please turn to that.

BY MS. DeBRUIN:

Q.   You also told us your conclusion is that communications over WiFi do not infringe.

          I'll give you and Mr. Karson a moment to get set up here.

A.   Thank you.

Q.   And I see you and Mr. Karson have placed Demonstrative Exhibit 1118 on the board.  Is this another board you've prepared?

A.   It is.

Q.   Can you describe this board for us?

A.   It is.  Now I'm going to describe the operation of the RIM system using WiFi; not cellular, using WiFi.  As far as my analysis of the RIM system using WiFi is concerned, why I've reached the conclusion it doesn't infringe, notice I blanked out the second step.  That's not part of the analysis.  And this RIM Relay, that's not part of the analysis.  That's not involved in the operation of the RIM system over WiFi.  Relay's not involved.

Q.   Could you describe for us how a BlackBerry handheld and a BES communicates over a WiFi network?

A.   I can.  The first thing that happens -- now, the

BlackBerry device is in somebody's hand.  Somebody, let's say, strolls into Starbucks and wants to communicate.  The first thing that happens is it actually does have a process called association.  It has to associate the WiFi with the wireless routing in Starbucks.  So once it has permission to communicate with that router, we're talking about a distance of a few tens of feet, inside Starbucks, what the handheld would then do is it will initiate a TCP connection back to the BES.  It actually engages in the three-step handshake that I mentioned earlier.

Now, the WiFi is probably around here someplace and -- then it's just carried over the Internet, the wired line Internet from that point forward.  But the BlackBerry actually initiates a TCP connection back to the BES.  That's the first thing that happens.

Q.  Dr. Acampora, you just said that there's a TCP connection?

A.  There is.

Q.  That's a connection, right?

A.  That's the connection.

Q.  That there's a TCP connection between the BlackBerry handheld and the BES; is that right?

A.  There is.

Q.  Why doesn't that satisfy --

MS. DeBRUIN:  If we could have on the board, please.

BY MS. DeBRUIN:

Q.  -- the claim construction for the next set of -- why doesn't that satisfy Claim 1?

A.  Well, remember I said earlier that the Step B, without a request from the wireless device, need be performed without a request from the wireless device. The Court has told us performing an enumerated step without the transmission from the wireless device of a code, signal or any other form of request that initiates the commencement of the performance of the step.

So all of the steps following the "without a request" language must be performed without a request from the wireless device.  This is clearly performed with a request from the wireless device.  It opens the TCP connection.  It starts the first part of this Relay handshake.  This handshake, again involving the exchange of information, so the two end points can detect and recover from network failure.  That's started by the BlackBerry.  So the "without a request" limitation requirement is not met with the BlackBerry communication with the BES over the WiFi.

Q.  What is your conclusion with respect to communication over a WiFi network, the connection is established with

a request from the wireless device?

A.   The request to establish a connection that exists between here and here (indicating) is made at the request of -- in fact, the first part of the handshake is actually called the "connection request."  It sends a connection request to the BES.  It says, Can I talk to you?  That's the first part of this handshake.

So it is initiating -- it is actually causing the connection to be established.  And the Court's claim construction tells us that that can't happen.  That's not allowed.

Q.   And I believe we're finished with the board.  If you could resume your seat, please.

A.   Okay.

MS. DeBRUIN:  And Mr. Karson can find his way from back behind the board.

BY MS. DeBRUIN:

Q.   How did you -- from what materials did you learn that RIM's system operates in the way you just described for WiFi; that is, that the BlackBerry handheld device makes a request to the BlackBerry Enterprise Server to establish the connection?

A.   From two sources.  One was RIM documentation itself.

MS. DeBRUIN:  And if we could please have RIM Trial Exhibit 4106.

And your Honor, I move Exhibit 4106 into evidence.  There's no objection.

THE COURT:  4106 is in evidence.

(Defendant's Exhibit 4106 received in evidence)

BY MS. DeBRUIN:

Q.  Could you tell us what Exhibit 4106 is?

A.  Yeah, this is RIM document entitled "WiFi Implementation Supplement."

MS. DeBRUIN:  If we could please turn to page 11.

BY MS. DeBRUIN:

Q.  Did you find material on page 11, if we can begin with "a BlackBerry device can establish..."?

A.  Yes.

Q.  This is some information that you reviewed?

A.  Yes.  Right from RIM document itself:  "A BlackBerry device can establish a WiFi connection from an enterprise WiFi network" -- that's a hotspot -- "or, in conjunction with a VPN session" -- we haven't spoken about VPN, it's not important for the purposes of this trial, but that also would be using WiFi -- "from a personal WiFi network or from a WiFi hotspot."

"The BlackBerry device can establish the WiFi connection."  The word "can" is -- not all BlackBerry devices are WiFi-enabled.  Some are, some aren't.  If it is, it can establish that connection.

Acampora - Direct

Q.  You said you had a few other examples.  Is there an additional example from this document?

A.  There is.

MS. DeBRUIN:  If we could please turn to page, last four digits, 2204.  And could we highlight, "after associating with the WiFi connection..."

THE WITNESS:  Yes.  So what's highlighted here, once again, "after associating with a WiFi connection using a WiFi profile" --

BY MS. DeBRUIN:

Q.  What does that mean, Dr. Acampora?

A.  That's the -- this association process that I mentioned earlier.  There's a procedure involved in just getting onto the hotspot.

Q.  Does the device initiate that as well?

A.  It actually does.  But in my mind, more significantly, it also -- the device then, after it has its association with the access point, which it starts, it starts that process, it then establishes the TCP connection.  The first connection request message goes from the device out to the -- back to the BES.  And we see it there.  The BlackBerry device tries to make the direct IP connection to the BlackBerry Router.  That's what happens.

MS. DeBRUIN:  If we could please have

Exhibit 4110 on the screen.

And your Honor, I move Exhibit 4110 into evidence.  There's no objection.

THE COURT:  Very well.  4110 is in evidence.

(Defendant's Exhibit 4110 received in evidence)

BY MS. DeBRUIN:

Q.  Can you tell us what RIM Exhibit 4110 is?

A.  This is, as the title suggests, this is BlackBerry Enterprise Server for IBM Lotus Domino.  So it's running on top of the machine.  It's running IBM Lotus Domino. This is Version 5.0.

Q.  Is this another document in which you found reference to the device requesting the connection in the WiFi case?

A.  It is.

MS. DeBRUIN:  Could we turn to page '97, please. And highlight the portion of the document that begins, "WiFi-enabled BlackBerry devices through BlackBerry Router."

THE WITNESS:  Okay.  So this is another document in which we see essentially exactly the same language as what I already identified in that early document. "WiFi-enabled BlackBerry devices can open a WiFi connection" -- then we'll go to the end -- "to connect directly with the BlackBerry Router."

The BlackBerry Router is part of the BES.  That's one of the software in the BES.

MS. DeBRUIN:  Can we turn to page 42 of this same document, 4110.  And if we could highlight the language that begins, "after BlackBerry devices connect," and again "through BlackBerry Router."

BY MS. DeBRUIN:

Q.  Is this another portion that you relied on?

A.  It is.  Same language we saw earlier.  Different document.  The BlackBerry device tries to make a direct IP connection to the BlackBerry Router.  Again, the router is part of the BES.

MS. DeBRUIN:  If we could have that off the screen, please.

BY MS. DeBRUIN:

Q.  Is it always necessary for the BlackBerry handheld device to request a connection if a connection is going to be established over WiFi between a BlackBerry device and the BES?

A.  It's -- from a technical point of view, it actually can be no other place.  Not only can we find support for reference in the RIM documents, a connection is started by the BlackBerry, but it actually can be no other way.

And I'll try to do this without stepping down.

This BlackBerry could be anywhere.  It could be

Connie Kuhl, Certified Realtime Reporter
Official Reporter - USDC  (415) 431-2020

in a Starbucks here in San Francisco, it could be in a Starbucks in New York City.  It could be at the user's home or office.  The BES has no way of knowing where the BlackBerry is.

Now, in order to communicate, you need to know the address.  You need to have -- the message that needs -- that leads to the BES would have to have an address on it identifying the current address of the BlackBerry, and it has no idea where that BlackBerry is. So it's sort of like, if you leave home, and somebody wants to correspond with you, you had better first tell that somebody where you're at.  Like I'm at such-and-such a hotel in such-and-such a city.  Send mail to me there.  Otherwise, nobody can send mail to you.

The BES has no idea where that BlackBerry is. But as part of the connection setup process, when the BlackBerry -- the BlackBerry knows where the BES is. The BES is stationary.  It has a permanent street address, if you will.  So it's easy for the BlackBerry to send a message to the BES.  And include a return address.  The return address would say, This is where I temporarily am.

So after the BES, after the BlackBerry sends something to the BES, now the BES can correspond.  So it

has to be sent by the BlackBerry.  There can be no other way.

Q.  Is it ever possible for a BlackBerry Enterprise Server to establish a connection between the wireless device and the BlackBerry Enterprise Server without a request from the wireless device?

Did I have too many negatives in that?

A.  No, I think I got it.  Maybe you want to repeat it.  I think I got it.

Q.  Sure.  Can the BES ever establish the connection with the device without the device requesting it?

A.  It cannot.

Q.  What is your conclusion with respect to infringement by use of RIM's products -- a WiFi network, does the use of RIM's product -- a WiFi network infringe the asserted claims of the '917 patent?

A.  No.

Q.  You've provided the jury with your analysis.  Now, I'd like to turn to Dr. Madisetti's analysis.  You said that the step establishing a connection between the wireless device and the server is not performed over the cell network and is not performed over the WiFi network.  What did Dr. Madisetti point to?

A.  Dr. Madisetti pointed to two things.  He points to the creation of a GME packet back at the BES, and he

pointed to a feature of the BES known as "least cost routing." And in his opinion, both of those meet the limitation of establishing a connection.

Q.  Does Dr. Madisetti's analysis make a distinction about whether this is happening -- whether a WiFi network is involved or a cell network is involved?

A.  No.

MS. DeBRUIN:  If we could please have Demonstrative 1105.

BY MS. DeBRUIN:

Q.  Is this a slide that you created?

A.  Well, it's a slide that I asked to be created.  It was actually -- the right-hand side is taken right out of a RIM document.  But otherwise, I did ask them -- this is my slide.

Q.  What is shown on Demonstrative 1105?

A.  Well, what I tried to show here is, a collection of software processes that we know as the BES.  So each block in this block diagram labeled "BES" is a software component, if you will.  And most of these have nothing to do with what's being accused.  They have to do with delivering mail or maintaining contact information, things like that.

Q.  Do you have a slide that would show just the relevant portions in your discussion of Dr. Madisetti's analysis?

A.  I do.

MS. DeBRUIN:  Can we please have that on the screen.

BY MS. DeBRUIN:

Q.  We have now on the screen Demonstrative 1106.  In connection with this demonstrative, could you describe for us what Dr. Madisetti identifies as establishing a connection -- as satisfying the "establishing a connection" step?

A.  Okay.  Dr. Madisetti apparently believes that when the BlackBerry Policy Service creates a GME packet, somehow wireless communications have been initiated between the wireless device and the BES.  But that's all inside the BES.  This GME packet is prepared inside the BES.  The cellular network is not involved at all at this point.  We haven't even gotten as far as the Relay, assuming that it was cellular.  All of this takes place inside the BES.  There is no wireless communications at all at this point.

Q.  Has there been any communication between the server and the wireless device at this point?

A.  No.  This takes place entirely inside of the BES.

Q.  Has there been any wireless communication initiated?

A.  Nope.  There's been no communications at all.

Q.  You mentioned that Dr. Madisetti also pointed to

determining a communication path; is that right?

A.   Correct.

Q.   Where does that occur in the BlackBerry Enterprise Server?

A.   Let me see if I can talk through this here.  It's not shown in this diagram, but if the BlackBerry has opened a connection back to the BES, there's something in the router, a port in the router, it's known as the direct connection port.  It's not shown here, but let's assume that the BlackBerry actually established a WiFi connection back to the BES.

Now, when the GME message, it will eventually -- it hits the dispatcher, a process called bit compression takes place.  Sometimes there are more bits in the message than are needed, so you want to compact the message.  Then you want to encrypt the data.  That happens with the dispatcher.

The BlackBerry Router, it gets this GME message, will first look to see if the direct connect exists.  Now, if it does exist -- by the way, the BES has no way knowing exactly if it leads out to WiFi or a USB port attached to a computer somewhere.  It simply knows there's a direct connection and it will use that.  Because it's typically less expensive than forwarding the message over the cellular network.  You typically

pay for the use of the cellular network and don't pay for the use of WiFi or USB. If that direct connection doesn't exist, then the BlackBerry will forward the packet out to the RIM Relay.

That decision is made entirely within the BES. There still has been no communications whatsoever, but somehow Dr. Madisetti thinks that's initiating wireless communications.

Q.   In your opinion, does that initiate wireless communications between the device and the server?

A.   No, this takes place entirely inside the BES. There's been no communications of any type at all.

Q.   If a BlackBerry handheld device were broken at the bottom of the Grand Canyon, I think you may have heard this example during the trial, do the things that Dr. Madisetti points to as establishing a connection between the wireless device and the server still happen?

A.   Yes, they would still happen.

Q.   Is it possible to initiate wireless communication with a broken device or one that's at the bottom of the Grand Canyon?

A.   I don't see how.

Q.   So what is your conclusion, Dr. Acampora, concerning whether use of RIM's products over a cellular network infringe the claims of the '917 patent?

A.   In my opinion, the use of the BlackBerry products over cellular does not infringe the asserted claims of '917.

Q.   And in particular, the step of without a request from the wireless device establishing a connection between the wireless device and the server is not met?

A.   Well, that's for WiFi.  I believe your earlier question was cellular.

Q.   I could leave off the "without a request from the wireless device."  The step of establishing a connection between the wireless device and the server is not met?

A.   That's correct.  The reason that -- in my opinion, the reason that operation of the RIM system over cellular does not infringe is because the establishing the connection step is not performed.  Once again, it's not shown here, but first BES sends to the Relay, the transmission has already happened, there's been no wireless communications of any type at that point.  It's not possible for the limitation to be met.  Transmission has to happen after wireless communication has been initiated between the BES and the device.

Q.   And with respect to WiFi, what is your opinion as to whether the use of RIM's products infringes in the WiFi case?

A.   In the WiFi case, the operation of RIM products does

not infringe, but for a different reason.

Q.   What is that reason?

A.   Okay.  As I testified a little while ago, in WiFi, in fact, there is a connection made, a connection is made between the BlackBerry and the BES.  If there's a connection.  There's a TCP connection.  But it's initiated by the wireless device, it's not initiated without a request from the wireless device.  So for that reason, operation of the RIM system over WiFi cannot infringe.

Q.   Are there any other steps -- we've been focusing this morning on establishing a connection.

MS. DeBRUIN:  If we could have Claim 1 of the '917 patent up, please.

BY MS. DeBRUIN:

Q.   Are there any other steps that you've identified as not performed in the use of RIM's products?

A.   Yes.  It's not a step.  In this condition -- well, I guess -- let me back up.  Just looking at the deliver -- the command substep, there are three parts to that.  There's establishing a connection, transmitting the contents of the mailbox from the server to the wireless device.

Now, for a different reason than what we've just been discussing from the establishing the connection

substep, I think the transmitting the contents of the

mailbox substep is also not met.

Q.  So is this an independent reason why the claim is not

practiced?

A.  It is.

Q.  First, what does Dr. Madisetti say is transmitting --

what does Dr. Madisetti have to say about transmitting

the contents of the mailbox step?

