Volume 9

Page 1633 – 1869

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

```
------------------------------)
                              )
Mformation Technologies, Inc., )
                              )
                  Plaintiff,  )
                              )
     v.                       )   No. C 08-4990 (JW)
                              )
Research In Motion, Ltd.,      )
et al.,                       )
                              )
                  Defendants. )   San Francisco, California
                              )   Friday, June 29, 2012
------------------------------)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        RUBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO

APPEARANCES (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        FERLILLA VICTORIA ROBERSON
                        MARIA A. MARAS
                        MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Friday, June 29, 2012

(9:00 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Before we have the jury come in and continue the examination, Mr. Noble informs me the matter that you asked me to spend my evening on you've resolved.

MR. McDONALD:  That's not correct, your Honor.  The motion still stands.  I was just informed by RIM's counsel that they are not going to call Mr. Owen, and they wish to provide a written response for Mr. Owen, over the weekend, presumably.

MR. CHARFOOS:  We have a enough live witnesses, we'd like to get on today.  We can defer the Owen issue until Tuesday.

THE COURT:  I don't care how you play it, but having tendered the motion to me and having spent so much time on it, I'm prepared to rule.  I don't need more paper.

MR. McDONALD:  We welcome a ruling, your Honor.

THE COURT:  It does seem to me that the material that was submitted to me establishes to my satisfaction that the RemoteWare system was configured in such a fashion that it could operate and be used wirelessly.

And that the testimony, as I have seen it, doesn't violate any rule of evidence.

The question, as it was being put to me, as I got the briefs, had to do with whether the testimony was the sole basis for establishing public use in a particular way.  And having satisfied myself that the testimony -- a proper foundation has been laid so the testimony doesn't become the sole basis, the testimony of the witness can be received in evidence with respect to his knowledge and use of the wireless technology.

MR. CHARFOOS:  Thank you, your Honor.

MR. McDONALD:  With respect, your Honor, the testimony at issue is not regarding his personal use. It's regarding what he was told about the use by others.

THE COURT:  That's why I said "based on what's been submitted to me."  I received in these papers a March 31, 2010, Joe Owen, pages 38 to 41.  That's what I was given.

MR. McDONALD:  Correct, your Honor.

THE COURT:  That testimony can be received.

MR. McDONALD:  Thank you, your Honor.

THE COURT:  Summon the jury.

(Dr. Acampora is on the witness stand.)

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT: Please be seated. Good morning, members of the jury.

You may resume your cross-examination.

CROSS-EXAMINATION (continued)

BY MR. THAKUR:

Q. Good morning, Dr. Acampora.

A. Good morning.

Q. So where we left off yesterday was RIM's sort of key dispute with respect to connection. But I had one sort of underlying thing I wanted to get out of the way.

Do you recall RIM counsel talking to Dr. Madisetti about offering his services on the National Expert Witness website?

A. I do.

Q. If you will concede that you advertise as well, we can move on past that point. Do you advertise, sir?

A. Pardon me?

Q. Do you advertise your expert services?

A. I do not.

Q. You do not?

A. I do not.

Q. Dr. Acampora, do you see your name there?

(Tendering document)

THE COURT: You've given the witness a document. The record didn't reflect that. But you're asking if he

sees a name on that document?

MR. THAKUR:  If he sees his name.

THE WITNESS:  I do not.

BY MR. THAKUR:

Q.  On the top left-hand corner?

A.  That is not me.

Q.  That is not you?

A.  That is not me.  That is one Anthony C. Acampora, and apparently this is a person who's at Fordham University, Nassau County, Bronx.  This is not me.

Q.  Well, we have another one.  Give me a second.

We'll come back to this one.  Apparently we have pointed out the wrong website.

MR. THAKUR:  Continuing on.  Could you put up Madisetti Demonstrative 350.

It's the summary of opinions.

It's never great to start out with technical issues early in the morning.

Chris we'll just turn to the Elmo.

BY MR. THAKUR:

Q.  Dr. Acampora, did you see this summary of the evidence that Dr. Madisetti presented?

A.  I did.

Q.  And your point was it's not the fact that Dr. Madisetti didn't present evidence.  Your argument is

that establishing a connection is not satisfied because of the connectionless protocol, the UDP, being used from the Relay to the handheld; is that correct?

A.   Well, not quite.  It's my opinion that the establishing connection step is not met because there's no connection established between the server from the wireless device, without a request from the wireless device, based on the threshold condition that Dr. Madisetti identified, and performed prior to transferring the contents of the mailbox and accepting the contents of the mailbox.  That's the sum and substance of my testimony.

Q.   Dr. Acampora, I understand you have lots of reasons. Could we agree that one of your reasons -- again, I'm repeating -- one of your reasons is that the connection between the Relay and the handheld is using a UDP connectionless protocol?  Is that correct?

A.   Well, it was my opinion that UDP is used between the Relay and the BlackBerry, and that's one of the reasons why the establishing connection step is not met.  But only one of the reasons.  I have other reasons as well having to do with the fact that the BES has already transmitted before the wireless network was even used.

Q.   Dr. Acampora, I'll make a deal.  You focus on one, I'll get to the next one.  You'll get your chance, okay?

Let's focus on the first one.  Okay?

Your first argument is there's no connection between the Relay and the handheld device because of the use of a UDP connection, which you call a connectionless protocol?

A.   That's one of my reasons.  That was a reason.

Q.   You stand by that reason today?

A.   I stand by that reason.

MR. THAKUR:  Okay.  Do you mind if I use the Elmo, your Honor?

THE COURT:  No.  Oh, the easel.

MS. DeBRUIN:  Your Honor, may I move so I can see?

THE COURT:  Certainly.

BY MR. THAKUR:

Q.   Dr. Acampora, what I have done on this is put two columns.  On the left-hand side I've identified "Research In Motion."  On the right-hand side I've identified "Mformation."

Your testimony is that the UDP does not establish a connection because it's a connectionless protocol, correct?

A.   It's my opinion that there's no connection established between the Relay and the BlackBerry because UDP is used between the Relay and the BlackBerry, and

there's no connection between the BES and the BlackBerry at all.

Q.  Dr. Acampora, simple question:  Is it your testimony that the UDP is a connectionless protocol and therefore cannot establish a connection?

That's one of your reasons.  Is that not correct?

A.  Yes, it's my opinion that between the Relay on the BlackBerry, UDP is used and cannot establish a connection.

Q.  So on RIM's side, we've got Dr. Acampora's testimony.

Okay, now let's take a look at the weight of evidence on Mformation's side.

MR. THAKUR:  Chris, would you pull up Trial Exhibit 370, please.

BY MR. THAKUR:

Q.  Do you recognize this document, sir?

A.  That's the '917 patent, yes.

MR. THAKUR:  Chris, would you pull up page 8, Column 3, lines 38 through 43.

Could you highlight the language:  "One or more networks may be included in the wireless network and may include both public networks, such as the Internet, and private networks and may utilize any networking technology and protocol."

"Any networking technology and protocol, such as

ethernet, Token Ring, Transmission Control

Protocol/Internet Protocol, TCP/IP, etc."

BY MR. THAKUR:

Q.  Do you see the patent not teaching you the use of any networking technology and protocol, and TCP followed by an "etc."?  Do you see that, sir?

A.  Well, I see the language that you brought up here, yes.

Q.  And it is still your opinion that the UDP protocol may not be used pursuant to this patent because it is a connectionless protocol?

A.  As far as the claims concern, the claim requires that a connection be established between the device and the server.  That term's been construed, and in accord with the Court's claim construction, I believe UDP -- well, I believe a couple of things.  A, there's no connection -- there's no wireless communications initiated between the BES and the BlackBerry.  And in addition, there's no connection established between even the RIM, the Relay and the BlackBerry because of the use of UDP.  And the BES transmits before the server network is used at all.

Q.  I thought we made a deal.  We're going to focus on the one item.  Everyone's heard your whole opinion and they're going to hear it, your counsel will help you through the whole opinion.

I want you to focus on Item 1. The deal is, you would agree that one of your reasons is the reason they cannot satisfy this patent is because the connection between the Relay and the BlackBerry handheld uses UDP, which is a connectionless protocol. Isn't that correct, sir?

A. That is --

MS. DeBRUIN: Objection, asked and answered.

THE WITNESS: That is one of the reasons.

THE COURT: Well, the question had changed in form, so I won't sustain an objection of asked and answered. But I'm becoming concerned that your effort to limit the witness to a single reason is being frustrated by his refusal to do that. So maybe as a foundation you can establish with the witness that he's willing to allow you to subdivide it in that way.

BY MR. THAKUR:

Q. Would you agree that one of the reasons, just one of the reasons, it's your opinion that the use of the BlackBerry handheld connected to the BES 4.0 and higher do not infringe, because there is the use of UDP, which is a connectionless protocol, from the Relay to the handheld. Is that correct, sir?

A. That's one of the reasons, correct.

Q. So we've explained that the patent itself discloses

the use of any networking technology and protocol.  Do you see that, sir?

A.  I do.

Q.  And you saw the word "TCP/IP, etc.," do you see that?

A.  I see that.

Q.  Despite that language, is it your opinion that the use of a UDP connectionless protocol is not disclosed by the '917 patent?

MS. DeBRUIN:  Objection, that question was asked and answered, your Honor.

THE COURT:  Well, no.  I'm not sure I understand that this is the same question as previously asked with respect to the claim.  The question now is whether UDP was disclosed by the '917 patent.  So if the witness understands that, he can answer that.

BY MR. THAKUR:

Q.  Was it disclosed, sir?

A.  Well, I don't know if UDP is disclosed.  I don't see it here.  I don't know if it might be anywhere else in the patent.  But I do know that in accord with the claim, when I apply the Court's claim construction, it is my opinion that the use of UDP between the Relay and the BlackBerry would not cause the initiation of wireless communications between a server and a device.

Q.  You also recall that you testified that RIM uses the

document -- uses the term "colloquially" or some people use the term "colloquially"?

A.  Even I do.

MR. THAKUR:  Let's have a look at RIM Trial Exhibit 353, please.

BY MR. THAKUR:

Q.  Do you see this document, sir?

A.  I do.

Q.  What is it?

A.  It's BlackBerry Enterprise Server for Microsoft Exchange Version 5.0, it's the administration guide.

MR. THAKUR:  Can you turn to page 338, please.

BY MR. THAKUR:

Q.  Do you see the use of the word UDP there, sir?

A.  I do.

Q.  And do you see the default Port No. 4071?

A.  I do.

Q.  Do you see on the left side, "outgoing syslog connections"?  Do you see that?

A.  I do.

Q.  Do you recall also seeing the document where the UDP under RIM was defined as a connection type?

A.  I do.

Q.  So we have presented RIM documents that refer to it as a connection type.

So the second is RIM's documents saying UDP is a connection.

Now, you have seen Mformation present those documents in this court and in this trial, have you not, sir?

A. Pardon?

Q. You have seen Mformation present some of RIM's documents referring to UDP as a connection in this trial, have you not?

A. I have.

Q. You have also said some people use it colloquially and imprecisely sometimes.

A. Well, I say people use it colloquially. I don't know if that's precise or imprecise. I know I understand what -- when I hear people using the word "connection," given the context, I don't know if they're speaking about a technical connection, establishing a connection before transmitting, or if they're referring to something else.

Q. Focusing on UDP, UDP is colloquially sometimes referred to as a connection, didn't you say that?

A. No, I didn't say that. But I do see UDP used in this document, it's referred to as being a connection type, and this is part of Java programming nomenclature.

Q. Well, you do know that millions of pages of documents

have been produced in this case, right, sir?

A.   I don't know the number, but I know a lot has been produced.

Q.   A lot has been produced.  Now, I came up with a couple of documents or a handful of documents, and we showed you a lot of other documents in this case, where the word "UDP connection" was used in RIM's documents.

Sir, did you find one -- I'm going to repeat the word "one" -- did you find one RIM document where the word "UDP" is not a connection that you identified in this case, sir?

A.   I don't remember.

Q.   You do not remember?

A.   Can I tell you one right now, no.

Q.   That's all right, Dr. Acampora.  I'll put down, "do not remember."

Let's continue on.  You heard some witnesses in this case, did you not, you heard a lot of witness testimony?

A.   I was here for the entire trial except for the damages phase.

Q.   You heard Dr. Madisetti testify?

A.   I did.

Q.   And you heard Dr. Madisetti said UDP is a connection, sir?

A.   I think he said that.  I wasn't quite clear what he was saying on that.  But he might have said that.

Q.   You heard Dr. Badri Nath testify in this case, sir?

A.   I did.

Q.   And he testified the difference between UDP being a connection and being a different connection management, did you hear that?

A.   That got a little confusing.  Because I also saw his class notes, which, as -- not surprisingly at all, this is what we teach.  TCP is a way of communicating where a connection is established before transmitting.  UDP is connectionless, you simply transmit.  It's in his class notes.

Q.   You use the word "management."  "Connectionless management."  He testified when asked in this courtroom whether UDP is a connection, and he said, "It is a connection."  Do you recall that?

A.   He said something about a port being used and somehow he thought that made it a connection.  As I explained, the use of a port number is merely providing an additional level of addressing, like dialing a telephone number, and then dialing an extension after the telephone rings.  It's nothing more than that.

Q.   Dr. Acampora, I'll give you the benefit of the doubt.  I'll put a question mark in front of Dr. Nath.

We have a disagreement on -- so I will strike him out, even though we had that witness testimony.

Now, one might ask, how does the industry use this term "colloquial" as to a UDP connection.

Dr. Acampora, do you see the document at the bottom saying, "developer.apple.com"?

A.   I do.

Q.   Are we talking about the same company, Apple, Inc.?

A.   I don't know.  Possibly.

Q.   The largest corporation in the entire world?

A.   I know who Apple is.  This came off the Internet.  So I can't verify its authenticity.  But it does say "Apple."  It says "developer.apple.com library" at the bottom, so perhaps it's an Apple document.

Q.   And you'd agree with me that Apple is the largest corporation in the world?

A.   By multiple capitalization, yes.

Q.   Let's see the words of Apple:  "To use a UDP connection."

MS. DeBRUIN:  Your Honor, objection, hearsay.

MR. THAKUR:  Your Honor, this is an expert.  He's expressing expert opinion.  We're entitled to question him about what is the normal use --

THE COURT:  Certainly.  To the extent any witness identifies a document as one that he relied upon for

purposes of his opinion, you can cross-examine him about the contents of the document.  I'm a little concerned that that foundation hasn't been laid.  But to the extent you lay a foundation that he recognizes this as a circumstance where the word "connection" is used in the same sense as the patent, then you may use it for purposes of challenging him in that regard.

BY MR. THAKUR:

Q.  Does this document disclose the use of the UDP connection using a port?

Perhaps I could just identify the sentence for you.  It says:  "To use a UDP connection, use and arrangement of the form UDP:host:port.  For example, to connect to --"

MS. DeBRUIN:  Objection, your Honor, counsel's reading the document into the record.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  Do you see the use of the word "UDP" as a connection using a port?

A.  Well, I see a reference.  If it's the third paragraph up from the bottom, reads, "To use a UDP connection" -- it gives an argument, some programming language, for example, to connect to UDP Port 2828 on the terminal server named -- it's simply telling how to connect to

UDP port.  That's the second stage of addressing.

Q.  So you would agree with me that the word "UDP connection" is used in the Apple document, correct, sir?

A.  For whatever the purposes.  I'm not at all familiar with this document.  I don't know if you'd like me to take the time to read it to be able to give an opinion on what Apple, if it is Apple, appears to be saying here.  But I don't disagree that the phrase, instructions, regarding this so-called UDP connection along with instructions as to connect through a UDP port, appears in this document.

Q.  So I'm going to write the word "Apple" on the left.

Let's take a look at the next document, sir.

Do you see the document on the bottom left-hand corner, it says "Copyright 2012, Microsoft"?

A.  I do.

Q.  Do you see the left top left-hand column where it says "4.1 UDP connection"?

A.  Where are we asking me to look now?

Q.  The title, it says "UDP Connection."

A.  "UDP Connection Initialization Packets."

Q.  And do you see the first sentence, explaining the use of a UDP connection in Microsoft?

A.  They appear to be describing -- Microsoft appears to be describing a process called "UDP connection

initialization."

Q.   I've written the "Microsoft" under "Mformation."

Now, unfortunately, this Court sets a time limit on the amount of time we can spend on this issue, or spend on presenting, but I've shown you a column on the left with evidence for what we have to date.  Do you see that?

On the left we have some failure to remember in your own testimony, that we heard, not saw, today.  Is it still your opinion that the use of a connectionless protocol does not satisfy establishing a connection requirement of the '917 patent, on the first issue?

A.   It's my opinion that the use of UDP between the RIM Relay and the BlackBerry handheld, that's the only place that UDP is used in the RIM system, it does not comply with the Court's construction of establishing a connection between the device and the server.  I don't believe that there's any connection established between the Relay and the device at all, but the Court's construction said that the connection needs to be established between the server and the device, and UDP is not between the server and the device.

And, before UDP is even used, the packet has already left the BlackBerry and is sitting at the Relay. So the Court's claim construction is not met by the use

of UDP over the cellular channel between the Relay and

the device.  That's my opinion.

Q.  Dr. Acampora, you're trying to absorb the second

argument into the first because the first one's

collapsing.  I'm asking you, if you look at the evidence

beside your testimony, is there any evidence whatsoever

that the use of a connectionless protocol, such as UDP,

does not satisfy the '917 patent?

A.  Yes.  The evidence is in how the RIM uses UDP.  Once

again, it's used between the Relay and the device, and

there is no initiation of wireless communications

between the Relay and the device before there's

transmission between the Relay and the device.

If you just limit it to that portion -- for some

reason you want to draw my attention away from the

establishing connection being completed between the

server and the device before transmitting.  In fact, I

testified to that effect, there's no connection

established between the Relay and the device.  Not when

UDP is used, because there's no initiation of wireless

communications before transmitting.

Q.  I promise you I'm going to get to that.

A.  I'm talking about just the link between the Relay and

the device now.  Just that link.

Q.  I want to focus on the link between the Relay and the

device.

So we've got this imbalance now.  I heard you say people use the word colloquially, right, "UDP connection"?

A.  I didn't say that.  I said people use the phrase "connection" colloquially all the time.

Q.  And you used the words, "That's an imprecise use"?

A.  It's imprecise only insofar as if they're speaking about communications and trying to distinguish connection-oriented communications from connectionless communications, and if people spoke of connections when they meant connectionless, that would be a mistake.  But the word is used colloquially all the time.  I'm not going to say incorrectly.  I know what people mean.  I think most people know what is meant.

Q.  Mr. Cherry made that statement in his patent, correct?

Do you remember that?

Mr. Cherry filed a patent application where he described the UDP as a connection.  Do you recall that?

A.  I didn't say he made a mistake.

Q.  You said "imprecisely."

A.  He chose to use those words in the context of the patent.  I think one would understand.  One would understand what -- where the word "UDP" appears, one

knows what that means.  There's no handshake before UDP is used.  It's connectionless, it's in every textbook on telecommunications that I'm aware of, and I'm aware of hundreds of them.

Q.  Dr. Acampora, you would never certainly make that kind of mistake, would you, sir?

A.  What mistake?

Q.  Calling UDP a connection?

A.  Calling UDP a connection.  I would not make that mistake, assuming, once again, that it wasn't -- that I wasn't speaking colloquially.

Q.  Dr. Acampora, do you see what I've placed in front of you?

A.  I do.

Q.  What is it?

A.  This is one of my patents.

Q.  And you're identified as an inventor on this patent; Isn't that correct, sir?

A.  Yeah, myself and a former student of mine from IBM.

Q.  And you signed an oath to tell the truth in this patent; isn't that correct, sir?

A.  I did.

Q.  Do you disavow any of the language in this patent?

A.  No.

Q.  You said you wouldn't make that kind of a mistake,

didn't you, sir, of using -- referring to UDP as a connection; isn't that correct?

A.   Unless I was using it colloquially.

Q.   Would you use it colloquially in a United States patent?

A.   That depends.  I need -- I'm not sure that it appears here, but if you'd call my attention to what you're referring to, I could probably provide some clarification.

Q.   I will draw your attention to it, sir.

A.   Thank you.

Q.   I'm asking you, would you use it colloquially on a United States patent on which you're identified as an inventor?

A.   I don't know.  Probably not, but I don't know.

Q.   You want some leeway.  That's fine.

Let's turn to Column 6 of this patent.

Read line 8, "Class III connections," if you'd be kind enough to read to me the first two sentences out loud.

MS. DeBRUIN:  Counsel hasn't laid a foundation on that objection, your Honor.

MR. THAKUR:  He's identified as the inventor.  Actually we'd ask permission to publish it.

THE COURT:  The objection is overruled.  You can

publish it.  Are you offering it in evidence?

MR. THAKUR:  Yes, I am your, Honor.

THE COURT:  What number?

MR. THAKUR:  We need an exhibit number.

DEPUTY CLERK:  5014.

MR. THAKUR:  Thank you.

THE COURT:  5014 is in evidence.

(Plaintiff's Exhibit 5014 received in evidence)

MR. THAKUR:  I'm going to use the Elmo, if I may?

THE COURT:  Perhaps one of your colleagues could assist.

MR. THAKUR:  I'm not as technically adept as Mr. McDonald.

I want to just get the name of Dr. Acampora. There you go.

BY MR. THAKUR:

Q.  This is a patent on which you're identified as an inventor, right?

A.  Yes.

Q.  Could you turn to Column 6, please.

A.  I'm there.

Q.  You're there.

So let me start reading out for you where the first full paragraph begins, I'll read the first two sentences, and this is, remember, a patent in which your

named as an inventor.

"Class III connections are those for applications such as paging, which only require the network to deliver, in its best effort, individual messages which are delay tolerant. Thus, Class III connections normally utilize protocols similar to a standard User Datagram Protocol (UDP)."

You see that, sir?

A. Yep.

Q. And that is in your patent, sir?

A. It is.

Q. I've run out of room, but I'll throw in an arrow.

(Counsel writing on easel)

Q. Dr. Acampora, based on what you've heard today and seen today, would you change your opinion that the use of a UDP connectionless protocol between the Relay and the handheld may satisfy a requirement of establishing connection?

A. A couple of things. First, I'm assuming you're not going to allow me to explain this, so I won't even attempt. But it's easy to explain.

Second, it's my opinion that the communications between the RIM Relay and the BlackBerry does not involve initiating wireless communications before transmitting, as the Court's claim construction

requires.

I even testified that even if a connection-oriented protocol were used on that link, which it's not -- UDP is used, not connection-oriented -- even if a connection-oriented protocol had been used between the relay and the BlackBerry, the Court's claim construction of establishing wireless communications between the BES and the BlackBerry before transmitting from the BES would not have been met.  Because the sequence of establishing the end-to-end connection from the BES to the BlackBerry before transmitting will not have been completed.  That must be completed before the transmission begins.

So the UDP issue I think is an important issue, but it's certainly not the primary issue.

And by the way, using my patent, it's used over an ATM connection, simply the use of UDP over an ATM connection.  ATM.  Different technology.  Has nothing to do with this litigation.  Is what I was really talking about in this patent.  ATM's connection-oriented.  Then you can send different types of protocols over it.  TCP, UDP, IP -- it doesn't matter.

Q.  Dr. Acampora, I'd like to use RIM boards.  Do you remember they were talked about yesterday?

Dr. Acampora, you're talking about a Step No. 2,

which is Argument Number 2, that transmission must begin after the completion of the connection stage.  But you do recall testifying in this case that the UDP and the use of a connectionless protocol does not satisfy Claim 1 of the '917 patent; isn't that correct, sir?

A.  Can you repeat that, please?

Q.  Did you not express an opinion that the use of a connectionless protocol, like UDP, between the Relay and the handheld makes it -- provides a basis for why the use of BlackBerry handhelds connected to the BES do not infringe the '917 patent?  Did you not express that opinion?

A.  That's one of many reasons.

Q.  We're in this problem because the '917 patent actually didn't disclose a connectionless protocol; isn't that correct, sir?

A.  The claim requires initiating wireless communications followed by transmitting.  The Court has construed this. You've heard this instruction many times.  So as far as the claims concerned, the left-hand side is my representation of the fact that the Court has told us, paraphrasing the words, first establish the connection. Only after that connection has been established, from the server to the device, can the transmission commence. Transmission cannot commence until the wireless

connection has been established between the server and

the device.

That's the construction that I followed.

Q. But I'm asking you a question --

A. So that's the only thing that's relevant. That's

what I applied. It says nothing about connectionless.

It just simply told us what the establishing a

connection step means.

Q. I asked you a very specific question. I want to make

sure -- clear your mind, and hear my specific question.

A. Okay.

Q. Does the '917 patent expressly disclose the use of

connectionless protocols?

A. I'm not sure I understand the question. Certainly

not in the claim. You're asking elsewhere in the

patent?

Q. Ignore that board. I'm asking you, does the '917

patent disclose the use of connectionless protocols?

A. Connection in the patent.

Q. You read the patent, sir?

A. Yes, I did.

Q. You spent 670 hours on this case, sir?

A. I did.

Q. And you still don't know whether they disclose

connectionless protocol?

A.   There's one place where you see in "UDP" was mentioned in the body -- it might have been.  But it's certainly not in the claim

MR. THAKUR:  Can we get an extra copy of the patent, please?

Why don't we go ahead and display it on the screen.  It's Trial Exhibit 370.

THE COURT:  Well, I don't know whether you all intend this, but I'm not going to allow the jury to sit here while the witness reads the patent.

BY MR. THAKUR:

Q.   As you sit here today, do you recall whether the patent expressly discloses the use of connectionless protocols?

A.   I don't know.  It might have mentioned UDP.  I have a vague recollection it might have been in there.  But again, it's not in the claim.  The claim is what the claim is.

MR. THAKUR:  Chris, would you turn back to page 8, Column 3, lines 38 to 43, we just saw those.

BY MR. THAKUR:

Q.   Do you see that language, sir?

A.   Yes.

Q.   We just spoke about it.  And you said that did not disclose connectionless protocol?

A.   And within this language there is a connectionless protocol.  IP.  IP is a connectionless protocol, and that's a good example of how a connectionless protocol would flow over a connection.

In the Internet, TCP is often used to establish a connection between two end points that will communicate over the Internet, and then over that TCP connection, IP packets will flow.  The IP packets are connectionless.

