Volume 10

Page 1870 – 2046

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

------------------------------)
                              )
Mformation Technologies, Inc., )
                              )
                  Plaintiff,  )
                              )
     v.                       )   No. C 08–4990 (JW)
                              )
Research In Motion, Ltd.,      )
et al.,                       )
                              )
                  Defendants. )  San Francisco, California
                              )  Tuesday, July 3, 2012
------------------------------)


TRANSCRIPT OF PROCEEDINGS


<u>APPEARANCES:</u>


For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLEN A. ARNTSEN
                        RUBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO

Case 3:08-cv-04990-EMC    Document 1012    Filed 07/09/12    Page 2 of 177    1871

**APPEARANCES** (cont.):

**For Defendant:**          WilmerHale
                            305 South Grand Avenue
                            Suite 2100
                            Los Angeles, California 90071
                      BY:   MARK G. MATUSCHAK
                            ANDREW B. GROSSMAN

                            Kirkland & Ellis, LLP
                            300 North LaSalle
                            Chicago, Illinois 60654
                      BY:   LINDA S. DeBRUIN
                            AARON D. CHARFOOS
                            TIFFANY PATRICE CUNNINGHAM
                            FERLILLA VICTORIA ROBERSON
                            MARIA A. MARAS
                            MICHAEL DALEY KARSON

**Also Present:**           Ray Dikun, RIM Vice-President

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020

Tuesday, July 3, 2012

(9:00 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Good morning.

Very well.  We're on the record out of the presence of the jury.

I received some requests having to do with matters that are coming up, but they don't deal with the current witness, correct?

MR. MATUSCHAK:  That's correct, your Honor.

MR. CHARFOOS:  We do have one issue that relates to the current witness, and I believe Mr. Matuschak has another issue more generally relating to the trial.

THE COURT:  So how long -- who is the current witness, remind me.

MR. CHARFOOS:  Julie Davis, RIM's damages expert.

THE COURT:  I see.  And how long will that be?

MR. CHARFOOS:  The testimony?  Or the argument about what we need to argue about?

THE COURT:  Is there an argument with respect to that witness?

MR. CHARFOOS:  There is.

THE COURT:  All right, what's that motion?

MR. CHARFOOS:  Your Honor, we had submitted to

you last week Exhibit 853, which was the cost to recreate the '917 patent. That particular document was in fact created in the overall context of the Mesirow valuation for the patent itself; and, therefore, plaintiffs argue that it should be excluded under the Court's motion in limine.

That document, however, was created by Dr. Kushwaha himself. And although it was provided to Mesirow, it was an independent analysis of the cost to recreate the patent.

THE COURT: I'm sorry, what is a cost to recreate a patent?

MR. CHARFOOS: It was his estimated amount of time and effort put in to develop the '917 patent. Which came to roughly a million dollars.

Now, Georgia-Pacific Factor No. 8 goes to the overall profitability of the product. And I'm concerned in particular, in addition to its relevance to the analysis that Ms. Davis conducted, that Mr. Basu may have left the jury with a misimpression that, if you recall, Mformation had lost money in all the years leading up to 2010, and Mr. Basu said that one of the reasons they lost money was because they were reinvesting in the company.

And he specifically says at page 409, starting at

line 22:  "You invest those years with your intellectual property, and once the revenue starts coming in, your losses turn into profit."

I don't want the jury to be left with the impression that Mformation has spent $111 million investing in the '917 patent when it's only been a million.  And, therefore, your Honor, we would ask that Ms. Davis be allowed to discuss 853, and that it be introduced into evidence.

MR. ARNTSEN:  And your Honor, we think that this is part of the Court's ruling.  With the third-party valuations, the Court said that damages for patent infringement are determined on the basis of a hypothetical negotiation at the time infringement began, citing the Unilaw case.  The Court finds that third-party valuations at issue are not relevant and thus are in.

In particular, none of the reports at issue attempted to assess the value of the '917 patent at the time infringement began, none assumed the patent was both valid and infringed.  Thus, admission of these reports is likely to confuse the jury by introducing a basis for evaluating damages that differs entirely from that the jury is being asked to apply.

And that's exactly the case with this document

here.  Essentially what it shows is the person here involved writing the software for Mformation's product. And it's got nothing to do with the damage determination.  It's inappropriate for an expert to rely on it because it's counter to Federal Circuit law and this Court's in limine decision, and it would only confuse the jury.

THE COURT:  You're offering it on damages?

MR. CHARFOOS:  Yes, your Honor.  Because it's relevant to, number one, the profitability of the product, as well as the relative value of that product. How much time and effort was put into creating it.

THE COURT:  What product?  The patent is not a product.

MR. CHARFOOS:  But -- I'm sorry, I misspoke. It's the cost to recreate the '917 patent itself.

THE COURT:  Well, how is that -- how is that relevant to damages?  Because someone can come up with a patented idea very quickly and other people can take a long time.  I've never thought about that as a damage issue.

MR. CHARFOOS:  Again, the profitability of the commercial invention is one of the Georgia-Pacific Factors, and so to the extent that this document shows the profitability of the commercial invention, then that

would go to Georgia-Pacific Factor No. 8.  And you know, other courts, including the Federal Circuit, have allowed those kinds of inquiries into the profitability.

And again, Mr. Basu suggested that they're investing all of this money into their intellectual property, and I think it's important for the jury to understand that it did not cost $111 million to create the '917 patent.  It was $1 million, according to Dr. Kushwaha's own analysis.

The other thing --

THE COURT:  Okay.  That the testimony you're trying to rebut was that it cost that to develop the '917 patent.  And you can argue that those numbers are not the basis.  The objection is sustained to using this for damages.

Now, it seems to me that there might be other purposes, but that is not one of the permissible purposes.

Anything else with respect to this witness?

By the way, I have the same kind of concern with respect to the rebuttal, but I guess I can wait on that.  That's why I was asking about the timing.

MR. CHARFOOS:  There is one other thing with respect to this witness, Mformation's counsel, and we've talked about this ahead of time, is intending to use

some of the RIM's license agreements with Ms. Davis. These are very, very sensitive license agreements.

Number one, we would request that those agreements, to the extent that they're introduced into evidence, be brought in under seal.

And number two, your Honor, we would ask that you would close the courtroom for the discussion of RIM's license agreements. Mr. Arntsen -- and he can step in if I misrepresent -- has taken those license agreements and grouped them together in a single section of his cross-examination, and we'll notify the Court before he begins that, which will allow that time that the courtroom's closed to be limited and as short as possible.

THE COURT: Any objection?

MR. ARNTSEN: I have no objection.

THE COURT: Very well. So you have to alert the Court to that.

MR. CHARFOOS: We will alert the Court to that, yes, your Honor.

THE COURT: All right. Summon the jury.

MR. MATUSCHAK: Your Honor, we have -- we had one other issue. And that is, I don't know if it's common to you, but there was a -- a report to us last night that there was a contact between a member of the jury

and, A, Dr. Kushwaha; and, B, a member of Mr. Thakur's legal team.  And I don't know if that made its way to your Honor, but we think that the Court should inquire with the juror about that contact, and just explain --

THE COURT:  I'll make some general statement to the jury.  I was -- it was brought to my attention.  As it was described to me, it was initiated by the juror, social gesture kind of things, and I didn't take much of a need to do anything more than continue to admonish the jury about that.

MR. MATUSCHAK:  Well, we would request that the Court actually ask the juror, make sure from the juror's perspective, that she had the same feeling.  And it may well be.  But it's -- because we don't know and we weren't there, so we just think it would be important to have clarified that the jury thinks this was also just a random event and --

THE COURT:  Well, it would be -- I'd do something to figure out what happened, but I thought I understood what happened.  Is this a request that the Court inquire further as to what happened of the juror?

MR. MATUSCHAK:  To -- yeah, to ask the juror in her own words to describe the contact so that we have the juror's version of that.  I'm not saying that anything that Mr. Thakur says is incorrect, but

sometimes two people have different views of the same --

THE COURT:  I understand your request.  Denied.

MR. MATUSCHAK:  Thank you, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  Good morning.

JURORS:  Good morning.  Good morning.

THE COURT:  We're about to resume.

It came to my attention that one or more of you might have seen or spoken with one of the lawyers or witnesses in the case as you were kind of moving around the court building.  And I simply wanted to add the Court's caution about that.  Because I've given that admonition to the parties, and that is this:  If they should happen to see you or encounter you, my instruction to them is turn around and go the other way.  And that's not out of disrespect, it is out of respect for your position as judges.

They treat me the same way.  I don't meet with the parties without everybody present.  I don't talk to them without everybody present.  Because I am neutral to this whole process, and our job as the judges is to have the parties feel as though we're neutral.

And, you know, it's often the case, I actually

ran into several of you in the elevator as we were going down, and we exchanged greetings, and that's normal. But it's important that, as we now come near to the close of this case, that we observe the neutrality of not wanting either party to feel as though we are more friendly toward them than somebody else, and of course, I expect that that's the case.

If any of you should feel that you would wish to speak with me more about contact that you had with them or they've had with you, let me know.  Just send me a note to that effect.  But otherwise, I would just continue to have you observe my admonitions.  Do not communicate with the parties in any way, and don't form or express any opinion about the decision in this case until the whole case is over.  I've given you my instruction on the law, you've heard the arrangements, you've heard all the evidence.  That's a very important part of our process.

Thank you very much.

All right.  So call your next witness.

MR. CHARFOOS:  Yes, your Honor.  We call Miss Julie Davis.

(Witness sworn)

DEPUTY CLERK:  Please be seated, and speak clearly into the microphone.

Please state your full name and spell your last name.

THE WITNESS:  Julie L. Davis, D-a-v-i-s.

JULIE L. DAVIS,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CHARFOOS:

Q.  Good morning, Ms. Davis.  How are you?

A.  Good morning.

Q.  Could you please tell the jury why you're here?

A.  I've been asked to address the amount of damages that RIM should pay to Mformation if you were to decide that the '917 patent is both valid and infringed.

Q.  And we heard the other day that Mr. Weinstein used a couple of assumptions when he was doing his damages analysis.  Do you have any assumptions with respect to your analysis as well?

A.  I do.

Q.  And what are those?

A.  I have the same two assumptions to start with, and that is, I start with an assumption that the patent is valid.  And I also start with the assumption that it is infringed.  I don't know if either one of those are true.

Q.   But if the jury finds that the patent is either invalid or not infringed, what damages would be owed to Mformation?

A.   If the patent is either not valid or not infringed, then the damages would be zero.

Q.   And have you come to a conclusion on the proper calculation of damages in the event that the patent is infringed and valid?

A.   I have.

Q.   Before we get to that, let's talk a little bit about your background.  And I think that Trial Exhibit 4815, which we don't need to bring up on the screen, is your CV.  But could you talk to the jury a little bit about where you work currently?

A.   I work at a firm in Chicago called Davis & Hosfield Consulting.

Q.   And what does Davis & Hosfield consulting do?

A.   We're a group of about 25 professionals.  We all come from background primarily in accounting and finance, and the type of consulting we do draws upon those background.  A lot of it's in the context of situations like this where there are two parties with a dispute to be resolved.

Q.   And are you the Davis in Davis & Hosfield?

A.   I am the Davis of Davis & Hosfield.

Q.  Can you tell the jury a little bit about your educational background?

A.  I grew up in Kansas and I attended college at Kansas State University.  My degree is in accounting, in 1978.

Q.  And you graduated summa cum laude, didn't you?

A.  I did.

Q.  Did you take the CPA exam?

A.  Yes, I took the CPA exam the year that I graduated.

Q.  And how did you score on the CPA exam?

A.  I scored a first in my state.

Q.  Are you licensed to practice as a CPA -- first of all, what is a CPA?

A.  A CPA, as you probably know, is a certified public accountant, and I am licensed to practice in five states, including here in California.

Q.  Before you started Davis & Hosfield, where did you work?

A.  When I first graduated from college, I started my career in Kansas City at one of the large international accounting firms at the time.  It was known as Touche Ross, that was before it merged with Deloitte.  I spent nine years there in the audit practice.

        And then when I moved to Chicago, I joined Arthur Andersen, which was yet another of the large international accounting and consulting firms at the

time.  I spent 15 years there, as part of the economic and financial consulting practice.  At the time I left I was in charge of the firm's worldwide intellectual property practice.

And in 2002, that portion of the practice of which I was a part was sold to yet another one of the large international accounting and consulting firms called KPMG.  I had a similar role there where I was in charge of international intellectual property practice.

Q.  And that I think brings us up to 2003 when you started Davis & Hosfield?

A.  Precisely.

Q.  Have you done any writing of any publications or books?

A.  I have authored a number of publications, and I also coauthored a book called *Edison in the Boardroom*.

Q.  Can you tell us what that is about?

A.  That particular book profiled the stories of companies who were known to be managing their patent portfolios well, companies like Hewlett Packard, IBM, Dow, Dupont, SC Johnson and others.

Q.  Have you been involved in any other patent cases?

A.  I have.  I have been asked to analyze damages in probably 300 or more patent cases.

Q.  Have you testified at trial before?

A.   I have.  I've testified probably 50 or more times at trial, including here in San Francisco and also in Oakland.

Q.   What kind of technology have you dealt with in those cases?

A.   The technologies have covered a variety of different kinds of products that range from jet engines to golf balls, farm tractors to kitty litter.  So it's all kinds of different product.  A number of those also involved cell phones and other technology that's used in cell phones.

Q.   Could you give the jury a sense of a little bit of a flavor of the different kind of clients you've had as well.

A.   I've worked with a lot of clients around the world, as a matter of fact, but a number of them here in San Francisco that you would recognize would be ones like Google, Genentech, Oracle, Intel, Cisco, would be some of those names.

Q.   Have you ever worked for my client, RIM, before?

A.   I have not.

Q.   Have you ever worked for my law firm Kirkland & Ellis?

A.   Yes, I have worked for some of your colleagues before.

Q.   Have you ever worked for WilmerHale, Mr. Matuschak's firm?

A.   I have.

Q.   Have you ever worked with the plaintiff's law firm Foley & Lardner?

A.   Yes, I have.

Q.   When you think about the cases that you handled in the past, what's the split between plaintiff and defendant?

A.   Probably half and half.  Half of those cases are on behalf of the patentee, who own the patent.  The other half are on behalf of the party that's accused of infringement.

Q.   What rate are you charging or is Davis & Hosfield charging for your work in this matter?

A.   The firm bills $575 an hour for my time.

Q.   And in terms of the amount of time that you have spent, how much time have you spent?

A.   I gather it's comparable to Mr. Weinstein's, probably 200 hours or more of my own time.

MR. CHARFOOS:  Your Honor, we would tender Ms. Davis as an expert in accounting and financial analysis in the calculation of damages for patent infringement.

THE COURT:  Very well.  The Court will recognize

her as an expert in those fields, and as I've told you before, that entitles her to express opinions about matters having to do with that area.

BY MR. CHARFOOS:

Q.   Can you tell the jury a little bit about the approach that you took in developing your opinion in this case?

A.   The approach that I took in this case is similar to the one that I take in all patent cases, and that is to start by asking a couple of my colleagues to assist me with my work, and together what we do is review all the documents that have been produced by either of the parties, and sometimes third parties in the case, we have read excerpts of depositions, individuals, many of whom you've heard from here in the courtroom, that had something to say that related to damages.

I interviewed a number of employees of RIM.  I have performed a number of different analyses.  I have prepared and submitted four different reports.  And ultimately I've been here in the courtroom to hear the same testimony you have or I've read it in the transcript.

Q.   And you were here in the courtroom when Mr. Weinstein testified, correct?

A.   I was.

Q.   Now, do you agree with Mr. Weinstein's conclusions?

A.   I do not agree with his conclusions.  There are several thing we do agree on, but not on the conclusions.

Q.   And what do you disagree with Mr. Weinstein on?

A.   Mr. Weinstein and I both agree that the appropriate measure of damages is something that we call a reasonable royalty.  And we both agree that the way to get to that reasonable royalty is to think about a hypothetical negotiation that takes place between the two parties, and also to consider what he probably referred to as the Georgia-Pacific Factors.  So the overall methodology is the same.  A difference of opinion about the outcome of that hypothetical negotiation.

        MR. CHARFOOS:  If we could have Demonstrative 1301 up, please.

BY MR. CHARFOOS:

Q.   Can you describe to the jury what Demonstrative 1301 is showing?

A.   This is showing what I believe to be the outcome of a hypothetical negotiation.  In simple terms, if you just think of it simply as a formula, it would be the number of RIM BlackBerry devices sold, starting November 1st of 2008, times a royalty rate per device, a one-time rate, paid per device, for a total damages number that

would be the amount that RIM should pay to Mformation in view of the fact that the patent is both valid and infringed.

Q. I know that you said there was some agreement with Mr. Weinstein. In terms of the royalty base, the number of units sold, is there essentially agreement between you and Mr. Weinstein?

A. Yes. We both agree that the total number of units sold starting November 1 of 2008 is about 18.4 million dollars -- I'm sorry, 18.4 million devices.

Q. And in terms of the royalty rate, do you agree with Mr. Weinstein on the royalty rate?

A. No. We have a difference of opinion on both how it would be paid in terms of the structure and the amount that would be paid.

Q. And is that essentially what we're going to be talking about here today?

A. I would expect that to be the case.

Q. You mentioned the Georgia-Pacific again.

MR. CHARFOOS: If we could have Demonstrative 1302 up.

Q. Now, you're not going to read all of this to the jury, are you, Ms. Davis?

A. Happily, we do not intend to do that today.

Q. Can you generally summarize, though, what

Georgia-Pacific tells you as a person who's going to try to come up with a reasonable royalty analysis?

A.   All these words that you see on the screen are from that Georgia-Pacific case that Mr. Weinstein talked about involved a company years ago called the Georgia-Pacific Corporation, and these are the factors that the judge believed would be appropriate to use as a guideline to determine the outcome of the reasonable royalty -- or determine the outcome of the hypothetical negotiation.  So I and other damages experts typically use these factors in arriving at an opinion regarding the amount of damages in a patent case.

Q.   And are some of these factors more important than others?

A.   Yes, it's true that in any case some factors are more important than others.

Q.   If you go to slide 1303, you have focused here on number 15, the hypothetical negotiation.  Why did you do that?

A.   I think in this case, as has been my experience in all the other cases probably that I've been involved with that include patent infringement, the 15th factor is the most important.  And that is the one that involves the hypothetical negotiation.

Q.   And if we go to slide 1304, can you tell the jury a

little bit again about what the hypothetical negotiation would have entailed?

A.   The hypothetical negotiation requires us to put ourselves in the shoes of the parties back on November 29th, 2005.  Mr. Weinstein and I both agree about that date.  We both agree that the two parties at the negotiation table are RIM and Mformation.  And we are to determine what would be important to them and what would be the outcome of that negotiation in order to determine the amount of damages.

Q.   And just to be clear, though, did RIM and Mformation sit down on November 29th, 2005?

A.   No, they did not.

Q.   And what would be the differences between an actual negotiation and a hypothetical negotiation?

A.   There are two significant differences between the hypothetical negotiation like we're talking about today and what happens in the real world.  And one of those is, that in a hypothetical negotiation, we are required to start with the assumption the patent is valid and infringed.  As you might expect, that's not the case in a real world negotiation, because the parties are fighting with that, much like they have here in the courtroom over the last couple of weeks.

The second big difference is that we are to

assume that both parties to the hypothetical negotiation know everything that we now all know about the facts and circumstances that took place both before and after the negotiation.  And of course, that's not something that would happen in the real world.

MR. CHARFOOS:  If we could go back to slide 1322, Mr. Rudd.

BY MR. CHARFOOS:

Q.  In addition to Georgia-Pacific Factor No. 15, are there any other factors that you have analyzed that you believe are more relevant to this case?

A.  Yes.  The reason Factor 15 is the most important is because really it encompasses all the others.  You have to consider the first 14 as part of the hypothetical negotiation considerations.  And I think for this particular hypothetical negotiation, there are a couple of sets of factors that are more important than the others.

One would be what I would think of as Nos. 9 and 10 on this list.  Those both go to the importance of the technology and the alternatives that would be available to RIM.  And then also items Nos. 1 and 2 on this list, both go to agreements that exist in the real world that reflect the amounts that have been paid for technologies that would be relevant for our consideration.

