Volume 11

                                        Page 2047 – 2170

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

             BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

-------------------------------)
                               )
Mformation Technologies, Inc., )
                               )
                   Plaintiff,  )
                               )
       v.                      )     No. C 08–4990 (JW)
                               )
Research In Motion, Ltd.,      )
et al.,                        )
                               )
                   Defendants. )  San Francisco, California
                               )  Thursday, July 5, 2012
-------------------------------)


                     TRANSCRIPT OF PROCEEDINGS


APPEARANCES:


For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                    BY: AMAR L. THAKUR
                        LISA MARIE NOLLER
                        SHAWN E. MCDONALD
                        ALLEN A. ARNTSEN
                        RUBEN RODRIGUES

Also Present:           Rakesh Kushwaha, MTO, CEO


                Connie Kuhl, Certified Realtime Reporter
                Official Reporter – USDC  (415) 431–2020

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        MARC H. COHEN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        FERLILLA VICTORIA ROBERSON
                        MARIA A. MARAS
                        MICHAEL DALEY KARSON


Also Present:           Ray Dikun, RIM Vice-President

Thursday, July 5, 2012

(9:45 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

MR. THAKUR:  Good morning.

MR. MATUSCHAK:  Good morning, your Honor.

THE COURT:  Please be seated.  We're on the record, out of the presence of the jury.

This is a session that we set aside to deal with some of the legal issues that are pending before the Court, and what I thought I would do, as I indicated before we took our holiday break, was to use the proposed closing instructions as a way of working through the legal issues, and as I come to various points in the closing instructions where I believe a legal issue is implicated and what I'm proposing to say, I'll pause at that point and invite more discussion about that.  And I'll invite you to do the same thing.  If I am going through the instructions and you believe I've come to a point where there is some legal issue that you would wish me to address, interrupt me at that point.

And so you've now gotten a copy of the draft.  It says "July 3rd" on it, but that was the file name that I had set up.  I actually was working on it yesterday.  And I wanted to get credit.

(General laughter)

MR. MATUSCHAK:  Thank you, your Honor.

THE COURT:  As I'm sure you were spending a part of your holiday involved in this case as well.

So, I'm on page 1.  And I don't note anything about that page.  And so I'll move on unless someone has a comment about that.

Going to page 2.  On line 2, I refer to a written copy of the stipulations.  There was some mention that you had reduced some of your stipulations to writing, and what's the state of that?

MS. NOLLER:  We filed them with the Court, your Honor.  They will be submitted with the exhibits.  We've agreed to that.

THE COURT:  Very well.  I'd like to see then just so I can see them.  So maybe at some point, Mr. Noble, could pull them up or if you have an extra copy.

And so you're free to refer to those.  I said I've asked the parties to provide me with a written copy of their stipulations.  In other words, I can say I've asked the parties to provide you with a written copy of the stipulations.  You will find them among the exhibits.

MS. NOLLER:  Yes, your Honor, that would be fine.

THE COURT:  Do we have a number so that -- was it given an exhibit number?

MS. NOLLER:  No, but we can, your Honor, if that's --

THE COURT:  I think that anything that is mixed in with the exhibits ought to have a number so that the jury can find reference to it.

MR. NOBLE:  5017.

THE COURT:  5017.  Very well.

Did you break out the request for admissions into a separate exhibit?  This is now page 2, lines 3 through 5.

MR. CHARFOOS:  Yes, your Honor.  Actually, I'm having Miss Cawley put an exhibit stamp on that right now.  We handed those to Mr. McDonald last Friday.  I don't know if they have any objections.

MR. McDONALD:  There's no objections, your Honor.

MR. CHARFOOS:  That would be 5018.

THE COURT:  Very well.

How about interrogatories?  Lines 9 and 10.  Have they been broken out in any way?

MR. McDONALD:  These are not in evidence, your Honor.

MR. MATUSCHAK:  I think there's just one that was marked as an exhibit, so that doesn't have to be dealt with.

THE COURT:  It's already been marked.

MR. MATUSCHAK:  It's already been marked, I think, and entered as an exhibit.

MR. McDONALD:  I don't think it's been entered into evidence.

THE COURT:  So I'll put a question mark about that, and you can check that and let me know if there's any further ruling that you need with respect to that.

It is sometimes convenient to have those matters placed before the jury.  It's not required.  You can simply read them because it's like sworn testimony.  But since it's done in writing, I have sometimes allowed the written question and answer to go in as well.  As I commented to the jury, it's sometimes problematic because many times there are legal objections that are included in the response and those are not matters for the jury to consider.

MR. McDONALD:  Just so the record's clear, we would object to it being submitted to the jury because it's not in evidence and evidence has closed.

THE COURT:  That's the question.  I thought I heard two different things about that, but we'll solve that problem.

MR. MATUSCHAK:  Since it was, though, referenced in the examination of a witness, I think it would be appropriate to remind the jury what an interrogatory is.

THE COURT:  You can argue by referencing to what was said, of course, if it was done during the trial.

All right, I finished page 2.  And I don't see anything further there that to the Court's view would require further decision.

Now on page 3.  Again, I don't see anything that needs further ruling.

Page 4.  I did note that in one of your proposed set with respect to page 4, there was the standard instruction about documentary evidence, some of which is in evidence and some of which is not.  And I have not -- sometimes various charts and diagrams were used during the trial, and sometimes witnesses actually made markings on them.  Technically, that is something that could go into evidence.  And so that is normally when that instruction is given, is when the witness has adopted an exhibit, drawn a diagram, made an "X" where something happened, those kinds of things.

But I don't have any of that in mind.  So I did not include at this point any of the demonstratives that were used during trial.  That is an exhibit created for purposes of trial coming into evidence.  You're free to use them, but I don't have any that to the Court's view are in evidence, but I'm not sure about that, so I would have any party that wishes me to give that instruction,

because a chart or diagram has been received into evidence, to bring that to the Court's attention.

On page 4, lines 22 through 24, I used "RIM" collectively. That question came up at some point as to whether or not the plaintiff contends that the companies have individual liability or whether or not your claim is against both companies jointly and severally. I don't know that I've heard any defense that one company or the other should be excused from the case. So I've left it as, whenever I say "RIM," I'm collectively referring to both companies.

And I've tried to consistently refer to Mformation as the plaintiff.

All right. Going to page 5.

MR. COHEN: Line 1, your Honor.

THE COURT: Yes.

MR. COHEN: I think we have a motion in limine on the, whether or not Mformation's the owner of the patent.

THE COURT: Very well. What word would you wish me to use? Assignee?

MR. COHEN: "Listed as the assignee on the face of the patent."

MR. McDONALD: Your Honor, it's been referred to as Mformation's patent throughout the trial. I don't see how we have to change the word "owner."

And also, your Honor, you ruled on their motion in limine regarding the assignment issue.

MR. COHEN:  The reason I'm bringing it up is I didn't want to waive RIM's ability to -- because it's our position that they aren't the rightful owner of the patent.  Now, you did pretrial prevent us from making that argument at trial.  But I don't want to waive that, so that's why I'm bringing it up now.

THE COURT:  Any previous objections to which the Court has ruled, favorably or unfavorably, are still objections for which under some circumstances you're free to challenge the Court's rulings, and I won't take any silence at this point as a waiver of any previously made objections.  My rulings stand; your motions stand.  The record, as far as the Court is concerned, is complete for past events.  And to the extent you would feel that you are required to renew all of those objections, if I'm giving language in the instructions, that's not necessary.

And I think it's -- rather than explaining assignees and their powers of -- I'll leave the language as Mformation's the owner.  Because legally, it stands in the same shoes as far as the Court's concerned.

MR. COHEN:  In that first paragraph, maybe you could explain this later on, but it says, from the patent laws, anyone who use the patented process to remotely

manage a wireless device -- RIM's been found not to be a direct infringer. So it's really anyone other than RIM. I don't want to suggest that RIM could be a direct infringer.

THE COURT: Well, this doesn't speak about particulars. This is a statement of the law. And both of these paragraphs -- I do later go to the companies involved, but I would not want to make this a detailed instruction on the case when I say, as I will explain later, anyone who uses "it directly infringes." Because that seems to be a statement of the law with respect to who would be guilty of direct infringement.

I do go on to explain in the next paragraph the law with respect to indirect infringement. And then I make clear on line 14 that in this case, Mformation alleges that RIM is guilty of indirect infringement.

MR. COHEN: I see that. Thank you.

THE COURT: So I'll leave that as it is.

All right. So the first legal issue, you'll see there on line 18 through 20, the Court indicates that for legal reasons the questions of "willful infringement" has been removed from the jury's consideration.

The Court intends to grant RIM's motion for judgment with respect to willful infringement. Before I do that on the record, let me see if the plaintiff wishes

to briefly address that issue further.

MR. McDONALD:  Your Honor, I believe we would like to respond in writing.  We've established evidence at trial showing that RIM was aware of the patent application through a disclosure from Dr. Kushwaha to Ken LeVine.  We have entered evidence -- that was through the testimony of Dr. Kushwaha.

We also have testimony of Dr. Kushwaha where Mformation disclosed the patent application at an OMA DM standards body meeting where Nick Alfano was present.  Nick Alfano was listed as a witness that RIM was going to bring to trial.  They disclosed him on June 25th as a witness to testify here live on the 28th.  And then did not produce him to testify to rebut that.  So that testimony stands unrebutted.

We also have evidence entered by Dr. Kushwaha, the e-mail whereby Badri -- Dr. Nath disclosed the issued patent to the OMA so that it could be disclosed to members on the OMA website in late 2005.  We think those three factors under the case law, including the *3M v. Johnson & Johnson* case cited in our opposition to RIM's motion for summary judgment of no willfulness, establishes, at least, that it a disputed issue of fact as to the subjective prong, and establishes that RIM should be guilty of -- should be found to have willfully infringed as to the

objective prong as well.

THE COURT: Well, it is my -- my tentative decision is based upon the question of whether or not the risk of infringement as it -- as the patent was perhaps known was sufficient to constitute and meet the objective standard.

All of the language with respect to the patent required the "establishing a connection" substep. And it seems that objectively, one who performs their process using what they regard as a connectionless protocol could reasonably believe that they don't infringe a patent that requires establishing a connection.

And the other factor that plays heavily in the Court's mind is that part of the objective standard is whether or not there is a good faith belief founded in the language of the patent with respect to the invalidity of the patent, and there are claims of the '917 patent that the Court has declared to be invalid. And the willfulness standard would be as to the entire patent, not as to a particular claim.

I'm not sure that I understand that when you say the application was disclosed that the fact of it was disclosed, but was the substance of it disclosed?

MR. McDONALD: During two disclosures.

THE COURT: I mean to the standard setting body.

MR. McDONALD:  Dr. Kushwaha testified that to the standard setting body he raised his hand and disclosed the application.

THE COURT:  I mean, that's what I'm asking.  The fact of the application or the contents.

MR. McDONALD:  He disclosed it in the context of --

THE COURT:  Not "it," the "it" is what I'm trying to figure out what you mean.

MR. McDONALD:  Sure, your Honor.  I have to look at the exact testimony.  But my understanding, if I remember correctly, he testified that at that meeting, he raised his hand and made a disclosure that Mformation's patent application would cover the lock and wipe standard being discussed.  So he disclosed the substance saying that it would cover the standard for remote management lock and wipe that was being discussed.

He also testified here at trial that he described and disclosed the substance of the application to RIM's Ken LeVine in spring or summer of 2001.

And your Honor, if I could just comment, I believe under the law, willfulness is assessed on a claim-by-claim basis because there could not be a willfulness award in any case where summary judgment had been granted on some claims, and clearly under the law

that occurs.

THE COURT:  Thank you.

Any response from the defense?

MR. COHEN:  What I've heard was, primarily is the subjective prong discussion.  Your Honor, you're right, that under the objective prong, they can't meet their burden.  In this case, the third claim construction order as we've put forth in our JMOL and in our request to file a summary judgment motion on that, we think is dispositive.

Of course, also on the objective prong is that -- what we're talking about is whether or not RIM has a reasonable defense.  Other defense, of course, is invalidity.  Mformation pretrial moved for summary judgment to get rid of those invalidity defenses.  That was denied.  So that on its own actually shows that it's not a sham defense, the invalidity.

Of course, the Court did grant RIM summary judgment motion that RIM's not a direct infringer.  That also would show objectively that they can't meet the requirement.

And as also pointed out, RIM was granted summary judgment on 35 of the 48 claims on invalidity.

So those are additional reasons that the objective prong couldn't be met.

THE COURT:  Well, you indicate that you intend to respond in writing.  Actually, I leave that to you.  This is an issue which I think is sufficiently new, given the recent decision, that I would -- I intend to write an order on this matter so that the record of my reasons are clear.

And -- but for purposes of the instructions, I don't intend at this point to instruct on willfulness.

MR. McDONALD:  Your Honor, we will file our submission regarding willfulness today.  And I would submit that it is still a live issue, and there would be no harm in instructing the jury and getting a finding from them on the subjective prong.  There's no harm in doing that.  And if you don't instruct them and have them make a finding, we can't go back later and do that obviously.

THE COURT:  Well, I've thought about that.  But my understanding is that they -- the law passes to the Court the requirement to make the finding with respect to the objective prong.  And that the jury doesn't get to the subjective prong without the Court having made that finding.

And that your argument would be that the Court could do it backwards?  The Court could allow the jury to make the subjective finding without the Court having made the objective finding?

MR. McDONALD:  I wouldn't characterize it as backwards, your Honor.  The question would be submitted to the jury.  They would make a finding on it.  That finding would not have legal effect until the Court decides the objective prong.

THE COURT:  You have case authority to that effect?

MR. McDONALD:  Well, your Honor, that decision came down last week, and no court I know of has applied it yet.

THE COURT:  I understand why you would wish that argument because it would add to efficiency, because if I'm wrong, then you'll have to have a new trial on willfulness.

If there are findings unfavorable to the plaintiff on the other parts, if you lose on the other part, there wouldn't be a need for a new trial on willfulness.

So the efficiency kind of works both ways.

MR. McDONALD:  Yes, your Honor.

THE COURT:  But thank you very much for your argument.  If you file papers that cause me to change my mind, you'll be among the first to know.  But what I'm going to do, though, is leave the instructions as they are for now.

MR. McDONALD:  Thank you, your Honor.

MR. CHARFOOS:  Your Honor, following up on one of your earlier comments, we actually have the stipulations here printed off with the exhibit number.

THE COURT:  Very well.

