Volume 12

Pages 2171 – 2321

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

------------------------------)
                              )
Mformation Technologies, Inc.,  )
                              )
                Plaintiff,    )
                              )
  vs.                         )    No. C 08-4990 (JW)
                              )
Research In Motion, Ltd.,      )
et al.,                       )
                              )    San Francisco, California
                Defendant.    )    Friday, July 6, 2012
------------------------------)

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                   BY:  AMAR L. THAKUR
                        SHAWN E. MCDONALD
                        ALLEN A. ARNTSEN
                        LISA MARIE NOLLER
                        RUEBEN RODRIGUES

Also Present:           Rakesh Kushwaha, CTO

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        TIFFANY PATRICE CUNNINGHAM
                        MEREDITH ZIANNI
                        FERLILLA VICTORIA ROBERSON
                        MARIA A. MARAS
                        MICHAEL DALEY KARSON

Also Present:           Ray Dikun, RIM Vice-president

Friday, July 6, 2012

(9:00 a.m.)

(In open court; jury not present)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Good morning.

MR. McDONALD:  Good morning, your Honor.

MR. MATUSCHAK:  Good morning.

THE COURT:  Please be seated.

Before we bring the jury out, understandably, both sides are interested to have the verdict form, and my staff will bring a draft up even as we are proceeding with the argument.  You might anticipate its form, but you'll see it.  And just to tell you my instructions and to see whether there's any objections to this proposed form, it is my custom, as I indicated, to have the -- a set of interrogatories, and in this case, to divide the elements into -- based upon contributory and inducement as well as the defenses.

But because direct infringement is not directly involved, I will ask the jury to answer an interrogatory with respect to whether or not they find direct infringement.  And it is -- it has been my direction to the staff to create a -- somewhat of a chart with a yes/no so as to know if they find that there's not a direct infringement which element is missing.

I had not instructed that they do that if they find that there is direct infringement.  In other words, to have them say, yes, there are elements, but that would be helpful to have them tell us whether they find not infringement, and -- that will be governed to move to contributory or inducing.  If they say yes, the elements of contributory and inducement of infringement would be the subject of their review.

And I do intend in the form that they go through the questions of the defenses, even if they find no infringement, since the question in some instances might influence further proceedings in the case.

Let me pause and see whether or not those general directions draw any objections from the parties.

MR. McDONALD:  We have no objection, your Honor.

MR. MATUSCHAK:  No objection, your Honor.

THE COURT:  Very well.  And I will inform the jury that we might take breaks out of the ordinary sequence in order to allow you to set up the courtroom for your argument.  And so you should feel free to use the entire courtroom.

My requirement is that you always be close to a microphone, though, because the court reporter needs to get a good record of your argument, but you're free to move around as long as you -- there's a handheld mic,

there are other devices that are available to you, so you may feel free to use the entire well of the courtroom.

Summon the jury.

MR. MATUSCHAK:  Your Honor, we do have one slight issue with respect to Mformation's closing argument.  I don't know if we need to do that now.

THE COURT:  One slight issue?

MR. MATUSCHAK:  We have an objection to a series of slides because of a certain statement that are on the slides.

THE COURT:  All right.  Show me the slide, tell me the statement.

MR. MATUSCHAK:  Here's the slide, your Honor. They're all pretty much the same.  They have that statement on the first page.  The issue is it's a quote from the spec.  I said, you know, if you add to that, as long as it meets the elements of Claim 1, it's fine, but the way it's written right now, it suggests that the language of the spec can trump the claim.  If the spec says you can use any networking protocol, it still has to meet the elements of Claim 1.  So I think that that's confusing to the jury because it suggests that you look to the spec to define the invention and not the claim.

THE COURT:  The objection is overruled.  They may use this.  It could cause the Court, depending on how

things go, to give further instructions, but the Court won't sustain an objection to you using language from the specification as part of your argument, as long as you don't ask the jury to do anything unlawful.

Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Be seated.

Good morning, Jurors.

THE JURORS:  Good morning.

THE COURT:  I'm going to ask the Clerk of Court to give you copies of my closing instructions.

Members of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law which applies to this case.  Copies of these instructions have been made available for you to consult.

As I have instructed you, it is your duty to find the facts from all the evidence in the case.  To those facts you must apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not.  In deciding the case you must not be influenced by bias or sympathy.  That means that you must decide the case solely on the evidence and according to the law.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all of my instructions.  You must not single out some and ignore others; they are all important.

The evidence from which you are to base your verdict consists of the sworn testimony of witnesses, both on direct and cross-examination, regardless of who called the witness; the exhibits which have been received into evidence; and the facts which have been admitted during pretrial proceeding; and any facts to which the lawyers have agreed or stipulated.  I have asked the parties to provide you with a written copy of their stipulation.  You will find this stipulation among the exhibits marked as Exhibit 5017.

You've received as evidence by a party to -- responses by a party to "Request for Admissions."  All facts which are admitted in such a response must be accepted as conclusively established.  You will find these admissions among the exhibits as Exhibit 5018.

The deposition testimony of one or more witnesses have been read or displayed.  Deposition testimony is given under oath.  You should give it the same force and effect as sworn testimony given here in trial.

Now, you've heard answers to written interrogatories.  You should give these answers the same effect as sworn testimony.

You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, that you must not perform any research on your own or consult reference works or additional information. You must also not conduct any experiments, including experiments on any exhibits provided to the jury.

If there is a conflict between the testimony of one or more witnesses and that of other witnesses, you may have to decide which testimony to believe and which testimony not to believe. You may disbelieve all or any part of any witness's testimony. In making that decision, you should take into account a number of factors, including the following:

(1) Was the witness able to see, or hear, or know the things about which that witness testified?

(2) How well was the witness able to recall and describe those things?

(3) What was the witness's manner while testifying?

(4) Did the witness have an interest in the outcome of this case or any bias or prejudice concerning

any party or any matter involved in the case?

(5)  How reasonable was the witness's testimony when considered in light of all the evidence in the case?

(6)  Was the witness's testimony contradicted by what that witness said or did at another time, or by the testimony of other witnesses, or by other evidence?

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things.  You need to consider whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail.

The persuasiveness of the evidence presented by each side does not necessarily depend on the number of witnesses testifying on one side or the other.  You must consider all the evidence in the case, and you may decide that the testimony of a smaller number of witnesses on one side has greater persuasiveness than that of a larger number on the other side.

You have heard testimony of individuals who, because of education or experience, have become experts in a particular field.  The law permits experts to state opinions about matters in the field of their expertise, and they are permitted to state the reasons for those opinions.  Expert opinion testimony should be judged just

like any other testimony.  You may accept it or reject, and give it as much weight as you think it deserves.  In deciding whether to believe an expert's testimony, you should consider the expert's training and experience, the facts the expert relied on, and the reasons for the expert's opinion.

Evidence may be direct or circumstantial.  Direct evidence is testimony about an event by a witness who personally saw or heard or performed the event.  Circumstantial evidence is indirect evidence about an event; that is, it is direct evidence that one event took place from which one can infer that another event, which was not itself directly observed, took place.  You are to consider both direct and circumstantial evidence.  The law permits you to consider direct and circumstantial evidence to be of equal persuasiveness.  However, it is for you to decide how persuasive to consider any evidence.

During the trial, I have ordered that evidence be stricken from the record and instructed you to disregard the evidence.  When you are deciding the case, you must not consider evidence which I told you to disregard.  Sometimes I admitted evidence for a limited purpose.  At the time the evidence was admitted, I told you the limited purpose for which the evidence was being admitted.  You must consider that evidence for that limited purpose only.

During your deliberations, you will have paper copies of the documentary evidence.  Some of the exhibits were in the form of computer-generated slides or animations.  Some were received in evidence and some were not.  With respect to electronic evidence, we will provide you with a computer on which to view the exhibits.  I have directed Mr. Noble, the Deputy Clerk, to assist you in understanding how to operate the equipment.  You will also be provided with a list of all exhibits which have been received in evidence.  If you need additional equipment or supplies, you may make a request by sending a note.

The parties to this case are corporations.  All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.  Under the law, a corporation is considered to be a person and like a person, a corporation is responsible for its conduct.  A corporation acts through its employees, agents, directors, or officers.  During these instructions when I speak of the conduct of Mformation or Research In Motion, Limited, and Research In Motion Corporation, which I will collectively refer to as "RIM," I am referring to the conduct of their respective employees, agents, directors and officers performed within the scope of their authority.

This is a patent infringement case.  Mformation

is the owner of the '917 patent.  Claims 1, 6, 21 through 25, and 27, which I'll refer to as the Asserted Claims, claim as an invention processes for remotely managing a wireless device over a wireless network.  As I will explain in more detail later, under the patent laws, anyone who uses the patented process to remotely manage a wireless device over a wireless network without a license from the patent owner is guilty of "direct infringement" of the patent.  A company directly infringes a patented process by performing each and every step of the patented process.

If, however, a company does not itself use the process, but makes a product, the only substantial use of which is to remotely manage a wireless device over a wireless network using the patented process; and the manufacturer sells the product to a customer; and the customer uses the product to remotely manage a wireless device over a wireless network under circumstances that I will describe in more detail later, or if a manufacturer actively induces the customer to use the patented process, under the United States patent laws the customer is a "direct infringer" and the manufacturer is an "indirect infringer."

In this case, Mformation alleges that RIM is liable for "indirect infringement."  Mformation alleges

that beginning on October 27, 2008, RIM began to

manufacture and sell to customers computer products that

were used by those customers to directly infringe the

Asserted Claims of the '917 patent, and that RIM actively

induced its customers to infringe the Asserted Claims.

Mformation also accused RIM -- that line should be

stricken.

However -- I see.

Mformation also accused RIM of willful

infringement.  However, for legal reasons the question of

willfulness has been removed from your consideration.

I apologize.  So as it's written it stands.

As I will discuss later, the Asserted Claims of

the '917 patent do not cover every process for remotely

managing a wireless device over a wireless network.  RIM

admits that it manufactures and sells BlackBerry devices

that are wireless, and that it manufactures and sells

BlackBerry Enterprise Server software that can, among

other things -- uses, be used by customers to remotely

manage BlackBerry devices over a wireless network.  RIM

contends that Mformation has not proved that the use of

its products by its customers infringes the particular

remote management process described in the Asserted Claims

of the '917 patent.  In addition, RIM alleges that the

Asserted Claims of the '917 patent are invalid because the

processes were already being used when Mformation filed its patent application or were obvious.  Therefore, you must decide whether Mformation has provided infringement and whether RIM has proved invalidity.

Now, your decisions involve a series of steps. The first step is to understand what the Court has decided is covered by the Asserted Claims of the '917 patent.

The words used in the "claim" of a patent define and limit the scope of the patented invention.  As I have previously instructed, under the law, it is the responsibility of the Judge to decide the meaning of the words and thus the scope of the asserted patent claims. The Judge reads the language of each patent claim, and other parts of the patent specification, such as the written description of the invention that is included in the application, the drawing, the file history that contains correspondence and other documents exchanged between the patent applicants and the Patent and Trademark Office, and reviews other material.  Based on that information, the Judge interprets or "construes" definitions of the words and phrases used in each patent claim, and before trial issues a written decision on the scope of each patent claim.  This is called the "claim construction."

There are rules that govern claim construction.

The Judge must construe the meaning of the words and phrases of a patent from the viewpoint of what a person of ordinary skill in the art at the time of the invention would understand the inventors meant based on what the inventors stated in the documents that were filed with the Patent and Trademark Office.  Thus, the meaning that the Court gave to the Asserted Claims in this case are based on what a person of ordinary skill in the art would understand the words and phrases of the patent to mean as of the effective filing date of the '917 patent application.  Now sometimes in the claim language, the inventors will use commonly used words.  In that case, the Court must construe the words to have their ordinary and customary meanings.  Sometimes the inventors will use technical words and phrases.  The Court must construe technical words according to the meaning a person of ordinary skill in the field would give to those words as of the effective filing date of the invention.  Finally, sometimes the inventors will coin a word or phrase, and in so doing, expressly define the word or phrase differently than a person of ordinary skill in the art would understand it to have.  The Court must construe any coined phrases to have meaning given to them by the inventors. Since the words and phrases define the scope of the patent as a matter of law, and since it is the responsibility of

the Court to state the law that is applicable to this case, in deciding if a patent claim has been directly or indirectly infringed or is invalid, you the jury must do so based on the Court's definition of the words and phrases in the patent claim.

Any expert witness must also accept the Court's interpretations as correct.

The Court's interpretation of what is covered by the Asserted Claims should not be taken by you as an indication that the Court has a view regarding whether Mformation has proved that RIM has indirectly infringed the Asserted Claims or whether RIM has proved that the Asserted Claims are invalid.  Indeed, when the Court issues its claim construction, it does not review the accused process.

Now, during the trial, I gave you instructions regarding the meaning of certain words and phrases used in the Asserted Claims.  I will now give you instructions on the meaning of the words and phrases in the Asserted Claims that you must follow in deciding the questions that are being submitted to you.  If you wish, you may use the copy of the patent that was given to you to follow along with this portion of the Court's instruction.

And deviating from my written text, anticipating that I might not have that, I have actually placed the

language in a footnote here before you.

Claim 1.  The claims of the '917 patent begin with:  "What is claimed is:"  The introductory language beginning with:  "A method for..." and ending with "comprising the steps of" is called the preamble.  The language of the preamble imposes limitations on the scope of the claim.  Preamble to Claim 1 of the '917 patent claims:  "A method for remotely managing a wireless device over a wireless network comprising a server and the wireless device...."

Claim 1 recites "a method."  The United States patent laws recognize several types of patents.  One type of patent claim as an invention a machine, apparatus or device.  The type of patent that is involved in this case is for a "process or method."  In general, a "process or method" patent does not claim the invention of a new machine.  A process or method patent claims as an invention new acts or manipulative "steps" that are performed upon a "thing" and that transforms the "thing" to a different state.  A method patent may recite that it uses a particular machine to perform a recited step.  In so doing, the inventors may use devices that are already known and that are already being used for some other process.  The essence of the method patent, however, is a claim to a series of novel and nonobvious steps that are

performed on a workpiece, that when performed together transform the workpiece.

A "wireless device" is a device that is capable of sending and receiving radio waves.

The word "server" means "a device or computer in a network that is dedicated to providing resources to the wireless device," over a wireless network.

The preamble to Claim 1 further recites:  "the wireless network operable to communicatively connect the server and the wireless device."

The phrase "remotely managing a wireless device over a wireless network" means "using the server that is physically separate from the wireless device to wirelessly control the functionality of the wireless device."

The preamble further recites, "The method comprising the steps of..."  The phrase "comprising the steps of" means that the recited steps are "essential," meaning they tell what the invention is.  Each recited step must be performed in the recited manner and, if the Court so construes, in the recited sequence.  Those who use the method might perform additional steps, but the recited steps must be performed to perform the patented process.

Following the preamble is the "body" of the claim.  Claim 1 recites six steps.  Each step is defined

by words that, in conjunction with the words and phrases in the other steps, define what is done, what machine does the step, upon what work-product the step is performed, and when the step is performed in relationship to the other steps.  For ease of reference, I will refer to each step as follows:

Step One:  The "transmitting registration information step";

Step Two:  The "verifying the registration information"" step;

Step Three:  The "establish a mailbox" step;

Step Four:  The "placing a command" step;

Step Five:  The "delivering the command" step; and

Step Six:  The "executing the command" step.

I will instruct you on the meaning of the word and phrases used in these steps.

Step One recites, "transmitting registration information relating to the wireless device from the wireless device to the server."  Claim 1 does not claim a process for composing registration information.  The process starts with transmitting "registration information relating to the wireless device" from the wireless device to the server.  Therefore, Step One must be completed before Step Two can be performed.

Step Two recites, "verifying the registration information at the server." To "verify" means to authenticate as authorized. Claim 1 does not claim as part of the invention any process for how the server knows the registration information.

Steps Three, Four and Five are preceded by a preamble; namely, "without a request from the wireless device..." to the server. Therefore, Steps Three, Four and Five must be performed "without the transmission from the wireless device to the server of a code, signal or any other form of request that initiates the commencement of the performance of the step."

Step Three recites, "without a request from the wireless device...establishing a mailbox for the wireless device at the server." The phrase "establishing a mailbox for the wireless device at the server" means "creating an address in memory of the server that can store information intended for delivery to the wireless device." "The wireless device" means one verified in Step Two.

Step Four recites, "without a request from the wireless device...placing a command for the wireless device in the box at the server." The phrase "bracing a command for the wireless device in the box at the server" means "storing at the server in the box associated with the wireless device a code or signal that is intended to

cause the wireless device to take or cease an action with respect to its functionality and other data for use by the wireless device."  Therefore, Step Three must be completed before Step Four can be performed.

The Step Five recites, "without a request from the wireless device...delivering the command from the mailbox at the server to the wireless device."  Therefore, Step Four must be completed before Step Five can be performed.

Step Five recites that delivering is performed "by" doing three recited steps.  I will refer to these as substeps.  Performance of each substep according to its limitations is essential.  I will give you the Court's construction of the words and phrases that limit the substeps.

