Linda S. DeBruin
(Admitted to this Court on September 27, 1991)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
linda.debruin@kirkland.com

Marc H. Cohen (CA Bar No. 168773)
KIRKLAND & ELLIS LLP
950 Page Mill Road
Palo Alto, CA  94304
Telephone:   (650) 859-7000
Facsimile:   (650) 859-7500
marc.cohen@kirkland.com

Mark G. Matuschak (*pro hac vice*)
WILMERHALE
60 State Street
Boston, MA  02109
Telephone:   (617) 526-6559
Facsimile:   (617) 526-5000
mark.matuschak@wilmerhale.com

Seth P. Waxman (*pro hac vice* pending)
WILMERHALE
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone:  (202) 663-6800
Facsimile:  (203) 663-6363
seth.waxman@wilmerhale.com

Andrew B. Grossman (CA Bar No. 211546)
WILMERHALE
350 South Grand Avenue, Suite 2100
Los Angeles, CA  90071
Telephone:   (213) 443-5303
Facsimile:   (213) 443-5400
andrew.grossman@wilmerhale.com

*Attorneys for Defendants and Counterclaim Plaintiffs*
RESEARCH IN MOTION LIMITED and
RESEARCH IN MOTION CORPORATION

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MFORMATION TECHNOLOGIES, INC., a Delaware corporation,<br><br>      Plaintiff and Counterclaim Defendant,<br><br>      v.<br><br>RESEARCH IN MOTION LIMITED, a Canadian corporation AND<br><br>RESEARCH IN MOTION CORPORATION, a Delaware corporation,<br><br>      Defendants and Counterclaim Plaintiffs. | Case No. 5:08-CV-04990-JW<br><br>Jury Trial Demanded<br><br>**RIM'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>**HEARING REQUESTED**<br>Date/Time:  August 6, 2012 at 9:00 a.m. |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

NOTICE OF MOTION AND MOTION ...........................................................................1

STATEMENT OF RELIEF REQUESTED........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

I.      LEGAL STANDARDS ..........................................................................................2

II.     ARGUMENT ..........................................................................................................2

        A.      This Court Should Grant JMOL Of Non-Infringement Because The Evidence Is Insufficient To Prove That Every Step Of The Asserted Claims Is Practiced...........2

                1.      No Connection Is Established Without A Request From The BlackBerry Device Before The BES Transmits To The BlackBerry Device. ..................................................................................................3

                2.      RIM's Accused Products Do Not Perform The Steps Of "Transmitting The Contents Of The Mailbox From The Server To The Wireless Device" And "Accepting The Contents Of The Mailbox At The Wireless Device." ...............................................................................5

        B.      Mformation Failed To Prove Indirect Infringement As A Matter Of Law..................7

                1.      Mformation Did Not Show Direct Infringement of the Asserted Claims. ....................................................................................................7

                2.      RIM Cannot Contribute To Infringement As A Matter Of Law Because RIM's Accused Products Have Substantial Non-infringing Uses.........................................................................................................9

                3.      RIM Does Not Have The Specific Intent To Induce Infringement. ................11

        C.      JMOL Of Invalidity Should Be Granted Because RIM Presented Substantial, Unrebutted Evidence That The Asserted Claims Are Invalid. ....................................12

                1.      The RemoteWare System and Its Use Anticipate Claim 1. .............................13

                2.      The RemoteWare System And Its Use Anticipate Claim 6...........................15

                3.      Mformation's Technical Expert Provided Baseless and Conclusory Testimony That Does Not Counsel Against JMOL.........................................16

                4.      The Combination Of the RemoteWare System And The Havinis Patent Renders Claim 27 Invalid. ............................................................................17

        D.      The Court Should Find That The '917 Patent Is Not Entitled To Claim Priority To The Provisional Application...................................................................................19

        E.      Mformation Has No Substantial Evidence Supporting Its Damages Claim. ..............20

1.   The Damages Evidence Does Not Support An $8 Per Unit Royalty Rate. ....................................................................................20

2.   Mformation Failed To Present Substantial Evidence Of Use Justifying The Jury's Damages Verdict. ...............................................23

3.   Mformation Failed To Appropriately Limit Its Damages Claim Solely To Indirect Infringement Damages. ...........................................24

III.   CONCLUSION ..................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
576 F.3d 1348 (Fed. Cir. 2009)........................................................................... 23

*Comaper Corp. v. Antec, Inc.,*
596 F.3d 1343 (Fed. Cir. 2010)........................................................................... 13

*DSU Med. Corp v. JMS Co.,*
471 F.3d 1293 (Fed. Cir. 2006) (en banc).................................................... 7, 11

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
363 F.3d 1263 (Fed. Cir. 2004)........................................................................... 23

*E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, LLC,*
525 F.3d 1353 (Fed. Cir. 2008)........................................................................... 19

*E-Pass Techs., Inc. v. 3Com Corp.,*
473 F.3d 1213 (Fed. Cir. 2007)............................................................................. 7

*Fujitsu Ltd. v. Netgear Inc.,*
620 F.3d 1321 (Fed. Cir. 2010)........................................................................ 7, 9

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.,*
593 F. Supp. 2d 1088 (N.D. Cal. 2009),
*aff'd*, 616 F.3d 1357 (Fed. Cir. 2010) ................................................................. 2

*Global-Tech Appliances, Inc. v. SEB S.A.,*
131 S. Ct. 2060 (2011) ................................................................................... 7, 11

*Goff v. Harrah's Operating Co.,*
412 F. Supp. 2d 1090 (D. Nev. 2005) .................................................................. 3

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
438 F.3d 1354 (Fed. Cir. 2006).................................................................... 9, 10

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
496 F.3d 1334 (Fed. Cir. 2007)........................................................................... 16

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
Civil No.: 96CV1307-B(AJB), 2004 U.S. Dist. LEXIS 20725
(S.D. Cal. Sept. 7, 2004) ............................................................................. 22, 23

*Joy Techs. Inc. v. Flakt, Inc.,*
6 F.3d 770 (Fed. Cir. 1993) ................................................................................. 7

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
292 F.3d 728 (Fed. Cir. 2002)............................................................................. 14

*Krippelz v. Ford Motor Co.,*
667 F.3d 1261 (Fed. Cir. 2012)..................................................................... 16, 17

*Lucent Techs Inc. v. Gateway, Inc.*,
    Nos. 02CV2060-B(CAB),        03CV0699-B(CAB),        03CV1108-B(CAB),
    2007 WL 925510 (S.D. Cal. Mar. 21, 2007) ............................................................... 9

*Lucent Techs., Inc., v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)..................................................................... 2, 20, 23, 24

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005)....................................................................................... 3

*Novartis Pharms. Corp. v. Abbott Labs.*,
    375 F.3d 1328 (Fed. Cir. 2004)....................................................................................... 2

*Oiness v. Walgreens Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) ...................................................................................... 22

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) .......................................................................................... 2

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007)..................................................................................... 14

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)..................................................................................... 19

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010).................................................................................. 22, 24

*Shockley v. Arcan*,
    248 F.3d 1349 (Fed. Cir. 2001).................................................................................. 22, 23

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012)................................................................................... 9, 10

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..................................................................................... 22

*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009)................................................................................. 10, 11

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003)..................................................................................... 12

**STATUTES**

35 U.S.C. § 271(c) ................................................................................................................. 9

**RULES**

Fed. R. Civ. P. 26(a)(2) ...................................................................................................... 16

Fed. R. Civ. P. 37(c)(1) ...................................................................................................... 16

Fed. R. Civ. P. 50 ................................................................................................................. 2

Fed. R. Evid. 703 .................................................................................................................. 14

Fed. R. Evid. 803(3) ............................................................................................................. 14

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on August 6, 2012 at 9:00 a.m., in the courtroom of the Honorable James Ware at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, the Court will hear RIM's Renewed Motion for Judgment as a Matter of Law.  This motion is based on the supporting Memorandum of Points and Authorities, and RIM's previous Motions for Judgment as a Matter of Law (Dkt. 985, 1003), which RIM incorporates by reference.

**STATEMENT OF RELIEF REQUESTED**

Research In Motion Limited and Research In Motion Corporation (collectively, "RIM") renew their motion under Rule 50(b) for judgment as a matter of law of non-infringement,[1] no contributory infringement, and no induced infringement.  RIM renews its motion for judgment as a matter of law that the asserted claims of U.S. Patent No. 6,970,917 ("the '917 patent") are invalid, the '917 patent is not entitled to claim priority to an earlier filed provisional application, and that Mformation cannot collect damages.[2]

**MEMORANDUM OF POINTS AND AUTHORITIES**

RIM's Renewed Motion for Judgment as a Matter of Law ("JMOL") should be granted, and RIM incorporates by reference its previous motions for JMOL (Dkt. 985, 1003).  During trial, Mformation failed to prove that a number of steps of the asserted claims are performed when the accused products are used.  Under the Court's claim constructions, no reasonable jury could find that RIM's products perform the step of, among other things, "with a request from the wireless device . . . establishing a connection between the wireless device and the server . . . wherein the connection is established based on a threshold condition."  Mformation also failed to present legally sufficient

---

[1] RIM should also be granted JMOL of non-infringement by use of RIM's BlackBerry Professional Software and claims 4 and 5 of the '917 patent.  Mformation does not contest (Dkt. 1034 at 1 n.1) JMOL on these issues on which it presented no evidence.

