UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES WARE, CHIEF JUDGE

```
------------------------------)
                              )
Mformation Technologies, Inc.,  )
                              )
                 Plaintiff,   )
                              )
    v.                        )   No. C  08-4990 (JW)
                              )
Research In Motion, Ltd.,     )
et al.,                       )
                              )
                 Defendants.  )  San Francisco, California
                              )  Monday, August 6, 2012
------------------------------)     (57 pages)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:


For Plaintiff:          Foley & Lardner, LLP
                        3579 Valley Centre Drive
                        Suite 300
                        San Diego, California 92130
                    BY: AMAR L. THAKUR
                        SHAWN E. MCDONALD
                        ALLAN A. ARNTSEN
                        JUSTIN E. GRAY

Also Present:           TODD DELAUGHTER, CEO

**APPEARANCES** (cont.):


For Defendant:          WilmerHale
                        305 South Grand Avenue
                        Suite 2100
                        Los Angeles, California 90071
                   BY:  MARK G. MATUSCHAK
                        ANDREW B. GROSSMAN

                        Kirkland & Ellis, LLP
                        300 North LaSalle
                        Chicago, Illinois 60654
                   BY:  LINDA S. DeBRUIN
                        AARON D. CHARFOOS
                        MICHAEL DALEY KARSON

Also Present:           ANTHONY S. KIM
(In-house)              BARBARA A. PARVIS

Monday, August 6, 2012

                                              (10:35 a.m.)

         (In open court)

         DEPUTY CLERK:  Remain seated and come to order.

         THE COURT:  Good morning, again.

         MR. THAKUR:  Good morning, your Honor.

         MR. MATUSCHAK:  Good morning.

         MS. DeBRUIN:  Good morning, your Honor.

         MR. McDONALD:  Good morning.

         THE COURT:  Please be seated.

         DEPUTY CLERK:  Calling case 08-4990, Mformation Technologies, Inc. vs. RIM Limited, et al.

         Counsel, please step forward and make your appearance for the record.

         MR. THAKUR:  Amar Thakur for Mformation Technologies, Inc.  I'm joined by my colleagues, Shawn McDonald --

         MR. McDONALD:  Good morning, your Honor.

         MR. THAKUR:  And Justin Gray, Allan Arntsen and Todd Delaughter, CEO of Mformation.

         THE COURT:  Good morning all.

         MR. MATUSCHAK:  Mark Matuschak for RIM.  With me are Linda DeBruin, Andrew Grossman and Aaron Charfoos.

         MR. GROSSMAN:  Good morning.

         MR. CHARFOOS:  Good morning, your Honor.

THE COURT:  Good morning.  I'd forgotten how nice you all look.

(General laughter)

THE COURT:  Very well.  So we are here on RIM's renewed motion for judgment, and alternative, I suppose as I would call it, motion for a new trial.

So, who will speak for the motion?

MR. MATUSCHAK:  Your Honor, I will start.  I'm going to address primarily the first of the two arguments that the Court asked us to address in your July 17th order.  I think those comprise issues that relate to both of those motions.

And then Miss DeBruin, I think, will speak also.

THE COURT:  Very well.

MR. MATUSCHAK:  We have a set of slides I'd like to hand up, if I may.

Your Honor, I'd like to start by addressing the first of the of the two questions you asked in your July 17th order.  And that question was in light of the Court's claim construction, to direct you to evidence produced during the plaintiff's case in chief, showing that a command is transmitted from the BlackBerry enterprise server to the BlackBerry handheld device after a connection has been established between the server and handheld device.

The answer to that question is very simple: There is no such evidence.  Mformation devotes nine pages of briefing to this issue, but you will search in vain throughout those nine pages for anything that answers the question that you asked.  The problem that Mformation has, the problem that they've had throughout this case, is that their case is built on this house of cards that ignores the fact that a connection must actually be made as part of the establishing step.  And that's what we argued at the close of Mformation's case in chief, that their case was built on this flawed theory.  Everything you've seen at trial, everything you've seen in the closings, everything you've seen in the post-verdict briefing, establishes that is, in fact, the case.  That's their theory, and it's wrong.

Now, they know that they lack the evidence that the Court asked it to cite because their whole case was built on a different theory, so they try to avoid the question.  And first, they refuse to accept the Court's construction.  In their recent briefs they claim that, and this is a quote, This court has at no point required that in order to have an established connection, anything more than having an initiated wireless communication is required.

But this court required exactly that.  This court

instructed the jury, and it's up on the screen in our first slide, that a connection must not only be initiated, but must be made by the server with the wireless device.

Now, at trial, Dr. Madisetti championed exactly the same flawed theory that Mformation argues now, and he pointed to two things and two things only to meet that establishing step. He said -- first, he said that the establishing step is met when, in the dispatcher -- this was his drawing -- in the dispatcher, the command is packaged in the GME protocol, and there is the GME protocol that he drew right there. We're still in the server here. There's been no communication with the BlackBerry device. The BlackBerry device is not even part of this diagram. And there certainly has been no connection that's actually been made at this point.

The second thing he said was, in the policy service -- or I'm sorry, in the router, chooses WiFi or cellular connection, Ports 3101 or 4101 -- we're still in the BES. No connection has been made between the server and the BlackBerry device at this point in time. In fact, he absolutely refused to agree with the idea, which is part of the Court's claim construction, that a connection must actually be made before the contents of the mailbox are distributed.

That's when I asked him, "Doesn't completion of

the establishing step require you to establish a connection?"

Answer:  "No, Sir.  The key is initiating."

Now, that's wrong, and it leads to the absurd results that I think the Court commented on after his testimony.

And that's when I asked him, I said, "So you believe you can establish a connection with a device that doesn't exist?"

And he says, "Yes.  The key word is 'initiating.'"

This point was graphically shown during his testimony as well.  This was a chart that they used and put in front of the jury.  And he again said, All right, here's where you start initiating, and here's where you complete initiating, and when you complete initiating you transmit -- this is all still in the BES.  Nothing has happened.  No connection has been made at this point to the BlackBerry device.  He never testified about any connection being made to the BlackBerry device because that wasn't part of his theory.  His theory was initiating meets the establishing step, period, full stop.

Mr. Thakur said the same thing.  The initiation is complete; the transmission can begin.

Again, there's -- no connection has been made.

They didn't even argue that a connection has been made at that point in time. Their whole case was built around the idea that all you have to do is begin the initiation process, and then you can transmit.

And in fact, Mr. Thakur said explicitly to the Court, "The sending is the connection, going over the network is the transmitting." That doesn't meet the Court's claim construction. The Court's claim construction says you have to finish that establishing step which includes actually making a connection. Then you can transmit.

And here he is articulating very simply what their theory was, that the connection is transmitted. That's inconsistent with the Court's claim construction, and that was their entire theory of the case. That's why there is no evidence that there was a connection actually made.