A.  Well --

Q.  Let me start you on one thing.  What does he identify

as the possible mailboxes?

A.  Okay.  Dr. Madisetti has identified three things as

possibly being mailboxes:  To identify something called

the ITAdminQueue; he's identified a single row within

the ITAdminQueue; and has identified the user

configuration table.  So he's actually identified three

possible -- three candidate mailboxes.

Q.  What does he say with respect to those three

candidate mailboxes?

A.  He believes that the contents of those mailboxes are

transmitted out to the device.

Q.  Is that what happens?

A.  No, that's not what happens.

Q.  Can you explain for us what actually happens?

A.  I can.

Q.   And have you prepared some demonstratives for this?

A.   Yes.

MS. DeBRUIN:   If we could have 1107.

BY MS. DeBRUIN:

Q.   Could you describe what happens in the BES in connection with the ITAdminQueue and the UserConfig table with regards to Demonstrative 1107?

A.   First, let me just take a step back so the jury understands what's on this slide.

There's something called the BlackBerry Configuration Database, that's that little cylindrical icon shown in the diagram.  What I've done is blow up two tables that exist inside that database.  One table is the ITAdminQueue.  And the second table is the user configuration table.

And let me describe first the ITAdminQueue.  The ITAdminQueue -- each row in the ITAdminQueue is a work order.  It's an order for work that will eventually be performed by the BlackBerry Policy Service.  And so one row is work that's going to -- corresponds to work that's going to be performed by the Policy Service.

Q.   If I could just stop you for a moment, Dr. Acampora.

MS. DeBRUIN:   And ask that we remove 1107 for a minute, and that we place on the screen Joint Trial Exhibit 496.

BY MS. DeBRUIN:

Q.  I'd just like to understand the basis for your statement concerning the ITAdminQueue.

A.  Sure.

        MS. DeBRUIN:  And if we could turn to page 10, please.  In fact, I should -- sorry, I got ahead of myself.  We can turn back to the first page.

BY MS. DeBRUIN:

Q.  What is Exhibit 496?

A.  This is a RIM document.  This is describing the Policy Service.  One of the blocks in that block diagram that I showed you.

Q.  Now, let's look at Section 4.1.1.  Did you review this document in determining what was contained in the ITAdminQueue in the BES?

A.  Among many other things, yes.

Q.  What did you find in this document?

A.  Well, the first row, the first sentence, what's highlighted.  Each row in this table -- "this table" being the ITAdminQueue -- contains a specific task for the Policy Server to work through.  It's a work order for the Policy Service.

Q.  And if we could turn, please, for the moment to page 19 of this same document.  Did you also refer to this documentation in determining how the RIM system

operates with respect to the ITAdminQueue?

A.   I did.  And --

Q.   Go ahead.  Sorry.

A.   The Policy Server interacts with devices through the GME protocol, the devices being the BlackBerrys.  It sends three different types of content through GME.

When sending administrative control directives to devices, the Policy Server sends GME packets with the ITAdmin content type.  So what the Policy Server is eventually sending out is the actual new software package or command that it wants the -- is instructing the BlackBerry as to what it should do.  It's converting the work -- it's performing whatever was asked to perform in a work request, and along the way it's determining, well, this work request corresponds to certain objects that happen to be sent out to the device, and then it prepares a GME packet with those objects and sends them out.  It does not send out the work request.

Q.   If we could go back to Demonstrative 1107.  I wanted to just provide the factual basis for what you were describing.  Could you please continue your description on 1107?

A.   Sure.  So as I just said, each row corresponds to a work request.  Eventually the BlackBerry Policy Service

gets around to servicing, let's say, the first row.  And the work request might be, as an example, send a new version of Microsoft Word out to the BlackBerry.  So the Policy Service then goes, gets the latest copy of Microsoft Word, prepares a GME message, actually probably a sequence of messages, but it will send the new version of Microsoft Word out to the device.  It doesn't send the work order.  The work order just told the BlackBerry Policy Servers what to do.  And based upon that work, the GME package is prepared.  And that contains the actual code, the zeros and ones, that are sent out from the device.

So I have analogy if I might.

Q.  Please go ahead.

A.  If you're in a restaurant and you order a turkey sandwich, the server, the order-taker -- let's not confuse server -- the order-taker will write down the order.  So there's a piece of paper.  Writes down on a piece of paper, "one turkey sandwich."  And then that order is brought to the kitchen, the kitchen prepares the turkey sandwich.  What's brought out to your table is the turkey sandwich.  Not the piece of paper that said, Tony Acampora ordered a turkey sandwich.  So that analogy is appropriate here.

What's in the ITAdminQueue would be sort of

equivalent to the piece of paper, and the turkey

sandwich is actually what's in the GME packet.

Q.   Are the contents of a row of the ITAdminQueue ever

sent from the server to the BlackBerry device?

A.   No.

Q.   Now, you mentioned that Dr. Madisetti had several

different potential mailboxes.  One of the other

potential mailboxes was the entire ITAdminQueue?

A.   Yes.  He said it was either a row in the ITAdminQueue

or the entire AdminQueue.  And just like no row is sent

out, the collection of all work orders, many of which,

maybe even most of which have been independent of that

device, that's not sent.

Why would the device want work orders for another

device?  The device only wants commands or software for

itself.  So the entire AdminQueue is never sent to a

device.  And as I said before, even a row in the

ITAdminQueue is never sent to the device.

Q.   There was a third potential mailbox that

Dr. Madisetti identified, and that's a row in the

UserConfig table.  Could you describe to the jury what

the "UserConfig table" is?

A.   That's information concerning a particular user.  So

somebody who's using a BlackBerry.  That's all it is.

It's not even a work order.  That's just information

concerning a particular user.  Like it might say, as an example, what version of Word that user currently has.  So if the Policy Server should be told, Send a new version of Word, what it might do is check the user configuration table and see what the current version is, and then decide, Oh, the user already has that version, or, no, I better send a new version.  But what's in the IT user configuration table is never sent.

Q.  So are the contents of an entry in the UserConfig table ever sent from the server to the BlackBerry device?

A.  No.

Q.  What is your conclusion as to whether --

MS. DeBRUIN:  If we could have Claim 1 back on the board, please.

BY MS. DeBRUIN:

Q.  What is your conclusion as to whether the step of transmitting the contents of the mailbox from the server to the wireless device is practiced by use of RIM's product?

A.  Okay.  So Dr. Madisetti believes that the mailbox is one of those three things:  A row in the ITAdminQueue; the entire ITAdminQueue; a row in the user configuration table.  If that's a mailbox -- now, I don't believe it is -- but if that's a mailbox, the contents have the

mailbox, the row in the IT queue or the entire ITAdminQueue, a row in the user configuration table, is not sent to the wireless device.  Transmitted to the wireless device is new software or a command but not the contents of the mailbox.  So the transmitting the contents of the mailbox step would not be met.

Q.   Moving on to another claim limitation or claim step.

THE COURT:  Can we use that as a place to pause?

MS. DeBRUIN:  We certainly can.

THE COURT:  And it's not because of the turkey sandwich.

(General laughter)

THE COURT:  We'll take our noon break, we'll come back to this matter at 1 o'clock.  Remember my admonition.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom)

(Luncheon recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. CHARFOOS:  Before we resume, you had asked for the RemoteWare documentation.  And just for the record, if you don't mind, we're going to hand up 4046, 523, 4045, 733, 7034, 4044, 443, and 526.

And, your Honor, as I had mentioned before, I

believe that the parties had narrowed down the dispute with respect to Mr. Owen's testimony to a single question and answer. We dropped all of the stuff that had to do with discussions about third parties in the industry, and now we're left with just a single question.

THE COURT: And what's that question?

MR. CHARFOOS: The question is: "And based on your 20 years of experience in the RemoteWare device management industry, would you say that prior to 1999 it was known in your industry how to wirelessly manage remote devices?"

"Yes."

MR. McDONALD: I passed to Mr. Noble the *Juicy/Orange Bang* decision. This was cited yesterday in the motion to exclude Mr. Foley's testimony. On the single page record cite is 292 F.3d 728 at 743. The court discusses admitting hearsay evidence regarding public use, and in light of the presumption of validity and the fact that this public use must be proven by clear and convincing evidence, not only does the court not permit admission of hearsay evidence on this point, but any actual testimony must also be corroborated, for as a matter of law it cannot be used to invalidate a patent.

Mr. Owen's proffered testimony is not even his testimony. He's talking about what someone told him. The declarant was never deposed. The declarant is not available for cross-examination, and there is no corroboration of the declarant's testimony.

MR. CHARFOOS: Your Honor, I think the only thing we're disputing, though, is the one question, and it goes to his knowledge of what is going on in the industry. His understanding of the industry. So the hearsay issue with all the other declarants is not at issue right now.

THE COURT: Well, I'm still trying to figure this out. And even though you have narrowed it down to one question and the one answer, I wanted to look at this material. I read portions of the case that you gave me. I want to say the *Orange Julius* case, but it was some other.

MR. McDONALD: Very close, your Honor.

THE COURT: Fine. And let me spend some time before I even give you a preliminary view on this matter. So thank you for your efforts to try and narrow it. But I'm not satisfied that I can give you a ruling now that will allow you to put this -- this is opinion testimony, as I take it -- in the record.

I should say that whether or not it meets the

evidentiary standard, it's ultimately up to the jury.  I

hear this, this is a motion in limine saying that the

jury shouldn't even hear it for purposes of evaluating

clear and convincing evidence of prior use.

MR. McDONALD:  That's correct, your Honor.

THE COURT:  So I understand that.  Thank you very

much for tendering up the issue.

Summon the jury.

MR. McDONALD:  Thank you.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may resume your examination.

MS. DeBRUIN:  Thank you, your Honor.

BY MS. DeBRUIN:

Q.  Welcome back, Dr. Acampora.

A.  Thank you.

MS. DeBRUIN:  May I have Demonstrative 1107 up on

the board.

BY MS. DeBRUIN:

Q.  Dr. Acampora, I have just a couple follow-up

questions.  Is it possible to connect, and I mean

physically connect, a BlackBerry device over a wire to

the BES?

A.  It is.

Q.   If you connect a BlackBerry device over a wire to the BES, is the procedure that you described as far as commands being placed -- strike that.

Is the procedure that you described with respect to the ITAdminQueue and the UserConfig table and how messages are created the same?

A.   Exactly the same.

Q.   Is the same process used regardless of whether the device is being used over WiFi or over a cell network?

A.   Exactly the same.

Q.   Thank you.

MS. DeBRUIN:  I'd like to have the language of Claim 1 up on the screen, please.

BY MS. DeBRUIN:

Q.   Before lunch, we just finished with transmitting the contents mailbox from the server to the wireless device. And you provided your opinion that that claim limitation was not met through use of the RIM system.

A.   That's correct.

Q.   In light of that conclusion that the step of transmitting the contents of the mailbox is not performed, are there any other steps of Claim 1 that cannot be performed?

A.   There are.

Q.   What is that?

A.   Well, the third substep of the delivery, the delivery command substep, also cannot be met because if the contents of the mailbox were not transmitted, the contents of the mailbox cannot be accepted at the wireless device.  So that limitation is also not met.

Q.   So that's another limitation that is not satisfied?

A.   That's correct.

Q.   That was one of the quickest ones we'll have.

Moving on, are there any other claim limitations that you've identified that are not satisfied in Claim 1?

A.   Yes.  The last limitation, "wherein the connection is established based on a threshold condition."

Q.   Why is your conclusion that that limitation, the threshold condition limitation, is not satisfied in use of RIM's products?

A.   There's no connection established.  So the notion of establishing a check based on a threshold condition, it's inapplicable.  There can be no threshold condition upon which a connection is established if a connection is not established.  And it's my opinion there's no connection established.

Q.   Now, Dr. Madisetti provided some testimony regarding this limitation.  Were you here for his testimony?

A.   I was.

Q. Did Dr. Madisetti identify any alleged threshold conditions?

A. He did.

Q. What were those?

A. Backlog of commands. Five times retry. Whether the device was in or out of coverage. And I believe the fourth was least cost routing.

Q. Setting aside your conclusion for a moment that the threshold limitation cannot be met because there's no connection established, do you have an opinion with respect to whether the threshold conditions Dr. Madisetti identified satisfy the Court's construction?

Do you want me to rephrase that, make it a little simpler?

A. I think I understand what you were asking. So if we suppose for a moment that a connection is established, would, in fact, as Dr. Madisetti identified the step of establishing a connection, what he identified as being establishing a connection would be what he based on identifying as a threshold -- I think that was your question.

Q. That was my question.

Do you have an opinion on that point?

A. I do.

Q.   What is your opinion?

A.   I don't think that even then, given that assumption, that the creation of a GME message or least cost routing would be based on any of the four thresholds that Dr. Madisetti identified.

MS. DeBRUIN:  If we could have the Court's claim construction Demonstrative 1115 on the screen, please.

BY MS. DeBRUIN:

Q.   Dr. Acampora, I've just had placed on the screen the Court's claim construction for threshold condition.

A.   Yes.

Q.   In reviewing Dr. Madisetti's threshold conditions, did you review the Court's claim construction?

A.   I did.

Q.   Can you explain what you looked at in the Court's claim construction?

A.   Okay.  So the Court has construed, "wherein the connection is established based on a threshold condition," the second of the highlighted phrase, to mean "establishing a connection between the wireless device and the server based on a predefined state of the server or the wireless device other than solely the elapsing of time."  It's got to be something other than merely the elapsing of time.

Q.   Now, if we could step through each of Dr. Madisetti's

alleged threshold conditions, I'd like to start with the first one you mentioned, a backlog of commands.  And my question for you is:  In addition to this limitation "wherein the connection is established based on a threshold condition," not being satisfied because there's no connection established, what else did you find wrong with Dr. Madisetti's allegation that a backlog of commands satisfied this threshold condition?

A.   Okay.  So what Dr. Madisetti identified as being a backlog of commands is an operational aspect of the BES known as throttling.  And what is throttling?  Every time the Policy Server wants to go and get a new work order, it has to go to a database.  And if that was done without any restrictions, the demand facing the database could overwhelm the database and the database either wouldn't respond properly or the other information would be delayed.

So what the BES does is builds in a mechanism whereby if there are work orders in the AdminQueue, no more than a fixed number will be scheduled, let's say, per minute.  Let's say five per minute.  And those five will be equally spaced over that one-minute interval. So for the example I'm giving, if the throttling condition is over one-minute interval allowing no more than five work requests to be processed, then every 12

seconds, one would be processed.

Now, that would not satisfy the Court's construction of establishing a connection based on something other than solely the elapsing of time. That would be exactly the elapsing of time. Every 12 seconds, go get another one. So that could not be done through establishing what Dr. Madisetti thinks is a connection.

Q. The second alleged threshold condition that you identified that Dr. Madisetti mentioned was five times retry. What was that?

A. Okay. So I mentioned earlier there was one instance where I needed to speak to an engineer to find out what was going on, because the documentation that Dr. Madisetti cited to simply didn't reveal what this was.

So, there is something called "five times retry." Dr. Madisetti mistakenly believes, and this is why I need to speak to Ron Davidson to clarify, that somehow the BES will try sending a GME packet to a targeted BlackBerry five times and then stop. And that's not what happens. In fact, the BES will continue -- suppose, for whatever reason, a message is not delivered to a BlackBerry. Every four hours, the BES will try again. And still not delivered four hours later, it

tries again.  It will do this forever if it wasn't stopped by some other mechanism.

And there is another mechanism.  There's a part of the BES called the BAS, not the BES but the BAS, the BlackBerry Administration Server.  And what it does is it the periodically checks to see if a particular work is still in the ITAdminQueue.