We didn't get into a lot of detail concerning communication protocol stacks.  It's rather involved.  But there is a layered structure.  TCP sits on top of IP.  The TCP end-to-end connection is first opened, and then over this reliable pipe that's been created, IP packets can then flow.  IP is viewed as connectionless, the same as UDP.  So as an alternative to TCP over IP, we also find UDP over IP, where UDP does not involve the notion of the connection end to end; it's simply the transmission of UDP packets, each of which has -- is then supporting the transmission of IP.

So, yeah, there is a connectionless protocol mentioned, it's IP.

Q.   Any other?

A.   Well, this is a little confusing, because it speaks of networking technology and protocol such as ethernet.  No ethernet is not a protocol.  There are protocols

using ethernet.  In fact, this is getting even further down into this protocol stack.  And it uses a scheme called "carrier sense multiple access with collision detection."  There's no notion of a connection associated with that.

Token ring?  I'm not sure, there may or may not be a notion of connection associated with that.

It's mentioned of the Internet, IP over the Internet is connectionless.  But, again, this could go TCP end-to-end connections.  So it's a hard charge.

Q.  Do you see this document, sir?

A.  I do.

Q.  What is this document?

A.  I don't know.  I'm not familiar with it.  It appears to be the cover page of a textbook, but I'm not familiar with this book.

Q.  And on the bottom right hand, it says "Mr. Buck Graham."  Do you see that, sir?

A.  Yes.  Buck Graham.

Q.  Do you have any reason to believe that's not the author?

A.  It appears to be a textbook authored by Buck Graham.

Q.  And the title is "TCP/IP"...?

A.  *TCP/IP Addressing, Second Edition*:  *Designing and Optimizing the IP Addressing Scheme.*  This appears to be

a how-to book.  How-to-do book.

Q.  Would you kindly turn to the third page.

A.  Okay.

Q.  I'd like you to read the last paragraph.  Just a couple of lines.  If you could kindly read that?

A.  What do you mean by the "last paragraph"?

Q.  Says "LAN emulation."

A.  Okay.

THE COURT:  Just a moment.  Read it to yourself.  This is not in the same class as your own patent, so I presume this is being read to refresh his recollection or to --

MR. THAKUR:  Or to impeach.

THE COURT:  -- or to ask further questions.

(Witness peruses document)

BY MR. THAKUR:

Q.  In fact, sir, wouldn't you agree that with the exception of TCP, in fact, every protocol disclosed in this patent is connectionless?

A.  I haven't finished reading.

Q.  Sorry.

(Witness peruses document.)

A.  Yes.  Again, ethernet is not a protocol.  It's a networking technology.  At the physical level it uses a scheme called --

THE COURT:  I'm not sure I understand what question you're answering now.  Now that you've read it, let's wait for a question.

BY MR. THAKUR:

Q.  Is it true that ethernet is connectionless?

A.  Ethernet is a networking technology that uses, as one of its protocols, something called "carrier sense multiple access with collision detection."  As I testified, that's connectionless.

Token ring --

THE COURT:  Just a moment, you've answered the question.

BY MR. THAKUR:

Q.  Ethernet is connectionless.  Is token ring connectionless?

A.  Token ring is a network technology.  This document refers to token ring as being connectionless.  I'm not sure I agree with that.  But I could accept that some might view token ring to be connectionless.  I'm aware of token ring operations that are not connectionless.

Q.  Dr. Acampora, do you see what's in front of you, sir?

A.  Yes, this appears to be another excerpt from a textbook, *The Industrial Communication Technology Handbook*.

Q.  Could you turn to the third page, the paragraph that

starts with, "The bit error rate."

Actually I have a foundation question.  Isn't token ring a technology developed by IBM?

A.   Well, IBM brought the -- a proposal for a token ring standing to the IEEE 802 committee that's responsible for developing standards for local area networks.  That was a competing standard to the ethernet standard that was proposed by IBM.

THE COURT:  I think that mic is very directional and it's to your side, so it's not the closeness, it's whether or not you're speaking into it.

THE WITNESS:  I see.  Thank you.

BY MR. THAKUR:

Q.   And IBM referred to token ring as a connectionless protocol, correct, sir?

A.   It does, but it also says on the top of that -- we didn't get into protocol language, this is what we're referring to now, token rings, ethernets.  These are lower level networks, upon which different services are built.  So on top of ethernet, one can send IP packets.  And one can also create TCP connections.  In fact, that's exactly what is done in wireless -- in WiFi.

I mentioned earlier, WiFi is one of the accused networks.  When used with RIM product.  And in fact, WiFi is one of 802.11 standards.  One of these local

area network standards.  And when communicating over the radio, the communication is connectionless, despite the fact, as I testified, using that radio link and then extending all the way back to the BES, one of the first things that the BlackBerry would do is establish the TCP connection.

So it's simply using ethernet as a transport mechanism to move the bits.  And the bits that it's moving initially establishing the TCP connection.  But after that TCP connection is established, then meaningful data can flow.  It's a multi-step process.

Q.  My question is really simple:  Does IBM refer to token ring as a connectionless system in the industry?

A.  I don't know who Richard Zurawski is, assuming he works for IBM, this would suggest that.  I don't disagree.  But there are also versions of token ring that are connection-oriented.

Q.  But IBM proposed token ring, sir?

A.  IBM proposed a token ring.  They were the first to bring a token ring proposal to the 802 committee.

Q.  You would defer to the person that proposed the proposal to what they would describe it as -- IBM describes token ring as a connectionless system?

A.  I don't disagree with that, but I would defer more to whatever was actually adopted.  The IBM proposal was not

accepted lock, stock and barrel.

Q.  The point I'm trying to get to, do you remember seeing the '917 patent?  Would you agree that the '917 patent discloses connectionless protocols?

A.  For use in some portions of this network, yes, it does.

Q.  Time to move on, sir.

I'm just doing to keep the jury from being distracted from the Argument Number 2 I'd like to talk about (at easel).

MR. THAKUR:  Chris, would you put on demonstrative on the screen, please.

Q.  Argument Number 2.  The one I promised I'd get to. Do you see that?

Now, you can go ahead and tell the jury what you think the transmit connect step is.  What is your opinion with respect to why the '917 claim is not infringed because transmission must begin after connection is complete?

A.  Okay.  So I said this before, and I'm going to try to do this from memory without having the Court's claim construction in front of me.

The Court was asked to construe the phrase "establish a connection," and there was more to that phrase.  If I can refer to this as the "establish a

connection" step.

The Court said, that:  "'Establishing a connection' means initiating wireless communications between the device and the server, and that step of initiating wireless communications between the server and the device must be completed before the next step in the claim transmitting the contents of the mailbox can begin."

,So it's a two-step process:  Initiate wireless communications between the device and the server, and then, transmit.

Q.  So Step 1 is initiating wireless communication, correct?

A.  Between the server and the device, or between the device and the server, whichever.

Q.  Now, I'm going to ask you to accept my hypothetical, the TCP, UDP protocols are irrelevant.  If UDP satisfies the protocol requirement, would you agree that there is --

A.  If UDP does what?

Q.  If UDP satisfies the requirement of establishing a connection.  I'm now asking you to assume your Argument Number 1 has been set aside.

For purposes of the discussion on your second item, I will ask that you agree that the use of whether

it's a TCP or a UDP or a connection protocol or a connectionless protocol is not relevant to our conversation on the second noninfringement arrangement.

Are you with me so far?

A.   I think so.

Q.   I want to focus on the argument you kept bringing in when we were talking about the first one.  That transmission must begin before connection is completed.  That is your testimony in the course of this trial, sir?

A.   That's the Court's claim construction.

Q.   We have no dispute on that issue.

THE COURT:  Did you say "before?"

THE WITNESS:  After, after.

THE COURT:  Did you say "before"?

MR. THAKUR:  Your Honor, in my own anxiousness, I may have misstated.  I will withdraw and restate that question.

BY MR. THAKUR:

Q.   Is it your opinion that the '917 patent is not infringed because transmission begins -- does not begin after a connection is established?

Does not begin until after a connection is established?

A.   I'm going to ask you --

Q.   We'll try a third time.  Would you -- is it your

opinion that the '917 patent is not infringed because transmission begins before a connection is established?

A.   That is correct.  That's one of the reasons.

Q.   Understood.  Remember we got past Number 1.  Now I'm asking you to focus on Number 2.

Argument Number 2 was, that that transmission must begin only after a connection is established, right?  So that's what we've got to prove to show infringement?

A.   That's correct.

Q.   So now let's take a look at what is marked as Trial Exhibit 139.  Do you see that, sir?

A.   I do.

Q.   Let's talk about how that system operates.  An IT administrator goes into the BlackBerry Configuration Database and issues a command.  Correct?

A.   Well, that's one way that it operates.  Are we looking only at what is in blue or the whole BES or --

Q.   Yeah.

A.   -- what portion are we looking at?

Q.   I thought I identified for you the one section to look at.  But, yes, we're going to talk only about the items in blue.

A.   Okay.

Q.   If I want to send a "kill handheld" command, okay, as

an IT administrator the first thing I do is go into the BlackBerry Configuration Database and enter a queue in the ITAdminQueue, correct, with a command, "kill"?

A.  No.  What an IT administrator would do would go into the ITAdminQueue and enter a work order to have the BlackBerry Policy Service prepare a command, the result of which, when it arrives at the BlackBerry, would be to kill the BlackBerry.

Q.  RIM refers to as a command, correct?

A.  Refers to what?

Q.  "Kill handheld" as a command?

A.  I'm not sure what you mean.

Q.  Is the use of the term "command" identified in RIM documents?

A.  It -- probably.

Q.  And one of those commands is the kill handheld command, correct?

A.  I believe that's the case.

Q.  So the "kill handheld" command is entered in the ITAdminQueue as a work order, correct?

A.  No.  What is entered in is a work order, the result of which would be the BlackBerry Policy Server sending out the actual command to the BlackBerry that results in the BlackBerry ceasing to operate.

Q.  Trying to go one step at a time, sir.  The first

step, the first step is the IT administrator would enter a work order in the ITAdminQueue to kill the handheld for a particular user; is that not correct?

A.   It will enter a work order intended to cause the BlackBerry to send a message containing the kill command.  That's roughly what happens.

Q.   Step No. 2.  The BlackBerry Policy Service will poll the ITAdminQueue periodically, correct?

A.   That's correct.

Q.   When it polls the ITAdminQueue, it will see that work order, correct?

A.   That's correct.

Q.   It will turn that work order into a payload, correct?

A.   Well, I don't think it turns that work order into a payload.  Based upon the information that it learns in that work order, it knows the payload has to be sent.  That payload was not in the ITAdminQueue.  That payload was somewhere else.  The ITAdminQueue basically told -- in this case, it told the Policy Server what payload to use.

Q.   It told it what it wanted done, correct?

A.   That's correct.

Q.   And the payload includes the PIN that was identified in the ITAdminQueue, correct?

A.   It does.

Q. That's the only way it's going to know which handheld it wants it to go to, correct, sir?

A. The PIN is the only way that the BlackBerry system knows to identify the BlackBerry to which this command is directed.

Q. The destination. It's like, we heard Mr. Cherry talk about the envelope. The PIN that is put in the ITAdminQueue that goes up to the BlackBerry Policy Server, that is the destination address; is that not correct, sir?

A. Well, that identifies only to RIM, the components of the RIM system, what BlackBerry device this kill command prepared by the Policy Service should be sent to. It identifies the BlackBerry.

Q. And that PIN comes from the ITAdminQueue into the BlackBerry Policy Server payload, correct?

A. No, it actually doesn't go quite that way. But eventually, the PIN is placed into the header of the GME packet.

Q. The destination?

A. It's not taken out of the ITAdminQueue. It's actually -- it's a multi-step process, but eventually the PIN winds up in the header.

Q. And the PIN is the destination address, correct?

A. The PIN identifies the BlackBerry that this command

is intended to.

Q.   The destination address.  The destination.  How about that?

A.   It identifies the BlackBerry that this kill command is intended for.

Q.   So it knows where it's going, correct?

A.   If nothing else happened, the PIN command would not -- the PIN command means nothing to the cellular network.  So there's more conversion that takes place after this leaves the BlackBerry, so the command could eventually get routed through the cellular network, arrive at the correct cell tower and received at the correct BlackBerry, since many BlackBerrys are being sent by that tower.  But without the PIN it wouldn't get there.

Q.   So now it gets to the dispatcher when it gets packaged in the GME, correct?

A.   No, it gets packaged in the GME in the BlackBerry Policy Service and the BlackBerry Dispatcher.  As I explained this process earlier, it's possible to send data using fewer bits than were originally -- than were in the original message.  It's a process called compression.  Like human speech, we can shorthand our speech.  We have people that do this when they text.  It doesn't look pretty.  But it's pretty standard.  Same

with data communication with too many bits.  So compression takes place and the compressed bits are encrypted, so now no one can read them.  That happens in the BlackBerry Dispatcher.

Q.  So, again, the GME datagram that's going to get sent includes the payload, it includes the PIN, it includes the compressed and in fact encrypted payload, correct?

A.  Well, you said payload twice.  It includes the compressed encrypted and a header.

Q.  And the header includes the destination address, and the -- excuse me, the handheld it's trying to get to, and it includes information about the BES that is actually sending it, correct?

A.  I believe that's the case.

Q.  So like the envelope, you have the sender information about the BES, you have the destination address about the BlackBerry handheld, correct?

A.  For sure it has the compressed encrypted payload and the PIN, and I believe it also identifies the BES.

Q.  You close the envelope, Mr. Cherry said, that makes it secret, which is the encryption and the compression, correct?

A.  Well, it's encrypted and compressed.  And there is a header, and now it's ready.  You don't need anything else.  Now you send it the BlackBerry route.

Q.  Dr. Madisetti said that process is initiating wireless communication.  You don't agree with that?

A.  No, I don't agree with that.

Q.  You also heard that initiating wireless communication is completed because the next step or one of the processes before it goes out the port is checking threshold conditions.  Did you hear that, sir?

A.  That was Dr. Madisetti's opinion, and I disagree with that.

Q.  But you heard Dr. Madisetti say that in his opinion the initiation step or the wireless communication is initiated in the BES.  You heard him say that?

A.  Well, I heard it, I think that's the result of what he said.  What he said is initiating wireless communications is one of two things:  Preparing the GME message, which takes place entirely within the BES; and making this least cost routing decision, which happens in the BlackBerry router, also within the BES.

Q.  Correct.

A.  So those two things that Dr. Madisetti identified as initiating wireless communications between the BES and the device all takes place within the BES.

Q.  So his opinion is, wireless communication is initiated in the BES, you heard that?

A.  I'm not sure I understand the question.  His opinion

is that preparing the GME packet is in -- somehow initiating wireless communications, even though there has been no wireless communications.  But that all takes place within the BES.

Q.  And then he also said that before the initiation step, the initiation step is completed within the BES, you heard him say that?

A.  Well, it must be completed inside the BES because the processes that he pointed to for initiating wireless communications are within the BES.  So it must have been within the BES.

Q.  And he identified four threshold conditions that are checked -- that are all completed within the BES?

A.  He identified four threshold conditions.  Again, you're aware, I disagree with any of those threshold conditions for a number of reasons.  Okay.

Q.  But you heard his testimony that the connection is established within the BES before transmission begins, correct?

A.  I'm not sure I heard him say that.  I thought he said that transmission and initiation of communications were simultaneous.

Q.  Transmission occurs when it goes out the BES, correct?

A.  Transmission occurs when it goes out the BES.

Q.   Right.   And his testimony is, wireless communication is initiated within the BES?

A.   Well, what he pointed to takes place within the BES. That I agree with.

Q.   And he identified Ports 31- and 4101 as WiFi and cellular ports, correct?

A.   He did.   3101 and 4101.

Q.   Okay.   So we've identified the disagreement on Argument Number 2.

          Now, the second argument you make relates to the WiFi.

          MR. THAKUR:   Chris, would you take that slide down, please.

BY MR. THAKUR:

Q.   Is it your opinion that the use of the WiFi system does not establish a connection because the BlackBerry handheld let's the BES know that it is available?

A.   It's my opinion that when the RIM system is operated over a WiFi network, there is in fact a connection established.   The wireless communications is in fact initiated between the BlackBerry and the BES before the step of transmitting the contents of the mailbox takes place.

          But that connection is started by the BlackBerry, and the Court's -- the claim says that that connection

has to be started without a request from the device.  So that cannot be the claimed step of establishing a connection, because it's started by the BlackBerry, and the claim says it cannot be started by the BlackBerry.  Or it cannot be started from the handheld device.

MR. THAKUR:  I want to put up on the Elmo what is Claim 1 of the '917 patent.

BY MR. THAKUR:

Q.  Do you recognize that claim?

A.  I do.

Q.  Again, I want to crystallize the issue, and then we'll talk about the evidence.  Okay.

Your testimony is that for the WiFi system, for the WiFi system, the connection is established without a request from the wireless device because it occurs before the -- you see the Elmo -- without a request from the wireless device performing the steps of, and it is your testimony that this claim is not infringed because the BlackBerry handheld lets the BES know that it is available before that step is performed, correct?

A.  Before what step is performed?

Q.  I'm saying, when does the BlackBerry handheld let the BES know that it is available for transmission?

A.  Now we're talking about WiFi?

Q.  Actually, forget cellular, we're done.  For the rest

of the time we're going to talk about WiFi.  Now we want to hear about the other argument because you have to prevail -- our argument is both WiFi and cellular infringe.  We've heard the arguments on that about cellular.  The Court can make its decision.

We'll focus now on WiFi.

Explain to me why the use of the WiFi system does not infringe Claim 1 of the '917 patent.

A.  Okay.  If you look at the delivery -- delivering the command substep -- I apologize for being repetitive, I've testified to this several times, but you asked.  Delivering the command substep is decomposed into three substeps:  Establish a connection, between the wireless device and the server; transmitting the contents of the mailbox from the server to the wireless device; and accepting the contents of the mailbox at the wireless device.

Now, notice that the command step containing those three substeps must be performed without a request from the wireless device.  We see that, "without a request from the wireless device" further up in this list of limitations.  And all of the steps beneath that point, establish a mailbox, placing a command, delivering the command, executing the command, must all be performed without a request from the wireless device.

And we have a construction that is without a request from the wireless device. And I'm paraphrasing because I don't have the construction in front of me. But the Court construed that without a request from the wireless device means no code, no signal, basically nothing can be sent from the wireless device that causes the resulting step. This has to be without a request of any type from the wireless device.

And in fact, in WiFi there is a connection established between the wireless device and the server. It would otherwise meet the claim construction of establishing a connection, except it fails on "without a request" because that connection is always initiated by the BlackBerry. Always.

In fact, not only do the RIM's documents tell us that, but as I testified yesterday, it can be no other way. There's no way for the BES to initiate that connection. That connection certainly exists. It's a TCP connection. There's a handshake involved. The BES cannot possibly initiate that connection because it doesn't know where the BlackBerry is, it wouldn't know what address to put on the initial handshake message to cause -- the BES has an interface to the Internet. The BlackBerry can be hanging anywhere in the world on the Internet. The BES has no idea where that is.

So it's not until the BES hears something from the BlackBerry -- namely, the first step of this three-way handshake -- that the BES has any awareness of where the BlackBerry is.  When that initial request message, tells the BES, By the way, if you want to communicate back to me, here's the routing number that you must use in order to reach me.  So it has to start at the request of the device.  It can be no other way.

Q.  I've been very patient with you, you've answered very long narrative answers to my questions.  I asked you a very narrow question.

My question is, does the device connect from the BlackBerry handheld using the WiFi system to the BES using the WiFi network?  Correct?  That was all I was trying to get to.  Your argument is -- let's just start from the beginning.

Your argument is that the use of the WiFi system does not infringe because the connection is made from the handheld to the BES.  That's a yes or no question.

A.  I'm not sure I understand the question.  But if it was to the effect, is it my position that the use of the RIM system over WiFi, doesn't infringe because the connection is established with a request from the handheld, rather than without a request?

Q.  That's it.

A.   The answer is yes.

Q.   That's all I'm trying to get to.  So if you would be kind enough to focus in on the question.

So that connection between the BlackBerry handheld and the BES can only take place after the BlackBerry handheld has first registered with the BES, correct?

A.   That's right.

Q.   So we're at a scenario where transmitting registration --

A.   Well, I say -- I spoke a little bit too quickly. That can only happen after the BlackBerry has been activated by the BES.  It has to be -- first have been activated.  It's not registration.  That's an activation.

Q.   You haven't argued that the lack of registration is a basis for noninfringement, have you, sir?

A.   No, I -- I have an opinion on that, but I wasn't asked questions about that here in court.

Q.   Doctor, my question is very clear.  In your direct testimony you did not express an opinion that the use of -- that the accused products do not infringe because they failed to register in accordance with Claim 1?

A.   That's correct.

Q.   So we have registration between the BlackBerry

handheld and the BES, correct, before the WiFi
connection can be established?

A.   Well, I prefer to call that activation.

Q.   All right.  Activation.  So the device has been
activated from the BlackBerry handheld to the BES.  Now
the IT policy has been set and the device is plugging
along in its normal use.  Are you with me so far?

A.   So far.

Q.   Now, I go to Starbucks at 9:00 a.m. in the morning.
Starbucks has a free WiFi system.  My BlackBerry
handheld -- if it's connected to the BES -- activated on
the BES -- will use the WiFi system to get to -- to
inform the BES that it is available via WiFi, correct?

A.   If it's a WiFi-enabled BlackBerry, and the user
chooses to connect to the BES via, it will request the
BES to open up the TCP connection.  It will send a
message to the BES asking the BES to open a TCP
connection.

Q.   Does the user do this on his BlackBerry?

A.   This is all done on the BlackBerry, yes.

Q.   Does the user have to take any action for that
connection to be established?

A.   It depends.  It may or may not.  If the BlackBerry
recognizes this particular WiFi network, if various
features were used.  In fact, because it's outside the

firewall there had probably -- the end process may involve logging in a few things that would need to take place.

Q.   The user could do that?  Or is it automatic?

A.   It could be either way.

Q.   It could be automatic?

A.   It could be either way.

Q.   Stick with the automatic option.  So I'm in the Starbucks at 9:00 a.m. in the morning.  I have a BlackBerry that's connected to the BES.  Are you with me so far?

A.   Well, no, not with you so far.  So the device already established -- asked the BES to establish a TCP connection?  You said there's already a connection.

Q.   One part at a time.  I have a BlackBerry that is registered on the BES?

A.   Or activated.  Okay.

Q.   I have a BlackBerry that is activated on the BES.

A.   Yes.

Q.   I go into the Starbucks at 9:00 a.m. in the morning.  Okay.  My BlackBerry is WiFi-enabled.  Correct?

A.   Correct.

Q.   Okay.  Starbucks is a no password, open WiFi system.  Do you understand that?

A.   Well, I'm not sure.  I'm just trying to recall

whether Starbucks wants some sort of dialogue.  Just with the access line.  Not with the BES.  This is just to get on the Starbucks network.  There may be something, I'm not sure.

Q.  Let's assume there's not.  Let's assume I'm going with the automatic option.  At 9:00 a.m., can my BlackBerry handheld advise the BES that I'm available?

THE COURT:  What's the question?

MR. THAKUR:  Your Honor, I'm just trying to establish the connection that he is saying exists.

BY MR. THAKUR:

Q.  So at 9:00 a.m. at Starbucks, before any command is sent, can the BlackBerry handheld inform the BES that the WiFi system is available and open a port for WiFi?

A.  Well, what will happen -- I just explained.  The BlackBerry will first associate with Starbucks access point.  The first thing.  And by the way, that also is started by the device.  Then, the next thing is the BlackBerry will attempt to establish a TCP connection to the BES.  So using Starbucks' WiFi network, and from there, it's over the Internet to wherever the BES may be.  The BlackBerry sends a TCP open connection request message.

Q.  All right.  So let me just mark on the patent, "9:00 a.m."  So at 9:00 a.m. the WiFi has informed the

BES that I'm available using WiFi.  Okay.

Now, let's talk about a scenario where this individual loses the BlackBerry handheld at the Starbucks.  Could you accept that hypothetical scenario?

A.  Yes.

Q.  Okay.  Now, at 2:00 p.m., that individual calls his IT administrator and says, I have lost my BlackBerry handheld, would you be kind enough to lock and wipe it.  Are you with me so far?

A.  Yep.

Q.  Now, the IT administrator is going to go on to the user Configuration Database, correct?

A.  Yep.

Q.  On that Configuration Database the person is going to enter a queue in the ITAdminQueue with a PIN and a "kill handheld."  Correct?

A.  It's going to put in a work order to have that BlackBerry wiped.  Locked, to have the BlackBerry taken care of.

Q.  And that work order is going to get pulled by the Policy Service, going to turn into a payload, turn into a GME datagram with a destination and a sender address, correct?

A.  That's correct.

Q.  In there will be the command "kill handheld"?

A.   That's correct.

Q.   Then the threshold condition of least cost routing or the other three or four that Dr. Madisetti identified is going to be checked, correct?

A.   I don't agree that any of those are thresholds.

Q.   I'm talking about -- just focus on the --

A.   In your case, the transmission would then go out over the direct connect, since that exists, by virtue of the BlackBerry having opened the TCP connection to the router.

Q.   So the initiating wireless communication was getting a GME datagram, deciding the port to send it out, as Dr. Madisetti said would be the completion of the initiating step, correct?

A.   I'm sorry, say that again.

Q.   I'm saying, if you took Dr. Madisetti's argument for why there was infringement on the connection, you would accept that that "kill handheld" command would turn into a GME datagram, is initiating wireless communication. Do you understand that was his testimony?

A.   So now you're asking me to assume Dr. Madisetti's hypothesis?

Q.   That's correct.

A.   His theory that creating GME message is somehow initiating wireless communications between the

BlackBerry and the -- between the BlackBerry and the BES?

Q.  Correct.

A.  I understand now.  I disagree with that, but I understand.

Q.  Understood.  I'm just trying to focus in on one argument at a time.  Because it gets messy when you talk about a lot.

Then the least cost routing threshold condition will be checked.  And when it is checked at that point, both Port 4101 and 3101 will be available because WiFi is -- has checked in with the BES, correct?

A.  Well, the router will check to see if that direct connection exists.  Dr. Madisetti called that a threshold.  I do not.

Q.  He called that the completion of the initiating step, correct?

A.  Well, that's a little bizarre, and here's why.

Q.  Dr. Acampora, my question was --

A.  The GME package is the initiating -- is somehow initiating wireless communication.  It's only after that it is sent to the router that the least cost routing decision is made, and he says that's a threshold.  But the threshold is what triggers the creation of the packet.  So he's got that backward too.  I mean you

can't have -- if he says creation of the packet, that happens back at the Policy Service, was somehow establishing a connection, but the claim says, "Wherein the threshold -- wherein establishing the connection is based on the threshold condition," the threshold condition that he point to, the least cost routing, happened after the establishing a connection.  So I actually don't understand that scenario.