Q.  All right.  Let's now walk the jury through your analysis.

MR. CHARFOOS:  And if we could go to Demonstrative 1305.

BY MR. CHARFOOS:

Q.  Looks like you've boiled fifteen down to four, so we're getting somewhere.

Can you describe to the jury what these four categories of considerations are?

A.  I think you've said it well, and that is that the other 14 factors can be condensed into these particular areas as far as what's most important, I think, to this hypothetical negotiation.  So if we can talk about them kind of topic by topic.

Q.  1306, the first one we're going to focus on is the relative importance of the technology.  What do you mean by that?

A.  When you put yourselves in the shoes of the negotiators at that hypothetical negotiation in 2005, one of the things they're going to consider is how important is this '917 patented technology.  And how badly does RIM need it to use in its product.  And in doing so, they would have to consider all the other technologies that are a part of those products.

Q.  Let's go on to 1307, and look at some of the other

technologies that were in the BlackBerry handheld themselves. And can you describe what you found?

A. Well, I think if you have a BlackBerry or know somebody that does, you're aware that it does all kinds of things. It has a number of features. If you're like me, you probably use yours mostly for e-mail and phone. But it can also be used for the calendar or contacts, you can access the Internet. You can use the camera. There are hundreds of features that are a part of this device (indicating).

And the '917 patented technology that has to do, as I understand it, with wireless activation and lock and wipe would be a single feature of those new technologies.

Q. And did you find anything in Mformation's documents that supports your conclusion?

A. Yes, I did.

MR. CHARFOOS: If we could go to 1308.

BY MR. CHARFOOS:

Q. Before we get into the text of the e-mail, can you tell the jury who Don Gobin is, the author of the e-mail?

A. The author of this e-mail, Don Gobin, as I understand it, was a senior engineer at Mformation at the time.

Q. And this April 26th e-mail -- I'm sorry, April 25th,

2006 e-mail sent to Dr. Kushwaha and Mr. Basu, who we've heard from here today, and can you tell the jury what it is about this e-mail that caught your attention?

A.  What caught my attention is perhaps common sense to the rest of us, but what he was saying is the big attraction towards RIM has nothing to do with their network or how they do push, it is all the BlackBerry patented form factor.  It's just so darn easy to use for e-mail.

Q.  And is your analysis of all of the functionality limited to the BlackBerry devices or did you also do analysis on the server as well?

A.  I also considered the functionality of the BES servers.

        MR. CHARFOOS:  Can we go to Demonstrative 1309.

BY MR. CHARFOOS:

Q.  And could you tell the jury what you found here?

A.  What I have learned is consistent with what you heard from Mr. Cherry, and that is that the BES has hundreds of features, regardless of which version you're talking about, and these are some of those features.

        So the BES is what provides the ability to send and receive wireless e-mail.  It provides the wireless calendar synchronization, wireless e-mail reconciliation, the BlackBerry browser.  Those are some

of the features that are part of the BES among the many hundreds that are in that software.

Q.   And given the fact that they have got all of these features, have they done anything to protect that?

A.   Yes, they have.  In my investigation I have learned that RIM has 4,000 patents and patent applications of its own.

MR. CHARFOOS:  If we could go to the next slide, please.

BY MR. CHARFOOS:

Q.   How does the fact that RIM has 4,000 patents and applications impact your analysis on the reasonable royalty?

A.   That helps put in perspective the amount of innovation that's in these devices, and helps us understand that the '917 patent, to the extent that it's being used by RIM at all, is one very small aspect of the overall products sold by RIM.

MR. CHARFOOS:  Can we go to slide 1311.

BY MR. CHARFOOS:

Q.   And can you describe for the jury the kinds of awards that you found that RIM won for its technology?

A.   RIM has won a number of awards over the years.  Last Friday I think you heard Mr. Lazaridis talk about a couple of them.  The first one on the list was one that

he mentioned, that he was particular proud of, and that was the "Telecom Product of the Year" in 2000.  And 2001 I think it's notable that RIM also won the "Hottest Product" by *Forbes Magazine*.  There are a number of others listed on this slide.  Keep in mind that all of these awards were won by RIM before it started selling the BES 4.0 accused server technology.

Q.  And you focused in on BES 4.0.

MR. CHARFOOS:  And, Mr. Rudd, if we could have Exhibit 4172 up, please.  And if we focus on the second page of that.

If we could just blow up -- there we go.

BY MR. CHARFOOS:

Q.  I know that the jurors have seen this a number of times, and we've seen the differences between versions 3.5, 3.6 and 4.0, we'll talk a little bit about those in more detail later, but it looks like BES 4.0 added a bunch of new features and --

A.  Yes, if you recall documented in Mr. Cherry's testimony and otherwise, across the top are various versions of BES as they were introduced one after the other.  On the far right-hand column is the BES 4.0.  So there were a number of new features that were introduced for the first time in the BES 4.0 version.

Q.  And just to be clear, is Mformation saying that all

of the new features made the product infringing?

A.   No, no.   It's my understanding that what made -- or what gave rise to the accused aspects of the BES 4.0 was the wireless activation.

Q.   And when you see a new product coming out with lots of new features and functionalities, what would you anticipate in terms of the price of that product?

A.   Often you would expect that if you have a new product that has additional features, additional functionality, that you'd have to pay more for it than the older product.   In this case, that was not true.

MR. CHARFOOS:   If we could go to Demonstrative 1313.

BY MR. CHARFOOS:

Q.   Could you tell the jury what you found with respect to the price of the BES?

A.   I compared the average selling price of the -- the list price of these products, both the old products that were not used in infringement as compared to the new products that were.

So in this case the BES 3.5 and 3.6 are not accused of infringement in this case and the price was higher.   The price was $4,999 for that software.   When RIM introduced the BES 4.0, with the accused feature, the price actually dropped to $3,999.

Q.  And did you also do an analysis of the BlackBerry handheld themselves?

A.  I did.  I looked at the average selling price of those devices as well.

MR. CHARFOOS:  If we could go to Demonstrative 1314.

BY MR. CHARFOOS:

Q.  What did you find?

A.  You'll recall that the BES 4.0s were introduced in 2004, so I looked at the average selling prices both before and after that introduction.  In 2003, the average selling price of all the BlackBerry devices was $373.  And after the BES 4.0 was introduced, the average selling price for 2/8/05 was about $355.  So the price had gone down.

MR. CHARFOOS:  Mr. Rudd, could you take that down for just a minute.

BY MR. CHARFOOS:

Q.  I think that brings us to the end of the relative importance of the technology section.  So having reviewed the different technologies and the documents, what's your takeaway in terms of your Georgia-Pacific analysis?

A.  Well, I think what we need to consider is, once again, putting yourselves in the shoes of the

hypothetical negotiators.  They're going to think about the relative importance of the '917 patent to technology as compared to everything else that is part of these products.  And they're going to think about how important that is in contrast to those other features.

MR. CHARFOOS:  If we could bring back up 1315 now.

BY MR. CHARFOOS:

Q.  We're now moving on to RIM's other alternatives.  What do you mean by "RIM's other alternatives"?

A.  What I mean in this situation is, once again, putting yourselves in the shoes of those negotiators.  One of the things they'll talk about is what else can RIM do rather than take a license for the '917.  Do they really need the '917 technology?  In this case RIM has alternatives.

MR. CHARFOOS:  Can we go to 1312, please.

BY MR. CHARFOOS:

Q.  And I said earlier that we're going to focus specifically on at least one of the functionalities.  But this is From trial Exhibit 4172 again.  And we see the wireless IT policies and command came out in BES Version 3.5.  What's the significance of that to you?

A.  I understand this line item, the wireless IT policies and commands, to include the lock and kill feature that

I understand to be accused by Mformation as part of the BES 4.0.

Q.   And if -- the jury probably remembers, but during his opening, Mr. Thakur talked about the BES -- or the lock and wipe feature and how important it was as a feature of the '917 patent.

Now, did the lock and wipe feature come out in Version 3.5 and 3.6 and are those accused of infringing?

A.   The lock and wipe feature was available.  It was part of the 3.5 and the 3.6.  The 3.5 was never accused of infringement in this case.  The 3.6 was accused for a period of time, but Mformation has withdrawn that.  And it is no longer accused in this case.

MR. CHARFOOS:  If we could take that down, please.

BY MR. CHARFOOS:

Q.   Now, the feature that Mformation alleges was added, and, therefore, alleges causes the BES 4.0 to infringe is this idea of the wireless activation.  And did you look at the relative importance of wireless activation in Version 4.0 and forward?

A.   I have considered that, yes.

Q.   First of all, can you tell the jury a little bit about when we're talking about -- when we're talking about wireless activation and provisioning?

A.   What I understand to be the case on the wireless activation -- as you know, I'm not a technical expert -- but I did in fact activate my device, and I didn't need to do so wirelessly.  I simply used the cable that came with it.  I plugged it into the computer, activated it, and I'm ready to start using it.  And that's all there was to it.

Q.   And so is it your understanding that this is a feature that's used every day or is it just used periodically.

A.   Most people would never have any reason to use it after you first got your device and set it up.

Q.   And would the fact that no accused versions of the '917 patent have had all of these features, and the wireless activation is the additional feature allegedly made in the product was something that was in the mind of RIM as they were doing the hypothetical negotiation?

A.   I think so, because, once again, it gets to the importance of the technology and how badly does RIM need it.  And since most people are using their e-mail and their phone and other features every day and perhaps have never used wireless activation, like me, and have never used lock and wipe, like me, then RIM would find that this isn't as important of a technology as some of the other aspects of the product.

MR. CHARFOOS:  If we could go to Demonstrative 1319.

BY MR. CHARFOOS:

Q.  And we're now on to the agreements.  Describe to the jury a little bit why you focused on the agreements.

A.  Well, once again, put yourself in the shoes of those negotiators, and one of the things they would be interested in knowing would be are there other agreements that involve either one of these parties that might provide some insight as to what someone would be willing to pay for the '917 technology.  So I have looked at both RIM agreements and I have looked at Mformation agreements.

Q.  And have you had any experience before this case looking at technology and license agreements?

A.  Yes, I have.  In all the patent cases that I've been involved with, I've probably over the years reviewed 10,000 or more license agreements.

Q.  And can you describe to the jury again what kind of license agreement would RIM and Mformation have agreed to at the hypothetical negotiation?

A.  Well, the agreement that would come out of that negotiation would be a simple patent license.  And what that would mean is that simply provides RIM the permission to use the '917 patent.  It doesn't give it

anything else.

MR. CHARFOOS:  If we could look at Demonstrative 1320 now.

BY MR. CHARFOOS:

Q.  Looks like you've focused on about five RIM agreements.  Can you tell the jury a little bit about how you came to those five?

A.  Well, RIM has several hundred agreements that I have reviewed.  These are the five that I think it makes sense for us to talk about today.  Because I thought they were most relevant for our consideration.

Now, to be clear, they are not comparable technology to the '917.  They're not identical to the '917.  However, they are comparable in terms of the importance of the technology and contribution it makes to the devices or to the software itself.  So that's why I thought they would be good benchmarks, good comparison points for us to consider.

Q.  Let's take a look at the first agreement.

MR. CHARFOOS:  If you could go on to Demonstrative 1321.

BY MR. CHARFOOS:

Q.  This looks like it's the RIM and CPA license agreement, which is RIM Trial Exhibit 4317.  Can you describe to the jury a little bit about what you found

here?

A.  This is the only agreement that I'm aware of that is for patents only.  We're going to contrast that in a little bit with software agreements, but this is a patent license only.  So it's similar in that respect to the hypothetical license, but in this case it involves 10 or more U.S. informed patents, so that's different than a single patent.  It does include security and authentication technology, and in this situation RIM agreed to pay the equivalent of about 14 cents per client for those 10 or more patents.  Under certain circumstances, they would have paid 50 cents per device.

Q.  You mentioned the only patent-only agreement and contrasting that with some of the other agreements.

MR. CHARFOOS:  If we could turn to Demonstrative 1322.

BY MR. CHARFOOS:

Q.  Can you describe to the jury a little bit about what the difference is between a patent agreement and a software license agreement?

A.  A patent license, as we talked about, simply gives RIM the right to use or the permission to use the '917 patent.  In contrast to that, a software license agreement provides much more.  To begin with, it provides the software, fully functioning software.  So

it works when you take it out of the package.

It also involves the maintenance and support related to that software.  It often involves professional services which might include training or help desk kinds of services.  And it typically involves the right to the intellectual property that's part of that software.  So that would include patents or trademarks or copyrights.

So overall, the software license agreement is typically far more valuable than a plain or naked patent license.

Q.  Mr. Weinstein testified that he believed that the bare naked patent license is more valuable than a software license agreement.  Do you agree with him on that?

A.  I do not agree with that.

Q.  Why not?

A.  Because I don't think the patent license gives you as much for your money.  If you can think of the patent license, for instance, as a building permit, it allows you the right to build a house on a piece of property, but you would typically expect to pay more if you actually got the house on the piece of property.  And that's what you would get with the software license, as an example.

Q.   Let's take a step through some of these license agreements.

MR. CHARFOOS:   And go to Demonstrative 1323.

Q.   This is talking about the Certicom agreements, and these are at RIM Trial Exhibits 4307 through 4316.   Can you tell the jury what you found here?

A.   This is one of the four software license agreements that I was talking about that RIM was a part of.   RIM agreed to pay a company called Certicom for what was called security and authentication features.   A lot of this involved the encryption technology used in the RIM devices.   RIM agreed to pay for those first 250,000 units at 1.50 per unit.   After that, it would pay only $1 per unit.   And keep in mind that we're talking about 18 million devices here.   So we'd be in the category of a dollar each.

MR. CHARFOOS:   Can we go to Demonstrative 1324.

BY MR. CHARFOOS:

Q.   And look at the next license agreement, the 4thPass agreement, 4303 through 4304.   What did you find?

A.   This is another agreement that I thought was comparable in the sense that it provided an important feature to the RIM products.   In this case it's the browser feature.   And RIM had agreed to pay to 4thPass 50 cents per device for those first 500,000 devices.

For the rest of what we would think of as the 18 million devices in this case, they would pay just 25 cents each for that software that provided that browser capability.

Q. The next agreement the Tele Atlas agreement, RIM Trial Exhibit 4325, can you describe to the jury what you found there?

A. This is yet another software agreement. In this case the software provided the map functionality on these devices, so if you were to use the map, it's probably using the Tele Atlas software. In this case RIM agreed to pay 50 cents per device for that software. I should probably be clear, all of these amounts we've been talking about on the per-device basis, that's a one-time payment when a device is sold. It's not a monthly payment.

Q. How does that contrast with the 50 cents a device that Mr. Weinstein is asking for?

A. Mr. Weinstein's talking about 50 cents per month or $12 a device.

Q. And if we -- with respect to the last agreement --

MR. CHARFOOS: Demonstrative 1326, which is the Glyph & Cog agreement, and could go to the agreement at Exhibit 4295.

Q. -- what did you find there?

A. In this particular case Glyph & Cog was providing

software that enabled you to view a .pdf attachment on your BlackBerry.  So if you received an e-mail and attached to it was a .pdf document, you could open and look at it using this software.

In this particular case, RIM agreed to pay Glyph & Cog a total of $18,000 for the software.  And that would equate to less than a penny per device for the 18 million devices we're talking about.

Q.   Have you created a slide that summarizes the agreements and the amounts?

A.   I have.

Q.   Can you tell the jury at Exhibit 1327, tell the jury what your takeaway is for the RIM license agreements?

A.   This is simply to put in perspective the various licenses we've looked at so far.  The ones we've talked about, the patent licenses to CP8 and the other license agreements with the other four parties are much, much lower values than what Mr. Weinstein has proposed as a royalty in this case.

Q.   Ms. Davis, have you also looked at Mformation's agreements?

A.   I have.

Q.   First of all, has Mformation ever licensed the '917 patent by itself in what you would call a bare patent license?

A.   No.

Q.   And so what will you look to in Mformation's license agreements as something to inform your opinion?

A.   What I looked at were RIM's software license agreements because I understand that software includes the '917 patent technology.

Q.   And I think you may have said "RIM's license agreements."

A.   I didn't mean that if I did say that.  I meant to say Mformation's software agreements.

Q.   Okay.  And how did you pick the most relevant Mformation agreements?

A.   In this case there are a number of agreements where Mformation has licensed software to its customers.  I have picked those customers that I think are most comparable in terms of size in particular to RIM, and the volume of devices we'd be talking about here.

        MR. CHARFOOS:  And, Mr. Rudd, if we could bring up Demonstrative 1333.

BY MR. CHARFOOS:

Q.   Can you -- I think the jury has seen some of these numbers before with Mr. Weinstein, but can you tell the jury what you're showing on Demonstrative 1333?

A.   You have seen some of these numbers because you saw for sure the T-Mobile and Sprint numbers in

Mr. Weinstein's testimony last week, but you'll recall that T-Mobile had agreed to pay a total of about $13.1 million for its 30-plus million subscribers.  And only 5.65 million of that was for devices itself.  The rest was for maintenance and support.

Sprint had agreed to pay $10.4 million for their 50-plus million subscribers.  $5.753 million of that was for the license, for the software, and the rest of that was for the maintenance and support and other services.

So in both of these cases, when I looked at that and compared what that would be on a per-subscriber basis, T-Mobile was about 39 cents per subscriber, and Sprint was about 31 cents per subscriber.

Q.  That's for full functioning software?

A.  That's for software.  The two numbers I just gave out, 31 cents and the 39 cents, that includes the maintenance and support also.

Q.  You keep differentiating and separating out maintenance and support.  For the bare patent license that would have been part of the hypothetical negotiation, would the parties have included maintenance and support?

A.  They would not.  So the most relevant numbers on the slide for that comparison would be the 5.65 million for T-Mobile, and 5.753 million for Sprint.

Q.   Now, you started with some of the high volume agreements.  I want to take a look at some of the low volume agreements to get an understanding of what those are.

MR. CHARFOOS:  If we could go to Demonstrative 1334.

BY MR. CHARFOOS:

Q.   Could you describe to the jury what's being shown on Demonstrative 1334?  These would be Mformation Trial Exhibits 2196 through 2200.

A.   These are some of those other license agreements Mformation had entered into for its software.  You can see across the bottom there that these are much lower volume, they range from 75 devices to a few hundred devices, in some cases a few thousand devices.  Nowhere near the 18 million devices we would be talking about in our case.  And that's part of why I think they'd be less relevant.

Q.   You have a question mark next to "GTSI."  Why is that?

A.   I have a question mark there for the number of devices because it's hard to tell from the documentation exactly how many were included.  It could be translated as either about 3,000 or 12,000.  So it's not clear.

Q.   And I think on 1335, you've put that next to what

Mr. Weinstein is asking.  How does this inform your opinion on the reasonable royalty?

A.  Once again, this just helps put in perspective Mr. Weinstein's proposed royalty with the actual agreements that Mformation's customers had entered into.

Q.  And have you calculated or did the agreements set out what the per-device royalty rate would be for some of these agreements?

A.  Yes, I have.

Q.  And what's the range there?

A.  I think the range probably is from about 20 cents per device on one end to $30 per device on the other end.

Q.  And which agreement is the $30 per device?

A.  There's only one agreement that that's high, it's for GTSI.

Q.  Is that the GTSI we see on 1335?

A.  It is.

Q.  And have you taken a look at that agreement to determine whether or not it's relevant to the hypothetical negotiation?

A.  I have.

Q.  And what was your conclusion?

A.  I don't think the GTSI agreement is particularly pertinent.  GTSI is a company that's -- sells to the government.  These are -- the $30 price was what GTSI

would pay to Mformation.  It would then mark it up to sell to the government.  The government has different standards involved, so I think that would be a different situation.

This is also -- you'll recall a case where none of the government's sales are included in damages, either in Mr. Weinstein's analysis or mine.  So, therefore, I don't think the GTSI license is particularly pertinent for us.

Q.  You had also mentioned that one of the license agreements goes down to 20 cents.  Do you know which one that is?

A.  There's actually a couple of them, one is the one I mentioned earlier, which is Sprint for 21 cents, but you'll recall last week you also saw that the Intel license was for 20 cents.