MR. THAKUR:  May I propose on page 5 where you've said "Mformation also accuses RIM of willful infringement" in the sentence.  Perhaps we could just take those two sentences out.

THE COURT:  I'm sorry?

MR. THAKUR:  I was going to propose it may be easier if we just took those two sentences out to avoid confusion.

THE COURT:  Having raised the question, I need to tell the jury it's no longer before them.  I wouldn't feel comfortable having the jury, leaving the jury to speculate as to why that was there, because they might believe that it's still there and somehow inherent in what else we're doing.

So since I allowed the parties to open and raise the issue, because I wasn't prepared to make a ruling prior to trial, it is my practice to remove the issue from the jury and let them know it's no longer this.  I can add language that you should take nothing from that favorable to one side or the other, and those kinds of words, but

I've found those to be uncomfortable.

MR. THAKUR:  Could it read instead:  "Mformation also includes RIM of willful infringement, the Court will decide that issue?

THE COURT:  I don't think it's the jury's business who's making the decision, so I don't want to do that.  It simply -- I advise them that it is not for them.  And so who does it is not adding to it.

Going back to the stipulation, I think it might be helpful to remove the Foley & Lardner caption from the -- what is called a joint stipulation.  And -- I would also have you remove all of those signature blocks.  Just leave it as a stipulation without all the dated and signs and all that kind of stuff.  All you have to do is shape it up so that it's neutral.

(Pause in proceedings)

THE COURT:  As to admissions, these did come from one side with the response from the other, so I don't have the same concern.

On the admissions, there's no signature page as to the sworn admission to these, but I'll leave it to the parties to figure out whether they want that.  But otherwise, the Court has no concern about the submitted admissions.

MR. MATUSCHAK:  Your Honor, if we're still on

page 5, I'm down at the bottom, I have one question or suggestion.

THE COURT:  Yes, I'm still on page 5.

MR. MATUSCHAK:  In that last paragraph, at the very bottom, at line 26, your Honor, you correctly state RIM's position that we contend that Mformation has not proven the use of its products by customers infringes the particular remote management process described in the claim.  But -- but the point that to infringe, you have to perform each and every step of the patent process doesn't actually come in until page 14.  And under contributory infringement.  And I thought since you were addressing that issue here, that would be an appropriate time to tell the jury that, an undisputed point, I think, which is that Mformation has to demonstrate that each and every step of that process is performed.

THE COURT:  So you want me to move that language? Is that what you're asking?

MR. MATUSCHAK:  Well, basically that we have the language that's now on the bottom of page 14.  Also on the top of page 6, I guess, because we're discussing this point, you know, our point that they haven't proved that anyone used that particular process, and it seems to me that's the right time to tell the jury to do that, they have to show that each and every element has been

performed.

THE COURT:  So you're asking me to strike it from page 5?

MR. MATUSCHAK:  No, no.  I would keep page 5 and 6 the way they are, and I would just add pretty much the same sentence that appears on line 26 on page 14 to the first line of page 5 after the carryover sentence.

THE COURT:  So you want me to add the sentence on page 14, line 26, to page 5, line --

MR. MATUSCHAK:  It's actually page 6, line 1.

THE COURT:  Page 6, line 1.  All right.  I'll take a look at that.

MR. McDONALD:  Our general objection to that proposal, your Honor, is we think it should appear once in the instructions, rather than twice.  Thus, no undue emphasis to be placed upon it.

THE COURT:  Very well.  I'll take that into consideration as well.

So I'm now on page 6.  And I do give the jury a little more in the language under "Interpretation of Claims" -- the reason I decided to do this is that during the trial, either through witnesses or in commentary, there was some comment on the standard used by the Court, and it just seems to me that it would be appropriate for the Court to give the jury the standard that is used for

claim construction.

And page 6, and you'll see later on there's some dates that the Court uses. And I was going to use this as a time to make sure that the dates that I'm using are noncontroversial, and so on page 6, line 26, I'm using a 1999.

MR. COHEN: And that is a disputed date or year, as the date of the invention. Mformation said they concede the invention in October or November of '99. Our position is it wasn't until 2000 or 2001.

MR. McDONALD: Dr. Kushwaha did testify that it was October 1999. There's been no evidence or testimony to rebut that point in time.

THE COURT: What's the law?

MR. COHEN: Let me get you the instruction.

THE COURT: Is that in one of the submitted sets?

MR. COHEN: I was referring to the model, Northern District.

THE COURT: I don't think I have that up here.

MR. COHEN: The model would be 4.3a1. It's in the anticipation section.

THE COURT: I'm sorry, give me that reference again.

MR. COHEN: Page 31 of my model. We could put it up on the screen. 4.3a1, the anticipation section. That

would be the last paragraph.

THE COURT:  I'm now at 4.3a1.  Where?

MR. COHEN:  The last paragraph.

THE COURT:  Is that relevant to this?  What I would use, if I understand, is the appropriate date for construing the claims?

MR. COHEN:  Well, you raise a good question, whether or not it's the date of the application, which is 2001, or the date of the invention, which is disputed.

MR. McDONALD:  Actually, your Honor, under the case law, the date of invention would be complete upon reduction to practice, not conception.  So the conception date is not the date upon which claim construction is conducted.  It's when the invention is complete, which is reduction to practice.  Either by filing a patent application or creating a physical embodiment of the invention.

THE COURT:  So what date would you claim I should use?

MR. McDONALD:  For claim construction, I would be fine with using the date of filing the provisional application, which would be December 5th, 2000.

THE COURT:  What's the defense position?

MR. COHEN:  Well, the provisional doesn't disclose everything that's in the utility application, so

we'd have to go with 2001.

THE COURT:  Well, this ties to another issue having to do with the demonstration, and I -- perhaps I should wait and see whether or not the Court's ruling on that has an effect on this, so let me write down both dates, and then I'll come back to this.  So I have December 5, 2000, and the defense date is what?

MR. COHEN:  Would be August 2001, the filing date of the '917 patent.

MR. McDONALD:  I believe it's August 20th, your Honor.

THE COURT:  August 20, 2001.  And I probably should, if I use that date, explain to the jury why that date is significant.  Like the date of the filing or the date of something.  So let me come back to that.

Very well.  Anything else on page 6?

Going to page 7.

Or should I add to line 15:  "The Court's interpretation of what is covered by the Asserted Claims should not be taken by you as an indication that the Court has a view regarding whether the plaintiff has proved that RIM has indirectly infringed the Asserted Claims...," or whether RIM has proved that the claims are invalid.

MR. McDONALD:  We have no objection, your Honor.

MR. COHEN:  Is that additional language, your

Honor?

THE COURT:  Yes, I'm proposing that.

MR. COHEN:  No objections.  And, of course, that 1999 on line 4 is the same issue as the previous page.

THE COURT:  Say that again.

MR. COHEN:  On line 4.

THE COURT:  Oh, yes, I'll circle it.  Thank you.

Very well, let's come to the tough sledding.  Now we'll go to the interpretation.  Page 8?

No objections?

Page 9?

MR. THAKUR:  Your Honor, on the preamble, you had previously construed the preamble to be limited to wireless.

THE COURT:  Say again?  Yes?  So what line are you referring to?

MR. THAKUR:  Your Honor, it would be lines 10 through 12.

THE COURT:  On which page?

MR. THAKUR:  On page 9, your Honor.  Then it repeats on page 10.

THE COURT:  I'm sorry, I don't see what you're asking me to do.

MR. THAKUR:  Your Honor, give me a quick moment. I'll quickly pull up the Court's previous instructions and

see if that's not incorporated.

Your Honor, the language comes from the Court's first claim construction order.

THE COURT:  Yes.

MR. THAKUR:  Document No. 127.

THE COURT:  And just tell me what language you're referring to in the instruction.

MR. THAKUR:  Your Honor, it would be on page 9.

THE COURT:  Yes, I have that.

MR. THAKUR:  "The method comprises" -- so we would ask, your Honor, that each -- your Honor, we simply would like the preamble to the precise method comprising steps of, and we would add the language that "all the steps must be performed wirelessly."

THE COURT:  Well, that's not exactly true, is it? Because there are some steps that are performed at the server, and I don't think that this is a method that requires that the server do its work wirelessly.  It is true that this claim is a method for wirelessly managing the device, but it doesn't mean that all of the steps have to be done wirelessly.

MR. THAKUR:  Your Honor, perhaps that clarification might serve the purpose by saying that the method relates to wireless device remote management.

THE COURT:  I have that.  I say that -- so I'm

not sure what it is that I would say here that is different than what I'm saying to make clear that some of the steps are wireless, but I use -- whenever I go to the step, whatever language there is that limits that step, I use those words.  But I'm not inclined at this point, because -- let me go to the order you're referring to.

MR. THAKUR:  Your Honor, actually conferring with my colleague, I think we will withdraw that objection and just proceed with your proposed instructions.

THE COURT:  Okay.  Then I won't look.

MR. COHEN:  Page 9, line 1.

THE COURT:  Yes.

MR. COHEN:  Looks like that's a new construction on wireless device.  Which would be consistent with the specification.  The specification says that wireless device can -- any data processing system such as personal computer systems, desktop or laptop computers, work station computer systems, all of those fall into what can be managed by this remote management of a wireless device.

THE COURT:  Did you list any that are not mobile?

MR. COHEN:  Somebody might think a desktop computer is not mobile, but, of course, if you put it in a car and connect it up to a satellite dish --

THE COURT:  No, I agree with you.  I don't believe that a desktop computer is mobile.  So your

concern's that wireless isn't necessarily mobile.

MR. COHEN:  Correct.

THE COURT:  So I'm willing to strike the word "mobile."  And then I would leave it:  "A 'wireless device' is a device that is capable of sending and receiving radio waves."

MR. COHEN:  That would be fine, your Honor.

MR. McDONALD:  We have no objection, your Honor.

THE COURT:  Very well.  All right.  So we were -- the concern by the plaintiff is removed.

I'm now down at the comprising steps.  The reason I put this in was the jury question.  I had not previously commented to the jury on what "comprising" means.  And I invite the parties' attention to the language I propose to use, which is:  "The recited steps are essential, meaning they all -- they tell what the invention is.  Each recited step must be performed in the recited manner and, if the Court so determines, in the recited sequence.  Those who use the method might perform additional steps, but those steps are not essential."

Might be to the performance of the method of the process.  I'm not sure that this is sufficient to deal with the jury question, but that's what I'm inviting the parties to attend to.  You have the question in mind?

So the two questions I have in mind are Questions

3 and 4.  And Question 4 -- Question 3, rather.  The jury note is:

"Regarding Court construction, 'establishing a connection between the wireless device and the server,' does this mean the connection has to directly occur between the device and the server, or does it describe the start and end points of a process and, thus, potentially including relays, wireless towers, etc.?"

The second question that I had in mind, Question 4:

"Defense attorney presented Exhibit 4204, RIM BlackBerry infrastructure equals relay, reference model, or document draft."

Now, their question really has to do with the draft itself.  But the relay came up as a device which does various functions in the accused process.  And so my intent was to instruct the jury on the law with respect to whether or not the patent is infringed if steps other than those listed are performed, and whether or not there's a significance to what machine does the various steps.

And I'm happy to leave the language if it is -- if I don't have any objection from anyone.

MR. COHEN:  No objection from RIM.

MR. McDONALD:  We have no objection, your Honor.

THE COURT:  Very well.  All right.  So I have

included an instruction that now goes to each of the steps, giving it, sort of the shorthand name, and so that takes us to page 10 ().

MR. McDONALD:  I'm sorry, your Honor.  I misunderstood the question on the floor.  The language on page 9 at lines 13 and 14, given the jury's question about the effect of additional steps in the process, the accused process, or the presence of additional devices along the way, I think the language at line 14 might be better to expressly state that those steps are not relevant to the question of infringement or invalidity.  Something to that effect.  Because --

THE COURT:  I don't want to use the word "relevant" because, for example, if the patent requires a step be performed at the server, and in an accused process, it's performed not at the server.  The fact that it performed not at the server might lead the jury to find that the patent is not infringed.  So that it is a question of fact for the jury to decide whether or not the process is performed by the devices, the claim discloses -- as performing those steps.

MR. McDONALD:  Perhaps something along the lines of, So long as each of the recited steps is met, the fact that such a step is performed -- is also performed elsewhere is not -- should have no effect on your

determination?  Or something along those lines?

THE COURT:  Well, why don't you two submit whatever you want me to look at, and I'll look at that and I'll put a mark by page 9, lines 12 through 14.

MR. McDONALD:  And a final housekeeping note, I misremembered the filing date of the '917 patent.  It's actually August 10th.

THE COURT:  10th, rather than -- very well.

Now we're on page 10.  The reason I added the language on page 10, line 2 and 3, is that there has been some evidence presented with respect to how the various registration steps might be performed, and I wanted to make clear that Claim 1 does not claim a process for composing registration information.  It seems to me that this is a process which presumes as a matter of prior art then that there is registration information.  It doesn't say how you get there or what it is.  It just says you're transmitting it, whatever "it" is.

MR. McDONALD:  We have no objection.

THE COURT:  And you'll see that because of the sequence issue that has been raised in the trial as to each step, I indicate whether or not the step must be completed before the next step can be performed.  Sometimes I use the word "performed," and sometimes I use the word "commenced."  That's another thing I wanted to

draw the parties' attention to, to see if there was any debate about that.

"Step Two:  Verifying the registration information."  I don't believe that the parties previously asked the Court to construe that language.

But again, since there was some testimony about the prior art, and this verifying step as far as the Court read the claim, does not -- the patent doesn't disclose anything about the verifying; indeed, how the server can verify.  It presumes that it knows how -- what the information that comes to it should be, and it assumes that the server verifies, based upon the presumed prior knowledge of the server.  And I say Step Two must be completed before Step Three can be performed.

Hearing no objections.

The preamble then that I point out is to Steps Three, Four and Five.  The preamble being, "without a request from the wireless device...," and I've adopted the same definition that I've given previously to the word "request."

"Step Three:  Establishing the mailbox," I add some language to that.  "'The wireless device' means one verified in Step Two.  Therefore, Step Two must be performed before Step Three" -- "can be performed," I would add.

"Step Four:  "Placing a command."

MR. COHEN:  Your Honor --

MS. NOLLER:  You just in lines 22 to 23, which talks about Step Three, you say:  "Step Two must be performed before Step Three."

THE COURT:  Yes.  I said:  "Therefore Step Two" -- wait, maybe my language -- let's see.  "Step Two must be performed before Step Three can be performed."