The first substep is:  "establishing a connection between the wireless device and the server."  This means "initiating wireless communication between a wireless device and the server."  Since the "delivering step" must be performed without a request from the wireless device, the "establishing a connection" substep must be initiated at the server.  There is a further limitation on this substep later in Claim 1, the last limitation of Claim 1 recites, "wherein the connection is established based on a threshold condition."  A "threshold condition" means "a

predefined state of the server or the wireless device other than solely the elapsing of time."  Since the determination of whether a threshold condition is met or not met also must be done without a request from the wireless device, that determination must be made at the server before a connection between the server and the wireless device is established.  The use of the phrase "connection is established" means that a connection must not only be initiated, but must be made by the server with the wireless device.  As the jury, it will be your responsibility to decide if the accused process involves a connection between the server that uses the RIM software and a BlackBerry handheld device.

The phrase "transmitting the contents of the mailbox from the server to the wireless device" means "wirelessly sending from the server to the wireless device the contents of the mailbox."  The "establishing a connection" substep must be completed before the "transmitting the contents of the mailbox" substep can commence.

The third substep of the delivering step is "accepting the contents of the mailbox at the wireless device.  As it is recited in the claim, this substep is subject to the limitation of being performed "without a request from the wireless device."  However, because the

Court has defined a request as one from the wireless device to the server and because this substep does not involve the server, the Court construes the "without a request from the wireless device" limitation as inapplicable "accepting" substep.  The "transmitting the contents of the mailbox" substep must be commenced before the "accepting the contents" substep can commence.

Step Six recites, "executing the command at the wireless device."  As it is recited in the claim, this step is subject to the limitation of being performed "without a request from the wireless device."  The "without a request from the wireless device" limitation is inapplicable to the executing step.

Claim 6.  The method of Claim 1, further com prying the step of:

Transmitting the information relating to execution of the command at the wireless device from the wireless device to the server.

This is an additional step.  All of the steps of Claim 1 must be performed before Claim 6 can be performed.  As to the other dependent claims, there are no other words or phrases that have been construed by the Court.

Unless otherwise indicated below, as to the defenses raised by RIM, Mformation has the burden of establishing that RIM induced or contributed to

infringement by another company by a preponderance of the evidence. This means that Mformation has to produce evidence which, considered in light of all the facts, leads you to believe that what Mformation claims is more likely true than not true. To put it differently, if you were to imagine that the persuasiveness of evidence could be weighed on scales, and you could put evidence tending to prove, for example, the likelihood that RIM induced or contributed to infringement on one side of the scales and evidence tending to prove the likelihood that RIM did not induce or contribute to infringement on the other side of the scales, the evidence on the "likelihood of inducing infringement" side would have to make the scale tip in Mformation's favor. If you evaluate the evidence and you find that the evidence is evenly balanced between the two sides, your decision on inducing infringement must be in favor of RIM. If you evaluate the evidence and you decide that what Mformation claims is more likely true than not true, in other words, if the scale tips to Mformation's side, even slightly, then your decision should be in favor of Mformation.

Based on what is covered by the Asserted Claims, the next series of steps involve your deciding whether Mformation has proved that RIM is liable to Mformation for contributory infringement or for inducing infringement.

As stated previously, Mformation alleges that RIM customers who use its BlackBerry Enterprise Server software with BlackBerry wireless devices infringe the Asserted Claims of the '917 patent.  Mformation alleges that RIM induces and contributes to its customer infringement by selling the BlackBerry Enterprise Server software and BlackBerry wireless device software.

I will now give you instructions as to each of these theories of infringement.

Mformation contends that RIM has contributed to infringement by another.  Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims.

In order for this to be contributory infringement by RIM, someone other than RIM must directly infringe the Asserted Claims of the '917 patent; if there is no direct infringement by anyone, there can be no contributory infringement.

In order for you to find that RIM is liable for contributory infringement of one or more of the Asserted Claims of the '917 patent, you must find that Mformation has proved by a preponderance of the evidence each of the following:

1.  On or after October 27, 2008, RIM manufactured and sold BlackBerry Enterprise Server

software and BlackBerry wireless devices to one or more enterprise customers in the United States or imported and sold those products to one or more enterprise customers in the United States;

2.  On or after October 27, 2008, RIM enterprise customers directly infringed the asserted claim;

3.  The products supplied by RIM contained important components used in the infringing process;

4.  The components supplied by RIM are not common components suitable for noninfringing use;

5.  RIM supplied the components with knowledge of the '917 patent and knowledge that the components were especially made or adapted for use in an infringing manner.

A company directly infringes a patented process by performing each and every step of the patented process. In deciding whether a company performs each step, you must compare the process used by the company with the process claimed in the asserted claim, using the Court's construction of the scope of the patent claim.  If so, the accused method infringes the Asserted Claims.  If, however, the accused method does not have every requirement of the Asserted Claims, the accused method does not infringe the Asserted Claims.  Infringement is not avoided because it is possible to operate an accused

method sometimes in a noninfringing mode.

A "common component suitable for noninfringing use" is a component that has uses other than in the patented method, and those other uses are not occasional, farfetched, impractical, experimental or hypothetical.

As an additional basis for liability, Mformation alleges that RIM is liable to it for actively inducing patent infringement.  In order for this to be inducement of infringement by RIM, someone other than RIM must directly infringe an asserted claim of the '917 patent. If there is no direct infringement by anyone, there can be no inducement.

In order for you to find that RIM is liable to Mformation for actively inducing infringement of one or more of the Asserted Claims of the '917 patent, you must find that Mformation has proved by a preponderance of the evidence each of the follow:

1.  That on or after October 27, 2008, in the United States another company directly infringed the Asserted Claims, that is, the company used the process covered by the asserted claim;

2.  That RIM intentionally took an action or series of actions that actually induced the direct infringement by the other company;

3.  That at the time it acted, RIM was aware of

the '917 patent; and

4.   That RIM knew or should have known that its actions would cause direct infringement by the other company.

If RIM did not know of the existence of the patent or that the acts it was inducing were infringing, it cannot be liable for inducement unless it actually believed that it was highly probable its actions would encourage infringement of a patent and it took intentional acts to avoid telling the truth.  It is not enough that RIM was merely indifferent to the possibility that it might encourage infringement of a patent.  Nor is it enough that RIM took a risk that was substantial and unjustified.

If you find that RIM was aware of the patent, but believed that the acts that it encouraged did not infringe that patent, or that the patent was invalid, RIM cannot be liable for inducement.

Now, as I have previously stated, RIM contends that because its customers do not directly infringe the Asserted Claims, it does not contributorily infringe nor does it actively induce infringement.  In addition, RIM contends that even if its customers directly infringe an Asserted Claim, it is not liable to Mformation because the Asserted Claims are invalid.  I will give you instructions

as to each defense.  Before discussing the specific rules, I want to remind you about the standard of proof that applies to these defenses.  To prove invalidity of any patent claim, RIM must persuade you by clear and convincing evidence that the claim is invalid.

A patent claim is invalid if the patent application was not filed within the time required by law. This is called a "statutory bar."  For a patent claim to be invalid by a statutory bar, all of its requirements must have been present in one prior art reference dated more than one year before the effective filing date.  Here is a list of ways RIM can show that the patent application was not timely filed:

1.  If the claimed invention was already patented or described in a printed publication anywhere in the world before one year before the effective filing date.  A reference is a "printed publication" if it is accessible to those interested in the field, even if it is difficult to find;

2.  If the claimed invention was already being openly used in the United States before one year before the effective filing date and that use was not primarily an experimental use (a) controlled by the inventor, and (b) to test whether or not the invention worked for its intended purpose;

3. If a device or method using the claimed invention was sold or offered for sale in the United States, and that claimed invention was ready for patenting, before one year before the effective filing date.

For a claim to be invalid because of a statutory bar, all of the claimed requirements must have been either (1) disclosed in a single prior art reference, (2) implicitly disclosed in a reference to one skilled in the field, or (3) must have been present in the reference, whether or not that was understood at the time. The disclosure in a reference does not have to be in the same words as the claim, but all the requirements must be there, either described in enough detail or necessarily implied, to enable someone of ordinary skill in the field of wireless device remote management looking at the reference to make and use the claimed invention.

The parties dispute the effective filing date, or what is also referred to as the priority date, in this case. Mformation filed a "provisional" patent application on December 5, 2000. You must determine whether one or more of the Asserted Claims of the '917 patent are sufficiently supported by the provisional application. Mformation contends that the Asserted Claims of the '917 patent are entitled to the filing date of the provisional

application, while RIM contends that the Asserted Claims are not.  Instead, RIM contends that the '917 patent should have a priority date of August 10, 2001, the date that the particular application that issued as the '917 patent was filed.

You must decide to which priority date you believe Mformation's patent claims are entitled.  You must decide whether the disclosure of the provisional application reasonably conveys to one of ordinary skill in the field of technology of the '917 patent that the inventor had possession of the invention claimed in the '917 patent at the time of filing the provisional application.  Mformation may rely on the filing date of its provisional application to establish the priority date if it proves that the application describes the invention, and does so in sufficient detail so that one skilled in the art can conclude that the inventor invented the claimed invention as of the filing date sought.  Adequate detail requires more than a generic statement of an invention's boundaries.  The provisional application must disclose all of the limitations of the Asserted Claims of the '917 patent in order for the '917 patent to have a priority date of December 5, 2000.

Mformation bears the burden of producing evidence that the '917 patent is entitled to a priority date of

December 5, 2000.  If you find that Mformation has produced such evidence, then RIM must prove to you by clear and convincing evidence that Mformation is not entitled to that priority date.

During this case, RIM has submitted prior art that was not considered by the Patent and Trademark Office during the prosecution of the '917 patent.  RIM contends that such prior art invalidates certain claims of the '917 patent.  In deciding the issue of invalidity, you may take into account the fact that the prior art was not considered by the Patent and Trademark Office when it issued the '917 patent.  Prior art that differs from the prior art considered by the Patent and Trademark Office may carry more weight than the prior art that was considered, and may make RIM's burden of showing that it is highly probable that a patent claim is invalid easier to sustain.

A patent claim is invalid if the claimed invention is not new.  For the claim to be invalid because it is not new, all of the requirements must have existed in the use of a single system or method that predates the claimed invention, or must have been described in a single previous publication or patent that predates the claimed invention.  In patent law, these systems, methods, publications or patents are called "prior art references."

If a patent claim is not new, we say it is "anticipated" by a prior art reference.

The description in the written reference does not have to be in the same word as the claim, but all of the requirements of the claim must be there, either stated or necessarily implied, so that someone of ordinary skill in the field of remote management of wireless devices looking at that one reference would be able to make and use the claimed invention.

In particular, RIM can show that a patent claim is not new if the claimed invention was already publicly known or publicly used by others in the United States before the effective filing to which you determine Mformation is entitled.

Public use includes any public use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.  To prevail on this defense, RIM must prove by clear and convincing evidence that the public demonstration met each of the limitations of the Asserted Claims and thus was an embodiment of the claimed invention.

Not all innovations are patentable.  A patent claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field at the

time of the effective filing date.  The Court, however, is charged with responsibility in making the determination as to whether a patent claim was obvious based upon your determination of several factual questions.  In particular, a patent claim may be obvious if the claimed invention was already described in another issued U.S. patent or published U.S. patent application that was based on a patent application filed before the effective filing date.

First, you must decide the level of ordinary skill in the field that someone would have had at the time the claimed inventions was made.  In deciding the level of ordinary skill, you should consider all of the evidence introduced at trial, including:

(1)  The levels of education and experience of persons working in the field;

(2)  The types of problems encountered in the field; and

(3)  The sophistication of the technology.

Second, you must decide the scope and content of the prior art.  Mformation and RIM disagree as to whether the Havinis patent in combination with RemoteWare should be included in the prior art you use to decide the validity of the Asserted Claims of the '917 patent.  In order to be considered as prior art to the '917 patent,

these references must be reasonably related to the claimed invention of that patent.  A reference is reasonably related if it is in the same field as the claimed invention or is from another field to which a person of ordinary skill in the field would look to solve a known problem.

Third, you must decide what difference, if any, existed between the claimed invention and the prior art.

Finally, you must decide which, if any, of the following factors have been established by the evidence:

(1)  Commercial success of a product due to the merits of the claimed invention;

(2)  A long felt need for the solution provided by the claimed invention;

(3)  Unsuccessful attempts by others to find the solution provided by the claimed invention;

(4)  Copying of the claimed invention by others;

(5)  Unexpected and superior results from the claimed invention;

(6)  Acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention;

(7)  Other evidence tending to show nonobviousness;

(8)  Independent invention of the claimed

invention by others before or at about the same time as the named inventor thought of it, and;

(9)   Other evidence tending to show obviousness.

Although you should consider all evidence of these factors, the relevance and importance of any of them to your decision on whether the claimed invention would have been obvious is up to you.

As I have already instructed you, "clear and convincing evidence" means that if you were to put the evidence on opposite sides of the scales, RIM, who has the burden of proof to prevail on those defenses by clear and convincing evidence.

I will instruct you about the measure of damages. By instructing you on the damages, I am not suggesting which party should win on any issue.  If you find that RIM infringed any valid claim of the Asserted Claims of the '917 patent, you must then determine the amount of money damages to be awarded to Mformation to compensate it for the infringement.

The amount of damages must be adequate to compensation Mformation for the infringement.  A damages award should put Mformation in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty.  You should keep in mind that

the damages you award are meant to compensate the patent holder and not to punish the infringer.

Mformation has the burden to persuade you of the amount of damages.  You should award only those damages that Mformation more likely than not suffered.  While Mformation is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty.  Mformation is not entitled to damages that are remote or speculative.

Damages that Mformation may be awarded by you commence on October 27, 2008.

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention.  This right is called a "license."  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between Mformation and RIM taking place at the time when the infringing activity first began.  In considering the nature of this negotiation, you must assume that Mformation and RIM would have acted reasonably and would have entered into a license agreement.  You must also assume that both parties believed the patent was valid and infringed.  Your role is to determine what the result of that negotiation would have been.  The test for damages is what royalty would have resulted from the hypothetical

negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must determine the "base," that is, the product on which the infringer is to pay. You then need to multiply the number of products by the "rate" that you find would have resulted from the hypothetical negotiation. For example, if the rate is $1 per device, and the licensee sold 200 devices that are found to have infringed, then the royalty would be $200.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

In order to recover damages for induced infringement, Mformation must either prove that the BlackBerry Enterprise Service software versions 4.0 and higher, which used -- when used with BlackBerry devices necessarily infringed the Asserted Claims, or prove acts of direct infringement by others that were induced by RIM. Because the amount of damages for induced infringement is limited by the number of instances of direct infringement, Mformation must further prove the number of direct acts of

infringement of the Asserted Claims, for example, by showing individual acts of direct infringement or by showing that a particular class of uses directly infringes.

In order to recover damages for contributory infringement, Mformation must either prove that the BlackBerry Enterprise Service software versions 4.0 and higher, when used with BlackBerry devices -- is that repeating the same -- all this is for contributory.

Because of the amount of damages for contributory infringement is limited by the number of instances of direct infringement, Mformation must further prove the number of direct acts of infringement of the Asserted Claims, for example, either by showing individual acts of direct infringement or by showing that a particular class of uses directly infringes.

Perhaps I will give ourselves a break, but after that I will permit counsels for the parties to make their closing arguments. Counsel for Mformation will make a closing argument followed by the closing argument by counsel for RIM. If Mformation's counsel does not use all the allotted time, counsel for Mformation will be permitted a rebuttal argument, after which I will have some additional instructions for you with respect to the conduct of your deliberations. Remember, statements of

the attorneys are not evidence.

In that respect, we'll take our breaks sort of around the argument. But since your attention is important to us, if any of you should need a break before we are scheduled to take one, get my attention so that we can respect that.

Maybe we can just take a short five-minute break just to allow the attorneys to set up the courtroom for our argument.

So I'll have you retire, and when we bring you back, we'll be ready for the closing argument of counsel.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Very well.  Out of the presence of the jury.

Let me check on the status of the verdict form. I always like counsel to have at least a draft, when you start your argument.  But for sure you will have it by the time you have to do your rebuttal argument and you will have it before you need to make your opening argument in draft form.  But sometimes there are changes that will need to be made before sending it in to the jury.

(Recess)

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.  Very well.

The Court will call on counsel for the plaintiff for closing argument.

MR. THAKUR:  Good morning, everyone.  This trial is about RIM paying Mformation what it owes Mformation for infringing the '917 patent.  This closing statement is my opportunity to summarize the evidence for you, and that you have seen during this trial, and explain why it is important.

In my opening statement, I said to you, seeing is believing.  I made you a promise that I will show you the evidence.  This morning I will show you the evidence that proves Mformation's case.

RIM's defense strategy in this case can be described in one word:  It's misdirection.  They have hired some of the most terrific lawyers that you can find in the defense bar.  You certainly didn't expect them to come here and not put up a fight.  I did.  But I will show you their misdirection along the way.

But what is this case about?  This case is about Dr. Kushwaha.  And this case is about his invention for wireless device remote management on which he obtained this patent (indicating).

As I said to you at the beginning, at the end of

the day, this is actually a pretty simple and straightforward case. You have seen the evidence in this case. You saw that RIM tested the invention. You saw that RIM signed an NDA and obtained confidential information about the invention. You saw RIM's senior executives, CEOs, write about the fact that they needed this invention. You saw them entering the license negotiations because they wanted to negotiate for the invention. And you have seen as in BES 4.0 when they released true wireless remote management, they included it in their product. And they did it without obtaining a license to Mformation's patent.