[2] RIM requests that the Court confirm its rulings of no infringement under the doctrine of equivalents and no willful infringement.  The Court has already granted RIM's Motion for judgment as a matter of law of no infringement under the doctrine of equivalents.  (Tr. 2115:12–2116:12.; Dkt. 1034 at 1 n.1)  The Court indicated that it "intends to grant RIM's motion for judgment with respect to willful infringement."  (Tr. 2056:23–24, Tr. 2058:9-12, 2061:2-6)

1    evidence of direct infringement by a RIM customer, the absence of substantial non-infringing uses,

2    and the requisite specific intent by RIM to induce infringement.

3        RIM also demonstrated that all asserted claims of the '917 patent are invalid.  The jury found

4    that claims 21–25, which depend from claim 1, "existed in the use of a single system or method that

5    predates the claimed invention . . . ."  (Dkt. 1026 at 9)  This Court should grant judgment as a matter

6    of law that claims 1, 6, and 27 are also invalid based on the unrebutted evidence of invalidity of each

7    of these claims.  Further, this Court should grant judgment as a matter of law that the '917 patent is

8    not entitled to claim priority to an earlier filed provisional application.

9        This Court should further vacate the jury's damages verdict, which is not supported by

10   substantial evidence.  Mformation's damages expert's opinions were based on assumptions about a

11   document that are not supported by the trial record and were not properly limited based on actual

12   evidence of usage and the distinction between direct and indirect infringement.

## I.    LEGAL STANDARDS

13

14       This Court should grant RIM JMOL because substantial evidence does not support any of the

15   jury's presumed findings on infringement, validity, and damages.  *See Novartis Pharms. Corp. v.*

16   *Abbott Labs.*, 375 F.3d 1328, 1332 (Fed. Cir. 2004).  JMOL is appropriate because Mformation "has

17   been fully heard" on these issues and "a reasonable jury would not have a legally sufficient

18   evidentiary basis" to find for Mformation on those issues.  Fed. R. Civ. P. 50; *see, e.g.*, *Funai Elec.*

19   *Co., Ltd. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1092 (N.D. Cal. 2009), *aff'd*, 616 F.3d

20   1357 (Fed. Cir. 2010).  The Court should grant JMOL because "'the evidence, construed in the light

21   most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion

22   is contrary to the jury's verdict.'"  *Lucent Techs., Inc., v. Gateway, Inc.*, 580 F.3d 1301, 1309 (Fed.

23   Cir. 2009) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

## II.    ARGUMENT

24

25       **A.    This Court Should Grant JMOL Of Non-Infringement Because The Evidence Is
              Insufficient To Prove That Every Step Of The Asserted Claims Is Practiced.**

26

27       Mformation has failed to show that use of RIM's accused products practices each and every

28   limitation of the asserted claims of the '917 patent.  Consequently, RIM is entitled to judgment as a

matter of law of non-infringement of all the asserted claims.

### 1. No Connection Is Established Without A Request From The BlackBerry Device Before The BES Transmits To The BlackBerry Device.

Judgment as a matter of law must be granted because Mformation never presented *any* evidence to establish that use of the accused products satisfies the claim requirement that a connection is established without a request from the wireless device *before* transmitting a command. Every asserted claim of the '917 patent requires performing the step of "without a request from the wireless device . . . establishing a connection between the wireless device and the server . . . wherein the connection is established based on a threshold condition."  (JX370 at 7:22–44)  As explained in RIM's motions for JMOL, incorporated by reference here, Mformation failed to provide a legally sufficient evidentiary basis for the jury to find that use of the accused products meets those requirements.  (Dkt. 985 at 4–12; Dkt. 1003 at 2)  That failure of proof is even more evident now, as demonstrated in RIM's Brief in Response to the Court's July 17, 2012 Order Requesting Further Briefing (Dkt. 1036) (incorporated by reference here) because Mformation failed to present evidence of infringement consistent with this Court's claim constructions.  Judgment of non-infringement as a matter of law must be granted in favor of RIM.[3]

Mformation's entire infringement case, which did not distinguish between cellular and Wi-Fi operation of the accused products (*see* Tr. 1022:2–5, 1114:8–1116:25), was premised on a flawed argument that a connection need not be made and that "establishing a connection" is complete when it is allegedly initiated.  Mformation's expert, Dr. Madisetti, argued that he did not have to show that

---

[3] Mformation improperly attempts to reargue claim construction regarding the order of steps, apparently recognizing that the verdict cannot be maintained under the Court's actual claim construction.  (Dkt. 1023 at 3 n.1)  Mformation's belated argument must be rejected as a matter of law.  Mformation's counsel admitted that, in order to practice the patent, "a connection does have to come into existence.  It has to move beyond the initiating to the point of actually having a connection."  (Tr. 1265:14-16; *see also* Dkt. 766 Tr. at 19:6-9)  Contrary to Mformation's argument, whether the steps in a wholly unrelated patent did not need to be practiced in a particular order says nothing about the requirements of the '917 patent.  *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005) ("A particular term used in one patent need not have the same meaning when used in an entirely separate patent, particularly one involving different technology."); *cf. Goff v. Harrah's Operating Co.,* 412 F. Supp. 2d 1090, 1105 (D. Nev. 2005) (particular order of steps required).

a connection is established, only that it is "initiated."

> Q.      I'm just asking you, using the Court's construction . . . doesn't completion of the establishing step require you to establish a connection?
> A.      *No sir*.   The Court's construction requires that establishing a connection is initiating wireless communications.  *The key is initiating*.   And that initiating step has to be completed before transmitting can commence.
>                 And that is His Honor's Construction.

(*Id.* at 1006:12–21 (emphasis added); *see id.* 896:7–13, 897:7–9, 899:16–900:2, 1092:4–1093:16; *see also id.* 1270:19–20)   But the Court made clear in its Closing Instructions that "[t]he use of the phrase 'connection is established' means that a connection must **not only be** initiated, but **must be made** by the server with the wireless device," and that connection must be made **before** the transmitting step begins.  (Dkt. 1017 at 12:7–17 (emphasis added))   Because Mformation presented no evidence that the accused RIM system "made" a connection before the transmitting step began, judgment as a matter of law must be entered for RIM.

Dr. Madisetti claimed that the "establishing a connection" sub-step is satisfied by preparing a GME message and determining how to send it.  (Tr. 1085:18–1086:4; *see also id.* at 894:23–896:13)  Both of these actions occur entirely and exclusively within the BES.  (*See, e.g.*, *id.* at 1506:5–1508:22)   As Dr. Acampora explained, neither of these actions results in a connection being made between the BES and a BlackBerry handheld device.  (*Id.*)

Indeed, Dr. Madisetti could not have shown that a connection is established without a request from the wireless device **before** transmitting because no mode of operation of the accused products satisfies those claim limitations.  As explained in detail in RIM's Brief in Response to the Court's July 17, 2012 Order Requesting Further Briefing (Dkt. 1036), when a BES communicates with a BlackBerry handheld device over a cellular network, the BES sends data to the RIM Relay over a wired connection.[4]   (*Id.* at 1000:25–1001:6, 1483:21–1484:14)   Thus, wireless communications do

---

[4] Mformation does not claim that this wired connection between the BES and the RIM Relay satisfies the "establishing a connection" sub-step or the "wherein the connection is established based on a threshold condition" limitation.  (Tr. 1001:4–6, 1491:13–16; JX370 at 7:22–44)

not occur at all until messages reach the RIM Relay,[5] but by that time, the BES has **already** transmitted data.  (*Id.* at 1010:6–9, 1492:8–14, 1493:6–1494:4)  In other words, with respect to cellular communications, the BES transmits data **before** any "wireless communications" occur at all, not **after** a connection is established, as the claims and the Court's construction require.