So the answer to the Court's question: There is no evidence in their case in chief that a connection is established or made before any command is transmitted.

Now, Mformation understands this as well as anyone, so they try to change the subject. They claim that they have proven a connection over WiFi before a command is transmitted. But that's also wrong. To start with, Dr. Madisetti didn't distinguish between WiFi and

cellular in his direct testimony.  Their case in chief is still completely bereft of anything showing a connection had actually been made over a WiFi.

His theory was initiating equals establishing, and that didn't depend on the difference between the two.

There's his slide again where he explained his theory.  This is what he says establishes a connection, two things:  Packaging and choosing.  Not making a connection.

So there was no evidence of a connection actually being made before transmission of a command in the WiFi context in their case in chief.  So Mformation glosses over this problem in their case in chief, and they say, Well, look at Dr. Acampora's testimony; he says a connection is made through WiFi.

But that doesn't help them.  Because his testimony was the connection between the BES and the BlackBerry over WiFi cannot be made except at the request of the BlackBerry device.  He says it can be no other way.  And why?  Because, he says, the BlackBerry can be anywhere.  The BES has no idea where the BlackBerry is.  The BES has a permanent address.  So the BlackBerry has to send a message to the BES saying, Here I am.  I'm at Starbucks down the corner.  Now you can send something to me.  Now I can establish that TCP connection.  And he

testified that BlackBerry initiates that TCP connection. And that's the only way it can happen.

None of this testimony was ever rebutted. None of this testimony was criticized. None of this testimony was contradicted in any way by Dr. Madisetti or anyone else in the courtroom.

Dr. Acampora's testimony does not help Mformation because he said that the TCP connection only exists at the request of the BlackBerry device. That's inconsistent with the requirements of Claim 1, which require it to be without a request from a handheld device.

Now, there's a second reason why Dr. Acampora's testimony doesn't help Mformation. Because Dr. Madisetti said that's not the connection. I'm not sure exactly what he was referring to here, but I think I know. He was trying -- what he says here is that the TCP connection that Dr. Acampora talked about is an unrelated connection to the connection that's established. He says that's not the right connection. He says, "My connection" -- meaning Dr. Madisetti -- is its initiation. So their own expert's testimony was that anything that Dr. Acampora said also could not be the connection required under Claim 1.

Now, they're going to contradict their own expert and say, Well, that is the required connection, but the problem they have is that the only evidence at trial was

that that was established at the request of the BlackBerry device.

And Dr. Madisetti never talked about whether a connection was actually made before transmitting, because that was unimportant to his theory.  It is important to the Court's claim construction, though.  And they knew they couldn't prove that so they wrapped their case in this cloak of initiating, hoping that nobody would notice.  And they were successful.  They did get their verdict.  But now they have to live with the consequences of that which doesn't save them from judgment as a matter of law.

One other point on this WiFi point, and that is, they cannot support their damages claim on the WiFi argument because neither Mr. Hatcher nor Mr. Wilson, the only two people who talked about direct infringement, neither one of them established any active direct infringement over WiFi.  They did not say -- ever say WiFi.  They didn't distinguish between WiFi or cellular.

Now, recognizing they have this problem, Mformation also tries to challenge the Court's claim construction.  There's the Court's claim construction on the top, "a connection between the server and the wireless device must be established before transmission of a command is commenced."  And that was exactly our theory of case from the beginning, as Mformation recognizes.

And there is Mformation, says, Well, nothing requires that to be true, "neither logic, grammar, the claim language, or the specification dictate that" that's required.  But it's a little late to be challenging the Court's claim construction now because they've already conceded that point during trial.  Your Honor asked Mr. Thakur directly, you said to him the --  "...a connection does have to come into existence.  It has to move beyond the initiating to the point of actually having a connection."

Mr. Thakur:  "Your Honor, we concede that, correct."

You said:  "And do you accept that that condition of being connected has to be satisfied in the patent before the transmission?"

Answer, Mr. Thakur:  "We do, your Honor."

The idea -- now, they recognize this is a problem for them.  They're trying to back away.  It's too late.  They've already conceded the Court's correct, and it's too late to change that.

I think I would say, your Honor, that Mformation knew from the beginning that they could not prove its case.  They had to establish that a connection was made, actually made, before transmitting occurred.  And so they intentionally decided to avoid that issue in the

presentation to the jury.

They premised their case on initiating equals establishing.  The Court told them that was wrong.  They got a verdict.  But the evidence -- their evidence contradicts the Court's claim construction.

The federal circuit has said in the *Exergen* case, which is 575 F.3d 1321 2009:  "No party may contradict the Court's construction to a jury."  That's exactly what you heard, it's exactly what their closing argument was.

The Court has already said in the *Cordis* case last year, 658 F.3d at 1357, "Testimony based on an incorrect understanding of the Court's construction must be disregarded."

Mformation's case and Dr. Madisetti's testimony are based on a theory that the Court rejected.  RIM is therefore entitled to judgment as a matter of law.  And, at a minimum, presenting the case based on an incorrect claim construction to the jury as Mformation did warrants a new trial on infringement.

And I'll cede the rest of my time to Miss DeBruin, your Honor.

MS. DeBRUIN:  Good morning, your Honor.  The second issue that you asked for briefing on was:  Is the jury's verdict inconsistent?  And if so, what do we do?

First, the verdict is inconsistent.  There is no

way -- if we could have Slide 1, please -- there is no way that Claim 1 can remain valid if Claims 21 through 25 are invalid.

Slide 2, please.

Claims 21 through 25 are dependent on Claim 1.

Next slide, please.

The jury's verdict is irreconcilably inconsistent.

There's other cases the same thing has happened on:  The *Comaper* case; the *Dun Oil Tool* case.

So what to do?  First, the Court can either reconcile the verdict, or the Court can grant a new trial. To reconcile the verdict, you either need to harmonize the verdict -- next slide, please -- and by harmonizing the verdict, that doesn't mean change the verdict.  That means interpret what the jury has said and take everything that they have said and find a way that it makes sense.  That simply can't be done here where the verdict is internally irreconcilable.

Now, what you can -- what you could do in some cases -- there's surplusage cases that Mformation cites to.  This isn't a surplusage case.  This isn't a case where the jury answered questions that they weren't to answer.  There were not instructions that told them not to answer certain questions but yet they went ahead and

answered those.  This isn't that case.  And those cases don't apply.

What you could do to reconcile the verdict is grant JMOL.  That JMOL, though, has to be based on the evidence at trial, not simply based on the inconsistency of the verdict form.

Here, RIM has filed a motion for JMOL, a renewed motion of JMOL for invalidity of Claim 1.  By granting that motion -- if we could have the next slide, please -- by granting that motion, the Court would be able to resolve the inconsistency in the jury's verdict.