And I'll make a number up again.  Perhaps every day it checks to see if the order is still there.  It will look five times, and it still finds the order present -- who knows how many time the BES might have tried to process that work order and have it delivered, who knows, every four hours the BES is going to try again and again, but the BAS will independently see, after the first day, is it still there?  After the second day, is it still there?  It will check five times, and then it will deactivate that work order.

That cannot be a threshold condition because that, too, is merely the passing of time.  So it's merely the passing of time.

Q.  The third threshold condition that you mentioned Dr. Madisetti referred to is device availability.  What is that?

A.  Dr. Madisetti seems to believe that when a BlackBerry becomes available -- let's say it's in a tunnel and now

has a radio signal so it can communicate.  Inside the tunnel suppose it can't communicate.  That somehow that would be a threshold condition.  And the fact is that the BES will not even know that the device became available, once again, until the device sends what's called a ping.  The device actually has to notify first the -- actually first the Relay, and the Relay would notify the BES that the device is now visible again, it's capable of communicating.

So that cannot be a threshold condition for establishing a connection because that would be done with a request from the device.  The device sends a notification, I'm available again.  I have radio communication.  And the establishing connection step must be performed without a request from the wireless device.  So that cannot be a threshold condition.

MS. DeBRUIN:  Can we look at that for a moment, please.  If we could have highlighted the "without a request" language.

BY MS. DeBRUIN:

Q.  I wanted to sure it was clear in connection with the WiFi case.

A.  Okay.

Q.  Could you explain what that means, that language means, "without a request from the wireless device,"

what that modifies?

A.    That modifies the following steps.  The claim read:

"Without a request from the wireless device performing

the steps of...," there's establishing a mailbox,

placing a command, delivering the command, which

includes establishing a connection.  So the delivering a

command substep, including establishing a connection

substep, cannot be performed with a request from the

wireless device.  It must be performed without a request

from the wireless device.

And as I just explained, when the device becomes

available again, it sends a ping, that would start the

process of message flow back to the device.  That's with

a request, not without a request.

Q.    Now, back to the threshold conditions.  The final

threshold condition that you mentioned that

Dr. Madisetti was alleging was the least cost routing.

Could you describe for us what that is and give -- could

you describe for us what that is?

A.    Yeah, well, as I explained earlier, it's possible for

a BlackBerry to have what's called a direct connection

to the router.  To the router component of the BES.  And

it can do that by USB cable, it can do it by WiFi.  And

generally, if the BES has a message to send to the

BlackBerry, that would be the lower cost route to take.

That's why this is called least cost routing.

The alternative, if no such direct connection exists, then the BES will attempt to deliver the message over the cellular network by going first to the Relay, then the cellular network.  That generally costs more.  So if there's a direct connection available, the router will send the GME message out the direct connection.  Doesn't know if it's going WiFi, doesn't know if it's going USB.  All it knows there's a direct connection, that's a low cost path, that's the one you want to use.

Q.  Why does that not satisfy the Court's construction of threshold condition?

A.  Okay, so there are a few reasons.  First, that's performed completely inside the BES.  That's a decision mailed by the router component of the BES, and the Court's claim construction said, "establishing a connection between the wireless device and the server means establishing" -- well, can we have it -- the claim construction up for "establishing a connection"?

MS. DeBRUIN:  If we can have the construction up for "establishing a connection," please.

BY MS. DeBRUIN:

Q.  So you're going to refer to that first and then explain the threshold condition piece?

A.  Yes.

Connie Kuhl, Certified Realtime Reporter
Official Reporter - USDC  (415) 431-2020

Q.   Okay.

A.   So the highlighted language the Court has construed to mean, "initiating wireless communications between a wireless device and the server," and I'll paraphrase, and this has to be done before the transmitting step can begin.  It has to be completed before the transmitting step begins.

So the least cost routing cannot be a threshold condition because it happens entirely within the BES, and as I explained earlier, there have been no wireless communications of any type.  So one cannot initiate wireless communications between the wireless device and the server by performing something entirely within the BES.

Q.   Now, it seems there, Dr. Acampora, that you're explaining to us in part how least cost routing cannot satisfy the establishing a connection between the wireless device and the server's step.  Is that right?

A.   That's right.

Q.   Does Dr. Madisetti point to it to satisfy that step?

A.   He does.  And then he also points to it as being the threshold condition upon which that decision is based.  So it's almost illogical.  What he identifies as being connection, he says least cost routing is establishing a connection.  First of all, least cost routing is

choosing between one of two preexisting connections, not establishing anything, just a decision.

But how can that decision be based upon a threshold condition which is exactly the same condition: Check to see if the direct condition exists. So Dr. Madisetti believes that checking to see if the least cost -- if the direct connection exists could be a threshold condition to checking to see if a least cost or direct connection exists.

It doesn't make sense. One must be predicated upon the other. And they're both the same thing. It's only done once.

MS. DeBRUIN: Can I have the claim construction back for "wherein the connection is established based on a threshold condition"?

BY MS. DeBRUIN:

Q. Dr. Acampora, we just went through a lot of technical details in talking about the various threshold conditions. I'd like to go up a step. Do we have to apply all those technical details to get to your conclusion that the limitation of "wherein the connection is established based on a threshold condition" is not satisfied?

A. No. You do not.

Q. What is the basis for your conclusion that wherein

the connection is established based on a threshold condition is not satisfied?

A.   Well, as I testified a little while ago, the "wherein the connection is established based on a threshold condition" is -- it's an inoperable limitation.  Because there was no connection established.

So first and foremost, the step of "establishing a connection between the wireless device and the server," in my opinion, is not performed, so it doesn't matter whether the connection is established based on a threshold condition because there is no threshold.  There is no connection established.  So this is basically an inoperable limitation.  Because it doesn't apply.  You can't establish a connection that's not established based on a threshold condition.  So that's my primary reason as to why that limitation is not there.

MS. DeBRUIN:  Could we please have slide 1101.

BY MS. DeBRUIN:

Q.   We've now reached the end of the noninfringement portion of your testimony.  Could you summarize for the jury your conclusions regarding whether use of RIM's products infringe the '917 patent claims?

A.   Yeah.  That's the first bullet.  For the reasons that I described, it's my opinion that use of RIM's products

does not infringe any of the asserted claims of the '917 patent.

Q. You have provided other opinions in this case?

A. I have.

Q. We're going to turn now to those opinions.

MS. DeBRUIN: I need to hand out some binders before we do that.

(Pause in the proceedings.)

BY MS. DeBRUIN:

Q. Dr. Acampora, what other opinions did you reach in this matter?

A. It's my opinion that the '917 patent is invalid.

Q. What materials did you consider to form that opinion?

MS. DeBRUIN: And I'd like to have Demonstrative 1002 on the screen, please.

THE WITNESS: Okay, I mentioned some of this earlier. I reviewed the patent, provisional application, the prosecution history that I described.

I reviewed prior art, lots of prior art. I applied my own personal experiences. And I also interviewed people in the art.

I relied upon deposition transcripts that were taken during these proceedings. And the various items identified under the third bullet, different court-related documents including infringement

contentions.

BY MS. DeBRUIN:

Q.   Did you speak with anyone while you were forming your opinion?

A.   I did, I spoke with Neil Hightower.

Q.   Who is Mr. Hightower?

A.   Neil Hightower is a person who I actually knew while I was still teaching at Columbia University.  He was working for BellSouth at the time, and BellSouth was one of our industrial affiliates, one of the industrial affiliates of the research centers that I was managing at the time.  And I knew Mr. Hightower at that time was working on a wireless data system called Mobitex, and I wanted to chat with Mr. Hightower concerning Mobitex.

Q.   Did you speak with anyone to confirm your understanding of any of the prior art you reviewed?

A.   I did, I spoke with Mr. Foley.

Q.   That's who we heard testify today?

A.   Yes, I did.  After reviewing some RemoteWare documents and looked at some related deposition testimony and gained an understanding of how RemoteWare operates, I then confirmed that understanding with Mr. Foley.

Q.   What do you mean when you say the '917 patent is invalid?

A.   I believe that it wasn't new.

Q.   The prior art that you're relying on in this case, was that prior art publicly used or publicly -- was that publicly used or on sale more than one year before Mformation filed for the '917 patent?

A.   Yes.

Q.   Was the prior art that you're relying on in this case even dated before Mformation even came into existence or claims to have made its invention?

A.   Yes.

Q.   I'd like to talk now just about an overview of the field of device management.  Did you identify any systems that performed mobile device management more than one year before Mformation -- and I should rephrase that -- that performed mobile wireless device management more than one year before Mformation filed for the '917 patent?

A.   I did.

MS. DeBRUIN:  Could we have slide 1003, please.

BY MS. DeBRUIN:

Q.   What's depicted on 1003?

A.   These are some examples of early device management systems.

Q.   Would you describe them for us.

A.   Sure.  I'll try to be brief here.  AMPS.  AMPS was

the first cellular system deployed in North America.  So this deployment goes back to the late '70s, early '80s.  And back then -- well, the same is true today, between the cell tower and the cell phone there were a bunch of radio channels.  And in order to communicate, either to place a call or to receive a call, the cell phone has to be told what radio channel to use.  So a command is sent from the base station out to the cell phone saying, Use radio channel 3.  So that's an early example of remotely managing a wireless device.

The Mobitex system, that's another early example.  Mobitex was a system that was actually developed by Ericsson and deployed by BellSouth.  It was a wireless data system.  It had the ability to send commands out to a wireless device.  It even had a mailbox at -- in fact, every bay station in the Mobitex system had a mailbox where the commands were stored until they were sent to the wireless device.

CDMA, the Verizon network, uses a technology known as Code Division Multiple Access.  It's CDMA.  One of the peculiar aspects of the operation of CDMA is that the cell phone is continually sent commands from the bay station telling it to raise its power level or drop its power level.  It's called "power control."  It's an essential feature of CDMA.  So power control commands

are continuously sent from the bay stations.

And the bottom line, these are features of actual wireless device management systems that were deployed and operational in the mid-'90s.

MR. THAKUR:  Your Honor, permission for a sidebar.  We have a demonstrative that we believe addresses an issue that needs to be discussed before she may publish it, your Honor.

THE COURT:  Counsel approach.

(At the sidebar, out of the hearing of the jury and the court reporter.)

THE COURT:  Members of the jury, something has come up that I need to discuss with the parties on the record.  And so I need to have you step out momentarily.  This is not our break.  We just got started.  We're just starting to have fun here.  But I expect it will take us about 15 minutes or so.  So if you want to use this as an opportunity to grab yourself a cup of coffee or something, I think I'll call us back in about 15 minutes.  So I'll have the Clerk of the Court escort you.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

MR. CHARFOOS:  Your Honor, if I can address counsel's --

THE COURT:  Just a moment.  We're on the record out of the presence of the jury.

The sidebar conversation had to do with whether or not the -- counsel should be able to use as a demonstrative a slide which would have the witness, as I understand it, testify that his opinion is based in part upon the deposition testimony of one of the witnesses whose testimony has not otherwise been played in the course of the trial, because I've had this objection to it.

And so as I understand it, part of the way -- I could resolve this is a number of ways.  First, I could resolve the question with respect to the deposition testimony so as to be played or not.

And then the secondary question is, even if I don't allow the deposition to be played, the question I asked at the sidebar is, since experts are permitted to rely upon hearsay information for purposes of their opinion, if it is the kind of information that people in the field rely upon for purposes of forming opinions, shouldn't I allow it to be displayed, even though it could not otherwise -- even though I haven't decided whether it could otherwise come into evidence?

Now, here is the part of this that I haven't articulated that I've been trying to come to grips with:

There is a standard for allowing prior art to invalidate, if it is publicly known and used. Now, part of how you establish whether something is publicly known or used can be the testimony of someone to that effect. It is not necessary that you call everybody who uses it to prove that it's publicly known that it's used. And so it's almost representational in its character.

And it can be seen as not applicable to the hearsay rule, because if what the expert is relying on is something that someone else is saying they've done, even if they're not telling the truth, the fact that people say they've done it becomes important to whether it's publicly disclosed that it's being done. Now, the truth of it is important, ultimately. But it's not being offered to prove that they did it. It's being offered to prove that it's publicly said that they did it.

Now -- and so I can give a limiting instruction to the jury that -- to that effect, but it seems to me that if a witness comes in and says that people say they've used it wirelessly, and in my opinion, that has import, that sometimes is how the public use element of prior art has been established.

Now, one of the concerns that has been expressed to the Court is that this is a matter of controversy

because the documentation of the RemoteWare system does not unambiguously disclose wireless use.  And that's why I wanted to read the material for myself, because it seemed to me that I had heard sufficient evidence referring to satellites and referring to cellular and other uses by a witness, who was otherwise associated with RemoteWare, that I thought that it has been sufficiently corroborated that it had a wireless functionality associated with it.

But I haven't had a chance to study these materials.  And so I could allow this material subject to a motion to strike.  If I later find that that conclusion is incorrect.  It greatly surprised me yesterday when the suggestion was made that there is no -- nothing in the documentation to instruct users of the system on its wireless use.  It's my experience that often the sellers of products that can be used wirelessly talk about how you set it up to use it wirelessly.  Now, this may have been early in the technology that they didn't instruct customers on doing it because it had to be set up by the company, and therefore why would you instruct companies on it.  But then there should be instructions to the employees of the company on how to set it up wirelessly.

One of the first things that was on the top of

the stack of documents that I haven't paid attention to yet, however, is this international application published under the Treaty Act. And this seems to show a drawing of wireless use of the Xcellenet technology.

MR. CHARFOOS: Your Honor, we've tabbed it. It specifically references RemoteWare and it specifically references using it wirelessly.

THE COURT: Have you seen this document?

MR. McDONALD: I have not read that document, your Honor.

MR. CHARFOOS: It's one of the documents that our expert relied on. In the joint pretrial conference statement we identified that as one of the documents in the RemoteWare system which invalidates the patent. It's in his expert report. Mr. McDonald may be referring to the fact he hasn't seen it today, but it certainly has been at issue in the case since the very beginning.

THE COURT: The language that I'm looking at here on Page --

MR. McDONALD: Frankly --

THE COURT: -- 11 of the document says "remote mobile servers" -- 110 are linked to a remote mobile communication network, remote mobile communication network. 120 includes various wire line communications,

such as switch analog/ISDN, and X.25, or wireless connections such as switched and digital cellular, satellite and radio frequency, and I've heard testimony that at least one company, PDM, or one of the partners to this, used it for automobiles and all sorts of things.  So...

MR. THAKUR:  May I address that?

THE COURT:  Certainly.

MR. THAKUR:  That's a patent application written about a RemoteWare product that was earlier than the one that they're relying upon.  In a patent application it's customary to discuss something that could be done.  What their defense is not -- it's not that piece of prior art.  Their defense is public use.  Which requires that it we done wirelessly.  And the only person who can talk about it being done wirelessly is somebody who personally did it.

THE COURT:  Maybe that's my misunderstanding.  So you're not relying upon disclosure but actual public use.

MS. DeBRUIN:  That's not correct, your Honor.  We are also relying on 102A, which is that the invention was publicly known or used in the United States.  And there is evidence of that.

MR. THAKUR:  Dr. Acampora never cited that patent

application --

THE COURT:  It's not whether he cited it, I was using this as the preliminary matter because the plaintiff has raised the question that this is not relevant prior art because it did not have wireless functionality.  That's what I've been trying to focus on, because that's a serious question.  I shouldn't even allow a RemoteWare to be cited if it is purely a wired system.