Q.  I'm saying, if the jury bought Dr. Madisetti's example, then his connection would have nothing to do with your 9:00 a.m. connection; is that correct?  If they accepted his argument as to what constitutes establishing a connection?

A.  So the GME package is establishing a connection, somehow that happened before the threshold condition of least cost routing is applied, and then it was sent.

Q.  Okay.

A.  Then that would have happened after 9:00 a.m.  Right.

MR. THAKUR:  Your Honor, actually this is a terrific point to take a break.

THE COURT:  I think so.  So we went to Starbucks at 9:00.  It is now 10:25.  We'll come back in about 15 minutes.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. THAKUR:  Yes, sir.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  You may resume your cross-examination.

MR. THAKUR:  Chris, could you kindly put up Acampora Demonstrative, page 76.

BY MR. THAKUR:

Q.  Dr. Acampora, in addition to your noninfringement opinion, did you express an opinion on invalidity as well?

A.  Yes, it's my opinion that the asserted claims were invalid.

Q.  And you believe that each and every claim is invalid; isn't that correct, sir?

A.  Each and every of the asserted claims is invalid. That's my opinion.

Q.  So with respect to your top two bullet points, it is your opinion that the United States Patent and Trademark Office got it wrong eight times, correct?

A.  Well, I believe that the examiner did not have RemoteWare, and the examiner, I testified yesterday, had

the examiner had RemoteWare, I think my words were, we wouldn't be here today.

Q.   And your second reason is that Mformation's July demonstration of its prototype invalidates the patent, correct?

A.   Well, I believe that the -- Mformation's July 24th demonstration invalidates Claim 1, and then in combination with RemoteWare and Havinis would invalidate the other claims as well.

Q.   So the demonstration in July by itself invalidates Claim 1; is that correct?

A.   That's correct.

Q.   Quickly to the threshold issue, I had the embarrassing mistake of showing you the wrong Dr. Acampora.  Can I just show this to you.

        Do you see that on the top left-hand corner it says "LexisNexis"?

A.   I do.

Q.   And it says, below it, "find exports by name."  Do you see that?

A.   Yes.

Q.   And it says "Anthony S. Acampora."

A.   I do.

Q.   And that is you, sir?

A.   That's me, but I must say --

Q.  My question was, Is that you?

A.  This is me, but I have no idea where this came from. I did not create this.

Q.  I see.  You can put it aside.

Let's focus on this issue of inability based on your demonstration.  You realize the July 24th -- the July demonstration, invalidity demonstration, requires that this jury first make an additional determination with respect to the provisional patent; isn't that correct, sir?

A.  Yes.

MR. THAKUR:  Chris, would you kindly pull up Exhibit 571, please.

BY MR. THAKUR:

Q.  Do you recognize this document?

A.  Can I see the next page?

MR. THAKUR:  Could you turn to the next page.

BY MR. THAKUR:

Q.  And let me go ahead and restate the question.

Do you recognize this as Mformation's provisional patent application?

A.  It appears to be, yes.

Q.  And it was filed in December of 2000.

A.  Yes.

Q.  Okay.  For the July demonstration to invalidate the

patent, the jury, the Court must first determine that this patent, provisional patent application, did not disclose all of the invention; isn't that correct?

A.   I'm not sure what the sequence is, but one would need to conclude that this patent did not disclose all of the elements of Claim 1.

Q.   So in July of 2000, the demonstration had to include all the elements of Claim 1, correct?

A.   Yes.

Q.   And in December, six months later, the inventors would have had to leave out one or more of the elements of Claim 1; isn't that correct?

A.   That's my opinion that happened.  It was not disclosed in the provisional application.

Q.   Do you see any logic in demonstrating an element -- a prototype that had everything, and then six months later filing with the United States Patent and Trademark Office a provisional patent application and not putting everything in there?

A.   I can't explain why, but I can tell you all the elements are not in the provisional application.  What was going through Dr. Kushwaha's mind or his patent attorney's mind, I can't even speculate on, but in my opinion, all the limitations are not in the provisional application.

Q.   So, first, the provisional application has got to fail for you to have the July demonstration, but now let's talk about the July demonstration of the prototype.

MR. THAKUR:  Could you -- could you turn to Acampora Demonstrative page 76, please?

BY MR. THAKUR:

Q.   So you have testified that the July 24 demonstration included everything in Claim 1; isn't that correct?

A.   Yes.

Q.   I want to use the demonstrative one more time.

(Counsel approaches easel)

Q.   I have written two columns.  I want to look at the evidence.  Now, this only matters if the jury -- if the Court accepts the proposition that in December of 2000 they didn't disclose all of the patent to the USPTO. You understand that, right?

A.   Yes.

Q.   This only matters in that scenario.  So we are going to take the hypothetical scenario.  The December 2000 application didn't mention.

In that scenario we'll balance the evidence from what RIM has presented and what Mformation has presented with respect to the July testimony on demonstration. Okay?

Your testimony that the patent is invalid is based on Dr. Kushwaha's December 9, 2010 deposition; isn't that correct?

A. That's correct.

Q. Did you hear Mr. Gabe Beltramino testify in this trial?

A. I did.

Q. Do you remember Mr. Gabe Beltramino said, I'm the guy who wrote the prototype server side software?

A. I did.

Q. And he said that server side software sits at Mformation's facilities, it was accessed through the Internet. Do you remember him saying that?

A. Something to that effect.

Q. So he testified that the -- that Mformation's prototype did not include several elements but at least wireless registration. Did you hear that testimony?

A. I did.

Q. Did you hear Dr. Kushwaha testify in this case?

A. I did.

Q. Did you hear Dr. Kushwaha testify that in his first deposition in April of 2010, he said that the prototype did not include wired registration, and in fact it included hard-coded registration. Did you hear him testify to that effect?

A.  Something to that effect.

Q.  Did you hear Dr. Kushwaha testified December 9th, 2010, incorrectly with respect to all the elements of Claim 1 being present in the prototype?  Did you hear that testimony?

A.  Could you repeat that, please?

Q.  Did you hear Dr. Kushwaha testify that on his -- at his December 9, 2010 deposition, he misunderstood and testified that the prototype included every element of Claim 1 in the patent?  Did you hear him say that?

A.  Something to that effect, yes.

Q.  Did you hear Dr. Kushwaha say, I'm sorry, I made a mistake?

A.  I believe so.

Q.  Did you hear Dr. Kushwaha say, I checked and at my next deposition, I clarified that the prototype did not include wired registration and threshold condition?  Did you hear him testify to that effect.

A.  I did.

Q.  You agreed yesterday with Mr. Matuschak:  If I want to understand how a software product works, what I need is to have control of the source code so I can open it up and look at it?

A.  In some circumstances, yes.

Q.  And you agreed with that yesterday, sir?

A.   In some circumstances, yes.

          MR. THAKUR:  Could you open up Trial

Exhibit 2193.

BY MR. THAKUR:

Q.   Do you recognize what this is, sir?

A.   It appears to be source code.

Q.   Did you hear testimony that this is the source code

for the prototype?

A.   I heard testimony concerning source code for the

prototype.  I can't tell you whether this is that source

code or not.

Q.   Does this prototype source code include wireless

registration?

A.   Well, I don't know if this is prototype source code.

And I don't know if it includes wireless registration.

I don't know.

Q.   Don't know because you didn't look at it; isn't that

correct, sir?

A.   Well, I don't read source code.  That's why I don't

know.

Q.   Dr. Acampora, when you expressed an opinion, did you

make any reference to Mr. Beltramino's testimony?

A.   Say again.

Q.   When you wrote your opinion that the patent is

invalid based on Dr. Kushwaha's December 9 testimony,

did you take a look at Dr. Kushwaha's April deposition?

A. April 2000 ...?

Q. '10?

A. '10. I did.

Q. Yet you made no mention of it, did you, sir?

A. Well, I based my opinion on his testimony given as Mformation's spokesperson, his 30(b)(6), which was later in time. But it was because it was his 30(b)(6).

Q. So was the April deposition, was 30(b)(6). Do you remember that?

A. I do.

Q. So don't you think that if someone got it right, said something different the second time, you might say, Hey, answer the question, maybe I need to explore this? You just take the second deposition and ignore the first?

A. His answers were unequivocal. So I accepted them. That's correct.

Q. And did you consider the February deposition?

A. Which?

Q. The deposition after the December 10th, 2000[sic], where he said, I got it wrong, let me clarify the exact date. Did you look at that deposition testimony?

A. I believe I did.

Q. And did you reference that in your opinion?

A. That, as I recall, was not a 30(b)(6) deposition.

Q.   It was a personal deposition, correct?

A.   That's my recollection.

Q.   But it was a deposition, correct, by Dr. Kushwaha?

A.   That it was.

Q.   Did you have somebody else look at the prototype source code to see if it had wireless registration?

A.   No, I did not.  I'm not sure it was available, but I did not.

Q.   You've got an army of lawyers at RIM.  You could have picked up the phone, and said, What is in the source code?  Did you do that, sir?

A.   I did not.

Q.   I don't fault anyone making money.  Okay.  That's the American way, they're entitled to it.  You're paid how much, sir?

A.   Say again?

Q.   How much are you paid an hour?

A.   $575 an hour for my time.

Q.   You said 670 hours?

A.   Yes.

Q.   $385,000 in this case?

A.   Over three and-a-half years, that's correct.

Q.   You're trying to invalidate a patent, that is your assignment.  Is it not, sir?

A.   No, my assignment is to render opinions.

Q.   Okay.  How about the extra two minutes of billable time to ask somebody and say, Look at the prototype code?

A.   I didn't do it.  I am not sure if it was available.  I'm not aware that it was available.

Q.   But you didn't do it?

A.   I didn't do it.

Q.   You didn't instruct anyone to do it?

A.   No.

Q.   Do you recognize this patent?  This is the patent that was issued to Dr. Kushwaha.  Correct?

A.   I don't know.  I can't see that far away.

Q.   Take my word for it.

A.   Okay.

Q.   To invalidate a patent you understand there is a higher evidentiary burden.  Do you understand that, sir?

A.   Higher evidentiary burden than what?

Q.   Than to prove infringement.

A.   That I do.

Q.   The defendant has to prove invalidity by clear and convincing standard, do you understand that?

A.   Yes.

Q.   Which is, as the Court will instruct later, means it's highly probable that it is invalid; isn't that correct?

A.  Yes.

Q.  Highly probable.  To prove that the jury has to include that the provisional patent application was not including all the claims of the -- Claim 1 of the '917 patent?

A.  Yes.

Q.  The jury has to presume that, balance that evidence, including the source code, they must rely on this (indicating).  Correct?

A.  The jury will rely on, I would assume, all of the evidence that it's heard.  And make a determination.

MR. THAKUR:  Your Honor --

BY MR. THAKUR:

Q.  Actually, Dr. Acampora, do you know Dr. Kushwaha?

A.  No.

Q.  Do you remember working at AT&T Bell Labs?

A.  I worked at Bell Labs for 20 years, yes.

Q.  Do you recall referring to it as "the preeminent research organization in the world of communication"?

A.  I've probably said that more than once.  Bell Labs basic research, I believe that to be the case.

Q.  And that is a former colleague sitting right there, isn't he, sir?

A.  I don't know if we -- if that's the case.  I left Bell Labs in 1988.  I don't know when Dr. Kushwaha

arrived.  I don't know if Dr. Kushwaha was in basic
research.  I don't know what he did at Bell Labs.

Q.  You're invalidating your colleague's life work based on one deposition testimony where he said, I am sorry, I made a mistake; isn't that correct?

A.  That is not correct.  I have other reasons to believe that the patent is invalid.

Q.  Based on public use.  Based on public use.  One deposition testimony where he said he got it wrong, and I'm sorry, I made a mistake, you're invalidating his life's work?

A.  I don't know if that's his life's work either, but I do believe that based upon his testimony, his unequivocal testimony in his December 9th, 2010 deposition, he testified that all of the elements were present in the demonstration.

And that's what I base my opinion on.

Q.  Okay.  Let's move on.  Your next basis --

MR. THAKUR:  Let's go back to Dr. Acampora's Exhibit 76.

BY MR. THAKUR:

Q.  You also gave another reason as to why this patent is invalid; isn't that right, sir?

A.  I did.

Q.  RemoteWare.

A.   Correct.

Q.   Your position -- is it correct that your position is that Version 3.1 of the RemoteWare product invalidates the prior art -- invalidates the '917 patent?  Is that correct?

A.   The fact that the RemoteWare product was known and used, yes.

Q.   RemoteWare Version 3.1, correct?

A.   3.1, yes.

Q.   So the rest of this morning when I refer to RemoteWare, you'll agree with me that we're talking about 3.1, correct?

A.   Fine.

Q.   Did you -- one second.

        I'm enjoying these boards (at easel again).

Q.   Did you inspect version -- the RemoteWare product?

A.   Well, that depends on what you mean by "inspect."  I reviewed the manuals and I reviewed deposition testimony given by XcelleNet engineers.

Q.   I'll get to you, Doctor.  I'll never cut you short.  You've got to tell me whether you looked at the product of RemoteWare.

A.   If that's what you mean, I did not.

Q.   Did you go somewhere and take a look at the operation of RemoteWare?

A.   That I did not.

Q.   An army of people on RIM's side, did you ask anyone to get you access to the RemoteWare product?

A.   I did not.

Q.   You heard Mr. Matuschak:  If I want to understand how a software product works, what I need is to have control of the source code so I can open it up and look at it.  You agreed with that, correct?

A.   In the circumstances that it was stated, I agree with that.

Q.   Did you take a look at the source code for the RemoteWare product?

A.   I did not, in the circumstances.

Q.   Let's talk about what you did do.  You looked at a handful of documents -- actually, you looked at the documents that have been identified by RIM's counsel in this case to describe how RemoteWare works.  You did do that, right?

A.   I did do that, yes.

Q.   And you relied on the testimony of the witness, Mr. Chris Foley, yesterday, as the sole basis for actual -- the fact that it was actually wirelessly used; is that correct, sir?

A.   No, that's not true.  I formed my opinions before Mr. Foley testified here.  I relied upon his deposition

testimony.  I relied upon Mr. Owen's deposition testimony.  I relied upon RemoteWare documentation.  And all of this told me that it was publicly known how to use this wirelessly.

Q.  We saw your slide yesterday.  You saw -- you relied on Mr. Foley's use of RemoteWare at Jack in the Box in San Diego over a satellite network, did you not, sir?

A.  Among other things, yes.

Q.  Mr. Foley, satellite network?

A.  And other things.

MR. THAKUR:  Chris, would you bring up Exhibit 523.

BY MR. THAKUR:

Q.  Do you recall seeing this document before?

MR. THAKUR:  Highlight the main -- thank you.

Q.  Do you see this document where it says:  "McCaw Wireless Data Division Strategic Alliance With XcelleNet to Bring New Applications to the Mobile WorkersMobile Workers Using XcelleNet RemoteWare, and McCaw's AirData Will be Able to Remotely Query Databases, Check Inventories, Update Entries and Execute Orders in a Single Session."

Do you see that, sir?

A.  I see that.

Q.  I'd like you to focus on the words, "will be able."

When I read the words "will be able," would you agree with me that means that it's not currently being done, it will be done?

A.   In terms of deployment and operation.  In terms of knowing it had the capability of doing this, it was known to be able to perform the steps, in that sense I'd agree.

Q.   For the sense of public use, you have to show that it was done.  Based on this document, as of that date, McCaw AirData had not yet been able to remotely query databases, check inventories and so on?

A.   I think there may be a misunderstanding.  It's my opinion that not only was it publicly used, but it was known how -- the attributes of RemoteWare system were known.  That was the disclosure that I relied on.

Q.   We'll focus on the public use because we'll leave it for the lawyers.

Right now it says "will be able."  Would you understand and agree with me as of that date it had not been done?

A.   Future.

Q.   Future.  Okay.  So in no evidence that was actually done?

A.   As far as the McCaw network is concerned, plus it doesn't speak to the satellite.

Q.   Do you remember the patent I just showed you, that's the patent you're trying to invalidate, right?

A.   You said it was.

Q.   Okay.  You've got to prove it by clear and convincing evidence?

A.   That's my understanding.

Q.   Did you ever pick up the phone and call McCaw?

A.   No.

Q.   You didn't do it?

A.   Nope.

Q.   You pick up the phone --

A.   I don't think McCaw exists.

Q.   You pick up the phone and call the army, the brigade, and say, Hey, can you check in with McCaw?  Did you do that?

A.   The army?

Q.   Did you ask any RIM lawyer or personnel to call McCaw and see if it was done?

A.   I did not.  And I don't know if it would have been possible.  That not being the reason it wasn't done, but I'm not sure McCaw even exists, it was gobbled up by somebody along the way.

Q.   Did you research whether McCaw has been gobbled up?

A.   I know much of McCaw's cellular network was acquired by AT&T many years ago.

Q.   You worked at AT&T.  Did you call AT&T?

A.   After I left AT&T.

Q.   You didn't call anybody, did you, sir?  You didn't call anybody?

A.   No.

Q.   Do you recall relying on the testimony of Mr. Foley yesterday -- actually do you recall listening to Mr. Foley testify yesterday?

A.   I listened to Mr. Foley's testimony, yes.

        MR. THAKUR:  Would you bring up Acampora Demonstrative slide 24, please.

BY MR. THAKUR:

Q.   Do you see that testimony?

A.   I do.

Q.   Do you see his testimony, the RemoteWare Version 3.0 or 3.1 does sessions wirelessly in the timeframe mid-1999 and earlier, and he said those were done over the Hughes satellite network?

A.   Yes.

Q.   That's what he testified?

A.   That's what he said.

Q.   Based on memory from 13 years ago.

A.   This is what he testified to under oath at his deposition.

Q.   Not one iota, not one document to prove that was

done.  Based on memory alone, sir?

A.  Are you asking me or --

Q.  I'm asking did you hear him identify one document, one piece of evidence, other than his memory alone, about what was done and when it was done?

A.  No.

Q.  You're invalidating a patent by a higher evidentiary burden, you understand that?

A.  I do.

MR. THAKUR:  One moment.  Give me one moment, your Honor.

(Pause in the proceedings)

BY MR. THAKUR:

Q.  Okay, Hughes satellite networks.  You actually showed a demonstrative how it works.

A.  Could you rotate that?

Q.  Sure.

Okay.  All right.  You see that demonstrative?

A.  Yes.

Q.  It's the bottom one with the satellite network that Mr. Foley said was implemented at Jack in the Box in San Diego.  Do you remember him saying that?

A.  Yes.

Q.  You understand that the patent claim requires wireless registration?

A.   Yes.

Q.   It requires wireless registration from the device to the server?

A.   Yes.

Q.   What if I was to show you that it was technologically not possible -- technologically not possible -- to send information from the dish network wirelessly to the server, would you change your opinion today, sir?

A.   I don't know -- I'd need to see what you're talking about.

Q.   One second.

Do you see this document?

THE COURT:   Counsel, can counsel approach.

(At the sidebar, out of the hearing of the jury and the court reporter.)

BY MR. THAKUR:

Q.   Dr. Acampora, I need to make sure the record is absolutely clear.  Mr. Foley testified that he used the Hughes satellite network at Jack in the Box, correct?

THE COURT:   I'm not sure it's necessary for this witness to remember all that.  But you can ask him to assume it if you want to use that as the basis for your question.

BY MR. THAKUR:

Q.   So if you could turn to page 2, of the document I've

presented to you, it actually shows the Hughes satellite network.  Do you see that, sir?

A.  This document, I'm not sure what the source is, or what the date is, but it pertains to DirectPC.com.

Q.  You see on page 2 where it says:  "DirectPC is a product and services of Hughes network system"?

A.  I do.

Q.  I'd like to read to you the paragraph, first paragraph, second line.

        MS. DeBRUIN:  Objection, your Honor, lack of foundation.  He hasn't established that this system is the Hughes satellite system used with RemoteWare.

        THE COURT:  Sustained.

BY MR. THAKUR:

Q.  To your knowledge, could the Hughes satellite network send registration information wirelessly through the satellite to the device?

A.  The Hughes network, Hughes satellite network that Mr. Foley referred to?

Q.  There's only one Hughes satellite network, correct?

A.  I don't know if that's the case at all.  But the one that Mr. Foley referred to, I believe, has two-way satellite capability.

Q.  Do you at least agree that this document's description of the Hughes satellite network says that

the communication over the satellite was one way, from the server to the --

MS. DeBRUIN:  Objection, your Honor, lack of foundation.

THE COURT:  Sustained.

MR. THAKUR:  I'm asking what this document says, sir.

THE COURT:  But you need a foundation that that's relevant to the jury hearing it.  Because if it's undated, and the witness says, I can't tell what date it is, or whether it is -- because it's of a product, as my understanding, not the network.

MR. THAKUR:  I can get the date.

BY MR. THAKUR:

Q.  Can you look at the bottom left-hand side, please.  Do you see what the website is -- actually, I have it right at the top, it says "19 captures."  Do you see the date on the top left-hand corner, it says, 11 October '99 through 12 April 2001?

A.  I do.

Q.  So this is in the timeframe, as late as 2001, correct?

MS. DeBRUIN:  Objection, your Honor.  This is outside of even the time period that Dr. Acampora was looking at.

MR. THAKUR:  No, it actually is because it can be -- as late as 2001, it was not done.  It was not technologically possible.  So, your Honor, the fact that it's after is favorable to our point.

THE COURT:  Well, to use this document as impeaching on the capability of a RemoteWare system, you need to put it into evidence.  And then -- because what you're doing is you're asking the witness if this is reliable.  I guess your question is, does it change his opinion.  But you can't ask him an opinion about the truth of the document unless you establish a relationship between the witness and the document such that he is able to do that.

So the foundation objection that's made, as I understand it, you haven't laid a foundation that he's competent to testify about the data in the document.  If you lay that foundation, then perhaps we can move on.

BY MR. THAKUR:

Q.  Do you understand satellite networks, how they operated 1999 through 2001?

A.  I worked in satellite systems research for a number of years.

THE COURT:  Can you pull the mic back toward you.  We've lost you.

THE WITNESS:  I'm sorry, your Honor.

Yeah, I worked at Bell Labs in basic research on satellite communications, I know how they work.

BY MR. THAKUR:

Q. And Hughes network was the -- one of the most significant, if not the most significant, satellite network in that timeframe?

A. I wouldn't know that, no.

Q. It's a satellite network; isn't that correct?

A. It may have been more than a Hughes satellite network. Hughes manufactured satellites and then offered a network using their own satellites, and offered satellites to others making their own networks. Hughes Electronics was a major satellite vendor to many, Hughes satellites.

Q. It's your testimony that this document does not change your opinion that Mr. Foley might have deployed over a satellite network in San Diego where it was bidirectional; is that your testimony?

A. Yes.

Q. Despite the fact that what you read says it's not possible?

A. Well, this dot-com may have had servers over a Hughes satellite and not have an uplink capability, but satellites have uplink capability. This document just tells me there was something called DirectPC.com in

which the return link was by telephone.  That does not say that the Hughes satellite network does not operate with bi-directivity.

Q.  I'll ask you the same question.  Did you pick up the phone and call Jack in the Box in San Diego?

A.  I did not.  I wouldn't know which Jack in the box to call, but I did not.

Q.  You're invalidating the patent.  It would be nice to have the evidence, wouldn't it, sir?

A.  I believe I have the evidence.

Q.  Did you pick up the phone and call Jack in the Box?

A.  I did not.

Q.  Did you ask anyone to pick up the phone and call Jack in the Box and say, Hey, how did you implement this?

A.  I did not.

Q.  Do you know if RIM actually knew about XcelleNet and RemoteWare?

A.  Well, based upon testimony that I heard here today, in the relevant timeframe it would appear that RIM knew about the RemoteWare and XcelleNet.

Q.  Do you know that RIM's employee discussed -- RIM's employee, Mr. Tyler Lessard, was deposed in this case?

A.  I need to check to see if I knew of that.  I might know of that.  I don't know.

Q.  You don't remember?

A.   I don't remember.  I would have to check my report to see if it was listed among the items I considered.

Q.   Do you remember whether Mr. Lessard was asked to grant access to XcelleNet to RIM's private APIs?

A.   Can you ask that one more time, please.

Q.   Do you recall whether Mr. Lessard testified that XcelleNet asked RIM to grant access to their private APIs?

A.   I don't know that.  It might have happened.  I don't know.  I don't know if I read his deposition.

        MR. THAKUR:  Could you play the Tyler Lessard deposition from 6/23, page 231.

            (Whereupon, the excerpt of the videotaped
            deposition of Tyler Lessard, dated June 23,
            was played.)

BY MR. THAKUR:

Q.   Do you know if Mformation asked RIM for access to the private APIs to deploy their system?

A.   I guess I missed the lead in to what was being discussed XcelleNet had access to.

Q.   My question was, isn't it true that RIM knew about XcelleNet?

A.   I believe that's the case, yes.

Q.   Is it not true that RIM -- isn't it true that XcelleNet asked RIM for access to their private APIs?

A.   That I don't know.

Q.   You just saw Mr. Lessard.

A.   I didn't see what -- that's the point.  I didn't see what the lead in was.  Apparently Remote was denied access to something.  I'm not sure what that was.  Unless it went by too fast and I just didn't see.

Q.   It's important enough, let's replay it.

(Deposition excerpt of Mr. Lessard replayed.)

A.   The "such access"?  That's the part that was missing.

Q.   Maybe we'll give you context when we go further.

Do you know if Mformation asked RIM for access to their private APIs?

A.   Based upon what I heard here today, I believe the answer is yes.

Q.   Do you know if they were granted such access?

A.   I don't remember.

MR. THAKUR:  Chris, help us out.

(Deposition excerpt of Mr. Lessard played.)

THE WITNESS:  Okay, so we're talking about the same, "such access."

BY MR. THAKUR:

Q.   Correct.

A.   Then an exception was made for Mformation and that exception was not made -- or the exception was for XcelleNet.

Q.  You've heard evidence in this case about RIM and having some interest in Mformation's product and services in 2000, 2001, 2002?

        MS. DeBRUIN:  Objection, your Honor.