MR. CHARFOOS:  And if we could go to Demonstrative 1336, please.

BY MR. CHARFOOS:

Q.  How did the higher buying agreements with these two companies compare with Mr. Weinstein's reasonable royalty?

A.  This also puts in perspective what Mr. Weinstein's proposed royalty looks like compared to what real world customers are willing to pay.  In this case, the two

highest volume customers that weren't carriers, telephone carriers, were Intel and Hughes. Intel had an agreement whereby they would pay only 20 cents per device above four million, so that would be in the category we're in in this case. And Hughes had an agreement where they would pay only 28 cents a device above the first million units, and once again, that's the category we'd be in for the 18 million units in this case.

MR. CHARFOOS: Mr. Rudd, could you take that down for a minute.

BY MR. CHARFOOS:

Q. So having reviewed all the license agreements between the two parties, how does that inform your opinion with respect to the reasonable royalty rate?

A. We now have some benchmarks. Having seen all these agreements, it gives you some perspective on what others in the real world have been willing to pay for features that are part of these products, and for the Mformation software. So I think given that nearly all of these agreements are for fully functioning software, we would expect the amount that RIM would pay for permission to use the '917 patent, the patent license itself, to be less.

MR. CHARFOOS: If we could go to 1337.

BY MR. CHARFOOS:

Q.  We've now made our way to other considerations, the last of your points for the hypothetical negotiation.

MR. CHARFOOS:  And, Mr. Rudd, could we bring up 1302?

Q.  And I think that we've covered in detail, Georgia-Pacific Factors 1, 2, 9, 10, and 15.  And I want to ask you about a couple of others.

First of all, Georgia-Pacific 10.  Did you analyze the evidence of the extent that RIM used this particular product?  Or the invention?

A.  You asked about 10, but I think if you're asking about the extent of use, you probably mean No. 11.

Q.  That's right, thank you.

A.  We've talked about 10 already.  But on 11, this has to do with the extent of use by RIM of the patented technology, and in particular, the extent of use by RIM's customers.  I'm not aware of any data that Mformation has submitted that shows how many customers or how often these products are used in an infringing manner, if at all.

Q.  Can we also focus on Georgia-Pacific 5.  Is there any evidence that RIM and Mformation are direct competitors?

A.  I certainly don't think of them as direct competitors.  As you know, Mformation doesn't sell any

devices like the BlackBerry.  Mformation sells software.  That software, though similar to the RIM software in some respects, perhaps, doesn't mean that you still don't have to buy the RIM software.  A company that has Mformation software still has to buy the RIM software that is going to be using BlackBerrys on its system.  So the products are not mutually exclusive.

Instead of competitors, I think this is a situation where actually Mformation is going to get more than just money out of this deal.  I think Mformation is going to get access to RIM's customers, because once RIM agrees to put this technology on all of its devices, then it would give Mformation the ability to go to those companies that are using the devices and see if they'd like to buy the Mformation software as well.

MR. CHARFOOS:  Can we go to Demonstrative 1340.

BY MR. CHARFOOS:

Q.  All right.  I think we've made it through all four of your important considerations for the hypothetical negotiations.  We've looked at some agreements, we've looked at some RIM documents, we've seen some e-mails with Mformation.

Can you tell the jury, then, based on all of that information, if you've come to an opinion and what that opinion is?

A.   I have.  In short, I think what we've done, once we've put ourselves in the shoes of these negotiators, is recognize there are a whole lot of technologies that are included in these products.  The '917, to the extent it's used at all, is a very minor aspect of that.

We have seen a number of agreements that range from a penny on one hand to maybe 50 cents or a dollar on the other hand.  Most of which are for fully functioning software.  So that provides us some background as to what would be perfect for this negotiation.

We have talked about some of those other negotiations, and in particular, the fact that RIM has other alternatives.  It doesn't really need this technology.  It can simply do what it did in the 3.5 and the 3.6.

So with all that in mind, I think five cents per device is the right answer.

MR. CHARFOOS:  If we could go to Demonstrative 1343.

BY MR. CHARFOOS:

Q.   So it's your opinion, Ms. Davis, that a nickel a device is the appropriate royalty rate?

A.   It is.

Q.   Does that seem a little low?

A.   No.  Not at all.  Once again, think about those other technologies that have been included and RIM paid a penny on one of them, maybe as much as 50 cents for the others, but those are software.

MR. CHARFOOS:  If we then go on to demonstrative 1334.

BY MR. CHARFOOS:

Q.   Which puts your five-cent royalty rate -- and again, that's five cents per device, not per month, correct?

A.   Per device.  And it's a one-time payment when the product is sold.

Q.   Can you tell the jury what you considered to be the appropriate calculation of damages, if RIM is found to be -- to infringe and the patent is found to be valid?

A.   I think the parties would have agreed that a simple one-time payment when the device is sold is the way they would structure a license.  In this case there have been about 18.4 million devices sold since November 1st of 2008.  If you would multiply that times the five cents per device, you end up at about a million dollars in this case.  This shows specifically $920,971, when you do that math.

MR. CHARFOOS:  You can take that down, Mr. Rudd.

BY MR. CHARFOOS:

Q.   That number obviously differs from Mr. Weinstein's

total calculation of damages.  Is that correct?

A.   It does.

Q.   And is there a particular, most significant area of disagreement or significant area of disagreement that led to the difference in the numbers?

A.   I think perhaps the most significant area of disagreement would come from Mr. Weinstein's reliance upon one of the documents from RIM in particular.

Q.   Would that be Exhibit 113?

MR. CHARFOOS:  Mr. Rudd, can we have Exhibit 113 up.  Thank you.

Q.   Is this the document you're talking about?

A.   That's the document I had in mind, yes.

Q.   And we heard Mr. Castell talk about this the other day.

MR. CHARFOOS:  But if we could go to page 9 and focus in.

Q.   What about Exhibit 113 did Mr. Weinstein focus on that you think is incorrect?

A.   Mr. Weinstein had focused on, you'll recall from his testimony, that bottom line called "Systems Monitoring" where this particular RIM document shows the name Mformation with $50 per seat.

Q.   Now, did Mr. Weinstein, as far as you know, speak with any RIM employees to understand what they meant by

"$50 a seat" here?

A.   He did not.

Q.   Did you?

A.   I did.

Q.   And what did you find out?

A.   I talked to three of the individuals that were listed on the front cover of this presentation as having been involved in the preparation of the presentation.  And what I learned from them is similar to what you heard from Mr. Castell last Friday, and what he had explained was that this document was something that he had prepared or at least this page he had prepared, where he was simply showing the price on the --

MR. ARNTSEN:  Your Honor, I object to the witness answering with regard to what Mr. Castell testified to. That wasn't in her report.

MR. CHARFOOS:  Your Honor, if I may respond. She's testifying as to what she heard the three other RIM employees that she worked with testify about.

THE COURT:  Well, it's sustained at least as to an opinion based upon the trial testimony.  But you're free to go into the area as long as you tie it to a previously formed opinion, and -- if that's a subject in her report.

BY MR. CHARFOOS:

Q.   Ms. Davis, based on your conversations with the three RIM employees --

MR. CHARFOOS:  And actually, Mr. Rudd, can you bring up page number 2 of Exhibit 113.

BY MR. CHARFOOS:

Q.   There's an awful lot of people on there, but three of those individuals you spoke with?

A.   Yes, I did.  I talked to Mr. Heit, Mr. Panezic and Mr. -- I'm looking for the other name up there -- Mr. Yach, as I recall -- oh, I'm sorry, Mr. Lewis. Allan Lewis.

MR. CHARFOOS:  If we could go to page 9 again.

BY MR. CHARFOOS:

Q.   What did those individuals tell you about the creation of this particular chart in Exhibit 113?

A.   What I had learned about this document in general was that this particular chart was capturing the price that the RIM employees believed that these other companies were charging for these particular types of software. So in this particular case, what that system monitoring line says is that RIM understood that Mformation was charging $50 a seat for software that involved in some way systems monitoring.

Q.   And based on your conversations with the author of

this document, was the $50 a seat the value that RIM placed on systems monitoring?

A.  No.  It was simply the amount that they understood that someone else was charging for their software.

Q.  And based on your discussions with the RIM authors of this document, was this overall document supposed to include all of the features of the BES that were important?

A.  No, it definitely does not cover all those features.  You recall some of those from the slide earlier that are not listed on here at all.

Q.  And this is a 2001 document.  Was this anticipated to be the cost or price in 2004, 2005, at the time of the hypothetical negotiation?

MR. ARNTSEN:  Object beyond the scope of the report.

THE COURT:  Sustained, unless you lay a foundation.

BY MR. CHARFOOS:

Q.  Do you have any reason to believe, Ms. Davis, that the prices as reflected in Exhibit 113 would be the prices that both RIM and Mformation would believe that this product would be worth at the time of the hypothetical negotiation?

MR. ARNTSEN:  Same objection.

THE COURT:  Sustained.

BY MR. CHARFOOS:

Q.  Did you have any conversations -- do you have any knowledge based on your conversations with RIM employees regarding whether or not the $50 per seat was the value of that particular feature after this particular document was created?

MR. ARNTSEN:  Same objection.

MR. CHARFOOS:  The question goes to whether she had conversations with anybody or not.

THE COURT:  I understand that, but what I was expecting you to do was to tie it to a previously rendered opinion.  Or deposition testimony so as to overcome the objection that this is something new.  So I'll sustain it until you do that.

MR. CHARFOOS:  Okay.

BY MR. CHARFOOS:

Q.  Let me ask you -- let's ask a different question. Based on your review of the agreements, have you found that any of the other components in Exhibit 113 were not actually as they're reflected on this particular chart?

A.  Yes.

Q.  And can you describe to the jury what other components you focused on looking at some of the other agreements?

A.   We've already talked about two of those components today.  One of them has to do with attachment handling, which this particular document shows to be $50 a seat, as it's provided by those particular vendors.  And then the second one that --

MR. ARNTSEN:  We object.  This is also beyond the scope of her report.  She never tied these things together at all.

MR. CHARFOOS:  Your Honor, she testified as to the value --

THE COURT:  Go to the report or go to the deposition and use it as a preface for the question, and then -- otherwise, it's sustained.

MR. CHARFOOS:  Let's go back to Demonstrative 1324.

BY MR. CHARFOOS:

Q.   Ms. Davis, in the 4thPass agreement, how much did RIM pay for browser technology?

A.   What RIM agreed to pay for the browser technology here was 25 cents a device after the first 500,000 devices were sold.

MR. CHARFOOS:  And if we could go to Demonstrative 1326.

BY MR. CHARFOOS:

Q.   The Glyph & Cog attachment-handling technology, how

much did RIM pay to Glyph & Cog for the attachment-handling technology?

A.    That was less than a penny per device for that attachment-handling software.

MR. CHARFOOS:  You can take that down, Mr. Rudd.

BY MR. CHARFOOS:

Q.    Can you sum up for the jury just briefly again how it is you came to your five-cent-a-device reasonable royalty?

A.    When you consider in total the overall importance of the '917 technology in comparison to all the other features that are part of the product, and you consider what RIM has agreed to pay for some of those other features, including the two we just talked about, then I think five cents is an appropriate amount for the '917 technology.

Q.    And if the patent is found invalid, how much does RIM owe Mformation?

A.    Then there would be no damages at all.

Q.    And if the patent is found not infringed, how much does RIM owe Mformation?

A.    There would also be no damages in that situation.

MR. CHARFOOS:  Your Honor, could I have just one second?

THE COURT:  Certainly.

(Pause in the proceedings.)

MR. CHARFOOS:  I have no further questions for Ms. Davis.  Thank you.

THE COURT:  Very well.  You may cross-examine.

MR. ARNTSEN:  Thank you, your Honor.

These go to you (tendering binder).

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. ARNTSEN:

Q.  Good morning, Ms. Davis.

A.  Good morning, Mr. Arntsen.  Nice to see you again.

Q.  Nice to see you.

Again, just kind of briefly recapping, you and Mr. Weinstein agree that if the jury finds that Mformation's patent is found valid and infringed by RIM, Mformation's entitled to damages adequate to compensate for that infringement, correct?

A.  We do agree on that.

Q.  And that's one of the assumptions for the hypothetical negotiation, correct?

A.  I understand that to be the law, but I think that also means that that's an assumption, yes.

Q.  And what RIM would have been seeking in that hypothetical negotiation is the ability to use the '917 patented method to wirelessly activate its device and to

implement particular device management functionality, correct?

A.   In the hypothetical negotiation, what RIM would get from that would be the right to use the '917 technology. I, of course, am not a technical expert, but my understanding of Mformation's position on what that includes is that that would include wireless activation and lock and wipe.

Q.   And you would agree that Claim 1 is broader -- of the '917 patent, is broader than lock and wipe, correct?

A.   Generally, that's my understanding, but once again, I don't want to tiptoe into the technical area.  That's outside my expertise.

Q.   You're here to talk about numbers rather than technology, right?

A.   I think that's fair to say.

Q.   And again, really, the essential difference between you and Mr. Weinstein is you believe that the appropriate royalty is five cents per device, and he believes the appropriate royalty is $12 per device, correct?

A.   I think you could boil it down to that, yes.

        MR. ARNTSEN:  Chris, could you pull up Davis slide 1314.

BY MR. ARNTSEN:

Q.   This is one of the slide you showed to the jury correct?

A.   Yes.

Q.   And what this shows is that the price of the BlackBerry in 2005, the year of the hypothetical negotiation, was 354.68, correct?

A.   That is correct.

Q.   And it's your testimony that the hypothetical negotiators would have found that if the '917 patent were valid and infringed by RIM, of that 354.68, five cents would go to Mformation and 354.63 would go to RIM, correct?

A.   Well, 354.63 may initially go to RIM, but RIM would, of course, have to pay it to others for other features that are part of this device, yes.

Q.   That's a good point.

MR. ARNTSEN:   Actually, Aaron, we may go into some other license agreements here.

MR. CHARFOOS:   Your Honor, we would ask the Court to clear the courtroom at this time.

THE COURT:   Members of the jury, you are privileged to hear in the course of this case about other license agreements that RIM has negotiated with others to help you decide some of the questions in this

case.  My understanding is that RIM regards these as confidential license agreements and would wish us to close the courtroom so that anyone who is outside of RIM and not a party to this case cannot listen to its confidential business information.

And so I'm asking the Clerk of Court to close the courtroom.  I'll ask the parties to assist the clerk by identifying any who remain as not being covered by the Court's instruction to close the courtroom to the general public.

Very well.

MR. ARNTSEN:  Chris, can you please pull up slide 1310, please.

Actually, can you pull up 1307.

What I'm trying to do is focus this so the courtroom is closed for as limited a time as possible.

THE COURT:  I'll order the court reporter to mark this part of the record as subject to a seal.

Go ahead.

(Whereupon, the following portion of the Trial Proceedings are held under separate cover as sealed)

//

//

(Morning recess)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. ARNTSEN:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

You may resume your examination.

MR. ARNTSEN:  Chris, if you could put up Weinstein slide 31, it shows Exhibit 113.

Nope, wrong slide number.

BY MR. ARNTSEN:

Q.  Miss Davis, do you have Exhibit 113 in front of you?

A.  I do.

Q.  I believe that the slide will be appearing momentarily, but I'll proceed with my questions.

Again, you indicated that you had spoken with some RIM employees about this document, correct?

A.  I did.

Q.  And I believe you spoke with Mr. Lewis, Mr. Heit, Mr. Panezic, correct?

A.  Exactly.

Q.  To be clear, you never spoke with Mr. Castell about

it?

A. I did not.

Q. And again, what you were told is that this is an internal RIM document that was used to assess third-party prices on a per-seat basis to identify potential revenue sources, correct?

A. That sounds consistent with what I was told, yes.

Q. And what it sets forth is information about what RIM knew about what third parties charge for their product, correct?

A. That's correct.

Q. And these were the prices that -- this is what RIM believed the prices were in the marketplace, correct?

A. Yes, that's my understanding.

Q. And these were of various types of software that were available for use with mobile devices, correct?

A. Yes.

Q. And again, what RIM was trying to do is identify what the -- what -- identify what software products with these functionalities were being sold, in the market, by the companies that RIM identified in the middle column, correct?

A. Yes, I think that's consistent with what I understood.

Q. And again, these charges here in the middle, in the

middle column, were one-time charges for the purchase of the software, correct?

A.   Yes.

Q.   And that's on a per-seat basis, right?

A.   Right.

Q.   And seat can be fairly equated with device, correct?

A.   I think in this case we think of them as being interchangeable for that purpose.

Q.   And again, the last column, the maintenance column, that was calculated as 20 percent, which was explained to you as common in the industry for annual software maintenance charges, correct?

A.   That is correct.

Q.   And again, looking under the reference to Mformation in the middle column, second from the bottom, that's what RIM understood that Mformation was charging for its product, correct?

A.   That's correct.  I'm sorry, we should be clear: That's what RIM understood as of 2001.

Q.   Right.

A.   Yes.

        MR. ARNTSEN:  You can take that down now, Chris.

BY MR. ARNTSEN:

Q.   Now, I want to talk about some Mformation agreements. First of all, you testified to some various agreements

that you referred to as carrier agreements, correct?

A.   I don't know that I'd characterize them that way in the courtroom, but I certainly think of them that way, and I talked about them that way in my report.

MR. ARNTSEN:  Can you pull up Davis slide 1328?

BY MR. ARNTSEN:

Q.   These were the agreements -- it's fair to call these carrier agreements, right?

A.   Yes.

Q.   One of them you talked about within the Sprint agreement, correct?

A.   I did.

MR. ARNTSEN:  Can you bring up slide 1329, please.

BY MR. ARNTSEN:

Q.   And this is a slide that you had prepared describing some salient features of the Sprint agreement, correct?

A.   We didn't look at this one this morning, but I had prepared it in case we wanted to talk about it, and that's the Sprint agreement we're talking about, correct.

Q.   Just to be clear, this is your slide, correct?

A.   Yes, it is.

Q.   And the Sprint agreement was entered into December 29, 2006, correct?

A.   It was.

Q.   And that was after the '917 patent issued, correct?

A.   It was.

Q.   And that was after BES 4.0 came up?

A.   That is correct.

Q.   Again, in the context of the hypothetical negotiation, again this would have been an agreement entered into while RIM was out there infringing, correct?

A.   As long as the jury believes that RIM is infringing at all, then this would have been during the period of time when RIM was selling the product that was accused of infringement, yes.

Q.   If the jury finds RIM is infringing, they were infringing then when this agreement was entered into, correct?

A.   At that time, yes.

Q.   And again, as I understand it, you calculated this 21 cents per subscriber by dividing the lump sum payment of 10 million-something by 50 million subscribers, correct?

A.   It's not quite that simple, but overall it's something like that.  I do that calculation in Appendix J of my report.

Q.   That's -- if you do the math, that's about it, right?

A.   Roughly, yes.

Q.   And you don't know how many of these subscribers were using smartphones, correct?

A.   I do not.

Q.   And you don't know how many of these subscribers were already using BlackBerry phones, do you?

A.   I do not.

Q.   And you don't know how many of these subscribers ever deployed or used the Mformation software, correct?

A.   That's correct.  I don't think we know how many subscribers used any of this software, BES or Mformation software.

Q.   Now, let's talk about the MetroPCS agreement.

          MR. ARNTSEN:  Chris, can you pull up slide 1330.

Q.   Again this is another slide that you prepared, correct?

A.   It is.

Q.   And this discusses the MetroPCS agreement that you testified to this morning, correct?

A.   It does.

Q.   And that agreement was also entered into after the period in which -- if the jury finds RIM infringing, it was during that period of infringement, correct?

A.   That's true.

Q.   Because again BES 4.0 came out in 2004 and the patent

issued in 2005.  Correct?

A.   Correct.

Q.   And again, your -- and again, your conclusion of this agreement is it provides for 75 cents per subscriber, correct?