MS. NOLLER:  Can be performed, yeah.

THE COURT:  "Step Four:  Placing a command." Again, I added "Step Three must be performed before Step Four can be performed."

"Step Five:  Delivering the command."

MR. COHEN:  On line 7, there's a missing quote.

THE COURT:  Yes.

New language, "Step Four must be completed before Step Five can be performed."

Then I introduce the substeps.  "Establishing a connection," the one that has been perhaps the most controversial.  There's some new language here:  "A 'threshold condition' means a predefined state of the server or the wireless device other than solely the elapsing of time.  Since this part of the process must be done without a request from the wireless device, indeed the determination that a threshold condition has been met

must be made at the server before the server establishes a connection with the wireless device.  The limitations: 'Establishing a connection between' the server and the wireless device, and within the -- and 'wherein the connection is established' mean that to perform this step the server must be in wireless communication with the wireless device."

That goes over to page 12, line 2.

MR. THAKUR:  Your Honor, I hate to take you back one construction, but I just noticed that we've added something that was not previously in the claim constructions on page 10.

THE COURT:  Page 10.

MR. THAKUR:  Yes, lines 22 through 23, where you say that "Step Two must be performed before Step Three can be performed."  Your Honor, that's not something that's been previously addressed, and I don't believe is necessary to address that at this stage.

The order of the steps was only discussed with the delivery element, which is what we're getting to now on page 11.  Seems like adding this requirement might be cause for confusion based on the testimony that's come in so far.

THE COURT:  I don't know that there is testimony about that, but it seems to the Court that the sequence of

the steps is an issue.  And although it might be to one or both parties important to only focus on the sequence at a particular point in the process, the Court determined that since it found a sequence, that it should instruct on the sequence which is neutral to whether or not a particular sequence fits or doesn't fit the patent.

And so if your request is, even though you recognize that the claim, properly interpreted, would mean that there is a sequence in the establishing a mailbox test, you would not want the Court to draw attention to it and leave the only sequence of controversy to be the one that the parties choose, I would decline to do that.

MR. THAKUR:  Your Honor, I think rather than saying it that way, what this leads one to think is that steps are to be performed and completed -- to me, it's sort of the argument the jury's heard all along.  You know, it's a recipe.  When you're cooking something, you can do one step first, do the second step later. Ultimately, the steps -- you know, there's no -- there's no requirement that they all be performed in the steps, that Step A be completed before the next step can begin. You have already made that determination with the delivery step.  And I think the parties have briefed the Court on this issue, and, therefore, it's appropriate to stick with that.

To identify, your Honor, that Step A, for example, "Step Two must be completed before Step Three can be performed," it's not something that the parties had anticipated, so we haven't laid the record as to how it would be performed and how it would be completed. Which now gives the defendant an opportunity to say, Oh, they didn't prove that.

THE COURT: Well, I did not -- I wasn't doing this based on who's proved what at this point. And quite frankly, I don't know that -- I didn't have in mind any failure of proof with respect to this by the plaintiff. So -- but if you -- if that is something that you believe visits an unfairness because you believe that the defense will argue that a step is out of order, I have heard evidence presented with respect to the order throughout the trial. And so it doesn't seem to me to be unfair to instruct the jury, if the Court finds that there is a sequence.

Now, let me hear from your opponent.

MR. COHEN: I think your claim construction order did list the steps in the order that they had to be performed. So...

THE COURT: No, that would be different than listing them in which they had to, but whether or not -- I think the plaintiff's objection is, previously the Court

has not ruled that there is a sequence on any steps other than one. And I'd have to go back to the -- to figure out whether or not that's true.

MR. THAKUR: Correct, your Honor.

THE COURT: But I do remember orders where I said sequence is something that can be limiting. And I do recall addressing the one or two sequences that the parties drew my attention to. And even in that ruling, I think I did comment on finding a sequence with respect to the registration part. So I'll go back to that and look, but it does seem to me that it's not a surprise the Court has previously found sequence to be important to this method.

MR. THAKUR: Your Honor, you have. In the Docket 355, whether a mailbox must be created after the device registration, the Court statement was as follows: "The Court's construction on mailbox, however, also does not require that be created in any specific order. Rather, as a general rule, the claim is not limited to the performance of the steps in the order recited unless the claim explicitly, implicitly requires such an order."

So this Court has previously declined to put that -- to put that, that the step had to be performed in that order.

THE COURT: That's what I'll go back and look at.

In other words, if I've declined to do it, your argument is, even though it's true, I shouldn't do it now, and I understand that argument. In other words, you're not objecting that this is an incorrect statement of the sequence. Your objection is that it is something the Court has not previously ruled on?

MR. THAKUR: Your Honor, no, we actually do take the position that the mailbox can preexist. It's something that you can -- you can have a -- a big mailbox that gets assigned at a later date.

THE COURT: Assigned? The step is "establishing a mailbox." So you cannot perform the step of "establishing a mailbox" if the mailbox previously existed.

MR. THAKUR: The mailbox exists, but the mailbox is really an address in the server, and in memory you do dynamic mailbox allocation, so the mailbox is not some fixed allocation, it continues to get assigned as space becomes needed.

THE COURT: Right. So the question is whether or not that can be done before you do the verification step.

MR. THAKUR: That's right. A big mailbox can exist, and -- because the big mailbox is in the address and the memory. And you can take up specific addresses in the memory as you put commands into it.

THE COURT: Very well. And so your request is that I strike that language, "Therefore, Step Two must be performed before Step Three can be performed"?

MR. THAKUR: That is correct.

THE COURT: I have that objection in mind.

MS. DeBRUIN: Your Honor, we would support the language you have in the construction now. And think it's called for by the claim language and the specification. You said in your original claim construction order that, Docket 127: "This implies that before registration of a wireless device, there is no mailbox for the particular wireless device." And I think this is what you're adopting here.

THE COURT: Well, that was what I had in mind. That's why I want to go back and reread it and see whether or not the state of the record is I declined to construe it or whether I did construe it.

MS. DeBRUIN: Your Honor, what counsel was referring to is during one of our summary judgment hearings, I had argued that there should be this order. It wasn't on claim construction. And what he read from your summary judgment order was you're referring to that.

MR. THAKUR: Basically you declined to do what this says here.

THE COURT: As part of the summary judgment

order?

MR. THAKUR:  Correct.

THE COURT:  All right.  Well -- but your later argument is, this is incorrect.  That's the more important argument as far as the Court is concerned.  As opposed to whether or not this is correct, and I previously declined to do it.  And so that's why I want to go back and take a look.

MR. THAKUR:  Okay.

MR. COHEN:  Your Honor, I think you're right, that if there is a dispute the Court wants to resolve it, as long as it's before submitting to the jury.

THE COURT:  It seems to me I'm trying to give the jury instructions that will allow them to decide the controversy.  If there is a controversy, then I need to do it, even if I haven't done it previously.  So as to not put the jury in the position of having to decide a matter of claim construction.

But let me go back and look, and we'll come back to it.

MR. THAKUR:  We just did not present this evidence.  We would be prejudiced, in light of the fact that we never anticipated that the Court would require such an order.

THE COURT:  I understand that.  But I was -- that

is, a secondary issue, an important one, though; namely, whether or not I am now providing something new which the plaintiff could not anticipate it needed to present evidence on, and which now gives the defense the opportunity to argue you failed to present evidence on, and since the Court hadn't done it previously, that's unfair.

I'll look at that as well.

MR. COHEN:  While we're right there, at page 10, line 23, just for -- usually you use the words "completed before the next step can be performed."  That sentence, you just use "performed" and "performed."

THE COURT:  I'll look at that.  Whatever language I use, I'll see if I should change the language.

All right, so Step Four is where I was and you brought me back here.  Anything on Step Four?

Again, I add:  "Step Three must be completed before Step Four can be performed."  I don't know whether or not I previously made a ruling on that.  But it did -- as I said, sequence was an issue that was raised during the trial of the case.  And I did intend to instruct the jury correctly with respect to any sequence that is required by the language of the claim.

Any objection?

MR. THAKUR:  Not by plaintiff.

THE COURT:  So "delivering the command," I have the note of a missing close quotation.  And then I go into the substeps.  And I have read substep A, "establishing a connection," and was seeing whether there is any objection to that language.

MR. THAKUR:  Your Honor, on page 11.

THE COURT:  Yes.

MR. THAKUR:  Your Honor, we do -- we -- our objection is actually not on page 11, but it's really more at the top of page 12.

THE COURT:  Yes.

MR. THAKUR:  It says:  "The limitations: 'Establishing a connection between' the server and the wireless device and 'wherein the connections established' mean that to perform this step the server must be in a wireless communication with a wireless device."

Your Honor, you previously construed "establishing a connection" is initiating wireless communication.  This must be in wireless communication is sort of not synonymous with this.  What we think makes more sense is to say that the connection -- on page 12, the top line, should say:  The connection is 'established' mean that to perform the step, the server must have initiated wireless communication with the wireless device.

That follows the initiating with something that

must be done to something that must be completed.  This would add a whole new dimension to the construction, and I think it would be very confusing to the jury.

THE COURT:  Well, not -- confusing is the concern, but -- I do hear your concern.  I have attempted to define the limitations, both of the "establishing a connection" substep and the "wherein" clause.  It seems to me that one of the debates that the parties are having is where to place the "wherein" clause.  The Court considers that a matter of claim construction, not a matter of fact.  And, therefore, it is important for the Court to tell the jury what the "wherein" clause limits.  It seems to me the "wherein" clause limits the "establishing a connection" substep.

MR. THAKUR:  We're in agreement so far, your Honor.

THE COURT:  And it also seems to me that, although the "establishing a connection" substep uses "establishing," the "wherein" clause uses the past tense, "established," and we've had this debate several times.

So the language that you're pointing to is language where the Court is instructing the jury that when those two limitations are read together, it means more than initiated.  Because you can't have established a connection if you are initiating a connection.  You

must -- a connection is only established after the connection has been made.

MR. THAKUR:  Has been initiated.

THE COURT:  No.  Made.  Because if I said, I am initiating a connection and, therefore, the connection is established, you might argue that the initiation alone is all you need to have established a connection.  And that might be your argument with respect to the technology.

But for claim construction purposes, the Court's ruling is that, although initiating a communication is a definition of "establishing a connection," the "wherein" clause adds a further limitation.  It requires that the connection that you might have established -- that you might be establishing be actually accomplished.

Now, it seems to me that the evidence that I've heard in the case between the two sides is that the communication is accomplished when the server does certain acts.  That's fair for you to argue about.  What the accused device does to perform the step.  But I should not leave the jury guessing about what "communications between two devices" mean.

And it seems that it's important for the Court to define what does it mean to have communications established between two devices.  And that's what I'm attempting to do, to say that it must be in wireless

communication with the wireless device.  Now, I don't --
well, let me see if you have a response to that.

MR. MATUSCHAK:  Your Honor, I think you have it
exactly right.  This is an issue that was in dispute, it's
a claim construction issue.  The parties have different
views about what that language means, and I think rather
than have -- I think if you leave this out, you're going
to have the jury then speculating.  And inevitably, this
is a claim construction, which is the Court's job.

I think you're exactly right that the parties can
argue their different positions based upon that
construction.  This has certainly been an issue that's
been all over the trial.

MR. THAKUR:  Your Honor, what you've already done
in lines 6 and 7, your Honor, and --

THE COURT:  Six and seven?

MR. THAKUR:  On page 12, your Honor.  You state
that the "establishing a connection" substep must be
completed before "transmitting the contents of the
mailbox" can commence.  Your Honor, we believe that
suffices to explain to the jury that the "establishing a
connection" substep must be completed.

What --

THE COURT:  Well, I would need to define what it
means to complete the "establishing a connection" substep,

because it is modified by the "wherein" clause.

Do you agree with that or not?

MR. THAKUR:  Your Honor, we believe what you've already previously provided is sufficient.  Because I agree -- I don't think there's any dispute that "wherein a connection is established based on a threshold condition" modifies the "establishing a connection."

THE COURT:  Substep.

MR. THAKUR:  Substep.  Correct.  But what it does is, by suggesting that the server must be in wireless communication gives it sort of a physical limitation rather than a communication limitation.  It's -- what they have down is they've added confusion by saying, any different protocols may or may not be used.  Now, you know, if any protocol could be used, then this would not be a concern.  It's the fact that they have said, in communication means setting up these TCP, you know, oriented connections, that's what's causing I think the confusion for the jury is either we say --

THE COURT:  It's not a confusion.  You can't say the jury's confused because they aren't.  They haven't even started doing it.

MR. THAKUR:  Right, right.

THE COURT:  But it does seem to me that, as I understand it, the two sides will argue about whether or

not a particular practice performs the step.  And that's not for the Court to comment on at all.  It seems to me that not every kind of communication practices the step.  There are smoke signals.  That's a form of communication.  So I'm not sure that I would subscribe to the notion that every kind of communication practices the step.  Only those that meet the limitations.

And one of the obligations of the Court is to make certain that the jury understands that the "establishing a connection" substep is limited by the "wherein" clause.  And that I say, there is a further limitation on this substep, I'm now reading page 11, line 19, in Claim 1.  The last limitation of Claim 1 recites:  "Wherein, the connection's established based on a threshold condition."

If, as I see it, that is to be read together, I am not content to leave as the sole definition of the substep "initiating wireless communication between a wireless device and the server."  That is -- certainly is a good definition if I don't take the "wherein" clause into consideration.  But I don't believe that it's sufficient if I do.

And so with the "wherein" clause brought into consideration as a further narrowing, because the threshold condition is part of the "establishing a

connection" substep, that causes -- uses the words "a connection is established.

MR. THAKUR:  Correct.

THE COURT:  So what does it mean for a connection to be established as opposed to the initiation?  That's the question that I'm trying to grapple with.  The parties can argue whether or not a technology has established that connection, but I won't leave the jury without instructions on what does it mean to have a connection established.

MR. THAKUR:  And I think, your Honor, that connection established should not be somehow suggested it's a physical connection.

THE COURT:  I didn't say a physical.

MR. THAKUR:  But it leaves the "must be in wireless communication," it's --

THE COURT:  Wireless by what?

MR. THAKUR:  It can be -- must have the ability, must have a wireless channel.  The concept is that -- I'm in agreement with you that the connection is established is the step.  But that "established" can either be the finished completion of the initiation step or it can be, must have a communication path to the wireless device.