What RIM is arguing today in this courtroom is that they don't need to license the '917 patent. And if they do, they should have to pay less than $1 million for this invention. So what it comes down to is three issues in this case. Those three issues are -- that you are going to decide are: Infringement, validity, and damages.

Notice I said I'd point out to you RIM's misdirection. You heard RIM's lawyer right in the beginning argue that Mformation is accusing them of stealing the invention, or -- and are accusing them of copying the source code of the invention. The word "stealing" has not come out of my mouth, it has not come out of the mouth of one Mformation witness. I never said

RIM copied our source code.  No witness has so testified. This case is about exactly what Judge Ware said to you when we started this case:  This is a patent infringement case.

So the first issue you must decide is infringement.  And to determine infringement you must determine that the use of RIM's BlackBerry handheld connected to BES 4.0 and higher infringed Claims 1, 6, 21 through 25 and 27 of the '917 patent.

But before I talk about infringement, let me talk to you about the burden of proof.  There is perhaps nothing more important for you to grasp in my presentation than the burdens of proof.  Because you've seen the evidence.  These are the scales of justice.  For Mformation to prove infringement, we must just tip the scales of justice just slightly.  That is our burden of proof.  We must prove infringement by a preponderance of evidence.

To determine infringement you must look at three things:  First you need to look at the '917 patent and its claims, and you need to look at the Court's construction of those claims.

The next thing you need to look at is the RIM product.  How did those products work?  Once you have the claims, once you have the products, you look at RIM's

accused products and determine if they practiced every step of those claims.

You have the claims in the patent. And you have seen the description of RIM's products. Fortunately, there is no dispute about RIM's products, how RIM's products work. We showed you how they worked.

Quick reminder, a user goes into the BlackBerry Manager, enters a user, the device is then registered wirelessly by transmitting registration information which is verified the BlackBerry administration database, then it sets up where the device is registered. When you want to put in commands to send there, you go in, you enter a command like a "kill handheld" command, the BlackBerry Policy Service periodically holds that, it converts it into a payload, it wraps it in an envelope, and that envelope is called a GME envelope.

But there's one part of the GME envelope they kept trying to avoid you from hearing. Every document showed you the GME is an end-to-end protocol. Once you package it in an envelope, it can go through the entire system, no matter what protocol lies along the way.

Finally, you must look at the evidence as to whether RIM performs each and every step of the method of Claim 1.

I'd like you to look at what Mformation's expert

presented to you.  He presented to you an extremely thorough, methodical and complete presentation of the evidence.  He did it with each and every step.  He showed you RIM's source code.  He showed you RIM's documents.  He showed you testimony from RIM's witnesses.  He showed you each and every element.  And comprehensive evidence.  He did that for Claim 1 and he did that for each and every dependent claim.

Now, what you heard was evidence, testimony from Dr. Acampora on behalf of RIM.  Dr. Acampora is a qualified individual.  He worked at the same location as a colleague of Dr. Kushwaha in AT&T Bell Labs.  But remember, he got paid $385,000 in this case.  And if he didn't agree with them, they would have found another expert.

What Dr. Acampora did was not challenge the evidence.  He did not challenge one item of the evidence.  What he did was try to direct you to words of the claim that he said they do not perform.  But the words mean something other than what were presented to you.  And those words are contradicted by their own documents.

Before I move on, RIM is not saying that they don't infringe any of these dependent claims.  They concede those points.  What they say is they don't infringe any of the dependent claims because they don't

meet certain of the elements of the independent Claim 1.

RIM's expert Dr. Acampora testified to noninfringement on their behalf.  Before we talk about his opinions, let's talk about what he did.  He did not review the software that is accused of infringing.  He didn't even look at the software.

He never went -- before expressing his opinion, went to see its operation.

He never looked at the source code for the software.

And he said he talked to some engineers at RIM to understand how the product worked.  In a case of this size and significance, he did not take one single note.  Not one single note.  You must decide if that is believable.

You heard RIM's lawyer, Mr. Matuschak, say to you:  "If I want to understand how a software program works, what I need is to have control of the source code so I can open it up and look at it."

Those are the words of RIM's attorneys.

Did Dr. Acampora look at the source code for the accused product?  He's told you he did not.

Now let's turn to RIM's noninfringement defenses.  They have two.  They say they don't infringe Claim 1 of the '917 patent for two reasons:  First, on the delivery step, you can go over the WiFi network or you can go over

the cellular network.  They give you a reason why they don't go over the WiFi network, and they don't say it's not because it's a connection.  Dr. Acampora says the WiFi provides you a TCP connection.  He said they don't do that because -- "without a request from the wireless device."

And they said they don't go through the cellular network because it -- halfway in the middle, somewhere in the middle, they have another device that they've identified as the Relay.  And up to that Relay they use a TCP connection, and then the other half of the way they use a UDP connection.

They infringe both ways.  I will show you that they infringe both through the WiFi connection and through the cellular.  But to infringe, they must infringe at least one, and I think you will conclude based on the evidence that they clearly do both.

But before that I'll put up on the Elmo the Court's claim construction of "establishing a connection."

On page 11, the Court has provided you a construction of what it means -- "establishing a connection" means "initiating -- initiating wireless communication."  Follow the words.  It is "initiating wireless communication."  That is what must be satisfied to meet the step of "establishing a connection."

Now, the delivering step must be performed

without a request from the wireless device. The "establishing a connection" substep must be initiated at the server. You have seen Dr. Madisetti explain to you how the polling and the packaging initiates establishing a connection, and that is performed at the server.

I will show you that again.

There is a further limitation on the substep. The last limitation is, "wherein, connection is established based on a threshold condition." Professor Madisetti showed you at least four threshold conditions. Professor Madisetti also showed that those threshold conditions are "a predefined state of the server or the wireless device other than the elapsing of time."

Since the determination of whether a threshold condition is met or not met also must be done without a request from the wireless device, that determination must be made at the server. And we showed you that. That it -- all of those special conditions are met at the server. We showed you the source code, showed you the documents, they showed you the testimony.

That determination must be made at the server before a connection between the server and the wireless device is established. The use of the phrase "connection is established" means that "a connection must not only be initiated but must be made by the server with the wireless

device."

What Dr. Madisetti showed you was that not only is the initiation done by the polling and establishing a GME packet, not only are the threshold conditions checked, then the connection is initiated when you send the command out to one of the ports.

Following -- on the second argument that RIM's expert argued, related to the "transmitting of the contents of the mailbox," the phrase "transmitting the contents of the mailbox from the server to the wireless device" means "wirelessly sending from the server to the wireless device the contents of the mailbox."  The "establishing a connection" substep must be completed before "transmitting the contents of the mailbox" substep can begin.

Read this language carefully, the "establishing a connection portion" is "initiating wireless communication."  The initiating wireless communication step must be completed before transmittal can begin, and we explain that transmission occurs when you go off the server.  The initiating of the wireless communication is complete at the server once the packaging of the GME end-to-end datagram is complete.

Let me show you exactly what RIM's expert argued to you.  This was a slide that RIM's expert provided --

let me try to give out explanation that I was trying to get from him.  He said, With respect to the WiFi connection, the step is done without a request from the wireless device.  He said the device connects in through the WiFi hotspot with the server.  The Relay does not matter.

So in the WiFi only the top two items matter even by RIM's concession.  But they say the -- that it is because the device connects in.  Let me show you the evidence that Professor Madisetti showed to you.

He explained to you that there is a difference between a connection that is made under the patent and the fact that it merely checks in.  And he tried to provide you an example.  He gave you a detailed explanation.  I'm not going to ask that you read that.  He showed you there's something that happens at 9:00, something that happens later in the afternoon, and that is done with a request.  Let me visually show you how that works.

So, this is what you would do when you are sending a command via WiFi without a request from the device.  At 8:00 a.m., I'm at my home.  I have a cellular connection at my house.  I leave to the office.  At 9:00 a.m., I reach my office.  My office has a WiFi.  The device checks in with the WiFi.  And this is the connection that RIM's expert, Dr. Acampora, was talking

about.

Now, let's talk about the 2:00 p.m. example, five hours later, that Professor Madisetti was talking about. At 2:00 p.m., what happens? At 2:00 p.m., my IT administrator wants to send me a new server update. What does the IT administrator do? The IT administrator puts a command in the memory of the server to have this sent out. The polling will take place, the packaging will begin, the GME datagram will be created. There will be a threshold condition connected. This time, let's make sure that the backlog is not too long. That you can get this command out. That occurs five minutes later. And then the connection is established by sending it out through the WiFi port that has now been opened.

This step occurs without a request from the wireless device.

This occurs without a request from the wireless device. The 9:00 a.m. check-in is misdirection. It has nothing to do with this case.

I'd like you when you consider this to look at the Court instructions to you. The Court has instructed those who use the method might perform additional steps. But the recited steps must be performed. The 9:00 a.m. checking in at the WiFi hotspot is an additional step. It has absolutely nothing to do so with a connection at

2:00 p.m.  Those steps are performed.  And Dr. Acampora did not dispute the TCP connection is a connection. Therefore, I present to you that at least over the WiFi, there should be no doubt that the element of without a request from the wireless device establishing a connection step is completed.

Now, let's take a look at their other argument. Which is over the cellular network.  They also infringe when they make a connection over the cellular network. They had two arguments:  Dr. Acampora showed you those two slides.  He said, Those steps are done without a request from the wireless device, but they don't establish a connection.  And they don't establish a connection before they transmit.  Those were his very arguments.

And he said to you that Mformation was hiding something from you.  There's a Relay in the middle. There's actually a lot in the middle.  To get a command from a BES to a wireless device goes through mobile switching centers, it goes through gateways.  One of those things it goes through for the BlackBerry handheld connected to the BES is a RIM Relay.

Professor Madisetti showed you detailed evidence. He showed you evidence -- he didn't give you argument -- he showed you evidence of what -- that fact that they establish a connection over the cellular network.  And he

showed it to you from RIM's own documents.  This is the administration guide from RIM's own documents.

They call TCP a connection.  That's a connection from the device to the Relay.  And then they call UDP a connection.  That's a connection from the Relay to the handheld device.  These are RIM's words.  These are RIM's words written by engineers and experts outside this courtroom when this lawsuit was not at issue.  They had no reason to be biased.

Keep in mind the exhibit number, Trial Exhibit 353, page 338.  That will remind you where you need to go if you need to confirm what RIM's documents showed.

RIM refers in its own BlackBerry website, "class connectors."  The protocol opens a UDP connection across the wireless network.  These are RIM's documents.

We asked Professor Madisetti, Do you think UDP sets up a connection?  And he said, According to the claimed step, both UDP and TCP use exactly the same way.  They initiate wireless communications by writing or by sending to a port, and an IP address.  They are indistinguishable.

In fact, the GME packet protocol has no knowledge of whether it is going through a TCP or a UDP connection.

So let's take a look at the weight of the

evidence.  You saw the patent Column 3, lines 38 through 43.  It says you may use any networking protocol.  You saw RIM's own documents.  You heard the testimony of Professor Madisetti.  You heard Professor Nath explain to you the difference between UDP connectionless management relating to setup and the difference between a UDP connection.  You heard Dr. Kushwaha testify in this case.

You saw Professor Acampora, RIM's expert.  He said companies like Apple and Microsoft use it colloquially.  But what do they do when they're not using it so colloquially?

You saw RIM's expert, Mr. Cherry, on the stand. And when asked whether he had signed under penalty of perjury, taken an oath, in his own patent, he called UDP a connection.

Dr. Acampora's own patent, it's an exhibit, take a look at it, Exhibit 5014.  He calls UDP a class connection.  Is it customary to be colloquial when you're writing your own patent to the U.S. Patent and Trademark Office?

You also heard the testimony of former executive officer Mr. Lazaridis.  He has a patented application as well, Exhibit 5015.  He too refers to UDP as a connection.

The weight of the evidence is overwhelming.

But let me explain to you how this works, because

I do think RIM's expert tried to confuse you in exactly where the establishing a connection occurs and where it is completed. So take a look at the process.

What I've shown you at the top is the BlackBerry Enterprise Server. Let's assume it is registered. Since registration is not in dispute. An IT administrator places the "kill" command in the box. The "kill" command is just one of hundreds of commands, but obviously an important one. The "kill" command is polled by the BlackBerry Policy Service and is packaged into a GME packet. The moment polling is done, initiating wireless communication has begun.

The GME packet is then compressed and encrypted.

Then the BES selects the cheapest communication path, least cost, either WiFi or BES, those are threshold conditions.

The initiation is complete. The transmission can begin. And when transmission begins, it goes over the WiFi or the cellular network. The patent expressly says you may utilize any networking technology and protocol. I've shown you the cellular network. Put the Relay in if it makes them feel better. You can throw the mobile switching networks in. There's billions of dollars of hardware that stand in the way going from the cellular port to the device.

But the patent expressly says you may utilize any networking technology and protocol. RIM misdirects you by saying that doesn't mean it satisfies Claim 1. Where in Claim 1 does it say you have to use a particular protocol? Where in the Court's claim construction does the word "protocol" come into play?

You heard Dr. Madisetti explain that the Relay has nothing, absolutely nothing to do with this case. Once it goes through the network, it reaches the device. The BlackBerry unpacks the device. It decrypts the GME packet. That is the acceptance step. And then the BlackBerry executes the command.

It is a three-step process, from the BES to the BlackBerry. You may utilize any networking technology and protocol along the way.

Let's see how this works over the Relay.

You have the BlackBerry Enterprise Server, the Relay and the BlackBerry. At the BES, you perform the steps of the commands of sending it out the WiFi device, checking on a threshold condition, and you may utilize any networking technology and the protocol. Relay is simply misdirection.

Remember, this is from the patent itself (indicating). The patent says you may utilize any networking technology and protocol, such as ethernet and

token ring and TCP/IP.  Ethernet and token ring are just like UDP connectionless protocol.  TCP is a connection-oriented protocol.  The protocol you use is a red herring.  Do not let it distract you.

They also argue that they don't have a mailbox. That is their second argument.  So, remember in the first argument, it's either over WiFi or over cellular.  They infringe both ways, but you need to find infringement by at least one.

The second argument they said, well, they don't have a mailbox.  You saw Professor Madisetti's clear testimony based upon RIM's documentation.  He identified three mailboxes:  The ITAdminQueue, a row, and a row in the UserConfig table.  He identified RIM's documents that show you what it is.

The ITAdminQueue contains a specific task for policy to work through.  He showed you the UserConfig Table.  He showed you RIM's source code.  The SQL script will create the initial BlackBerry admin server tables. It's right from their source code.  If one doesn't exist, create one.

He showed you all the entry fields in the ITAdminQueue.

Again, if it doesn't exist, create one.

I won't bore you with the details we're looking

at source code, it's almost as incomprehensible to me. But you have it, you've seen it.  And the evidence was detailed.

"The use of RIM BlackBerry server Version 4.0 and later, in combination with the handhelds, practices the step of establishing a mailbox."  They presented no evidence to you to the contrary.  The only thing you heard was argument about how these mailboxes are work requests. They meet the Court's claim construction.  That's the burden we needed to prove.

Cursory statements are insufficient.

The next argument is, well, once you have proved direct infringement, that the use of the product infringes, they argue that we also have to prove that they either contributed -- they infringe either by contributory patent infringement or by induced patent infringement.  I will not read the instructions again for you, but the evidence you saw in this case was overwhelming.

Let's quickly look at what Professor Madisetti told you.  The RIM customers, all they need to do is wirelessly enterprise activate their devices.  The server verifies the device.  And they need to do nothing else. That's it.  You saw how it was done.

RIM makes available to its customers guides and documents that instruct its customers how to perform

wireless enterprise activation and to send the policies. You saw over the course of this case, these are made available to these customers, instructing them exactly how to perform the steps.

You heard Dr. Madisetti identify for you the RIM enterprise graphical user interface, and you heard the testimony of two direct infringers -- the documentation is enough, but what you heard was essentially the testimony of two direct infringers, Mr. Hatcher and Matthew Wilson. To prove infringement, they showed you that they personally infringed and by doing it hundreds of times. But what is at issue is not the number of times or the individual times. What are at issue are the class of users.

Every person who does wireless activation will get ITAdmin policies, and at that point infringement is complete. It is the class of products. It is not -- it would be so easy for every company that provided a product and infringed the method process by simply saying, Go bring in the customers. You can imagine how hard that would be. That is why the law specifically provides you, you either bring in the direct infringements for every step or you identify the class of products and show how the class of products infringe. And we did that for you.

In this case, RIM will argue with respect to

indirect infringement, they had no knowledge of the '917 patent.  Let's remember the testimony.  Dr. Kushwaha testified that he told Mr. LeVine from RIM about the patent application when they visited him.  He was at the OMA meeting when Mr. Alfano, who was the RIM's standards representative, was present and IBM's lock and wipe was discussed, and Dr. Kushwaha raised his hand and said, We have IT on it.

But to me the single most persuasive fact is there's an OMA standards body.  RIM is the founder.  The parties have an understanding at the OMA you disclose by putting it on the website.  The parties have entered into a contract.  We have an arrangement that I don't have to send it to you, I put it on my website.