Communications between a BES and a BlackBerry handheld device over a Wi-Fi network also fail to satisfy the claims as construed by the Court.  Dr. Acampora explained that communications over a Wi-Fi network involve a connection using the TCP protocol that requires a handshake.  (Tr. 1495:17–21)  But as Dr. Acampora testified, the BES does not establish that connection—*the BlackBerry device requests the connection*.  (Tr. 1495:23–1496:16; 1497:6–23; 1498:2–11; 1499:15–25; 1500:15–24; 1501:20–25; 1510:3–10; 1680:18–1681:5; DX4106 at 11; DX4110 at 42, 97)  The BlackBerry device **must** set up the connection because, as Dr. Acampora explained, the BES does not know the location of the BlackBerry device.  (Tr. 1502:20–1504:2)  Thus, because Mformation failed to provide evidence that the actual steps were performed—indeed because it could never provide such evidence—the jury's verdict on Question 2 cannot stand as a matter of law, and this Court should grant RIM JMOL of non-infringement for all asserted claims.

### 2. RIM's Accused Products Do Not Perform The Steps Of "Transmitting The Contents Of The Mailbox From The Server To The Wireless Device" And "Accepting The Contents Of The Mailbox At The Wireless Device."

There is no legally sufficient basis to support a finding that the "transmitting the contents" or "accepting the contents" sub-steps of the delivering step of claim 1 are performed when using the accused products.

At trial, Dr. Madisetti opined that three data structures in the BES could comprise the "mailbox" recited in claim 1:  (1) an individual row within the IT Admin Queue; (2) the IT Admin Queue as a whole; and (3) an individual row within the User Configuration Table.  (*Id.* at 871:4–12)

---

[5] The RIM Relay uses the UDP protocol to communicate with BlackBerry handheld devices. (Tr. 1010:6–9)  "UDP does not provide connection management" and, with UDP, "no connection needs to be set up."  (*E.g.*, *id.* at 741:4–23; DX4736 at 3–4)  Even Dr. Madisetti agreed that using UDP does not satisfy the claims' requirement of transmitting **after** a connection is established because UDP involves establishing a connection and transmitting "**at the same time**."  (*Id.* at 1022:6–20 (emphasis added))  Thus, use of the UDP protocol is inconsistent with the claim requirements and the Court's constructions.

1   Mformation incorrectly argues that it need not prove that **all** of "the contents" of those data

2   structures are transmitted to the device (*see* Dkt. 1023 at 5), but Mformation did not even prove that

3   **any** of the contents of those three data structures are wirelessly sent from the server to the wireless

4   device.   The only evidence presented concerning that limitation was Dr. Madisetti's testimony

5   regarding the first possibility—an individual row within the IT Admin Queue—and even that

6   evidence is insufficient.[6]

7         Each row within the IT Admin Queue represents an individual IT administration work

8   request, which contains a number of pieces of information for the Policy Server.   (JX496 at RIM-

9   MF0035806)   The data in the work request is a set of instructions to the BlackBerry Policy Service

10  to create a GME message.   (Tr. 1514:20–1515:12)   The data in the work request is not sent to a

11  BlackBerry device.   (*Id.*)   Rather, it is the GME message, not the work request in the IT Admin

12  Queue, that is ultimately sent to the BlackBerry device.   (*Id.*)   Accordingly, the "contents" of a row

13  in the IT Admin Queue—the work request—are **never** sent from the server to the BlackBerry device.

14  (*Id.* at 1515:13–1516:5)   Indeed, Dr. Madisetti admitted that GME messages formed by the Policy

15  Service, **not** the work request information in a row of the IT Admin Queue, are transmitted to a

16  BlackBerry device.   (*Id.* at 1080:17-24; 1067:16–1068:12)

17        During his testimony concerning the "transmitting the contents" limitation, Dr. Madisetti did

18  not identify any data purportedly comprising "the contents" of the alleged mailbox that are

19  transmitted to the device.   (*See id.* at 898:11-900:15)   Instead, he simply read vague statements from

20  RIM documents stating that commands are sent to BlackBerry devices.   (*See, e.g., id.* at 898:24-

21  899:3.)   Similarly, during his testimony on the "accepting the contents" limitation, Dr. Madisetti did

22  not identify any alleged "contents" that are "accepted" by the device.   (*See id.* at 900:16-904:25)

23  Instead, he simply referred to RIM documents and testimony describing how GME packets as a

24  whole are received and decrypted.   (*See id.*)   Dr. Madisetti never established any link between IT

25  administrative work requests in an entry of the IT Admin Queue and data transmitted to a

26

---

27  [6] Dr. Madisetti admitted that the contents of the IT Admin Queue as a whole are not sent to a
    BlackBerry device.   (Tr. 1076:1–5)   Dr. Madisetti did not even mention the User Configuration
28  Table in relation to the "transmitting the contents of the mailbox" limitation.   (*Id.* at 898:11–900:15)

BlackBerry device.  Accordingly, there was no basis to conclude that such work requests are represented by data in the IT Admin Queue that is then transmitted to and accepted by a BlackBerry device, as required by the claim.

### B.      Mformation Failed To Prove Indirect Infringement As A Matter Of Law.

Mformation's claims for indirect infringement are likewise unsupported by sufficient evidence.  First, Mformation failed to meet its burden of showing specific instances of direct infringement to support its indirect infringement claims.   Second, Mformation's claim for contributory infringement fails in light of the substantial non-infringing uses for RIM's products.  Third, Mformation's claim for induced infringement likewise fails because Mformation has not shown that RIM specifically intends to induce infringement of the '917 patent.   *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc).

### 1.      Mformation Did Not Show Direct Infringement of the Asserted Claims.

Indirect infringement depends upon a finding of direct infringement by a third party.  *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993).  Mformation bears the burden of proving direct infringement for each instance of indirect infringement by a preponderance of the evidence.  *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010); *DSU Med. Corp.*, 471 F.3d at 1303.  Mere speculation or conjecture cannot substitute for actual evidence, and inferences may not be drawn from such evidence to reach a finding of direct infringement.  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007).  Even assuming Dr. Madisetti's opinion of how the accused products are used to infringe were sound—and it is not—Mformation did not present legally sufficient evidence of actual use in that manner.

The only evidence Mformation introduced at trial purportedly showing instances of direct

1    infringement was the testimony of Messrs. Hatcher and Wilson.[7]   But neither Mr. Hatcher nor

2    Mr. Wilson testified that they used a BES in the specific manner that Mformation contends infringes

3    because they offered no testimony or evidence showing that their use of a BES met the "establishing

4    a connection" or "threshold condition" limitations of claim 1 in the way Dr. Madisetti testified

5    infringes.   For example, Dr. Madisetti relied on least cost routing, which involves determining

6    whether data will be sent to the RIM Relay or directly to a BlackBerry handheld device over a Wi-Fi

7    network or a USB connection, for his opinion as to both the "establishing a connection" and

8    "threshold condition" limitations of claim 1.    (Tr. 895:14–896:13;  909:22–910:9)    Neither

9    Mr. Hatcher nor Mr. Wilson testified that they used a BES or a BlackBerry device with Wi-Fi

10   enabled, let alone that they performed the claimed method based on least cost routing using a Wi-Fi

11   connection or any other alleged "threshold condition."

12        Mformation attempted to cure this deficiency by eliciting an opinion from Dr. Madisetti that

13   the BES "automatically" performs each step of claim 1, but the Court excluded that opinion because

14   it was not previously disclosed.  (*Id.* at 985:1–987:22)  Dr. Madisetti's allowed testimony that the

15   "user of the device" need not take any action after activation is performed (*Id.* at 989:10–15) cannot

16   cure this failure of proof because Dr. Madisetti concedes that the IT Administrator, a different

17   individual, must take further action.  (*See, e.g.*, *id.* at 849:19–850:12; 986:24–987:15; 1115:2–8)

18   Because Mformation presented insufficient evidence of any underlying direct infringement of

19   claim 1, RIM is entitled to JMOL of no indirect infringement.

20        Further, dependent claim 6 recites the additional step of "transmitting information relating to

21   execution of the command at the wireless device from the wireless device to the server."  (JX370 at

22   8:4–6)   At no time did Messrs. Hatcher or Wilson testify that their use of the accused products

23   involved the BlackBerry handheld device sending any information relating to execution of a

24   ───────────────────────────────
     [7] Contrary to Mformation's contention (Dkt. 1023 at 7), Mr. Schnurr's testimony does not show
25   direct infringement and was even more obscure than that of Messrs. Hatcher and Wilson.  Mr.
     Schnurr did not testify with respect to all the steps of the asserted claims including the "threshold
26   condition" limitation and discussed only acts that occurred during a period in which Mformation has
     been barred from seeking damages (*i.e.*, before October 27, 2008).  (*See* Dkt. 1031, App. G at 116,
27   118, 120, 122, 124, 129, 131–32, 134, 137; PX1029; PX1030; PX1031; PX1032; PX1033; PX1035;
     PX1036)
28

1   command by the BlackBerry handheld device back to the BES.   Similarly, dependent claim 27

2   recites the additional limitation that "the command comprises monitoring a location of the wireless

3   device in the wireless network."   (JX370 at 10:11–13)   Again, neither Mr. Hatcher nor Mr. Wilson

4   testified that their use of the accused products involved monitoring network location information of

5   BlackBerry handheld devices.   Thus, for these additional reasons, Mformation has failed to prove

6   that any RIM customer actually used the method of claims 6 or 27 of the '917 patent.