Now, I'm going to leave to our papers the details of RIM's motion for JMOL on invalidity.

Mformation also has a JMOL of invalidity.

Next slide, please.

The -- Mformation's JMOL, for the most part, is based on an argument that RIM's evidence at trial was uncorroborated.  Now, your Honor has already addressed that issue, addressed that same argument, and rejected it when Mformation made it during the summary judgment briefing.

Mformation also argues that the evidence that RIM presented at trial is hearsay.  Again, Mformation made those same arguments during the trial.  Your Honor overruled them.

RIM came forward with substantial evidence -- substantial unrebutted evidence showing invalidity of Claim 1.

Now, Mformation only came forward -- next slide, please -- with one in its JMOL motion -- only targets one specific claim limitation.  And that is the limitation of verifying the registration information.  This is a limitation on which Dr. Madisetti provided testimony outside of his expert report, something completely new, concerning this limitation.  This is the only limitation that Mformation relied on in their JMOL, and that does not work, because:

One, RIM had substantial evidence that this step was met, based on Dr. Acampora's testimony; and, second, even based on the argument that Dr. Madisetti improperly made that somehow this was done by a human rather than the server, there's substantial evidence in the record that that's not right.

And here we have two examples.  The server uses this information, the registration information that's entered, to authenticate the client.

And also Mr. Foley's testimony that the server has to match up the registration information.

Next slide, please.

Now, if the Court determines not to grant RIM's

JMOL of claim -- for Claim 1, and not to grant Mformation's JMOL with respect to Claims 21 and 25, there's only one thing left to do, and that is to grant a new trial on invalidity.  And there's a case, the *Comaper* case, that addresses this very issue.  "When faced with inconsistent verdicts and the evidence would support either (one), the district court must order a new trial."

Here, there's other reasons to have a new trial in addition to the inconsistency of the verdict, and there's one that goes specifically to invalidity, and that is Dr. Madisetti's testimony that I made reference to before.

If we could have the next slide, please.

Now, Dr. Madisetti testified repeatedly -- he was asked repeated questions during his testimony that made him go beyond his report.  In one case, Mformation was able to get that information in.  That was the verification step that I talked about.  In other cases, Mformation's counsel tried to get beyond Madisetti's report, but RIM's objections were sustained.

But the problem is, the damage was done.  The damage was done, based on the questions that Mformation's counsel asked.  The damage was done, based on the partial answers that Dr. Madisetti got out.  Even though the jury was instructed to ignore them, the damage was done.

Now, Dr. Madisetti had basically no basis in his expert report to say that RemoteWare did not anticipate. But through this repeated going outside of the report to the jury, RIM was prejudiced and the jury was confused.

This is one other reason to grant a new trial in addition to -- and I think it also explains something about the jury's inconsistency.

With respect to the invalidity of the patent, there's two other things that I'd like to just quickly address that your Honor will need to consider if JMOL is granted for RIM with respect to Claim 1, and that's Claim 6 and Claim 27.

If we could have the next slide, please.

With respect to Claim 6, just like Claim 1, Claim 6, RIM has moved for JMOL of invalidity based on RemoteWare. RIM's evidence was unrebutted but for again this problem with Dr. Madisetti where he was going outside his expert report.

Here, Mformation's counsel asked Dr. Madisetti about CONNECT:Manage, a product that was not even at issue in this lawsuit. He didn't even ask about RemoteWare. He was reading from Dr. Madisetti's report, asked about CONNECT:Manage. Dr. Madisetti admitted during cross-examination that that wasn't RemoteWare. But the confusion was there, the confusion for the jury.

You can't look at that evidence to support -- to deny RIM's JMOL with respect to Claim 6. You have to look at what RIM came forward with, which is unrebutted evidence from the documents and from Mr. Foley that Claim 6 was practiced by RemoteWare, and Dr. Madisetti's opinion about CONNECT:Manage, which is not the product at issue, does not change the substantial evidence, does not affect the substantial evidence that RIM came forward with.

The other claim that your Honor needs to deal with is Claim 27. And there, RIM has moved for -- had moved for obviousness of Claim 27. And your Honor had the jury make factual findings concerning that. The jury accepted RIM's contentions on the factual findings relating to the level of ordinary skill. It accepted RIM's findings as to the scope and content of the prior art. It accepted Mformation's findings as to the differences. But, as RIM has demonstrated in its JMOL motion, that -- those differences are not substantial or relevant, and do not prevent your Honor from granting -- from finding that Claim 27 is obvious.

Dr. Acampora came forward with evidence explaining how you could combine RemoteWare with the Havinis patent. That testimony was largely -- that testimony was undisputed.

Next slide, please.

Dr. Acampora explained that it would be common sense to combine Havinis, which taught the idea of having a command that would ask the device to tell its location, to combine with that the RemoteWare system, which provided for a way to send commands to a device.

For that reason -- for other reasons that we've discussed, and relying on RIM's filing for its renewed JMOL motion -- which we just filed some reply briefs today on the JMOL and on the new trial, so the motions are fully briefed -- RIM submits that the Court should find Claim 27 obvious.

Just to sum up, the secondary considerations are also an issue on obviousness. And I direct the Court to our JMOL motion with respect to the secondary considerations, because there was no evidence in the record, none at all, that would support the jury's findings with respect to the secondary considerations.

Here again, we have an issue where the JMOL interacts with the new trial motion. Mformation relied on various RIM internal e-mails to make various arguments that were improper, given the scope that your Honor said could be given to those e-mails at trial. Those e-mails very well may be the reason that the jury reached the conclusions that it did with respect to the secondary

considerations.  However, there is no evidence in the record that would support the jury's finding as to those secondary considerations.

So in summary, RIM would request JMOL with respect to all the matters of liability.

One quick point on damages, your Honor.  The damages that were awarded in this case are -- if we could have the next slide, please.

The damages that were awarded in this case are not supported by substantial evidence.  They're based on an exhibit, Plaintiff's Exhibit 113, that Mr. Weinstein, Mformation's expert, made certain assumptions about.  We demonstrated during trial, your Honor, that those assumptions were wrong.

If I could have the next slide, please.

Mr. Weinstein said he would consider what one of the authors said about 113.  Well, we had one of the authors come to trial, and what Mr. Castell, who authored that table from Exhibit 113 on which Mr. Weinstein relies, Mr. Castell confirmed that Mr. Weinstein's assumptions were wrong.  Exhibit 113 did not provide an exhaustive list of all the features for the BES.  Exhibit 113 did not provide what pricing was actually being received for these things.  And Exhibit 113 did not provide what dollar amounts any companies actually paid.

Next slide, please.

Mr. Castell was asked during trial about an e-mail that he wrote that prefaced Exhibit 113.  And he says he would "probably revisit some of this".

Next slide, please.