And my earlier objections that I had had to do, I thought, to a hearsay objection to the manuals themselves.  I overruled that saying the manuals could come in.  Without reference to whether or not it was invalidating prior art based on this wireless functionality question.

But the document that I have in front of me is actually dated in 1995.  And filed in 1994.  So it does satisfy the limitation having to do with the timeliness of it.

MR. THAKUR:  Your Honor, but that would require that Dr. Acampora have expressed an opinion that that patent application anticipates the patent in suit.  No such --

THE COURT:  I'm not using this for purposes of obviousness or anticipation.  That's not my decision at

this point.  My decision at this point is whether the jury can hear opinions with respect to its value in making a decision, whether it's relevant.  And the question of whether it's relevant seems to me to tie into whether it could be understood by a person of skill in the art as having wireless functionality.  And this allows me as a foundational matter to know whether or not it falls within that category.

Now, sure, you can do a lot after the jury hears it, convince the jury that it doesn't reach the clear and convincing standard, or that some other impeachment of the document might undermine their reliance on it, but that doesn't mean I'm going to keep the -- not this document, but keep the core question of the functionality of RemoteWare away from the jury.

And then so since you're challenging that there is insufficient corroboration, I've got to judge whether or not the witness, who I haven't heard yet -- and actually I lost track of the transcript that you wanted me to look at the last time.  Can I see the transcript of that witness's testimony?

MR. CHARFOOS:  Yes, your Honor.

MR. McDONALD:  And, your Honor, the reason we called for the sidebar that we requested it, the slide shows testimony that the defendant is no longer seeking

to even present through Mr. Owen's deposition.  We objected to that.  They've withdrawn that testimony and have narrowed it to this single page.

MR. CHARFOOS:  We haven't withdrawn that testimony at all.

MR. McDONALD:  Is that on that page?

MR. CHARFOOS:  We're playing everything we had originally designated.  We took out 72 to 78.  You never even objected to the testimony that's presented on the page.

MR. McDONALD:  That's what we're fighting about.  This testimony is inadmissible as a matter of law.

MR. CHARFOOS:  You never made that objection to the testimony.

MR. McDONALD:  I'm making it now.

THE COURT:  Okay.  Now, this part that has been highlighted for me, doesn't come within the concerns that are being expressed.  This is a witness who is expressing opinion that it was known in the industry how to wirelessly manage remote systems.  Is there an objection to that?

MR. McDONALD:  He's saying the RemoteWare product, if I remember correctly, your Honor.

THE COURT:  Well, that might be, but it says:  "In that capacity, you have been in charge both as a

chief technology officer, a vice-president of engineering for a number of products that deal with remote device management.  Is that correct?"

"That's correct."

"And specifically over the last 20 years or so you've also worked on the development of product that remotely manage the systems on a remote device.  Is that correct?"

"Yes."

"Based on your knowledge over the last 20 years, I'd like to draw your attention to the time period to 1999.  Would you say that it was known in the industry how to, as you describe it, manage remote systems prior to 1999?"

"Yes."

"And based on your 20 years of experience in the remote device management industry, would you say that prior to 1999 it was known in your industry how to wirelessly manage remote systems?"

"Yes."

What's wrong with that?

MR. McDONALD:  That testimony itself, your Honor, is not objectionable.  It's the testimony they're seeking to admit regarding specific instances of use of the RemoteWare system.

THE COURT:  I thought my attention was being brought to the objectionable part.

MR. CHARFOOS:  Your Honor, what I'm confused by, I'll be honest, is that there's a process in place where the parties disclose deposition designations to each other, work through those deposition designation objections and come to an agreement.  We had agreed -- first of all, they never even objected to the language that's on this slide.  We had come to an agreement on nearly all of Mr. Owen's testimony, except for questions from pages 72 to 76.  And the pages 90 to 92 that you see.  I agreed earlier today to withdraw our designations of 72 to 76 to try resolve the issue.

But what Mr. McDonald is currently doing is interjecting an objection, which was never made, in the middle of Dr. Acampora's testimony.  And I mean it's completely disrupted the flow of the trial.  And it completely violates the agreements that the parties put in place to avoid this very issue.

THE COURT:  Well, that's why they call it trial.  We've got all kinds of interruptions through the whole process.  So that's not my concern.  But your tardiness objection is well taken by the Court.

Well, I'm going to overrule the objection to the use of the material witness as otherwise said he relied

on for purposes of his opinion.  I'll give a limiting instruction with respect to that.

The important issue so far as the Court is concerned remains whether or not the RemoteWare is a relevant prior art.  I'm going to give the definition of that to the jury.  You can all argue about whether or not it is or is not under the Court's instruction.

Summon the jury.

MR. McDONALD:  Thank you, your Honor.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Thank you, ladies and gentlemen. Please be seated all.

You can understand how one of my instructions is you must decide the case based solely on the evidence presented to you.  And there will be occasions as you are coming to appreciate why I want to meet with counsel and discuss matters outside of your presence so as to avoid your hearing information that you shouldn't. There will be occasions when I say, Well, you've heard it, but I want you to disregard it or strike it.  But that's sometimes not sufficient in the Court's mind. Just as when you start deliberating, we'll close our doors and we won't hear you, there are times when we have to close the door and you not hear us.  I'm sure

you appreciate that.

Resume your examination.

MS. DeBRUIN:  Thank you, your Honor.

BY MS. DeBRUIN:

Q.  Dr. Acampora, when we took our break you were talking about the last row on slide 1003.

A.  I was.

Q.  Had you finished your discussion of that or do you have more to add?

A.  I had finished my discussion.  These systems are example of systems that were capable of remote device management over wireless networks in the mid-1990s.

MS. DeBRUIN:  Can we please have slide 1004.

BY MS. DeBRUIN:

Q.  Is slide 1004 a slide you created, Dr. Acampora?

A.  It is.

Q.  What does it show?

A.  Okay.  So it's a timeline which shows when each of those six examples of wireless device management occurred relative to when Mformation was founded, relative to when Mformation filed its patent and so forth.

Q.  Thank you.

MS. DeBRUIN:  Could we have the slide off the screen, please.

BY MS. DeBRUIN:

Q.   Now, one of the systems that you mentioned was Mobitex.  What is Mobitex?

A.   Mobitex is a system deployed by BellSouth for enabling wireless data.  Wireless data was not always an easy thing to do.  It was quite a challenge, and Mobitex is one of the early examples of wireless data.

          MS. DeBRUIN:  I'd like to have slide 1005 on the screen.

BY MS. DeBRUIN:

Q.   Can you describe at a high level the Mobitex system?

A.   I can.  I sort of whited out some of the switching components of the Mobitex system.  But what I have shown are the bay stations.  I've shown the wireless devices.  And I show at each bay station something called a mailbox and the mailbox held commands that were waiting to be sent to the wireless devices.  It also held other forms of data that were waiting to be sent to the wireless devices.

Q.   Was that actually called a mailbox in the Mobitex system?

A.   Yes, it was explicitly called a mailbox in Mobitex.

Q.   What kind of devices did Mobitex manage?

          MS. DeBRUIN:  And if we could have slide 1006, please.

THE WITNESS:  Okay.  So Mobitex managed all the sorts of wireless devices.  Including some early RIM products.  So RIM had a radio motor card, the type of card you plug into a laptop computer.  That allowed the laptop computer to be managed over Mobitex.

There was some software, RIM called -- from RIM called RAD I/O, this allowed wireless computers to communicate over the Mobitex network.  There was an early interactive pager.  That operated over Mobitex.  And in fact, an early BlackBerry actually operated over Mobitex using that early version of the BES.

Q.  What kind of device management capability did Mobitex include?

MS. DeBRUIN:  And can we have slide 1007, please?

THE WITNESS:  What I've illustrated here are two commands that could be sent from the Mobitex network out to a wireless device.  First, the die command.  And this is actually taken from RAM Mobile Data.  That's what BellSouth called the Mobitex network before it rebranded as being BellSouth.

And one of the things that you can do in Mobitex is, or BellSouth wireless network, if you lost your device, you can call BellSouth and tell them, I lost my device, and they would then issue a die command, and that die command would be sent to the device and stop

the device from sending.

There was also something called a live command. So if you should refind your device, the device is not like permanently disabled, it could be re-enabled, you can call BellSouth back and they'll issue a live command and bring your device back to life.

Q.   What's at the bottom of slide 1007?

A.   Okay, this is actually excerpted from RAM Mobile Data document.  And what it shows is, as an example, Mobile Device A, send a message -- wants to send a message to Mobile Device B.  But we see Mobile Device B is on the far side of the hill, relative to where the bay station is.  The bay station is that tower-like thing sort of in the middle of the drawing.  So in that case, the message will be stored in a mailbox at the bay station.  And when wireless Device B rolls around to the near side of the hill, it may now communicate with the bay station, the contents of the mailbox will be sent to the device.

MS. DeBRUIN:  Your Honor, may I move exhibit -- I'd like to move Exhibit 10 -- RIM Trial Exhibit 1006 into evidence.  There's no objection.

THE COURT:  1006 is in evidence.

(Defendant's Exhibit 1006 received in evidence)

BY MS. DeBRUIN:

Q.   Dr. Acampora, did you focus for your invalidity

analysis on particular systems that were identified on the first chart that we looked at?

A.   I did.  I focused on RemoteWare.

Q.   Let's talk about RemoteWare.  We've heard a bit about RemoteWare yesterday and today from Mr. Foley.  What is RemoteWare?

A.   RemoteWare is a wireless device management system that had been deployed in the mid-1990s.

Q.   Who developed RemoteWare?

A.   A company called XcelleNet.

Q.   Did you focus on any particular version of RemoteWare?

A.   I focused on RemoteWare Version 3.1.

Q.   When was Version 3.1 released?

         MS. DeBRUIN:  And if we could please have Demonstrative 1008.

         THE WITNESS:  1996.

         So these were various documents, user and administrative guides, reference manuals, concerning RemoteWare and these were all published by XcelleNet in 1996.

BY MS. DeBRUIN:

Q.   Are these the user guides that we saw in Mr. Foley's testimony?

A.   Yes, they are.

Q.   So you have Trial Exhibit 4045, Trial Exhibit 7034 and Trial Exhibit 733?

A.   Yes.

Q.   Are you going to be making reference to those through your testimony?

A.   I will.

Q.   Now, I want to understand.  In patent cases, sometimes you rely on a particular document.  Is that what you're doing here?

A.   No.

Q.   What are you relying on here?

A.   I'm relying upon the RemoteWare system and how it was used.  So that was out in the public -- the RemoteWare was out, the capabilities of RemoteWare were known, the types of things you can do with it were known, and I'm really relying on RemoteWare, not on any one document but RemoteWare, and the fact that it was publicly known and used for my analysis.

Q.   Was RemoteWare 3.1 publicly used in the U.S. more than one year before Mformation filed for the '917 patent?

A.   It was.

Q.   Was it also known and used in the U.S. before the Mformation even made its supposed invention?

A.   It was.

MS. DeBRUIN:  If we could please have slide 1009.

BY MS. DeBRUIN:

Q.  What did you rely on with respect to -- in addition to the manuals that we just looked at?  What else did you rely on for the date of when RemoteWare 3.1 was available?

A.  Okay, in addition to these documents, I also relied on deposition testimony, deposition testimony taken of Mr. Foley, so this is different than the testimony he gave yesterday, this is testimony he gave awhile back at a deposition.

And I also relied on deposition testimony taken of Mr. Owen.  He was vice-president of engineering at XcelleNet.

THE COURT:  Can I just comment to the jury about Mr. Owen.  You have not heard from Mr. Owen yet.  And I believe they're going to play a portion of his deposition.  Part of the concern the Court would wish you to know with respect to Mr. Owen in particular at this point, because he has not testified, this witness is relying on having read his deposition.  Part of his deposition may or may not be played to you.  It's permissible for witnesses who are expressing opinion to rely on statements by people who are not there testifying.  In fact, they can rely even on things those

people tell them they've heard and know as a result of some process they're engaged in.

You're evaluating this witness and his opinion, and sometimes he will rely upon others and what they have said to him.

So that testimony can be received only for the limited purpose of helping you evaluate this witness's testimony. Whether it's true or not is a matter that is not necessarily before you at this point.

MS. DeBRUIN: Thank you.

BY MS. DeBRUIN:

Q. Dr. Acampora, what did you learn from Mr. Owen's deposition?

A. Well, I learned that two pharmaceutical companies, Pfizer and Schering-Plough, were using RemoteWare in the mid-1990s and using it wirelessly.

Q. You said you also relied on Mr. Foley. What did you learn from Mr. Foley's previous deposition testimony?

A. Okay, so the question related to events during the mid-1999 timeframe and earlier on. Mr. Foley testified that he knew of a fast food restaurant chain in San Diego that used satellite communications, so there was a satellite dish on the rooftop. And that's how this particular restaurant chain communicated with regard to use of RemoteWare. That's what I learned from

Mr. Foley.

Q.  Let's talk about the patent office and their examination of the '917 patent.  Did the patent examiner have RemoteWare before her in deciding whether to allow the '917 patent?

A.  She did not.

MS. DeBRUIN:  And if we could please have Trial Exhibit 370, the '917 patent, and if you would call out the references section.

BY MS. DeBRUIN:

Q.  Did you review the references cited in the '917 patent to make that determination?

A.  I did.  These were the documents that were reviewed by the patent examiner.  I reviewed these documents.  These documents did not relate to RemoteWare.  And I concluded that the examiner did not have RemoteWare available to her at the time she was considering the patent litigation.

Q.  Did you also check the provisional application?

A.  I did.

Q.  And did you find any evidence of RemoteWare there?

A.  No.

Q.  Did you need to check the provisional application?

A.  No.  As I understand it, I did not -- the patent examiner may not even look at the provisional

application.  And I've filed a provisional application myself.  The purpose when I filed them was simply to preserve the date, establish the date when I believe that I invented my invention.

And then that would be followed up with what's called the utility application, that's the real patent application, and that's the one that will either be issued or not issue issued.  So the examiner is not obliged to.

But in any event, I did review the provisional application.  There was no mention of that there.

Q.  Do you have an opinion on what would have happened if the patent examiner had known about RemoteWare?

A.  I don't think we'd be here today if the patent examiner knew about RemoteWare.  She would not have approved the issue.

Q.  I'd like to provide a high level overview of RemoteWare.  You've just talked to Mr. Foley, but I'd like to orient us to the areas of RemoteWare that you determined were appropriate in your conclusions?

A.  Okay.

MS. DeBRUIN:  If we could have on the screen Demonstrative 1010.

BY MS. DeBRUIN:

Q.  This is the demonstrative we saw earlier in

Mr. Foley's testimony.  Could you -- in using this demonstrative, could you describe the RemoteWare system?

A.  Yes.  The RemoteWare system consisted of -- well, RemoteWare consisted of two pieces of software.  There was service side software, and that was installed on a corporate server.  And that's what's shown on the left-hand side.  That's the server, RemoteWare server side, software installed.

There was also RemoteWare client software.  That would be installed out on a client.  The clients could be wired, and as we see in this drawing, the clients could also be wireless.  The first client on the top -- and Mr. Foley tried to highlight this.  It's not very visible.  Can you see on the left-hand side of this laptop is a little vertical line.  That's intended to be the antenna on a wireless card.  There it is.  You see it a little bit better.  And a laptop could also communicate over wireless networks by using the cell phone.  Because at one time, I guess you still could, you can tether a cell phone to a laptop, and that laptop is now wirelessly enabled.

And the client could also communicate by satellite wirelessly.

Q.  Where was the RemoteWare product installed?

A.  Well, as I said, it was installed on the server and

it was installed on the client.