        MR. THAKUR:  He was present at trial, your Honor.

        THE COURT:  What's the basis of the objection?

        MS. DeBRUIN:  Lack of foundation.

        THE COURT:  Overruled.  You can answer that yes or no.

        THE WITNESS:  I'm aware that there was some dialogue between RIM and Mformation.

BY MR. THAKUR:

Q.  And you heard testimony that Mformation -- you heard testimony that RIM evaluated XcelleNet as well?

A.  Yes.

Q.  You heard testimony in this case that RIM considered acquiring Mformation's product?

A.  Well, I heard some discussion that that was a consideration.  But my understanding is that this did not happen.

Q.  And you heard testimony from RIM executives saying Mformation's product is better than others, do you recall that?

A.  That I'm not sure I recall.

Q.  Were you here for my opening statement where certain

e-mails were presented?

A.   I was here for your opening statement, and I saw certain e-mails, yes.

Q.   You don't recall e-mail from RIM's executives saying Mformation's product is better than others?

A.   I don't recall.  I might have.  I don't know if I viewed the materials you presented in your opening to be particularly favorable toward Mformation.

Q.   Sir, I want to summarize here in terms of your opinions.  In this case, you understand, with respect to invalidity, you're attempting to invalidate the patent by clear and convincing evidence, a higher evidentiary burden, correct?

A.   That's what I understand.

Q.   And your opinions are based solely on the review of some documents and some testimony of Mr. Foley and Mr. Owen, correct?

A.   And my background in the field.

Q.   But the evidence.  You didn't inspect the product, did you, sir?

A.   I did not.

Q.   You did not see the operation of the product, did you, sir?

A.   No -- and again, that I'm not so sure if that's a "did not."  I believe that I did by viewing, carefully

reviewing the documents and listening to the testimony of XcelleNet employees.  So I'm not so sure that I didn't inspect the product.  I think I did inspect the product.

Q.  You didn't ask anyone to get you access to the product, did you, sir?

A.  No, that I didn't do.

Q.  And in the words of Mr. Matuschak, you look at the source code; you didn't look at the source code, did you, sir?

You didn't look at the source code for RemoteWare?

A.  I did not look at the source code for RemoteWare.

MR. THAKUR:  Your Honor, I have no further questions.

THE COURT:  Very well.  Any redirect?

MS. DeBRUIN:  Yes, your Honor.

REDIRECT EXAMINATION

BY MS. DeBRUIN:

Q.  Good morning, Dr. Acampora.

A.  Good morning.

Q.  I'd like to start with invalidity, since that was one of the things that we just talked about.  I believe counsel said to you that it was technologically not possible for the Hughes satellite system to have both an

uplink and a downlink, to be able to both receive and

transmit.  Do you recall those questions?

A.  I do.

MS. DeBRUIN:  Your Honor, may I approach?

THE COURT:  Certainly.

BY MS. DeBRUIN:

Q.  Dr. Acampora, I've just handed you a document that

bears a date, May 6th, 1997.  Do you see that?

A.  Yes.

Q.  And its headline is:  "Introducing DirectPC

Enterprise Edition."  Do you see that, sir?

A.  Yes.

Q.  Do you know what the DirectPC Enterprise Edition is?

THE COURT:  You mean independent of the document,

or --

BY MS. DeBRUIN:

Q.  Do you know either based on the document or

independent of the document?

THE COURT:  That's compound, but --

MR. THAKUR:  Your Honor, he's already testified

he doesn't.  That was the company document I was showing

to him.

THE COURT:  Not this document.  This is a

different document.

MR. THAKUR:  But the same DirectPC.

THE COURT:  Well, that's your recross.  I'm not sure that that's applicable.

So what's the question to the witness?

BY MS. DeBRUIN:

Q.  Dr. Acampora, after reviewing the document that I handed you, is it -- was it technologically possible for the Hughes satellite network system to both receive and transmit?

MR. THAKUR:  Objection, foundation, your Honor.

THE COURT:  Overruled.  I think that was part of his testimony when you had him under examination.  So the objection's overruled.  At least in part.  I'm somewhat concerned as to basing it on this document.

THE WITNESS:  Well, let me give you a two-part answer.  Independent of this document, I know that it's possible to send uplink to a satellite.  Otherwise, there could be no downlink from the satellite.  So the satellite inherently has two-way capability.

Now, this is really dealing more with a service that's offered on the satellite.  And this particular service in fact had two-way capability.

BY MS. DeBRUIN:

Q.  So the Hughes DirectPC Enterprise Edition had two-way capability?

A.  That's correct.

Q.   Now, also during your cross-examination, counsel put on the screen Exhibit 523.

MS. DeBRUIN:   If we could please have that up for a minute.

BY MS. DeBRUIN:

Q.   Counsel had you look at this document and he said that this was only talking about what would happen in the future.  Do you recall those questions?

A.   I do.

Q.   Counsel did not have you look at the second page of the document, though, and I'd like to take a look at the second page.

MS. DeBRUIN:   And if we could please highlight the language at the bottom of the second full paragraph beginning "the more than."

BY MS. DeBRUIN:

Q.   Do you see in the second page of Exhibit 523, it makes reference to:  "The more than 50 pilot customers working with the wireless data division are strong evidence that McCaw's AirData service is a practical wireless network solution for a wide range of industries"?

A.   I see that.

Q.   So this wasn't just talking about future; is that right?

A.   It would appear that this was not talking -- this was talking about here and now, 50 pilot customers working with; not to work with but working with.  So this was happening.

Q.   Now, did you rely just on Hughes network's satellites being used with the RemoteWare system to show that that system is wireless?

A.   No.

Q.   What else did you rely upon?

A.   I relied upon the deposition testimony of Mr. Owen, where he said that there was other usage of RemoteWare being made over cellular -- over data networks such as McCaw's -- well, he might not have actually said McCaw's, but I definitely read in his document as support that RemoteWare was offered wirelessly, two-way wirelessly, over a network other than the satellite network; namely, McCaw's data network, which is a cellular network.  It's a cellular network designed for data.  It uses well-known data protocol known as CDPD, cellular digital packet data.  This was well known at the time.  It's a cellular data network.

Q.   Did you also rely on the Crumpler patent?

A.   I did.

        MS. DeBRUIN:  Could we have the Crumpler patent, RIM Trial Exhibit 4046, on the screen, please.

BY MS. DeBRUIN:

Q.   Is this a copy of the Crumpler patent that you relied on to show that the RemoteWare system was wireless or could be used in a wireless manner?

A.   Yes.

MS. DeBRUIN:   And could we please -- please highlight the drawing that's on the bottom of the Crumpler patent on the first page.

BY MS. DeBRUIN:

Q.   Does the drawing on the front page of the Crumpler patent show devices communicating wirelessly?

A.   They do.   The little bolt-like icons appearing sort of in the upper right corner -- yeah, those things -- that's a universal icon for a wireless link.

Q.   And you testified during your direct examination that the Crumpler patent disclosed RemoteWare; is that right?

A.   It did.

Q.   Now, one thing I noticed was missing from Mr. Thakur's examination of you, he didn't challenge any of the steps being performed by RemoteWare.   Did I miss something?

A.   I don't recall.

THE COURT:   It sounds argumentative.   Ask a more substantive question.

BY MS. DeBRUIN:

Q.   Dr. Acampora, during your cross-examination, did Mr. Thakur challenge at all your opinion that the various steps of Claim 1 of the '917 patent were performed by RemoteWare or disclosed by RemoteWare?

A.   I don't recall that he did ask any questions about my opinion regarding the steps being performed by RemoteWare.  I don't think he did.

Q.   And the only thing he focused on was the wireless nature of the RemoteWare system; is that right?

A.   Well, the wireless nature, and use of source code or something like that.

Q.   He never showed you anything that would suggest you misunderstood the operation of the RemoteWare system; is that right?

A.   That's correct.

Q.   Did you need to see the source code for the RemoteWare system in order to understand what was publicly known about its operation in the 1990s?

A.   Well, the short answer is, no.  I would rather have -- personally, I would rather have documents that describe what's going on, testimony from people who were doing it, to get an understanding of what the parts are and how they operate, as opposed to looking at source code, because source code requires reverse engineering.

This is what the source code says.

Now, can I reverse-engineer that and try to create some sort of a block diagram, what the parts are and how they operate?  If I have nothing else available except source code, then that might be necessary.  Or if the documents, and in this case, testimony, did not provide a sufficient disclosure that I can visualize what the parts are and how they operate, then might have needed to go to the source code.  But in the cases of RemoteWare, I believe the documents and the testimony were sufficient to the level of understanding that I needed.

Q.  I'd like to move to another subject now.  I'd like to move to your opinions concerning noninfringement.

Mr. Thakur asked you various questions concerning connections.

A.  He did.

Q.  One question that he asked you is whether you could find in any RIM document a description of the UDP protocol as connections.  Do you remember that question?

A.  I do.

Q.  And I believe you said, as you were sitting here, you couldn't pull up a document.

MR. THAKUR:  Objection, your Honor, misstates the --

THE COURT:  Overruled.

BY MS. DeBRUIN:

Q.  I believe you said you couldn't pull up a document while you were sitting there.  I'm paraphrasing what you said.

A.  That's right.

Q.  Dr. Acampora, I've handed you a document that is entitled "RIM Wireless Basics."  Do you see that?

A.  I do.

MS. DeBRUIN:  Your Honor, we'd seek to admit RIM Trial Exhibit 4173.

THE COURT:  Without objection, RIM Exhibit 4173 is in evidence.

(Defendant's Exhibit 4173 received in evidence)

MS. DeBRUIN:  If you could please display 4173.

If you could turn please to page 6, if we could have that on the screen.

BY MS. DeBRUIN:

Q.  Dr. Acampora, the document that I've just handed you, Exhibit 4173, sets out its objective as:  "Welcome to RIM Wireless Basics.  The purpose of this course is to demonstrate the workings of the RIM wireless network, and how the components fit together."

Do you see that?

It indicates the target audience are for people

who are new to RIM and have a basic internetworking knowledge of networks.  Do you see that?

A.  Yes.

Q.  And if we turn to page 11, we can see a protocol stack.  Is that what you'd call this figure?

A.  That's a -- of a protocol stack, yes.

Q.  We talked a little bit about that during your cross-examination.

A.  Yes.

Q.  But here at the bottom of the stack is UDP.  Do you see that?

A.  Yes.

Q.  And let's turn to page 13 and see what this RIM document says about UDP.  Bottom of the page.  UDP.

"The UDP is adopted between the Relay/NIA and the mobile device because it is connectionless and, thus, low overhead over the wireless transport."

Do you see that, Dr. Acampora?

A.  Yes.

Q.  And there's even a further definition if you turn back to page 84:  "UDP, User Datagram Protocol, another data transmission protocol built on top of IP."

Then it goes on.

"So it's sometimes called UDP/IP.  UDP guarantees that arriving packets are not corrupted, but it doesn't

try to reassemble them or see if all packets arrived. Therefore, there's less overhead than TCP and it can be much faster."

Is that consistent with your understanding of UDP?

A.   Yes.  This is what I tried to explain yesterday in my tutorial.  We can communicate using TCP, set up a connection by handshaking.  There's overhead associated with that.  There's overhead associated with maintaining the connection.  During the lateral connection, there's more non-user-bearing information going across that connection, just to maintain.  Just to keep the connection alive.  It's a high overhead way of communicating.  And in some cases you don't want to pay the overhead.

Cellular is a good example, the battery, you pay for it, pay for whatever is going over the radio, whether it's information you wanted to send or TCP overhead.  Once you use TCP, it has to be done.

So UDP might be the preferable protocol to use over the radio.  And it's connectionless.  And it spares the user the overhead.

That protocol stack that you showed, by the way, is completely consistent with what we had been talking about.  We saw TCP from the BES to the Relay, and then

we saw UDP from the Relay out to the BlackBerry.

Q.   I just have two more documents on this point.

Dr. Acampora, if you could please turn your attention to RIM Trial Exhibit 4204.  The title of this document is "BlackBerry Infrastructure Relay Reference Model."  Do you see that?

A.   Yes.

MS. DeBRUIN:  Your Honor, RIM seeks admission of RIM Trial Exhibit 4204.

MR. THAKUR:  No objection.

THE COURT:  4204 is admitted.

(Defendant's Exhibit 4204 received in evidence)

BY MS. DeBRUIN:

Q.   Dr. Acampora, does this document appear to be a reference model concerning the Relay, which we've talked about in this case?

A.   That it is.

Q.   If you could turn, please, sir, to page 107 of 130.  Just to help.  Because the page numbers are very small.  That bears production number ending with 5726.  So it's toward the end of the document.

Do you see here this is another document from RIM that indicates that UDP is a connectionless protocol?

A.   I do.  This is textbook stuff.  I'm looking at the protocol stack on top of that.  And UDP is standard

connectionless host-to-host protocol, yes.

Q.  I could go on and show you more, but I'll move on. Because I have a question for you.

Does it -- Mr. Thakur showed you various uses of the word "connection" in various RIM documents.  We've just seen uses of UDP that indicates it's connectionless.

First question:  Do the references that Mr. Thakur showed you today, do they say anything about establishing a connection between the wireless device and the server?

A.  No, they don't.  That was the point I was trying to make.  This has -- I'm actually -- to relate that discussion in the RIM documents of connection type to the patent, because the patent requires a step of establishing communication.  Initiating wireless communications.  That doesn't happen in the UDP.  No matter what it's called.  No matter what it's called, it doesn't happen.

Q.  And none of those documents refer to a step of establishing a UDP connection where they contradicted what you're saying; is that right?

A.  That's correct.

Q.  Now, Mr. Thakur also showed you the patent, and he referred you to a specific part in the specification

where the patent talks about various protocols or networking techniques that could be used.  Do you recall that testimony?

A.   I do.

Q.   Now, do we look to the patent specification to decide whether a product is a product or a method is being performed?

MR. THAKUR:  Objection, your Honor, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No.  You look to the claims.

BY MS. DeBRUIN:

Q.   Does the specification describe the scope of the invention?

A.   To my understanding, it does not.  It's the claims that describe the scope of the invention.  This is what's claimed.  And it's laid out in a series of claim elements.

Q.   If the claims require a step, can we ignore that step because there's some broader language in the specification possibly?

A.   No.

MS. DeBRUIN:  If we could have Demonstrative 1103, please.

BY MS. DeBRUIN:

Q.   Yesterday you went through a discussion with us of how the claims of the patent were amended during the prosecution of the '917 patent.  Do you recall that testimony?

A.   I remember that.

Q.   In the originally filed Claim 1, was there even a step of establishing a connection?

A.   There was not.  There was a step of delivering the command.  But no substeps associated with that step.

Q.   So perhaps a broader disclosure could support that Claim 1, but not Claim 1 as it actually issued; is that fair?

A.   Well, yes.  That's -- that's fair.  I don't know if that's what happened.  But that's certainly fair, uh-huh.

Q.   But -- because Claim 1, as it issued, requires a step of establishing a connection; isn't that right?

A.   Yes, it does.  So it's definitely narrower than just delivering a command.  Now, delivering a command is being given some scope to it.  Being given some definition.  It's not just delivering the command, but now deliver the command specifically this way.  So I would interpret this to be considerably narrowed from the original of what was Claim 1 when the patent was

filed.

Q.  Are you familiar with Professor Tanenbaum's book on computer networks?

A.  Quite.

Q.  Does computer -- does Professor Tanenbaum's book support your testimony concerning UDP being a connectionless protocol?

A.  It does.

Q.  (At easel)  Do you recall this demonstrative that Mr. Thakur went through with you?

A.  I do.

Q.  Would Professor Tanenbaum's book belong on the RIM side of this chart?

A.  Yes.

MR. THAKUR:  Your Honor, I object.  This is beyond the scope that was already introduced in direct.

THE COURT:  I'm sorry, this is now coming after your examination and she's permitted to use something you used during your examination.

MR. THAKUR:  I'm not objecting to the use of it. I'm objecting to what it is that's being used, your Honor.

THE COURT:  Overruled.

BY MS. DeBRUIN:

Q.  Is Professor Tanenbaum considered an authority in the

field of computer networks?

A.   Not only is Professor Tanenbaum considered an authority, I don't know of anyone, I don't know of anyone in the field who doesn't have a copy of one of the many editions of that textbook sitting on his shelf.

Q.   And do you recall Dr. Nath testifying here in court?

A.   I do.

MS. DeBRUIN:   And if we could please have Dr. Nath's course notes on the screen.   It's RIM Trial Exhibit 4736.

BY MS. DeBRUIN:

Q.   Do you recall seeing that document?

A.   I do.

Q.   And did Dr. Nath in his course notes that he uses to teach his students say that you don't need to establish a connection with UDP?

A.   He did.

MR. THAKUR:   Your Honor, this is beyond the scope of his expert report.   This was never raised or identified in his expert report.

THE COURT:   Overruled.

THE WITNESS:   He did.

BY MS. DeBRUIN:

Q.   And we saw that, we looked through -- I won't take the time now, but we looked through this document on

Dr. Nath's examination.  Do you recall that?

A.  I do.

Q.  So can I put Dr. Nath over in the RIM column?

A.  Yes.

Q.  I'm running out of room.

THE COURT:  And time.

MS. DeBRUIN:  I'm conscious of that, your Honor.
I'm watching my watch.

BY MS. DeBRUIN:

Q.  One other thing, and this is probably a good one to
end on.  The Court's claim construction --

MS. DeBRUIN:  Could we have on the screen,
please.  The Court's claim construction for
"establishing a connection between the wireless device
and the server."

BY MS. DeBRUIN:

Q.  Dr. Acampora, in your analysis here, you applied this
claim construction; isn't that right?

A.  That's correct.

Q.  And this claim construction belongs on RIM's side of
the chart as well; isn't that right?

MR. THAKUR:  That calls for legal conclusion.
That's argumentative as well.

THE COURT:  You both are using it for that
purpose as far as the Court is concerned.  Overruled.

THE WITNESS:  The question was again?

BY MS. DeBRUIN:

Q.  Yes, doesn't the Court's claim construction belong as yet another item supporting the RIM column here?

A.  It does.

MS. DeBRUIN:  Your Honor, can I have a moment?

THE COURT:  Certainly.

(Pause in the proceedings.)

MS. DeBRUIN:  I have no further questions, your Honor.

THE COURT:  Very well.  The witness is excused.

Members of the jury, you should understand that though the question was put as to whether the Court's claim construction should be put on one side or the other of that chart, that when the Court does its claim construction it does it as part of the preliminary process in the case, and before it has any information, like you've had, in the trial.  My claim construction is of the claim.  Not how the claim relates to an accused process.

It's up to you to decide whether the claim as I have construed it applies to the accused process.

It is noon.  So we'll take our break at this point.  We'll come back to this matter at 1 o'clock.  Remember my admonitions.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Please be seated.

One of the jurors gave a note to the Clerk of Court, and I'm going to have the Clerk of the Court share it with you.  And I should tell you it's my intent not to address it at this point, but to perhaps address it as part of my closing instructions.  But since it is a note that I share with the parties, you may wish to address it by evidence.  But I don't want you to start answering questions of law, because the question that's put does have some implications for the law with respect to this matter.  As you will soon see.

Any other matters out of the presence of the jury?

MR. THAKUR:  No, your Honor.

MR. MATUSCHAK:  No, your Honor.

THE COURT:  Very well.  I'll see you at 1 o'clock.

(Luncheon recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  All right.  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Before we resume, one of your number passed a note, and we always appreciate receiving your notes.  I always share them with the parties.  We might not respond to them immediately, but in due course they are matters that we will take into consideration.

Where are you going next?

MR. MATUSCHAK:  I'm calling our next witness, your Honor, Mike Lazaridis.

THE COURT:  Very well.

Good afternoon, Mr. Lazaridis.  Come all the way forward and be sworn.

(Witness sworn)

DEPUTY CLERK:  Please seated and speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  My name is Mike Lazaridis.  Last name's spelled L-a-z-a-r-i-d-i-s.

MIKE LAZARIDIS,
   called as a witness by the Defendant,
   having been duly sworn, testified as follows:

Connie Kuhl, Certified Realtime Reporter
Official Reporter - USDC  (415) 431-2020

DIRECT EXAMINATION

BY MR. MATUSCHAK:

Q. Good afternoon, Mr. Lazaridis.

A. Good afternoon.

Q. Could you tell the jury how old you are, sir?

A. I'm 51.

Q. Are you currently employed?

A. No, I'm not.

Q. Were you previously employed?

A. Yes, I was.

Q. By whom?

A. By Research In Motion.

Q. What was your job at Research In Motion?

A. I was founder and president and co-CEO.

Q. And although you're no longer the CEO, are you still on the board of directors of Research In Motion?

A. Yes, I am.

Q. Where do you live?

A. Bamberg, Ontario.

Q. Could you explain to the jury whereabouts in Canada that is?

A. Ontario -- so if you're familiar with Toronto, Waterloo is about a hour west of Toronto. And -- an hour west of Toronto. And Bamberg is just a few minutes out of town.

Q.   Have you always lived in Canada, Mr. Lazaridis?

A.   No.

Q.   Where did you -- where were you born?

A.   I was born in Istanbul, Turkey.

Q.   And at some point did you leave Turkey?

A.   Yes.

Q.   And why was that?

A.   My parents left Turkey and they went to Germany.  My father confided in me that he was looking for greater religious freedom.

Q.   And how long did you live in Germany?

A.   About two years.

Q.   While you were living in Germany, did you develop any interest in electronics?

A.   Yes.

Q.   And how did that occur?

A.   There were two toys that I had, one was Lego, was very popular at that time, and the other very popular toy in Germany was electric trains.  And I wasn't allowed to actually play with electric trains and power them up, because they made too much noise and the landlords didn't like the fact that there was a child upstairs in our apartment.  But my father showed me how to light up the lights on the train and on the locomotive using a battery and some wire on the tracks.

And I was just absolutely fascinated.  I remember that moment, I was absolutely fascinated that I could use a battery at one end of the track, and I could turn lights on on the train, and for a four-year-old boy, that was magical.

Q.  How did you end up coming to Canada after that, sir?

A.  My parents, we took a -- my parents and I took a boat, across the Atlantic.

MR. MATUSCHAK:  If I could have Demonstrative 801, please.

BY MR. MATUSCHAK:

Q.  Mr. Lazaridis, is that a picture of you getting off the boat, as they go?

A.  Yes.

Q.  And who's that with you?

A.  That's my mother and father.

Q.  Thank you.

MR. MATUSCHAK:  Take that down.

Q.  Did you -- after you arrived in Canada, did you do any reading to pursue your interest in electronics?

A.  Yes.  I spend a great deal of time in the school and public libraries.

MR. MATUSCHAK:  If I may, your Honor.

Q.  I want to show you a book, Mr. Lazaridis, called *The Boy Electrician*.  Is that one of the books you read when

you arrived in Canada?

A.  Yes, I looked at this book several times and tried to do some of the projects that were in it.  It was difficult because it was an old book, and I couldn't find much of the material.  I had to improvise.

Q.  Did you try to do all the projects in that book?

A.  No, not all the projects.

Q.  And did your interest in electronics continue when you went to high school?

A.  Yes, it did.

Q.  In what way, sir?

A.  Well, I took, along with honors math and science, I took -- it was called the shop program.  It was a skills program.  And we had a superb electronics shop.  It was full of new equipment that was donated to the high school.  And my teacher showed it to me, and I was -- it was like a kid in a candy shop.  So I wanted to open all the boxes.  But he had one rule.  He said that only if I could prove to him after reading the manuals that I understood how to use the equipment.  It was delicate and expensive equipment.  That summer I opened all the boxes.

        MR. MATUSCHAK:  Now, if we can have Demonstrative 802.

BY MR. MATUSCHAK:

Q.  Could you tell the jury, please, Mr. Lazaridis, what's pictured on this slide?

A.  Is there any way I could point to it or --

Q.  Yes.

MR. MATUSCHAK:  May I approach, your Honor?

THE COURT:  Sure.

THE WITNESS:  That's in my -- our second home, this is after we moved from our first house.  This is the basement (indicating).  And I had paneled it and turned it into my lab.

And from left to right, this is an oscilloscope that I had built in grade 11.  The oscilloscope, it's a measuring instrument that allows me to see electrical signals in both time and amplitude.  It was a very important tool for me to be able to debug the computer that I had built in grade 12.  And that was -- computer was the same design that my partner, my friend at the time, Doug Fregin, had built in his house, and he did that so we could share programs and share like understanding how it worked.

This is really early, this would be the beginning of the 1970s.

So you see the lights and switches, and one of the improvements that we worked on together, I came up

with was using a tape recorder that I used for studying spelling in public school, I took that tape recorder and made it my file storage.  It was like my disk drive. And I wrote the software so I could store all the programs onto the tapes.  It was little cassette tapes. Then I could play the cassette tapes depending on what program I wanted to load on the computer.

The other thing that -- and of course, this is all, you know, scrounged components.  I went to swap meets.  I ordered parts from the local Radio Shack or anywhere I could find them.  And then I took apart televisions and radios that I found at the edge of the curb on garbage day and took those parts out.

And then finally, this would be what you see today as a printer, and the keyboard on it was -- this was considered a teletype, very old teletype.  It ran very, very slowly.  And I rebuilt it so that I could use the computer to print to it, and then I could use the keyboard to enter commands into the computer.

Q.  Thank you.

MR. MATUSCHAK:  You can take that down, please.

BY MR. MATUSCHAK:

Q.  Did you continue your education after high school, Mr. Lazaridis?

A.  Yes, I did.

Q.  And how did that happen?

A.  I went to the University of Waterloo, I visited the campus and I saw they had a large -- they were the first university in Canada to have a mainframe computer.  It was a large computer room.  Be twice as big as this courtroom.  And they had the big glassed-in areas around the top of the classrooms.  It was very, very impressive.  I was impressed with that.  But what really intrigued me was the co-op program I had there.  I could go to school for four months and work for four months in the industry, and that helped me pay for my tuition, but at the same time it also gave me this great opportunity to work in the industry.

Q.  Can you give us some examples of your co-op work?

A.  I worked at Control Data.  I don't know if many of you remember Control Data, but at the time in the '70s, big mainframes were the popular computer system.  These were giant machines.  The biggest ones were other $100 million.  They were liquid-cooled.  And Control Data had a research and manufacturing facility in Toronto.  Like I said, it was an hour from Waterloo.  So I went to work there.