A.   That's one of the provisions, yes.

Q.   There are some other provisions also, correct?

A.   Yes, including the lump sum that you see in the second bullet on this slide.

Q.   And this lump sum payment is in addition to the 75 cents per subscriber, correct?

A.   That's right.

Q.   And also that 75 cents per subscriber doesn't factor in $250,000 a year in certification and OEM support, correct?

A.   The 75 cents does not.  I think the 3.8 million may.  I would have to check the agreement to be sure.

Q.   If you want to take a look at your report, it's page 42 of your report or in the little numbers at the bottom, page 45.  Depending on which are easier for you to look at.

A.   I'm sorry, tell me that page number again.

Q.   What?

A.   Can you tell me that page number?

Q.   I believe it's page 42 in the page numbers you put on

there and page 45 in the page numbers I put on there.  I thought I did it to make it clearer, but I may not have succeeded.

MR. ARNTSEN:  Chris, can you pull up page --  strike that.

Q.  I'll just give you a minute to look at your report, when you're ready.

A.  If you're talking about MetroPCS, I'm looking at page 43 of my report.

Q.  And again, the $250,000 a year is in addition to the upfront payment, correct?

A.  That's part of the 3.8 million that was on the slide.

Q.  Okay.  Can you take a look at Exhibit 4382, which I believe is in front of you?

MR. ARNTSEN:  And I'd move that into evidence if it's not in already.

MR. CHARFOOS:  No objection, your Honor.

THE COURT:  4382 is in evidence.

(Plaintiff's Exhibit 4382 received in evidence)

MR. ARNTSEN:  Could you pull up 4382, 0009.  And can you highlight the chart, please.  Or pull it out.  That's kind of hard to see.

BY MR. ARNTSEN:

Q.  Do you have that in front of you, Ms. Davis?

A.  Is this Exhibit 1?

Q.   I believe so.  Can you see it?  Looks like you're on
the same page.

A.   I'm not on the same page.  I'm not trying to read it,
but I can see it.

Q.   The per-device fee's at the bottom, correct?

A.   Yes.

Q.   And again, while you identified the 75 cents per
device, in fact, the first hundred thousand devices are
at 3.75, correct?

A.   They are, yes.

Q.   And then again, the next 150,000 are at 2.86, and so
on and so forth.  Correct?

A.   Correct.

Q.   And again, that's in addition to the upfront fee that
you had identified, correct?

A.   That's right.

Q.   And as with the Sprint agreement, you don't know how
many of the MetroPCS subscribers were smartphone users,
correct?

A.   I do not.

Q.   And you do not know how many were already using
BlackBerrys, right?

A.   Correct.

Q.   And you don't know how many deployed or used the
Mformation software, correct?

A.   We don't know.

MR. ARNTSEN:  Chris, you can take that down.  And can you pull up slide 1331.

BY MR. ARNTSEN:

Q.   Now, this is your slide for T-Mobile, correct?

A.   It is.

Q.   Now, this was entered into even later.  Again, this was after -- if the jury finds RIM infringing, RIM's been infringing for awhile at the time this agreement was entered into, correct?

MR. CHARFOOS:  Objection, argumentative, your Honor.

THE COURT:  Overruled.  This is assumption.

THE WITNESS:  Yes, if I were to assume that RIM was infringing, this was during the period when that is happening.

BY MR. ARNTSEN:

Q.   Okay.  And again, doing the math here, you divided the total by the number of subscribers, correct?

A.   Once again, it's not quite that simple, as Appendix J shows, but you can think of it that way, generally.

Q.   And you don't know how many of these subscribers were smartphone users, correct?

A.   We do not.

Q.   And you don't know how many were already using

BlackBerrys, correct?

A.   That's correct.

Q.   And you don't know how many of these subscribers ever deployed or used the Mformation software, correct?

A.   That's right.

Q.   Now, there was one other agreement that you mentioned in your report but you didn't talk about today, and that was an agreement that Mformation had with Cingular. You're familiar with that agreement, correct?

A.   I am.

Q.   And you discuss it in your report, correct?

A.   I do.

Q.   And in fact, if you want to turn to page 22 of your report, or 25 of the numbers -- of the numbers I put on.

A.   You're talking about page 42?

Q.   42.  I'm sorry.  42.

A.   I have that.

Q.   Thank you.  Ask you to take a look at Exhibit 4281. In the binder of exhibits.

        MR. ARNTSEN:  First, I'd move Exhibit 4281 into evidence.

        MR. CHARFOOS:  No objection, your Honor.

        THE COURT:  4281 is in evidence.

        (Plaintiff's Exhibit 4281 received in evidence)

        MR. ARNTSEN:  Chris, can you pull up 4281, 0001.

BY MR. ARNTSEN:

Q. This is the Cingular agreement, correct?

A. It is.

Q. Again, this was also -- if the jury finds that RIM infringes the patent, this was after the infringement occurred, correct?

A. Right, this was signed, or it was dated April 20th, 2006.

Q. And Cingular, they're AT&T now, aren't they?

A. That's my understanding, yes.

MR. ARNTSEN: Chris, can you --

BY MR. ARNTSEN:

Q. Ms. Davis, can you turn to pages 71 -- I believe page 71 of the agreement.

MR. ARNTSEN: Chris, can you pull up 481, 0071. The Bates number ends at 73.

BY MR. ARNTSEN:

Q. Are you there?

A. Yes.

Q. And this sets forth the pricing under the Cingular agreement, doesn't it?

A. It does.

MR. ARNTSEN: Chris, can you first pull up the sections, the 1.2 through 1.22. No, go down just a little further. Right there. Can you pull that up,

please.

BY MR. ARNTSEN:

Q.   Okay.   So first of all, these are options for pricing
for the software, correct?

A.   Yes.

Q.   And on a per-subscriber basis, again for the first
50,000 subscribers, it's 7.67 per device, correct?

A.   Correct.

Q.   And then again, going up the top, Tier 5, that's
$3.35 per device, right?

A.   Yes.

        MR. ARNTSEN:   And now, Chris, can you pull out
Section 1.3.

Q.   Now, Section 1.3 discusses client software licenses,
and that would be in addition to the server software
licenses in Section 1.2, correct?

A.   That's my understanding, it's a different software,
yes.

Q.   And again, the per-device fees here range from 4.17
to 4.96, correct?

A.   That's correct.

Q.   And again, that would be on top of the 3.38 to 7.67
server software fees, correct?

A.   To the extent that Cingular chose to have both of
those types of software, yes.

Q.   Okay.  And then, Ms. Davis, could you turn to the next page.

MR. ARNTSEN:  And, Chris, turn to page 72, please.

Q.   And then another piece of software that was identified here was security and encryption software, correct?

A.   Yes.

Q.   And this would be again cumulative of the server and client device fees, correct?

A.   As long as Cingular chose to use this particular module of software, that would be true.

Q.   And that's on a per-device basis of between 83 cents and 2.92, correct?

A.   That's right.

Q.   You have a calculator up there, correct?

A.   I do.

Q.   So assuming that Cingular decided to buy these three pieces of software and pay for them on a per-device basis, for the first user, it would be 7.67, correct?

A.   I'm with you so far.

Q.   Plus 4.96.  Correct?

A.   Yes.

Q.   Can you add those two together, please?

A.   So far I have $12.63.

Q.   Plus 2.92, correct?

A.   That's correct.

Q.   So what does that add up to?

A.   That would total $15.55 for the first subscriber.

Q.   Okay.  And then now here, I guess these actually -- these go up to 10,000, right?

        Looking at the second page.  First one may go up to -- but in terms of the schedule under the license, can you now calculate the numbers for the last subscriber?  The smallest numbers on the pages?

A.   I can add up what's on these pages, yes.

        THE COURT:  Normally I would have required you to do this and ask it as a leading question, rather than asking this in real time, but I'm indulging -- presuming this is the only one you're going to add up.

        MR. ARNTSEN:  That would be right, your Honor.

BY MR. ARNTSEN:

Q.   That would be 3.38 plus 4.17 plus 83 cents?

A.   Yes.

Q.   What would that add up to?

A.   $8.38.

Q.   So the range here is 3.38 to 15.55, correct?

A.   For these numbers on these pages, yes.

Q.   Put that away, and now we'll talk about the enterprise licenses.

Ms. Davis, you see we've put up a board -- do you recognize that as your slide 1334?

A.  I do.

Q.  And these -- each of the bars here represents an agreement between Mformation and one of its customers, correct?

A.  It does.

Q.  And if you take a look, the first one, Pfizer, if you take a look, I believe that's Exhibit 2196.  Can you take a look in your exhibits and confirm that that's the case?

A.  Yes, that's the Pfizer license.

MR. ARNTSEN:  And I'd move Exhibit 2196 into evidence.

MR. CHARFOOS:  No objection, your Honor.

THE COURT:  2196 is in evidence.

(Plaintiff's Exhibit 2196 received in evidence)

BY MR. ARNTSEN:

Q.  And then the second agreement listed, GTSI, that's Exhibit 2197, correct?

A.  Yes, it is.

MR. ARNTSEN:  And I'd move Exhibit 2197 into evidence.

MR. CHARFOOS:  No objection, your Honor.

THE COURT:  Received.

(Plaintiff's Exhibit 2197 received in evidence)

BY MR. ARNTSEN:

Q.  And the third, MetLife, is Exhibit 2198, correct?

A.  Yes, it is.

MR. ARNTSEN:  And I'd move 2198 into evidence.

MR. CHARFOOS:  No objection, your Honor.

THE COURT:  It's received.

(Plaintiff's Exhibit 2198 received in evidence)

BY MR. ARNTSEN:

Q.  And then the fourth, the Colgate agreement, that's Exhibit 2199, correct?

A.  Yes, it is.

MR. ARNTSEN:  And I'd move Exhibit 2199 into evidence.

MR. CHARFOOS:  No objection, your Honor.

THE COURT:  Received.

(Plaintiff's Exhibit 2199 received in evidence)

BY MR. ARNTSEN:

Q.  And the fifth and final one is Credit Suisse First Boston, correct?

A.  Yes.

Q.  And that's Exhibit 2200, correct?

A.  Yes.

MR. ARNTSEN:  And I'd move Exhibit 2200 into evidence.

MR. CHARFOOS:  No objection, your Honor.

THE COURT:  Received.

(Plaintiff's Exhibit 2200 received in evidence)

BY MR. ARNTSEN:

Q.  And again, what you have on this chart, you list the amount that Mformation received under each of these licenses, correct?

A.  No.  Not exactly.  I have shown the total amount reflected in the agreement and its attachments.  That is not the same as what Mformation received.

Q.  Okay.  And can you explain the difference, please?

A.  Because I'm aware that there are documents that reflect Mformation received far less than what was agreed to in the agreements.

Q.  Okay.  And actually I'll give you a chance to explain that.  The numbers up at the top, for instance, for Pfizer, that's the total amount reflected in the document, correct?

A.  It is.

Q.  And if you could get -- and that's $64,900, correct?

A.  Correct.

Q.  And that was for -- and there were 1,000 devices with Pfizer, correct?

A.  I assumed there were 1,000 devices.  I don't know exactly how many Pfizer had.

Q.  Can you do the calculation, what that is on a per-device basis?

A.  I think we can do that without a calculator.  $4.90.

MR. ARNTSEN:  Ruben, can you write that one down?

THE COURT:  This is again something you can do ahead of time because it's math.  So you can do it and ask it as a leading question or just say, Your Honor, we would ask the Court to take notice that the division comes up to these numbers and ask questions about the numbers.  But to do the math, this is taking too much time.

MR. ARNTSEN:  Okay.

BY MR. ARNTSEN:

Q.  So with the first one at $4.90, correct?

A.  Yes.

Q.  And then GTSI -- and that's per device, correct?

A.  Correct.

Q.  And GTSI, I believe you identified that was $30 per device, correct?

A.  Not exactly.  There are some devices that are different than that.  But most of them are $30 according to the invoices.

Q.  Okay.  $30.  That was the number you testified to on direct examination, correct?

A.  Yes.

Q. Okay. And then for MetLife, $2400 and 75 devices. And again, that's on a -- that $2400, that's an annual charge, right?

A. That's not clear from the document.

MR. ARNTSEN: Chris, take a look at page 7, 2198.

BY MR. ARNTSEN:

Q. Can you pull up 0007?

A. Which exhibit?

Q. 2198, the MetLife exhibit.

You see that indicates $8 recurring service fees indicated on a calendar quarter basis in advance?

A. It says that it's not clear if it's $8 a calendar quarter or if it's invoicing on a calendar quarter basis. The invoices attached aren't clear.

Q. So it's either --

A. I assumed it was on a quarterly basis.

Q. So you're assuming it's $32 a year, correct?

A. For purposes of this demonstrative, that's correct.

MR. ARNTSEN: Ruben, can you put that up, please?

THE WITNESS: This was a one-year agreement.

BY MR. ARNTSEN:

Q. Then for Colgate, the 28,400, and the 400 devices, that is $72, and that's on an annual basis, correct?

A. I'll take your word for that math.

Q.   Then Credit Suisse Boston, if you do the math there, it's 21.50 a device, correct?

A.   I'll take your word for that as well.

Q.   Okay.  And again, these are all, with the -- I hadn't heard of GTSI, but putting GTSI aside, these are all large, sophisticated entities, correct?  Pfizer, Metropolitan Life, Colgate, Credit Suisse First Boston?

A.   Correct, they're large companies.  They aren't necessarily large volumes when it comes to what they were purchasing for their employees.

Q.   But they are large, sophisticated companies, correct?

A.   Sure.

Q.   They're not in the habit of overpaying, correct?

A.   I would assume not.

Q.   And again, just referring back again to Exhibit 113, RIM understood that Mformation was charging $50 for its service monitoring software, correct?

A.   That's my understanding of what RIM thought Mformation was charging.

Q.   Okay.  Yet it's your testimony that the Mformation hypothetical negotiator would have settled for five cents per device, correct?

A.   Yes, four years later, that's true.

        MR. ARNTSEN:  Thank you, that's all.

        THE COURT:  Any redirect?

MR. CHARFOOS:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. CHARFOOS:

Q.  Ms. Davis, Mr. Arntsen asked you a number of questions about some of the RIM license agreements, CP8 and some of the other agreements, and he kept focusing on, do you get the patent rights, do you get the patent rights, do you get the patent rights?  Do you remember that?

A.  I do.

Q.  Well, do you get any patent rights under those agreements as far as you understand?

A.  As far as I understand, you certainly get the right to use any patented technology that's embedded with the software.

Q.  So why did you look at those agreements?  Why was it important for you to look at those particular agreements, if there wasn't a specific grant of a patent right in them?

A.  Because the software itself provides the functionality that I was using as the basis for the comparison.

Q.  Now, Mr. Arntsen also kept focusing on the fact that a number of the agreements occurred after the date of the hypothetical negotiation.  What impact would any of

those have on the hypothetical negotiation itself if they occurred after the date of that hypothetical discussion?

A.  My understanding of the law, and Mr. Weinstein and I both share this understanding, is that we are to look at anything that's happened, both before and after the hypothetical negotiation, including licensing that were executed after that date.

Q.  And would that be called the Book of Wisdom?

A.  Yes, that was the term that Mr. Weinstein called it, and that's accurate.

Q.  And Mr. Weinstein also looked at things that happened after the date of the hypothetical negotiation to inform his analysis, correct?

A.  Yes, he did.

Q.  Now, Mr. Arntsen also kept asking you how many of Cingular's customer's were smartphone users and how many used the Mformation patented technology.  Do you recall that?

A.  I do.

Q.  For the 18.4 million units that you and Mr. Weinstein assume are included in the royalty base, have you both assumed that each and every one of those will have used Mformation's technology?

A.  I certainly have not assumed that because I know that

that's not the case.

Q.   So it's -- that 18.4 million, some of those people also may not have used Mformation's technology?

A.   That's correct.

Q.   Mr. Arntsen focused on the MetroPCS license --

MR. CHARFOOS:  Which, Mr. Rudd, could you bring up 4282, page 9.

Q.   The per-device fee, he said, Well, if we look at the per-device fee, that's $3.75 a device for zero to 100,000 customers, right?

A.   I think that's 100,000, yes.

Q.   And he said, Well, so they'd be paying $3.75 a device for the first hundred thousand customers.  Do you recall that?

A.   Yes.

Q.   And again, the royalty base in this instance, the numbers of subscribers that RIM has is 18 million, correct?

A.   Right.  We're talking about 18.4 million devices for the purposes of the hypothetical negotiation.

MR. CHARFOOS:  And, Mr. Rudd, if we could focus on point No. 1, the second sentence.

BY MR. CHARFOOS:

Q.   "When the total number of activated modules increases to a lower price-per-module tier, the lower price per

module shall apply retroactively to all modules activated to date by customer."

What does that mean to you?

A. What I understand that to mean is that as soon as MetroPCS sells enough devices to get into the next tier of pricing, the pricing drops for all the ones that have already purchased as well as all the future ones.

Q. So in fact, if there were 8 or 9 million customers on MetroPCS, as you've said, they all are paying 75 cents; is that correct?

A. Correct. And that's why I've included the bar charge. It was in my demonstratives earlier today.

Q. Mr. Arntsen also focused on the Cingular agreement, which is Exhibit 4281.

MR. CHARFOOS: Can you bring that up?

Q. And you didn't talk about Cingular in your direct, did you?

A. I did not.

Q. Why is that?

A. This agreement is not signed, it looks like it could potentially be a draft. It's not clear to me what Cingular agreed to. So I don't think it's one that we should rely on for purposes of our discussion.

MR. CHARFOOS: So if we go to page 41 and focus on the bottom.

BY MR. CHARFOOS:

Q.   Is that what you were focusing on?

A.   That's part of what I was focusing on.  There are other aspects of this agreement that make it clear that it's probably not necessarily the final agreement.

MR. CHARFOOS:  If we go to, say, next page, Mr. Rudd.

BY MR. CHARFOOS:

Q.   The statement of work.  Blank.  Is that another issue?

A.   Exactly.

Q.   And did you actually look at the amount of money that Cingular had paid to Mformation under some other agreement?

A.   I have certainly looked at the amount of money that Mformation has recorded as revenue from Cingular, and it's significantly different than what this document suggests would have been paid.  It's quite a bit less.

Q.   So it's nowhere near what was reflected in the particular document?

A.   Nowhere near, no.

Q.   Focusing now on 1334, which Mr. Arntsen wrote on, can you describe again to the jury why you did not believe that the agreements, as they're reflected on 1334, would reflect what RIM and Mformation would have agreed to in

a hypothetical negotiation?

A.   Once again, we're talking about agreements here that involve a very small number of devices.  To a few hundred, maybe a few thousand.  That's a whole lot different than 18.4 million.  And also these total dollar amounts here, I have included include a lot more than simply a license to even the software.  This also includes the support and maintenance payments that are part of it.  So this was the total amount they agreed to pay, and as I explained to Mr. Arntsen, the books and records of Mformation reflect that they paid less.  Significantly less.

MR. CHARFOOS:  And if we can look at Demonstrative 1336.

BY MR. CHARFOOS:

Q.   Did you find any agreements in Mformation's portfolio which did in fact reflect what you thought would be closer to what RIM would be paying?

A.   Well, I think these two agreements that you heard about last week, the Intel agreement and the Hughes agreement, are at least closer in terms of volume.  The Intel agreement contemplated pricing for numbers of devices in excess of 4 million.  So that's at least in a different category than these over here that are a hundred --

MR. ARNTSEN:  I object.  This is outside the scope of her report.

THE COURT:  So you may rephrase.  I'll sustain the objection.  So disregard the witness's answer.

But I might -- I invite you, you can reframe your question in relationship to the report.

BY MR. CHARFOOS:

Q.  In your report, how much did you find that Intel paid Mformation for its license to Mformation's technology?

A.  What I reflected in the opinions to my report is that Intel would have agreed to pay 20 cents per device for all those devices, over 4 million in total.

Q.  And in terms of the 20 cents, what exactly did RIM get as part of that 20 cents fee?

A.  You said what did RIM get?

MR. ARNTSEN:  Your Honor, I don't believe this is in her report anywhere.

THE COURT:  Overruled.  She referred to the report.  So I'll allow the witness's answer to stand.

BY MR. CHARFOOS:

Q.  Look at Appendix G.

A.  I am.

Q.  And do you see the reference to the Intel agreement?

A.  I do.

Q.  And can you tell the jury what that reflects?

A.   It shows that the client licenses per device activation were 20 cents per device from 4 million subscribers and beyond.