This concept, it must be in wireless communication, suggests that there is, you know, that the

two have to speak to get to that point.  What we're trying to say is that the server can make that decision using the appropriate protocol so it can get to there.  So it is the ability to wirelessly communicate, not some physical in wireless communication.

THE COURT:  Let me see if I understand your argument.  So the ability to wirelessly communicate is sufficient for a wireless communication to be established?

MR. THAKUR:  Correct.  It's the -- once a server selects the appropriate protocol that is end-to-end, it has the ability to communicate with the device.  That is establishing a connection.

THE COURT:  Well, see, that's going to -- I'm trying my best not to put the jury in the position of trying to -- not having a proper instruction to answer the hypothetical that you all put to the witnesses during the course of the trial, and the hypothetical I have in mind is the device that is in the million pieces down at the bottom of the Grand Canyon.

MR. THAKUR:  Right.

THE COURT:  And your argument is that the server still has the ability to communicate with that device.

MR. THAKUR:  Exactly, your Honor.  In wireless communication when I pick up my phone and I dial a number, my carrier is now charging me even though the phone is

ringing on the other side.  So the point is, wireless communication occurs from the sender, unlike in a wired communication with the parties --

THE COURT:  But if the phone is ringing on the other side you've established a communication.  No one answers.

MR. THAKUR:  A busted phone is still ringing in the literal sense.  What I'm saying is, the busted phone may not -- what you're -- you're converting the ringing is the signal that gets to the device because it's there.  The question of whether the phone has the audio capability is not part of this claim.

THE COURT:  You threw me off.  The phone is ringing, so...

MR. THAKUR:  I apologize.

THE COURT:  So -- something is ringing.  What's ringing?

MR. THAKUR:  The point is that the signal to the busted device in the Grand Canyon has been sent and can be sent.  The fact that the busted phone in the canyon can't receive it --

THE COURT:  Let me see.  Your definition that you would have me adopt is that the established -- the communication is established when the signal is sent.

MR. THAKUR:  Is able to be sent.

THE COURT:  Is able to be sent.

MR. THAKUR:  That's correct.  Because it's --

MR. MATUSCHAK:  That's always going to be true, your Honor.  My phone, I'm not doing anything with it and it's capable of doing something.  Now, I think Mr. Thakur's hypothetical would mean that by doing absolutely nothing, I have infringed the patent.

THE COURT:  Well, I didn't get that one.  But...

MR. THAKUR:  Even I'm thrown off with that one.

THE COURT:  Let's see.

MR. MATUSCHAK:  My point, your Honor, was the claim says that you have to do -- you actually have to do things.  You have to -- one of the steps is "establishing a connection."  And the connection then has to be established, as you said, in the "wherein" clause.  This isn't a system claim where all you have to have is a system that's capable of doing something.  This is a method claim where you actually have to do something.

MR. THAKUR:  And --

MR. MATUSCHAK:  The doing something, if you don't mind, is that you have to perform the step of establishing.  But then the question is, because of the Court's construction with respect to the order of the steps, when is that completed?  And I think your Honor's absolutely correct that that's something that you need to

define for the jury.

MR. THAKUR:  And it could be, as you said, to mean to perform that the server sends wireless communications.  So it's not the "must be" when the server sends wireless communication, that at least allows both sides to argue their case.

If the argument that it must be in wireless communication leads one to think that there has to be a two-way connection, and that is not how wireless communication works.

THE COURT:  Would I be, in your view, consistent with the claim if I said when the signal or communication is sent over the connection?

MR. THAKUR:  Over a connection?

THE COURT:  Over a connection.

MR. THAKUR:  Yes.

Well, your Honor, I am not sure that clarifies anything for the jury.  You throw the word "connected" in. Over a communication path?

THE COURT:  Over a communication path.

MR. THAKUR:  Yes.

THE COURT:  What's the defense position for that?

MR. MATUSCHAK:  Your Honor, the claim step is "between the wireless device and the server."  So if --sending cannot be the completion of the connection, of,

make the something connected, because sending you don't even have to have a wireless device.

A BES sitting with no wireless BlackBerrys connected to it at all or wireless BlackBerrys set up with that BES would be capable of sending something, but it's -- the requirement of the claim is that there's to be a "connection between the wireless device and the server." And that can only be completed once, I think as your Honor had said, when the server is in wireless communication with the wireless device.

MR. THAKUR:  Your Honor, you can send, in wireless communications with push technology, once the device is registered.  That's the whole point, that you can send -- in fact, the patent used the word "push." That's my point.  Is that the server knows how to packet a command in an envelope and use an end-to-end protocol. They can get there.  It doesn't matter whether they use relays, whether there's 50 things in the middle.  Once you have end-to-end protocol and the server sends it, that's wireless communication.

MR. MATUSCHAK:  Well, if that was true, your Honor, then that's the claim language they should have used.  They could very easily have said "send wireless communication."  They picked the language which is "establishing a connection" and "wherein the connection is

established."  Having picked that language, I think the last argument by Mr. Thakur, that just sending is enough, is inappropriate.

MR. THAKUR:  I would argue that is what we -- it says any networking protocol could be used.  The whole purpose of using connection and connectionless protocols is we're going to use push technology, which is how wireless works.

THE COURT:  Well, I visited this several times -- "several" is the wrong word -- millions of times, and let me see what I want to do.  I am convinced that I need to put the two limitations together.  And I don't hear any objection to that.  I do not understand that in the written description, the inventors state that the process can be used with a push device.  They never say push protocol.  They never list a push protocol.  But they talk about the various devices.  And I think it's fair to regard the use of the phrase "push device" as a device which can receive signals without having initiated the process of receiving signals.

But that it seems could be practiced with simply the step of transmission.  And so transmission is sending to devices which otherwise don't request the information.  And the inventors did put in a step called "establishing a connection" prior to transmission, and that the

"connection is established."

Now, one of the -- one of the problems the Court has grappled with is that it has defined establishing a connection with a different word than connection.  I said, initiating communication.  But I have used the "between the wireless device and the server."  In other words, one of the debates that the parties are tendering to the Court is whether or not something can happen between the two devices that occurs solely within one of the devices and never involves the other device, and the inventors chose to use these terms, and it's our job to interpret how one of skill in the art would understand what it means to establish a connection between two devices, and whether or not that can be done solely by one of the devices and satisfy that language.

Technology being what it is, I now understand that, that there were in existence at the time various signal processes by which one device could transmit to another device information without the other device seeking the information.  Making a prior request for it.  And so as I started out, this then requires the Court to determine whether to give meaning to "establishing a connection" that is different than transmission.

My current language uses the phrase "be in wireless communication."  And I'm not sure that, if I add

more language, I'm going to clarify this.  If I take the plaintiff's suggestion of defining "wireless communication" as being performed when the signal is sent over a channel capable of reaching the wireless device, that puts me in a position where I'm actually further narrowing and adding language to the claim that wasn't there.  And I don't know that I have in mind any language in the written description of that kind.

The position of the plaintiff that a wireless check must be established, and that was something that during the trial I invited further requests from the parties to do more claim construction and nobody took me up on it, maybe that language alone is all that I need to do that a connection must be established, and then leave it to the parties to argue whether or not a connection is establishing, and then the further step having to do with whether one must be performed to the other might do it.

So let me look at this.  Because, quite frankly, my job is to get it right, and then leave it to you all to argue about whether a particular technology does what these inventors had in mind.

MR. MATUSCHAK:  I was just going to say, your Honor, if you don't do what you've done here and just say "the connection has to be established," then I think we're back to where we were before, which is we're going to be

arguing claim construction to the jury. They're going to say, Well, the establishing step is completed when you initiate. And we're going to say, No, the establishing step is not completed when you initiate, because that's just the beginning part of that.

THE COURT: I mean, I can add both sentences. The step requires more than initiating communication. When viewed in light of the "wherein" clause, the connection must be established as part of the step.

MR. MATUSCHAK: Yeah.

THE COURT: Because I don't think it's fair to argue that preparation to establish a connection or starting to establish a connection completes that step, when viewed in light of the "wherein" clause, and I don't want to leave the jury with that impression. And I don't understand the plaintiff to be arguing that, quite frankly.

So let me try the language that I just mouthed for myself, even though sometimes what goes through my brain never makes it to paper; hence, the objections you might have after that.

Okay. So let's move on to the "Step B: Transmitting." Now, here I did use the language "can commence," because that is the language I had used earlier, and so I've left that.

"Step C:  Accepting the contents."  This is a debate that we had in chambers, and I love debating in chambers, so I wanted to bring you all into the debate. This has to do with grammar.  And the question that I asked in chambers, and that I now put to you, is whether or not the "without a request from the wireless device" limitation applies to the accepting and the executing -- the accepting substep and the executing step.

The reason I put it in here is I heard an expert witness testify -- maybe both, but at least one I made a note of -- that it does.  And it seems to me that if the device is performing the act, it is potentially ambiguous to say that it performs the act without a request from itself.  As the word "request" has been defined by the Court, which is "a code or signal that initiates the step."  So if something is doing something, it seems redundant or perhaps contradictory to say it does that without requesting itself to do that.

MR. THAKUR:  Your Honor, we agree with your proposal.

THE COURT:  So I intend to instruct that the "without a request from the wireless device" limitation is inapplicable to accepting and inapplicable to executing.

And I see my grammar teacher over there is helping.  The one clarification that I could make that

would solve the problem, I think clearly, would be if I were to define "without a request from the wireless device" to mean "without a request from the wireless device to the server."  That language is not used in the claim.  But it seems to me that accepting and executing do not involve "a code or signal from the wireless device to the server."  But do involve a code or signal from the wireless device because it initiates it using codes and signals.  It can't do it any other way.  And so...

MR. COHEN:  That's what we were talking about over here, exactly that.  So we do think that that limitation, without any question, the wireless device is relevant to the accepting the contents, because of the way this claim is read, "Without a request from the wireless device is to the server."

THE COURT:  Is what?

MR. COHEN:  "Without a request to the wireless device is to the server."  And so that's why that accepting substep makes sense, in itself.  Because it's not -- it's performing the step by itself, but it's not --

THE COURT:  So is it your position that I should redefine the preamble to be "without a request from the wireless device to the server"?

MR. COHEN:  If you need to.  But that was -- I think that this claim doesn't -- I don't think you need

the last sentence, starting at line 15 to line 16.

THE COURT:  I'm on page 12.

MR. COHEN:  I'm sorry.  The "because" line, starting on page 12, line 12, starting with "because."  I don't think that sentence is necessary.

THE COURT:  Well, there was testimony that these steps are performed without a request from the wireless device, and it was that testimony that drew my attention to it.  Because grammatically, that is what -- all of these steps follow that preamble.  And --

MR. COHEN:  Then, your Honor, we'd be fine with "without a request from the wireless device to the server."

MR. THAKUR:  Your Honor, no objection.

THE COURT:  So I would go back and add that to the definition of "without the transmission from the wireless device to the server" -- this is on page 10, line 14 -- "of a code, signal or any other form of request that initiates the commencement of the performance of the step."

MR. COHEN:  Can you give us a moment to confer on that?

THE COURT:  Why don't we take a break?  It's about 11:30.  Come back in about 15 minutes.

(Recess)

DEPUTY CLERK:  Remain seated; come to order.

THE COURT:  Please, please, be seated.

Let's continue to march, and then maybe we'll do some ten step backwards for our one step forward, but otherwise, some would describe that as progress -- yes.

MR. COHEN:  Thank you for giving us time to confer.  When we left off we were talking about accepting the contents substep.

THE COURT:  Yes.

MR. COHEN:  Let me make clear what RIM's position is.  Our position on this claim is the claim is drafted to the way it is, and we don't want to change the claim language right now.  And so I understand that -- the Court's desire to maybe try to fix the claim, but that's not what we want to do here.

So we're going to object to the "because" sentence.  Page 12, starting at line 12, the "because" sentence.  And similarly, the "because" sentence at page 12, line 20.  We just think that it's not -- we understand construing claims, but now's not the time to try to fix the claim.

THE COURT:  Well, I do have an obligation to construe the claims so that they are valid unless it is irreconcilable, and it does seem to me that I can reconcile those by simply saying that one is not

applicable to the other.  And the problem is presented by my definition.  The problem is not necessarily caused by my definition.  But my definition adds to the potential, because I have defined "without a request from a wireless device" in a way that could render the accepting and executing step ambiguous.

But if I added "without a request from the wireless device to the server," even though that language is not done, if I interpret that limitation to mean that, because the word "request" uses the word "from."  But if it goes from the device, that seems to me that it -- the inventor had in mind that it was something that initiated from the device as opposed to something in the device.  And, therefore, it does seem to me fair to consider that the requested language is something that is initiated by the wireless device to the only other device that is listed here, the server.  And so if I do that, then the language would be because the accepting step does not involve a signal from the device to the server, it doesn't apply.

And I think that's what I would -- and the same is true with the executing step.  I understand your objection.  Everybody's got good objections.

MR. COHEN:  So that I understand it, you're going to remove the "because" language?

THE COURT: No. I'm going to change the "because" language in view of my insertion on page 10, line 14, of the words "to the server" as my now, the definition of what "a request from the wireless device" means.

And therefore, the "because" language would be there, but it would say: "Because the accepting step does not involve a signal from the wireless device to the server, the limitation doesn't apply" -- "the without a request limitation doesn't apply." That's not my final wording. I'm just explaining how I want to do it.

I'll give you another opportunity, once I give you a final set here, to make further objections because that would be fair.

Anything further on the accepting or the executing the command language?

MR. THAKUR: Your Honor, plaintiff objects to the language, lines 15, 16, where it says: "The transmitting the contents of the mailbox substep must be completed before the accepting the contents substep can commence."

THE COURT: Why?

MR. THAKUR: It wasn't an issue in this case so we had not considered it, but as I sit here, it sounds possible that when you're dealing with sending large volumes of information, some of it may get to the device

first, and begin processing and accepting while information is still coming.  And it seems unnecessary to, to determine that it has to be completed.  I understand that transmission must begin before acceptance can occur.  But the idea that partial acceptance cannot occur seems inconsistent, as I sit here today, from how I understand wirelessly it's delivered.  And I guess I would argue the same unnecessary point.

MR. COHEN:  It's not the relevance of the case what we did talking about in the patent, the disclosure in the patent and the claim language.  Claim language says "transmitting the contents."  And then it's "accepting the contents."  Not transmitting some of the contents and accepting some of the contents.

MR. THAKUR:  But it doesn't say transmitting the contents in its entirety before acceptance can begin.  And that's essentially what they're arguing.