What makes it more compelling is, in this case, RIM's knowledge is self-evident.  We're only talking about damages from when this lawsuit was filed.  They got the complaint.  What is this complaint about?  It's about patent infringement.  They have knowledge of the patent.

RIM then says, Well, we have substantial noninfringing use.  You may over the course of this trial have been wondering why are we talking about wired registration?  That's what they were trying to say.  Well, there's wired registration capability so as a result people do that, it's a substantial noninfringing use.

Remember the testimony.  Remember the documents. RIM's own witness, Mr. Schnurr's videotape was played here.  He identified to you that Coca-Cola was willing to tolerate a 10 percent failure rate.  They were willing to tolerate a 10 percent failure rate in return for just having wireless registration.

RIM has produced absolutely no evidence that anyone performs hard wire.  Not one witness.  This was all their argument.  Did you hear one witness come in here and tell you, Hard wire registration is the way it's done? You saw Mr. Cherry talk about the documents.

Let me quickly show you the witnesses you heard from.  You heard from Mr. Hatcher.  I won't read you his testimony.  Basically he said, I do wired registration, I've done it hundreds of times.

You heard it from Mr. Matthew Wilson.  Did you use wired registration before with BES 3.6?  Yes.  Since then?  No.  In fact, when he was asked whether BES 5.0 supports wired activation, he said, I didn't even know that.  This is what he does for a living.

You also heard from Mr. Cherry.  You saw the document.  The document of enterprise activation doesn't even mention wired registration.

Now, it is possible that there are a few people out there who may do wired registration.  But the Court's

instructions are clear.  Occasional use is insufficient to avoid infringement.  RIM is a wireless company.

So, let me remind you of the burden of proof.  We have presented to you evidence that shows RIM's infringement.  And we have to prove to you that it is more likely than not that RIM infringes.  And we believe we have met that burden.

RIM's next argument is validity.  Well, if we infringe, the patent is invalid.  You heard three arguments from them.  First, they said the July 2000 demonstration.  Next, they talk about RemoteWare.  Number 3, they talk about RemoteWare plus the Havinis patent.

First, with respect to the demonstration, that question only becomes relevant if the provisional application doesn't disclose this element.  You heard Dr. Acampora say, "Wherein, the connection is established based on a threshold condition" is not disclosed in the provisional.

So here's the question:  The decision tree.  Does the provisional application disclose "wherein, the connection is established based on a threshold condition"?

I'm going to show you Paragraph 6 of the provisional application where those exact words are present.  If the answer is, yes, the patent is valid, you

can move past this argument.  If no, then you can confirm whether RIM has provided clear and convincing evidence that the July 2000 demonstration only used all of the requirements of Claim 1 of the '917 patent.  And if you determine, no, the patent is valid.  And throughout it all, remember RIM's burden is clear and convincing evidence.

This is the provisional patent application (indicating).  This is what Paragraph 6 says:  "If the command is to monitor some parameters on the device, then agent periodically sends the information back to the server, which could be based on a certain threshold condition or based on time interval".

This is right from the provisional patent application.

Only if you conclude that it is insufficient must you determine the issue of the July 2000 demonstration.

Again, let's remember the burdens of proof.  For the July 2000 demonstration they must prove that every element of Claim 1 of the '917 patent was actually demonstrated at this presentation to investment bankers.  That burden is clear and convincing evidence.  It's not slightly more than equal.

So let's weigh the evidence.  Their expert testified that on a December 9, 2010 deposition,

Dr. Kushwaha got it wrong.  He said wireless registration was included in the demonstrative prototype.

Now, let's look at Mformation's evidence.  Before that deposition, also a corporate 30(b)(6) deposition, he testified correctly that wireless registration was hard-coded.  So it was not as though he had subsequently tried to recant testimony after the fact.  He testified after the December deposition that:  "I got it wrong.  I looked at the source code, here's what happened."

You heard Dr. Kushwaha testify at trial.  He told you, "I got it wrong."  And he said, "I'm sorry."

You heard the testimony of Mr. Beltramino.  He was asked by RIM's counsel, Do you know why Dr. Kushwaha asked you to testify here today?  And he said, "Yes, I know.  Because I've been working for the company for 12 years.  And I wrote Provsys.  I know what it has.  And I came here to tell the truth.  And the truth is that Provsys did not have wireless registration."

So you have Mr. Beltramino's trial testimony.  But you have something more compelling.  If you want to know the truth, look at the source code.  We presented to you the source code.  It's overwhelming, the weight of evidence.  RIM cannot meet the burden of proving invalidity based on a demonstration based on clear and convincing evidence.

So now let's go to RIM's second argument.  The second argument relates to RemoteWare.  Again, I continue to remind you that when it comes to validity, they must prove it by clear and convincing evidence.

Dr. Acampora is a very thorough individual.  He wasn't so in this case.  Did he look at the prior art RemoteWare product?  No.

Did he observe the RemoteWare product in operation?  No.

Did he ask anyone to obtain the RemoteWare product?  No.

Did he review the source code for the RemoteWare product?  No.

What did he do?  He relied on the testimony of Mr. Foley and Mr. Owen.

Did they have any documents to show you?  No.

Mr. Foley was paid for his testimony.  He came here to say that he remembered over 12 or 15 years ago that some restaurant in San Diego, Jack in the Box, did it across the Hughes satellite, and he didn't even know exactly how it worked.  This is what he was willing to rely on to destroy a man's life's work.

Remember what Mr. Matuschak said.  Look at the source code.  And what did Dr. Acampora do?  Nothing.

I'm not going to sit here and show you each piece

of evidence that's missing.  But let me just show you one item, the RemoteWare that's clearly absent.  You heard Dr. Acampora say, Oh, a client name causes the client registration.  Is that sufficient?  Well, Professor Madisetti showed you that's half the truth.  Look at the document.  A template client is not registered at the server until a successful communications session occurs and the server administrator verifies the new client.

The server administrator is a human being. Dr. Acampora had just jumped at a conclusion because he was paid to testify here that the patent is invalid.

Next, they argue that the patent is obvious. What they did was they showed you one paragraph from a patent.  And what they told you was, that this shows a command monitoring the location.  They did that because no matter how hard they tried, no matter how much misdirection they engaged in, RemoteWare did not have monitoring.  So they had to find something else.

The United States Patent and Trademark Office, one thing they had access to, it would be patents.  And they try to say, We'll find this patent where monitoring is available, combine it with RemoteWare, and it would be obvious to a person of ordinary skill in the art.  The only thing you had was testimony of an expert.  Nothing whatsoever to indicate the two would be combined.

Let me ask you the obvious common sense question: If it was so obvious, do you think RIM's CEO's would have met with Mformation, trying to figure out how to do remote device management?  Years later?  Would they have?

What makes it even so ridiculous they would make this argument is, RIM evaluated XcelleNet, which is the company that makes RemoteWare.  They looked at the very product and concluded that Mformation's solution was better.  You heard the testimony of Mr. Lessard.  They gave Mformation access to their private APIs.  Which they had never given to anyone else.  And they did not do it for XcelleNet.  And this is the evidence that Dr. Acampora tried to tell you invalidates the patent.

As I explained to you, after you determine validity, the next item you must determine is damages. But before I turn to damages, I want you to quickly remember the relationship of the parties.

In 2001, RIM was still trying to figure out how to implement IT policies.

In 2002, the parties were talking about doing a deal.  Senior most executives, including the former chief executive officer who you heard testify at trial, was writing e-mails about it.

What were they saying?  Mformation's approach is better than others.  Mr. Lazaridis was instructing his

employees to take control of Mformation's agent.  What was happening at Mformation?  Mformation was under a nondisclosure agreement, disclosing the most confidential information, including confidential product architecture, to RIM.  You saw those documents; you heard that testimony.

And then they entered into a negotiation.  They entered into license agreements to obtain a copy of Mformation's solution.

But what happened?  As the year progressed, they couldn't reach a deal.  They couldn't get a deal done.  But that does not mean that RIM was not interested.  You saw the surveys of findings of their own customers.  Ninety percent wanted lock and wipe.  Similar persons wanted management.  That's what RIM's customers were telling them in 2002.

This is a survey in 2003 of RIM's own customers.  Goldman Sachs, Merrill Lynch, customers RIM considered its most prized customers.  They needed to deploy without touching the desktop.  They wanted wireless device remote management.  Sure, RIM could have introduced the BES 3.6, which could provided some of the features in a wired way.  They tried to get around this invention by doing it in an interim approach through a wired solution, but that was not acceptable to the customers that mattered to RIM.

They wanted to deploy without touching the desktop. Wireless device remote management.

So what happened?  In 2004, RIM got passed its interim solution, and in fact actually announced and then eventually released wireless device remote management, and what it did is provide simplified deployment, connect the handheld to the BlackBerry with cradleless wireless provisioning.

Remember what I showed you at the opening?  Can you imagine every time you go, you mail it to the IT administrator, they put it in the cradle, provision it, send it back to you.  They tell you it's not one time. Just think of the box, think of the cradle.  Think of the shipping cost.  Think of the IT administrator.  It's a whole lot less than what Mformation's asking you for this case.

2005.  Well, RIM has released BES 4.0.  The sales of the devices skyrocket.  But Mformation does have one bit of good news.  They get the patent.  You heard Dr. Kushwaha tell you about how excited he was.

But what has happened to Mformation as a company? No one wanted it.  No one wanted wireless device remote management that was available from RIM in an integrated solution.  The sales dried up.  They had to restart on the consumer market.

The patent issued in 2005, and you heard RIM's lawyer right at the outset, Well, BES issued in 2004, why didn't you sue us?  Well, the patent issued in 2005.  You heard from Mr. Basu as well.  He said, There was not one day between 2005 and 2008 I did not think of suing them because of the breach they created between us.  Every day I thought about it.  But the reality was we were avoiding retaliation.  So many phones in the market, to decide to take on a small company like us, they could shut us down.

They waited, and they waited until they could diversify so they could handle this fight.

And in 2008, they did indeed file this lawsuit.

And this brings me to what we're actually asking you.  Every case I've ever heard of, they tell you, it's not about the money.  We don't do it.  In my experience, it's always about the money.  This case is about damages.

You heard Mr. Weinstein testify in this case. And he said we're entitled to 50 cents per device per month.  Which is a total of $199.1 million.  It's a lot of money.  It's a lot of money because they sold a lot of devices.  The corporate market wanted it and they gave it to them.  This is an extremely valuable feature.

Now, how did Mr. Weinstein arrive at his conclusion?  Did he do it out of thin air?  No, he started with RIM's own documentation.  He showed you what RIM had

put down for their device.  It's $50 a seat for Mformation.  RIM argued that's your real price.  Of course it's your price.  Just tell me what you're willing to offer for that.  We're not agreeing that that was our price.

But what Mr. Weinstein said was okay.  You don't look at the price that you offer at a particular time.  What you want to look at is part of the platform, what is the appropriate percentage of the revenue you should get.  And that's why he calculated the percentage by taking 650 and dividing it by 50.  He was extremely conservative in his approach.  What he didn't do was add in the hundred dollars per seat for system management.  Essentially he took a two-thirds haircut.  That works out to 7.7 percent per device.  Of the software revenue for device management, that's offered by RIM.

What he did was he took that 7.7 and he multiplied it by the monthly software revenue of $7.59.  He discounted it based on the profit margin being 91 percent, which equaled 58 cents per month times a profit margin bringing it down to 53, and he narrowed it down to 50 cents.  So it's 7.7 percent, raise 50 cents per month per device.  This is from RIM's own documentation.

Then he multiplied it by the number of devices.  The number of devices is not in dispute.  You heard RIM's

own expert talk about the number of devices.  And these are the number of devices that are connected -- BlackBerry handhelds that are connected to the BES.  The consumer marketplace, the people that don't do that are excluded from this number.  That's how successful this technology has been based on that he arrived at a number of $199.1 million.

What did Ms. Davis do?  What Ms. Davis did was ignore RIM's own documents, talked about how valuable it was.  You saw these documents.  They talked about how cradleless provisioning in wireless device remote management was very important to them.  You saw these documents in this case.  These are RIM's own documents.

Their own press release talking about how important it was.

E-mails from their CEO's talking about the fact that customers can't provision and manage our products. It is their weakness.

E-mails from Mr. Lazaridis talking about Mformation's agent being better than others and him wanting to use that and incorporate the agent software in their own platform.

Again, debriefing notes from discussions with Goldman Sachs.  Need to deploy without touching the desktop.  This was extremely valuable technology.  And RIM

knows that.

You saw that evidence.

Look at this slide.  Perhaps nothing is more telling.  This is what happened with the number of devices once BES 4.0 wireless device remote management came out.

Now, RIM's expert, she did not -- she identified five agreements for you to compare.  Only one of them related to a patent.  What I found curious was, she took the patent that had nothing to do and, in her own words, is not comparable technology to Mformation and said, This is something you should consider.  Yet Research In Motion has entered into patent license agreements for hundreds of millions of dollars.  Hundreds of millions of dollars.  But they were put aside, they were not taken into consideration, not mentioned as if they don't exist.

And she identified four products, software agreements, that by her own concession do not involve comparable technology.

Look at all the evidence that Mformation presented to you before the date of infringement that would be considered at the time of the hypothetical negotiation.  25 to $30.  You saw the exhibit.  You saw RIM saying 50 bucks.  It didn't shock them.  You saw RIM enter into customer agreements for those kinds of numbers.  GTSI.  Pfizer.  MetLife.  Colgate.  CSFB.  Additional

exhibits.

And that's all the exhibits you saw before the date of the hypothetical negotiation.

Based on that, Mr. Weinstein presented to you a royalty of $12 per unit. He showed you his calculation. He showed you where it came from. He showed you how he arrived at this analysis.

Ms. Davis threw a handful of agreements up in the air and said, These are what you should consider. And even now I'm going to go way below those numbers and I'm going to offer you, recommend a royalty of a nickel a device.

Go to the grocery store and see what you can buy for a nickel a device. You might get a minute or two. You might get a plastic fork. You don't buy technology that helps you dominate the corporate enterprise market. You don't buy technology that Goldman Sachs says, I need to deploy for tens of thousands of employees, and I'll pay you what it takes.

That is what they got from Mformation.

Finally, Ms. Davis identified three agreements that she said were comparable that were after the date of infringement, presumably in a situation where your negotiating leverage has considerably gone down. You heard about the Sprint agreement. It didn't even identify

the number of customers.  What she did was took the $5 million number, ignoring the other 5 million service revenue, and then said, Let's divide it by 50 million users, which is actually twice the number of users, and then identified it by whole cloth.

Let's look at the analysis from Dr. Weinstein. It's closer to 10 million because you take the software and maintenance revenue.  You take the 10 million, you divide that by the actual customers at the time.  27 million.  Five percent of smartphone users are people that can actually benefit.  You take a third of that out for RIM customers already getting it.  And you have 10 million divided by 1 million customers.  That's $10 a unit right there.  And that assumes every customer deploys it.

Is that realistic?  Think of the watercooler. That's what they're doing.  They're buying a watercooler that anybody in the room can go and get a cup from.  But that doesn't mean everyone in this courtroom is going to get a cup of water.  If it's 10 percent, that's a hundred dollars a unit.  I'm not suggesting the number was likely that high.  With Sprint's calculation.  But my point is, those documents are misleading and they're taken out of context, and Ms. Davis's analysis was not thorough.  And it was not based on this agreement.  He just came up with a million dollars out of thin air.

This is the number that Mr. Weinstein presented.

Anyway, in conclusion, I want to speak to you from the heart.  This really is a simple and straightforward case.  You have heard all the testimony.  You've seen the witnesses.  This is your opportunity to give Dr. Kushwaha the justice that's been denied him for 10 years.

As I said to you earlier, RIM's lawyers are the gold plate version of the defense bar.  There's no doubt about that.  You should have expected them to put up a tremendous high quality fight.  I don't take anything away from them.  But what they did in this case was simple misdirect.  They hired the best lawyers to avoid responsibility for their actions.  Their defense is based on a technical expert who ignores the evidence, who shuts his eyes and ears to what is available to see.  And their case is based on a damages expert who takes five cents out of thin air and says this is what this technology is worth.

You have a chance to correct a wrong that was done to Dr. Kushwaha.  And for that, we ask you to award damages in favor of Mformation in the amount of $199 million.

After I sit down, you will hear from Mr. Matuschak, and he will argue that they don't infringe.

And they will argue that even if they infringed, they should pay less than a million dollars.  I will receive an opportunity to rebut their closing argument.  When all we hear from them is a mirage.  They will be dancing and wobbling around the claims to tell you they don't do this, and they will tell you this isn't worth a lot of money.

Look at the evidence.  See it with your own eyes.  Thank you.

THE COURT:  Let's take a recess so that the defense counsel can prepare the courtroom for closing argument.  We'll come back in about five minutes.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

DEPUTY CLERK:  Remain seated and come to order.

THE COURT:  Ready to resume?

MR. MATUSCHAK:  Yes, your Honor.

THE COURT:  Summon the jury.

DEPUTY CLERK:  All rise.

(The jury enters the courtroom.)

THE COURT:  Please be seated.

Members of the jury, before I call on counsel to make its closing argument, let me kind of revisit the schedule with you.  It would be my desire to get the case to you and then to have you start your deliberations before we take a lunch break.  If I do that, that means

that if I allow the parties the time that they've used and allocated to them, the case, we will finish the argument and my final instructions by about 1 o'clock, so you would be taking a little later lunch, but that would mean you would have the case starting at 1 o'clock.  That's my intent.