7          Mformation's reliance on RIM's user manuals as circumstantial evidence of direct

8   infringement also fails.   (*See* Dkt. 1023 at 7)   RIM's user manuals merely describe the ***capability of***

9   RIM's accused products to perform certain actions—actions which do not amount to infringement as

10   described above.   (*See* JX139; JX142; JX143; JX166; JX1018; JX1019; JX1042; JX2019; JX2022;

11   DX4119; DX4121)   Evidence showing that a device is merely ***capable of*** performing identified

12   actions but not suggesting that users actually use the product in the allegedly infringing manner is

13   insufficient to show direct infringement.   *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365–66

14   (Fed. Cir. 2012); *Fujitsu*, 620 F.3d at 1329.

> ### 2.    RIM Cannot Contribute To Infringement As A Matter Of Law Because RIM's Accused Products Have Substantial Non-infringing Uses.

15

16          Mformation bore the burden of proving that the accused RIM products have no substantial

17   non-infringing uses. 35 U.S.C. § 271(c); *Lucent Techs. Inc. v. Gateway, Inc.*, Nos. 02CV2060-

18   B(CAB), 03CV0699-B(CAB), 03CV1108-B(CAB), 2007 WL 925510, at *2 (S.D. Cal. Mar. 21,

19   2007) (citing *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006)).

20   Mformation failed to meet its burden, as the evidence actually demonstrates that the accused

21   products have substantial non-infringing uses on both a functional and component basis.

22          The BES can perform enterprise activation over a wired USB connection, as acknowledged

23   by Mformation's witnesses.   (Tr. 717:13–18, 782:5–10, 1096:11–1099:15)   Wired enterprise

24   activation does not infringe the '917 patent.   (*See, e.g.*, *id.* at 1096:11–1097:6)   Similarly, a wired

25   connection can be used to issue IT administration commands or to send applications to a BlackBerry

26   device.   (*Id.* at 1521:21–1522:7)   When performed over a wire, those functions do not infringe,

27   because they are not performed wirelessly as required by the patent.   (*See* JX370 at 7:22)   These uses

28

1    are substantial because "they are not unusual, far-fetched, illusory, impractical, occasional, aberrant,

2    or experimental."  *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009).

3    Indeed, Mformation's own witnesses acknowledged that wired activation of BlackBerry devices was

4    the exclusive method of activation in previous versions of the BES (Tr. 716:17–21; 766:16–18) and

5    that it is still offered as a means of activating a BlackBerry device in the accused versions of RIM's

6    BES products (*Id.* at 717:13–18; 782:5–10; 1096:11–1099:15).   This demonstrates that wired

7    communications between a BlackBerry device and a BES are "not unusual, far-fetched, illusory,

8    impractical, occasional, aberrant, or experimental." *Vita-Mix*, 581 F.3d at 1327.

9          Mformation admits that wired activation does not infringe the '917 patent.  (*See* Dkt. 1023 at

10    8)  Instead, Mformation claims that such use is not "substantial."  (*Id.*)  But Mformation bears the

11    burden of proving that wired activation is not a "substantial" non-infringing use.  *Toshiba*, 681 F.3d

12    at 1363 (citing *Golden Blount*, 438 F.3d at 1363).  Mformation did not present any "survey, expert,

13    or other evidence showing how frequently" RIM's customers used wired or wireless activation.  *See*

14    *id.*  Mformation's reliance on Mr. Hatcher's testimony that he had not performed wired activation

15    and Mr. Wilson's testimony that he did not know that wired activation was an option in the most

16    recent version of BES is insufficient to meet its burden.  (Dkt. 1023 at 8)  Both Messrs. Hatcher and

17    Wilson were aware of the ability to perform wired activation using accused versions of BES

18    software.  (*See* Tr. 717:13–18; 782:5–10)  Moreover, Dr. Madisetti admitted that three of the five

19    ways of activating a BlackBerry handheld device on a BES are wired.  (*Id.* at 1096:11–1099:15)

20    Wired activation is an admittedly non-infringing use of RIM's accused products, which is

21    substantial.  Accordingly, JMOL is appropriate on Mformation's claim of contributory infringement.

22          Further, the specific components of the BES software identified by Dr. Madisetti as allegedly

23    performing the claimed method steps also may be used in a non-infringing manner.  The BlackBerry

24    Manager, Administration Service, Configuration Database, Policy Service, Dispatcher, and Router

25    are all used during the process of issuing IT administration commands via a wired connection, and

26    Dr. Madisetti offered no testimony or evidence suggesting they function any differently in that role.

27    (*See, e.g.*, Tr. 847:15–853:9)  Nor could he because these components follow "exactly the same"

28    process when commands are sent over a non-infringing wired connection.  (*Id.* at 1521:21–1522:11;

1    *see* JX370 at 7:22)  The accused BES software components have substantial non-infringing uses.

2          Similarly, the BlackBerry Manager and BlackBerry Administration Service are user

3    interfaces that allow an administrator to cause the BES to perform many other tasks than those

4    accused of infringement, which Dr. Madisetti never discussed.   (*See* Tr. 993:14–994:3)   The

5    BlackBerry Configuration Database stores a host of information and tables that are not accused of

6    infringement.   (*E.g.*, JX139 at RIM-MF0008895; JX350 at RIM-MF0009766; JX1018 at RIM-

7    MF0110846; JX1019 at RIM-MF0036697; JX4207)   The BlackBerry Dispatcher and BlackBerry

8    Router handle, among other types of data, e-mail data which Mformation does not contend

9    infringes.[8]   (*E.g.*, JX139 at RIM-MF0008895; JX350 at RIM-MF0009766; JX1018 at RIM-

10   MF0110846; JX1019 at RIM-MF0036686)  Dr. Madisetti did not address these other uses or show

11   why they are not substantial.  Instead, he merely offered the unsupported conclusion that "there is

12   not any example of any noninfringing use."  (Tr. 971:19–23)  This conclusory statement cannot

13   sustain Mformation's burden.

14                    **3.       RIM Does Not Have The Specific Intent To Induce Infringement.**

15         RIM is also entitled to JMOL of no inducement because Mformation presented no legally

16   sufficient evidence of RIM's specific intent to induce infringement.  Active inducement requires that

17   the accused infringer knowingly induce acts that constitute patent infringement with the specific

18   intent to encourage another's infringement. *Global-Tech*, 131 S. Ct. at 2068; *DSU Med. Corp.*, 471

19   F.3d at 1306.  Mere knowledge of a patent is not enough.

20         The materials that Mformation contends show specific intent, including the documents Dr.

21   Madisetti identified during his testimony, also show users how to perform those non-infringing

22   functions.  (*E.g.*, JX353 at RIM-MF0009425)  "'[W]here a product has substantial non-infringing

23   uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge

24   that some users of its product may be infringing the patent.'"  *Vita-Mix*, 581 F.3d at 1329 (quoting

25   ─────────────────────

26   [8]  RIM's BES and BlackBerry devices have substantial non-infringing uses that are unrelated to
     Mformation's allegations.  Both Dr. Acampora and Mformation's own witnesses acknowledged that
27   the BES software can be used to reconcile e-mail, manage calendar entries and contacts, surf the
     Internet, take pictures, send text messages, run various applications, and make phone calls.  (Tr.
28   711:3–11, 781:8–25, Tr. 1484:15–19)

1   *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003)).   For example,

2   Dr. Madisetti admitted that three of the five methods of performing Enterprise Activation involved

3   the use of a wired connection, rendering them non-infringing.  (Tr. 1096:11–1099:15)  Similarly, the

4   BES graphical user interface cannot evidence specific intent to infringe, since that same user

5   interface is used to perform many non-infringing functions.  For example, an IT administrator would

6   use the BlackBerry Administration Service—discussed by Mr. Wilson—to perform activation and

7   send IT administration messages both wirelessly and by way of USB cable.  (Tr. 768:3–8, 782:5–10)

8   Mformation also did not present any evidence purporting to show RIM describing or

9   instructing how to perform ***all*** the steps of any claimed method.  Mr. Hatcher testified that he called

10  RIM's technical support services for help with enterprise activation, but did not testify that he was

11  instructed to perform specific steps that may correspond to any other limitation of the patent.  (Tr.