I asked him what he'd revisit and what he meant by that.  What he said is that the information in 113, in particular, the pricing example, was "far removed from reality".

Next slide, please.

And evidence at trial showed that that was far removed.  With respect to attachment handling, which is one of the items shown in 113, it says on 113 that's $50 a seat.  What did RIM actually pay?  A penny a device.  A penny.

Now, if you calculate this based on Mr. Weinstein's calculation, you would have to be paying, again, $12, what Weinstein said RIM would have to pay, for something that showed $50 a seat on Exhibit 113.

Next slide, please.

Similarly, with respect to the browser, this had $200 a seat on Exhibit 113.  Under Weinstein's theory -- Mr. Weinstein's theory, you'd have to pay $48.  What did RIM pay?  RIM paid between 25 and 50 cents.

Next slide, please.

The damages are not supported by the evidence. They're derived from faulty assumptions. The *Uniloc* court said that, "Fundamentally flawed premise results in fundamentally flawed conclusion," and that's what we have here, your Honor.

THE COURT:  Thank you.

Counsel?

MR. THAKUR:  Good morning, your Honor.

THE COURT:  Good morning.

MR. THAKUR:  I will address almost all the issues in the JMOL, with the exception of the inconsistent verdict.  I'll ask my colleague, Shawn McDonald, to come up.

Let's start with the first main issue which is the issue of the construction of the "establishing a connection", and "wherein" the connection's established. What RIM is doing here is not actually talking about the evidence and claim construction.  What they're asking for is a reversal of this court's claim construction.  That is a direct attack on the claim construction, not an attack on the evidence.

Let's walk through what actually happened here at trial, and let's remember, the jury heard all of this. They heard your closing instructions, they spent five days methodically going through the evidence and arriving at

the conclusion.

What this court said was:  Establishing a connection is initiating wireless communication.  That's the establishing a connection.

What this court also recognized was, But the connection has to be established.

Well, if establishing a connection is initiating wireless communication, what is the connection being established?  It is the -- that the connection has been initiated?  Or, put another way, it has been completed, before the transmission can commence?  No one is disputing this Court's claim construction.  Establishing a connection, it means initiating wireless communication, that's this Court's construction.  Wherein the connection's established is when that initiating step has been completed or it has been initiated.

And RIM's own expert agreed with that construction.  So there was no dispute during trial as to what that meant.

What we are hearing today is this word connection must be made.  That was never what these steps are.  The connection is made when the connection is established.  What now you're hearing is connection must be made somehow like a two-way setup, and this Court in its claim construction order said, Initiating wireless communication

does not mean a setup of a two-way path between the device and the server.  That would be like going back to, you know, even before I was born, frankly, when you called an operator and said, I need to make a connection, and a wire line connection was made.  That does not make any sense in an environment of a push connection.  The patent expressly discloses connectionless protocol.

So let's talk briefly about what happens for this infringement.  For the infringement process is, there's a command placed in the box.  That command is then placed into a header using the GME protocol.  There is a destination address; there's a sender address; and there is the payload.  And then the least-cost routing condition is checked, and then it is sent.

It is sent.  Transmission occurs after the connection has been established.  It's done all by the server.  And it is with the device, because all the connection information to the device is in that GME end-to-end protocol.  The -- what RIM really argued through this case and at trial is that one of the ways, which is doing cellular, they used a connectionless protocol.  And the jury heard the evidence, the jury carefully considered the evidence, and they rejected it.

So in a cellular environment, the initiating wireless communication is done at the server, it is

initiated.  So it is completed before its transmission commences.  And that is what the evidence was presented at trial, that's what the jury heard, and that's what the jury based its conclusion on.

Just to quickly highlight:  The issue of whether the connection is established means a completion of initiating wireless communication.  Again, what we're hearing today is different.  Their own expert, Dr. Acampora, did not dispute that that was what was required.  Quote-unquote.  This is RIM's own expert.  "It is my opinion that when the RIM system is operated over the WiFi network, there is in fact a connection established."

I'll get to that sentence in a second.

The wireless communication is in fact initiating between the BlackBerry and the BES before the transmitting the contents of the mailbox takes place.

Dr. Acampora says two things in those sentences. Each one is sufficient for this court to find -- sustain the verdict.  First, it is my opinion that when the RIM system is operated over a WiFi network, there is a connection established.  You can go over WiFi; you can go over cellular.  There is no dispute between RIM's expert and our expert that a connection is established in a WiFi network.

Their argument was, in a WiFi network the request is made by the device, not by the BES.  And we have explained to the jury with a very clear example:  At 9:00 a.m. in the morning, your WiFi may let the BES know you're there, but the connection that is used at 2:00 p.m. when you're sending the command is done by the server, not by the device.  The jury heard that carefully and considered it.

THE COURT:  That was a hypothetical.  But what if it's sent at 9:00?

MR. THAKUR:  Even if it's sent at 9:00, still at 9:00, the check -- time is a continuum, right?  It's not exactly.  At 9:00, the WiFi checks in.  At 9:01, when the command is still made, the server is going to check the package, the command, and check the least-cost routing and is going to send that.  You cannot have an identical moment simultaneously where a WiFi --

THE COURT:  Why -- so why bother with the example of 2:00 p.m.?

MR. THAKUR:  I was just giving an example so the jury can understand.

THE COURT:  So your argument is that the WiFi -- is a connection established between the handheld and the server as a result of a request of the handheld device and WiFi?

MR. THAKUR:  It is not by the request of the device.  It is done by the server.  When the server wants to use the WiFi to send a command, the server --

THE COURT:  I didn't ask that.  When the server wants to use WiFi to send a command, the focus there is on the command.  But is a connection established between the handheld device and the server when WiFi is being used?

MR. THAKUR:  I quote Dr. Acampora --

THE COURT:  I'm asking you yes or no.

MR. THAKUR:  The answer is yes.

THE COURT:  Who initiates that connection?

MR. THAKUR:  That is initiated by the server.

THE COURT:  How?

MR. THAKUR:  Because the server will take the command --

THE COURT:  I'm not talking about commands.

MR. THAKUR:  But how is it --

THE COURT:  I'm not talking about commands.  That's a second process.  Because it could be that the server has no commands.

MR. THAKUR:  Right.

THE COURT:  So if there are no commands --

MR. THAKUR:  Right.

THE COURT:  -- and the handheld device communicates with the server through WiFi --

MR. THAKUR:  Right.

THE COURT:  -- has a connection been established?

MR. THAKUR:  It's irrelevant for the purposes of this claim.

THE COURT:  It may be irrelevant.  But I want your position on it.  Has a connection been established?

MR. THAKUR:  It's not initiating wireless communication, so the connection has not been -- does not.