Q. With reference to the server portion of the RemoteWare product, could you describe to us, for us, what we see there in the outbound queue?

A. Yes. Well, first of all, there is something in RemoteWare called the outbound queue. And the outbound queue stores sessions. Before the sessions are sent out to the client for execution. And the sessions contain what RemoteWare calls events.

Q. Would it be helpful if we moved to 1011?

A. Sure.

Q. Let's move to 1011.

A. It's actually a multistage process. But cutting to the chase, stored in a session are a number of events. Some of these events are commands intended to cause the wireless -- the client device wireless or otherwise to take some specific action.

Q. Have you come to an opinion whether RemoteWare Version 3.1 discloses all the limitations of Claim 1?

A. I have, and I believe that it does.

Q. I'd like to now step through all the limitations of the claim and talk to you about where in the RemoteWare materials you located those limitations. If we could start at the top with the preamble.

MS. DeBRUIN: I'd like to have Demonstrative 1012

on the screen, please.

And your Honor, in connection with this demonstrative, I'd seek to admit RIM Trial Exhibit 523, to which there's no objection?

THE COURT:  523 is in evidence.

(Defendant's Exhibit 523 received in evidence)

BY MS. DeBRUIN:

Q.  Dr. Acampora, did you come to a conclusion as to whether the preamble of Claim 1 is satisfied by RemoteWare Version 3.1?

A.  I have.

Q.  What is that conclusion?

A.  I believe that the preamble is satisfied by RemoteWare 3.1.

Q.  Did you consider the Court's -- strike that.

Could you please describe for us how you -- what materials you looked at in coming to that conclusion?

A.  The Court's claim construction.  I looked at a press release that was that was published by XcelleNet, and I also looked at Mr. Foley's deposition testimony.  I'm not going to read all of this to you, but you can see the press release discusses, in the highlighted section, efficiently managing remote communications.

Jumping to the next highlight.  RemoteWare system, it's used with McCaw's AirData network and

mobile users.  So that's telling me this is wireless because AirData network wouldn't see a serial system that used a very early wireless protocol called CDPD.

And jumping out to Mr. Foley, you've seen this already, he's testifying that he's familiar with the local 3.1 being used over the Hughes satellite network.

Q.  So those are things that you relied on for RemoteWare being used for wireless device management, managing a wireless device over a wireless network?

A.  Yes.

Q.  Did you rely on anything else in regards to RemoteWare managing a wireless device over a wireless network?

A.  Yes.

MS. DeBRUIN:  If we could please have RIM Trial Exhibit 4046 on the screen, please.

And your Honor, I'd seek to admit this into evidence, 4046.

THE COURT:  4046 is in evidence.

(Defendant's Exhibit 4046 received in evidence)

BY MS. DeBRUIN:

Q.  What is Exhibit 4046?

A.  This is an international patent application, and we can notice that it was -- the applicant was XcelleNet.

Q.  When was this patent application published?

A.   It was published, reading right from the top, June 20th, 1996.

So unlike in the U.S. where patent applications are not published, in Europe they actually are.  Even before the patent issues.  This one was published in 1996.

Q.   May we refer to this document as the Crumpler patent?

A.   Yes.

Q.   That way I don't have to keep saying "4046."

A.   Fine.

Q.   What does the Crumpler patent describe?

A.   Well, it's describing RemoteWare, but what I relied on this document for is the description of RemoteWare and its ability to perform over wireless communications.

Q.   If we could turn, please, to page 11 of the document. And I'd like to focus your attention to line 1 through line 3.

What version of RemoteWare was the Crumpler patent talking about?

A.   Versions 1.0 through Versions 1.4.  Earlier versions than 3.1.

Q.   And if we could -- on that same page, if we could move down to lines 12 to 13.  Did you refer to these lines in the Crumpler patent?

A.   Yes.  "Remote/mobile servers are linked to a

remote/mobile communications network."

So this is telling me this is wireless.

Q.   Further down in this document, lines 16 through 17, what did this tell you?

A.   Once again, wireless communications switched, and digital cellular, satellite and radio frequency.  So this is describing a wireless communications capability.

Q.   There's a reference in the first text that we have there to "Communications Network 120."  What did you understand that to mean?

A.   That refers to a drawing that appears somewhere in the patent.  And that's Item 120 referring to that drawing.

Q.   Distance Network 120 includes various wireless -- is that including --

MS. DeBRUIN:  It's hard to see on the screen, the language that we had in the second portion, and perhaps we can blow it all up together.

BY MS. DeBRUIN:

Q.   I'd like to focus in on that particular language between lines 12 and line 17.

A.   Yes.

Q.   So --

A.   So, it's telling us these mobile servers are linked to the mobile communication network, and that mobile

communication network is -- that's the second pass we've looked at it.  That includes connection such as switching digital cellular, satellite and radio frequency.

Q.  Is that wireless?

A.  That's wireless.  It's the radio.

Q.  If we could also go down to line 27 through line 35 and talk about that portion.  Is there anything in this portion of the Crumpler patent application that you referred to?

A.  Yes.  At line 30, again I won't read, but we can jump ahead to see, microprocessor-driven units such as cellular telephones.  So cellular, once again, is one type of radio system.  It's a nationwide cellular network.

Q.  So this was even in an earlier version of the version of the RemoteWare on which you're relying?

A.  That's correct.

Q.  So there was wireless capability even in this earlier version?

A.  That's correct.

        MS. DeBRUIN:  Could we see the Court's claim construction Demonstrative 1013.

BY MS. DeBRUIN:

Q.  Dr. Acampora, in your opinion, did the RemoteWare

Version 3.1 satisfy this Court's claim construction with respect to the terms in the preamble?

A. Yes. There are two terms in the preamble that the Court construed. One phrase was -- starting on the left-hand side is the claim language. Shown on the right is the claim construction. So the one was "remotely managing a wireless device over a wireless network." And the construction: "Using a server that is physically separated from the wireless device to wirelessly control the functionality of the wireless device."

And second limitation, actually concerned the word "server" appearing in the preamble. And the Court has construed "server" to mean "a device or a computer in a network that's dedicated to providing resource uses to the wireless device."

Q. And did you hear Mr. Foley's testimony today regarding the server?

A. I did. And his testimony was that it was recommended that a use -- a customer deploy the RemoteWare service software on a single computer dedicated to the RemoteWare, otherwise the -- it would suffer.

Q. In your opinion, does the preamble satisfied by RemoteWare?

A. Yes.

MS. DeBRUIN:  If we could please have Demonstrative 1016.  And we can check that -- whoops.  I went too far.  I apologize.  1014.

BY MS. DeBRUIN:

Q.  We can check off the preamble?

A.  We can.

Q.  Let's move to the first step of Claim 1, transmitting registration information.  Did you find that -- let me ask it this way:  Does RemoteWare -- did RemoteWare Version 3.1 perform the claim step of transmitting registration information?

A.  It did.

Q.  Where did you find that in the RemoteWare materials?

MS. DeBRUIN:  And I'd like Exhibit 1015, please.

A.  We see here, and this is the RemoteWare user's guide, we referenced this earlier, and what we see here is that there's something called a client -- this is actually assigned to the client.  To the device.  And this is an instruction to somebody using that device.  And that person is being told:  "Type the client name as given to you by the server administrator."  So...

Q.  What is the client name?

A.  The client name is the name of the device.  The wireless device.  The remote device.

And the user of that device is being instructed,

type in the client name.  And they're also told, if you jump to the bottom cite, the client, the device, transmit these values to the server.  So these values include the client name, and then we're told we jump back to the first cite, although it's not highlighted: "An incorrect client name will cause the client registration to fail."

So I'm assuming based on this that the client name is registration information that's transmitted. Looking at the bottom site, the client transmits these values to the server.  And then it's used for registration purposes.

Q.  Is the first step of transmitting registration information satisfied by RemoteWare?

A.  It is.

Q.  Now, we can check that off on 1016?

A.  Yes.

Q.  The one I tried to bring up before.  And we can move on to verifying the registration information.  Did RemoteWare Version 3.1 perform this step of verifying the registration information?

A.  Yes, it did.

Q.  And where did you find that in the RemoteWare materials?

MS. DeBRUIN:  If we could have Exhibit 1010,

please.

A.   Okay.   So we saw the top site earlier, this is the RemoteWare user's guide.   "An incorrect client name will cause the client registration to fail."

So this is telling us that there was verification of the registration information to the server.   The server was looking at the registration information that was sent from the client, and it's possible that it would find out, though, the information isn't what it was expecting and the registration will fail.   But if it's what it's expecting, the registration will not fail.

But there's an attempt to verify the registration information with the server.   And in fact, we're told that the setup -- looking at the second cite, the setup will actually display a message if the registration is successful.

Q.   So you found the first two steps of Claim 1 by looking at the RemoteWare user's guide, Trial Exhibit 733?

A.   That's correct.

Q.   What's your conclusion with respect to the verification step?   Is that done by RemoteWare?

A.   It, too, is done by RemoteWare.

MS. DeBRUIN:   If we could have 1018, please.

BY MS. DeBRUIN:

Q.   Check off that one.  And we'll move now to, "Without a request from the wireless device.  Performing the steps of..."

And then we have a series of steps that must be done in that way.  We'll start with "establishing a mailbox for the wireless device at the server."

Did you find that limitation, "without a request from the wireless device, establishing a mailbox for the wireless device at the server," to be done by RemoteWare 3.1?

A.   Yes.

MS. DeBRUIN:  And I'd like to call up Demonstrative 1019.

BY MS. DeBRUIN:

Q.   And ask that you tell us how you found that limitation.

A.   Okay, so, again, this is an excerpt from Mr. Foley's deposition at this point, and what he's saying here, if we look on the third line of his answer:  "Blow out all the file locations."  What he's testifying to here is that when you install the RemoteWare server, the server side software, we had to blow out all the file locations.  In other words, clear some memory space where we would eventually be storing this information.

So when you install RemoteWare, you clear some memory space, that's going to become the mailbox.

MS. DeBRUIN:  And your Honor, may I approach the witness, please, to put one of the boards up?

THE COURT:  Sure.

MS. DeBRUIN:  I think it might be helpful as we talk through this, if we put the board that shows the RemoteWare system.

I want to get it in a good spot where everyone can see it.

THE COURT:  That's good.

MS. DeBRUIN:  Can you see it?

BY MS. DeBRUIN:

Q.  Dr. Acampora, what have you identified as the mailbox in the RemoteWare system?

A.  The outbound queue.

Q.  The testimony from Mr. Foley that you have that we have on the screen, what was the purpose of you looking to that testimony?

A.  Well, that told me that this was done without a request from the wireless device.  This was part of the RemoteWare installation process.  When you install RemoteWare, there were no wireless devices, no clients.  Had the server install the software.  At that point, we blow out all the file locations that's clearing station

memory.  That space will become the outbound queue.

MS. DeBRUIN:  If we could have Demonstrative 1020, please.

BY MS. DeBRUIN:

Q.  What information was stored in the outbound queue?

A.  Sessions.  So this is a screenshot, and this was excerpted from a RemoteWare -- the RemoteWare reference manual.  This is the service manual.  And what we see here is an actual snapshot of a bunch of sessions that are sitting in the outbound queue.  We see the session names.  That's the second column.  You see some flags and session names.

Next we see the client, the device associated with the session.  And then we see some other parameters.  When did the sessions start -- these were outbound sessions.  Remember, Mr. Foley testified there were also inbound sessions.  But these were all outbound sessions.

And the status.  Some sessions were active, some were blocked, some were pending.

Q.  Did the outbound queue store data including commands to be sent to the device?

A.  Yes, it did.

MS. DeBRUIN:  Could we have the Court's claim construction for mailbox, which is Demonstrative 1021.

BY MS. DeBRUIN:

Q. And for "without a request to the wireless device," did you apply this claim construction in your analysis?

A. I did.

Q. Is there anything that you need to refer to in this before telling us your conclusion?

A. Well, yeah, "establishing a mailbox for the wireless device at the server," claim limitation, was construed to mean, "creating an address in memory of the server that can store information intended for delivery to the wireless device."

The address in memory is the outbound -- as you remember, is the outbound queue. That stores sessions. The sessions contain events. And those events are information intended for delivery to the wireless device. At least some of the events. Not all of the events. But some of the events in the session are intended for delivery to the wireless device.

And again, this was done without a code, signal or any request from the device. This was done when the software was installed on the server.

Q. That was what you referred to in Mr. Foley's testimony?

A. That's correct.

Q. Do you have an opinion as to whether RemoteWare

satisfies "without a request from the wireless device, establishing a mailbox for the wireless device at the server"?

A.  I do.

MS. DeBRUIN:  Could we have 1022.

BY MS. DeBRUIN:

Q.  And let's check off that item.  And we'll move on to the next item, which is, again, this is one of the steps that must be done, "without a request from the wireless device, placing a command for the wireless device in the box at the server."  Did you find that limitation in the RemoteWare materials?

A.  I did.

Q.  Did the RemoteWare Version 3.1 system perform that step?

A.  It does.

MS. DeBRUIN:  Let's look at Demonstrative 1023.

BY MS. DeBRUIN:

Q.  Were commands placed in the outbound queue?  You told us the outbound queue is the mailbox.  Were commands placed in the outbound queue?

A.  Yes, events were placed in the sessions.  Sessions were then assigned to clients.  And the client -- the session was assigned to a client, it's now placed in the outbound queue.  So events go to the session, session

goes to the outbound queue.  Those events are in the outbound queue.

Q.  And the outbound queue is the mailbox?

A.  The outbound queue is mailbox.

MS. DeBRUIN:  If we could please turn to Exhibit 1024.  And this references Trial Exhibit 7034.

BY MS. DeBRUIN:

Q.  What are some examples of RemoteWare commands?

A.  This is a list of some RemoteWare -- these are lists of events, and we can see that some of these events are commands.  Looking at the first category, "File Transfer," get files from client.  Well, that's a command that will be executed on the server, and the server told get file from clients.  So the server will place a command into the outbound queue, telling the client, Give me such-and-such a file.  So -- or send files to the client.  So server is being told, Send file.  And these are specific files, out to the client. Check this.  The server would ask the client to check the status of his disk, like as an example, how much memory remains, so that a server knows whether I can still send you a new software upgrade.  You've got memory to absorb it.

Delete files.  The client will be told to remove certain files.

Execute program or run an application.  Remove a directory, a whole directory of files and you remove them from the disk.

These are all examples of events which are commands that can be sent out to the device.

Q.  Now, you told us that sessions were assigned to devices.  How do you know that?

A.  The next --

Q.  Next slide?

A.  Next slide.

MS. DeBRUIN:  If we can have 1025, please?

THE WITNESS:  So, again, this is the RemoteWare reference manual we see.  This screen is associated with assigning clients to do newly created session.

BY MS. DeBRUIN:

Q.  What is the table that's shown there?

A.  These are the actual assignments, being told which client these particular sessions were associated with.

Q.  What happened after the session was assigned to a device?

A.  It's placed in the outbound queue.

MS. DeBRUIN:  Can we see 1026, please.

THE WITNESS:  There again, that's the outbound queue.  Those are the sessions that are piling up in the outbound queue.

BY MS. DeBRUIN:

Q. And you saw that in the RemoteWare reference manual?

A. Yes.

Q. Did Mr. Foley testify about this earlier?

A. He did.

MS. DeBRUIN: Let's look at the Court's claim construction, 1027.

BY MS. DeBRUIN:

Q. This is the Court's claim construction for placing -- for the placing step.

A. Yes.

Q. Did you consider this claim construction in coming to your conclusions?

A. Yes, I did.

Q. And what is your conclusion as to whether the RemoteWare -- whether RemoteWare satisfies the step of placing of Claim 1?