Q.  And what was your field of study at the University of Waterloo?

A.  It was computer science and electrical engineering.

But it was a major in electrical engineering.

Q.  Did you graduate, sir?

A.  No, I did not.

Q.  Why not?

A.  Because I started Research In Motion my last term at school, and it just took on a life of its own.

Q.  Why did you start Research In Motion in your last term of college or university?

A.  I would have graduated 1984, so the year coming up to that, there was a recession in the -- North America, and our jobs were hit by that recession, and there was -- if you try and put yourself back in that time, we were going to work and getting placements during our co-op terms, and our co-op job prospects were closing down. And then our placement record for graduates was going down as well.  It was the lowest one that we remembered, that I knew of at the time, in terms of whether people got jobs.

So there was in discussion amongst the engineers, you know, what are we going to do?  And you know, the common sentiment was that, you know, what are we going to do?  We're not going to get a job.  You know, and that went from -- everywhere from fear to almost this belief of, they were entitled to a job, they went to school for four years, they put in their time.  And I

remember having these discussions with them and saying, You know, look, why can't we create our own jobs? I was consulting at the time. And you know, we've gotten this fine education from one of the top schools in Canada. Why can't we get into this new field called computers and personal computers, which was just nascent at the time. And I had to put my money where my mouth was, because one of them challenged me, If you believe it so much, why don't you go do it. And I did.

Q. Did you start the company with anyone else?

A. I called my school friend, the one that built the identical computer in high school, Doug Fregin, and asked him to join me, told him what I was trying to do, and he left school and joined me at the company we started.

Q. What year was this again?

A. We incorporated Research In Motion in 1984, in March.

Q. All right. I'm going to start a little timeline.

MR. MATUSCHAK: If I can get Demonstrative 804, please.

BY MR. MATUSCHAK:

Q. So we have on the timeline Research In Motion is founded in 1984. Is that correct, sir?

A. That's correct.

Q. Now, do you know Mformation, the plaintiff in this

case, was founded in 1999.

A.   Yes.

MR. MATUSCHAK:  You can take that down for now, thanks.

BY MR. MATUSCHAK:

Q.   Where did you get the money to start the company?

A.   Well, I didn't have any money, but my parents gave me -- my father gave me his savings.  It was $15,000.  And I was able to then go and apply for a student venture loan.  It was a government student venture loan for students that wanted to start their own businesses, in the summer.  And they matched it with another 15,000 in loan.  So I had 30,000 Canadian to start the business.

Q.   Where was your first office?

A.   It was a 500-square-foot office above a bagel store in a strip mall in Waterloo.

MR. MATUSCHAK:  Can we see Demonstrative 805, please.

BY MR. MATUSCHAK:

Q.   Is that a picture that was taken in that office above the bagel store, Mr. Lazaridis?

A.   Yes.

Q.   And who's shown in that picture?

A.   Well, if you can recognize, that's me on the right

with -- and then my partner, Doug Fregin, was on the left-hand side of that picture.

Q.  Thank you.

Now, after you founded RIM, around the time it was founded, did you work with any major automotive companies?

A.  Yes, we worked with General Motors.

Q.  And what kind of work did you do with General Motors?

A.  General Motors had put out a request for tender. They had a -- this was a truck manufacturing plant.  It was very large.  It had a lot of assembly lines.  It went on for a great distance.  It was very noisy.  And so they needed something to replace what they called the enunciators, it was these big boxes with light bulbs in them.  All these boxes were wired with 120-volt wiring to these controllers.

So if someone on the assembly line ran out of supplies, they could pull a cable, and that would signal to the sign saying, Turn on one of the lights.  Or if there was an emergency, they pulled -- all stop, they could tell who pulled that emergency cord based on the information that was turned on on the lights.  The problem was that it was just a light bulb with a piece of plastic on it that had a number, a code on it, and they had to look up the codes in a manual to figure out

what it meant.  What just happened?  A light came on.
What does that mean?

And so the assembly plant, truck plant manager
put out a request for proposal saying, Look, if we could
put some kind of display system up there, and then that
way, we didn't have to go up with a ladder every time we
wanted to change something.  It was very expensive to
change them.

When I read that, I realized that I could use the
electronic signs that were coming out, those LED
signs -- I'm sure you've seen the red LED signs.  These
were very new at the time, and very expensive.  And I
was able to use technology at the time, I could
literally use the computer system I built in high
school, the same Z80 computer, if that means anything to
you -- at the time it was a very popular microprocessor.
And I could use some technology just becoming available,
wasn't even fully standardized yet, it was a networking
technology, a wired networking technology, and I
presented that as a proposal to the general -- to
General Motors.  And they accepted it.

MR. MATUSCHAK:  If we could see a demonstrative,
Exhibit 6, please.

BY MR. MATUSCHAK:

Q.  Is that a picture of the sign that you were working

on, sir?

A.  Yes.

            MR. MATUSCHAK:  Take that down.

BY MR. MATUSCHAK:

Q.  I think you said that this involved a network?

A.  Yes.

Q.  Was this -- what could you do on that network?

A.  It was a -- it was industrial grade.  It was a very rugged network, because it had to run in the same pipes with the high current for the assembly equipment and the arc welders, and it had to run for, in some cases over a mile.

            And then what we did is we designed it so that the network cable could connect to each of the signs, and then each sign had a unique numbering, an ID.  And I don't know if you've ever seen sometimes electronics have a little switch inside, they have little miniature switches, and you could select the ID for each sign with that switch.  That allowed us to uniquely address each sign on that network.

            And the other thing that we decided to do was -- because the industry at the time used something called -- what would you call them today?  They were called PROMs, Programmable Read-Only Memories.  What you'd store the program on.  You couldn't update it,

you'd have to physically remove the memory from the socket and replace it with new memory.  It was very expensive and very time-consuming to do on the factory floor.

So what we decided to do was put memory inside that we could load with the actual programs for the signs and everything else, and what I designed was a network system that allowed us to talk to each sign, interrogate the sign, download new programs to the sign, run diagnostic, and then we could load the triggers and the messages and the conditions under which they would display those codes, or full English words to define the conditions that were necessary to run the plant.

Q.  So were you managing devices on that network?

A.  Yes.

Q.  Was that a wired or a wireless network?

A.  That was a wired network.

MR. MATUSCHAK:  Okay.  And if we can put Demonstrative 807.

BY MR. MATUSCHAK:

Q.  Just to add to our timeline.  So this occurred really in the same year that your company was formed; is that correct?

A.  Yes, within a year.

MR. MATUSCHAK:  We can take that down.

BY MR. MATUSCHAK:

Q.   Now, aside from the money from the GM contract, how were you financing your company as time went on?

A.   Well, the GM contract, the product became a standard General Motors product in their catalogs, so other plants started ordering the systems.  So we were busy dealing with that.  And growing on the sales of that.

But we also received an opportunity to bid on an RFP -- request for proposal -- with Kodak and the National Film Board of Canada for new technology that was coming out for a bar code on motion picture film.  And the whole idea back then, this is before we had video editing or any of the technologies we have today, but people actually shot on film, motion picture film, and then they had to edit the film.  They had to edit the different scenes together, they had to keep track of the negatives and positives and the opens.

So what Kodak had decided to do was to preexpose these miniature high density bar codes while they're making the film.  So if you can imagine, right between the sprockets there was a little bar code that was preexposed by machinery that manufactured the film.  Every six inches, precisely, would be another one.  Each one was highly unique.  It talked about the manufacturer, it had the code of the manufacturer, and a

number that was -- that was unique for up to 10 years of film production, because they were worried about documentaries that could run 10 years and they didn't want to have numbers repeat and complicate the process.

So the technology was very difficult; and we came up with a way to solve the problem, and that became --

THE COURT:  I find some of this fascinating, but I wonder about its relevance to where we are, so I'm going to invite you to give us more of a postcard version of this part of things.

MR. MATUSCHAK:  Your Honor, we're almost --

THE COURT:  I always hear that.  Move ahead.

MR. MATUSCHAK:  All right, I will, your Honor.

BY MR. MATUSCHAK:

Q.  Did your company win any awards as a result of that work?

A.  Yes, we won a -- both a technical Emmy and a technical Oscar.

MR. MATUSCHAK:  Your Honor, if I may approach.

Q.  Are these those awards, sir?

A.  Yes, this is the Emmy award.  And this is the Oscar.

Q.  Did you get one of those little statues?

A.  No, that's for the stars.

Q.  Did Research In Motion do any work for cell phone companies in its early years?

A.   Yes.

Q.   And what was the first time that you worked with a cell phone company?

A.   We worked with a company called Cantel, Canadian Telecom, between 1987 and 1988.

Q.   What was it you were doing with Cantel?

A.   One of the first company's in Canada putting in a cellular phone system.  This is one of the very first analog cellular phones, and they were very successful with that.  And they had just purchased brand-new wireless cellular data systems.  This was a cellular system that was designed for data as opposed to voice.

Q.   What was the name of that wireless cellular data system?

A.   It was called Mobitex.

Q.   Was Mobitex a wired or wireless network?

A.   Mobitex network was a wireless network.

Q.   And I think you said you started working with that around '87 or '88?

A.   That's correct.

        MR. MATUSCHAK:  If we can put up Demonstrative 808.

BY MR. MATUSCHAK:

Q.   And going back to our timeline, that's about four years after starting your company; is that correct, sir?

A.   Approximately.

Q.   And I think if I get my math right, almost 25 years ago, right?

A.   Yes.

          MR. MATUSCHAK:  You can take that down.

BY MR. MATUSCHAK:

Q.   What were you asked to do with respect to the Mobitex project?

A.   They had just purchased the system.  They had put in some of the -- they put in some of the network, the wireless network in cities in Ontario, and a lot of the books were still full of the radios and the terminals and all the equipment, because this was the beginnings where the idea was we would use these networks for police, fire and ambulance or taxicabs.  And they were designed originally to fit into the back of -- the trunks of cars.

          The problem was that the manuals were still being translated from Swedish, because Ericsson was a Swedish company, to English.  So it was a bit of a challenge for us.  But we were able to figure out how it all worked and start putting all this together.

Q.   Was that project successful, sir?

A.   Yes, it was.

Q.   After you worked on the Mobitex -- by the way, did

Cantel later become Rogers?

A.   Yes.

Q.   After you worked on the Mobitex network for Cantel or Rogers, did RIM start to develop its own products for the Mobitex network?

A.   Yes, we did.

Q.   Have you ever heard of a RIM product called RIMGate?

A.   Yes.

MR. MATUSCHAK:  And if we can get Demonstrative 809 up, please.

BY MR. MATUSCHAK:

Q.   Sir, looking at Demonstrative 809, is that computer in the middle there that says "RIMGate"?  Is that what the RIMGate was?

A.   Yes, the -- that was the RIMGate right there.

Q.   And if I understand this diagram correctly, RIMGate connected the wireless Mobitex network to a wired network?

A.   It connected the Mobitex network, yes, to the terrestrial wired network.

Q.   Did RIMGate later evolved into something else?

A.   RIMGate was the beginning.  And it evolved into both the Relay and the Enterprise Server.

Q.   And when you say "the Relay," is that also sometimes called a network operations center?

A.   Yes.

Q.   And what is the BlackBerry Relay or network operations center?

A.   It's now a dispersed system.  At the time it was a system that was operated in Ontario.  It allowed us to the packet switching wireless network to packet switching terrestrial -- this was before the Internet, and it turned out to be ideal for the Internet.

Q.   Is the BlackBerry Relay an important or minor portion of the Research In Motion solution today?

A.   It is a very important part of the wireless solution.

Q.   Why is that?

A.   Because it solved many of the security issues and the addressing issues and the performance issues at that time and still do today.

Q.   Let me go back.

       MR. MATUSCHAK:  If we can have Demonstrative 810, please.

Q.   Now, the next slide shows a Mobitex user's manual.  Do you see that, Mr. Lazaridis?

A.   Yes.

Q.   And then we've highlighted a portion of a page of that manual with the heading, "What Is RIMGate?"  Do you see that?

A.   Yes.

Q.   And at the bottom you see the copyright date, Version 1.0 is April 1993, do you see that?

A.   Yes.

MR. MATUSCHAK:  Can we go to Demonstrative 811, please.

BY MR. MATUSCHAK:

Q.   So now we're into the early '90s and RIM is still working with Mobitex?

A.   Yes.

Q.   Did RIM build any other products that used Mobitex network?

A.   We developed software for it that worked with computers to connect to the radios.  We built our own radio technology.  So we built our own radio modems for Mobitex.  We built a point-of-sale terminal like you'd see in a store with your credit card.  Only this one was -- had antenna on it.  And we built the interactive pagers.

MR. MATUSCHAK:  You can take that down, please.

If I may approach, your Honor?

THE COURT:  Yes.

BY MR. MATUSCHAK:

Q.   Mr. Lazaridis, showing you this device, can you tell us what that is, please?

A.   This is the Inter@ctive pager.  The very first one we

built.

Q.   And that Inter@ctive pager, did that work on the Mobitex network also?

A.   Yes, it did.

Q.   What did the Inter@ctive pager do?

A.   The Inter@ctive pager did a number of things, but the other thing that was important about it was that we miniaturized it from what was available in the day.  So we used our own radio technology, used our own computer technology.  We put a small keyboard in and a small display, and we made sure the battery lasted a long time, that it worked with the networks, and that you can send or receive messages on it, including e-mails.

Q.   Was there any way to manage the Inter@ctive pager if, for example, somebody lost it?

A.   Yes, there was.  The network had all kinds of commands in it that we had to implement to be supported -- use with the network, the Mobitex network.  And there were management commands in it.

        MR. MATUSCHAK:   If we can see Demonstrative 815, please.

BY MR. MATUSCHAK:

Q.   And, Mr. Lazaridis, showing you a copy of a page in the Mobitex manual, Exhibit 1006, that's already in evidence, did the Mobitex manual have something called

the "die" command?

A.   That's correct.

Q.   Did you actually see this manual back in the 1990s?

A.   Yes.

Q.   And did you see this version of the manual came out in August of 1990?

A.   Yes.

Q.   Now, could -- this talks about both "live" and "die" commands.  Could those commands be sent wirelessly?

A.   They were sent wirelessly.

Q.   And did RIM come up with the "live" and "die" commands?

A.   No, that was Ericsson's specification.

Q.   So that was even before you started working with the Mobitex network?

A.   It might have been.

Q.   And did the Inter@ctive pager have to implement these "live" and "die" commands?

A.   Yes.  Any radio for the Mobitex network had to allow these commands be certified for use.

        MR. MATUSCHAK:  If we could look at Demonstrative 813.

BY MR. MATUSCHAK:

Q.   Is that the same Inter@active pager, Mr. Lazaridis?

A.   It's the same model, yes.

Q.   And you see a press release that announces that September 18, 1996?

A.   Yes.

Q.   And we go to 814 on our timeline, we're now up to 1996.  So we've been looking at this point with Mobitex for at least eight years; is that correct?

A.   Yes.

          MR. MATUSCHAK:  Take that down.  And put up 816.

BY MR. MATUSCHAK:

Q.   What's that, Mr. Lazaridis?

A.   That's the Inter@ctive -- that's the next generation Inter@ctive pager to this.  It was the Inter@ctive Pager 950.

Q.   And it's also known as the BlackBerry?

A.   It also became the BlackBerry, yes.

Q.   And showing you this device, is that the same device that's pictured up on the screen?

A.   It's the same model.

Q.   What does it say on the back?

A.   It says "BlackBerry."

Q.   And when was that introduced?

A.   The BlackBerry version of this Inter@ctive pager was released in 1999.

          MR. MATUSCHAK:  And you can take that down.

BY MR. MATUSCHAK:

Q.   What was new about the BlackBerry?

A.   Well, can we have the picture back?

Q.   Sure.

A.   Would make it easier.  It did a lot of things.  First of all, to get a sense of it, it was very small.  So it was designed to look like a pager at the time.  And paging was very popular in the United States at that time.  What we decided to do was to make it something that people understood, because it was so revolutionary and so new, it was hard for us to explain what it did.

But I'll try and talk about some things now that we take for granted, but back then they were very new.  One of the things you'd say here is it showed you the battery and the antenna signal.  This display was very low power, was always on.  This was the e-mail folder.  This was what we call compose, that's a pen on paper, this is how you compose an e-mail.  This is your saved e-mail so you can mark an e-mail saved so it wouldn't get deleted.  This was to search your e-mail or other thing in the product.

This was your contacts or what we call today your address book.  That was a calendar where you could store your calendar events.  This was your notifications.  You could set it up to vibrate or to make sounds, depending

on what happened.  The messages that arrived.  There was a calculator.  And if you keep going, there's a little wrench that meant it was the options so you could change how the device behaved.

And then there was other things where it showed, it was like a little airplane that said basically airplane mode.  So you could turn the radio off for when you went on an air flight.

Then the other thing we noticed was that, when we built this, if we made the keyboard smaller, you could easily use it very confidently with your two thumbs.  And that's really where we invented this whole miniature thumb keyboard technology that became our iconic look.

And of course, very simply, with the track wheel and the back button.  And it ran on a double A battery just like the pagers at the time.

Q.  How many double A batteries did it run?

A.  One, just like the pagers.

Q.  Prior to this time could you send an e-mail in a device of that size, wirelessly?

A.  No, this was the first one you could do it with this size.

Q.  Okay.  Now, when you designed the BlackBerry, did you face any challenges relating to network capacity?

MR. MATUSCHAK:  You can take that down.

THE WITNESS:  Yes, there was -- it's hard to imagine with the kind of broadband 4G networks we have, what the humble beginnings were in wireless data in North America.  And around the world.  So you have to consider that the amount of data that we could send on a wireless network was 8,000 bits per second for the entire session.  Today that's, just, you know, it's laughable.  But back then it was a real constraint.

And we had to make sure that the applications, the BlackBerry e-mail application, minimized its use of the network.  And it sounds kind of odd, but if we couldn't achieve enough users per bay station -- these were the wireless towers, at the time -- then it was no longer economical for the network operator to grow and expand and invest in the networks.  And the cost to the user would be unusable it would be so expensive.

So everything we did at the time was to minimize how much we used the network.  So we compressed all the data, we made sure that everything we sent -- we didn't resend, so we got rid of all the redundancy in the e-mail system.  And one of the added benefits of that was the pager worked very quickly, messages would send very quickly from device to device.  And e-mail to the device.  And it also saved the battery life.  That's why that double A battery could run for over a week.

Q.  Now, how was the BlackBerry received in the marketplace when it was first introduced?

A.  We didn't have very much of a budget to promote it. We were only about 200 people at the time.  What we found, though, was in testing with customers, that if we just get them to use it for awhile, they would immediately understand its value.

So what we did was we got some of those co-op students that -- from when I was one of them.  And we trained them how to install this on people's desktop. Then we sent them into New York to -- we literally gave these away to CEOs and their assistants or the executive staffs to try it.  And we had people that were trained to set it all up for them at the time.

Q.  Did anyone return any of those BlackBerrys that you gave away?

A.  Not many, no.

Q.  Now, Mr. Lazaridis, does security play any role in the success of the BlackBerry?

A.  Yeah, security was one of the most important problems that we had to solve.

Q.  Why is that?

A.  Well, I remember when I first started working with this idea and to try explain it to some of the customers, they told us that even the ones who

understood at the time what it did and how it would work, and understood its value right away, they told me that if we couldn't convince them that it was secure, that it protected their corporate network and their corporate data, that they would not roll it out, it would just be an experiment.

MR. MATUSCHAK:  If we can see the next demonstrative, 817.

BY MR. MATUSCHAK:

Q.  Mr. Lazaridis, I'm showing you a page from the website of the Smithsonian Museum in Washington, D.C. Do you see BlackBerry Model 900M there?

A.  Yes.

Q.  And can you tell what's pictured directly above the BlackBerry?

A.  That's Alexander Graham Bell's telephone.

Q.  And did the BlackBerry win some awards right after it was first introduced?

A.  Yes, the BlackBerry won the award.

MR. MATUSCHAK:  Can we have Demonstrative 818, please.

BY MR. MATUSCHAK:

Q.  And are these two of those first awards, sir?

A.  Yes.

Q.  And how significant did you consider these awards at

the time?

A.   Well, I mean the *PC World* is still available today, so we, you know, the magazine gave an award to an unknown company at the time.  Research In Motion was not that well known.

Q.   What do you mean you were an unknown company?

A.   We were a small company.  People considered us a startup at the time.

Q.   The "Telecom Product of the Year award, continue.

A.   Again, we got an award for the ability to send and receive corporate e-mail.  This was very new at the time.  And we had done it in a way that was compelling.

Q.   Did the BlackBerry continue to receive other awards in the years since 2000?

A.   Yes, we did.

        MR. MATUSCHAK:  Now, you can take that down.

BY MR. MATUSCHAK:

Q.   I think you said in 1999 you had roughly around 200 employees.

A.   That's correct.

Q.   And you said that the BlackBerry was introduced in January 1999.  But we know from before you came into court, Mr. Lazaridis, that the first BlackBerry Enterprise Server was not introduced till later that year.  Why was there some delay between the BlackBerry

and the first BlackBerry Enterprise Server being introduced?

A.   We were working as fast as we could.  The Enterprise Server was a far more complex project.  And it was a small team.  And they weren't ready to announce the product or ship the product.  But we had developed a desktop version, so that the people could hook it up to their -- the computer they had on their desk.  And then that would connect them into their corporate e-mail and act as a gateway to the network.

The other thing was, it worked out for us because the companies were still just testing it in the first few months, so we weren't going to roll it out right away.

Q.   Are you aware, sir, that the first version of the BlackBerry Enterprise Server required a wired connection to manage the BlackBerry devices?

A.   That's right.  So at the time the -- back then, we used contact managers.  I'm not sure if maybe you remember them, but you would have your -- there's a program called Intellisync that we licensed that allowed the BlackBerry to be loaded and synchronized every day with your contact information.  You know, your -- so people had their own contact database or their own system on their computer.  So we used that serial port

to connect that.

The other thing we did was we used that serial port, the hard connection to your computer on your desk in the office, so that we could put the security keys on here and we could prove to the IT and the security managers of those corporations that that process was done within their premises.  This was before we received all our security citations.

Q.  When the first BlackBerry came out in 1999, you had spent years in wireless?

A.  Yes.

Q.  Why did the first BES then require a wired connection instead of wireless?

A.  Um, well, this is the gateway.  So this would have been prohibitively expensive to use wireless to connect your gateway into the Mobitex system.  But web -- remember, these are computers.  The gateways are computers, they're servers, they sit on the ground, they're in the corporation, they're in the data center.  The data center has connectivity.  Wired connectivity.  And that's far more economical.  Has much more bandwidth.  The wired connections have far more bandwidth, and there was no need for wireless in that environment.

Q.  When the first version of the BES came out, did you

want it to manage a BlackBerry wireless server?

A.   Yes.

Q.   And what network did the first BlackBerry operate on?

A.   Mobitex.

Q.   And did the Mobitex network in 1999, when BlackBerry came out, still have that same "die" command we talked about earlier?

A.   Yes.

Q.   And could that "die" command be used with the BlackBerry?

A.   Yes.

Q.   How else did you protect data on the first BlackBerry?

A.   Well, one of the things that we were told by our customers was that we had to protect the data -- we didn't just have to protect the network, we also had to protect the data that was on the BlackBerry.  So we put a very advanced password mechanism on the BlackBerry. It was designed so that it couldn't be circumvented.  It was built right inside the operating system.  And we came up with an innovation where if you typed the wrong password in for more than 10 times, it would completely wipe the device.

Q.   Now, would a wipe command have enhanced the security of the BlackBerry's data under those circumstances?

A.   I don't believe so.

Q.   Why not?

A.   Because if I took this BlackBerry from someone, the first thing I would do is turn the radio off, and as soon as I turn the radio off, I circumvent any wireless management commands to the device.

Q.   So if you turn the radio off, the person back in the IT department can't send a wireless command?

A.   By the time you realize it was stolen and you called them or they went to the IT department and got permission to wipe the device, because you wouldn't want to wipe the device of a CEO by accident, it was too late.  I'd imagine anyone that knew what they were doing, just turn the radio off and that would circumvent anything they could do.

      MR. MATUSCHAK:  Can we have up the exhibit -- before that, we move to admit Exhibit 2142.  There's no objection, your Honor.

      THE COURT:  2142 is in evidence.

      (Defendant's Exhibit 2142 received in evidence)

BY MR. MATUSCHAK:

Q.   I'd like to show you an e-mail dated August 29, 2001, from someone named Ken LeVine to you concerning Mformation.  Do you see that?

A.   Can I just ask, can I look at it in here?  I'm just

running out of room on here.

Q.   I'll take these things back from you and all of these exhibits will be in that binder in front of that.

         So we're at 2142.  They should be numbered sequentially.

         Do you have this, sir?

A.   Yes.

Q.   All right.  And you see that's an e-mail to you dated on August 29th, 2001, from Ken LeVine concerning Mformation?

A.   Yes.

Q.   Who's Ken LeVine?

A.   Ken LeVine was an employee of Research In Motion.

Q.   Was he an executive employee?

A.   Yes.

Q.   Now, this e-mail says that Mformation is going to do a pilot at RIM and it's similar to the Afaria XcelleNet product.  What do you understand was going on here?

A.   Well, from the e-mail it sounds like we were going to the -- pilot their solution at RIM.  And that it was a similar solution to another company called Afaria with XcelleNet.

Q.   You said Ken LeVine was an employee of RIM at that time in August of 2001?

A.   That's correct.

Q.   Did you know when you got this e-mail from Mr. LeVine in August that he had joined Mformation's advisory board in June 2001, two months before this?

A.   I did not.

Q.   Did you know at the time that you received this e-mail that Ken LeVine had actually been promised or awarded stock options in Mformation?

A.   No, I didn't.

Q.   When you were talking or e-mailing with Mr. LeVine after the point in time that you got this e-mail about Mformation, did he ever tell you that he was on Mformation's advisory board and had stock options in Mformation?

A.   No.

          MR. MATUSCHAK:  All right.  You can take that down.

BY MR. MATUSCHAK:

Q.   Now, we've talked about the launch of the BlackBerry early 1999.  Once that was on the market, what were your main concerns as CEO of RIM?

A.   Our customers were very important to us.  And the thing that was very important to us was -- we were in a brand-new market set.  There were a lot of competitors in that space, Nokia, Motorola, Ericsson, Microsoft. Others.  There was a lot of very large companies that

were looking at what we were doing and realizing that they wanted to compete with us.