Q.   And what is it that Mr. Weinstein's asking per device in this case?

A.   $12 per device.

MR. CHARFOOS:  No further questions, your Honor.

THE COURT:  Very well.  The witness is excused. Thank you very much.

(The witness exits the witness stand.)

MR. CHARFOOS:  Your Honor, I have a couple of housekeeping matters.

THE COURT:  Very well.

MR. CHARFOOS:  First of all, we have a number of documents we'd like to admit into evidence.  We've provided a list to Mr. Arntsen of many of these documents.  They are not objected to, and my understanding is Mformation is going to double-check that, but subject to that double-check, there is no problem to introducing those into evidence.

I'll read those numbers to you:  828, 5020, 4261, 4815, 173, 275, 495, 714, 881, 969, 972, 973, 974, 975, 1007, 4043, 4119, 4121, 4127, 4174, 4341, 4355, 4365 and-6, 4382, 4403, 4416 through -7, 4426, 4453, 5515, 4766, 4772, 4832.

In addition, your Honor, RIM has a number of admissions for -- request for admissions.  There are 19 of them.  We're not sure how the Court would like to receive those, but we would like to put those into evidence before RIM closes its case.

THE COURT:  Request for admissions, you can put the request and the admission in a document and read it.  Sometimes it's helpful to the jury to have that in a paper form so they can consider it.  But if you haven't done that, you can do it at a later time.  But you can recite the -- unless it's something you'd rather do in writing, you can recite the request for admission and the -- whatever the admission is.

MR. CHARFOOS:  We have -- why don't we submit something in writing, your Honor, as long as, for purposes of any upcoming motions, I would have considered to have been put in during our case.

THE COURT:  I've mentioned depositions, I've mentioned interrogatories.  I'm not sure I've mentioned requests for admissions.  It's a device that the law has created for the parties to remove matters from your consideration so they can simply admit to a fact or a legal proposition without their having to be any further evidence on it.  And so once a fact is admitted, you have to accept that as established.  And again, these

requests for admissions and the answers are done under the same circumstances as testimony.  It's a sworn admission by one party to the other.

So what you're hearing is that there are 19 requests for admissions and responses.  Sometimes the response is an admission.  Sometimes it's objection to the request.  But as I understand it.  These are admissions that are being made that will be put in writing so that you can read them and the parties might draw your attention to them during the argument.

MR. CHARFOOS:  The next thing, your Honor -- and we will submit that to you.  The next thing, your Honor, is RIM would like to play the deposition of Joe Owen. It's 23 minutes.

THE COURT:  Very well.

MR. CHARFOOS:  Mr. Owen was the product manager, director of product management, vice-president of product development and a chief technology officer for XcelleNet.  During this trial you've heard about two products, the RemoteWare product and the Afaria product, and as you saw, RIM was focused in the invalidity product on the RemoteWare product.

(Whereupon, the excerpt of the videotaped deposition of Joseph Owen, dated March 31, 2010, was played for the jury.)

MR. CHARFOOS:  Your Honor, that's the end of the video.  We're not asking for any comment.  We would like, though, to move our demonstratives into the record.

THE COURT:  What's your demonstratives?

MR. CHARFOOS:  The demonstratives we used during our case in chief.  We can prepare a packet to let the record reflect what we've used.

THE COURT:  Well, certainly if they've been marked, they're part of what is part of the record.  Whether or not they're received into evidence and would go into the jury room is a different matter.  I am not sure I understand your request.  But I'll take that up.

The exhibits that you read out earlier are in evidence without objection.

(Defendant's Exhibits 173, 275, 495, 714, 828, 881, 969, 972, 973, 974, 975, 1007, 4043, 4119, 4121, 4127, 4174, 4261, 4341, 4355, 4365 and -6, 4382, 4403, 4416 through -7, 4426, 4453, 4766, 4772, 4815, 4832, 5020, 5515 received in evidence)

THE COURT:  Do you have further evidence?

MR. MATUSCHAK:  No, your Honor, RIM rests.

THE COURT:  Very well.  Defense rests.

Members of the jury, it's about 12:11, so we'll come back at about 1:15.  Remember my admonitions.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Please be seated.  Out of the presence of the jury.

Does either side wish to make any motions at the close of the defense case?

MR. MATUSCHAK:  Yes, your Honor.

MR. THAKUR:  Yes, your Honor.

THE COURT:  What's your motion?  Just give me the motion without argument.

MR. MATUSCHAK:  Yes, your Honor.  RIM would move for judgment as a matter of law.  On the issue of, we would renew our motion as -- in terms of the written motion that we previously filed with the Court with respect to judgment as a matter of law on the plaintiff's case.  I don't think any of those issues have changed at all from the time that we filed that motion.

We would -- I would like to point out just quickly these additional things that we're moving on that were not covered or were covered just slightly in that original motion.  The first of which was not covered was on invalidity.  And RIM moves for judgment as a matter of law that the '917 patent is invalid.

First, that RemoteWare 3.1 anticipates all

asserted claims except Claim 27 by clear and convincing evidence.

Second, that RemoteWare 3.1 and the Havinis patent anticipate by clear and convincing evidence Claim 27, there was a motivation to combine those references.

And third, that Claim 1 is invalid due to demonstrations of public presentation of its prototype more than one year before the filing of the '917 patent.

That, your Honor, involves a couple of questions:

One, being we think they're not entitled, they've not demonstrated they're entitled to the filing of the provisional.

Two, that the demonstration itself invalidates based upon that, and that Dr. Kushwaha's changing testimony not be an admission for the jury.

And third, I would say that RemoteWare or the Havinis patent combined with that demonstration render obvious all claims other than -- render obvious all claims that have been asserted, there was a motivation to combine.

And I may have said with respect to Claim 27 the RemoteWare and Havinis anticipated, I meant render obvious. That there was a motivation to combine.

Two other really quick points, your Honor. One

is, there still apparently is in the plaintiff's jury instructions a request on doctrine of equivalents. Although we did raise this before, there has been absolutely no testimony whatsoever on the doctrine of equivalents by Dr. Madisetti or anyone else.  That should be out.

And BlackBerry provisional software is a product that had been accused in the case, but that hasn't been mentioned, so I think that should be out.

And if your Honor would permit us, we'd submit a written motion that illustrates or identifies these points.

THE COURT:  Very well.  And I'll ask the same of plaintiff, if you have motions without argument, just tell me what the motions are.

MR. THAKUR:  Sure.  Your Honor, the first motion requests judgment as a matter of law concerning RIM's defenses under 35 Section 112.  RIM has failed to put forth any evidence, let alone clear and convincing evidence, in support of its 112 defenses.

RIM has also withdrawn all jury instructions regarding 35 Section 112, judgment as a matter of law, and Mformation on these defenses is therefore appropriate.

THE COURT:  That's it?

MR. THAKUR:  Second, Mformation requests judgment as a matter of law concerning RIM's defense of public use related to Mformation's July 2000 demonstration. The only evidence relating to this defense that RIM has presented is the uncorroborated, uncontradicted and in fact redacted deposition testimony by Dr. Kushwaha.

During this trial Mformation has presented unrebutted evidence that its July 2000 prototype did not practice all steps of Claim 1 of the '917 patent.  Most notably, Mformation witness Gabriel Beltramino unequivocally testified that this prototype, which he authored, did not improve at least the wireless registration steps of the '917 patent claims.

THE COURT:  Sounds like it's going into the argument.

MR. THAKUR:  Sorry.  Last one is judgment as a matter of law in Mformation's favor on this defense is appropriate.

The third, Mformation requests judgment as a matter of law concerning RIM's defenses of anticipation relating to Unicenter, Howard and Mobitex references. During this trial, no witness has provided any analysis of either of these three references, and as a result, judgment as a matter of law on these three are appropriate.

Fourth, judgment as a matter of law with respect to RIM's defense of anticipation.  Throughout -- judgment as a matter of law of defense -- defense of anticipation relating to the RemoteWare efforts.  Throughout the trial testimony of RIM's expert Dr. Acampora relied on the uncorroborated testimony of witness Chris Foley, which is based on observation and not his personal knowledge.  And the uncorroborated testimony of Joe Owen, which is also unreliable and unexamined hearsay.  Therefore, Mformation moves as a judge -- for judgment as a matter of law in Mformation's favor on this defense.

Couple more, your Honor.  Mformation requests judgment as a matter of law concerning RIM's defense of obviousness.  RIM has asserted three dozen prior art references for purposes of obviousness.  However, during trial, RIM's expert Dr. Acampora expressed an opinion on only one, the Havinis patent.  Therefore, judgment as a part of law in Mformation's favor on this defense is appropriate.

Finally, Mformation requests judgment as a matter of law concerning RIM's defense of noninfringement as it relates to the claim term establishing a connection between a wireless device and server.  The Court construed establishing a check between the wireless

device and the server as initiating wireless communication between the wireless device and the server.

In its order construing this term, the Court cited to express language in the '917 patent specification that wireless networks used in the invention would utilize any networking technology and protocol.  The Court's prior order on summary judgment declined to limit the '917 patent claims.  Dr. Acampora conceded the '917 patent specification discloses the use of any communication protocol.  In fact, the patent expressly discloses connection-oriented and connectionless protocols such as ethernet and token ring.

Your Honor, consequently, judgment as a matter of law in Mformation's favor on this defense is appropriate.

Those are all.

THE COURT:  Are you presenting rebuttal?

MR. THAKUR:  We are, your Honor.

THE COURT:  All right.  So when we come back, it's -- did you formally rest in front of the jury?

MR. MATUSCHAK:  I did, your Honor.

THE COURT:  Very well.  So when we come back, I'll explain to the jury the rebuttal case.  And can I

have a proffer with respect to your rebuttal?

MR. THAKUR:  Your Honor, we plan to rebut on the invalidity defense that was presented by Dr. Acampora, specifically for public use, and the RemoteWare system. And obviousness, finally, with Claim 27.

THE COURT:  Very well.  So I'll consider all of the motions submitted to the Court.  But to the extent the motions would be inconsistent with further evidence with respect to invalidity, the motion is denied, and you should then present evidence in rebuttal to invalidity.  Notwithstanding the motion having been made.

Counsel?

MR. MATUSCHAK:  Your Honor, with respect to the rebuttal witness, there are two issues with respect to his testimony.  One relating to secondary considerations of nonobviousness and whether he should be permitted to talk about that.  And the second relates to -- we can try to limit it, but we have actually two slides, they're both the same, but an issue that I think requires the Court's help.

THE COURT:  Put them up.

MR. MATUSCHAK:  Can we put up -- do you have slide 10?

MR. THAKUR:  Yes.

MR. MATUSCHAK:  I guess it's slide 9.

MR. THAKUR:  Just put the slide up.

MR. MATUSCHAK:  Okay.  So on this slide, your Honor, I think the issue that we have with it is that it really is directing itself toward noninfringement rather than invalidity.  Basically, this is supposed to be about invalidity.  What you have here set up, the system that we've heard testimony about, which is RIM's system, and RIM's system, of course, is not described in the patent.  In particular, there's no discussion in the patent about, you know, picking and choosing one of two options, WiFi or cell network.  That's from the testimony how RIM system works, but the patent doesn't talk anything about that.

And I think the intent of this slide is to try to suggest to the jury this is their noninfringement argument.  They want to make that in closing, that's fine, but it doesn't belong in their invalidity rebuttal case.  This is RIM's system, not the patent's system.

THE COURT:  Response?

MR. THAKUR:  Your Honor, if that is RIM's system, we should get a summary judgment ruling.

I say that in jest.

The simple issue we're going to be presenting our rebuttal testimony on is the fact is, they take -- the

threshold condition is not disclosed in the provisional and how the threshold condition is applied.  All we want to do is present in the -- in that disclosure that the placing a command, the preparing a transmission and the evaluating threshold condition all in the server is expressly disclosed in the provisional patent application.

This says the server, it makes no mention of the BlackBerry system whatsoever.  Basically it's an effort to keep the slide out by suggesting it relates to infringement while it clearly does not.

The only complaint that I heard from Mr. Matuschak was that it shows transmission of the WiFi or cellular network.  The fact that the transmission occurs over the WiFi or cellular network is not a infringement slide; it's simply an indication of the --

THE COURT:  What's the device?

MR. THAKUR:  The device is BlackBerry device. It's showing how it gets there.

MR. MATUSCHAK:  I think Mr. Thakur just said they're using the slide to show that a threshold condition will be disclosed.  In that case we can eliminate everything after "threshold condition," and they would be able to use the slide for that purpose to demonstrate where the threshold condition was evaluated

in the patented system.

MR. THAKUR:  We do need to do that because the threshold condition's evaluated both going back towards, the server to the agent, the agent to the server.

THE COURT:  Very well.  The objection is overruled.  You can use the slide.

What's the other one?

MS. DeBRUIN:  Your Honor, I've just handed up a packet of materials.  The other objections relate to secondary considerations.  There's four exhibits that -- if we can resolve the issue with respect to whether Dr. Madisetti can testify as to secondary considerations based on those exhibits, it will take care of the issue in the slide.

The first is Exhibit 2069.  Which is in the packet that I handed you.  With respect to that exhibit, it was never even mentioned in Dr. Madisetti's expert report or at his deposition.  So on that basis alone, 2069 should be out.

There are three other exhibits, and this is all in the briefing that Mformation and RIM submitted over the last evening.  One is Exhibit 205.  And that is -- makes mention of an Mformation opportunity.  That document has no nexus to the '917 patent.  And for that basis, on that basis, Dr. Madisetti should not be able

to base secondary considerations of nonobviousness on that document.

The other two failed in a similar way, Exhibit 185 and Exhibit 327. Those also have no nexus to the '917 patent. They relate to Mformation's agent. There's no mention of the '917 patent. And there's no nexus.

Indeed, Mformation admitted in earlier briefing, earlier Daubert briefing, that there was no nexus, and they said they would establish a nexus at trial. They never did, your Honor. And Dr. Madisetti should not be able to testify concerning secondary considerations relating to those two exhibits.

THE COURT: Response?

MR. THAKUR: Your Honor, there's actually four exhibits involved: 185, 327, 2069, and 205. The first three exhibits are actually already admitted in evidence. So what RIM is complaining to is the actual use of evidence, use in Dr. Madisetti's presentation, exhibits that have already been admitted into evidence.

205 is the sole one that has not come into evidence.

First, with respect to Exhibit 2069, their objection is that we have not established a nexus. We clearly have. Dr. Kushwaha testified that Version 1.4

of Mformation's product implemented each and every step of Claim 1 of the '917 patent, your Honor.

So nexus has already been established.

And the same is true, your Honor, for exhibits -- the same argument applies for 185, 205 and 327.

The second argument they just made with respect to those exhibits is, that relates to the agent.  But your Honor, the device server and the agent software work hand in hand, the two are intertwined.  The idea that they were referencing the agent without reference to the server software, frankly, doesn't comport.

THE COURT:  I'll sustain as to 205, 185 and 327. I don't understand what 2069 does or what this is.  What is this?  This is a November 30, 2004 press release about the BlackBerry Enterprise Server.  So what is the proffer as to what the witness will say?

MR. THAKUR:  That the release of the BES 4.0 included those functionalities that were -- there of a long-felt need for those particular capabilities.

MS. DeBRUIN:  Your Honor, that was never in his expert report.  Never mentioned at his deposition.

THE COURT:  That being that the release satisfied a long-felt need?  Or what?  What is the -- I'm sorry, I need to understand.  His opinion is that this press release, he'd like to use this to support his opinion

that there was a long-felt need.

MR. THAKUR:  Correct.

THE COURT:  What's the objection?

MS. DeBRUIN:  One objection, your Honor, is he never said that at his deposition.

THE COURT:  He didn't rely upon this -- when you say "he didn't say that," what is the "that"?

MS. DeBRUIN:  He never made any mention of either that exhibit, 2069.  It was never at issue at his deposition, it was never raised in his expert report. And he never made any such arguments as plaintiff is saying he will make based on, I believe, the wireless enterprise activation, is I believe what they're seeking to bring in through this.  And Dr. Madisetti had nothing to say in that regard independent of efforts in saying anything about this particular exhibit.

MR. THAKUR:  Your Honor, Dr. Madisetti in Paragraph 369 expressly relies on the BlackBerry website which says the same exact information that's in that exhibit.

THE COURT:  I can rely on the website but not the document.  Sustained as to the document, all right?

See you now at about 1:15.

(Luncheon recess)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. CHARFOOS:  If I may, we have pulled together the requests for admissions, the --

THE COURT:  Both sides agree?

MR. THAKUR:  We have not actually had a chance to review.  So perhaps we can do that shortly.

THE COURT:  All right.  Summon the jury.

Are we going to meet Thursday morning?

MR. THAKUR:  Not for testimony, your Honor.

MR. MATUSCHAK:  We won't need to meet for testimony, I don't think.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Very well.  Members of the jury, we're going to enter now a new phase of the case.  The plaintiff, who has the initial burden to prove infringement, rested.  And then the defense presented its evidence, with respect to noninfringement.  But also offered in evidence, among others, a defense that the patent was and is invalid.

And so now we go back to the plaintiff for their rebuttal case, because they haven't had an opportunity to meet the evidence with respect to invalidity of the

patent, and so now the plaintiff is permitted to call witnesses or present other evidence with respect to that defense that has been raised by the defendant.

MR. THAKUR:  Thank you, your Honor.

The plaintiff calls Dr. Madisetti.

THE COURT:  Very well.

Dr. Madisetti, you've previously been sworn, and so I'll simply remind you that your testimony is under oath.

THE WITNESS:  Yes, your Honor.

THE COURT:  You may inquire.

VIJAY MADISETTI,

   called as a witness by the Plaintiff, having
   been previously duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. THAKUR:

Q.  Professor Madisetti, welcome back.

A.  Good afternoon.

Q.  What is the purpose of your rebuttal testimony this afternoon?

A.  When I was here last time, I testified about the use of RIM's products and how they infringed the '917 patent, and Dr. Acampora presented evidence regarding noninfringement, and also his opinions regarding invalidity.  So I'm here to rebut Dr. Acampora's

opinions on validity.

Q.  I see.  Did you prepare a set of demonstratives?

A.  Yes, I did.

Q.  And are these the demonstratives (indicating)?

A.  Yes, sir.

Q.  Perhaps you could summarize for us what are the opinions you'll be expressing today.

A.  Yes.  These are the opinions that I'll be expressing today.  I'm expressing today.  Dr. Acampora has not shown that the RemoteWare Version 3.1 system or the associated documents anticipates any of the Claims 1, 6 or 21 through 25 of the '917 patent.

Dr. Acampora has not shown that Claim 27 of the '917 patent is obvious in light of the RemoteWare Version 3.1 system and the Havinis patent.

Dr. Acampora also has not shown that Mformation's July 2000 demonstration invalidates Claim 1 of the '917 patent.

Q.  And what is the basis of your opinion today?

A.  In this demonstrative I list the basis of my opinion. I have reviewed the following facts and data:

I've reviewed the '917 patent, including the provisional application, prosecution history, specification, claims, and the Court's construction.

I've reviewed Dr. Acampora's opinions.

I've reviewed the RemoteWare Version 3.1 documents and other alleged prior art documents cited by Dr. Acampora.  As was noted, the RemoteWare Version 3.1 source code was not provided to me, just the documents.

And also a review of the deposition transcripts.

Q.  And in fact, in addition to Version 3.1 source code not being provided to you, did they actually provide you a functioning version of the RemoteWare Version 3.1?

A.  No, sir.

Q.  Before we get into your opinions with regard to validity, could you provide just a brief explanation of the different standards with respect to infringement and invalidity?

A.  Yes, I can.  With respect to infringement, you have to show by a preponderance of the evidence that -- Mformation has to show by a preponderance of the evidence that the user of RIM's product infringes the claim.  So it means that it's more likely than not.

And in case of invalidity, it is RIM's responsibility or burden to show by clear and convincing evidence that the prior art invalidates the '917 patent.

Q.  Since this is such an extremely important slide, I want to make sure we clarify the two issues more strictly.

Is it your testimony that Mformation must prove

by a preponderance of the evidence that the use of the BlackBerry handheld in conjunction with BES 4.0 and higher infringed Claims 1, 6, 21 through 25 and 27 of the '917 patent?