MR. COHEN:  If you're going to accept the contents, you have to transmit the contents first.

THE COURT:  Well, if I change the language to "commence," that would solve the problem, wouldn't it?  The "transmitting the contents of the mailbox substep must be commenced before the accepting the contents substep can commence."

MR. THAKUR:  I accept, your Honor.

THE COURT:  Anything further on those two, accepting or executing?

MR. THAKUR:  No, your Honor.

THE COURT:  Claim 6.  The only thing I've added that's new is that this is an additional step.  And although the other dependent claims are limitations on command, this is an additional step, and I state:  "All of the steps of Claim 1 must be performed before Claim 6 can be performed."

Infringement.  This is now page 13, line 6. Don't I need to add both devices here?

"As previously stated, Mformation alleged that RIM customers who use its" -- I didn't like BES, I was going to call BlackBerry Enterprise Server software, because I know you all have used that.  Because I wanted to say "and BlackBerry devices," and -- but don't I need to include both?  Or with BlackBerry devices?

MR. THAKUR:  Actually, you could go:  "Mformation alleges that RIM customers who use its BlackBerry handheld," so it would be saying its RIM customers who use its wireless device.  It's at the end of line 12, your Honor.

THE COURT:  The end of line 12.

MR. THAKUR:  That the RIM customers who use its handhelds.

MR. COHEN:  You need both the BES software and the BlackBerry devices?

MR. THAKUR:  Right.

THE COURT:  And I take it that there are no BlackBerry devices other than handhelds.

MR. THAKUR:  Yes, though I was proposing the RIM customers who use its handhelds connected to the BES. Because actually the universe of the infringing product is --

THE COURT:  You don't connect to software. That's why -- you all have used "BES," that's why I was trying to get away from it.  You all have used BES interchangeably with the server itself.  You call it the BES.  And the software, which is the product.  And so I was trying to be consistent in my language in calling it the BlackBerry Enterprise Server software, and I didn't want to call BlackBerrys -- but the BlackBerry handheld devices -- but it's got to be "with," because every construction I heard is you need both.

MR. THAKUR:  That's right, it's the subset that's accused.

THE COURT:  All right.  So let me go contributory.  Anything on contributory patent infringement?

MR. McDONALD:  Yes, your Honor.

THE COURT:  Yes.

MR. McDONALD:  The parties submitted an agreed construction for "contributory infringement."

THE COURT:  You did?

MR. COHEN:  I'm sorry, I was still on page 13.

MR. McDONALD:  Oh, sure.

MR. COHEN:  Line 8.

THE COURT:  Line 8.  Yes.

MR. COHEN:  Looks like there's something missing.  It says, On or after October 27, RIM made and sold in the United States or imported into the United States and sold a product that was used by RIM's customers, and when used by its customers, infringed the Asserted Claims.

That sounds like a statement.  Of course --

THE COURT:  Oh, I see, yes.

MR. McDONALD:  We have no objection, your Honor.

MR. COHEN:  To the Court making that statement -- maybe did you want a contention there?  On or after --

THE COURT:  These two drafts may have been put together, but I understand the concern.  So, yes, we'll -- that sentence probably should be stricken, the second sentence.

So now we're going to the contributory joint construction.

MR. McDONALD:  That's correct, your Honor.

THE COURT:  That's in the agreed-upon instructions?  And what page?

MR. McDONALD:  Your Honor, in RIM's submission from Tuesday, Docket No. 994.  It's at page 45.  Construction No. 30.  And the issue here is --

THE COURT:  I'm sorry, I have -- I don't have those listed.  Let's see, 994, 996 -- I don't have a 995.

MR. McDONALD:  It would be either RIM's Instruction No. 30 or Mformation's No. 29.

THE COURT:  I have that, yes.

MR. McDONALD:  In No. 30 the parties' agreed language refers to the "component."  And the draft instructions we have from your Honor, Nos. 3 through 5, refer to "products."  And in No. 4, for instance, the products supplied by RIM are not common components.  There's no dispute that the overall BlackBerry device has a substantial noninfringing use.  But the issue is whether the components that are used for infringement, the subcomponents contained within that, have a substantial amount of infringing use.  And that's why we -- we would like for the language regarding "component" to be used rather than "product."

THE COURT:  Let me go back and use my structure but with your language and see if we can solve that.  So where would I start?

MR. McDONALD:  I think at Point 3.

THE COURT:  Yes.

MR. McDONALD:  "The product supplied by RIM contain important components."

THE COURT:  Just a moment.  Yes.

MR. McDONALD:  Then Item 4, the components --

THE COURT:  Wait just a moment.  Components in the infringing process?  That doesn't quite work.

MR. McDONALD:  We can say "used in the infringing process."

THE COURT:  Used.

MR. McDONALD:  Used to infringe?

THE COURT:  Used to infringe.  That sounds better.

Yes?  And then what else?

MR. McDONALD:  No. 4, we would say "the components supplied by RIM," rather than products.

THE COURT:  Yes.

MR. McDONALD:  That language is fine, the rest of it.

And No. 5, "RIM supplied the component or components," plural.

THE COURT:  Yes.

MR. McDONALD:  The second line there, "components," plural, and "was" would be changed to

"were."

THE COURT:  Okay.  And that's agreed?

MR. McDONALD:  I believe that comports with your agreement, your Honor.

MR. COHEN:  I'd have to take a look at the final language, but it sounds consistent with the model instruction.

THE COURT:  Very well.  All right.  Anything else?

MR. McDONALD:  Not as to contributory, your Honor.

THE COURT:  I did raise a question with myself about whether or not I should use the word, on page 14, line 26, "literally," since that raises a legal issue as to whether or not the motion by RIM to not instruct on the doctrine of equivalents because there's been no evidence on that should be granted.

MR. McDONALD:  I'm sorry, I didn't hear the last part.

THE COURT:  Should be granted.  So the question of literal infringement -- the word "literally" is what I have here on page 14, line 26.  Ordinarily, I don't use the word "literal infringement" unless I'm contrasting it with infringement under the doctrine of equivalents.

So I've used consistently here, "direct or

indirect infringement," and not introduced "literal."  And so I would strike the word "literally," and do so because I would find that RIM's objection is well taken that there has been no tender of evidence that any of its products are used by its customers without infringing, literally, but infringing under a doctrine of equivalents.

MR. McDONALD:  Thank you, your Honor.  I'm sorry for asking you to repeat that.

THE COURT:  No, no, I said it differently.  So my repeating it helped me.

MR. McDONALD:  We have no objection.

THE COURT:  Very good.  All right.

Now I'm on page 15.

MR. McDONALD:  Yes, your Honor, as to inducement, the parties submitted an agreed instruction.  This is RIM's Proposed Instruction No. 31, I believe, and it hews quite closely to the model.  My only concern is the instructions the Court has issued, they omit the second paragraph from the model.  Because at Point 3 in the draft, it states that one of the requirements is that at the time it acted RIM was aware of the '917 patent.  But under the case law, RIM can still be liable without actual awareness in accordance with the second paragraph of the model instruction.  And that's agreed by the parties.

THE COURT:  Have been aware?  When you say "the

second paragraph," is that the second bullet point?

MR. McDONALD:  No, I'm sorry, your Honor, it's the -- in the model instruction and the agreed instruction, there's a second paragraph below that.

THE COURT:  "If you find"?

"If RIM did not know of the existence"?

MR. McDONALD:  Correct.

THE COURT:  You want me to add that as language in the instruction?

MR. McDONALD:  That's correct, your Honor, and that's directly from the Northern District model.

THE COURT:  If that's agreed, you want me to add both of those paragraphs?

MR. McDONALD:  I assume RIM would like the second one.  We have no objection.

MR. COHEN:  It would be both paragraphs.

THE COURT:  All right.  And then what is it about my bullet points that -- my numbered paragraphs you want me to change?

MR. McDONALD:  Nothing, your Honor.

THE COURT:  Oh.  Very well.  So you simply want me to add the language from the RIM's Instruction 31?

MR. McDONALD:  That's correct, your Honor.

THE COURT:  Defenses?

Anticipation?

Now, this raises a legal issue.  Again, this is the one we deferred until now, and maybe given the hour I should defer it until after lunch.  We obviously aren't going to finish this, if I were to keep us for another 10 or 15 minutes.

The issue we'll come back to is the question of the evidence with respect to the demonstration.  And it is the -- just to prepackage this, it is the Court's tentative decision to grant Mformation's motion with respect to this, because it seems to me that the evidence tendered by RIM on this issue was based on an opinion that was based solely on deposition testimony that was subsequently recanted, and in view of the testimony from the witness who wrote the code that was used, or at least he testified he did, that the wired registration is written right in the code, and was not done wirelessly nor demonstrated wirelessly, that that would make the demonstration one that was not disqualifying.  And that's my intent.  So think about that, and when we come back, we can talk.

MR. MATUSCHAK:  Thank you, your Honor.

THE COURT:  It's about 12:15.  Let's give ourselves till 1:30.

MR. THAKUR:  Thank you, your Honor.

(luncheon recess)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Please, be seated.

Back on the record.  We were starting to consider the Court's proposed instructions with respect to defenses, affirmative defenses.  And the first part of that was the determination of a date that the Court should state as the -- in subparagraph (1).

MS. DeBRUIN:  Your Honor, we have an interesting situation here.  I think first we need to address the demonstration issue, because that will drive this point. If the demonstration weren't involved, I don't think there's really a dispute about the prior art being early enough, so we can discuss that as a second matter.  But I think first we should address the demonstration point.

THE COURT:  Very well.  Who wants to open that?

MR. MATUSCHAK:  Well, I will, your Honor, if you don't mind, since you said you gave us sort of your tentative thoughts.

THE COURT:  Use the podium for our court reporter.

MR. MATUSCHAK:  Your Honor, on that issue, I understand the Court's point of view, but I would say there was at least five things that point to not granting judgment as a matter of law to Mformation on the issue of whether the demonstration had all the elements of Claim 1.

First, you have the 30(b)(6) testimony of Dr. Kushwaha, sworn testimony which he changed. He claimed he was confused. We all saw the video. The jury saw the video. And I think they were entitled to infer that he was anything but confused. Magistrate Lloyd found when he tried to change his testimony for his deposition that he was not entitled to do that and obstructed those changes.

He had interrogatory answers that were sworn that supported his testimony that all of the elements of Claim 1 were in the demonstration.

You have the fact that they did not give their own expert the source code for that demonstration.

And that the only basis that they have for saying that all the elements weren't in there was the testimony of one witness, from Beltramino, who said that the code he reviewed was from May, not from July, when the demonstration was done, from May. And the jury should be entitled to infer that the idea that nobody made -- in a startup company, made any changes to code from the end of May until the end of July, I think they're entitled to draw an inference that that is not credible testimony.

And Mr. Beltramino's a long-time Mformation employee, he's got a stake in the case, he's sitting there testifying while his boss Dr. Kushwaha is looking at him right across the table. I think all of those issues

implicate really classically jury issues of credibility. Any one of those I think would be enough to create a triable issue of fact, but I think all five of those clearly demonstrate that if the jury resolves the inferences of those five facts in our favor, they could include that Mformation is not telling the truth about what was in the claim demonstration and that Dr. Kushwaha's original testimony and his interrogatory answers were in fact true.

And I have seen summary judgment cases where, where the court will not grant summary judgment against someone who changed their testimony under certain circumstances, but I've never seen a case where someone who changed their testimony about something is a recipient of summary judgment in their favor. I think with all due respect, your Honor, that with respect to the law of who decides credibility, who decides reasonable inferences and who decides the weight of the evidence, that deciding that issue in Mformation's favor really turns that law completely on its head.

THE COURT: And I do understand that -- and let me comment and give you further opportunity to comment. The Court heard a description of what the demonstration consisted of. And there was never any questions asked in the deposition about what steps were performed in the

demonstration.  The registration step would have required that someone using the device -- I can't recall which kind of a phone they had --

MR. McDONALD:  It was a Nextel phone, I think, your Honor.

THE COURT:  I don't remember Nextel.  But it was a brand of phone that I heard.  Actually, sends something in, registering, and it would have required someone on the other side at the server taking some affirmative acts to verify it.  I never heard anything of that kind taking place at the demonstration.

As the Court heard the evidence, it was in conjunction with maybe a PowerPoint presentation what the demonstration consisted of was accessing the server and seeing the phone be wiped or terminated or somehow the dramatic step that they wanted to demonstrate.  And that was consistent.

So it wasn't -- there wasn't enough in the deposition in terms of that level of detail that I considered it impeachment.  And -- although the witness did say -- Dr. Kushwaha did say all the elements were demonstrated, it seems to me that that didn't necessarily mean that all of the steps were performed with the level of detail that it would seem to me that would need to be performed in order to demonstrate wireless registration.

And it seemed to me that there was no impeachment of the witness who testified that he wrote at least the version of the code that was being displayed in the courtroom, which was written, and he displayed something which was meaningful to him to show that the registration was wired, and there was no evidence to the contrary.

Whose burden is it?

MR. MATUSCHAK:  Well, I think it's our burden. But I do want to address those two issues that your Honor identified.

THE COURT:  And is it -- what's the level of your burden?  Is it preponderance or clear and convincing?

MR. MATUSCHAK:  On this one, your Honor?

THE COURT:  Yes.

MR. MATUSCHAK:  I think our level is clear and convincing.

THE COURT:  So let me have your comment.

MR. MATUSCHAK:  Well, on the registration step and the verification steps are fundamental elements of Claim 1.  And so when somebody says, I demonstrated all of the elements of Claim 1, I think it's a fair inference for the jury to take that that means he actually did demonstrate the registration, that he had a phone, he said, Look, I'm going to demonstrate, here's how you get registered with the device.  Now we're at the server.  Now

we're going to have somebody back at the home office send the "kill" command, and here this is what's going to happen, this is all happening wirelessly.  Isn't that kill?

THE COURT:  Let me comment.  Seems to me that the stronger argument -- the strongest part of your argument is that the Court should apply some kind of a judicial estoppel, that having said it in a 30(b)(6) deposition, the Court should have granted a motion in limine not to allow that to be contradicted.  But I don't recall if that was asked, but it wasn't done.

And so having now heard the contradictory evidence, your position, as I understand it, is the jury should now be allowed to judge the credibility of the witnesses with respect to whether or not that part of the demonstration was performed, just based on the summary statement, all of the elements were performed.  And I do understand that, and that's a good argument.