And so I'll -- although we're creatures of habit, sometimes at noon our attention starts to wane, I'll ask you for your indulgence, if you'll understand it's all of our desire to make sure that we get the case to you as efficiently as possible.

Counsel?

MR. MATUSCHAK:  Thank you, your Honor.

Good morning, ladies and gentlemen.

First, on behalf of my co-counsel and my client RIM in this case, I want to thank you for your time and attention these past few weeks.  And I have to tell you my dad, if he were alive today, he would be very proud someone called me a gold-plated lawyer, but as a kid we're taught to believe the truth and to believe in common sense.

Now, you've had to sit through more than your share of complicated testimony, but you've hung in there with us, you paid attention, and for that I am grateful, and my client, RIM, is most grateful.

Now is the time to get to look back on all the evidence, everything that happened over the last three weeks.

Mformation has thrown up a lot of distractions on the way. Remember how those started? The very first thing you saw when this case started was a snippet from a string of e-mails taken out of context. You heard claims that RIM copied something. Even though Mformation didn't give RIM anything to copy. And as I said in my opening, Mformation was trying to get you to take your eyes off the ball. And that hasn't changed throughout the course of this case.

Now you're being asked to decide, did RIM infringe Mformation's patent? Is that patent valid? And I told you after Mr. Cherry testified, I want you to understand the technology. RIM and its witnesses want you to understand the technology. Because if you do, then you will conclude when you're sitting together with the verdict form that RIM earned its success, that it didn't do anything wrong, that the '917 patent is not infringed by RIM, that that patent's invalid.

Now, when we started this case I also asked you to think about how you would feel if someone falsely accused you of doing something. Now when that happens in a patent case, it's very difficult and expensive to stand

on principle.  I told you when we started that you would meet one of the most distinguished professors you'd ever see.  And you met him, Dr. Acampora.  He directed the Center for Telecommunications at Columbia University in New York.  He founded the Center for Wireless Communications at UCSD.  He's the man whose entire professional life has been spent learning about, teaching about, working with wireless technology.  That's all he's done.

And he plays it right down the middle.  You heard it from his mouth.  He has been for lawyers who represent RIM, and he's been against us.  Sometimes we don't like what he says.  But we all respect his integrity.

You heard how much he charges.  You've heard how many hours he spent to investigate this case.  To satisfy himself before he could get up on that stand and testify.  RIM hired the best it could find.  When this lawsuit came out of the blue four years after the companies stopped working together.

Next slide, please.

You remember Mr. Lazaridis.  He told you this case to him is about defending the honor and the integrity of his company and his employees.  Mr. Lazaridis and RIM chose to stand behind those employees like Mr. Cherry and the engineers who spent 10 years of their lives working to

develop the BlackBerry Enterprise Server.

Our Constitution guarantees the right to do what RIM has done here.  Guarantees the right to a jury trial.  Where we can't stand on principle.  Knowing we can put our trust in you and your common acceptance.  Because RIM knows, like I know, that if you understand the facts and the technology, if you aren't thrown off by efforts to hide the ball, then you will see that RIM has not copied, has not infringed, has not done anything wrong.

Now, you've heard a lot of complicated testimony, and I'm pretty sure that you hope never to see a 300-plus page PowerPoint presentation again where every word on the screen is read to you like a carefully scripted movie.  But despite all of Mformation's testimony, this case is really pretty simple.  It goes back to what Mr. Basu said in 2002 to RIM:  "What you code belongs to you; what we code belongs to us."

Now, at the beginning of this case, Mr. Thakur stood right here and he pointed to a big stack of papers, source code, on that table, and he said, "I want to emphasize this point.  You may conclude that Research In Motion copied our invention."

I wrote that down when he said it, and when the court reporter gave us the transcript, I highlighted it.  It's getting a little -- it's been around for a few weeks

so it's getting a little messed up there (indicating).

I highlighted it and I saved it because he said he was going to show you, and not tell you.  Well, you know, the way to prove copying is to put that source code up side by side and see whether it's copied.  I was waiting the whole trial to see if that was going to happen.

That never happened.

Dr. Madisetti never did that.

But on that point, at least, Dr. Madisetti is not really to blame.  It wasn't his fault.  RIM gave over its own source code.  Dr. Madisetti showed you some of that.  We have nothing to hide.  But Mformation refused to give their own source code to their own expert so that he could do that comparison.

Now, this is where the common sense that I talked to you about when we started comes into play.  Ask yourself:  Why wouldn't Mformation give its own expert its own source code?  And let him make that comparison?  To show you whether what Mr. Thakur said was true or not?

Your common sense tells you why.  Mformation knows there has been no copying.  That's why they never even had their expert look.

Now, that didn't stop him from claiming that we copied.  And that's exactly the kind of conduct you've

seen throughout this case.  Repeated day in and day out. Witness after witness from Mformation gets up on the stand, and says one thing, something else that they told that was different from what they said before they walked through the doors of that courtroom out in the real world.

Now, after Mr. Lazaridis testified, Mr. Thakur stood back up here again and he finally admitted, All right, we're not accusing RIM of copying the source code. Because what did Mr. Basu and Dr. Kushwaha say on the stand?  They said, they never gave it to us.  We never had the source code.  What they both called the recipe, they never gave to us.

They each told you that they never gave RIM that big pile of paper that Mr. Thakur was pointing to when he stood up in his opening and said we copied.

All right.  So, now we know that despite what they told you then, this case is not about copying the source code, copying what their witnesses called the recipe.  Because there's a very easy way to prove it, and they didn't even try.

All right, well, if it's not about copying the recipe, is this case about RIM stealing the concept?  The concept of doing wireless device management or wireless remote unlock.  Well, you know that can't be true either. Wireless device management was not new.  Wireless device

management with lock and wipe was not new.

Next demonstrative, please?

You saw that Mobitex back in 1990, nine years before Mformation was even formed, had the "die" command.

Next slide, please.

You've seen the RemoteWare in painstaking detail. There is the "delete file" command.  That's no different.

You've seen Exhibit 4443, that these ideas were not new to RIM before Mformation came to talk to us.  This is that BES 2.2 development plan --

Actually, can we go back for a second?  Thank you.

It's in March of 2001.  March of 2001.

Now we go to the next page.

In that -- at that time, RIM was already talking about doing wireless kill and erase.  Before anyone from Mformation ever walked through the doors of RIM's offices. We already knew about the concept.  So this case is not about copying the recipe.  And it's not about stealing the concept.

All right.  Well, is it about using what Mformation told RIM, what became of this patent?  And Mr. Thakur tells you that Dr. Kushwaha told RIM all about how his product worked and gave demonstrations in 2001 and 2002.

Wait a second.  Let's get Exhibit 4460.

Here's their presentation to RIM in May 2001.
Now, that's two months after that last RIM document I just showed you where RIM was talking about doing wireless lock and wipe.

Go to the last page, please.

In May 2001, two months later, Mformation wasn't telling RIM how to do wireless lock and wipe.  They were asking RIM, How do you do it?

Go to the prior page, please.

In May 2001, Mformation wasn't telling RIM how to deploy applications wirelessly.  Like the Angry Birds thing from the opening.  They were asking RIM, How do you do it?

In May 2001, Mformation wasn't telling RIM how to update an application wirelessly over the air.  They were asking RIM, How do we do it?  They had asked RIM how to do what Dr. Kushwaha says he invented.

And remember, Dr. Kushwaha couldn't say that what he showed RIM was anything but the finished cookie.

Here is his testimony:  He says -- I asked him: "What you showed them was the finished cookie, not the recipe."

He says:  "I don't remember."

Mr. Basu, Dr. Kushwaha told you the secret recipe

is the source code.  And they never gave the source code to RIM.  And in fact, the whole deal fell apart over that issue.

Exhibit 642.  You saw that in this e-mail from Dave Castell at RIM to Mr. Basu.  And he says:  "Your security model is flawed."  He says:  "The security code is a nonmodifiable source code."  He says:  "That's a nonstarter."

And Mr. Lazaridis explained to you why that was true.  RIM had a great new product, the BlackBerry.  But it was still a small company.  I think he said there were maybe 200 people.  And it was up against some of the biggest companies in the world:  Microsoft and IBM.

Here's what Mr. Lazaridis said.  He said:  "Well, I remember when I first started working with this idea and to try to explain it to some of the customers, they told us that even the ones who understood at the time what it did and how it would work, and understood its value right away, they told me that if we couldn't convince them that it was secure, that it protected their corporate network and their corporate data, that they would not roll it out, it would just be an experiment."

Now, because of security, the BlackBerry is used by companies all over the world.  It's used by the Department of Defense, it's used by police departments

across the country, it's used by the President of the United States.  Mr. Lazaridis told you that RIM could not get a security clearance and its security credentials if it didn't have access to the source code so it could prove that what was there was secure.

RIM is so well known for its security that even Dr. Madisetti up on the stand had to agree that if the security of the BlackBerry was compromised, it could be disastrous for our country, it could be disastrous for RIM's reputation.

Now, RIM wanted to work with Mformation.  That's true.  Mr. Lazaridis told you, he said, We couldn't find enough engineers.  We were growing quickly.

Ken LeVine, the guy who was on their payroll, he was successful in getting RIM interested in Mformation.

Mformation said, No.  I'm not going to give you the source code.  We're not going to give you access to the recipe.

Mformation chose to walk away from the table.  That's why the deal never happened.

And then RIM went on to do what it was planning to do before Mformation ever walked in the door.  We have that in Mr. Basu's own e-mail.  It shows that Mformation knew this all along.  That Mformation was just a stopgap solution.  That RIM was planning to develop its own

standards-based device management agent from the ground up. Mformation knew that was the plan. That RIM was always intending to build its own system from the ground up. And when Mformation walked out the door and said, We're not giving you our source code, what was RIM to do? What were they to do? They implemented the plan they had all along.

And you heard that from Mr. Cherry.

Now, you don't have to rely on Mr. Cherry or his degree in theology to know he was telling the truth. Because you know that Dr. Kushwaha could not have disclosed the key parts of his invention to RIM. Even if he had wanted to.

Next slide. Shows how Mformation had to change when the patent examiner said, You haven't invented anything new. He knew that Claim 1 did not have the three key steps that the patent examiner made them add, these three steps here (indicating). That the patent examiner made them add. Until July 2005. Long after the last of their meetings with RIM.

Now, Mformation says, Well, you know, there was stuff buried someplace else in that application when it was first filed. But it wasn't in Claim 1.

There's another reason that -- you know your common sense will tell you that Mformation knew that RIM

didn't take anything that Dr. Kushwaha told them. Remember him talking about the nondisclosure agreements? I think Mr. Thakur referenced them in his closing just a few minutes ago. Those agreements said neither company could use the information provided by the other without permission.

As I told you in my opening, if they thought RIM had used anything that they weren't supposed to use that was disclosed to them in confidence, then there would be another claim in this lawsuit. A claim for violating those nondisclosure agreements. A claim that RIM broke its promise in that legal contract between the companies.

Well, guess what? They never made the claim. They're here suing us anyway for patent infringement. If they really thought RIM took any of that information and used it, they would have brought the claim for violating those nondisclosure agreements. But they didn't. Your common sense tells you this is exactly like when Mr. Thakur stood up here and told you they copied the source code. They make these statements, but they know they weren't able to back them up.

So the case is not about copying. The case is not about stealing a concept. The case is not about figuring out from the demo what the recipe was from the big cookie.

What's left?  Well, we know it can't be accidental infringement.  Because remember RIM is not accused of directly infringing the '917 patent itself.  RIM is only accused of inducing or contributing to other people's infringement of the patent.

And to prove that, Mformation first has to prove to you not only that using the BlackBerry Enterprise Server infringes Claim 1, but that people actually used the BlackBerry Enterprise Server in an infringing way.

And they have to prove two more things:  First, on inducement.  Here's what Judge Ware told you.  And I'd like to direct your attention to Points 2 and 3.  For inducement, Mformation has to prove that RIM intentionally took an action or series of actions that actually induced direct infringement by someone else.

And Point 3, that RIM knew about the patent.

And actually if you could highlight Point 4.

And that RIM knew or should have known that its actions would cause infringement of the '917 patent.

Well, there's absolutely no evidence that RIM knew that if people used the BES they would be infringing.

During Dr. Madisetti's testimony, Mformation just pointed to some manuals.  They said, Well you, know, RIM has these user guides.  That's what he said in the last part.  He says, second part, RIM specifically instructs

and encourages its customers to use the user guides. Well, of course they do.

But Judge Ware's instructions tell you that's not enough. Telling you how to use a product doesn't establish inducement.

As you've seen, we've given over pretty much every e-mail in the whole company. You've seen all the dirty laundry. We have got nothing to hide. But there's nothing, not one thing, that ever mentioned any knowledge of Mformation's patent. There's not one e-mail that is, Let's encourage people to infringe Mformation's patent.

To prove inducement you have to prove intent. And despite hundreds of hours of depositions that RIM's executives and engineers had to sit through, despite millions of pages of documents from the company and e-mails that Mformation rummaged through, you will find nothing.

Now, Dr. Kushwaha did say, Oh, I told Mr. LeVine. The guy that Mformation had secretly on its payroll. He's the guy I told. The guy who, by the way, is dead and can't come here to contradict him.

There's nothing, there's no evidence that meets the requirement that RIM knew of the patent or knew that if people used the BES they would be infringing the patent, and that's why we're here. Mr. Thakur likes to

say, I'm going to show you the evidence.  Well, where is it?  They've got every e-mail.  They've got every manual.  They've deposed our company representatives for hundreds and hundreds of hours.  You haven't seen anything.

If we can get the next slide.

For contributory infringement, Judge Ware told you that you have to find, in Point 4, that these components by RIM are not suitable for noninfringing use, meaning that they have no other use.  You can only use them to infringe the patent.

That RIM need to have known about the '917 patent in Point 5, and that RIM supplied the BES with the knowledge that the components were especially made or adapted for use in an infringing manner.

Again, there's no support, there's no evidence to prove any of that.  In fact, you heard there were five different ways to activate a BlackBerry device.  Three of them were over a wire.  Mformation admits that if you activate your BlackBerry device over a wire, it doesn't infringe.  Three out of five is a suitable and substantial noninfringing use.

But you don't even have to get past the first step.  Because using the BES simply does not do what Claim 1 says.

Now, remember, in my opening we talked about what

happened at the patent office when Mformation filed its application.  And the patent examiner said, Dr. Kushwaha, you haven't invented anything new yet.  Anybody's allowed to do what you originally filed because that's old.

So Mformation had to add those three steps in 2005 to get the '917 patent.  RIM does not do those three things.

Let's talk about each one.

We've heard a lot about this "establishing a connection" piece.  Judge Ware has told you that establishing that connection requires three things:

First, it requires initiating a wireless device -- a wireless communication between a wireless device and the server.

Not initiating a thought process, which path should I take, Dr. Madisetti said.  Not writing something down that may or may not be said by creating an envelope. Not initiating communication with, over WiFi or choosing which port to communicate over.  Not initiating a communication with the Relay.  It's initiating wireless communication between the BlackBerry and the server. That's Point 1.

Second, as Judge Ware instructed you again today, the use of the phrase "connection is established" means that "a connection must not only be initiated but must be

made by the server with the wireless device."

And third, all that has to happen, the initiating and the connection made before "transmitting the contents of the mailbox" can begin.

What did Mr. Thakur tell you?  Let's show the slide that he showed you.

He says that you begin initiating here -- we'll talk about that in a minute.  He says initiation is complete here (indicating) and then transmission begins.

THE COURT:  You're blocking your screen.

MR. MATUSCHAK:  Oops, I'm sorry.

He says initiating begins here (indicating).  Initiation is complete here (indicating).  And transmission begins.

Well, he forgot about something very important that the Judge told you this morning.  The Judge told you that the use of the phrase "connection is established" means that "a connection must not only be initiated but must be made by the server to the wireless device."

Must be made.

There's nothing on this slide that shows a connection made to the wireless device.  This is only about initiating.  It's the same thing that Dr. Madisetti said on the stand, and he was wrong.

And all you have to do is look at the Court's

instructions on page 12 to figure that out.

But what else is important about this is Mr. Thakur told you that transmission begins with initiation is complete.  That's not the Court's construction.  The Court says:  "The 'establishing a connection' substep must be completed."

The "establishing a connection" substep, which means initiation and making that connection.  That connection has to be made.  Both of those things has to happen before you can start transmitting.  That's what the Judge's instructions say, black on white on the papers that you have in your hand.

They have admitted to you standing up here that if you follow the Court's instructions, we don't infringe.

Now, in my example to you I told you that the Judge's instructions in a sense mean you finish dinner, before dessert.  Don't take my word for it.  Look at RIM's system and you'll see that does not happen.

First, Mr. Cherry explained to you the -- inside the BES, the command is packaged in something called the "GME envelope."  And that GME protocol or envelope is sent over a wire connection using the TCP protocol to the BlackBerry Relay.  Or also called the network operations center.

Now, Mr. Thakur wants you to believe that this

GME envelope can somehow send itself all the way to the BlackBerry.  No one testified about that.  No one said that.  GME, it's Gateway Messaging Envelope.  It's an envelope.  They're just going to sit there unless something else transmits it to the BlackBerry.  And we've heard about two different ways it can be transmitted.  One is called TCP.  And one is called UDP.