12  720:7–722:8)  He also testified that he has consulted RIM's online knowledgebase for "problems

13  [he] had," but did not identify any particular document or functionality.  (Tr. 721:12–22)  And

14  Mr. Wilson testified that he learned how to perform enterprise activation through RIM

15  documentation (Tr. 775:7–12), but did not specify any document at all, let alone one that instructed

16  each of the claimed method steps.  Dr. Madisetti identified RIM documents during his testimony, but

17  did not testify that any of them instructs a BES user how to perform each step of claim 1 in the

18  required order.

19  Because intent to induce infringement cannot be inferred due to the many substantial non-

20  infringing uses of the accused RIM products, no reasonable jury could find that RIM induces

21  infringement of the '917 patent, and JMOL should be granted.

22  **C.   JMOL Of Invalidity Should Be Granted Because RIM Presented Substantial, Unrebutted Evidence That The Asserted Claims Are Invalid.**

23  

24  All asserted claims are invalid,[9] and no reasonable jury could have found otherwise.  Because

25  Mformation did not contradict or impeach the evidence presented by RIM at trial in any meaningful

26  way, this Court should grant this motion based on RIM's unrebutted evidence.

27  _____

[9] All asserted claims of the '917 patent are invalid as anticipated or obvious.

28

1

### 1.      The RemoteWare System and Its Use Anticipate Claim 1.

2    The jury's finding on the validity of claim 1 is not supported by substantial evidence.  As

3    explained in RIM's Brief in Response to the Court's July 17, 2012 Order Requesting Further

4    Briefing (Dkt. 1036), incorporated by reference here, the jury's verdict is irreconcilably inconsistent

5    because claim 1 cannot be valid when dependent claims 21–25 are invalid.  *Comaper Corp. v. Antec,*

6    *Inc.*, 596 F.3d 1343, 1350 (Fed. Cir. 2010).  This Court should resolve the inconsistency by granting

7    judgment as a matter of law that claim 1 is invalid.[10]

8    The RemoteWare system anticipates claims 1, 6, and 21–25 of the '917 patent.  (Dkt. 1003 at

9    4–5)  RIM presented significant, unrebutted evidence describing how the RemoteWare system

10   operated and how customers used the RemoteWare system, including:[11]

11   • **Unchallenged, Contemporaneous RemoteWare Documentation:** including
12     RemoteWare Client User's Guides (DX0733, DX4043), a Server Reference Manual
       (DX0734), and an Administrator's Guide (DX4045) showing all elements of claims 1, 6
13     and 21-25 were in RemoteWare version 3.1;

14   • **Documents Describing the Use of RemoteWare**: including the Crumpler International
       Publication (DX4046) and a March 1995 Press Release showing that RemoteWare had
       wireless capabilities and was in fact used wirelessly as early as 1995 (DX0523);

15
16   • **Testimony of Christopher Foley**: a former consultant who worked for the company that
       made and sold RemoteWare and who was trained and actually used RemoteWare version
17     3.1 in the field and worked directly with customers running RemoteWare version 3.1, all
       prior to October 1999 (Tr. 1346:15–1347:15, 1433:17–24, 1343:1–1344:14, 1359:4–7);

18   • **Testimony of Joe Owen:** XcelleNet's former Chief Technology Officer who has been
       involved in the development of RemoteWare and testified regarding customers using
19     RemoteWare wirelessly in the mid-1990s (Dkt. 1031, App. E at 93–96, 101–03); and

20   • **Testimony of Dr. Anthony Acampora**: RIM's technical expert who reviewed all the
       evidence and concluded that the RemoteWare system and its use anticipates claims 1, 6
21     and 21–25.  (Tr. 1536:19–23, 1589:17–1590:5, 1590:24–1591:12, 1616:7–10)

22   The totality of RIM's evidence demonstrates invalidity by the RemoteWare system.  *Pfizer, Inc. v.*

23

24

25   [10] If the Court does not grant JMOL that claim 1 is invalid, then this Court should order a new trial.
     *See* RIM's Brief in Response to the Court's July 17, 2012 Order Requesting Further Briefing and
26   RIM's Motion for New Trial, both being filed today.

27   [11] Exhibit A to this brief summarizes all of the evidence RIM presented at trial showing that the
     RemoteWare system renders the asserted claims invalid.

28

RIM's Renewed Motion For JMOL            -13-            Case  No. 5:08-CV-04990-JW

*Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007). [12]

In response to RIM's overwhelming evidence, Mformation did not provide any challenge to how the RemoteWare system operated and was used. In particular:

- Mformation never suggested that the contemporaneous RemoteWare documentation, described above, improperly depicted how the RemoteWare system worked;

- Mformation did not challenge Dr. Acampora's technical description of the RemoteWare system or how it was used. Instead, Mformation focused on the irrelevant issue of whether Dr. Acampora had inspected RemoteWare source code or had seen RemoteWare in operation. Mformation never identified anything wrong with Dr. Acampora's technical analysis (Tr. 1706:24–1707:1, 1707:11–13); and

- Mformation's only substantive challenge of the RemoteWare system was raised during the cross examination of Mr. Foley when Mformation asked whether the Hughes satellite network used by some RemoteWare customers could both send and receive data wirelessly. (Tr. 1437:21–1439:1)  Mformation presented no evidence and elicited no testimony that the Hughes network could not both send and receive data wirelessly and, indeed, presented no other challenge to Mr. Foley's description of the use and operation of RemoteWare.[13]

Mformation instead focused its rebuttal of RIM's invalidity defense by attempting to argue that RemoteWare was not used wirelessly. (*See, e.g.*, Tr. 1437:21–1438:6, 1717:15–1718:3) However, as RIM explained in its Second JMOL Motion (Dkt. 1003 at 5–6), this position is contrary to all of the evidence presented at trial. Documents describing RemoteWare show that the system operated over cellular and satellite links. (*See* DX733 at RIM-MF0036571 (satellite); DX734 at RIM-MF2642039 (cellular); DX4045 at RIM-MF2641512 (satellite); DX4046 (wireless))  Mr. Foley identified and testified about these documents and also explained how customers such as Jack in the Box and Padcom used RemoteWare wirelessly prior to October 1999. (Tr. 1346:15–1347:15,

---

[12] All of RIM's evidence at trial—the RemoteWare documentation, the testimony of Messrs. Foley and Owen and Dr. Acampora's opinions and testimony—consistently describe the RemoteWare system and its use and thus was corroborated. *See* Exhibit A. Mformation relies on *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728 (Fed. Cir. 2002), to argue that the testimony of RIM's witnesses should be disregarded as uncorroborated, (Dkt. 1034 at 5), but this Court has already repeatedly rejected this argument. (Dkt. 770 at 5; *see also* Dkt. 691 at 11-12 (denying Mformation's Motion for Summary Judgment of No Anticipation where motion was based on similar grounds))

[13] Mformation did not elicit any evidence to contradict Mr. Foley's testimony that RemoteWare customers sent and received data wirelessly over the Hughes network. (*See* Tr. 1435:19–1436:5, 1437:21–1439:1)  Dr. Acampora explained that devices communicating wirelessly over a satellite network would "send uplink to a satellite. Otherwise, there could be no downlink from the satellite," and the Hughes satellite network "in fact had two-way capability." (Tr. 1725:14–21)

1348:2–19, 1413:22–1417:14)  Similarly, Mr. Owen described how RemoteWare customers Pfizer and Schering-Plough equipped field sales representatives with laptops and then wirelessly "deploy[ed] new pieces of software and . . . update[d] various drug industry-related documents" to those laptops in the mid-1990s.[14]  (Dkt. 1031, App. E at 101–03)  RIM also presented the Crumpler International Publication describing "RemoteWare 1.0–1.4 ***marketed*** by the assignee of the present invention" (DX4046 at RIM-MF2642096) (emphasis added) and a March 1995 Press Release showing that "more than 50 pilot customers" were using RemoteWare on McCaw's wireless network.  (DX0523 at RIM-MF2609431)  After reviewing RIM's evidence, this Court indicated it was satisfied that RemoteWare was used wirelessly.  (Tr. 1635:22–25)

### 2.    The RemoteWare System And Its Use Anticipate Claim 6.

RIM also presented substantial, unrebutted evidence at trial that claim 6 is invalid in view of the RemoteWare system and its use.  (Dkt. 1003 at 9–10)  RemoteWare documentation provides examples of server-side logs showing that a RemoteWare client received commands, also known as events, from the server and then executed those events.  (DX0734 at RIM-MF2641864)  Mr. Foley testified about this document, explaining that after a client executed an event it acknowledged back to the server the successful or unsuccessful completion of the task defined by the event. (Tr. 1380:22–1381:12, 1382:9–20)  Mr. Foley's testimony is consistent with DX0734 because a server-side log could only show the status of the completion of an event if the client transmitted information relating to the execution of that event back to the server.  Dr. Acampora similarly testified, relying on Mr. Foley's sworn deposition testimony consistent with DX734, that after an event was executed, "the client could confirm back to the server that the [event] occurred." (Tr. 1592:5–11)  Based on all of this evidence, Dr. Acampora concluded that the RemoteWare system and its use anticipate claim 6.