THE COURT:  All right.  So your position is that using WiFi -- so when the server makes a choice between WiFi or cellular, under the way the RIM device operates, is it your understanding that it will always use WiFi if it's available?

MR. THAKUR:  Correct.

THE COURT:  Why?

MR. THAKUR:  Because it's cheaper.

THE COURT:  And how does it know that WiFi is available?

MR. THAKUR:  It's because the port is open.  When the WiFi --

THE COURT:  What do you mean it's "open"?

MR. THAKUR:  What happens is, when the -- the device has a WiFi connection, it lets the server know that, I have a WiFi connection.

THE COURT:  And so there is a connection.

MR. THAKUR:  I have a WiFi connection availability.

THE COURT:  So there is a connection.

MR. THAKUR:  The word "connection", we've got to be careful with.

THE COURT:  Say again?

MR. THAKUR:  We've got to be careful with the word "connection".

THE COURT:  I have been trying that for a long time.

(General laughter)

MR. THAKUR:  The device is letting the server know that I'm here.

THE COURT:  Is that a connection?

MR. THAKUR:  That is not a connection.

THE COURT:  What is it?

MR. THAKUR:  A connection is an initiating --

THE COURT:  What is that?

MR. THAKUR:  All that is saying is that, I'm here.

THE COURT:  What is that?

MR. THAKUR:  It's a recognition of presence.

THE COURT:  What's a recognition of presence, in electronics?

MR. THAKUR:  It's a pathway.

THE COURT:  And a pathway is not a connection?

MR. THAKUR:  No, because your construction is initiating wireless communication.

THE COURT:  No, that's the -- that's not the definition of a connection.

MR. THAKUR:  It's -- establishing a connection. And the connection is when that is done.  You can't have a connection when you say, establishing a connection is initiating wireless communication.  What is a connection? When that is done.

THE COURT:  Yes.

MR. THAKUR:  And that's what we've testified and that's what -- the evidence you heard at trial.

THE COURT:  This is very perplexing, as you can imagine.  Go ahead with your argument.  Because, I mean, what I've been listening for is whether or not I heard anything different here today.  And so far, I haven't. It's always refreshing to have oral argument on the motions because it provides me with an opportunity to have you highlight what you think is the evidence.  But you would agree with me that the argument that you're making to me now is precisely the position that plaintiff took during trial.

MR. THAKUR:  Absolutely.

THE COURT:  And so there is -- the job that the

Court has is to pair up not the experts' conclusions about whether the patent is practiced, but the experts' opinions with respect to how the RIM device works, because that's a factual issue.

MR. THAKUR:  Correct.

THE COURT:  And at this point, do you consider it undisputed how the RIM device operates?

MR. THAKUR:  I consider it undisputed how the device operates.

THE COURT:  So then the Court is in a position of determining whether or not the undisputed evidence with respect to how the RIM device operates practices the invention.

MR. THAKUR:  That's correct.

THE COURT:  And was in that position at the close of the plaintiff's case in chief.

MR. THAKUR:  I believe that's correct.

THE COURT:  Maybe it would be fruitful for you to address whether or not counsel is correct that you do not take issue with the Court's claim construction with respect to whether transmission must take place after a connection has been established.

MR. THAKUR:  We do, your Honor.  Actually, I will note that they pulled out a footnote on one of my briefs, and I will be the first to acknowledge that footnote which

relates to the *Belkin Core* case was really a preservation of a construction difference that we had with this court. Unlike them, where I think attacking the brief straight out --

THE COURT:  It's perfectly okay, except that that then raises the question:  If you disagree with the Court's claim construction, is it your position that you satisfied the Court's claim construction as I made it for the trial, or whether or not you believe your evidence supports the proper construction?

MR. THAKUR:  No, your Honor.  We met this Court's claim construction.  That's what was presented:  Initiating wireless communication.  Initiated.  All we have done perhaps in the footnote, and one might question as to whether that was the right legal strategy or not even to identify that.  Frankly, the construction set a rather high barrier for us, perhaps what we think was a little higher barrier than what the law requires.  But that, frankly, should be something I would ask this Court to ignore.

THE COURT:  Ignore?  I won't.  But --

MR. THAKUR:  Ignore from -- well, not take offense.  That's what I meant.

THE COURT:  Oh, no.  Not offense.  Never.  But what is the evidence that you would highlight that the

transmission takes place after a connection has been established?

MR. THAKUR:  So what we have -- it's the testimony -- evidence that we have set forth in the brief is that initiating wireless communication takes place within the server.  That is establishing a connection, there is no dispute about that issue since that's what the Court's instruction is.

The Court next said the connection must be established before connection -- before the transmission commences.  What we have said is the connection must be established means the completion of the initiating step, and/or, that the connection has been initiated.  Because that's what made logical sense.  When you're taking the word "initiating" -- when you say "establishing a connection", you say "initiating".  Where the connection has been established, it must mean the connection has been initiated.

That's the testimony that the expert presented. And what I find so remarkable is that that is the testimony that RIM's own expert said is the correct interpretation and the correct application of this Court's standard.

THE COURT:  Well, now we're talking the law with respect to claim construction.  It was, and remains, my

construction that transmission is a substep of delivery that must take place the way this claim is worded:  After a connection has been established.  Your argument, as I understand it, is that transmission must take place after a connection has been initiated.

MR. THAKUR:  Has been established, or what we said is completion of the initiating step.

THE COURT:  Right.  Completion of the initiation, rather than completion of a connection.

MR. THAKUR:  You said establishing a connection is initiating wireless communication.  The connection established would logically followed that the connection has been initiated.

THE COURT:  But I didn't say that.  You made that conclusion.  In other words, you're not now quoting the Court's construction, you are making an argument about how the Court's construction should be construed.

MR. THAKUR:  That's what we -- well, I think what we're saying is, that's what we presented as evidence and testimony.

THE COURT:  I understand that.  But I'm saying I want to make a distinction.  You're not quoting the Court. You're now making a juror -- a logical one, I presume, you would argue.

MR. THAKUR:  Right.

THE COURT:  But you're not quoting the Court. Indeed, the Court's construction requires that a connection be completed.  And you're arguing that a connection is completed when the connection is initiated.

MR. THAKUR:  Or completing of the initiation step, correct.

THE COURT:  Yes.  And there's no requirement that the connection be between the server and the wireless device.

MR. THAKUR:  No, that is the Court's construction.  We have said that the establishing a connection, initiating wireless communication, is from the server to the device.  The way it is from the server to the device is you have a GME protocol.  The GME protocol includes a header, includes a destination, it includes a payload.  That is a connection to the device in a push environment.

THE COURT:  Connect.  And because -- I think I understand you plainly -- because the payload is the command, and because the connection is defined by you as initiating, your argument is you transmit the command after initiating, but you don't have any evidence that you transfer the command after the connection is actually established.