A. Well, the events that I showed in the last slide -- well, two slides back, are code or signals intended to cause the wireless device to take this action. So applying the Court's claim construction "placing the command for the wireless device," that limitation is met.

MS. DeBRUIN: If we could have slide 1028, and check off that claim limitation.

THE WITNESS:  Yep.

BY MS. DeBRUIN:

Q.  The next limitation or next step, rather, in Claim 1 is the delivering step, which includes a series of substeps.

A.  Yes.  We've seen this before.

Q.  We have.  I'd like to start with the delivering step and the first two substeps, the establishing a connection and transmitting.

First, did you find that RemoteWare Version 3.1 performed the step of delivering the command by "establishing a connection and transmitting the contents"?

A.  I did.

Q.  Did RemoteWare deliver commands from the outbound queue to the device?

A.  They did.

MS. DeBRUIN:  If we could look, please, at 1029.

BY MS. DeBRUIN:

Q.  Would you explain to us what you found in the RemoteWare materials shown here?

A.  Okay, so the top block is from RemoteWare reference manual, I referenced this before.  This is actually a subset of a slide that Mr. Foley used earlier today where he was describing the steps associated with

executing a session.  So I'm starting from Step 8.  But there were Steps 1 through 7.

Step 8:  "Initiate connection to the client." RemoteWare actually –– the RemoteWare server actually communicates with the client by establishing a TCP connection.  That's one way you can communicate, by establishing TCP.  So this is a step of initiating the connection to the client.

And then execute during events, once the connection is established.  So that during events, some during events, during –– let me take a step back.

There are before events.  These are events that the server executes before the connection is established.

There are after events.  These are events that either the server or the client will execute after the connection has done its job.

And then there are during events.  These are events that actually execute after the connection is established.  During the time that connection is up, execute the during events.

Q.  Now, you've highlighted yellow the portion that corresponds to "establishing a connection"; is that right?

A.  Yes.

Q.   And then you have highlighted orange the portion that relates to transmitting the contents of the mailbox?

A.   That's correct.

Q.   So you found both separate steps being performed; is that right?

A.   Yes, and just to -- just to that bottom pullout, this is in the RemoteWare reference manual, and this is simply description:  "File transfer events and messaging events require a connection."

So these are during events.  Transfer files, during a connection.  You can send messages during a connection.

Q.   So the messages in the commands are sent after the connection is established?

A.   That's correct.  First, set up the connection.  When the connection is up, there's a reliable end point connection, point to point.  Now you can use that virtual pipe that you have, the connection, to actually deliver the commands to the client.

Q.   You found this in the RemoteWare reference manual, Exhibit 7034?

A.   That's correct.

Q.   How did -- you mentioned that the connection was a TCP connection.  How did you know what kind of connection was established by the server?

A.  I have a slide showing that.

MS. DeBRUIN:  If we could have 1030, please?

THE WITNESS:  So, again, relying on Mr. Foley's deposition testimony, he's saying here -- and this is a description of RemoteWare once again.  So TCP/IP.  This is a very popular set of protocols used over the Internet.  In fact, probably the most common form of communication over the Internet.  TCP over IP.  TCP is the connection-oriented protocol that I described to you earlier.  And he's telling us that that's the transport of choice for a lot of RemoteWare customers.  TCP is what was used to connect the server to the client.

Q.  Now, we're not done with the delivering step yet, but I'd like to just, focusing on the two substeps of "establishing a connection and transmitting the contents of the mailbox," I'd like to look at the Court's claim construction on Demonstrative 1031 with respect to those two substeps, "establishing a connection and transmitting the contents."

Did you find that RemoteWare Version 3.1 satisfied the Court's claim construction for those steps?

A.  Yes.  So we can see, and we discussed this earlier, the Court's claim construction for establishing a connection requires the initiating wireless

communications between the device and the server.  So TCP certainly does that as part of the handshake, there's wireless communications initiated to the wireless server, but no content has been transferred.

And we also know that happens before the events that happened or execute during a connection.  So the commands are sent after the connection has been established.  So the sequence is performed in RemoteWare as well.  First establish a connection.  Complete that process.  Then transmit the contents of the mailbox.

Q.  We have one final substep in the delivering step, and that is the accepting step.

A.  Yes.

MS. DeBRUIN:  If we could please have demonstrative 1032.

THE WITNESS:  So this is from the RemoteWare user's guide.  And in RemoteWare it turns out that -- well, ESD.  I haven't described that.  That's "Electronic Software Distribution."  This is a mechanism in RemoteWare whereby new software can be sent out and installed on a client computer.  And what we're told here is that ESD, once Electronic Software Distribution has arrived, an alert icon appears when the files are detected.

So the user, after he sees an icon appear on the

screen telling the user, You have new software.  So we know that the software was accepted.  It arrived, it was accepted.  It was accepted because the client now raises an icon and displays it on the monitor.  So the user can now see, You have new software.

BY MS. DeBRUIN:

Q.  Was the step of accepting the contents of the mailbox at the wireless device performed by RemoteWare Version 3.1?

A.  It is.

Q.  May we check that off on the next slide, 1033?

A.  Yes.  That completes the delivery step.

I've shown that all three substeps were in fact performed.

Q.  We're on a roll.  We have the next step, which is "executing the command at the wireless device."

A.  Yes.

Q.  Did you find that RemoteWare Version 3.1 performed this step?

A.  It does.

Q.  Where in the RemoteWare materials did you find this step disclosed?

MS. DeBRUIN:  And if I could have Demonstrative 1034, please.

THE WITNESS:  Okay.  So here I relied both on

Mr. Foley's deposition and also on RemoteWare reference manual. So what Mr. Foley's describing, without reading it word for word, he's describing tasks that can be executed on the client following the commands that are issued from the server. But what it's telling is, if we jump to the bottom of the blowup, execution. This determines how the client can control execution of this work object. The work object is a collection of events, and events again are commands. And execution can be forced.

So in RemoteWare when a client, a command, it's optional whether the client is going to perform whatever it's asked to do in that command or not. It actually has an option. Unless it's forced. If a command is identified as being a forced command, it cannot be disabled by the client. So the execution we know had to take place.

Q.  Did you have any testimony from -- were you relying on any testimony from Mr. Foley that most commands were forced on the device?

A.  I believe he said that.

Q.  Is it your opinion that the executing step was performed by RemoteWare Version 3.1?

A.  Yes.

MS. DeBRUIN:  If we could have 1035, and check

off that step.

BY MS. DeBRUIN:

Q.   We have one final limitation of Claim 1 for RemoteWare, and that's one we talked about in your not infringement testimony, "wherein the connection is established based on a threshold condition."

Did you find that limitation as satisfied by RemoteWare Version 3.1?

A.   I did.  I believe I've identified two thresholds upon which a connection is established.

Q.   Now, you only had to find one, right?

A.   I only had to find one, yes.

MS. DeBRUIN:  Could we please have slide 1036.

BY MS. DeBRUIN:

Q.   Where did you find your threshold conditions?

A.   Well, in Mr. Foley's deposition, and in the RemoteWare reference manual.  So what Mr. Foley's testifying to here is, actually a limitation of RemoteWare.  There's a maximum number of concurrent connections that the RemoteWare server can establish, one to each client.  This would be analogous to having, let's say, five telephone lines and a sixth call is being placed, there's no line.

So RemoteWare actually had a parameter, an actual number of concurrent connections.  If the number of

connections currently established equals that number, then that connection cannot be established. If the number is -- of concurrent connections is less than that number, the next connection could be established. It worked that simply.

Well, that's Threshold 1.

Threshold 2, wait for file to exist. So this is another event, stored in the outbound queue, part of the session. And here, the server can be told, Don't establish a connection, don't send anything until you've determined that a specific file exists. If that file exists, you can establish the connection. If that file does not exist, do nothing.

That's the second threshold.

Q.   Again, you just needed one, right?

A.   I only needed one, yes.

MS. DeBRUIN:  If we could have slide 1037.

BY MS. DeBRUIN:

Q.   Did you consider the Court's claim construction in your analysis of this limitation?

A.   Yes.

And once again, the construction is, "establishing a connection between the wireless device and the server, based on the predefined state of the server or the wireless device, other than solely the

elapsing of time."

          The predefined state that I identified was the number of concurrent connections, that's a state.  It changed with time.  And that's a state that's used to establish a connection.  If the number of concurrent sessions is less than the maximum number, the next connection would be made; otherwise, it can't.

          And another predefined state is whether a file, a specific file, is or is not in the session.  If it's in, establish a connection, send the session.  If not, don't.

Q.  Can we check off the threshold limitation as being satisfied?

A.  In my opinion, yes.

          MS. DeBRUIN:  If we could have 1038, please.

BY MS. DeBRUIN:

Q.  Dr. Acampora, would you please summarize your conclusion regarding Claim 1 and RemoteWare?

A.  Yeah.  As you can see, based upon the explanations that I gave, I believe that RemoteWare includes all of the claim limitations of Claim 1.

Q.  Did you also conclude that RemoteWare was used by customers to manage wireless devices more than one year before Mformation filed for the patent?

A.  Yes.  That's what was talked about earlier.

Q.   And you also concluded that they used -- that it was known publicly, known even before Mformation claims to have made its invention?

A.   That's correct.  RemoteWare 3.1 is known and used, both, before Mformation made its invention.

MS. DeBRUIN:  Your Honor, I don't know if you wish to take an afternoon break.  Now would be a good breaking point.

THE COURT:  Well, we do wish.  It's about 10 of the hour.  We'll come back at five after the hour.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom)

(Afternoon recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MS. DeBRUIN:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may resume your examination.

MS. DeBRUIN:  Thank you.

BY MS. DeBRUIN:

Q.   Dr. Acampora, before we resume examining the claims.  First of all, your opinion is that prior public use of

the RemoteWare system would anticipate Claim 1 of the '917 patent; is that right?

A.  That's correct.

Q.  In addition, your opinion is also that we do not have to necessarily, but rather than based on the set of materials that were available when considering the RemoteWare system, that the RemoteWare system was publicly known and all the steps that are set out in Claim 1 were publicly known prior to the invention of the '917 patent and one year before it's filing date; is that right?

A.  That's correct.

Q.  I'd like to move now to dependent Claim 6.  Unlike the noninfringement case part of this case, we -- for invalidity, we have to cover all the claims; isn't that right?

A.  That's my understanding.

        MS. DeBRUIN:  If I could please have Demonstrative 1039.

BY MS. DeBRUIN:

Q.  Is it your opinion that RemoteWare anticipates Claim 6 of the '917 patent?

A.  Yes.

Q.  Could you please tell us -- first, what does Claim 6 require?

A.  Claim 6 requires transmitting information concerning the executing of the command from the client back to the server.  I've paraphrased, but that's what the claim involves.

Q.  And where did you find that to be present in the RemoteWare materials?

A.  Mr. Foley was asked, is there an after event at the client -- this is after files have been sent to the client during an event -- an after event the client could confirm back to the server that the occurred?  He was asked that question.  Answer:  Yes.

Q.  Can we check off Claim 6 on 1040?

A.  Yes.

Q.  We can move to Claim 21.  Did you find that Claim 1 was disclosed by RemoteWare?

A.  Yes.

Q.  What does Claim 21 require?

A.  Like it says, this is a command, this is the method of a command that can enable or disable access of wireless device to the server.  So I can communicate to the server or I cannot communicate with the server, either/or.

Q.  Based on prior rulings from the Court, what are you understanding "enabling/disabling" to mean?

A.  Either enabling or disabling.

Q.   Did RemoteWare send command to disable access?

A.   It did.

          MS. DeBRUIN:  Could we have slide 1041, please.

BY MS. DeBRUIN:

Q.   Would you please explain where in the RemoteWare materials you saw disabling access disclosed?

A.   Well, in the Mr. Foley's deposition -- and I believe he testified about this here at trial -- there was a poison pill session, the attempt of which was to be used if the laptop was stolen.  It's an outbound session. And he was asked a question, the first question.  His answer was:  "Yes, there are instances where you'd want to have a poison pill session on the chance that that client's machine connects in."

          Question:  "So the poison pill question was outbound?"

          The question he was answering:  "Could you eliminate the laptop or disable access with the laptop or anything like that?"

          And his answer was:  "Yeah, you can use the poison pill to do that."

Q.   Did you find other disclosures of this in the RemoteWare reference manual?

A.   Yes.  In the RemoteWare reference manual, we spoke about this earlier, there's an event or command called

"delete file," which would permanently remove one or more files from the server.  Or client.  And in this case, the client.  And one or more could include all.

And there's also "remove directory."  Remove directory, you basically eliminate all the files on that directory.  If that directory happened to be a directory associated with communication instructions, the device could no longer communicate.

Q.  May we check off Claim 21 as being disclosed by RemoteWare?

A.  Yes.

Q.  Let's move to Claim 22.  Did you find Claim 22 disclosed by RemoteWare?

A.  Yes.

Q.  What is Claim 22?

A.  Okay, this is the command comprising enabling/disabling, which I interpreted, I was told to interpret, the Court's order, enabling or disabling.

Q.  Where did you find that in the RemoteWare materials?

MS. DeBRUIN:  And if we could please have slide 1043.

THE WITNESS:  Well, two places, one of which we already discussed.  The lower one, "delete files."  The "delete file" command can be used to remove a file from the server or client.  That would disable the

application associated with that file.

But in this case we could also send or enable new applications. I mentioned earlier Electronic Software Distribution. This is an ability of RemoteWare to send new software to the device. You could send new applications to the device thereby enabling it. So here both disabling and enabling commands are in RemoteWare.

BY MS. DeBRUIN:

Q. You saw that in the RemoteWare reference manual?

A. I did.

Q. If we could check off Claim 22 and move to Claim 23.

Claim 23 requires, "Wherein, the command comprises erasing all or part of the contents of the wireless device." That sounds similar to some things that you just talked about. Did you find that?

A. I did. So this is not speaking to an application but contents of the wireless device.

MS. DeBRUIN: Can we please have slide 1045.

BY MS. DeBRUIN:

Q. Would you please describe where you found this -- where you found this step of Claim 23?

A. "Delete files. Permanently remove one or more files from the server or client."

So the client is the, what I'm relying upon here. When you delete a file, you're erasing contents of the

wireless device.  You're erasing some disk space.

Or you can remove the directory.  That would delete all the files associated with that directory.

Q.  Again, you saw that in the RemoteWare reference manual?

A.  In the RemoteWare reference manual, yes.

Q.  Let's check off Claim 23.  And move to Claim 24.

And actually before we do that, do you recall some testimony a few days ago where Mr. Basu from Mformation testified that Mformation had invented lock and wipe?

A.  I do.

Q.  Did Mformation invent lock and wipe?

A.  Not in my opinion.  Lock and wipe was out there before Mformation was ever invented.

Q.  Dependent claims that we just talked about and you found in RemoteWare, that responds to a lock and wipe functionality; is that right?

A.  That is lock and wipe functionality.  Disable the device, don't allow it to communicate, and erase its disk.  That's lock and wipe.

Q.  You found that in RemoteWare; is that right?

A.  That's in RemoteWare.

Q.  Did you find it in -- in your review of the prior art, did you find lock and wipe functionality anywhere

else?

A.  I did.

MS. DeBRUIN:  And could we have Demonstrative 1047, please.

BY MS. DeBRUIN:

Q.  Could you describe what's on 1047?

A.  Okay.  Two things.  The top block we've already seen. This is the die command used in Mobitex.  And once again, you lose your wireless device and you're a BellSouth subscriber, back in the days of Mobitex, BellSouth issues a die command, cannot use or send any traffic to the network.  It's lost its ability to communicate.