Q.  And how did the size of those companies compare to the size of RIM back at that time?

A.  We were very small compared to them.  They were giants.

Q.  At that time did you ever hear the phrase "BlackBerry killer"?

A.  Yes.

Q.  What did that refer to?

A.  Well, the BlackBerry was seen as the standard in wireless e-mail systems and security.  And these big companies were trying to come up with solutions that would replicate the BlackBerry experience, on different technologies.

        MR. MATUSCHAK:  Can we see Exhibit 364, please.

BY MR. MATUSCHAK:

Q.  Do you have that, Mr. Lazaridis?

A.  Yes.

Q.  All right.  Now, this e-mail you sent to Ken LeVine January 18th, 2002.  Do you see that?

A.  Yes.

Q.  And in the second paragraph you say:  "We are ahead, way ahead of everyone in the enterprise space."  What did you mean by that?

A.   Well, we had -- as you can see, we had 13,000 companies using BlackBerry.  We had 5,000 BlackBerry Enterprise Servers installed and operating.  300,000 BlackBerrys in use for a small company like ours, that was very successful.

Q.   And if we could look at the next paragraph, you also then say:  "We have tremendous momentum, but with momentum comes inertia."  Do you see that?

A.   Yes.

Q.   And then you would have a list of momentum and a list of inertia; is that correct?

A.   Yes.

Q.   So this e-mail, 2002, how long had the BlackBerry been out at this time?

A.   If it would be three years.

Q.   So after three years you already had 13,000 companies using the BlackBerry?

A.   Correct.

Q.   You already had 300,000 BlackBerrys in use?

A.   Correct.

Q.   And when you said 5,000-plus BBES servers in operation, what were you referring to?

A.   That was BlackBerry Enterprise Server, and we shortened that to BES.  BlackBerry Enterprise Server.

Q.   Then you provide a list of what you say is "Our

inertia."  Do you see that?

A.   Yes.

Q.   And what did you mean by "inertia"?

A.   I mean, it sounds like I was trying to motivate someone, but we had -- we were building a system, the gateway.  The BlackBerry Enterprise Server, when people started putting more and more BlackBerrys on there, they wanted it to be able to manage those Enterprise Servers using the tools that they already had in place to manage their laptops and PCs and printers on the corporate network.

Q.   Turn to the next page of this e-mail.  There's various competitors that you have listed there.  You say:  "Competitors like SEVEN, VIAIR, WirelessKnowledge, Microsoft, Lotus and others have seen this as our weakness."

     Do you see that?

A.   Yes.

Q.   And are these some of the competitors you were talking about earlier?

A.   That's correct.

Q.   You then say:  "In fact, companies like Mformation have built a whole business around our weakness," and you say, "It's time to get rid of that weakness."

     What do you mean?

A.   One of the things that was happening was we were trying to manage our resource.  We had a very small team working on the gateway and on the products.  And we were trying to manage those resources and get around to all of those things that we wanted to do, and we were very carefully and deliberately making sure that we worked on those features that had the most impact and our customers most wanted.

And what that did was it allowed our competitors to then go out and work on other features that we hadn't gotten around to or take shortcuts that would compromise either the security of the product or the capacity of the network or the cost to the user, the battery life of the product.  And so they took different approaches, and then at certain times we'd have to respond competitively to that.

Q.   Now, you say in the last section there, "in order of importance," and then you have a list.  Do you see that?

A.   Yes.

Q.   And the first thing under that is:  "Manageability and provisioning of desktop, handhelds, server and Relay by our customers using tools that they already have and are familiar with."

Do you see that?

A.   That's correct.

Connie Kuhl, Certified Realtime Reporter
Official Reporter - USDC  (415) 431-2020

Q.   What did you mean by "tools they already have and are familiar with"?

A.   I mentioned it before, but these are large organizations, large enterprises, like 280 or Fortune 1000, and they already had thousands, if not tens of thousands, of computers and laptops to manage, and they used existing software packages that they had invested in and trained their staff to use to manage those systems.

What they were asking us was to make the BlackBerry Enterprise Server compatible with those systems and standards so they could continue to use those existing software packages.  And in fact -- well, that's it.

Q.   Was Mformation one of those existing tools that you were talking about here?

A.   Yeah, so Mformation came up with a proprietary way to do that that competed with those existing solutions.

Q.   Okay.  So that's not the same as the tools that those people already had.  Mformation's tools were not the same ones that companies already had?

A.   Companies -- the companies hadn't installed Mformation with the same regard as those competitions.

Q.   At some point did you consider the idea of buying Mformation, the company?

A.   Yes, we did.

MR. MATUSCHAK:  Can I have Exhibit 362, please.

BY MR. MATUSCHAK:

Q.   I'll give you a chance to find that, Mr. Lazaridis.
It's a series of e-mails about that topic, and I'll
start at the bottom, the e-mail that starts the chain
from Dave Castell to you and Jim Balsillie.  Do you see
that?

A.   Yes.

Q.   Who is Jim Balsillie?

A.   Jim Balsillie was co-CEO.

Q.   We've heard he's six-foot-five; is that right?

A.   No.

Q.   How tall is he?

A.   Six feet.

Q.   In the first paragraph says:  "Ken and I had a brief
chat about your interest in Mformation."  Do you see
that?

A.   Yes, yes.

Q.   And who do you understand Ken is that's being
referred to here?

A.   Well, I would understand today that that would be Ken
LeVine.

Q.   Because he's copied on the e-mail there?

A.   Yes.

Q.   And that's the same Ken LeVine we've talked about who introduced Mformation to you; is that correct?

A.   That's correct.

Q.   And in the last paragraph, do you see where it talks about a series of venture capital funds that are investing in Mformation?

A.   Yes.

Q.   And then if we can go up one e-mail in the chain, the next e-mail, Jim Balsillie asks you, "Is this product worth buying?"  Do you see that?

A.   Yes.

Q.   And you respond to him, do you not?

A.   I do.

Q.   Let's take a look at that.  You say to him:  "Yes, along with a group focused on this critical requirement from our customer base.  Absolutely."

     Do you see that?

A.   Yes.

Q.   What did you mean by "along with a group focused on this critical requirement"?

A.   Our BlackBerry Enterprise Server group, the group that made the -- that wrote the software and managed the software for the Enterprise Server, was very small.  It was hard getting people at that time that had the necessary skill.  And what I wanted to do was I wanted

to make sure that that -- the BlackBerry Enterprise
Server could be managed by the existing tools that our
customers are using.

Q.   Now, if we go to the next e-mail, Jim Balsillie
writes back to you, does he not?

A.   Yes.

Q.   And he says:  "Management are a bunch of dorks.  Ex
BSWD and CEO is bad and unlikeable."  Do you see that?

A.   Yes.

Q.   Why was he writing to you about Mformation's
management, or do you have an understanding as to why he
was doing that?

A.   Well, I mean, you know, if you're planning to
purchase a company or thinking about it, you want to
make sure that there's a cultural fit.  And he's -- I
think he's just bringing up a problem that he was
noticing.

        MR. THAKUR:  Your Honor, we object.  This is
hearsay.

        THE COURT:  It's a tardy objection, but I would
have sustained it, as to the speculation.  We have the
words, however.  Go on.

BY MR. MATUSCHAK:

Q.   Why was consideration about Mformation's management
important to you at that time?

A.   Because that's when I was looking for -- I was looking for a group that had the experience and the talent and the engineering resources to augment our BlackBerry Enterprise Server team.

Q.   All right.  And what did you understand from Mr. Balsillie's e-mail?

A.   The -- well, he's -- he obviously doesn't like them.

Q.   Okay.  Now, you respond back again to him, do you not?

A.   Yes.

Q.   And you say to him:  "Darn, it will take us too long to recreate, and with them we would have had a lock on the corporate market."

        Do you see that?

A.   Yes.

Q.   What did you mean by "it will take us too long to recreate"?

A.   To recreate a team of engineers and developers as experienced that we could have added right away for the BlackBerry Enterprise team.

Q.   Did you ultimately develop a team like that?

A.   Yes, we did.

Q.   And what did you mean about having a "lock on corporate market"?

A.   Well, if we could get the BlackBerry Enterprise

Server to be manageable with the tools that they already had, then the customers could deploy BlackBerry Enterprise Servers quite easily without having to install anything in them.

Q.   Had RIM acquired other companies in the past or -- has it acquired other companies in the past?

A.   Yes.

Q.   And when that has occurred, that's the effect on the investors of the companies they're going to acquire?

A.   They make a return on investment.

MR. MATUSCHAK:  Could we go to Exhibit 185, please.

BY MR. MATUSCHAK:

Q.   Do you have that, sir?

A.   Yes.

Q.   Series of e-mails, there's a long one that's from Dave Castell to you on February 19th, 2002.  Do you see that?

A.   Yes.

MR. MATUSCHAK:  And if we can show the last paragraph, please, the last bullet point at the bottom.

BY MR. MATUSCHAK:

Q.   In that last paragraph, Mr. Castell tells you that Mformation has expressed willingness in the past to let RIM take ownership of the agent.  Do you see that?

A.   Yes.

Q.   What did you understand when he talked about -- when he said "agent"?

A.   It was a piece of software they had written that they'd loaded onto BlackBerrys.

Q.   Was that on the server or on the device?

A.   That was on the device.

Q.   Okay.  And did you have an understanding of why Mformation was interested in letting RIM take ownership of their agent?

A.   If we were to take it over and made sure it worked well, with our security and worked with the security to certify the security of that model, and then we'd preload it on our BlackBerrys, it would make them standard in the industry.

Q.   And how would making them a standard benefit Mformation?

A.   It would make it more probable that they could sell their solution.

Q.   Let's go to the top, your response to Mr. Castell. And you said -- you see where you said:  "Okay to take control of the agent ASAP."  Do you see that?

A.   Yes.

Q.   Now, you talked about why that would benefit Mformation.  Why would RIM want to do that?

A.   Because if we took control of the agent, then we could make sure that it met our security requirements and that we could then certify that the software didn't have any vulnerabilities.

Q.   Well, would installing someone else's agent on a BlackBerry cause any problems or potential problems for RIM?

A.   Well, it would if we had to stand up -- we're to stand behind it as something we preloaded on the product.

Q.   And why would that be so?

A.   Because we tested the BlackBerry system, and we provided the BlackBerry system and the source code to various testing agencies, to confirm and get certified that it was a -- that the security system was validated.

MR. MATUSCHAK:  You can take that down.

BY MR. MATUSCHAK:

Q.   Could you just put somebody else's agent in a little container or something, you know, isolate it inside the BlackBerry?

A.   No, we would need to access the source code to be able to verify and provide those assurances to the security.

MR. MATUSCHAK:  Can we see Exhibit 772, please.

BY MR. MATUSCHAK:

Q.   This is an e-mail from Upal Basu of Mformation to Dave Castell at RIM.  Do you see that?

A.   Yes.

Q.   And if we look about halfway down, there's a paragraph that says -- yeah, that's it.

We understood that you wanted to use our device management agent as a stopgap solution Version 1.0 till you built your own standard based device management agent from ground up.

Do you see that?

A.   Yes.

Q.   This is in 2002.  From 2002, until this lawsuit was brought, did anyone from Mformation ever tell you or suggest to you that RIM was not allowed to build its own software from the ground up?

A.   No.

Q.   Let's go to the very next sentence of the e-mail.  Do you see here, sir, where Mr. Basu of Mformation says: "In summary, what you code belongs to you; what we code belongs to us."

Do you see that?

A.   Yes.

Q.   Was that your understanding also?

A.   Yes.

Q. Now, one last thing about this e-mail. I'd like to direct you to the middle of the page. There's a paragraph that starts, "with this understanding."

MR. MATUSCHAK: If we could see that for one second, there we go. Thank you.

BY MR. MATUSCHAK:

Q. And Mr. Basu, do you see where he said right above "Version 1.0," "we agreed to the following"?

A. Yes.

Q. And then in that first bullet point, what does Mr. Basu of Mformation say with respect to payment for the agent?

A. That he will grant us royalty-free license to it.

Q. And did you have some understanding as to why Mformation wanted to do that?

A. Because then we'd be taking on the responsibility of the software and making sure it was secure, and if we preloaded it on all our products, we'd be creating a market for them. They can become the standard.

Q. Did RIM end up licensing the device agent software from Mformation?

A. No.

Q. Why not?

A. Because we couldn't get the source code. They changed their mind.

Q.   Why would getting source code make any difference?

A.   If we didn't get source code, we couldn't assure ourselves or the security agencies that there wasn't anything that was either malicious or that was -- I -- I couldn't possibly compromise the security of whoever had the product.

Q.   Why would that be a product for you?

A.   Because we put our name on it.

Q.   Did Mformation continuing selling its own products even after the licensing discussion broke down?

A.   Yes.

Q.   Was Mformation an ISV partner of RIM's?

A.   Yes, they were.

Q.   And what is an ISV partner?

A.   ISV stands for "independent software vendor," and what we were trying to do was to build an ecosystem around the BlackBerry customer base.  We were helping our ISV partners to better support our customers and customize a solution for various customers that we just couldn't get to.

Q.   What could the ISV partners do?

A.   The ISV partners were able to add and -- they were able to customize a solution for various customers that we had.

Q.   What kind of information does RIM share with its ISV

partners?

A.  We share with them whatever they need to make their solution work.  So they could write for the product.

Q.  Do ISV partners know what RIM is going to do before announcing it publicly?

A.  Yes.

Q.  Do ISV partners get access to nonconfidential or secret RIM information that's not accessible to the general public?

A.  Yes.

Q.  Now, sir, Mformation brought this lawsuit on October 31st, 2008.  Are you aware of that?

A.  Yes.

Q.  And do you understand Mformation claims that RIM's BlackBerry Enterprise Server 4.0 was the first RIM product that infringed the patent?

A.  That's what they claim.

Q.  The BES Version 4.0 came out in 2004.  We've already established that.  But when that was released to the general public in 2004, did you get a call, an e-mail, a letter, a note, anything from Mformation, from anyone there, saying, Hey, what are you doing, that's our idea?

A.  No.

Q.  For that entire four-year period, 2004 to 2008, was Mformation still an ISV partner?

A.   Yes.

Q.   And throughout that four-year period was Mformation continuing to leave nonpublic information about how RIM's products worked?

A.   Yes.

Q.   Now, Mr. Lazaridis, can you tell us why you're here in San Francisco today instead of back home in Ontario where you live?

A.   I'm here to defend the honesty and integrity of RIM.

          MR. MATUSCHAK:  I have no further questions, your Honor.

          THE COURT:  Very well.  You may cross-examine.

          MR. THAKUR:  Your Honor, biology gets the better of many of us.  Would it be okay if we took our afternoon break at this time?

          THE COURT:  What gets the best of us?

          MR. THAKUR:  Biology.

          THE COURT:  Oh, okay, I didn't mean to call you out.  We can take our break at this time.  It's about 2:10.  We can come back in about 15 minutes.

          MR. THAKUR:  Thank you, sir.

          DEPUTY CLERK:  All rise.

          (The jury exits the courtroom)

          (Afternoon recess)

          DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  You may resume your cross-examination.

MR. THAKUR:  Thank you, your Honor.

Chris, would you kindly bring up Trial Exhibit 2247.  Turn to page 3.  Start with the e-mail halfway page down, Don Morrison.  Just highlight that e-mail.

CROSS-EXAMINATION

BY MR. THAKUR:

Q.  Mr. Lazaridis, I wanted to give some of your e-mail a little context.  So this starts on the date January 17, 2002.  Do you see that, sir?

A.  Yes.

Q.  You also see that it is to yourself and Mr. Balsillie, both co-CEOs of RIM at that time, correct?

A.  Yes.

MR. THAKUR:  If you could highlight that for me. It has to do with the concern.  There we go.

The rest of that paragraph, please.

BY MR. THAKUR:

Q.  Do you understand, it says:  "It has to do with the concern around managing yet another platform, the absence of effective management tools and the inability to control, provision and maintain the service and components to the level they want to."

As of January 17th, 2002, there was no integrated solution to manage these wireless devices at the enterprise; isn't that correct, sir?

A.  There were other solutions.

Q.  Right.  But the regular -- there was no one integrated solution that someone at the company could use to control and manage the devices as of January 17th, 2002?

A.  I don't completely agree with that.

MR. THAKUR:  Let's go to page 2.  Go to the top of that e-mail, from Mr. Morrison on January 17th at 3:38 p.m.  Scroll up.  Right at the top.

Actually you may need to get to page 1 to get the context of the date.

At the bottom.  Could you highlight who that email's coming from.

BY MR. THAKUR:

Q.  Do you see that e-mail?  It's from Mr. Werezak to DePaul?

A.   Yes.   Can I see what the subject was?

Q.   Yes.   You need to go to the previous page.

A.   I didn't catch the subject.

        MR. THAKUR:   Can we go to the previous page and catch the subject line?

BY MR. THAKUR:

Q.   Right at the bottom says:   "Do you understand bite on SEVEN from our Friday discussion."

        Do you see that, sir?

A.   That's what it says, yes.

Q.   SEVEN is a conference event?

A.   No.   SEVEN is a competitor.

        MR. THAKUR:   If you go to the next page at the top.

BY MR. THAKUR:

Q.   Okay.   The key line I want you to highlight says: "It also came up yesterday in my dialogue with Mformation."

        Do you see that?

A.   Yes.

Q.   So would you agree with me as of January 17th, 2002, RIM was talking to Mformation, correct?

A.   It would appear that way from the e-mail.   I don't know that I have seen this before.

        MR. THAKUR:   Let's go back to the previous page

at the bottom again.  Thanks.  That's it.

BY MR. THAKUR:

Q.  Do you see your name addressed as well,
Mr. Lazaridis?

A.  Sorry, I must have gotten mixed up.

MR. THAKUR:  If you could scroll up, let's
highlight the whole e-mail.

BY MR. THAKUR:

Q.  This is an e-mail from you, correct?

A.  Yes.

Q.  Dated the same day, correct?  January 17th?

A.  Yes.

Q.  You say there:  "I want to meet on this.  I feel very
strongly that we need to deal with this quickly."

Do you see that, sir?

A.  Yes.

Q.  Those are your words, right?

A.  That's my e-mail.

Q.  And you say:  "When can we meet?"  Correct?

A.  Yes.

Q.  Okay.

MR. THAKUR:  Let's go to Exhibit 362.

Q.  The bottom it says:  "Jim's e-mail to Mike."
Correct?

The very next day.

Okay.  Do you agree January 18th is the very next day following the prior discussion about Mformation?

A.  That e-mail was discussing a BlackBerry competitor --

Q.  I'm sorry?

A.  The previous e-mail discussed was a BlackBerry competitor named SEVEN.

Q.  But you saw that Mformation was being discussed as part of that e-mail chain?

A.  It was, but that wasn't the subject of that e-mail.

Q.  Let's focus on this, shall we, sir?  You agree in this case you're talking about Mformation, right?

A.  I'm responding to -- well, that's Jim, Jim sending me an e-mail, yes.

Q.  So Jim is your co-CEO, correct?

A.  That's correct.

Q.  And you're the two guys running the company?

A.  That's correct.

Q.  Mr. Balsillie asks you:  "Is this product worth buying?"

A.  That's what that e-mails says.

Q.  And you responded:  "Yes.  Along with a group focused on this critical requirement from our customer base.  Absolutely."

Is that your response, sir?

A.  That was the response in the e-mail.

MR. THAKUR:  Okay.  If you scroll up to the e-mail above.

BY MR. THAKUR:

Q.  Mr. Balsillie to you.  His response is:  "Management are a bunch of dorks."

Do you see that?

A.  Yes.

Q.  Was it your opinion as well that management was a bunch of dorks at Mformation?

A.  I hadn't formed an opinion.

MR. THAKUR:  Scroll up to the next e-mail.

BY MR. THAKUR:

Q.  This is your response, correct, sir?

A.  Yes.

Q.  You start with:  "Don, it will take us too long to create, and with them we will have a lock on the corp market."

And when you say "them", you're referring to Mformation; is that correct, sir?

A.  I'm referring to the group of engineers and people at Mformation, correct.

Q.  And the technology, the --

A.  No, the engineers.

Q.  You didn't want the technology?  You just wanted the engineers?

A.   That's correct.

Q.   Do you know how many people were at Mformation at the time?

A.   No.

Q.   You know it was a very small company?

A.   Yes.

Q.   Do you recognize Dr. Kushwaha?

A.   No.

Q.   So when you say you were interested in Mformation, you wanted the people, did you want Dr. Kushwaha?

A.   I don't recall.

Q.   But you recall you wanted the people, but you don't recall if you wanted Dr. Kushwaha?

A.   Yes.

      MR. THAKUR:  If we could go to Trial Exhibit 319. Scroll down to the middle of the second e-mail from the top.

      It's from Dave Castell -- nope, the one above that.  Oh, actually, sorry, yes, that's the one.  The one above that.

BY MR. THAKUR:

Q.   This is four days later on Tuesday, do you see that, January 22, 2002?

A.   Yes.

Q.   And actually, the e-mail chain is discussing

introducing Synchronex, which is actually someone else, correct?

A.  Yes.

Q.  Yet you asked Mr. Castell:  "Any further musings with respect to *Synchrologic vs. Mformation*," correct?

A.  That's correct.

Q.  Do you see Mr. LeVine over there?

A.  I don't see Mr. LeVine over there.  I'm sorry.

Q.  So you're discussion with respect to Mformation was primarily with Mr. Castell; isn't that correct?

A.  I don't know recall that, no.

Q.  That's fine.

          MR. THAKUR:  Scroll up to the e-mail above.

          If you could highlight the second paragraph that says...

BY MR. THAKUR:

Q.  Actually before I do that.  This is an e-mail from Mr. Castell to you; is that correct?

A.  That's correct.

Q.  It's on Tuesday.  January 22nd.  At 7:29 p.m. in the evening, correct?

A.  That's correct.

Q.  So the next paragraph says:  "I find myself a little torn between the two companies because, although there is overlap in the device management area, they are quite

different in other areas.  Mformation fills the device management and monitoring hole with more depth and mostly single focus on our devices."

Do you see that, sir?

A.   Yes.

Q.   You understood Mformation to provide device management and monitoring; is that correct?

A.   That's what that e-mail says.

Q.   But you don't remember?

A.   No.

Q.   Any reason to doubt the e-mail that was written in 2002?

A.   Not from Dave Castell.

MR. THAKUR:  If we could turn to Trial Exhibit 185.  Could we look at the date at the very top.

BY MR. THAKUR:

Q.   Okay.  This is an e-mail dated February 19, 2002. Correct?

A.   That's correct.

MR. THAKUR:  Scroll down to the original e-mail.

BY MR. THAKUR:

Q.   From Mr. Castell to you.  That's the e-mail on February 19, 2002, correct?

A.   That's an e-mail from 2002.

Q.   A mere few weeks after the earlier discussion on --

in January of 2002?

A.   If you say so.

MR. THAKUR:  Okay.  I'd like to scroll down to the third bullet point from the bottom.

BY MR. THAKUR:

Q.   "Mformation's attraction with our carrier and government customers is quite likely going to end with us preloading this agent anyways."

A.   That's what it says.

Q.   You don't remember whether the carriers were pressing RIM to load it?

A.   No.

MR. THAKUR:  Go to the top paragraph, "Ray, Ken and I."  It says:  "Ray, Ken and I."

BY MR. THAKUR:

Q.   It says:  Ray, Ken and I are in agreement on a short-term course of action on the device management front.  While we aren't ruling out the potential for acquisition (Mformation, Synchrologic, etc.), the best quick fix in the short term would be to take ownership over Mformation's agent, document it, and call it our own over-the-air API 1.0."

Do you see that, sir?

A.   Yes.

Q.   At that time your intention was to take Mformation's

agent and put it on to the RIM system and call it RIM's over-the-air API?

A.   That was one option.   There were other companies that did similar things.

MR. THAKUR:   Scroll up to the top of the e-mail.

BY MR. THAKUR:

Q.   Do you see what your instruction to Mr. Castell was?

"Okay, take control of the agent."   Do you see that, sir?

A.   Yes.

Q.   Did you write an e-mail to anyone at RIM saying, "Okay, take control of Synchrologic"?

A.   I was responding to his letter to me saying that they were offering us to take control of their agent.   And I said, Of course.

Q.   You never wrote "take control of Synchrologic's agent" to your recollection, ever?

A.   It says, "Okay, take control of the agent."   That's what I wrote.

Q.   I'm -- we understand that meant Mformation.   But there was another company you were considering, Synchrologic, do you recall that?

A.   Yes.

Q.   Did you ever write an e-mail saying "take control of Synchrologic's agent"?

A.  No.

MR. THAKUR:  If we could turn to Trial Exhibit 2250, please.

I want to stick with the timeline, so we've got January, February, now we're into May.

If you could scroll halfway down the e-mail, let's get the date.  Let's go down to the bottom.

BY MR. THAKUR:

Q.  Do you see that e-mail, it says Thursday, May 9, 2002.  Correct?

A.  Yes.

Q.  Okay.  Do you see the subject line?  It says: "BlackBerry Alternative."

A.  Yes.

Q.  Do you see the second line, it says -- actually the first line in the e-mail says:  "What do you think about evaluating this new product as a potential alternative to BlackBerry?"  Do you see that?

A.  Yes.

Q.  Do you see "good.com"?

A.  Yes.

Q.  Was Good a significant competitor of RIM at that time?

A.  Good was a competitor of BlackBerry, they were trying to recreate the solution.

MR. THAKUR:  Could we scroll down second from the bottom.

BY MR. THAKUR:

Q.  "Complete management from the server, devices need only be cradled for initial provisioning and then only for battery recharging thereafter."

Does that provide you an understanding that as of May 2002, Good was providing management from the server but without cradling -- but with cradling?

A.  They claimed to have that feature, yes.

Q.  So your competitor now was on the market with management but still cradled, correct?

A.  Yes.

Q.  RIM did not have that capability as of May 9, 2002, correct?

A.  You could still deploy BlackBerrys from the server.

MR. THAKUR:  Could we scroll to the top?  Can you get that signature line in as well, please.

BY MR. THAKUR:

Q.  You see this e-mail on which you are cc'd, correct?

A.  Yes.

Q.  Let's see the discussion.  So Lockheed Martin -- Lockheed Martin, it's a big defense contractor in the United States?

A.  Yes, and they were a big BlackBerry customer.

Q.   So Lockheed Martin has entered into a very heated dialogue regarding the Good Technology offering and what would appear to be some key advantages.  Do you see that?