A.   Yes.

Q.   Secondly, with respect to invalidity, it is RIM's burden to prove by clear and convincing evidence that each of the claims, which is Claims 1, 6, 21 through 25 and 27, are invalid by clear and convincing evidence?

A.   Yes, that's right.

Q.   Let's talk through the two invalidity arguments that RIM presented in this case.  The first one was, do you recall the testimony with respect to the July 2000 demonstration by Mformation?

A.   Yes.

Q.   Do you understand that before you get to the July demonstration, you first must have to examine the provisional patent application?

A.   Yes.

Q.   Let's turn to Mformation's provisional patent application.  What did you do to arrive at an opinion with respect to the provisional patent application?

A.   As described here, I reviewed the Claim 1 of the '917 patent, the Court's claim constructions, and the provisional patent application itself, to verify that

the provisional patent application disclosed all elements of the claim.

Q.  And what is the purpose of the provisional patent application?

A.  A provisional patent application is a marker in time that describes when the -- a marker in time for the invention.  For the inventors to claim the benefit of the provisional patent's marker in time, the provisional patent has to disclose all elements of the claim.  And they have one year from the date of filing of the provisional patent to actually file the nonprovisional application.

Q.  And the provisional was filed in December of 2000?

A.  The provisional was filed in December of 2000.

Q.  And the regular was filed in August of 2001. Correct?

A.  Yes.

Q.  So within the one-year timeframe?

A.  That's right.

Q.  So what is your opinion with respect to the provisional patent application?

A.  My opinion is that Mformation's provisional patent application discloses all elements of Claim 1 of the '917 patent.

Q.  And did you focus your analysis with respect to the

provisional patent application?

A.   Yes.

Q.   And what did you focus on?

A.   As here is a Claim 1, this is a demonstrative from Dr. Acampora's opinion, and as highlighted there, he focused on one particular limitation of Claim 1, which is "wherein the connection is established based on a threshold condition."

     And he opined that that limitation was not present in the provisional application that was filed in December of 2000.

Q.   Okay.  And beside this limitation, did you express any opinion about any other limitations being missing?

A.   No.

Q.   And is it your conclusion -- did you arrive at a conclusion with respect to whether this -- whether a -- "wherein a connection is established based on a threshold condition" is disclosed in the provisional?

A.   Yes, I would have an opinion.

Q.   So before we get to where you arrived at an opinion, perhaps you can explain to us, analyzed this in light of Dr. Acampora's presentation?

A.   Yes.  This is again Claim 1, and I put the Court's construction on the left, so you'll notice that the "wherein the connection is established based on a

threshold condition is the limitation that's related to

establishing a connection between the wireless device

and the server," and the Court's construction of

"establishing a connection between the wireless device

and the server based on a predefined state of the server

or the wireless device other than solely elapsing of

time."

And the Court's construction for establishing a

connection was initiating a wireless connection.

Q.   Perhaps you could --

A.   Wireless communications.

Q.   Perhaps you could explain to us how this works.

A.   Yes.  So here is a schematic, the demonstrative that

I created that will explain how the Court's

construction, I've applied it.

So as you can see, there's a server on the top,

and there is a wired device on the bottom.  So you start

off by placing a command in the mailbox at the server.

Then at that point I've identified, you begin initiating

the wireless communication step.  Because at that point

you take the command, you put -- you've prepared the

command for transmission, you put the destination

address, you put the source address, and at that point

you put the device address, and then you evaluate a

threshold condition.

So that after evaluation of that threshold condition is where I mark the completion of the -- of the initiation of the wireless communication.  So at that point, the step of initiating wireless communication is completed.

And following that, there is transmission of the contents of the mailbox over the wireless network where the device can then receive the command and accept the command and execute the command.

And so that's the context in which the threshold condition is evaluated.

Q.  And is it your testimony that each and every step of the method is performed either at the server or the device?

A.  Yes, sir.

Q.  Perhaps you could tell us a little bit about what you found with respect to the threshold condition with the provisional patent application.  Is this the provisional patent application?

A.  Yes, this is Exhibit 0571, which is the provisional patent application filed in December of 2000.

Q.  And you stated that you found that the provisional patent application disclosed the threshold condition.  Perhaps explain where you found that.

A.  Yes, I can.  And it is demonstrative of Exhibit 571

on page 4, as I've extracted this Section 6.  Here, if you read Section 6 on page 4 of 571, it says:  "If the command is to monitor some parameters on the device, then agent periodically sends the information back to the server, which could be based on certain threshold conditions or based on time interval."

Q.   And this is the language in the provisional patent application?

A.   This is the language in the -- directly taken from the provisional patent application on December 2000.

Q.   And based on your analysis, then what is your opinion as to whether Mformation's provisional patent application discloses the threshold conditions?

A.   Yes, as you can see from this language, the -- as you can see from the language, that the threshold condition is disclosed.

Q.   And that was your opinion?

A.   Yes.  This is my opinion, that in the provisional patent application, "wherein the connection is established based on a threshold condition" is disclosed in the provisional patent application.

Q.   So one of the bases for the testimony, for the July 2000 demonstration, is the fact that the July 3rd demonstration included every element of Claim 1, but actually the December provisional application did not

include every element because he was missing the threshold conditions.

Can you think of any logical reason why an inventor would not include everything they know about an invention in the provisional patent application?

MR. MATUSCHAK:  Objection, your Honor, beyond the scope.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  And one other question I have with respect to this slide, you mentioned that the transmission occurs over the WiFi -- is sent to the handheld.  How does that occur?

A.  Could you please repeat the question?

Q.  Perhaps you could explain.  Once the threshold condition is satisfied and the command is transmitted, how is the command transmitted from the server to the device?

MR. MATUSCHAK:  Objection, your Honor.  Not clear whether he's talking about that or something else.

THE COURT:  Sustained.  I presume it's based upon the patent, but maybe you should make that clear.

BY MR. THAKUR:

Q.  Okay.  How would a command be transmitted from the server to the device in the context of the patent?

A.   Over a wireless network.

Q.   And a wireless network may include WiFi?

A.   Yes.

Q.   And that wireless network may include a cellular network?

A.   Yes.

Q.   So continuing on, based on your testimony here today, you've arrived at the conclusion that the provisional patent application discloses the -- every element, including threshold condition, of the '917 patent -- excuse me -- what is in Claim 1 of the '917 patent.   Is that correct?

A.   Yes, that's correct.

Q.   Then so if that's true, then the July 30 demonstration would not be a basis for invalidity of the patent; is that correct?

A.   Yes, that's correct.

Q.   And that is because it was done less than one year before the application was filed, correct?

A.   Yes.

Q.   But for now, let us assume that the provisional application did not exist.  So it did not exist or RIM's expert is correct that the provisional does not disclose every element, it does not disclose the threshold condition.

So based on the July 31 demonstration alone, what is your opinion as to whether it provides a basis for invalidating the '917 patent?

A.   It's my opinion that the July 2000 demonstration does not include all elements of the claim.

Q.   And to arrive at that conclusion, what did you review?

A.   I reviewed the testimony of Dr. Kushwaha, this includes the four depositions that he had provided.  One is on April 20th, 2010; December 9th, 2010; February 3rd, 2011; and February 11, 2011.

Q.   And you recall that in his April 20th, 2010 deposition he testified that the prototype did not include wireless registration, correct?

A.   Yes.

Q.   And you remember that when you read the February 3 deposition, he indicated he'd made the mistake of believing that every element of the claim was included in the prototype; is that right?

A.   Yes.

MR. MATUSCHAK:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. THAKUR:

Q.   Do you recall what he said in the February 3, 2011

deposition?

A.   Yes, he said -- he clarified he made a mistake and he apologized for it.

Q.   And in the February 3rd, 2011 deposition, what did he testify about the presence of wireless registration in the prototype?

A.   He said that the steps of registration were represented into the server.

Q.   And he -- he arrived at that testimony on a review of the software?

A.   Of the source code.

Q.   Of the prototype?

A.   Yes.

Q.   And you also reviewed Dr. Kushwaha's testimony from this trial?

A.   Yes, I reviewed it, yes.

Q.   And you reviewed Mr. Beltramino's testimony from this trial, including discussion of the source code?

A.   Yes, I did.

Q.   So based upon this evidence, have you arrived at an opinion with respect to whether the July 2000 demonstration discloses -- invalidates the '917 patent?

A.   Yes, it is my opinion that Dr. Acampora has not shown by clear and convincing evidence that the July 2000 demonstration invalidates Claim 1 of the '917 patent.

Q.   So the second basis for invalidity asserted by Research In Motion in this case was prior art.  There were two pieces of prior art.  One was briefly mentioned in passing, the other was discussed.  The one that was mentioned in passing was Mobitex's RemoteWare was discussed.  Perhaps I could just quickly address the issue of Mobitex.  Are you familiar with Mobitex?

A.   Yes.

Q.   And how are you familiar with Mobitex?

A.   From the documents provided by RIM as well as some of my personal knowledge.

Q.   Do you recall the testimony of Dr. Acampora with respect to Mobitex?

A.   Yes, I do.

Q.   And do you recall that he never once said that Mobitex invalidates any claim of the '917 patent?

A.   Yes, he made no such claim.

Q.   Despite that fact, let's just quickly see if you can give us an example of something that would be missing from Mobitex.

         MR. THAKUR:  Chris, would you kindly pull up Exhibit 1008.

Q.   Are there any elements of -- that are clearly and expressly missing from Mobitex that are practiced by Claim 1 of the '917 patent?

A.   This is a -- an Exhibit No. 1008 that is a description of the Mobitex technology that I'm referring to.

Q.   Okay.  And I was saying could you identify an element that's clearly missing from the Mobitex that is required by Claim 1 of the '917?

A.   Yes, it's the mailbox.

Q.   Explain to me how the patent discloses a mailbox and Mobitex does not satisfy that limitation?

A.   In Mobitex the mailbox is established at the request of the device.

Q.   And in Mobitex --

A.   In Mobitex, the mailbox is established at the request of the device, while in the patent requires that the mailbox should be established without a request from the device.

Q.   And you have a citation to Mobitex where it discloses expressly what's required, that the mailbox is created with a request from the device; is that right?

A.   Yes.

Q.   Perhaps I could turn to that.

MR. THAKUR:  Chris, would you kindly turn to page 183, Section 4.4.

Q.   Could you explain what we're seeing here.

A.   Yes, this is Section 4.4 from the Exhibit 1008.  It

talks about Mobitex network mailbox.  As you can see

here the terminal and personal subscriptions can

subscribe to the Mobitex network mailbox facility.

And Item 2 in this document, you'll see that the

address has to subscribe or request the mailboxes.

MR. THAKUR:  Chris, would you kindly pull up

Exhibit 881, page 2, please.

BY MR. THAKUR:

Q.   What is this document?

A.   Exhibit 881, the mobile data communication guide to

Mobitex.  And it describes the network.

MR. THAKUR:  Chris, would you kindly pull up

page 98.

BY MR. THAKUR:

Q.   Could you explain what we see here?

A.   Yes, here is again confirmation that the mailbox, a

function in Mobitex to which the user can subscribe.  So

this is -- this describes that Mobitex is establishing a

mailbox at the request of the device.

Q.   And is it your opinion that there are elements of

Claim 1 that are also missing from the Mobitex prior

art?

A.   Yes.

Q.   Overall, your opinion, does Mobitex invalidate any of

the claims of the '917 patent?

A.   Mobitex does not.

Q.   Perhaps we could now turn to RemoteWare.  Did you review the materials with respect to RemoteWare?

A.   Yes, I've reviewed all the evidence provided by RIM regarding the RemoteWare Version 3.1 system, and its documents which I referenced in Dr. Acampora's report.  And I also reviewed Dr. Acampora's reports and depositions.

Q.   And you did not review RemoteWare Version 3.1 software because it was not provided to you?

A.   There was no software or source code provided to me.

Q.   And you did not review -- you've testified to this already.  You did not review 3.1 source code because it was not provided to you?

A.   It was not provided to me, no, sir.

Q.   Did you arrive at an opinion with respect to whether the RemoteWare Version 3.1 anticipates any claim of the '917 patent?

A.   Yes, I have an opinion.  And my opinion is that Dr. Acampora has not shown that RemoteWare Version 3.1 system on its documents and anticipates Claim 1 of the '917 patent especially, verifying the registration information at the server.

          "Without a request from the wireless device ... transmitting the contents of the mailbox from the server

to the wireless device;

"Without a request from the wireless device ... accepting the contents of the mailbox at the wireless device."

Further, Dr. Acampora has not shown that the RemoteWare Version 3.1 system anticipates Claim 6 and 21 through 25 of the '917 patent.

Q. Okay. So let's start with Claim 1. Perhaps we could take a look at the issue of verifying the registration information at the server. Do you recall Dr. Acampora's testimony of his claim set as it relates to RemoteWare?

A. Yes, I do.

Q. Actually I'll just refer to RemoteWare. If I refer to RemoteWare, I'm referring to 3.1, is that fair?

A. Yes.

Q. Did Dr. Acampora point to registration information in his testimony?

A. Yes, he did.

Q. Is this the -- is this a presentation he provided?

A. Yes. This is the support that he cites for verifying registration information at the server. Applying name to verification.

Q. Does this show the verification of the registration information at the server?

A. As indicated on report, it does not.

Q.   What is this document?

A.   This is the RemoteWare Windows client, the user's guide.

MR. THAKUR:  And, Chris, would you kindly pull up page 15 and call out the note section near the bottom of the page.

BY MR. THAKUR:

Q.   What does this disclose to us actually?

A.   It discloses clearly that the server administrator verifies the new client.

Q.   So why does this not meet the element of verifying the registration information at the server?

A.   Because a human being or a server administrator does the verification.  It's not verification at the server.

Q.   So when the verification at the server by the patent is required by a server of the hardware, and what we're seeing here is a server administrator, in fact a human being is verifying that?

A.   Yes.

Q.   The second part of that element you said was missing was without a request from the wireless device transmitting the contents of the mailbox from the server to the wireless device.  Do you see that, sir?

A.   Yes, I do.

Q.   Dr. Madisetti, what is your spin as to the why this

is missing?

MR. THAKUR:  Perhaps bring up slide 18.

THE WITNESS:  This is the testimony of Dr. Acampora on this particular limitation where he relies on this demonstrative with respect to transmitting the contents of the mailbox from the server to the wireless device.

MR. THAKUR:  Chris, would you kindly pull up Exhibit 733.

BY MR. THAKUR:

Q.  This is the document we just saw?

A.  Yes, this is Exhibit 733, which is the RemoteWare version of 3.1 Windows client, the user spec.

MR. THAKUR:  Chris, would you pull up page 28, Table 4.

BY MR. THAKUR:

Q.  What do we see here, Dr. Madisetti?

A.  Yes.

MR. MATUSCHAK:  Objection, this is not his report.

MR. THAKUR:  Your Honor, the opinion is expressly set forth in his report, your Honor.

THE COURT:  Why don't you use it as a preface to your question and therefore overcome the objection.

MR. THAKUR:  Okay.

BY MR. THAKUR:

Q.  Did you rely on Exhibit 733 in your expert report?

A.  Yes, sir.

Q.  And did you --

MR. MATUSCHAK:  Objection, your Honor.

THE COURT:  Well, you need to make reference to the report because that would overcome the objection.

MR. THAKUR:  Okay.

BY MR. THAKUR:

Q.  Did you express an opinion in your report that RemoteWare does not transmit the contents of the mailbox without a request from the device?

A.  Yes, I did.

Q.  Based on that, does this document show any evidence that the request is done out --

MR. MATUSCHAK:  Objection, your Honor, not in his report.

THE COURT:  Sustained.

MR. THAKUR:  Okay.

BY MR. THAKUR:

Q.  With respect to your testimony here today, is it your understanding that the RemoteWare documentation discloses any transmission of -- any transmitting the contents of the mailbox without a request from the device?

A.   As I referred to this document in my report --

MR. MATUSCHAK:  Objection, your Honor.

BY MR. THAKUR:

Q.   Perhaps you could testify without the document.

THE COURT:  Remove the document.

BY MR. THAKUR:

Q.   Remove the document.

A.   Please repeat your question.

Q.   So what is your opinion with respect to whether the RemoteWare transmits the contents of the mailbox without a request from the device?

A.   My opinion is that the transmission cannot occur without a request from the device.

Q.   And that is supported by your analysis and review of the RemoteWare documentation?

A.   Yes, it is.

Q.   I'd like next to discuss the step of the -- you refer to -- your opinion was that the RemoteWare 3.1 system does not anticipate Claim 1 of the '917 patent.  You said it was based on, "without a request from the wireless device, accepting the contents of the mailbox at the wireless device."  Do you see that?

A.   Yes, I do.

Q.   And do you recall Dr. Acampora's testimony on this?

A.   Yes, I do.

Q.   I'll show you a few slides.

Do you see his testimony?

A.   Yes, I do.  He refers to Exhibit 733, which says,
"Alert icon appears" --

MR. MATUSCHAK:  Objection.

MR. THAKUR:  The expert is allowed to provide
evidentiary detail for an opinion expressly provided in
his report.  This was expressly provided in his report.

THE COURT:  I'm not sure -- I heard an objection,
so you can always overcome that by going to the report
and using that as the question.

MR. THAKUR:  Okay.  Fair enough.

Give me a quick moment, your Honor.  I wasn't
quite prepared for this interruption.

(Pause in the proceedings.)

BY MR. THAKUR:

Q.   Do you recall writing an expert report in this case?

A.   Yes, I do.

Q.   Do you recall providing an opinion that the -- do you
recall providing an opinion that Dr. Acampora does not
cite to any documents or testimony to show that a
wireless device is a RemoteWare system or take any
action that would be accepting the contents of the
mailbox under the '917 patent?

A.   Yes, there's no evidence cited regarding accepting

the contents of the mailbox without a request from the device.

Q.  And does this evidence that he presented at trial change your opinion in any way?

A.  No, it does not.  It is requested by the device.

Q.  Does this trial exhibit actually show that it is requested by the device?

MR. MATUSCHAK:  Objection, your Honor, beyond the scope of --

THE COURT:  Sustained.

BY MR. THAKUR:

Q.  So, finally, based upon your previously stated opinion, is it your opinion that RemoteWare system does not show -- does not actually have acceptance of the contents of the mailbox of the device without a request from the wireless device?

A.  Yes.  It -- based on my review of the documentation, the acceptance is performed at the request of the device.

Q.  Let's turn now to Claim 6.

MR. THAKUR:  Will you turn to slide -- thanks.

Q.  Do you recall hearing Dr. Acampora's testimony that RemoteWare anticipates Claim 6?

A.  Yes, I did.

Q.  And what does Acampora rely on for the basis of his

testimony that RemoteWare anticipates Claim 6?

A.   He relies on Mr. Foley's deposition on page 172,
lines 15 to 20.

MR. THAKUR:  Chris, would you kindly pull up --

BY MR. THAKUR:

Q.   Actually, first of all, is this correct?

A.   No, it's not.

Q.   Exhibit 734 --

MR. THAKUR:  Chris, would you kindly pull that
up.  Page 372.

MR. MATUSCHAK:  I'm going to object, your Honor.
This is beyond the scope.

THE COURT:  Sustained.  Unless you want to
preface it with the report.

BY MR. THAKUR:

Q.   Professor Madisetti, did you provide an expert report
in this case?

A.   Yes, I did.

Q.   Did you express the following opinion in the expert
report in this case, that, "Dr. Acampora has not shown
that the RemoteWare system discloses transmitting
information relating to the execution of the command at
the wireless device from the wireless device to the
server"?

A.   Yes, there's no such transmitting of execution

information.

Q.   Number two, did you express the second opinion that, regarding the acknowledgments discussed in Paragraph 340 of Dr. Acampora's report, all Dr. Acampora --

MR. MATUSCHAK:  I'm going to object, your Honor. May I be heard at sidebar?

THE COURT:  Counsel, approach.

(At the sidebar, out of the hearing of the jury and the court reporter.)

BY MR. THAKUR:

Q.   To your understanding, Dr. Madisetti, does the RemoteWare system provide for any basis to provide an acknowledgment of the execution of the command at the handheld back to the server?