The problem that that will introduce is, then I have to give the jury now a decision tree that follows several things that would come from that, and that's why --

MR. MATUSCHAK:  Not necessarily --

THE COURT:  -- the clear and convincing standard is one that I'm latching on to, because even if you

presented some evidence, I have to judge the motion by the evidentiary standard that you have to meet. And so I have to decide whether a reasonable juror, applying the clear and convincing evidence standard, could find...

And so that's what I tentatively found should be decided in Mformation's favor.

MR. MATUSCHAK: And I would say, your Honor, let me first just address the -- Mr. Beltramino's testimony that this is what I did. We don't even think today that we have the right code. The code that we have and what he testified to was code from May of 2000. And I think it's legitimate to question and to let the jury decide if in the context of a startup company, which probably some of jurors may have experienced, it's not reasonable to believe that engineers are sitting around for two months doing nothing because Dr. Kushwaha said, Well, let's not do anything for the next two months until we have some demonstration.

THE COURT: That's not precise. His direction was not to do anything that would affect their demonstration. You could do all kinds of things, he just didn't want when the server was called up in the middle of their road show to push the button and have nothing happen because something had happened in a testing fashion that they knew would work. I do recall, and it's fair to say

there was testimony by another witness, that it continued to work.  And your challenge is, that is circumstantial evidence, that they could have come up with another code that was loaded and that would have been used in the demonstration and that would have shown wireless registration.

And I do understand that to be the argument.  I wonder whether or not that too would meet the clear and convincing standard.

MR. MATUSCHAK:  Well, it seemed to me, if you have a sworn 30(b)(6) deponent's testimony, you have a sworn interrogatory answer, a sworn affidavit that was submitted on behalf of that company to defeat summary judgment, and you have the other inferences that I talked about before with respect to the date of the code and Mr. Beltramino's position, and the fact that they didn't show it to their expert, it seems to me that that does sufficiently raise the issue to where a jury could credibly find -- a reasonable juror could find that as clear and convincing evidence that they did have all the elements of that invention shown in the demonstration.

And I understand that to take the burden of proof into effect, but we're still talking on all those issues about all those things on the issues of credibility, weight of the evidence and the reasonable inferences that

could be drawn from the testimony at trial.

THE COURT:  Do you have any documentary evidence that would contradict the testimony of the witness with respect to the state of the software as of the demonstration?

MR. MATUSCHAK:  Yes, your Honor.  I think we do. We have a few.  One is Trial Exhibit 692, which is an Mformation presentation -- for the actual presentation at Deutsche Bank.

MS. DeBRUIN:  Your Honor, a PowerPoint presentation that Dr. Kushwaha testified related to the that presentation.  It talks about doing over-the-air realtime provisioning, which is what we're talking about here.

THE COURT:  Over-the-air provisioning, yes.

MS. DeBRUIN:  Provisioning.

THE COURT:  That's post-registration.

MS. DeBRUIN:  That's the registration process. The registration and verification.  Provisioning the device.

THE COURT:  See, now I didn't understand that. So "provisioning" is a word that you believe links the device to the server?

MS. DeBRUIN:  Exactly, your Honor.

THE COURT:  Where do you get that?

MR. MATUSCHAK:  I think that was in the actual testimony.  I think that's the testimony from Dr. Kushwaha.

It's clearly not establishing, you know, a communications path.  "Provisioning" is something you do before that.  That's part of that wireless activation and verification step.

THE COURT:  Very well.  Let me hear from your opponent.

MR. McDONALD:  Thank you, your Honor.  The Court is correct to grant Mformation's motion for JMOL as to its public use defense.  The key, apart from everything else, I'd like to take this in steps.  RIM seeks to rely upon the December deposition testimony of Dr. Kushwaha, but if you look at what he said, he was asked whether the prototype was capable or had wireless registration.  He was never asked whether wireless registration was in fact demonstrated at that Deutsche Bank demonstration.

THE COURT:  Now, doesn't that pose a problem for you, though?  Because the law with respect to public use doesn't necessarily require that you demonstrate some of the things that take place inside of a machine that can't be demonstrated.

And so if your argument is that the device was capable of being wirelessly activated, and you go to a

demonstration and you say to the world, I have a device here that I have wirelessly activated, and you describe that, and you say, Now having it wirelessly activated, I'm now going to send it a command which is going to wipe that device -- the question becomes whether or not you have publicly disclosed each of the steps of your invention and whether the law requires that if you go through each of those steps in what is called a demonstration of it.

I had that issue in mind and I actually looked at some of the law with respect to that. And if you give me a moment, I can give you some of what I found. But I'm not certain that -- I'm going to get the material I was looking for in a moment.

MR. McDONALD: If I could respond.

THE COURT: Certainly, while I'm getting that, you could tell me something different.

MR. McDONALD: This is a public use defense, not a public description defense. The words "used by Dr. Kushwaha" frankly don't matter. It's the device and the server and what's done between them. He could have said -- I'm not saying he had said this, but hypothetically, even if he said, I'm now performing wireless registration, that doesn't matter. What matters is what happened with the device and the server, and under the *Motionless Keyboard* decision --

THE COURT:  That's what I wanted to look at. That's your statement of the law.  I'm not certain that that's --

MR. McDONALD:  Right.

THE COURT:  -- accurate.

MR. McDONALD:  Okay.  I would respectfully refer the Court to the *Motionless Keyboard* decision.  I don't have the full cite with me now, but we cited it in our briefing to RIM's motion for summary judgment as to public use.  And in that case a method claim was at issue, and the Federal Circuit held that merely displaying a product used to practice the method did not cause an invalidating use, because the actual steps were not performed.  Right?

THE COURT:  Right, but that doesn't -- that's still not complete.  Your statement of law is that if the steps to be performed are internal -- and you can't display them, you can only show the results of them -- you haven't publicly used it because you haven't displayed them.  And I'm not sure that display is necessary of all the steps, is necessary for purposes of the public use doctrine.

MR. McDONALD:  I apologize, I probably misspoke and stated it -- that's not my position.  You don't have to show the internal workings, but the actual recited step has to occur.  Whether it's visible or not.  It must have

occurred.

THE COURT:  Right.

MR. McDONALD:  There's -- in the claim requiring wireless registration, that had to have occurred.

THE COURT:  But I heard your argument that it did occur, it just didn't occur at the demonstration.

MR. McDONALD:  Absolutely it did not occur, your Honor.

THE COURT:  What was your first statement?

MR. McDONALD:  My statement was just assuming it had occurred.

THE COURT:  No, no, no.  You went to something that you started out with --

Can you read that back?

(Record read)

THE COURT:  So if he says it and it is not happening, then that doesn't do it, but if he says it and it is happening, that is a display.

MR. McDONALD:  Frankly, what he says doesn't matter at all.  The only thing that matters is what happens between the device and the server.  And the witness gave --

THE COURT:  What he says doesn't matter?  It does seem to me that -- I won't accept that as a proposition.

MR. McDONALD:  Let's take what he said off the

table, sir.  Mr. Gabriel Beltramino testified that wireless registration was not possible with the prototype code, and he explained that to the jury.  RIM has presented no --

THE COURT:  That is important.  In other words, the question is, and he did not -- he had not reduced to practice --

MR. McDONALD:  Correct.

THE COURT:  -- wireless registration.  And so the invention date is later.

MR. McDONALD:  That's correct, your Honor.

THE COURT:  Because at the point of the demonstration, they had not invented that step.

MR. McDONALD:  They had not reduced that step to practice.

THE COURT:  Well, you don't get to be inventive unless you've reduced it to practice.

MR. McDONALD:  That's correct, your Honor, yes.

THE COURT:  Let me ponder that.  Give me one second.  Let me remind myself what I looked at before.

Very well.  Thank you for that.

Now I've kind of refreshed my memory about my earlier consideration of this.  And I guess I would have the parties address the question now that I have heard, which is not whether or not it was demonstrated but

whether or not the device that was demonstrated was capable of performing all of the steps of the patent. And so the issue is whether or not the plaintiff's position being that -- I don't know what your position is. You said "reduced to practice."

So prior to the demonstration, the wireless registration had been conceived.

MR. McDONALD: Correct, your Honor.

THE COURT: But it had not been reduced to practice.

MR. McDONALD: That's correct, your Honor.

THE COURT: And it was first reduced to practice when?

MR. McDONALD: I believe Mr. Beltramino testified that wireless registration was reduced to practice in December of 2000 in Version 1.0 software. Different software code.

THE COURT: I'm sorry, so that's what date?

MR. McDONALD: December 2000.

THE COURT: Okay.

MR. McDONALD: So the record complete, I now have the citation for *Motionless Keyboard*. That's 486 F.3d 1376.

And that testimony by Mr. Beltramino is completely unrebutted. Their expert didn't even look at

the prototype code.

THE COURT:  Let me hear from the defense.

MR. MATUSCHAK:  Well, when your Honor asked the question, So when did they reduce that to practice? the first thing that popped into my mind was, Well, which -- at which time do you want Mformation's answer?  Because they've answered that in many different ways.

In February of 2010 in their interrogatory answers they cited the document that I quoted to your Honor just a few minutes ago, Exhibit 692.  They cited that as evidence of the reduction to practice, and that document actually has a printout page of demonstration that says "add subscriber," which is that provisioning that registration phase.

In those same interrogatories in February of 2000, with respect to this issue of reduction to practice, where Mformation said not later than June 2000, they developed a prototype system that could register the device on a server and assigned a command mailbox for the device.  That prototype allowed commands to be wirelessly issued to the device, to lock the device and to erase the contents and memory.

Now, they said the same thing earlier in July of 2009 in their interrogatory answers.

So -- and I would also point out that the person

who actually worked on the server side stuff, Mr. Magam, his declaration, supports the idea they continued to make changes to that source code up until the time of the demonstration.

THE COURT:  All right.  Well, then let me change my mind.  So I will consider this a question of fact to be decided by the jury.

MR. McDONALD:  If I can comment, your Honor, before you change your mind.

THE COURT:  You already did.

MR. McDONALD:  The interrogatory responses cited by counsel do not talk about wireless registration.  They merely state registration was completed.  Referring to --

THE COURT:  But there was never a patent claim of registration.  It was wireless.

MR. McDONALD:  It was a narrative answer, it just referred to registration.

THE COURT:  I understand that can be the argument, that it shouldn't be read that way.  But that's what -- what I'm changing my mind on is to allow the jury to decide it.  I was -- it is a high burden.  But I'm convinced as a result of this argument, to not -- to put the Court in the position of finding that a reasonable juror could not find that RIM cannot meet that burden. And so what I need to do then is to construct jury

instructions which will allow the jury to make that decision, and based upon that, to go in a different direction, depending.

So I need to know what the two dates are. The date I have is December 2000. And the other date is what?

MR. McDONALD: Not to beat a dead horse, your Honor, I don't think sufficient attention has been given to the requirement for corroboration. The document they cite to Exhibit 692 is merely a PowerPoint. It doesn't show anything about what's actually happening between the server and the device. There's testimony that that PowerPoint, it was just something shown to people to show what the system might look like. There's no documentary corroboration for wireless registration being part of the prototype. Corroboration is necessary to invalidate. RIM has no corroborating evidence. And for that reason the JMOL should be granted.

THE COURT: Thank you. Again rejected.

I just need to know the two dates. I will allow you all to argue about it. You will have an opportunity to renew these motions after the jury comes back, of course, that's why you do it now. And it seems to me that --

MR. THAKUR: The demonstration was July 2000.

THE COURT: So it's July 2000 or December 2000?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  All right.

And have you all tendered to me instructions that take this into consideration already so I don't have to compose all of the other, the decision tree language that the jury will need to use, depending upon which date they adopt?

MR. MATUSCHAK:  I believe we have, your Honor.

MR. McDONALD:  Your Honor, that's in Mformation's Proposed Jury Instruction No. 37, I believe in Docket 1001.

THE COURT:  I have Mformation's first amended proposed.  Would that work?

MR. McDONALD:  That's correct, your Honor.

THE COURT:  37.

MR. McDONALD:  And that's based on the model, your Honor.

THE COURT:  I don't see the dates.

MR. McDONALD:  At line 14 on page 25, before --
"One year before the effective filing date," we could use the December 5th, 2000 date for that.  So one year before December 5th, 2000.

MS. DeBRUIN:  Your Honor, this brings up the dispute that we have about the provisional application. It's RIM's position that the provisional does not support

the final application that was filed.  So this brings us to that dispute.

THE COURT:  All right.  Let's discuss that.

MR. McDONALD:  Still within that same document, Proposed Instruction No. 39 refers to a date of application and whether Mformation's patent is entitled to claim priority to the provisional.  Page 30.

THE COURT:  This is further to the question raised by Ms. DeBruin?

MR. McDONALD:  Yes, your Honor.  This goes to the provisional application.

THE COURT:  So what are you asking me to look at?

MR. McDONALD:  Sure.  In the Mformation First Amended Instructions at page 30, we have Proposed Jury Instruction No. 39.

THE COURT:  Any objection to that?

MS. DeBRUIN:  Uh.  We believe the priority date is an issue that the Court should decide.  That there's no disputed issues of fact and it's an issue of law that your Honor should be deciding.  We briefed this issue before trial started, both parties submitted briefs on this point.

MR. McDONALD:  So, your Honor, at pages 4 and 5 of that same document, Mformation has briefed why this issue is one for the jury.  And it comes down to the fact

that the written description requirement is a question of fact that the jury must decide.

THE COURT:  The written description requirement?

MR. McDONALD:  That's what this question turns on, your Honor, whether or not the provisional provides written description support for everything in the claims as issued.  And that's from the *Power Oasis* decision that RIM has relied upon heavily.

And I'll quote from another case we cited:  "The Court may not determine the proper priority date without regard to the jury's factual findings."  And that was as to the written description requirement.  This is at page 5.

THE COURT:  Give me a moment.  I'm reading again the language of the provision.

So what is the defense argument, that I should find the provisional insufficient for purposes of what -- what is it?  I'm trying to decide whether it's sufficient for purposes of --

MS. DeBRUIN:  It doesn't disclose, your Honor, the language from the claim "wherein the connection is established based on a threshold condition."

That language is not taught by the provisional. We have a slide that --

THE COURT:  I recall that.

MS. DeBRUIN:  -- demonstrated --

MR. McDONALD:  Dr. Madisetti testified that it did, and under the case law this question is one for the jury.

THE COURT:  Where is it in the provisional?

MR. McDONALD:  If you have a copy of the provisional, you can display.