Now, this TCP connection to the BlackBerry Relay, Dr. Acampora told you to set up as soon as the BES starts up.  It has nothing to do with the -- whether there's a command to be sent.  If the BES is on, it sets up a connection even if there's nothing to send.

At the Relay that GME envelope is then packaged in this UDP protocol, which is sent over the wireless network to the BlackBerry.  There's no dispute about any of that.

Now, there has been a lot of confusion over whether using this UDP protocol from the Relay to the BlackBerry is a connection.  Now, network engineers consider it connectionless.  And indeed, Mr. Thakur admitted that.  He told you a week ago, UDP is a connectionless protocol.  Those are his words, not mine.  Now he wants you to believe that a connectionless protocol actually establishes a connection.  Just like Dr. Madisetti said, you can establish without

establishing.

And manuals and patents sometimes do refer to UDP as a connection.  Because it's a way to transmit information from one place to the other.  But all of the experts, all of them, agree that there is something significantly different between those two.  TCP uses that handshaking process to set up a connection in advance before any information is transferred.  Just like the patent talks about.  Many establish the connection, then transmit.

In the example from Dr. Nath, the company inventor of the '917 patent, it was like you agreed to meet up with someone at a particular street corner.  You have to agree on a place first.  Then you'd meet and can transmit information.

My example was like dialing a phone number.  You have to wait for the other person to answer.  Then you've got a connection, then you can transmit.  That's what the patent is about.  That's what the Judge had told you the patent is about.  It's not just me.

You simply cannot transmit information until that connection just like the patent says.

And that's really important because of what you heard today.  The connection has to be made all the way to the wireless device before -- to complete that

establishing step.  That's what the Judge's instructions are.

But UDP doesn't do that.  UDP doesn't have a handshaking process.  UDP does not wait to transmit information until the connection is actually established. Dr. Nath gave you that example himself, the co-inventor. He said, It's like mailing a letter.  Just send it off. My example is like sending a text message, you don't wait to establish a connection, you just send it.

And it's exactly what Dr. Nath said he taught to his students at Rutgers.  Remember this.  He tells them in his teaching notes, Why UDP?  Because no connection needs to be set up.

And you heard Dr. Madisetti talk about the leading textbook in the field.  *Computer Networks* by Tanenbaum.  And you heard him read this passage:  Many client-server applications that have one request and one response use UDP rather than go to the trouble of establishing and later releasing a connection."

Everyone agrees there is a difference between TCP and UDP.  And they all agree that with TCP there's handshaking and with UDP there is not.

Now, Mr. Thakur said, Well, you know, look, there's someplace in the patent that says you can use it with any protocol.  You notice he didn't point to anyplace

in the claim.

Just like you hear in the patent video, the invention is defined by the claim language.  And you can look at Judge Ware's instructions that you have on page 6 and on page 16, the words of the claim define -- limit the scope of the patented invention, and those words of the claim have to be compared to the accused products.  Not other words.

Here's Judge Ware's claim construction:  "The 'establishing a connection' substep, including making the connection, must be completed before 'transmitting the mailbox -- the contents of the mailbox' substep can begin."

Not start dinner and then have dessert.  Not initiate dinner and then have dessert.  Finish dinner, and then have dessert.

That's what this patent is about.

And what did Dr. Madisetti say about whether that happens with UDP?

Video clip, please.

(Video clip played.)

MR. MATUSCHAK:  5:26 p.m., on May 2nd, 2011, under oath, Dr. Madisetti said:  "UDP establishes a connection and transmits at the same time."

I'm not making this up, you heard him say that.

And you saw on the slide we just showed you, Mformation says, Well, you know, initiation is complete and then transmission begins, but that can happen only after the establishing step is complete. Dessert with dinner. That's what Dr. Madisetti said. Same time. Transmit and establish at the same time.

That's not what Judge Ware said. And that by itself means that RIM cannot -- the use of the BES cannot infringe this step. It does not meet that requirement. It does not meet that order of steps that the Judge has said is required.

Now, the difference between TCP and UDP is important for that reason, but it's also important because what's made the BlackBerry so successful. You heard Mr. Lazaridis tell you: Doing it the way RIM does it reduces overhead on the network, makes it less expensive, saves battery life, allows you to transmit faster. Those are all important things today.

We still complain about battery life. We still complain when it takes our smartphones 10 seconds to open up a web page. But back in 1999 when the BlackBerry came out, networks were very, very slow. It was more than just an annoyance. Sending an e-mail could take a long time. Network time was even more expensive. The BlackBerry had to run on a single double-A battery for a week. Using the

Relay and UDP allowed the BlackBerry to solve those challenges and become successful.

And the difference between what RIM does and what the '917 patent describes is the difference between the BlackBerry being successful and being a failure.  So what RIM does is not only different but it's an incredibly important difference.

Now, I know one of you asked the question during trial, Does the connection have to directly occur between a device and the server or does it describe the start and end points of the process?

Let me try and answer that.  Let's look back at what Mr. Cherry described.  Dr. Acampora testified that the BES, the server, doesn't even know where the BlackBerry is.  Over the cell network only the Relay knows.  That was important for RIM's success, as Mr. Lazaridis told you.

But it's a problem for Mformation.  Because they need the server to initiate the wireless communication. They needed it to start before the contents of the mailbox are transmitted, and they need it to finish before the contents of the mailbox are transmitted.  That's what the claim says; that's what Judge Ware says.  Dinner then dessert.

But in the RIM system the server doesn't initiate

the wireless communication at all.  The Relay does.  And that establishing step doesn't happen first, like Judge Ware says it must.  The Relay initiates the wireless connection or the wireless communication after the BES has already started transmitting.  In this case dessert is on the table before dinner.  That doesn't match up with what Judge Ware says the claim means.  And so RIM doesn't infringe.

Now, there are other reasons why RIM doesn't use Mformation's recipe.  Let's talk about the last clause of Claim 1, also one that they had to be added to get to patent.  This "wherein" clause, the "connection is established based on a threshold condition."  Now, your common sense tells you exactly what Judge Ware instructed you.  And that is, you can't complete the step of establishing a connection without actually making a connection.

And the Court told you as much:  "The use of the phrase 'connection is established' means that 'a connection must not only be initiated but must be made from the server to the wireless device."  That's on page 12 of what you have.

To find for Mformation, you would have to believe what Dr. Madisetti said, that you could establish a connection without establishing a connection.  Those were

his words.  You would have to believe that, as he said on that stand, you can establish a connection with a device that doesn't even exist.  That's in a million pieces at the bottom of the Grand Canyon.  But you can't believe that because Judge Ware has told you that's wrong.  You can't establish a connection just by initiating it.  You have to make a connection to complete that step.

Dr. Madisetti's entire theory that all you have to do is initiate and then transfer, the same thing you saw on the slide this morning, is wrong and it does not meet what Judge Ware told you today.

If we can go to the next slide.

In addition, Judge Ware told you that "a threshold condition has to be based on something other than solely the elapsing of time."  And Dr. Acampora went through each and every one of those four supposed threshold conditions that Dr. Madisetti talked about and he showed you that none of those meet the Court's claim definitions either.  It's another reason why RIM doesn't use Mformation's recipe.

Let's look at another requirement the patent office made Mformation add to its claim.  "Transmitting the contents of the mailbox from the server to the wireless device."

Now, what did Dr. Madisetti tell you about that?

Well, Dr. Madisetti couldn't quite figure out where the mailbox is.  First, he says, Well, I think it might be something called the ITAdminQueue.  The whole thing.  But then he admitted, Well, wait, the contents of that whole ITAdminQueue are never transmitted.  So then he says, Well, okay, if it's not the whole thing, maybe it could be one row in that queue.  Do you remember that queue is like an Excel table, it's got columns and rows.  But then he admitted that the contents of a whole row is not transmitted either.  Then he said, Well, if it's not that, maybe it could be some entry in the user configuration table.

And I have to tell you when he was saying this stuff, it felt like it was in one of those old Wendy's commercials:  "Where's the beef?"  Except in this case it's, Where's the mailbox?  Dr. Madisetti couldn't tell us.

He could not find one where the contents are transmitted like the claim requires.  All of his mailboxes require you to change the words of the claim.  The claim says "transmitting the contents."  What does Dr. Madisetti say?  Transmitting some of the contents.

You have to apply the words of the claim as they were written and as they were approved by the patent office, not as Mformation wishes if they went back they

could have them changed to.

Even if you could rewrite the claim, Dr. Acampora told you that RIM still would not be able to infringe because what's in all of those things are just a bunch of work orders.  And I think you remember this, I remember it was about lunchtime that he said this, that it's like -- there's a list of work orders that are in those things Dr. Madisetti calls mailboxes, they're like an order you place in a restaurant, I want a turkey sandwich.  What gets transmitted or delivered to the BlackBerry, or to you, the restaurant, is not the order slip.  Someone creates that turkey sandwich and that is what's transmitted.  That's how this claim works.

The work orders that Dr. Madisetti says the contents of the mailbox are never sent anywhere.  A BlackBerry doesn't get everybody's order in the restaurant.  A BlackBerry doesn't get the order ticket. A BlackBerry gets the turkey sandwich.  Nothing is transmitted from what Dr. Madisetti calls the mailbox. And that's another reason that RIM does not use Mformation's technology.

Now, there's one more.

There's another part of the claim that Mformation had to add to get its patent.  The requirement that all these steps be performed without a request from the

wireless device.  And Dr. Acampora explained that for WiFi, RIM does establish a connection.  It uses the TCP protocol we talked about that requires that handshake.  It can handle a lot more data.  You know that from your own personal experience.  I know every time I try to download an application, it says it's too big.  It's often free, go to any Starbucks in town.  You can take the time to establish a connection there.  You don't care, you don't worry about battery life because somewhere where there's WiFi you can probably plug your phone in.

But as Dr. Acampora told you, the BES server can never establish that connection because the BES server doesn't know where the BlackBerry is.  It doesn't know that you're in the Starbucks at Market and Third.  The BlackBerry has to tell the server, I'm here, if you have something for me.  That's a request.

And it doesn't matter if you come to Starbucks or your office at 9:00 a.m., get a cup of coffee, get on the WiFi, and then come back at 5:00 p.m. and do the same thing on the way home.  If you leave your BlackBerry there, it's the same connection that was only established by that request from the BlackBerry device.  If you take your BlackBerry with you and come back again, guess what, it's going to have to tell the server again, Here I am, send me what you have.  Because, as Dr. Acampora told you,

the BES does not know where that BlackBerry is.

This is different from the cell network because in the cell network you have the Relay. The Relay is that special piece that knows where the BlackBerry is in WiFi. There's no way the BES can figure out where the BlackBerry is, but for the BlackBerry to tell it, and that is a request.

Dr. Madisetti never said one word to contradict anything Dr. Acampora said on this point with respect to the operation of WiFi and RIM system.

Now, we've seen, just like I told you when we started, RIM does not perform those very steps that the patent office made Dr. Kushwaha add to Claim 1 in 2005. And it's also important to understand, as Judge Ware told you, that use of the BES does not infringe if any part of this recipe is not performed. If you find just one thing of the recipe is different, the law is, no infringement. One difference and your job is done. That's what everyone in this room agrees. And that's what the Judge told you on page 9 of his instructions. Each step must be performed. Because the law recognizes what common sense tells you: That if you change a step in the recipe, you get a different cookie.

When you're thinking about this issue, when you're thinking about does RIM use the same recipe, ask

yourself, Why did we keep hearing over and over again from Dr. Madisetti to Mr. Thakur statements that your common sense tells you don't make sense?  You can establish a connection with something that doesn't exist. Dr. Madisetti.

You can establish a connection with something that's smashed at the bottom of the Grand Canyon. Dr. Madisetti.

You can send the contents of the mailbox without sending the contents of the mailbox.  Dr. Madisetti.

Mr. Thakur told you a connectionless protocol establishes a connection.

And today he said a request from the WiFi is not a request.

Well, your common sense tells you the answer, why you were hearing things like that.  Just like if you were out on the street and somebody told you something that seemed a little wrong.  Dr. Madisetti is having a hard time, Mformation is having a hard time, because they're trying to fit a square peg in a round hole.  Our recipe is different.  And that means the BES does not infringe.

We don't infringe that first step.

You've also been instructed that because all the claims beside Claim 1 are so-called dependent claims, each one includes everything in Claim 1.  So if there's

something in Claim 1 that's not done, all of the other claims, there also is no infringement.

And so when you get that verdict form and review the questions the Judge asks you, for every question that deals with infringement, I ask you to answer no.

You will get a set of questions also on the verdict form about invalidity, and, you know, we say that the '917 patent, even when they added those three steps in 2005 that the patent office made them add, it still was not new, because a product called RemoteWare had all those steps.  And it had those steps before Mformation.

Now, Judge Ware instructed you that you can prove invalidity by looking not only at earlier patents but by earlier products, and even earlier publications.

There's no dispute that the patent office did know about RemoteWare.  We saw, and you can see when you look at your patent, it has that section "References cited."  It gives you the list of things that the patent examiner considered.  And Dr. Madisetti admitted up on the stand, he said, Nope, none of those things is RemoteWare.  Not a single one.

And here's what Judge Ware told you about this issue:  He says, as part of his instructions today: "Prior art that differs from the prior art considered by the patent office may carry more weight than the prior art

that was considered, and may make RIM's burden of showing that it is highly probable that a patent claim is invalid easier to sustain...."

Now, interestingly enough, Mformation knew about RemoteWare.

May we have the next slide, please?

You remember Exhibit 2078.  This is the exhibit where Mformation identifies RemoteWare as one of its major competitors.  In July of 2002, long before the patent was issued by the patent office.  Mformation chose not to tell the patent examiner about RemoteWare.  Just like it chose not to tell you about the Relay or about UDP.

Mformation knew that if they told the patent examiner about RemoteWare, they would not get their patent.  Just like if they told you about the Relay and UDP, they knew they couldn't win their case.  The examiner had already made them add three steps to their recipe. Mformation was going to take a chance.  So they decided to hide the ball from the patent examiner, just like they tried to hide the ball from you.

There's one big difference.

Here, I get to stand up and point out what you weren't shown.  You remember from the patent video that doesn't happen at the patent office.  It's all between the patentee and the patent office.  Nobody gets to stand up

and say they forgot to tell you something.  Dr. Acampora can't come in and say, Wait a second, this isn't really how it works.  The patent system relies upon the patentee to come in and disclose freely, just the way we disclose freely our e-mails, our documents, our source code, everything that we have in this case.

Mr. Thakur is right about one thing, and that is, it is our burden to prove invalidity by clear and convincing evidence.  Well, you heard Dr. Acampora and his testimony was certainly clear:  Unlike Dr. Madisetti, Dr. Acampora tried to explain to you, like I've tried, so that you will understand the technology and you will know what's going on.  Dr. Acampora's testimony was also convincing.

Next slide.

He took you through each step of the '917 patent, and showed you that RemoteWare met every single one of them.  And for every single one of those checkmarks you remember he went back to the documents and came back to check it off.

Get the next slide.

Here are three of those RemoteWare documents that he was relying upon in detail.  You can see each of them is dated in 1996.  Three years before Dr. Kushwaha ever claims to have had his idea.

Take that down.

Now, what was Mformation's response to all of this? Remember when they tried to argue that RemoteWare was not wireless? You'd have Mr. Foley come here from Georgia and say, Yes, I know it was wireless. I climbed on the roof. I saw the satellite dishes. There were no other connections. I saw it work. And you saw the documents that backed him up that referenced satellites that sell your connections.

But what happened when Dr. Madisetti got up on the stand? Dr. Madisetti never disputed that RemoteWare was wireless. Never said it was not wireless. Again, this whole effort to discredit Mr. Foley, to make him tell you that he was fired in front of this whole courtroom, had nothing to do with this case. Was simply to get you to believe something that even Dr. Madisetti didn't believe. And that you saw was contradicted and demonstrated in the documents that RemoteWare was wireless.

Now, Dr. Madisetti disputed really only two things with any kind of explanation: First, he said, Well, when RemoteWare server sends a -- tells a device "delete file," that's not a command. But when I asked him, Well, when I'm the server and I say to you something that says, "delete file," if that's not a command, what is

it?

He had no answer.  And when he finally answered, he said, Well, it's a command, but it's somehow not the command that the Court was talking about.

Well, let's look at that.

Here's the Court's construction.  The Court's construction is that "a command is a code or signal intended to cause a wireless device to take or cease action with respect to its functionality, or other data for use by the wireless device."

Dr. Madisetti said the telling the wireless device "delete a file" does not cause the wireless device to take or cease action with respect to its functionality.

Now, you don't need to be a PhD to figure out that is not true.  A "delete file" command does exactly that.  If you delete a file, you can't work with that file anymore.  If you can't work with that file anymore, that affects your functionality, the functionality of that device, and the functions you can perform on that device.

What else did Dr. Madisetti say about RemoteWare?  Well, he also said it does not meet the verifying step because he said the verification is done by a human and not the server.  First, he's wrong.  Here's one of the RemoteWare manuals and it says the server uses this information to authenticate your client.

Look at the Judge's instruction about verification. He says that means authentication. Look at this document Exhibit 4043. It says the server does the authentication. It's plain as day. But it doesn't even matter. Because the claim doesn't say that verification has to be done by the server. It just says at the server.