Mformation's only rebuttal of RIM's evidence was the irrelevant testimony of Dr. Madisetti.

---

[14] Contrary to Mformation's assertions, Mr. Owen's testimony is not unreliable hearsay because he was describing his then-existing state of mind from personal first hand knowledge.  (Dkt. 1031, App E at 101-04); Fed. R. Evid. 803(3).  Dr. Acampora is entitled to base his conclusions on facts and data even if those facts or data are not admissible at trial.  Fed. R. Evid. 703.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(Tr. 2001:16–2002:1)  Dr. Madisetti first tried to introduce a new opinion as to claim 6, which was excluded.  (Tr. 2000:20–2002:6)  He then testified about CONNECT:Manage, an irrelevant version of RemoteWare released years after RemoteWare version 3.1 that RIM did not rely on at trial and that was released years after RemoteWare version 3.1.   (Tr. 2002:17–2003:9, Tr. 2020:5–12 (Dr. Madisetti testifying that CONNECT:Manage "only came in because [Mformation's] counsel read my report"))  There was no evidence at trial which would allow any inference that RemoteWare version 3.1 did not disclose the additional limitation of claim 6.   Based on RIM's unrebutted evidence, claim 6 is anticipated.  *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1345 (Fed. Cir. 2007).

### 3.   Mformation's Technical Expert Provided Baseless and Conclusory Testimony That Does Not Counsel Against JMOL.

Mformation did not provide any viable basis for opposing RIM's demonstration that RemoteWare anticipates claims 1, 6 and 21–25.  First, Dr. Madisetti simply opined, without any support, that RemoteWare lacked two limitations.  (Tr. 1998:9–13, 1999:19–2000:16)  But bare conclusory opinions unaccompanied by any description or analysis are insufficient.  (Dkt. 1003 at 8–9); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1268-69 (Fed. Cir. 2012) (holding that generic and conclusory expert testimony at trial is insufficient to sustain a jury's verdict).

Second, Dr. Madisetti expressed a new opinion at trial that the "verifying the registration information at the server" limitation of claim 1 was performed by an administrator, not the server. (Tr. 1995:13–14)  As an initial matter, Mformation never disclosed this opinion to RIM prior to its presentation at trial, warranting exclusion of this opinion.  Fed. R. Civ. P. 26(a)(2); Fed. R. Civ. P. 37(c)(1).  Furthermore, RIM presented substantial evidence that the RemoteWare server, not the administrator, performed the client verification.  (Dkt. 1003 at 7–8)  Mr. Foley testified in detail that the client name sent to the server during the registration process "would have to match up with what is in the listing [at the server] for a successful registration."  (Tr. 1358:3–17) Moreover, RemoteWare documentation demonstrates that the server, not an administrator, completes the client verification.  (DX4043 at RIM-MF0035834 ("Enter the registration information.  The Server uses this information to authenticate your Client"))

Based on the uncontroverted evidence at trial, a reasonable jury would have concluded that there was clear and convincing evidence that claim 1 existed in the use of the RemoteWare system prior to October 1999.  Accordingly, this Court should find claim 1 invalid as anticipated.

### 4. The Combination Of the RemoteWare System And The Havinis Patent Renders Claim 27 Invalid.

As RIM explained in its Second JMOL Motion, RIM has demonstrated that claim 27 is invalid as obvious in view of the combination of RemoteWare and U.S. Patent No. 6,295,454 ("the Havinis patent").  (Dkt. 1003 at 10–11; Tr. 1602:17–1603:6; DX4092)  The jury's verdict adopted RIM's contentions on the person of ordinary skill in the art and found that the combination of RemoteWare and the Havinis patent was within the scope and content of the prior art.  (Dkt. 1026 at 7)  It is now up to this Court to enter judgment that claim 27 is invalid.  (*See* Dkt. 1017 at 20)

### a. RIM Presented Substantial, Unrebutted Evidence That Claim 27 Is Invalid As Obvious.

Though the jury found differences between the claimed invention and the prior art (Dkt. 1026 at 7), RIM has demonstrated that none of these differences are substantial or relevant.  Referencing column 5, lines 16–26 of the Havinis patent, Dr. Acampora explained that the "Mobile Location Center . . . sends a command message, including a command" to the mobile device. (Tr. 1602:17–23)  That command instructs the device to "[b]egin collecting some location information . . . and reports that back."  (Tr. 1602:24–1603:6)  Dr. Acampora further explained that the RemoteWare system and the Havinis patent are "directed to the same subject.  RemoteWare is all this infrastructure to send commands . . . . So [the Havinis patent is] adding one more command to the repertoire of commands [included in RemoteWare], it would have been one skill in the art motivated to combine them.  It's common sense."  (Tr. 1606:5–17)

Mformation's only challenge to Dr. Acampora's technical conclusions was unsupported testimony from Dr. Madisetti.  (Tr. 2008:22–2009:3, 2010:5–22)  Like claim 6, Dr. Madisetti first tried to offer a new opinion as to claim 27 (precluded based on RIM's objections), and then offered conclusory opinions without any citation to evidence in support of those opinions.  (Tr. 2008:19–2010:22)  Such conclusory opinions are insufficient to rebut RIM's substantial and unrebutted evidence.  *Krippelz*, 667 F.3d at 1268-69.  Therefore, this Court should find claim 27 is invalid.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### b. Mformation Presented No Substantial Evidence Relating To Objective Indicia Of Non-Obviousness.

Mformation offered no credible evidence to support the jury's finding regarding certain objective indicia of non-obviousness.[15]  In fact, neither Dr. Madisetti nor any other Mformation witness provided any such testimony.  To the contrary, the evidence presented at trial goes against finding that any objective indicia support a finding that claim 27 is not obvious.

First, Mformation presented no evidence showing "commercial success of a product due to the merits of the claimed invention."  Indeed, Mformation's co-founder, Dr. Rakesh Kushwaha, testified that by 2008 Mformation lost money for nine consecutive years.  (Tr. 613:2–7; *see also* Tr. 616:22–25 (Mformation lost $111 million over 11 years))  Mformation's damages expert, Mr. Weinstein, admitted that Mformation and its customers thought that Mformation's product (allegedly embodying the '917 patent) was of "poor software quality."  (Tr. 1224:16–1227:10, 1227:23–1229:10, DX5007 at 16)  Mformation presented no evidence showing that any commercial success of the accused products had a nexus to the claimed invention in the '917 patent.  And Mr. Weinstein admitted that RIM's accused products included many important features that had nothing to do with the '917 patent, and he was precluded from arguing that RIM's success was because of the '917 patent.  (Tr. 1193:5–18, 1195:12–1200:2; Dkt. 770 at 9–10)

Second, Mformation failed to establish "a long felt need for the solution provided by the claimed invention" or the "unsuccessful attempts by others to find the solution provided by the claimed invention."  Dr. Acampora provided unrebutted testimony about prior art device management systems, many of which addressed the same alleged solution provided by the '917 patent.  Dr. Acampora testified that the Mobitex network could send commands, such as the DIE command, to wireless devices.  (Tr. 1552:11–1554:6)  He also testified about RemoteWare and explained how the system and its use anticipated and/or rendered obvious the asserted claims.  In fact, the jury found that five claims of the '917 patent existed in the prior art and, therefore, there

---

[15] The jury found that the evidence presented at trial established commercial success, long felt need, unsuccessful attempts by others, acceptance by others and other evidence tending to show nonobviousness with respect to the claimed invention.  (Dkt. 1026 at 8)

1    was no long felt need because they were successfully solved by the prior art.[16]

2        Third, Mformation failed to present any evidence even suggesting "acceptance by others of

3    the claimed invention as shown by praise from others in the field or from the licensing of the

4    claimed invention."  Mformation presented no evidence showing any praise, recognition, or awards

5    received by Mformation for the '917 patent.   But there was evidence of complaints about

6    Mformation's  system.    (Tr. 1224:16–1227:10,  1227:23–1229:10;  DX803;  DX874;  DX5007)

7    Dr. Kushwaha also testified that Mformation has never licensed the '917 patent to anyone.

8    (Tr. 553:6–8)   Accordingly, the jury's findings on objective indicia of non-obviousness are not

9    supported by substantial evidence.  This Court should give little weight to these objective indicia in

10   its final determination that claim 27 is invalid as obvious in view of the combination of the

11   RemoteWare system and the Havinis patent.

12        **D.    The Court Should Find That The '917 Patent Is Not Entitled To Claim Priority
               To The Provisional Application.**

13        The issue of priority in this case is a question of law for this Court to decide.  *PowerOasis,*

14   *Inc. v. T-Mobile USA, Inc.,* 522 F.3d 1299, 1307 (Fed. Cir. 2008); *E.I. du Pont de Nemours & Co. v.*

15   *MacDermid Printing Solutions, L.L.C.*, 525 F.3d 1353, 1359 (Fed. Cir. 2008).  At the request of this

16   Court, RIM submitted a pre-trial memorandum demonstrating that U.S. Prov. Appl. No. 60/251,034

17   (JX0571, "the provisional application") did not disclose two limitations of claim 1: establishing a

18   connection "based on a threshold condition" and establishing a mailbox "without a request from the

19   wireless device."  (Dkt. 945 at 2–8; Dkt. 956)  The case law places the burden on Mformation "to

20   come forward with evidence to prove entitlement to claim priority to an earlier filing date."