MR. THAKUR:  We believe the connection is

established, right, at that point.  If initiating wireless communication is establishing, when you have established a connection, you have initiated it.

THE COURT:  I understand your argument.  In other words, I would have to define "initiating a communication" as being the only requirement; that making a connection is not required.

MR. THAKUR:  We believe a connection is made when the initiating step is completed, or it's been initiated.  So "establishing" is "initiating".  "Established" is "initiated".

THE COURT:  Right.  In other words, your argument is that the patent does not require a connection be established between the server and the wireless device, only a connection has to be initiated between the server and the wireless device.

MR. THAKUR:  Your Honor, but that's -- we do think a connection has to be -- there has to be a connection established between the server and the device.  The way a connection is established is when there's a completion of the initiation step.  Or it has been initiated.

THE COURT:  Would you say that transmission takes place when the initiation of the transmitting step --

MR. THAKUR:  Transmission takes place after the

initiation has been completed.

THE COURT:  No, I'm asking transmission.  Is transmission -- transmitting, does transmitting require initiating transmission, or does it require completion of transmitting?

MR. THAKUR:  Transmitting from the server would have to begin the starting process.

THE COURT:  I understand that.  But I'm asking whether it includes also completion of that process.

MR. THAKUR:  Eventually.  It has to be completed for it to be accepted.

THE COURT:  So for the transmitting step, you agree that not only must you initiate transmission, transmitting, but you must complete transmitting?

MR. THAKUR:  Eventually, correct.

THE COURT:  But the establishing step you don't believe requires the completion of the connection.

MR. THAKUR:  Completion of the connection -- completion of the transmission or completion of the connection?

THE COURT:  Connection.

MR. THAKUR:  It does.  The connection is established.  Let me give you maybe -- it's sort of like when I want to send a package from my house to Florida.  I take the package, I wrap it up, I put a sender address, I

put a destination address, I put the package.  Now, I take the least-cost routing, perhaps the United States Postal Service or the FedEx.  The USPS is the cheapest.  I put it in that box.  At that point, the ability to send, which is the connection, has been established, to send to the property in Florida.  The truck takes it out -- that is when transmission commences.  Transmission commences after this package is fully wrapped, fully able to get there.

The fact that it can't get there -- let's assume in Florida there's been unfortunately a hurricane and the particular premises that I was sending to is unable to receive.  That is irrelevant.

That's the analogy of the device at the bottom of the -- frankly, the device at the bottom of the Grand Canyon is no different from a device that's turned off.  Or at the house, there's no resident available at the house.

The three-step process is establishing a connection, and the connection must be established before transmission begins, and then the last step is acceptance.

THE COURT:  So you think the inventors used the word "established" to mean the same thing as "establishing"?

MR. THAKUR:  It means the finishing of the establishing.  The past tense.

THE COURT:  Do I ever say that, that "establish" means the ending of the "establishing"?

MR. THAKUR:  Your Honor, you said establishing a connection is initiating.

THE COURT:  But do I ever say that to establish means the completion of the establishing?

MR. THAKUR:  That would seem to be the only logical --

THE COURT:  I know, but I do ever say it?

MR. THAKUR:  You did not say it.  But I will say that RIM's expert did say it.  So both experts interpreted it that way.

THE COURT:  Well, but we left off on the question of transmitting.

MR. THAKUR:  Right, but what I would say is your Honor, if this Court -- the Court -- you must presume that the jury understood the instructions and that there was no further direction given, it followed the instruction of the court.

THE COURT:  I'm not at the jury.  This is a motion for judgment.  I've been debating with myself because of the motion made at the close of the plaintiff's case.  The jury wasn't involved at that point.  And I -- this is a motion that would require me to look to the evidence at the close of your case with respect to

infringement.

MR. THAKUR:  Correct.

THE COURT:  And at the close of their case with respect to the invalidity, that was their burden.  And I'm not at this point considering what the jury did.  I might, with respect to the motion for a new trial.

Well -- I'll let you finish out your time.  As I said, I am pleased that the argument is not presenting anything new with respect to either the argument or the evidence.  It seemed to me that this was a case that was well-tried on both sides.  As you said, my claim construction did put you in a position where perhaps you had to make an argument that you otherwise didn't feel you should have been required to make.  But that is -- the obligation of the Court is to give it.  And I believe that the inventors, by placing a substep called "establishing a connection" meant something about that.  It has a meaning.  And I can't read it out of the claim.  I've got to give it a meaning.  It is very different from simply having a command and transmitting the command.  It means something has to be done to fulfill that obligation.

And, quite frankly, I started this argument, as I expressed at the close of the plaintiff's case, with serious concern as to whether the plaintiff had presented evidence that the RIM device practiced that step, with

respect to the UDP protocol.

Now, with respect to the WiFi protocol that is used as an alternative, it seems to me that your argument would be that the handshake that takes place between the server and the device is also a connection.

Or is it?

MR. THAKUR:  The handshake that -- the handshake establish -- the question of the connection being established under either parties' evidence is sufficient. The question is:  When you're actually sending the command to the device using the WiFi, the connection is made between the server and the device by the server, not by the device.

THE COURT:  Does the patent require a timing other than a sequence?

MR. THAKUR:  It performs a sequence.  And what I'm saying is, in the WiFi, the fact that they perform an additional step is irrelevant.  The steps of the claims are performed.  What they are trying to do is that the device notifies the server, at 9:00 a.m., that, "I'm here".  That is an additional step that is irrelevant to the performance of the steps.

THE COURT:  But we went through that.  You don't regard "I'm here" as a connection.

MR. THAKUR:  It can't be.

THE COURT:  And the fact that the server uses that, "I am here" -- however you want to call it --

MR. THAKUR:  Right.

THE COURT:   -- is not as a result of any signal from the wireless device?

MR. THAKUR:  It is not -- there is a signal from the wireless device to the server to let them know it's present.  But it is not the signal that is considered when it is sending the command.  So what I'm saying is --

THE COURT:  Well, why, if it chaoses that signal, chooses that path --

MR. THAKUR:  Right.

THE COURT:  -- when it sends the command --

MR. THAKUR:  Right.

THE COURT:  -- then what -- in what respect can you say it is not relevant?

MR. THAKUR:  What I'm saying is that the -- for a patent to be infringed, each of the steps must be performed.  The connection is established, initiating wireless communication, takes place with the server over the WiFi network.  The mere fact that WiFi lets you know, "I'm here" -- perhaps I can give you a single example:

We're all sitting in court and we make an appearance to the Court and let you know we're here.  But that is not the communication that takes place when we're

arguing.  That's when we make a second appearance and come up for our particular hearing.  It's sort of the same analogy.