But we can look further.  I -- I'm not going to read this to you, certainly not the whole page, but Parker patent describes activation of the handset.  So it's a patent that's in the field of wireless device management.  It speaks about activating a handset.  And it's characterizing that as unlocking the handset; i.e., the handset is enabled for normal use.

On the other hand, you could also relock the handset.  So, in other words, now it's no longer capable of normal use.  It's been relocked.

And there's one more spot.  The Zicker patent. This is the patent that has to do with sending commands

to -- from a wireless network to a device used for activating the device.  So this is an over-the-air activation type of action.  And what Zicker is describing here is a deactivation command.  So in addition to activating, you could deactivate the device.  So you by a cell phone out of the box, turn it on, using Zicker telephone number product, instructions provided, you now have a functional phone.  Or you can send a deactivation command, which has the effect of preventing the mobile station from communicating.  So this is locking a device.

MS. DeBRUIN:  RIM moves to admit Exhibits 1008, 4085 and 4073.

BY MS. DeBRUIN:

Q.  Dr. --

THE COURT:  Those are unobjected to?

MS. DeBRUIN:  They are unobjected to.

BY MS. DeBRUIN:

Q.  Dr. Acampora, the dates associated with the three references we've just spoken about, those are all before the claimed invention by Mformation, right?

A.  That's correct.

Q.  Did you also find some examples of the wipe feature?

A.  I did.

Q.  In addition to the RemoteWare example?

A.   Yes.

          MS. DeBRUIN:  If we could have slide 1048,
please.

BY MS. DeBRUIN:

Q.   Could you describe what you found with respect to the
wipe feature?

A.   Two more patents.  Isikoff patent speaks about
receipt of lower level codes.  And if you go on, Isikoff
speaks about destruction of this data on the laptop.  By
deleting or overwriting data.  So this is wiping the
device.  What Isikoff is describing here is wiping clean
the disk of a laptop.

          Parkinson patent.  Another wireless device
management patent.  Here Parkinson speaks about
reverting to manufacturer configuration.  In other
words, anything after that device was manufactured that
might have been installed on it will be deleted because
the device is reverting back to the manufacturer
configuration, how it appeared when he took it out of
the box.  So that's another wipe disclosure.

          MS. DeBRUIN:  Your Honor, RIM moves to admit
Exhibits 4078 and 4070.  There were no objections to
those exhibits.

          THE COURT:  Very well.  4078 and 4070 are in
evidence.

(Defendant's Exhibits 4070 and 4078 received in evidence)

BY MS. DeBRUIN:

Q.   The Isikoff patent and Parkinson patent are both dated before plaintiff's claimed invention date of October 1999, right?

A.   That's correct.

Q.   Let's move now to Claim 24.

Did you find Claim 24, which requires transmitting new programs and data to the wireless device, in RemoteWare?

A.   Yes.

MS. DeBRUIN:   If we could please have Demonstrative 1049.

BY MS. DeBRUIN:

Q.   Please describe to the jury where you found that in the RemoteWare materials.

A.   I could be brief here.  This is from RemoteWare reference manual.  I've relied upon this earlier.  It was a feature of RemoteWare, Electronic Software Distribution, where you can send new software to a client.

And we also see the "send file" command that would transfer server files out to the client, and that's another way of transmitting new programs and data

to the wireless device.

Q.  Let's check off Claim 24, and move on to Claim 25.

A.  Okay.

Q.  Did you find Claim 25, which requires querying a current state of the wireless device, in the RemoteWare material?

A.  I did.

MS. DeBRUIN:  I would like slide 1051 on the screen, please.

THE WITNESS:  We spoke about this already.  There is a list of events, events or commands.  One of the events is "check disk."  We retrieve storage characteristics.  The client can be told, Determine how much disk space remains and retrieve it.  So that's an example of the command comprising querying the current state of the wireless device.  How much memory remains.

BY MS. DeBRUIN:

Q.  Can we check off Claim 25?

A.  Yes.

Q.  There's one additional dependent claim that's been asserted, and that's Claim 27.  Did you find Claim 27, which requires monitoring a location of the wireless device in the wireless network, in RemoteWare?

A.  No.

MS. DeBRUIN:  Can we have Demonstrative 1053,

please.

BY MS. DeBRUIN:

Q.   Even though you didn't find this in the RemoteWare system, do you have an opinion as to whether this claim is invalid?

A.   I do.

Q.   What is that opinion?

A.   I believe that the Claim 27 is invalid.  It's obvious.  It's an obvious thing to do.

Q.   Did you find another reference that you would combine with RemoteWare that would invalidate Claim 27?

A.   I did.

        MS. DeBRUIN:  Could we have demonstrative 1054, please.

BY MS. DeBRUIN:

Q.   What was that other reference?

A.   Yet one more patent.  The Havinis patent.  The first highlighted line, the MLC is the Mobile Location Center, and the Mobile Location Center has determined that the mobile station, that's MS, should calculate its location.  So what it does is it sends a command message, including a command, to collect location information.

        So the server is telling the client, Begin collecting some location information.  And then in this

case, you look at the last highlighted section, the mobile station must send the location information to some other entity.

So the mobile device determined where you are, and reports that back. So that's querying the location of the device.

MS. DeBRUIN: Your Honor, we would move to admit RIM Trial Exhibit 4092. There's no objection.

THE COURT: 4092 is in evidence.

(Defendant's Exhibit 4092 received in evidence)

BY MS. DeBRUIN:

Q. Dr. Acampora, the Havinis patent was filed in March of 1999; is that right?

A. Yes.

Q. That is before the date that Mformation claims to have invented the '917 patent; is that right?

A. That's correct.

Q. Did you reach a conclusion regarding whether it would have been obvious to one of ordinary skill to combine RemoteWare and Havinis to invalidate Claim 27?

A. I have formed such an opinion. I believe it would have been obvious to make that combination.

Q. And in doing that, the law requires you to determine who one of ordinary skill in the art would be; isn't that right?

A.  That's my understanding.

Q.  And that person is assumed to have the same level of skill as a typical practitioner in the art?

A.  That's correct.

Q.  They are also assumed to have knowledge of all the prior art?

A.  That's correct.

Q.  Did you arrive at a characterization of "one of ordinary skill in the art"?

A.  I did.

MS. DeBRUIN:  Can we have slide 1055.

BY MS. DeBRUIN:

Q.  What was your characterization of "one of ordinary skill in the art"?

A.  Based upon the type technology that's disclosed in the patent, based upon what I know people in the industry were doing at that time in the field of wireless device management, I believe that a person of ordinary skill in the art of this patent would have a Bachelor of Science degree in computer science or electrical engineering or some similar degree to that; and a few years of experience working in wireless networks, or wireless data or wireless device management.

So a bachelor degree plus some experience.

Q.  Did Dr. Madisetti arrive at a slightly different
characterization?

A.  He did.

MS. DeBRUIN:  If we could have Demonstrative
1056, please.

BY MS. DeBRUIN:

Q.  How did Dr. Madisetti's characterization differ from
yours?

A.  He also believes that a person of skill in the art
should have a Bachelor of Science degree in computer
science or electrical engineering or a similar degree.
I agreed with that.

And his beyond the bachelor's level skill is
slightly different than mine.  He believes the person
requires five years of programming experience in the
field of cellular telephony, and including experience in
developing software for remote wireless device
management.

So except for the type of experience,
post-degree, the person of ordinary skill was otherwise
quite similar.

Q.  And I understand you believe your characterization
was the proper one.  But in applying your analysis here
of whether there would be a motivation to combine these
two references, does it matter whose definition, whose

characterization is applied?

A.   No.  I believe that there would have been a motivation to combine under both Dr. Madisetti's and my own opinion of what one of skill in the art would find.

Q.   Why would you find to be why one of ordinary skill in the art would have been motivated to combine RemoteWare and the Havinis patent?

A.   They're directed to the same subject.  RemoteWare is all this infrastructure to send commands.  Wouldn't it be nice if one of the commands could have been "Determine where you are"?  RemoteWare was used to communicate with fleet vehicles like police, and if you're a dispatcher, wouldn't it be nice to also be able to find out where the closest patrol car is if some 911 call comes in.  So it's adding one more command to the repertoire of commands, it would have been one skill in the art motivated to combine them.  It's common sense.

Q.   Can we check off Claim 27 as being disclosed by the combination of RemoteWare and Havinis?

A.   Yes.

Q.   We're now through RemoteWare.  And we're moving on to another subject.

        Did you have any other basis to support your conclusion that the '917 patent is invalid?

A.   Yes.

Q.   What was another basis for your opinion that the '917 patent was invalid?

A.   Okay.  The Mformation demonstration that we've heard of earlier in this trial, I believe that demonstration in and of itself would invalidate the '917 patent.

MS. DeBRUIN:  Can we have slide 1058, please.

BY MS. DeBRUIN:

Q.   So you're speaking about the July 24th, 2000 demonstration?

A.   That's the one.

Q.   In analyzing whether the demonstration invalidates Mformation's '917 patent, do we need to consider Mformation's provisional application?

A.   No.

Q.   Why not?

A.   All of the elements of Claim 1 were not disclosed in that provisional application.

Q.   Have you identified any limitations that are not disclosed in the provisional application?

A.   The threshold condition limitation is not disclosed in the provisional application.

Q.   The final limitation of Claim 1 is of establishing a connection based on a threshold limitation?

A.   That's correct.

Q.   Did you review the provisional application?

Connie Kuhl, Certified Realtime Reporter
Official Reporter - USDC  (415) 431-2020

A.  I did.

Q.  And in your review, you did not find a connection -- find any reference to establishing a connection based on a threshold condition?

A.  I did not.

Q.  Did any witnesses who testified during this trial mention -- strike that.

There were several witnesses who testified during this trial regarding the provisional application; isn't that right?

A.  Yes.

Q.  Did any of those witnesses testify that the provisional application disclosed every limitation of Claim 1, including the step of establishing a connection based on a threshold condition?

MR. THAKUR:  Objection, your Honor, the inventors could not talk and provide expert opinions.

THE COURT:  Say that again.

MR. THAKUR:  The inventors cannot provide expert opinion, and this is a new issue in their case in chief.

THE COURT:  The inventors, you mean the previous witnesses?

MR. THAKUR:  Correct.  So what I'm saying is she has no foundation for her question.

THE COURT:  I'm sorry, restate your question.  I

didn't think it was limited in that way.  But restate it.

BY MS. DeBRUIN:

Q.  I was asking any witnesses, whether there were any witnesses at all, including Dr. Madisetti, who has come here as an expert, my question, Dr. Acampora, is: You've sat here through all the trial except for, I believe, some of the trial related to damages.  Is that right?

A.  That's correct.

Q.  During the entire trial that you've sat through, were there any witnesses who came forward and testified that the provisional application disclosed the limitation that you found missing, establishing a connection based on a threshold condition?

A.  No.

Q.  So what is your conclusion regarding the provisional application?

A.  I don't believe the provisional application discloses all the limitations of Claim 1.  And, therefore, the patent should not be allow the filing date of the provisional.  All of the invention wasn't there.

Q.  This issue doesn't matter when we're talking about RemoteWare; is that right?

A.  That's correct.  It has nothing to do with

RemoteWare.

Q.   Because it's so early.  It's earlier than when Mformation even claims to have invented the '917 patent, right?

A.   If you're asking whether the RemoteWare would invalidate, assuming that the provisional application date is the prevailing date, the answer is, it would still invalidate because it was much earlier than that.

Q.   Thank you.

Turning now to the July 24th, 2000 demonstration, based on the -- based on what you've heard, the evidence that you've been presented with, when did Mformation create a single prototype that included every element of Claim 1?

A.   June of 2000.

MS. DeBRUIN:  Could I have Demonstrative 1060, please.

BY MS. DeBRUIN:

Q.   What are you relying on to make that statement?

A.   Dr. Kushwaha's deposition, his December 9th deposition.  My understanding is that Dr. Kushwaha testified as the 30(b)(6) witness.  My understanding is that he was speaking to Mformation.  His word is Mformation's word.  And he was asked a question:  "When was the first time that every element of Claim 1 of

the '917 patent was present in a single prototype?"

He answer the:  "June of 2000."

Then he was asked:  "How do you know it was June of 2000?"

And he replied:  "It was a very significant event in my memory," and he gives the reason why.

Q.  You mentioned that a July 2000 demonstration was given.  Is that right?

A.  Correct.

Q.  And that's what you're relying on to invalidate the '917 patent Claim 1?

A.  That's correct.

Q.  Does Mformation at that demonstration demonstrate that included every element of Claim 1?

A.  In my opinion, it did.

MS. DeBRUIN:  Can we have Demonstrative 1061, please.

BY MS. DeBRUIN:

Q.  What are you relying on for that opinion?

A.  The same deposition testimony from Dr. Kushwaha.  At the deposition he was asked:  "Did the prototype that you demonstrated in July of 2000 include every element of Claim 1 of the '917?"

He said:  "Yes."

He was asked again:  "At that presentation, the

prototype that you showed to Deutsche Bank Alex. Brown included every element of Claim 1 of the '917?"

Answer:  "That is correct."

Q.  Was Mformation's demonstration in July of 2000 subject to any confidentiality agreement?

A.  Not that I can determine.

MS. DeBRUIN:  Can we have slide 1062, please.

BY MS. DeBRUIN:

Q.  Did you rely on this testimony from Dr. Kushwaha?

A.  Yes.

Well, A, I didn't see any confidentiality agreement; and B, Dr. Kushwaha testified saying in deposition:  "Was there a confidentiality agreement?"

Answer:  "No."

So Deutsche Bank was free to tell everybody.  It was public at that point.

Q.  Did you reach a conclusion regarding the validity of Claim 1 of the '917 patent in light of Mformation's July 24th, 2000 demonstration?

A.  I did.  And I believe that that demonstration would invalidate Claim 1.

Q.  What about the other claims of the '917 patent?  Does Mformation's July 24th, 2000 demonstration invalidate Claim 6, Claims 21 through 25 and 27?

Why don't we take it in pieces.  First, does it

anticipate that -- let me withdraw the question and ask another question.

A.   I'm not sure I understand that question.

Q.   Sure.  Have you formed an opinion that it would be obvious to combine Mformation's July 24th, 2000 demonstration with the disclosure for the dependent claims, Claims 6, 21, 25 and 27, in RemoteWare and -- well, 27 would be from Havinis -- to invalidate all the claims in the '917?

A.   That question I understand.

MR. THAKUR:  Objection, there was no such comment in the expert report.

THE COURT:  Say that again?

MR. THAKUR:  There was no such disclosure in the expert report.

THE COURT:  Sustained.  Without the question including the reference.

MS. DeBRUIN:  If I could just have a moment, your Honor.

THE COURT:  Sure.

(Pause in the proceedings.)

MS. DeBRUIN:  Your Honor, would you like me to handle this on the record or would you like to have a sidebar?

THE COURT:  No, all you have to do is incorporate

the reference in the question to satisfy the Court.

MS. DeBRUIN:  Can I have a sidebar for some guidance?

THE COURT:  Certainly.

MS. DeBRUIN:  Thank you.

(At the sidebar, out of the hearing of the jury and the court reporter.)

BY MS. DeBRUIN:

Q.  Dr. Acampora, in your expert report you indicated that prior art includes all public demonstrations prior to filing of the patent.  Isn't that right?

A.  Correct.

Q.  And that a patent could be invalid as obvious when the difference between the subject matter sought to be patented in the prior art -- strike that.

You went on to say that a reference may be obvious if the differences between the claimed invention and the device used would have been obvious to one of ordinary skill in the art.