A.   Yes.

Q.   "Do you have any positioning or technical collateral which could be useful as I work to politically maintain the validity of the RIM solutions going forward?"

THE COURT:  Viability, not validity.

BY MR. THAKUR:

Q.   I'm sorry.  I'll read that slowly.

"Do you have any positioning or technical collateral which could be useful as I work to politically maintain the viability of the RIM solutions going forward?  Please keep in mind that LM/EIS has a signed corporate nondisclosure agreement on file with RIM."

"Your aggressive support would be greatly appreciated."

Do you see that?

A.   Yes.

Q.   So this is the response from an individual, Peter Sowa, at Lockheed Martin following a discussion with respect to the Good product, correct?

A.   That's correct.  That's what the e-mail says.

Q.  So that's May 16, 2002.

        MR. THAKUR:  Let's turn to Trial Exhibit 381,
please.

Q.  Do you recognize this document, sir?

A.  Not this particular document.

Q.  So January, February, May, now comes June of 2002.
BlackBerry has conducted a research, isn't that correct,
sir, of its customers?

A.  Yes.

        MR. THAKUR:  I'd like to turn to page 7.  If you
can highlight the third -- the portion on the bottom
quarter, which is the percentages.

BY MR. THAKUR:

Q.  Do you see the line that says:  "Setting up handhelds
is preferable to installing desktop software."

        In that study 62 percent agreed with that and 38
percent disagreed.  Do you see that, sir?

A.  I see that.  I don't understand what it means.

Q.  Okay.

        MR. THAKUR:  If we can go to the next page.

        The next page, please.  That's page 8.

        So if you could circle the portion at the very
top.  It says "BES."

BY MR. THAKUR:

Q.  So do you see that you have conducted a survey, and

this is the portion of the survey relating to the BES.
Correct?

A.   There are a great number of things talked about in there.

Q.   I just want to make sure this was related to the BES. You saw that?

A.   Yes.

MR. THAKUR:  Chris, scroll to the paragraph below it.  The numbers.  There you go.

BY MR. THAKUR:

Q.   Do you see the portion on the left where your customers say:  "Ability to lock lost or stolen devices over-the-air."  73 percent said extremely valuable, and 21 percent say valuable.  Correct?

A.   That's correct.  That's what it says.

Q.   Next line is:  "Wireless IT policy allows IT to push out policy."  56 percent say extremely valuable and 35 percent say valuable.  Do you see that?

A.   Yes.

Q.   Next line:  "Enhanced management console for managing users policy."  53 percent say extremely valuable, and 36 percent say valuable.  Do you see that, sir?

A.   Yes.

Q.   So this is in June of 2002.  Correct?

A.   Yes.

MR. THAKUR:  If we could turn to Trial Exhibit 2251.

BY MR. THAKUR:

Q.  Okay.  So let's go from the top.  January, February, May, you've done a survey in June of 2002.  At this point, do you see a discussion with an e-mail from Mr. DePaul to you, Mr. Lazaridis, in December of 2002?

A.  It's an e-mail from Ray DePaul, yes.

Q.  And the subject of that is the "BES Roadmap"; isn't that correct, sir?

A.  Yes.

Q.  It talks about two releases that are coming up, BES 3.6 and 4.0.  Do you see that?

A.  Yes.

Q.  The first paragraph says:  "The key competitive implication" -- if you could take a look at that.

"The key competitive implication of the above plan is the delay in providing the wireless PIN and zero desktop features.  As we're all aware, these are features that Good has been shipping since May.  And based on a RIM survey of ITAdmins, wireless contacts was important for 81 percent of them.  Tasks and memos, less so."

So you see this e-mail to you referencing your competition from Good?  Do you see that?

A.   Yes, synchronizing contacts wirelessly.

Q.   And you see the reference to that study that I mentioned to you.  Do you see that, sir?  The June 2002 customer study?

A.   Where is that?  I'm sorry.  I missed it.

Q.   Do you see the fact where it says zero desktop was preferred by 62 percent of the ITAdmin, but that number dropped to 36 percent as the implications of upgrading handheld without desktop software was explained.  Those were the numbers I just referred to in the trial exhibit on the customer survey.  Do you recall that, sir?

A.   I can't be certain that it's the same survey, but that's what this e-mail says.

Q.   But the numbers match?

A.   If you say so.

Q.   Most importantly, if we can now read the next paragraph.  The next paragraph of the same e-mail.  Starts with "unfortunately."

        MR. MATUSCHAK:  Your Honor, we're spending a lot of time on versions before the accused version product.

        THE COURT:  Overruled.

BY MR. THAKUR:

Q.   "Unfortunately, this delay may be interpreted as an inability to respond to the competition and may harm our credibility with the customer/carriers that were

informed of the prior roadmap."

When you are referring to competition, you're referring to Good, aren't you, sir?

A.   Yes.  And others.

Q.   And others.

"For this reason, I agree with the approach of a 3.6 interim release to get attachment viewing, Java, and OTAFM in the market.  Approximately 60 percent of the ITAdmins view OTAFM as an important feature, and attachment viewing has become table stakes.  The alternative of waiting, 18 months from Good's launch without at least a partial response to the competition, isn't preferred."

Do you see that, sir?

A.   Yes, but they're talking about attachment viewing and over-the-air floor managers being the key issue that our customers are asking for.  I don't understand what this has to do with Mformation.

Q.   I'm just asking you if that's what the document says?

A.   That's what the document says.

Q.   And you understand the need that you can't wait 18 months after Good's launch for at least a partial response to the competition?

A.   This is what it's like to run a company in a growing market.

MR. THAKUR:  If I could turn to Trial Exhibit 200.

BY MR. THAKUR:

Q.  Do you see this document at the very top says, "BlackBerry Financial Sector – Debriefing Notes, February 27, 2003."  Do you see that, sir?

A.  Yes.

MR. THAKUR:  Next page, please.  Bottom of the page, Chris.  Could you highlight that.  There you go.

BY MR. THAKUR:

Q.  Do you see the language where it says:  "They need to reduce the cost of upgrades and overall BlackBerry support.  They are pushing for no desktop with wireless servicing, which will make BES 4.0 a very valuable upgrade for them."

Do you see that, sir?

A.  Yes.

Q.  The concept of wireless servicing with BES 4.0 is a valuable upgrade:  Isn't that correct, sir?

A.  Yes.

MR. THAKUR:  If you could turn to the next page, please.

See Paragraph 3, highlight "open discussion."

BY MR. THAKUR:

Q.  Do you see in this document "Overall discussion

comments by group"?

A.   Yes.

Q.   And you see the second bullet point where it says,
"No desktop deployment"?

A.   Yes.

MR. THAKUR:   Could you turn to the second half of
that document, please.

BY MR. THAKUR:

Q.   Do you see the highlighted portion?

Do you see the words, "need to deploy without
touching the desktop."?

A.   Yes.

Q.   We've gone from January, February, May to
December 2003.  And now let's take a look at Trial
Exhibit 2095.

Do you see the date on that, sir?

A.   Yes.

Q.   That's the date of the release -- announcement of the
release of BES 4.0, correct?

A.   That's correct.

MR. THAKUR:   Let's go to the -- highlight the
fourth paragraph where it says "simplified deployment."

BY MR. THAKUR:

Q.   So it says:  When you release BES 4.0, as follows:
"Simplified deployment BlackBerry Enterprise Server

Version 4.0 will enable users to quickly connect their handheld to BlackBerry Enterprise Server with cradleless wireless provisioning making it easier for IT departments to deploy BlackBerry throughout their company.  IT will be able to easily maintain control over BlackBerry without requiring centralized IT deployment or device fulfillment".

Do you see that, sir?

A.  Yes.  This was an invention we came up with for initializing the security keys on the devices without having to connect them with the wire.

Q.  So wireless registration?

A.  No.  It was wireless synchronization of security keys, which was a very difficult problem in encryption. And we got the NSA to approve it.

Q.  Does it use the words "NSA" in there, sir?

A.  No.

Q.  Does it use the words "wireless encryption" in there?

A.  No.  But that was the issue.

Q.  Mr. Lazaridis, do you recognize this document?

A.  I have to read it.  I don't recall it.

Q.  Perhaps I could help you with that.  It says "United States Patent Application."  Do you see that at the top, sir?

A.  I know it's a patent application.

Q.   It identifies an inventor, does it not, sir?

A.   Yes.

Q.   It identifies you as an inventor?

A.   Yes.

Q.   And you're identified as the sole inventor on this patent?

A.   Yes.

Q.   When you filed this application, you took an oath?

A.   Yes.

Q.   And the oath says that you will declare that all statements made herein are of my own knowledge and are true, and that all statements made on information and belief are believed to be true.  Do you remember that oath?

A.   Yes.

        MR. THAKUR:  Your Honor, permission to publish this patent application?

        MR. MATUSCHAK:  No objection, your Honor.

        THE COURT:  Without objection.  What document number is this?

        MR. THAKUR:  Your Honor, we're going to enter it as an exhibit.

        THE COURT:  Say again?

        MR. THAKUR:  We'll enter it as the next exhibit.

        MR. MATUSCHAK:  I'll object to it at this point,

your Honor.  I don't object to them showing it.

THE COURT:  If the jury is going to see it, it has to be in evidence.

MR. MATUSCHAK:  That's fine.  Withdraw the objection.

DEPUTY CLERK:  5015.

THE COURT:  5015 is in evidence.

(Plaintiff's Exhibit 5015 received in evidence)

THE COURT:  All right.

MR. THAKUR:  Would you kindly display.

BY MR. THAKUR:

Q.  Do you see it's a patent on which you're identified as an inventor?

A.  Yes.

Q.  And it was published on March 3, 2005, which predates the filing of this lawsuit.  Correct?

A.  Yes.

Q.  I'd like to point out the words to you that are highlighted.  "A mobile station, 30, configured as a wireless server, 30, may, for example, operate as a wireless http server to accept TCP/IP or UDP/IP connections of various kinds."  Correct?

A.  That's what that says.

Q.  And you understand that UDP is a protocol that may be used to make connections?

A.   Yeah.  A UDP is connectionless as well.

By the way, that patent was for a web server.

Q.   Has RIM entered into license agreements for other patents?

A.   I'm sorry?

Q.   Has RIM entered into license agreements for other patents?

MR. MATUSCHAK:  Objection, your Honor.  Beyond the scope.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.   You mentioned the name Ken LeVine, correct?

A.   You mentioned the name Ken LeVine.

Q.   We heard the name Ken LeVine on direct exam, correct?

A.   Yes.

Q.   Who was Mr. Ken LeVine?

A.   Ken LeVine was an employee, friend.

Q.   You said he was an executive?

A.   That's what I recall.

Q.   Was Ken LeVine a good man?

A.   He worked for me.  Why would I think otherwise?

Q.   Do you have any reason to believe that he would not have acted in the best interest of Research In Motion?

A.   I didn't at the time.

Q.   Do you know?

A.  It's questionable now.

Q.  You understand he's passed away, right?

A.  Yes.  It's unfortunate.  Many of my friends have passed away.

Q.  So he's not here to answer --

THE COURT:  Well, that's going to be argumentative.

MR. THAKUR:  All right.

BY MR. THAKUR:

Q.  Do you recall that in 2007, Research In Motion failed to file a second quarter financial statement?

A.  I recall that, yes.

Q.  And do you recall that as a result that on February 5, 2009 --

MR. MATUSCHAK:  Objection, your Honor.  Beyond the scope.

THE COURT:  What's the relevance?

MR. THAKUR:  Your Honor, this is to show -- deal with credibility of this individual.  We're accused of willful infringement.  This gentleman has entered into agreements with the government.

MR. MATUSCHAK:  It has nothing to do with anything, has nothing to do with any patents.  I object, your Honor.

THE COURT:  It seems to me you need to, if you're

offering it on his character for truthfulness, you have to establish that he is the person who acted untruthfully.  And so the reason I hesitate is I don't know enough of a foundation yet as to what his connection with that event or whether or not it reflected untruthfulness.

So I'll invite you to lay that foundation.

BY MR. THAKUR:

Q.  Do you recall that the Ontario Securities Commission -- do you know who the Ontario Securities Commission is, the OSC?

A.  Yes, I do.

Q.  And do you understand that there was a Management Cease Trade Order issued by the OSC which was in effect from November 7, 2006, until May 23, 2007?

A.  Yes.

Q.  And that you entered into a settlement on February 5, 2009?

MR. MATUSCHAK:  I'm going to object, your Honor.  He's just reading the document that he was --

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  Have you ever entered into a settlement agreement --

MR. MATUSCHAK:  I would object, your Honor.

MR. THAKUR:  I'm asking him as an open question.

He can answer yes or no.

MR. MATUSCHAK:  Well, once he asks the question, then we're going to be spending a lot of time talking about it.

THE COURT:  Well, I'll allow you to ask the question as long as you tender to the Court you had a good faith belief in asking the question, that it bears on his making a statement under oath that he admits was wrong or words to that effect.  So go ahead, if you believe in good faith that that is the tenor of the disclosure that you're about to ask him about.

MR. THAKUR:  Thank you, your Honor.

BY MR. THAKUR:

Q.  On February 25, 2009, was there a settlement agreement with a company, Research In Motion; yourself, Mr. Lazaridis; and Mr. Balsillie, the other co-CEO, relating to previously disclosed OSC investigations of the company's historical stock options granting practices?

Do you recall that?

A.  There was a settlement.

Q.  Do you recall that the settlement was in the aggregate in the amount of 83.1 million to the company?

A.  Yes.

Q.  Do you recall that you yourself personally, you paid

Canadian $1.65 million to the government for the cost of that investigation?

A. Yes, I did.

Q. Do you recall that yourself and Mr. Balsillie and two former officers of the company also agreed to pay a monetary penalty in the aggregate of 1.425 million? Do you recall that?

A. Yes, I do.

Q. Mr. Lazaridis --

MR. MATUSCHAK: I'm going to move to strike. This established what the Court was worried about. There was nothing that establishes untruthful -- there was no statement that he establishes that he made that was incorrect. There was none of the foundation that your Honor just asked counsel to make.

THE COURT: Well, sometimes settlements are made without admitting any -- you know, you settle. So I was expecting that he would ask a question where in the settlement he acknowledged untruthfulness. I didn't hear that. So the motion to strike is granted.

The jury will disregard the testimony.

But if you believe you can go back and establish that --

MR. THAKUR: Your Honor, we'll let the evidence in the case speak for itself. But thank you.

BY MR. THAKUR:

Q.  Do you own 30 million shares of RIM stock?  And that is approximately 5 percent of the company; isn't that correct?

A.  Approximately.

MR. THAKUR:  Your Honor, we identified exhibits 2247, 319, 2250, 381, and 2251, which were not objected to.  May we admit them into evidence?

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  Very well.  I need that list.  They are in evidence.

MR. THAKUR:  2247, 319, 2250, 381 and 2251.

(Plaintiff's Exhibits 319, 381, 2247, 2250 and 2251 received in evidence)

MR. THAKUR:  Your Honor, I have no additional questions.

THE COURT:  Very well.

Do you have any redirect?

MR. MATUSCHAK:  Yes, your Honor.

Could we get Exhibit 5015 up on the screen?

Huh?  We don't have that?

MR. THAKUR:  We used the Elmo.

MR. MATUSCHAK:  Oh, okay.

THE COURT:  Can you sharpen it a bit?

MR. MATUSCHAK:  I'll try.

REDIRECT EXAMINATION

BY MR. MATUSCHAK:

Q.   You were asked some questions on direct about this patents application, which was Exhibit 5015.  Do you recall that?

A.   Yes.

Q.   And I think you said this had to do with the web server; is that correct?

A.   Yes.

Q.   All right.  And anywhere in this language that you were directed to by Mr. Thakur, do you see the words, "establish a connection"?

A.   No.

Q.   Thank you.

     Now, Mr. Lazaridis, you are a named inventor on a number of patents; isn't that true?

A.   Yes.

Q.   And approximately how many issued United States patents have come out in your name as an inventor?

A.   Approximately a hundred.

Q.   All right.  I'm going to show you one of those, Mr. Lazaridis.  It's U.S. Patent Number 7,529,230.  Is that one of your patents, sir?

A.   It's one of mine, yes.

Q.   Could you turn with me to Column 19 -- strike that.

MR. MATUSCHAK:  Your Honor, I offer the '230 patent?

THE COURT:  '230 or '320?

THE WITNESS:  It says '230.

MR. MATUSCHAK:  I thought it was '230.

THE COURT:  Thank you.

MR. THAKUR:  No objection, your Honor.

DEPUTY CLERK:  5016.

BY MR. MATUSCHAK:

Q.  That's your name listed there as one of the inventors.  Do you see that?

A.  Yes.

MR. MATUSCHAK:  If we could turn to Column 19, line 21.  Just that whole section, that's good.

BY MR. MATUSCHAK:

Q.  Do you see there, sir, that you're talking about what is generally important in the transport layer?

A.  Yes.

Q.  And you say it's one or more of the following properties.  Do you see that?

A.  Yes.

Q.  Now, in line 25, you say, "This means that using a session-based, aggressive message delivery can be a problem."  Do you see that?

A.  Yes.

Q.   And what were you talking about there?

A.   Well, the whole advantage of using packet switch networks was you could address a packet of information to a destination number and just send it into the network.

Q.   And this session-based message delivery, is that what you just described or is that something different?

A.   That's something different that would require a connection to be established, like a phone call or modem connection.

Q.   Let's look at line 32, please.  Down to the B section.  Do you see where it says it should offer a connectionless datagram reassembly delivery method?

A.   Yes.

Q.   Can you think of any connectionless datagram reassembly delivery method?

        MR. THAKUR:  Objection, your Honor.  Beyond the scope of cross.

        THE COURT:  Overruled.

        THE WITNESS:  UDP.

BY MR. MATUSCHAK:

Q.   And if we go down, the next sentence you say:  "Many connection-based transports have been tried, including modifications to the transport control protocol (TCP) used on the Internet with limited success."

Do you see that?

A.   That's correct.

Q.   What did you mean by that?

A.   Well, it was -- a school of thought at the time that people wanted to use the TCP connection protocol over Mobitex.  And it was highly consumptive.  It was unreliable.  And it drained the battery.

MR. MATUSCHAK:  All right, you can take that down.  If we could have Exhibit 2251, please.

And if we can highlight the paragraph, the last big paragraph there, and actually the -- yeah, that's good.  Thank you.  Very much.

BY MR. MATUSCHAK:

Q.   Now, Mr. Thakur asked you about this part at the bottom where there's some talk about this attachment viewing, Java, and OTAFM and how important that was.  Do you remember that?

A.   Yes.

Q.   What's "attachment viewing, Java"?  What does that mean?

A.   Attachment viewing was the ability of the BlackBerry to actually view attachments.  That was one of the most important things our customers kept asking for, it's like Word documents and PowerPoint.

Q.   Do you understand whether any product of Mformation's

that you were discussing with them in this time period of 2001 to 2003 had anything to do with attachment viewing?

A.   No.

Q.   There was also reference to OTAFM.  I notice Mr. Thakur did not want to you explain that.  Could you tell us what that is?

A.   OTAFM stands for over-the-air file management.  It was -- customers wanted to be able to manage their e-mails into their various files and folders that they'd created.  And this allowed them to do it.

Q.   Did that have anything to do with the solution you were talking about with Mformation?

A.   None.

        MR. MATUSCHAK:  You can take that down.

Exhibit 351, the cover page.

BY MR. MATUSCHAK:

Q.   Sir, I wanted to talk to you about the timeline, was there are a couple of things that were left out of the timeline.  Here we are in June --

        MR. MATUSCHAK:  I'm sorry, I thought it was 351.

But I could be wrong.

        I apologize.

        381.

BY MR. MATUSCHAK:

Q. So this is the survey that you were asked about in June 2002. Do you see that?

A. Yes.

Q. All right. Let's talk about a couple of things that weren't on the timeline before.

MR. MATUSCHAK: Can we see 4469, please?

Or 4449. Sorry.

BY MR. MATUSCHAK:

Q. Exhibit 4449 is a document entitled "BES 2.2 Development Plan." Do you see that?

A. Yes.

Q. And this is now way back in March 2001 before Mr. Thakur's timeline started. Do you see that?

A. Yes.

Q. All right. And if you look at the very last page at the bottom -- before I ask you about this, Mr. Thakur showed you that survey and said, you know, customers wanted the lock and wipe. Do you remember that?

A. I'm sorry, could you --

Q. In the survey do you remember Mr. Thakur was pointing out the customers were saying it would be nice to have wireless lock and wipe?

A. Yes.

Q. Okay. And if you look at the last bullet point of

this document from 2001, over a year before, was that something that RIM was already considering?

A.  Yes, absolutely.

MR. MATUSCHAK:  And if we look at Exhibit 4503 -- oh, I have to move this into evidence, your Honor.

THE COURT:  What number was it?

MR. MATUSCHAK:  4503.

THE COURT:  4503 is in evidence.

(Defendant's Exhibit 4503 received in evidence)

BY MR. MATUSCHAK:

Q.  October 7th, 2002, this is dated?

A.  Yes.

Q.  I can never count without my fingers.  So this is four months after the survey, correct?  Of --

A.  It would appear that way, yes.

Q.  And this was announcing the BlackBerry Enterprise Server 3.5, which you weren't asked about.  Do you see that?

A.  Yes.

MR. MATUSCHAK:  Can we turn to the third page, please.  And if we can get paragraph -- I think it's the third paragraph from the top.

BY MR. MATUSCHAK:

Q.  Do you see where this paragraph says that Version 3.5 is providing a lock or erase all data on a BlackBerry

handheld?

A.   Yes.

Q.   And you understand that Version 4.0 is the first version that's been accused of infringement in this case?

A.   Yes.

MR. MATUSCHAK:  No further questions, your Honor.

THE COURT:  Very well.  The witness is excused. Thank you very much, sir.

THE WITNESS:  Thank you.

(Witness exits the witness stand.)

MR. MATUSCHAK:  I would like to comment, your Honor.

THE COURT:  Very well.

MR. MATUSCHAK:  Ladies and gentlemen, you've now heard from Mike Lazaridis.  He's retired.  He's not CEO anymore.  He didn't have to come here.  He could have stayed back in Canada.  He earned his retirement.  He's a very successful man.

But he came here.  He came here to stand behind his employees, he came here to stand behind Mr. Cherry, who you heard a couple of days ago.  Because when his employees are accused of copying, falsely accused of copying, he's here for them.  That's why he's here.

You've already heard Mr. Cherry's story.  He

spent 10 years with 20 other engineers working to make the BlackBerry Enterprise Server better and better. 10 years, day in and day out. They did the coding. They did the work. Not Mformation. Mr. Cherry and his 20 engineers.

The old fashioned way, the hard work way.

Mr. Lazaridis came here not just to tell a story, although it's a pretty interesting story, it happens to be the story of the invention of one of the greatest electronics products of the 20th century.

But he came here so you could understand that RIM doesn't have to copy. Mr. Lazaridis has been working in wireless networks and RIM has been working with wireless networks since 1988. More than a decade before Dr. Kushwaha had his first idea about wireless networks. They knew about sending wireless commands since 1990. In the Mobitex. It had been out there in the marketplace.

Mr. Lazaridis came here to establish, to tell you why RIM chose not to establish a communication, a connection, for the same reasons that Dr. Nath, the co-inventor said, for the same reasons that Dr. Acampora explained to you: RIM didn't want to tie up the networks. They didn't want to cost the customers a lot of money to connect to the network for a long time. And

they wanted to make something better.  These are important things.

You saw from Mr. Lazaridis's patent that I showed him, this was a big deal.  People were saying you can use TCP to do this.  You couldn't.  It wouldn't work the right way.  And that's what his patent was about in part.

Mr. Lazaridis came here to explain, because he's convinced that if you understand the background, if you understand the technology, you will understand that this case is not about patents.  You will understand that this parade of witnesses that you've seen from Mformation, the people contradicting their own testimony, their own sworn testimony, every time they come up and sit in that chair, this case has nothing to do with the patents.

What this case has to do is Dr. Kushwaha trying to keep his venture capital and investment banker friends for putting the responsibility for Mformation's lack of success in the marketplace where it belongs on Dr. Kushwaha, not on RIM.

Thank you.

THE COURT:  Any request for comment?

MR. THAKUR:  There's no one more than me who respects an immigrant coming to North America and being

successful.  I salute him for that.  I take nothing away from him having accomplished some great things.  But just because he built the pager doesn't mean he came up with everything.  We know that.

Let's look at the facts.  I've always said to you see the facts because, you know, he's good at arguing -- lawyers are good arguers.  I ask you to look at the facts.  They looked at the inventions.  They demoed it.  They looked at it for months on end.  In January there was an urgent need to come to a determination about a management solution.  You saw Mr. Lazaridis's e-mails.  You saw the nondisclosure agreement that had been signed, and pursuant to that the January in-depth technical meetings that took place where Dr. Kushwaha disclosed everything about how their invention worked.

And people try to confuse you with, well, they didn't get the source code, so they didn't copy it.  We have never said they copied the source code.  I can show you how an idea works.  And you can get an idea about how it works.  And go build it.  This is what the patent's about.  It's about the idea and about how it works.  You see documents up there from 1990 that says "kill."  I don't know how many documents, I could show you a newspaper and I could find you the word "kill" every day for the last 10 years.

The problem isn't about kill.  The problem is about how it's done.  You've got to look at the story.  The first part of the story is, they needed it.  There's no dispute about that.  Their customers wanted it.  You saw their own customer surveys that they wanted it.  So that's the first part.

Number two, they were in a competitive environment.  Okay.  In the competitive environment, you've got to go back to the timeline.  There was a company called Good.  You see any Good handheld devices today?  Actually, Good got to the market with device management before RIM.  They got there almost a couple of years before them.  Yet, what did RIM do?  RIM said, We've got to compete.  And they came up with the competition solution that had an interim solution.  The interim solution was to provide some of these device management capabilities without doing it entirely wirelessly.  And it took them another 18 months to come up with a full wireless solution.

BES 4.0 met every element of the claim of the '917 patent.  That's what it's about.  Okay.  You can't come -- what patent law says is you can take an invention, and as long as you don't do some of the elements, you don't infringe.  That doesn't mean they weren't doing device management.  But what we have here

is BES 4.0 that did everything the way the patent claims.  This is a patent infringement case, and that's what it's about.  BES 4.0 is what does every element of the Claim 1 of the '917 patent.