A.   No, sir, based on my review of the documents, it does not.

Q.   Did you express the following opinion in your expert report:  "The logs of the CONNECT:Manage systems do not disclose that the wireless device has transmitted information relating to the execution of the command back to the server"?

A.   That's correct, that's my opinion.

Q.   And you further expressed the opinion that Dr. Acampora has not shown how information relating to the deployment of software on a particular device is

based into the CONNECT:Mg logs?

A.   Yes, that's my opinion.

Q.   And finally, did you express the opinion that the scanning of a client by the inventory manager is not a command under the Court's construction and, therefore, any action taken by the client in response to the inventory manager is not transmitting information of the execution?

A.   That's also my opinion.

Q.   So based on the testimony, is it your opinion that Claim 6 one -- is it your opinion that Claim 6 of the '917 patent is not anticipated by the RemoteWare system or reference documents?

A.   It's my opinion that Dr. Acampora does not show any evidence that Claim 6 has been anticipated by the RemoteWare 3.1 system or its documents.

Q.   Okay.  Perhaps we could now discuss Claims 21 and 22 briefly.

     Do you recall Dr. Acampora's testimony with respect to Claims 21 and 22?

A.   Yes, I do.

Q.   Do you recall Mr. Foley's testimony with respect to what the RemoteWare Version 3.1 performs?

A.   Yes, sir.

Q.   Do you see the reference to the word "poison pill"?

A.   Yes.

Q.   Is there any document -- any reference in the RemoteWare system or documentation whatsoever relating to "poison pill"?

A.   No.

Q.   Number two, the next reference says:  "Permanently remove one or more files from the server or the client."

A.   Yes.

Q.   What is a "delete file"?

A.   It deletes the file.

Q.   And based upon what you see here, what is your understanding of what the scope of this delete file is?

A.   It just removes a file.  It's no disclosure in the RemoteWare system, or documentation that it affects the functionality or meets the Court's construction of command.

Q.   Is this command enabling access of the wireless device?

A.   None at all.

Q.   And the third item identified by Dr. Acampora was remove directory.

A.   Removes a client or server directory.

Q.   Does that comprise enabling or disabling access of the wireless device server?

A.   No, it does not.

Q.   Perhaps we could move to Claim 22.  Do you recall
Dr. Acampora's testimony with respect to Claim 22?

A.   Yes, I do.

Q.   Do you recall him presenting this evidence with
respect to as a basis for anticipating Claim 22?

A.   Yes.

Q.   Perhaps you could explain to us why.  Is it your
opinion that this does not anticipate claim?

A.   Yes, both of these are done, the ESD, for instance,
the electronic software distribution, is done at the
request of the client.  And it is not provided evidence.

MR. MATUSCHAK:  Move to strike, beyond the scope.

THE COURT:  Sustained.

BY MR. THAKUR:

Q.   Did you express an opinion in your expert report with
respect to whether Claim 22 is anticipated by a
RemoteWare reference?

A.   Yes, I expressed that opinion in my report.

Q.   Did you express the following opinion in your expert
report:  "Dr. Acampora has not shown that the delete
file event of either RemoteWare or CONNECT:Manage would
be used or -- to enable or disable an application that
may run in the wireless device"?

A.   Yes, based on my review of the documents, that's my
opinion.

Q.   And did you further express the opinion that he relies on --

MR. MATUSCHAK:  Objection, your Honor.

MR. THAKUR:  Your Honor, we'll leave the second sentence out.

BY MR. THAKUR:

Q.   Okay.  So based on your review of the RemoteWare system, is it your testimony that Dr. Acampora has not shown that it anticipates any of the claims of the '917 patent?

Perhaps I could bring you back to the --

A.   Are we talking Claim 22, 23?

Q.   21, 22, excuse me.

A.   Yeah, it doesn't anticipate Claims 21 or 22.

Q.   So in summary, does the RemoteWare system anticipate Claim 1 of the '917 patent?

A.   No, it does not.

Q.   Claim 6 of the '917 patent?

A.   No, it does not.

Q.   21 of the '917 patent?

A.   No.

Q.   22 of the '917 patent?

A.   No, it does not.

Q.   Let's turn quickly to the Havinis patent.  Do you recall Dr. Acampora's testimony with respect to

Claim 27?

A.  Yes, I do.

Q.  And what was his testimony?

A.  His testimony was that the Havinis patent, which is 4092, complied with RemoteWare 3.1 documentation, would render Claim 27 as invalid.  And he cited this evidence from Column 5.

Q.  Can Havinis be combined with 3.1 to make Claim 27 the '917 patent obvious?

A.  No.

Q.  Why not?

A.  In reference to a mobile system, it's operating on a communication network.  It's not related to managing device from the server.

Q.  One of the decisions in deciding what -- whether a patent is invalid or is obvious, you do have to consider a person of ordinary skill in the art, correct?

A.  Yes.

Q.  Did you express an opinion with respect to what a person of ordinary skill in the art would find?

A.  Yes, I did.

Q.  And is this one of the demonstratives you prepared?

A.  Yes.  Here I listed my opinion of a person of skill in the art.  And it's a Bachelor of Science in computer science or electrical engineer, or a similar degree.

And with the experience of approximately five years in experienced programming in the field of cellular telephony.  Including approximately one to three years of experience developing software products for remotely managing wireless devices.

Q.  So you do not disagree with Dr. Acampora about the education of a person of skill in the art, correct?

A.  No.

Q.  But you believe that more experience is required than Dr. Acampora considered appropriate for a person of ordinary skill in the art?

A.  Yes, I do.

Q.  You specifically identified programming in the field of cellular telephony.  Why do you think programming skills are important?

A.  There are about 3,000 standards with respect to cellular telephony, which is a lot of APIs you have to be familiar with.

Q.  Under either definition, do you have an opinion with regard to the validity of the '917 patent, Claim 21?

A.  Yes.

Q.  What is your opinion?

A.  My opinion is that -- go to the next slide, yes.  I would like to -- so with respect to Claim 27, it's my opinion that Havinis only discloses the position, the

location of the -- at the request of the device.  So it does not anticipate -- it does not render obvious Claim 27 in combination with RemoteWare 3.1.

Q.  Perhaps I can quickly identify a couple of pin cites in the Havinis.

MR. THAKUR:  Could you put on the screen Exhibit 5092.  Go straight to Column 15 26.

BY MR. THAKUR:

Q.  What are we reading here?

A.  The context of Havinis which is the operation of the mobile networks.

Q.  And so this is --

MR. MATUSCHAK:  Objection, your Honor, beyond the scope.

MR. THAKUR:  Your Honor, this is the patent that's been specifically identified as the basis of testimony here.

THE COURT:  Use the report.

MR. THAKUR:  Okay.

BY MR. THAKUR:

Q.  Did you express an opinion in your report with respect to the Havinis patent?

A.  Yes, I did.

Q.  Was it your opinion that it would not have been obvious to one of ordinary skill in the art to combine

Havinis '454 with any or all of the Mobitex system, the RemoteWare system, the Howard '820 patent and the Unicenter TNG system?

A.   Yes.

Q.   Did you further have an opinion that, as discussed herein, Havinis '454 does not disclose the elements where Dr. Acampora asserts they're disclosed?

A.   Yes, it is done at the request of the device.

Q.   And is it further your opinion the Havinis '454 is also not directed to wireless device remote management (instead it relating to over the air wireless service provisioning), and consequently not in the same field as the invention of the '917 patent?

A.   Yes, I did.

Q.   Finally, did you express the opinion that Dr. Acampora fails to show that there would be reason, teaching motivation, or suggestion to combine Havinis '454 with any or all of the Mobitex system, the RemoteWare system, the Howard '820 patent and the Unicenter TNG system or that such a combination had a reasonable expectation of success?

A.   Yes, that's my opinion.

Q.   So based on your review of what Dr. Acampora testified with respect to, what were your final opinions with respect to validity?

A.   This summarizes my opinions on validity.  It's my opinion that Dr. Acampora has not shown that the RemoteWare Version 3.1 system and -- or its associated documentation anticipates any of the Claims 1, 6 or 21 through 25 of the '917 patent.

Dr. Acampora has not shown that Claim 27 of the '917 patent is obvious in the light of the RemoteWare Version 3.1 system, and the Havinis patent.

And with respect to Claims 23, 24, 25, it's because Claim 1 is not shown invalid, my opinion holds for those claims as well.

And that Dr. Acampora has not shown that Mformation's July 2000 demonstration invalidates Claim 1 of the '917 patent.

Q.   And what you state here is that Dr. Acampora has not shown these things.  In fact, Dr. Acampora has not shown by clear and convincing evidence that each one of these anticipated references, anticipated Claim 1, 6 or 21 through 25 of the '917 patent; is that correct?

A.   Yes, there was no clear and convincing evidence that was offered by Dr. Acampora because, as mentioned, these references cite requests from the device.

MR. THAKUR:  Thank you, Dr. Madisetti.

THE COURT:  You may cross-examine.

MR. MATUSCHAK:  Yes, your Honor, thank you.

                    May I approach, your Honor?

                    THE COURT:  Certainly.

CROSS-EXAMINATION

BY MR. MATUSCHAK:

    Q.  Good afternoon, Dr. Madisetti.

    A.  Good afternoon, sir.

    Q.  Now, sir, you understand that Dr. Acampora says
     the '917 patent is invalid, correct?

    A.  Yes, that's what he opines.

    Q.  And you understand that the reason he says it's
     invalid is because, that he says, that Mformation was
     not the first to do what Claim 1 says, correct?

    A.  Yes.

    Q.  Okay.  You disagree with that; is that correct, sir?

    A.  Yes, I disagree with it.

    Q.  But you are not the patent examiner, are you?

    A.  I'm not the patent examiner.

    Q.  And you were not the patent examiner who looked at
     the '917 patent during its course at the patent office,
     are you, sir?

    A.  No, sir.

        MR. MATUSCHAK:  Can we get Demonstrative 222,
     please.

BY MR. MATUSCHAK:

    Q.  Dr. Madisetti, you see up on the screen the cover

page of the '917 patent on the left?  Do you see that?

A.  Yes, I do.

Q.  And you know that on the cover page of every patent there's a section called "References cited," correct?

A.  Yes.

Q.  And here we have the "References cited" portion of the '917 patent.  You see that, we've blown that portion up?

A.  Yes.

Q.  And you understand that is a list of the prior art that the patent office considered before determining to issue this patent; is that right, sir?

A.  I'm not a legal expert, but I think that's true.

Q.  And the RemoteWare product is not on that list, is it?

A.  It's not.

Q.  In fact, none of those references describe the RemoteWare product, do they?

A.  The RemoteWare is not listed on this page.

Q.  So according to the "References cited" on the face of the '917 patent, the patent examiner did not have any information about RemoteWare; isn't that correct, sir?

A.  Again, I cannot make the determination, but it's not listed on the cover page.

Q.  Well, in considering whether RemoteWare invalidates

the '917 patent, the jury has got to consider something that the patent office never had the opportunity to consider; isn't that true, sir?

MR. THAKUR:  Objection, foundation, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes, it's not listed on the cover, that's all I can say.

BY MR. MATUSCHAK:

Q.  Now, you did hear testimony while you were here in court that RemoteWare was actually a competitive product to Mformation's product, correct?

A.  Refer me to the testimony.

Q.  You don't recall that?

A.  Not specifically.

Q.  Okay.

MR. MATUSCHAK:  If we can get Demonstrative 223, please.

Q.  We have up on the screen, Dr. Madisetti, the cover page of one of the RemoteWare manuals.  Do you see that?

A.  Yes, I do.

Q.  And the copyright dated 1996, do you see that?

A.  Yes, I do.

Q.  In 1996, that's three years before Mformation even existed, correct?

A.  I'm not sure when they were formed.

Q.  You don't remember that Mformation was formed by Dr. Kushwaha in 1999?

A.  That's -- I mean, I don't recall the exact date.  But it's earlier.

Q.  All right.

MR. MATUSCHAK:  Could we get Demonstrative 224, please.

Q.  Now, in RemoteWare, you talked about this delete files.  Do you see that?

A.  Yes.  That is opinion offered by Dr. Acampora, yes.

Q.  And you have an opinion about that too that you just offered a few moments ago, correct?

A.  Yes, sir.

Q.  All right.  And "delete file" means deleting a file on the server or the client, according to this document, correct?

A.  Yes, it says:  "Permanently remove one or more files from the server or the client."

Q.  I think you testified that deleting a file is not a command under the Court's claim construction.  Did I hear that correctly?

A.  Yes.

MR. MATUSCHAK:  Let's put up Demonstrative 225, please.

BY MR. MATUSCHAK:

Q.   On the left is the Court's claim construction that talks about what a command is; is that correct, sir?

A.   Yes, it is.

Q.   And so that's a code or signal intended to cause the wireless device to take or cease an action with respect to its functionality and other data for use by the wireless device.  Do you see that?

A.   I do.

Q.   And that's the definition that we're all bound by here, correct?

A.   That's the construction of the Court, yes.

Q.   All right.  Now, if a server, if the RemoteWare server tells a RemoteWare client, "delete file," you're telling the jury that's not a command?  Under this Court's claim construction?

A.   No -- yes, it's not a command under the Court's construction.  Because it does not -- the RemoteWare documentation does not describe the filing in context of taking or ceasing an action with respect to its functionality.

Q.   What would you call it when the server tells the remote device, "delete file"?  What would you call that?

A.   It deletes the file.  It's a delete file, yes.

Q.   You said it's not a command.  It must be something.

Is it a suggestion?

A.   I've applied the Court's construction, sir.  There's a specific construction for the command.  I applied the Court's construction.

Q.   I understand.  I just want to know what you would call it when the RemoteWare server tells the RemoteWare device, "delete file."  You said it's not a command.  So I want to know what you would call that.

A.   As I said, it's not a command in the Court's construction.  It could generally be called some sort of command under a Windows environment.

Q.   Okay.  So --

A.   But it's not in the Court's construction.

Q.   So it's a command but not a command under the Court's construction?

A.   Yes, I've applied the Court's construction to the word "command."

Q.   And you say it's not a command under the Court's claim construction because it won't have any effect on the functionality -- with respect to the functionality, correct?

A.   Yes.

Q.   So it's your testimony that deleting a file on a device will not have any effect on that device's functionality; is that true?

A.   Yes, not as disclosed in the documentation.

Q.   So if I delete a file out of the device, the device can no longer perform any functions related to that file; isn't that true?

A.   It's not -- the "delete file" is not disclosed with respect to any functionality.  In the RemoteWare.

Q.   I'm talking about the Court's claim construction.  I think you said that "delete file" can't be a command because it doesn't take an action with respect to the functionality, correct?

A.   And other data for use on the wireless device.  Yes.  It deleted browser data.  It doesn't affect anything.

Q.   But if I delete a file, I can no longer perform any functions relating to that file, correct?

A.   That is your assumption.  It's nondisclosed.  In the context of affecting functionality of the device.

Q.   Is it your testimony, Dr. Madisetti, that if a server on RemoteWare causes a RemoteWare client to delete a file that that client can nevertheless perform functionality with respect to what was on that deleted file?

A.   There is no implication that the file had functionality.  I mean, RemoteWare does not disclose a file as having functionality.

Q.   So in your view, files don't have functionality?

A.   No, it's my view that it doesn't meet the Court's construction.  RemoteWare does not describe a "delete file" in the context of affecting functionality.

Q.   Well, every file has some functionality, doesn't it, sir?

A.   It's the functionality of the file.  We're referring to the functionality of the device.

Q.   Well, if a file has functionality, and I put it on my device, now my device has functionality that it didn't have before, correct?

A.   No, sir.

Q.   Okay.  Now, you testified that you didn't get the source code for the RemoteWare product, correct?

A.   I did not get any source code.

Q.   Okay.  But you didn't go out and look for it yourself, did you?

A.   No, sir.

Q.   You didn't ask any of Mformation's lawyers to go out and look for it, did you?

A.   No.

Q.   Just like Dr. Acampora, you reached your conclusions without the source code, correct?

A.   I was referring to Dr. Acampora's opinion and looking for evidence about his opinions.

Q.   Right, and just like Dr. Acampora, you reached your

opinions that you testified about earlier today without looking at the source code, correct?

A.   Yes, I have not looked at the source code.  I was not provided any.

Q.   By the way, with respect to -- you talked about in your direct testimony something called CONNECT:Manage.  Do you remember that?

A.   It was not referred to, but in Dr. Acampora's testimony in this court.

Q.   Right, because Dr. Acampora never said anything about "CONNECT" in his testimony in this courtroom?

A.   It only came in because my counsel read my report.

Q.   All right.

        MR. MATUSCHAK:  Now, can you -- can we get an Exhibit 4043, please.  And if we can go to the page that's -- on page numbers, it's 35834.

BY MR. MATUSCHAK:

Q.   You testified on direct about this portion of the page where the exclamation point is, correct?

A.   This was Dr. Acampora's slide.

Q.   You testified about it, did you not?

A.   Yes, I commented that there was no --

Q.   Can you turn into your report, please, sir, on validity that's in the binder in front of you.

A.   Which one is it?

Q.   The validity report.

If you can't find it, I have one here.

MR. MATUSCHAK:  Your Honor, may I approach?

THE COURT:  Sure.

BY MR. MATUSCHAK:

Q.   And you see, Dr. Madisetti, I think it's Paragraph 135 -- that you start this issue about verifying -- whether the RemoteWare system as testified to by Dr. Acampora verifies the registration process. Do you see that?

A.   Yes, I see here that he --

Q.   And one at a time --

MR. THAKUR:  Objection, argumentative.  He's interrupting the witness.

THE COURT:  Yes.  But it is useful to object if a witness is being nonresponsive.  But you should object as opposed to simply trying to outtalk him, and that way the court reporter has that in mind.

And as you might have remembered from your last testimony, this is cross-examination.  So the lawyer has the style of asking a question that calls for a yes or no answer.  And if you can answer it "yes" or "no," you should do so without volunteering why you're answering it unless you're asked to do that.

Go ahead.

MR. MATUSCHAK:  Thank you, your Honor.  Sorry.

BY MR. MATUSCHAK:

Q.  Dr. Madisetti, there were three paragraphs in your expert report on validity that deal with this verification (indicating), a portion of Claim 1; is that correct?

A.  No.

Q.  There are four paragraphs in your expert report dealing with that verification step, correct?

A.  Yes, sir.

Q.  And not one of those four paragraphs ever mentions this portion of Exhibit 4043; is that true, sir?

A.  No, sir.  It does.

Q.  And where does it do that?

A.  I say that Dr. Acampora has not shown that it's verified registration information at the server, based on the review of this document.

Q.  There's no reference to Exhibit 4043 there, is there, sir?

A.  There's no explicit reference to this exhibit.  It's cited at the --

Q.  There's nothing that says "Exhibit 4043," correct?

A.  No, sir, not in this section.

Q.  All right.

MR. MATUSCHAK:  Your Honor, I move to strike his

earlier testimony with respect to Exhibit 4043 as beyond the scope of his report.

THE COURT:  Denied.

BY MR. MATUSCHAK:

Q.  Now, Dr. Madisetti --

MR. MATUSCHAK:  If we can get Demonstrative 226 up, please.

Q.  You were asked about a Mobitex, you remember that?

A.  Yes.

Q.  And now, Doctor, I think you testified Dr. Acampora did not actually say that Mobitex invalidates the '917 patent, correct?

A.  Yes.

Q.  What Dr. Acampora did say was that Mobitex shows you could accept a remote lock command before the '917 patent, correct?

A.  Could you be more specific?  I don't recall the exact testimony.

Q.  Let's just look at what the document says.  You see up here the Mobitex manual that you've reviewed in the course of this case, correct?

A.  This is the mobile data manual.

Q.  Yes, one of the documents that you reviewed as part of your analysis of this case.  Isn't that true?

A.  Yes, I opined that this was not part of the Mobitex

specification.

Q.  And this shows that there is -- this is dated August 1990, correct?

A.  Yes, sir.

Q.  And this shows there was something called a "die" command; is that right?

A.  Yes, sir.

Q.  So we know that there was a "die" command at least as early as 1990, correct?

A.  Yes.

Q.  Now, at the time of your expert report, didn't you form any opinion as to how the "die" command actually worked, correct?