MR. MATUSCHAK:  Paragraph 6 is what he referred to, I think.

THE COURT:  "If the command is to monitor some parameters of your device, then agent periodically sends the information back to the server, which could be based on certain threshold conditions or based on time interval."

MS. DeBRUIN:  And that, your Honor, we would submit is going the wrong way and is not talking about establishing a connection.  The language the provisional has to support is "wherein the connection is established based on a threshold condition."  The language that Dr. Madisetti referred to -- and this was the first time at trial that he ever referred to this language as working -- he said that it supports him, but he has it backwards.  This language is talking about the device sending information back to the server to report on what it's doing.  It doesn't say anything, your Honor, about

"establishing a connection based on a threshold condition."  And that was a limitation that Mformation had to add to its claims in order to obtain allowance.

MR. THAKUR:  Your Honor, the only way that argument makes sense is if you didn't read the rest of the patent.  This is about sending commands from the server to the device.  That's the only commands that are disclosed, that's what this patent is about.

The sentence says:  "If the command is to monitor some parameters on the device, then agent periodically sends the information back to the server, which could be based on certain threshold conditions."

The "which" modifies the sentence.

THE COURT:  Which sentence?  What does it modify?

MR. THAKUR:  "If the command is to monitor some parameters on the device, then agent periodically sends the information back to the server, which could be based on certain threshold conditions or based on time interval."

There are no threshold conditions at the agent. It's all about the server managing the device.  The language is right there in the provisional.

THE COURT:  I disagree that there aren't threshold conditions that could affect the device.

MS. DeBRUIN:  Indeed, your Honor, if I could draw

your attention -- do you have a copy of the '917 patent --

THE COURT:  Oh, yes.

MS. DeBRUIN:  -- up there?

THE COURT:  I have it plastered in the back of my mind.

MS. DeBRUIN:  If I could draw your attention, please, to Claim 8 that was issued in the '917 patent, that actually talks about a threshold condition that is relating to this very thing that's in the provisional, the device reporting information back to the server based on a threshold condition.  Claim 8:  "The method of Claim 6, wherein the information relating to execution of the command is transmitted based on a threshold condition of the wireless device."

And Claim 6 is talking about transmitting information relating to execution of the command at the wireless device from the wireless device to the server.

MR. THAKUR:  Your Honor, the word "threshold condition" has a -- is a threshold condition.  It doesn't mean -- Claim 1 is "wherein a connection is based on the threshold condition."  That's how commands are sent.  That's what I'm saying the provisional discloses.  The Claim 8 deals with a threshold condition off the device.

Perhaps I overstated my point.  There are threshold conditions, the word itself, exists.  But the

connection, where the command goes to the device, wireless device remote management is about the server controlling the device.  And that's what threshold condition relates to.

THE COURT:  As I look at the provisional application, it is spartan compared to the utility application.  Now -- and I notice several things about the provisional application that indicates a mixture between what became the claims -- because this was a patent which even in the -- even in the provisional application, the inventors contemplated it working as a push -- in a push environment as well as a pull environment.  Now, if the -- if it's operating in a pull environment, that means that the wireless device initiates the connection and makes the request.  And in that environment, certainly a threshold condition would be one which could speak to conditions of the wireless device.  Not of the server.

And so I won't regard the provisional application as limited only to a push environment.  It speaks to both. And so what I have to do is to figure out whether from these words, the inventors should get the benefit of an issued patent which contains limitations that arguably were not part of the initial submitted invention.

For example, the statement is made in Paragraph 3 of the provisional:  "Once the client is registered, the

server can send the commands to control and manage the client behavior."

And that speaks in terms of a push circumstance.

But it also says, in Paragraph 4:  "The server maintains a mailbox for each client, which can be accessed by client, either on demand or periodically.  Commands are kept in the box until the client accepts them."

That to me speaks to a pull situation where the mailbox there and the client, based on some circumstances, would demand that information.  On demand or periodically.

Now, the paragraph that you two are referring me to speaks in terms of a command which is something that is issued to the server, but it is a command to monitor some parameter of the device.  Now, it seems to me you could express monitoring as a command, because the server can say to itself, I want you to look at some state of the device.  That's not a command necessarily to the device. It's a command within the server.  But it could be a command to the device.  Depending.

So it's conditional.

"If the command is to monitor some parameters of the device, then" -- so the "then" gives me the answer to the proposition, if that is what the command is about -- "then agent periodically sends the information back to the server."

So that seems to me that, having received that command, the inventors contemplated that the device would then give the information that the server would wish to monitor about its parameters, that -- and it said "periodically."

And so the question becomes, what does -- which could be based on certain threshold conditions, or based on --

MS. DeBRUIN:  Your Honor, if you look at Claims 6, 7 and 8 of the issued '917 patent.

THE COURT:  Wait a minute.  So that seems to me grammatically to modify what the agent is doing.  Because if the command is what is being modified, it seems grammatically incorrect to modify that after speaking of what the agent does.

Now your attention is drawn to Paragraph 6, which is a dependent claim from 1, which is the sending -- that's one of the claims at issue here, and that's the new step where the agent, the wireless device, would send back to the server information relating to its execution of a command that it has received.

And what else do you want me to read?

MS. DeBRUIN:  It provides in dependent Claim 7 and 8 that that could be done either periodically, based on time or in it could be done based on a threshold

condition of the wireless device.

THE COURT:  Yes, right, I see that.  So that's understandable to me that if it is sending back information having to do with execution, it can periodically inform the server that execution is -- has taken place, or it can do it based on some condition of the device itself.

MS. DeBRUIN:  And RIM's position is that's what the language that Mformation points to in its -- that that supports this idea that the agent can send back information based on a threshold or periodic link.

THE COURT:  You don't disagree with that?  You just disagree as to when that language says that?

MR. THAKUR:  What I'm agreeing with is that that language limits it to one directional.  The concept is communications can occur from the server to the agent based on command, and they can be information sent from the device.  Threshold conditions could apply in either direction.

THE COURT:  Well, there's something in between these two, right?  We're looking at the provisional application and the issued patent.  Show me the first filed application and let me see what, if anything, was said there with respect to this matter.

MR. THAKUR:  Your Honor, it would be the same

disclosure as the regular patent application.

THE COURT:  No.  The claims changed, and so I'm asking to see the first filed language of the claims.  It could be that -- counsel here pointed out to me that -- Claims 6, 7 and 9, they might be the same as in the first filed application, I have -- I haven't been asked to look at the written description.

(Pause in the proceedings.)

THE COURT:  See, now I'm looking at the claims, and I presume this is to be the ones in the first filed application.

Now, having looked at the document just handed to me, it seems that the original claims as submitted do disclose the -- in what was then called Claim 3 and 4, the condition is established periodically.  This is -- "wherein the connection is established periodically, and where the connection is established based on a threshold condition."

So the connection here is a connection.

MR. THAKUR:  From the server to the device, your Honor.

THE COURT:  There was no connection step.

MS. DeBRUIN:  In Claim 2, your Honor.

THE COURT:  All right.  Let me go to 2.

Yes.  "Establishing a connection between the

wireless device and the server."

MS. DeBRUIN:  And the step of Claim 4, "wherein the connection is established based on a threshold condition" does not have any support in the provision.

THE COURT:  Claim 2 says:  "The method o f Claim 1, wherein the delivering step comprises the steps of:  Establishing a connection between the wireless device and the server;"

Which might be different than between the server and the wireless device, but let's not bother that right now.

"Transmitting a request for contents of the mailboxes from the wireless device to the server;"

So that seems to contemplate a pull circumstance.

"Transmitting the contents of the mailbox from the server to the wireless device," so that's the pull kind of circumstance, as I read that.

And then Claim 3, "wherein the connection is established periodically," that is a connection between the wireless device and the server.  But it is in a pull circumstance.

MS. DeBRUIN:  If you wish to look at more claims, your Honor, Claim 11 in the original set of claims is specifically what Paragraph 6 of the provisional was directed to.

THE COURT:  Yes, I see that.  11 is:  "The method of Claim 9, wherein the information relating to execution of the command is transmitted based on a threshold condition of the wireless device."

MR. THAKUR:  Your Honor, if you continue to scroll down, there are claims disclosing the server to the device.  Claim 16, which is based on Claim 12, it's from the server to the device.

And then if you go to Claim 15, it discloses, "wherein the connection is established based on a threshold condition."  And this would involve the --

THE COURT:  It's really 16, 17 and 18, but I see where that speaks in terms of transmitting without a request from the wireless device.

MS. DeBRUIN:  Your Honor, we have -- we don't have any dispute that the application as filed in August, the final application, disclosed this.  Our dispute is that the provisional application filed in December of 2000 does not support, does not provide any support for "wherein the connection is established based on a threshold condition."

THE COURT:  What was the timing again?  The provisional was filed when?

MS. DeBRUIN:  December of 2000.

THE COURT:  And the utility?

MS. DeBRUIN:  August, August 10th of 2001.

Provisional was December 5th.

MR. THAKUR:  Your Honor, I'd defer to my colleague's point, but this is an issue of written description, it's something if the Court is in doubt, it will be properly resolved by the jury.

MS. DeBRUIN:  Your Honor, in the briefing that we filed pretrial, we cited you to several cases:  The *Dupont* case, which says:  "Determination of the priority date, e.g., the effective filing date, is purely a question of law.  And the facts underlying that determination are undisputed."

Here the facts are undisputed, your Honor.  We're simply looking at the language of the provisional application, much as you do in claim construction.  That's a job for the Court.  Not a job for the jury.

THE COURT:  Well, it seems to me that I'm at this point in my own analysis:  It occurs to me reading Paragraph 6 that that speaks to the circumstances under which the agent would send information back to the server.

Now, I suppose one consideration that the Court could make, if it is persuaded to give this to the jury to decide, is to interpret Paragraph 6.  I have not ever had the occasion of interpreting the scope of provisional applications and instructing the jury on that

interpretation.  Ordinarily, if I'm doing that, it's as a matter of law and I'm making a decision about a legal issue, not a factual issue.

And it actually has -- well, so...

What I would benefit from on a legal basis is then seeing a case where a court has had this problem; namely, having a provisional application that did not disclose an element, which was included in the utility, and finding that the -- and included in the utility application as a result of the PTO action, and finding that that affected the relevant date.

MR. McDONALD:  So, your Honor, this is still within Mformation's First Amended Proposed Jury Instructions.  At page 4 and 5, we briefed this issue.  At footnote 1, we cite to case law regarding whether one application -- not a provisional but a regular application -- provides support for a later application.  That is in footnote 1.  You have the case, *Positive Technologies v. Sony Electronics, Inc.*

There's also the *Cummings-Allison* -- this is all in Docket 1001, where the Court is -- you know, the issue is whether a prior application provides support for a later application.

THE COURT:  I need to go further than that, as I understand that law.

MR. McDONALD:  Okay.

THE COURT:  The question is:  Where the limitation was added as a result of office action.  In other words, the rejection has meaning.  Because if the claim is rejected and then is allowed, I'd need to have a case where a court has then been persuaded of the rejection and subsequent allowance, what the law is with respect to that.

MR. McDONALD:  So your Honor, the *Waldemar Link* case, 32 F.3d 556.

THE COURT:  Just a moment.

MR. McDONALD:  Sure.  32 F.3d 556.

THE COURT:  All right.  I'll look at that.

It's a little late for me to be doing that kind of analysis.  The other case to the contrary?

MS. DeBRUIN:  I'd refer you, your Honor, to our filing.  It's Docket No. 956.  And what I'm looking at is at the bottom of page 1.  The reference to the *E.I. Dupont* case, 525 F.3d 1353, at page 1359.

And we also cite to the *New Railhead Manufacturing* case, which is 298 F.3d 1294.

THE COURT:  Very well. All right.  So let me --since you've given me some midnight oil to burn, let me look at those.  This would further delay some of your knowledge about what I'm going to say to the jury until

you're perhaps closer to standing before them for your argument.  But be that as it may.

Now, so in my mind -- we're back to page 16, Paragraph 1 -- I had in mind the dispute over the conception date.  And I was turning to Mformation's Proposed Instruction 37 to guide me through that.  I was now going to Paragraph 2.

MS. DeBRUIN:  Your Honor, I have something to insert before that.

THE COURT:  Yes.

MS. DeBRUIN:  Following the first paragraph, the parties had proposed an instruction --

And if I could have Mformation's Proposed Instruction No. 32 on the screen, please.

We thought it would be useful to put this language following your initial paragraph of, before anticipation, to talk about the burden of proof, and also to note this is from the Northern District model rules. The second paragraph, that during this case, RIM has submitted prior art -- that was not considered.

THE COURT:  I'm looking on page 16 prior to line 8.

MS. DeBRUIN:  Yes.  Right before the heading, "Anticipation."  So after line 6.

THE COURT:  After line 6.  And you want me to

insert -- this is 32 of whose proposed instruction?

MS. DeBRUIN:  Mformation's instruction.

THE COURT:  Both paragraphs?

MS. DeBRUIN:  Yes, your Honor.

THE COURT:  All right, thank you.

MR. McDONALD:  If I could comment on that.  We would not object to that insertion, but I think the better place for it would be your burden of proof section that starts at page 18.

THE COURT:  You all can confer about that and let me know.

MS. DeBRUIN:  I think we have one other requested change before we get to where you were.  I had a little catching up to do.  Line 10 of --

THE COURT:  Which page?

MS. DeBRUIN:  Page 16.  Line 10, I'm starting at line 9:  All of its requirements must have existed in a single" -- this says just "method."  The Northern District model instructions say "single device or method."  What we're looking at here is a system, so we would request "in a single system or method."

MR. McDONALD:  Your Honor, it's just a method claim.  The model instructions are written for system method and device claims.  The fact that only a method claim is at issue, we think the use of "method" alone is

correct.

MS. DeBRUIN:  Your Honor, we're looking to the RemoteWare system as prior knowledge of the claimed method.  So we would request both the language "system" and "method" be included.  And consistent with the Northern District rules.

MR. McDONALD:  The system has never been asserted as a prior art reference itself.  Merely the use of that system to practice a method.  So we think using the word "method" is the only appropriate choice.

THE COURT:  Well, what I understood to be tendered to the jury was, the RemoteWare system; that is, how it operated.  And that came in through witness testimony as well as the manuals.  You know.

So the question that I'm being asked here is whether or not the word "single system" is meaningful to take part of the evidence with respect to RemoteWare out of contention?