Next slide is the Court's claim construction. And there you see the verified means to authenticate just like we saw in that document. Proof.

This slide also says that Claim 1, this is the Judge's construction, does not claim as part of the invention any process for how the server knows the registration information.

So now those are the only two specific things that Dr. Madisetti explained about RemoteWare. And they were both wrong and demonstrably wrong.

On everything else, Dr. Madisetti just gave you a bunch of conclusions. This step is not met, that step is not met. And although Mr. Thakur likes to talk about showing you the evidence and not telling you the evidence, Dr. Madisetti did not show you any evidence for these steps. That's because all he had in his report were a bunch of conclusions with no facts to back them up. So unless you believe Dr. Madisetti about command not being commands, or verifying not being verifying, there's really

no other dispute.  RemoteWare had all the elements of Claim 1 and the other dependent claims.

Mr. Thakur had another argument, Dr. Acampora did not have the source code for the RemoteWare.  Guess what, both experts, Dr. Acampora and Dr. Madisetti performed their analysis without the source code because the RemoteWare documentation had everything they needed.

Now, I told you when we started that this case is a claim of invalidity.  You stand in the shoes of the patent examiner.  You now have all the facts the patent examiner did not have when they issued this patent.  And you know -- we know people these days don't always like to take responsibility.  Some people are always blaming somebody else, shifting responsibility to others.  You may have seen this in your workplace.  Somebody's supposed to do something and you end up having to do it.

Well, here you have to take the responsibility for standing in the shoes of the patent examiner.  Because our patent system depends on you doing that.  It won't work without you.  Because if Mformation can get away with hiding the ball from you and from the patent examiner in this case, you can bet they and others will do it again.  And the result is that people go running around suing folks who have done nothing wrong on patents that never would have been issued if the patent examiner had all the

information.

It's not an easy job that you have.  But it's your duty to do the right thing.  And when you see the verdict form from the Court on those questions that relate to invalidity, I ask you to answer them in a way that demonstrates that the patent is not valid.

There's another reason to find this patent is not valid.  You remember Dr. Kushwaha testified under oath in his deposition that his demonstration at Deutsche Bank in July of 2000 had all the elements of Claim 1.

Can you play that, please?

(Video deposition excerpt played)

MR. MATUSCHAK:  He got up on the stand and told you here that he was confused and made a mistake.  I submit to you that that does not look like somebody who's confused.  And there was a reason that he said it at the time.  There was a reason for that.  He wanted to get the benefit of the earliest possible invention date, so he thought if he said he did it in June, he thought he would be able to claim this in June.  He wanted to have his invention date before the time he came to RIM when he told them how to do things.

How can we deploy applications over the air?  How do we update applications over the air, and how do we implement wipe over the air (indicating)?

Then, he realized that if all the elements of Claim 1 were present in the demonstration that would make his patent invalid, so he had to change his testimony. This wasn't a mistake.  This was a very calculated plan that went wrong, and then he changed his mind.

Now you can take that down for a second.

Mr. Beltramino I think was cited as the person who said, Well, I created the code.  Wireless demonstration step wasn't in that code.

But he was talking about code from May of 2000. We're talking about a demonstration that was in July of 2000.  Two months later.  You saw Mr. Margam's declaration.  It's Exhibit 4838.  And Mr. Margam said that they were making changes to the code all the time.  What a coincidence:  They didn't bring Mr. Margam here to testify.  They brought Mr. Beltramino, who can sit here while his boss is watching him and say, Yeah, say that, in this code for May, we didn't have wireless registration. I'll submit to you that's not the right code.

And I've started a timeline to make this a little bit easier.  So you have the Deutsche Bank demonstration in July of 2000.  You have the first RIM/Mformation meeting, May of 2001.  The patent application filed August 2001, after the first meeting with RIM.

The application was filed more than one year

after that demonstration to Deutsche Bank, and as you heard the Judge tell you, that means the patent is invalid because this is what they call the "statutory bar."  It's there because patents are supposed to be about something new.

Now, Mformation says, Well, okay, we've got to figure out some fix for this one now.  They say, Well, look at this provisional application.  That has everything in it that Claim 1 has.  They want the date of the provisional application because it's less than a year.

And we'll put that in the next slide, please.

So there's the provisional application in December of 2000.  So now that's less than a year to August.  And they think they've got the problem solved.  The problem that was caused by Dr. Kushwaha getting up on the stand the first time and saying, All the elements of my invention were in that demonstration.

But the law says, as Judge Ware read to you this morning, the provisional has to disclose every part of the recipe or it doesn't count.

In December of 2000, before Dr. Kushwaha went to RIM, he had it backwards.  Let's look at Exhibit 571, which is his provisional application.  You saw this very briefly in Mr. Thakur's closing.  But here in 2000, he's saying:  "If the command is to monitor some parameters on

the device, then the agent periodically sends the information back to the server, which could be based on certain threshold conditions...."

In December of 2000, when he filed the provisional, Dr. Kushwaha's invention was for a wireless device, not the server, to send information based on a threshold condition. Wireless device sending it based on a threshold condition.

What does the patent say?

"Without a request from the wireless device, the connection is established based on the threshold condition."

It's exactly the opposite.

And remember what the Judge told you on page 19 on this point, it's Mformation's burden to prove that that provisional application disclosed all the elements of Claim 1, and on that threshold condition what's disclosed in the provisional was exactly the opposite of what's in the patent. So the provisional cannot save Mformation from that more than one-year period, and the '917 patent is invalid for that reason as well.

Now, those questions are going to be a little bit more complicated to you. You'll have to -- I think you'll be asked first, Did Mformation demonstrate all of the elements of the claim were in the provisional? I submit

to you you should answer that question no.  And you'll be then asked if we proved to you that the patent is invalid on that basis, and I think you should answer those questions yes.

Now, I'm going to talk a minute about damages. You know, I think we all know the real world, when you're successful, when somebody's successful, there's always someone who will come around claiming, trying to claim a piece of it.  Someone who says it's really all their work when it wasn't.

And that's what happened here.  Mr. Thakur showed you -- remember this little chart -- how successful the BlackBerry had been.  He wants you to believe that's not because the BlackBerry was a revolutionary product that's enshrined in the Smithsonian Museum.  That it's not because of all the hard work that Mr. Lazaridis did trying to solve these problems that no one had solved before. Not because of all the hard work Mr. Cherry and all his engineers did to try to create the BlackBerry Enterprise Server.  It's all because of Mformation.

That's what they want you to believe, and you have to be believe that to get anywhere near Mr. Weinstein's number.  His number is so extreme, so outrageous, that the only way they can justify that is to claim that they are responsible for the entire success of

the BlackBerry.

And they say a picture is worth a thousand words. Let's look at this picture.  This slide tells you all you need to know.  Out there in the real world Mformation licensed its patent for 20 cents a device to Intel in the volume we're talking about here and 21 cents to Sprint. Not 20 cents a month.  20 cents, period.  Because you only do activation once.  Why would anyone in the real world pay 20 cents or even 20 cents a month for two years to do something you only have to do once to activate it?  You do it when you get it and you're done.

In their hypothetical dream world, Mformation wants you to give them 60 times that, or $12 per device. To get to that number you have to find the patent has infringed.  You have to find the patent was valid.  You have to find that the patent value goes up 60 times when you walk through those two doors at the back of the courtroom.  And you have to believe that people would pay every month for something that they do one time.

And you have to believe one more thing that Mformation never proved to you.  You have to believe that every single one of those 18.4 million BlackBerrys that Mformation talks about was shown to have been activated wirelessly.

Why is that?  Let's look at the Judge's

instruction.  He says to calculate an ongoing royalty, you must first determine the base.  That's the product on which the infringer has to pay.  Then multiply the number of products by the rate that you find would have resulted from the negotiation.  He gives an example.  For the example, if the rate is $1 per device and they sold 200 devices, they are found to have infringed, royalty's $200.

All right.  Take that down.

You sat in this courtroom every minute of this trial, and you never heard testimony that would prove that 18.4 million BlackBerrys, the base, were wirelessly activated.  Mformation did not even try to prove that.

What did you see?  What did you hear?

Next slide, please.

There were two witnesses that Mformation called on this point, Mr. Hatcher and Mr. Wilson.  What did they say?  The first one said, I've done this maybe a hundred times.  The second one said, Yeah, about a hundred times also.  If you give them the benefit of the doubt, and this is a stretch, that they testified that they activated 200 BlackBerrys between them, and that was performed using every step of Claim 1 the way it says in the patent, which cannot occur, then it's a base of 200.  It's not a base of 18.4 million.

Mr. Thakur got up and said, Well, you know,

that's hard to prove.  Well, that's not an excuse.  That's their burden.  Look in the instructions.  They have to prove that.  There are many ways that you can prove that, and they didn't try.  They put two people on for 200 devices.  And that means even if you apply Mr. Weinstein's number, $12 times 200, you get $2400.  And they still have to prove infringement to get that, and they still have to prove their patent's valid.

Next slide.

Here's what happens when you let the real world in the door of the courtroom.  You still have to find the patent's infringed, you still have to find the patent's valid, you still have to apply all of Mr. Weinstein's assumptions, including the 18.4 million BlackBerrys were actually wirelessly activated.  Which they never proved.  But if you give them what they charge in the real world, the number is 3.68 million.  That was the number Mr. Weinstein calculated.

Next slide, please.

If you decide to stay in the real world and use a reasoned approach, like Ms. Davis did, you still have to find the patent not infringed, you still have to find the patent valid, but there's your number.  And even that assumes they actually proved those 18.4 activations.  They didn't.  We were all waiting for them to bring somebody on

to prove that.  That's why Ms. Davis's calculations assumed it.  We thought they'd bring somebody to demonstrate it, but they didn't.  They only proved 200.

Next slide, please.

They put this document up, and it's the entire basis of Mr. Weinstein's damages theory, and they want you to say, Well, gee, people wanted to charge a lot of money for this.  30 bucks a seat for Mformation.  But as Mr. Castell told you, these are the prices companies wanted to charge for their software products in 2001.  Four years before this hypothetical negotiation.  These were not the prices that people actually charged in the real world.  For example, the chart refers to attachment handling.  And this chart says, well, that's going to cost $50 a seat, that's what those companies want to charge.  Well, what did they really charge?

Next slide, please.

We know that RIM actually licensed the attachment handling software and paid less than one cent per device from Glyph & Cog.  Not $50.  Less than one cent.  The chart was issued for numbers.  This is the real thing.

THE COURT:  Counsel, I'll remind you you have about five minutes.

MR. MATUSCHAK:  Thank you, your Honor.

At the end of the day all you need to know on

damages is they did not prove infringement, the patent is not valid, that means the right number is zero.  They struck out in this courtroom the way they struck out in the marketplace.  They do not deserve money for what Mr. Cherry and his engineers did.

Now, as I was thinking about what I was going to say to you, I thought about the witnesses in this case, Mr. Lazaridis, Mr. Cherry, Tony Acampora, and I thought about words that we don't hear much anymore.  Words like honesty, truthfulness, integrity, hard work.  You've seen the people that represent these two companies, and I submit to you, if you ever read this book in high school, this was like a *Tale of Two Cities*, a tale of two companies.  They're not the same company.  One is here because the founder wants to blame someone else for his failures in the marketplace.  We know why Mformation brought this lawsuit.  This is what Mformation's investors, those venture capital funds and investment bankers were seeing from their investment.  Don't you think they got a little frustrated Mformation is not earning any money?  Don't you think they asked a few questions in that board room about when it was going to turn around?

That's why Mformation is in this courtroom to blame somebody else for their problems.

RIM is here for a different reason.  RIM is here because of principle.  RIM is here in the person of Mr. Lazaridis, the man who founded the company 20 years ago, with $15,000, his parents' life savings and a matching student grant.  It was here in the person of Mr. Dikun, who's in charge of BlackBerry product development.  It was here in the person of Mr. Sanchez, RIM's chief patent officer.

RIM is here to stand behind Mr. Cherry and their engineers who did the work, who have worked hard for 10 years to create the BlackBerry Enterprise Server.  And RIM is here in this courtroom because it's willing to stand on old-fashioned principle, just the way the founder of our country provided.  A jury trial.

RIM is putting its trust in you and in your common sense.  In your ability to see, just like my grandparents could see, the truth, regardless of your background, and regardless of your education, is not manufactured, bricks on the scales of justice, truth is isn't on a slide.  Truth is in your mind and it's in your heart.  And that truth tells you that the '917 patent is not valid and it's not infringed.

Thank you.

THE COURT:  Okay.  Do you need to change anything about the courtroom for rebuttal?

MR. THAKUR:  I don't.  I wonder if the jury would benefit from a five-minute break?

THE COURT:  I'll leave that up to the jury.  Do you need a quick break before we get to rebuttal?  All right.

MR. THAKUR:  I apologize.

With all the discussion of dinner and desserts, cookies, recipes, the beef, turkey sandwich, I thought we'd all be ready for lunch.  I ask for you to bear with me 10, 15 more minutes.  I don't have a lot more to follow up with.

The first thing you know we've talked a lot about honesty and integrity and challenging the integrity of Dr. Kushwaha.  And I find that unfortunate.  He's a good man.  He made a mistake in a deposition.  Other than that, he's a good man.  I want you to listen to honesty and integrity.  I told you at the beginning you did not -- not once was that mentioned.  Not once do I suggest that they copied our source code.  And I want you to read the words that I actually said.

And I said:  "I want to emphasize this point -- you may conclude that Research In Motion copied our invention.  I have my opinions on that.  You may have your own.  Copying the invention is not copying the source code.  At no point has anyone ever accused them of copying

our source code."

And I said:  "You may conclude that they willfully infringed, but that is not our burden. Mformation's burden is simply to prove that the use of RIM's products more likely than not resulted in infringement of the '917 patent.  And we will meet that burden."

That was my promise to you.  When you read it in its entirety.  Our burden was to prove infringement and we have met that burden.

It's perfectly fine to take documents out of context, show words to you outside the courtroom, but when you come in here, we have an obligation of showing you everything and giving you a chance to understand it all.

They mentioned a document, Trial Exhibit 4443, where they identified lock and wipe and IT policy.  That same document says, We don't know how to do it.  We need to figure out how to implement it.  And that's in 2001. Knowing you need something, that tells you how valuable the infringement is.  They knew they needed it.  It's not in dispute.  The fact is they didn't know how to do it. That's clear.

Honesty and integrity.  Talk about Mr. LeVine. He's no longer with us today.  They gave him 300 dollars' worth of options.  Three hundred dollars' worth of

options.  As a thank you gift for giving us some advice.
An elderly gentleman who gave them a courtesy of starting
with a young company and giving them some advice.  A thank
you gift.  And yet during the course of this trial, you
heard them attack him as if he had done something
improper.

They attacked us by saying, Oh, these three key
elements in the patent.  You saw that up on the slide.
You also saw the opening patent video, that is the way the
patent process works is you disclose an invention and you
go back and forth to the patent office until you
eventually get a patent.  You're not allowed to add
anything to the patent.  What is in the claim is added
from other claims in the patent.  That is the normal
process of how patent prosecution works.  They don't show
you the original application where those things are
present.  Nothing new was added.

Then they talk a little bit about inducement.
They said, Well, we didn't know the patent.  We showed you
all our e-mails.  The BES 5.0 was released after the
patent was filed.  Any discussion about the patent after
the lawsuit was filed was subject to a privilege.  They
know we wouldn't get those e-mails.  They know that, and
yet they tell you, you didn't bring us any e-mails.

They talk about UDP.  We've already discussed

this adequately.  I won't go through it again.  But it is misdirection.  It has nothing to do with this case.  The claim doesn't limit it to protocol.  The Court's construction doesn't limit it to protocol.  And the patent tells you you can use any protocol.

They talk about battery life.  What's that got to do with anything in this case?

And they also give you examples of connection and based on the devices that are lost in the Grand Canyon.  These are the only two slides I will show you.

I have a couple of slides really quickly.  I had anticipated this issue.

Remember what we talked about, how the device and the connection works.  You enter the command, once the command is polled and the GME packaging begins, you have initiated the connection.  Once you've checked the threshold conditions, you have completed initiating.  That is establishing the connection step.  That is not wherein the connection is established.

What happens?  You may use any networking technology and protocol.

Then, transmission is completed.  That is when the connection is established.  That is what the Court instructed you.

Let's go to the example at the bottom of the

Grand Canyon.  What's happening here is going from the BES to the BlackBerry.  That is now when the connection is established.  The connection is established based on the threshold condition.  That was the threshold condition.

Now, let's take a look at the scenario where the BlackBerry's busted.  Those early steps, the initiating has been completed.  That relates to establishing the connection.  That has been performed.  When it goes over the protocol to the BlackBerry, it is not able to make a connection.  So there is no connection that's established.  Those are two different things.  They are simply trying to confuse you between what the claim requires and what -- examples that don't matter.

I know that they talk heavily about Dr. Acampora's testimony about RemoteWare.  And how it was clear and convincing based on his testimony alone.  I think you should determine for yourself the only thing clear about Dr. Acampora's testimony was that it was not convincing.