21   *PowerOasis*, 522 F.3d at 1305–06.  Mformation did not carry that burden at trial.  Mformation only

22   presented Dr. Madisetti's testimony that the provisional application disclosed the "threshold

23   condition" limitation.  (Tr. 1984:22–1985:16)  First, as RIM explained in its Second Motion for

24   JMOL (incorporated by reference), Dr. Madisetti's testimony was based on a twisting of the plain

25   language in the provisional application.  (Dkt. 1003 at 13)  Second, even if Dr. Madisetti's testimony

26

27   _____

[16] This would also suggest that the jury also erred in finding that there was no "[o]ther evidence
tending to show obviousness."

28

was sufficient to show that the "threshold condition" limitation was disclosed by the provisional application—which it was not—Mformation presented no evidence that the provisional application disclosed the "establishing a mailbox" "without a request" limitation (or any other limitation) of claim 1.  (*Id.* at 13–14)  This Court should find that the '917 patent is not entitled to claim priority to the provisional application.

### E.      Mformation Has No Substantial Evidence Supporting Its Damages Claim.

Because the damages verdict was not supported by substantial evidence and is based on pure guesswork, this Court should vacate the jury's damages award and grant JMOL for RIM.  *See, e.g.*, *Lucent Techs.,* 580 F.3d at 1340 (reversing denial of defendant's JMOL motion regarding damages and vacating the damages award).

### 1.      The Damages Evidence Does Not Support An $8 Per Unit Royalty Rate.

The jury's $8.00 per unit royalty rate and $147 million damages award was not supported by substantial evidence.

### a.      Mr. Weinstein's Improper Reliance on and Faulty Assumptions About Ex. 113 Fail To Support The Jury's Royalty Rate.

Mr. Weinstein relied on two internal RIM documents to conclude that Mformation was entitled to a $12 per unit royalty rate:  PX113 and PX889.  He first relied on page 8 of PX113, a 2001 presentation (Tr. 1862:8-11), to calculate a percentage (7.7%) that he contended showed the relative value of the "systems monitoring" technology to RIM.  (Tr. 1163:8–16)  Mr. Weinstein then multiplied this percentage by the average revenue, including actual and forecast, in PX889 entitled "Net Activations, Service Price & COGS, & Attach Rate (S/W & Acc) Assumptions: RIM Internal & Confidential - High Level Forecasting Model - Working State Model for Sensitivity Analysis Only."  (Tr. 1167:16–1168:1)  Using these two documents, he proposed a reasonable royalty rate of $0.50 per unit per month or $12 per unit over an estimated two-year lifespan for BlackBerry devices. (Tr. 1168:24–25)

Mr. Weinstein's analysis and Mformation's damages claim were premised on inherently flawed assumptions concerning PX113.  Most significantly, Mr. Weinstein admitted he both assumed that the dollar values shown in PX113 indicated the relative value of various technologies

to RIM and that "systems monitoring" related to the '917 patent.[17]  (Tr. 1159:9–1162:2, 1160:17–19 ("Yes, I used it as representative of the systems monitoring function at, both in terms of cost and relative value to RIM."), 1207:4–1208:9 (testifying that he assumed systems monitoring (and logging, problem alerting and help desk management) had something to do with the '917 patent even though claim 1 does not talk about it))  But Mr. Weinstein's assumption was not supported by any evidence, and was instead based on gross speculation.  PX113 does not present the relative value to RIM of the components described there or the value of the patented technology.

Mr. Weinstein admitted that he would let the authors of the document "speak for themselves" as to the meaning of the chart shown in PX113.  (Tr. 1212:9–17)  Those authors confirmed that Mr. Weinstein's assumptions about PX113 were wrong.  David Castell, the author of the PX113 pricing chart (who was not responsible for setting the price of any BlackBerry products) (Tr. 1852:19-1853:14, 1854:25-1855:16), testified that:  (1) he did not prepare an exhaustive or accurate list of every component involved in BlackBerry Enterprise Software (Tr. 1853:15-21); (2) the PX113 chart reflected what Mr. Castell understood companies were charging for their software in 2001, not the value to RIM (Tr. 1853:22-25, 1854:21-24); and (3) he never verified that this chart accurately reflected any dollar amounts received by companies for their software (Tr. 1854:1-4).  Mr. Castell further testified that RIM never paid any companies these dollar amounts for their software.  (Tr. 1854:5–7)  By 2002—*three years* before the date of the hypothetical negotiation on which the royalty rate is supposed to be based—Mr. Castell realized his "pricing example [in PX113] was far removed from reality."[18]  (Tr. 1855:17–25)  Ms. Davis, RIM's damages expert, also spoke to three other authors of PX113 who confirmed Mr. Castell's testimony that PX113 does not reflect the value that RIM placed on systems monitoring.  (Tr. 1922:4–1923:4)

---

[17] This Court sustained RIM's objections to Mr. Weinstein improperly presenting his assumptions as facts:  "As an expert witness, I will permit you to make assumptions.  And the reason I believe the objections are well stated is because you are making these statements as though they are things you know as a matter of fact. . . . I don't understand [t]hat you were there and you can't lay a foundation as to what was said or what was meant or those kinds of things."  (Tr. 1161:11–1162:2)

[18] In fact, the evidence showed that RIM actually paid nowhere near these amounts.  (DX4295; DX4303; Tr. 1925:17-1926:4)

Because Mformation provided no evidentiary support for Mr. Weinstein's faulty assumptions with respect to PX113, an exhibit dated four years before the hypothetical negotiation, those assumptions cannot support a reasonable royalty rate.  Accordingly, this Court should vacate the jury's damages award and grant judgment against Mformation's claim for damages.  *See, e.g., Shockley v. Arcan*, 248 F.3d 1349, 1363–64 (Fed. Cir. 2001) (vacating damages award "derived from speculative assumptions"); *Oiness v. Walgreens Co.*, 88 F.3d 1025, 1029–31 (Fed. Cir. 1996) (same); *Integra Lifesciences I, Ltd. v. Merck KGaA*, Civil No.: 96CV1307-B(AJB), 2004 U.S. Dist. LEXIS 20725, at *29 (S.D. Cal. Sept. 7, 2004) (finding expert's calculation "lacks factual and economic basis, and cannot be adopted as the reasonable royalty calculation"); *see Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion."); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[E]vidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute").

> **b.    Mformation's Damages Claim Was Also Based On Faulty Assumptions With Respect To Non-infringing Alternatives.**

To support Mformation's damages claim, Mr. Weinstein also assumed that versions 3.5 and 3.6 of the BES were not commercially viable non-infringing alternatives because they required wired activation.  (*see* Tr. 1242:13–18)  Notably, BES version 3.5 was never accused and BES version 3.6 was initially accused and later dropped from Mformation's allegations of infringement.  (*See, e.g.*, Tr. 1901:3–13)   Mr. Weinstein assumed that the use of wired activation rather than wireless activation prevented these prior versions of the BES from being acceptable non-infringing alternatives—even though activation typically occurs only one time.  (Tr. 1242:13-18, 1204:8-13)  But again Mformation failed to present substantial evidence to support this assumption.  Mr. Weinstein failed to talk to any RIM employees or to conduct any surveys to determine whether BES versions 3.5 and 3.6 were commercially viable.  (Tr. 1242:19–25)

Mr. Weinstein himself admitted that the existence of non-infringing alternatives to the patent would reduce the value of the patent.  (Tr. 1200:21–24)  Mr. Weinstein agreed that a licensee, such

as RIM, could choose to use the non-infringing alternative rather than pay a higher royalty rate for the patent.  (Tr. 1200:25–1201:4)  By incorrectly assuming that BES versions 3.5/3.6 were not viable non-infringing alternatives, Mr. Weinstein presented an overinflated reasonable royalty opinion based on speculation.  This provides an additional basis for vacating the jury's damages award.  *See Shockley*, 248 F.3d at 1363-64; *Integra Lifesciences I*, 2004 U.S. Dist. LEXIS 20725, at *29.