THE COURT:  Let me ask this one and then I'll let you go to the new trial issue.  Do you recall the "without a request from the wireless device" preamble as applicable to the establishing a connection substep?

MR. THAKUR:  Those are each separate steps.  So without a request from the wireless device -- that is correct, without a request from the wireless device, those steps must be performed.

THE COURT:  All right.  So that the connection --

MR. THAKUR:  Right.

THE COURT:   -- must be made without a request from the wireless device.

MR. THAKUR:  Correct.

THE COURT:  Thank you.  All right.  You want to address the new trial issue?

MR. THAKUR:  Sure.  RIM has sort of thrown a bevy of motions to you, so I'll just focus on a key couple of points, your Honor.  The first one is that the -- they're asking for RIM's JMOL on validity that Claim 1 cannot remain valid, and time to shoehorn in the fact that there was this inconsistent verdict, because to be clear, the inconsistent verdict cannot be made consistent by making

Claim 1 invalid.  What you have to do is grant RIM's JMOL on Claim 1 as being valid.  The evidence was presented to this Court; the jury heard it; they carefully considered it.  Claim 1 was found to be valid.

I'll deal with the issue of how to resolve the inconsistent --

THE COURT:  How would -- could you?

MR. THAKUR:  Absolutely.

THE COURT:  How?

MR. THAKUR:  I'll run over a couple of key points.

THE COURT:  You're running out of time.

MR. THAKUR:  I'll be very brief.  The first one, your Honor, is the issue of obviousness.  We ask that this Court resolve the issue of obviousness.  The verdict form was highlighted where they identified that the prior art was presented by RIM, but they took Mformation's contention as to the difference between the prior art and Mformation's -- and the invention.  It would be logical that they would find RIM's prior art to be within measure because Mformation had absolutely no incentive to present information about prior art.  They presented the RemoteWare.  He did not challenge the authenticity of the RemoteWare.  So therefore, that's what the jury obviously presumably found as the prior art.

But the difference between the prior art and our invention was -- clearly was in our favor, and the jury went through all of the different elements as to what constitutes obviousness. Every single one. They found -- of the ones they found, they were all in our favor. They do not find one item that supported their argument for obviousness.

So we ask that this Court go ahead and resolve that issue as well.

Your Honor, with respect to the evidence on damages, it was amply discussed. This Court let in the evidence that it considered proper. The arguments that they're making here were made to the jury. The jury carefully considered it and did not find in their favor. It's just an effort to essentially ask this Court to do what you know was the role of the jury, and the jury has appropriately ruled.

I'm ask my partner to respond to you on the issue of inconsistency.

THE COURT: Thank you.

MR. McDONALD: Shawn McDonald for plaintiff Mformation. I'll try to be especially brief.

This Court should do basically what Judge Hamilton did in the *Jumpsport* case, and what was done in the *Intermec* decision, both cited in our brief. Grant

JMOL of no anticipation, as a matter of law. Because Claim 1 was found to be not anticipated.

The *Jumpsport* case, and especially the *Intermec* case, are especially informative here because we have the benefit of the jury's findings on obviousness. If we look at the verdict form, answer on Question 16, which my colleague Mr. Thakur just referred to, when asked what difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention, the jury expressly found Mformation's contention was correct. In doing so, they established that none of the claims is obvious.

They also did that with respect to Question Number 17, where they did not check that any other evidence tending to show obviousness had been shown. So the jury made an express finding that RIM failed to submit any evidence tending to show obviousness.

A claim can be invalid for obviousness and not be anticipated, but it cannot be anticipated unless it is obvious. And we addressed this in our briefing. That's one of the reasons that the *Comaper* decision that RIM strongly relies upon is completely inapposite. There, anticipation was not at issue. The sole defense at issue was obviousness. The reason the federal circuit reversed *Comaper* is because the District Court applied the

anticipation standard.  So that decision is completely inapplicable to the present case.

And here, the *Intermec* decision is especially informative because there the jury also found no obviousness and made express findings with regard to special interrogatories --

THE COURT:  I'm sorry, I've lost sense of this. Did the jury find the with respect to the dependent claims that they were invalid solely on the grounds of obviousness?

MR. McDONALD:  No, your Honor.  Anticipation was the only general verdict question put to the jury on a claim-by-claim basis.

THE COURT:  So they found that they were invalid as anticipated?

MR. McDONALD:  Correct, your Honor.

THE COURT:  So I thought -- I'm not sure why I'm hearing about the obviousness issue.

MR. McDONALD:  Sure.  Because here -- you didn't ask the jury to give a general verdict on obviousness. You kept that for the Court.  But you asked them to answer special interrogatories, Questions 14 through 16.  And also Question 17.  They answered those in a way that would basically mandate that there is no obviousness that has been shown.  So they found the claims not obvious.

If you look at what they did on the dependent claims, a claim cannot be anticipated if it is not obviousness. So therefore they made a finding because the claims are not obvious, that they also cannot be anticipated. And the Court, the federal circuit, addresses --

THE COURT: They did make that finding?

MR. McDONALD: If I could have the Elmo, please. This is what the verdict form held with regard to obviousness. Question Number 14 was just the scope of ordinary skill in the art. Scope and content of the prior art, RIM referred to that. But of critical importance here, when asked, What difference, if any, existed between the claimed invention and the prior art, they found Mformation's contention was correct. And Mformation's expert said, No claim was anticipated and no claim was obvious. So there the jury found that Mformation's contention to see obviousness was correct.

THE COURT: But how do you know that that question is answered only with respect to obviousness?

MR. McDONALD: I would submit that it's not answered just with respect to obviousness.

THE COURT: All right. That's what I thought you said.

MR. McDONALD: That would also go to

anticipation, your Honor.

THE COURT:  Exactly.  So that means that their verdict is irreconcilable, doesn't it?

MR. McDONALD:  It does not, your Honor, because if you look at what the jury did with regard to the dependent claims, they were expressly instructed with regard to Claim 6 in assessing infringement that the dependent claim needs to include all of the limitations of Claim 1.  That was part of the closing jury instructions.  That instructions did not mention any of the other dependent claims.

So the most reasonable interpretation of what the jury did is that when they were considering Claim 6 with regard to obviousness in question Number 18.  They considered all of the limitations of Claim 1.  And that's why they found it not obvious -- I'm sorry, not anticipated.  But when assessing Claims 21 through 25, they didn't look to Claim 1 to get those --

THE COURT:  How do you know that?

MR. McDONALD:  I would say that's the most reasonable interpretation.

THE COURT:  But you can't say they didn't.  You can say, I argue that they might not have, because that's all speculation.  But you can't say what they did.

MR. McDONALD:  Let me say that I would argue it

is a reasonable interpretation of what they did.

THE COURT:  And I understand argument.  But that's different than fact.