And I can call your attention to your report if you'd like.

A.  Okay.

Q.  To take a look at paragraph 47.

A.  What page is that on?

Q.  Unfortunately, I don't have a page.  I just have a

paragraph number.

A.   Yes, that's in my report.

Q.   If you could turn, please, to your report at Paragraph 469, and again, I apologize I don't have a page number.

          THE COURT:  Paragraph 47 is on page 16, is my understanding.  And what was the other paragraph?

          MS. DeBRUIN:  Paragraph 469.

          THE COURT:  That would be on page 121.

          THE WITNESS:  Yeah, I was getting there.  Thank you.  I've got it.

BY MS. DeBRUIN:

Q.   Did you offer an opinion that, based on your review of the evidence, the prior art discloses each and every element of Claim 1 of the '917 patent, and that there is a motivation to combine those pieces of prior art, and therefore invalidate Claim 1?

A.   Yes.

Q.   And it mentioned above, the prior art includes public demonstrations?

A.   Yes.

Q.   And you also opined that that same combination of the prior art would invalidate the dependent claims; is that right?

A.   That's correct.

Q.  Dr. Acampora, you can put your report away.  I'd like to summarize your conclusions on invalidity of the '917 patent.

MS. DeBRUIN:  And if we can have slide, Demonstrative 1063, please.

BY MS. DeBRUIN:

Q.  What are your conclusions?

A.  Well, my conclusion is summarized in this chart.  I believe that RemoteWare invalidates Claims 1, 6, 21 through 25.

If that RemoteWare and Havinis are combined, the combination would invalidate Claim 27.

And --

Q.  And let me interrupt you, for the third item, it's the information that we just discussed in connection with your expert report?

A.  That's correct.  So Mformation's demonstration in July of 2000, combined with RemoteWare and Havinis, since RemoteWare has all of the dependent claims, and RemoteWare plus -- well, all the dependent claims absent Claim 27 -- RemoteWare and Havinis gets to Claim 27.

Then if you combine RemoteWare with the Mformation demonstration with all the elements of Claim 1, the demonstration combination with RemoteWare and Havinis would invalidate all of the asserted claims.

MS. DeBRUIN:  Can we go to Demonstrative 1064, please.

BY MS. DeBRUIN:

Q.  Would you just sum up for the jury the overall conclusions that you reached in this case?

A.  Yeah, this is where we started.  And as I stated then, it's my opinion that the use of RIM's products do not infringe any of the asserted claims in the patent.

And that the asserted claims are invalid.

MS. DeBRUIN:  Thank you.  No more questions.

THE COURT:  Very well.  You may cross-examine.

CROSS-EXAMINATION

BY MR. THAKUR:

Q.  There's a lot to grasp, so let me put the conclusions, as I understood them, into three basic points.  Your first opinion is the patent is not infringed, correct?

A.  The asserted claims are not infringed, yes.

Q.  And you said that's true for each and every claim, correct?

A.  Each and every of the asserted claims, yes.

Q.  The patent is invalid, correct?

A.  The asserted claims are invalid.

Q.  And each and every claim except for one is invalid based on RemoteWare alone?

A.  That's my opinion.

Q.  And, third, the patent is invalid because there was a demonstration made in July of 2000, correct?

A.  That's correct.

Q.  And the July 2000 demonstration would invalidate only if the jury also concluded that the provisional application did not disclose the threshold condition; is that correct?

        MS. DeBRUIN:  Objection, your Honor.

        THE COURT:  Overruled.

BY MR. THAKUR:

Q.  Please answer.

A.  That's correct.

Q.  So let's -- before we get to each one of those of your opinions, I want to just take a look at the materials you reviewed.  Maybe grab the easel real quick.

        THE COURT:  Are you proposing to write down the things he reviewed?

        MR. THAKUR:  I am, your Honor, just going to do a little comparison.

        THE COURT:  I just -- writing takes time, and I thought we had enough charts in this trial to create our own movie.  So I was --

        (General laughter)

THE COURT:  -- hoping not to have you spend time writing a list.  But let's see how this goes.

MR. THAKUR:  Your Honor, please indulge me just this one moment.

THE COURT:  Certainly, certainly.

BY MR. THAKUR:

Q.  I wanted to have a quick comparison of the materials that were reviewed by Dr. Madisetti and yourself.  On the left side I'm going to have by Dr. Madisetti.  And I'm going to write "Dr. Acampora."  Okay.

So first of all, BES software.  Right?  This is the software that's accused in this case.  Did you review the BES software?

A.  I reviewed sections of the software, when Dr. Madisetti pointed to it.

Q.  Let me restate it.  Did you take a look at the BES software before you expressed an opinion in this case?

A.  I did not.

Q.  Did you hear testimony from Dr. Madisetti that he did?

A.  I heard testimony that he reviewed portions of the software.  Not the whole software.  But portions, yes.

Q.  All right.  Did you -- this is the BES operation. Did you do an inspection of the operation of how the BES performs?

A.   I did.

Q.   And when did you do that?

A.   Several weeks ago.

Q.   You did not do that before you expressed an opinion in this case; is that correct, sir?

A.   That's correct.

Q.   Did you hear testimony from Dr. Madisetti that he did inspect an operation of the BES prior to expressing his opinion?

A.   Well, to some limited extent, he observed the BES, yes.

Q.   Did you make an observation of the use of the BES by any customer prior to expressing your opinion?

A.   No.

Q.   Did you hear testimony from Dr. Madisetti that he in fact did do an inspection of the use of the BES by a customer?

        MS. DeBRUIN:  Objection, your Honor.

        THE COURT:  Overruled.

        MS. DeBRUIN:  There's lack of foundation for what counsel's asking.

        THE COURT:  Overruled.

BY MR. THAKUR:

Q.   I'll reask the question --

A.   I don't recall.

Q.   Most importantly, did you hear RIM's counsel,
Mr. Matuschak, say -- I'm going to quote him:  "If I
want to understand how a software product works, what I
need is to have control of the source code so I can open
it up and look at it."

         Did you hear him make those statements?

A.   I did.

Q.   Do you agree with his statements?

A.   Well, if you give me the context in which he stated
that, I might be able to answer the question.  Possibly.
Possibly.

Q.   I'll repeat his words, do you agree with him or do
you not agree with him?

         "If I want to understand how a software product
works, what I need is to have control of the source code
so I can open it up and look at it."

         Do you agree with those words or not agree with
those words?

A.   My recollection, when he said that, I would agree
with that.

Q.   Did you hear Dr. Madisetti say he conducted an
inspection of the BES source code prior to expressing an
opinion in this case?

A.   I heard him say that he looked at some of the source
code prior to expressing an opinion, yes.

Q.  Did you look at the BES source code prior to expressing an opinion in this case?

A.  I did not.

Q.  You did not.

Isn't it correct, sir, that your review of the accused products, the BES, is based on your review of RIM documents?  Isn't that correct?

A.  In part.

Q.  And what is the other part?

A.  Deposition testimony offered by RIM engineers, and I also spoke with Mr. Davidson.

Q.  When you spoke with BES -- when you spoke with individuals at RIM, did you take any notes?

A.  I did not.

Remember there were two types of conversations.  First type, I reviewed the RIM documents, I reviewed testimony given by RIM employees, I formed my understanding of how the RIM system operates.  Then I spoke with several engineers to confirm that understanding.

But I did not base my opinions on those discussions.  They were simply to convince me that the understanding I had gained from the documents was accurate.  With one exception.  I spoke to Mr. Davidson before forming an opinion on one and only one issue.  I

testified about that.  That was the "five times retry threshold."

Q.  How many pages of documents did you review in this case?

A.  I couldn't even begin to estimate.  But a lot.

Q.  Thousands?

A.  I don't want to say thousands.  But I reviewed a lot.

Q.  When you met with these people, did you take notes?

A.  I didn't meet.  These were phone conversations.

Q.  I get on the phone and have a conversation, I take notes.  Did you take notes?

A.  No.

Q.  With all these phone conversations, you did not take one single note?

A.  That's correct.

Q.  Not one single note?

A.  No.

MR. THAKUR:  Could you bring up their Exhibit 1004, please.

BY MR. THAKUR:

Q.  That's RIM's demonstrative.  Do you see this demonstrative?

A.  I do.

Q.  Do you recall RIM's counsel, Mr. Matuschak, accusing my expert of hiding something because a Relay was

missing?

A.  I do.

Q.  Now, I would consider it improper to accuse you of things that are missing.  But would you agree with me that for the BlackBerry Enterprise Server to communicate with the BlackBerry a lot more things have to be present in the Relay?

A.  Well -- well, that depends.  What level of explanation are you seeking?

Q.  So the BlackBerry Enterprise Server communicates through the public switch telephone network; isn't that correct, sir?

A.  No, it communicates through a wireless network.  I don't know -- I actually don't think you could use a PSTN.

Q.  If you use a wireless network, you'll go to a mobile switching center; isn't that correct, sir?

A.  That's correct.  What the Relay will do is forward messages on to the correct carrier's networks, and the carrier would then attempt to deliver the message to the BlackBerry.

Q.  And the carrier will have switches?

A.  The carrier will have switches.

Q.  The carrier will have gateways?

A.  Yes.

Q.   You don't see any gateways up there, you don't see any switches up there, do you, sir?

A.   No.

Q.   But you weren't hiding anything, correct?

A.   For my purposes, the explanation I gave, how the BES communicates with the BlackBerry, via cellular, in my opinion, all that's needed to provide the explanation are on the chart.  I did explain there's a cellular network.  I did explain there's a connection made between the Enterprise and the Relay.  So, visible or not, I did describe the intervening things, but they just weren't relevant to my analysis.  The Relay is.

Q.   So the core issue that we've got to get to in this case is whether Claim 1 of the '917 patent, the element of establishing a connection, is satisfied or not, is that's what we've been hearing for nine days; isn't that correct?

A.   That's one of the issues.

Q.   Okay.  So they say confront the evidence head on.  So I'm going to put their evidence head on.

        Dr. Acampora, do you see those exhibits, those are RIM's exhibits, correct?

A.   Yes.

Q.   Your point is, that RIM does not infringe because they do not establish a connection over the cellular

network because there is the use of a connectionless protocol UDP; is that correct?

MR. ARNTSEN:  Your Honor, may I move this board? I think it's blocking the jurors.

THE COURT:  Sure.

THE WITNESS:  That's only part of my opinion. The fact that UDP is used between the Relay and the BlackBerry, that's only a portion.  I also testified that even if some sort of connection existed between the Relay and the handheld, that the limitation would not be met, because the BES has already transmitted to the Relay before any communication took place over the wireless network.  So the sequence of steps is not met. Whether UDP is used or not.

Now, in addition, UDP is used, and that's connectionless.

BY MR. THAKUR:

Q.  And you don't think a connectionless protocol satisfies Claim 1 of the '917 patent?

Let me withdraw and restate that.

It is your testimony that a connectionless protocol, the use of a connectionless protocol would not satisfy the element of establishing a connection which is initiating wireless communication under Claim 1 of the '917 patent?

A.   It's my opinion that the use of the RIM system that includes a connectionless protocol between the Relay and the BlackBerry does not infringe Claim 1, but even if there were a connection of some type between the Relay and the BlackBerry, it's still my opinion the RIM system cannot possibly infringe because the sequence of the connection, the step, and the transmission step would not be met.

Q.   Would you be kind enough to indulge me on the first one -- we'll go through both of them, okay?  Let's address the first one, sir.

A.   Okay.

Q.   This is TCP, correct?

A.   That's correct.

Q.   So, you do not disagree that the TCP satisfies what's disclosed in the patent; is that correct?

A.   Can you repeat that, please?

Q.   You do not disagree that the use of TCP as a protocol is expressly disclosed in the patent, do you agree with that?

A.   It's mentioned TCP -- but I'll go a step further. TCP and its handshake, in my opinion, would establish a connection.  But that connection, once again, is between the BES and the Relay.  It stops there.

Q.   So we're halfway there, sir.  A TCP connection is

there.  Now, he's got to get the other half, good?

A.   Okay.

Q.   So your problem is UDP is a connectionless protocol.
We don't have a connection, correct?

A.   Well, no.  That's only partially correct.

Q.   We'll get to the second argument later.

A.   As I said, even if UDP were replaced by something
else, I still believe that the claim cannot be
infringed, because -- it can't separate one from the
other.  The rest of them try to deconvolve these.  UDP
is connectionless.  And for that reason, there's no --
in my opinion, there's no initiation of wireless
communication between the -- even between the Relay and
the handheld, let alone the BlackBerry and the handheld,
prior to transmitting the contents.  That's my opinion.

Q.   And that is because you believe that the patent
requires that a connection be set up before transmission
begins; is that correct?

A.   Well, the Court has told us that the establishment of
the connection step involves -- and I haven't got the
claim construction right in front of me -- but involves
initiating wireless communications between the device
and the server.  And that step, initiating wireless
communication between the device and the server, must be
performed and completed before the transmission step can

begin.  So TCP satisfies it because there was a setup of a connection.

Q.  TCP satisfies what?  TCP satisfies the requirement of establishing a connection because there is a prior setup, handshake?

A.  No.  That TCP connection does not -- the setup of that TCP connection is not the initiation of wireless communications between the device and the server.  That TCP connection is between the Relay and the BES, and the wireless network, the server, is not involved at all.

Q.  Okay.  Perhaps you could make it easier for me.  If for some reason we were -- in my hypothetical, you went TCP from the server to the Relay from the Relay to the handheld, we wouldn't have this issue of connectionless protocol; is that correct?

A.  No, that's not correct.

THE COURT:  May I use this as an opportunity -- I always hate to interrupt good conversation, but we are after 4 o'clock.  And I don't know that if I waited a little bit longer it's going to find a more convenient place, so I apologize.

MR. THAKUR:  You've been kind enough to indulge me, so...

THE COURT:  Members of the jury, we'll stop to today.  We'll come back tomorrow morning at 9 o'clock.

Remember my admonitions.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  We're out of the presence of the jury.  Any matters that you require the Court out of the presence of the jury before we break?

MR. THAKUR:  It's been a long day, your Honor.  No, not tonight.

THE COURT:  That's a good answer.

MR. CHARFOOS:  Can we have final decision on Owen, your Honor?  We'd love to play the Owen deposition.

THE COURT:  Remind me what that question is.

MR. CHARFOOS:  May we play the Owen deposition tomorrow?

THE COURT:  Oh.  Well, since it's not till tomorrow, I'll give myself one more sleepless night and we'll talk about it in the morning.

MR. CHARFOOS:  Thanks you, your Honor.

MR. THAKUR:  Thank you, your Honor.

THE COURT:  See you.

(Adjourned)

oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

INDEX OF EXAMINATION

Witness:                                                    Page:

CHRISTOPHER FOLEY

Direct By Mr. Charfoos (cont.) . . . . . . . . .1411

Cross By Mr. McDonald  . . . . . . . . . . . .1423

Redirect By Mr. Charfoos . . . . . . . . . . .1442

ANTHONY ACAMPORA

Direct By Ms. DeBruin  . . . . . . . . . . . .1452

Cross By Mr. Thakur  . . . . . . . . . . . . .1617

oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

INDEX OF EXHIBITS

| Exhibit No. | Received: |
|---|---|
| 4021 | 1422 |
| 4106 | 1499 |
| 4110 | 1501 |
| 1006 | 1554 |
| 523 | 1563 |
| 4046 | 1564 |
| 4070 and 4078 | 1600 |
| 4092 | 1603 |

oOo

CERTIFICATE OF REPORTER

        I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Thursday, June 28, 2012

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC   (415) 431-2020