And sometimes I find it confusing when I keep hearing of BES 4.0 is the first product accused.  You've got to follow the timeline.  BES 4.0 came out in 2004.  The lawsuit was filed in 2008.  Of course, they're going to accuse the product that's on the market.  Right?  We're not going to accuse a product that's -- we can't get damages.  You've heard about damages from the day of the lawsuit going forward.  We're accusing the product that's on the marked at that time.

Finally, I think you heard him mention, Well, you saw Mr. Lazaridis talk about a connectionless protocol, establishing a connection.  You really have to watch the words.  UDP is a connectionless protocol.  Okay.  It's a protocol.  They use the word "connectionless" where you don't establish a -- set up a handshake before you communicate.  TCP you do that.  But that's a protocol.  That doesn't mean you can't use both of those kinds of protocols to establish a connection.  And everything you have seen so far in this case shows that you use either one of those protocols to establish a connection.

That's all I have, your Honor.  Thank you.

THE COURT:  Call your next witness.

MS. DeBRUIN:  RIM calls David Castell to the stand.

THE COURT:  Come all the way forward and be sworn by the Clerk of the Court.

(Witness sworn)

DEPUTY CLERK:  Please be seated and speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  William David Castell, C-a-s-t-e-l-l.

WILLIAM DAVID CASTELL,

   called as a witness by the Defendant,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DeBRUIN:

Q.  Good afternoon, Mr. Castell.

A.  Good afternoon.

Q.  Were you once employed by RIM?

A.  Yes, I was.

Q.  Are you still employed by RIM?

A.  No, I'm not.

Q.  When did you stop working at RIM?

A.  I retired at the end of June in 2008.

Q.   How long did you work for RIM?

A.   For 10-and-a-half years.

Q.   I'd like to talk a little bit about your background. Where did you go to college?

A.   I went to the University of Waterloo.

Q.   Where do you live?

A.   I live in Waterloo.

Q.   What did you major in in college?

A.   It was computer science.

Q.   Did you receive a degree?

A.   Yes, I did.

Q.   Did you do any further study after receiving your computer science degree?

A.   Yes, I went back to school at University of Toronto.

Q.   What did you study there?

A.   I went to law school and business school.

Q.   You decided not to be a lawyer?

A.   I decided not to be a lawyer.

Q.   What kind of work did you decide to do after getting your graduate degrees?

A.   I decided to go back into the tech industry, and in particular, I was really attracted to the product management.

Q.   What attracted you to product management?

A.   Well, I'd done an internship in product management

during my schooling, and a product manager is kind of like a CEO of a product. You get a real breadth of perspective around the product, not just working with engineering and defining what the product's going to be, but how it would be priced, how it would be marketed and sold to the market, so you really got to see a little bit of everything.

Q. After you finished your legal apprenticeship, did you go to work at RIM?

A. Yes, I did.

Q. What year was that?

A. That was the beginning of 1998.

Q. What was RIM like when you started in 1998?

A. It was still a very small company. It was a little more than 150 people, and most of us were crammed in the first floor of a single building.

Q. Did RIM have any product on the market when you started?

A. They had a few products, yes.

Q. What were those products?

A. Well, the main focus of the company at the time was building two-way pagers, but they also had some other radio products to be built into other people's product and some specialty software products.

Q. Were there any products that you were specifically

brought in to work on?

A. Yeah, I was brought in to work on what, at the time, was a side project. While the company was focusing on two-way paging, there was this thought of a wireless corporate e-mail might be an emerging market that they would like to focus on. Kind of a way of hedging bets against two-way paging.

Q. What was that side project?

A. It was what's evolved into the -- and renamed the BlackBerry Wireless E-mail Solution.

Q. That was a pretty good bet to hedge?

A. They did a good job.

Q. What was your first title at RIM?

A. It was product planning manager.

Q. What were your responsibilities?

A. Again, it was a very broad perspective. It was working with engineering to get the product built. But also trying to define what the product was going to be, who it was going to be targeted at, what problems it was going to solve, how we were going to sell it and market it and price it. All kinds of things really to get this product to market.

Q. How would you go about determining what features would be in the product?

A. Part of it was discussing internally what market we

were going to pursue with it, was it going to be an e-mail pager solution, or ultimately we decided to focus on the positioning it as an electronic organizer, so that brought all kinds of features like address book and calendar and synchronizing those with your desktop.

But because the solution was focused on mobile professionals and wireless e-mail, we had to talk to certain mobile professionals to understand what their needs were. And because we were focusing on the corporate market, we had to talk a lot to the IT departments. These were the computer departments in the companies who ran the e-mail servers to understand what their needs were.

Q. When did you have discussions with those IT departments?

A. Some of it was before launch. We had trial -- some early trial users. Like Intel was an early investor in RIM, so they volunteered to be a trial user. Also in the two-way paging LSAT volunteered, so we discussed with them throughout 1998 leading up to the launch, and we also had discussions postlaunch of BlackBerry through 1999 and continuing discussions as the products continued to evolve.

Q. Did you identify any features prelaunch of the BlackBerry, so in 1998, from your discussions with these

IT departments?

A.   Yeah, absolutely.  Became very clear that security was important.  Intel, for example, coined the phrase "only the paranoid survive," so you can imagine how important knowing that e-mail was completely secure flowing from the networks to the devices.  So it became very clear early on that security was of utmost importance.

Q.   When do you mean when you say "security"?

A.   Well, many different aspects.  One of it is the security of the messages as they flow from behind the four walls of the corporation, leaving the corporation and flowing to the device, making sure that at no point it could be intercepted and read.  So this is what we called end-to-end encryption.

And also security of the device itself was important.  We'd heard a lot from them about concerns over information on the devices and their CEO calling saying, Well, maybe we've left the device in a cab and what am I going to do, it has all kinds of information on it.  So they were very concerned about the security of information on their device as well.

Q.   How did they want to address that concern of the engine's on the device and maintaining its security?

A.   Well, a frequent feature that they discussed is, what

they'd like to have is -- we dubbed it "remote kill,"
but if their CEO called them up and says, I lost my
device, they wanted a big red button they could press
and have the device delete itself, and tell the CEO,
It's all safe and the device is taken care of.

Q.  So you had requests from customers in 1998 for remote
kill, this big red button?

A.  Yeah, it was either through 1998 or early '99 when we
were talking to customers about that period, but
definitely dating back to that period, we had frequently
heard that scenario, and that request for a feature.

Q.  So if the customers were asking for this feature in
1998, 1999, did you provide it in the initial release of
the BlackBerry?

A.  No, we didn't provide that in the initial release.

Q.  Why not?

A.  Well, part of what we focused on with the feedback
was mandatory passwords of the device through what we
called IT policy, and we introduced that in a subsequent
release of the solution.

      And that was a complete solution to the problem.
Because if you didn't have the device being locked and
being able to trust the lock on the device, somebody
would just pick up the device in the back of the taxi
and turn the radio off.  A remote kill was not really a

solution.

I understood the emotion behind wanting something to press and have it deleted, but it wasn't a technical solution to their problem. Their solution was to have enforced passwords on the device and trust those passwords will protect the device, and if somebody tries to get through the passwords, have the device erase itself.

Q. Did there come a time that RIM ultimately provided this remote kill on the device?

A. Yes, there did.

Q. When was that?

A. It was with the BlackBerry Enterprise Server 3.5 release, and it was launched in October of 2002.

MS. DeBRUIN: And can we please have Exhibit 4503 on the screen.

BY MS. DeBRUIN:

Q. Is this exhibit, 4503, a press release for BES Version 3.5?

A. Yes, it is.

Q. Did you also -- in 3.5, did you also introduce other wireless administration features?

A. Yes. We had a number of commands, wirelessly lock the device, wirelessly set a password. But then we also introduced wireless IT policies. This was the, where

they can set a feature where the IT department forces passwords to be set and requires them to be changed with a certain frequency.

MS. DeBRUIN:  If we could please go to page 3 of the press release.

BY MS. DeBRUIN:

Q.  The portion where it says, "IT administrators are able to define," is this talking about the wireless IT policies?

A.  Yes.

Q.  So how would a wireless IT policy work?

A.  Well, they would set -- they would define what the policy is for the company; that, for example, all users have to set their password, it has to be a certain length.  It might have to be changed every number of days, and once they set that, it gets pushed out to the devices, and the devices reacted to that policy and prompt the user to set a password.

Q.  You mentioned that the remote kill was also included in this release.

MS. DeBRUIN:  Could we please go to the last page, I believe, of this document.

BY MS. DeBRUIN:

Q.  Does this refer to -- says:  "RIM is now also providing corporate customers with a remote control

feature that enables IT departments to wirelessly set password and lock or erase all data on a BlackBerry handheld."

Is that "lock or erase all data" the remote kill function that you were talking about?

A.   Yes, it is.

Q.   That was available in BES 3.5?

A.   Yes.

Q.   And when was BES 3.5 released?

A.   October of 2002.

Q.   Did you have some interactions with Mformation during your work at RIM?

A.   Yes, I did.

Q.   I'd like in particular to focus in on -- I'm trying to be conscious of our time -- there are a few documents that Mformation's damages expert has used in this case that I'd like to see if you can explain to us.

MS. DeBRUIN:  I'd like you to turn to Exhibit 314, which is already in evidence, and if we could please have that on the screen.

BY MS. DeBRUIN:

Q.   Do you recognize Exhibit 314?

A.   Yes, I do.

Q.   And if we could turn to the page that bears production number, last four digits 4078.  Are these

your notes?

A.  Yes, they are.

Q.  What do these notes relate to?

A.  Well, this is the notes I was taking from the meeting that I had with Mformation.  They came and met a number of people at RIM.

Q.  When did that meeting occur?

A.  It's August 30th, 2001.

Q.  You have that noted up in the corner there?

A.  Yes.

MS. DeBRUIN:  If we could focus in on the portion of the page down below the line.  Yes, thank you.

BY MS. DeBRUIN:

Q.  What does this portion of this page from your lab notebook refer to?

A.  This was in the afternoon.  I had met with Ted Yarnell, who was the vice-president of worldwide sales, from Mformation.

Q.  And what notes did you make of the meeting with Mr. Yarnell?

A.  He was telling me, well, he was responsible for selling the product to the customers they were selling it to, and he was telling me what their pricing model was when they were selling it to those customers.  I was just taking notes down on what he was saying their

pricing was.

Q.   So does this reflect at all what you thought the Mformation product would be worth?

A.   No, I was just taking notes of what he told me.

Q.   Are you aware of any customers who actually paid these amounts for Mformation's product?

A.   No, I don't know of any.

Q.   What amounts was he telling you?  I'm just finding it a little bit hard to read the writing on the exhibit.

A.   I do have the benefit of understanding my own chicken scratching.  The first amount is a $50,000 per server license per network.

So BlackBerry supported a number of Internet networks.  So the idea was they would buy a server for each of the networks that a company was using, then for each of the users, the devices or the users that were checking to it, they had a user fee as well.  And that ranged from $70 down to $30, if it was a volume price.  Then there was an additional 20 percent annual maintenance charge, so this is a -- for software licenses you often charge a 20 percent of what the upfront fee was to cover upgrades to the software.  So it gives you free upgrades if you keep paying that maintenance.

Q.   So these are numbers that Mr. Yarnell told you; is

that right?

A.   Yes.

MS. DeBRUIN:  If you could turn, please, to Exhibit 103.

BY MS. DeBRUIN:

Q.   We'll first look at the e-mail that's the first page of this exhibit.  Do you recognize this e-mail?

A.   Yes.

Q.   There's a presentation attached to this e-mail.  What is this presentation?

A.   This is a presentation that I had created that was really just a what-if presentation.  What if RIM wanted to focus more on enterprise software, what it might look like.

Q.   When did you prepare this document?  Other than the cover e-mail.

A.   The presentation was prepared around the middle of 2001.

MS. DeBRUIN:  If you could turn -- if we could turn, please, to page 8 of Exhibit 113.

BY MS. DeBRUIN:

Q.   Did you prepare this chart that is on page 8?

A.   Yes, I did.

Q.   Would you please explain what this chart is?

A.   Well, this is part of the -- in the what-if scenario,

and the brainstorming, this is under why.  At the time we were making $10 a month for service fee from the carriers, and I was just saying maybe there's a guy making recurring revenue, rather than from the carriers, but make it through the sale of corporate software.

So I had thrown down some components that I was aware of.  There were some companies in market selling components, and generally what I understood their pricing to be in the market.  And then the maintenance column, which was this recurring annual revenue, I tried to make my example come out to be about $120 a year, just to make the point that there were other ways of getting $10 a month rather than a service fee through a carrier.

Q.  Were you trying to be inclusive and include all possible components?

A.  No, I was just trying to throw some examples and was really trying to get to this 120-dollar-a-year number on the last column.  So I wasn't meaning to be exhaustive or accurate here.  I was really just trying to illustrate a point.

Q.  You said that the numbers reflected what you understood various companies were charging for their software.

A.  Yes.

Q.  Did you do anything to verify that those companies were actually receiving those dollar amounts for their software?

A.  No.

Q.  Did RIM ever pay any of those companies those dollar amounts for their software?

A.  No.

Q.  I'd like to look in particular at the systems monitoring line.  Do you see that right above the total?

A.  Yes, I do.

MS. DeBRUIN:  If we could highlight that.

BY MS. DeBRUIN:

Q.  What was your source for the information in this line, the $50 a seat?

A.  Really it was from my notes from the meeting with -- in the summer of 2001.  It was between 70 and $30.  So I picked a middle number of $50.  They told me 20 percent maintenance, so 20 percent of 50 is $10 a year.  So that's -- I was really just using their numbers for that.

Q.  Does this chart, in particular the middle column, reflect RIM's view of the value of any of these features?

A.  No, it does not.

Q.  Does this chart reflect the value of these different

components to RIM?

A.  No, not at all.  I was just throwing down numbers.  I wasn't even responsible for any pricing of anything at RIM at that point.

Q.  When you put the chart together, did you make sure it included all the features of the BES?

A.  No.

Q.  What did you do to verify the dollar amounts in the chart?

A.  I did nothing at all.  It was really, it wasn't on any kind of planning document.  It was a brainstorming document to get people thinking about why we might want to pursue enterprise software more aggressively.

Q.  Were you responsible for setting the price of any BlackBerry product when you drafted this presentation?

A.  No, not at all.

Q.  Turning back to the e-mail, the first page to which this presentation was attached, what did you mean in this e-mail when you said that you'd probably revisit some of this?  Do you see that language?

A.  Yeah.  Really was primarily this pricing.  The rest of the document I was still pretty comfortable with pursuing, but at this point at the end of 2002, it became very clear that my pricing example was far removed from reality.

For example, we had -- handling the company, talking to customers, it became very clear that they did not expect to pay anything, and indeed we made it a feature of the product and competitors at the time were offering it for free as part of the product.

We had also just launched a BES 3.5 browser platform STK for end-to-end communication, and it became clear that the customers were not expecting to pay much, if anything, for that feature as well.  So because those developments happened, this was really indefensible, that part of the presentation.  The other parts I was comfortable, but this one really needed to be revisited.

Q.  By "this one," you're referring to the chart we just examined?

A.  That part of the presentation, yes.

MS. DeBRUIN:  Very well.  No further questions.

THE COURT:  Very well.

Cross-examination.

MS. NOLLER:  I don't know if your Honor wants to let the jury go home early, but...

THE COURT:  Well, it's about 3:48, but if you would prefer, I'll charge you the time.

MS. NOLLER:  We'll take the charge.

MS. DeBRUIN:  Your Honor, we have a witness who traveled here from Canada.

THE COURT:  I didn't know that he was not going to be available to us.

MS. NOLLER:  I didn't either.  But I don't think I will be done in 10 minutes.  I don't know.

THE COURT:  This is the kind of thing that I'd hoped counsel would have chatted about previously.

MS. NOLLER:  All right.  I didn't know.  We'll try.

CROSS-EXAMINATION

BY MS. NOLLER:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Sir, I know you're retired from RIM, but how much stock do you currently hold?

A.  Stock in RIM?

Q.  In RIM.

A.  I don't hold any stock.

Q.  Did you hold any at the time of your retirement?

A.  I don't believe so, no.

Q.  Okay.  I want to start with the document that you were just looking at, which is Exhibit 113.

MS. NOLLER:  And, Chris, if we could just get that up on the screen, please.  I'd like you to go to the chart that counsel was just referring to.

BY MS. NOLLER:

Q. You were just talking about some of the numbers on this chart, sir, correct?

A. Yes.

Q. And you said you applied the 20 percent maintenance fee to systems monitoring for Mformation because that was data they gave you in an August 30th meeting. Is that what you just said?

A. Yes.

Q. Actually, you applied the 20 percent maintenance fee to all numbers in that chart for all software, correct?

A. That's correct.

Q. You also said that this was a -- I think you said a what-if scenario; is that fair?

A. Yes.

Q. Now, in November of 2002, the BES actually was in existence, though, correct?

A. The BES was in existence, yes.

Q. And it was never called the "BlackBerry carrier server," was it?

A. No.

Q. It was the BlackBerry Enterprise Server?

A. Yes.

Q. So this was always something that you guys were pricing and working with, right?

A.   Yes.

Q.   This wasn't a new thing for RIM, was it?

A.   I agree.

Q.   And pricing would have been an important aspect of your marketing, correct?

A.   Well, the pricing -- the pricing didn't change too much from earlier pricing, but it was important when it was originally set, yes.

Q.   So this wasn't -- the idea of pricing wasn't new to RIM in 2002, was it?

A.   No.

Q.   And it's something that you guys focused on quite a bit, correct?

A.   I can't focus -- I can't comment on how much of a focus was given to pricing.  I know the pricing didn't change much in the BES.  So I can comment when I set the pricing originally, I focused on it back in '99.  But I don't know how much focus was given afterwards.

Q.   Okay.  And let's talk about some of the focus that you provided on that pricing.

        MS. NOLLER:  So let's go back, please, Chris, to Exhibit 314.

BY MS. NOLLER:

Q.   This is that notebook of yours, right?

        MS. NOLLER:  If we could turn, please, Chris, to

page 37, which are the notes about the August 30th, 2001 conversation with Mformation.  If you could just --

thank you very much.

BY MS. NOLLER:

Q.  All right.  Now, this is the information that you said that Mformation provided to you, correct?

A.  Yes.

Q.  And above where you put "$50,000 per server per network," you also wrote "enterprise SW."  Is that correct?

A.  Yes, that's what it says.

Q.  And SW is typically shorthand for software; is that right?

A.  Yes.

Q.  Now, you also said you wrote "70, $30 per agent," correct?

A.  Yes.

Q.  Now, that was cumulative pricing in addition to the $50 per network per server fee?

A.  That was my understanding.

Q.  And when you met with Mformation, they were meeting with you about an enterprise solution, not a carrier solution, right?

A.  Well, I don't remember it, there's another price down there that I can't right now understand what it's for

unless it was for carriers.  So...

Q.  And you're talking about "ASP $3 a month wholesale," correct?

A.  Yeah, I'm not sure what that price was about.

Q.  And that's separate from the -- where it says "pricing model," colon, "$50,000 per server per network," and the "agent, 70 to $30 figure," right?

A.  Yeah, my understanding, it is separate.

Q.  You did not think the 30 to $70 price was unreasonably low, did you?

A.  I didn't have an opinion one way or the other.  I was just writing down what he was telling me.

        MS. NOLLER:  Can you please play clip 13, please.

        Actually before you do that.

BY MS. NOLLER:

Q.  You were deposed in this case, correct?

A.  Yes, I was.

Q.  And during the deposition you agreed to tell the truth, right?

A.  Yes.

Q.  And it was the same oath you took today?

A.  Yes.

        MS. NOLLER:  All right.  Now play clip 13, please, Chris.

        (Whereupon, an excerpt of the videotaped

deposition of Mr. Castell, was played.)

MS. NOLLER:  Have a safe trip home to Canada, sir.

THE COURT:  Any further questions?

MS. DeBRUIN:  Yes, your Honor, just very quickly.

REDIRECT EXAMINATION

BY MS. DeBRUIN:

Q.  Mr. Castell, just to clarify, the chart in Exhibit 113, on page 8, you created that chart in 2001; is that right?

A.  Yes.

Q.  At that time, were you responsible at all for setting pricing at RIM?

A.  No, not at all.

MS. DeBRUIN:  Thank you.  No more questions, your Honor.

THE COURT:  Very well.  Witness is excused.

(Witness exits the witness stand.)

THE COURT:  I don't suppose you want to start a witness with the time we have left?

MS. DeBRUIN:  Your Honor, I just wanted to read some exhibits that I wanted to make sure were admitted.

THE COURT:  And no commentary request with respect to this witness.

So what documents?

MS. DeBRUIN:  Documents 4503, 1008, 4085, 4073, 4028, 4663, and 4704.

THE COURT:  Very well.

MS. NOLLER:  I don't believe we have any objection to those.

THE COURT:  Very well.  They're in evidence without objection.

(Defendant's Exhibits 1008, 4028, 4073, 4085, 4503, 4663 and 4704 received in evidence)

THE COURT:  With that, though, we will terminate our session for the day.  We'll come back to this matter on Tuesday.  Let me revisit our calendar.  Is that our last day for evidence in this case?  Or do we have more?

MR. THAKUR:  Your Honor --

MR. MATUSCHAK:  It's our last day of evidence, but I think he may have some more, your Honor.

THE COURT:  I'm sorry, let me get my calendar in front of me.

Well, we're scheduled to have testimony on Tuesday, Thursday and Friday.  Let me have the lawyers stay in and we'll talk about that.

And I'll tell you when we come together on Tuesday whether or not we still need the full schedule that we've set out for you.  So I'll see you on Tuesday morning at 9 o'clock.  Remember my admonition.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom)

THE COURT:  Very well.  Just on the -- out of the presence of the jury.

Just on the schedule question:  I presume you'll be calling a new witness when we come together on Tuesday?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  And when do you expect, based upon reasonable anticipation of the time for cross-examination, you will rest?

MR. MATUSCHAK:  Tuesday.

THE COURT:  So you will be done with your evidence.  Do you anticipate a rebuttal?

MR. THAKUR:  Your Honor, we do, at least on validity, on the issue of validity of the patents. There may be a witness or two depending on what we hear on Tuesday.  I think we'll finish within a day for sure, so Thursday.

THE COURT:  Within the day.  So we won't be in a position to have argument until at least Thursday afternoon?

MR. THAKUR:  That's probably correct, your Honor.

THE COURT:  So there may be then argument on Friday?

MR. THAKUR:  Correct.

MR. MATUSCHAK:  I would say, your Honor, that we would propose that we just set Friday as the argument day so we know in advance when we have to exchange things.  Rather than -- because, otherwise, we'll have to do it at a time before.

THE COURT:  So perhaps what we will do then, I need some time with you to settle instructions.  So let's make that Thursday afternoon.  Which might ruin my holiday.  But that's why they pay me the big bucks.

(General laughter)

THE COURT:  So then we will have argument on Friday the 6th.

Now, we weren't planning to have the jury in on Monday the 9th, because that's a Monday.  But there is no reason why they, if you finish and submit it to them, they couldn't use Monday for deliberations, unless for some reason you tell me that you would not wish to have that day scheduled.  I'll raise that with them.  It's not uncommon for jurors to stick to the schedule we've given them then and for some of them to have arranged that Monday to not be available to us.

And my staff, knowing there's no trial, might have scheduled things for me on that day.  So all of that we'll talk about when we come back together.  I'd

like not to have too much of a delay with respect to commencement of deliberations.  And there may be further legal motions that will be made at the end of the respective cases.

But since the time for argument has not previously been scheduled, I schedule out generally just the time for the trial.  It would be important for the Court to have any proposed -- have you given me your proposed jury instructions?  I haven't looked at what you've submitted.

MR. MATUSCHAK:  We have, your Honor.

MR. THAKUR:  Yes.

THE COURT:  So if there are any new instructions, sometimes during the course of trial, things come up for which the parties now wish to have the Court give instructions, and quite frankly, there are some things that I have determined perhaps I would need to comment on, just based on the state of the record.

But anything of that kind, you need me for on Tuesday, because it would be my intent to start to put the instructions in their final form for Thursday afternoon meeting.

You received the note?

MR. MATUSCHAK:  I was going to raise that, your Honor.  I thought that it would be appropriate for the

Court to respond to that note because I think the answer is pretty clear.  It's a document that is in evidence, so it can be considered, but they can give it whatever weight they want.  I think that's the correct response to that question.

THE COURT:  Well, I normally wouldn't comment in that way.  I didn't pay attention to whether it was a draft version and what significance it had.  I wouldn't want to comment about that.  But the question is:  Was this document ever finalized?  If this draft was never finalized, why should it be considered credible?  So that's argument as to the last question.

The first question as to whether it may be used is something I can't answer, and why it was not -- or was it ever finalized is a fact question I don't know the answer to.

Very well.  Anything else out of the presence of the jury?

MR. MATUSCHAK:  No, your Honor.

MR. THAKUR:  No, your Honor.

THE COURT:  Very well then.  I'll see you Tuesday morning at 9 o'clock.

MR. THAKUR:  Thank you, your Honor.

MR. MATUSCHAK:  Thank you, your Honor.

(Adjourned)

oOo

INDEX OF EXAMINATION

Witness:                                              Page:

ANTHONY ACAMPORA

Cross By Mr. Thakur (cont.)  . . . . . . . . .1637

Redirect By Ms. DeBruin  . . . . . . . . . . .1723

MIKE LAZARIDIS

Direct By Mr. Matuschak  . . . . . . . . . . .1744

Cross By Mr. Thakur  . . . . . . . . . . . . .1797

Redirect By Mr. Matuschak  . . . . . . . . . .1827

WILLIAM DAVID CASTELL

Direct By Ms. DeBruin  . . . . . . . . . . . .1840

Cross By Ms. Noller  . . . . . . . . . . . . .1857

Redirect By Ms. DeBruin  . . . . . . . . . . .1862

oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

INDEX OF EXHIBITS

| Exhibit No. | Received: |
|---|---|
| 5014 | 1657 |
| 5015 | 1820 |
| 319, 381, 2247, 2250 and 2251 | 1826 |
| 4173 | 1731 |
| 4204 | 1734 |
| 2142 | 1777 |
| 4503 | 1833 |
| 1008, 4028, 4073, 4085, 4503, 4663, and 4704 | 1863 |

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Friday, June 29, 2012