A.  That's not correct.  I did.

Q.  Let me ask it this way:  You express no opinion about when the server tells a device to die in the Mobitex networks, whether that's a command or not.  Is that true?

A.  You have to refer me to a specific section.  I discussed the "die."

Q.  All right.  Sir, I'd like to show you page 218 from your deposition on invalidity in May of 2011.  Do you have that, sir?

A.  I see a portion of my deposition, yes.

Q.  That's May 13 of 2011; is that correct?

A.  Yes.

Q.  If you look at the beginning of line 11.

A.  Yes.

Q.  Do you see where you asked the question:  "And you believe that Mobitex is instead relating to keeping track of devices for operating services such as billing. I'm just trying to understand whether the 'die' command is strictly related to keeping track of devices for ACK billing or something, it's somewhere else."

Do you see that?

A.  Yes, I do.

Q.  And you said:  "Again, I have not formed an opinion on what it can do.  I have not formed one."

Do you see that?

A.  I see what it said there.

Q.  You did not at the time of your deposition have an opinion on what the "die" command could do, correct?

A.  No, sir.

Q.  All right.

Well, you do know that when a server tells a device to "die" on the Mobitex network, that's a command, isn't it?

MR. THAKUR:  Objection, your Honor, beyond the scope of direct.

THE COURT:  Overruled.

THE WITNESS:  Could you repeat that question?

BY MR. MATUSCHAK:

Q.  Yes.  When a server tell a device to "die" on the Mobitex networks, that's a command, is it not?

A.  It is a form of command, yes.

Q.  And it's a command within the meaning of the Court's claim construction in this case, is it not, sir?

A.  No, sir.

Q.  Well, if a Mobitex server is telling a device to "die," and that's not a command, what is it?

A.  As I said, it's not a command in the Court's construction.  I'm not offering anything else.

Q.  And the Court's construction --

MR. MATUSCHAK:  Well, if we can put back up actually Demonstrative 225, please.

Q.  So the Court's construction is a command, is a code or signal -- this is what we talked about before, correct?

A.  Yes.

Q.  And you think that a "die" command does not take or cease an action with respect to wireless devices functionality; is that correct?

A.  I can explain.  But --

Q.  I just want to know, do you say, sir, that a "die" command is not intended to cause the wireless device to

take or cease an action with respect to its functionality and other data for use by the wireless device.  Yes or no?

A.   It does affect the functionality of the device.

Q.   And that leads to the command --

A.   In the sense that it affects the functionality with respect to devices, but not with respect to the server.

Q.   So you think in Mobitex this device that has the "die", it can still send information back to the server?

A.   Yes, it can, it can send system packets.

Q.   You also talked about the provisional application earlier in your testimony here this afternoon.  Do you recall that?

A.   Yes, I do.

Q.   And you said all of the limitations of Claim 1 are disclosed in the provisional application, correct?

A.   Yes.

Q.   But you understand that the provisional must obtain all of the elements of Claim 1 or Mformation does not get the benefit of that date.  Correct?

A.   That's what I understand.

Q.   And if they don't get the benefit of that date, they have to use the August 2001 date, correct?

A.   I'm not a legal expert.  That's my understanding.

Q.   Now, the provisional application, I think we saw this

screen earlier, the certification page and the cover page.  After you go beyond that, there's about three pages, right, sir?

A.  I think there are four.  But roughly.

Q.  Fair enough.  The '917 patent which was filed in July of 2001, that has seven columns of text, correct?

A.  Again, I don't know the exact number.  But I will agree.

Q.  And you would agree with me that the provisional application does not include all the text that the specifications of the '917 patent has, correct?

A.  Again, I would take your word for it.

Q.  The '917 patent also has a figure, right?

A.  Yes.

Q.  And the provisional has no figures, correct?

A.  No, it does not have figures.

Q.  The '917 patent has claims, correct?

A.  Yes.

Q.  The provisional has no claims, correct?

A.  No, it does not.

        MR. MATUSCHAK:  Demonstrative 27.  Please.

BY MR. MATUSCHAK:

Q.  This is the part that Dr. Acampora said was not met by the provisional, correct?

A.  Yes.

Q.   He said the provisional lacked this element of the claim, "the connection being established based on a threshold condition."  Right?

A.   Yes.

Q.   But you say a threshold condition is disclosed in two places in the provisional, right?

A.   Could you refer to where I said that?

Q.   Okay.  I thought that's what we talked about.

MR. MATUSCHAK:  Let's go to Exhibit 571, last page, please.

Q.   All right.  So I think that you said on direct that one of the places that discloses a threshold condition is Item 4.  Did you say that?

A.   No, I did not.

Q.   Well, forget Item 4.  You did point to Item 6, though, right?

A.   Yes, sir.

Q.   Let's talk about that one.  And that No. 6 does use the word "threshold condition," doesn't it?

A.   Yee.

Q.   But there's a problem with the way it uses it, isn't there, sir?

A.   No, sir.

MR. MATUSCHAK:  Well, let's go back to Demonstrative 207.

BY MR. MATUSCHAK:

Q.   You recall that this, "wherein the connection is established when based on a threshold condition element has to be done without a request from the wireless device", correct?

A.   Yes.

MR. MATUSCHAK:  All right.  Let's go back to 571, where we were, again.  Let's highlight No. 6.

BY MR. MATUSCHAK:

Q.   Here in the provisional it says:  "The agent periodically sends information back to the server which could be based on certain threshold conditions."

Do you see that?

A.   Yes, I see that.  In English, yes.

Q.   So Step 6 in the provisional is talking about the agent or device sending information back to the server based on a threshold condition, correct?

A.   No, sir.

Q.   That's what it says, isn't it?

A.   No, it does not.

Q.   It says:  "The agent periodically sends information back...," right?

A.   But that refers to that phrase.  The second part refers to the command being sent to the monitor. Otherwise, this phrase would be duplicative of how the

agent does it.  Clearly says the agent sends information back, so this refers to the server, and the command.

Q.  So where it says:  "The agent periodically sends the information back to the server, which could be based on certain threshold conditions," you are telling us that what that means is not that the device sends it back but that the server sends something to the agent?

A.  Exactly.  Because it already says "the agent periodically sends information back."  You won't repeat that again.  Says that could be based on a certain threshold condition all the time.

Q.  It has to be your testimony, right, sir?

A.  I could not --

        MR. THAKUR:  Objection.  Argumentative, your Honor.

        MR. MATUSCHAK:  I'll withdraw it, your Honor.

        THE COURT:  Very well.

BY MR. MATUSCHAK:

Q.  Well, if this language means that the agent sends information to the server based on a threshold condition, that would be exactly the opposite of what Claim 1 requires, correct?

A.  If it meant that.  It's not my opinion it meant that. And furthermore, even if it meant that, it describes threshold conditions in the context of communications.

So I see two reasons why I won't agree with you.  Even if your hypothesis were true, which it's not.

Q.   But you do agree with me that if that's what it means, device to server based on threshold conditions, that's the opposite of what Claim 1 requires?

MR. THAKUR:  Objection, asked and answered.

THE COURT:  Overruled.

THE WITNESS:  But I don't agree it's the opposite.  If it is -- it is my opinion that the threshold condition are time and efforts from the command to the server.

BY MR. MATUSCHAK:

Q.   I'm simply asking that if the jury finds that that language means something different, that it means that the device is sending information to the server, based on a threshold condition, that would be the opposite of what Claim 1 requires, correct?

A.   Again, I'm not sure I understand what "opposite" means.

Q.   Well, Claim 1 says you have to send -- the connection has to be based on a threshold condition which is done without a request from the device, correct?

A.   That's right.

Q.   So if this means it has to be done with a request from the device, that's different from Claim 1, correct?

A.  I don't see "with a request" in this.

Q.  Now, you also said that Mformation did not disclose all the elements of Claim 1 in that demonstration they did at Deutsche Bank back in July of 2000, correct?

A.  Yes.

Q.  And in coming up with that opinion, you did not do any independent analysis, did you, sir?

A.  I don't understand.  What do you mean by "independent"?

Q.  Well, all you did was read Dr. Kushwaha's deposition transcripts, correct?

A.  I was responding to Dr. Acampora's evidence that he offered.

Q.  Right.  And in the responding to Dr. Acampora, you did not do any independent research on that point.

A.  I was not asked to, sir.

Q.  All right.  Not only were you not asked to, but you didn't do any independent research, correct?

A.  Beyond referring to the testimony from OEM, no, sir.

Q.  You know that Mformation claims to have the source code for that demonstration, right?

A.  Again, I'm not privy to that.

Q.  You heard Dr. Kushwaha testified here that he has that source code, right?

A.  Yes.

Q.   And Mformation never gave that to you to look at?

A.   No, sir.

Q.   And you chose not to look at it before you wrote your reports; is that correct, sir?

A.   I was not asked to comment on it.

Q.   You were not asked and you never did it?

A.   I did not.

Q.   So based on the source code of that demonstration, the prototype, you can't say whether it had all the elements of Claim 1 in it or not, can you?

A.   I heard the testimony of Gabe --

Q.   Based on the source code -- your analysis of the source code?

A.   There was no analysis of the source code by me.  So I don't have an opinion based on my analysis.  I do have opinion based on others' analysis.

        MR. MATUSCHAK:  Thank you.  I have no further questions.

        THE COURT:  Do you have much in the way of redirect?

        MR. THAKUR:  Your Honor, I have no redirect.

        THE COURT:  Very well.  Dr. Madisetti is excused.  Very well.

        THE WITNESS:  Thank you.

        (The witness exits the witness stand.)

THE COURT:  Do you have further rebuttal?

MR. THAKUR:  Your Honor, give me a quick minute to confer.  I believe the answer is no.

MR. MATUSCHAK:  I don't know if we've passed over the comment issue or not, your Honor.

THE COURT:  Well, it would be his opportunity to open.

MR. THAKUR:  We rest on our rebuttal case.

THE COURT:  Very well.  Any requests for a surrebuttal?

MR. MATUSCHAK:  No, your Honor.

THE COURT:  Both sides rest?

MR. THAKUR:  Both sides rest.

THE COURT:  Very well.

Members of the jury, you now have heard all of the evidence in the case.  There are lots of documents and evidence, much for you to consider.

I'd like to discuss the timing.  I'd like for you to make a decision before you leave today, and that will require your kind of meeting and conferring among one another.

Tomorrow's the 4th of July, so we weren't planning to be here anyway.  And I want you to have a happy holiday and come back safe and sound to us when we're next in session.

Our next session was scheduled to be on Thursday. And at that point you were going to still be hearing evidence, and then again we were scheduled to be in trial on Friday when you were scheduled to be hearing evidence. And we were going to be here on Monday, and then the case was going to be argued and submitted to you on July 10th.

Well, as you now see, you've heard all of the evidence, and so the next event that would be scheduled in the trial would be for me to give you my instructions on the law. I do that first. And then I allow the parties to make their closing arguments. One of the benefits of my interim arguments is that I have had and you have had the benefit of hearing the parties argue about the case even as the case has gone on. So I use that in deciding how much time to give to the parties to make their closing arguments.

Also I give them my instructions ahead of time, because it's fair in our system to allow the parties with the law already in hand to compose their arguments so that they can try to persuade you that the evidence supports their side of the case.

In order to do that, I have a practice of meeting with the parties and discussing my instructions, and sometimes there are objections to the language of some

of the instructions.  So I want to spend some time making certain that what I tell you is clear and according to the law.  So I will spend Thursday, some part of Thursday doing that.

So my request would be, not only do you take Wednesday off but you take Thursday off as well.  And come in on Friday for purposes of hearing my instructions and the closing argument of the parties.  And we expect that at the end of the day on Friday, if not before, you will have heard my instructions and the closing arguments.

And so the reason I'm asking for a decision is ordinarily we're not in trial on Monday, I have other matters.  I'll be here, it's just the day I reserve for certain other matters that come before the Court.  But you could convene on Monday since you've heard all the evidence on Friday.  It's not a day that you otherwise have on your schedule.  So you could advance your work by meeting on Monday.  But since I've already given you Monday as a nontrial day, it wouldn't surprise me if some of you have made alternative arrangements.

So what I'd ask you to do is meet before you leave and simply give a note to the Clerk of Court as to whether or not you would convene on Monday, because the parties would want to know that you're here and

deliberating on Monday.  And then that would at least give you a day ahead of the period of time you would otherwise be meeting.

If you decide that because of not having that date scheduled, you can't start until Tuesday, we'd understand.  So don't feel any pressure, it's just a benefit to you.  Because once the case is submitted to you, we allow you to set your own schedule.  You can decide to take lunch breaks or rest breaks as you desire.  We do have to coordinate that a little bit with the Court's schedule.

So if you would do the Court the courtesy of simply convening before you leave as to whether or not you would be available to us on Monday to begin your deliberations.

Actually, you may end up having some time on Friday to start your deliberations.  But Monday is the date that I would wish to know about.

And give us a note.  And after that, you are excused.  And I want to excuse you with the same admonition I've given you before.  As I said, you haven't heard everything yet, and I still want to admonish you don't form or express any opinions about the case until the matter's been finally submitted to you for a decision.

With that, I'll ask you to accompany the Clerk of Court to the jury room, and then you may be excused.

I'll ask the parties to remain briefly.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  Please be seated.  Out of the presence of the jury.

I thought that maybe it would -- I would benefit from having a little bit of time to digest some of these motions, and that if we gave the jury the freedom from Thursday morning, that would give us time to not only review jury instructions but to see whether or not there are aspects of the case that are affected by the motions for judgment.

There have been a number of issues that have been raised with respect to the claims that I would benefit from a more considered time with you to work that out. And it seems to me that, rather than trying to package the argument and instructions into half a day, that Friday would then give us the benefit of your having a more considered period of time.  You do need to make up a request to the Court about how much time you wish to have for purposes of your closing argument.  And I'll also consider that as well on Thursday.

I have a number of instructions from various

parties with respect to some of the issues in the case. I presume that you've already worked out with the Clerk of Court the arrangements of the exhibits, and I would want you to have in mind any stipulations, requests for admissions and those kinds of matters that we've acknowledged but not necessarily examined, for the jury.

I did note that marked as exhibits and put into evidence are some things that the Court otherwise would not receive in. For example, resumes of expert witnesses aren't exhibits. They're demonstrative. But it seems to me the parties have put those in evidence by stipulation. So the jury can sit there and read through those matters.

I am most concerned about any electronic versions of the exhibits and working out with you, if you haven't already, how to make those materials available to the jury. I don't presume those carts are going to be wheeled in for purposes of this. Maybe they are. But since so much of the material has been presented electronically, according to our rules, some provision should be made so the jury can look at it.

I did notice there was a screen in their room. I didn't know whether that was done under your auspices or not.

DEPUTY CLERK: Yes, it was.

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

THE COURT:  Okay.  So aren't you presuming --

DEPUTY CLERK:  They have a screen, projector and printer.  They need the laptop is the last thing.

THE COURT:  A printer.  There are no Mobitex or other devices there for them to fire up?

MR. MATUSCHAK:  It's all run by RemoteWare, your Honor.

THE COURT:  Anything you have out of the presence of the jury before we adjourn for the day?

MR. THAKUR:  I have one thing in particular, which was the response brief to RIM's JMOLs and, frankly, our process for filing ours.  It's sort of burdensome on us to file a response since they've essentially moved for a JMOL on each and every issue in this case.  Will this Court give us some extra time to prepare JMOL response briefs on certain topics?

THE COURT:  You used to as a judge feel a sensitivity when parties did things for the record because I sometimes interpreted that as this isn't for you, this is for the Ninth Circuit because the record needs more attention than I do.  I no longer consider that.  If you want to file something in writing to preserve your record in this, feel free to do so.  But you don't necessarily need to present it to me in writing.

There are some parts of the motion that I think I need to consider, and maybe I -- what I had intended to do is simply write jury instructions, presuming that certain matters will not be submitted to the jury.

Let me highlight one.  The doctrine of equivalents.  It does seem to me that although it was pled, there was no testimony that in my view would put the jury in a position where they could make a determination that something was done in the same way to accomplish the same result, and so I would not otherwise instruct on that.  And so that would lead me to grant a motion with respect to that.

But I can raise that in the context of my jury instructions, and when you see the proposed instructions, you can then say, Your Honor, there's a defense that shouldn't be there, or a defense that should be there that is not included, and that would lead us to a more natural discussion of whatever defenses I'm leaving out or putting in that speak to those various motions.

MR. THAKUR:  And that also applies to our affirmative motion on the JMOL, would you like a written brief by a particular deadline so as to facilitate your analysis?

THE COURT:  Again, you're free to do that.  But

you have made your motion.  I have it under submission. The motion is essentially based on what you've heard, and using the proper evidentiary standard, we believe we're entitled to judgment.  Putting it in writing is not going to, in my view, assist you given the timing of what we're doing with me.

It would allow you, however, to preserve with greater detail, in case you believe I'm making an error in granting or denying the motion, the record of that. And so you have the timing of what we're now going to be going to the jury, so if you want me to see anything or consider anything in addition, you've got to get it to me before that.  I won't put any deadlines on it.  It's a matter for you to decide.

MR. MATUSCHAK:  Your Honor, I do have one motion since the -- since both sides have now rested and the plaintiff has rested with rebuttal, we do have a renewed motion with respect to invalidity or a judgment as a matter of law on all the same issues that I identified in my earlier motion on that basis.

THE COURT:  Very well.  Your motions are renewed.

MR. THAKUR:  Your Honor, we have no additional motions.

THE COURT:  Very well.

DEPUTY CLERK:  Let me check with the jury.

THE COURT:  Before you leave -- we can do that off the record.

So instead of Thursday afternoon for our purposes of our meeting, then we'll come together Thursday morning at 9 o'clock.  I hope that I'm in a position to get to you drafts of the instructions before that.  But I'm not certain that I have a draft in a state that I would want you to start working on it at this point.  And so you've given me some time for the balance of the afternoon, so I'll go back to those matters with the time that you've left me.

All right.  We have a very wise jury.  The jury has elected not to meet in court on Monday, July 9th.  So that if you give the case to them on Friday, Monday would be free as scheduled, and they would come back to the matter on Tuesday as scheduled.  So you can schedule yourselves accordingly.

Very well.  I'll see you when I next see you.

MR. THAKUR:  Thank you, your Honor.

MR. MATUSCHAK:  Thank you, your Honor.

MR. THAKUR:  Your Honor, I actually have one question.

THE COURT:  Off the record?

MR. THAKUR:  Yes.

(Adjourned)

INDEX OF EXAMINATION

Witness:                                              Page:

JULIE L. DAVIS

Direct By Mr. Charfoos . . . . . . . . . . . . .1881

Cross By Mr. Arntsen . . . . . . . . . . . . . .1927

Redirect By Mr. Charfoos . . . . . . . . . . .1952

VIJAY MADISETTI

Direct By Mr. Thakur . . . . . . . . . . . . . .1977

Cross By Mr. Matuschak . . . . . . . . . . . .2012

                              oOo

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020

INDEX OF EXHIBITS

Exhibit No.

4382 . . . . . . . . . . . . . . . . . . . . . . . 1938

4281 . . . . . . . . . . . . . . . . . . . . . . 1941

2196 . . . . . . . . . . . . . . . . . . . . . . 1946

2197 . . . . . . . . . . . . . . . . . . . . . . 1947

2198 . . . . . . . . . . . . . . . . . . . . . . 1947

2199 . . . . . . . . . . . . . . . . . . . . . . 1947

2200 . . . . . . . . . . . . . . . . . . . . . . 1948

173, 275, 495, 714, 828, 881,

969, 972, 973, 974, 975, 1007,

4043, 4119, 4121, 4127, 4174,

4261, 4341, 4355, 4365 and −6,

4382, 4403, 4416 through −7,

4426, 4453, 4766, 4772, 4815,

4832, 5020, 5515 . . . . . . . . . . . . . . 1962

oOo

CERTIFICATE OF REPORTER

        I, Connie Kuhl, Official Reporter for the United
States Court, Northern District of California, hereby
certify that the foregoing proceedings were reported by
me, a certified shorthand reporter, and were thereafter
transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Tuesday, July 3, 2012