MR. McDONALD:  Frankly, your Honor, I don't understand why they want the word "system" in there.  It could be "method" or "use of a system," I guess that could be appropriate.  But a "system" itself cannot anticipate this claim.  Would have to be "use of a system."

MS. DeBRUIN:  And in the pretrial order, your Honor, we provided that when the invention's cited in the

asserted claims, the '917 patent were disclosed in the following printed publications or systems.

THE COURT:  I think counsel is correct that it has to be the "use of that system".  It seems that you're collapsing system into use, so why wouldn't must have existed in the use of a single system or method...?

MR. McDONALD:  We have no objection to that, your Honor.

MS. DeBRUIN:  Your Honor, our only concern with that, however, would be that under 102(a), as your Honor has noted, it's not just public use.  It's public knowledge.  And I'm concerned that putting the language "use" in the jury instruction would require proof of a specific use, when we should be able to invalidate the method claim by showing there was prior public knowledge under 102(a) that those steps would occur with the RemoteWare system.

THE COURT:  Well, I can add to the language, but it does go on to say:  "Describe then a single previous publication that predated the claimed invention."  I'm not sure how "single" works with the RemoteWare product, since it took several manuals.  All of which related to the RemoteWare product and how the customers used it to, in my view, pull all of the elements together that the defense wanted to be pulled together.  So --

MS. DeBRUIN:  And, your Honor, on that note, we have a case -- I'm not even going to try to pronounce it, it's a German word:

S-t-u-d-i-e-n-g-e-s-e-l-l-s-c-h-a-f-t.

It's a decision by Judge Rader sitting by designation, and he provides that you can describe a system --

THE COURT:  *Studiengesellschaft.*

MR. McDONALD:  Yes, your Honor.

THE COURT:  I took German in college.

What about that?

MS. DeBRUIN:  In that case they provided that multiple references could anticipate because they describe a single system.  That's what we were doing here.

MR. McDONALD:  That's actually not correct, your Honor.  The references themselves were never asserted to be invalidating.  It was the prior art alleged system itself.  Multiple references were used in an attempt to prove that what that system was.  The written references themselves were never invalidated.

THE COURT:  That was a system claim?  Give me the citation so I can read that myself.

MS. DeBRUIN:  726 F.2d 724, and the page cite is 726 through -27.

And I wasn't suggesting, your Honor, that we were

relying on the references themselves.  We were relying on the references to describe the system.

THE COURT:  All right.  Well, all right.  So now you interrupted me as I was swimmingly going through 1, 2, 3 down here at the bottom.  I haven't made it past 1.  By my --

MS. DeBRUIN:  Could I have one more?

THE COURT:  Sure.

MS. DeBRUIN:  This is just a follow-up from that. We would request the addition of "system" or "method" on line 10.  There was a similar change that would have to be made on line 12.

Thank you, your Honor.

THE COURT:  I'm sorry, it says:  "These methods, publications or patents."

MS. DeBRUIN:  Right.  If we introduce "systems" above on line 10 --

THE COURT:  I see.  Use of.  All right.

Now, let's go down to the bottom of the page because I'm running out of time.  Because you wouldn't want me to give, "Well, members of the jury, I couldn't finish my instructions, so here are my notes."

Other than RemoteWare, do I need Paragraph 2 in this anywhere in the world, before a certain date?

MR. McDONALD:  I would submit you do not, your

Honor.  It's just the use of the RemoteWare system that they're relying on.

MS. DeBRUIN:  And we have the Havinis patent for obviousness, but that would fall under the claimed invention being --

THE COURT:  I thought for awhile you had this Canadian Mobitex or something else going on, but --

MS. DeBRUIN:  No.

THE COURT:  So I'll skip Paragraph 2 at this point.  How about another patent -- we can strike that.

MS. DeBRUIN:  We do need the Havinis patent.  I'm just trying to look and see where we could show that was prior art.

THE COURT:  But you used that for obviousness, you didn't use it for anticipation.

MS. DeBRUIN:  Correct, your Honor.

THE COURT:  So I'm striking that.

I'm now on to obviousness.

MS. DeBRUIN:  It looks, though, we might need to put the paragraph back into anticipation, because it doesn't seem that there's a separate provision in obviousness that provides what is prior art.  So to get the Havinis patent to be prior art, I think we might need the Item No. 2 that we just struck on page 16.

MR. McDONALD:  We would submit the better place

to put that, if you did put it in, would be in the obviousness section, so...

THE COURT:  That's what I thought the suggestion was, that I move now the reference to a patent, which is really Paragraph 3.

MS. DeBRUIN:  No, I think we need 2.

THE COURT:  So both 2 and 3 --

MS. DeBRUIN:  Just 3, your Honor.  I've been corrected.

THE COURT:  I'll move 3 into obviousness.  Okay. Good suggestion.  Move on.  Obviousness.  Anything else?

MS. DeBRUIN:  Page 17, line 22.

THE COURT:  Yes.

MS. DeBRUIN:  Instead of "RemoteWare," it should be "the Havinis patent."

THE COURT:  Wasn't it a combination?

MS. DeBRUIN:  Or a combination of the two, I guess it should be.  RemoteWare and Havinis.

THE COURT:  Right.  Very well.

I'm now at the bottom of page 17 and looking forward to looking at the number 18.

MR. McDONALD:  The very bottom of the page, we have no issue with the obviousness instruction beyond what's been discussed.

This burden of proof section --

THE COURT:  Yes.

MR. McDONALD:  Mformation would propose that language in -- at page 18, line 26, the first clause of that sentence, I think it's a little bit unclear for the jury, and we think it would be good to have a single place in the instructions where the jury could go to immediately find the burden of proof for all claims and defenses.

THE COURT:  I'll move this whole thing up.

MR. McDONALD:  We also then would like as an addition at the end a paragraph stating -- I'm looking at page 19, line 15, right before the damages section -- something to the effect of as to its definitions of "anticipation" and "obviousness," "RIM has the burden of establishing anticipation and obviousness by clear and convincing evidence."

THE COURT:  I had intended that.  And to define that.

MR. McDONALD:  Thank you, your Honor.

THE COURT:  Okay, damages.

MS. DeBRUIN:  Just a minor comment, your Honor, on line 19, from the model instructions it just looks like there's two words missing.  "If you find that RIM infringed any" -- "valid claim," should be centered before "of the asserted claims."

And that comes from Model Rule 5.1.

THE COURT: All right. Top of page 20.

MS. DeBRUIN: One request of page 20, line 6, your Honor. Instead of the sentence -- there's an agreed sentence that the parties had, and it's an Mformation Instruction 44, it reads: "There can be no damages awarded for any infringement prior to October 27, 2008."

THE COURT: Why do you want that?

MS. DeBRUIN: Instead of the damages --

THE COURT: That seems to assume a fact not in evidence, that there was infringement prior to October 27, 2008.

MS. DeBRUIN: That's a fair point, your Honor. We'll withdraw that and go with your -- with the proposed language.

MR. ARNTSEN: We're fine either way, your Honor.

THE COURT: All right. Reasonable royalty.

MR. ARNTSEN: Your Honor, this jumps us up to page 21. The only question I have is the first full paragraph on page 21 starting: "A second way to calculate a royalty is to determine a one-time lump sum payment." The only evidence here was on the running royalty. The ongoing royalty. There was no evidence whatsoever about a one-time lump sum royalty.

So I think this would just confuse the jury and, there's just no reason to have the paragraph here.

There's no evidence of it.

MS. DeBRUIN:  Your Honor, we think that this paragraph should remain in.  There was talk of the extent that the total number -- in fact, plaintiff started their case saying, you know, This is a case for $199 million. They weren't talking about a royalty when they were doing that.

MR. ARNTSEN:  Your Honor, that was the damage total.  Both experts just talked about ongoing royalties. One --

THE COURT:  I think that's fair.  Although both could be reduced to a total, that's different than a one-time lump sum payment, which has to be discounted and those kind of things.  So I'll strike.

MR. ARNTSEN:  Thank you, your Honor.

MS. DeBRUIN:  Back on page 20, your Honor, there's an explanation of how to calculate, and it uses revenue numbers, and because of your ruling on the entire market value rule, we're just taking number of products times whatever the royalty value is.  So we have a suggested modification to that.

THE COURT:  Where do I find that?

MS. DeBRUIN:  It's in RIM's Proposed Instruction No. 47.  And it's line 17 to 18 of that proposed instruction.

THE COURT:  And what do you want me to strike in lieu of that?

MS. DeBRUIN:  What you should strike is, beginning on line 24, page 20, "You then need."  Starting there.  Striking through page 21, line 3.

MR. ARNTSEN:  Your Honor, we'd object to that. The language you have comes right from the model instruction, and we believe that it's appropriate.

MS. DeBRUIN:  We believe it's confusing, your Honor, to talk about revenue when the jury has not been looking at revenue numbers.  Rather, they've been looking, because of your ruling on Daubert, and the entire market value rule, they've only been looking at a value per device.  Not a percentage of revenue.

THE COURT:  I'm a little confused by those two arguments, but I'll look at that and see what I make of it.  Value per device versus revenue.

But you have given me language -- have you looked at her proposed language on that Instruction No. 47?

MR. ARNTSEN:  I have not, your Honor.

MS. DeBRUIN:  Your Honor, they put forward language similar to RIM's proposal in their proposed instructions.

THE COURT:  What was their proposal number?

MR. ARNTSEN:  Which line?

MS. DeBRUIN:  42.

THE COURT:  You're asked to compare your 42 with their 47, lines 17 and 18.

MR. ARNTSEN:  That would be fine, your Honor.  If we're looking at the sentence, if I understand what we're substituting here, but -- we're fine using the second paragraph in our Instruction 42 and kind of plugging in, I guess, for the second paragraph that you have under reasonable royalty (indicating DeBruin).

If you take a look at them, it will make sense.

THE COURT:  I'm looking for my post-lunch version.  I had it a minute ago.

All right.  Here's what I propose:  It's 3 o'clock.  Let me let you go, and let me work, because holding you here will -- it's not going to be as productive as if we come together in the morning before I give instructions.

But I can send to you sort of progress as I kind of try and solve some of the problems that I have.

There are several major issues that I might comment on.  And it does seem to me that anticipating the case that is being submitted to the jury, I need to provide the jury with a definition of what it means to have a connection established.

And -- although, the parties drew my attention to

the "establishing a connection" substep, in all of the work that the Court has done, it has not to its satisfaction defined what it means for "a connection to be established."  And because the phrase is used in the patent, it falls to the Court to define that phrase.  And I've sort of had the benefit of your argument and further thinking, and it seems to me that there might be language that I can compose that will assist the jury in this job and lead the parties to arguing the facts, not the meaning of the word, but the facts as to whether or not the accused product does practice the limitation of a connection established.

And I'm also persuaded as a result of these conversations to leave for the jury then some of these decisions with respect to the various dates that they should apply in making their factual judgments about whether certain things are true or not true.  Which makes the jury verdict form on -- a much more complicated document than those matters that are not being decided by the jury.  But I'll face that once I get the instructions settled.

Let me, before we break, give the two sides an opportunity to comment.

MR. THAKUR:  Your Honor, we had a suggestion that we wanted to have you take into consideration:  Our

original schedule for closing and submission was Tuesday. It seems to me that there is a lot going on here. The Court still has to do -- we still have to prepare, and being a much smaller team, obviously we've been in here all today. Would this Court consider going back to the original schedule and having arguments submission on Tuesday?

THE COURT: I don't know how to turn my jury around, though.

MR. THAKUR: I'm sorry?

THE COURT: I don't know how to turn my jury around. I've put in motion their being here. You mean bring them in and send them home?

MR. THAKUR: We could reach out to them -- I don't know if you have that ability -- but give them an extra day off, give the parties some time to complete their work.

The honest answer, your Honor, we just don't have the resources they do, and it would give us --

THE COURT: I'm not going to ask you to do anything else. So you can totally devote all of your resources to whatever you want to do and not to anything I need to have you do.

MR. THAKUR: We think it would give everyone some time to have a little more considered approach to closing.

THE COURT:  Well, I'm not even sure I considered that as a stipulation, but let me hear.

MR. MATUSCHAK:  We would oppose that, your Honor. It's been two days, we've had a day off, we've had the weekend, a long weekend before that to prepare for the closing.  I'm not sure what Mr. Thakur was doing, but that's what I was doing.  We have promised the jury the case tomorrow.  We'll always have to make last-minute changes based upon what the Court does, but I think that's no reason to push this off until a week later.

THE COURT:  Well, to -- I don't intend to change the schedule at this point.  And I have in mind your request that I not give any sequence instruction that I haven't given already, and that -- I think that is part of why you're making the request.

Anything else?

MR. MATUSCHAK:  I think you asked us to think about the amount of time for closings.

THE COURT:  Oh, yes.

MR. MATUSCHAK:  I think we've agreed that we both, if your Honor would, please, that we would have 75 minutes maximum each for closing.  Where we do have some disagreement is how much time Mr. Thakur would have for rebuttal.

THE COURT:  What I do is give you an amount of

time you want, and then you can decide how much you want to use in your opening argument and how much to save for rebuttal. It's up to you. You can have a five-minute rebuttal or a 75-minute rebuttal, so far as the Court is concerned. You do have the burden of proof, and you use that to give your rebuttal. But I think normally, given the fact that there are claims as well as affirmative defenses, that everybody's got burdens of proof.

So what is your request?

MR. THAKUR: Your Honor, it was 75 minutes. We both agreed. I think Mr. Matuschak is requesting for a 20-minute rebuttal, I'd ask for 30 minutes, just because there's so many more validity type references. I was going to break it 45/30, opening and rebuttal. And Mr. Matuschak would like you to break it --

THE COURT: He doesn't get to say how much time you do on rebuttal.

MR. THAKUR: Thank you, your Honor. That's what we were hoping for. Then we're fine.

THE COURT: 75 minutes each.

MR. MATUSCHAK: That's fine, your Honor.

THE COURT: Good. All right. So leave us with a way of being in touch with you, and we'll go back to the drawing board here. All right?

MR. MATUSCHAK: Thank you, your Honor.

MR. THAKUR:  Thank you.

THE COURT:  If the jury comes and we're not ready, we'll have them cool their heels for a little bit. I anticipate that we should be ready for them as close to 9:00 as we can.

I will be here maybe a little bit earlier than I normally am, but quite frankly, much of this has to be settled tonight and can't wait for the morning.

Thank you all.

(Adjourned)

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Thursday, July 5, 2012

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020