They, again in an effort to misdirect you, somehow suggest that Dr. Kushwaha didn't even come up with the invention.  This is the first time we've heard that.  We were talking about pointing the finger in the wrong direction.  They said, Dr. Kushwaha actually came up with the patent knowledge, he learned about it from RIM

in 2001.  That document shows you that they still were trying to figure it out.  I find that not the actions of an honest -- of a company that has honesty and integrity.

Finally, they try to talk about damages, and they point you to two agreements.  Sprint and Intel.  You heard the testimony from Sprint.  I talked about it at the beginning.  If you actually value it by the customers that would use it, $12 is an absurdly conservative number.  And then they showed you the Intel agreement.  What they don't tell you is the Intel agreements relates to WiMAX.  It doesn't even work on the cellular network.  It has nothing to do with this agreement.  You are truly comparing apples and oranges.

Your Honor, with your permission, may we walk through the verdict form?

THE COURT:  Well, I've given you only a draft. You can certainly use portions of it.

But members of the jury, until I finally submit the verdict form to you, what you're seeing is just a draft that I shared with the parties, and it might change in the form.

MR. THAKUR:  Thank you, your Honor.

Just going to put up for you what we thought was the verdict form, a couple of questions you may have to answer in terms of where the evidence is.  Again,

Question 1 is, we simply have to prove by preponderance of the evidence that RIM's enterprise customer directly infringed.

You saw Mr. Hatcher, you saw Mr. Wilson.  They told you that they directly infringed.  And so we ask that you circle "yes."

Next question was:  "Do you find that the process used by the RIM enterprise customers practicing the following substeps of the Claim 1 of the '917 patent?"

You have heard testimony and seen testimony before today, the only issues were relating to establishing a connection for the cellular and without a request from the wireless device for the WiFi.  We believe we've shown you the evidence.

And we ask that you circle each and every one of these elements as "yes."

The next question you will be asked to determine is whether you find -- which claims are directly infringed by the enterprise customers.  As we explained, if Claim 1 is infringed, they do not dispute that they infringed the remainder of the claims.  And so, consequently, we will also request that you circle "yes" on all of these claims.

Question 4 here in the proposed form asks:  "Has Mformation proved by a preponderance of the evidence that on or after October 27, 2008, RIM manufactured and sold

the BES software and wireless devices?"  We ask that you answer, yes.

The next question will relate to the has Mformation proved by a preponderance of the evidence that the products supplied by RIM contained important components used in the infringing process?

BlackBerry BES is about wireless devices in both before you actually can provide other features and capabilities.  We ask that you circle "yes".

Question 6 relates to components supplied by RIM that are not common components suitable for noninfringing use.  Again, we ask that you answer "yes" because that's what this product is about.

The next question is:  Did RIM supply these components with knowledge of the '917 patent and knowledge that the components are made or adapted for use in an infringing manner?

RIM has shown you the documentation.  We've shown you the evidence.  They thoroughly knew what the BES 4.0 did, and we ask that you circle "yes."

The next item, Question No. 8, is inducing infringement.  We believe that it is abundantly clear that RIM has taken actions or a series of actions that actually induce the direct infringement of the other company.  You saw the manuals.  You saw the testimony.  You saw the

website.  Again, we ask that you answer yes.

The next question is, Was RIM aware of the '917 patent?  We've shown you the evidence about how they were aware.  Since this lawsuit was filed.  You can't close your eyes to that fact that they were aware since this lawsuit was filed.

Next question relates to proving by a preponderance of the evidence that RIM knew or should have known that its actions would cause direct infringement.  They're not -- the sole purpose of releasing these products to the commercial marketplace is to actually have these products used, and they knew that this would cause direct infringement.

The next item that -- once you've identified those claims, you will then be asked to turn to the defenses that RIM was presented in this case.

The first one is, did the provisional patent application filed in December 2000 disclose every limitation of the '917 patent?  Clearly it's right in the document for you to see.  We ask that you circle "yes."

Next.  So if you do that, then the next question you will be asked to do is, did RIM prove by clear and convincing evidence that the provisional application did not disclose every limitation of the '917 patent?  The answer is no.  Clearly they have a burden of clear and

convincing evidence to prove it's not there while it's right there in the language.

Next question is, have they proved by clear and convincing evidence that Mformation publicly demonstrated a prototype on July 24, 2000, that included every element?

We ask that you circle "no."

The next questions relate to obviousness. This is the set of questions that the jury will be asked what is a level of ordinary skill in the art, and the Judge determines obviousness based on this. We have provided you our contention, we ask that you respectfully check "Mformation."

Again, with respect to the scope and content of the prior art, we ask that you check "Mformation's contention."

Same for the following items.

You have heard evidence about this, I will let you determine for yourself the fact of whether the BES 4.0 was a commercial success, the fact that you saw RIM's customers and surveys talking about needing it, talking about XcelleNet not being able to provide it, and the RemoteWare not having wireless device management.

This is the one time I will use the word "copying." Patent law allows for you to -- copying the claimed inventions, and that's what I was talking about in

my opening, I believe they did.  You'll have to make that determination.  These are ones that you can determine. You don't have to determine all of them.  I think unexpected and superior results, clearly everyone was looking for it.  You saw RIM's e-mail that said Mformation's approach was better than others.

And the acceptance and praise by the industry, you have seen the industry awards and you have seen how successful RIM was following the decision to infringe.

The next question is, have they proven anticipation?  Clear and convincing evidence by RIM that all the requirements of '917 existed in the use of a single system or method that predates.  No.

And then you will turn to damages.  To determine damages, you must identify the royalty per unit. Mr. Weinstein has provided you his analysis of $12 per unit.  We ask that you fill in "$12 per unit."

Finally, you will be asked to fill in the number of units.  It's 18.4 million.  You heard RIM's expert Julie Davis talk about it.  You heard Mr. Weinstein talk about it.  And for the first time in this case, you heard the suggestion that they don't -- that the number of units should be less.  Clearly that is not the case.  Every unit is therefore wireless registration.  That means they infringe because everything after that occurs without

involvement by the user.  And those class of devices are what infringed.

So we will ask respectfully that you fill in that verdict form as recommended.

I want to conclude a little bit about my journey. I met these guys in '07.  I remember going to their offices and talking about infringement.  And I knew they were scared; they told me they were scared.  And they said, This is going to be really difficult, really expensive, and we're going to be overmatched.  I didn't tell them this, but you know what I knew?  I said:  You have no idea.

This has been a difficult journey.  For them; for me.  But I promised them I would be there.  Five years ago, that I would be there at the end.  And I stand here today.

I know we were overmatched.  I know this has been a difficult journey.  But I believe justice will finally be done here.  We have something they don't.  We have the evidence.  And you have seen the evidence.

But in this case, it's not just about Dr. Kushwaha and me.  This is also about you.  In this case, let's talk about what we all know.  This is a big, significant patent case.  And when you issue an award of $199 million, there will be reports across the country.

And there will be other business companies that will hear this news.  And you will have a chance to make a difference.  Not make a difference just to Dr. Kushwaha's life but make a difference in the lives of those others whose patents are about to be infringed by those big companies.  You can stop them and make them think twice before they do what they did to him.

Thank you.

MR. MATUSCHAK:  Your Honor, since the verdict form wasn't available, can I have two minutes to talk about the verdict form?

THE COURT:  Certainly.

MR. MATUSCHAK:  I only have one thing to tell you about the verdict form:  It's your job to fill that out.  It's not the lawyers' job.  We don't circle the verdict form.  I'm not going to circle that verdict form.  I'm not going to tell you how to answer those questions.  You know in your head and your heart how to answer those questions.  That's your job and we put our trust in you.

Thank you.

THE COURT:  Members of the jury, I often don't comment on the argument by the two sides.  That's why it's argument.  But I do want to caution you that your decision in this case should be without regard to the effect of the decision on any other case or any other patents.  This is

a case that you should decide based solely on the evidence in this case with respect to these parties and the contentions that are made here.  It would be improper for you to try to send a message beyond the decision in this case to anyone.

When you retire you should elect one member of the jury as your presiding juror.  That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement, if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you've considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict, but of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and the effect of the evidence simply to reach a verdict.

Now, during the course of your deliberations, you may take rest breaks or lunch breaks as you wish. Since we will be standing by pending your deliberations, please send us a note as to what your schedule will be. During any break, do not deliberate further from the case. Cease all deliberations until your foreperson has brought you back into session with all of you present.

Now, it is -- the Court has to apologize to both sides that I didn't have a version of the verdict form available. I try to do that before the argument takes place, but it didn't happen because of the detail that I wanted to use in it. And so it is -- you will see from the verdict form not only questions but you will see directions, and I try to put those in italics, so as you go through the various questions sometimes the direction will be based on your answer, go to the next question, and other times, it will be based on your answers, skip to further questions. So you should follow each of those.

After you've reached unanimous agreement on a verdict, your foreperson will fill in the form. There will be an official form -- although it's my practice to allow each of you to have a copy, there will be one that the foreperson would sign and date, and advise the Deputy Clerk that you are ready to return to the courtroom.

If it becomes necessary during your deliberations

to communicate with me, you'll find a form for that purpose included in the material sent to the jury room. Any one of you may communicate with me by filling out the form.  Give the form to the courtroom deputy and they'll get it to me.  No member of the jury should ever attempt to communicate with me except by a signed writing.  And I will communicate with any member of the jury on anything concerning the case only in writing.  Or orally here in open court.

Let me comment about the transcript.  Often jurors wish to have portions of the testimony in a transcript because you've seen during the trial the parties have the benefit of a transcript.  Well, this is not the official transcript.  They've made arrangements with the court reporter to give them an unofficial copy so that they can use it to anticipate testimony or refer to testimony.  If you wish to have testimony of a witness read back, we'll have to follow a process where the court reporter will read it back.  It's not the Court's policy to compile a set of transcripts and send it to the jury room, but that is available to you.

You're not to tell anyone, including me, how the jury stands -- numerically or otherwise -- until after you've reached a unanimous verdict or have been discharged.

At this point, I'll have the Clerk of Court take charge of the jury, conduct them to the jury room and keep them safe for the conduct of their deliberations.

DEPUTY CLERK:  All rise.

(The jury exits the courtroom.)

THE COURT:  Please be seated.  Out of the presence of the jury.

Draft 3 of the verdict form is one which I've made one further change, so that should show up here momentarily.  And I'll tell you what the change is so your attention can be drawn to it immediately.

What was previously on page 5, which was a series of directions before going to the defenses, I intend to delete.  As I told you, my intent is to have the jury answer the defenses even if they have not answered that there is infringement.  So that the patent might be found invalid even if it is not found to have been infringed.  So there are separate matters that the jury's attention would be drawn.  As soon as that comes, I'll have it reviewed.  But as you have been reviewing the draft, I wanted to give you an opportunity to speak to that.

MR. McDONALD:  If I may, your Honor.  At Question 1, we believe rather than having the direction proceed to Question 2, it should be as your Honor said it would be earlier this morning:  If you answered "yes,"

proceed to Question 3.  If you answered "no," proceed to Question 2.

Because otherwise -- if they found "yes" for Question 1, they will just be circling the question for Question 2.  And it does present the possibility of an inconsistent verdict.  If they answered "yes" for 1, and then "no" for something in 2, we wouldn't know what the verdict would be.

MR. MATUSCHAK:  We think that it's right the way it is, your Honor.

THE COURT:  You would not wish to change?

MR. MATUSCHAK:  Correct, your Honor.

THE COURT:  So, again, tell me the order -- you're not objecting to the questions, only -- only objecting to Question 2 as potentially causing confusion?

MR. McDONALD:  No, your Honor, I think the questions are fine.  I think that after Question 1, it should read:  If you answer "yes" to Question 1, proceed to Question 3.  So they would skip Question 2.  They've already found that it would -- they've already found infringement.  Asking them to say what steps are missing doesn't make any sense.  And that's what Question 2 does.

MR. MATUSCHAK:  Well --

THE COURT:  Well, the reason Question 2 asks for steps is also to inform us if they find that there's no

infringement, we would then know which steps they found were not practiced.  Otherwise, you're correct, it -- you would have us use the substeps only to verify that each step is infringed.  But I need the opportunity to know what step is missing.

MR. McDONALD:  That's not what I meant to say, your Honor.  If the jury answers "no" to Question 1, then absolutely we would like to know which step they think is not present.  But --

THE COURT:  That you would get that out of the current form.

MR. McDONALD:  That's correct, your Honor.  But under the current form, if they answered "yes" to Question 1, there's no reason to have them step through Question 2 because they've already answered those as all "yes" by the fact that they've answered "yes" to Question 1.

THE COURT:  Presumably.  But you are correct that it would preclude there being an inconsistency, because if they answer "yes" to one, and answer "no" as to any of the steps, that would produce an inconsistency, but I'd have the opportunity to send them back and fix that.

MR. McDONALD:  Okay, your Honor.

MR. MATUSCHAK:  If we're still on Question 2, I have one request to that.  Particularly since one of our

defenses with respect to the use of WiFi transmission is that it's not done, it's not done without a request from the wireless device, that actually doesn't appear on this. I know it's embedded in many of these, but not all. Of the things that are shown here. But I think there should be somehow a separate way for the jury to be able to identify that.

THE COURT: I could include, as I did in brackets on substep A, in the establishing a mailbox step, because that is the first of the steps that is preceded by that preamble. "Without a request from the wireless device to the server," as I have now construed it. If that's what you want.

MR. MATUSCHAK: And as long as it was clear that that was for all of the -- for all the steps.

THE COURT: Well, that would make that chart much larger if I were to include that in each one, but if that's your request, I'll consider it.

MR. McDONALD: That's currently in the instructions, your Honor. And we think it would unnecessarily clutter and make the form confusing.

THE COURT: I understand.

MR. MATUSCHAK: With respect to that same question, your Honor, I think you asked them if they answer "no," to go to -- to sign the form, but they still

have to go and do the issues relating to invalidity.

THE COURT:  Oh, yes, I tried to -- it's -- I do communicate as I did in here, that further instruction should be stricken.  And I would strike that and would -- let's see.  So -- let me consider that.  So I'll take that into consideration in the next draft.

You understand the request?  Plaintiff's counsel?

MR. McDONALD:  I do understand, your Honor.

THE COURT:  Anything further?

MR. McDONALD:  Yes, your Honor.  As to Question No. 6, we'd request that the language from Question No. 5 be repeated for clarity.  Question No. 5:  "Did Mformation prove by a preponderance of the evidence that the products supplied by RIM contained," quote, "important components used in the infringing process?"

We'd like that language, Instruction No. 6, where it currently says:  "Did Mformation prove by a preponderance of the evidence that the components supplied by RIM," we think that phrase is unclear.  And it would be clearer if it stated:  By a preponderance of the evidence, that the important components used in the infringing process supplied by RIM are not common components used for -- suitable for noninfringing use.

So just adding before the word "components" --

THE COURT:  Don't I say those components, because

you have to answer "yes" to get to 6?

MR. McDONALD:  I think that's a much cleaner solution, your Honor.

MR. MATUSCHAK:  We don't have any objection to that, your Honor.

THE COURT:  Very well.  Anything else?

MR. McDONALD:  In Question No. 8, your Honor, at the very end where it says "by the other company," we believe it should say "by the other person or company."

THE COURT:  Enterprise activation by a person is not something that I have heard in this case.

MR. McDONALD:  Well, we heard testimony from Mr. Hatcher, who is an individual.  Now he's no longer with EveryNetwork.

THE COURT:  I don't believe that there's any evidence that an individual has bought a server and purchased a BlackBerry device, and between him or herself and the device uses enterprise management.  So I won't change that to "person."

MR. McDONALD:  And finally, your Honor, Question No. 9:  "Did Mformation prove by a preponderance of the evidence that at the time it acted, RIM was aware of the '917 patent?"  We'd ask that the language from the Court's instructions be included as well and specifically --

THE COURT:  I'm not going to insert my instruction into the question.  But I'm --

MR. McDONALD:  Not the --

THE COURT:  You're now looking at Question 11?

MR. McDONALD:  Question No. 9, your Honor.

THE COURT:  Yes?

MR. McDONALD:  We would ask that language from the instructions at page 16, the bottom of 16 to the top of 17, be added reading, quote, "or that RIM believed that it was highly probable its actions would encourage infringement of a patent and it took intentional acts to avoid learning the truth."  Because --

MR. MATUSCHAK:  Well, I think then you just start -- your Honor, you just start for -- the rest of the instructions, if you're going to add that sentence, then the next sentence also has to be in there too.

MR. McDONALD:  And we would not object to that.

MR. MATUSCHAK:  And the sentence after that.

THE COURT:  Denied.

MR. McDONALD:  Thank you, your Honor.

THE COURT:  Very well.  Let me quickly then make these changes.  The note from the jury indicates they'll take their lunch break between 1:00 and 2:00, and they'll be back until 4:00 today.

We'll stand in recess pending the jury's

deliberations.

(Recess)

(Whereupon, the jury deliberated until 4:00 p.m.;

to resume Tuesday, July 10 at 9:30 a.m.)

oOo

INDEX OF PROCEEDINGS

Court's Instructions . . . . . . . . . . . . . .2176

Summation – Mr. Thakur . . . . . . . . . . . .2211

Summation – Mr. Matuschak. . . . . . . . . . .2248

Rebuttal – Mr. Thakur. . . . . . . . . . . . .2297

oOo

CERTIFICATE OF REPORTER


     I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Friday, July 6, 2012

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431–2020