> ## 2.   Mformation Failed To Present Substantial Evidence Of Use Justifying The Jury's Damages Verdict.

Under the Court's instructions (Dkt. 1017 at 24), which followed a similar instruction proposed by Mformation, the amount of Mformation's damages for indirect infringement is limited by the number of instances of direct infringement that Mformation proved.  *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009) ("Cardiac can only receive infringement damages on those devices that actually performed the patented method during the relevant infringement period."); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004) ("A defendant's liability for indirect infringement must relate to the identified instances of direct infringement.  Plaintiffs who identify *individual* acts of direct infringement must restrict their theories of vicarious liability—and tie their claims for damages or injunctive relief—*to the identified act*.") (emphases in original).  Mformation must either show that the accused products necessarily infringe or point to specific instances of direct infringement.  *Dynacore*, 363 F.3d at 1275-76; *see* Dkt. 1017 at 24.

Mformation has not shown that the accused products necessarily infringe and has not provided any evidence of what percentage of customers either actually use the accused functionality or actually use those accused features in such a way that each and every step of the claimed method is performed.  *See, e.g.*, *Lucent Techs.*, 580 F.3d at 1333–35 (recognizing that evidence of usage can assist the jury and the Court with respect to determining whether a royalty is reasonable and vacating the jury's award where "[n]o evidence describes how many Microsoft Outlook users had ever performed the patented method or how many times").  In fact, as discussed above, Mformation did not present substantial evidence of a single instance of direct infringement.  Mformation's damages calculation should have been tied to instances of use of RIM's BES software in the particular manner

1   Mformation contends infringes the patented methods.  Instead, Mformation simply presumes that

2   mere evidence of the sale of an accused product by RIM, without more, is sufficient.

3          In this case, Mformation chose to attempt to prove direct acts of infringement through the

4   testimony of Mr. Wilson and Mr. Hatcher.  Mr. Wilson testified that over eight years at Foley &

5   Lardner, he performed wireless enterprise activation over a hundred times.  (Tr. 763:21–24, 767:5–

6   15)  Mr. Hatcher similarly testified that he performed enterprise activation "a hundred [times],

7   maybe."[19]  (Tr. 716:12–16)  Equally absent from Mr. Wilson's and Mr. Hatcher's testimony was any

8   discussion about the number of times that they performed each and every step of the asserted claims

9   of the '917 patent.  Under *Lucent*, the lack of evidence of usage of the asserted claims of the '917

10  patent means that Mformation failed to carry its burden of proof with respect to the extent to which

11  any infringing method has been used.  *Lucent Techs.*, 580 F.3d at 1334–35.  Even if one views this

12  evidence in the light most favorable to Mformation, Mformation has attempted to show at most two

13  hundred uses. Mformation has provided no evidence or methodology sufficient to support the jury's

14  award of $147.2 million.  The Court should accordingly grant JMOL that Mformation cannot

15  recover the damages awarded by the jury.  Alternatively, RIM requests that this Court limit damages

16  to the maximum number of instances of infringing use (200) that Mformation sought to establish.

### 3.      Mformation Failed To Appropriately Limit Its Damages Claim Solely To Indirect Infringement Damages.

19          Mformation's request for reasonable royalty damages is also unsupportable because it does

20  not distinguish between direct and indirect infringement.  *See ResQNet.com*, 594 F.3d at 869 ("At all

21  times, the damages inquiry must concentrate on compensation for the economic harm caused by

22  infringement of the claimed invention").  At the beginning of this lawsuit, Mformation asserted both

23  direct and indirect infringement, and Mr. Weinstein included RIM's alleged direct infringement in

24  his damages calculations.  (Dkt. 417, Ex. A ¶ 46 n.46)  Subsequently, this Court granted summary

25  judgment that RIM does not directly infringe the '917 patent.  (Dkt. 691 at 29)  Mr. Weinstein did

---

[19]  Since Mr. Wilson testified that he joined Foley & Lardner in 2004 (Tr. 764:4–6) and Mr. Hatcher testified that he used BES version 4.0 as far back as 2006 or 2007 (Tr. 712:21–24), before the October 27, 2008 damages cut-off (Dkt. 691 at 26), much of their testimony regarding the number of times they performed wireless activation is irrelevant to the calculation of damages.

1   not adjust his damages calculation, however, to reflect this ruling and to determine the appropriate

2   reasonable royalty where only indirect infringement occurs.  Indeed, Mr. Weinstein admitted at trial

3   that his damages calculation did not separately determine how much Mformation's reasonable

4   royalty would be for strictly indirect infringement.  (Tr. 1224:12–15)  The jury accordingly had no

5   basis, other than pure speculation, to determine damages as to indirect infringement only.  Thus,

6   Mformation's request for damages is unsupportable because it is not tied to the economic harm

7   allegedly incurred as a result of infringement.  This Court should vacate the damages award and

8   grant RIM judgment as a matter of law on Mformation's claim for damages.

**III.     CONCLUSION**

10          For the foregoing reasons as well as the reasons set forth in RIM's Motions for Judgment as a

11  Matter of Law (Dkt. Nos. 985, 1003) and RIM's Brief in Response to the Court's July 17, 2012

12  Order Requesting Further Briefing (Dkt. 1036), RIM respectfully requests that this Court GRANT

13  RIM's Renewed Motion for Judgment as a Matter of Law.

1    DATED:  July 27, 2012

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KIRKLAND & ELLIS LLP
Respectfully submitted,

/s/  Linda S. DeBruin
Linda S. DeBruin

Linda S. DeBruin
(Admitted to this Court on September 27, 1991)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email: linda.debruin@kirkland.com

Marc H. Cohen (CA Bar No. 168773)
KIRKLAND & ELLIS LLP
950 Page Mill Road
Palo Alto, CA  94304
Telephone:     (650) 859-7000
Facsimile:      (650) 859-7500
Email: marc.cohen@kirkland.com

Mark G. Matuschak (*pro hac vice*)
WILMERHALE
60 State Street
Boston, MA  02109
Telephone:     (617) 526-6559
Facsimile:      (617) 526-5000
mark.matuschak@wilmerhale.com

Seth P. Waxman (*pro hac vice* pending)
WILMERHALE
1875 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone:  (202) 663-6800
Facsimile:  (203) 663-6363
seth.waxman@wilmerhale.com

Andrew B. Grossman (CA Bar No. 211546)
WILMERHALE
350 South Grand Avenue, Suite 2100
Los Angeles, CA  90071
Telephone:     (213) 443-5303
Facsimile:      (213) 443-5400
andrew.grossman@wilmerhale.com

*Attorneys for Defendants and Counterclaim Plaintiffs*
Research In Motion Limited and Research In Motion Corporation

1

## CERTIFICATE OF SERVICE

2

I hereby certify on this July 27, 2012 that a copy of the foregoing was filed electronically

3

through the Court's CM/ECF system, with notice of case activity automatically generated and sent

4

electronically to all parties.

5

DATED: July 27, 2012                                    KIRKLAND & ELLIS LLP
                                                        Respectfully submitted,

6

7

                                                        */s/ Kathleen Cawley*_____
                                                        Legal Assistant

8

Linda S. DeBruin (Admitted to this Court on            Mark G. Matuschak (*pro hac vice*)

9

September 27, 1991)                                    WILMERHALE
KIRKLAND & ELLIS LLP                                  60 State Street

10

300 North LaSalle                                      Boston, MA  02109
Chicago, IL  60654                                     Telephone:    (617) 526-6559

11

Telephone:    (312) 862-2000                           Facsimile:    (617) 526-5000
Facsimile:    (312) 862-2200                           mark.matuschak@wilmerhale.com

12

linda.debruin@kirkland.com

                                                        Seth P. Waxman (*pro hac vice* pending)

13

Marc H. Cohen (CA Bar No. 168773)                      WILMERHALE
KIRKLAND & ELLIS LLP                                  1875 Pennsylvania Avenue, N.W.

14

950 Page Mill Road                                     Washington, DC  20006
Palo Alto, CA  94304                                   Telephone:  (202) 663-6800

15

Telephone:    (650) 859-7000                           Facsimile:  (203) 663-6363
Facsimile:    (650) 859-7500                           seth.waxman@wilmerhale.com

16

marc.cohen@kirkland.com
                                                        Andrew B. Grossman (CA Bar No. 211546)

17

                                                        WILMERHALE
                                                        350 South Grand Avenue, Suite 2100

18

                                                        Los Angeles, CA  90071
                                                        Telephone:    (213) 443-5303

19

                                                        Facsimile:    (213) 443-5400
                                                        andrew.grossman@wilmerhale.com

20

*Attorneys for Defendants and Counterclaim Plaintiffs*
Research In Motion Limited and Research In Motion Corporation

21

22

23

24

25

26

27

28