MR. McDONALD:  And just to distinguish the *Dun Oil* decision for a second.  In *Dun Oil* during deliberations the jury sent back a note asking the difference between dependent and independent claims and was expressly instructed as to the fact that each dependent claim -- each dependent claim -- has to include all of the limitations, and that's in the subsequent decision that's noted when Judge Marilyn Huff got the case.

THE COURT:  But I didn't have the benefit of that.  In fact, this was a jury that asked for technical questions.

MR. McDONALD:  They didn't ask any questions as to technicalities on Question 18, your Honor.  That is correct.  But --

THE COURT:  They asked none.

MR. McDONALD:  As far as reconciling the verdicts, this is exactly the factual situation of *Jumpsport* and *Intermec*.  We know what the jury did with regard to Question Numbers 16 and 17.  And the only way that is -- that express finding can be afforded on merit and good faith, as the Court needs to do, is to enter JMOL

that none of the claims is anticipated.  And that was done by Judge Hamilton in the *Jumpsport* case, and it was affirmed by the Federal Circuit with positive commentary on this express point.

Now, these answers as to the dependent claims are surplusage.  And the cases that RIM cites, they have made the argument that the -- because the jury, the verdict form did not say skip the dependent claims.  This cannot be surplusage.

The *Sylvester* case we cite is a Ninth Circuit decision that's expressly on point because there -- this is exactly the situation.  In *Sylvester*, the verdict form did not say, Skip these dependent questions, so to speak.  But the Ninth Circuit says that fact is not dispositive.  In *Sylvester*, the District Court disregarded the answers to the follow-on questions as mere surplusage and the Ninth Circuit affirmed that.

THE COURT:  Bring your argument to a close.

MR. McDONALD:  That's it.  Thank you, your Honor.

THE COURT:  Can we -- the court reporter has to take a break just for a second to arrange something else, so we'll come back in five minutes.

(Recess)

DEPUTY CLERK:  Remain seated; come to order.

THE COURT:  Please be seated.

Did you stand to make a final statement?

MR. MATUSCHAK:  I have three very quick points, your Honor.

THE COURT:  Very well.

MR. MATUSCHAK:  The first, your Honor, is Mr. Thakur, in answering your question, I think about whether something is established or initiated, he equated "initiated" with "established".  I heard that clearly several times.  And that is inconsistent with your Honor's construction.  It's in the closing instructions -- I don't know if we have those -- but your Honor said, "A connection must not only be initiated but must be made by the server with the wireless device."

And that's the house of cards on which their case on infringement was based, and that's the one that falls.  The reason for that is very simple:  Because it's got to be between the server and the wireless device.  Initiated never gets you out of BES.

With respect to WiFi, on this -- Mr. Thakur said, Well, what the BlackBerry device is sending is just saying, I'm there.  That's not what the evidence was.  The only evidence was from Dr. Acampora, was that, quote, "The BlackBerry actually initiates a TCP connection back to the BES."

Their own expert, Dr. Madisetti, says, TCP is the

connection.

So that is a connection.  And that's the only reason, under the evidence that was before the Court, that a connection can be made over a WiFi.  And that was only as part of defendant's case.  That was -- never came out as part of the plaintiff's case.  As I said, the plaintiff's case was entirely stopped at the point of initiation.

Last point, your Honor:

With respect to invalidity, I mean, we can -- both of us on both sides can stand up and tell you why we think we know what happened in the jury room, but the fact is we don't.  There's no way to reconcile those verdicts.  You could make equally good arguments that says, Oh, it has to be this way because otherwise it wouldn't make sense.  Just like they can say, Well, you know, they couldn't have found Claim 1 valid if -- and they must have made a mistake on dependent claims.  We could say, Well, they couldn't have found dependent claims invalid unless they found a mistake on independent claims.

They are irreconcilable.  The only thing to do is grant our JMOL based upon the evidence; or, two, grant a new trial based on the inconsistency in the verdicts.

Thank you, your Honor.

THE COURT:  Very well.

MR. THAKUR:  Your Honor, just -- only one of those points I want to make, one sentence:

We presented evidence that not only must the connection be initiated, it must be made by the server and the device.  So both those elements were satisfied.  And I explained how the GME protocol connects the header, the sender information, and does it over the device.  I just wanted to say, you know, that we met both those burdens in our case in chief.  And it's in the briefings.

I won't cite anything additional.

THE COURT:  Well, this, as you might know, is presently scheduled to be my last law and motion calendar, and I could not have wished for a better end to my tenure as a judge hearing matters than to have you all stand before me and argue, because you've all acquitted yourselves quite well, and that includes those of you who didn't speak today but who participated either verbally or in writing during the course of the trial.

And I again want you to carry back to your clients the Court's appreciation that you afforded me the assistance of a technical advisor during the course of this trial.  In the future, judges will make such requests, and I know that there are circumstances which will sometimes interfere with the economics of allowing that, but in this case, it was invaluable to the Court to

have the benefit of your expert witnesses as well as someone who could sit with me and go through that technical information and -- both before trial, during the trial and now in these post-trial proceedings.

One of the things that I have tried to make as a part of my practice as a judge is not ever to have anyone walk into my courtroom and know what I'm going to do before I do it.  I just think that the point of judging is to listen diligently to both sides and to make a judgment only after you've had the matter submitted to you.  Of course, there are questions of law which I'm bound to follow as a result of the -- this court being a trial court, controlled by both the circuit, the federal circuit and the Ninth Circuit and the Supreme Court.  And I try to, at least to the point that I'm predictable, have the parties say, Well, we know that he will apply the law as it's laid down.  And this is an area of law, patent law, where there are quite a few decisions, some of which can be cited to support completely opposite propositions.  But there is a well worn set of principles and standards that the Court observes in these kinds of cases.

And I also appreciate from the standpoint of this particular case the amount of energy that went into presenting the evidence with respect to how the accused process works.  And I really admired the inventors that

came to patent their process.  Whatever I do is no reflection on the process that they went through to come to the fact this they have an issued patent, which the court begins its process by presuming its validity.

I also have a motion before me that would, if I rule in a particular way, grant a new trial.  And I want you to know that none of my rulings in these motions will depend upon a feeling that some other judge, should he or she take on this case, wouldn't give you a fair proceeding.  I'm not going to make a ruling just to save anybody work, because I know that whatever I do here will produce further proceedings one way or the other.

But, in a matter of very short period of time, I will issue a written order with respect to these motions. And will sign my name with the same amount of pleasure that I have enjoyed serving as a judge on every case in which I've been pleased to serve.

So thank, you all very much for your argument. The matter is submitted.

DEPUTY CLERK:  All rise.

Court is now in recess.

(Adjourned)

oOo

CERTIFICATE OF REPORTER

      I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Tuesday, August 7, 2012

Connie Kuhl, Certified Realtime Reporter
Official Reporter – USDC  (415) 431-2020